# 18-3123-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————◆———————

HORROR INC., a Massachusetts corporation, MANNY COMPANY,
a Connecticut Limited Partnership,

*Plaintiffs-Counter-Defendants-Appellants,*

– v. –

VICTOR MILLER, an individual,

*Defendant-Counter-Claimant-Appellee,*

DOES, 1 through 10, inclusive,

*Defendants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT, NEW HAVEN

## DEFERRED JOINT APPENDIX
## VOLUME I OF III
## [PAGES A-1 – A-300]

MARC TOBEROFF
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, California 90265
(310) 246-3333

*Attorneys for Defendant-Counter-
Claimant-Appellee*

KATHLEEN M. SULLIVAN
TODD ANTEN
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiffs-Counter-
Defendants-Appellants*

*(For Continuation of Appearances See Inside Cover)*

BONNIE E. ESKENAZI
JULIA R. HAYE
GREENBERG GLUSKER FIELDS CLAMAN
   & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067
(310) 553-3610

*Attorneys for Plaintiffs-Counter-*
   *Defendants-Appellants*

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, filed August 24, 2016 (Doc. 1)................ A-13

Answer and Counterclaim filed by
Defendant/Counterclaimant Victor Miller, filed
November 17, 2016 (Doc. 37) ............................... A-36

Local Rule 56(a)(1) Statement in Support of
Plaintiffs' Motion for Summary Judgment, filed
June 9, 2017 (Doc. 43-2) ...................................... A-66

Declaration of Robert M. Barsamian in Support of
Plaintiffs' Motion for Summary Judgment, filed
June 9, 2017 (Doc. 43-3) ...................................... A-83

Declaration of Sean S. Cunningham in Support of
Plaintiffs' Motion for Summary Judgment, filed
June 9, 2017 (Doc. 43-4) ...................................... A-87

Exhibit A to Cunningham Declaration:
July 24, 1978 Correspondence from the WGA
(Doc. 43-5)............................................................ A-98

Exhibit B to Cunningham Declaration:
Writer's Flat Deal Contract between Victor Miller
and The Manny Company (Doc. 43-6)................... A-99

Exhibit C to Cunningham Declaration:
First Draft Treatment, titled *The Long Night at
Camp Blood* [reproduced at A-425 – A-439]
(Doc. 43-7)

Exhibit D to Cunningham Declaration:
Second Draft Treatment, titled *Friday 13*
(Doc. 43-8)............................................................ A-101

**Page**

Exhibit F to Cunningham Declaration:
First Draft Screenplay, without title page
[reproduced at A-440 – A-508] (Doc. 43-10)

Exhibit G to Cunningham Declaration:
Second Draft Screenplay, titled *Friday 13*
[reproduced at A-509 – A-600] (Doc. 43-11)

Exhibit H to Cunningham Declaration:
Rights Agreement between The Manny Company
and Georgetown Productions, Inc., dated May 7,
1980 (Doc. 43-12)...................................................   A-120

Declaration of Julia R. Haye in Support of
    Plaintiffs' Motion for Summary Judgment,
    filed June 9, 2017 (omitted herein) (Doc. 43-13)

Exhibit I to Haye Declaration:
May 9, 2017 Printout of Sean S. Cunningham's
IMDbPro Filmography (Doc. 43-14)....................   A-127

Exhibit J to Haye Declaration:
Expert Report of William L. Cole (Doc. 43-15)....   A-131

Exhibit K to Haye Declaration:
Excerpts of Deposition of Victor Miller,
dated April 28, 2017 (Doc. 43-16)........................   A-164

Exhibit L to Haye Declaration:
Transcript of January 27, 2003 interview of
Victor Miller conducted by Peter Bracke
(Doc. 43-17)...........................................................   A-261

Exhibit N to Haye Declaration:
1977 WGA Theatrical & Television Basic
Agreement (Doc. 43-19).........................................   A-287

**Page**

Exhibit O to Haye Declaration:
1980 Copyright Registration for *Friday the 13th*
(Registration No. PA 81-093) (Doc. 43-20)........... A-400

Exhibit R to Haye Declaration:
Victor Miller's Notices of Termination of
Copyright for *Friday the 13th*, dated January 21,
2016, June 27, 2016 and July 14, 2016
[reproduced at A-618 – A-624, A-631 – A-634]
(Doc. 43-23)

Exhibit S to Haye Declaration:
Letter from WGA to Victor Miller, dated
June 14, 1979 (Doc. 43-24) ................................. A-402

Exhibit T to Haye Declaration:
Victor Miller's Application for Membership in
the WGA, dated March 21, 1974 (Doc. 43-25) ..... A-404

Exhibit U to Haye Declaration:
Letter from Victor Miller to WGA, dated
June 4, 1979 (Doc. 43-26) ................................... A-405

Exhibit W to Haye Declaration:
Stipulated Settlement, *Manny Co. v. Georgetown
Prods., Inc.*, No. 86-7665 (2d Cir. Jan. 8, 1998)
(Doc. 43-28)........................................................ A-406

Exhibit X to Haye Declaration:
Executed Letter of Irrevocable Authority to
Paramount Pictures Corporation, dated July 19,
1988, re: *Friday the 13th* and *Friday the 13th,
Part II* (Doc. 43-29) ............................................ A-409

Declaration of William L. Cole in Support of
Plaintiffs' Motion for Partial Summary Judgment,
filed June 9, 2017 (Doc. 43-30) ........................... A-413

**Page**

Exhibit Y to Cole Declaration:
Sample form "Assignment Agreement"
(Doc. 43-30)......................................................... A-416

Declaration of Victor Miller in Support of His
Motion for Summary Judgment, filed June 9,
2017 (Doc. 45-1)................................................... A-420

Exhibit A to Miller Declaration:
First Draft Treatment, titled *The Long Night at
Camp Blood* (Doc. 45-1)...................................... A-425

Exhibit B to Miller Declaration:
First Draft Screenplay, without title page
(Doc. 45-1)............................................................ A-440

Exhibit C to Miller Declaration:
Second Draft Screenplay, titled *Friday 13*
(Doc. 45-1)............................................................ A-509

Exhibit D to Miller Declaration:
Writer's Flat Deal Contract between Victor Miller
and The Manny Company (Doc. 45-1).................. A-601

Exhibit E to Miller Declaration:
Advertisement in *Variety* for *Friday the 13th*,
dated July 4, 1979 (Doc. 45-1) ............................ A-603

Exhibit F to Miller Declaration:
Letter from Sean Cunningham to James Trupin of
JET Literary Agency, dated August 22, 1979
(Doc. 45-1)............................................................ A-604

Exhibit G to Miller Declaration:
Copy of a document containing the credit block
for *Friday the 13th* (Doc. 45-1) ............................ A-605

**Page**

Declaration of Marc Toberoff in Support of
Defendant and Counterclaimant Victor Miller's
Motion for Summary Judgment, filed June 9,
2017 (Doc. 45-2)..................................................... A-606

Exhibit C to Toberoff Declaration:
E-mail exchange between Marc Toberoff and
Jennifer Parsignault of PWGA, with attachments,
dated June 7, 2017 (Doc. 45-2)............................. A-610

Exhibit D to Toberoff Declaration:
Rights Agreement between The Manny Company
and Georgetown Productions, Inc., dated May 7,
1980 [reproduced at A-120 – A-126] (Doc. 45-2)

Exhibit H to Toberoff Declaration:
Victor Miller's Notice of Termination of
Copyright for *Friday the 13th*, dated January 21,
2016 (Doc. 45-2)..................................................... A-618

Exhibit J to Toberoff Declaration:
Victor Miller's Notice of Termination of
Copyright for *Friday the 13th*, dated June 27,
2016 (Doc. 45-2)..................................................... A-621

Exhibit K to Toberoff Declaration:
Document Cover Sheet to U.S. Copyright Office
re: Notice of Termination (Doc. 45-2) ................... A-625

Exhibit L to Toberoff Declaration:
Victor Miller's Notice of Termination of
Copyright for *Friday the 13th*, dated July 14,
2016 (Doc. 45-2)..................................................... A-631

Supplemental Declaration of Sean S. Cunningham
in Support of Plaintiffs' Opposition to Motion for
Summary Judgment, filed June 30, 2017
(Doc. 47-1)............................................................. A-635

**Page**

Plaintiffs' Local Rule 56(a)(2) Statement in Support
of Opposition to Motion for Summary Judgment,
filed June 30, 2017 (Doc. 47-2) ............................ A-641

Plaintiffs' Evidentiary Objections to the
Declarations of Victor and Marc Toberoff,
dated June 30, 2017 (Doc. 48) .............................. A-652

Excerpt of Defendant and Counter-Claimant Victor
Miller's Memorandum of Points and Authorities
in Opposition to Plaintiffs' Motion for Summary
Judgment, filed June 30, 2017 (Doc. 51) ............... A-660

Declaration of Victor Miller in Opposition to
Plaintiffs' Motion for Summary Judgment, dated
June 30, 2017 (Doc.51-1) ..................................... A-662

Exhibit I to Miller Declaration:
June 30, 2017 Printout of Victor Miller's
IMBbPro Filmography (Doc. 51-1) ....................... A-666

Declaration of Marc Toberoff in Opposition to
Plaintiffs' Motion for Summary Judgment, filed
June 30, 2017 (Doc. 51-2) ..................................... A-671

Exhibit P to Toberoff Declaration:
Excerpts of Deposition of Sean R.
Cunningham, dated May 12, 2017 (Doc. 51-2) ..... A-674

Exhibit Q to Toberoff Declaration:
Excerpts from *Crystal Lake Memories: The
Complete History of Friday the 13th*, by Peter
Bracke (Doc. 51-2) ............................................... A-754

Exhibit R to Toberoff Declaration:
Excerpts from *On Location in Blairstown: The
Making of Friday The 13th*, by David Grove
(Doc. 51-2).......................................................... A-761

**Page**

Defendant and Counter-Claimant Victor Miller's
Local Rule 56(a)(2) Response and Statement of
Disputed Material Facts in Opposition to
Plaintiffs' Motion for Summary Judgment, filed
June 30, 2017 (Doc. 51-3) ......................................  A-784

Declaration of Jennifer C. Parsignault,
Manager-Compliance Department of the PWGA
Pension and Health Plans, filed July 14, 2017
(Doc. 55-1)...........................................................  A-800

Exhibit A to Parsignault Declaration:
PWGA Pension Plan Statements for Victor
Miller, 1978-1981 (Doc. 55-1)..............................  A-803

Exhibit B to Parsignault Declaration:
Excerpts of Victor Miller's Earning Statements
from 1981 to the present [excerpted as a
voluminous exhibit] (Doc. 55-1) ..........................  A-807

Declaration of Marc Toberoff in Reply to Plaintiffs'
Evidentiary Objections and in Further Support of
Defendant and Counterclaimant Victor Miller's
Motion for Summary Judgment, filed July 14,
2017 (Doc. 56-1)...................................................  A-812

Exhibit T to Toberoff Declaration:
Letter from Bonnie Eskenazi to PWGA
Custodian of Records, enclosing Subpoena, dated
November 22, 2016 (Doc. 56-1)............................  A-816

Exhibit U to Toberoff Declaration:
Excerpts of January 3, 2017 E-mail from Jannette
Gore to Marc Toberoff attaching production of
documents [excerpted as a voluminous exhibit]
(Doc. 56-1)...........................................................  A-828

**Page**

Plaintiffs' Evidentiary Objections to the July 14,
 2017 Declarations of Marc Toberoff and Jennifer
 C. Parsignault, filed August 4, 2017 (Doc. 64)...... A-847

Notice of Appeal, filed October 18, 2018.................. A-865


**Query   Reports   Utilities   Help   Log Out**

APPEAL,CLOSED,EFILE

# U.S. District Court
## District of Connecticut (New Haven)
## CIVIL DOCKET FOR CASE #: 3:16-cv-01442-SRU

Horror Inc. et al v. Miller et al
Assigned to: Judge Stefan R. Underhill
Cause: 28:2201 Declaratory Judgment

Date Filed: 08/24/2016
Date Terminated: 09/28/2018
Jury Demand: Both
Nature of Suit: 820 Copyright
Jurisdiction: Federal Question

**Plaintiff**

**Horror Inc.**
*a Massachusetts corporation*

represented by **Alexander Rudolf Malbin**
Ferdinand IP, LLC/ NY
125 Park Avenue
25th Floor
New York, NY 10017
212-520-4296
Fax: 212-905-6747
Email: amalbin@24iplg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bonnie E. Eskenazi**
Greenberg Glusker Fields Claman
Machtinger & Kinsella LLP
1900 Avenue of the Stars
21st Floor
Los Angeles, CA 90067
310-553-3610
Fax: 310-553-0687
Email:
BEskenazi@GreenbergGlusker.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edmund J. Ferdinand , III**
Ferdinand IP, LLC
129 Post Road East
Westport, CT 06880
203-557-4224
Fax: 203-905-6747
Email: jferdinand@24iplg.com
*LEAD ATTORNEY*


*ATTORNEY TO BE NOTICED*

**Julia R. Haye**
Greenberg Glusker Fields Claman
Machtinger & Kinsella LLP
1900 Avenue of the Stars
21st Floor
Los Angeles, CA 90067
310-553-3610
Fax: 310-553-0687
Email: JHaye@GreenbergGlusker.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Strom Rutherford**
Ferdinand IP, LLC
1221 Post Rd East
Westport, CT 06880
203-557-4224
Fax: 203-905-6747
Email: jrutherford@24iplg.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Manny Company**                represented by    **Alexander Rudolf Malbin**
*a Connecticut Limited Partnership*                 (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Bonnie E. Eskenazi**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Edmund J. Ferdinand , III**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Julia R. Haye**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Jessica Strom Rutherford**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*


V.

**<u>Defendant</u>**

**Victor Miller**
*an individual*

represented by  **John J. Martin**
J Martin Business Law Group, LLC
PO Box 1350
Fairfield, CT 06825
917-902-8872
Email: jhnjmartin@att.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marc Toberoff**
Toberoff & Associates, PC
23823 Mailbu Rd., Suite 50-363
Mailbu, CA 90265
310-246-3333
Fax: 310-246-3101
Email:
mtoberoff@toberoffandassociates.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Does**
*1 through 10, inclusive*

**<u>Counter Claimant</u>**

**Victor Miller**
*an individual*

represented by  **John J. Martin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marc Toberoff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**<u>Counter Defendant</u>**

**Horror Inc.**
*a Massachusetts corporation*

represented by  **Alexander Rudolf Malbin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bonnie E. Eskenazi**
(See above for address)


*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edmund J. Ferdinand , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julia R. Haye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessica Strom Rutherford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Manny Company**                          represented by   **Alexander Rudolf Malbin**
*a Connecticut Limited Partnership*                          (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Bonnie E. Eskenazi**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Edmund J. Ferdinand , III**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Julia R. Haye**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Jessica Strom Rutherford**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/24/2016 | 1 | COMPLAINT against Does 1-10, Victor Miller ( Filing fee $400 receipt number 0205-4113361.), filed by Horror Inc., Manny Company. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2)(Ferdinand, Edmund) (Entered: 08/24/2016) |
| 08/24/2016 | | Request for Clerk to issue summons as to Victor Miller. (Ferdinand, Edmund) (Entered: 08/24/2016) |


| 08/24/2016 | 2 | NOTICE of Appearance by Alexander Rudolf Malbin on behalf of Horror Inc., Manny Company (Malbin, Alexander) (Entered: 08/24/2016) |
|---|---|---|
| 08/24/2016 | 3 | Corporate Disclosure Statement by Horror Inc., Manny Company. (Ferdinand, Edmund) (Entered: 08/24/2016) |
| 08/24/2016 | | Judge Stefan R. Underhill added. (Walker, A) (Entered: 08/24/2016) |
| 08/24/2016 | 4 | Order on Pretrial Deadlines: Motions to Dismiss due on 11/24/2016. Amended Pleadings due by 10/23/2016 Discovery due by 2/23/2017 Dispositive Motions due by 3/25/2017<br>Signed by Clerk on 8/24/2016. (Oliver, T.) (Entered: 08/24/2016) |
| 08/24/2016 | 5 | ELECTRONIC FILING ORDER - PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER<br>Signed by Judge Stefan R. Underhill on 8/24/2016.(Oliver, T.) (Entered: 08/24/2016) |
| 08/24/2016 | 6 | STANDING PROTECTIVE ORDER<br>Signed by Judge Stefan R. Underhill on 8/24/2016. (Oliver, T.) (Entered: 08/24/2016) |
| 08/24/2016 | 7 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Victor Miller* with answer to complaint due within *21* days. Attorney *Edmund J. Ferdinand, III* *Ferdinand IP, LLC* *129 Post Road East* *Westport, CT 06880*. (Oliver, T.) (Entered: 08/24/2016) |
| 08/24/2016 | 8 | AO 121 Report on the Filing of an Action re: Copyright Form Completed (Attachments: # 1 Copy of Complaint) (Oliver, T.) (Entered: 08/24/2016) |
| 08/24/2016 | 9 | NOTICE TO COUNSEL/PRO SE PARTIES : Counsel or pro se parties initiating or removing this action are responsible for serving all parties with attached documents and copies of 5 Electronic Filing Order, 6 Protective Order, 4 Order on Pretrial Deadlines, 3 Corporate Disclosure Statement filed by Horror Inc., Manny Company, 2 Notice of Appearance filed by Horror Inc., Manny Company, 1 Complaint filed by Horror Inc., Manny Company, 8 Report on Copyright Form<br>Signed by Clerk on 8/24/2016.(Oliver, T.) (Entered: 08/24/2016) |
| 08/25/2016 | 10 | MOTION for Attorney(s) Bonnie E. Eskenazi to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number 0205-4115304) by Horror Inc., Manny Company. (Attachments: # 1 Exhibit Affidavit of Bonnie E. Eskenazi)(Ferdinand, Edmund) (Entered: 08/25/2016) |
| 08/25/2016 | 11 | MOTION for Attorney(s) Julia R. Haye to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number 0205-4115342) by Horror Inc., Manny Company. (Attachments: # 1 Exhibit Affidavit of Julia R. Haye)(Ferdinand, Edmund) (Entered: 08/25/2016) |
| 08/26/2016 | 12 | ORDER granting 10 Motion for Attorney Bonnie E. Eskenazi to Appear Pro Hac Vice. Certificate of Good Standing due by 10/25/2016. Signed by Clerk on 8/26/2016. (Oliver, T.) (Entered: 08/26/2016) |
| 08/26/2016 | 13 | ORDER granting 11 Motion for Attorney Julia R. Haye to Appear Pro Hac Vice. Certificate of Good Standing due by 10/25/2016. Signed by Clerk on 8/26/2016. (Oliver, T.) (Entered: 08/26/2016) |
| 08/26/2016 | 14 | CERTIFICATE OF GOOD STANDING re 10 MOTION for Attorney(s) Bonnie E. Eskenazi to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number |


| | | 0205-4115304) by Horror Inc., Manny Company. (Ferdinand, Edmund) (Entered: 08/26/2016) |
|---|---|---|
| 08/26/2016 | 15 | CERTIFICATE OF GOOD STANDING re 11 MOTION for Attorney(s) Julia R. Haye to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number 0205-4115342) by Horror Inc., Manny Company. (Ferdinand, Edmund) (Entered: 08/26/2016) |
| 08/29/2016 | 16 | NOTICE of Appearance by Jessica Strom Rutherford on behalf of Horror Inc., Manny Company (Rutherford, Jessica) (Entered: 08/29/2016) |
| 09/14/2016 | 17 | NOTICE of Appearance by John J. Martin on behalf of Victor Miller. (Gould, K.) (Entered: 09/15/2016) |
| 09/14/2016 | 18 | MOTION on consent for Extension of Time until 30 Days respond to the complaint by Victor Miller. (Attachments: # 1 Proposed Stipulation)(Gould, K.) (Entered: 09/15/2016) |
| 09/16/2016 | 19 | ORDER granting 18 Motion for Extension of Time. Signed by Judge Stefan R. Underhill on 9/16/2016. (Buttrick, A.) (Entered: 09/16/2016) |
| 09/16/2016 | | Answer deadline updated for Victor Miller to 10/17/2016. (Buttrick, A.) (Entered: 09/16/2016) |
| 09/21/2016 | 20 | MOTION for Attorney(s) Marc Toberoff to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number 0205-4141431) by Victor Miller. (Attachments: # 1 Affidavit MarcToberoff's Affidavit in Support of Motion)(Martin, John) (Entered: 09/21/2016) |
| 09/22/2016 | 21 | ORDER granting 20 Motion for Attorney Marc Toberoff to Appear Pro Hac Vice. Certificate of Good Standing due by 11/21/2016. Signed by Clerk on 9/22/2016. (Oliver, T.) (Entered: 09/22/2016) |
| 10/14/2016 | 22 | NOTICE of Appearance by Marc Toberoff on behalf of Victor Miller (Toberoff, Marc) (Entered: 10/14/2016) |
| 10/17/2016 | 23 | First MOTION to Dismiss *the Complaint for Failure to State a Claim* by Victor Miller.Responses due by 11/7/2016 (Attachments: # 1 Memorandum in Support) (Toberoff, Marc) (Entered: 10/17/2016) |
| 10/17/2016 | 24 | First MOTION to Strike 1 Complaint by Victor Miller.Responses due by 11/7/2016 (Attachments: # 1 Memorandum in Support, # 2 Affidavit Declaration of Victor Miller) (Toberoff, Marc) (Entered: 10/17/2016) |
| 10/22/2016 | 25 | NOTICE by Victor Miller *of Errata* (Attachments: # 1 Memorandum in Support Corrected Memorandum in Support of Motion to Strike, # 2 Affidavit Corrected Declaration in Support of Motion to Strike)(Toberoff, Marc) (Entered: 10/22/2016) |
| 10/24/2016 | 26 | CERTIFICATE OF GOOD STANDING re 20 MOTION for Attorney(s) Marc Toberoff to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number 0205-4141431) by Victor Miller. (Toberoff, Marc) (Entered: 10/24/2016) |
| 10/28/2016 | 27 | MOTION for Extension of Time to File Response/Reply as to 24 First MOTION to Strike 1 Complaint until 1/27/2017 by Horror Inc., Manny Company. (Rutherford, Jessica) (Entered: 10/28/2016) |
| 10/28/2016 | 28 | RESPONSE *to Plaintiffs' October 27, 2016 Letter* filed by Victor Miller. (Toberoff, Marc) (Entered: 10/28/2016) |



| 10/28/2016 | 29 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephone Status Conference set for 11/3/2016 at 03:30 PM before Judge Stefan R. Underhill.<br><br>The call-in for the conference is 888.636.3807; when prompted for the access code, dial 650 8043 followed by #. (If asked whether to join the conference as the host, bypass that option by dialing #.) (Buttrick, A.) (Entered: 10/28/2016) |
|---|---|---|
| 10/31/2016 | 30 | Second RESPONSE *to Plaintiffs' October 27, 2016 Letter* filed by Victor Miller. (Toberoff, Marc) (Entered: 10/31/2016) |
| 11/01/2016 | 31 | RESPONSE re 30 Response, 28 Response *to Defendant's letter dated October 28, 2016* filed by Horror Inc., Manny Company. (Eskenazi, Bonnie) (Entered: 11/01/2016) |
| 11/02/2016 | 32 | RESPONSE *to Plaintiffs' Letter Filed November 1, 2016,* filed by Victor Miller. (Toberoff, Marc) (Entered: 11/02/2016) |
| 11/03/2016 | 33 | RESPONSE re 32 Response *Defendant's letter dated November 2, 2016* filed by Horror Inc., Manny Company. (Eskenazi, Bonnie) (Entered: 11/03/2016) |
| 11/03/2016 | 34 | RESPONSE *to Plaintiffs' November 3, 2016 Letter* filed by Victor Miller. (Toberoff, Marc) (Entered: 11/03/2016) |
| 11/03/2016 | 35 | Minute Entry. Proceedings held by telephone conference before Judge Stefan R. Underhill: denying as moot 23 Motion to Dismiss; denying as moot 24 Motion to Strike; denying as moot 27 Motion for Extension of Time to File Response/Reply.<br><br>Telephone Motion Hearing held on 11/3/2016 re 24 First MOTION to Strike 1 Complaint, 23 First MOTION to Dismiss, 27 MOTION for Extension of Time to File Response/Reply; Telephone Status Conference held on 11/3/2016. Total Time: 0 hours and 30 minutes. (Court Reporter S. Masse.) (Buttrick, A.) (Entered: 11/04/2016) |
| 11/07/2016 | 36 | MEMORANDUM of Status Conference 35 AND ORDER.<br>Signed by Judge Stefan R. Underhill on 11/7/2016. (Buttrick, A.) (Entered: 11/07/2016) |
| 11/17/2016 | 37 | ANSWER to 1 Complaint with Affirmative Defenses with Jury Demand , COUNTERCLAIM against All Plaintiffs by Victor Miller.(Toberoff, Marc) (Entered: 11/17/2016) |
| 11/30/2016 | 38 | Joint REPORT of Rule 26(f) Planning Meeting. (Eskenazi, Bonnie) (Entered: 11/30/2016) |
| 12/08/2016 | 39 | *Plaintiffs'* ANSWER to 37 Answer to Complaint, Counterclaim by Horror Inc., Manny Company.(Eskenazi, Bonnie) (Entered: 12/08/2016) |
| 12/20/2016 | 40 | ORDER approving 38 Report of Rule 26(f) Planning Meeting, with the following deadlines: Discovery due by 4/24/2017, Dispositive Motions due by 5/15/2017. Signed by Judge Stefan R. Underhill on 12/20/2016. (Buttrick, A.) (Entered: 12/20/2016) |
| 03/31/2017 | 41 | Joint MOTION to Amend/Correct 40 Order, Set Deadlines/Hearings by Horror Inc., Manny Company.Responses due by 4/21/2017 (Haye, Julia) (Entered: 03/31/2017) |
| 04/04/2017 | 42 | ORDER granting 41 Motion to Amend/Correct. Signed by Judge Stefan R. Underhill on 4/4/2017. (Buttrick, A.) (Entered: 04/04/2017) |



| 04/04/2017 | | Set Deadlines/Hearings: Discovery due by 6/2/2017; Dispositive Motions due by 6/9/2017. (Buttrick, A.) (Entered: 04/04/2017) |
|---|---|---|
| 06/09/2017 | 43 | MOTION for Summary Judgment by Horror Inc., Manny Company.Responses due by 6/30/2017 (Attachments: # 1 Memorandum in Support, # 2 Statement of Material Facts, # 3 Affidavit of Robert Barsamian, # 4 Affidavit of Sean Cunningham, # 5 Exhibit A to Sean Cunningham Declaration, # 6 Exhibit B to Sean Cunningham Declaration, # 7 Exhibit C to Sean Cunningham Declaration, # 8 Exhibit D to Sean Cunningham Declaration, # 9 Exhibit E to Sean Cunningham Declaration, # 10 Exhibit F to Sean Cunningham Declaration, # 11 Exhibit G to Sean Cunningham Declaration, # 12 Exhibit H to Sean Cunningham Declaration, # 13 Affidavit of Julia Haye, # 14 Exhibit I to Julia Haye Declaration, # 15 Exhibit J to Julia Haye Declaration, # 16 Exhibit K to Julia Haye Declaration, # 17 Exhibit L to Julia Haye Declaration, # 18 Exhibit M to Julia Haye Declaration, # 19 Exhibit N to Julia Haye Declaration, # 20 Exhibit O to Julia Haye Declaration, # 21 Exhibit P to Julia Haye Declaration, # 22 Exhibit Q to Julia Haye Declaration, # 23 Exhibit R to Julia Haye Declaration, # 24 Exhibit S to Julia Haye Declaration, # 25 Exhibit T to Julia Haye Declaration, # 26 Exhibit U to Julia Haye Declaration, # 27 Exhibit V to Julia Haye Declaration, # 28 Exhibit W to Julia Haye Declaration, # 29 Exhibit X to Julia Haye Declaration, # 30 Affidavit of William Cole, # 31 Exhibit Y to William Cole Declaration)(Eskenazi, Bonnie) (Entered: 06/09/2017) |
| 06/09/2017 | 44 | EXHIBIT *Notice of Manual Filing* by Horror Inc., Manny Company re 43 MOTION for Summary Judgment . (Eskenazi, Bonnie) (Entered: 06/09/2017) |
| 06/09/2017 | 45 | MOTION for Summary Judgment by Victor Miller.Responses due by 6/30/2017 (Attachments: # 1 Affidavit, # 2 Affidavit, # 3 Statement of Material Facts)(Toberoff, Marc) (Entered: 06/10/2017) |
| 06/12/2017 | 46 | CORRECTED MOTION for Summary Judgment by Victor Miller.Responses due by 7/3/2017 (Attachments: # 1 Memorandum in Support)(Toberoff, Marc) Modified on 6/12/2017 (Oliver, T.). (Entered: 06/12/2017) |
| 06/12/2017 | | Docket Entry Correction re 46 MOTION for Summary Judgment MODIFIED TO EDIT THE WORD CORRECTED INTO THE DOCKET TEXT (Oliver, T.) (Entered: 06/12/2017) |
| 06/30/2017 | 47 | Memorandum in Opposition *of Plaintiffs* re 45 MOTION for Summary Judgment , 46 MOTION for Summary Judgment filed by Horror Inc., Manny Company. (Attachments: # 1 Affidavit of Sean Cunningham, # 2 Statement of Material Facts) (Eskenazi, Bonnie) (Entered: 06/30/2017) |
| 06/30/2017 | 48 | OBJECTION re 45 MOTION for Summary Judgment , 46 MOTION for Summary Judgment filed by Horror Inc., Manny Company. (Eskenazi, Bonnie) (Entered: 06/30/2017) |
| 06/30/2017 | 49 | ENTERED IN ERROR - MOTION for Summary Judgment by Victor Miller.Responses due by 7/21/2017 (Attachments: # 1 Declaration of Victor Miller, # 2 Declaration of Marc Toberoff, # 3 Rule 56(a)2 Response)(Toberoff, Marc) Modified on 7/5/2017 (Oliver, T.). (Entered: 07/01/2017) |
| 06/30/2017 | 51 | Memorandum of Points and Authorities in Opposition re 43 MOTION for Summary Judgment filed by Victor Miller. ( REPLACING DOC #49 ) (Attachments: # 1 Declaration of Victor Miller, # 2 Declaration of Marc Toberoff, # 3 Rule 56(a)2 |

| | | |
|---|---|---|
| | | Response) (Oliver, T.) (Entered: 07/05/2017) |
| 07/03/2017 | 50 | NOTICE by Victor Miller re 49 MOTION for Summary Judgment *of Errata* (Toberoff, Marc) (Entered: 07/03/2017) |
| 07/05/2017 | | Docket Entry Correction re 49 MOTION for Summary Judgment MODIFIED TO NOTE ENTRY AS ENTERED IN ERROR AND REDOCKETED AS DOC #51 (Oliver, T.) (Entered: 07/05/2017) |
| 07/05/2017 | 52 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. <br><br> Set/Reset Deadlines as to 45 MOTION for Summary Judgment, 43 MOTION for Summary Judgment, 46 MOTION for Summary Judgment. Motions Hearing set for 10/19/2017 at 01:15 PM in Courtroom One, 915 Lafayette Blvd., Bridgeport, CT before Judge Stefan R. Underhill. (Buttrick, A.) (Entered: 07/05/2017) |
| 07/14/2017 | 53 | REPLY to Response to 43 MOTION for Summary Judgment filed by Horror Inc., Manny Company. (Eskenazi, Bonnie) (Entered: 07/14/2017) |
| 07/14/2017 | 54 | OBJECTION re 51 Memorandum in Opposition to Motion, *Declarations of Victor Miller and Marc Toberoff* filed by Horror Inc., Manny Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Eskenazi, Bonnie) (Entered: 07/14/2017) |
| 07/14/2017 | 55 | REPLY to Response to 45 MOTION for Summary Judgment , 46 MOTION for Summary Judgment filed by Victor Miller. (Attachments: # 1 Affidavit)(Toberoff, Marc) (Entered: 07/14/2017) |
| 07/14/2017 | 56 | RESPONSE re 48 Objection filed by Victor Miller. (Attachments: # 1 Affidavit) (Toberoff, Marc) (Entered: 07/14/2017) |
| 07/14/2017 | 57 | OBJECTION filed by Victor Miller. (Toberoff, Marc) (Entered: 07/14/2017) |
| 07/14/2017 | 58 | OBJECTION re 43 MOTION for Summary Judgment *Expert Report and Declaration of William L. Cole* filed by Victor Miller. (Toberoff, Marc) (Entered: 07/14/2017) |
| 07/21/2017 | 59 | RESPONSE re 54 Objection filed by Victor Miller. (Attachments: # 1 Affidavit) (Toberoff, Marc) (Entered: 07/21/2017) |
| 07/21/2017 | 60 | OBJECTION re 53 Reply to Response to Motion filed by Victor Miller. (Attachments: # 1 Letter to Court)(Toberoff, Marc) (Entered: 07/21/2017) |
| 08/04/2017 | 61 | RESPONSE re 55 Reply to Response to Motion by Horror Inc.*Letter to Hon. Stefan R. Underhill*. (Eskenazi, Bonnie) (Entered: 08/04/2017) |
| 08/04/2017 | 62 | RESPONSE re 60 Objection *Victor Miller's Objections to Plaintiffs' Misleading Citations* filed by Horror Inc.. (Eskenazi, Bonnie) (Entered: 08/04/2017) |
| 08/04/2017 | 63 | RESPONSE re 58 Objection *Opposition to Objection and Motion to Exclude Expert Report and Declaration of William L. Cole* filed by Horror Inc.. (Eskenazi, Bonnie) (Entered: 08/04/2017) |
| 08/04/2017 | 64 | OBJECTION re 55 Reply to Response to Motion, 56 Response *Evidentiary Objections to July 14, 2017 Declarations of Marc Toberoff and Jennifer C. Parsignault* filed by Horror Inc.. (Attachments: # 1 Affidavit)(Eskenazi, Bonnie) (Entered: 08/04/2017) |

| | | |
|---|---|---|
| 08/04/2017 | 65 | RESPONSE re 57 Objection *Response to VIctor Miller's Evidentiary Objections to Declarations of Sean S. Cunningham, Julia R. Haye and Robert M. Barsamian* filed by Horror Inc.. (Eskenazi, Bonnie) (Entered: 08/04/2017) |
| 08/04/2017 | 66 | RESPONSE re 59 Response *to Victor Miller's Response to Plaintiffs' Evidentiary Objections* filed by Horror Inc.. (Eskenazi, Bonnie) (Entered: 08/04/2017) |
| 08/04/2017 | 67 | OBJECTION re 59 Response *Concerning Deposition Transcript of Sean S. Cunningham or, in the Alternative, Motion to Suppress Deposition Transcript of Sean S. Cunningham* filed by Horror Inc.. (Attachments: # 1 Affidavit)(Eskenazi, Bonnie) (Entered: 08/04/2017) |
| 08/16/2017 | 68 | ORDER: The briefing is closed for the pending motions. Signed by Judge Stefan R. Underhill on 8/16/2017. (Landman, M) (Entered: 08/16/2017) |
| 10/19/2017 | 69 | Minute Entry for proceedings held before Judge Stefan R. Underhill: Motion Hearing held on 10/19/2017 re 45 MOTION for Summary Judgment filed by Victor Miller, 43 MOTION for Summary Judgment filed by Horror Inc., Manny Company, 46 MOTION for Summary Judgment filed by Victor Miller. Total Time: 1 hours and 53 minutes. (Court Reporter Sharon Masse.) (Schneider, K) (Entered: 11/07/2017) |
| 05/03/2018 | 70 | ExParte Motion by Victor Miller *Ex Parte Application for Leave To Submit Important Newly Discovered Evidence in Support of (1) Miller's Motion for Summary Judgment (Dkts. 45, 46) and (2) Miller's Opposition to Plaintiff's Motion for Summary Judgment (Dkt. 51)*. (Attachments: # 1 Declaration of Marc Toberoff, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6)(Toberoff, Marc) Modified on 5/3/2018 (Oliver, T.). (Entered: 05/03/2018) |
| 05/04/2018 | 71 | Memorandum in Opposition re 70 EXPARTE MOTION filed by Horror Inc., Manny Company. (Eskenazi, Bonnie) (Entered: 05/04/2018) |
| 05/07/2018 | 72 | Memorandum in Support re 70 EXPARTE MOTION *for Leave To Submit Important Newly Discovered Evidence in Support of (1) Miller's Motion for Summary Judgment (Dkts. 45, 46) and (2) Miller's Opposition to Plaintiff's Motion for Summary Judgment (Dkt. 51)* filed by Victor Miller. (Toberoff, Marc) (Entered: 05/07/2018) |
| 09/28/2018 | 73 | ORDER denying 43 Motion for Partial Summary Judgment; granting 45 Motion for Summary Judgment; granting 46 Motion for Summary Judgment; denying as moot 70 ExParte Motion. Signed by Judge Stefan R Underhill on 9/28/2018 (Pincus, A). (Entered: 09/28/2018) |
| 09/28/2018 | 74 | JUDGMENT entered in favor of Does, Victor Miller against Horror Inc., Manny Company.  For Appeal Forms please go to the following website: http://www.ctd.uscourts.gov /forms/all-forms/appeals_forms Signed by Clerk on 9/28/2018. (Oliver, T.) (Entered: 09/28/2018) |
| 09/28/2018 | | JUDICIAL PROCEEDINGS SURVEY - FOR COUNSEL ONLY: The following link to the confidential survey requires you to log into CM/ECF for SECURITY purposes. Once in CM/ECF you will be prompted for the case number. Although you are receiving this survey through CM/ECF, it is hosted on an independent website called SurveyMonkey. Once in SurveyMonkey, the survey is located in a secure account. The |


| | | |
|---|---|---|
| | | survey is not docketed and it is not sent directly to the judge. To ensure anonymity, completed surveys are held up to 90 days before they are sent to the judge for review. We hope you will take this opportunity to participate, please click on this link:<br><br>https://ecf.ctd.uscourts.gov/cgi-bin/Dispatch.pl?survey<br>(Oliver, T.) (Entered: 09/28/2018) |
| 10/01/2018 | 75 | MOTION Request for Publication of Opinion re 73 Order on Motion for Summary Judgment,,, Order on ExParte Motion by Victor Miller.Responses due by 10/22/2018 (Toberoff, Marc) (Entered: 10/01/2018) |
| 10/09/2018 | 76 | Joint STIPULATION *Re: Attorney's Fees and Costs* by Victor Miller. (Attachments: # 1 Text of Proposed Order)(Toberoff, Marc) (Entered: 10/09/2018) |
| 10/12/2018 | 77 | ORDER approving and adopting 75 Joint Stipulation Re: Attorney's Fees and Costs. Signed by Judge Stefan R Underhill on 10/12/2018 (Pincus, A). (Entered: 10/12/2018) |
| 10/17/2018 | 78 | AO 121 Report on the Determination of an Action re: Copyright Form Completed (Attachments: # 1 copy of judgment) (Oliver, T.) (Entered: 10/17/2018) |
| 10/18/2018 | 79 | NOTICE OF APPEAL as to 74 Judgment, by Horror Inc., Manny Company. Filing fee $ 505, receipt number ACTDC-5014011. (Eskenazi, Bonnie) (Entered: 10/18/2018) |
| 10/18/2018 | 80 | CLERK'S CERTIFICATE RE: INDEX AND RECORD ON APPEAL re: 79 Notice of Appeal. The attached docket sheet is hereby certified as the entire Index/Record on Appeal in this matter and electronically sent to the Court of Appeals, with the exception of any manually filed documents as noted below. Robin D. Tabora, Clerk. Documents manually filed not included in this transmission: none (Oliver, T.) (Entered: 10/18/2018) |
| 12/21/2018 | 81 | MOTION for Attorney Fees by Victor Miller.Responses due by 1/11/2019 (Attachments: # 1 Affidavit of Marc Toberoff, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Affidavit of Douglas Fretty, # 9 Exhibit 1, # 10 Exhibit 2, # 11 Exhibit 3)(Toberoff, Marc) (Entered: 12/21/2018) |
| 12/31/2018 | 82 | TRANSCRIPT of Proceedings: Type of Hearing: Motion Hearing. Held on 10/19/2017 before Judge Stefan R. Underhill. Court Reporter: Sharon Masse. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 1/21/2019. Redacted Transcript Deadline set for 1/31/2019. Release of Transcript Restriction set for 3/31/2019. (Masse, S.) (Entered: 12/31/2018) |
| 01/11/2019 | 83 | Memorandum in Opposition re 81 MOTION for Attorney Fees filed by Horror Inc., Manny Company. (Attachments: # 1 Affidavit Declaration of Julia Haye, # 2 Exhibit Exhibit A to Declaration of Julia Haye)(Eskenazi, Bonnie) (Entered: 01/11/2019) |

| 01/25/2019 | 84 | REPLY to Response to 81 MOTION for Attorney Fees filed by Victor Miller. (Toberoff, Marc) (Entered: 01/25/2019) |
| 02/11/2019 | 85 | ORDER of USCA as to 79 Notice of Appeal filed by Horror Inc., Manny Company USCA Case Number 18-3123 (Oliver, T.) (Entered: 02/11/2019) |
| 03/06/2019 | 86 | ORDER of USCA as to 79 Notice of Appeal filed by Horror Inc., Manny Company USCA Case Number 18-3123 (Oliver, T.) (Entered: 03/07/2019) |
| 04/12/2019 | 87 | ORDER of USCA as to 79 Notice of Appeal filed by Horror Inc., Manny Company USCA Case Number 18-3123 (Oliver, T.) (Entered: 04/15/2019) |
| 05/22/2019 | 88 | ORDER finding as moot 75 Motion Request for Publication of Opinion. Signed by Judge Stefan R Underhill on 5/22/19. (Caldero, M.) (Entered: 05/22/2019) |
| 05/22/2019 | 89 | ORDER: 81 Motion for Attorney Fees denied without prejudice to renewal following a decision by the Second Circuit Court of Appeals. Signed by Judge Stefan R Underhill on 5/22/19. (Caldero, M.) (Entered: 05/22/2019) |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| HORROR, INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership,<br><br>                          Plaintiffs,<br><br>        - against -<br><br>VICTOR MILLER, an individual; and DOES 1 through 10, inclusive,<br><br>                    Defendants. | Case No.: _____<br><br>**COMPLAINT** |

Plaintiffs, HORROR, INC., a Massachusetts corporation, and MANNY COMPANY, a Connecticut limited partnership (the "Plaintiffs"), by and through their attorneys, Greenberg Glusker Fields Claman & Machtinger LLP and Ferdinand IP, LLC, allege as follows:

**PRELIMINARY STATEMENT**

1.      This lawsuit seeks, among other things, a declaration that Plaintiff Horror, Inc. ("Horror") is the exclusive owner of the copyright in and to the screenplay on which the original horror film entitled *Friday the 13th* (the "Film") was based.

2.      In 1979, Sean S. Cunningham ("Cunningham") had the idea to capitalize on the success of the then-recently released and hugely successful horror film *Halloween*. Through the Manny Company, in which he was a general partner, Cunningham hired defendant Victor Miller ("Miller"), a writer with whom he had previously worked, to work with him in developing ideas for a new horror film and to thereafter draft a screenplay based on the jointly developed ideas. Miller had never written a horror screenplay prior to his being hired by Cunningham and was guided in the process, and

directly supervised, by Cunningham.  Accordingly, Miller entered into an employment agreement with the Manny Company pursuant to which Miller wrote a screenplay for the Film as a work for hire (the "Screenplay").

3.      Thereafter, Georgetown Productions, Inc. ("Georgetown"), Horror's predecessor in interest, took a bold risk and financed the entire production budget of the Film in exchange for the Manny Company's assignment of all its rights in and to the Screenplay, including without limitation any and all copyrights therein.  Released in 1980, the Film was a breakout hit and spawned many sequels over the past 36 years.

4.      In spite of the fact that he voluntarily executed an employment agreement and for 36 years has accepted the benefits flowing therefrom, Miller has now repudiated his employment agreement and has improperly and deceptively purported to terminate Horror's copyright ownership in and to the Screenplay under Section 203(a) of the United States Copyright Act.  He cannot do so.  Because the Screenplay was written as a work for hire, Miller does not have any right to terminate Horror's copyright interests thereto and is not entitled to recapture any rights therein.

5.      As a result of Miller's improper actions, a cloud has been placed on Horror's rights in and to the popular and lucrative *Friday the 13th* movie franchise and has caused, and will continue to cause, both Horror and the Manny Company significant damages.  In addition to seeking a declaration of the parties' respective rights, the Manny Company seeks a determination that Miller has materially breached the Employment Agreement, has slandered Horror's title in *Friday the 13th*, and has engaged in unfair trade practices.

6.      Since the initial release of the Film in 1980, Horror has invested substantial time, money and effort developing and growing this singular independent horror film into one of the most successful and iconic film franchises of all time.  Miller's attempt to re-characterize his initial work for hire efforts as an independent project 36 years after the fact is nothing more than a transparently disingenuous money grab.

## JURISDICTION AND VENUE

7.     This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201, and the United States Copyright Act, 17 U.S.C. §§ 101 *et seq.*  Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1338(a), and the principles of pendent jurisdiction pursuant to 28 U.S.C. § 1367(a).

8.     Venue in this Judicial District is proper under 28 U.S.C. §§ 1391(b) and (c), and § 1400(a) because a substantial part of the events giving rise to the plaintiffs' claims occurred in this Judicial District, one of the plaintiffs resides and may be found in this Judicial District, and defendants are subject to personal jurisdiction in this Judicial District by virtue of their transacting and/or soliciting business in this Judicial District.

## THE PARTIES

9.     Horror Inc. ("Horror") is a corporation organized and existing under the laws of Massachusetts, with its principal place of business located in Newton, Massachusetts.  Horror is the owner of certain rights in and to the *Friday the 13th* movie franchise, including without limitation the copyright in the Screenplay.  Horror acquired its rights in the Screenplay, among other things, from its predecessors-in-interest, Georgetown Productions, Inc. ("Georgetown"), Jason Productions Inc., Friday Four Inc. and Terror Inc.

10.     The Manny Company is a limited partnership organized and existing under the laws of Connecticut, with its principal place of business located in the state of Connecticut.  Sean S. Cunningham Films, Ltd. ("SSCF") is the general partner of the Manny Company, and its principal is Sean S. Cunningham ("Cunningham").  Horror and the Manny Company are sometimes referred to herein as "Plaintiffs."

11.     Plaintiffs are informed and believe, and based thereon allege, that Miller is an individual who, at all times relevant to the events at issue herein, was a citizen of and

A-16

resided in the state of Connecticut.  Plaintiffs are further informed and believe, and based thereon allege, that Miller currently is a citizen of and resides in the state of California.

12.     Plaintiffs are unaware of the true names and capacities of the defendants sued herein as Does 1 through 10, inclusive, and therefore sue these defendants by fictitious names.  Plaintiffs will seek leave of this Court to amend this Complaint to allege their true names and capacities when ascertained.  Plaintiffs are informed and believe, and based thereon allege, that each fictitiously named defendant is responsible in some way for the acts, occurrences and events alleged in this Complaint, and is liable to Plaintiffs therefor.  Defendant Miller and Does 1 through 10 are sometimes referred to collectively herein as "Defendants."

13.     Plaintiffs are informed and believe, and based thereon allege, that at all times relevant herein, each of the Defendants was the agent, servant, or employee of each other Defendant, and at all times relevant herein was acting within the scope of such agency.

## FACTS COMMON TO ALL COUNTS

14.     Miller and Cunningham first began working together in or about 1976 on a series of motion picture projects.  The first motion picture on which they worked together was entitled *Here Come the Tigers*.  Although both of them jointly worked on developing the ideas for the story line, Cunningham produced *Here Come the Tigers* and Miller wrote the screenplay.  Shortly thereafter, and in keeping with their prior method of working together, Cunningham and Miller began development on another motion picture, entitled *Manny's Orphans*.   For *Manny's Orphans*, Cunningham hired Miller through his newly created company, the Manny Company, which was a signatory to the Writer's Guild of America, Inc. ("WGA").  Regardless of the hiring entity, however, their method of working together remained the same – they met frequently to develop ideas for *Manny's Orphans* and Cunningham produced the film while Miller, under Cunningham's

supervision and direct control, wrote the screenplay which embodied their joint ideas. Neither of these family friendly films performed well at the box office.

15.     In or about 1979, the low-budget horror film *Halloween* became a huge box office success.  The surprising success of *Halloween* prompted Cunningham to focus on the horror films genre for his next project.  Having worked on two film projects together already, Cunningham and Miller embarked on this next film project using the same method of script development.  They met several days a week to discuss potential ideas for a horror film with the intention of Cunningham going on to produce the film and Miller writing the Screenplay for the Manny Company under Cunningham's supervision and direct control.  Cunningham had previously produced a horror film, whereas Miller had no previous experience in the horror genre.  Eventually, Cunningham came up with the idea to make a horror film called *Friday the 13th*.  Cunningham began investigating whether the title was available for use and hired Miller to write the Screenplay based on the ideas they had been and were continuing to discuss.

16.     Accordingly, on or about June 4, 1979, the Manny Company and Miller entered into a Writer's Flat Deal Contract, pursuant to which the Manny Company employed Miller to "write a complete and finished screenplay for a proposed motion picture . . . presently entitled or designated Friday 13" (the "Employment Agreement").

17.     The Employment Agreement was entered into and executed in the state of Connecticut, both parties to the Employment Agreement were residents of the state of Connecticut at the time of its execution, and all of the writing services performed by Miller pursuant to the Employment Agreement were performed in the state of Connecticut.  A true and correct copy of the Employment Agreement is attached hereto as Exhibit 1.

18.     In the Employment Agreement, Miller expressly warranted and represented that he was a member in good standing of the WGA, and that he would maintain his membership in the WGA in good standing "during the term of this employment."  The

Employment Agreement is the standard WGA short form complete screenplay agreement issued by the WGA at the time, and provides that it is to be governed by the provisions of the WGA 1977 Theatrical and Television Basic Agreement (also known as the "Minimum Basic Agreement" or "MBA"). Plaintiffs are informed and believe, and based thereon allege, that under the terms of the Employment Agreement (which incorporated the MBA requirements), Miller collected employee benefits, including without limitation pension, health and welfare benefits. In addition, as a result of the Employment Agreement, on information and belief, Miller has collected residual payments in accordance with the MBA over the past thirty-six (36) years.

19.     As an employee of the Manny Company, Cunningham met with Miller several times a week to discuss ideas and to develop the script and story line of the Film. Sometimes Miller would pitch ideas for the film to Cunningham, and Cunningham would either approve or veto the ideas. Other times, Cunningham would direct Miller to incorporate certain ideas into the Screenplay even when Miller did not approve of those ideas.

20.     Before a draft of the Screenplay was completed, and based solely on Cunningham's idea to produce a horror film entitled *Friday the 13th*, Cunningham took an ad out in Daily Variety to determine if there was sufficient interest to secure funding for the proposed film. The ad stated, in pertinent part, "*Friday the 13th*, The Most Terrifying Film Ever Made! Available December 1979." Immediately, Cunningham began receiving calls from distributors who were interested in distributing the film based solely on the title.

21.     Thereafter, Cunningham and Miller began furiously working on the development of the Screenplay. At all times, Cunningham exercised control and authority over the development of the story line, scenes, characters, plots, themes, and other creative elements of the Screenplay.

22.     One of the people who responded to Cunningham's Daily Variety ad was Phil Scuderi ("Scuderi"), a principal of Georgetown.  On behalf of Georgetown, Scuderi offered to finance a portion of the Film's budget, but at this time Cunningham did not have a completed draft of the Screenplay.  Thereafter, in or about mid-August 1979, when Cunningham was able to provide an early draft of the Screenplay, Georgetown offered to invest the entire $500,000 budget for the Film, on the condition that Georgetown would have complete control over the Screenplay and the Film.  Cunningham agreed.

23.     The Film began pre-production in mid-August 1979 and principal photography occurred in or about October 1979.  Beginning in mid-August 1979 and throughout the pre-production and production process, Scuderi, on behalf of Georgetown, provided extensive notes, mark-ups and ideas which were incorporated into the final shooting script and Film itself – many of which never appeared in any drafts of the Screenplay written by Miller.

24.     Pursuant to an agreement dated as of May 7, 1980, Georgetown documented its investment in the Film and the Manny Company sold to Georgetown all of its right, title, and interest in and to the Screenplay (the "Rights Agreement"), including without limitation its copyright in the Screenplay.  Among other things, the Rights Agreement specifically states that Miller wrote the Screenplay "as author for The Manny Company" and provides that Georgetown may copyright the Screenplay in its own name.

25.     The Film was released on or about May 9, 1980, and was an immediate hit, enjoying unprecedented box office success for a horror film.

26.     On or about September 4, 1980, Georgetown filed with the U.S. Copyright Office an application for copyright registration of the Film, in which it claimed, *inter alia,* authorship of the Film and the Screenplay.  This application matured into U.S. copyright registration no. PA 81-093, for which the U.S. Copyright Office issued a

certificate of registration having an effective date of September 26, 1980.  A true and correct copy of the Certificate of Registration is attached hereto as Exhibit 2.  Because this certificate of registration was issued within five years of the first publication of the Film, in accordance with 17 U.S.C. § 410(c), the certificate constitutes prima facie evidence of the validity of the underlying copyright as well as the facts stated in the certificate, including, without limitation, Georgetown's exclusive ownership of copyright in and to the Film, and Georgetown's original authorship of the Film and the Screenplay.

27.     Horror, as the successor-in-interest to Georgetown, currently holds all right, title, and interest, in and to the Screenplay, the Film, and any and all elements contained within the Film.  Although Georgetown and/or its successors in interest, including Horror, have licensed certain distribution rights to third parties in and to the Film, at no time has Horror assigned to any third parties any of its copyright(s) in and to the Screenplay and/or the Film.

28.     Notwithstanding that the Employment Agreement was governed by the WGA and that Miller's screenwriting services were therefore provided to the Manny Company as an employee on a work-for-hire basis, and on information and belief, that Miller has received employee benefits as a result of performing his screenwriting services on the Screenplay, on January 26, 2016, Miller issued a purported Notice of Termination of the copyright(s) in and to the Screenplay under Section 203(a) of the United States Copyright Act (17 U.S.C. § 203(a)) (the "Termination Notice").  However, although the Termination Notice was directed to the Manny Company and several of Horror's licensees, it was not served on Horror, the current copyright holder, and was therefore defective on its face.  On June 27, 2016, Miller re-issued his purported Notice of Termination (the "First Amended Termination Notice"), which included Horror and purported to be effective on July 1, 2018.  Further, on July 14, 2016, Miller once again re-issued his purported Notice of Termination, modifying some of the recipients' addresses ("Second Amended Termination Notice").  The Second Amended Termination

Notice purported to take effect on July 15, 2018.  The Termination Notice, the First Amended Termination Notice and the Second Amended Termination Notice are sometimes referred to collectively herein as the "Termination Notices."

29.    When Miller issued the purported Termination Notices, Miller knew and understood that he had been employed by the Manny Company to write the complete and finished Screenplay on a work-for-hire basis, knew or should have known that Horror was the copyright owner of the Screenplay, and therefore knew or should have known that the purported Termination Notices were false and without legal basis.

30.    Horror and the Manny Company dispute the validity of the Termination Notices, dispute that Miller has any termination rights under Section 203(a) of the United States Copyright Act or otherwise, and dispute that Miller has the right to seek to terminate Horror's copyright(s) in and to the Screenplay.

31.    Moreover, Miller's Termination Notices constitute a material breach and repudiation of his Employment Agreement with the Manny Company, and accordingly have placed a cloud on Horror's copyrights in the Screenplay, which has caused damage to Horror and the Manny Company.  Unless and until this dispute is resolved and the Court issues a declaration regarding the parties' respective rights in and to the Screenplay, including whether Miller is entitled to terminate Horror's copyright interests therein, Horror will no longer be able to exploit its copyrights in and to the Screenplay.

## CAUSES OF ACTION

### COUNT I – DECLARATORY JUDGMENT

**(By All Plaintiffs Against All Defendants)**

32.    Plaintiffs repeat and reallege, and incorporate herein by reference, the allegations contained in paragraphs 1 through 31, above, as though fully set forth herein.

33.    By reason of the foregoing facts, an actual controversy has arisen between the parties as to whether Miller has the right to terminate Horror's copyright interests in

A-22

and to the Screenplay pursuant to Section 203(a) of the United States Copyright Act (17 U.S.C. § 203(a)) or otherwise, and whether Miller's Termination Notices are valid. Specifically:

    a.    Horror and the Manny Company contend, and Miller disputes, that the Screenplay was written as a work-for-hire pursuant to the Employment Agreement;

    b.    Horror and the Manny Company contend, and Miller disputes, that Miller does not have any right to terminate Horror's copyright interests in the Screenplay pursuant to Section 203(a) of the United States Copyright Act (17 U.S.C. § 203(a)) or otherwise, nor to otherwise interfere with Horror's exclusive rights in connection with the Screenplay;

    c.    Horror and the Manny Company contend, and Miller disputes, that Miller's Termination Notices are improper, invalid, and of no force and effect;

    d.    Horror and the Manny Company contend, and Miller disputes, that Horror is entitled to continue to exclusively exploit the copyright in and to the Screenplay throughout the entirety of the copyright term;

    e.    Horror and the Manny Company contend, and Miller disputes, that Miller's Termination Notices constitute a material breach and repudiation of the Employment Agreement; and

    f.    Horror and the Manny Company contend, and Miller disputes, that even if Miller's Termination Notices or any of them are deemed valid (which plaintiffs dispute), that Miller's termination is limited solely to the creative elements contained in the Screenplay which were created by Miller, and not the entirety thereof, which will be determined after discovery in this matter.

34.     In view of the foregoing, an actual controversy has arisen and exists between Horror and the Manny Company, on the one hand, and Miller, on the other hand, within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.  Accordingly, Horror and the Manny Company hereby request a declaration of this Court under the provisions of 28 U.S.C. § 2201, setting forth the respective rights and other legal relations of Plaintiffs and Miller.  In particular, Horror and the Manny Company request a declaration that:

a.     The Screenplay was written as a work-for-hire pursuant to the Employment Agreement;

b.     Miller does not have any right to terminate Horror's copyright interests in the Screenplay pursuant to Section 203(a) of the United States Copyright Act (17 U.S.C. § 203(a)) or otherwise and does not have any right to interfere with Horror's exclusive rights in connection with the Screenplay;

c.     Each of Miller's Termination Notices is improper, invalid, and of no force and effect;

d.     Horror is entitled to continue to exclusively exploit the copyright in and to the Screenplay throughout the entirety of the copyright term;

e.     Each of Miller's Termination Notices constitutes a material breach and repudiation of the Employment Agreement; and

f.     Even if any of Miller's Termination Notices is deemed valid (which plaintiffs dispute), Miller's termination is limited solely to the creative elements contained in the Screenplay which were created by Miller, and not the entirety thereof, which will be determined after discovery in this matter.

## COUNT II – BREACH OF CONTRACT

### (By Plaintiff Manny Company Against Defendant Miller)

35.     Plaintiffs repeat and reallege, and incorporate herein by reference, the allegations contained in paragraphs 1 through 34, above, as though fully set forth herein.

36.     As set forth in detail above, pursuant to the terms of the Employment Agreement, Miller was employed by the Manny Company to write the complete and finished Screenplay as a work-for-hire, and the Employment Agreement was governed by the terms of the WGA's MBA.

37.     At all relevant times herein, Miller knew and understood that he was employed by the Manny Company to write the complete and finished Screenplay on a work-for-hire basis, as a member in good standing of the WGA and pursuant to the terms of the WGA's standard employment agreement in use at the time.

38.     Further, there was at all times relevant herein, an implied covenant in the Employment Agreement that Miller would act in good faith and deal fairly with the Manny Company in all aspects of their contractual relationship, and would refrain from conduct that would result in destroying, frustrating, or injuring the Manny Company's rights under the Employment Agreement.

39.     Except as may have been excused or prevented by Miller, the Manny Company has fully performed all conditions, covenants, duties and obligations required to be performed on its part under the Employment Agreement.

40.     Miller has materially breached and repudiated the Employment Agreement by, among other things: (a) issuing the Termination Notices; (b) sending the Termination Notices to several of Horror's licensees; and (c) falsely claiming that he is entitled to terminate Horror's copyright in and to the Screenplay, thereby exceeding the scope of his rights under the Employment Agreement.

41.     For the reasons set forth hereinabove, Miller has also breached the covenant of good faith and fair dealing implied in the Employment Agreement, thus depriving the

Manny Company of the benefits for which it bargained under the Employment Agreement.

42.     As a direct and proximate result of Miller's acts of material breach and repudiation, the Manny Company has suffered damages in an amount to be proven at trial, but which the Manny Company is informed and believes, and on that basis alleges, exceeds the jurisdictional minimum of this Court.

## COUNT III – SLANDER OF TITLE

### (By Plaintiff Horror Inc. Against All Defendants)

43.     Plaintiffs repeat and reallege, and incorporate herein by reference, the allegations contained in paragraphs 1 through 42, above, as though fully set forth herein.

44.     Although Miller either knew or should have known that Horror was the copyright owner of the Screenplay, Miller intentionally served his Termination Notices on certain of Horror's licensees, including Paramount Pictures Corporation, New Line Film Productions, Inc., and Warner Brothers Entertainment, Inc. (collectively, the "Licensees"), for the purpose of disparaging and slandering Horror's right, title, and interest in and to the Screenplay.  Miller's Termination Notices are false, and constitute false statements derogatory to Horror's title in and to the Screenplay.

45.     On information and belief, Miller's acts of purposefully sending the Termination Notices to the Licensees were malicious and were intended to impugn the integrity of Horror, diminish the value of Horror's property in the eyes of its Licensees, and to slander Horror's title in and to the Screenplay.

46.     Miller's actions have, in fact, impugned the integrity of Horror, diminished the value of Horror's property, and slandered Horror's title in and to the Screenplay.

47.     As a direct and proximate result of Miller's conduct, Horror has suffered damages in an amount to be proven at trial, but which Horror is informed and believes, and on that basis alleges, exceeds the jurisdictional minimum of this Court.

48.     Furthermore, Horror is informed and believes, and based thereon alleges, that Miller's conduct as hereinabove alleged was not only knowingly false, but was also malicious and oppressive.  Accordingly, Plaintiffs are entitled to an award of punitive and exemplary damages.

### COUNT IV – CONNECTICUT UNFAIR TRADE PRACTICES ACT

**(By Plaintiff Horror Inc. against All Defendants)**

49.     Plaintiffs repeat and reallege, and incorporate herein by reference, the allegations contained in paragraphs 1 through 48, above, as though fully set forth herein.

50.     Miller's acts of knowingly sending the false Termination Notices offend public policy as has been established by the common law of the State of Connecticut, including, without limitation, the common law of contracts and slander of title of the State of Connecticut, and therefore constitute unfair or deceptive acts or practices in violation of the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. § 42-110 ("CUTPA").

51.     Miller's acts of knowingly sending the false Termination Notices constitute an immoral, unethical, oppressive, and unscrupulous business practice, and therefore constitute unfair or deceptive acts or practices in violation of CUTPA.

52.     Miller's acts of knowingly sending the false Termination Notices has directly and proximately caused Horror to suffer substantial and foreseeable ascertainable harm, including, but not limited to, lost licensing revenues which Horror would have realized from the exploitation of its rights in and to the Film but for Miller's aforementioned conduct, and therefore constitute unfair or deceptive acts or practices in violation of CUTPA.

53.     Furthermore, on information and belief, Miller's acts of knowingly sending the false Termination Notices constitute intentional and wanton violations of Horror's rights under the Employment Agreement and Horror's rights in and to the Film, and

exhibit a reckless indifference to Horror's aforementioned rights.  Accordingly, Horror is entitled to an award of punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

54.     Horror is entitled to recover its costs and reasonable attorneys' fees incurred in pursuing this matter pursuant to Conn. Gen. Stat. § 42-110g(d).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs claim relief as follows:

1.     On Count I:

    a.     For a declaration that:

        i.     The Screenplay was written as a work-for-hire pursuant to the Employment Agreement.

        ii.     Miller does not have any right to terminate Horror's copyright interests in the Screenplay pursuant to Section 203(a) of the United States Copyright Act (17 U.S.C. § 203(a)) or otherwise and does not have any right to interfere with Horror's exclusive rights in connection with the Screenplay.

        iii.     Each of Miller's Termination Notices is improper, invalid, and of no force and effect.

        iv.     Horror is entitled to continue to exclusively exploit the copyright in and to the Screenplay throughout the entirety of the copyright term.

        v.     Each of Miller's Termination Notices constitutes a material breach and repudiation of the Employment Agreement.

        vi.     Even if any of Miller's Termination Notices is deemed valid (which plaintiffs dispute), Miller's termination is limited solely to the creative elements contained in the Screenplay which were

A-28

created by Miller, and not the entirety thereof, which will be determined after discovery in this matter.

    b.    For Plaintiffs' reasonable attorneys' fees.

2.    On Count II, for damages according to proof but which the Manny Company is informed and believes, and on that basis alleges, exceed the jurisdictional requirements of this Court;

3.    On Count III, for damages according to proof but which Horror is informed and believed, and on that basis alleges, exceed the jurisdictional requirements of this Court;

4.    On Count IV,  for compensatory damages according to proof but which Horror is informed and believed, and on that basis alleges, exceed the jurisdictional requirements of this Court, as well as punitive damages and attorney's fees as provided for by law; and

5.    On all Counts,

    a.    For Plaintiffs' costs of suit herein; and

    b.    For such other and further relief as the Court may deem just and proper.

Dated: August 24, 2016

Respectfully submitted,

FERDINAND IP, LLC

By: *Edmund J. Ferdinand, III*
EDMUND J. FERDINAND, III (ct21287)
jferdinand@24iplg.com
ALEXANDER R. MALBIN (ct29419)
amalbin@24iplg.com
JESSICA S. RUTHERFORD (ct27273)
jrutherford@24iplg.com
129 Post Road East
Westport, Connecticut 06880
Telephone: 203.557.4224
Fax: 203.905.6747

and

BONNIE E. ESKENAZI (SBN 119401)
BEskenazi@GreenbergGlusker.com
JULIA R. HAYE (SBN 198138)
JHaye@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590
Telephone:  310.553.3610
Fax:  310.553.0687
(Admission *Pro Hac Vice* Pending)

*Attorneys for Plaintiffs,*
*Horror, Inc. and Manny Company*

# EXHIBIT 1

<u>WRITER'S FLAT DEAL CONTRACT</u>

(Short Form; complete screenplay, no options)

EMPLOYMENT AGREEMENT between <u>The Manny Company</u>

(hereinafter sometimes referred to as "Company") and <u>Victor Miller</u>

_____(hereinafter sometimes referred to as "Writer"),

dated this_____day of_____, 19_____.

    1. The Company employs the Writer to write a complete and finished

screenplay for a proposed motion picture to be budgeted at $<u>under $1 million</u> ,

and presently entitled or designated <u>Friday 13</u>

and including the following:

|  |  |
|---|---|
| ◯ Treatment | (x) First draft screenplay |
| ◯ Original Treatment | (x) Final draft screenplay |
| ◯ Story | ◯ Rewrite of screenplay |

based upon (describe form of material & title)_____

_____

written by_____.

    2. (a) The Writer represents that (s)he is a member in good standing
of the Writers Guild of America, (West or East), Inc., and warrants that (s)he
will maintain his/her membership in the Writers Guild of America, (West or
East), Inc., in good standing during the term of this employment.

    (b) The Company warrants it is a party to the WGA 1977 Theatrical
and Television Basic Agreement (which agreement is herein designated MBA).

    (c) Should any of the terms hereof be less advantageous to the
Writer than the minimums provided in said MBA, then the terms of the MBA shall
supersede such terms hereof; and in the event this Agreement shall fail to
provide for the Writer the benefits which are provided by the MBA, then such
benefits for the Writer provided by the terms of the MBA are deemed incorporated
herein. Without limiting the generality of the foregoing, it is agreed that
screen credits for authorship shall be determined pursuant to the provisions
of Schedule A of the MBA in accordance with its terms at the time of such
determination.

    3. The Company will pay to the Writer as full compensation for his

services hereunder the sum of <u>Nine thousand two hundred eighty-two</u> DOLLARS

($ <u>9,282</u> ), payable as follows:

                                       (Continued)

(3/77)

(2)

(a) Not less than _____ DOLLARS ($ _____ )
shall be paid not later than the first regular weekly pay day of the Company
following the expiration of the first week of the Writer's employment.

(b) _____ DOLLARS ($ _____ )
shall be paid within forty-eight (48) hours after delivery of the TREATMENT,
ORIGINAL TREATMENT or STORY, whichever is appropriate, to the Company.

(c) Five thousand five hundred sixty-nine DOLLARS ($ 5,569 )
shall be paid within forty-eight (48) hours after delivery of the FIRST DRAFT
SCREENPLAY to the Company; and

(d) Three thousand seven hundred and thirteen DOLLARS ($ 3,713 )
shall be paid within forty-eight (48) hours after delivery of the FINAL DRAFT
SCREENPLAY.

(e) _____ DOLLARS ($ _____ )
shall be paid within forty-eight (48) hours after delivery of the REWRITE.

4. The Writer will immediately on the execution hereof diligently
proceed to render services hereunder and will so continue until such services
are completed.

5. On delivery of a treatment to the Company, the Company may call for
changes within three (3) days thereafter; if the Company fails in writing to
call for any such changes, the treatment shall be deemed approved, and the Writer
shall proceed with the first draft screenplay based on such treatment or
adaptation.

On delivery of a first draft screenplay to the Company, the Company
may call for changes within three (3) days thereafter; if the company fails in
writing to call for any such changes, the first draft screenplay shall be deemed
approved, and the Writer shall proceed with the final draft screenplay.

On delivery of the final draft screenplay to the Company, the Company
may call for changes within three (3) days thereafter; if the Company fails in
writing to call for any such changes, the final draft screenplay shall be deemed
approved.

6. This contract is entire, that is, the services contemplated hereunder
include all of the writing necessary to complete the final screenplay above
described, and this Agreement contemplates payment of the entire agreed upon
compensation.

_____
(Writer)

Address 726 Broad St.

Stratford, Conn. 06497

_____

_____

The Manny Company
(Company)

By _____

Title (Sean S. Cunningham)
General Partner

Address 155 Long Lots Road

Westport, Connecticut 06880

A-33

# EXHIBIT 2

Case 3:16-cv-01442-SRU   Document 1-2   Filed 08/24/16   Page 2 of 3

# FORM PA

UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

PA    81-093

PA          PAU

EFFECTIVE DATE OF REGISTRATION

9       26       80
(Month)   (Day)   (Year)

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE CONTINUATION SHEET (FORM PA/CON)**

**(1) Title**

TITLE OF THIS WORK:

FRIDAY THE 13TH

NATURE OF THIS WORK: (See instructions)

motion picture photoplay in 95 minutes

PREVIOUS OR ALTERNATIVE TITLES:

**(2) Author(s)**

IMPORTANT: Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). If any part of this work was made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates blank.

**1**
NAME OF AUTHOR: Georgetown Productions, Inc.
Was this author's contribution to the work a "work made for hire"?   Yes x   No
AUTHOR'S NATIONALITY OR DOMICILE:
Citizen of USA (Name of Country) or Domiciled in (Name of Country)
AUTHOR OF: (Briefly describe nature of this author's contribution)
entire work (see Space "6")
DATES OF BIRTH AND DEATH
Born (Year)   Died (Year)
WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:
Anonymous?   Yes   No
Pseudonymous?   Yes   No
If the answer to either of these questions is "Yes," see detailed instructions attached.

**2**
NAME OF AUTHOR:
Was this author's contribution to the work a "work made for hire"?   Yes   No
AUTHOR'S NATIONALITY OR DOMICILE:
Citizen of (Name of Country) or Domiciled in (Name of Country)
AUTHOR OF: (Briefly describe nature of this author's contribution)
DATES OF BIRTH AND DEATH
Born (Year)   Died (Year)
WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:
Anonymous?   Yes   No
Pseudonymous?   Yes   No
If the answer to either of these questions is "Yes," see detailed instructions attached.

**3**
NAME OF AUTHOR:
Was this author's contribution to the work a "work made for hire"?   Yes   No
AUTHOR'S NATIONALITY OR DOMICILE:
Citizen of (Name of Country) or Domiciled in (Name of Country)
AUTHOR OF: (Briefly describe nature of this author's contribution)
DATES OF BIRTH AND DEATH
Born (Year)   Died (Year)
WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:
Anonymous?   Yes   No
Pseudonymous?   Yes   No
If the answer to either of these questions is "Yes," see detailed instructions attached.

**(3) Creation and Publication**

YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED:
Year 1980
(This information must be given in all cases.)

DATE AND NATION OF FIRST PUBLICATION:
Date April 18, 1980
(Month)   (Day)   (Year)
Nation U.S.A.
(Complete this block ONLY if this work has been published.)

**(4) Claimant(s)**

NAME(S) AND ADDRESS(ES) OF COPYRIGHT CLAIMANT(S):

Georgetown Productions, Inc.
c/o Paramount Pictures Corporation
1 Gulf and Western Plaza
New York, New York 10023

TRANSFER: (If the copyright claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright.)

• Complete all applicable spaces (numbers 5-9) on the reverse side of this page
• Follow detailed instructions attached   • Sign the form at line 8

DO NOT WRITE HERE
Page 1 of _____ pages

| EXAMINED BY | R.W. | APPLICATION RECEIVED | FOR COPYRIGHT OFFICE USE ONLY |
|---|---|---|---|
| CHECKED BY | G.N. | SEP 04 1980 | |
| CORRESPONDENCE ☐ Yes | | DEPOSIT RECEIVED SEP 26 1980 | |
| PA   81-093 | DEPOSIT ACCOUNT FUNDS USED ☒ | REMITTANCE NUMBER AND DATE | |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED ADDITIONAL SPACE, USE CONTINUATION SHEET (FORM PA/CON)**

**PREVIOUS REGISTRATION:**

- Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office? Yes ___ No **X**
- If your answer is "Yes," why is another registration being sought? (Check appropriate box)
  - ☐ This is the first published edition of a work previously registered in unpublished form
  - ☐ This is the first application submitted by this author as copyright claimant
  - ☐ This is a changed version of the work, as shown by line 6 of the application
- If your answer is "Yes," give: Previous Registration Number _____ Year of Registration _____

**⑤ Previous Registration**

**COMPILATION OR DERIVATIVE WORK:** (See instructions)

PREEXISTING MATERIAL: (Identify any preexisting work or works that the work is based on or incorporates.)
Some of the musical compositions in the sound track.

MATERIAL ADDED TO THIS WORK: (Give a brief, general statement of the material that has been added to this work and in which copyright is claimed.)
Screenplay, remaining musical compositions and other literary and cinematographic materials.

**⑥ Compilation or Derivative Work**

**DEPOSIT ACCOUNT:** (If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.)

Name: Brylawski & Cleary
Account Number: DA 050385

**CORRESPONDENCE:** (Give name and address to which correspondence about this application should be sent.)

Name: E. Fulton Brylawski
Address: 224 East Capitol Street (Apt)
Washington, D.C. 20003
(City) (State) (ZIP)

**⑦ Fee and Correspondence**

**CERTIFICATION:** * I, the undersigned, hereby certify that I am the: (Check one)
☐ author ☐ other copyright claimant ☐ owner of exclusive right(s) ☒ authorized agent of: Copperton Productions Inc.
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge

Handwritten signature: (X) Debra Acevedo
Typed or printed name: Debra Acevedo   Date 9/3/80

**⑧ Certification (Application must be signed)**

**MAIL CERTIFICATE TO**

Brylawski & Cleary
(Name)
224 East Capitol Street
(Number, Street and Apartment Number)
Washington, D.C. 20003
(City) (State) (ZIP code)

(Certificate will be mailed in window envelope)

**⑨ Address For Return of Certificate**

* 17 U.S.C. §506(e): FALSE REPRESENTATION - Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

U.S. GOVERNMENT PRINTING OFFICE: 1980-311-425/9

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Horror, Inc., a Massachusetts corporation, and The Manny Company, a Connecticut Limited Partnership,**<br><br>      **Plaintiffs,**<br>   **vs.**<br><br>**Victor Miller, an individual; and DOES 1 through 10,**<br><br>      **Defendants.** | **Case No.: No. 3:16-cv-01442-SRU**<br><br><br>**<u>ANSWER AND COUNTERCLAIM</u>** |
| **Victor Miller, and individual**<br><br>      **Counterclaimant,**<br><br>   **vs.**<br><br>**Horror, Inc., a Massachusetts corporation, The Manny Company, a Connecticut Limited Partnership; and Does 1 through 10,**<br><br>      **Counterclaim Defendants.** | <br><br><br><br><br><br>**November 17, 2016** |

**PRELIMINARY STATEMENT**

1.      Defendant Victor Miller ("Defendant" or "Miller") admits Paragraph 1, solely to the extent that plaintiff Horror, Inc. ("Horror") seeks the declaration stated, but otherwise denies the allegations contained in Paragraph 1.

2.      Paragraph 2 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 2 contains factual allegations, defendant Miller only admits that Sean Cunningham ("Cunningham"), in 1979, inspired by the then-recent success of the horror film *Halloween* (1978), wanted to make a horror film with Miller with whom he had previously worked; that Miller promptly wrote a film treatment and then a first draft screenplay for a horror film, both originally entitled "The Long Night at Camp Blood," and was thereafter presented by Cunningham with a screenplay agreement which Miller signed.  Miller otherwise denies the allegations in Paragraph 2.

3.      Paragraph 3 contains conclusions of law as to which no responsive pleading is required. Defendant admits that the film *Friday the 13th* (the "Film") was released in 1980 and was a hit which spawned many sequel films. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the remainder of Paragraph 3 and on that basis denies the same

4.      Paragraph 4 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 4 contains factual allegations, Defendant denies them.

5.      Paragraph 5 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 5 contains factual allegations, Defendant denies them.

6.      Paragraph 6 contains conclusions of law as to which no responsive pleading is required. To the extent paragraph 6 contains factual allegations, Defendant denies them.

A-38

## JURISDICTION AND VENUE

7.      Paragraph 7 contains conclusions of law as to which no responsive pleading is required.

8.      Paragraph 8 contains conclusions of law as to which no responsive pleading is required.

## THE PARTIES

9.      Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9 and on that basis denies the same.

10.      Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 10 and on that basis denies the same.

11.      Defendant admits only that he is an individual, that he was once a citizen and resident of Connecticut, but that he is currently and has been since 2001 a citizen and resident of the state of California, but Defendant otherwise denies the allegations in Paragraph 11.

12.      Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12 and on that basis denies the same.

13.      Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 13 and on that basis denies the same.

## FACTS COMMON TO ALL COUNTS

14.      Paragraph 14 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 14 contains factual allegations, Miller admits only that he wrote the screenplays for *Here Come the Tigers* and *Manny's Orphans*, and that Cunningham received a producer credit on both films, but Miller otherwise denies the allegations of Paragraph 14 and/or lacks knowledge or information sufficient to form a belief as to the truth of

those allegations and on that basis denies the same.

15.     Miller admits only that the horror film *Halloween* (released in 1978) was a box office success and that its success apparently prompted Cunningham to want to produce a horror film, that Cunningham and Miller had worked on two prior films together, but otherwise denies the allegations contained in Paragraph 15 and/or lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on that basis denies the same.

16.      Paragraph 16 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 16 contains factual allegations, Miller admits only that on or about June 4, 1979 he signed a screenplay agreement with Manny ("Screenplay Agreement"), and Miller refers the parties and the Court to the Screenplay Agreement as to its true contents, but otherwise denies the allegations contained in Paragraph 16.

17.     Miller admits that he wrote the screenplay for the Film ("Screenplay") in Connecticut, that the Screenplay Agreement was entered into and executed in Connecticut, that he was a resident of Connecticut at the time of its execution, and that a copy of the Screenplay Agreement is attached as "Exhibit 1" to Plaintiffs' complaint, but otherwise lacks knowledge or information sufficient to form a belief as to the truth of the other allegations in Paragraph 17 and on that basis denies the same.

18.     Paragraph 18 contains conclusions of law to which no responsive pleading is required. To the extent paragraph 18 contains factual allegations, as to those allegations regarding the contents of the Screenplay Agreement Miller refers the Court and parties to the Screenplay Agreement itself, and Miller otherwise denies the allegations in Paragraph 18.

19.     Miller admits only that he and Cunningham naturally discussed ideas for the Film, but otherwise denies all allegations in paragraph 19.

20.     Miller denies that Cunningham placed an ad in *Daily Variety* for *Friday the 13th*, before a draft of the Screenplay had been completed by Miller.  Miller lacks knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 20 and on that basis denies the same.

21.     Paragraph 21 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 21 contains factual allegations, Miller denies them.

22.     Miller denies that Cunningham placed an ad in *Daily Variety* for *Friday the 13th*, before a draft of the Screenplay was completed by Miller.  Miller lacks knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 22 and on that basis denies the same.

23.     Miller admits only that the Film began pre-production in or about August 1979 and that principal photography occurred in or about October 1979, but denies all other allegations in Paragraph 23.

24.      Miller lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24 and on that basis denies the same.

25.     Miller admits the allegations in paragraph 25, but lacks knowledge or information sufficient to form a belief as to the truth of the allegation that the Film's success was "unprecedented" and on that basis denies the same.

26.     Paragraph 26 contains conclusions of law to which no responsive pleading is required. Miller lacks knowledge or information sufficient to form a belief as to the truth of the factual allegations contained in Paragraph 26 and on that basis denies the same.

27.     Paragraph 27 contains conclusions of law to which no responsive pleading is required. Miller lacks knowledge or information sufficient to form a belief as to the truth of the

factual allegations contained in Paragraph 27 and on that basis denies the same.

28.      Paragraph 28 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 28 contains factual allegations, Miller admits that on January 26, 2016 he issued notices of termination regarding his Screenplay under 17 U.S.C. § 203(a) directed to the Manny Company and several successors-in-interest. Miller also admits that on June 27, 2016 he issued that notice of termination to include Horror with an effective date of termination date of July 1, 2018. Miller further admits that on July 14, 2016 he re-served the notice of termination, modifying some of the recipients' addresses, with an effective termination date of July 15, 2018.  The three termination notices are referred to collectively herein as the "Termination Notices." Miller denies all other allegations in Paragraph 28.

29.      Paragraph 29 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 29 contains any factual allegations, Miller denies them.

30.      Paragraph 30 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 30 contains any factual allegations, Miller admits that Horror and Manny dispute herein the validity of the Termination Notices, but denies all other allegations in Paragraph 30.

31.      Paragraph 31 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 31 contains any factual allegations, Miller denies them.

## CAUSES OF ACTION

## COUNT I – DECLARATORY JUDGMENT

(By All Plaintiffs Against All Defendants)

32.       Defendant re-alleges and incorporates by reference his responses to Paragraphs 1-31, inclusive.

33.     Miller admits only that Plaintiffs seek declarations from the court, but otherwise denies the allegations contained in Paragraph 33.

34.     Miller admits only that Plaintiffs seek declarations from the court, but otherwise denies the allegations contained in Paragraph 34.

## COUNT II – BREACH OF CONTRACT

(By Plaintiff Manny Company Against Defendant Miller)

35.      Defendant re-alleges and incorporates by reference his response to Paragraphs 1-34, inclusive.

36.     Paragraph 36 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 36 contains any factual allegations, Miller denies them.

37.     Paragraph 37 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 37 contains any factual allegations, Miller denies them.

38.     Paragraph 38 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 38 contains any factual allegations, Miller denies them.

39.     Paragraph 39 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 39 contains any factual allegations, Miller denies them.

40.     Paragraph 40 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 40 contains any factual allegations, Miller denies them.

41.     Paragraph 41 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 41 contains any factual allegations, Miller denies them.

42.     Paragraph 42 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 42 contains any factual allegations, Miller denies them.

A-43

## COUNT III – SLANDER OF TITLE

(By Plaintiff Horror, Inc. Against All Defendants)

43.     Defendant re-alleges and incorporates by reference his responses to Paragraphs 1-42, inclusive.

44.     Paragraph 44 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 44 contains any factual allegations, Miller denies them.

45.     Paragraph 45 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 45 contains any factual allegations, Miller denies them.

46.     Paragraph 46 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 46 contains any factual allegations, Miller denies them.

47.     Paragraph 47 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 47 contains any factual allegations, Miller denies them.

48.     Paragraph 48 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 48 contains any factual allegations, Miller denies them.

## COUNT IV – CONNECTICUT UNFAIR TRADE PRACTICES ACT

(By Plaintiff Horror, Inc. against All Defendants)

49.     Defendant re-alleges and incorporates by reference his responses to Paragraphs 1-48, inclusive.

50.     Paragraph 50 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 50 contains any factual allegations, Miller denies them.

51.     Paragraph 51 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 51 contains any factual allegations, Miller denies them.

52.     Paragraph 52 contains conclusions of law to which no responsive pleading is

A-44

required. To the extent Paragraph 52 contains any factual allegations, Miller denies them.

53.     Paragraph 53 contains conclusions of law to which no responsive pleading is required. To the extent Paragraph 53 contains any factual allegations, Miller denies them.

54.     Paragraph 54 contains conclusions of law to which no responsive pleading is required.

## **PRAYER FOR RELIEF**

1.     With respect to the relief requested in paragraph 1 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to any of the relief requested in said paragraph.

2.     With respect to the relief requested in paragraph 2 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to any of the relief requested in said paragraph.

3.     With respect to the relief requested in paragraph 3 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to any of the relief requested in said paragraph.

4.     With respect to the relief requested in paragraph 4 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to any of the relief requested in said paragraph.

5.     With respect to the relief requested in paragraph 5 of the Prayer for Relief, Plaintiffs specifically and generally deny that Counterclaimant is entitled to any of the relief requested in said paragraph.

## AFFIRMATIVE DEFENSES

In addition to the grounds set out in the Answer to the Complaint herein, Defendants hereby additionally allege as follows:

### FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

1.      The Complaint and each purported claim therein fail to state a claim upon which the relief sought or any relief could be granted.

### SECOND AFFIRMATIVE DEFENSE

### (Statute of Limitations)

2.      The Complaint and each purported claim therein is barred, in whole or in part, by Plaintiffs' failure to bring such claims within the governing statute of limitations.

### THIRD AFFIRMATIVE DEFENSE

### (Rescission)

3.      The Complaint and each purported claim therein is barred, in whole or in part, because any alleged contract(s) was rescinded.

### FOURTH AFFIRMATIVE DEFENSE

### (Waiver/Acquiescence/Estoppel)

4.      The Complaint and each purported claim therein is barred, in whole or in part, by the doctrines of waiver, acquiescence and/or estoppel.

### FIFTH AFFIRMATIVE DEFENSE

### (Laches)

5.      The Complaint and each purported state-law claim therein is barred, in whole or in part, by the doctrine of laches.

A-46

### SIXTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

6.      The Complaint and each purported claim therein is barred, in whole or in part, by the equitable doctrine of unclean hands.

### SEVENTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

7.      The Complaint and each purported claim therein is barred, in whole or in part, by the equitable doctrine of unjust enrichment.

### EIGHTH AFFIRMATIVE DEFENSE

### (Judicial Estoppel)

8.      The Complaint and each purported claim therein is barred, in whole or in part, by the equitable doctrine of judicial estoppel.

### NINTH AFFIRMATIVE DEFENSE

### (Equitable Estoppel)

9.      The Complaint and each purported claim therein is barred, in whole or in part, by the doctrine of equitable estoppel.

### TENTH AFFIRMATIVE DEFENSE

### (Harmless Error)

10.     Any alleged errors in any of the Termination Notices are harmless error and do not render them invalid.

### ELEVENTH AFFIRMATIVE DEFENSE

### (California Anti-SLAPP Statute Bars State Law Counts)

11.     Plaintiff's state-law Counts are barred by California's anti-SLAPP statute,

California Code of Civil Procedure, Section 425.16 *et seq.*

## TWELFTH AFFIRMATIVE DEFENSE

### (Illegality)

12.     The Complaint and each purported claim therein is barred, in whole or in part, to the extent of any illegality of any matters set forth in the Complaint.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Claim Preclusion)

13.     The Complaint and each purported claim therein is barred, in whole or in part, by the doctrine of *res judicata* or claim preclusion.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Issue Preclusion)

14.     The Complaint and each purported claim therein is barred, in whole or in part, by the doctrines of collateral estoppel or issue preclusion.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Duress)

15.     The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because of duress.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Statute of Frauds)

16.     The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because of the Statute of Frauds.

A-48

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Failure of Consideration)

17.     The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because the contract(s) lacked consideration.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Misrepresentation)

18.     The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because of the misrepresentations of Plaintiffs and/or their predecessors-in-interest.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Against Public Policy)

19.     The Complaint and each purported claim therein is barred, in whole or in part, any alleged contract between the parties or their respective predecessors-in-interest which is contrary to public policy is unenforceable, and any relief requested in the Complaint which is contrary to public policy should not be granted.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Bad Faith)

20.     The Complaint and each purported claim therein is barred, in whole or in part, because Plaintiffs have acted in bad faith for improper purposes with respect to the subject matter of the claims.

A-49

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Preemption)

21.     The Complaint and each purported state-law claim therein is barred, in whole or in part, because they are preempted by federal law.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (Lack of Personal Jurisdiction)

22.     The action is barred because the District Court of Connecticut lacks personal jurisdiction over Victor Miller.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Accord and Satisfaction)

23.     The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because of accord and satisfaction.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Fraud)

24.     The Complaint and each purported claim therein is barred, in whole or in part, by the Plaintiffs' fraud.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (Unconscionability)

25.     The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because of unconscionability.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

### (Mistake)

26.     The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because of mistake.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

### (Lack of Capacity to Contract)

27.     The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because one or more parties to the contract lacked the capacity to contract.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

### (Indefinite Contract)

28.     The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because of indefiniteness.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

### (Assumption of Risk)

29.     The Complaint and each purported claim therein is barred, in whole or in part, by the fact that Plaintiffs assumed the risk when undertaking all activities from which any of their alleged injuries arise.

A-51

### THIRTIETH AFFIRMATIVE DEFENSE

### (Lack of Standing)

30.     The Complaint and each purported claim therein is barred, in whole or in part, because Plaintiffs lacks standing to pursue its claims.

### THIRY-FIRST AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

31.     The Complaint and each purported claim therein is barred, in whole or in part, because of Plaintiffs' failure to take reasonable steps to mitigate their alleged losses.

### THIRTY-SECOND AFFIRMATIVE DEFENSE

### (Full Performance)

32.     The Complaint and each purported claim therein is barred, in whole or in part, because as to any alleged contract between the parties or their respective predecessors-in-interest, Defendant has fully performed all of the conditions, covenants and promises on their part to be performed under the purported contracts, except those which have been excused or prevented by the conduct and actions of Plaintiffs.

### THIRTY-THIRD AFFIRMATIVE DEFENSE

### (Law of the Case)

33.     The Complaint and each purported claim therein is barred, in whole or in part, by the doctrine of law of the case.

### THIRTY-FOURTH AFFIRMATIVE DEFENSE

### (Failure to Comply With F.R.C.P.)

34.     Defendant is not required to separately admit or deny each averment contained in each Paragraph of the Complaint due to Plaintiff's failure to comply with Rules 8(a) and 8(e) of

A-52

the Federal Rules of Civil Procedure.

## THIRTY-FIFTH AFFIRMATIVE DEFENSE

### (Unknown Defenses)

35.     Defendant believes, and based upon such information and belief alleges that Defendant may have additional affirmative defenses available to him, which are not now fully known and which the answering Defendant is not fully aware.  Defendant accordingly reserves the right to assert any additional affirmative defenses after the same have been ascertained.

## THIRTY-SIXTH AFFIRMATIVE DEFENSE

### (Reservation of Right to Amend)

36.     The Complaint and each purported claim therein fails to state the claims for relief with sufficient particularity to permit Defendant to discern and raise all appropriate defenses, and Defendant therefore reserves his rights to amend or supplement this answer with additional defenses.

**COUNTERCLAIM**

**PRELIMINARY STATEMENT**

1.       The U.S. Copyright Act of 1976 (the "Copyright Act"), 17 U.S.C. §203 (a),

provides an author with the inalienable right to recapture the copyright to his/her creative

material, after a lengthy waiting period, by statutorily terminating *without cause* prior transfer(s)

of copyright, so long as the author's material is not "work for hire" under the Copyright Act, and

statutory notice of termination is given within a defined time window.

2.       In early 1979 Victor Miller ("Miller" or "Counterclaimant"), a freelance writer,

working at home, authored the original treatment and screenplay of *Friday the 13th* (1980), a

low-budget independent film produced by Sean Cunningham ("Cunningham"). Miller received

sole writing credit on the film. Miller's treatment and much of his screenplay were written by

him on speculation with no guarantee of compensation.  Such material written "on spec" clearly

does not qualify as "work for hire" under Section 101 of the Copyright Act, 17 U.S.C. 101.  To

the extent Miller wrote any of his screenplay under a contract that he and Cunningham later

signed in June 1979 (attached as Exhibit 1 to the Complaint herein), Miller worked as an

independent contractor, not as Cunningham's traditional employee.  This material likewise did

not qualify as "work for hire" because Miller's contract did not "expressly [state] … that the

work shall be considered a work made for hire" as required by 17 U.S.C. 101(2).

3.       In 2016 Miller properly availed himself of his right under Section 203(a) of the

Copyright Act to recover the copyright to his literary material by serving and filing with the U.S.

Copyright Office notices of termination within the prescribed statutory window to do so.  This is

a civil action against plaintiffs/counterclaim-defendants The Manny Company ("Manny") and

Horror Inc. ("Horror") (individually or collectively, "Counterclaim-Defendant(s)" or

17

"Plaintiff(s)") seeking declaratory relief that Miller's statutory termination is valid and effective under the Copyright Act.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over the claims set forth in this Counterclaim pursuant to the Copyright Act, 17 U.S.C. § 101 *et al.*, and 28 U.S.C. §§ 1331 and 1338(a).

5.      This Court has personal jurisdiction over the Counterclaim-Defendant Horror because on information and belief Horror is a Massachusetts corporation regularly doing business in the State of Connecticut and in this district and maintains contacts within the State of Connecticut and this district.

6.      This Court has personal jurisdiction over the Counterclaim-Defendant Manny because on information and belief Manny is a Connecticut partnership regularly doing business in the State of Connecticut and in this district and maintains contacts within the State of Connecticut and this district.

7.      Venue is proper in the United States District Court for the District of Connecticut pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a), because the Counterclaim-Defendants are conducting business in this district and are subject to personal jurisdiction in this district.

## PARTIES

8.      Counterclaimant Miller is an individual, who is a citizen and long-time resident of the State of California, and is and at all times has been a citizen of the United States.

9.      Counterclaimant is informed and believes and based thereon alleges that Counterclaim-Defendant Manny is a partnership organized under the laws of the State of Connecticut; that it has its principal place of business in the State of California, and that it is

owned, run and/or controlled by its founder, Cunningham, who is a citizen and long-time resident of the State of California.

10.     Counterclaimant is informed and believes and based thereon alleges that Counterclaim-Defendant Horror is a corporation organized under the laws of the State of Massachusetts and has its principal place of business in the State of Massachusetts, but regularly conducts business in the State of California.

11.     Counterclaimant is informed and believes and based thereon alleges that the fictitiously named Counterclaim-Defendants captioned hereinabove as Does 1 through 10, inclusive, and each of them, were in some manner responsible or legally liable for the actions, damages, events, transactions and circumstances alleged herein.  The true names and capacities of such fictitiously named Counterclaim-Defendants, whether individual, corporate, associate, or otherwise are presently unknown to Counterclaimant, and Counterclaimant will amend this Counterclaim to assert the true names and capacities of such fictitiously named Counterclaim-Defendants when the same have been ascertained.  For convenience, each reference herein to the named Counterclaim-Defendant(s) shall also refer to the Doe Counterclaim-Defendants and each of them.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

12.     Miller, a Yale graduate, has authored, and published, numerous novels, teleplays and screenplays. In 1979 Miller's best friend was Sean Cunningham, an independent film producer. Cunningham had recently seen the slasher horror movie *Halloween* (1978), and inspired by its enormous financial success, he wanted to produce a slasher horror film.  Lacking the special skills necessary to write a screenplay, Cunningham sought the collaboration of Miller, a talented freelance writer, who by that time was already an established author.

13.     Miller watched *Halloween* and soon wrote a detailed film treatment for a horror movie he entitled "The Long Night at Camp Blood" (the "Treatment").  Shortly afterwards, Miller wrote an original screenplay incorporating the elements of his Treatment, also originally titled "The Long Night at Camp Blood" (the "First Draft"). Miller received no compensation while writing the Treatment and the First Draft.  Miller wrote the Treatment and First Draft entirely of his own volition, and although he hoped that Cunningham would succeed to raise independent financing for this horror film, Miller wrote the Treatment and First Draft with no guarantee of compensation.

14.     Miller wrote the Treatment, First Draft and subsequent screenplay material, alone, at his home, on his own "IBM Selectric" typewriter, using his own typewriter ribbon and paper.  Though Miller never hired an assistant, he certainly had discretion to do so.  Miller set his own hours and worked at his own pace. Of course, Miller tossed around ideas for the slasher film with Cunningham, but Miller was not compelled to accept and implement Cunningham's suggestions.

15.     Cunningham was impressed by the Treatment and First Draft, but he wanted a more commercial title for the film.  He called it "Friday 13."  Miller wrote a second draft screenplay using the title Friday 13 (the "Second Draft"). As usual, Miller worked from home, using his own instrumentalities and materials.

16.     As the Second Draft was nearing completion, Cunningham presented Miller with a two-page form screenplay agreement ("Agreement") between Cunningham's alleged entity, Manny, and Miller, which Miller and Cunningham signed on or about June 4, 1979.  The Agreement which is attached as Exhibit "1" to the Complaint herein includes no agreement (or mention) that Miller's screenplay material shall be a "work for hire" under the Copyright Act.

The Agreement also makes no mention of Miller's Treatment. After the Agreement was executed, Miller made relatively small revisions to the Second Draft, other than altering the ending, and completed a final shooting script (the "Final Draft"). Miller's original Treatment, First Draft, Second Draft and Final Draft are collectively referred to herein as the "Screenplay." At no point did Cunningham, Manny, or any other person or entity have the ability to assign additional projects to Miller, as the Agreement was only for a "first draft screenplay" and "final draft screenplay."

17.    Miller was not paid a salary by Manny.  He was paid the modest $ 9,282 fee set forth in the Agreement for a "first draft screenplay" and "final draft screenplay", collectively. Manny did not withhold from such compensation any income tax, social security and Medicare (nor pay an employer's matching amount), nor upon information and belief did Manny report or pay payroll taxes or Federal Unemployment tax (FUTA) with respect to Miller, as required by law for traditional employment.  Miller also never received any customary employment benefits from Manny, such as healthcare, a pension, unemployment insurance, or workers' compensation.

18.    Cunningham was impressed and encouraged by Miller's Screenplay to such an extent that on July 4, 1979, he bought a full-page advertisement in *Variety* to attract financing, which promoted the (yet-to-be-produced) movie as "FRIDAY the 13th  THE MOST TERRIFYING FILM EVER MADE!"  The ad attracted the attention of Phil Scuderi of Georgetown Productions, Inc. ("Georgetown") which allegedly financed the movie.

19.    Pre-production of the film was conducted in or about July – August 1979 and principal photography of the film occurred in or about September – October, 1979.

20.    Paramount Pictures released the resulting film "Friday the 13th" (the "Film") on April 18, 1980.  Miller received sole credit as the writer of the Film.  The Film was enormously

successful, and launched an extremely lucrative entertainment franchise. On information and belief, Cunningham and his successors have made and continue to reap millions of dollars from the Film and franchise. His "best friend" Miller who created and authored the Film's story and Screenplay received $9,282, and relatively modest residual payments.

21.     The Treatment and that portion of the Screenplay Miller wrote "on spec" with no guarantee of compensation does not qualify as "work for hire" under the Copyright Act. To the extent Miller wrote a portion of the Screenplay subsequent to his Agreement, Miller worked as an independent contractor specially commissioned to create such material for use as a part of a motion picture. Accordingly, such material likewise does not qualify as "work for hire" because the parties never "expressly agree[d] in a written instrument signed by them that the work shall be considered a work made for hire" as required by 17 U.S.C. § 101(2).

22.     Pursuant to the Copyright Act, 17 U.S.C. § 203(a), Miller as the author of the Screenplay, has the full power and authority to recover his copyright in the Screenplay by serving within the statutorily defined time window (June 4, 2014 to June 4, 2017) a two-year advance notice of termination on Cunningham/Manny or on Manny's successor in interest and filing that notice with the U.S. Copyright Office prior to the notice's effective termination date.

23.     On January 26, 2016, Miller availed himself of his statutory termination right by serving Cunningham/Manny with a notice of termination, with an effective termination date of January 25, 2018 (the "Termination Notice") and by thereafter filing the notice in 2016 with the U.S. Copyright Office. On June 27, 2016, Miller served an amended notice of termination, with an effective termination date of July 1, 2018 ("First Amended Termination Notice"), revised to include as recipients Plaintiff Horror and other alleged successors of Manny who were not reflected in the U.S. Copyright Office records regarding the Screenplay and thereafter filed that

notice in 2016 with the U.S. Copyright Office.  In an abundance of caution, when the First Amended Termination Notice to one recipient was returned, Miller, on July 14, 2016, reissued the notice of termination with an effective date of July 15, 2018 ("Second Amended Termination Notice"), and modified some recipients' addresses, and thereafter also filed that notice in 2016 with the U.S. Copyright Office.  .  The Termination Notice, First Amended Termination Notice and Second Amended Termination Notice are sometimes collectively referred to herein as the "Termination Notices" or the "Termination." In connection with the Termination, Miller studiously complied with the procedures set forth in 17 U.S.C. § 203(a) and 37 C.F.R. § 201.10, the regulations promulgated thereunder by the Register of Copyrights.

24.     Within weeks after Horror was formally served, Counterclaim Defendants filed their complaint in the above-titled action, accusing Miller of a "disingenuous money grab," and challenging the validity of the Termination on the purported ground that the Screenplay was a "work for hire" under the Copyright Act.  Incredibly, though Miller was an obvious freelancer and his relationship with Manny lacked all indicia of traditional hierarchical employment, Counterclaim-Defendants frivolously claimed that Miller wrote the Screenplay as Manny's regular employee, not as an independent contractor commissioned to write a motion picture screenplay, knowing that the Screenplay Agreement did not qualify under 17 U.S.C. § 101(2). In addition, Counterclaim-Defendants sued Miller for alleged breach of contract, slander of title and violation of the Connecticut Unfair Trade Practices Act, all based on their unsupported assertion that the Termination was invalid under federal law.

## COUNT I – DECLARATORY JUDGMENT

(By Counterclaimant Against All Counterclaim-Defendants)

25.     Counterclaimant re-alleges and incorporates by reference paragraphs 1 through

24 inclusive, as though fully set forth herein.

26.     By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between Counterclaimant and Counterclaim-Defendants concerning their respective rights and interests regarding the Screenplay, for which Counterclaimant desires a declaration of rights.

27.     Counterclaimant contends, and Counterclaim-Defendants deny, that his Termination is valid and effective under the Copyright Act.

28.     Counterclaimant thus seeks a declaration from this Court that:

a.     Miller's Screenplay (and the Treatment incorporated therein) are not works for-hire under Section 101 of the Copyright Act (17 U.S.C. § 101).

b.     Miller's Termination Notice is valid and effective under the Copyright Act, and will terminate on January 25, 2018, the date set forth therein, any and all grant(s), assignments(s) or transfer(s) by Miller of his copyright in and to the Treatment and Screenplay, and, as of said date, Miller will have recaptured and will own the U.S. copyright in and to the Treatment and Screenplay he authored.

c.     Alternatively, Miller's First Amended Termination Notice is valid and effective under the Copyright Act, and will terminate on July 1, 2018, the date set forth therein, any and all grant(s), assignments(s) or transfer(s) by Miller of his copyright in and to the Treatment and Screenplay, and, as of said date, Miller will have recaptured and will own the U.S. copyright in and to the Treatment and Screenplay he authored.

d.     Alternatively, Miller's Second Amended Termination Notice is valid and effective under the Copyright Act, and will terminate on July 15, 2018, the date set forth therein, any and all grant(s), assignments(s) or transfer(s) by Miller of his copyright in

and to the Treatment and Screenplay, and that as of said date, Miller will have recaptured and will own the U.S. copyright in and to the Treatment and Screenplay he authored.

29.     A declaration of the Court is necessary pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, so that the parties may know their respective rights and obligations as to the Termination Notices and the copyright interests thereby recovered by Counterclaimant Miller.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Counterclaimant prays for judgment against Counterclaim-Defendants as follow:

1.     For a declaration that:

    a.     Miller's Termination is valid and effective under the Copyright Act as alleged hereinabove;

    b.     As of the effective Termination date determined by the Court, Miller will own exclusively the U.S. Copyright in the Treatment and Screenplay authored by him; and

    c.     As of that effective Termination date, Counterclaim-Defendants, their licensees, assigns or successors, may not continue to exploit the U.S. copyright to the Screenplay, in whole or in part, without a new license from Miller.

2.     For costs of suit;

3.     For reasonable attorneys' fees; and

4.     For such other and further relief as this Court may deem just and proper.

RESPECTFULLY SUBMITTED,

DEFENDANT/COUNTERCLAIMAINT,

VICTOR MILLER

By: /s/ Marc Toberoff
Marc Toberoff (FBN phv08515)
TOBEROFF & ASSOCIATES, PC
23823 Malibu Rd., Ste. 50-363
Malibu, CA 90265
Federal Bar No. phv08515
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
Email: mtoberoff@toberoffandassociates.com

His attorneys.

A-63

**JURY TRIAL DEMANDED**

Defendant/Counterclaimant hereby requests a trial by jury on each claim for relief or portion thereof alleged in the Complaint and/or Counterclaim for which a trial by jury is allowable.

DEFENDANT/COUNTERCLAIMAINT,

VICTOR MILLER

By: /s/ Marc Toberoff
   Marc Toberoff (FBN phv08515)
   TOBEROFF & ASSOCIATES, PC
   23823 Malibu Rd., Ste. 50-363
   Malibu, CA 90265
   Federal Bar No. phv08515
   Telephone: (310) 246-3333
   Facsimile: (310) 246-3101
   Email: mtoberoff@toberoffandassociates.com

   His attorneys.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **Horror, Inc., a Massachusetts corporation, and The Manny Company, a Connecticut Limited Partnership,**<br><br>       **Plaintiffs,**<br>  **vs.**<br><br>**Victor Miller, an individual; and DOES 1 through 10,**<br><br>       **Defendants.** | **Case No.: No. 3:16-cv-01442-SRU** |

| |
|---|
| **Victor Miller, and individual**<br><br>       **Counterclaimant,**<br><br>  **vs.**<br><br>**Horror, Inc., a Massachusetts corporation, The Manny Company, a Connecticut Limited Partnership; and Does 1 through 10,**<br><br>       **Counterclaim Defendants.** |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing Answer and Counterclaim, dated

November 17, 2016 was served electronically by the Court's ECF system on said date and that

all interested parties in this case are registered CM/ECF users.

The undersigned declares under penalty of perjury under the laws of the United States

that the above is true and correct.

Dated: November 17, 2016                    /s/ Marc Toberoff _____

1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| HORROR, INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership,<br><br>    Plaintiffs,<br><br>    - against -<br><br>VICTOR MILLER, an individual; and DOES 1 through 10, inclusive,<br><br>    Defendants. | Case No.: 3:16-cv-01442-SRU<br><br>**June 9, 2017** |

**LOCAL RULE 56(a)(1) STATEMENT IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Edmund J. Ferdinand, III (ct21287)
jferdinand@24iplg.com
Alexander R. Malbin (ct27273
amalbin@24iplg.com
FERDINAND IP, LLC
Jessica S. Rutherford (ct29419)
jrutherford@24iplg.com
129 Post Road East
Westport, Connecticut 06880
Telephone:  (203) 557-4224
Fax:  (203) 905-6747

Bonnie E. Eskenazi (CA SBN 119401)
BEskenazi@GreenbergGlusker.com
Julia R. Haye (CA SBN 198138)
JHaye@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590
Telephone:  (310) 553-3610
Fax:  (310) 553-0687
(Admission *Pro Hac Vice*)

*Attorneys for Plaintiffs and Counterclaim
Defendants Horror, Inc. and Manny Company*

Pursuant to Local Civil Rule 56(a), Plaintiffs and Counterclaim Defendants Horror, Inc. and Manny Company respectfully submit their "Local Rule 56(a)(1) Statement" setting forth, for purposes of the present motion only, all facts relevant to the motion as to which there are no genuine issues to be tried.

In support of this statement, Plaintiff submits the sworn Declaration of Sean S. Cunningham ("Cunningham Decl. ¶__") and exhibits attached thereto, the sworn Declaration of Robert M. Barsamian ("Barsamian Decl. ¶__") and exhibits attached thereto, the sworn Declaration of Julia R. Haye ("Haye Decl. ¶__") and exhibits attached thereto, the sworn Declaration of William L. Cole ("Cole Decl. ¶__") and exhibits attached thereto, and pleadings referenced in the Court's Docket Index ("D.I.").

## FACTS AS TO WHICH THERE ARE NO GENUINE ISSUES

1.  Sean S. Cunningham ("Cunningham") is the principal of Sean S. Cunningham Films, Ltd. ("SSCF"), the general partner of The Manny Company ("Manny").

     (Cunningham Decl.  ¶ 2.)

2.  Victor Miller ("Miller") is a screenwriter who is, and has been, a member of the Writers Guild of America – East ("WGA") since 1974.

     (Haye Decl., ¶¶ 13-14, Exs. T, U.)

3.  The WGA is a federally-recognized labor union representing writers in the film and television industry.  On behalf of its members, the WGA has negotiated the collective bargaining agreements with the motion picture industry's multi-employer bargaining associations.

     (Haye Decl., ¶ 3, Ex. J at 2-4; *Wellman v. Writers Guild of Am. West*, 146 F.3d 666, 668 (9th Cir. 1998) ("[T]he [WGA] is a labor union and the screenwriters' collective bargaining representative in the motion picture industry.") *see also Stone v. Writer's Guild of Am. West*, 101 F.3d 1312, 1314 (9th Cir. 1996).)

4.     Miller and Cunningham first began working together professionally in or about 1976 on a series of motion picture projects.  In total, they worked together on five motion pictures over a five-year period.

     (Haye Decl., ¶ 4, Ex K at 47:3-48:6; Cunningham Decl. ¶ 3.)

5.     In or about 1976, Miller and Cunningham began to work together on *Here Come the Tigers*.

     (Haye Decl., ¶ 4, Ex K at 66:22-68:10, 70:1-73:17; Cunningham Decl. ¶ 3.)

6.     *Here Come the Tigers* began with Cunningham's idea to make a family film similar to *Bad News Bears*.  After Cunningham invited Miller to work on this non-union project, they began to work together to develop ideas for the story line.  Cunningham produced *Here Come the Tigers* and Miller wrote the screenplay with regular input from Cunningham.

     (Haye Decl., ¶ 4, Ex K at 66:22-73:13; Cunningham Decl. ¶ 3.)

7.     Miller, who was a member of the WGA at the time, wrote *Here Come the Tigers* for Cunningham under a false name because Miller knew that he was not permitted to accept employment on non-union projects according to WGA rules or on terms which violated the WGA's then-operative collective bargaining agreement.

     (Haye Decl., ¶ 4, Ex. K at 64:24-65:22.)

8.     Miller knew and understood that, by accepting non-union employment on *Here Come the Tigers*, he would not be entitled to the minimum employment terms or employee benefits conferred on WGA writers under the WGA collective bargaining agreement.

     (Haye Decl., ¶ 4, Ex. K at 17:2-18:9, 65:6-9, 114:21-115:3.)

9.     In 1978, Cunningham asked Miller to join him on another family film project—*Manny's Orphans*.

     (Haye Decl., ¶ 4, Ex. K at 76:18-23; Cunningham Decl. ¶ 4.)

A-69

10.     The initial idea for *Manny's Orphans* came from another team member, Steve Miner, who together with Cunningham and Miller developed the story for the film.

    (Cunningham Decl.¶ 4; Haye Decl., ¶ 4, Ex. K at 76:20-77:1, 81:1-9.)

11.     Cunningham hired Miller for *Manny's Orphans* through his newly created company, Manny, which, on or about July 25, 1978, became a signatory to the 1977 WGA Theatrical and Television Basic Agreement (the "MBA"), the then-operative collective bargaining agreement governing WGA writers and signatory employers.

    (Haye Decl., ¶ 4, Ex. K at 76:20-23, 79:12-18; Cunningham Decl. ¶ 4, Ex. A.)

12.     For all produced films they worked on prior to *Friday The 13th* (the "Film"), Cunningham and Miller's method of working together remained the same: Cunningham or someone on his team other than Miller came up with the idea for the films, then Miller and Cunningham would meet at their respective houses, Cunningham's home office, or a local diner, and would speak on the phone to discuss specific ideas for the films, Miller would submit drafts of his writings and Cunningham would make changes and modifications and mark up the drafts with handwritten comments and notes for Miller or discuss conceptual changes to the draft, and Miller would take Cunningham's notes and comments and make edits.  Their discussions would include specifics regarding the film's elements, such as story beats, plots, scenes, and characters.  At times, they would hash out disagreements regarding the scenes and plots to jointly decide how it should proceed.

    (Haye Decl., ¶ 4, Ex. K at 66:22-73:13, 80:4-11, 82:12-84:21; Cunningham Decl. ¶ 6.)

13.     In 1979, after the success of *Halloween*, Cunningham decided that he wanted to make a horror film.

    (Cunningham Decl. ¶ 6.)

14.     Cunningham contacted Miller to see if he would be interested in working on this new horror film idea.  Miller was hesitant because he was not familiar with the horror genre, and had never before worked on a horror film.

(Haye Decl., ¶ 4, Ex. K at 87:15-88:7; Cunningham Decl. ¶ 7; Haye Decl. ¶ 5, Ex. L at 7.)

15.    Cunningham, on the other hand, had already produced the cult classic horror film *The Last House on the Left*, famed director Wes Craven's first film.

(Haye Decl., ¶ 4, Ex. K at 88:8-16, 89:3-8; Cunningham Decl. ¶ 7; Haye Decl. ¶ 5, Ex. L, at 6.)

16.    To enable Miller to write a horror movie, Cunningham explained to Miller key elements of successful horror films, such as, for example, making each killing personal to the victim, killing off an important character early in the film when the audience least suspects it and to communicate that all characters are "fair game," and keeping the killer masked, i.e., not allowing the killer to appear as an ordinary and relatable human being.

(Haye Decl. ¶ 4, Ex. K at 89:15-21, 90:9-11, 190:8-20; Cunningham Decl. ¶ 8; Haye Decl. ¶ 5, Ex. L, at 7, 12.)

17.    After these initial discussions, in the late spring of 1979, Cunningham and Miller orally agreed that Miller would be engaged to write the screenplay for Cunningham's horror film project and that it would be done as a union film.

(Haye Decl. ¶ 4, Ex. K at 156:12-20; Cunningham Decl. ¶ 9.)

18.    After reaching this oral agreement, Cunningham and Miller began discussing ideas for the Film.

(Haye Decl. ¶ 4, Ex. K at 157:6-20, 159:20-162:1; Cunningham Decl. ¶ 9.)

19.    Cunningham and Miller's first task was coming up with the venue for the Film to take place.  They met several times a week, at each other's houses and in Cunningham's home office to discuss ideas and locations for the Film.

(Haye Decl. ¶ 4, Ex. K at 157:6-20, 159:20-162:1, 162:2-8, 162:24-163:20; Cunningham Decl. ¶ 10; Haye Decl. ¶ 5, Ex. L at 7, 8.)

20.     Miller submitted various location ideas for the Film to Cunningham, which were rejected.

Eventually Miller suggested the idea of setting the Film in a summer camp before it

opens.  Cunningham and Miller agreed that this should be the venue for the Film.

>  (Haye Decl. ¶ 4, Ex. K at 160:23-162:8, 162:24-163:11, 165:1-8; Cunningham Decl.
>
>  ¶ 10; Haye Decl. ¶ 5, Ex. L at 8.)

21.     Around this same time, Cunningham focused on a title he had previously come up with,

"Friday the 13th," as the title for the Film.

>  (Cunningham Decl. ¶ 11; Haye Decl. ¶ 5, Ex. L at 9.)

22.     Cunningham explained to Miller that he was not sure if the title "Friday the 13th" would

be available for use, so they also considered other title ideas.

>  (Cunningham Decl. ¶ 11; Haye Decl. ¶ 5, Ex. L at 9.)

23.     After settling on the summer camp location and prior to June 1979, Cunningham began

talking to potential financiers about the Film, including Phil Scuderi ("Scuderi"),

principal of Georgetown Productions, Inc. ("Georgetown"), predecessor-in-interest to

Plaintiff Horror, Inc. ("Horror").  Scuderi previously financed *The Last House on the Left*

and *Here Come the Tigers* with Cunningham.

>  (Cunningham Decl. ¶ 12; Haye Decl. ¶ 5, Ex. L at 8.)

24.     Miller had a bad experience with Scuderi on *Here Come the Tigers*.  Scuderi insisted on

inserting a scene that used "bathroom humor."  Miller hated the idea, but since Scuderi

was financing the film, Miller was forced to accept the insertion of the scene.

>  (Haye Decl. ¶ 4, Ex. K at 85:7-86:6; Cunningham Decl. ¶ 13.)

25.     On or before June 4, 1979, Manny and Miller executed a Writer's Flat Deal Contract (the

"Employment Agreement") for the Film.

>  (Cunningham Decl. ¶ 14, Ex. B.; Haye Decl. ¶ 14, Ex. U.)

26.     Miller understood that the Employment Agreement be entered into pursuant to, and be

governed by, the MBA, and that Miller would receive the employee benefits provided for

in the MBA.

(Haye Decl. ¶ 4, Ex. K at 18:3-5, 114:21-115:3-17, 118:12-19; Cunningham Decl.

¶ 15.)

27.     The Employment Agreement is the standard WGA short form complete screenplay

agreement issued by the WGA at the time.

(Cunningham Decl. ¶ 17.)

28.     The Employment Agreement provides that it is to be governed by the provisions of the

MBA.

(Cunningham Decl. ¶¶ 14, 17, Ex. B.)

29.     The Employment Agreement specifically states, in boldface type, that it is an

"EMPLOYMENT AGREEMENT" between Manny and Miller.

(Cunningham Decl. ¶ 14, Ex. B.)

30.     The Employment Agreement does not include any language of assignment.

(Cunningham Decl. ¶ 14, Ex. B.; Cole Decl., ¶3, Ex. Y.)

31.     Pursuant to Paragraph 2 of the Employment Agreement, Miller expressly warranted,

represented, and agreed that he was a member in good standing of the WGA, and that he

would maintain his membership in the WGA "during the term of this employment."

(Cunningham Decl. ¶ 14, Ex. B.)

32.     The Employment Agreement provides that "benefits for the Writer provided in the [1977]

MBA are deemed incorporated" into the Employment Agreement.

(Cunningham Decl. ¶ 14, Ex. B.)

33.     The MBA provides for benefits such as pension, health, and welfare, payment of

residuals and sequel payments, and guaranteed minimum salary requirements.

(Haye Decl. ¶ 7, Ex. N, *see*, Articles 9, 13, 15, 17.)

34.     Miller admitted in his deposition that one of the advantages of being a member of a labor

union is that the union negotiates with signatory employers to provide its members with

employment benefits that, in a free market economy, each individual may not have the

leverage to be able to obtain.

(Haye Decl. ¶ 4, Ex. K at 114:21-115:3.)

35. Although Cunningham had not yet secured financing for the Film at the time

Cunningham entered into the written Employment Agreement with Miller, Cunningham

knew that, pursuant to the MBA, he was contractually committed to pay Miller the nearly

$10,000 due to him thereunder, irrespective of whether Cunningham ultimately secured

financing for the Film.

(Cunningham Decl. ¶ 16.)

36. The Employment Agreement includes a section by which the parties were required to

designate any pre-existing materials on which the screenplay was based ("based upon

(describe form of material & title) _____ written by _____").

(Cunningham Decl. ¶ 14, Ex. B.)

37. Cunningham left the pre-existing materials section of the Employment Agreement blank.

(Cunningham Decl. ¶ 18.)

38. Cunningham and Miller both signed the Employment Agreement which indicated that no

pre-existing materials existed.

(Cunningham Decl. ¶ 14, Ex. B.)

39. On June 4, 1979, Miller sent a copy of the Employment Agreement to the WGA.

(Haye Decl. ¶ 14, Ex. U.)

40. In 2003, Miller admitted in an interview that he and Cunningham "did not get started on

the project until about June or July of 1979."

(Haye Decl. ¶ 5, Ex. L at 8.)

41. In early June 1979, Cunningham paid for a full-page ad in Daily Variety announcing the

Film, which ad was scheduled to run on the 4th of July, 1979.

(Cunningham Decl. ¶ 19; Haye Decl. ¶ 5, Ex. L at 9.)

42. Cunningham and Miller began developing the screenplay for the Film (the "Screenplay").

Miller's first prepared a treatment for the Screenplay, so that Cunningham would have

material to show potential investors.

(Haye Decl. ¶ 4, Ex. K at 170:7-20, 172:6-14.)

43.     Based on meetings and discussions between Miller and Cunningham, after Cunningham

        agreed to set the Film in a summer camp, and after Cunningham's guidance about how to

        present the killer, depicting the actual killing on a personal level (such as garroting, not

        just being shot by a gun), and killing off an important character early in the Film, Miller

        prepared the first draft of the treatment of the Film (the "Treatment").

        (Haye Decl. ¶ 4, Ex. K at 89:15-21, 90:9-11; Cunningham Decl. ¶ 20, Ex. C.)

44.     Miller never placed a copyright notice on the first draft of the Treatment, nor did he

        register the Treatment with either the WGA or the United States Copyright Office.

        (Haye Decl. ¶ 4, Ex. K at 182:4-6, 208:7-10; Cunningham Decl. ¶ 20, Ex. C.)

45.     Miller included a note in the first draft Treatment, "Hi Phil," directed to Scuderi.

        (Cunningham Decl. ¶ 21, Ex. C, at 12.)

46.     The young boy character Jason is dead throughout the first draft Treatment; he does not

        come back to life and he is not the villain.

        (Cunningham Decl. ¶ 21, Ex. C.)

47.     Cunningham revised, rewrote, and restructured the first draft Treatment on his own and

        made several creative changes, which ultimately were included in the early drafts of the

        Screenplay and the Film.

        (Haye Decl. ¶ 4, Ex. K at 180:17-181:24. 274:23-276:11; Cunningham Decl. ¶ 22,

        Ex. D.)

48.     Cunningham placed a title page on the second draft Treatment, which changed the title of

        the Treatment to "Friday 13"—the same project name as listed in the Employment

        Agreement, and he also included a copyright designation: "© Sean S. Cunningham Films,

        Ltd.", the general partner of Manny.

        (Haye Decl. ¶ 4, Ex. K at 274:23-276:11; Cunningham Decl. ¶ 22, Ex D.)

A-75

49.     Miller and Cunningham met at each other's houses, and in Cunningham's home office, to develop scenes and discuss ideas for the Screenplay.

> (Haye Decl. ¶ 4, Ex. K at 162:24-163:11, 186:22-190:5; Cunningham Decl. ¶ 25; Haye Decl. ¶ 5, Ex. L at 7.)

50.     In developing the Screenplay, Miller and Cunningham discussed scenes, plots, characters and story lines, and certain scenes, plots, characters, and story lines went into the Screenplay and the Film over Miller's objections and at the direction of Cunningham.

> (Haye Decl. ¶ 4, Ex. K at 186:22-190:20; Cunningham Decl. ¶ 25;  Haye Decl. ¶ 5, Ex. L at 7-9, 12, 16, 21.)

51.     Miller used Cunningham's assistant, copy machine and office facilities during the course of his work in preparing the Screenplay.  In fact, the entire second draft of the Screenplay was typed by Cunningham's assistant.

> (Haye Decl. ¶ 4, Ex. K at 212:5 - 213:5; Cunningham Decl. ¶ 26, Ex. G.)

52.     Miller received a copy of the second draft of the Screenplay, entitled "Friday 13," contained a copyright notice in the name of SSCF.

> (Cunningham Decl. ¶ 26, Ex. G; Haye Decl. ¶ 17.)

53.     The Film officially began pre-production in mid-August 1979, and principal photography began in or about September 1979.

> (Cunningham Decl. ¶ 27.)

54.     Beginning in mid-August 1979 and throughout the pre-production and production process, Scuderi provided extensive notes, mark-ups and ideas which were incorporated into the final shooting script and Film itself—some of which never appeared in any drafts of the Screenplay written by Miller prior to the beginning of filming.

> (Cunningham Decl. ¶ 28.)

55.     In every iteration of Miller's Treatment and Screenplay, the character of Jason died as a young boy.

> (Cunningham Decl. ¶ 20, 22, 25, 26, 29, Exs. C, D, F, G.)

56. Miller was vehemently opposed to the idea of Jason coming back to life.

   (Cunningham Decl. ¶ 29; Haye Decl. ¶ 5, Ex. L at 21.)

57. The white hockey mask which the adult villainous character Jason now famously wears did not first appear until *Friday the 13th, Part III*, long after Miller's involvement in the franchise ended.

   (Cunningham Decl. ¶ 29.)

58. Miller had absolutely no involvement in creating Jason as the adult murderer and indestructible character that has become the face of the entire *Friday the 13th* franchise.

   (Haye Decl. ¶ 4, Ex. K at 264:15-265:3, 265:13-266:12.)

59. Pursuant to an agreement dated as of May 7, 1980, Manny sold to Georgetown Productions, Inc. ("Georgetown") all of its right, title, and interest in and to the Screenplay (the "Rights Agreement"), including, without limitation, its copyright in the Screenplay. The Rights Agreement states that Miller wrote the Screenplay "as author for The Manny Company" and provides that Georgetown may copyright the Screenplay in its own name.

   (Cunningham Decl. ¶ 30, Ex. H; Barsamian Decl. ¶ 3.)

60. The Film was released on or about May 9, 1980, and was an immediate hit.

   (Cunningham Decl. ¶ 31.)

61. The Copyright Registration for the Film is registration no. PA 80-093, for which the U.S. Copyright Office issued a certificate of registration having an effective date of September 26, 1980.

   (Haye Decl. ¶ 8, Ex. O.)

62. Miller knew no later than 1980 that Cunningham, Manny, and Georgetown claimed sole ownership of the Treatment, Screenplay, and Film. (Cunningham Decl. ¶ 20, 22, 25, 26, 29, Exs. C, D, F, G.; Haye Decl. ¶¶ 5, 8, Exs. L (at 21), O.)

63. Horror acquired its rights in the Screenplay, among other things, from its predecessors-in-interest, Georgetown, Jason Productions Inc., Friday Four Inc. and Terror Inc. Horror

currently holds all right, title, and interest, in and to the Screenplay, the Film, and any and all elements contained within the Film.

(Barsamian Decl. ¶ 4.)

64.   Under the terms of the Employment Agreement and MBA, over the past thirty-eight years, Horror has paid, and Miller has collected, and continues to collect, benefits provided by the MBA, including without limitation residuals and sequel payments calculated in accordance with the terms of the MBA.

(Haye Decl. ¶ 4, Ex. K at 261:20-263:16; Cunningham Decl. ¶ 32; Barsamian Decl. ¶ 5; Haye Decl. ¶ 5, Ex. L at 22-23.)

65.   In or about August 1980, when the first sequel to the Film was announced, a dispute arose regarding payments due to Miller pursuant to the MBA.

(Haye Decl. ¶ 4, Ex. K at 119:21-122:9; Barsamian Decl. ¶ 5; Haye Decl. ¶ 15, Ex. V.)

66.   Beginning in 1980, at Miller's request and on his behalf, the WGA pursued Manny for payments due to Miller under the MBA.

(Haye Decl. ¶ 4, Ex. K at 233:11-25, 234:10-236:15, 243:19-244:10, 246:7-13, 247:5-248:8; Cunningham Decl. ¶ 32.)

67.   The dispute that commenced in 1980 was eventually settled by all parties and all sums due to Miller under the MBA were paid in full, and all sums which thereafter became due to Miller have been timely paid.

(Haye Decl. ¶ 4, Ex. K at 249:4-8, 250:2-19, 257:8-259:1, 262:9-263:16; Cunningham Decl. ¶ 32; Barsamian Decl. ¶ 5; Haye Decl. ¶¶ 5, 16, 17, Exs. L (at 22-23), W, X.)

68.   In 2003, Miller gave a recorded interview to journalist Peter Bracke for a book that Bracke was writing on the history of the *Friday the 13th* franchise.

(Haye Decl. ¶ 5, Ex. L.)

69.   Miller admitted in his 2003 interview with Bracke that "Sean and [Scuderi] were the owners of this thing, I was not an owner."

(Haye Decl. ¶ 5, Ex. L, at 21.)

70.    Miller admitted in his 2003 interview with Bracke that at the time Miller met

Cunningham, he knew that Cunningham had previously produced a horror film, *The Last*

*House on the Left*, Wes Craven's first film.

       (Haye Decl. ¶ 5, Ex. L.)

71.    Miller admitted in his 2003 interview with Bracke that at the time they were working on

the Film, Miller and Cunningham "were in each other's houses probably two, three or

four days a week just working on things."

       (Haye Decl. ¶ 5, Ex. L at 7.)

72.    Miller admitted in his 2003 interview with Bracke that the idea to make a horror film was

Cunningham's idea, based on the success of the recently released *Halloween*.

       (Haye Decl. ¶ 5, Ex. L at 7.)

73.    Miller admitted in his 2003 interview with Bracke that prior to working on the Film with

Cunningham, Miller "had no background in horror movies whatsoever," and he "was not

a big horror film person."

       (Haye Decl. ¶ 5, Ex. L at 7.)

74.    Miller admitted in his 2003 interview with Bracke that, at Cunningham's suggestion,

Miller "went dutifully down to one of the theaters in Bridgeport and watched

*Halloween*."

       (Haye Decl. ¶ 5, Ex. L at 7.)

75.    Miller admitted in his 2003 interview with Bracke that several of the pieces of wisdom

that Cunningham taught Miller about horror films was that the killing needed to be

personal, that guns were "terribly impersonal weapons," that Miller should kill off an

important character early in the screenplay to keep the audience believing that anyone is

fair game, and that the killer should remained masked and should not become ordinary or

relatable.

       (Haye Decl. ¶ 5, Ex. L at 8, 10.)

76.     Miller admitted in his 2003 interview with Bracke that Miller and Cunningham "did not

get started on [the Film] until about June or July of 1979."

        (Haye Decl. ¶ 5, Ex. L at 8.)

77.     Miller admitted in his 2003 interview with Bracke that Miller's "first week's work" on

the Film was coming up with about 40 to 50 venue ideas, that he "would go over and

pitch them to Sean and we would both say, 'Nah, nah, nah.'"  Then, he "finally went over

and said, 'I think I got it, it is a summer camp before it opens,'" and they both agreed on

this venue before Miller started writing.

        (Haye Decl. ¶ 5, Ex. L at 8.)

78.     Miller admitted in his 2003 interview with Bracke that Miller had nothing to do with

depicting Jason as a mongoloid child figure in the dream sequence at the end of the Film,

and the only time Jason appears in the Film "it is a fantasy," not reality.

        (Haye Decl. ¶ 5, Ex. L at 12.)

79.     Miller admitted in his 2003 interview with Bracke that Miller did not write the

motorcycle scene in the Film, which was Scuderi's idea, and which ultimately was

included in the Film even though Miller "was just appalled" by the scene.

        (Haye Decl. ¶ 5, Ex. L at 16.)

80.     Miller admitted in his 2003 interview with Bracke that Miller was unhappy that

Georgetown went on to bring Jason back to life and make him a killer in the sequels to

the Film, noting his unhappiness with "taking this one little weird rubber faced kid out of

the water and turning him into a monster."  Miller was "just not particularly interested in

a strange little boy being unkillable."

        (Haye Decl. ¶ 5, Ex. L at 21.)

81.     Miller admitted in his 2003 interview with Bracke that Miller entered into a lawsuit in

1986 with Cunningham and Georgetown because "[his] union was trying to get what was

owed to [him], so [he] had to sue, [his] union sued Sean so Sean had to sue Georgetown"

to get the money he was owed pursuant to the MBA.

(Haye Decl. ¶ 5, Ex. L at 22.)

82.    Miller admitted in his 2003 interview with Bracke that Miller received the money he was

owed under the MBA in connection with the Film.

(Haye Decl. ¶ 5, Ex. L at 23.)

83.    Miller was interviewed by author David Grove and quoted extensively in Mr. Grove's

2013 book, *On Location in Blairstown: The Making of Friday The 13th*.

(Haye Decl. ¶ 9, Ex. P.)

84.    Miller admitted in his interview with Grove that, for the Film, "I do know that we [i.e.,

Cunningham and Miller] settled early on with the decision to keep ghosts and the

supernatural out of the mix."

(Haye Decl. ¶ 9, Ex. P at 30.)

85.    Miller admitted in his interview with Grove that, for the Film, he "made up a list of

venues for teenagers to be isolated in that included 'summer camp' about midway down

the page.  [Cunningham and Miller] both finally agreed that was it."

(Haye Decl. ¶ 9, Ex. P at 30.)

86.    Miller admitted in his interview with Grove that, for the Film, he "would come in with

ideas and we'd [i.e., Cunningham and Miller] wrestle them back and forth."

(Haye Decl. ¶ 9, Ex. P at 30.)

87.    Miller admitted in his interview with Grove that, for the Film, "I certainly didn't even

consider a male villain after I had seen Michael Myers in *Halloween*."

(Haye Decl. ¶ 9, Ex. P at 31; Haye Decl. ¶ 10, Ex. Q at 4.)

88.     Miller admitted in his blog that, in all of Miller's drafts of the Treatment or Screenplay,

"Jason was dead from the very beginning.  He was a victim not a villain."

(Haye Decl. ¶ 10, Ex. Q at 4.)


Dated: June 9, 2017

Respectfully submitted,


By: _Bonnie Eskenazi_____

EDMUND J. FERDINAND, III (ct21287)
jferdinand@24iplg.com
ALEXANDER R. MALBIN (ct29419)
amalbin@24iplg.com
JESSICA S. RUTHERFORD (ct27273)
jrutherford@24iplg.com
129 Post Road East
Westport, Connecticut 06880
Telephone: 203.557.4224
Fax: 203.905.6747

BONNIE E. ESKENAZI (SBN 119401)
BEskenazi@GreenbergGlusker.com
JULIA R. HAYE (SBN 198138)
JHaye@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590
Telephone:  310.553.3610
Fax:  310.553.0687
(Admission *Pro Hac Vice*)

*Attorneys for Plaintiffs,*
*Horror, Inc. and Manny Company*

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2017, a true and correct copy of the foregoing LOCAL

RULE 56(a)(1) STATEMENT IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL

SUMMARY JUDGMENT was filed electronically. Notice of this filing will be sent to those

who are currently on the list to receive e-mail notices by operation of the Court's electronic filing

system. Parties may access this filing through the Court's system.


By: _____

EDMUND J. FERDINAND, III (ct21287)
jferdinand@24iplg.com
ALEXANDER R. MALBIN (ct29419)
amalbin@24iplg.com
JESSICA S. RUTHERFORD (ct27273)
jrutherford@24iplg.com
129 Post Road East
Westport, Connecticut 06880
Telephone: 203.557.4224
Fax: 203.905.6747

BONNIE E. ESKENAZI (SBN 119401)
BEskenazi@GreenbergGlusker.com
JULIA R. HAYE (SBN 198138)
JHaye@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590
Telephone:  310.553.3610
Fax:  310.553.0687
(Admission *Pro Hac Vice*)

*Attorneys for Plaintiffs,*
*Horror, Inc. and Manny Company*

08226-00016/2798235.10

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| HORROR, INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership, Plaintiffs, <br><br> - against - <br><br> VICTOR MILLER, an individual; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.: 3:16-cv-01442-SRU <br><br> **June 9, 2017** |

**DECLARATION OF ROBERT M. BARSAMIAN IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF PLAINTIFFS'
COMPLAINT AND COUNT I OF DEFENDANT'S COUNTERCLAIM**

A-84

## DECLARATION OF ROBERT M. BARSAMIAN

I, ROBERT M. BARSAMIAN, declare:

1.      The facts set forth in this declaration are personally known to me and I have first-hand knowledge thereof.  If called as a witness, I could and would testify competently to the facts set forth herein under oath.

2.      I am currently a shareholder and officer of Plaintiff Horror, Inc. ("Horror"), a privately held Massachusetts corporation.  Horror is the successor-in-interest to Georgetown Productions, Inc. ("Georgetown").   I am also the sole officer and director of Horror, and as a result, I have personal, first-hand knowledge regarding the finances of Horror, including without limitation revenues received, and expenses paid, by Horror.

3.      Pursuant to an agreement dated as of May 7, 1980, plaintiff Manny Company ("Manny") sold to Georgetown all of its right, title, and interest (including all of its obligations under the Writer's Flat Deal Contract with defendant Victor Miller ("Miller")) in and to the screenplay on which the original *Friday the 13th* (1980) film was based (the "Screenplay"), including, without limitation, its copyright in the Screenplay.

4.      Horror currently owns the rights to the *Friday the 13th* franchise, including the copyright and all right, title and interest in and to the original *Friday the 13th* (1980) film (the "Film"), released on or about May 9, 1980, the copyright and all right, title and interest in and to the Screenplay, and any and all materials on which the Film was based.  Horror acquired its rights in and to the Screenplay and Film, among other things, from its predecessors-in-interest Georgetown, Jason Productions Inc. (a/k/a Jason, Inc.), Friday Four Inc. and Terror Inc.

5.      In or about August 1980, when the first sequel to the Film was announced, a dispute arose regarding payments due to Miller pursuant to the MBA.  The matter was eventually settled and all sums due to Miller under the MBA were paid in full, and all sums which thereafter became due to Miller have been timely paid.  Over the past thirty-eight years, Horror has paid all

sums due to Miller under the Employment Agreement and MBA, including without limitation residuals and sequel payments, calculated in accordance with the terms of the MBA.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 8th day of June, 2017, at Newton, Massachusetts.

Robert M. Barsamian

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2017, a true and correct copy of the foregoing

DECLARATION OF ROBERT M. BARSAMIAN IN SUPPORT OF PLAINTIFFS' MOTION

FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF PLAINTIFFS' COMPLAINT

AND COUNT I OF DEFENDANT'S COUNTERCLAIM was filed electronically.  Notice of

this filing will be sent to those who are currently on the list to receive e-mail notices by operation

of the Court's electronic filing system. Parties may access this filing through the Court's system.


By: _Bonnie Cokenay_

EDMUND J. FERDINAND, III (ct21287)
jferdinand@24iplg.com
ALEXANDER R. MALBIN (ct29419)
amalbin@24iplg.com
JESSICA S. RUTHERFORD (ct27273)
jrutherford@24iplg.com
129 Post Road East
Westport, Connecticut 06880
Telephone: 203.557.4224
Fax: 203.905.6747

BONNIE E. ESKENAZI (SBN 119401)
BEskenazi@GreenbergGlusker.com
JULIA R. HAYE (SBN 198138)
JHaye@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590
Telephone:  310.553.3610
Fax:  310.553.0687
(Admission *Pro Hac Vice*)

*Attorneys for Plaintiffs,*
*Horror, Inc. and Manny Company*

A-87

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

HORROR, INC., a Massachusetts corporation; and
MANNY COMPANY, a Connecticut Limited Partnership,
Plaintiffs,

- against -

VICTOR MILLER, an individual; and DOES 1 through 10,
inclusive,

Defendants.

Case No.: 3:16-cv-01442-SRU

**June 9, 2017**

**DECLARATION OF SEAN S. CUNNINGHAM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF PLAINTIFFS'
COMPLAINT AND COUNT I OF DEFENDANT'S COUNTERCLAIM**

## DECLARATION OF SEAN S. CUNNINGHAM

I, SEAN S. CUNNINGHAM, declare:

1. The facts set forth in this declaration are personally known to me and I have first-hand knowledge thereof.  If called as a witness, I could and would testify competently to the facts set forth herein under oath.

2. I am an established producer, director, and writer of feature films.  I first began producing and directing films in 1970, and have produced over twenty-seven feature films throughout my decades-long career.  My films have enjoyed both critical acclaim and box office success.  I primarily produce and direct feature films through my company, Sean S. Cunningham Films, Ltd. ("SSCF"), of which I am a principal.  SSCF is the general partner of Plaintiff Manny Company ("Manny").

3. I first began working with Defendant Victor Miller ("Miller") professionally in or about 1976 on a series of motion picture projects.  In total, Miller and I worked together on five motion pictures over a five-year period.  The first motion picture on which we worked together, *Here Come the Tigers*, began with my idea to make a family film about a motley crew of kids on a baseball team similar to *Bad News Bears*.  This film was a non-union project, which means that it was made outside of the auspices of the Writers Guild of America, East. Inc. or Writers Guild of America, West, Inc. (collectively, the "WGA"), the entertainment industry labor union to which many professional screenwriters belong.  After I invited Miller to work on this non-union project we began to work hand in hand to develop ideas for the story line.  I produced *Here Come the Tigers* and Miller wrote the screenplay with regular input from me.  Miller, who informed me that he was a member of the WGA at the time, wrote *Here Come the Tigers* under a false name (Arch McCoy).

4. In 1978, in keeping with our prior method of working together, I once again asked Miller to join me on another film project—*Manny's Orphans*.  This time the initial idea for the

film came from another one of my team members, Steve Miner, who together with Miller and I developed the story for the film which focuses on a soccer team at an orphanage.  I hired Miller through my newly created company, Plaintiff Manny Company (defined above as "Manny"), which became a signatory to the 1977 WGA Theatrical and Television Basic Agreement (the "MBA"), the then-operative collective bargaining agreement governing WGA writers and signatory employers.  Attached hereto as Exhibit "A" is a true and correct copy of July 24, 1978 correspondence from the WGA confirming that Manny had become a guild signatory and would be employing WGA member Miller.

5.      Manny became a signatory employer to the MBA upon Miller's request.  Miller insisted the film be produced as a WGA film, so that Miller would receive the minimum employment terms and benefits conferred to him by the MBA, including guaranteed salary minimums, residuals, and contributions to the WGA's pension and health funds.

6.      Regardless of which entity I used to engage Miller, and regardless of which film we were working on, our method of working together remained the same: I or someone on my team other than Miller came up with the idea for the films, then Miller and I would meet at our respective houses, my home office, or a local diner, and would speak on the phone to discuss specific ideas for the films, Miller would submit drafts of his writings to me and I would make changes and modifications and mark up the drafts with handwritten comments and notes for Miller or discuss conceptual changes to the draft,  and Miller would take my notes and comments and make edits.  Our discussions would include, among other things, specific discussions regarding the film elements, plots, scenes, and characters.  Sometimes, we would hash out disagreements regarding the scenes and plots to jointly decide how it should proceed.  Neither *Here Come the Tigers* nor *Manny's Orphans*, both family friendly films, performed well at the box office.

7.      In the spring of 1979, after I realized that I would be unable to successfully sell *Manny's Orphans*, I began thinking about ideas for my next film.  Reflecting upon the surprising success of *Halloween*, I decided that I wanted to make a horror film.  Having already worked

with Miller on two previous films and by then considering Miller part of my filmmaking team, I

contacted Miller to see if he would be interested in working on my new horror film idea.  Miller

was very hesitant—he was not familiar with the horror genre, and had never worked on a horror

film.  I, on the other hand, had already produced the cult classic horror film *The Last House on

the Left*, Wes Craven's first film.  I told Miller to go see the film *Halloween* to learn about the

horror genre and, at my request, he went to see *Halloween*.

8.      Although Miller was hesitant to work on my horror film project, I assured Miller

that I would teach him about the horror genre and guide him through the writing process.  I

started by tutoring Miller on key elements of successful horror films, such as, for example,

making each killing personal to the victim, killing off an important character early in the film

when the audience least suspects it and to communicate that all characters are "fair game," and

keeping the killer masked, i.e., not allowing the killer to appear as an ordinary and relatable

human being.

9.      After these initial discussions and based on my assurances of support and

guidance, in the late spring of 1979, Miller and I orally agreed that Miller would write the

screenplay for my horror film project, and that, like *Manny's Orphans*, it would be done under

the auspices of the WGA.  We then began discussing ideas for the Film.

10.      After Miller agreed that he was on board to work on my horror film, our first task

was coming up with the venue for the film to take place.  Miller and I met several times a week,

at each other's houses and in my home office to discuss ideas and locations for the film.  Miller

submitted various location ideas to me, which I rejected.  Eventually Miller suggested the idea of

setting the film in a summer camp before it opens.  We both agreed that this should be the venue

for the film.

11.      Around this same time, I began pondering potential titles for the film.  While

working on *Manny's Orphans*, I had come up with the title idea "Friday the 13th."  Although not

a good fit for *Manny's Orphans*, I held on to the idea.  When we started developing ideas for my

horror film (which became *Friday the 13th* (the "Film"), I told Miller that I thought "Friday the

13th" would be a great title.  However, as I also explained to Miller, I was not sure if the title would be available to use, so we also considered other title ideas.

12.     After settling on the summer camp location and prior to June 1979, I began talking to potential financiers about the project.  One investor I spoke with about the Film was, Phil Scuderi ("Scuderi"), principal of Georgetown Productions, Inc. ("Georgetown"), predecessor-in-interest to Plaintiff Horror, Inc. ("Horror").  Scuderi previously financed *The Last House on the Left* and *Here Come the Tigers* with me.  At this preliminary stage, I described the Film idea as "Ten Little Indians" at a summer camp.  Scuderi responded that he liked the idea, although financing was not yet discussed.  Other investors with whom I spoke at the time also reacted favorably and expressed support for the Film.

13.     Miller had a bad experience with Scuderi on *Manny's Orphans*.  Scuderi insisted on inserting a scene that used "bathroom humor."  Miller hated the idea, but since Scuderi was financing the film, Miller was forced to accept the insertion of the scene.  Notwithstanding Miller's prior bad experience with Scuderi, I told Miller that Scuderi was one of the potential financiers who was interested in the Film.

14.     On or before June 4, 1979, Miller and I, on behalf of Manny, reduced our oral agreement to writing by executing a Writer's Flat Deal Contract, pursuant to which Manny "**employ**[ed]" Miller to "write a complete and finished screenplay for a proposed motion picture . . . presently entitled or designated **Friday 13**" (the "Employment Agreement") (emphasis added).  The Employment Agreement specifically states, in boldface type, that it is an "EMPLOYMENT AGREEMENT" between Manny and Miller.  A true and correct copy of the Employment Agreement is attached hereto as Exhibit "B."

15.     Notably, Miller requested that the Employment Agreement be entered pursuant to, and be governed by, the MBA, so that he would receive the employee benefits provided for in the MBA, which included a guaranteed minimum salary, payment of residuals, sequel payments, and pension, health, and welfare benefits.

16.     Although I had not yet secured financing for the Film at the time I entered into the written Employment Agreement with Miller, I knew I was contractually committed to pay Miller the nearly $10,000 due to him thereunder, irrespective of whether I ultimately secured financing for the Film.  In fact, I made a partial payment to Miller at the time we both signed the Employment Agreement.

17.     The Employment Agreement was the standard WGA short form complete screenplay agreement issued by the WGA at the time, and provided that it was to be governed by the provisions of the MBA.  I did not draft the Employment Agreement from scratch.  Rather, I used the standard WGA form and filled in information regarding the Film and Manny's engagement of Miller.

18.     The Employment Agreement had a separate section by which Miller and I were required to designate any pre-existing materials on which the screenplay was based ("based upon (describe form of material & title) _____ written by _____").  I left this section blank because no treatment or screenplay existed prior to the date the Employment Agreement was entered.

19.     At the beginning of June 1979, I also devised a plan to test whether my desired title, "Friday the 13th", was available.  I thought that if I announced the Film in Daily Variety, then if anyone claimed rights in the title, I would surely receive a complaint.  In early June 1979, I used approximately $3,000 of my own funds to pay for a full-page ad in Daily Variety announcing the Film, which was scheduled to run on the 4th of July, 1979.

20.     Meanwhile, after entering into the Employment Agreement, in early June 1979, Miller and I began vigorously developing the screenplay for the Film (the "Screenplay").  Miller's first step in the process was to prepare a treatment for the Screenplay, so that I would have material to show potential investors, including Georgetown's Scuderi, who had already expressed interest in the Film.  Based on my meetings and discussions with Miller regarding the agreed-upon setting, scenes, story arc, plots and characters for the Film, and based on my tutorials and guidance about how to present the killer, depicting the actual killing on a personal level (such as garroting, not just being shot by a gun), and killing off an important character early

in the Film, Miller prepared the first draft of the treatment of the Film (the "Treatment").   Miller never placed a copyright notice on the first draft Treatment, nor, to my knowledge, did he ever attempt to register the first draft Treatment with either the WGA or the United States Copyright Office.  A true and correct copy of the first draft Treatment is attached hereto as Exhibit "C."

21.     Knowing that Scuderi was already interested in the Film and was a potential financier and that he would be reviewing the Treatment, Miller included a note in the first draft Treatment, "Hi Phil," directed to Scuderi.   This note to Scuderi appears in the Treatment at a point of a scene involving "bathroom humor," similar to Miller and Scuderi's heated disagreement over the "bathroom humor" scene Scuderi insisted on including in the *Manny's Orphan's* screenplay.  Without consulting with me, Miller titled the first draft Treatment "The Long Night At Camp Blood." At the time, neither Miller nor I knew whether we would be able to use the "Friday the 13th" title that I wanted to use.

22.     When I received the first draft Treatment from Miller, it was not polished enough to show to potential financiers.  Therefore, I revised and restructured the draft Treatment on my own, and made several creative changes in a second draft Treatment, which ultimately were included in the early drafts of the Screenplay and the Film.  I placed a title page on the second draft Treatment, which changed the title of the Treatment to "Friday 13"—the same project name as listed in the Employment Agreement, and I also included a copyright designation: "© Sean S. Cunningham Films, Ltd.", the general partner of Manny.  In addition to circulating the second draft Treatment to potential investors, I gave the revised second draft Treatment, including the cover page, to Miller.  At no time did Miller ever object to, or complain, about the copyright notice in the name of SSCF.  A true and correct copy of the second draft Treatment is attached hereto as Exhibit "D."

23.     My Daily Variety ad ran on July 4, 1979, as planned.  The ad read, in pertinent part, "*Friday the 13th*, The Most Terrifying Film Ever Made! Available December 1979."  A true and correct copy of the ad is attached hereto as Exhibit 'E.'  Immediately after the ad ran, I began receiving calls from distributors who were interested in distributing the film based solely

on the title.  To my surprise, I did not receive any complaints about the title, indicating to me that I was free and clear to use my desired title.

24.     One of the people who responded to my Daily Variety ad was Scuderi, who had already expressed interest in the Film.  Scuderi offered to finance 25% of the $500,000 budget, even though at that time I did not yet have a completed draft of the Screenplay.

25.     In response, Miller and I continued to vigorously develop the Screenplay.  We met at each other's houses, and in my home office, to develop scenes and discuss ideas for the Screenplay.  Throughout the entire process, we discussed scenes, plots, characters and story lines, and I retained control over what went into, or stayed out of, the Screenplay and, ultimately, the Film.  Changes made by me which appear in the second draft Treatment also appear in Miller's first draft of the Screenplay.  The copy of the first draft Screenplay produced by Miller is missing the title page.  A true and correct copy of the first draft Screenplay, which was produced by Miler in this action, is attached hereto as Exhibit "F."

26.     During this iterative process, Miller physically wrote the Screenplay.  Miller used my assistant, copy machine and office facilities during the course of his work in preparing the Screenplay.  In fact, the entire second draft of the Screenplay was typed by my assistant.  Like the second draft of the Treatment, the second draft of the Screenplay, entitled "Friday 13," also contained a copyright notice in the name of SSCF.  Again, Miller never once complained to me about the copyright notice or claimed that it was incorrect.  A true and correct copy of the second draft Screenplay is attached hereto as Exhibit "G."

27.     Once I had a first draft of the Screenplay (which was an early draft and still a work in progress), in or about late July 1979, I submitted it to Scuderi.  After reviewing the early draft of the Screenplay, Scuderi, on behalf of Georgetown, offered to finance the entire $500,000 budget for the Film, on the condition that Georgetown would have complete control over the Screenplay and the Film.  Reluctantly, I agreed.  Despite Miller's prior disagreement with Scuderi and my concern about timely payments from Scuderi, I felt I needed to accept the offer

to keep my team, including Miller, together.  Thereafter, the Film officially began pre-production in mid-August 1979, and principal photography began in or about September 1979.

28.     Beginning in mid-August 1979 and throughout the pre-production and production process, Scuderi, on behalf of Georgetown, provided extensive notes, mark-ups and ideas which were incorporated into the final shooting script and Film itself—some of which never appeared in any drafts of the Screenplay written by Miller prior to the beginning of principal photography.

29.     In what has become the quintessential closing scene of the Film, the character "Jason"—who, in Miller's Treatment and Screenplay, died as a young boy and never appears in any of Miller's drafts— emerges from the depths of the lake as a disfigured child, and reaches out of the water to pull one of the main protagonists into the lake.   Miller told me that he was vehemently opposed to the idea of Jason coming back to life at all, much less as a macabre mongoloid child, because the whole point of his script was that Jason's mother killed the camp counselors as vengeance for her son's death.  I was not fond of the idea either, and was not sure how we could make it work.  At Georgetown's insistence, the scene was written and incorporated into the Film, and gave birth to the character Jason as an immortal adult killer who returned from the dead, and to numerous sequels in the franchise.  Notably, Jason, as the murderous adult villain wearing a white hockey mask, did not first appear until *Friday the 13*[th], *Part III*, long after Miller's involvement in the franchise ended, and during a time in which I was not involved in the franchise.

30.     Pursuant to an agreement dated as of May 7, 1980, Manny sold to Georgetown all of its right, title, and interest (including all of its obligations under the Employment Agreement) in and to the Screenplay (the "Rights Agreement"), including, without limitation, its copyright in the Screenplay.  Among other things, the Rights Agreement specifically states that Miller wrote the Screenplay "as author for The Manny Company" and provides that Georgetown may copyright the Screenplay in its own name.  A true and correct copy of the Rights Agreement is attached hereto as Exhibit "H."