31.     The Film was released on or about May 9, 1980, and was an immediate hit, enjoying unprecedented box office success for a horror film.

32.     Under the terms of the Employment Agreement and MBA, Manny was obligated to pay all amounts due and owing to Miller by it.  In fact, in or about August 1980, when the first sequel to the Film was announced, a dispute arose regarding payments due to Miller pursuant to the MBA.  At Miller's request and on his behalf, the WGA pursued Manny for payments due to Miller under the MBA.  Pursuant to Manny's agreement with Georgetown, I believed that Georgetown was the party obligated to make the required payments to Miller.  Therefore, I initiated litigation against Georgetown to require Georgetown to make these payments to Miller. The matter was eventually settled by all parties and all sums due to Miller under the MBA were paid in full by Horror, Inc., Georgetown's successor-in-interest.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 8th day of June, 2017, at Los Angeles, California.

_____
Sean S. Cunningham

A-97

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2017, a true and correct copy of the foregoing

DECLARATION OF SEAN S. CUNNINGHAM IN SUPPORT OF PLAINTIFFS' MOTION

FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF PLAINTIFFS' COMPLAINT

AND COUNT I OF DEFENDANT'S COUNTERCLAIM was filed electronically.  Notice of

this filing will be sent to those who are currently on the list to receive e-mail notices by operation

of the Court's electronic filing system. Parties may access this filing through the Court's system.


By: _Bonnie Eskenazi_

EDMUND J. FERDINAND, III (ct21287)
jferdinand@24iplg.com
ALEXANDER R. MALBIN (ct29419)
amalbin@24iplg.com
JESSICA S. RUTHERFORD (ct27273)
jrutherford@24iplg.com
129 Post Road East
Westport, Connecticut 06880
Telephone: 203.557.4224
Fax: 203.905.6747

BONNIE E. ESKENAZI (SBN 119401)
BEskenazi@GreenbergGlusker.com
JULIA R. HAYE (SBN 198138)
JHaye@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590
Telephone:  310.553.3610
Fax:  310.553.0687
(Admission *Pro Hac Vice*)

*Attorneys for Plaintiffs,*
*Horror, Inc. and Manny Company*

08226-00016/2806413.2

A-98

WRITERS GUILD OF AMERICA, EAST, INC.

#268

RECD. SIG. ADMIN.

NOV 13 1978

W A, W.

DATE: JULY 24, 1978

TO:   ELENA THURSTON, WGA/WEST

FROM:  AMY NADLER, WGA/EAST

RE:   NEW SIGNATORY: 1977 WGA THEATRICAL AND TELEVISION BASIC AGREEMENT

LTR/ADH. DATED:  JULY 6, 1978

DATE RECEIVED BY WGA/E:   JULY 24, 1978

COMPANY:  THE MANNY COMPANY (A CONNECTICUT LIMITED PARTNERSHIP)
          155 LONG LOTS RD.
          WESTPORT, CONNECTICUT  06880
          203-259-7848
          ATTENTION MR. STEVE MINER, PRODUCER

DOCUMENT EXECUTED BY:  STEVE MINER, PRODUCER

ADDITIONAL INFO.:   PARTNERS: SEAN S. CUNNINGHAM
                              SEAN S. CUNNINGHAM FILMS, LTD.
    ATTORNEY: MICHAEL LYNNE, ESQ.
              SCHLANGER BLUMENTHAL AND LYNNE
              488 MADISON AVE.
              NEW YORK, NY
              758-0190

BUSINESS MANAGER: VINCENT ANDREWS MANAGEMENT CORP.
                  488 MADISON AVE.
                  NEW YORK, NY
                  759-1780

PROJECT:  FEATURE FILM ENTITLED "MANNY'S ORPHANS"

WRITER:  WGA/EAST MEMBER VICTOR MILLER

ENTERED COMPUTER
AC 02 E

WGA/EAST SIGNATORY #303
Copies distrib. by WGA/W:
Membership    ...................
Circulation   ...................
Company file  ...................
WGA/East Sig. file ...................
Blue Book     ...................

CC:   MRS. HEATHER ANDES, WGA-INDUSTRY HEALTH FUND
      MR. ANDREW B. MACDONALD, PRODUCER-WGA PENSION PLAN

EXHIBIT
8
MILLER J

WGAE000006

WRITER'S FLAT DEAL CONTRACT

(Short Form; complete screenplay, no options)

EMPLOYMENT AGREEMENT between The Manny Company

(hereinafter sometimes referred to as "Company") and Victor Miller

_____ (hereinafter sometimes referred to as "Writer"),

dated this _____ day of _____, 19____.

    1. The Company employs the Writer to write a complete and finished

screenplay for a proposed motion picture to be budgeted at $under $1 million ,

and presently entitled or designated Friday 13

and including the following:

- ◯ Treatment
- ◯ Original Treatment
- ◯ Story
- (x) First draft screenplay
- (x) Final draft screenplay
- ◯ Rewrite of screenplay

based upon (describe form of material & title)_____

_____

written by_____

    2. (a) The Writer represents that (s)he is a member in good standing of the Writers Guild of America, (West or East), Inc., and warrants that (s)he will maintain his/her membership in the Writers Guild of America, (West or East), Inc., in good standing during the term of this employment.

    (b) The Company warrants it is a party to the WGA 1977 Theatrical and Television Basic Agreement (which agreement is herein designated MBA).

    (c) Should any of the terms hereof be less advantageous to the Writer than the minimums provided in said MBA, then the terms of the MBA shall supersede such terms hereof; and in the event this Agreement shall fail to provide for the Writer the benefits which are provided by the MBA, then such benefits for the Writer provided by the terms of the MBA are deemed incorporated herein. Without limiting the generality of the foregoing, it is agreed that screen credits for authorship shall be determined pursuant to the provisions of Schedule A of the MBA in accordance with its terms at the time of such determination.

    3. The Company will pay to the Writer as full compensation for his

services hereunder the sum of Nine thousand two hundred eighty-two   DOLLARS

($ 9,282   ), payable as follows:

(3/77)

RECEIVED JUN - 6 1979 (Continued)

EXHIBIT
9
MILLER
PENGAD 800-631-6989

EXHIBIT B

WGAE000004

(2)

(a) Not less than _____ DOLLARS ($ _____)
shall be paid not later than the first regular weekly pay day of the Company
following the expiration of the first week of the Writer's employment.

(b) _____ DOLLARS ($ _____)
shall be paid within forty-eight (48) hours after delivery of the TREATMENT,
ORIGINAL TREATMENT or STORY, whichever is appropriate, to the Company.

(c) Five thousand five hundred sixty-nine DOLLARS ($ 5,569 )
shall be paid within forty-eight (48) hours after delivery of the FIRST DRAFT
SCREENPLAY to the Company; and

(d) Three thousand seven hundred and thirteen DOLLARS ($ 3,713 )
shall be paid within forty-eight (48) hours after delivery of the FINAL DRAFT
SCREENPLAY.

(e) _____ DOLLARS ($ _____)
shall be paid within forty-eight (48) hours after delivery of the REWRITE.

4. The Writer will immediately on the execution hereof diligently
proceed to render services hereunder and will so continue until such services
are completed.

5. On delivery of a treatment to the Company, the Company may call for
changes within three (3) days thereafter; if the Company fails in writing to
call for any such changes, the treatment shall be deemed approved, and the Writer
shall proceed with the first draft screenplay based on such treatment or
adaptation.

On delivery of a first draft screenplay to the Company, the Company
may call for changes within three (3) days thereafter; if the company fails in
writing to call for any such changes, the first draft screenplay shall be deemed
approved, and the Writer shall proceed with the final draft screenplay.

On delivery of the final draft screenplay to the Company, the Company
may call for changes within three (3) days thereafter; if the Company fails in
writing to call for any such changes, the final draft screenplay shall be deemed
approved.

6. This contract is entire, that is, the services contemplated hereunder
include all of the writing necessary to complete the final screenplay above
described, and this Agreement contemplates payment of the entire agreed upon
compensation.

(Writer)

Address 726 Broad St.

Stratford, Conn. 06497

The Manny Company
(Company)

By _____

(Sean S. Cunningham)
Title General Partner

Address 155 Long Lots Road

Westport, Connecticut 06880

(3/77)

WGAE000005

**EXHIBIT B** 12

EXHIBIT

tabbier  1 5

# F R I D A Y  1 3

A Screenplay Treatment

By

Victor Miller

©Copyright 1979
Sean S. Cunningham Films, Ltd.
All Rights Reserved

Property of:
Sean S. Cunningham Films, Ltd.
155 Long Lots Road
Westport, CT 06880
Telephone:  203 255 0666
Telex:  New York City 148 411
          Answerback VASBL

f a d e  i n

FLASHBACK:

A sign...CAMP CRYSTAL LAKE

Hotpress Letters:

JULY 4, 1958

We hear the Everly Brothers' latest hit, "Wake Up Little Susie"...CAMPERS come and go, eagerly dragging their parents from activity area to activity area.  The camp is filled with joyous reunions on this parents' day.  There are swim meets, riflery demonstrations, awards presentations...

THE CAMERA MOVES like an observer, taking it all in...

Slowly we are drawn down a side path...it is overgrown...private...a little forbidding.

FOREBODING MUSIC pulsates on the TRACK...we hear a rustling in the leaves...heavy breathing...we see that it is just two CAMPERS, making their first furtive scramblings at making out...

CONFIDENTIAL EXHIBIT D

PLAINTIFFS002301

FRIDAY 13, Page 2

THE CAMERA is a full-fledged voyeur as this
early-developed 15-year-old GIRL kisses with
girlish abandon.  The BOY is handsome, just be-
ginning to learn confidence...Both know that
they will be sent home if they're caught.
THE MUSIC builds in intensity.  THE CAMERA MOVES
CLOSER, stalks the young lovers.  The GIRL takes
the BOY'S hand from under her t-shirt.  "I thought
I heard something," she says.  The BOY tries again.
THE CAMERA is a relentless stalker...closer and
closer...

In a passionate embrace, the GIRL looks up and sees
what will be the last sight she will ever see: a
hatchet flashes into view and splashes between
the GIRL'S eyes... The BOY struggles for his life...
He fights the CAMERA, awash in his girlfriend's
lifeblood.  A hunting knife falls to the forest
floor.  The BOY picks it up and slashes at the
hand that is trying to strangle him.  The index
finger of the unseen assailant is lopped from its
hand, landing on a bed of moss...The BOY drops the
knife...Is struck dead, his skull crushed, by a
heavy stone.  A bloody hand reaches into FRAME
and snatches up the severed finger.  The ATTACKER
runs away...

CONFIDENTIAL EXHIBIT D

PLAINTIFFS002302

31

FRIDAY 13, Page 3

QUICK CUT TO: a young attractive COUNSELLOR,
searching for the missing campers, stands at the
edge of the death-site and shrieks with terror.
The MUSIC has stopped abruptly.
The SCREEN BLEEDS TO WHITE
It is completely quiet.

THE PRESENT: ESTABLISHING THE HORROR

FADE IN: a wooded country road.
HOTPRESS TITLE:

PRESENT

In the BG a filling station on its last legs...
A mangey dog waddles out to sniff a young hitch-
hiker who makes her solitary way along this road.
She adjusts her backpack, pats the friendly dog.
This is ANNIE, 19, immature, but very eager to
please. She is cute, talkative. She thumbs a ride
in an open Jeep...Throughout the following sequence
the CAMERA remains in the driver's POV. We do not
see the nice person who has picked up ANNIE. ANNIE
is elated. She talks away and the driver need do
nothing more than shrug...ANNIE says she is going
to be a counsellor at Camp Crystal Lake and ,"boy
am I ever excited about it." The new owner of the

PLAINTIFFS002303

FRIDAY 13, Page 4

camp has written to hire her after she answered
an ad in a campus paper. She wants to work with
children.

The Jeep roars past Camp Crystal Lake...
ANNIE turns to the DRIVER: "Didn't we just pass
the camp?"....ANNIE looks frightened. The DRIVER
remains silent..."Please stop!"...The Jeep goes
faster down the dirt road. "Please!"

ANNIE vainly grabs for the keys to stop the car,
but the DRIVER's hand slaps her away.

IN A FLASH: we see the hand! It is missing its
index finger...

Panicked, without any other recourse, ANNIE jumps
from the moving Jeep, aiming for the underbrush
alongside the road. She rolls, is upended, and
lands awkwardly. She starts running, but the brush
is so thick.

The Jeep has stopped...The assailant advances re-
lentlessly...ANNIE is pursued.  Her screams cannot
be heard by anyone.  She turns to beg for mercy
and her throat is slashed!


COUNTERPOINT: ESTABLISHING CAMP CRYSTAL/BLOOD

A gaily decorated VW camper (six years old) lumbers
past the gas station we saw earlier. In it are
three 20-year-olds who look healthy, full of fun,
fresh and expectant. The driver/owner of the van

FRIDAY 13, Page 5

is NED; a joker and a know-it-all who fancies him-
self a ladies man. His best pal is JACK, a real
ladies man and a jock. JACK is handsome, a basket-
ball player, and supremely confident. Next to him
sits MARCIE, the original party girl. She is up
for any kind of fun, with an accent on the kinds
of fun you're not supposed to have. She is very
pretty in a flashy way.

They chatter expectantly about their new jobs as
counsellors at Camp Crystal Lake. JACK will run
the athletic program, MARCIE will handle water-
safety, and NED will run the rifle range. They
will also take care of other areas: maintainance,
cabin-monitoring, etc. NED hopes the other female
counsellors will be up to his standards. "They
better be gorgeous and they better put out!"

...The van swings wide and makes its turn down
the dirt road which is bordered by the sign:


                    CAMP CRYSTAL LAKE
                    ─────────────────▶


The camper van bumps and jolts its way into the
center of the camp compound where we see a Jeep
parked near the main administration building. The
Jeep could be the one which stopped for ANNIE...

FRIDAY 13, Page 6

A strong, physical, and charming man in his
forties comes out to greet the new arrivals.
He is a real go-getter, the new owner and supervisor
of the camp. He is STEVE CHRISTY. He is accompanied
by the three other counsellors who have arrived.
STEVE performs the introductions and we meet:
BRENDA, a slightly bored, slightly above-it-all
girl who is stunningly beautiful. She will handle
the archery program. BILL is a good-looking, shy
young man who will run the canoeing and sailing
activities.
But the CAMERA LINGERS longest on ALICE, a quiet
girl who is softly beautiful, haunting in an ether-
eal way with a smile that can melt most men. NED
looks at BRENDA with a wink, but he is equally
pleased that ALICE is part of the staff. This
could be quite the summer.

LATER:

In the camp council room, part of the administration
building, MR. CHRISTY is finishing up his talk about
how he intends to make Crystal Lake into one of the
best camps on the East Coast. He gives them all
their various assignments, mentioning that the State
camp safety inspectors will be arriving in the morning
at 8:30. Alot of work must be done to be ready.
Dismissing Annie as late and probably irresponsible,
STEVE sets about showing the new counsellors the

FRIDAY 13, Page 7

idiosyncracies of the camp: the tool shed, equip
ment shed...power generator...

And then he tells the new employees that he must
go to the county seat to take care of some paper-
work, pick up last-minute supplies, and so forth.
He'll be back at midnight and, if they're still
awake, they'll properly celebrate the new beginning
of Camp Crystal Lake.

Before STEVE drives away in his Jeep, NED brings
up a tender subject; he'd heard some strange
rumors about the place.BRENDA nods. "My uncle
asked me if I was going to work at Camp Blood,"
she says.

"The past is past," CHRISTY replies. He then un-
folds the tale of terror from 1958. His parents
had owned the place then. The brutal murder of
the two campers had been unsolved, and the effect
was devastating: his folks went bankrupt and the
camp was sold at auction. CHRISTY was 18 at the
time and he vowed he would buy it back, fix it up,
and re-dedicate it to the memory of his parents.

As STEVE drives off, the kids get acquainted.
NED and MARCIE are supremely happy that they are
without adults and can have a ball on their first
day there.

FRIDAY 13, Page 8

BRENDA checks out her archery shack and the
targets and the archery range. As she turns from
one target, an arrow streaks into the gold!
She whips around, furious, to see NED standing
there laughing, a bow in his hands. "You do
something dumb like that again, and I'll tack
your hide on the wall to dry!" she yells.
BILL checks out his canoes....JACK takes a look
in the camping equipment shed and inventories
the knives, the axes, and the Coleman lanterns.
...MARCIE checks out the diving board, the floats,
the lifesaving gear...
Inside the arts and crafts building ALICE is dusting
and cleaning and sweeping and moving her supplies
to where she wants them for her work. Slowly, we
become aware that she is being watched...something
or someone is at a far window...
Suddenly the door to the room flings back against
the wall with a bang as loud as a pistol shot.
ALICE turns with a violent start...BILL stands in
the gloom. He apologizes. ALICE, still a bit spooked,
laughs. They flirt a little bit, becoming more com-
fortable with one another and the possibility of
a nice summer romance...or more. The quiet warmth
of this moment is ripped apart by five shots as
we QUICK CUT to see NED firing rapid fire into
a target at the rifle range.

CONFIDENTIAL EXHIBIT D

FRIDAY 13, Page 9

THE IDYLLS OF YOUTH:

Later, the new counsellors trek down to the shore
for a cool swim in the lake. The Sun is high in
the sky and MARCIE skins out of her clothes, pre-
ferring to swim in the nude. NED & JACK join her,
while BILL & ALICE prefer to leave their suits on.

DANGER WATCHES:

As the kids swim, BRENDA joining them in the
skinny-dipping, the CAMERA lurks at the edge of
the forest, watching....the sense of danger is
heightened...we want these young people to get
in their camper and run.
As they swim, the watcher goes to the camp and
rummages through the new people's gear. In
ALICE's cabin, the watcher opens her knapsack.
Before we know what is happening, the watcher
places a live snake in the pack and steps back
quickly...the watcher goes to the camp kitchen,
does something in the larder which we cannot see...
Heads for the power generator...
The kids end their swimming, but ALICE prefers to
stay on the beach, working on her tan, as the others
go up to the cabins. She lies alone. We sense she
is being watched. The sun moves through the sky
and suddenly a shadow falls on her face. She
wakes with a start.

CONFIDENTIAL EXHIBIT D
PLAINTIFFS002309

A-111

FRIDAY 13, Page 10

It is only NED, saying she has overslept. ALICE thanks him and says she must go unpack her knapsack and get ready for supper.

...ALICE steps out of the shower, wearing her towel as a sarong, and hurries across the campground to her cabin....her pack sits upon her bed, unopened. ALICE comes in, combs her beautiful hair. Picks up the bag. Puts it on the dresser, starts to open it. Stops. Takes off her towel, then flips open the bag and the snake leaps out to strike and misses her. ALICE screams, pinned back against a wall as the snake coils upon her bed to strike again! The others come running and JACK kills the snake on her bed with a shovel he picked up outside.

BRENDA and MARCIE try to comfort ALICE. "Let's go cook some supper and smoke some grass," says MARCIE. "I'm bushed and I'm hyper after that snake thing decided to wander into your pack."

THE NIGHT BEGINS AT CAMP BLOOD/CRYSTAL

They fix dinner and later, as dusk drops into night, BILL & JACK go to start the generator for electric lights.

Once in the shed, JACK goes about the process of starting the gas-fired engine. However, as soon as the engine catches fire, a giant electric arc

A-112

FRIDAY 13, Page 11

races through JACK'S body, grounding him, send-
ing several hundred volts through him, locking
him in place. BILL throws a commando-type body
block on him which severs the connection and saves
JACK'S life. "Thanks," says the still-dazed JACK.
"I figured I had to save you," BILL says, "be-
cause the last thing I wanted to do tonight was
give you mouth-to-mouth resuscitation." BILL looks
at the generator. It's a total loss and then he
sees a puddle on the ground where JACK stood.
"That's as good a ground as any," he says. "It
wasn't here this morning," JACK replies. They
figure it's probably an underground well...They
trudge off...
JACK opens up the supply shed and he grabs four
Coleman lanterns; he hands two to BILL. We see
what the two boys don't see: four camp axes are
missing from their rack.

THE SPRING WINDS TIGHTER: FALSE ALARMS

The boys return and start lighting the lanterns
as ALICE reaches into her dishwater and lets out
a scream. She's only cut herself on a broken piece
of glassware...Just jumpy...BRENDA reaches up high
in the larder and a whole clatter of cans falls down,
making a tremendous noise..."That Steve really isn't

FRIDAY 13, Page 12

much for neatness," MARCIE says.

NED dips a chip into the California dip which
MARCIE made from food in the larder. He nibbles
the onions and sour cream and gags immediately,
falling to the floor, clutching his throat and
thrashing. He turns dark red...The others huddle
round in panic.

NED smiles and does a big finish! He was just
having fun...the practical joker..."I don't think
I can handle a whole summer of your bullshit,"
says BRENDA.

IT BEGINS NOW:

"Where are the fucking knives?" says BRENDA. "How
are we supposed to make supper without knives?"
"I'll get some sheath-knives from the supply shed,"
NED says, hoping to make up for his sins. He
leaves.

Thunder rolls in the distant mountains...
JACK & MARCIE aren't all that hungry. They go for
a walk, holding hands. Once outside, they walk to
the edge of the lake...kiss...hold...lightning
flashes and they run for the nearest cabin. On
the way they grab a lantern, run into the cabin,
and make love on the bottom bunk...The lantern
throws strange shadows on the walls....THE CAMERA
PANS upwards from the lovers' faces. There is a
brownish stain on the bottom of the mattress on

CONFIDENTIAL EXHIBIT D

41

PLAINTIFFS002312

FRIDAY 13, Page 13

the upper bunk.

THE FIRST ONE IS DEAD:

In a flash of lightning we see NED, his throat
slashed, lying on the bunk above the lovers!

THE SECOND SHALL DIE:

MARCIE has to go to the privy. JACK lights a joint.
She gives him a jaunty peck on the cheek and leaves
him lying on his back, smoking the joint...MUSIC
SWELLS...He smiles...the brown stain grows slightly
larger...JACK looks curious.Did the stain grow?
Suddenly a hand snaps around from under the bed,
clamps JACK'S forehead to the mattress and an
arrow pops up surprisingly through JACK's throat!
The killer has been under the bed!...It is the
hand with the missing finger...

SO SHALL THE THIRD:

MARCIE enters the outdoor privy...It is a four-holer,
with more space than average, and some mirrors on
the wall. MARCIE stops for a moment to admire her-
self...Smiles...fixes her hair...the MUSIC SWELLS...
She is being stalked...she will be next if she
doesn't get out of there now! She is unaware...
She goes into one of the stalls...we see her feet,
then see her reading the graffiti...A SOUND? She
listens..."Is that you, Jack?" The SOUND comes back.

FRIDAY 13, Page 14

"Jack, stop fooling around!" Just as she starts
to open the stall door, it is slammed open and
she is killed by an axeblow directly to her
screaming mouth---as thunder snaps.

THE SPRING IS WOUND TIGHTER AND TIGHTER:

Ignorant of all that has happened, BILL, BRENDA
and ALICE sit around the supper table. They
think NED is probably working up a joke and that
JACK & MARCIE are probably making love, so they
start to eat without them. The storm grows outside.

BRENDA finishes quickly and says she's tired.
She will go to her cabin and write a letter, then
sack out. She says good night and leaves as BILL
& ALICE clean up...

BRENDA MUST GO:

We follow her out of the main cabin into the
night with her flashlight. The first few drops
of rain pelt her. She is being watched. She starts
to run through the rain. Stops, turns, loses her
bearings....She is frightened...The light from
the main cabin should be over there, but it isn't...
The lightning illuminates a figure, moving towards
her...BRENDA races through the briars, weeds,
underbrush...It pursues her...In the flashes of

CONFIDENTIAL EXHIBIT D

FRIDAY 13, Page 15

lightning we see bits and pieces of the killer,
but never enough to know the total horror...

AND TIGHTER UNTIL IT SHATTERS:

Back in the main cabin BILL & ALICE get closer
together. He makes a few advances and they begin
some harmless petting.
Outside the figure of the watcher drags something
along in the rain...
BILL confesses he is really exhausted. ALICE
encourages him to nap on her lap until MR. CHRISTY
returns. He doezes off. When he's asleep, ALICE
Gets up to make a perimeter check of the building.
She pumps up the Colemans...closes a window that
is open...She doesn't notice that some of the
rain has been tracked in...footsteps. ALICE is
satisfied that all is well. She goes back to the
couch and BILL is gone...."Bill?" He is nowhere
in sight..."Must have gone to his cabin for some-
thing. She decides to make some cocoa for both
of them...She opens the larder and there, an arrow
through both eyes, is BILL, skewered horribly to
the door...
ALICE bolts in sheer and utter panic! She must
get help! Get the others! "JACK! MARCIE! HELP!
BRENDA!" She runs from the main cabin, through
the rain. She stops when she sees a lantern in one
of the cabins!

CONFIDENTIAL EXHIBIT D

FRIDAY 13, Page 16

ALICE runs for the cabin, throws open the door
and sees a girsly tableau: JACK, NED, and MARCIE
are arranged in a ghastly dumb-show of sexual
activity---dead....

ALICE runs away, runs for the camper van. Gets
in. Tries to start it...It won't start...She
runs back to the main cabin, terrified. She must
be where there is light. She goes in and races
across to close all the windows. As she reaches
for the last one, the dead, wet, mutilated body
of BRENDA is tossed at her like a frightful jack-
in-the box!...Run, ALICE, run! She screams through
the building, aiming for the front door...
She screams! Runs right into a thing at the door!

THE TENSION BACKS OFF:

It is a woman wearing a slicker. A nice-looking
woman in her fifties. The kind of woman you'd want
to meet at a bridge party...."There there now, my
dear," says MRS. VOORHEES who takes her to the
couch to calm her down. MRS. VOORHEES lives in
the area, saw the lights, and heard the commotion...
"So many dead..." ALICE says over and over...
"That's why they call it Camp Blood," Mrs. VOORHEES
says. "I lost my own son here many years ago...
Drowned in a foolish canoeing accident..There
wasn't adequate supervision...the counsellors were
more interested in committing sinful acts...And

FRIDAY 13, Page 17

the very next year those two children were killed."
ALICE calms down and, as MRS. VOORHEES strokes
ALICE'S soft hair, we notice that MRS. VOORHEES
is missing her index finger...
"I'll be glad when Mr. Christy gets back," ALICE
moans...

AND SNAPS APART:

MRS. VOORHEES slips a hunting knife from her
slicker. "He won't be coming back," she says.
"I killed him a long time ago..."
ALICE sees at the last possible moment that
MRS. VOORHEES is about to stab her...runs...
stumbles...falls... The older woman is strong...
pursues her with the relentless determination of
a mad woman...ALICE runs out into the storm,
runs into something---it's the hanging body of
MR. CHRISTY---hanging from a tree...Races through
the mud...slides...grabs the shovel that Jack
had used on the snake and swings it at her pursuer.
MRS. VOORHEES goes down. ALICE shrieks and slumps
down as MRS. VOORHEES clears her head and again
pursues her victim...again and again they close
for combat...MRS. VOORHEES cannot be stopped...
and they wheel, roll in the mud and the lightning
cracks a tree...it is suddenly silent...

CONFIDENTIAL EXHIBIT D

PLAINTIFFS002317

FRIDAY 13, Page 18

IT IS ALL OVER:

It is daylight as a State vehicle drives along
the road to Camp Crystal Lake. The two BUREAUCRATS
look perfect for their job. They turn in and
drive down the road and THEY JAM ON THEIR BRAKES!
Their tires slew around in the mud...
WE SEE WHAT THEY SEE:

All the pretty young dead bodies hang like awful
Easter eggs from the main tree by the flagpole
in front of the main cabin: ANNIE, MR. CHRISTY,
NED, JACK, MARCIE, BRENDA, BILL....They rock slowly...

They get out of their car and see that below the
tree is a figure of a woman with her back to us,
slowly rocking back and forth...She is humming
to herself...
"Miss?" says one of the BUREAUCRATS.
SHRIEK as ALICE, driven out of her mind, turns around
with the bloody head of MRS. VOORHEES in her lap!
A bird of prey screams in the sky and WE ROLL
CREDITS....

END

CONFIDENTIAL EXHIBIT D

PLAINTIFFS002318

KNOW ALL MEN BY THESE PRESENTS:

THAT, the undersigned THE MANNY COMPANY ("Assignor"), having an office at 155 Long Lots Road, Westport, Connecticut, for the sum of $25,000 paid to me simultaneously herewith by GEORGETOWN PRODUCTIONS, INC. ("Purchaser"), a Massachusetts corporation, having a place of business at 46 Church Street, City of Boston, State of Massachusetts, does hereby sell, assign and transfer to Purchaser, absolutely and forever, all the right, title and interest throughout the world in and to a certain screenplay written by Victor Miller, as author for Assignor pursuant to an agreement, a copy of which is annexed hereto as Exhibit A. (Said screenplay is hereinafter referred to as the "Screenplay").

1. <u>Enumeration of Rights</u>. Without limiting the generality of the above grant, Assignor hereby sells, assigns and transfers to the Purchaser, all the literary, dramatic, dramatico-musical, spoken stage, motion picture, radio and television, phonograph and commercial exploitation rights in the Screenplay, including the following rights exercisable for the Purchaser's sole benefit and in its sole discretion:

(a)  The right to make adaptations or versions of the Screenplay or any part thereof for any purpose whatsoever;

(b)  The right to produce, transmit, exhibit and exploit such adaptations and versions, or cause the same to be produced, transmitted, exhibited and exploited

by any means or devices whatsoever now or hereafter known;

    (c)   The right to use the Screenplay in whole or in part, to arrange and change the same, and add to or subtract therefrom;

    (d)   The right to use the title of the Screenplay in connection with any adaptation or version thereof, or in conjunction with other material not based on the Screenplay; and the right to use the Screenplay with a different title;

    (e)   The right to translate the Screenplay and any adaptations and version thereof into any and all languages for use in any medium; and

    (f)   The right to copyright the Screenplay and any adaptation or version thereof in the United States or elsewhere, in the Purchaser's name or otherwise for its sole benefit, and to secure renewals or extensions of such copyrights in its name or otherwise;

    (g)   The title and the theme to the Screenplay.

2.   <u>Warranties</u>.   Assignor represents and warrants to the Purchaser:

    (a)   That Victor Miller is the sole author of the Screenplay;

    (b)   That the Screenplay is original, and does not infringe upon any statutory copyright or common law copyright, proprietary right or any other right whatsoever;

-2-

CONFIDENTIAL

**EXHIBIT H**

PLAINTIFFS000020

(c)  That the Screenplay is innocent and contains no matter that is scandalous, libelous, obscene or otherwise contrary to law;

(d)  That the Screenplay has not heretofore been published or used in any medium for any purpose; and

(e)  That Assignor is the sole and exclusive owner of the Screenplay; that Assignor has not heretofore assigned, pledged or encumbered the same; that Assignor has granted no licenses and made no commitments with respect thereto; and that Assignor has the full power and authority to make this sale.

3.  <u>Indemnity</u>.  Assignor shall indemnify Purchaser for, and hold it harmless from, any loss, damage or expense (including reasonable attorneys' fees) that it may suffer or incur by reason of the breach (or alleged breach) of any of the foregoing representations or warranties or any covenant contained herein.

4.  <u>Further Assurances</u>.  Assignor shall execute, acknowledge and deliver any and all further instruments that the Purchaser may deem necessary or expedient to effectuate the purposes and intent of this bill of sale.

5.  <u>Suits</u>.  Assignor hereby irrevocably appoints the Purchaser its true and lawful attorney-in-fact to institute and prosecute for its sole benefit such proceedings as it may deem expedient and necessary to protect the rights herein granted.  The

-3-

CONFIDENTIAL                    **EXHIBIT H**                    **212**
PLAINTIFFS000021

Purchaser may sue in its own name or in my name, and at its option, may join me as a party plaintiff or defendant in any such suit.

6.  <u>Purchaser's Assumption</u>. Purchaser assumes all obligations of the Assignor which may accrue or be incurred from the date hereof including, but not limited to Assignor's future obligations to the Writers Guild of America, Inc.

7.  <u>Purchaser's Successors, Etc</u>.  This Agreement shall inure to the benefit of the Purchaser, its successors and assigns, its subsidiaries, licensees, sub-licensees, distributors and franchise holders.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of this 7th   day of May, 1980.

THE MANNY COMPANY

By _____

GEORGETOWN PRODUCTIONS, INC.

By _____

-4-

STATE OF       )
             : ss.:
COUNTY OF      )

       On the      day of May   1980, before me personally

came               , to me known and known to me to be

a General Partner of THE MANNY COMPANY, the Partnership

named in and which executed the within instrument, and the said

General Partner acknowledged to me that he executed the said

instrument for and on behalf of and with the authority of said

Partnership.

STATE OF *MASS.*    )
                : ss.:
COUNTY OF *SUFFOLK* )

       On the *27th* day of May, 1980, before me personally

came *DANIEL J FLYNN*       , to me known, who, being by me duly

sworn, did depose and say that he is the *PRESIDENT*     of

GEORGETOWN PRODUCTIONS, INC., the corporation described in and which

executed the foregoing instrument; that he knows the seal of said

corporation; that the seal affixed to said instrument is such corporate

seal; that it was so affixed by order of the board of directors of

said corporation, and that he signed his name thereto by like order.

WRITER'S FLAT DEAL CONTRACT

(Short Form; complete screenplay, no options)


EMPLOYMENT AGREEMENT between ___The Manny Company_____

(hereinafter sometimes referred to as "Company") and _Victor Miller_____

_____(hereinafter sometimes referred to as 'Writer"),

dated this_____day of_____, 19____.

    1.  The Company employs the Writer to write a complete and finished

screenplay for a proposed motion picture to be budgeted at $_under $1 million_ ,

and presently entitled or designated _Friday 13_____

and including the following:

        ( ) Treatment          (x) First draft screenplay
        ( ) Original Treatment    (x) Final draft screenplay
        ( ) Story             ( ) Rewrite of screenplay

based upon (describe form of material & title)_____

_____

written by_____.

    2. (a) The Writer represents that (s)he is a member in good standing
of the Writers Guild of America, (West or East), Inc., and warrants that (s)he
will maintain his/her membership in the Writers Guild of America, (West or
East), Inc., in good standing during the term of this employment.

    (b) The Company warrants it is a party to the WGA 1977 Theatrical
and Television Basic Agreement (which agreement is herein designated MBA).

    (c) Should any of the terms hereof be less advantageous to the
Writer than the minimums provided in said MBA, then the terms of the MBA shall
supersede such terms hereof; and in the event this Agreement shall fail to
provide for the Writer the benefits which are provided by the MBA, then such
benefits for the Writer provided by the terms of the MBA are deemed incorporated
herein. Without limiting the generality of the foregoing, it is agreed that
screen credits for authorship shall be determined pursuant to the provisions
of Schedule A of the MBA in accordance with its terms at the time of such
determination.

    3.  The Company will pay to the Writer as full compensation for his

services hereunder the sum of _Nine thousand two hundred eighty-two_____ DOLLARS

($_9,282_____), payable as follows:

                                  (Continued)

    (3/77)

A-126

Case 3:16-cv-01442-SRU   Document 43-12   Filed 06/09/17   Page 8 of 8   (?)

(a) Not less than _____ DOLLARS ($ _____ )
shall be paid not later than the first regular weekly pay day of the Company
following the expiration of the first week of the Writer's employment.

(b) _____ DOLLARS ($ _____ )
shall be paid within forty-eight (48) hours after delivery of the TREATMENT,
ORIGINAL TREATMENT or STORY, whichever is appropriate, to the Company.

(c) Five thousand five hundred sixty-nine DOLLARS ($ 5,569 )
shall be paid within forty-eight (48) hours after delivery of the FIRST DRAFT
SCREENPLAY to the Company; and

(d) Three thousand seven hundred and thirteen DOLLARS ($ 3,713 )
shall be paid within forty-eight (48) hours after delivery of the FINAL DRAFT
SCREENPLAY.

(e) _____ DOLLARS ($ _____ )
shall be paid within forty-eight (48) hours after delivery of the REWRITE.

4. The Writer will immediately on the execution hereof diligently
proceed to render services hereunder and will so continue until such services
are completed.

5. On delivery of a treatment to the Company, the Company may call for
changes within three (3) days thereafter; if the Company fails in writing to
call for any such changes, the treatment shall be deemed approved, and the Writer
shall proceed with the first draft screenplay based on such treatment or
adaptation.

On delivery of a first draft screenplay to the Company, the Company
may call for changes within three (3) days thereafter; if the company fails in
writing to call for any such changes, the first draft screenplay shall be deemed
approved, and the Writer shall proceed with the final draft screenplay.

On delivery of the final draft screenplay to the Company, the Company
may call for changes within three (3) days thereafter; if the Company fails in
writing to call for any such changes, the final draft screenplay shall be deemed
approved.

6. This contract is entire, that is, the services contemplated hereunder
include all of the writing necessary to complete the final screenplay above
described, and this Agreement contemplates payment of the entire agreed upon
compensation.

_____
(Writer)

Address  726 Broad St.

         Stratford, Conn. 06497

_____

_____


The Manny Company
(Company)

By _____

Title  (Sean S. Cunningham)
       General Partner

Address 155 Long Lots Road

        Westport, Connecticut 06880

**IMDbPro**

Notifications | Help    Marc Toberoff

## Sean S. Cunningham
Producer | Writer | Director

Overview    Personal Details    Media    Connections    Clients

EXHIBIT
21

| | |
|---|---|
| KNOWN FOR | Friday the 13th (1980) | DeepStar Six (1989) | Freddy vs. Jason (2003) |
| AWARDS | 2 nominations More » |
| AKA | Sean Cunningham |
| BORN | Dec 31, 1941 (age 75) |
| HEIGHT | 5' 5" (1.65m) |
| GUILDS * | DGA | WGA |

Photos (3)
Videos (5)

*Starred info submitted by page owner via IMDb Resume (has not been verified by IMDb).*

**STARmeter**
**22,692**
▲ 1,448 this week

**Our Shared Credits**

See how I'm connected to Sean S. Cunningham.

Claim my page

### Featured Images

 

### Filmography       Filter

| PROJECTS IN DEVELOPMENT (3 TITLES) STATUS | YEAR | BUDGET |
|---|---|---|
| Incubus – Director, Producer | | |
| The Drifter – Grateful Thanks | | |
| The Elevator Game – Executive Producer | | |

| FILMS IN PRODUCTION (2 TITLES) STATUS | YEAR | BUDGET |
|---|---|---|
| The Nurse with the Purple Hair – Director, Executive Producer, Producer | 2017 | Post-Prod |
| DeathDate (Short) – Very Special Thanks | Post-Prod | |

| TELEVISION IN PRODUCTION (1 TITLES) STATUS | YEAR | EPISODE COUNT |
|---|---|---|
| WingMutt (TV Series) – Special Thanks (1 episode) | | 1 |
| Pilot – Special Thanks | Pre-Prod | |

| PAST FILM & VIDEO (44 TITLES) U.S. GROSS | YEAR | BUDGET |
|---|---|---|
| The Emerging Past Director's Cut – Inspiration | 2017 | |
| Stasis – Thanks | 2017 | |
| Debris (Short) – Executive Producer | 2015 | $10K |
| The 'Thing' (Short) – Director | 2015 | |
| Devil's Deal (Short) – Special Thanks | 2015 | $10K |
| Lazarus: Apocalypse – Original Inspiration | 2014 | |

### Contacts (2)

**COMPANY**
**Crystal Lake Entertainment**
CEO (Executive)
http://crystallakeentertainment.com

+1 818 995 1585 phone
+1 818 995 1677 fax
contact@crystallakeentertainment.com

4420 Hayvenhurst Ave
Encino, CA 91436
USA
See map »

**LEGAL REPRESENTATIVE**
**Wyman & Isaacs**
Robert Wyman

310-358-3221 phone
310-358-3224 fax

8840 Wilshire Blvd
# 2
Beverly Hills, CA 90211
USA
See map »

**Representatives:**

Robert Wyman

### People Also Viewed

Betsy Palmer

### Clip

 

See all videos (5) »

### Personal Details

BORN IN
New York City, New York, USA

BIOGRAPHY
Like William Girdler, Oliver Hellman or even Ed Wood, Sean S. Cunningham had a successful career of starting films cheap and fast. Originally from New York, Cunningham had a vast knowledge of directing films and came

Crystal Lake Memories: The Complete           2013
History of Friday the 13th (Video) – Himself -
Producer / Director, Very Special Thanks

Emerging Past (Video) – Inspiration            2011        $275K

Voorhees (Born on a Friday) (Short) – Special  2011        $50
Thanks

Monsterpiece Theatre Volume 1 – Special        2011        $950K
Thanks

The Last House on the Left – Producer (as      2009        $15MM
Sean Cunningham)
                                                          $33MM

Friday the 13th – Producer                     2009        $19MM
                                                          $65MM

El Panda (Short) – Dedicatee                   2009        BRL 3K

D.O.D. (Short) – Very Special Thanks           2008        $500

Trapped Ashes – Director (segments: Jibaku)    2006

Delivery (Video) – Special Thanks              2006        $250K

Freddy vs. Jason – Producer                    2003        $30MM
                                                          $82MM

Jason X – Executive Producer                   2001        $11MM
                                                          $13MM

XCU: Extreme Close Up – Director, Producer     2001        $3MM

Jason Goes to Hell: The Final Friday –         1993        $3MM
Producer
                                                          $16MM

My Boyfriend's Back – Producer                 1993
                                                          $3.3MM

House IV (Video) – Producer                    1992

The Horror Show – Producer                     1989
                                                          $1.7MM

DeepStar Six – Director, Producer              1989        $8MM
                                                          $8.1MM

Friday the 13th Part VII: The New Blood –      1988        $2.8MM
Writer (characters) (uncredited)
                                                          $19MM

House II: The Second Story – Producer          1987
                                                          $7.8MM

Jason Lives: Friday the 13th Part VI – Writer  1986        $3MM
(characters) (uncredited)
                                                          $19MM

House – Producer                               1985        $3MM
                                                          $19MM

Friday the 13th: A New Beginning – Writer      1985        $2.2MM
(characters) (uncredited)
                                                          $21MM

The New Kids – Director, Producer              1985

A Nightmare on Elm Street – Director (chase    1984        $1.8MM
scene) (uncredited), Special Thanks (as Sean
Cunningham)                                               $27MM

Friday the 13th: The Final Chapter – Writer    1984        $2.6MM
(characters) (uncredited)
                                                          $33MM

Spring Break – Director, Producer              1983

---

Hollywood. He started about the
same time Wes Craven did.
Cunningham meets ...

**News (305)**

**Blu-ray Review: House: Two
Stories Collection**
Apr 12, 2017 5:56 PM, -08:00 | DailyDead

**X Marks The Spot For Jason
Voorhees**
Apr 12, 2017 10:21 AM, -08:00 |
FilmSchoolRejects

**House – Two Stories | Blu-ray**
Apr 11, 2017 6:00 AM, -08:00 | ioncinema

**April 11th Blu-ray & DVD
Releases Include House: Two
Stories Box Set, The
Phantasm Collection**
Apr 10, 2017 5:09 PM, -08:00 | DailyDead

See all news (305) »

| | | | |
|---|---|---|---|
| **Friday the 13th Part III** – Writer (characters) (uncredited) | 1982 | $2.3MM | $36MM |
| **A Stranger Is Watching** – Director | 1982 | | |
| **Friday the 13th Part 2** – Director ('Friday the 13th Part 1' footage), Writer (characters) (uncredited) | 1981 | $1.2MM $19MM | |
| **Friday the 13th** – Director, Producer, Writer (story) | 1980 | $550K $37MM | |
| **Here Come the Tigers** – Director, Producer | 1978 | $200K | |
| **Manny's Orphans** – Director, Producer | 1978 | $400K | |
| **The People Who Own the Dark** – Producer | 1976 | | |
| **Case of the Full Moon Murders** – Director, Producer | 1973 | | |
| **The Last House on the Left** – Producer | 1972 | $90K | |
| **Together** – Director, Producer, Writer | 1971 | | |
| **The Art of Marriage** – Director (uncredited), Producer (uncredited) | 1970 | | |

| PAST TELEVISION (5 TITLES) | YEAR | EPISODE COUNT |
|---|---|---|
| **Jason Xmas** (TV Mini-series) – Writer (based on a character created by) (9 episodes, 2014–2017) | 2014–2017 | 9 |
| Part 9 (Jan 13, 2017) – Writer (based on a character created by) | | |
| Part 8 (Jul 12, 2015) – Writer (based on a character created by) | | |
| Part 7 (Jan 7, 2015) – Writer (based on a character created by) | | |
| Show more | | |
| **Dark Dreamers** (TV Series) – Actor (1 episode) | 2011– | 1 |
| Sean S. Cunningham – Actor | | |
| **His Name Was Jason: 30 Years of Friday the 13th** (TV Movie) – Himself, Executive Producer | 2009 | |
| **Terminal Invasion** (TV Movie) – Director, Executive Producer | 2002 | |
| **Reiselust** (TV Series) – Writer | 1986– | |

| SELF (25 TITLES) U.S. GROSS | YEAR | BUDGET |
|---|---|---|
| **To Hell and Back: The Kane Hodder Story** – Himself | 2016 | |
| **The Insiders on TheLipTV** (TV Series) – Himself (1 episode, 2014) | 2014 | |
| Sean S. Cunningham (Oct 27, 2014) – Himself | | |
| **Monster Man** (TV Series) – Himself (1 episode, 2012) | 2012 | |
| Seeing Double/Pilot (Mar 14, 2012) – Himself | | |
| **Face Off** (TV Series) – Himself - Party Guest / Himself - Guest Judge (2 episodes, 2011) | 2011 | |
| Twisted Tales (Mar 16, 2011) – Himself - Party Guest | | |
| Bad to the Bone (Feb 16, 2011) – Himself - Guest Judge | | |
| **The Movie Loft** (TV Series) – Himself (1 episode, 2009) | 2009 | |
| Episode dated 1 July 2009 (Jul 1, 2009) – Himself | | |

| | | |
|---|---|---|
| The Man Behind the Legacy: Sean S. Cunningham (Video) – Himself | 2009 | |
| Going to Pieces: The Rise and Fall of the Slasher Film – Himself | 2006 | |
| Never Sleep Again: The Making of 'A Nightmare on Elm Street' (Video) – Himself | 2006 | |
| The House That Freddy Built (Video) – Himself | 2006 | |
| Hitchcocked! (TV Movie) – Himself | 2006 | |
| The Perfect Scary Movie (TV Movie) – Himself | 2005 | |
| Genesis: Development Hell (Video) – Himself | 2004 | |
| On Location: Springwood Revisited (Video) – Himself | 2004 | |
| The 100 Scariest Movie Moments (TV Mini-series) – Himself (1 episode, 2004) | 2004 | |
| Part I: 100-81 (2004) – Himself | | |
| The 100 Greatest Scary Moments (TV Movie) – Himself (as Sean Cunningham) | 2003 | |
| Return to Crystal Lake: Making 'Friday the 13th' (Video) – Himself (as Sean Cunningham) | 2003 | |
| Freddy Vs. Jason Weigh-In Las Vegas (Video) – Himself | 2003 | |
| Celluloid Crime of the Century (Video) – Himself | 2003 | |
| It's Only a Movie: The Making of 'Last House on the Left' (Video) – Himself (as Sean Cunningham) | 2002 | |
| By Any Means Necessary: The Making of 'Jason X' (Video) – Himself | 2002 | |
| The Many Lives of Jason Voorhees (Video) – Himself | 2002 | |
| Scream and Scream Again: A History of the Slasher Film (TV Special) – Himself | 2000 | |
| Fear, Panic & Censorship (TV Movie) – Himself | 2000 | £100K |
| Mario Bava: Maestro of the Macabre (TV Movie) – Himself | 2000 | |
| Welcome to Primetime (Video) – Himself | 1999 | |

| ARCHIVE FOOTAGE (2 TITLES) U.S. GROSS | YEAR | BUDGET |
|---|---|---|
| Moxina (Short) – Mentor Cunningham, Sean S. (archive footage) | 2012 | |
| Never Sleep Again: The Elm Street Legacy (Video) – Himself (archive footage) (uncredited) | 2010 | |

| OTHER (1 TITLES) U.S. GROSS | YEAR | BUDGET |
|---|---|---|
| Friday the 13th: The Game (Video Game) – Producer, Writer (based on the characters of) | 2017 | |

**Expert Report**

William L. Cole
Partner
Mitchell, Silberberg & Knupp, LLP

Horror, Inc. and Manny Company v. Victor Miller
Case No. 3:16-cv-01442-SRU

May 11, 2017

**I.      Purpose**

1.      The parties are involved in a dispute involving ownership of the copyright in and to the screenplay on which the original horror film entitled *Friday the 13th* was based. Resolution of that dispute may turn in part on whether the defendant was an employee of plaintiff Manny Company when he performed writing services in connection with that screenplay.

2.      **Expert Question**:  I have been asked to opine on custom and practice for screenwriters in the motion picture industry and how that custom and practice is impacted or controlled by the Writers Guild of America ("WGA") Basic Agreement ("WGA Basic Agreement").  Specifically, I have been asked how the WGA and companies signatory to the WGA Basic Agreement have historically treated literary material written for theatrical motion pictures when that material is written (a) before signing an agreement for writing services; or (b) after signing an agreement for writing services?

3.      **Answer**:  To the extent that this was a work done with the knowledge and consent of Mr. Cunningham as an authorized representative of the guild signatory, The Manny Company, the WGA and signatory employers treat both situations the same.  It does not matter whether the work was written before or after Mr. Miller signed the agreement.  Under the custom and practice in the industry, both situations are treated as having been written pursuant to the same employment agreement.  Further, even in the absence of a written employment agreement, under the custom and practice in the industry, writing performed with the knowledge and consent of a signatory employer is treated as writing under employment covered by the WGA Basic Agreement.

I expect to be called to provide expert testimony at deposition and trial regarding my opinions formed resulting from my review as described below, any matters set forth in this report, and rebuttal of any matters raised by defendant.  This report includes my opinions regarding the issues based on the information currently available and provided to me.

**II.      Credentials of Expert**

4.      I am an attorney at law duly licensed to practice by the State of California as well as, *inter alia*, the Supreme Court of the United States.  I am, through my Professional Corporation, a partner in the law firm of Mitchell, Silberberg & Knupp, LLP ("MSK").  I have practiced continuously at MSK since 1977 and have been a partner in the firm since 1982.  I

have served as the chair or co-chair of the MSK Labor and Employment Department since the mid-1980's. During my entire tenure at MSK and continuing, most of my time has been devoted to representing employers in the motion picture and television industry. In that connection, I have been the primary outside counsel in connection with collective bargaining issues for the Association of Motion Picture and Television Producers from 1977-1982 and the Alliance of Motion Picture and Television Producers from 1982 to present. These entities are the multi-employer bargaining associations which have negotiated the motion picture industry's primary collective bargaining agreements, including the WGA Basic Agreement, since at least 1960.[1] I have also represented and continue to represent major motion picture and television studios, independent motion picture and television companies, television networks and pay and basic cable television production companies in connection with issues relating to collective bargaining and grievance and arbitration under the industrywide collective bargaining agreements, including the WGA Basic Agreement.

5.      I graduated with a Juris Doctor degree from Stanford University Law School in 1977 and was awarded the *Order of the Coif*. I have been recognized as a leading labor and employment and entertainment lawyer by several publications, including, *inter alia*, being named Los Angeles Labor Law- Management Lawyer of the Year by The Best Lawyers in America in 2012, one of the 100 Most Powerful Employment Attorneys in the United States by Human Resource Executive, and to the Who's Who in Entertainment list by the Los Angeles Business Journal. I served as the Management Co-Chair of the American Bar Association Sports and Entertainment Committee, Labor and Employment Law Section from 2001-2005 and have spoken extensively regarding entertainment labor law issues. My curriculum vitae is attached as Exhibit 1.

6.      Of particular relevance to the issues discussed in this report, commencing in 1977 and throughout my career, I have represented the various clients discussed in paragraph 4 with respect to a wide variety of issues arising under the WGA Basic Agreement. This representation has included advice regarding the proper interpretation and application of that agreement, handling hundreds of grievances regarding the interpretation and application of that agreement and representing employers in dozens of arbitrations regarding the interpretation of that agreement. The arbitrations I have handled include many industrywide cases on important issues regarding interpretation and application of the WGA Basic Agreement as well as cases on behalf of individual companies. In the course of this representation, it has been necessary for me to become familiar with the content, interpretation and application of WGA agreements going back to the 1950's, including the 1977 WGA Basic Agreement. In order to prepare for and litigate these cases, I have reviewed bargaining notes and other communications regarding bargaining for the 1977 and other WGA Basic Agreements, have investigated the practices of signatory companies and have become intimately familiar with the terms of those agreements. I am frequently consulted by employers and others in the motion picture and television industry regarding the interpretation and application of the WGA Basic Agreement. Among the issues I have investigated and analyzed in connection with the foregoing are several which relate

---

[1] For a brief period between 1977-1982 a second multi-employer association, known as "The Alliance," represented certain producers which had split from the Association of Motion Picture and Television Producers. Two separate WGA agreements were negotiated by the Association and the Alliance in 1977 with certain differences not relevant to the current dispute. The Alliance of Motion Picture and Television Producers was formed in 1982 to reunite the major producers and has continued to be the negotiator of the WGA Basic Agreement since that time.

8852234.2

**EXHIBIT J**                                                                    **9**

specifically to the dispute in this case, including issues relating to the provisions on "speculative writing" and issues relating to what work falls within the coverage of the WGA Basic Agreement.  The specific language relevant to my analysis has remained unchanged in all relevant respects from the 1977 WGA Basic Agreement to the present.

I have not authored any publications in the last ten years, nor have I worked previously as an expert witness.  My billing rate for this matter is $775 per hour for all services rendered.  The opinions expressed in this Report, however, are my own, and my pay is in no way contingent on the conclusions I reach or on the outcome of this litigation.

### III.    Background Facts

7.    In connection with the preparation of this report I reviewed and considered several documents provided by counsel for plaintiffs or otherwise available to me.  The documents I reviewed are listed on Exhibit 2 attached hereto.  Among them are the Complaint in this matter, an Application for Membership in the Writers Guild of America, East, Inc. from defendant dated March 21, 1974 and correspondence related thereto, a Writer's Flat Deal Contract between The Manny Company and defendant which I have been advised was the written agreement entered into June 4, 1979 between those parties relating to defendant's writing services on *Friday the 13th*, documents relating to The Manny Company becoming a signatory to the 1977 WGA Basic Agreement in July of 1978, a letter dated June 14, 1979 from the Writers Guild of America, East, Inc. ("WGAE") to defendant confirming that defendant had filed a copy of his employment agreement for *Friday the 13th* with the WGAE and a copy of the uncertified draft of defendant's deposition.  I also reviewed the 1977 WGA Basic Agreement, prior and subsequent WGA Basic Agreements and arbitration awards rendered in connection with the interpretation and application of the speculative writing provisions of the WGA Basic Agreement.

8.    Based on the information in the documents referred to above as well as information provided to me by counsel for plaintiffs and information relating to the WGA Basic Agreement and the WGAE of which I have personal knowledge, as well as on my nearly forty (40) years of experience handling matters relating to the WGA in the motion picture industry, I have based my opinion in this report on the following factual background:

9.    At all times relevant to this dispute, The Manny Company (a Connecticut Limited Partnership) was a signatory to the 1977 WGA Basic Agreement and defendant was a member of the WGAE.  As a member of the WGAE, defendant was required by rules issued by his union to work only for employers which were signatory to an agreement with the WGAE.  Defendant has acknowledged that he was aware of these rules and, in fact, had previously written under a pseudonym when working on a non-union basis in order to avoid sanctions from his union.

10.    At all times relevant to this dispute, Sean S. Cunningham ("Cunningham") was a partner in The Manny Company and an authorized agent of that partnership.  Defendant and Cunningham, who is a producer, had worked together on projects prior to the writing of any literary materials relating to *Friday the 13th*.  One such project was entitled *Manny's Orphans* and it was Cunningham who engaged defendant to work for The Manny Company as a writer on that project.  That work was performed under the 1977 WGA Basic Agreement.

11.     There is a dispute between the parties as to whether the June 4, 1979 written employment agreement was signed before or after defendant began to perform writing services relating to *Friday the 13th*.  The defendant has testified that with the knowledge and consent of Mr. Cunningham, he believes he began writing a treatment for the motion picture in April or May of 1979 and that he signed the employment agreement in early June of 1979.  The defendant also testified that the reason he signed the employment agreement in June of 1979 was that he had already written a treatment and at least one draft of a screenplay for *Friday the 13th* and that he would not get paid for that work unless he signed the employment agreement.  He further testified that this was the way he had worked with Mr. Cunningham in the past in that defendant would agree to start writing while Mr. Cunningham searched for financing for the project and that defendant would get paid for the writing when financing was in place.

12.     There are several provisions of the 1977 Basic Agreement which are relevant to this dispute.  The 1977 Basic Agreement (like prior and subsequent Basic Agreements) applies to two scenarios: (1) the employment of writers to write covered literary material; and (2) the purchase of pre-existing covered literary material from "professional writers."  This concept is found in several provisions of the 1977 Basic Agreement, including, but not limited to, the following:

        a.     The preamble of the agreement which designates the provisions in the agreement as being either: (i) general provisions applicable to both theatrical employment and purchases and television employment and purchases; (ii) television provisions applicable to television employment and purchases only; and (iii) theatrical provisions applicable to theatrical employment and purchases only.

        b.     The definition of "writer" in Article 1.B.1 as a person "employed" to write literary material.  The term "writer" is used throughout the 1977 Basic Agreement to refer to the persons covered by that agreement and their rights and responsibilities.  Separate provisions in the 1977 Basic Agreement apply to "professional writers."

        c.     The definition of "professional writer" as a person who sells or licenses the ownership of or rights to use previously unexploited literary material written by the writer (and who has specified prior writing experience and credits).  The term "professional writer" is referred to throughout the 1977 Basic Agreement to refer to persons who, on their own and not at the request of a signatory production company, write literary material and sell it to a signatory company ("Independently Written Material").  Independently Written Material must be distinguished from material written at the direction or with the consent of a signatory company ("Directed Material") since, under the "speculative writing" provisions of the WGA Basic Agreement discussed below, writing of Directed Material must be compensated under the minimum wage provisions of the collective bargaining agreement.

        d.     Article 19.A provides that if a writer utilizes an office in his home in connection with an employment agreement with the Company, such utilization by the writer shall be deemed to be at the request of and for the convenience of the employer.

        e.     Article 35 provides that all minimums required to be paid under the 1977 Basic Agreement are wages or salaries paid to employees and are subject to all federal, state and

local laws relating thereto.  It is common practice in the motion picture industry to employ writers on a flat deal basis for theatrical motion pictures.  A flat deal basis means employment on a project basis to write a script or other literary material for a single motion picture.  Under Article 13.A. of the WGA Basic Agreement, specific rates are set for such flat deal contracts and those payments are treated as wages subject to withholding under Article 35.

13.     Article 20.A.1, entitled Speculative Writing, provides, in relevant part:

"The Company and the Guild agree that there shall be no speculative writing, nor shall either party condone it as a practice.  As used herein, the term 'speculative writing' has reference to any agreement covered hereunder which is entered into between the Company and any writer whereby the writer shall write material, payment for which is contingent upon the acceptance or approval of the Company or upon the occurrence of any other event such as financing, or whereby the writer shall, at the request of the Company, engage in rewriting or revising any material submitted under the terms of this Basic Agreement and compensation for the writer's services in connection with such material is contingent upon the acceptance or approval of the company, or upon the occurrence of any other event such as obtaining financing.  Company shall not request a writer to write and submit literary material, other than a submission contemplated by Article 3B2 of this Basic Agreement, unless the Company first makes a commitment with the writer for the writing of at least a story or treatment.  If the Company does so make a prohibited request, the writer shall not write and submit such material."

14.     Article 20 has been applied and enforced by the WGAE and the Writers Guild of America, West., Inc.[2] to distinguish a situation in which a writer, on his or her own and without the suggestion or request of a signatory company, writes literary material "on spec" and completely independently and sells it to the signatory company (a covered acquisition from a professional writer) from the improper practice of a signatory employer suggesting or asking that a writer write literary material with payment contingent upon the signatory company approving the content of the material, obtaining financing or some other contingency.  When a signatory company requests that a writer engage in speculative writing, the WGAE and WGAW use Article 20 to force the signatory company to treat the writer as having been employed to write the material and to pay the writer pursuant to the minimum terms of the WGA Basic Agreement.  This principle is discussed in the arbitration decision entitled Writers Guild of America, West, Inc. and Largo Entertainment (Roberts, 1995) attached as Exhibit 3 and is generally recognized in the motion picture and television industry.

IV.     **Analysis**

15.     I have been advised that the defendant in this case has argued that the literary material he allegedly wrote prior to signing the employment agreement with The Manny Company was written "on spec" and should be treated as an acquisition from a professional

---

[2]  The Writers Guild of America, West, Inc. ("WGAW") and the WGAE are sister unions which jointly negotiate many collective bargaining agreements in the motion picture and television industry.  While both unions are represented in such joint negotiations, the WGAW serves as the primary negotiator with respect to some and the WGAE serves that role with respect to others.  The WGAW serves as the primary negotiator with respect to the WGA Basic Agreement.

8852234.2
**EXHIBIT J**                                     **12**

writer.  It is my opinion that this conclusion is completely inconsistent with the custom and practice in the motion picture industry and with the historical application of the provisions of the WGA Basic Agreement for three reasons.   First, if, as the defendant has testified, the writing was done with the knowledge and consent of Mr. Cunningham, an authorized representative of The Manny Company, it would be deemed work suffered to be performed by The Manny Company and therefore work covered by The Manny Company's collective bargaining agreement.  Any time a company signatory to the WGA Basic Agreement knowingly permits a person to write literary material for it, that work is treated as work covered by the Basic Agreement and subject to its minimum terms and conditions regardless of whether there is a written employment agreement already in place confirming the employment relationship.

16.     Secondly, the defendant testified that he understood that the employment agreement was entered into so that he could be paid for the writing he had previously performed. He further testified that the amount he was to be paid was determined by the terms of the 1977 WGA Basic Agreement.  Therefore, even if writing services were performed prior to the date that the writing agreement was signed (which plaintiffs dispute), it was plainly contemplated that the writing agreement would have retroactive effect and the writing agreement specifically provided that the covered work was subject to the collective bargaining agreement.  It should be noted in this regard that it is common in the motion picture industry for writing work covered by an employment agreement to commence before the written contract is actually signed and in fact it is frequently the case that an employer holds back payment after delivery of a writing until the writer has either signed the employment agreement or has at least signed a certificate of authorship.  Indeed, the 1977 WGA Basic Agreement itself recognizes that employment may commence before a written contract is tendered. Thus, Article 19.B.1 provides that for a simple week-to-week contract, the contract will be submitted to the writer or his agent within two weeks after his employment and for a simple deal contract (such as the employment contract signed by defendant in this case), the contract will be submitted to the writer or his agent within three weeks after his employment.  In short, the fact that writing is performed before the written contract is signed does not affect the fact that any writing contemplated by that contract is retroactively covered by it.  Further, the employment agreement at issue in this case is in a very different form than is used when a professional writer sells Independently Written Material to a signatory company.  Such acquisitions of spec scripts or other spec literary material are customarily documented by acquisition agreements, not employment agreements.  Those acquisition agreements specify a price being paid for a completed work and focus on the rights being transferred to the purchaser.  The employment agreement in this case does not contemplate acquisition of an independently written, completed treatment or script, but rather is in the form of a traditional employment agreement specifying writing steps to be performed in stages, with payment of separate amounts for each step.  Thus, the form of the agreement confirms that the parties contemplated an employment relationship.

17.     Third, the defendant's testimony that his understanding with Mr. Cunningham was that the defendant would write while Mr. Cunningham sought financing for the project and that he would be paid if financing was obtained falls squarely under the prohibitions of the speculative writing provisions contained in Article 20 of the 1977 WGA Basic Agreement quoted above.  As discussed in the Largo Entertainment arbitration decision and as generally recognized in the industry, the WGA has historically and consistently required that the remedy for such a violation is to treat the writing as covered by the WGA Basic Agreement and to

require payment of compensation for the work at the minimum wages specified in that agreement.

18.     In sum, under the custom and practice in the motion picture industry as well as the terms of the 1977 WGA Basic Agreement, even if, as defendant contends and plaintiffs contest, defendant wrote a treatment and draft screenplay before he signed the employment agreement, that fact would be irrelevant to the question of whether the writing was covered by the terms of the writing agreement and the WGA Basic Agreement.  The relevant facts are that the writing was performed at the direction or with the knowledge and consent of an authorized representative of The Manny Company, which was a signatory to the 1977 WGA Basic Agreement.  In light of the fact that the writing was performed at the direction or at a minimum with the knowledge and consent of Mr. Cunningham, it was Directed Written Material and, under industry custom and practice, must be treated as material covered by the WGA Basic Agreement and the writing contract.

**Reservation:**  I reserve the right to supplement and/or amend this report and my opinions, as necessary, if additional documents or information are made available to me for my review or if I am asked to render additional opinions.  Further in support of my opinions, I may also use any of the previously produced documents referred to in this report or in any attachment hereto.  Finally, if defendant elects to engage an expert witness on the matters addressed herein, I will review defendant's expert report and reserve the right to comment upon any of the opinions proffered by defendant's expert at my deposition or during trial.

Dated: May 11, 2017

_William L. Cole_

A-138

# EXHIBIT 1

Curriculum Vitae for

William L. Cole

**Education**

University of California, Irvine
BA, Social Ecology 1974
Magna Cum Laude, Phi Beta Kappa

Stanford University Law School
JD 1977
Order of the Coif

**Employment History**

Mitchell, Silberberg & Knupp, LLP
Associate Attorney  1977-1982
Partner  1982-Present

Co-Chair Labor & Employment Department
Former Managing Partner

**Experience**

Thirty-nine years of experience representing employers in all areas of labor and employment law, with a specialty in the entertainment industry.  Representations include:

Advice and counsel to the principal multi-employer bargaining association representing employers in the motion picture and television industry.

Lead counsel for the employers in numerous entertainment industry arbitrations with the Writers Guild of America, the Directors Guild of America, the Screen Actors Guild and the International Alliance of Theatrical and Stage Employees, including several industrywide arbitrations.

Lead counsel in numerous employment discrimination, wage and hour, whistle blower, ERISA, LMRA Section 301 and wrongful termination cases, including class actions.

Representation of employers before the National Labor Relations Board, the Department of Labor and other administrative agencies.

Chief management negotiator in numerous private and public sector collective bargaining negotiations.

Representation of multi-employer Taft-Hartley Benefit Plans.

A-140

**Honors and Awards**

"Los Angeles Labor Law-Management Lawyer of the Year," *The Best Lawyers in America (*2012)

"Leading Labor & Employment Lawyers in California," *Chambers USA*

Recognized by *Best Lawyers in America*© in the fields of Employment Law, Entertainment Law-Motion Pictures and Television, Labor Law-Management, and Litigation-Labor and Employment.

"Top Labor & Employment Lawyers in California," *Daily Journal*

"100 Most Powerful Employment Lawyers," *Lawdragon*

"Top 5% of Lawyers in Southern California," Southern California *Super Lawyers*

"Leading Management Labor & Employment Attorneys in California," *Who's Who Legal: California*

"Who's Who in Entertainment Law," *Los Angeles Business Journal*

"Top Labor & Employment Attorneys," *Los Angeles Business Journal*

"Who's Who in L.A. Law," *Los Angeles Business Journal*

AV® Preeminent Rating, Martindale-Hubbell

**Professional, Business and Civic Affiliations**

Former Management Co-Chair, American Bar Association Sports and Entertainment Committee, Labor and Employment Law Section (2001-2005)

Executive Committee, Los Angeles County Bar Association, Labor Law Section (1989-90)

Former Member of the Board of Directors, PBS Foundation

**Speaking Engagements**

Numerous speaking engagements relating to labor and employment law in the motion picture and television industry, including for the American Bar Association, the Los Angeles County Bar Association and the UCLA Entertainment Law Symposium.

# EXHIBIT 2

A-142

### LIST OF DOCUMENTS REVIEWED

1.      Complaint;

2.      Application for Membership in the Writers Guild of America, East, Inc. from defendant dated March 21, 1974 and correspondence related thereto;

3.      Writer's Flat Deal Contract between The Manny Company and defendant which I have been advised was the written agreement entered into June 4, 1979 between those parties relating to defendant's writing services on *Friday the 13th*;

4.      Documents relating to The Manny Company becoming a signatory to the 1977 WGA Basic Agreement in July of 1978;

5.      A letter dated June 14, 1979 from the Writers Guild of America, East, Inc. ("WGAE") to defendant confirming that defendant had filed a copy of his employment agreement for *Friday the 13th* with the WGAE;

6.      A copy of the uncertified draft of defendant's deposition; and

7.      The 1977 WGA Basic Agreement, prior and subsequent WGA Basic Agreements and arbitration awards rendered in connection with the interpretation and application of the speculative writing provisions of the WGA Basic Agreement.

A-143

# EXHIBIT 3

|                                                      |     |                    |
|------------------------------------------------------|-----|--------------------|
| In the Matter of the Arbitration                     | )   |                    |
|                                                      | )   |                    |
| Between                                              | )   | ARBITRATOR'S       |
|                                                      | )   |                    |
| WRITERS GUILD OF AMERICA, WEST, INC.                 | )   | FINDINGS           |
|                                                      | )   |                    |
| -and-                                                | )   | AND                |
|                                                      | )   |                    |
| LARGO ENTERTAINMENT, INC.                            | )   | AWARD              |
|                                                      | )   |                    |
| Grievance: Claim on Behalf of Tim Metcalfe for       | )   | Case No. 92-CO-52  |
| Unpaid Compensation; Cross Claim                     | )   |                    |
| of Largo for Breach of Contract,                     | )   |                    |
| Conversion and Fraud - all in                        | )   |                    |
| connection with the Theatrical                       | )   |                    |
| Motion Picture Entitled "HOMEPIE"                    | )   |                    |

This arbitration proceeding is conducted pursuant to the terms of Article 10 and Article 11 of the 1988 Theatrical and Television Basic Agreement ("MBA") executed by the Writers Guild of America (referred to herein as the "Guild") and the Alliance of Motion Picture & Television Producers, Inc.  Largo Entertainment, Inc. (hereinafter designated "Largo") is a signatory to the said collective bargaining agreement.  The Guild and Largo concur that the matters identified herein are properly submitted to arbitration in this proceeding.

-1-

## THE ARBITRATION HEARING

The claim initiated by the Guild on behalf of Tim Metcalfe, as well as the counterclaims advanced by Largo here put at issue, were heard in arbitration at West Hollywood, California on February 1, February 22 and April 26, 1993. Throughout the course of the proceedings both parties were afforded full opportunity to present sworn testimony, cross-examine witnesses and introduce documentary evidence. Thereafter, a verbatim transcript of the hearing was prepared. Finally, written argument was submitted in the form of post-hearing briefs.

## THE APPEARANCES OF COUNSEL

Largo Entertainment, Inc. was represented at the hearing by Mr. Arthur Carvalho, Jr. of Lang, Hanigan & Carvalho, attorneys at law. The appearance on behalf of the Writers Guild of America, west, Inc. and its aggrieved member, Tim Metcalfe, was made by Mr. Joel L. Block, Associate Counsel.

## THE MATTERS AT ISSUE

When this matter came to hearing, the parties stipulated it would be my responsibility to identify the issues to be resolved. I exercise that authority by stating the issues in the following terms:

-2-

1. Did Largo Entertainment, Inc. breach the writers services agreement (dated "As of October 15, 1991") with Tim Metcalfe?

2. Did Tim Metcalfe breach the said writers services agreement?

3. Did Largo Entertainment, Inc. breach Article 13.A. of the MBA by not paying Tim Metcalfe minimum compensation for three high-budget theatrical treatments?

4. Did Tim Metcalfe convert the $50,000.00 payment made to him by Largo Entertainment, Inc. pursuant to the said writers services agreement?

5. Did Tim Metcalfe defraud Largo Entertainment, Inc. by inducing Largo to enter into the said writers services agreement and thereby inducing Largo to pay him the sum of $50,000.00?

6. If any of the foregoing inquiries are answered in the affirmative, what is the appropriate remedy?

FINDINGS OF FACT

Tim Metcalfe has worked as a screenwriter for a number of years during which time he has earned several motion picture writing credits. The events which now bring Metcalfe to arbitration were initiated in May of 1991 when Largo contacted his agent, Tom Strickler. Strickler was advised that Largo was interested in engaging the services of Metcalfe to write a screenplay based upon an existing screenplay entitled "HOMEPIE", a property owned by Largo. Metcalfe expressed interest in the undertaking and, on May 29, 1991, he met

–3–

with Curtis Burch, Senior Vice-President of Creative Affairs at Daybreak Productions (the entity which was to produce "HOMEPIE") and Elizabeth Lane, Largo Vice-President of Creative Affairs.

There followed a series of several meetings convened between Metcalfe, Burch and Lane to discuss and develop an approach to the "HOMEPIE" project. In the course of those sessions they came upon the idea of using the true story of a murder which Lane had seen in a <u>Vanity Fair</u> article as the basis of the new "HOMEPIE" screenplay. In late July of 1991, Metcalfe, Burch and Lane met with Daybreak Productions executive Chuck Gordon and Largo creative executive Lloyd Levin. At this meeting, Levin approved the story approach presented and announced "Let's go ahead with it". Burch and Lane were then authorized to engage the services of Metcalfe.

Strickler, on behalf of Metcalfe, initiated a series of exchanges with Largo Vice-President of Business and Legal Affairs Phillip Muhl intended to form the basis for the construction of a writers services contract between Metcalfe and Largo. At about this same time, Burch told Metcalfe that Largo would require he write a "beat sheet" which he defined as an outline or treatment. It developed, however, that in early August of 1991 Metcalfe was informed Largo had cancelled the project.

In mid-September of 1991, Largo advised Strickler that the "HOMEPIE" project had been resurrected. In response to that turn of events, a new series of meetings between Metcalfe, Lane and Burch were convened in late September and early October of 1991. It is the

-4-

testimony of Metcalfe that during those meetings he advised Burch and Lane that the construction of one or more outlines in advance of the submission of a draft screenplay was not compatible with his writing methodology but that both Burch and Lane insisted upon such a procedure. In their turn, Burch and Lane deny such a conversation took place. In any event, however, Metcalfe did begin to prepare an outline.

In the meanwhile, Attorney Peter Nichols (representing Metcalfe) and Largo Director of Business Affairs Kenneth Low began discussing the terms of Metcalfe's engagement by Largo. In mid-October of 1991, Low mailed a proposed writers services contract to Nichols. The contract called for the payment to Metcalfe of the sum of $100,000 for writing and delivering to Largo a first draft screenplay based on the existing screenplay "HOMEPIE" as written by Thomas Szollosi. The first draft remuneration of $100,000 was to be paid to Metcalfe one-half ($50,000) upon the commencement of his services on the first draft and one-half ($50,000) upon completion and delivery to Largo of the completed first draft. The proposed contract specifically set forth as a condition precedent to any obligation of Largo thereunder the following term:

> "1.4   Artist's meeting with creative executive designated by Largo for the Picture for the purpose of reviewing the direction and approach of the screenplay for the Picture, and Largo's agreeing on said direction and approach."

On October 21, 1991, Nichols replied to Low by faxing a copy of the proposed contract with his handwritten interlineations and

-5-