comments. With regard to Paragraph 1.4, Nichols wrote "pls. omit; I believe this has been satisfied". He further suggested an amendment to provide for the immediate commencement of the services of Metcalfe.

On October 22, 1991, Strickler and Burch reached a verbal agreement on the terms of the engagement of Metcalfe. The following day, Low returned the proposed contract interlineated by Nichols and dated "As of October 15, 1991". On that document, Low wrote that the meeting seeking the approval of the direction and approach of the screenplay would take place on October 28, 1991. He further rejected the incorporation of a statement that the services of Metcalfe would commence immediately. On October 24, 1991, Nichols agreed to leave the language of Paragraph 1.4 unchanged upon the representation of Low that the creative meeting identified therein would take place on October 28, 1991. Nichols also proposed an amendment of the commencement of services provision to identify the same date.

Metcalfe met with Burch and Lane on October 28, 1991. On that occasion, he provided Burch and Lane with a written treatment incorporating the story concepts they had previously identified. At the end of the treatment Metcalfe set forth a series of questions regarding the storyline and added "Is this treatment something in it's present form we can submit in lieu of a verbal pitch? Or are they're [sic] ways we need to modify it ... or is the verbal pitch mandatory?" There followed a discussion during which comments and ideas were provided by all three participants. After the meeting was adjourned, Metcalfe incorporated the revisions and new ideas advanced

-6-

A-150

during the discussion and prepared a new treatment in anticipation of a presentation to Levin.

The writers services agreement as negotiated between the representatives of Metcalfe and Largo was ultimately executed by the parties on November 14, 1991.  Paragraph 1.4 of that document sets forth a condition precedent to the imposition of any of the obligations thereunder in the following terms:  "Artist's meeting with the creative executive designated by Largo for the Picture for the purpose of reviewing the direction and approach of the screenplay for the Picture, and Largo's agreeing on said direction and approach".  In Paragraph 3 of the agreement it is provided that the services of Metcalfe "in connection with the First Draft shall commence upon a date to be designated by Largo".  Finally, Paragraph 5.1 states that the first one-half ($50,000) payment for the first draft would be made upon the commencement of services by Metcalfe.  The following day, Metcalfe met with Lane and Burch at which time he presented a second treatment incorporating the changes that had been suggested during their prior meeting.  There followed a discussion and exchange of ideas relating to the second treatment.  On November 18, 1991, Metcalfe was paid the $50,000 commencement of services payment called for by Paragraph 5.1 of his writers services agreement.

In the third week of November, 1991, Metcalfe forwarded to Lane and Burch a third treatment.  This was followed by a meeting convened between all three individuals on November 26, 1991 at which time the treatment was discussed and further story concepts

-7-

exchanged. A fourth treatment was then prepared by Metcalfe and submitted to Lane and Burch on December 3, 1991. The discussion of that date generated the preparation of a fifth treatment by Metcalfe, a document submitted to Burch and Lane on December 20, 1991. When Burch and Lane then told Metcalfe the story concept was not yet ready for presentation to Levin, Metcalfe declared he would make no more changes in the absence of authorization to begin the first draft screenplay itself.

On January 20, 1992, Metcalfe, Burch and Lane met with Levin to pitch the screenplay concept set forth in the fifth treatment prepared by Metcalfe. Levin announced he desired a new opening to the story and he suggested certain other changes. Metcalfe replied by stating his frustration at being asked to prepare yet another treatment and he declined to do so, particularly in light of the reality that he had not been paid for the preparation of any of the five treatments he had already submitted.

On January 23, 1992, Burch and Strickler engaged in a telephonic conversation regarding the progress on the "HOMEPIE" project. That afternoon, Burch sent Strickler two written "studio notes" setting forth concepts Largo wished to incorporate in the story as developed in the treatments submitted by Metcalfe. Burch thereafter discussed those suggestions with Metcalfe on February 6, 1992. Metcalfe repeated his disenchantment with any further changes in the storyline and repeated his refusal to proceed further.

On February 21, 1992, Largo made written demand upon

-8-

Metcalfe for the return of the $50,000 he had been paid on the "HOMEPIE" project. When Metcalfe refused to return the payment, he was served with a notice of the filing of a court action by Largo on May 8, 1992. Thereafter, the present arbitration proceedings were initiated by the Guild on behalf of Metcalfe.

## RELEVANT PROVISIONS OF THE MBA

### ARTICLE 1 - DEFINITIONS

The following terms or words used herein shall have the following meaning:

B.     THEATRICAL
        1.   Writer and Professional Writer
        b. 2. The term "treatment" means an adaptation of a story, book, play or other literary, dramatic or dramatico-musical material for motion picture purposes in a form suitable for use as the basis of a screenplay. The term "original treatment" means an original story written for motion picture purposes in a form suitable for use as the basis of a screenplay.

### ARTICLE 13 - COMPENSATION

A.     THEATRICAL
        1. a.  Minimum Compensation

#### FLAT DEAL SCREEN MINIMUMS

        (f)   Treatment                    $16,790

### ARTICLE 20 - SPECULATIVE WRITING

A.     THEATRICAL
        1.    The Company and the Guild agree that there shall be no speculative writing, nor shall either party condone it as a practice. As used herein, the term "speculative writing" has reference to any agreement covered hereunder which is entered into between the

–9–

Company and any writer whereby the writer shall write material, payment for which is contingent upon the acceptance or approval of the Company or upon the occurrence of any other event such as obtaining financing, or whereby the writer shall, at the request of the Company, engage in rewriting or revising any material submitted under the terms of this Basic Agreement and compensation for the writer's services in connection with such material is contingent upon the acceptance or approval of the Company, or upon the occurrence of any other event such as obtaining financing. Company shall not request a writer to write and submit literary material, other than a submission contemplated by Article 3.B.2. of this Basic Agreement, unless the Company first makes commitment with the writer for the writing of at least a story or treatment. If the Company does so make a prohibited request, the writer shall not write and submit such material.

## THE CONTENTIONS OF THE PARTIES

It is the position of the Guild that Largo required Metcalfe to write a succession of treatments on the project "HOMEPIE" and, as a consequence, pursuant to the provisions of the MBA minimum payment schedule applicable to treatments for high budget theatrical productions Largo owes him $16,790. for each of three of those treatments. The Guild argues the writers services agreement at issue promised Metcalfe $100,000 for the first draft of the "HOMEPIE" screenplay but he was prevented from performing under the contract by the non-negotiated insistence of Largo upon the treatments. The Guild asserts Metcalfe should therefore receive the benefit of the bargain and be awarded the balance of $50,000 for a first draft. In this regard, it is further said that because Largo by its own conduct prevented performance on the

-10-

part of Metcalfe it is not now entitled to a return of the monies paid to Metcalfe. The Guild therefore seeks an order requiring Largo to pay Metcalfe the balance due on the fixed compensation guaranteed for the screenplay, the required minimum for each of three high budget theatrical treatments along with the pension and health fund contributions required by Article 17 of the MBA as well as interest at the rate identified in Article 13.A.14. of the said MBA.

Largo defends the claims of Metcalfe by stating that when he was contacted regarding the "HOMEPIE" project he met with creative executives Burch and Lane to develop a direction and approach to the screenplay. Largo notes that the contract thereafter negotiated includes a requirement of creative approval by Largo. It is said that this condition precedent mandated that Metcalfe orally pitch and sell the story to Largo creative executive Lloyd Levin who alone was authorized to give the requisite approval to proceed. Largo asserts that when Metcalfe, Burch and Lane finally presented an outline of the proposed screenplay for approval Levin suggested certain additional changes, Metcalfe became angry and he thereupon "walked out". Largo argues the five outlines Metcalfe wrote during the process of developing a screenplay do not constitute treatments for they all repeat essentially the same concept and yet none of them may be said to be a complete story. Largo adds that, in any event, it did not solicit or require a written treatment and it is therefore not obligated to pay for any such efforts. Largo further insists that, because it did not authorize Metcalfe to write a "HOMEPIE" screenplay and he did not do

-11-

so, he has converted and must return the $50,000 paid to him in anticipation of his imminent commencement of the writing of a screenplay. Finally, Largo claims Metcalfe never intended to perform under the writers services agreement and he is therefore guilty of fraud. Largo seeks the return of the $50,000 paid to Metcalfe along with interest and attorney's fees.

## DISCUSSION BY THE ARBITRATOR

This inquiry into the respective rights and obligations of the parties must begin with an analysis and application of the provisions of Section 1.4 of the writers services agreement executed by Metcalfe and Largo. Section 1.4 incorporates a condition precedent to the obligations of Largo set forth in the balance of that document. The provision reads, "Artist's meeting with the creative executive designated by Largo for the Picture for the purpose of reviewing the direction and approach of the screenplay for the Picture, and Largo's agreeing on said direction and approach". As a matter of law, until this condition precedent was satisfied there was no contract. Largo argues the requirement was never met.

Section 1.4 does not make the undertaking subject to prior approval by Largo of a complete story to serve as the basis for the contemplated screenplay. To the contrary, it requires approval by a Largo creative executive of no more than "the direction and approach of the screenplay". Largo here argues that such approval was never

-12-

provided.   The   record   made   at   arbitration   is,   however,   to   the
contrary.

Section 1.4 did not remain unsatisfied into February of
1992 when Largo first sought return of the $50,000 paid to Metcalfe.
As far back as July of 1991, Chuck Gordon and Lloyd Levin approved
the storyline Metcalfe had developed through the progression of a
series of meetings with Burch and Lane.  In late July of 1991, Levin
announced "Let's go ahead with it".  In doing so, he conferred
approval of the direction and approach initiated by Metcalfe and, with
that approval, fulfilled the condition precedent set forth in
Section 1.4.  Indeed, following the hiatus and in the progress of the
project, the work of Metcalfe contemplated by the writers services
agreement went forward, the agreement was ultimately executed and
payment of $50,000 made to Metcalfe by Largo upon the "Artist's
commencement of services".  The engagement of Metcalfe and the
direction and approach of his screenplay was approved by the
authorized Largo creative executive.  With that, all of the remaining
terms and conditions of the writers services agreement dated "As of
October 15, 1991" became operative.

In the writers services agreement, Metcalfe undertook to
write and deliver to Largo a first draft screenplay for a proposed
feature-length theatrical motion picture tentatively entitled "HOMEPIE"
and additionally, at the option of Largo, a rewrite of the first draft
and a polish of the rewrite.  Metcalfe was committed to perform those
services "in consultation with such representatives of Largo as may be

-13-

designated by Largo and in accordance with Largo's reasonable instructions".  The parties further contractually agreed that "Artist shall incorporate into the Work such changes, revisions, deletions or additions as may be required or suggested by Largo or any Largo designated representatives".  These contractual provisions anticipate that Largo would exercise creative control over the writing process and, further, that Metcalfe would meet with Largo representatives as often as Largo deemed necessary.  This consultation process and the incorporation of any resultant changes into the effort are specifically made a component of the services of Metcalfe.  Metcalfe initiated those services and pursued the undertaking during a series of meetings with Largo representatives Burch and Lane, meetings that began in September of 1991.

Section 3 of the writers services agreement provides that the services of Metcalfe in connection with the first draft of the screenplay "shall commence upon a date to be designated by Largo".  In all of the exchanges and meetings between the parties, Largo never formally designated such a date.  Nevertheless, Largo participated in the rendering of services by Metcalfe during his several meetings with Burch and Lane convened to discuss and form a direction and approach of the screenplay.  These meetings were in the main scheduled by Burch.  They fit easily within the contractual description of the services of Metcalfe and the "Start Date" identified in Paragraph 3 must therefore be set as the date of the first such meeting, i.e., late September of 1991.

-14-

**EXHIBIT J**                                                          **34**

The writers services agreement calls for compensation of the artist upon the commencement of his services. One-half of the amount to be paid to Metcalfe for the first draft is contractually made payable upon the commencement of his services. The plain language of the phrase "services on the First Draft" is broader than the arguments of Largo allow. A reasonable interpretation of this provision, particularly when read in concert with the clauses describing the services of Metcalfe, compels the inclusion of the creative meetings convened with Burch and Lane within the meaning of the contractually anticipated writing effort. Metcalfe, having commenced his services under the writers services agreement in September of 1991, was entitled to payment of the $50,000, a right that attached on and after the execution of the agreement on November 14, 1991. Indeed, in recognition of that obligation Metcalfe was paid the $50,000 on November 18, 1991 and he suffers no obligation to now return any portion thereof.

Following the "commencement of services" payment required by the contract Largo, in the persons of Lane and Burch, pursued the creative meetings with Metcalfe. Thus, a third, a fourth, and a fifth treatment were all prepared and the anticipated presentation meeting with Levin took place on January 20, 1992. Throughout all of this, Largo acted in compliance with the terms of the writers services agreement. When, in the following month, Metcalfe stated he was prepared to go forward with the writing of the screenplay but he would submit no additional treatments, the parties parted ways. When

-15-

that occurred, Largo was not in breach of the writers services agreement and Metcalfe is therefore not entitled to any further payments thereunder.   On the other hand, it cannot be said that Metcalfe was in violation of the agreement, for he "walked" only after being denied authorization to write the first draft screenplay for which he had been engaged.   Through the conduct of Largo, he was prevented from fulfilling his obligations under the agreement and he does not stand in breach of that agreement by reason of his failure to proceed further.   For almost four months Largo had held him in an exclusive employment relationship yet prevented him from performing the full services anticipated by the agreement.   He was therefore excused from any further services under the terms of the contract but by reason of his own conduct that excuse does not entitle him to additional payments pursuant to the said contract.

There remains the question of the propriety of the claim of Metcalfe for reimbursement for three of the five treatments submitted to Largo.   As to this claim, the Guild does not assert a liability on the part of Largo arising out of its writers services agreement with Metcalfe but rather an obligation found in Article 13.A.1.a.(f) of the MBA, a provision mandating a minimum compensation for a "treatment". Article 1.B.2. of the MBA defines a treatment as "an adaptation of a story, book, play or other literary, dramatic or dramatico-musical material for motion picture purposes in a form suitable for use as the basis of a screenplay".   Nothing in this definition requires one treatment to be substantially different from another or that a treatment

-16-

**EXHIBIT J**                                                                 **36**

attain a certain level of completeness. Pursuant to this definition appearing in the MBA, any adaptation of material which appears in a form suitable for use as the basis of a screenplay constitutes a "treatment". In the matter at hand, Metcalfe wrote five adaptations of the Vanity Fair story using the character that had been developed in the "HOMEPIE" original screenplay. Each of those five submissions was "in a form suitable for use as the basis of a screenplay". Each of those five submissions therefore fits the definition of a "treatment" as set forth in the MBA.

But that is not the end of the matter. Largo, in the persons of Burch and Lane, deny instructing Metcalfe that he had to submit a written treatment or outline as opposed to providing simply an oral presentation. On the other hand, Metcalfe insists he was told he would have to write a treatment in order to secure approval to begin work on the screenplay. This conflict in the evidence must be resolved in favor of Metcalfe. This is because Burch concedes that he and Lane told Metcalfe it would be necessary that he develop "a complete story with full characterization, plot and background development" for submission to Levin before being authorized to write the screenplay. Thus, Largo made it clear to Metcalfe that he was to produce a fully developed adaptation of the Vanity Fair story in a form suitable for use as the basis of a screenplay, i.e., the very definition of a treatment.

Metcalfe reluctantly complied with the demand for written material. The successive treatments he prepared were analyzed and

-17-

discussed during the creative meetings he attended with Burch and Lane. Furthermore, each treatment was accepted and used by Burch and Lane as the basis for the discussions that followed. Not once did Burch or Lane tell Metcalfe he was not required to write the treatments. To the contrary, they accepted the treatments, discussed the treatments and incorporated the concepts developed in each successive treatment. This pattern of consent and acceptance of the benefit of utilizing the written treatments was played out a total of five times. Lane and Burch then chose to submit the fifth treatment to Levin prior to his January 20, 1992 meeting with Metcalfe. Levin himself used that treatment as the basis for notes recorded at their meeting.

When Largo required Metcalfe to submit written material, whether labeled as treatments, stories or outlines, it did so as a condition imposed on a non-contractual basis. Uncompensated treatments or stories required as a condition of securing the opportunity to write a screenplay are prohibited by the MBA as speculative writing. Burch and Lane joined with Metcalfe in the utilization of the successive treatments and thereby gave full consent to their preparation. Largo may not now avoid the contractual compensation that attaches thereto under Article 13.A.1.a.(f) of the MBA, i.e., $16,790. The Guild claims reimbursement to Metcalfe for but three of the five treatments and he is entitled to such reimbursement. In all of this, Metcalfe acted free of any fraud.

-18-

## AWARD OF THE ARBITRATOR

1. Largo Entertainment, Inc. did not breach the writers services agreement (dated "As of October 15, 1991") with Tim Metcalfe.

2. Tim Metcalfe did not breach the said writers services agreement.

3. Largo Entertainment, Inc. did breach Article 13.A. of the MBA by not paying Tim Metcalfe minimum compensation for three high budget theatrical treatments.

4. Tim Metcalfe did not convert the $50,000 payment made to him by Largo Entertainment, Inc. pursuant to the aforesaid writers services agreement.

5. Tim Metcalfe did not defraud Largo Entertainment, Inc. by inducing Largo to enter into the aforesaid writers services agreement and thereby paying him the sum of $50,000.

6. Largo Entertainment, Inc. shall forthwith pay to Tim Metcalfe the sum of $50,370 representing reimbursement for three of the five treatments prepared by Metcalfe. The requests advanced herein by the parties for additional benefit payments, interest and attorney's fees are denied.

Dated:  December 8, 1995
        Rolling Hills, California


THOMAS T. ROBERTS, Arbitrator


–19–

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is Greenberg Glusker Fields Claman & Machtinger LLP, 1900 Avenue of the Stars, 21st Floor, Los Angeles, California 90067.

On **May 12, 2017**, I served the following documents: **PLAINTIFFS' DESIGNATION OF EXPERT WITNESS** on the interested parties in this action by placing a copy thereof enclosed in a sealed envelope addressed as follows:

| | |
|---|---|
| Marc Toberoff | *Attorneys for Defendant Victor Miller* |
| Toberoff & Associates, PC | T: 310-246-3333 |
| 23823 Malibu Rd., Suite 50-363 | F: 310-246-3101 |
| Malibu, CA 90265 | E: mtoberoff@toberoffandassociates.com |
| | |
| John J. Martin | *Attorneys for Defendant Victor Miller* |
| J Martin Business Law Group, LLC | T: 917-902-8872 |
| PO Box 1350 | E: jhnjmartin@att.net |
| Fairfield, CT 06825 | |

☒     **(BY E-MAIL)**  I caused a true copy of the foregoing document to be served by e-mail at the e-mail address set forth above.  Each e-mail was complete and no reports of error were received.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **May 12, 2017**, at Los Angeles, California.

_____
        Jannette G. Gore

_____
Signature

1

1          UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF CONNECTICUT

3

4    HORROR, INC., a Massachusetts  )

5    corporation; and MANNY COMPANY,) Case No.

6    a Connecticut Limited          ) 3:16-cv-01442-SRU

7    Partnership,                   )

8              Plaintiffs,          )

9        - against -                )

10   VICTOR MILLER, an individual;  )

11   and DOES 1 through 10,         )

12   inclusive,                     )

13              Defendants.    ) (Pages 1-282)

14   ------------------------------)

15

16   VIDEOTAPED DEPOSITION OF:

17              VICTOR MILLER

18              FRIDAY, APRIL 28, 2017

19              9:12 A.M.

20

21

22

23   REPORTED BY:

24              SUSAN NELSON

25              C.S.R. No. 3202

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

2

```
1    1    Videotaped deposition of VICTOR MILLER, the witness,

2    2    taken on behalf of Plaintiffs, commencing at

3    3    9:12 A.M., on FRIDAY, APRIL 28, 2017, at 1900 Avenue

4    4    of the Stars, Los Angeles, California, before

5    5    SUSAN NELSON, C.S.R. No. 3202.

6    6    APPEARANCES OF COUNSEL

7    7    FOR PLAINTIFFS:

8    8            GREENBERG GLUSKER FIELDS CLAMAN

9    9            & MACHTINGER LLP

10   10           BY:  BONNIE E. ESKENAZI, ESQ.

11   11                (Admission Pro Hac Vice)

12   12           1900 Avenue of the Stars

13   13           21st Floor

14   14           Los Angeles, California 90067-4590

15   15           (310) 553-3610

16   16           BEskenazi@GreenbergGlusker.com

17   17   FOR DEFENDANT:

18   18           TOBEROFF & ASSOCIATES, PC

19   19           BY:  MARC TOBEROFF, ESQ.

20   20           23823 Malibu Road

21   21           Suite 50-363

22   22           Malibu, California 90265

23   23           (310) 246-3333

24   24           mtoberoff@toberoffandassociates.com

25   25   ALSO APPEARING:  MICHAEL CURRIE, VIDEOGRAPHER
```

3

```
 1    1                    I N D E X

 2    2   WITNESS      EXAMINATION       PAGE

 3    3   VICTOR MILLER

 4    4           By Ms. Eskenazi       8

 5    5           (P.M. Session)       209

 6    6           By Mr. Toberoff      274

 7    7

 8    8

 9    9        QUESTION INSTRUCTED TO NOT ANSWER

10   10                  (NONE)

11   11

12   12

13   13

14   14

15   15

16   16

17   17

18   18

19   19

20   20

21   21

22   22

23   23

24   24

25   25
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                    **43**

17

```
1      A.  Yes, I have.

2      Q.  Okay.  So, Mr. Miller, why is it that you

3  joined the WGA?

4      A.  The -- The Black Pearl, which I'd been hired

5  to do the screenplay for from Scott O'Dell's book,

6  was going to be a union production, and I joined the

7  WGA.

8      Q.  And did you have to pay dues to become a

9  member of the WGA?

10      A.  I did.

11      Q.  And did it give you certain benefits by

12  being a member of the WGA?

13          MR. TOBEROFF:  Vague.

14  BY MS. ESKENAZI:

15      Q.  You can answer.

16      A.  The benefit was status.

17      Q.  Did you -- did you, for example, have the

18  benefit under -- by being a WGA Guild member, of

19  having a minimum wage for any film that you worked

20  on?

21      A.  There -- there were contract -- there were

22  levels of budget and -- I wouldn't call it a wage,

23  but I would -- I would call it a contracted amount

24  for first draft, second draft, et cetera.

25      Q.  And you took advantage of those by being a
```

18

```
 1       1   Guild member.  Right?
 2       2        A.  Yes.
 3       3        Q.  And the Guild membership entitled you to
 4       4   certain residuals.  Isn't that right?
 5       5        A.  Yes, it did.
 6       6        Q.  And it entitled you, for example, to be
 7       7   represented by the Guild for free in any financial
 8       8   disputes with producers?
 9       9        A.  To the best of my knowledge.
10      10        Q.  What are the other benefits that are offered
11      11   for Guild membership?
12      12            MR. TOBEROFF:  Vague.
13      13            THE WITNESS:  Yeah.
14      14   BY MS. ESKENAZI:
15      15        Q.  You can answer.
16      16        A.  I'm having trouble.  The status of being a
17      17   Guild member of being in the -- in the directory, of
18      18   having a standard contract for my employment, and
19      19   ultimately, at the end, pension and welfare benefits.
20      20        Q.  And when you signed up for the WGA, were you
21      21   made aware that there is a set of these WGA rules
22      22   that both the signatory production company has to
23      23   follow and the Guild member has to follow?
24      24            MR. TOBEROFF:  Lacks foundation.
25      25            THE WITNESS:  I -- I assume I got a
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                                        45

41

```
 1    audiotapes.  And this is not the way it's supposed to

 2    work, Bonnie.  You're a very experienced litigator.

 3    You know that quite well.

 4    BY MS. ESKENAZI:

 5         Q.  Mr. Miller, was that your voice on that

 6    interview tape?

 7         A.  I assume so.

 8         Q.  You don't know what your own voice is?

 9         A.  I'm so confused by what's going on, I have

10    no idea, but --

11              MR. TOBEROFF:  You can answer the question.

12              THE WITNESS:  Okay.  Yes, that sounds like

13    my voice.  Sorry.

14    BY MS. ESKENAZI:

15         Q.  So let me ask you, when did you first meet

16    Sean Cunningham?

17         A.  I would say in the early seventies when I

18    was working for Brad Talbot and Saul Swimmer on

19    The Black Pearl.  And Sean was visiting with Brad

20    Talbot, I believe, in their offices.  And I'd come in

21    to drop off a draft, and we were introduced.  And

22    since we both lived on the same line of the Metro

23    North Railroad, we went home together.  He got off in

24    Westport, and I got off in Stratford.

25         Q.  Okay.  So you were both living in
```

47

```
 1        A.  Keeping your -- keep reminding yourself it's
 2   only a movie.  That's all I remember.
 3        Q.  Okay.  Between about 1978 and 1983, you made
 4   five films with Mr. Cunningham?
 5        A.  Would you enumerate them?
 6        Q.  I will.
 7        A.  Please.
 8        Q.  Let me help you.  So Here Come the Tigers in
 9   or around 1977 or 1978.  Yes?
10        A.  Very well.
11        Q.  Yes?  So you made that film with
12   Mr. Cunningham?
13        A.  Yes, I did.
14        Q.  Manny's Orphans in or around 1978?
15        A.  I assume so, yes.  I -- I don't have a mind
16   that has -- there isn't a day planner up in my head.
17        Q.  But -- but you remember making that film --
18        A.  Oh, yes.
19        Q.  -- with Mr. Cunningham?
20        A.  Absolutely.
21        Q.  Okay.  Friday the 13th in or around 1979?
22        A.  Yes.
23        Q.  A Stranger is Watching in or around 1981 or
24   '82?
25        A.  Yes.
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                          47

48

```
 1        1       Q.  And Spring Break in or around 1983?
 2        2       A.  I didn't make a movie with him.  I made two
 3        3   drafts.
 4        4       Q.  So you worked with Mr. Cunningham on Spring
 5        5   Break in or around 1983?
 6        6       A.  Correct.
 7        7       Q.  And all of those are five movies --
 8        8       A.  Okay.
 9        9       Q.  -- so motion pictures, yes?
10       10       A.  Yes.  Yes.
11       11       Q.  Okay.  And you were the screenwriter or
12       12   you -- you wrote scripts for each of those films,
13       13   each of those five films that we've enumerated?
14       14       A.  I was the screenwriter for those five films.
15       15       Q.  And during that period of time, 1978 to 1983
16       16   when you were working on those five films with
17       17   Mr. Cunningham, did you have any other paid
18       18   screenwriting work outside of what Mr. Cunningham
19       19   gave you?
20       20       A.  To 980- -- to 1983?
21       21       Q.  Approximately.
22       22       A.  In 1983, I sold a screenplay -- oh, Lord --
23       23   called Getting In, to EMI.  I also wrote novels and
24       24   novelizations and non- -- and a nonfiction book.
25       25       Q.  During the period of time 1978 to 1983?
```

64

1    Come the Tigers.

2        A.   Hm-hm.

3        Q.   And do you see about one-third of the way

4    down the first page of Exhibit 6, it says "Writing

5    credits, Arch McCoy."

6             Who is Arch McCoy?

7        A.   Arch McCoy was a pseudonym I used to write

8    this movie.

9        Q.   And why did you use a pseudonym?

10           MR. TOBEROFF:   First I'd like to -- before

11   we go further -- object that you're asking him

12   questions about a document you could have easily

13   produced to us and never saw fit to produce to us --

14           MS. ESKENAZI:   It's publicly available

15   online.

16           MR. TOBEROFF:   -- prior to this.   It doesn't

17   matter.   You're -- you obviously find this document

18   relevant to the case, you wouldn't be asking

19   questions about it.   And you failed to produce it

20   where you could easily have produced it to us.

21   BY MS. ESKENAZI:

22       Q.   Who's Arch McCoy?   Oh, you said that.

23       A.   Yes.

24       Q.   Why did you use the word -- the name -- the

25   pseudonym Arch McCoy in connection with Here Come the

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                          49

65

```
 1   Tigers?
 2        A.  Because I was supporting a wife and two
 3   children on virtually no money at all.  And Sean said
 4   that he could not afford a Guild salary, so I agreed
 5   to write it under a pseudonym.
 6        Q.  And so you wrote the script under the name
 7   Arch McCoy in order to avoid telling the Guild that
 8   you were doing a non-Guild film.  Is that right?
 9        A.  For less than Guild fees.
10        Q.  All right.  And that was, as you understood,
11   a violation of Guild rules.  Right?
12        A.  It was.
13        Q.  Okay.  So you lied to the Guild.  Is that
14   right?
15             MR. TOBEROFF:  Misstates testimony.
16             THE WITNESS:  I did not lie to the Guild.
17   BY MS. ESKENAZI:
18        Q.  You misled the guilt.  Isn't that right?
19        A.  I didn't -- I didn't say boo to the Guild.
20        Q.  Right.  You -- you hid this from the Guild
21   deliberately.  Isn't that right?
22        A.  Yes.
23        Q.  Okay.  And you don't see that as being the
24   same as telling a lie.  Right?
25        A.  I'm not about to agree with you on that.
```

66

```
 1      1      Q.  Okay.  But Arch McCoy is not your real name,
 2      2   is it?
 3      3      A.  No.
 4      4      Q.  So it's untrue that Arch McCoy wrote Here
 5      5   Come the Tigers.  Isn't that right?
 6      6          MR. TOBEROFF:  Asked and answered.
 7      7          THE WITNESS:  Asked and answered.
 8      8          Yes, ma'am.
 9      9   BY MS. ESKENAZI:
10     10      Q.  Isn't that correct?  Arch McCoy did not
11     11   write Here Come the Tigers.  Is that right?
12     12      A.  That's correct.
13     13      Q.  Okay.  So let's talk a little bit about the
14     14   process of your writing Here Come the Tigers.
15     15          Did you meet with Sean in your house, in his
16     16   house to discuss the concepts?
17     17          MR. TOBEROFF:  Concept of what?
18     18          MS. ESKENAZI:  Of the film.
19     19   BY MS. ESKENAZI:
20     20      Q.  Let me ask it -- let me ask it differently.
21     21      A.  Okay.
22     22      Q.  You said that Sean came up with the idea of
23     23   let's rip off Bad News Bears.  Right?
24     24      A.  Yup.  Yup.
25     25      Q.  Okay.  What happened after that?
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                    51

67

```
 1              MR. TOBEROFF:  Calls for a narrative.
 2              THE WITNESS:  Well, I had to go see Bad News
 3       Bears.
 4       BY MS. ESKENAZI:
 5          Q.  Okay.
 6          A.  So I went to see Bad News Bears, and then I
 7       began to noodle up ideas.
 8          Q.  And did you discuss those ideas with
 9       Mr. Cunningham?
10          A.  From time to time.
11          Q.  And did he discuss those -- his ideas with
12       you as to what he wanted this film to look like?
13          A.  He spoke as a -- as a director and I was a
14       writer.  That's the way we had worked.
15          Q.  The question I asked was, did the two of you
16       discuss the ideas of what this film was supposed to
17       look like whilst you were writing for the film?
18              MR. TOBEROFF:  And he answered your
19       question.
20              THE WITNESS:  "Look" is too amorphous.  You
21       mean the visual style?
22       BY MS. ESKENAZI:
23          Q.  No, I mean what the story is supposed to be.
24          A.  That's different from --
25          Q.  Did you discuss the story with him?
```

68

```
1      A.  I discussed the story with him, yes.

2      Q.  And did he suggest changes or modifications?

3      A.  In the same way that any director would.

4      Q.  Is that a "yes"?

5      A.  That's a yes.

6      Q.  And where did you meet with Mr. Cunningham?

7      A.  My house, his house, The Rocket Diner, a

8   number of places.

9      Q.  And did you also speak by phone?

10      A.  A lot.

11      Q.  When you met at Mr. Cunningham's house,

12   where did you meet?  Did he have a home office?

13      A.  At that point, I think we met in either his

14   patio, his living room, or his kitchen.

15      Q.  Okay.  And at this time that you're working

16   on Here Come the Tigers, you were both still living

17   in Connecticut.  Isn't that right?

18      A.  Yes.

19      Q.  And do you remember that Mr. Cunningham gave

20   you a CPM machine?

21      A.  Mr. Cunningham gave me a CPM machine in

22   19- -- that was when we were working on Spring Break.

23   That was 1980, blah, blah, whatever.  Yeah.

24      Q.  In connection with Spring Break?

25      A.  In connection with Spring Break.  Had
```

69

1    nothing to do with any of the earlier films.

2        Q.  Okay.  And where is it that you wrote?

3            Where is the location that you wrote?

4        A.  I wrote all of my work for all of the

5    projects --

6            MR. TOBEROFF:  Wait.  Wait.

7            Are you asking about --

8            MS. ESKENAZI:  Here Come the Tigers.

9            MR. TOBEROFF:  Here Come -- she's just

10   asking about Here Come the Tigers.

11           THE WITNESS:  Oh, sorry.  An alcove off our

12   dining room at 728 Broad Street in Stratford,

13   Connecticut.

14   BY MS. ESKENAZI:

15       Q.  Hm-hm.  And when you met with Mr. Cunningham

16   at his house, did you take notes?

17       A.  The way Sean and I worked, I would show him

18   the pages, and he would read them and he would make

19   little sort of marks on the side.  He would say make

20   this funnier or he would put a line down.  We had --

21   we had a whole language, sort of, whatever.  And he'd

22   put another thing here saying speed it up, slow it

23   down, that kind of stuff, which is what a director

24   would say when working with a writer.

25       Q.  That's also what a co-writer might say.

70

```
 1    1   Isn't that right?
 2    2           MR. TOBEROFF:  Calls for speculation.
 3    3           THE WITNESS:  It's what a co-writer -- no,
 4    4   I've co-written four screenplays, and usually we just
 5    5   argue with each other.
 6    6   BY MS. ESKENAZI:
 7    7       Q.  And -- and are you testifying that you
 8    8   didn't argue with Mr. Cunningham over points in the
 9    9   script?
10   10       A.  I argued with Sean over everything.
11   11       Q.  Okay.  So he would give you handwritten
12   12   notes on these script pages that you would bring to
13   13   his house?
14   14           MR. TOBEROFF:  What are we -- are we
15   15   talking -- still talking about --
16   16           MS. ESKENAZI:  Here Come the Tigers.
17   17           MR. TOBEROFF:  -- Here Come the Tigers?
18   18           MS. ESKENAZI:  Here Come the Tigers.
19   19           MR. TOBEROFF:  So she's just talking about
20   20   Here Come the Tigers right now.
21   21           THE WITNESS:  Right.  Yeah.  Yeah.
22   22   BY MS. ESKENAZI:
23   23       Q.  To your understanding -- strike that.
24   24           Do you have an understanding of whether it
25   25   is unusual for screen -- motion picture screenwriters
```

71

```
 1    to work at home?

 2         A.  Again, please.

 3         Q.  Do you have an understanding as to whether

 4    it's unusual or not for motion picture screenwriters

 5    to work at home?

 6         MR. TOBEROFF:  All motion picture

 7    screenwriters?

 8         THE WITNESS:  It's a -- it's a huge

 9    question.  I would say that most screenwriters

10    because all the screenwriters I know are independent

11    contractors and work out of their house.  They may

12    rent office space so that the child isn't coming and

13    grabbing their leg.  But home, home office, whatever,

14    those are -- those are the people I know.  There may

15    be somebody still stuck in the studio system working

16    in the back lot of Warner Bros.

17    BY MS. ESKENAZI:

18         Q.  Putting aside your legal conclusion, which

19    you're not -- you're not qualified to make --

20         A.  I'm not -- I'm very not qualified.

21         Q.  -- about whether someone is an independent

22    con- --

23         MR. TOBEROFF:  Mischaracterizing the

24    testimony.  Sorry, go ahead.  I'm sorry to interrupt

25    you.
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                    56

72

1    BY MS. ESKENAZI:

2        Q.  -- whether somebody is an independent

3    contractor or not.

4        A.  Right.

5        Q.  My question was, and it seems like I got an

6    answer from you --

7        A.  You did.

8        Q.  -- that it's not unusual for motion picture

9    screenwriters to be working at home or a home office

10   or someplace --

11       A.  Not only is it --

12       Q.  -- not on a studio lot?

13           MR. TOBEROFF:  Answer the question.

14           THE WITNESS:  Sorry.

15           It is not unusual.

16   BY MS. ESKENAZI:

17       Q.  Okay.  So for Here Come the Tigers, did you

18   discuss things like plot and scenes and characters

19   with Sean?

20       A.  Yes.

21       Q.  Okay.  And did he make suggestions to you

22   about those elements, plot and scenes and characters?

23           MR. TOBEROFF:  For Here Come --

24           THE WITNESS:  For Here Come the Tigers --

25   BY MS. ESKENAZI:

73

```
 1      1       Q.  For Here Come the Tigers.  I'm only talking
 2      2   about Here Come the Tigers right now.
 3      3       A.  He did.  And I discussed them, and we argued
 4      4   them.
 5      5       Q.  And did you incorporate his ideas?
 6      6       A.  The ones I -- I liked, yes.
 7      7       Q.  Was there ever a time where your ideas
 8      8   conflicted with his ideas, and Sean said you needed
 9      9   to do this and you said, "No, I refuse"?  Or did you
10     10   reach a consensus most of the time?
11     11       A.  Sometimes a consensus.  I don't think we
12     12   ever got to the "I refuse."  I mean -- and we found a
13     13   third way.
14     14       Q.  So once Here Come the Tigers went into
15     15   production, did you continue to have a role?
16     16       A.  Not really, except as a -- I played the
17     17   announcer in the -- in the booth.
18     18       Q.  Okay.  But you didn't continue to write
19     19   while it was in production?
20     20       A.  Oh, I made changes as -- as they came up
21     21   because it always happens when you're -- when you're
22     22   shooting a movie that scenes get cut, scenes need to
23     23   get added, things happen, people get sick, so.  But I
24     24   don't -- I don't have any specific.
25     25       Q.  You don't have a specific recollection about
```

75

```
 1          MR. TOBEROFF:  Wait.

 2          THE WITNESS:  Sorry.  Okay.  Never mind.

 3          MR. TOBEROFF:  Just focus on her question.

 4          THE WITNESS:  Okay.

 5   BY MS. ESKENAZI:

 6       Q.  And you told Peter Bracke the fact that Here

 7   Come the Tigers didn't do well financially didn't

 8   stop us from making another G-rated film.

 9          Do you remember saying that?

10       A.  I don't recall saying it.

11       Q.  Okay.

12       A.  I don't contest it.

13       Q.  Okay.  Why don't you turn to what's been

14   marked as Exhibit 4 and turn to page 5.

15       A.  Of what?

16       Q.  Exhibit 4.

17       A.  Oh.

18          MR. TOBEROFF:  Which is?

19          MS. ESKENAZI:  Is the transcript.

20          MR. TOBEROFF:  Purported transcript?

21          MS. ESKENAZI:  Marked -- yes.

22          THE WITNESS:  Page what?

23   BY MS. ESKENAZI:

24       Q.  Page 5.

25       A.  Okay.  Okay.
```

76

```
 1    1        Q.  Okay.  Do you see about halfway down the
 2    2   page in the paragraph about Last House on the Left?
 3    3        A.  Oh, yes.
 4    4        Q.  Yes.  Where you're talking about Here Come
 5    5   the Tigers, which -- and it says:
 6    6             "In our first project together,
 7    7        which was called Here Come the
 8    8        Tigers, which was a Bad News Bears
 9    9        redact, and that came out, I guess
10   10        it made its money back, but they
11   11        lied about America wanting G-rated
12   12        films.  But that did not stop us
13   13        from making another G-rated film."
14   14        Do you see where it says that?
15   15        A.  Hm-hm.
16   16        Q.  Who is the "us" you're talking about?
17   17        A.  Sean and me.
18   18        Q.  Okay.  And was Manny's Orphans a WGA film?
19   19        A.  Yes.
20   20        Q.  Okay.  And the Manny Company hired you to
21   21   write Manny's Orphans?
22   22        A.  The Manny Company hired me to write Manny's
23   23   Orphans from a story by Steven Miner.
24   24        Q.  Ah, so Steven Miner this time came up with
25   25   the idea?
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                                    60

77

1       A.  Correct.

2       Q.  And is Steven Miner credited as a co-writer?

3       A.  I don't -- I don't believe so.  Maybe it

4   says -- I don't know.

5           MS. ESKENAZI:  Let me ask the court reporter

6   to mark as Exhibit 7 --

7           MR. TOBEROFF:  Before we go into the next

8   exhibit, do you want to take a bathroom break?  Do we

9   need a break now?

10          THE WITNESS:  Let me look at my watch.

11          MS. ESKENAZI:  Let -- oh, that's not the

12  right one.

13          THE WITNESS:  Yes?

14          MR. TOBEROFF:  Yeah.

15          THE WITNESS:  Okay.

16          MR. TOBEROFF:  I have to go.

17          THE WITNESS:  Let's break.

18          MS. ESKENAZI:  Okay.

19          THE WITNESS:  I'm not going to be here

20  without you.

21          MS. ESKENAZI:  That's totally fine.

22          THE VIDEOGRAPHER:  This will mark the end of

23  DVD number 1.  The time is 10:34 a.m., and we're off

24  the record.

25          (Recess taken.)

79

```
1       A.  My best recollection is, Stephen had put a
2   story on paper, one or two pages, I don't know.  And
3   it had the basic elements of the -- of the plot about
4   a poor soccer team in an orphanage.  And -- and the
5   key ingredient in that story that Stephen wrote was
6   that there was a girl disguised as a boy in the
7   orphanage.  And that was -- that was kind of it.
8           And I don't remember sitting down with Steve
9   and talking with him much about it.  I did it the way
10  I did most of the stuff, which was to start writing
11  down -- writing down screenplay, writing down story.
12       Q.  And at the time you knew the Manny Company
13  was a WGA signatory?
14           MR. TOBEROFF:  At the time he wrote the
15  screenplay?
16           MS. ESKENAZI:  Yes.
17           THE WITNESS:  Yes, otherwise Arch McCoy
18  would have written this thing.
19           MS. ESKENAZI:  Okay.  Let me show you what's
20  been -- what we will ask the court reporter to mark
21  as Exhibit 8.
22               (The document referred to was
23                marked as Exhibit 8.)
24  BY MS. ESKENAZI:
25       Q.  Let me just ask you preliminarily.  Have you
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

80

1    1    ever seen what's been marked as Exhibit 8 before

2    2    today?

3    3        A.  No, ma'am.

14   4        Q.  Okay.  Did you have a written agreement with

5    5    the Manny Company to write Manny's Orphans?

6    6            MR. TOBEROFF:  Vague as to time.

7    7            THE WITNESS:  The way I usually worked with

8    8    these people with -- I mean my best friend Sean, was

9    9    I would start writing before any paperwork, whether

10   10   it was an outline or whatever, and then they would

11   11   backfill and -- and pay me.

12   12   BY MS. ESKENAZI:

13   13       Q.  That's not what I asked you.  I asked you

14   14   whether there was a written agreement between you and

15   15   the Manny Company with respect to Manny's Orphans?

16   16       A.  I do not recall.  I assume so, but I do --

17   17           MR. TOBEROFF:  Don't -- do --

18   18           THE WITNESS:  I do not -- I do not -- I no

19   19   longer assume.

20   20   BY MS. ESKENAZI:

21   21       Q.  And you don't have a copy of that document,

22   22   either?

23   23       A.  I do not.

24   24       Q.  Okay.  So let's talk a little bit about the

25   25   process of developing the script for Manny's Orphans.

81

1    Did you continue to meet with Sean at Sean's

2    house and at your house in connection with developing

3    that script and the treatment for Manny's Orphans?

4         MR. TOBEROFF:  Vague.

5         THE WITNESS:  My answer will be vague.  I

6    can only assume so because that's the way we worked.

7    I would -- I would do stuff and then we would talk

8    about it, 'cause I knew he was going to be directing,

9    if we got the money.

10   BY MS. ESKENAZI:

11        Q.  And do you know whether he had the money or

12   not?

13        A.  Not when it began.

14        Q.  And you're sure of that?

15        A.  I'm fairly sure of it.

16        Q.  How do you know that?

17        A.  It's the way we always worked.

18        Q.  But I'm asking you whether you have

19   firsthand knowledge as to whether or not

20   Mr. Cunningham had any money committed when you

21   started working?

22        A.  I know -- no.  To answer your question, no,

23   I do not have.

24        Q.  Okay.

25        A.  But I do remember writing my basic stuff

82

1    without any money in hand.

2        Q.  And -- but you don't know whether or not

3    when you started writing Mr. Cunningham had any money

4    committed from outside people?

5        A.  I do not know.

6        Q.  Okay.  And do you remember the day on which

7    you started writing?

8        A.  I do not.

9        Q.  Do you remember the day on which you entered

10   an agreement with Mr. Cunningham?

11       A.  I do not.

12       Q.  So, again, with respect to Manny's Orphans

13   and you said that the process -- you don't have a

14   specific recollection with respect to

15   Manny's Orphans, but it was the way you always

16   worked, that you would discuss with Mr. Cunningham

17   the ideas in the script, plot, characters, setting.

18           Is that correct?

19       A.  I think that's too specific.  We just -- we

20   generally just talked about the major story beats.

21       Q.  So your testimony is you never discussed

22   anything specific with Mr. -- with Mr. --

23       A.  No, you -- you --

24       Q.  Let me finish my question.

25       A.  I'm sorry.  Okay.

83

```
 1        1         Q.  Is your testimony that you never discussed
 2        2    anything specific with Mr. Cunningham about
 3        3    Manny's Orphans script?
 4        4         A.  No, that's not my testimony.
 5        5         Q.  Okay.  So is it correct, then, you discussed
 6        6    portions of the script, things like plot, characters,
 7        7    scenery, settings with Mr. Cunningham?
 8        8              MR. TOBEROFF:  Are you talking about
 9        9    Manny's --
10       10              MS. ESKENAZI:  I'm talking about
11       11    Manny's Orphans.
12       12              THE WITNESS:  Yes, we're -- we're still on
13       13    that.
14       14              Scenery and settings doesn't sound right.
15       15    Plot and character, yes.
16       16    BY MS. ESKENAZI:
17       17         Q.  Okay.
18       18         A.  'Cause he was going to direct these suckers.
19       19         Q.  And sometimes he would give you notes on
20       20    where he wanted the script to go with respect to plot
21       21    and characters.  Isn't that right?
22       22         A.  I don't -- I wouldn't characterize it that
23       23    way, no.
24       24         Q.  Why not?
25       25         A.  'Cause I don't know what the, you know,
```

A-190

84

```
 1      1     notes on plot and character is.  It's kind of gummy.
 2      2        Q.  Okay.  So after Mr. Cunningham would read a
 3      3     script on Manny's Orphans, he would ask you to make a
 4      4     certain change.  Is that right?
 5      5        A.  After he said, "I really like this," then he
 6      6     might say, "I think this will work better if this
 7      7     scene comes after that scene," something like that,
 8      8     and we would discuss it.  As -- I know I just
 9      9     finished a -- doing this -- a film with Tom Holland
10     10     and we had the same kinds of discussions, so yeah.
11     11        Q.  And you would make those changes that
12     12     Mr. Cunningham asked you to make?
13     13        A.  If I believed in them.
14     14        Q.  Okay.  Do you recall any time where you
15     15     said, "I refuse to make that change"?
16     16        A.  I would say things like, "Are you serious?
17     17     This" -- "this thing works the way it is."  Or, "I
18     18     think that will destroy what's coming down the line,"
19     19     or something like that.  We would have discussion.
20     20            Oftentimes we would find, as I said before,
21     21     a third option which was much better, but it
22     22     wasn't -- I don't want to characterize Sean's and my
23     23     relationship as him standing over me with a riding
24     24     crop saying you've got to change this as -- that's
25     25     not the way we worked.
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

85

```
1        1        Q.  And you don't remember any time on
2        2    Manny's Orphans where he said to you this has to
3        3    change and you didn't like it and -- and you made the
4        4    change anyway?
5        5        A.  Manny's Orphans.  No, the only one I
6        6    remember was in Here Come the Tigers.
7        7        Q.  And what happened with Here Come the Tigers?
8        8        A.  I don't want to go into it.
9        9        Q.  What -- can you tell -- I'm asking you to go
10      10    into it.
11      11            MR. TOBEROFF:  No, you have to answer the
12      12    questions.
13      13            THE WITNESS:  Oh, Okay.
14      14            MR. TOBEROFF:  You volunteered, so now you
15      15    have to answer the question.
16      16            THE WITNESS:  There was a horrible
17      17    suggestion in the --
18      18    BY MS. ESKENAZI:
19      19        Q.  By Sean?
20      20        A.  I won't reveal the source of it.
21      21            MR. TOBEROFF:  You have to reveal the
22      22    source.
23      23            THE WITNESS:  All right.  Mr. Scuderi wanted
24      24    a scene in the dugout where one of the boys would
25      25    fart and a big pink cloud would come out.  And I
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

86

1    said, "Over my dead body."  And Mr. Scuderi

2    prevailed, I forget.

3    BY MS. ESKENAZI:

4        Q.  Okay.  And who is Mr. Scuderi?

5        A.  The man who put you up the money for Here

6    Come the Tigers.

7        Q.  Okay.  So he was -- he was the financier?

8        A.  To the best of my knowledge.

9        Q.  Was Mr. Scuderi also involved in financing

10   Friday the 13th?

11       A.  To the best of my knowledge.

12       Q.  Okay.  And I take it from -- from your face

13   and your description that you did not like

14   Mr. Scuderi's suggestion with respect to Here Come

15   the Tigers?

16       A.  Not at all.

17       Q.  Okay.  And it went into the script anyway?

18       A.  Yes.

19       Q.  When Manny's Orphans went into production,

20   did you continue to have a screenwriting role with

21   respect to Manny's Orphans, which -- did you make

22   changes during production?

23       A.  Yes.

24       Q.  Were you on set?

25       A.  Occasionally.

87

```
 1      Q.  How often?

 2      A.  I have no recollection.

 3      Q.  Now, prior to working on Friday the 13th, is

 4   it true that you had no background in horror films

 5   whatsoever?

 6      A.  No background?  Can you define "background"?

 7   Do you mean writing them?  Seeing them?

 8      Q.  Did you tell Mr. Bracke that prior to

 9   writing Friday the 13th you had no background in

10   horror movies whatsoever?

11      A.  In that case, I meant writing and

12   constructing, yeah.

13      Q.  And that's correct --

14      A.  Yes.

15      Q.  -- you had no background in writing and

16   constructing horror films --

17      A.  Correct.

18      Q.  -- at that point in time?

19          That's yes?

20      A.  That is correct.

21      Q.  And prior to writing Friday the 13th, is it

22   true that you didn't even like horror films?

23      A.  I got scared easily.

24      Q.  Okay.  And did you describe yourself to

25   Mr. Bracke as a woose?
```

88

```
 1        A.  I did.

 2        Q.  And what is a woose?

 3        A.  A woose is a weak, spineless coward.

 4        Q.  Okay.  And so as a -- as a result of that

 5   description, you said you were not a big horror film

 6   person?

 7        A.  That's correct.

 8        Q.  So at the time that you began working on

 9   Friday the 13th, you knew that Sean Cunningham had

10   prior experience producing a horror film Last House

11   on the Left.  Right?

12        A.  I did know that.

13        Q.  And that was a successful horror film,

14   wasn't it?

15        A.  I can't speak to that, but yes, it was very

16   popular.

17        Q.  It certainly was well noted, wasn't it?

18        A.  Hm-hm.

19        Q.  And, in fact, is a cult film even today?

20            MR. TOBEROFF:  You can answer if you know

21   that answer.

22   BY MS. ESKENAZI:

23        Q.  Do you know?

24        A.  I don't know the answer.

25        Q.  You don't know one way or the other?
```

A-195

89

1      A.  I don't know one way or the other.

2      Q.  Okay.

3            In fact, though, you were impressed with

4  Mr. Cunningham because he had done Last House on the

5  Left which was a lot more than you had done.  Right?

6      A.  I did say that.

7      Q.  Yes.  And that was true, wasn't it?

8      A.  It was.

9      Q.  And in order to learn how to write in this

10  genre, you actually went to go see Halloween.  Right?

11      A.  Yes.

12      Q.  And you also learned how to write in the

13  horror film genre from Mr. Cunningham, didn't you?

14      A.  Not really.

15      Q.  He taught you that killings had to be

16  personal, didn't he?

17      A.  Yes, he did.

18      Q.  Okay.  And one of Sean's pieces of wisdom

19  that he imparted to you was that guns are terribly

20  impersonal weapons for movies.  Right?

21      A.  Yes, I did quote him that.

22      Q.  All right.  And so in Friday the 13th as a

23  result of Mr. Sean -- of Mr. Cunningham's tutorage,

24  you didn't use guns to kill any of the victims off,

25  did you?

90

```
 1       1       A.   No.

 2       2       Q.   That's correct.  Right?

 3       3       A.   I don't like the -- the acceptance of at

 4       4   Sean's tutelage in there that this was -- this was

 5       5   the way we worked.  And he was not a teacher and I

 6       6   was not a student.  I mean, I learned more from Debra

 7       7   Hill and John Carpenter about the elements of a

 8       8   successful horror film than anyone else.

23, 24, 25  9       9       Q.   But you did learn from Mr. Cunningham about

10      10   the horror film genre, didn't you?

11      11       A.   Those two elements that you mention.

12      12       Q.   Well, we'll talk about more elements than

13      13   that.

14      14       A.   Okay.

15      15       Q.   Okay.  And when did you learn from John

16      16   Carpenter and Debra Hill about writing horror films?

17      17       A.   When I saw Halloween.

18      18       Q.   Okay.  Just watching the movie you --

19      19       A.   Yes, ma'am.

20      20       Q.   -- you feel you learned?  Okay.

21      21           MS. ESKENAZI:  Let me show you what's

22      22   been -- we will ask to be marked as Exhibit 8 -- 9

23      23   which is an employment agreement between the Manny

24      24   Company and Victor Miller.

25      25               (The document referred to was
```

97

```
 1     1     A.  Yes, ma'am.

26 2     2        Q.  Okay.  So does this refresh your

   3     3     recollection that on or about June 4, 1979, you sent

   4     4     to the Writers Guild of America a copy of the

   5     5     contract between you and the Manny Company relating

   6     6     to Friday the 13th?

   7     7        A.  Yes.

   8     8        Q.  Okay.  And you see a little "Received" stamp

   9     9     down on the bottom that says June 6, 1979?

  10    10        A.  Yes.

  11    11        Q.  It's on both Exhibit 11 and Exhibit 9?

  12    12        A.  Correct.

  13    13        Q.  Okay.  Do you have any reason to believe

  14    14     that the Writers Guild of America didn't receive

  15    15     Exhibits 9 and 11 on or about June 6th, 1979?

  16    16        A.  No.

  17    17           MR. TOBEROFF:  Actually, my copy, it looks

  18    18     like it says received June 6th and somebody wrote on

  19    19     it 1978.  It's very strange.

  20    20     BY MS. ESKENAZI:

  21    21        Q.  It looks like 1979 to me, but that's not a

  22    22     great copy, so.

  23    23        A.  It says June 6th.

  24    24        Q.  Okay.

  25    25           MR. TOBEROFF:  It says June 6, but the --
```

A-198

100

```
 1      1    Right?
 2      2        A.  Yes.
 3      3        Q.  So why did you sign this employment
 4      4    agreement in or about June of 1979?
 5      5            MR. TOBEROFF:  Vague and ambiguous.
 6      6    BY MS. ESKENAZI:
 7      7        Q.  Why did you enter into an employment -- a
 8      8    written employment agreement with the Manny Company?
 9      9        A.  Because I had already written a treatment
10     10    and at least one draft, if not two drafts, of the
11     11    screenplay originally titled Long Night at Camp Blood
12     12    and then Friday 13.  And that I wouldn't get paid
13     13    unless I signed this thing.  And it was represented
14     14    to me that that's all there was in the pot.
15     15        Q.  Well, these amounts that are specified in
16     16    this employment agreement are the minimums.  Right?
17     17    They weren't violative of the Writers Guild?
18     18        A.  No, they were not.
19     19        Q.  Okay.  So you say that you had already
20     20    written a treatment and at least one or two drafts of
21     21    the screenplay by the time June 4th came around.
22     22    Right?
23     23        A.  Yes.  Yes, I do.
24     24        Q.  Okay.  Do you see on Exhibit 9, the
25     25    employment agreement, it says:
```

A-199

114

```
 1      1    labor union is to be able to take advantage of the

 2      2    benefits that are -- the employment benefits that are

 3      3    required by the Guild when a Guild signatory hires a

 4      4    writer.

 5      5            Isn't that right?

 6      6        A.  I cannot speak to the whole point of being

 7      7    in a labor union.  There's a delicate balance between

 8      8    being in the union and being in the real world.

 9      9        Q.  But one of the -- one of the advantages to

10     10    being in a labor union is that they provide you

11     11    employment benefits that in a free system, in a free

12     12    economy, you may not have the leverage to be able to

13     13    obtain.

14     14            Isn't that right?

15     15            MR. TOBEROFF:  Objection.  Is that a

16     16    question?

17     17            MS. ESKENAZI:  It is.

18     18            THE WITNESS:  If you could restate it.

19     19            MS. ESKENAZI:  Can you read it back, please.

20     20            (Record read as follows:

21     21                "QUESTION:  But one of the

22     22            advantages to being in a labor

23     23            union is that they provide you

24     24            employment benefits that in a free

25     25            system, in a free economy, you may
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

115

| 1 | 1 | not have the leverage to be able to |
| 2 | 2 | obtain.  Isn't that right?") |
| 3 | 3 | THE WITNESS:  Yes. |

4   BY MS. ESKENAZI:

5       Q.  Okay.  And the employer cannot avoid

6   granting the employee these benefits once they

7   have -- once they have hired you in connection with a

8   writing assignment.

9           Isn't that right?

10          MR. TOBEROFF:  Vague.  Calls for

11  speculation.  And calls for a whole host of legal

12  conclusions.

13  BY MS. ESKENAZI:

14      Q.  Well, let me ask you this.

15          MR. TOBEROFF:  He's here to testify as to

16  things he perceived.

17  BY MS. ESKENAZI:

18      Q.  Let me ask you this.  Do you see anywhere in

19  this employment agreement where you're entitled to

20  residuals?

21      A.  No.

22      Q.  Do you see anywhere in this employment

23  agreement where you're entitled to sequel rights,

24  sequel payments?

25          MR. TOBEROFF:  Calls for a legal conclusion.

```
                                                              117
 1    1    BY MS. ESKENAZI:

 2    2        Q.  Okay.  So even though this employment

 3    3    agreement that you signed doesn't say that you're

 4    4    entitled to residual payments, you were entitled to

 5    5    residual payments, weren't you?

 6    6        THE WITNESS:  Yes.

 7    7        MR. TOBEROFF:  Calls for a legal conclusion.

 8    8        MS. ESKENAZI:  He's answered.

 9    9        THE WITNESS:  Yes.

10   10        MR. TOBEROFF:  Please let me object --

11   11        THE WITNESS:  Okay.  Sorry.

12   12        MR. TOBEROFF:  -- before you snap an answer

13   13    back.  Okay?

14   14        MS. ESKENAZI:  And, in fact --

15   15        MR. TOBEROFF:  Wait, wait, wait.  Time out.

16   16    Time out.

17   17        I -- you need to -- she's asking you

18   18    questions.  This is at the heart of this case.  I

19   19    want to be able to object.  You have to pause, slow

20   20    down, wait a couple seconds, and then let me object

21   21    and then you can answer.  And only answer questions

22   22    that you sure you understand.

23   23        If she's asking you about a legal document,

24   24    even though you're not a lawyer, you can read the

25   25    document before -- read the document before you
```

A-202

118

```
1    1    answer the question.  Okay.
2    2    BY MS. ESKENAZI:
3    3        Q.  So -- so in fact a few years after you
4    4    signed the employment agreement, which has been
5    5    marked as Exhibit 9, you asked the WGA to sue Sean
6    6    Cunningham for those residual payments, didn't you?
7    7            MR. TOBEROFF:  Lacks foundation.  Assumes
8    8    facts.
9    9            You can answer.
10   10           THE WITNESS:  Yes.
11   11   BY MS. ESKENAZI:
12   12       Q.  And you asked the WGA, even though the
13   13   employment agreement, which is Exhibit 9, doesn't
14   14   specifically include sequel payments, you asked the
15   15   WGA to sue Sean Cunningham for sequel payments that
16   16   you believed you're entitled to with respect to
17   17   Friday the 13th.
18   18           Isn't that right?
19   19       A.  I believe so.
20   20       Q.  And the WGA did in fact pursue
21   21   Mr. Cunningham for those employment benefits on your
22   22   behalf.  Isn't that right?
23   23       A.  Yes.
24   24       Q.  Okay.  And why did you believe yourself
25   25   entitled to residuals and sequel payments?
```

119

1      A.  I do not know.

2      Q.  Did the WGA tell you that you were entitled

3  to those?

4      A.  I can only assume so.  I don't think I

5  invented it.

6      Q.  In fact, you wrote to Mr. Cunningham early

7  on seeking those residual payments, didn't you?

8      A.  Hm-hm.

9      Q.  Yes?

10      A.  I -- oh, no, wait a minute.  I'm sorry.

11  That was a knee-jerk.

12          I don't recall writing to him.

13          MS. ESKENAZI:  Okay.  I'll ask the court

14  reporter to mark as Exhibit 13 a letter from Victor

15  Miller to Sean.

16          MR. TOBEROFF:  The last -- the last -- the

17  letter dated June 14th, what's the exhibit number on

18  that?

19          MS. ESKENAZI:  It's Exhibit 12.

20          MR. TOBEROFF:  Okay.  Sorry.

21          MS. ESKENAZI:  Okay.  I'm going to ask the

22  court reporter to mark as Exhibit 13 a letter from

23  Victor Miller to Sean Cunningham dated August 11th,

24  1980.

25              (The document referred to was

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

120

1        marked as Exhibit 13.)

2   BY MS. ESKENAZI:

3        Q.  Have you had an opportunity to take a look

4   at Exhibit 13?

5        A.  Yes, I have.

6        Q.  Okay.  And is that your signature on the

7   bottom of Exhibit 13?

8        A.  It is.

9        Q.  And did you write it at or about

10  August 11th, 1980?

11       A.  Yes, ma'am.

12       Q.  Now, does that refresh your recollection

13  that you sent the letter to Sean Cunningham asserting

14  that you had certain rights to payment pursuant to

15  the Guild rules --

16       A.  Correct.

17       Q.  -- for Friday the 13th?

18       A.  16A5a.

19          MR. TOBEROFF:  What?  I don't understand

20  the --

21  BY MS. ESKENAZI:

22       Q.  And what is paragraph 16A5a?  Do you have a

23  present recollection of what that is?

24       A.  I do not, but it says "concerning separated

25  rights and sequels."  And Sean had told me when we

A-205

121

```
 1      were signing the contract that I had separated
 2      rights.
 3          Q.  And that was pursuant to the Guild
 4      agreement.  Isn't that right?
 5          A.  I believe so.
 6          Q.  That's one of the employment --
 7          A.  I don't know.
 8          Q.  -- benefits that you get being a Guild
 9      member.  Right?
10          A.  I assume so.
11          Q.  It wasn't in the contract.  It didn't say
12      specifically "separated rights or sequel payments,"
13      did it?
14          A.  Right.
15          Q.  And it didn't say "residual payments," did
16      it?
17          A.  It's -- that piece of paper, no.
18          Q.  Right.  That -- however, the employment
19      benefits specified by the MBA entitled you to those
20      benefits.  Right?
21              MR. TOBEROFF:  Do you know the answer to
22      these questions?
23              THE WITNESS:  As that -- that one I do not
24      know.
25              MR. TOBEROFF:  Okay.  Then you have to just
```

122

1    answer to your knowledge.

2           THE WITNESS:  I do not know.

3    BY MS. ESKENAZI:

4       Q.  But you knew when you wrote in August of

5    1980 to Sean Cunningham asserting your right to

6    separated rights and sequels that you were entitled

7    to those employment benefits as a result of paragraph

8    16A5a of the Writers Guild?

9       A.  Yes, ma'am.

10      Q.  Okay.  Okay.  Now, let's go back to the

11   employment agreement, which is Exhibit 9.

12          Okay.  At the time you signed that

13   employment agreement, did you ask Mr. Cunningham any

14   questions about it?

15      A.  I do not recall.

16      Q.  Did you ask the WGA any questions about

17   Exhibit 9 at the time -- at or about the time you

18   signed it?

19      A.  I do not recall.

20      Q.  Do you recall whether you asked anybody

21   about Exhibit 9 at or about the time you signed it?

22      A.  I think the only person I spoke to was Sean.

23      Q.  Okay.  And I just want to be clear.  I may

24   have asked this before, but I just want to be clear

25   that when you said that the only person that you

132

```
 1       1              MS. ESKENAZI:  Would read back the question,
 2       2       please.
 3       3              (Record read as follows:
 4       4                 "QUESTION:  But you filed a
 5       5              notice of termination based on your
 6       6              belief that you had actually
 7       7              written something prior to June
 8       8              4th, 1979?")
 9       9              MR. TOBEROFF:  Calls for a legal conclusion.
10      10              THE WITNESS:  I did.
11      11       BY MS. ESKENAZI:
12      12          Q.  Okay.  Now, when your wife told you that it
13      13       must have been earlier than June 4th, 1979, tell me
14      14       how that -- the context of that con- -- that
15      15       conversation came up.
16      16          A.  I was trying to work out the steps that led
17      17       to Friday the 13th.  And as I did that, I realized
18      18       that it was much earlier -- that the treatment was
19      19       written in -- a much more accurate would be May,
20      20       April or May, and then the first draft right after
21      21       that.
22      22              Because, once again, I was working on a
23      23       project for -- which then Sean would go and get the
24      24       funds as a -- as we had done in all of the previous
25      25       events.
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

A-208

148

```
 1     1            THE WITNESS:  Sure.
 2     2            MR. TOBEROFF:  Yeah.  I'd like -- can we
 3     3     break for lunch at like one?  Is that good for
 4     4     everyone?  Keep going?
 5     5            MS. ESKENAZI:  That's fine.
 6     6            MR. TOBEROFF:  Or later.
 7     7            THE REPORTER:  Off the record?
 8     8            MS. ESKENAZI:  Yes.
 9     9            THE VIDEOGRAPHER:  Okay.  Then this will
10    10     mark the end of DVD number 2 in today's deposition.
11    11     The time is 12:05 p.m., and we are off the record.
12    12               (Recess taken.)
13    13            THE VIDEOGRAPHER:  This marks the beginning
14    14     of DVD number 3 in today's deposition of Victor
15    15     Miller.  The time is 12:24 p.m., and we're back on
16    16     the record.
17    17     BY MS. ESKENAZI:
18    18        Q.  So let's talk about the process of creating
19    19     Friday the 13th.  How did you first learn about the
20    20     Friday the 13th film as a possibility?
21    21        A.  As a possibility?  Sean called and said, as
22    22     we had done before, "Halloween's making a lot of
23    23     money.  Let us capitalize on it."
24    24            And I went to see Halloween.  And I studied
25    25     the structure and seemed to see what the -- the
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                              85

156

```
 1      1    conversation with Sean.

 2      2              MR. TOBEROFF:  After he saw Halloween?

 3      3              MS. ESKENAZI:  After he saw Halloween.

 4      4              THE WITNESS:  I -- I cannot really recall

 5      5    that other than, I would assume --

 6      6              MR. TOBEROFF:  Don't assume.

 7      7              THE WITNESS:  All right.  I don't assume.

 8      8              MR. TOBEROFF:  You're not here to assume.

 9      9    You either recall something or you don't.

10     10              THE WITNESS:  Okay.  I -- I do not recall.

11     11    BY MS. ESKENAZI:

12     12         Q.  Okay.  So after you saw the movie Halloween,

13     13    did you and Sean both decide that there should be a

14     14    further development of that?

15     15         A.  I think that was decided in that phone call.

16     16         Q.  In the first phone call?

17     17         A.  Yeah, in the first phone call, that this was

18     18    going -- and like all of the other projects before

19     19    it, I would whip up a treatment and a screenplay, if

20     20    possible, and Sean would find the money.

21     21              MS. ESKENAZI:  Okay.  Strike that as

22     22    nonresponsive.  So --

23     23              MR. TOBEROFF:  I don't know what that means.

24     24              MS. ESKENAZI:  It was not responsive to

25     25    the --
```

33, 34

157

1        MR. TOBEROFF:  No, but she's not striking

2    it.  You can move to the court to strike it.

3        MS. ESKENAZI:  That's correct.  That's what

4    I'm doing.

5    BY MS. ESKENAZI:

6        Q.  So after you saw the movie Halloween, what

7    was your next step in -- in moving the development

8    process for the film along?

9        A.  After I came up with those four things?

10       Q.  Yes.

11       A.  Right.  My next step was to noodle in my

12   head about what would be the ideal location for a

13   bunch of teenagers to be where they could not be

14   helped by adults.  And my best recollection is that I

15   came up with probably fifteen or twenty different

16   locations that could be possibilities.  And the last

17   one I wrote down was "summer camp before it opens."

18   And I took that list to Sean to discuss it with him

19   in his kitchen, and we both agreed summer camp was

20   sheer brilliance.

21       Q.  Okay.  So let me ask you another question.

22           Halloween, where did you see it?

23       A.  In a -- in a movie theater in Bridgeport,

24   Connecticut.

25       Q.  Do you remember the name of the movie

A-211

159

```
 1    1      Q.  Page 8.
 2    2      A.  Yes.  Oh, page 8.  Okay.
 3    3      Q.  Okay?
 4    4          MR. TOBEROFF:  Wait a second.  I need to get
 5    5   Exhibit 4.  Sorry.  Sorry.  I wonder why these are
 6    6   not here.
 7    7          I think you're looking at my copy.
 8    8          THE WITNESS:  Oh, no wonder.  Yes, I am.
 9    9          MS. ESKENAZI:  Okay.
10   10          MR. TOBEROFF:  Now this is your copy.  Your
11   11   copies have the exhibits on them, mine don't.
12   12          THE WITNESS:  I get the little sticker.
13   13   BY MS. ESKENAZI:
14   14      Q.  Okay.
15   15      A.  All right.
16   16      Q.  Page 8.
17   17      A.  Yeah.
18   18      Q.  Okay?
19   19      A.  Hm-hm.
20   20      Q.  Do you see where it says:
21   21              "Basically, my first week's
22   22          work was noodling up."
23   23      A.  Yup.
24   24      Q.      "I came up with about 40, 50, or
25   25          60 different venues."
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

160

```
 1        1       A.   Hm-hm.

 2        2       Q.   Is that correct?  Is that consistent with

 3        3   your current recollection?

 4        4       A.   My current recollection it was fewer than

 5        5   that, but I -- I --

 6        6           MR. TOBEROFF:  Just answer her question.

 7        7           THE WITNESS:  Oh.  Is that correct?  Again,

 8        8   please, the end of the question?

 9        9   BY MS. ESKENAZI:

10       10       Q.   Is it correct that -- or is it consistent

11       11   with your current recollection that you came up with

12       12   40, 50, or 60 different venues during your first

13       13   week's work?

14       14       A.   No, I think it was fewer.

15       15       Q.   Okay.  And what makes you think it was fewer

16       16   than 40, 50, or 60?

17       17       A.   I have no idea other than a gut feeling that

18       18   that's an awful lot.

19       19       Q.   Okay.

20       20       A.   Even for me.

21       21       Q.   And you see where it says in the next

22       22   paragraph:

23       23           "You know, it took a lot, and I

24       24           would go over and pitch them to

25       25           Sean."
```

40, 41

161

```
 1        A.  Hm-hm.

 2        Q.      "And we would both say, 'Nah,

 3            nah, nah, nah.'"

 4        A.  Hm-hm.

 5        Q.      "Then I finally went over to Sean

 6            and said, 'I think I got it.  It's a

 7            summer camp before it opens,' and we

 8            both said, 'Yippee,' and I went home and

 9            started writing."

10        A.  Hm-hm.

11        Q.  Yes?

12        A.  Yes.

13        Q.  Okay.

14            MR. TOBEROFF:  What -- what's the question?

15            MS. ESKENAZI:  I just -- first I was just

16        asking him if he saw where that was.

17            MR. TOBEROFF:  Oh.  Oh, okay.

18            THE WITNESS:  Yes.  Yes, yes, yes.

19            MS. ESKENAZI:  I just want to make sure

20        we're all on the same page.

21            MR. TOBEROFF:  All right.  All right.  Okay.

22            MS. ESKENAZI:  Okay.  All right.

23        BY MS. ESKENAZI:

24        Q.  Now, is your current recollection consistent

25        with that?
```

162

1    A.  Yes.

2    Q.  Okay.  So when you say you would go over,

3    did you mean go over to Sean's house?

4    A.  Either he would come over to mine or I'd go

5    over to his.  It was equal opportunity.

6    Q.  And when you say that you and Sean would --

7    you would pitch the ideas to Sean?

8    A.  Hm-hm.  Hm-hm.  Right.

9    Q.  That -- does that mean that you were

10   suggesting ideas to him which he could reject or

11   accept?

12        MR. TOBEROFF:  Okay.  I just want to make

13   sure that you're looking at the paragraph she's

14   referring to so when you answer, you're answering --

15        MS. ESKENAZI:  That's why I -- that's why I

16   say, "Do you see that?"

17        MR. TOBEROFF:  I understand, but he -- but

18   he's not looking at it when you're asking the

19   question, so I want to make sure he --

20        THE WITNESS:  Okay.

21        MR. TOBEROFF:  -- he looks at the paragraph

22   and then responds.

23   BY MS. ESKENAZI:

24   Q.  Okay.  When you say here you would pitch the

25   ideas to Sean, does that mean you would tell him your

163

```
 1    1    ideas which he could accept or reject?
 2    2        A.  That would not be a fair characterization of
 3    3    how the pitch went.  I would -- I would say one.  He
 4    4    would say another.  I mean, he pitched, too.  We'd
 5    5    pitch back and forth, and then we would -- it was --
 6    6    this is the way we worked a lot.
 7    7        It was, you know, by collaboration, by
 8    8    mutual support.  I'd say one.  He'd say, oh, how
 9    9    about that, that, that, and how about -- you know, I
10   10    said, you know, "How about summer camp before it
11   11    opens?"  And he said, "Fabulous."
12   12        But it wasn't -- it wasn't a sense where I'd
13   13    say a -- I don't know -- a trailer park, and he said,
14   14    "Absolutely not, I forbid you to have a trailer
15   15    park."
16   16        Q.  But if he said he didn't like the trailer
17   17    park idea, you would go on to another idea.
18   18        Isn't that right?
19   19        A.  Yeah, and then he -- and then he would say,
20   20    "How about a dugout in a baseball game?"
21   21        And I'd say, "That sucks."
22   22        He'd say, "Yeah, it does."
23   23        I mean, that's the way a writer and a
24   24    director work together.  And then it wasn't -- it
25   25    wasn't a sense of, gee, Sean -- I hope Sean likes
```

165

```
 1        A.  No, that would be a mischaracterization,
 2   which is what I said.  And we both said, "Yippee."
 3        Q.  Okay.  Right.
 4        A.  It was -- it was collaboration.  It wasn't
 5   a -- you know.
 6        Q.  Okay.  But Sean said "yippee" meaning good,
 7   good to go?
 8        A.  Right.
 9        Q.  I like that idea.  Right?
10        A.  And we both -- we both said -- I mean, it
11   came up.
12        Q.  Well, I -- is it true that with respect to
13   the other locations that you recommended, that you
14   also liked those ideas?
15        A.  No.
16        Q.  No, you just wrote them down, and you
17   presented them --
18        A.  I -- I wrote down --
19        Q.  Let me finish.
20        A.  I'm sorry.
21        Q.  You just wrote down these other locations
22   even though you didn't like them?
23        A.  I wrote down a list of possibilities that
24   might or might not be usable.  Some I liked.  Some I
25   said, oh -- even as I wrote them, I said no.  But I
```

A-217

170

| | | |
|---|---|---|
| 1 | 1 | knowledge. |
| 2 | 2 | THE WITNESS:  To my knowledge. |
| 3 | 3 | BY MS. ESKENAZI: |
| 4 | 4 | Q.  "To my knowledge," that's correct? |
| 5 | 5 | A.  Yeah. |
| 6 | 6 | Q.  Okay.  All right. |
| 49,50 7 | 7 | MS. ESKENAZI:  So let us show you -- or |
| 8 | 8 | let's ask the court reporter to mark as Exhibit 14 -- |
| 9 | 9 | I've asked the court reporter to mark as Exhibit 14 a |
| 10 | 10 | document which is Bates-stamped VM 0001 through |
| 11 | 11 | VM 00016 entitled "The Long Night at Camp Blood." |
| 12 | 12 | (The document referred to was |
| 13 | 13 | marked as Exhibit 14.) |
| 14 | 14 | BY MS. ESKENAZI: |
| 15 | 15 | Q.  Do you recognize what's been marked as |
| 16 | 16 | Exhibit 14? |
| 17 | 17 | A.  I do. |
| 18 | 18 | Q.  Okay.  Can you tell us what that is? |
| 19 | 19 | A.  It is a treatment that I submitted for |
| 20 | 20 | Sean's use to raise funds. |
| 21 | 21 | Q.  Well, when you say you submitted it for use |
| 22 | 22 | to Sean to raise funds, how do you know that?  How do |
| 23 | 23 | you know that he used this treatment to raise funds? |
| 24 | 24 | A.  Because it's very difficult to sell a movie |
| 25 | 25 | without either a treatment or a screenplay.  And -- |

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

A-218

172

```
 1       1   questions.

 2       2           MS. ESKENAZI:  Can you read the question

 3       3   back.

 4       4           THE REPORTER:  One moment, please.

 5       5           (Record read as follows:

 6       6              "QUESTION:  When you say 'we

 7       7           came up with this,' you mean you

 8       8           and Sean?")

 9       9           THE WITNESS:  No.

10      10   BY MS. ESKENAZI:

11      11       Q.  Who is "we"?

12      12       A.  I wrote it.

13      13       Q.  And did you write it with input from Sean?

14      14       A.  I believe so.

15      15       Q.  Okay.  Whose handwriting is on there --

16      16       A.  That's mine.

17      17       Q.  -- on page 1?

18      18           "Canoeing," et cetera, is your handwriting?

19      19       A.  Yes.  Yep.

20      20       Q.  Okay.  And If you turn to page 6, VM 00006.

21      21   On the bottom, there's a note, which says:

22      22              "I forgot to insert the part

23      23           where Jack checks out is camping

24      24           gear" --

25      25           I think that means "his camping gear."
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                    **95**

173

| | | |
|---|---|---|
| 1 | 1 | A. Hm-hm. |
| 2 | 2 | Q. -- "and we see the line of |
| 3 | 3 | hatchets and Coleman lanterns, |
| 4 | 4 | et cetera." |
| 5 | 5 | Do you see where it says that? |
| 6 | 6 | A. Hm-hm. Yep. |
| 7 | 7 | Q. Is that a note that you wrote to Sean? |
| 8 | 8 | A. It's a note I wrote to myself and possibly |
| 9 | 9 | to Sean as well. |
| 10 | 10 | Q. And why do you think it's a note that you |
| 11 | 11 | wrote to yourself? |
| 12 | 12 | A. Because as you -- as I laid out the story, I |
| 13 | 13 | would suddenly remember something like you forgot to |
| 14 | 14 | put that in, and so I put it in here. That's the |
| 15 | 15 | kind of informal way we were working. |
| 16 | 16 | Q. You and Sean? |
| 17 | 17 | A. Yeah. |
| 18 | 18 | Q. Right. So that's a note to Sean to say I |
| 19 | 19 | forgot that? |
| 20 | 20 | A. It's a note to me -- it's a note to me and |
| 21 | 21 | to admit that it -- it needs for the next draft, to |
| 22 | 22 | take care of it. |
| 23 | 23 | Q. Okay. And is this an idea that you and Sean |
| 24 | 24 | talked about where Jack checks out his camping gear? |
| 25 | 25 | A. I don't remember. |

180

1    BY MS. ESKENAZI:

2        Q.  Well, let me ask you, what is it?

3            MR. TOBEROFF:  -- misstates the discussion.

4    BY MS. ESKENAZI:

5        Q.  Okay.  What is what's been marked as

6    Exhibit 15?

7        A.  It -- it's a -- the first time I saw it was

8    when it was sent to me.

9        Q.  What does that mean, when was it sent to

10   you?

11       A.  It appears --

12           MR. TOBEROFF:  Answer her question first.

13           THE WITNESS:  Oh, what?

14           MR. TOBEROFF:  What did you mean by that?

15           THE WITNESS:  With the discovery materials.

16   BY MS. ESKENAZI:

17       Q.  So the first time you saw this treatment was

18   in connection with this --

19       A.  This case, yeah.

20       Q.  -- litigation?

21           You've never seen this before?

22       A.  No, this is a cleaned-up version of what I

23   had written.

24           MR. TOBEROFF:  She's asking you if you ever

25   saw it before.

181

1           THE WITNESS:  No.

2     BY MS. ESKENAZI:

3           Q.  Do you know who wrote it?

4           A.  I did, except for the -- the rearrangement

5     on the page and with the sort of little blog lines

6     under each scene or act.

7           Q.  And is it your testimony that -- that you

8     didn't use this treatment in order to write your

9     first draft of the script?

10          A.  It is.

11          Q.  So -- okay.  So when you were writing your

12    first draft of the script, you did not have what's

13    been marked as Exhibit 15 before you?

14          A.  I cannot be sure.  I don't think so.

15          Q.  But you don't know one way or another.  You

16    might have had it?

17          A.  I might have had it.  I might not.

18          Q.  Okay.

19          A.  This is -- this took out all of the asides

20    and the funny little misprints and the typos and --

21    that I -- that I put in.  But it -- thirty-five years

22    later, it doesn't look familiar.

23          Q.  You don't know one way or the other?

24          A.  I don't know one way or another.

25          Q.  Okay.  So with respect to what has been

A-222

182

1    1    marked as Exhibit 14, which is a document you say you

2    2    literally wrote and typed?

3    3       A.  Right.  Yep.

54   4    4       Q.  Did you ever attempt to register what's been

5    5    marked as Exhibit 14 for copyright registration?

6    6       A.  I did not.

7    7       Q.  And is there anywhere indicated on

8    8    Exhibit 14 the date that it was written or over the

9    9    period of time it was written?

10    10       A.  No.

11    11       Q.  Do you know whether these two treatments,

12    12    Exhibits 14 and 15, ever got reconciled?

13    13       A.  Offhand, no.

14    14       Q.  Okay.  So let's talk a little bit about

15    15    screenplay drafts.  Oh, so -- let me go back a

16    16    second.

17    17       Other than these two screenplay treatments,

18    18    are you aware of any other treatments that were

19    19    written for the film that eventually became

20    20    Friday the 13th?

21    21       A.  No.

22    22       Q.  Okay.  So let's talk about the -- the

23    23    treatment that's been marked as Exhibit 14.

24    24       Did Sean give you any comments or changes

25    25    that he wanted in Exhibit 14?

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

186

```
 1      1      Q.  But he didn't disclose what finances he
 2      2  actually had --
 3      3      A.  No.
 4      4      Q.  -- or didn't have?
 5      5      A.  No.
 6      6      Q.  Okay.  So how long before you started the
 7      7  screenplay after you finished the treatment?
 8      8      A.  I have no recollection.  But we were under
 9      9  the gun, and I assume it was quickly.
10     10      Q.  In fact, you've told people that everything
11     11  was happening really fast at that time.
12     12          Isn't that right?
13     13      A.  I think so.
14     14      Q.  So describe the process between the
15     15  treatment and the screenplay.  How did it go from
16     16  treatment to screenplay?
17     17      A.  Can you ask a question that has --
18     18      Q.  Okay.
19     19      A.  -- fewer paragraphs in it?  I mean, in the
20     20  sense that from treatment to screenplay is an
21     21  infinite array of processes.
22     22      Q.  Did you -- during the time you were drafting
23     23  the screenplay after you finished the treatment --
24     24      A.  Right.
25     25      Q.  -- did you -- were you continuing to meet
```

55, 56, 57

187

1    with Sean Cunningham?

2        A.  We either met or -- or spoke on the phone.

3        Q.  How frequently?

4        A.  I have no particular memory.

5        Q.  Have you ever told anyone it was two to four

6    days per week?

7        A.  I -- if you have it there somewhere, I must

8    have told somebody.  But I don't remember.  I do not

9    recall specifically.

10       Q.  Is that inconsistent with your recollection?

11       A.  Well, it depends -- I mean, we were -- we

12   live twenty minutes apart.  He would drive to my

13   house.  I would drive to his.  We were in and out of

14   each other's house all the time.  So it's -- it's

15   entirely possible two to four days a week we'd hang

16   out.

17       Q.  And it was during this period of time that

18   you were writing the screenplay that you were back

19   and forth with Sean?

20       A.  Yeah.

21       Q.  Yes?

22       A.  Yes.

23       Q.  Okay.  And during that period of time, did

24   you discuss character and scene development with

25   Sean?

188

1    MR. TOBEROFF:  But you're talking about the

2    time between the first draft and the treatment?

3    MS. ESKENAZI:  Yes.

4    THE WITNESS:  We -- it's my -- it's my

5    impression that we discussed all kinds of aspects.

6    You know, we -- we --

7    MR. TOBEROFF:  But she's asking you --

8    You want to read back the question.

9    THE WITNESS:  Character --

10    MS. ESKENAZI:  No, no, no.

11    MR. TOBEROFF:  I --

12    MS. ESKENAZI:  You can answer.

13    THE WITNESS:  Yeah.

14    MS. ESKENAZI:  Please don't interrupt the

15    witness's answer.

16    Go ahead.

17    THE WITNESS:  Okay.  Shoot me again the

18    question, please.

19    THE REPORTER:  One moment, please.

20    (Record read as follows:

21        "QUESTION:  And during that

22        period of time, did you discuss

23        character and scene development

24        with Sean?")

25    THE WITNESS:  I have no specific memory, but

189

```
1    1    I think it goes without saying if you're talking to a
2    2    director.
3    3    BY MS. ESKENAZI:
4    4        Q.  Who was also a producer of the film?
5    5        A.  (Nods head.)
6    6        Q.  Yes?
7    7        A.  Producer of the film, yes.
8    8        Q.  Okay.  So what kinds of things did you
9    9    discuss with Sean Cunningham when you were drafting
10   10   the screenplay after you finished the treatment?
11   11       A.  The kinds of things we discussed I can only
12   12   characterize as what -- what do both of us like and
13   13   what do both of us not like, where -- and, you know,
14   14   how can we kick it up a notch.  It was that kind of a
15   15   thing.
16   16            And as I've said earlier, Sean would make
17   17   notes, you know, like make this scarier, or make this
18   18   funny, or whatever.
19   19       Q.  And you would incorporate Sean's -- Sean's
20   20   notes into your screenplay?
21   21       A.  The ones that we both agreed were good,
22   22   yeah.
23   23       Q.  Well, for example, he advised you to keep
24   24   the villain masked, to not show him doing things like
25   25   brushing his teeth.  Right?
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

190

```
 1      1       A.  Hm-hm.
 2      2       Q.  And you -- yes?
 3      3       A.  Yes.  I'm sorry.
 4      4       Q.  And you incorporated that into your --
 5      5       A.  I did.
 6      6       Q.  Okay.
 7      7       A.  I did.
 8      8       Q.  And you've also said to people that Sean is
 9      9    a good student of filmmaking, and you learned from
10     10    him on Friday the 13th.  Right?
11     11       A.  Yes.
12     12       Q.  Okay.  Sean also suggested to you that you
13     13    learn from Alfred Hitchcock --
14     14       A.  Hm-hm.
15     15       Q.  -- in Psycho and that you kill off a major
16     16    player at the outset.  Isn't that right?
17     17       A.  That is correct.
18     18       Q.  And as a result, you killed off Annie at the
19     19    outset?
20     20       A.  That is -- yes, ma'am.
21     21       Q.  So do you have a -- do you know one way or
22     22    another whether the first draft of the screenplay was
23     23    drafted after Sean got a funding commitment or
24     24    before?
25     25       A.  First draft.  My best recollection is the
```

208

1     THE WITNESS:  I do not know.

2     BY MS. ESKENAZI:

3     Q.  Okay.  We would ask you to look through your

4     documents to see if you have an original of either

5     14, 15, or 16.

6     A.  (Nods head.)

7     Q.  Okay.  Did you ever attempt to register

8     what's been marked as Exhibit 16 for copyright

9     protection?

10     A.  I did not.

11     MS. ESKENAZI:  Why don't we take a lunch

12     break --

13     MR. TOBEROFF:  Okay.

14     MS. ESKENAZI:  -- since it's 1:30.  Come

15     back in 45 minutes?  An hour?  I mean, I don't know

16     how long --

17     We can go off the record.

18     THE VIDEOGRAPHER:  This will mark the end of

19     DVD number 3 in today's deposition of Victor Miller.

20     The time is 1:33 p.m., and we're off the record.

21          (Whereupon at 1:33 P.M., the

22          videotaped deposition of VICTOR

23          MILLER was adjourned for noon

24          recess.)

25

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

212

```
 1      1      as Exhibit 17?
 2      2          A.  Yes, I do.  Yes, that I wrote the treatment
 3      3      and the first and most -- probably most of the second
 4      4      draft before the contract was signed.
 5      5          Q.  Okay.  And do you recall seeing this cover
 6      6      page on the second -- on what is the second draft at
 7      7      or about the time that you wrote it?
 8      8          A.  Well, no.  I mean, I -- this is not the
 9      9      draft I handed in because it has scene numbers and it
10     10      has copyright 1979, Sean Cunningham Films Limited,
11     11      property of Sean, and Friday the 13th -- and
12     12      Friday 13.
13     13          Q.  So what is marked Exhibit 17 is not your
14     14      work?
15     15              MR. TOBEROFF:  Well --
16     16              THE WITNESS:  It is my work, but it's been
17     17      reconfigured.  It's been retyped so that it's not
18     18      exactly -- it's not the one I handed in exactly.
19     19      BY MS. ESKENAZI:
20     20          Q.  Okay.  So who -- if you know, who typed
21     21      what's been marked as Exhibit 17?
22     22          A.  I would think it was Sean's secretary.
23     23          Q.  And you got a copy back from Sean's
24     24      secretary?
25     25          A.  Yes, ma'am.
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

213

| 1 | 1 | Q.  Okay.  And this is the copy that you |
| 2 | 2 | received back from Sean's secretary -- |
| 3 | 3 | A.  Yes. |
| 4 | 4 | Q.  -- at or about June 1979.  Is that correct? |
| 5 | 5 | A.  Correct. |
| 6 | 6 | Q.  Okay.  And did you ever tell Sean that the |
| 7 | 7 | copyright on this -- on the cover page of what's been |
| 8 | 8 | marked as Exhibit 17 was incorrect? |
| 9 | 9 | A.  I did not. |
| 10 | 10 | Q.  Okay.  In fact, up until the time you filed |
| 11 | 11 | this notice of termination, you have repeatedly said |
| 12 | 12 | to people that Sean is the owner of Friday the 13th |
| 13 | 13 | and you're not an owner. |
| 14 | 14 | Isn't that correct? |
| 15 | 15 | A.  That -- that's -- I cannot say that's |
| 16 | 16 | completely correct.  I -- it's too vague for me. |
| 17 | 17 | Q.  You've told people that you were not an |
| 18 | 18 | owner of Friday the 13th.  Isn't that right? |
| 19 | 19 | A.  I have told people that, yes, I was left in |
| 20 | 20 | the lurch. |
| 21 | 21 | Q.  That you were not an owner? |
| 22 | 22 | A.  Right. |
| 23 | 23 | MR. TOBEROFF:  Answer -- just listen to her |
| 24 | 24 | question and answer her question. |
| 25 | 25 | THE WITNESS:  Okay. |

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                   **107**

A-231

216

1       this.

2           Q.  And approximately when was that?

3           A.  June.

4           Q.  Okay.  And what makes you think that you

5       wrote a third draft?

6           A.  Because the ending is different when I wrote

7       the -- the -- the other draft.

8           Q.  Tell me what those differences are.

9           A.  This does not include Jason coming out of

10      the water.

11          Q.  And you believe that you wrote that third

12      draft in June of Jason coming out of the water?

13          A.  In June or July, yeah.

14          Q.  The idea for Jason coming out of the water

15      was an idea that was given to you by Mr. Cunningham,

16      wasn't it?

17          A.  That would be an overstatement.  Basically,

18      he said -- and I quote because I remember the phone

19      call very well -- he said, "We need a chair jumper at

20      the end."

21              My -- my reaction to that was, "You want

22      Jason coming out of the water?"

23              And he said, "Yes."

24          Q.  So you -- your testimony is that it was your

25      idea to have Jason coming out of the water?

A-232

217

65  1     1        A.  It was Sean's idea that we needed a chair

    2     2     jumper.  And the most logical one was Jason coming

    3     3     out of the water as a nightmare.

    4     4        Q.  Okay.  So if --

    5     5        A.  And then Alice in the hospital was -- came

    6     6     out of that.

    7     7        Q.  Came out of that from whom?

    8     8        A.  From me.  I wrote -- that was the complete

    9     9     thing.  Jason coming out of the water, the policeman

   10    10     coming to the -- to the camp, picking up with Alice

   11    11     in the hospital bed and with her saying, "Where's the

   12    12     boy?"

   13    13        Q.  So if -- if the -- if somebody said to you

   14    14     that Jason coming out of the water at the end was

   15    15     Phil Scuderi's idea, you would disagree with that.

   16    16            Is that correct?

   17    17        A.  I would disagree with that strongly.

   18    18        Q.  Okay.  And why is it that you believe that

   19    19     you wrote that different ending in June of 1979?

   20    20            MR. TOBEROFF:  Misstates his testimony.  He

   21    21     said June or July.

   22    22            THE WITNESS:  I said June or July.

   23    23            MS. ESKENAZI:  June or July.

   24    24            THE WITNESS:  Yeah.

   25    25            MS. ESKENAZI:  June or July of 1979.

222

```
 1    1    just -- what does that mean to you?
 2    2         A.  It means that they were hiring people and
 3    3    casting people and --
 4    4         Q.  So -- so you don't know whether they were
 5    5    actually filming at that time?
 6    6         A.  Oh, no, they were not filming at that time.
 7    7         Q.  They were not filming.
 8    8         A.  No.
 9    9         Q.  Okay.  So you believe you wrote the Jason
10   10    scene coming up out of the water before they actually
11   11    started filming?
12   12         A.  Yes, ma'am.
13   13         Q.  Okay.  Got it.
14   14              And with respect to the second draft of the
15   15    screenplay, did you ever make an attempt to register
16   16    the copyright in your own name for the second draft?
17   17         A.  I did not.
18   18         Q.  After you completed -- and so other than
19   19    that last set of scenes where Jason coming up out of
20   20    the water --
21   21         A.  Sure.
22   22         Q.  -- were there additional drafts that you
23   23    wrote after that?
24   24         A.  I -- I do not have a specific memory, but I
25   25    can assume there were changes.  I would change a
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                    110

228

1      1        A.  It was a -- a motorcycle policeman who drove

2      2    up and interrupted the kids in their horseplay and

3      3    then he warned them and left.

4      4        Q.  And you did not write that scene?

5      5        A.  I did not write that scene.

6      6        Q.  And you didn't like that scene, did you?

7      7        A.  No, I certainly did not.

8      8        Q.  Okay.  But it was in the script -- it was in

9      9    the film anyway, wasn't it?

10     10       A.  It was.

67,68  11  11       Q.  Okay.  And did you also not write the scene

12     12   where -- or write the description of Jason as being a

13     13   mongoloid?

14     14       A.  That came -- I believe that came after Sean

15     15   and Tom Savini spoke, so I probably did not write

16     16   mongoloid.  I wrote that he was slow.

17     17       Q.  And you wrote that he was slow after talking

18     18   with Mr. Cunningham about the character of Jason?

19     19       A.  No, I wrote it because that -- that

20     20   justified to me Jason's drowning much better than if

21     21   he'd been a fully confident and competent child.

22     22       Q.  But in the script that you wrote where Jason

23     23   comes out of the water --

24     24       A.  Right.

25     25       Q.  -- you couldn't tell whether he was slow or

229

```
 1    not just by having him come up out of the water,
 2    could you?
 3         A.  Not particularly, no.
 4         Q.  And the scene that you wrote, Jason was --
 5             MR. TOBEROFF:  Depends how fast he came out
 6    of the water.  Just joking.
 7             MS. ESKENAZI:  Yes.
 8             THE WITNESS:  Yes.
 9             MS. ESKENAZI:  Don't quit your day job.
10    BY MS. ESKENAZI:
11         Q.  So when you wrote the last couple of scenes
12    with Jason coming out of the water --
13         A.  Right.
14         Q.  -- your intention was that Jason wasn't
15    real.  Is that right?  He was just a fantasy?
16         A.  Which was borne out in what -- in the
17    following scene in the hospital, yes, ma'am.
18         Q.  So when did you complete your writing
19    services under the employment agreement for
20    Friday the 13th?  When was the last writing you did?
21         A.  I cannot give you a month on that.
22         Q.  Were you paid all of your guaranteed sums
23    under the employment agreement?
24             MR. TOBEROFF:  What do you mean by
25    "guaranteed sums"?  Are you referring --
```

233

```
 1    1      Q.  -- dated August 11, 1980.
 2    2      A.  We have that somewhere.
 3    3      Q.  You should have that in front of you.
 4    4      A.  Yeah.
 5    5      Q.  It might be in that smaller pile, look under
 6    6   there.
 7    7      A.  This one?  Okay.  One, two -- yes.
 8    8      Q.  Okay.  All right.  Now, you copied James
 9    9   Kaye on the bottom of that letter.
10   10      A.  Correct.
11   11      Q.  Okay.  Why did you copy Mr. Kaye?
12   12      A.  Because I wanted him to watch out for my
13   13   interests.
14   14      Q.  And that was one of the benefits that you
15   15   obtained by -- strike that.
16   16          Mr. Kaye was the lawyer for the WGA, East.
17   17   Right?
18   18      A.  Correct.
19   19      Q.  And one of the benefits that you got as a
20   20   member is to be able to contact the WGA to have them
21   21   watch out for your interests.  Right?
22   22      A.  That is correct.
23   23      Q.  Okay.  Now, Friday the 13th was released in
24   24   1980.  Right?
25   25      A.  That is correct.
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                                  **113**

234

1    1        Q.  So just some months before you wrote this

2    2    letter to Mr. Cunningham?

3    3        A.  Released?

4    4        Q.  Yes.

5    5        A.  Before August 1980?

6    6        Q.  Yes.

7    7        A.  I don't think so, because I -- I -- I don't

8    8    remember the shooting schedule exactly, but it was in

9    9    the middle of summer.

10   10       Q.  Right.  August of 1979 it was shot?

11   11       A.  Oh, sorry.

12   12       Q.  September '79?

13   13       A.  I'm sorry.  Yes, absolutely.  I got -- yes,

14   14   I got confused.

15   15       Q.  That's okay.  That's okay.

16   16       A.  All right.  Right.  So that it had been

17   17   released by August 1980.  Yes, it was released in --

18   18   on May 4th or 10th, somewhere in there.

19   19       Q.  1980?

20   20       A.  Yes.  Correct.

21   21       Q.  Okay.  So just a few months later, you sent

22   22   this letter to Mr. Cunningham saying you're owed

23   23   additional money.  Isn't that right?

24   24       A.  When I heard about the sequel, yes.

25   25       Q.  And you copied Mr. Kaye so that Mr. Kaye

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                    114

235

```
1    would be able to follow up on your sequel rights --
2         A.  Yes, ma'am.
3         Q.  -- sequel payments?
4         A.  Yes, ma'am.
5         Q.  And you knew Mr. Kaye because of why?
6         A.  Because he was the only lawyer I'd ever
7    talked to at WGA.
8         Q.  And did you talk to him before you sent this
9    letter on August 11th, 1980?
10        A.  I must have.
11        Q.  And you must have because -- well, why?
12        A.  Because he knew more than I did.  And I
13   would not have known what the sum would be,
14   et cetera, et cetera.
15        Q.  The sum indicates that you talked to
16   Mr. Kaye as well as the specific reference to
17   paragraph 16A5a of the Writers Guild contract?
18        A.  Yes.
19        Q.  Okay.  Now, at some point, Mr. Kaye as your
20   WGA representative took over trying to collect your
21   employment benefits for you.  Right?
22             MR. TOBEROFF:  Vague.
23             THE WITNESS:  He was trying to -- I don't
24   know about employment benefits, but he was certainly
25   going after the fees that were in the MBA.
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

236

1    BY MS. ESKENAZI:

2         Q.  Right.  And you had those fees in the MBA

3    pursuant to your employment contract Exhibit 9.

4    Right?

5         A.  Yes, ma'am.

6         Q.  Okay.  And one of the benefits, one of the

7    employment benefits that you got by signing that

8    employment agreement was to have a WGA representative

9    go after the producer for free, they didn't charge

10   you anything for that.  Right?

11        A.  I was not charged anything, no.

12        Q.  And you took advantage of that benefit in

13   connection with Friday the 13th because you had that

14   available to you through your WGA membership?

15        A.  Yes, ma'am.

16        Q.  Okay.  And the WGA actually instituted a

17   grievance procedure against Mr. Cunningham, didn't

18   it?

19        A.  That's beyond my -- I know they followed up.

20        Q.  Okay.

21        A.  I don't know about grievance procedures.

22        MS. ESKENAZI:  Okay.  So let me show you --

23   well, let's have the court reporter mark as

24   Exhibit 18 a document that is two pages from James

25   Kaye to Michael Lynne, dated September 5, 1984.

243

```
 1      1         Q.  Have you ever assigned any of your rights in
 2      2    Friday the 13th to any other person or entity?
 3      3         A.  No.
 4      4         Q.  To this day, you own all of the rights?
 5      5         A.  Yes, according to the -- the reason we're
 6      6    here.
 7      7              MS. ESKENAZI:  Okay.  Let me ask the court
 8      8    reporter to mark as Exhibit 19 a letter from James
 9      9    Kaye to Sean S. Cunningham, dated April 11, 1985.
10     10              (The document referred to was
11     11              marked as Exhibit 19.)
12     12    BY MS. ESKENAZI:
13     13         Q.  Okay.  Have you seen what's been marked as
14     14    Exhibit 19 before today?
15     15         A.  I have.
16     16         Q.  Okay.  And did you receive Exhibit 19 on or
17     17    about April 11th, 1985?
18     18         A.  Yes, I did.
19     19         Q.  Okay.  And did you authorize Mr. Kaye to
20     20    send this letter to Mr. Cunningham on your behalf?
21     21         A.  I did.
22     22         Q.  And it asserts that you were owed sequel
23     23    payments and residuals under the MBA.  Right?
24     24         A.  Yes, ma'am.
25     25         Q.  And it threatens to force the Manny Company
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                               117

A-241

244

```
1      1   into a grievance procedure if you're not paid.
2      2           Is that right?
3      3      A.  That's correct.
4      4      Q.  And the grievance procedure is another
5      5   benefit of having an employment agreement under the
6      6   WGA system.  Right?
7      7           MR. TOBEROFF:  Calls for a legal conclusion.
8      8           THE WITNESS:  I can't speak to the legal
9      9   conclusion, but I can say that without the Writers
10    10   Guild helping me, I was screwed.
11    11   BY MS. ESKENAZI:
12    12      Q.  Without the -- without being able to invoke
13    13   the employment benefits under the Writers Guild --
14    14      A.  Correct.
15    15      Q.  -- you would not --
16    16           MR. TOBEROFF:  She -- let her finish before
17    17   you agree with the question --
18    18           THE WITNESS:  I'm sorry.
19    19           MR. TOBEROFF:  Wait a second.  Wait.  Slow
20    20   down.  Slow down.  You don't have to be sorry.  It's
21    21   a common thing.  But it's important that you
22    22   finish -- let her finish the question.
23    23           THE WITNESS:  Okay.
24    24           MR. TOBEROFF:  Think about exactly what
25    25   she's asking you.  Give me time to object.  And then
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

246

```
 1          "Accordingly, the Guild must

 2          proceed with the previously filed

 3          grievance."

 4     A.   Okay.

 5     Q.   Do you see that?

 6     A.   Hm-hm.

 7     Q.   Does that refresh your recollection that you

 8   authorized --

 9     A.   It does.

10     Q.   -- that you authorized a grievance to be

11   filed against the Manny Company on your behalf by the

12   WGA?

13     A.   Yes.

14          MS. ESKENAZI:  Okay.  Let me ask the court

15   reporter to mark as Exhibit 21 a letter dated

16   August 26, 1985 from James Kaye to Michael Lynne.

17          (The document referred to was

18          marked as Exhibit 21.)

19   BY MS. ESKENAZI:

20     Q.   Have you seen what's been marked as

21   Exhibit 21 before today?

22     A.   I have.

23     Q.   And did you receive it on or about

24   August 26, 1985?

25     A.   I did.
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                                    119

247

```
 1          Q.   Okay.  And do you see that by this letter
 2    the Guild is submitting this matter to arbitration
 3    pursuant to the MBA?
 4          A.   Yes.
 5          Q.   Okay.  And did you authorize the Guild to
 6    submit your matter to arbitration pursuant to the
 7    MBA?
 8               MR. TOBEROFF:  Do you recall that?
 9               THE WITNESS:  I don't recall specifically
10    authorizing this.  I think it was -- it had its own
11    movement, whatever, motion.  It was already put in
12    motion.  I mean, he didn't call me and say is it all
13    right if we -- I think I got this -- I got this
14    letter the same way Michael Lynne did.
15    BY MS. ESKENAZI:
16          Q.   Okay.  So did you call Mr. Kaye after
17    receiving what's been marked as Exhibit 21 and tell
18    him, "No, stop, the arbitration"?
19          A.   I did not.
20          Q.   Okay.  So even if you didn't specifically
21    verbally authorize Mr. Kaye to move forward with an
22    arbitration against the Manny Company for your
23    employment benefits, you were okay with him doing
24    that.
25               Is that right?
```

248

1      A.  Yes.

2         Q.  And Guild arbitration is another benefit

3    under the MBA that's given to employees that sign an

4    employment contract.  Right?

5         MR. TOBEROFF:  Calls for a legal conclusion.

6         You can answer.

7         THE WITNESS:  As a non- -- as a nonattorney,

8    yes.

9    BY MS. ESKENAZI:

10        Q.  Are you aware that Mr. Cunningham filed an

11   action against Georgetown and Belmont to secure

12   payment of the sums that you claimed you were

13   entitled to under the MBA?

14        A.  I have a recollection of that, yes.

15        Q.  Okay.  And that action was settled, wasn't

16   it?

17        A.  I cannot speak to that.

18        MS. ESKENAZI:  Okay.  Let me show you what's

19   been marked as -- or what we'll ask the court

20   reporter to mark as Exhibit 22, which is a letter

21   dated January 15, 1987 from Bruce Karp of Blumenthal

22   & Lynne to James Kaye.

23             (The document referred to was

24        marked as Exhibit 22.)

25   BY MS. ESKENAZI:

249

```
 1      Q.  Have you ever seen what's been marked as

 2  Exhibit 22 before today?

 3      A.  I have.

 4      Q.  Okay.  And does it refresh your recollection

 5  that in or about 1987 that the Manny Company was

 6  settling the dispute about payments owed to you in

 7  conjunction with the Friday the 13th film?

 8      A.  It is being settled, yes.

 9          MS. ESKENAZI:  Okay.  Let me -- okay.  Let

10  me ask the court reporter to mark as Exhibit 23 a

11  letter dated January 16th, 1987 from Michael Lynne to

12  James Kaye.

13              (The document referred to was

14          marked as Exhibit 23.)

15  BY MS. ESKENAZI:

16      Q.  Okay.  Have you seen what's been marked

17  Exhibit 23 before today?

18      A.  Yes, I did.

19      Q.  Okay.  And did you receive it on or about

20  January 16th, 1987?

21      A.  Yes, I did.

22      Q.  And did you understand that -- did you

23  understand that Paramount would be making all

24  payments directly to you instead of going through

25  either Georgetown or the Manny Company?
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

250

```
 1        1              Let me rephrase that.
 2        2              Did you understand that, as part of the
 3        3    settlement of the action between Mr. Cunningham and
 4        4    Georgetown and Belmont, that everyone agreed that
 5        5    Paramount would be making payments to you?  Residuals
 6        6    and sequel payments or whatever payments were
 7        7    necessary, they'd be making those payments directly
 8        8    to you instead of going through the Manny Company?
 9        9              MR. TOBEROFF:  In June -- January 16, 1987
10       10    or on or about that time?
11       11              MS. ESKENAZI:  Yeah.
12       12              THE WITNESS:  I remember reading this.  I
13       13    didn't understand a lot of it, but I can see it here
14       14    in black and white.
15       15    BY MS. ESKENAZI:
16       16         Q.  And did you in fact start receiving payments
17       17    from Paramount to Wordsmith?
18       18         A.  I believe I did, but I cannot -- I do not
19       19    have the records in front of me.
20       20              MS. ESKENAZI:  Okay.  Let me put in front of
21       21    you, then, let me ask the court reporter to mark
22       22    Exhibit 20- -- as Exhibit 24 a letter from Lola
23       23    Langner of Paramount Pictures to Michael Lynne, dated
24       24    December 6th, 1988.
25       25              (The document referred to was
```

75

257

```
 1      1    into the weeds of two legal documents, December '88
 2      2    and -- and his original contract, and tying the two
 3      3    together and --
 4      4           MS. ESKENAZI:  We don't -- we don't need a
 5      5    speaking objection.
 6      6           MR. TOBEROFF:  And objection.  Objection.
 7      7    BY MS. ESKENAZI:
 8      8       Q.  So you can answer if you understand.
 9      9       A.  I -- hit one more time.
10     10           (Record read as follows:
11     11               "QUESTION:  When you signed
12     12           this agreement, did you understand
13     13           that you were going to be getting
14     14           payments directly from Paramount
15     15           which payments were calculated
16     16           based on amounts owed to you under
17     17           your employment agreement, Exhibit
18     18           9, for Friday the 13th?")
19     19           MR. TOBEROFF:  Calls for a legal conclusion.
20     20           MS. ESKENAZI:  You've already stated your
21     21    objection.  You can --
22     22           MR. TOBEROFF:  I'm repeating it, because
23     23    she's restating the question.
24     24           THE WITNESS:  Okay.
25     25           MR. TOBEROFF:  And in an abundance of
```

A-248

258

```
 1    caution.
 2              THE WITNESS:  Yes.
 3    BY MS. ESKENAZI:
 4         Q.  Okay.
 5         A.  That's all I understood.
 6         Q.  And you've received sums due to you pursuant
 7    to the employment agreement directly from Paramount
 8    since 1988?
 9              MR. TOBEROFF:  Are you talking about this
10    letter, or are you talking about the employment
11    agreement?  Because I think he's answering questions
12    looking at this letter and you keep saying employment
13    agreement.
14              THE WITNESS:  Correct.
15              MR. TOBEROFF:  So if you're asking your
16    questions on the employment agreement, give him the
17    employment agreement or please look at the employment
18    agreement.
19    BY MS. ESKENAZI:
20         Q.  You understood that the arbitration that was
21    pursued on your behalf --
22         A.  Hm-hm.  Right.
23         Q.  -- was to collect employment benefits under
24    the employment agreement from the Manny Company.
25    Right?
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                    125

A-249

259

| | | |
|---|---|---|
| 1 | 1 | A.  Yes. |
| 2 | 2 | MR. TOBEROFF:  She's referring -- |
| 3 | 3 | MS. ESKENAZI:  Okay.  Yes. |
| 4 | 4 | MR. TOBEROFF:  She's referring to the |
| 5 | 5 | contract when she says "employment agreement."  She's |
| 6 | 6 | not -- |
| 7 | 7 | BY MS. ESKENAZI: |
| 8 | 8 | Q.  The Exhibit 9.  Right? |
| 9 | 9 | A.  Yes. |
| 10 | 10 | Q.  You under- -- right. |
| 11 | 11 | A.  Yes, I did. |
| 12 | 12 | Q.  Okay.  And that in settlement of your |
| 13 | 13 | claims, it was agreed by you and Paramount and the |
| 14 | 14 | Manny Company, all the people that signed what's been |
| 15 | 15 | marked as Exhibit 24, everybody agreed that instead |
| 16 | 16 | of having the Manny Company pay you directly for |
| 17 | 17 | those employment benefits that everyone would allow |
| 18 | 18 | Paramount to pay you directly -- |
| 19 | 19 | MR. TOBEROFF:  Mischaracterizes -- |
| 20 | 20 | BY MS. ESKENAZI: |
| 21 | 21 | Q.  -- those benefits? |
| 22 | 22 | MR. TOBEROFF:  Mischaracterizes the |
| 23 | 23 | documents. |
| 24 | 24 | MS. ESKENAZI:  It doesn't at all, but -- |
| 25 | 25 | MR. TOBEROFF:  Yes. |

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

261

1        1              directly?")

2        2              THE WITNESS:  All I understood at the time

3        3    was that I was going to get paid.

4        4    BY MS. ESKENAZI:

5        5        Q.  By Paramount?

6        6        A.  I don't know about perpetuity, but I'd been

7        7    waiting since 1980.

8        8        Q.  You signed this agreement.  Right?

9        9        A.  I did.

10       10        Q.  And did you read it before you signed it?

11       11        A.  I did.  But I'm not --

12       12        Q.  Did you have an opportunity to ask the WGA

13       13    representative questions about it?

14       14        A.  I had a -- I guess I had an opportunity, I

15       15    could have.

16       16        Q.  And did you?

17       17        A.  No.

18       18        Q.  Okay.

19       19        A.  That's --

20       20        Q.  Did you understand at that time that instead

21       21    of receiving payments under your employment agreement

22       22    from the Manny Company that Paramount Pictures was

23       23    now directed irrevocably to make those payments

24       24    directly to you?

25       25              MR. TOBEROFF:  Which payments?

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                    127

262

```
 1         MS. ESKENAZI:  All of the payments he was
 2   owed under his employment agreement.
 3         MR. TOBEROFF:  The payment for the first and
 4   second drafts?
 5         MS. ESKENAZI:  All the -- all the payments
 6   that he was owed under the employment agreement.
 7         MR. TOBEROFF:  You mean payments he hadn't
 8   received yet?
 9         MS. ESKENAZI:  The payments we hadn't
10   received yet, that's what -- that's the definition of
11   being owed, yes.  That Par- --
12         MR. TOBEROFF:  Under the MBA?
13         THE WITNESS:  Yes.
14   BY MS. ESKENAZI:
15     Q.  You understood that.  Right?
16         Okay.  And my question is, that you have
17   been receiving payments since 1988 directly from
18   Paramount Pictures for Friday the 13th?
19     A.  To the best of my knowledge, yes.
20     Q.  Okay.  And, in fact, over the last
21   forty years you've received something in excess of
22   $220,000 in residuals, sequels, and other payments
23   under the employment agreement -- right? -- for
24   Friday the 13th?
25     A.  I can't speak to the number, but I have
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                                    **128**

A-252

263

```
 1    received payments.
 2         Q.  So you haven't ever taken the opportunity to
 3    add any of those numbers up?
 4         A.  No.
 5         Q.  You don't know how much that is?
 6         A.  No.
 7         Q.  Okay.  So since the residual and sequel
 8    payment dispute was resolved in 1988, have you ever
 9    again complained to the WGA that you have not been
10    paid sums owed to you for Friday the 13th?
11         A.  I don't believe so, but I cannot be a
12    hundred percent sure.
13         Q.  But you don't recall sitting here today any
14    time you've complained since 1988 that you have not
15    received sums owed to you?
16         A.  Not at this moment.
17         Q.  Okay.
18              MR. TOBEROFF:  So we've been going about an
19    hour-and-a-half or more.  Can we just take a short
20    break now?
21              MS. ESKENAZI:  We could.  I'm almost done,
22    but sure.
23              MR. TOBEROFF:  That's okay.  Okay.
24              THE WITNESS:  Almost done done or just this
25    done?
```

264

```
1      1          MS. ESKENAZI:  No, I'm almost done.

2      2          THE WITNESS:  Oh.

3      3          MS. ESKENAZI:  I think I probably have

4      4    fifteen or twenty minutes left.

5      5          MR. TOBEROFF:  Okay.  Let's take a few

6      6    minutes.

7      7          MS. ESKENAZI:  Don't leave with your -- with

8      8    your microphone on.

9      9          THE VIDEOGRAPHER:  The time is 3:34 p.m.,

10    10    and we are off the record.

11    11          (Recess taken.)

12    12          THE VIDEOGRAPHER:  Okay.  The time is 3:52

13    13    p.m., and we're back on the record.

14    14    BY MS. ESKENAZI:

15    15          Q.  Mr. Miller, after Friday the 13th the

16    16    original film came out, you didn't have anything more

17    17    to do with the films.  Right?

18    18          A.  I asked Sean why I wasn't considered for the

19    19    sequel, why wasn't I hired for the sequel or any

20    20    other sequels.  And he said, "Because you'd cost too

21    21    much money."

22    22          I put everything I had into Friday the 13th

23    23    and I regarded it as a very special screenplay and

24    24    then I was just cut loose.  So it wasn't -- it wasn't

25    25    that I walked away.  It was that I was cut loose.
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                                    130

A-254

265

```
 1          Q.  And you were cut loose because
 2   Mr. Cunningham decided you'd be cut loose.  Right?
 3          A.  He was in charge of the money.
 4          Q.  That's right.  And he was in charge of
 5   whether you'd be hired or fired.  Right?
 6          A.  No.
 7          Q.  No?
 8          A.  No.
 9          Q.  Who was in charge then?
10          A.  I wasn't fired.  You can't fire --
11          Q.  But you weren't hired.
12          A.  I wasn't hired the first time.
13          Q.  You weren't hired for Friday the 13th part
14   2, 3, 4, 5, or any of the others, were you?
15          A.  That is correct.
16          Q.  And that was Mr. Cunningham's decision?
17          A.  Evidently.
18          Q.  Not yours?
19          A.  Evidently.
20          Q.  Okay.  The -- the concept of Jason being the
21   villain was not yours.  Is that correct?
22              MR. TOBEROFF:  Vague.
23              THE WITNESS:  In the sequels?
24   BY MS. ESKENAZI:
25          Q.  Yes.
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

266

1        A.  In the sequels?  I had nothing to do with

2    the sequels.

3        Q.  Okay.  So the concept of Jason actually

4    being alive and becoming the killer was not your

5    idea.  Is that correct?

6        A.  Yes.

7        Q.  And the hockey mask that Jason wears, that

8    was not your idea either.  Right?

9        A.  That came in the --

10            MR. TOBEROFF:  Answer the question.

11            THE WITNESS:  Oh, sorry.

12            No, it was not.  Sorry.

13            MS. ESKENAZI:  Okay.

14            MR. TOBEROFF:  If I could just instruct you

15    to focus on her question and answer that question.

16            THE WITNESS:  Okay.

17    BY MS. ESKENAZI:

18        Q.  When did you first come to believe that you

19    had the right to terminate Horror's rights in and to

20    Friday the 13th?

21        A.  When I read on the Internet about the whole

22    idea of -- of the law that said you could reestablish

23    your rights, regain your rights, and I saw a number

24    of cases being written about.  And I saw that there

25    was an attorney who had turned the Superman case into