A-256

274

```
 1    1   you.
 2    2           THE WITNESS:  Not working?
 3    3           THE VIDEOGRAPHER:  Can we go off the record
 4    4   for a second?
 5    5           MS. ESKENAZI:  Sure.
 6    6           THE VIDEOGRAPHER:  The time is 4:03 p.m.,
 7    7   and we're off the record.
 8    8           (Recess taken.)
 9    9           THE VIDEOGRAPHER:  Okay.  The time is
10   10   4:05 p.m., and we are back on the record.
11   11
12   12                   EXAMINATION
13   13
14   14   BY MR. TOBEROFF:
15   15       Q.  Okay.  I'm going to be referring to
16   16   Exhibit 14 which is your treatment entitled "The Long
17   17   Night at Camp Blood."  If you could take that out.
18   18       A.  I have it.
19   19           Drinking again?
20   20       Q.  If you could just take out two documents and
21   21   push the others away --
22   22       A.  Okay.
23   23       Q.  -- so we can focus on that.  Exhibit 14 and
24   24   then Exhibit 15, which is entitled "Friday 13, a
25   25   Screenplay Treatment by Victor Miller.  Copyright,
```

84, 85

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                      133

275

1    John Cunningham Films," et cetera.

2            Do you see that?

3        A.  I do.

4        Q.  Okay.  You wrote Exhibit 14.  Correct?

5        A.  I did.

6        Q.  Now, other than the -- other than to the

7    extent that the content of Exhibit 14 appears in

8    Exhibit 15, other than that, do you recall or -- or

9    did you write Exhibit 15?

10           MS. ESKENAZI:  Objection.  Vague and

11   ambiguous.

12           THE WITNESS:  The -- the material that I

13   wrote in 14 appears in 15.

14   BY MR. TOBEROFF:

15       Q.  Okay.  Did you -- taking, for example,

16   page -- Bates stamp on the bottom Plaintiffs 002302,

17   where it says on top "Friday 13, page 2."

18       A.  Yes, sir.

19       Q.  Did you write that?

20       A.  No.

21       Q.  And on the next page, 2303 through 2318, you

22   notice that each page says Friday 13, page 3, and

23   then Friday 13, page 4, and so on at the top

24   through -- through page 18.

25           Do you see that?

276

| | | |
|---|---|---|
| 1 | 1 | A. Yes, sir. |
| 2 | 2 | Q. Did you type that? |
| 3 | 3 | A. No. |
| 4 | 4 | Q. Okay. Did you type up this document? |
| 5 | 5 | A. I did not. |
| 6 | 6 | Q. Did you write this cover page that said |
| 7 | 7 | "Friday 13"? |
| 8 | 8 | A. No, I did not. |
| 9 | 9 | Q. Did you write where it says "Copyright 1979, |
| 10 | 10 | Sean S. Cunningham Films Limited"? |
| 11 | 11 | A. No. |
| 12 | 12 | Q. What is your belief as to what this |
| 13 | 13 | particular version of your treatment was used for? |
| 14 | 14 | MS. ESKENAZI: Objection. Calls for |
| 15 | 15 | speculation. Lacks foundation. Vague and ambiguous. |
| 16 | 16 | THE WITNESS: Um -- |
| 17 | 17 | BY MR. TOBEROFF: |
| 18 | 18 | Q. As Bonnie would say, you can answer. |
| 19 | 19 | A. Yes, I can. |
| 20 | 20 | MS. ESKENAZI: I could have said that. |
| 21 | 21 | You can answer. |
| 22 | 22 | THE WITNESS: Yes. Thank you. I will do |
| 23 | 23 | that. |
| 24 | 24 | For instance, the fade-ins, flashbacks, the |
| 25 | 25 | present establishing the horror, none of that is |

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

**EXHIBIT K**                                                    135

281

```
1    1    STATE OF CALIFORNIA    )

2    2    COUNTY OF LOS ANGELES )  ss.

3    3

4    4

5    5         I, VICTOR MILLER, hereby declare under the

6    6    penalties of perjury of the laws of the United States

7    7    that the foregoing is true and correct.

8    8         Executed this _____ day of

9    9    _____, 2017, at

10   10   _____, California.

11   11

12   12

13   13        _____

14   14        VICTOR MILLER

15   15

16   16

17   17

18   18

19   19

20   20

21   21

22   22

23   23

24   24

25   25
```

[4/28/2017] Miller, Victor (Vol. 01) - 04/28/2017 - FINAL

282

1   STATE OF CALIFORNIA    )

2   COUNTY OF LOS ANGELES )  ss.

3        I, SUSAN NELSON, C.S.R. 3202, in and for the

4   State of California, do hereby certify:

5        That, prior to being examined, the witness named

6   in the foregoing deposition was by me duly sworn to

7   testify the truth, the whole truth and nothing but

8   the truth;

9        That said deposition was taken down by me

10  stenographically at the time and place therein named,

11  and thereafter transcribed via computer-aided

12  transcription under my direction, and the same is a

13  true, correct and complete transcript of said

14  proceedings;

15       Before completion of the deposition, review of

16  the transcript [X] was [ ] was not requested.  If

17  requested, any changes made by the deponent (and

18  provided to the reporter) during the period allowed

19  are appended hereto.

20       I further certify that I am not interested in the

21  event of the action.

22       Witness my hand this 12th day of May, 2017.

23

24  _____
    Susan Nelson, C.S.R. No. 3202
    Certified Shorthand Reporter
25  State of California

**Victor Miller**

**Go way back to the beginning and you tell me how you first became a writer in the first place.**

I  think my first actual memory is of lying to my mother when I was 3 years old when she caught me with a girl from down the street, and I tried to convince her that what her own eyes were telling her was not the truth, and that what I was doing in the bathroom with Mary what's her name was not what she saw.  As near as I can tell, I have always been good at lying, and when it came time for me to be in preschool and they said write stories, I just wrote stories, and I just told lies and it was very fun.

Eventually I realized that telling lies in real life did not work as well, and I was not very good at it really, because my mother never believed the first one.  That is, as near as I can tell it has just always come easily to my mind that I would say something that was basically not true or think something that was not what you thought it was.  Then I took all the courses.  Somehow I was just born with the DNA that I would be horribly verbal, that I would always try to talk my way out of things, that I was not particularly gifted, and that if I could impress the jocks with my wit and my ability to be sarcastic, that I might avoid a thorough drubbing at their hands.

**I take it you were not on the football team.**

 No I was a crossover, I mean  I did soccer and track and things like that and I was all right and I could pass.  But I was not a total nerd, certainly half of me was nerd and half of me was a jock want to be, so I could sort of wander around.  I just always used that part of my chart.  Then I have had astrologers look at my chart and say, "My God, I've never seen so much Mercury in anyone in my life."  I think I came out of my  mother speaking.  So I have just always tried to defend myself using words, which has got me in a lot of trouble over the years but it also made an income for me.

I mean the other thing I do habitually and from a very early age, my mother and father called me a worry wart, because I was always creating these dire scenarios.  You know, if I had an infected finger, clearly I was going to die by the morning.

 **Hypochondriac?**

At the very least, yes.  I mean, I did everything and then, of course, if I saw things happening, I just sort of thought up these really wonderfully negative outcomes.

1

**EXHIBIT L**

Eventually you know, the 20 years I spent in soap opera, that was a very lucrative way of thinking, and it also required vast amounts of vodka in order to stop the process somewhere around dusk or local sunset. I think that is the place where it starts. I was diagnosed as having obsessive negative thinking and the guy put me on Prozac and at least it made it controllable so it was a doable deal.

**What year was that?**

That was like 1994, so that was later on. Because I got sober in 1989, because up until that point I was using, you know, just self medicating because at 6 p.m. I could slam enough vodka into me so that the world got rosy again, and you know that sort of hamster cage in my head would stop going around and around and around. You know I think that is all part of the deal that makes you a writer. I think one of the reasons I am not one of the more successful novelist or screenwriter or whatever, is that their minds are even worse than mine or they can maximize it better. Sometimes I think I just was not sick enough to be really good, but my wife would dispute that.

**Well, you know there is a long history of alcohol and writing out of the famous writers.**

And I justified my drinking for many years that way saying that if it worked for the Great Gatsby, maybe I have a Gatsby in me that can come out if I just keep drinking.

**Were you drinking through Friday the 13th?**

Oh yes, I mean I was a very controlled drinker which is the reason I could make a living as a writer, that is, I could not drink until 6 p.m. or 5 p.m. whenever it was, so that I always made sure that I did my day's output and then used the booze, so that was kind of a savior, that is why I did not fall apart totally. I had what we in AA call a high bottom in that I did not lose everything, you know, I have the same wife and children that I started with and all that. Somehow somebody will write the ultimate exposé about how this all figures in. But surely the idea that my mind instantly leaps to a negative outcome made it possible for Friday the 13th to happen.

**Yes, well it makes perfect sense now. Now when did you first start drinking in writing, like when did that sort of go together?**

Well the drinking actually started when I was 13.

**You were a young one.**

CONFIDENTIAL
**EXHIBIT L**                    **139**
PLAINTIFFS000027

No, everybody at AA starts in their teens, just go to any meeting and you will listen and they will all say, "Oh yeah, I started when I was 13."

I was raised by two people who were raised in the twenties and went through the depression so it was natural that I just had to drink a lot.  Then the writing thing did not have to go along with it, my father drank a lot and he was a businessman, so you could do both.

Anyway, I did not have any of these thoughts or (_____) until after I stopped drinking in 1989.  Up until that point, everything was just this huge sort of mess that rolled along and as of 1980 it got profitable.

**Did you go to school for writing?**

Let's see, I was an English major at Yale where they taught me how to deconstruct poetry and I am not sure that really helped a lot.  I took all of the fiction courses that Yale then offered and was randomly criticized by most of my teachers for not being, you know, deep or artistic or whatever.  I remember I took a course at Yale which is famous on the campus known as Daily Themes where you write a one-page theme five days a week whether you want to or not.  And, the first batch I got back from my teacher who was a brilliant man wrote, "When are you going to stop this soap opera crap."  Of course, how pathetic he was that I would end up writing soap opera for 20 years.  So, I did it all, I never thought I would fit in particularly well because I was never a hugely artistic man, I like plot, I love movies.  I had gone to movies since 1946 and just loved all of the dark ones and the ones where people got shot and the shadows on the walls did all of the violence for you, you know all that kind of film was that I just absolutely adored.

Later I went to Tulane University in the Department of Theater and Speech, got a masters, but that was sort of lit/crit.  I did not aim to start writing, I mean I gave up on the writing for the most part until it must have been about 1966 or 1967.  Then I ran into a playwright at the Shakespeare Theater in Connecticut when I was working there and he said, "Why don't you write plays?"  And I  said, "Cause I don't know anything about it."  Then he coached me and I was off and running.

**When did you graduate finally and get your masters?**

 From Yale I graduated in 1962 and then I think in 1967 I got a masters from Tulane.

**So there was not that much time between when you left Tulane and when you started writing plays?**

No, no about a year or so.

3

**EXHIBIT L**

**But you did think about leaving writing at that time?**

Oh yes, no I had not written a thing since Yale, that was it, I was just out there trying to figure out what I wanted to do.  Originally I wanted to be an actor and then a very nice person at Yale said that I was the most self conscious actor he's ever seen and I would really waste my time if I kept it up.  And it was one of those marvelous moments, it was the right thing to say to me at the right time and I did not die, and I realized he was absolutely right and I would never get any better.  So I did not spend my entire time chasing after it.

So I gave up writing and then just sort of picked it back up again and enjoyed it, but I was writing sort of Neil Simon type plays and then I was writing arty stuff because I went to a play writing seminar in New York at the Herbert Bergoff school and they were all arty there, so I became arty for a while.

**That was probably a good time period too, working with that.**

Yes, and you have to experiment with everything.

**When did you write your first screen play, would that be when you met Sean Cunningham?**

No, I had just written play.  Then I had a play done off Broadway and the whole process was so painful that I decided to be a novelist so I switched over and wrote a detective novel which got bought by Bantam Books.

**What was that called?**

That was called "Fernanda."

**Was it a hit?**

No, it was an undistinguished paperback about a female private eye.  But based on that, the guy at Bantam said, no I guess it was Pocketbooks, I will have to send you that..

At any rate, on the basis of that, he gave me Kojak episodes to novelize.  So that is where I really started learning about the craft and putting this stuff together, I mean it was kind of an odd way into the business.  So I had to take a dramatic form which is essentially the TV one-hour, and if you remember the form of Kojak, you see the actual killer doing his work and then somewhere around the opening credits you see Kojak roll up in his car and you know more than he does. But for the purpose of making them into novels, I thought it would be much more fun if nobody knew anything and we just went along with him inside his head and followed him.  So I had to sort of change the entire point of view, and that somehow taught me a great deal because my next job after that was somebody

4

**EXHIBIT L**

asked me to take a novel and turn it into a screen play because he had heard that I worked the other way, so I tried the other and it was a movie called the Black Pearl from a young person's novel by the name of Scott (Bodell).  There may have been other versions of it too.  The Black Pearl came out during the newspaper strike in the seventies I think.

**I think it was 1972, I might be wrong.**

At any rate, I finally got around to seeing it and it was pretty ghastly.  Originally it was supposed to have young Donnie Osmond in it, and it might have been a hit at that point, but by the time it got made it was nothing and really undistinguished.

But the people who were doing that movie introduced me to Sean who was wandering around in New York.

**Do you remember what year this was?**

This would have been in the mid seventies.

**I do not know if it was after he did Last House.**

Oh yes, it was after Last House, and he was trying to get projects mounted and stuff like that and I bumped into him because he was using office space where I was doing this Black Pearl project.  And we got along famously and talked about doing projects together and that bore the fruit of, I mean we did a lot of stuff that basically never saw the light of day, but then that also resulted in two films that we had made.  Those where the days when everybody said, "What America needs is a good G rated movie," Bad News Bears and all that, and that resulted in our first project together which was called Here Come the Tigers which was a Bad News Bears redact and that came out, I guess it made its money back, but they lied about America wanting G rated films.  But that did not stop us from making another G rated film.

**Manny's Orphans?**

Yes, Manny's Orphans or Kick depending on which version you saw, and that did not make any money either.

**Wasn't that supposed to be a TV series at one point too?**

I have no idea if it ever did.  Steve Miner had come up with the idea for it and I wrote the screen play and we did it, a low budget film, and shot it around Bridgeport, Connecticut.

5

**When you first met Sean Cunningham, what was your first impression or do you remember your first conversation or did it feel right, right when you met him?**

Yes, I was very impressed, he was very funny, fast, incredible mind and seemed to know a lot, and of course, he had done Last House On The Left which was a lot more than I had done.  It was just one of those things where you had to kind of sense that you could give each other straight lines and the other person would make something out of it.  It was just genuinely fun to sit around and…… plus I was commuting back to Stratford and he was going back to Westport, and so we would be on the train for an hour as well.  At that point it was just fun to talk and then sort of think about projects in the future.

**Were you aware of his background in adult film at that point?**

No, no, not at all.

**What did you think of the Last House On The Left?**

I did not see it for years, this was pre a lot of things, pre DVD and being able to get that stuff so quickly, but I did not see it for years and I enjoyed it.

**It's a really interesting film, I saw it again recently, it's really daring, you know.**

Well it certainly was a merchandising marvel with that keep your mind……because I had not seen the movie, but I certainly knew the PR campaign and that certainly stuck in my head.  No, it was funny because Sean was anything but scary, we were funny and goofy and sort of carefree at that point.

**You were doing Manny's Orphans and Here Come the Tigers, it is interesting that you talked before about when you were in school, your teacher saying stop the soap opera stuff because it's (_____) on many occasions that he always viewed the movies as a business and not with the art, he was not trying to make art films.  So did you guys ever talk about that, was that sort of….?**

No, and as a matter of fact that is kind of funny because I do not remember him ever saying that around me but then mind is also selective.  I always like his metaphor of the roller coaster, you know, that a good movie was putting together a good roller coaster for people, less so for Manny's Orphans or for Here Come the Tigers but certainly very true for Friday the 13th.  And yes, we both wanted to make a living at it but I think at that point I was putting together entertainment and we definitely thought about movies as entertainment, not as teaching tools for the universe so that part would be true.

6

**Now getting to Sean, of course, the famous stories and he put out the ad in the paper and got funding. So when did you first hear of Friday the 13th, I guess it was not called Friday the 13th obviously.**

Because that is his other hand. On the side where I was living on and basically we were in each other's houses probably two, three or four days a week just working on things. I mean, we were coming up with projects that we thought would be great for Clint Eastwood, you know, which never were and other kinds of things. And one day I was living in Stratford, and he called me up and said, "Halloween is making a lot of money at the box office, why don't we rip it off?" Well now, since we had all ready done the same favor to Bad News Bears, you know, this is a lingua franca that I was quite comfortable with, and …….

**And given your background your kind of love of horror movies, not just horror movies…**

Oh, none. I had no background in horror movies whatsoever, other than I think when I was 6 years old I had to be taken out of Seven Keys to Baldpate which was actually a comic horror movie which I keep trying to find a copy of and I was scared to death, and I was basically a (woose) as a kid, so I was not a big horror film person.

At any rate though, I went dutifully down to one of the theaters in Bridge Port and watched Halloween and I came home, and I think that John Carpenter and Debra Hill did such a wonderful job, they made it very easy for me to figure it out. It had very clean lines and basically you had to start with some evil that had happened before the movie ever began so there was kind of that gothic sense of a historical evil lurking around that had never been quite avenged, and that you needed to find a way to keep the adult from being able to materially aide or save teenagers, and these were really made very clear. Because I remember in the original Halloween, Jamie Lee Curtis' character would go around banging on adult doors and say, "Help me, help me, help me, " and you would hear the adult voices inside saying, "Oh, it's just a kid, it's just Halloween, oh don't even open the door." And they kept finding ways of getting her father, sheriff out of the way. So all of these big people, you have to keep them off the canvas because it is all about sex and violence. And that was the other lesson I learned, which was if you make love without the benefit of marriage, you get killed. Then the other thing is that each of the killings need not be particularly gory but it must be inventive, it certainly must be something very personal and a kind of a hand to hand thing. It was one of Sean's pieces of wisdom that we always worked under which was that guns are terribly impersonal weapons for movies. I mean, unless I can wrap my hands around your throat, it is really not killing you because it is a very personal thing and you have to take full responsibility for it. So basically I went back with this and I started noodling about venues more than anything else.

7

**This is probably what, early 1979 then?**

Everything happened really fast, I think it was in the middle of 1979.

**Because the movie came out in 1978, but I know Halloween took a long time. Because that came out in 1978 and I know it took a long time, I think it was released over the course of the whole year across the country regionally. So I was just wondering when you first saw Halloween.**

My impression is that we did not get started on the project until about June or July of 1979, but I am willing to be told otherwise.

**But now, you did actually like the film, I mean you thought Halloween was a good film.**

Oh, yes, it scared the hell out of me, I loved it, it was fun and I like the Michael Myers character, I like Donald Pleasance anyway, and God knows Jamie Lee Curtis was wonderful. I enjoyed it, it was not something I wanted to do a lot of, but as a film it certainly looked great.

**When Sean called you then and you started work, did he have the funding already?**

No. That all came later, so basically my first week's work was noodling up, I came up with about 40, 50 or 60 different venues.

**What were some of the other ideas, if you remember?**

Like high schools, I cannot remember, but anywhere that kids would be, play rooms, forest, whatever. You know, it took a lot and I would go over and pitch them to Sean and we would both say, "Nah, nah, nah, nah." Then I finally went over and said, "I think I got it, it is summer camp before it opens," and we both said, "Yippie," and I went home and started writing.

**Had you ever gone to camp?**

No, I was too scared to. Going away was just too scary for me, I tell you I was a (woose). My older brother went to camp and I did not like the stories he came back with.

**Did any of those stories influence the film?**

I do not think so, it was just really the whole idea of living in these big rooms with people with double bunk beds sounded pretty awful. I think people who are going to become alcoholics later in life do not go to camp.

8

**EXHIBIT L**

**The scene I always remember that still gives me chills is when they go and find the ax in the bed, and that to me says this is a person scared of summer camp, I don't know why when I see.**

Well, you would be absolutely right. That was one of the mildest, the ax and the snake in there.

Anyway, I started writing it and I came up with the highly unfavorable title of Long Night at Camp Fun, and that was it's working title until about the third or fourth draft, when Sean said, "I've got the name of the movie." Somewhere around there must have been when he was doing the marketing stuff about getting the fund raising. But I was not a part of that process, I was just off in my little office typing my life away.

**I wanted to ask about the three-piece structure of the film, I think that is one of main reasons it was so successful, is that you have sort of like a half hour of kind of set up, a half hour of the kids being killed off and you have a half hour of the final battle so to speak, now is that something that you were really conscious of creating?**

Not a bit, not a bit. Obviously I had Milton Academy and Yale education, so something must have stuck in there, but it was not conscious. I certainly knew I had to establish stuff, you know what was going on and keep all of the given circumstances very clear as to how helpless these people would be. Sean was instrumental in saying, "Look, we should learn from Alfred Hitchcock when he killed off Janet Leigh as a horrible surprise." And that really spun horror movies around totally, that you would kill off a major contract player, so that resulted in that piece of structure which I think was really important that you say whatever this movie is about, this person is not taking prisoners, there is something really awful out there. Then you could spend your time being more interesting about the character and why people were there and whether they had any prior lives before the beginning of the movie and all that kind of stuff.

**So it seemed clear that you had set up with the two kids at the beginning that got killed but that's the horrible incident, it happened a long time ago and then you introduced Annie who is sort of a Janet Leigh character who gets killed off unexpectedly.**

Yes. So then basically as we were putting this thing together it was that the audience should not be able to trust anything.

**When did the idea of Mrs. Voorhees come about?**

Mrs. Voorhees came in I think the first or second week that I was working, because had the summer camp then I needed the prior evil, so once I had that her kid had drowned that all sort of came fairly quickly. Because clearly what

9

A-270

had been done had to justify an awful lot of bad activity, so I figured this would certainly do it.  In the 20-something years since the writing of the movie, I have had a very helpful psychiatrist explain Mrs. Voorhees to me based on a lot longer interview than this one.

**What did he say?**

He said, "My God, don't you know what you've done?"  And is said, "I'm totally clueless."  But he pointed out to me that I had created a mother, in some ways very much like my mother because not that my mother was a killer, but that she was not always nice to her children so the scary woman is a theme in my work. In many ways this was a better version of her because she was killing people because they had not taken good care of her son, so in some ways she was the best mother of all.  You know, that she loved her son so much that she would continue committing these horrible acts for eternity just to make up for the loss of her kid.  But none of that was on a conscious level as I was writing it.  Of course, it was perfect for me that the two counselors were making love when they should have been watching the poor little boy and that theme would be repeated throughout the movie so that we knew right from the get-go that this has a lot to do with the psycho sexual craziness.

**And, of course, that tied in then with the counselors would all be having sex of course…..**

Absolutely, because what else would you be doing to open up a camp, I mean apparently not painting canoes.

**How did you come up with the various counselors?  Obviously, Alice was the lead, and then I think there were five others, I mean did you come up with a number? Like Halloween only really has three kids in it, it's very sparse.**

I do not know, I sort of started peopling them, you knew you had to have this sort of the corn-ball clown guy, he is just one of those characters that comes from commedia dellarte I guess, but I am not that highfalutin, and he certainly comes from Abbot and Costello Meet the Wolfman.  It just seemed like I needed enough really good looking people.  I mean, I was sitting in the waiting room at Columbia Pictures after Friday the 13th had come out and was such a success, and I heard one of the guys, I guess at Tristar, was describing the movie as the Pepsi generation kids, that they were all clean cut and nice and what not and being horribly killed.  I guess that is what I was working with.  You just could not have two or three people open up a camp and it looked like a good idea.

**You also had the one adult character who was Steve Christy.  Now was he kind of put in there just to make us feel a little safer perhaps who was an adult that might help?**

10

EXHIBIT L

PLAINTIFFS000035

Steve gave credibility to the fact that why else would you have these kids just careening around, so it was very important to use him sparingly and to keep him always doing something else off stage.  So he gave it kind of a legitimacy so that you know you did not think that somehow 18 year olds were capable of opening up a summer camp by themselves.  Otherwise I made sure that he was out of the way.  He knew the surrounding neighbors, he knew Mrs. Voorhees and these other people so that you could sort of meet the camp through him.

**What also helps is when Mrs. Voorhees showed up she says, "Mention Mr. Christy," so you think that might be a friend of his. Since you were very clear on the sex and death connection, did you set it up that he had an affair with the Adrienne King character on purpose?  Because what is interesting in these movies, like in Halloween she is a virgin so you sort of know okay this is going to be the person that lives, but in this case Alice is not a virgin clearly.**

I bent that one around because it was more interesting to me because remember I was 40 writing this and that somebody my age (_____).  Actually that line used to be if I remember right it was a more important line but it just got whittled down both by budget and the constraint of time shooting the movie.   It was not necessarily important that you be a virgin historically but that you not fool around certainly on this campus.

**Did you find it hard to write dialog for teens?  You were 40 at the time.**

I was 40 but at the same time I also had a house full of teenagers.  My older son at that point was 12 or 13 and I would ask them anything that was necessary plus I have always been enough of a Peter Pan so I tend to identify downward.

**We were talking before about Ned, the goofy character.  I had heard in one version of the script that he was supposed to be crippled or something like that, that is what Mark Nelson said when I interviewed him.**

No, no.  Who is Mark Nelson, the actor?

**Mrs. Voorhees, I thought it was very interesting that you did not introduce her until basically the third act, and was that something you discussed with Sean that you are not going to see her, I mean you actually do not even know it is a woman at that point.**

There were two and I do not know which was the more important.  I knew from the get-go that we were going to cast, I mean we were using the Donald Pleasance formula right, so that means you have maximum five shooting days with whoever your name player is, and I think we made a more interesting choice by saying that our Donald Pleasance is actually going to be the killer rather than

11

**EXHIBIT L**

PLAINTIFFS000036

just the failed psychiatrist and made it much more fun. It saved us an incredible a lot of money and it is a cheat obviously because we never let you see it and never even know that there is a neighbor of any sort, but it seems to have worked.

One of the things I think, Sean is a great student of film making and he would say things that I always thought were really campy and right on. Like that it is a good idea to keep your villains masked because if you start seeing your villain brush his teeth, you know it becomes very ordinary. So I guess we went to the furthest extreme possible, you not only did not notice any teeth either.

**Don't you think in a Stranger Is Watching which you guys did afterward, you kind of go in the opposite where at every point you see him the whole time and he is brushing his teeth.**

And I think that makes it a lot less successful, but in that instance I was working from Mary Higgins Clark's book and did not have the freedom. Because doing it again, we would make him a lot less human looking.

**Speaking of not human looking, I talked to Betsy Palmer and she had claimed when she got the script Jason was I guess a Mongoloid, for lack of a better word, so when she got to the set suddenly he became a Mongoloid now.**

She is absolutely correct.

**Okay, so did you have anything to do with changing him into…?**

No, never. I think it would be fair, and again time plays tricks on me, but I think it would be fair to say that we may have intimated that Jason was not a normal kid, he was so slow, but I think when Tom Savini and Sean got together they cooked up the grotesque mask for the character which was fine. Because if you think about it, the only time Jason actually appears in my movie and when you actually see his face, it is a fantasy, so he could be anything you wanted him to be. But I think in reality, certainly when I let go of the screen play, Jason was just a slow kid who probably needed more help than your average camper but not for these kids. When you have Tom Savini, you know, my God, he is so fabulous, very seductive.

**The snake scene that occurs now, I always thought that was very interesting because it sort of like set the tone about these kids, I mean they really killed that snake from what I understand on the set, I mean was that something you specifically put in there?**

I do not know, I put the snake in and I am not sure that I called for it to be killed on screen. I do not remember that version. It does not sound like me, because I

12

**EXHIBIT L**

A-273

probably would have written the cop out but I do not know.  I called for it to be killed, but not necessarily on screen.

**Did that tie in at all with the characters in terms of showing that these kids could fight back if necessary?**

Absolutely, absolutely.

**Of course the violence was a huge issue when the film came out, was that specifically set down in the script that these kids would be killed very graphically in those certain ways or was that more invented later on?**

No, I wrote it all.  I remember it was hot and it was a summer afternoon and this guy came up in his car with Pennsylvania plates and it was Tom Savini and he had done thorough reading of the script and we sat around Sean's patio and I was stunned.  This guy was saying things like, "Ok, now look on page 43 you got an ax in the face.  Now, do you want a fake ax, real face or do you want a fake face, real ax?"  I am looking to Sean, and say, "My God, you know, I just write this shit, what's this?"  And it was absolutely wonderful and his kind of sprightly and creative and can-do attitude made me think, gee I can make this really interesting because this guy can do it all.  I do not know at what stage the thing was but obviously in order for me to say that I had already put an ax in somebody's face.  But he encouraged me to think that lots of stuff could be done.  I think the funny thing about Friday the 13th and I will go to my grave saying this is that it is not grossly violent.  Sean said to me years ago, "You know when we want to make a network version of this, we only have to take out 25 seconds of film."  For its time and what I think was so great about the editing and the special effects, is that everything was a buildup and then you finally you saw this one shot of this thing and nobody lingered on it, and we got in and we got out real fast and it was more of the thought of having an ax in your face that lingers with you rather than seeing real sheep's blood dripping down.

**I talked to Bill Frede, the editor, and my take even back then was that it was sort of like a punctuation mark, because it really is not that awful at all.**

**Actually I do want to ask you about that, one of the things I hope to do in the book is, I think it is very easy to disprove that Friday the 13th was just gore.  Like there were a lot of things you set up; for example, I notice you do a lot of things in the film and I just wonder if you do it consciously.  For example, the scene with Kevin Bacon, they just had sex and she gets up to go to the bathroom and right when she gets up he's like, you know, "It's getting cold in here."  I remember the whole audience goes "Oh" because you realize that Mrs. Voorhees or the killers come in which is why it's cold, so you'd set up that something bad was going to happen, and that to me says that you would not do things like that and let people know the killer is in the room if you were just trying to shock them.  Then the whole rest of**

13

A-274

**the scene your like, "Oh my God, something bad's gonna happen." Whereas if you did not do anything like that, then all of a sudden the air would come through his neck and you get a big shock but you would not get any suspense.  Am I right in that….**

Yes, I think it is that but it was the other things where he looks up, I mean he is smoking the joint, he looks up and that was all scripted, and he sees this sort of a flowing stain and what is that, is that from some previous counselor who wet his bed or what, and he reaches up…..  I have forgotten when we saw Ned's face, Ned's body up there but it all sort of works together and a drop of blood comes down.

**The other thing about the Ned's death, is that Sean pans up and cuts to him dead on the bed right when they have an orgasm, is that written that way too?**

I'm not sure, I know that we wanted it as soon as we had gotten them to their whatever that you were supposed to see, I mean all of these revealed were plotted out one after the other so that it just got creepier and creepier that it really does make sex very creepy if you see there is a dead body up there.

**But those are very Hitchcock because he gave that famous story about you could film a scene of people in a restaurant with a bomb on the table, you could either get the shock or you could get the suspense, and it seems like you guys genuinely went for the suspense.**

That is what we were aiming for.

**In terms of Alice, did you try to kind of give her a character (_____),  I mean did you talk a lot about that character or work on that a lot in terms of….for me like Halloween the reason that really works so well is Jamie Lee Curtis is always watching, always aware, and at the end of the movie she, I guess, learned something, she learns about the presence of evil, blah, blah.   Did you try to do anything similar like that with Alice?**

No, the Alice character was more of a kind of an outsider, even while she was there, that is probably the only thing that I was conscious of doing on her, was that the other people kind of fit in better, that she had a history that was not all cool, but no I do not think I was conscious of working her through anything, because I guess if I had paid too much attention to that, you would wonder why the hell is she watching all these people disappear and not doing something about.

**Where did strip Monopoly come from?**

14

Strip Monopoly came from.  This is off the record.  When I was 13 or 14, Henry Fonda with Jane and Peter and the third Mrs. Fonda lived down the road.  We were always looking for things to do, my older brother and me and the two Fondas, and one day we played dirty Scrabble, so that was always stuck in my mind.  There I was not knowing that I was with the 15-year-old Jane Fonda, and it was a moment in my idealistic past that we played dirty Scrabble, so somehow I just went to strip Monopoly.  To tell you the truth, I do not if it is possible, any more than it is for Betsy Palmer to string people up in trees.  Again, that is a part…..because in the soap opera business you basically have to show how everybody does everything, if I had to take time out and show you that she got a block and tackle out and a wench, I mean God, yes, it is all impossible, and if you want to tell me how she gets a hunting arrow up through Kevin Bacon, through the mattress, through the springs and without any ability to have any sort of back swing from underneath the bed……

**Yes, but that is very Halloween, I don't know, like when Jamie Lee finds all the bodies, that is a classic moment, like Mr. Christy just happens to fall from the tree right when she is walking by it, you know it is very convenient.**

I remember in an early draft I had all the bodies hanging from the trees but it was kind of like sort of Polish Easter eggs or Czechoslovakian Easter eggs.

**Yes, but
I'm sure Sean had some input there in terms of blocking or how it might work…..**

Oh God yes, they were working at this camp in the fall and the foliage was turning and they were really under the gun.

**Now the final battle with Mrs. Voorhees, how did you come up with decapitation?**

It has always been one of those things that I have found particularly disquieting ever since somebody explained the French Revolution to me.  (_____) is like the worst thing that could possible happen I thought, so…..

**What is interesting because, yes were going to talk about the sequels, but you kill off your killer.  Yes.  Now originally didn't it end with Jason jumping out of the water.**

Originally it just ended with her killing Mrs. Voorhees and then that was like an ultimate draft, and then Sean called me up and said we need a chair jumper for the end.  I said okay, and I wrote the sequence where she is in the little boat, she sets off in the boat and the sun rises on her and then she wakes up and you

15

**EXHIBIT L**

know Jason comes out of the water and she wakes up in the hospital bed which is as close as I could steal from Carrie without being arrested.

**It totally worked by the way, it still works.**

It worked for him in other horror movies before.

**But obviously you had no idea, oh well now we are going to have Jason the sequel, that was never a part of the plan?**

No, no I had no clue whatsoever that there was a possibility.  I mean because sequels were not all that big then, not that I can remember anyway, certainly that was not where my head was.

**When you turned in your final, that sort of draft, that was probably what September 1979?**

I would think so, yes.

**If I understand correctly, you did not go to the set at all.**

I went to the set once.  I visited once and it happened to be on the day in which they were shooting the scene in which the hunting arrow comes up Mr. Bacon's neck, I was very fortunate.

**Why didn't you go to the set, did they ask you to do rewrites or come and add things?**

No, no, I mean that was not the way, remember I had done two movies before with Sean and that was not really the way we worked.  If he had a particular problem with a scene that was coming up, he would call me and we would talk, but I am not conscious at this moment of any times we would do that.

**I did hear some rewrites were done by Ron Kurtz, do you know him?**

I do not know Ron Kurtz.  The only scene I did not write was the motorcycle cop, that was a total invention. and when I heard about it I was just appalled because the entire point was to create an environment in which there was no way these kids could get any help from the outside, and that just worked so far against it.

**The only thing it does help is it does make the adults seem like buffoons, because he is very goofy.**

Right, and that is even sillier, that really does not help me at all.  Because for instance the Ralphy rat boy stuff is a different kind of tone, so that is why I think the motorcycle cop was a bad tone for the thing.  Because I was not trying to

16

save the kids from buffoons, you know.  I like to think that out there outside their world there were very effective adults who could have helped them but they were unable to get them or even know what is going on.  That is the only scene that I am aware of that has nothing to do with me whatsoever, and it is just….

**It is a comic release basically, it is supposed to be assumed.**

 I was told that it was the brainstorm of the man who came up with the cash.

 **I was going to ask you, did Steve (Managian) and Phil (Scadari), they were the backers….**

Yes, it was (Scadari).

**Did they have any input at all in the script?**

That was the only thing I know of.

**So they were not around over your shoulder.**

No, no.

**In a lot of the sequels they actually were, they were very involved I discovered.**

Well, that would explain a lot.

**Yes it would.  Steve (Managian) is the one who was responsible for going beyond the final chapter, you know it really was supposed to end at part 4 and then he came through and he started 5 until….  But I did find him so I am supposed to call him back, I am actually very interested to talk to him.**

**Now as far as the casting goes, I am assuming you did not have any input there?**

They hired a casting agency and I went and sat with them and there was a big auditioning thing, and I remember I was there for one day and it was the day in which Kevin Bacon was there as was Adrienne King, I met her.  They read the thing and I went off again.

**Were you happy with the cast they chose?**

Absolutely, absolutely.  I thought they did a fabulous job, the kids were interesting and real.  If it had been cast in Los Angeles, I think the look would have been quite different, it was clearly these are New York actors.  The women

17

**EXHIBIT L**                    **154**
PLAINTIFFS000042

were not pneumatically endowed, which was a fantasy of mine so I missed that, but I thought it made it much more real.

**Were you aware of the tension that was going on between Adrienne King and Betsy Palmer during the shoot?**

Not a bit, what was it?

**They did not get along very well.  I interviewed both and you know there was the scene at the end they are fighting and Betsy Palmer actually went ahead and just slapped her and she broke down to tears and ran after Sean….. Betsy also told me some other stuff that I do not think I can print basically.**

**When did you first see the film after it was completed?**

I remember going a couple of time.  Because remember, Sean and I were just hanging out, he had a lot more to do by this time obviously, but I would still go over to his office and talk with Cindy and what not when I had nothing to do.  By this time, I was looking for new projects and I think at that point I was trying to sell my blood too because I had no income.  I remember a couple of times Sean and I had lunch and we stopped by on the way at the editing room and I would see little scenes being edited and I thought that was cool, I guess Sean's wife Susan was helping on the editing, so that was neat I thought.  I think I saw a screening at one of the screening places in Manhattan.

**Was that with an audience?**

No, I think it was just with us.  Then I saw it for real in Millford, Connecticut at the (_____) with some friends, at you know Cinema 1, 2, 4, 5, 6 and 8, and it was absolutely terrifying.  But the most interesting moment was at the end when the head comes off, she slinks into the boat and paddles out.  Half the audience got up and turned and left through the exit.  So that when Jason came out of the water the half that were seated or standing trying to see over the people who were leaving, screamed, absolutely the most wonderfully chilling sound I've heard in my life.  Everybody who was headed for the exit whipped around and I saw nothing but white faces.  They are all standing screaming and pissed off as they had been at this wonderful chair jumping thing, so that was great.  Then I saw it again, Sean was always very big on going to theaters, to as many different demographics as you could.  So I went from that all white theater three or four weeks later to an all black theater where the audience response was just as great but it was much more interesting for me than the white preppy, to watch these people talking to the screen and saying, "Don't go in there girl, don't you go in there," and "Oh you ass hole," and I loved it.  But Sean was not interested in just seeing interesting dialogue from the audience, he was very interested in

18

seeing how you plot a movie out and get the effects by watching how the audience will respond.

**Did you put anything intentional in there to have people talk back to the screen?**

No, nothing that I know of.

**Now when the film came out absolutely it was huge, were you surprised first of all that Paramount picked it up and then secondly, were you surprised how successful it was?**

I was working for some company in New York that makes motivational slide shows and I was writing a script for them, and I got a call in the middle of it and it was Sean saying Paramount has picked this up and is releasing it in a thousand movie theaters or whatever, which was the unheard of number.  And I said, "Holy shit."  So I was pleased as punch and then when I hung up I did not have to be quite so respectful of the people I was working with.  No, even at that with a thousand movie theaters, I did not expect it to have the impact that it did.  Remember, we had done two movies before and they were nice and respectful and nothing happened, so I was used to nothing happening.

**Were you at all disturbed or personally hurt when, you know, I don't if you remember, Siskel and Ebert launched a campaign against the film, they actually printed Betsy Palmer's address and told people to write her and tell her how awful it was she was in this movie, …..**

I had to be reminded of that because I had totally forgotten it.  That was just unconscionable the idea of printing somebody's home address or phone number or anything.  But I think at that point I was just thinking, boy the more publicity they give, the better off we can be, so that did not hurt.  As a graduated Yaley, I was already used to people talking about how trashy I was, you know so that always hurt but I was never fooling myself about what Friday the 13th was.  It is a good show and you know, we are building a roller coaster here and we want to build the best damn roller coaster that we can.  I got nervous when psychiatrists were coming on to me that it was a bad idea.  Because you know, they have PhDs and it is hard to be totally sure they are not right.

**Well you know, the only thing different though about Friday the 13th at that point really, was that you had the low bid score, but it was not like horror films were not made before.**

Oh right, yea, but we seemed to be the most visible at that moment and we caught all of the flack.

19

**Yes, Halloween I think started and then you guys were the next big hit so you were the easy target.**

**You wrote something which I read which was very entertaining at the time in the newspaper and it was a little article on what its like to be the writer for Friday the 13th and I often remember that. You talked a little bit about, I think it was kids driving passed your house and singing the Jason theme. Did you suddenly have, like I don't mean famous, but did you start getting people calling you to speak, did your profile go up?**

Well I was hot for about 30 seconds. Was this the Washington Post thing?

**I think it was, yes.**

Because a friend of mine, a good friend, who was the (_____) editor I guess there and so that happened. Yes, for about 30 seconds. I remember buying Variety every week when we were in the top ten and I had a stack of writings that were amazing and I just could not believe it, and it was really great. But then after that the public went on to the next thing and I was not it.

**Did you get a lot of offers though, like do other horror films and things like that?**

No. Immediately I went out and took all kinds of meetings and what not and I got a contract on one sentence. The guy said what's your next idea and I said, "Well, it's a horror film in a hospital," and this was with Frank Price at Columbia and he said, "Fine, get this guy's agent on the phone." So I had a development deal on the basis of one sentence (_____). So I go home back to Connecticut and I have this fabulous check in my pocket and my wife is all happy, we are living in this little shit box of a house. I get a phone call from one of the producers who works for Frank Price and he said, "Victor, we have a problem," and I said, "What," and he said, "Well, we've done some research and found out that movies made in hospitals don't make any money." I said, "Do I have to give my check back?" He said, "No, no, no, but we came up with an alternative location for this screen play." I said, "What?" He said, "How about, would you put it in a girl's college." And I said, "Well sure, I'd be glad to." I mean he only had one sentence anyway. I have mentioned it to groups that I have talked to. As I look back, that is when I realized that I had truly become a whore, when I did not have a concept to begin with and I was only too happy to change the location which is all I had anyway, just so I could keep the check they gave me, I knew I was in trouble, but I was too busy wanting to ……

**Did you write that script?**

Oh yes, I wrote it and it never got made it has been turned around to this day I guess.

20

**EXHIBIT L**

**What was it called?**

It was called Asylum.  It is a wonderful screenplay.  You know, it suffers from all the distance that you get and remember that studios cannot afford to make low budget movies, so they made a deal with me but they never could make the movie.  Just to open up Columbia's doors in the morning costs more than to make Friday the 13th.

**I have to ask you about the sequels, in the email you said you wanted to sort of set the record straight.  The part 2 I understand was put in production like literally a month after the movie opened, no one approached you about doing a follow-up?**

No, and you know, it had this life of its own, remember Sean and (Scadari) were the owners of this thing, I was not an owner.  They went on.  And I was, at that point, working on the Columbia screen play and so I was busy and there was no way they could have paid my new salary level.  Which I think that is one of the things about sequels, is that you always try to get a new writer because that way you can pay them minimum.

**Were you upset that you were not included, did you want to be a part of the sequel at first?**

Not really, not really.  I wanted to go on a different kind of roller coaster and I certainly hoped that we could do that.

**Is it fair to say that you were not happy with the direction they took with part 2 and the whole Jason thing?**

For me to say I'm unhappy with it, it should mean that I've seen them and I haven't, so my unhappiness is simply that it is taking this one little weird rubber faced kid out of the water and turning him into a monster.  I thought it was a brilliant idea that they gave him the hockey mask because that has been an icon that has come down through the years.  But I just do not think it is very interesting, and I certainly love the Freudian themes that wrap around me and Mrs. Voorhees and so I am just not particularly interested in a strange little boy being unkillable.

**Now if you were going to do it, how would you have done it, I mean a sequel?  Because I know Sean Cunningham said his original idea was make a totally different kind of movie every year, like have a new Friday the 13th movie that would have nothing to do with the other one so it would be almost like an anthology of movies.**

21

A-282

I would go with Sean on that, I would think that is a much better idea.  I mean, look at what we did, when Sean came up with the title Friday the 13th, he called me and said, "Look you got to put in some reference  to Friday the 13th because otherwise it's nice that I came up with this title but it should have some kind of reverberation of the movie," and I said, "Fine, okay."  So I had that cop turn to Peter Brouwer and say, "A full moon and it's Friday the 13th."  Talk about shoehorning, that was it, I think that is the only reference and we are off and running.  Friday the 13th is not the significant deal to make the movie scary, so I thing that anthology Friday the 13th would be much more interesting.  But who is to argue with the fact that they sell all these hockey masks.

**Oh yes.  But the glory days were the first four, those really made a lot of money and I have done research and they have pretty much dropped off, and now they will make a little bit of money but they are cheap enough that they still make them but they are not the force they were, I don't think.**

I suddenly have to ask you whether you know the people at (Automat) Films.  Well Jeff called me last night and they are sending me the new DVD, so definitely check that out because….

**Jeff is a good friend of mine.**

Oh great, he was great, he was a wonderful interviewer, and I had a wonderful time and they even sent me my expense check on time.

**Yes, they are great.  He's is in so many big DVDs.**

So I guess it is ready and they have all of these interviews that you can probably help yourself to.

**Yes, they gave (_____) Freda and Sean Cunningham, because Sean has been a little tough.**

I think he is going to be very surprised by the interview I gave Jeff Schwartz because I have nothing but good things to say about him.

**There are two things actually I want to talk to you about.  First, I think both of you entered into a law suit with Georgetown Productions back in 1986 was it.  What was that about exactly?**

Well, my union was trying to get what was owed me so I had to sue, my union sued Sean so Sean had to sue Georgetown, getting the money out of (Scadari) was always troublesome.

**Why didn't you just sue (Scadari) yourself.**

22

Because I'm not a lawyer and I don't know…..   Whatever my guild did, it did it the right way and I eventually got my money, but it took forever.  And these are the sequels, etc., and cable vision and everything else.  I got my money in 1988 and that was a long time coming.

**I hope you still get money, right?**

Yes, I get a night out with the little woman.

**Do you have part of the point like in the sequels for writing, I know what it just says like based on characters created by?**

No, that's all, they just have to give me a flat fee.

**Why don't you still talk with Sean, is there a reason you don't?**

After Friday the 13th, Sean and I threw ourselves into doing the screen play of a novel I had written called Hide the Children, and we got it picked up by Filmways which was then in business.  I cannot remember the guy's name we were working with; but eventually that project did not happen.  We worked on my Hide the Children thing, Filmways picked it up and Sean was going to produce and direct and I had the screen play from the novel by…and Filmways collapsed in the deal and it never got made.  Then we did Stranger Is Watching, and actually I was busy doing Columbia's project so I could not do the first pass on that, so I actually replaced whoever the first writer was.  We did that, that movie did not do well at all.

**That  was supposed to be Sean's sort of ticket to the big time, correct?**

Exactly, that was MGM, yes that was the biggie.

**I watched it recently and it has a very similar feel to Friday the 13th, I do not know if you used any of the changes of how it is sort of set up and the payoff with scenes and scares and the ending, to me it is sort of similar to the Mrs. Voorhees moment when he gets stabbed in the neck and all that, I do not know if that was something conscious on your part…**

I have no clue, it has been so long since I have seen it and I was working for Mary Higgins Clark.  Then lightening was going to strike twice, I was down in Florida with my family over some like Easter vacation or something, and Sean said go see Porkies, that is the same way he said go see Halloween.  So I went and saw Porkies and then we met for dinner and Sean said, "I want to make a movie called Spring Break."  I said, "That's absolutely brilliant and I think you're right on."  Sean at that point was very keen on not being "just a horror film" producer which did not seem to hurt his buddy on Last House on the Left.  At any rate, he wanted to branch out, so Spring Break was going to be the next project

23

and I was going to write the screen play.  I went back to Connecticut and I wrote, I don't know one, two or three drafts on Spring Break, and we met, we talked and did lot of things, etc.  Then I got a phone call one morning who said, "Victor, I'm not going to go ahead with you on Spring Break," which basically I was being fired over the phone on Spring Break.  I was just so done in…

**Why did he not want to use you?**

There are only two excuses; a) my screen play in his opinion sucked, I assume, we did not get into the reason or, b) whoever the money people were had some other writer they wanted to use.  Or just creative differences really do exist, but I had never been told any.  We were just sort of going along and I was stunned, but no so much stunned by being fired, I've been fired a lot since then, but they fired over the phone by a guy who I had been in and out of his house with and vice versa for what three, four or five years or something like that, and I just could not believe that this was happening and that was that.

**So you guys never tried to patch it up since then?**

No.  I mean he sent me a letter at one point but it did not really deal with it and I never talked to him again and I think…..

**Do you miss him?**

Very much, yes, I mean in that sense that I think we were the best for each other and that maybe history is bearing that out, I don't know.  All I know is he gave me strength where I was weakest and I think I did the reverse for him, you know gave him the strength where he was weak.

Yes, there was a wonderful shorthand that we had that we could use words or phrases that nobody else in the room understood that I knew exactly what he wanted and vice-versa.  I mean for instance there was….Bob and Ray used to do this wonderful parody of Kojak where Kojak would yell "Greenberg, Goldstein, Miller, Smith, Brown get in here,"  and you would hear these feet running in and then he would say, "All right, you cover all the train stations in America, make sure no one gets in or out, Goldstein get all the airports and make sure that no plane leaves in the next 48 hours," and these stupid things.  But if you watch cop movies, you find that every one of them has these Kojak moments in them, "Quick, you go there, you there," and it is meaningless where you send them, like you have to send them, right?  So Sean would just look over the top of a coffee cup at me and say, "Let's do a Kojak moment there,"  "Fine, absolutely,"  you could just put in Kojak.  He was the only producer I have ever worked with who could right next to one of my scenes make this funnier, with most producers they are not very helpful.  Somehow with him it was fine, I mean we could just trade this stuff and it was a symbiotic relationship which I have never had again and

24

never had before.  So I mourn the loss of that, I don't think he treated me all that kindly, but then I.....

**Did he treat you fairly businesswise?**

Not particularly, no, you know.  That is stuff I do not want to go into.

**Yes honestly that is what I have gotten from most of the people.  I mean I have been surprised how open they have been and stuff they have given me, but they have gone into very specific details and how they don't feel….**

I would certainly rather that come out of somebody else, but that seems to be an ongoing problem.  You know, anything I signed, I signed, you know, I am not saying nobody pulled the wool over my eyes, nobody fooled me.  But the stories I hated to hear later on in my dotage were the ones where everybody says well George Lucas gave a point to the costume woman on American Graffiti and I go ………, I don't have any points on Friday the 13th.  I thought it more important to the (_____) of the costume woman.  You hear that kind of stuff and you say oh well, look at the karma that George Lucas enjoyed, and I ride my motorcycle around North Bay around this area and I am on Lucas Rd a lot.

Then I had to work.  Sean did not need to after that, whereas I did.  But you know for my own growth and my own development I guess that's what I had to do.

**What do you think you took the most from Friday the 13th?**

This is beyond stupid but feel free to print it if it turns you on.  Up until 1980, I would be at parties or something and people would say what do you do and I'd say, "I write," they would say, "What have you written that I know," and I would say "nothing."  I had book credit, you know the detective (_____) and I had the Kojak novels and whatnot.  But as of May 1980, I can go in almost any area and they would say what are you, what were you and who were you, and I would say I'm a writer.  "What did you write?"  I'd say, "Among other things Friday the 13th."  They would be quick to say, "I never saw that because I wouldn't go to that kind of movie but my children liked it."

**If you asked people of my age they would not say that, they be saying, "Oh my God, I love that movie."**

So that somehow validated me as a writer to the outside world.  It did not make me a better writer or anything else, and personally I did not solve all my inner turmoil, but it sure made it easier to go to parties.

**So I take it you would do this all over again if you had the choice.**

25

A-286

Yes, definitely.  You know, I would probably hold Sean up for a point or two, and I did, I brought up that subject to him way back when, and he said, "I can't afford you, I haven't got any."  I said okay.

**Aren't points free, isn't points on the future?**

Points are on the future but if you have given away x number and you are holding on a certain amount for your wife and children, you cannot give away 125 points.

**I'm sure the backers got their own points.**

**Well I really want to thank you, this was a treat for me, I hope you had fun.**

I did, I did, and if you want to do follow-ups or whatever, I'm here and if you're going to come to the Bay Area, let's have supper.

26

Case 3:16-cv-01442-SRU   Document 43-19   Filed 06/09/17   Page 2 of 114

# WRITERS GUILD of AMERICA

★ THEATRICAL & TELEVISION ★

## 1977

## BASIC AGREEMENT

8955 BEVERLY BLVD ● LOS ANGELES CA ● 90048

22 WEST 48TH STREET ● NEW YORK NY ● 10036



175

EXHIBIT N

# WRITERS GUILD OF AMERICA THEATRICAL AND TELEVISION BASIC AGREEMENT OF 1977

## Table of Contents

| Article | | Page |
|---|---|---|
| 1 | Definitions | |
| | A. General | 3 |
| | B. Theatrical | 4 |
| | C. Television | 8 |
| 2 | Term and Effective Date | |
| | A. General | 15 |
| | B. Theatrical | 16 |
| | C. Television | 16 |
| 3 | Recognition | |
| | A. General | 17 |
| | B. Theatrical | 18 |
| | C. Television | 18 |
| 4 | Parties Bound by this Basic Agreement | |
| | A. General | 19 |
| | B. Theatrical | 19 |
| | C. Television | 20 |
| 5 | Geographical Application of this Basic Agreement (General) | 20 |
| 6 | Guild Shop (General) | 21 |
| 7 | No Strike, No Lockout (General) | 26 |
| 8 | Credits for Screen Authorship (General) | 28 |
| 9 | Minimum Terms (General) | 28 |
| 10 | Grievance and Arbitration | 28 |
| 11 | Grievance and Arbitration Rules and Procedures | 31 |
| 12 | Court Proceedings | 39 |
| 13 | Compensation | |
| | A. Theatrical | |
| |   1. Minimum Compensation | 40 |
| |   2. Narration by a writer other than any Writer of Screenplay or Story & Screenplay | 42 |
| |   3. Initial Payment | 43 |
| |   4. Maximum Period of Employment | 43 |
| |   5. Computation of Writer's Period of Employment | 43 |
| |   6. Waiting Time | 44 |
| |   7. Extension of Employment Period | 44 |
| |   8. Failure to Deliver Material Within Allotted Time Period | 44 |
| |   9. Teams | 45 |
| |   10. Week-to-Week, Term, Flat Deal | 45 |
| |   11. Applicable Deal Minimum Compensation | 46 |
| |   12. Inapplicability of Provisions | 47 |

i

**EXHIBIT N**

**Article** | | **Page**
--- | --- | ---
13. | Purchases | 47
14. | Payment of Compensation Under Deal Contract | 48
15. | Minimum Weekly Compensation | 48
16. | Theatrical Motion Picture Released on Free Television | 49
B. | Television |
1. | Minimum Basic Compensation | 49
2. | High Budget Films | 49
3. | Low Budget Films | 50
4. | Negative Cost | 50
5. | Story Claim by Production Executive | 50
6. | Step Outline | 51
7. | Schedule of Minimum Compensation | 51
8. | Reading Time and Obligations of Free Lance Writer re Revisions | 64
9. | Time of Payment | 65
10. | Cut-Off | 66
C. | Claimed Overpayment | 66
D. | Payment Procedures | 66
14 | Writers also employed in additional capacities (Television) | 66
15 | Television Exhibition |
A. | Theatrical | 73
B. | Television | 92
16 | Separation of Rights |
A. | Theatrical | 112
B. | Television | 130
17 | Pension Plan and Health Fund |
A. | Pension Plan | 139
B. | Health and Welfare Fund | 142
18 | Notice to Writers Employed on Same Material (General) | 144
19 | Use and Delivery of Standard Form Contracts |
A. | General | 144
B. | Theatrical | 145
C. | Television | 146
20 | Speculative Writing |
A. | Theatrical | 147
B. | Television | 148
21 | Location Expenses (General) | 150
22 | Term Contracts-Options (General) | 151
23 | Lay-Off (General) | 151
24 | Guaranteed Employment (General) | 152
25 | Notice of Termination of Employment (General) | 153

**Article** | | **Page**
--- | --- | ---
26 | Force Majeure | 153
27 | Motion Pictures to Which Agreement Not Applicable (Theatrical) | 154
28 | Warranty and Indemnification (General) | 154
29 | Separate Agreement (General) | 155
30 | Writer Employment Agreement of Company (Theatrical) | 155
31 | Opportunity to Execute Similar Agreement (Theatrical) | 155
32 | Reference to Agreement (General) | 156
33 | Jurisdictional Disputes (General) | 156
34 | Apprenticeship Program (General) | 156
35 | Recognition of Agreement (General) | 156
36 | Tape (Television) | 157
37 | Names on Literary Material (Television) | 158
38 | Non-Discrimination (General) | 158
39 | Pilot Screening (Television) | 158
40 | Security Instruments (Television) | 159
41 | Notices (General) | 160
42 | Posting Bonds (Television) | 160
43 | Computation of Time (General) | 160
44 | Severability of Provisions (General) | 161
45 | Producer-Writer Cooperative Committee (General) | 161
46 | Foreign Performance Fees (Theatrical) | 161
47 | Writer's Right to View Cut, Answer Print and Sneak Preview |
A. | Theatrical | 162
B. | Television | 163
48 | Professional Status of Writers (General) | 163
49 | Shopping of Material |
A. | Television | 164
B. | Theatrical | 164
50 | Copyright (Television) | 164
51 | Supplemental Markets | 165
52 | Industrial Films (General) | 182
53 | Financial Information | 182
54 | Prohibition of so-called "morals clause" | 183
55 | Restraint on license right of approval | 183
56 | Significance of Titles and Sub-Titles (General) | 183

**EXHIBIT N**

| Article | Page |
| --- | --- |
| Schedule A - Theatrical | 184 |
| Schedule A - Television | 200 |
| Schedule B - Television | 213 |
| Exhibit 1 — WGA - British Screenwriting Credits Agreement | 216 |

# WRITERS GUILD OF AMERICA 1977
## THEATRICAL AND TELEVISION BASIC AGREEMENT

This agreement, hereinafter referred to as "Writers Guild of America 1977 Theatrical and Television Basic Agreement," executed as of the 2nd day of March, 1977, by and between Writers Guild of America, West, Inc. and Writers Guild of America, East, Inc. (hereinafter referred to as the "Guild"), and the following producing member companies of the Association of Motion Picture and Television Producers, Inc.:

1  AARON SPELLING PRODUCTIONS, INC.
2  A & S PRODUCTIONS, INC.
3  (THE) ALPHA CORPORATION
4  AMERICAN INTERNATIONAL PRODUCTIONS, A CALIFORNIA CORPORATION
5  ARTANIS PRODUCTIONS, INC.
6  AUBREY SCHENCK ENTERPRISES, INC.
7  BING CROSBY PRODUCTIONS, INC.
8  BRIEN PRODUCTIONS, INC.
9  BRISTOL PRODUCTIONS, INC.
10  CHARLES FRIES PRODUCTIONS
11  CHARLESTON ENTERPRISES CORPORATION
12  CHRISLAW PRODUCTIONS, INC.
13  CINE FILMS, INC.
14  CINE GUARANTORS, INC.
15  CINEMA VIDEO COMMUNICATIONS, INC.
16  COLUMBIA PICTURES INDUSTRIES, INC.
17  C-O-P PRODUCTIONS, INC.
18  DAISY PRODUCTIONS, INC.
19  DANNY THOMAS PRODUCTIONS
20  DARR-DON, INC.
21  DUBIE-DO PRODUCTIONS, INC.
22  EDPROD PICTURES, INC.
23  FOUR STAR INTERNATIONAL, INC.
24  FRANK ROSS PRODUCTIONS, INC.
25  GEOFFREY PRODUCTIONS, INC.
26  GUS PRODUCTIONS, INC.
27  HANNA-BARBERA PRODUCTIONS, INC.
28  HAROLD HECHT COMPANY
29  HERBERT LEONARD ENTERPRISES, INC.
30  INTERNATIONAL TELEVISION PRODUCTIONS
31  JACK CHERTOK TELEVISION, INC.
32  JACK ROLLINS AND CHARLES H. JOFFE PRODUCTIONS
33  JOE R. HARTSFIELD PRODUCTIONS, INC.
34  (THE) KAPPA CORPORATION
35  LEGARLA, INC.
36  LEONARD FILMS, INC.

iv

1

**EXHIBIT N**

178

37  LEVY-GARDNER-LAVEN PRODUCTIONS, INC.
38  LOCATION PRODUCTIONS, INC.
39  LUCILLE BALL PRODUCTIONS, INC.
40  (THE) MALPASO COMPANY
41  MAX E. YOUNGSTEIN ENTERPRISES, INC.
42  METEOR FILMS, INC.
43  METRO-GOLDWYN-MAYER, INC.
44  MURAKAMI WOLF PRODUCTIONS, INC.
45  NGC TELEVISION, INC.
46  NORLAN PRODUCTIONS, INC.
47  PAX ENTERPRISES, INC.
48  PAX FILMS, INC.
49  RAINBOW PRODUCTIONS, INC.
50  RASTAR ENTERPRISES, INC.
51  RASTAR PRODUCTIONS, INC.
52  RFB ENTERPRISES, INC.
53  ROBERT B. RADNITZ PRODUCTIONS, LTD.
54  SAMUEL GOLDWYN JR. PRODUCTIONS, INC.
55  SHELDON LEONARD PRODUCTIONS
56  SPELLING-GOLDBERG PRODUCTIONS
57  (THE) STANLEY KRAMER CORPORATION
58  SUMMIT FILMS, INC.
59  T & L PRODUCTIONS, INC.
60  TORI PRODUCTIONS, INC.
61  TROLLET PRODUCTIONS, INC.
62  TWENTIETH CENTURY-FOX FILM CORPORATION
63  WALT DISNEY PRODUCTIONS
64  WARNER BROS. INC.
65  WOLPER PICTURES, LTD.
66  WRATHER CORPORATION

(each hereinafter referred to as the "Company" and collectively as the "Companies") In consideration of the mutual agreements herein contained, the parties hereto agree as follows:

The provisions of this Basic Agreement shall be designated as follows:

(i)   General provisions (herein designated "General") applicable to both theatrical employment and purchases and to television employment and purchases, and

(ii)  Provisions (herein designated "Television") applicable to television employment and purchases only, and

(iii) Provisions (herein designated "Theatrical") applicable to theatrical employment and purchases only.

2

## Article 1   Definitions

The following terms or words used herein shall have the following meaning:

A.   GENERAL.

1.   The term "television motion picture" (sometimes referred to in this Basic Agreement as "television film") means the entertainment portion of motion pictures, whether made on or by film, tape or otherwise and whether produced by means of motion picture cameras, electronic cameras or devices or any combination of the foregoing or any other means, methods or devices, now used or which may hereafter be adopted for the recordation of motion pictures produced primarily for exhibition by free television, excepting for the purpose of this Basic Agreement, kinescopes of live television broadcasts.

2.   The term "theatrical motion picture" means motion pictures and photoplays, whether made on or by film, tape or otherwise and whether produced by means of motion picture cameras, electronic cameras, or devices or any combination of the foregoing or any other means, methods or devices now used or which may be hereafter adopted other than those motion pictures produced primarily for exhibition by free television.

3.   The term "free television" means any method of exhibition by television of visual images but excluding "pay television".

4.   The term "pay television" means a method of exhibition by television of a motion picture where a charge is paid by or assessed to or collected from the viewing audience, including subscription, telemeter or any other method whereby a charge is paid by the viewing audience for the right to view such motion picture.

5.   The term "literary material" shall be deemed to include stories, adaptations, treatments, original treatment, scenarios, continuities, teleplays, screenplays, dialogue, scripts, sketches, plot, outlines, narrative synopses, routines, and narrations, and, for use in the production of television film, formats.

6.   The term "radio rights" means the right to broadcast by radio for aural reception only and unaccompanied by any recordation, transmission or broadcast intended for visual reception.

7.   "Week-to-Week Employment". Employment of a writer on a week-to-week basis is employment which, except for such restrictions as may herein elsewhere be contained, may be terminated by the Company or writer at any time.

8.   The term "public domain" refers to literary material which is not subject to copyright protection in the United States.

9.   A "member of the Guild in good standing" is defined as a member of the Guild who has tendered the initiation fee and periodic dues uniformly required as a condition of acquiring or retaining membership.

10.  The term "writer" shall not be deemed to include any corporate or impersonal purveyor of literary material or rights therein.

3

EXHIBIT N

11. Other than as provided in Article 14 hereof, this Basic Agreement shall not nor is it intended to cover the employment of Producers, Directors, Story Supervisors, Composers, Lyricists, or other persons employed in a bona fide non-writing capacity except to the extent that such employment consists of writing services covered under this Article 1, section B 1(a) (2) and section C 1(a), nor the employment of Story Analysts, at any time prior to the expiration of this Basic Agreement, in the synopsizing of literary material, as referred to in subparagraph 1(f) of the wage scales and working conditions of the current agreement between "Producer and I.A.T.S.E. & M.P.M.O. and Local #854 thereof."

12. It is understood that this Basic Agreement shall not, nor is it intended to, cover contracts for the purchase of literary material (a) which literary material at the time of purchase is published or exploited in any manner or by any medium whatever, or (b) with a person who is not a professional writer as defined in Article 1 B 1 b or 1 C 1 b hereof, whichever of said subparagraphs of Article 1 is applicable.

13. Other terms not expressly defined in this Basic Agreement are used in their present commonly understood meaning in the Theatrical Motion Picture and Television Motion Picture Industry in the State of California.

## B. THEATRICAL.

### 1. Writer and Professional Writer.

a. A "writer" is a person who is:

(1) Employed by the Company to write literary material as defined herein, where the Company has the right by contract to direct the performance of personal services in writing or preparing such material or in making revisions, modifications or changes therein; or,

(2) employed by Company, who performs services (at Company's direction or with its consent) in writing or preparing such literary material or making revisions, modifications, or changes in such literary material regardless of whether such services are described or required in his contract of employment; provided, however that any writing services described below performed by Producers, Directors, Story Supervisors (other than as provided in Article 14 hereof), Composers, Lyricists, or other employees, shall not be subject to this Basic Agreement and such services shall not constitute such person a writer hereunder:

(a) Cutting for time

(b) Bridging material necessitated by cutting for time

(c) Changes in technical or stage directions

(d) Assignment of lines to other existing characters occasioned by cast changes

(e) Changes necessary to obtain continuity acceptance or legal clearance

(f) Casual minor adjustments in dialogue or narration made prior to or during the period of principal photography

(g) Such changes in the course of production as are made necessary by unforseen contingencies (e.g., the elements, accidents to performers, etc.)

(h) Instructions, directions, or suggestions, whether oral or written, made to writer regarding story or teleplay

In addition to the foregoing in the case of a person who at the time he performs services has not received at least two screen credits for story or screenplay or both, as determined pursuant to the Theatrical Schedule A of this Basic Agreement, or Schedule A of prior Theatrical basic agreements, within a period of ten years (or has not received at least one of such credits within a period of five years) immediately prior to the rendition of such services, and who is employed solely in the capacity of the bona fide producer of a motion picture and whose employment does not include the requirement that he perform writing services, then, such person may, in addition to the above, perform the following writing services: make changes in dialogue, narration or action, but not including significant changes in plot, story line or interrelationship of characters, and such services by such person shall not be subject to this Basic Agreement. If such person does make significant changes in plot, story line or interrelationship of characters, then such services by such person shall be subject to this Basic Agreement, except Article 6 hereof.

In addition to the foregoing, in the case of a person who at the time he performs services has received at least two such screen credits within such ten-year period (and with at least one of such credits within such five-year period) immediately prior to the rendition of such services, and who is employed solely in the capacity of the bona fide producer of a motion picture, and whose employment does not include the requirement that he perform writing services, then, if such person shall perform writing services in addition to those described in (a) through (b) above, such services by such person shall be subject to this Basic Agreement.

In addition to the foregoing, in the case of a person who at the time he performs services is employed solely in the capacity of the director of a motion picture, and whose employment does not include the requirement that he perform writing services, then, such person may, in addition to the above, perform the following writing services, make changes in dialogue, narration or action, but not including significant changes in plot, story line or interrelationship of characters, and such services by such person shall not be subject to this Basic Agreement. If such person does make significant changes in plot, story line or interrelationship of characters, then such services by such person shall be subject to this Basic Agreement, except Article 6 hereof.

In any event, if any producer or director shall receive screen credit pursuant to the provisions of the Theatrical Schedule A attached hereto or is determined by a Guild credit arbitration committee to be entitled to such credit pursuant to such Schedule A and the Guild's credit rules

Article 1B
Definitions
THEATRICAL

4

Article 1B
Definitions
THEATRICAL

5

180

EXHIBIT N

relating to the quantity and quality of the contribution necessary for such credit in effect on the effective date of this Basic Agreement, then the provisions of paragraph 9 of Article 6 hereof shall apply with respect to such person.

With respect to a person employed solely as a producer-director, on the motion pictures which he directs the director paragraph above shall apply and on the motion pictures which he does not direct, the producer paragraphs above shall apply.

As used above, "producer" shall also include the bona fide executive producer of said motion picture if such executive producer is of the same industry stature and has responsibilities and functions similar to those held or exercised by the following executive producers during 1977: Samuel Arkoff, Ron Miller and Marvin Mirisch.

With respect to signatory Companies, no services of any kind of any executive of the same industry stature and with responsibilities and functions similar to those held by or exercised by the following executives during 1977: Cardon Walker, Alan Ladd, Jr., John Calley, and Daniel Melnick, shall be covered by any provisions of this Basic Agreement, except that if any such executive shall receive screen credit pursuant to the provisions of the Theatrical Schedule A of this Basic Agreement or is determined by a Guild credit arbitration committee to be entitled to such credit pursuant to such Schedule A and the Guild's credit rules relating to the quantity and quality of the contribution necessary for such credit in effect on the effective date of this Basic Agreement, then the provisions of paragraph 9 of Article 6 of this Basic Agreement shall apply with respect to such person.

b. A "professional writer" hereunder is a person who on or after March 2, 1977, sells or licenses to the Company the ownership of or rights to use literary material written by such writer, for use in the production of a motion picture, which literary material had not prior to such sale or license been published or exploited in any manner or by any medium whatever, and who at such time:

(1) has received employment for a total of 13 weeks as a motion picture and/or television writer, or radio writer for dramatic programs; or

(2) has received credit on the screen as a writer for a television or theatrical motion picture; or

(3) has received credit for three original stories or one teleplay for a program one-half hour or more in length in the field of five television; or

(4) has received credit for three radio scripts for dramatic radio programs one-half hour or more in length; or

(5) has received credit for one professionally produced play on the legitimate stage, or one published novel.

The Company may rely on the statement of the writer with respect to whether or not the material had theretofore been published or otherwise exploited.

It is understood that the employment of the writer need not be consecutive for the purpose of b. (1) above.

2. The term "treatment" means an adaptation of a story, book, play or other literary, dramatic or dramatico-musical material for motion picture purposes in form suitable for use as the basis of a screenplay. The term "original treatment" means an original story written for motion picture purposes in a form suitable for use as the basis of a screenplay.

3. The term "screenplay" means the final script with individual scenes, full dialogue and camera setups.

4. The term "first draft screenplay" means a first complete draft of any script in continuity form including full dialogue.

5. The term "story" means a literary or dramatic material indicating the characterization of the principal characters and containing sequences and action suitable for use in, or representing a substantial contribution to, a final script.

6. "Shorts" or "short subjects" for the purposes of this Basic Agreement, are defined as motion pictures which when released are 3,600 lineal feet or less in length, other than motion pictures known as cartoons, newsreels, trailers, travelogues, commercials or news and sports commentaries and motion pictures intended primarily for exhibition by free television, if such motion pictures are originally made and originally distributed as such.

7. "Rewrite" as used herein means the writing of significant changes in plot, story line, or interrelationship of characters in a screenplay. "Polish" as used herein means the writing of changes in dialogue, narration or action, but not including a rewrite.

8. Merchandising Rights — The term "merchandising rights" means the right to manufacture and/or sell or otherwise dispose of any object or thing first described in literary material written by the writer pursuant to an employment agreement, subject to this Basic Agreement, entered into on or after June 16, 1970, or acquired from a professional writer; provided such object or thing is fully described in such literary material and by such description appears to be unique and original.

The writer shall have no merchandising rights. However, if the Company exploits the merchandising rights (as defined above) in any such literary material, Company shall pay to such writer an amount equal to five per cent (5%) of absolute gross (that is, monies remitted by the manufacturer on account of the exploitation of the subject merchandising rights). The provisions of this subsection 8 are also applicable to a writer who is not entitled to Separation of Rights.

## C. TELEVISION

### 1. Writer and Professional Writer

a. A "writer" is a person who is:

(i) engaged by the Company to write literary material as defined herein (including making changes or revisions in literary material), where the Company has the right by contract to direct the performance of personal services in writing or preparing such material or in making revisions, modifications or changes therein; or

(ii) engaged by Company who performs services (at Company's direction or with its consent) in writing or preparing such literary material or making revisions, modifications, or changes in such material regardless of whether such services are described or required in his contract of employment.

A writer is a creative and professional person who performs a unique and indispensable function in relation to the production of motion pictures. It is an element of good faith, and part of the consideration of this agreement, that no company will use any of the following provisions of this paragraph with the purpose or intent of circumventing the employment of writers. Accordingly, it is agreed that the following services performed by an employee who is not employed as a writer shall not be subject to this agreement and such services shall not constitute such a person a writer hereunder:

(a) Cutting for time

(b) Bridging material necessitated by cutting for time

(c) Changes in technical or stage directions

(d) Assignment of lines to other existing characters occasioned by cast changes

(e) Changes necessary to obtain continuity acceptance or legal clearance

(f) Casual minor adjustments in dialogue or narration made prior to or during the period of principal photography

(g) Such changes in the course of production as are made necessary by unforeseen contingencies (e.g., the elements, accidents to performers, etc.)

(h) Instructions, directions or suggestions, whether oral or written, made to a writer regarding story or teleplay

In addition to the foregoing, if a person is employed solely in the capacity of the bona fide executive producer or bona fide producer of a specific television program and his employment agreement does not include the requirement that he perform writing services, and if said person has not been employed as a writer at least twice since June 1, 1966, and if said person nevertheless renders writing services (other than those specified in (a) through (h) above), then his employment as a

writer shall be subject to this Basic Agreement, except that Article 6, and Article 14, of this Basic Agreement shall not be applicable if he performs no more than the following writing services on not more than three programs in any one production season (not more than one of which may be a program in a mini-series, which for this purpose is a series of not more than 8 episodes in the production season): changes in dialogue, narration or action, but not including significant changes in plot, story line or interrelationship of characters. If such person makes significant changes in plot, story line or interrelationship of characters, such person shall be subject to Articles 6, and 14, of this Basic Agreement.

In determining whether a person has been employed as a writer since June 1, 1966, for the purposes of this subparagraph, (i) each separate occasion, if any, for which he has declared earnings to the Guild for services as a writer performed on a particular theatrical motion picture or television project since June 1, 1966, and (ii) each occasion, if any, on which he has been listed as a participating writer in relation to a screen authorship credit determination pursuant to a collective bargaining agreement with the Guild with respect to services performed as a writer since June 1, 1966, shall be conclusively counted as an employment as a writer. The exception provided for in this subparagraph shall not be valid in a particular case unless the company obtains from the individual a warranty in writing that he has not been employed as a writer at least twice since June 1, 1966. If the Guild should question whether the exception applies, whether relating to employment by the Company or by another signatory, the Company shall cooperate in making available to the Guild any evidence in its possession or control which may be relevant to the inquiry. Said exception shall not apply to a writer if such writer has been previously employed as a writer also employed in additional capacities as provided in said Article 14.

With respect to signatory Companies, no services of any kind of any executive of the same industry stature and with responsibilities and functions similar to those held by or exercised by the following executives during the 1977-78 broadcast season: Larry White at Columbia Pictures Industries, Inc.; Allan Shayne at Warner Bros. Inc., Sy Salkowitz at Twentieth Century-Fox Film Corp., and Ron Miller at Walt Disney Productions, shall be covered by any provisions of the Basic Agreement, except that if any such executive shall receive screen credit pursuant to the provisions of the Television Schedule A of this Basic Agreement or is determined by a Guild arbitration committee to be entitled to such credit pursuant to such Schedule A and the Guild's credit rules relating to the quantity and quality of the contribution necessary for such credit in effect on the effective date of this Basic Agreement, then the provisions of Article 6, paragraph 9 shall apply with respect to such person.

In addition to the foregoing, in the case of a person who at the time he performs services is employed solely in the capacity of the director of

Article 1C
Definitions
TELEVISION

EXHIBIT N

a specific television program, and whose employment does not include the requirement that he perform writing services, then, such person may, in addition to (a) through (h) above, perform the following writing services: make changes in dialogue, narration or action, but not including significant changes in plot, story line or interrelationship of characters, and such services by such person shall not be subject to this Basic Agreement. If such person does make significant changes in plot, story line or interrelationship of characters, then such services by such person shall be subject to this Basic Agreement, except Article 6 hereof.

In any event, if any director shall with respect to the particular program receive screen credit pursuant to the provisions of Schedule A attached hereto or is determined by a Guild credit arbitration committee to be entitled to such credit pursuant to the Television Schedule A and the Guild's credit rules relating to the quantity and quality of the contribution necessary for such credit in effect on the effective date of this Basic Agreement, then the provisions of Article 6, paragraph 9 shall apply with respect to such person. A writer who renders services as a director on a particular episode shall be deemed to be a director as to such episode.

b. A "professional writer" means any person who has (a) received employment for a total of 13 weeks as a television, motion picture or radio writer, or (b) has received credit on the screen as a writer for a television or theatrical motion picture, or (c) has received credit for three (3) original stories or one (1) teleplay for a program one-half hour or more in length in the field of live television, or (d) has received credit for three (3) radio scripts for radio programs one-half hour or more in length, or (e) has received credit for one professionally produced play on the legitimate stage or one published novel.

2. The term "teleplay" means the final script with individual scenes, full dialogue or monologue (including narration in connection therewith), and camera setups if required; provided, however, that if the Company desires any script to consist in part of suggested or indicated dialogue (so that an actor portraying a role may extemporize therefrom) such suggested or indicated dialogue shall be deemed to satisfy the requirement of "full dialogue or monologue".

The term "rewrite" means the writing of significant changes in plot, story line or interrelationship of characters in a teleplay.

The term "polish" means the writing of changes in dialogue, narration or action, but not including a rewrite.

A "back-up script" is a story and/or teleplay for a proposed episodic series for which a writer is employed prior to the exploitation of the television sequel rights for such proposed series, other than a pilot script.

A "pilot script" is a story and/or teleplay intended to be used for the production of a pilot film for a proposed serial or episodic series and setting forth the framework intended to be repeated in subsequent episodes, including the setting, theme and premise of the proposed serial or series and its

central running characters. A story and/or teleplay may be a "pilot script" whether or not there is a separate format for the proposed serial or series and regardless of whether it is written for broadcast as a unit of a unit series or as a one-time program. The foregoing definition of pilot script also may apply to a story and/or teleplay intended to be used for the production of a pilot film for a proposed unit series which does not have central running characters, but which story and/or teleplay does set forth the context and continuing framework intended to be repeated in subsequent units, including the central premises, themes, setting (locale, time, etc.), flavor, mood, style and attitude of the proposed unit series.

Nothing herein shall be construed to require that a pilot be produced for any such serial or series nor that a pilot script must be written for any such serial or series.

3. The term "first draft teleplay" means a first complete draft of any script in continuity form including the full dialogue.

4. The term "story" means a story indicating the characterization of the principal characters and containing sequences and action suitable for use in or representing a substantial contribution to a final script; provided, however, that the writer shall not be obligated to insert dialogue therein (except to the extent necessary to show characterization) or to prepare the story in the form of a step outline.

5. A "national radio network broadcast" means a broadcast carried simultaneously by a station or stations in excess of the stations comprising a regional radio network. A "regional radio network" means a network maintained by a network company for regional coverage as distinguished from national or transcontinental coverage.

6. The term "dramatic rights" means the right of presentation in dramatic form on the speaking stage with living actors appearing and performing in the immediate presence of an audience, without any recordation, transmission, or broadcast thereof intended for aural or visual reception at places away from the place of performance; except that the dramatic rights shall include the right to broadcast directly by television such live presentation without any kinescope or other recording thereof, subject to restriction concerning the time when such broadcasts may be made as hereinafter provided.

7. The term "publication rights" means the right to publication of the work in book form or in magazine or periodical form, including serial publication.

8. "Sequel rights" means the right to use the leading character or characters of a work participating in a substantially different story in an "episodic series" or "serial" type filmed television program or radio program.

9. The term "single unit" means a filmed television program intended for broadcast as a single show, broadcast or program, and not as a part of a unit series or episodic series.

Article 1C
Definitions
TELEVISION

183

11

Article 1C
Definitions
TELEVISION

10

EXHIBIT N

10. The term "unit series" means a series of films each of which contains a separate complete story, without a character or characters common to each of the films in the series but held together by the same title, trade name or mark or identifying device or personality common to all the films in the series.

11. "Episodic Series" means a series of films each of which contains a separate complete story with a character or characters common to each of the films in the series, provided, however, that such series shall still remain an episodic series even though a two- three- four- or five- multi- part story is utilized in the series.

With regard to "literary material" for an "episodic series," "extricable material shall consist of the plot of such material, and such original characters and characterizations which are distinctive and identifiable and which are the sole original creation of the writer, but shall not include the names of the characters.

12. The term "serial" means a series of films in which generally the same characters carry on a continuing narrative.

13. The term "established serial or episodic series" means a serial or episodic series based upon material that has been published or exploited in any manner or by any medium whatsoever, or based upon a story in the public domain or owned by the Company.

## 14. Merchandising Rights

a. The term "merchandising rights" with regard to any established serial or episodic series, or any unit series or one-time television program to which separated rights do not apply, means the right to manufacture and to sell or otherwise dispose of any object or thing first described in literary material written by the writer, provided such object or thing is fully described therein and by such description appears to be unique and original.

b. With regard to writers entitled to separation of rights, merchandising rights shall mean the exclusive right to grant to manufacturers or others the right to refer, in conjunction with the marketing or exploitation of objects or things, to the series in which the writer's separation of rights exists or to characters of such series, but such objects or things shall not include:

(1) The television film itself or any part of the television film;

(2) Music composed for or identified with such series or with any episode of such series, including any form of exploitation of music, such as records or publishing;

(3) Objects or things furnished by a manufacturer or other person or company for use in or in connection with such series or any episode of such series, where the Company receives no revenue from the marketing of such objects or things (for example, a motorcycle manufacturer furnishes motorcycles to the Company

for photography in a series dealing with motorcyclists in exhange for the right granted to the manufacturer to refer to the series or to characters of the series in conjunction with the marketing and exploitation of its motorcycles);

(4) Objects or things manufactured or sold by any sponsor of such series, where the right to refer to such series or characters of such series in conjunction with the marketing of such objects or things is obtained by the sponsor as part of the initial agreement for the sponsorship of the series, and the Company receives no revenue from the marketing of such objects or things (as distinguished from the revenue received by the Company for the series itself); but the sponsor referred to in this subparagraph (4) refers to the overall sponsor or sponsors of the series, as distinguished from the companies advertising in "spot" commercials.

(5) Objects or things which, in the reasonable judgment of the Company, it would be harmful to the Company, network, sponsor or series to identify with such series or with characters of such series.

To effectuate the purposes of the foregoing provisions the writer shall, prior to granting any license hereunder, notify the Company in writing of the proposed license and the object or thing which is to be the subject of the license, at least ten business days before granting the license, so as to give the Company the opportunity to give appropriate notice to the writer. If the Company notifies the writer that any proposed license is in violation of any of the foregoing provisions of this subsection 14, the Company shall concurrently send a copy of such notice to the Guild. Within one business day after receipt of such notice the Guild may submit the dispute to arbitration, for which purpose the "quick arbitration" provisions of subsection 26 of Schedule A (Theatrical Credits) shall be used (but for this purpose a special panel of arbitrators shall be selected by the parties as promptly as possible following the execution of this agreement). With respect to subparagraph (5), the arbitrators' authority shall be limited to deciding whether the Company's judgment is reasonable. The reserved merchandising rights do not include the right to use or license the use of:

(i) The name or likeness of any person;

(ii) Any proper name, trade-mark, service mark, trade name, or literary or artistic character (except public domain characters) existing and first exploited independently of such series.

The Company does not warrant or represent that it has or will have the right to use the title of the series or of any episode of the series in merchandising deals. In the event that a writer of a particular episode is entitled to a merchandising rights payment, the amount due such individual shall be deducted from the merchandising rights payment which would otherwise be due the writer entitled to separation of rights in the series. The definition of

Article 1C
Definitions
TELEVISION

12

13

Article 1C
Definitions
TELEVISION

184

''merchandising rights'' as it applies to writers entitled to separation of rights shall be without prejudice to the respective positions of the parties hereto as to the meaning of the term in previous collective bargaining agreements.

15. A ''sketch'' as used herein shall mean a self-contained dramatic unit having a plot and constituting 50% or less of the entertainment portion of a comedy-variety program and a ''routine'' as used herein shall mean a self-contained dramatic unit constituting 50% or less of the entertainment portion of a comedy-variety program; provided that such sketch or routine is either (a) an adaptation of material previously used in television or any other medium; or (b) original and written to fit the special talents and personality of the particular actor or actors in the film involved.

16. The term ''simulcast'' means the broadcast of a single performance of a program by radio and television, whether or not the radio and television broadcasts are made at the same time, provided that the original broadcasts by radio and television take place within twenty-one days of each other.

17. Whenever the term ''comedy-variety program'' or ''variety program'' is used herein, it shall be deemed to include quiz or audience participation programs except with respect to the provisions fixing applicable minimum compensation. The term ''quiz or audience participation program'' means a program based on the participation by individuals in quizzes or stunts or where the moderator or master of ceremonies conducts interviews. Writers of variety and audience participation programs shall be deemed included under all the provisions of this Basic Agreement, the same as writers of dramatic programs, despite the fact that only ''story'' and ''teleplay'' are hereinafter referred to.

18. The term ''weekly unit of television films'' means the number of television films of a particular series of variety (including comedy-variety), quiz or audience participation programs prepared by the same writer or writers for initial broadcast within one week.

19. The term ''format'' means a written presentation consisting of the following:

(a) As to a serial or episodic series, such format sets forth the frame-work within which the central running characters will operate and which framework is intended to be repeated in each episode, the setting, theme, premise or general story line of the proposed serial or episodic series and the central running characters which are distinct and identifiable including detailed characterizations and the interplay of such characters. It may also include one or more suggested story lines for individual episodes.

(b) As to a multi-part series telling a complete story such as ''Rich Man, Poor Man'' (Book I) or ''Roots'' or a prime time serial, such as ''Executive Suite'', such format as described in (a) above shall be called a ''bible'' if, in addition and at the request or upon the instructions of the Company, it contains all of the following characteristics and requirements:

(i) It is in much greater detail than a traditional format, and includes the context, framework and central premises, themes and progression of the multi-part series or serial.

(ii) It sets forth a detailed overall story development for the multi-part series or for the first broadcast season of the serial (or such lesser period as may be contracted for with the writer) and includes detailed story lines for (A) all of the projected episodes of the multi-part series or (B) most of the projected episodes for the first broadcast season of the serial (or such lesser period as may be contracted for with the writer).

(iii) The characters must be not only distinct and identifiable, but must be set forth with detailed descriptions and characterizations.

(c) Except as to minimum compensation, a ''bible'' is a format for all other purposes of this Agreement, including but not limited to Article 16.B.

(d) As to a unit (anthology) series, a format means a written presentation consisting of the following: a detailed description of the concept of the proposed series, the context and continuing framework intended to be repeated in each episode, and the central premises, themes, setting (locale, time, etc.), flavor, mood, style and attitude of the proposed series; and it may include suggested story lines for several of the projected episodes.

20. The term ''narration'' means material used (typically off camera) to explain or relate sequences or action (excluding promo's or trailers).

## Article 2   Term and Effective Date of Agreement

### A.   GENERAL

1. The term of this Basic Agreement shall commence on March 2, 1977 and shall continue to and including March 1, 1981.

2. With respect to all employment agreements with writers in effect on March 2, 1977 the terms of this Basic Agreement relating to minimum compensation and to rights in material shall apply only to services performed and literary material written under such employment contracts where the date of actual employment (i.e., the commitment date) was on or after March 2, 1977, except as specifically otherwise provided herein in Article 2, Section B or Section C.

3. With respect to literary material acquired from professional writers (as described herein) the terms of this Basic Agreement relating to minimum compensation and rights in material shall apply only to unpublished and unexploited literary material acquired from such professional writers on or after March 2, 1977.

4. Company or Guild may by written notice to the other served not earlier than ninety (90) days prior to the expiration date of this Basic Agreement

Article 1C
Definitions
TELEVISION

Article 2A
Term and Effective
Date of Agreement
GENERAL

EXHIBIT N

signify its desire to negotiate a new collective bargaining agreement which shall become effective upon a date determined by mutual agreement between the Company and the Guild. Such notice shall set forth in detail the proposals or recommendations of the party serving such notice. If such notice is served, the parties hereto agree to commence negotiations covering the proposals or recommendations set forth therein, and the proposals and recommendations of the party receiving such notice, within thirty (30) days after the receipt of such notice and to continue such negotiations diligently and in good faith, it being understood and agreed that the existing Basic Agreement shall continue in full force and effect until the termination date above provided.

5. Nothing herein contained shall be deemed to modify or affect the terms or conditions of any existing contract which are more favorable to the writer than the terms and conditions of this Basic Agreement.

B. THEATRICAL

1. With respect to all theatrical employment agreements with writers under term or deal contracts which were in effect on March 2, 1977, the new minimum compensations, conditions and Theatrical Schedule "A" as herein contained shall not in any manner be applicable for the period prior to, nor effective until:

(a) in the case of a term contract, the effective date of the exercise of the next option which occurs after March 2, 1977, for the renewal of the employment period, or six (6) months after the effective date of the commencement of the current employment period, whichever is the earlier, but in no event prior to March 2, 1977.

(b) in the case of a deal contract, the effective date of the next step, of such deal contract, which commences after March 2, 1977.

2. Any contractual obligation by Company, in effect on December 12, 1966, to give credit for source material or story, in connection with a photoplay, shall not in any manner be affected by the provisions of the Theatrical Schedule "A" contained herein.

C. TELEVISION

1. With respect to television film employment agreements with writers on a term or week-to-week contract basis in effect on March 2, 1977, the terms of this Basic Agreement relating to rights in material shall apply only to literary material written pursuant to assignments made on or after March 2, 1977.

2. Notwithstanding any other provisions of this Article, the terms of this Basic Agreement relating to rights in material shall not apply to literary material written pursuant to any agreement in effect on March 2, 1977, if the granting or reserving of such rights, as herein provided, would conflict with any contractual obligation of the Company to any third party entered into prior to the effective date of this Basic Agreement; provided that the Company does not have a right to require the removal or elimination of the conflict created by such contractual obligation to the third party.

## Article 3   Recognition

A. GENERAL

1. Company each week shall send the Guild a list of the names of writers in the employ of a Company at any time during the preceding week; provided that failure on the part of the Company to furnish any list shall not constitute a default by the Company or a breach of this Basic Agreement unless the Company fails to deliver such list within seven (7) days after receiving from the Guild a written request so to do. Company will send two additional copies of work lists to Guild, so that Guild may distribute copies to Pension and Health Fund Administrators. An inadvertent failure on the part of the Company to comply with the provisions of this paragraph shall in no event constitute a default by the Company or a breach of this Basic Agreement.

2. In the event the Company borrows the services of a writer from a company controlled by such writer then the Company shall not acquire such writers services on terms less advantageous to the lending company than if the Company had employed an individual to write the material pursuant to the terms of this Basic Agreement.

3. Borrowing a writer's services through a loan-out company will not in any manner deprive the writer of any benefits of this agreement to which the writer would have been entitled had he been employed directly by the Company, provided that the Company (as distinguished from the loan-out company) shall be responsible for such benefits only to the extent that they are within the control of the Company. Such benefits to which the writer is entitled from the Company shall include but not be limited to credits, compensation for television licensing of theatrical motion pictures, residuals with respect to television motion pictures, and separation of rights, if applicable.

With respect to compensation, and other payments which may be due under this Basic Agreement, the Company shall pay the loan-out company or the writer at least minimum, but is not responsible for payment by the loan-out company to the writer. With respect to grievance and arbitration, claims by the loan-out company against the Company for unpaid compensation for writing services under the loan-out agreement shall be subject to grievance and arbitration to the same extent as though the transaction had been an employment contract. With respect to pension and health and welfare, the Company and the loan-out company shall either provide specifically that the compensation to the loan-out company shall include payments on account of health, welfare and pension contributions under this agreement attributable to the writing services of the borrowed writer to the Company, and the exact dollar amounts constituting the payments attributable to the writing services of the borrowed writer and for pension and health and welfare shall be separately itemized in the agreement; or absent such specific agreement and itemization, the Company shall be deemed to have agreed to reimburse the loan-out company on account of pension and health and welfare contributions attributable to the borrowed writer's writing services to the Company. The Guild agrees that it will grant waivers of the

EXHIBIT N

temization requirement of the foregoing sentence under appropriate circumstances. In no event shall the Company be obligated to make larger contributions than it would have been obligated to make had it employed the borrowed writer directly. 'Loan-out company,' for the purposes of the foregoing and for the purposes of Article 12 of this Basic Agreement, means a company controlled by the writer and which is signatory to the Basic Agreement.

B. THEATRICAL.

1. The Company hereby recognizes the Guild as the exclusive representative for the purpose of collective bargaining for all writers in the motion picture industry.

2. The provisions of this Basic Agreement (other than the provisions of Article 6, Guild Shop, Article 17, Pension Plan, Health and Welfare, and Retiree Plan) to the extent the same are applicable, shall apply to professional writers. The Company each week, shall send the Guild a list of the names of the writers, professional and non-professional, from whom the Company acquired literary material which had not been previously published or exploited in any manner or by any medium, provided that failure on the part of the Comaany to furnish any such list shall not constitute a default by the Company or a breach of this Basic Agreement unless the Company fails to deliver such list within 48 hours after receiving from the Guild a written request so to do.

C. TELEVISION

1. The Company hereby recognizes the Guild as the exclusive representative for the purpose of collective bargaining of all writers engaged by the Company as employees for the purpose of preparing literary material for the entertainment portion of motion pictures produced primarily for exhibition over television.

2. If a professional writer sells or licenses to the Company the ownership of or rights to use literary material written by such writer, for use in the production of television film, then upon condition that such literary material had not prior to such sale or license been published or exploited in any manner or by any medium whatsoever, Company agrees that the provisions of this Basic Agreement (other than the provisions of Article 6 and Article 17) to the extent the same are applicable, shall be effective to determine the rights of such professional writer and the obligations of the Company with respect to such literary material. The Company may rely on the statement of the writer with respect to whether or not the material had theretofore been published or otherwise exploited. The Company each week, shall send the Guild a list of the names of the writers from whom the Company acquired literary material which had not been previously published or exploited in any manner or by any medium, provided that failure on the part of the Company to furnish any such list shall not constitute a default by the Company or a breach of this Basic Agreement unless the Company fails to deliver such list within 48 hours after receiving from the Guild a written request so to do.

## Article 4   Parties Bound by This Basic Agreement

A. GENERAL.

1. With regard to a partnership signatory, all general partners are personally bound.

2. With regard to any entity which becomes bound by this Basic Agreement by reason of this section, said entity will upon request of the Guild execute necessary documentation, but will be deemed signatory even without doing so.

3. With respect to a theatrical motion picture or a television film covered hereunder which is financed fifty percent or more by Company (or a 50% or more owned subsidiary of Company), Company will obtain a warranty from the actual employer or purchaser that writer was paid all compensation for writing services theretofore due. Upon request of Guild, Company will provide Guild with a certified copy of such warranty provision.

4. In the event the Company borrows a writer (whose employment had he been employed directly by the Company would have been covered by this Basic Agreement), whether from a domestic or foreign company, the Company shall, within ten days after the execution of the agreement covering the loan-out transaction, give the Guild a written notice of the transaction, including the name of the lending company. An inadvertent failure by the Company to give such notice shall not be deemed to be a breach of this Basic Agreement. If such lending company is a "loan-out company," as defined in Article 3 a. 3, of this Basic Agreement, and is not a signatory to this Basic Agreement, but if such company becomes a signatory to this Basic Agreement within six months next following the date of service of such notice upon the Guild, then such loan-out transaction shall be deemed to have been and to be covered by Article 3 A. 2. and 3. The Guild agrees to give the Company written notice of the fact that such loan-out company has become a signatory to this Basic Agreement promptly following the occurrence of such event.

B. THEATRICAL

1. This Basic Agreement shall be binding upon the Company and its subsidiaries in which it has a fifty percent (50%) or more financial interest and all parties who by reason of mergers, consolidations, reorganizations, sale assignment or the like shall succeed to or become entitled to a substantial part of the business of a subsidiary.

2. With respect to a motion picture produced by an independent producer under a contract with Company for the financing and distribution of such motion picture, if Company gives the Guild notice within ten (10) days following agreement between Company and independent producer with respect to such contract that such motion picture is not covered by this Basic Agreement, then Company shall not be obligated with respect to such picture except as otherwise provided in Article 15. If the Company does not give the Guild such notice, then Company shall be obligated under this Basic Agreement (and no other collective bargaining agreement with the Guild shall be

19

Article 4A, B
Parties Bound by
This Basic Agreement
GENERAL, THEATRICAL

187

EXHIBIT N

applicable) with respect to such motion picture. The provisions of this subsection 2. apply only to (i) a writer whose employment, had he been employed directly by Company in connection with such motion picture, would have been covered by this Basic Agreement; and (ii) a professional writer where the sale or license of the literary material involved, had it been made directly to Company in connection with the motion picture involved, would have been covered by this Basic Agreement.

3. Company agrees to notify the Guild within seven (7) days after it executes an agreement with any person, firm or corporation (not covered by the provisions of the preceding subsections 1. and 2. of this Article), for the use of its studio for the production of a theatrical motion picture. Company further agrees to notify the Guild within fourteen (14) days after it executes an agreement in the County of Los Angeles, California, with any person, firm or corporation (not covered by the provisions of the preceding subsections 1. and 2. of this Article) for the production, distribution or release of a theatrical motion picture where Company's studio is not used for the production of such picture; such notice to the Guild shall contain the name and address of such person, firm or corporation as well as the name of the person who signed the agreement on behalf of such person, firm or corporation. An inadvertent failure on the part of the Company to comply with the provisions of this paragraph shall in no event constitute a default by the Company or a breach of this Basic Agreement.

C.    TELEVISION

1. Company agrees to cause any subsidiary company, owned or controlled by it, which shall hereafter engage in the production of television films, to become a signatory to this Basic Agreement prior to its employment of any writer employed to prepare any material for use in such films.

2. With respect to a television film produced by a non-signatory independent producer under a contract with Company for the financing, production and distribution of such television film, if Company gives the Guild written notice not later than ten (10) days following agreement between Company and independent producer with respect to such contract that such television film is not to be covered by this Basic Agreement, then Company shall not be obligated hereunder with respect to such film.

a. If Company does not give the Guild such notice then Company shall be obligated hereunder with respect to such television film.

b. This provision is subject to Article 5 "Geographical Application."

## Article 5    Geographical Application of this Basic Agreement (GENERAL)

Notwithstanding anything to the Contrary contained herein, this Basic Agreement shall apply to writers only in the specific instances set forth below

Article 4C
Parties Bound by
This Basic Agreement
TELEVISION
Article 5
Geographical Application of
This Basic Agreement
(GENERAL)

20

regardless of where the contract of employment or acquisition, as the case may be, is signed:

1. As to a writer or professional writer who lives in the United States, if a deal is made in the United States to employ such writer to render his services or if an acquisition deal is made in the United States with such professional writer, and if at the time such deal is made such writer or professional writer is present in the United States, regardless of where the services are rendered; provided further however that if such writer or professional writer is a permanent resident of the United States but is temporarily abroad, and if the deal is made by his agent, attorney or other representative (including the Guild acting on the writer's behalf) who is in the United States at the time the deal is made, such deal shall be within the scope and coverage of this paragraph 1, even if such deal is made by such representative in communication by telephone, mail or cable with a representative of the Company, whether such representative of the Company is in the United States or abroad.

2. As to a writer or professional writer who lives in the United States and is transported abroad by Company, if a deal is made to employ such writer to render his services or if an acquisition deal is made with such professional writer while the writer or professional writer is abroad as a result of being so transported.

3. As to an employee whose writing services are required or requested by the Company to be performed and are performed in the United States under the supervision and direction of the Company.

4. "A writer or professional writer who lives in the United States," as such phrase is used in subsections 1. and 2. above, does not include either of the following:

a. A person who lives outside the United States (other than for a temporary visit) even though he may at any given time be temporarily in the United States; or

b. A person who lives outside of the United States (other than for a temporary visit) whether or not he has retained his domicile in the United States.

5. A "deal is made" within the meaning of both 1 and 2 above when agreement is reached by the Company and the writer as to the money terms.

## Article 6    Guild Shop — (GENERAL)

Except as provided below, in both theatrical and television films each writer employed by Company on the effective date of this Basic Agreement who is then a member of the Guild in good standing shall remain a member in good standing, and each writer so employed who is not a member shall, on or before the thirtieth day following the effective date of this Basic Agreement, become and remain a member of the Guild in good standing. Each writer employed hereunder by Company after the effective date of this Basic Agreement shall not later than the thirtieth day following the beginning of his first employment, as hereinafter defined, in the motion picture and television industry, become and remain a member of the Guild in good standing.

Article 6
Guild Shop —
(GENERAL)

21

EXHIBIT N