# 18-3123-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————◆———————

HORROR INC., a Massachusetts corporation, MANNY COMPANY,
a Connecticut Limited Partnership,

*Plaintiffs-Counter-Defendants-Appellants,*

— v. —

VICTOR MILLER, an individual,

*Defendant-Counter-Claimant-Appellee,*

DOES, 1 through 10, inclusive,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT, NEW HAVEN

## DEFERRED JOINT APPENDIX
## VOLUME II OF III
## [PAGES A-301 – A-600]

MARC TOBEROFF
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, California 90265
(310) 246-3333

*Attorneys for Defendant-Counter-
Claimant-Appellee*

KATHLEEN M. SULLIVAN
TODD ANTEN
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiffs-Counter-
Defendants-Appellants*

*(For Continuation of Appearances See Inside Cover)*

Bonnie E. Eskenazi
Julia R. Haye
Greenberg Glusker Fields Claman
   & Machtinger LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067
(310) 553-3610

*Attorneys for Plaintiffs-Counter-*
   *Defendants-Appellants*

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ...................................... A-1

Complaint, filed August 24, 2016 (Doc. 1)................ A-13

Answer and Counterclaim filed by
Defendant/Counterclaimant Victor Miller, filed
November 17, 2016 (Doc. 37) ............................... A-36

Local Rule 56(a)(1) Statement in Support of
Plaintiffs' Motion for Summary Judgment, filed
June 9, 2017 (Doc. 43-2) ....................................... A-66

Declaration of Robert M. Barsamian in Support of
Plaintiffs' Motion for Summary Judgment, filed
June 9, 2017 (Doc. 43-3) ....................................... A-83

Declaration of Sean S. Cunningham in Support of
Plaintiffs' Motion for Summary Judgment, filed
June 9, 2017 (Doc. 43-4) ....................................... A-87

   Exhibit A to Cunningham Declaration:
   July 24, 1978 Correspondence from the WGA
   (Doc. 43-5)............................................................. A-98

   Exhibit B to Cunningham Declaration:
   Writer's Flat Deal Contract between Victor Miller
   and The Manny Company (Doc. 43-6).................. A-99

   Exhibit C to Cunningham Declaration:
   First Draft Treatment, titled *The Long Night at
   Camp Blood* [reproduced at A-425 – A-439]
   (Doc. 43-7)

   Exhibit D to Cunningham Declaration:
   Second Draft Treatment, titled *Friday 13*
   (Doc. 43-8)............................................................. A-101

**Page**

Exhibit F to Cunningham Declaration:
First Draft Screenplay, without title page
[reproduced at A-440 – A-508] (Doc. 43-10)

Exhibit G to Cunningham Declaration:
Second Draft Screenplay, titled *Friday 13*
[reproduced at A-509 – A-600] (Doc. 43-11)

Exhibit H to Cunningham Declaration:
Rights Agreement between The Manny Company
and Georgetown Productions, Inc., dated May 7,
1980 (Doc. 43-12).................................................... A-120

Declaration of Julia R. Haye in Support of
Plaintiffs' Motion for Summary Judgment,
filed June 9, 2017 (omitted herein) (Doc. 43-13)

Exhibit I to Haye Declaration:
May 9, 2017 Printout of Sean S. Cunningham's
IMDbPro Filmography (Doc. 43-14)..................... A-127

Exhibit J to Haye Declaration:
Expert Report of William L. Cole (Doc. 43-15).... A-131

Exhibit K to Haye Declaration:
Excerpts of Deposition of Victor Miller,
dated April 28, 2017 (Doc. 43-16)........................ A-164

Exhibit L to Haye Declaration:
Transcript of January 27, 2003 interview of
Victor Miller conducted by Peter Bracke
(Doc. 43-17)............................................................ A-261

Exhibit N to Haye Declaration:
1977 WGA Theatrical & Television Basic
Agreement (Doc. 43-19)........................................ A-287

**Page**

Exhibit O to Haye Declaration:
1980 Copyright Registration for *Friday the 13th*
(Registration No. PA 81-093) (Doc. 43-20) ........... A-400

Exhibit R to Haye Declaration:
Victor Miller's Notices of Termination of
Copyright for *Friday the 13th*, dated January 21,
2016, June 27, 2016 and July 14, 2016
[reproduced at A-618 – A-624, A-631 – A-634]
(Doc. 43-23)

Exhibit S to Haye Declaration:
Letter from WGA to Victor Miller, dated
June 14, 1979 (Doc. 43-24) ................................... A-402

Exhibit T to Haye Declaration:
Victor Miller's Application for Membership in
the WGA, dated March 21, 1974 (Doc. 43-25) ..... A-404

Exhibit U to Haye Declaration:
Letter from Victor Miller to WGA, dated
June 4, 1979 (Doc. 43-26) ..................................... A-405

Exhibit W to Haye Declaration:
Stipulated Settlement, *Manny Co. v. Georgetown
Prods., Inc.*, No. 86-7665 (2d Cir. Jan. 8, 1998)
(Doc. 43-28) ........................................................... A-406

Exhibit X to Haye Declaration:
Executed Letter of Irrevocable Authority to
Paramount Pictures Corporation, dated July 19,
1988, re: *Friday the 13th* and *Friday the 13th,
Part II* (Doc. 43-29) .............................................. A-409

Declaration of William L. Cole in Support of
Plaintiffs' Motion for Partial Summary Judgment,
filed June 9, 2017 (Doc. 43-30) ............................ A-413

**Page**

Exhibit Y to Cole Declaration:
Sample form "Assignment Agreement"
(Doc. 43-30).......................................................... A-416

Declaration of Victor Miller in Support of His
  Motion for Summary Judgment, filed June 9,
  2017 (Doc. 45-1)................................................... A-420

Exhibit A to Miller Declaration:
First Draft Treatment, titled *The Long Night at
Camp Blood* (Doc. 45-1)...................................... A-425

Exhibit B to Miller Declaration:
First Draft Screenplay, without title page
(Doc. 45-1)............................................................ A-440

Exhibit C to Miller Declaration:
Second Draft Screenplay, titled *Friday 13*
(Doc. 45-1)............................................................ A-509

Exhibit D to Miller Declaration:
Writer's Flat Deal Contract between Victor Miller
and The Manny Company (Doc. 45-1).................. A-601

Exhibit E to Miller Declaration:
Advertisement in *Variety* for *Friday the 13th*,
dated July 4, 1979 (Doc. 45-1) ............................ A-603

Exhibit F to Miller Declaration:
Letter from Sean Cunningham to James Trupin of
JET Literary Agency, dated August 22, 1979
(Doc. 45-1)............................................................ A-604

Exhibit G to Miller Declaration:
Copy of a document containing the credit block
for *Friday the 13th* (Doc. 45-1) ............................ A-605

**v**

**Page**

Declaration of Marc Toberoff in Support of
Defendant and Counterclaimant Victor Miller's
Motion for Summary Judgment, filed June 9,
2017 (Doc. 45-2)................................................... A-606

Exhibit C to Toberoff Declaration:
E-mail exchange between Marc Toberoff and
Jennifer Parsignault of PWGA, with attachments,
dated June 7, 2017 (Doc. 45-2)............................. A-610

Exhibit D to Toberoff Declaration:
Rights Agreement between The Manny Company
and Georgetown Productions, Inc., dated May 7,
1980 [reproduced at A-120 – A-126] (Doc. 45-2)

Exhibit H to Toberoff Declaration:
Victor Miller's Notice of Termination of
Copyright for *Friday the 13th*, dated January 21,
2016 (Doc. 45-2)................................................... A-618

Exhibit J to Toberoff Declaration:
Victor Miller's Notice of Termination of
Copyright for *Friday the 13th*, dated June 27,
2016 (Doc. 45-2)................................................... A-621

Exhibit K to Toberoff Declaration:
Document Cover Sheet to U.S. Copyright Office
re: Notice of Termination (Doc. 45-2)................... A-625

Exhibit L to Toberoff Declaration:
Victor Miller's Notice of Termination of
Copyright for *Friday the 13th*, dated July 14,
2016 (Doc. 45-2)................................................... A-631

Supplemental Declaration of Sean S. Cunningham
in Support of Plaintiffs' Opposition to Motion for
Summary Judgment, filed June 30, 2017
(Doc. 47-1)............................................................ A-635

**Page**

Plaintiffs' Local Rule 56(a)(2) Statement in Support of Opposition to Motion for Summary Judgment, filed June 30, 2017 (Doc. 47-2) ............................ A-641

Plaintiffs' Evidentiary Objections to the Declarations of Victor and Marc Toberoff, dated June 30, 2017 (Doc. 48) .............................. A-652

Excerpt of Defendant and Counter-Claimant Victor Miller's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment, filed June 30, 2017 (Doc. 51) ............... A-660

Declaration of Victor Miller in Opposition to Plaintiffs' Motion for Summary Judgment, dated June 30, 2017 (Doc.51-1) ..................................... A-662

Exhibit I to Miller Declaration: June 30, 2017 Printout of Victor Miller's IMBbPro Filmography (Doc. 51-1) ...................... A-666

Declaration of Marc Toberoff in Opposition to Plaintiffs' Motion for Summary Judgment, filed June 30, 2017 (Doc. 51-2) ..................................... A-671

Exhibit P to Toberoff Declaration: Excerpts of Deposition of Sean R. Cunningham, dated May 12, 2017 (Doc. 51-2) ..... A-674

Exhibit Q to Toberoff Declaration: Excerpts from *Crystal Lake Memories: The Complete History of Friday the 13th*, by Peter Bracke (Doc. 51-2) ................................................ A-754

Exhibit R to Toberoff Declaration: Excerpts from *On Location in Blairstown: The Making of Friday The 13th*, by David Grove (Doc. 51-2)............................................................ A-761

**Page**

Defendant and Counter-Claimant Victor Miller's
  Local Rule 56(a)(2) Response and Statement of
  Disputed Material Facts in Opposition to
  Plaintiffs' Motion for Summary Judgment, filed
  June 30, 2017 (Doc. 51-3) ....................................... A-784

Declaration of Jennifer C. Parsignault,
  Manager-Compliance Department of the PWGA
  Pension and Health Plans, filed July 14, 2017
  (Doc. 55-1)............................................................. A-800

Exhibit A to Parsignault Declaration:
  PWGA Pension Plan Statements for Victor
  Miller, 1978-1981 (Doc. 55-1).............................. A-803

Exhibit B to Parsignault Declaration:
  Excerpts of Victor Miller's Earning Statements
  from 1981 to the present [excerpted as a
  voluminous exhibit] (Doc. 55-1) .......................... A-807

Declaration of Marc Toberoff in Reply to Plaintiffs'
  Evidentiary Objections and in Further Support of
  Defendant and Counterclaimant Victor Miller's
  Motion for Summary Judgment, filed July 14,
  2017 (Doc. 56-1)................................................... A-812

Exhibit T to Toberoff Declaration:
  Letter from Bonnie Eskenazi to PWGA
  Custodian of Records, enclosing Subpoena, dated
  November 22, 2016 (Doc. 56-1)............................ A-816

Exhibit U to Toberoff Declaration:
  Excerpts of January 3, 2017 E-mail from Jannette
  Gore to Marc Toberoff attaching production of
  documents [excerpted as a voluminous exhibit]
  (Doc. 56-1)............................................................ A-828

**Page**

Plaintiffs' Evidentiary Objections to the July 14,
    2017 Declarations of Marc Toberoff and Jennifer
    C. Parsignault, filed August 4, 2017 (Doc. 64)...... A-847

Notice of Appeal, filed October 18, 2018.................. A-865

The term "first employment" as referred to above shall mean the first such employment to which the provisions of this Basic Agreement apply as a writer for a motion picture by an employer in the motion picture and television industry, on or after the effective date of this Basic Agreement.

2. The provisions of paragraph 1 of this Article 6 shall not apply:

a. If a writer is not a member of the Guild at the time of his employment and although required by the provisions of his employment agreement to do so, fails or refuses to become a member of the Guild in good standing within the 30 days abovementioned, provided that within 15 days after written notice thereof from the Guild to the Company, the Company shall either terminate such employment or shall pay or cause to be paid the initiation fees and dues of the writer in the manner, within the time, and subject to the provisions of subsection 5.b. hereof relating to the payment of dues. If the Company elects to and does pay such initiation fees and dues, such writer shall be deemed to be a member of the Guild in good standing, but only for the period necessary to permit him to complete the performance of his services in connection with the then current assignment. The Company may use this exception only once for any particular person.

b. To a writer whom the Company is required to employ as a condition of the sale or license of material, provided that within 15 days after written notice from the Guild to the Company that such writer is not a member of the Guild in good standing, the Company shall either terminate such employment, or shall pay or cause to be paid the initiation fees and dues that the writer would otherwise be required to pay hereunder during such employment, in the manner, within the time, and subject to the provisions of subsection 5.b. hereof relating to the payment of dues. However, the writers employed by the Company within the exception provided for in this subparagraph (b) shall not exceed 10% of the total number of writers in the employ of the Company. For the purpose of such computation if the Company has in its employ at any time less than 10 writers, then 1 of such writers so employed may fall within this exception. Promptly following the employment of any writer claimed by the Company to be within this exception, the Company will notify the Guild in writing of the name of the writer employed, the date of the employment agreement and the fact that the Company claims that such writer is an exception hereunder. For the purpose of such computation a writer who is employed under an exclusive contract by a Company shall be regarded as being employed by the Company at all times during the term of such contract, including periods during which the writer may be on layoff and periods during which such contract may be suspended by reason of illness or default of the writer or otherwise. The writer shall be regarded as continuing in the employ of the Company by which he is employed regardless of the fact that his services may be loaned to another Company.

3. The term dues as used herein shall not include fines or initiation fees.

4. Promptly after request by any person designated by the Company, the Guild will admit such person to membership in the Guild upon terms and conditions not

more burdensome to such person than those then applicable to other applicants. Membership shall be effective as of the date of such request. Guild agrees that during the term it will not impose any unreasonable initiation fee as a condition to admission to membership, and agrees that during the term hereof it will not impose upon its members any obligation to pay dues that do not uniformly apply to all members of the Guild.

It is agreed that the Guild shall not close its membership books or otherwise prevent any person who wishes to become or remain a writer from becoming a member of the Guild, but on the contrary (subject to the provisions hereof relating to waivers as to members suspended or expelled) will make available the privileges of membership to any and all writers employed by the Company. The Guild will reinstate or readmit to membership any writer who applies for reinstatement or readmission, after being declared to be not in good standing or after suspension, expulsion, or resignation for any reason whatsoever, provided the writer will apply for such reinstatement or readmission and with such application tender to the Guild unpaid dues permitted by law, and upon such tender the Company may employ or continue to employ such writer. Instead of readmitting or reinstating such writer, the Guild may at its option grant to the Company a waiver as to such writer, in which event, for the purpose of determining the Company's compliance with the provisions of this Article 6, such writers shall not be considered as being employed by the Company.

5. If during any time that a writer is employed by the Company under a contract of employment such writer is or becomes a member of the Guild in good standing and if such writer shall subsequently and before his employment under such contract terminates, cease to be a member of the Guild in good standing then:

a. If such writer has ceased or shall cease to be a member for any reason other than his failure to pay dues, such writer shall, for the purposes of this Basic Agreement, be deemed to remain a member of the Guild in good standing throughout the writer's employment under said contract of employment as the same may be extended or renewed pursuant to any provisions or options therein contained.

b. If the has ceased or shall cease to be a member in good standing by reason of his failure to pay dues, and if the Guild gives the Company written notice of that fact within three business days after such writer is first named on the weekly list provided for in Article 3 A.1. of this Basic Agreement (in the case in which he has ceased to be a member in good standing prior to such employment), such writer shall, for the purposes of this Basic Agreement, be deemed to remain a member in good standing for a period of 15 days after written notice that he has ceased to be a member in good standing for failure to pay dues, from the Guild to such writer and to the Company, and if, prior to the expiration of said 15 days' period, payment of said dues in fact due and owing and specified in said notice shall be made by the writer or the Company, then, for the purposes of this Basic Agreement, such writer shall not lose his status as a member in good standing. To the extent that it may be lawful for the Company to do so, the Company may require, as a condition of employment, that any writer become and/or remain a member of the Guild in

EXHIBIT N

good standing, and may also require such written consent or consents as may be necessary so that, if the Company elects, it may pay to the Guild any dues of any writer and the Company shall have the right, insofar as its obligations to the Guild and to any writer under the terms and provisions of this Basic Agreement are concerned, if it elects, to deduct the amount of such dues from any compensation then or thereafter due or to become due to the writer. If, prior to the expiration of said 15 day period, payment of said dues in fact due and owing as specified in said notice shall not be made, the Company shall terminate the employment of such writer.

Every personal service contract of employment shall provide that if the writer fails or refuses to become or remain a member of the Guild in good standing, as above provided, the Company shall have the right at any time thereafter to terminate such employment agreement with such writer.

If the Company is required or directed by any decision of a court of competent jurisdiction or any proper governmental authority to refund to any writer, in whatsoever form the same may be recovered, any dues deducted and paid to the Guild by the Company under the provisions of subsection b. of this paragraph 5., the Guild agrees to repay to the Company the amount of such dues so refunded. The Guild will cooperate with the Company in obtaining the necessary authorizations from writers for the payment and deduction of dues in the manner provided in subsection b. above.

Notwithstanding anything to the contrary in paragraph 2. of this Article 6. or in this paragraph 5., if the payment of initiation fees or dues (in the case of paragraph 2), or if the payment of dues (in the case of this paragraph 5), or the deduction thereof from the compensation of any writer, is or shall become contrary to law, or any statute, or is declared by any court of competent jurisdiction in the State of California or by any Federal Court or the National Labor Relations Board or its General Counsel, or by any other board or individual having jurisdiction over the matter, to be in violation of any applicable law or statute and if by reason thereof the Company fails to deduct and pay to the Guild such initiation fees or dues, as the case may be, as aforesaid, and shall notify the Guild thereof in writing within the 15 days after any notice from the Guild abovementioned, then although such initiation fees or dues, as the case may be, are not paid within the 15 days' period, for the purposes of this Basic Agreement such writer shall, nevertheless, be deemed to remain a member of the Guild in good standing throughout the term of the writer's assignment.

6. The Guild will facilitate employment of its members by the Company and will at all reasonable times promptly furnish to the Company in writing information concerning the status of any of its members, and the Company shall be entitled to rely upon such information so furnished by the Guild.

7. The Guild represents and warrants that discipline, resignation, admission, reinstatement, readmission and all other matters relating to membership status will at all times during the term hereof be within the exclusive jurisdiction of the Guild; and the Guild agrees that it will exercise such jurisdiction subject to and in accordance with the provisions and intent of this Article 6 and of any other applicable provisions of this Basic Agreement.

8. It is understood that the provisions of this Article 6 shall never under any circumstances be so construed during the term of this Basic Agreement as to constitute or permit what is known as a "closed shop" or construed in any manner that will at any time deprive the Company of its right to employ or continue the employment of a writer who is not a member of the Guild in good standing, or who does not become a member of the Guild in good standing within the period prescribed in subsection 1. of this Article 6 if the Company has reasonable grounds for believing that such a membership was not available to such writer on the same terms and conditions generally applicable to other like members of the Guild, or if the Company has reasonable grounds for believing that membership in the Guild was denied, deferred, suspended or terminated for reasons other than the failure of such person to tender the applicable periodic dues uniformly required as a condition for acquiring or retaining membership in the Guild.

9. If a person who has not been listed by the Company as a writer in accordance with the provisions of Article 3 hereof shall receive, or shall have been entitled to receive, a writing credit in the form of 'story by', 'written by', 'screenplay by', or 'teleplay by', and if the period during which the person performed his services in the writing of the literary material has exceeded a period of thirty (30) days from the commencement of such services, then within fifteen (15) days after receipt of written notice from the Guild to the Company, the writer or the Company shall pay or cause to be paid the initiation fee, if any, and the dues which otherwise would have been payable to the Guild and such person shall be deemed to have been a member of the Guild in good standing during the time that he was performing his services as a writer. For such purpose the person receiving or entitled to such credit or the Company may apportion on a reasonable basis, salary payable to such person during the period he was employed as a writer.

10. Where the Company has failed to include a writer employed by the Company on the list of names of writers to be sent to the Guild under Article 3 of this Basic Agreement and where such writer's performance of writer's services has continued for more than thirty (30) days after the beginning of his first employment, then within fifteen (15) days after receipt of written notice thereof from the Guild to the Company the writer or the Company shall pay or cause to be paid (in the manner, within the time, and subject to the provisions of subsection 5.b. hereof, relating to the payment of dues) the initiation fee, if any, and the dues payable to the Guild for the period during which such writer was employed by the Company after such thirty (30) day period. Upon such payment, such writer shall be deemed to have been a member of the Guild in good standing during the time that he was so performing his services as a writer. The provisions of this paragraph shall not apply in the event the Guild gives the Company such notice prior to the expiration of such period of thirty days.

11. In relation to investigations by the Guild of compliance with the provisions of this agreement, the Guild through its authorized representatives shall have access to the Company's premises at reasonable times during normal business hours for the purpose of interviewing the Company's employees whose employment is covered by this agreement, provided that such interviews shall not interfere with the normal conduct of the Company's business.

## Article 7   No Strike, No Lock-out Clause — (General)

1. The Guild agrees that during the term hereof it will not call or engage in any strike, slowdown or stoppage of work affecting theatrical motion picture or television film production against the Company.

2. If, after the expiration or other termination of the effective term of this Basic Agreement, the Guild shall call a strike against any Company, then each respective then current employment contract of writer members of the Guild (hereinafter for convenience referred to as "members'') with such Company shall be deemed automatically suspended, both as to service and compensation, while such strike is in effect, and each such member of the Guild shall incur no liability for breach of his respective employment contract by respecting such strike call, provided such member shall promptly, upon the termination of such strike, and on the demand of the Company perform as hereinafter in this paragraph provided, and the member shall be deemed to have agreed as follows:

a. That if the writer has been assigned to the writing of any material at the time any such strike is commenced, he will, after the termination of such strike and upon the request of the Company, report to the Company and perform his services in the completion of such assignment at the same salary and upon the same terms and conditions as were agreed upon prior to the commencement of said strike.

b. That he will immediately, after the termination of such strike and upon the request of the Company, execute a new contract on the same terms and conditions, and at the same salary or other compensation as agreed upon in the employment contract which was in effect at the time the strike commenced, except that such new contract shall be for a term or periods, including options, equivalent to the unexpired term of the contract which was in effect when such strike was commenced.

c. That he will, in lieu of b., after the termination of such strike, at the option of the Company, and upon its demand, execute an agreement in writing with the Company extending the term or period of such personal service contract in effect when such strike was commenced for a period of time equal to the period of any suspension by such strike.

3. If the member shall fail to perform the foregoing, or if he shall fail actually to finish his services in the assignment mentioned in 2. a., (except by reason of his death, physical disability, or default by the Company), then the waiver of liability by the Company heretofore given shall be null and void.

4. The member further agrees that the statute of limitations as a defense to any action by the Company against the member for his failure to perform during such strike is extended by a period equivalent to the duration of such strike. If the member asserts any claim or defense by reason of the expiration of time during which he can be required to perform services by virtue of any statute (such as the seven-year statute) which claim or defense is based in whole or in part on the lapse of time during such strike, the waiver by the Company is ineffective thereupon,

and the statute of limitations as to the Company's rights is waived by the member automatically.

5. The automatic suspension provisions of this Article 7 shall not affect the Company's right to sue any individual writer for breach of contract arising during the period of such strike, unless such writer shall have complied with his obligations under the provisions of this Article 7. Nothing herein contained shall be construed to deprive the Company of its right to terminate the employment contract at any time after such member shall strike or otherwise fail or refuse to perform services.

6. The provisions of this Article 7 shall be deemed included in all employment contracts between writers and Company which are now in effect and all such employment contracts which shall be entered into during the effective term of this Basic Agreement.

7. The Guild agrees that it will take such affirmative actions as may be necessary and lawful in order to require its members to perform their respective obligations under the provisions of this Article 7.

8. Notwithstanding the expiration or other termination of the effective term of this Basic Agreement, by termination or otherwise, the provisions of this Article 7 shall be and remain in full force and effect for a period of seven (7) years following the termination of any such strike, unless this covenant be sooner terminated by the written consent of Company and Guild.

9. The Guild is a corporation. Nothing in this subsection 9. shall enlarge the liability of its officers, directors, agents, and members, this subsection 9. being an additional limitation thereon. The Guild will not be held liable for unauthorized acts of its officers, agents, directors, or members; neither the Guild, nor its officers, directors, agents, or members not participating in the actions hereinafter mentioned, shall be liable for any strike, slow-down, or work stoppage, unless the same be authorized by the Guild in accordance with its by-laws, but the foregoing exemption of this sentence shall not apply unless the Guild upon request from the Company affected thereby shall proclaim promptly and publicly that such strike, slow-down or work stoppage is unauthorized, and follows such pronouncement within a reasonable time thereafter, if requested so to do by the Company affected, with disciplinary proceedings in accordance with its by-laws against the participants in such unauthorized action.

10. The Company agrees that it will not call or engage in any lockout of members.

11. In accordance with and to the extent required by Articles 11 and 12 of this Basic Agreement as to any matter arbitrable thereunder, the Guild has right to strike Company so long as the Company's wrongful failure to participate in Grievance and Arbitration procedures continues. Such action on the part of the Guild is not a waiver of right to compel Company to participate in Grievance and Arbitration procedures. If Company shall contest the arbitrability of such issue, such issue of arbitrability shall first be determined prior to the arbitrator's proceeding with a hearing on the merits.

**EXHIBIT N**

## Article 8   Credits for Screen Authorship — (General)

The Company agrees that credits for screen authorship shall be given only pursuant to the terms of and in the manner prescribed in the applicable Schedule A attached hereto and by this reference incorporated herein, with respect to credits for screen authorship finally determined during the term hereof, and with respect to credits for screen authorship finally determined after the expiration of the term hereof involving material written during the term hereof or during the term of a prior collective bargaining agreement between the Company and the Guild; provided however that any such credits determined during the term of a successor collective bargaining agreement between the Company and the Guild shall be determined pursuant to the terms of such successor collective bargaining agreement.

## Article 9   Minimum Terms — (General)

The terms of this Basic Agreement are minimum terms; nothing herein contained shall prevent any writer from negotiating and contracting with any Company for better terms for the benefit of such writer than are here provided, excepting only credits for screen authorship, which may be given only pursuant to the terms and in the manner prescribed in Article 8. The Guild only shall have the right to waive any of the provisions of this Basic Agreement on behalf of or with respect to any individual writer.

## Article 10   Grievance and Arbitration

### A.   MATTERS SUBJECT TO GRIEVANCE AND ARBITRATION (GENERAL).

Except as otherwise specifically provided in this Article or elsewhere in this Basic Agreement, the following matters shall be submitted to grievance and thereafter to arbitration as hereinafter provided, and no other matters shall be submitted to grievance or arbitration:

1. Any dispute between the Guild and the Company concerning the interpretation of any of the terms of this Basic Agreement and the application and effect of such terms as determined by an interpretation thereof.

2. Any alleged breach of any of the terms or provisions of this Basic Agreement by the Guild or the Company.

3. Any claim by the Guild and a writer on the one hand against the Company on the other hand for unpaid compensation under the writer's individual employment agreement or loan-out agreement with the Company, or for payment under a purchase agreement with the Company in the case of a professional writer, excluding, however, any claim not related to the writer's services as a writer or not related to the sale of literary material. (Claims for compensation or payment under an employment, loanout or

purchase agreement shall be referred to hereinafter as "compensation claims" or "claims for compensation"). Notwithstanding the foregoing, the grievance committee and arbitrator shall not have jurisdiction to render an award for compensation or payment exceeding the sum of seventy-five thousand dollars ($75,000.00) for a theatrical employment or purchase or thirty-five thousand dollars ($35,000.00) for a television employment or purchase (said amounts are herein referred to as the "applicable sum"). If a compensation claim exceeds the applicable sum, the claim may nevertheless be submitted to grievance and arbitration, but by such submission the Guild and writer waive any award exceeding the applicable sum and shall have no further claim or right with respect to any amount in excess of the applicable sum. A claim for compensation cannot be split nor may more than one grievance or arbitration proceeding be brought for the purpose of avoiding the jurisdictional maximum applicable sum.

4. In any grievance or arbitration proceeding with respect to a claim for compensation brought under Section 3 of this Article 10 A, the Company may, but need not, assert any and all defenses, including defenses based on an alleged right of suspension or termination, and any counterclaim or setoff (hereinafter referred to as "cross-claim"). A cross-claim is either mandatory or permissive. A mandatory cross-claim is one arising out of or related to the pending claim for unpaid compensation. A permissive cross-claim is any other cross-claim by the Company against the writer. Provided that the Company has obtained knowledge of the facts upon which the cross-claim is based, the Company shall assert any and all mandatory cross-claims in any arbitration proceeding involving a compensation claim. Provided, however, if the amount claimed by the Company in a cross-claim exceeds the applicable sum of $75,000.00 or $35,000.00, as the case may be, the Company shall have the option of submitting such cross-claim to grievance and (whether or not submitted to grievance) to arbitration or to institute an action at law or in equity with respect to such cross-claim. The Company may, but need not, assert any permissive cross-claim.

5. Any claim of overpayment by a Company under Article 11 A 9 of this Basic Agreement.[1]

### B.   LIMITATION OF MATTERS SUBJECT TO GRIEVANCE AND ARBITRATION

1. Except as otherwise provided in this Basic Agreement, disputes under individual employment agreements, and loan-out agreements and under purchase agreements with professional writers, involving (i) Company's rights of suspension and termination, (ii) Company's right to seek or obtain injunctive relief or specific performance (iii) any of the warranties or grants of rights made by the writer, or (iv) any of the rights of the Company to any literary material, shall not be subject to grievance or arbitration (except as provided to the contrary in Article 16), and the Company reserves all of its legal and equitable rights and remedies with respect thereto. Any decision in

[1] Articles 10 A 5 and 11 A 9 replace Article 13 C of the 1973 Basic Agreement.

Article 8
Credits for Screen Authorship — (General)
Article 9
Minimum Terms — (General)
Article 10A
Grievance and Arbitration
MATTERS SUBJECT TO
GRIEVANCE AND ARBITRATION (GENERAL)

A-305

grievance or award in arbitration purporting to determine or affect any of the aforementioned matters shall, to that extent, be of no force or effect whatsoever, provided, however that if the Company asserts in any grievance or arbitration any defense or cross-claim involving or based upon the alleged exercise of a right of suspension or termination, the same shall be determined in such grievance and arbitration proceeding.

2. The grievance committee and the arbitrator shall have jurisdiction to determine only such disputes as are submitted for grievance or arbitration under this Basic Agreement, subject to the limitations upon the powers of said grievance committee and arbitrator under this Basic Agreement. Neither the grievance committee nor the arbitrator shall have the power or jurisdiction to reform, amend or extend the express terms and provisions of this Basic Agreement or of any employment agreement, loan-out agreement or purchase agreement.

## C. MATTERS SUBJECT TO ARBITRATION BUT NOT GRIEVANCE

Notwithstanding anything elsewhere contained in this Article 10, the following matters shall be submitted to arbitration but not to grievance:

1. Any dispute as to whether the arbitrator has jurisdiction or whether any matter is arbitrable, provided however, that the arbitrator may not order an arbitration of any matter not arbitrable as provided above.

2. Any dispute concerning the credit provisions of this Basic Agreement. Such disputes are subject to the procedures set forth in Article 11 E of this Basic Agreement.

3. Any dispute concerning separation of rights under the provisions of subsection 6 of Article 16 A of this Basic Agreement.

4. Any dispute concerning allocation of receipts under Section 15 A 3 a of this Basic Agreement.

## D. REFUSAL TO ARBITRATE

A failure or refusal by any party to go to grievance on a matter subject to grievance or to arbitrate an arbitrable matter, including disputes as to jurisdiction and arbitrability pursuant to this Article 10, is a substantial breach of this Basic Agreement. A failure or refusal by any party to go to grievance on a matter subject to grievance or to arbitrate an arbitrable matter shall not limit, impair or divest the jurisdiction and powers of the grievance committee or arbitrator provided notice of grievance or arbitration has been served as provided herein. Grievance and arbitration may proceed despite the failure of a party to appear and the grievance committee or arbitrator may enter an award against such a party.

## E. REFERENCES

All references in Articles 10, 11 and 12 to individual employment agreements, loan-out agreements or purchase agreements only refer to such agreements as are subject to this Basic Agreement.

## Article 11. Grievance and Arbitration Rules and Procedures

### A. GENERAL RULES

Unless otherwise provided in this Article 11 or elsewhere in this Basic Agreement, the rules and procedures for grievance and arbitration shall be as follows:

1. Parties

a. In any grievance or arbitration concerning any claim by a writer for compensation under Article 10 A 3, the Guild and the writer involved shall be jointly a party and may be represented by joint counsel. In any grievance or arbitration concerning such a claim by any loan-out company, the loan-out company shall also be jointly a party and may be represented by joint counsel. The claim shall be initiated by the Guild on behalf of the writer and the loan-out company, if any.

b. Except as provided in section a. above, only the Company and the Guild shall be parties.

c. The party commencing a claim in grievance or arbitration is sometimes referred to herein as complainant. The party against whom such grievance or arbitration is commenced is sometimes referred to herein as respondent. Use of such terms in the singular shall be deemed to include the plural.

d. The grievance and arbitration provisions shall apply to disputes with respect to purchase agreements with professional writers to the same extent but no greater than are applicable to disputes involving employed writers.

e. As used in Articles 10, 11 and 12 of this Basic Agreement, the term "writer" shall be deemed to include the plural, the writer's loan-out company if any (as defined in Article 3 of this Basic Agreement) and, in the case of a purchase agreement, a professional writer (as defined in Article 1 of this Basic Agreement).

2. Time Limits

a. Proceedings for grievance (or arbitration, to the extent a party is required to initiate arbitration without invoking grievance proceeding) of a claim relating to actual or alleged television employment or purchase shall be commenced no later than two years after the party bringing the grievance or arbitration proceeding (whether it is the Company, Guild or the writer) has obtained knowledge of the facts upon which the claim is based. Proceedings for grievance (or arbitration, to the extent a party is required to initiate arbitration without invoking grievance proceeding) of a claim relating to actual or alleged theatrical employment or purchase shall be commenced no later than eighteen (18) months after the party bringing the grievance or arbitration proceeding (whether it is the Company, Guild or the writer) has obtained knowledge of the facts upon which the claim is based.

EXHIBIT N

b. In any event, grievance and arbitration proceedings shall commence not later than four years after the occurrence of the facts upon which the claim is based. An arbitration may be commenced prior to initiation or conclusion of a grievance proceeding, if it reasonably appears that the grievance proceeding will not be concluded in sufficient time to permit the arbitration proceeding to be commenced in time.

c. With respect to separation of rights in television literary material, Company may accelerate the applicable limitation of time by serving notice on the Guild, after the literary material is completed, that the writer concerned does not have separation of rights in such material and contracts upon which the Guild's grievance position in such notice is based. The Guild must respond within 90 days from the date such notice is received or the claim to separation of rights is waived on behalf of the writer and the Guild.

d. If grievance or arbitration proceedings are not commenced within the applicable time period specified in this Article 11, such claim shall be deemed to be waived. All time limits provided in Article 11 may be extended by mutual agreement of the parties to the dispute.

e. It is the intent of the Guild and the Company that all arbitration awards should be rendered within 60 days following the close of the arbitration hearing or submission of post-hearing briefs, whichever is later. However, the arbitrator's failure to render an award within such period shall not deprive him of jurisdiction over the dispute or render the award invalid because it is made thereafter.

## 3. Place of Hearing

The situs of the grievance or arbitration proceedings shall be Los Angeles, California unless the parties mutually agree to New York, New York or some other situs. If the parties agree to New York, New York, the arbitrator shall be selected from the New York list of arbitrators set forth in Article 11.C.2.

## 4. Award

The grievance committee and the arbitrator may make any appropriate award permitted herein. Such award shall be in writing and shall be limited as provided in this Basic Agreement. Subject to the provisions of this Basic Agreement, the award shall be final and binding upon the parties to the proceeding, whether participating in the proceeding or not, and in any grievance or arbitration proceeding in which the writer involved is not a party. Any interpretation of this Basic Agreement made in such award shall be final and binding on such writer.

## 5. Costs

Each party shall pay the costs of its representatives on the grievance committee. The fee and expenses of the arbitrator shall be shared equally, unless otherwise provided by the arbitrator. The arbitrator may require a court reporter and a transcript, and if so required, the cost thereof shall be

shared equally. All other costs and expenses of grievance and arbitration shall be borne by the party incurring the same.

## 6. Notices

a. All written notices referred to in this Article 11 commencing second step grievance or arbitration or alleging a cross-claim shall be sent by registered or certified mail or by personal delivery and shall set forth the particulars thereof. All other written notices may be served by first class mail, postage prepaid, unless otherwise specifically provided herein.

b. All notices sent by the Guild to the Company shall be sent to the address designated by the Company in writing to the Guild at the time Company becomes signatory to the Basic Agreement. Should Company change its address for the purpose of receiving notices relating to grievance or arbitration, the Company shall notify the Executive Director of Writers Guild of America, West, Inc. of such new address, which shall then be substituted for the prior address.

c. Unless otherwise designated by Company in a written notice to the Guild, all notices sent by the Guild to the Company shall be addressed to the attention of an officer of the Company, or to its Labor Relations Department. If the Company maintains an office in Los Angeles, California or its vicinity, all such notices shall be sent to said office.

## 7. Conduct of Proceedings

Except as set forth elsewhere herein, the grievance committee and the arbitrator shall adopt such rules of procedure and shall conduct proceedings in such manner as they shall determine to be proper; provided, however, that each party to any grievance or arbitration shall be afforded a reasonable opportunity to present evidence and argument before the grievance committee and the arbitrator.

All hearings, deliberations and proceedings of the arbitrator and the grievance committee shall be closed to the public and shall be absolutely privileged. Only interested parties, their representatives and witnesses may attend. All communications to and from the arbitrator or the grievance committee shall likewise be absolutely privileged.

## 8. Claims for Compensation, Cross-Claims and Defenses

Sub-sections a. through e. of this Section 8 relate to compensation claims, cross-claims and defenses covered by Articles 10 A 3 and 4 of this Basic Agreement.

a. The grievance committee and arbitrator shall have no jurisdiction to determine or affect any claim relating to services in connection with any photoplay or television film other than the photoplay or television film as to which the compensation claim is asserted unless a defense or cross-claim is asserted with respect to another photoplay or television film.

**EXHIBIT N**

Case 3:16-cv-01442-SRU  Document 43-19  Filed 06/09/17  Page 22 of 114

b. Decision made or award rendered in grievance or arbitration of a claim for compensation shall be limited to deciding or awarding what compensation, if any, is due the writer from the Company and what amount, if any, is due the Company from the writer on account of such cross-claim asserted by the Company in such grievance or arbitration.

c. If a claim for compensation under Article 10 A 3 of this Basic Agreement is submitted to grievance or arbitration, any claim of a breach of this Basic Agreement arising out of or connected with said claim must, to the extent permitted by the Basic Agreement, be submitted for grievance and arbitration together with the claim for compensation, provided, that the Guild or the writer has obtained knowledge of the facts upon which said claim of breach is based. Failure to so submit such claim shall constitute a waiver of any and all rights to assert such claim thereafter.

d. The institution of any action in court by the Company shall not stay an arbitration proceeding brought by the Guild and writer for compensation, nor shall any such grievance or arbitration proceeding stay any action instituted by the Company upon any matter Company is not required to submit to grievance or arbitration as a defense or cross-claim, whether or not such action is instituted prior to the submission of the compensation claim to grievance or arbitration.

e. Cross-claims must be submitted to grievance or arbitration by serving written notice on the complainant, by certified or registered mail, setting forth the particulars thereof.

9. Overpayments

If the Company claims that it has made an overpayment to a writer of any compensation provided for in this Basic Agreement or in any prior collective bargaining agreement between the Company and the Guild (i.e. minimum compensation, residuals and other compensation provided for in this Basic Agreement or any other such collective bargaining agreement (hereinafter called "MBA compensation")) or of any compensation provided for in an employment contract with a writer or a loan-out contract (or a purchase agreement in the case of a professional writer) not in excess of $35,000 in the case of a theatrical employment, loan-out or purchase or $35,000 in the case of a television employment, loan-out or purchase (hereinafter called "arbitrable overscale compensation"), and if the Company desires to offset such payment against other compensation payable to such writer the Company shall advise the Guild thereof in writing setting forth the particulars of such claim of overpayment. If the Guild requests that the question of whether the Company has overpaid MBA compensation or arbitrable overscale compensation to the writer be submitted to grievance and arbitration, such request shall be made within seven days after such notice from the Company to the Guild. If the Guild does timely make such request, the Company may proceed with the offset, subject to all of the legal rights and remedies of the writer. If the Guild does timely make such request then pending the outcome of such grievance and arbitration, the

Company agrees that it will not apply the offset, but will pay the amount it desires to apply as an offset to the Guild. The Guild shall then promptly deposit the amount so paid in a separate interest — bearing trust account until it is determined in such grievance and arbitration proceeding whether there was in fact an overpayment of MBA compensation or arbitrable overscale compensation, as the case may be. The grievance and arbitration shall involve only the question of whether there was in fact an overpayment of such compensation, and the amount thereof, and if it is determined that there was in fact an overpayment of such compensation, the right of offset is recognized. Upon conclusion of the arbitration, the payments into such account, together with applicable interest, shall be paid to the Company or to the writer in accordance with the arbitration decision. The parties shall cooperate in obtaining a speedy determination of the grievance and arbitration. As to any claimed right of offset with respect to any alleged overpayments of monies other than MBA compensation or arbitrable overscale compensation, the Guild and Company reserve their respective rights and contentions.

B. GRIEVANCE

1. Step One — Informal Conference

a. Prior to submitting to grievance any matter properly a subject thereof, an authorized representative of the Guild and an authorized representative of the Company will meet in a good faith attempt to settle the dispute. If the representatives of the parties shall fail to settle the dispute within seven (7) days after the matter is first brought to the attention of the respondent then the dispute may be referred to Step Two-Grievance.

2. Step Two — Grievance

a. Commencement of grievance

Complainant shall set out the nature of its claim in writing, and serve a copy ("grievance notice") thereof upon respondent by certified or registered mail. Respondent may, but need not, reply in writing, setting forth its position. The parties shall attempt to agree upon a mutually satisfactory date to convene a grievance committee and hold a grievance hearing, but if no mutually agreeable date is chosen, respondent may within five days after receipt of the grievance notice designate by written notice to complainant a date upon which the grievance committee shall convene to hold the grievance hearing. Such date shall be no earlier than fifteen nor later than thirty days after receipt of the grievance notice. If respondent fails or refuses to designate such a date, complainant may designate the date for such meeting, such date to be not earlier than fifteen nor later than thirty days after service of the grievance notice.

b. Grievance committee

The grievance committee shall consist of three representatives chosen by respondent and three representatives chosen by complainant.

EXHIBIT N

Either party shall have the right to designate a substitute for any of its representatives. The committee will, by majority vote, select its chairman.

**c. Grievance hearing**

The grievance committee thus designated shall meet upon the date selected pursuant to the procedure described above, and shall consider and attempt to resolve the dispute brought before it. The hearing shall be conducted in an orderly fashion, but rules of evidence and technicalities of procedure shall not be controlling. It is the intent of this Basic Agreement that the committee members shall use their good faith, best judgment and common sense, as persons experienced in the motion picture and television industry, in attempting to resolve the dispute brought before it. No matter shall be considered by the grievance committee unless a quorum is present. A quorum shall consist of six (6) members. If any four members of the committee shall agree on a decision, such decision shall be final and binding upon the parties to the proceedings and any interpretation of this Basic Agreement made in such decision shall also be binding upon the writer or writers involved. If no decision is agreed upon, then in any subsequent arbitration or other proceeding, no reference shall be made to the grievance proceeding or to any statements or discussions therein, or to the failure of the grievance committee to settle the dispute.

**d. Unresolved grievance**

If either party fails to designate its representatives within ten (10) days after notice of grievance is served, or if the committee shall fail to meet and commence hearings on the date selected in accordance with the procedures described above, or if four members of the committee shall fail to concur in a decision, or if a grievance hearing is waived by both parties hereto, or in any event if the dispute has not been settled by the committee or otherwise within forty-five (45) days after the mailing of the grievance notice, then either party may submit such matter to arbitration.

**C. ARBITRATION**

**1. Initiation of Proceedings**

A dispute which is subject to grievance proceedings shall not be subject to arbitration, except as provided in section B.2.d. of this Article 11. An arbitration shall be initiated by complainant by written notice, setting forth the particulars of the claim, to be sent to respondent by certified or registered mail.

**2. Selection of Arbitrator**

a. The arbitrator shall be a disinterested person. The parties shall in good faith attempt to mutually agree upon an arbitrator. Should they fail to so agree within seven (7) days after respondent's receipt of the arbitration notice, the arbitrator shall thereupon be chosen by means of a simultaneous exchange of lists between parties setting forth in preferen-

tial order the names of the arbitrators on the applicable authorized list in subsection c. of this Section 2. The arbitrator who is highest on the lists exchanged and is willing to serve shall be the arbitrator. If the respondent fails to submit the preferential order list described above, the complainant may select the arbitrator from the authorized list.

b. If more than one Company is a party, such companies shall, in good faith, attempt to agree mutually upon the preferential order for a single list of arbitrators to be exchanged as aforesaid. If such Companies are unable to agree between or among themselves as to the preferential order for a single list, then the Company which is the real party in interest shall exchange its list of arbitrators with the Guild. In the event that such Companies cannot agree on which of them is the real party in interest, then such Companies shall determine by lot which Company shall exchange its list of arbitrators with the Guild.

c. The authorized lists of arbitrators approved by the parties hereto is as follows:

LOS ANGELES

Benjamin Aaron
Roger Davis
Dixon Q. Dern
Orrin B. Evans
Martin Gang
Edgar Allen Jones
Sam Kagel
Adolph Koven
Dean Richard Maxwell
Edward Mosk
Addison Mueller
Dorothy Nelson
Edward Perlstein
Norman Rudman
Murray Schwartz
George Slaff
Gordon Stulberg
Kenneth Ziffren
Paul Ziffren

NEW YORK

James Altieri
Thomas G.S. Christensen
Daniel Collins
Milton Friedman
Walter Gellhorn
George Moskowitz
George Nicolau
Eva Robins
Israel Ben Scheiber
Michael Sovern
Arthur Stark
Abram Stockman
Herbert Wechsler
Benjamin H. Wolf
Arnold M. Zack

Such lists may be revised by mutual consent from time to time.

**3. Substitution of Arbitrators**

If the arbitrator selected cannot serve, a substitute shall be selected in accordance with subsection 2 above.

**4. Notice of Hearing**

The arbitrator or, at his request, one of the parties shall give written notice to the parties of the time and place of the arbitration hearing. In fixing such date, the arbitrator shall consult the parties and shall consider the time reasonably necessary for the parties to prepare their cases.

36

37

196

Article 11B, C
Grievance and Arbitration
Rules and Procedures
ARBITRATION

Article 11C
Grievance and Arbitration
Rules and Procedures
ARBITRATION

**EXHIBIT N**

5. **Hearing**

a. The arbitrator may, upon a showing of good cause, continue the hearing.

b. The arbitration shall take place as noticed or continued regardless of whether one or more of the parties fails to participate.

## D. ARBITRATION OF DISPUTES WHICH INVOLVE QUESTIONS OF JURISDICTION OR ARBITRABILITY

An objection to jurisdiction or arbitrability shall first be determined by the arbitrator prior to proceeding with a hearing on the merits. If the arbitrator determines that there is jurisdiction and that the dispute is arbitrable, the arbitrator shall proceed to a decision on the merits; provided, however, that the party contesting arbitration or jurisdiction shall not by proceeding to a determination of the merits of such arbitration be deemed to have waived its position that the dispute is not arbitrable or that the arbitrator does not have jurisdiction. If the arbitrator rules he has no jurisdiction over the dispute or that the dispute is not arbitrable, then each party is relieved of its obligation to further delay taking any action at law or in equity which it may desire to take.

## E. ARBITRATION OF DISPUTES CONCERNING CREDIT PROVISIONS

A dispute concerning the credit provisions of this Basic Agreement shall be submitted to an expedited arbitration proceeding governed by the following rules:

1. The Guild shall act on behalf of itself and the writer.

2. Within twenty-four (24) hours after the Guild serves written notice upon the Company concerning a dispute involving a credit provision, an authorized representative of the Guild and an authorized representative of the Company will meet in a good faith attempt to settle or resolve the dispute.

3. In the event the parties shall fail to meet or shall otherwise fail to settle or resolve the dispute within 24 hours after the 24 hours provided in subsection 2 above, the dispute shall be submitted to arbitration to be commenced not later than 5 business days after the service of the written notice provided for in subsection 2 above.

4. The dispute shall be submitted to a single arbitrator mutually selected from the authorized revolving list of arbitrators approved by the parties hereto as follows:

Roger Davis                    Edward Mosk
Dixon Q. Dern                  Ed Perlstein
Martin Gang                    Gordon Stulberg
                               Kenneth Ziffren

In the event the parties are unable, within 48 hours (not including weekends or holidays) after respondent's receipt of the written notice provided for in subsection 2 above, to agree upon an arbitrator from the above list or

Article 11D, E.
Grievance and Arbitration
Rules and Procedures
ARBITRATION OF DISPUTES WHICH INVOLVE
QUESTIONS OF JURISDICTION OR
ARBITRABILITY, ARBITRATION OF DISPUTES
CONCERNING CREDIT PROVISIONS

38

otherwise, the arbitrator will automatically be the person who is available and willing to serve, who is not disqualified because of personal interest in the dispute or representation of a party having a personal interest in the dispute, and who, at the expiration of said 48 hour period, is next in sequence on the above list following the person last selected from said list to serve in any arbitration under Article 11 E. "Next in sequence" shall be determined on an industry-wide basis, not a company by company basis.

5. Notwithstanding anything in this Basic Agreement to the contrary, the arbitrator shall have jurisdiction and power to award damages, to order the Company to withdraw, cancel, change, or re-do advertising materials already issued or prepared, to require the Company to re-do any film titles, and to order any other reasonable relief the arbitrator deems appropriate in the circumstances whether relating to credit on the screen, advertising or otherwise. Any award rendered by the arbitrator shall be binding on the parties and upon the writer.

6. Any or all time limits set forth herein may be waived by the mutual consent of the parties.

7. To the extent not inconsistent herewith, all other provisions of the Basic Agreement relating to arbitrations shall be applicable.

## Article 12.   Court Proceedings

A. Nothing in this Basic Agreement shall limit the rights of the Guild or any writer to assert any and all appropriate legal and equitable rights and remedies to which the Guild or such writer is entitled in courts of competent jurisdiction with regard to an alleged breach of Article 8 and Schedule A of this Basic Agreement with respect to writing credit; subject, however, to the following conditions and limitations:

1. The Guild and the writer shall be bound by any court proceedings instituted by the Guild.

2. If the Guild or the writer commences any proceedings in court with respect to any such alleged breach prior to the submission of the dispute to arbitration hereunder, then neither the Guild nor the writer may submit such dispute to arbitration and no arbitrator shall have jurisdiction to consider the alleged breach of such credit provision.

3. If the Guild or the Company commences an arbitration proceeding hereunder with respect to any such alleged breach prior to the submission of the dispute to a court, then neither the Guild nor the writer shall thereafter commence any proceeding in court with respect to such alleged breach.

4. Any permissible court proceeding referred to in this Section A must be commenced by the Guild or the writer, if at all, within the applicable time limits specified in subsection 2. of Article 11.A.

B. With respect to a compensation claim which is arbitrable pursuant to the provisions of this Basic Agreement, the writer, at this option need not proceed by grievance and arbitration but instead may institute an action at law or in equity with

**EXHIBIT N**

respect to such claim prior to a decision in grievance or prior to submission of such claim to arbitration; provided, however, that for compensation claims of $35,000.00 or less for television employment or purchase, the writer must submit such claim to grievance and arbitration pursuant to Articles 10 and 11 of this Basic Agreement and failure to so proceed by grievance and arbitration shall constitute a waiver by the writer as to such compensation claim.

C. Nothing in this Basic Agreement shall impair, affect or limit the right of the Company, the Guild or any writer to assert and exercise any and all appropriate legal or equitable rights or remedies to which such Company, Guild or writer is entitled in any court of competent jurisdiction as to any dispute which is not subject to grievance or arbitration pursuant to this Basic Agreement. The rights of the parties to assert and exercise legal or equitable rights or remedies as to disputes which are subject to grievance or arbitration are as more particularly defined in this Basic Agreement.

D. The Guild shall have the right to take to grievance and arbitration a claim of the Guild of a breach by the Company of any of the terms or provisions of this Basic Agreement, including a failure to pay minimum compensation, regardless of whether or not such claimed breach may also involve a breach by the Company of its contract with the writer and such proceeding shall not affect the right of the writer to pursue his own remedies at law or in equity, except as limited by the provisions of this Basic Agreement.

E. Nothing in this Basic Agreement shall preclude any court of competent jurisdiction from confirming, setting aside or modifying any grievance or arbitration award hereunder in any proceeding brought for such purpose in accordance with applicable law.

## Article 13 Compensation

### A. THEATRICAL

Company agrees that the minimum basic compensation to be paid a writer who is employed for a feature length photoplay on a so-called flat deal basis shall be as herein set forth.

For the purpose of this Article 13.A 1. a "High Budget" photoplay shall be a photoplay the cost of which equals or exceeds $1,000,000; a photoplay the cost of which is less than $1,000,000 shall be referred to as a "Low Budget" photoplay.

1. a. Minimum Compensation (See table on page 41)
   b. Discount — New Writers

Company may employ a writer who has not been previously employed as a writer under any Guild MBA in television or theatrical motion pictures or radio dramatic programs on a flat deal basis at not less than 75% of the applicable minimum compensation set forth in this paragraph 1. If such writer receives any writing credit on the theatrical motion picture for which he was so employed, his compensation will be adjusted to 100% of the applicable minimum compensation. Such payment will be made within ten (10) business days after determination of final writing credit.

**1. a. Minimum Compensation**

FLAT DEAL SCREEN MINIMUMS

| ITEMS | HIGH BUDGET Effective 3/2/77-3/1/79 | HIGH BUDGET Effective 3/2/79-3/1/80 | HIGH BUDGET Effective 3/2/80-3/1/81 | LOW BUDGET Effective 3/2/77-3/1/78 | LOW BUDGET Effective 3/2/78-3/1/79 | LOW BUDGET Effective 3/2/79-3/1/80 | LOW BUDGET Effective 3/2/80-3/1/81 |
|---|---|---|---|---|---|---|---|
| a. Screenplay, including treatment | $20,821 | $22,695 | $26,326 | $10,611* | $11,407 | $12,377 | $14,172 |
| b. Screenplay, excluding treatment | 14,414 | 15,711 | 18,225 | 6,632 | 7,129 | 7,735 | 8,857 |
| c. Final Draft Screenplay or Rewrite | 6,406 | 6,983 | 8,100 | 3,979 | 4,277 | 4,641 | 5,314 |
| d. Polish | 3,203 | 3,491 | 4,050 | 1,990 | 2,139 | 2,321 | 2,658 |
| e. First Draft of Screenplay (alone or with option for Final Draft Screenplay): | | | | | | | |
| First Draft Screenplay | 9,610 | 10,475 | 12,151 | 4,775 | 5,133 | 5,569 | 6,377 |
| Final Draft Screenplay | 6,406 | 6,983 | 8,100 | 3,183 | 3,422 | 3,713 | 4,251 |
| f. Treatment | 6,406 | 6,983 | 8,100 | 3,979 | 4,277 | 4,641 | 5,314 |
| g. Original Treatment | 9,610 | 10,475 | 12,151 | 5,495 | 5,907 | 6,409 | 7,338 |
| h. Story | 6,406 | 6,983 | 8,100 | 3,979 | 4,277 | 4,641 | 5,314 |
| i. Additional Compensation — Screenplay — No Assigned Material | 3,203 | 3,491 | 4,050 | 1,516 | 1,630 | 1,769 | 2,026 |

Note: The minimum for a Screen Writer shall not be less than the "appropriate" television film minimum, consistent with the particular literary element and the length of the film.

*If a writer is employed for a low budget photoplay during the first year of this Agreement, such writer shall be entitled to an adjustment of his compensation under the following circumstances: (i) such employment is subject to this Agreement; (ii) such writer has received compensation for such employment in an amount less than the amount which would have been the applicable minimum compensation for the services performed had the percentage increase for the first year of this Agreement been 12% instead of 6%; (iii) a photoplay is produced at any time after the employment, using the literary material written by the writer under such employment. The adjustment shall be the amount by which the total of the following three items exceeds the compensation paid to the writer for such services: (1) the applicable minimum compensation for such services (computed without this adjustment); (2) 6% of the applicable minimum compensation for such services for a medium budget photoplay as in effect during the third period of the 1973 WGA Agreement, and (3) 20% of such 6%. The adjustment, if any, shall be paid to the writer upon commencement of principal photography of such photoplay. Any dispute as to whether the Company has used literary material written by such writer shall be subject to grievance and arbitration hereunder.

c. Additional Payment — No Assigned Material

When Company employs a writer to write a screenplay on a flat deal basis at the minimum basic compensation provided in this Article 13A, unless Company in good faith furnishes such writer a novel, play, treatment, original treatment, or story upon which the screenplay is to be based or from which it is to be adapted, such writer shall be paid an additional amount as described in item 1 above. Any dispute as to whether or not Company has so furnished such writer a novel, play, treatment, original treatment, or story shall be subject to automatic arbitration by the Guild Arbitration Committee (referred to in the Theatrical Schedule A) provided, however, that in the event Company or the writer does not accept the decision of such Guild Arbitration Committee, such party shall notify the Guild, and the other party, in writing, of its position and such dispute shall thereupon be subject to the Grievance and Arbitration provisions of Articles 10, 11 and 12 of this Basic Agreement.

## 2. Narration by a writer other than any writer of screenplay or story and screenplay

Minimums for narration are based on status of film assembly and nature of previously written material as follows:

| Nature of Material Written prior to employment of narration writer | Film Footage Assembled in Story Sequence | Film Footage Not Assembled in Story Sequence |
|---|---|---|
| None | Applicable Screenplay excluding Treatment Minimum | Applicable Screenplay including Treatment Minimum |
| Story Only | Applicable Screenplay excluding Treatment Minimum | Applicable Screenplay excluding Treatment Minimum |
| Story and Screenplay | Per Rate Schedule A | Per Rate Schedule A |

| Rate Schedule A: | Effective 3/2/77-3/1/79 | Effective 3/2/79-3/1/80 | Effective 3/2/80-3/1/81 |
|---|---|---|---|
| Two minutes or less | $197 | $215 | $249 |
| Over two minutes thru five minutes | $693 | $755 | $876 |
| Over five minutes — applicable polish minimum | | | |

Aggregate sound track running in minutes of narration written by writer hired pursuant hereto.

Narration writer may be hired on a week-to-week basis.

There is no separation of rights for narration.

## 3. Initial Payment

With respect to any employment under this Article 13.A. on a Flat Deal basis, the Company will pay to the writer, not later than the next regular payday in the week following the day the Company instructs the writer to commence his services, a single advance amount (to be applied against the first compensation which otherwise would be due to the writer) at least equal to the greater of (a) 10% of the writer's agreed compensation which otherwise would be due to the writer upon delivery of the first required material, or (b) one week's compensation at the weekly rate for term employment for 14 out of 14 weeks.

## 4. Maximum Period of Employment

With respect to writers employed at the minimum basic compensation provided for in this Article 13A to write a story, treatment, original treatment, first draft screenplay, final draft screenplay, screenplay, or rewrite, the Company shall not require the writer to render services beyond that period of weeks (and fractions thereof) obtained by dividing such applicable minimum basic compensation set forth above in a through i, as the case may be, by the minimum weekly compensation provided for in Article 13A, subsection 15, hereof, for writers employed on a weekly basis.

In the event that the same writer is employed to write any combination of those items set forth above in a through i, such time periods shall be cumulative.

If the writer is required by written notice from the Company to render his services beyond such time period, he shall be entitled to the specified compensation on delivery and to the minimum weekly compensation to which such writer would be entitled if employed on a weekly basis, as hereinafter in subsection 15 of Article 13A provided, for services rendered after the expiration of such period.

## 5. Computation of Writer's Period of Employment

In computing the duration of a writer's employment under this Article 13A there shall be excluded the following:

a. Any time during which the writer's employment agreement was suspended by reason of any breach or default on the part of the writer;

b. Any time during which the writer's employment agreement was suspended by reason of any of the causes specified in the "force majeure" clause of such writer's employment agreement;

c. Except as hereinafter provided, waiting time which occurs during or after the writer's employment.

Any excess waiting time shall be included in computing the duration of the writer's employment. However, excess waiting time after the expiration of the duration of the writer's employment shall not be included in computing the duration of the writer's employment unless the writer holds himself available for the Company's further instructions pursuant to the Company's written notice to the writer so to hold himself available after the expiration of the writer's employment.

Article 13A
Compensation
THEATRICAL

42

Article 13A
Compensation
THEATRICAL

43

EXHIBIT N

199

Any time during which the writer shall make revisions called for by the Company shall be included in computing the duration of the writer's employment.

### 6.  Waiting time

The waiting time to be excluded in computing the duration of the writer's employment shall not exceed three (3) days following delivery of material, and such waiting time shall not be compensable. In the event that the same writer is employed to write any combination of story, treatment or original treatment, first draft screenplay, final draft screenplay or screenplay, such waiting time shall be cumulative. "Excess waiting time" as used in this Article 13A means waiting time in excess of the waiting time to be excluded as provided in this subsection 6. If the writer is called into conference on any day or instructed to perform any services on any day, such day may not be included in waiting time. Sundays and Holidays generally recognized in the motion picture industry shall be excluded in computing waiting time.

### 7.  Extension of Employment Period

If the employment agreement under this Article 13A for a treatment on a Flat Deal basis contains any option for additional literary material, and the Company wishes the writer to change, revise or complete his assignment after the expiration of the maximum allotted employment period under this Article, the Company may postpone the time for exercise of such option by notifying the writer that it elects to continue the employment of the writer on a week-to-week basis commencing upon the expiration of the employment period then expiring at the minimum weekly compensation prescribed in subsection 15. hereof, but without any minimum guaranteed period of employment. The Company must notify the writer to this effect promptly upon the expiration of such maximum allotted employment period. Such employment shall continue until further notice from the Company, and the waiting time shall commence upon such termination of the employment. If the Company thereafter exercises any option, and the maximum allotted employment period under this Article 13A for which the Company would be entitled to the writer's services under such option shall exceed the period during which the writer performed his services (excluding time for which the writer was compensated on a week-to-week basis and excluding waiting time), then the Company shall be entitled to credit against the amount due under such option, an amount equal to the minimum weekly compensation specified in subsection 15. herein for the period of such excess. Such credit shall not exceed the amount actually paid to the writer for services performed on a week-to-week basis.

### 8.  Failure to Deliver Material Within Allotted Time Period

If the writer has not completed and delivered to the Company the material within the maximum allotted employment period provided for in this Article 13A, or any shorter period specified in the individual writer's employment agreement, then the Company may exercise the succeeding option and require the writer to complete such material within the succeeding option period. If the writer has not completed and delivered to the Company the material within such maximum allotted employment period, or such shorter period specified in the individual writer's employment agreement, and if the failure of the writer to so complete and deliver such material was not caused by any instructions or directions on the part of the Company, then and at any time thereafter and prior to the delivery of such material, the Company may terminate the writer's employment agreement, and the Company shall not be obligated to make any further or additional payment thereunder. For the purposes of determining whether to terminate such contract, the Company may require the writer to deliver for inspection any material then written and compliance with such requirement shall not constitute delivery for the purpose above mentioned without the written consent of the Company. The Company shall retain title to and ownership of any material theretofore delivered for which payment was made by the Company, subject to the provisions of Article 16A.

### 9.  Teams

A team of writers may be employed on a flat deal basis at the applicable above prescribed minimums on condition that the employment period shall not exceed one-half of the applicable periods herein set forth.

### 10.  Week-to-Week, Term, Flat Deal

The Company may employ a writer on a week-to-week or term basis to write a story, treatment, original treatment, first draft screenplay, final screenplay, screenplay, or rewrite. At any time thereafter, Company may employ such writer or any other writer on a flat deal basis to write any such material in accordance with the provisions of this Article 13A. If Company employs a writer on a flat deal basis to write any such material, at any time thereafter Company may employ such writer or any other writer to write any such material on a week-to-week basis or term basis. If the Company imposes the condition that such material must be completed and delivered by a specified date, and the writer accepts the employment upon such conditions and completes and delivers the material to the Company in compliance with such condition, then such employment shall be deemed to be employment on a flat deal basis and the writer shall be entitled to the applicable flat deal minimums provided in this Article 13A for the work involved. If the Company employs two writers as a team on a week-to-week basis to write a story, treatment, original treatment, first draft screenplay, final screenplay, screenplay or rewrite and imposes the condition that such material must be completed and delivered by a specified date, and if the period by which the writers are to complete and deliver the material under their employment agreement is less than one-half of the applicable maximum period of employment for the work involved provided in this Article 13A, the Company shall only be obligated to pay to each such writer one-half of the amount payable to one writer employed on a flat deal basis for the work involved; but if the period by which the writers are to complete and deliver the material under their employment agreement is more than one-half of the applicable maximum period of employment for the work involved provided in this Article, the Company shall not be obligated by this Article 13A to pay any

44

45

Article 13A
Compensation
THEATRICAL

Article 13A
Compensation
THEATRICAL

200

EXHIBIT N

additional amount to such writers. For example, if a team of writers is employed on a week-to-week basis during the period March 2, 1977 to March 1, 1979 to write a "screenplay, including treatment" for a High Budget photoplay (for which the Flat Deal Minimum is $20,821) and a date later than ten (10) weeks after the commencement of such employment is specified in their employment agreement for completion and delivery of such final screenplay, then if such final screenplay is completed and delivered within such time the Company need only pay each writer the ten thousand four hundred thirty dollars ($10,430) received as weekly salary. In the event of a dispute as to whether the Company has imposed such a specified date of completion and delivery, such dispute shall be referred to the Producer-Writer Cooperative Committee and its decision shall be final.

## 11. Applicable Deal Minimum Compensation

When Company hereafter employs one or more writers on a flat deal basis for the minimum basic compensation as above provided, then regardless of the exercise of any option, if a photoplay is actually produced by Company from the screenplay so written under such deal basis, the compensation (hereinafter called "applicable minimum deal compensation") paid to the writer or writers who participated in the writing under such flat deal shall be not less than the applicable "Flat Deal Screen Minimums" set forth in Article 13A, subsection 1A, above. In the event an amount at least equal to such applicable minimum deal compensation has not been paid to such writer or writers by the time screen credits for such photoplay have been finally determined, then Company shall pay to the writer or writers, receiving screen credit for such photoplay, within thirty (30) days after such screen credit has been finally determined, the difference between all of the compensation theretofore paid to the writer or writers employed by Company on such flat deal basis in connection with such photoplay, on the one hand, and the applicable minimum deal compensation provided, on the other hand. A writer or writers employed at the minimum week-to-week compensation to write a treatment and also a screenplay for a photoplay which is produced by Company, shall be compensated at not less than the applicable minimum basic compensation provided for in this Article 13A, and shall be considered as employed on a flat deal basis at such minimum compensation for purposes of subsection 1C of this Article. No writer employed on a term basis shall be entitled to additional compensation by reason of the provisions of this Article 13A.

Where a planned Low Budget theatrical motion picture is produced as a High Budget theatrical motion picture for reasons other than force majeure (including but not limited to disability, illness or inclement weather) or labor cost escalations undetermined at commencement of production, the Company shall pay any necessary increase in the applicable minimum deal compensation within 30 days after Company knows that the cost of the motion picture has increased or will increase past the High Budget break figure, and in any event within 30 days after delivery of the answer print of said motion picture.

## 12. Inapplicability of Provisions

The provisions of this Article 13.A. shall not apply to writers employed at compensation in excess of the applicable minimum specified in this Article except as hereinafter provided. However, even though the total compensation shall exceed such minimums, the amount payable for the writing of the story, treatment, original treatment, first draft screenplay, final screenplay, screenplay or rewrite shall be not less than the minimum for such individual work as above designated. The provisions of paragraphs 4, 5 and 6 of this Article 13.A. shall be applicable to writers employed at compensation not exceeding twice the applicable minimum compensation except that the three day waiting period in paragraph 6 shall be two weeks for the above-scale writer covered by this sentence. The provisions of paragraph 8, paragraph 14 and the last two paragraphs of paragraph 15 of this Article 13.A. are applicable to all employment agreements regardless of compensation.

The provisions of this Article 13A shall not apply to any short or short subject, except that the Company agrees that any such agreement made by the Company with any writer employed on a similar basis with respect to a short or short subject shall guarantee such writer an aggregate compensation for services rendered in the writing and preparation of such material which shall be not less than a sum equal to the minimum weekly compensation to which such writer would be entitled if employed on a weekly compensation basis, as provided in subsection 15. hereof, multiplied by the number of weeks (plus any fraction of a week) during which the writer actually and continuously performed such services, it being understood that the Company may terminate the employment of such writer at the time the writer becomes entitled to additional compensation by reason of the provisions of this paragraph or at any time thereafter.

## 13. Purchases

a.   The applicable minimums for purchases or licenses subject to this Agreement from a professional writer shall be the flat deal minimum for the appropriate budget as determined by the Company in good faith; provided however that if a photoplay is produced based upon the story, treatment or screenplay, as the case may be, and if such photoplay is a medium budget or high budget photoplay, and if the purchase price or license fee paid for the acquisition or license was less than the applicable minimum for the respective type of work (story, treatment or screenplay, as the case may be) for such class of photoplay (medium budget or high budget) pursuant to Article 13 A 1, an additional payment shall be made to the professional writer in an amount such that such writer shall have received in the aggregate an amount equal to such higher applicable minimum.

b.   If the Company has acquired an option to purchase or license literary material subject to this Basic Agreement from a professional writer, the Company may not, prior to exercise of the option, employ a second writer to render any writing services on the optioned material

EXHIBIT N

unless the amount paid by the Company for such option equals or exceeds 10% of the applicable minimum purchase price for the literary material set forth above.

### 14. Payment of Compensation Under Deal Contract

Writers employed to write on a deal basis shall be paid at the following times: Within forty-eight (48) hours (excluding Saturdays, Sundays, and holidays usually recognized in the motion picture industry) after the delivery of a completed story, treatment or original treatment, first draft screenplay or final draft screenplay, respectively, not less than the applicable minimum shall be paid to the writer. Such payment shall not be contingent upon the acceptance or approval by the Company of the material so delivered.

In any case of a default for the payment of compensation to a writer under contract subject to this Basic Agreement, interest shall be due at the rate of 1¼% per month, but it shall not commence until one week after written notice to Company from the Guild or the writer, of the alleged default. If Company has failed to make such payment because the executed contract was not delivered by the writer to the Company, then no such interest shall be due. If the contract is not so delivered by the writer because of a dispute as to the terms of the contract and the Company shall be held to be wrong, the above described interest payment shall be applicable.

### 15. Minimum Weekly Compensation

Every writer employed on a week-to-week or term basis shall receive a salary at the rate of not less than the amount a week specified below for the respective period designated:

| Term Contracts | At The Rate Of Per Week | | |
| --- | --- | --- | --- |
| | 3/2/77-3/1/79 | 3/2/79-3/1/80 | 3/2/80-3/1/81 |
| 40 out of 52 weeks | $ 821 | $ 895 | $1,038 |
| 20 out of 26 weeks | 894 | 974 | 1,130 |
| 14 out of 14 weeks | 968 | 1,055 | 1,224 |
| Week-to-Week | 1,043 | 1,137 | 1,319 |

Every week-to-week or term contract shall specify the exact compensation for each full week of services rendered or to be rendered thereunder.

If any writer under a week-to-week or term contract shall render services after the expiration of the guaranteed period of employment, then, for purposes only of prorating days worked in a partial workweek (i.e., less than six (6) days), at the end of such employment, the writer shall receive one-fifth (⅕) of the weekly rate for each day worked during such partial workweek, after the expiration of the guaranteed period.

Company may employ a writer who has not been previously employed as a writer under any Guild MBA in television or theatrical motion pictures or radio dramatic or comedic programs on a week-to-week or term basis for a

period not to exceed fourteen (14) consecutive weeks at 75% of the minimum weekly compensation as provided in this paragraph 15.

### 16. Theatrical Motion Picture Released on Free Television

If a theatrical motion picture is released on free television before it has had a bona fide theatrical release (determined as provided in Article 15 A.3. (j) of this Basic Agreement), the compensation of the writer or writers who have received screen authorship credit for such motion picture shall be adjusted so that it shall be no less than the appropriate television minimum compensation or the appropriate theatrical minimum compensation, whichever is higher.

## Article 13   Compensation

### B.   TELEVISION

#### 1.   Minimum Basic Compensation

Company agrees that the minimum basic compensation to be paid for writing services covered by this Basic Agreement shall be as herein set forth during the periods indicated. For convenience, the periods are herein designated:

| | From | Through |
| --- | --- | --- |
| "1st Period" | March 2, 1977 - March 1, 1978 | |
| "2nd Period" | March 2, 1978 - March 1, 1979 | |
| "3rd Period" | March 2, 1979 - March 1, 1980 | |
| "4th Period" | March 2, 1980 - March 1, 1981 | |

The applicable minimum shall be the minimum for each writer, except where a bona fide team of no more than two (2) writers offer, prior to employment on the script in question, to collaborate in which event such writers shall be considered a unit which unit shall receive in the aggregate not less than the applicable minimum compensation.

With respect to the provisions for increased rates during specified periods, the intent is that as to free-lance employment the rates applicable when the employment is entered into shall apply, except that where an employment is entered into during one period, but is not to start until a subsequent period, the rate applicable during the subsequent period applies.

#### 2.   "High Budget" Films:

For the purpose of this schedule "High Budget" films shall be films the negative costs of which equals or exceeds the following amounts:

| | |
| --- | --- |
| 15 minutes or less | $ 16,500 |
| 30 minutes or less (but more than 15 minutes) | 27,500 |
| 60 minutes or less (but more than 30 minutes) | 52,250 |
| 75 minutes or less (but more than 60 minutes) | 72,000 |
| 90 minutes or less (but more than 75 minutes) | 92,000 |
| 120 minutes or less (but more than 90 minutes) | 125,000 |

**EXHIBIT N**

3. **"Low Budget" Films:**

For the purpose of this schedule, films, the negative cost of which is less than the amounts indicated above, shall be referred to as "Low Budget" films.

4. **"Negative Cost":**

a. "Negative Cost" for the purposes of this Article 13B shall be deemed to include all actual costs and expenses of production including overhead and, except to the extent hereinafter provided, excluding deferments. If no overhead has been charged, an amount equal to 20% of all direct charges shall be added to represent an overhead charge.

b. It is agreed that if the Company rents studio facilities and the customary rental includes a charge for overhead, the provisions of the preceding quoted sentence shall be waived, but the Guild shall have the right at all times to have a determination by arbitration as to whether said customary rental charge has in fact included a charge for overhead.

c. If more than 50% of the cost of any item is deferred, the negative cost of the film shall be revised to include a charge of not less than 50% of the total cost of such item including the amount deferred.

d. If the compensation of any actor, writer, director or producer shall include a participation in the receipts of a film and the initial salary paid such employee shall be less than 100% of his established television salary, or 50% of his established theatrical motion picture salary (if he has not established his television salary) the negative cost shall be revised to include an amount equal to such established television salary or 50% of such established theatrical motion picture salary, as the case may be. The "established theatrical motion picture salary" for the purposes hereof shall be computed by dividing the total compensation earned by the employee in theatrical motion pictures during the year immediately preceding the assignment in question by the total weeks and fractions thereof worked for such compensation.

e. Any dispute relating to the determination of the negative cost of a film shall be resolved by a Price Waterhouse audit, the costs of which are to be borne equally by the Company and the Guild.

f. If a low budget minimum shall be paid to a writer prior to the production of a film whose negative cost shall in fact require the payment of a high budget minimum, the writer shall be paid the difference not later than 60 days after the completion of production of the film.

5. **Story Claim By Production Executive**

If Company shall claim that a writer has been assigned to write a teleplay based upon a story composed or created by a production executive, the story and teleplay shall be subject to an automatic arbitration pursuant to the provisions of the Television Schedule A hereof and if the arbitrators shall accord both the story and teleplay credit to the writer, then the combined

story and teleplay minimum above provided for shall apply to the material so written, provided that Company may appeal any such credit determination to arbitration pursuant to Articles 10, 11 and 12 hereof.

6. **Step Outline**

The writer may not be compelled to prepare a step outline of the teleplay. For such purpose the term "step outline" shall mean a development of the story in the form of a condensed scene-by-scene progression indicating action and the substance of essential story dialogue, but without dialogue.

7. **Schedule of Minimum Compensation**

a. STORY (For all television films except serials which are covered by e(1) or e(3) below)

High Budget

| Program Length in Minutes | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| 15 or less | $ 571 | $ 617 | $ 666 | $ 726 |
| 30 or less (but more than 15) | 1,046 | 1,130 | 1,220 | 1,330 |
| 60 or less (but more than 30) | 1,901 | 2,053 | 2,217 | 2,417 |
| 75 or less (but more than 60) | 2,611 | 2,820 | 3,046 | 3,320 |
| 90 or less (but more than 75) | 2,756 | 2,976 | 3,214 | 3,503 |
| 120 or less (but more than 90) | 3,611 | 3,900 | 4,212 | 4,591 |

Low Budget

| | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| 15 or less | $ 487 | $ 526 | $ 568 | $ 619 |
| 30 or less (but more than 15) | 808 | 873 | 943 | 1,028 |
| 60 or less (but more than 30) | 1,530 | 1,652 | 1,784 | 1,945 |
| 75 or less (but more than 60) | 2,102 | 2,270 | 2,452 | 2,673 |
| 90 or less (but more than 75) | 2,251 | 2,431 | 2,625 | 2,861 |
| 120 or less (but more than 90) | 2,972 | 3,210 | 3,467 | 3,779 |

b. TELEPLAY (For all television films except serials which are covered by e(1) e(3) below)

High Budget

| | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| 15 or less | $1,046 | $1,130 | $1,220 | $1,330 |
| 30 or less (but more than 15) | 1,699 | 1,835 | 1,982 | 2,160 |
| 60 or less (but more than 30) | 3,293 | 3,556 | 3,840 | 4,186 |
| 75 or less (but more than 60) | 4,621 | 4,991 | 5,390 | 5,875 |
| 90 or less (but more than 75) | 4,884 | 5,275 | 5,697 | 6,210 |
| 120 or less (but more than 90) | 6,479 | 6,997 | 7,557 | 8,237 |

Low Budget

| | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| 15 or less | $ 762 | $ 823 | $ 889 | $ 969 |
| 30 or less (but more than 15) | 1,309 | 1,414 | 1,527 | 1,664 |
| 60 or less (but more than 30) | 2,497 | 2,697 | 2,913 | 3,175 |
| 75 or less (but more than 60) | 3,476 | 3,754 | 4,054 | 4,419 |
| 90 or less (but more than 75) | 3,688 | 3,983 | 4,302 | 4,689 |
| 120 or less (but more than 90) | 4,881 | 5,271 | 5,693 | 6,205 |

50

51

203

Article 13B
Compensation
TELEVISION

Article 13B
Compensation
TELEVISION

EXHIBIT N

c.  STORY AND TELEPLAY where the same writer prepares both ("bargain rates") (For all television films except serials which are covered by e(1) or e(3) below).

### High Budget

| Program Length in Minutes | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| 15 or less | $1,428 | $1,542 | $1,665 | $ 1,815 |
| 30 or less (but more than 15) | 2,614 | 2,823 | 3,049 | 3,323 |
| 60 or less (but more than 30) | 4,753 | 5,133 | 5,544 | 6,043 |
| 75 or less (but more than 60) | 6,534 | 7,057 | 7,622 | 8,308 |
| 90 or less (but more than 75) | 6,890 | 7,441 | 8,036 | 8,759 |
| 120 or less (but more than 90) | 9,028 | 9,750 | 10,530 | 11,478 |

For programs in excess of one hundred and twenty minutes, compensation is based on the one hundred twenty minute or less minimum (shown herein) plus, for each additional thirty minutes or less, the difference between the appropriate sixty-minute compensation less the thirty-minute compensation.

The minimums set forth in the above schedules constitute the writer's minimum compensation for the purposes of Article 15.B.

The category of minimums provided for in schedule c. of this paragraph 7 (the so-called "bargain rate") is applicable only where the employment is for story and teleplay, not where the employment is for story with option for teleplay.

### Low Budget

| Program Length in Minutes | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| 15 or less | $1,213 | $1,310 | $1,415 | $1,542 |
| 30 or less (but more than 15) | 2,020 | 2,182 | 2,357 | 2,569 |
| 60 or less (but more than 30) | 3,826 | 4,132 | 4,463 | 4,865 |
| 75 or less (but more than 60) | 5,347 | 5,775 | 6,237 | 6,798 |
| 90 or less (but more than 75) | 5,626 | 6,076 | 6,562 | 7,153 |
| 120 or less (but more than 90) | 7,431 | 8,025 | 8,667 | 9,447 |

cc.  STORY WITH OPTIONS

If Company engages a writer to write a story with an option to have the writer write a teleplay, Company if it exercises such option must do so within fourteen (14) days after delivery of the final story.

d.  GOING RATE AND BONUS: additional compensation shall be payable to the writer or writers of a story and teleplay for a network prime time episodic series, other than a pilot, in the amount and subject to the terms and conditions specified in this subparagraph d:

(1)  Such additional compensation shall be paid only for the writing of both story and teleplay, whether by option or otherwise. The payment of such additional compensation is not dependent upon credit or production of the teleplay, but such additional compensation shall not be payable to the writer of a story if no teleplay is written based on that story; provided, however, that if a writer writes a story, and another writer is assigned to write the teleplay based on such story, the writer of the story shall be paid his share of the "bonus" when the other writer is assigned to the teleplay, whether or not such other writer actually writes the teleplay. The additional compensation shall not be paid more than once, so that in any case in which the teleplay is rewritten, or more than one teleplay based on the story is written, or the story itself is rewritten, the additional compensation shall be payable only to the original writer of the story and the original writer of the first teleplay based on the story.

(2)  Such additional compensation shall be payable only to a writer (herein for convenience called a "qualified writer") who has previously written at least once within the genre of the particular program (viz., comedy, drama, etc.) and who has previously received compensation in that genre equal to the applicable "going rate" set forth in subparagraph (3) below, or to a writer (herein for convenience also called a "qualified writer") who has previously written at least twice within the genre of the particular program; provided however that if a writer not qualified to receive such additional compensation writes a story only, and the teleplay is written by a qualified writer, then the "bonus" shall be paid to the two writers as provided in subparagraph (3) below.

A writer who has been employed pursuant to Article 13.B.7.s shall be deemed by the Company which so employed him to be a qualified writer in all genres, and by all other Companies as a qualified writer in the genre in which he had been so employed.

(3)  Where additional compensation is payable pursuant to this subparagraph d:

(i)  If the story and teleplay are written by the same writer, the total compensation paid for story and teleplay shall consist of the "going rate" (which shall include but in no case be less than the minimum rate specified in Article 13.B.7 a. b. and c.) plus a "bonus". The "going rates" are:

| | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| For a 30-minute episode | $3,710 | $ 4,007 | $ 4,328 | $ 4,718 |
| For a 60-minute episode | 4,770 | 5,152 | 5,564 | 6,065 |
| For a 90-minute episode | 7,950 | 8,586 | 9,273 | 10,108 |
| For an episode in excess of 90 mins | 9,540 | 10,303 | 11,127 | 12,128 |

The "bonus" is:

| | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| 30 minute episode | $1,590 | $ 1,717 | $ 1,854 | $ 2,021 |
| 60 minute episode | 2,650 | 2,862 | 3,091 | 3,369 |
| 90 minute episode | 2,650 | 2,862 | 3,091 | 3,369 |
| over 90 minute episode | 3,710 | 4,007 | 4,328 | 4,718 |

If the rate of compensation payable to the writer under his employment contract exceeds the going rate, such excess may by mutual agreement apply against and be deemed to be payment to that extent of the bonus.

**EXHIBIT N**

teleplays, rewrites and polishes for episodes of network prime time episodic series.

(3) As to serials other than those described in subparagraphs (1) and (2) above, there is to be no differentiation between stories and teleplays for compensation purposes and minimum compensation for writing such material for such Serials shall be as follows:

| | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| 15 minutes or less | $ 984 | $1,063 | $1,148 | $1,251 |
| 30 minutes or less (but more than 15 minutes) | 1,639 | 1,770 | 1,912 | 2,084 |
| 60 minutes or less (but more than 30 minutes) | 3,115 | 3,364 | 3,633 | 3,960 |

f. INSTALLMENT PAYMENTS

Payment of the writer's agreed upon compensation shall be made in installments as follows:

(1) If employment is for Story and Teleplay, not less than

(a) 30% of agreed compensation on delivery of story.

(b) 40% of agreed compensation on delivery of first draft teleplay. In no event shall the total of installments (a) and (b) be less than 90% of the applicable minimum compensation for story and teleplay.

(c) Balance of agreed compensation on delivery of final draft teleplay.

(2) If employment is for Teleplay, not less than

(a) 60% of agreed compensation or 90% of applicable minimum compensation, whichever is greater, on delivery of first draft teleplay.

(b) Balance of agreed compensation on delivery of final draft teleplay.

With respect to any employment under Article 13.B.7.a.b. or c. above relating to pilot films and one-time programs 90 minutes or more in length, the Company will pay to the writer, not later than the next regular payday in the week following the day the Company instructs the writer to commence his services, a single advance amount (to be applied against the first compensation which otherwise would be due to the writer) at least equal to 10% of the moneys which otherwise would be due to the writer upon delivery of the first required material.

g. PLOT OUTLINE — NARRATIVE SYNOPSIS OF STORY

Company may request writer to prepare a narrative synopsis of reasonable length (herein designated as an "outline") of a story owned by writer in order to determine its suitability for television purposes. The minimum compensation for the preparation of such outline shall be:

(ii) If the teleplay is written by a free-lance writer based upon a story written by another writer, the bonus referred to in (i) above shall be paid in the ratio of 40% to the writer of the story and 60% to the writer of the teleplay.

(iii) If the story and teleplay are written by separate term writers they shall receive the appropriate bonus specified in (i) above in the ratio of 40% story, 60% teleplay. If the teleplay is written by a writer who is under term employment, and is based upon a story written by a free-lance writer, and if such free-lance writer was employed on the basis of a story with option for the teleplay, one-half of the bonus shall be paid to the writer of the story and the other half as a contribution by the Company to the Writers Guild-Industry Health Fund referred to in Article 17 of this Agreement.

(4) Neither the bonus nor the part of the "going rate" in excess of minimum shall be deemed to be part of the "applicable minimum compensation" referred to in Article 15 B of this Agreement, nor part of "initial compensation" for the purposes of Article 17 of this Agreement.

(5) The bonus shall be payable upon delivery of the teleplay, except as otherwise provided above.

dd. With respect to one-time shows or unit series shows or anthology series (such as "movies-of-the-week"), of 30 minutes or longer, produced for network prime time exhibition, the compensation paid to the writer of the story and teleplay shall be not less than the compensation specified in paragraph d. above for a 30 minute, or a longer than 30 minute (as the case may be), episodic program, including the bonus. However, this paragraph dd. shall not be construed to increase the minimum rate of compensation for such programs, as elsewhere herein provided, for the purposes of Article 15.B of this Agreement or otherwise. Further, this paragraph dd. shall not apply to comedy/variety, quiz and audience participation, documentaries and other types of non-dramatic shows (e.g. Wild Kingdom and travelogues).

e. SERIALS

(1) Employment and purchase of literary material for Serials produced for broadcast five times per week in other than prime time is the subject of the Guild's 1977 agreement with the networks. The effective application of the 1977 network agreement to all such programming produced by the Company is subject to the provisions of Article 36 of this agreement.*

(2) The minimum compensation for stories and/or teleplays, rewrites and polishes for episodes of a once-a-week network prime time serial shall be the corresponding minimums for stories and/or

*Said Writers Guild of America 1977 Network Basic Agreement was accepted in accordance with Article 36.

Article 13B
Compensation
TELEVISION

Article 13B
Compensation
TELEVISION

EXHIBIT N

Company shall within fourteen (14) days from time of delivery of such outline notify writer of its election to acquire such outline and employ writer to prepare a teleplay based thereon. If Company shall so elect, the above applicable minimum for the outline shall be deemed an advance against the total compensation payable with respect to such story and teleplay. If Company shall elect not to proceed, it shall return the outline to the writer not later than the end of such fourteen (14) day period and writer shall be entitled to retain the above applicable minimum for the outline and shall own all right, title and interest in the literary material contained in such outline, except to the extent that the outline was prepared for an episodic series or serial type film and program format and/or characters belonging to the Company were incorporated in the material written by the writer.

Company shall sign and deliver to writer, on the date of hiring, a slip stating that it has employed the writer to prepare an outline of such material and that the conditions of such employment are upon terms not less favorable than those provided by this paragraph g.

h. COMPENSATION FOR REWRITES AND POLISHES

Company shall pay not less than the following minimum compensation with respect to rewrites and polishes:

(1) REWRITES

(Program Length in minutes)

High Budget — Non-serial pictures and serials described in 13.B.7.e.(2)

| Program Length in Minutes | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| 15 minutes or less | $ 617 | $ 666 | $ 719 | $ 784 |
| 30 minutes or less (more than 15) | 1,029 | 1,111 | 1,200 | 1,308 |
| 60 minutes or less (more than 30) | 1,948 | 2,104 | 2,272 | 2,476 |
| 75 minutes or less (more than 60) | 2,733 | 2,952 | 3,188 | 3,475 |
| 90 minutes or less (more than 75) | 2,868 | 3,097 | 3,345 | 3,646 |
| 120 minutes or less (more than 90) | 3,788 | 4,091 | 4,418 | 4,816 |

Low Budget — Non-serial pictures and serials described in 13.B.7.e.(2)

| Program Length in Minutes | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| 15 minutes or less | $ 452 | $ 488 | $ 527 | $ 574 |
| 30 minutes or less (more than 15) | 772 | 834 | 901 | 982 |
| 60 minutes or less (more than 30) | 1,472 | 1,590 | 1,717 | 1,872 |
| 75 minutes or less (more than 60) | 2,049 | 2,213 | 2,390 | 2,605 |
| 90 minutes or less (more than 75) | 2,175 | 2,349 | 2,537 | 2,765 |
| 120 minutes or less (more than 90) | 2,876 | 3,106 | 3,354 | 3,656 |

Teleplays for serials described in 13.B.7.e.(3)

| Program Length in Minutes | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| 15 minutes or less | $ 285 | $ 308 | $ 333 | $ 363 |
| 30 minutes or less (more than 15) | 476 | 514 | 555 | 605 |
| 60 minutes or less (more than 30) | 903 | 975 | 1,053 | 1,148 |
| 75 minutes or less (more than 60) | 1,177 | 1,271 | 1,373 | 1,497 |
| 90 minutes or less (more than 75) | 1,331 | 1,437 | 1,552 | 1,697 |
| 120 minutes or less (more than 90) | 1,759 | 1,900 | 2,052 | 2,237 |

(2) POLISHES

(Program length in minutes)

High Budget — Non-serial pictures and serials described in 13.B.7.e.(2)

| Program Length in Minutes | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| 15 minutes or less | $ 308 | $ 333 | $ 360 | $ 392 |
| 30 minutes or less (more than 15) | 514 | 555 | 599 | 653 |
| 60 minutes or less (more than 30) | 974 | 1,052 | 1,136 | 1,238 |
| 75 minutes or less (more than 60) | 1,366 | 1,475 | 1,593 | 1,736 |
| 90 minutes or less (more than 75) | 1,433 | 1,548 | 1,672 | 1,822 |
| 120 minutes or less (more than 90) | 1,893 | 2,044 | 2,208 | 2,407 |

Low Budget — Non serial pictures and serials described in 13.B.7.e.(2)

| Program Length in Minutes | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| 15 minutes or less | $ 225 | $ 243 | $ 262 | $ 286 |
| 30 minutes or less (more than 15) | 385 | 416 | 449 | 489 |
| 60 minutes or less (more than 30) | 737 | 796 | 860 | 937 |
| 75 minutes or less (more than 60) | 1,024 | 1,106 | 1,194 | 1,301 |
| 90 minutes or less (more than 75) | 1,089 | 1,176 | 1,270 | 1,384 |
| 120 minutes or less (more than 90) | 1,439 | 1,554 | 1,678 | 1,829 |

Teleplays for serials described in 13.B.7.e.(3)

| Program Length in Minutes | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| 15 minutes or less | $ 246 | $ 266 | $ 287 | $ 313 |
| 30 minutes or less (more than 15) | 411 | 444 | 480 | 523 |
| 60 minutes or less (more than 30) | 779 | 841 | 908 | 990 |

i. SKETCHES, COMEDY/VARIETY, VARIETY, QUIZ AND AUDIENCE PARTICIPATION PROGRAMS.

Employment and purchase of literary material for Sketches, Comedy/Variety, Variety programs and for Quiz and Audience Participation programs are the subject of the Guild's 1977 Agreement with the networks. The effective application of the 1977 network agreement to all such programming produced by the Company is subject to the provisions of Article 36 of this agreement.*

j. k. and l. [deleted; combined in i above]

m. (1) FORMAT

Minimum basic compensation for a format shall be:

| | |
|---|---|
| 1st Period | $1,978 |
| 2nd Period | 2,136 |
| 3rd Period | 2,307 |
| 4th Period | 2,515 |

If a story, or stories, are included in a purchased format and the story is used, the applicable minimum for such story or stories shall apply. If such story or stories are not used no story minimum would apply.

*The Writers Guild of America 1977 Network Basic Agreement was accepted in accordance with Article 36.

EXHIBIT N

If a writer is employed to write a format and a story or stories are included, at the direction of Company, the applicable story minimum shall apply.

(2) **BIBLE**

Minimum basic compensation for a network, prime time bible shall be:

| | |
|---|---|
| 1st Period | $10,000 |
| 2nd Period | 10,800 |
| 3rd Period | 11,664 |
| 4th Period | 12,714 |

plus 10% thereof for each detailed storyline in excess of six (6) ordered by the Company in connection therewith. With respect to a non-network and/or non-prime time bible for a multi-part closed end series, the minimum basic compensation shall be 20% less than set forth above. The writer of the bible shall be entitled to the applicable story payment plus story share of the bonus (if applicable) for each segment or episode of the multi-part program or prime-time serial for which he receives story credit. 10% of the applicable minimum for a bible may be credited against such payment for each story. Notwithstanding the foregoing should the Company separately pay the full story and teleplay minimum including going rate and bonus (if applicable) to the bible writer or any other writer, the story payment including bonus (if applicable) otherwise due to the bible writer under this subparagraph shall not be required

(3) **REWRITE, POLISH**

Minimum basic compensation for a rewrite of a format shall be 50% of the applicable minimum set forth above. Minimum basic compensation for a polish of a format shall be 25% of the applicable minimum set forth above.

Minimum basic compensation for a rewrite or polish of a bible shall be:

| | Rewrite | Polish |
|---|---|---|
| 1st period | $5,000 | $2,500 |
| 2nd period | 5,400 | 2,700 |
| 3rd period | 5,832 | 2,916 |
| 4th period | 6,357 | 3,178.50 |

provided however that where the writer rewrites or polishes more than six story lines in the bible, the minimum basic compensation shall be increased as follows (for rewrite or polish, as the case may be) for each such story line in excess of six:

| | Rewrite | Polish |
|---|---|---|
| 1st period | $500 | $250 |
| 2nd period | 540 | 270 |
| 3rd period | 583.20 | 291.60 |
| 4th period | 635.70 | 317.85 |

With respect to rewriting or polishing a non-network and/or non-prime time bible, the minimum basic compensation shall be 20% less than set forth above.

n. **NARRATION**

Minimum basic compensation for a narration shall be as follows:

**NARRATION**
(by writer other than writer of teleplay or story and teleplay)

| Nature of material | FILM ASSEMBLED IN STORY SEQUENCE | | | | FILM FOOTAGE NOT ASSEMBLED IN STORY SEQUENCE | | | |
|---|---|---|---|---|---|---|---|---|
| | ** Credit to Narration Writer | Freelance Writer | Minimum | Residuals to Narration Writer | ** Credit to Narration Writer | Freelance Writer | Minimum | Residuals to Narration Writer |
| 1. narration already written when narration writer hired | Narration written by | Schedule A | See Rate | Yes, based on % of applicable minimum in Rate Schedule A | Written by | Schedule B | See Rate | Yes, based on % of applicable minimum in Rate Schedule B |
| 2. Story only | Narration written by (if story credit, then on same card) | Schedule A | See Rate | Yes, based on % of applicable minimum in Rate Schedule A | Narration written by (if story credit, then on same card) | Schedule A | See Rate | If "Narration by" credit, then only credit, as determined on WGA credit arbitration |
| 3. Story and Teleplay | None, but if over 8 minutes of narration only receive Narration by credit (same card) | Schedule C | See Rate | Automatic arbitration (aggregate of no more than story & teleplay residuals) | None, but if over 8 minutes of narration, may receive Narration by WGA credit | Schedule C | See Rate | If "Narration by" credit, then only credit, then residuals as determined on WGA credit arbitration |

** Credits not to affect rates — There is no Separation of Rights for Narration

o.   REMAKES

The Company's right to remake a television film shall be subject to the following:*

(1)   If the writer's material is used for the remake and no writer is employed to rewrite, adapt or revise such material for the remake, the Company will pay the writer a sum equal to the full applicable minimum compensation provided for in this agreement appropriate to the writer's initial employment to write such material, together with any additional compensation for television re-runs or theatrical exhibition which may become due. Said full minimum compensation shall not be diminished by virtue of any sharing of credit by said writer for the remake (but this provision shall not be construed as affecting the rule that a bona fide team shall be considered a unit as provided in paragraph B.1. of this Article).

(2)   If a writer is employed to re-write, adapt or revise such literary material for the remake then the writer of the original material shall nevertheless be a participant in the credit determination and if afforded credit shall accordingly be entitled to be paid the full applicable minimum compensation provided for in this agreement appropriate to such credit, and any additional compensation for television re-runs or theatrical exhibition which may become due as a result of such remake. Said full minimum compensation shall not be diminished by virtue of any sharing of credit by said writer for the remake (but this provision shall not be construed as affecting the rule that a bona fide team shall be considered a unit as provided in paragraph B.1. of this Article).

(3)   The references to the "full applicable minimum compensation" in subdivisions (1) and (2) of this Paragraph o. are intended to refer to the applicable rates provided for in Article 13.B.7.a., b. or e. of this Agreement.

p.   NON COMMERCIAL OPENINGS AND CLOSINGS

Where a writer other than the writer of the teleplay for a television film writes literary material for self-contained units of entertainment which are used as opening, closing and/or bridging material in such film, the total minimum compensation for all such self-contained units in such film will be:

| Aggregate Running Time of Material | 1st Per | 2nd Per | 3rd Per | 4th Per |
| --- | --- | --- | --- | --- |
| 3 minutes or less | $514 | $555 | $599 | $653 |
| More than 3 minutes | 721 | 779 | 841 | 917 |

*But as to any Series in production prior to March 6, 1973, this paragraph B.7.0. shall remain as in the 1970 WGA agreement.

Article 13B
Compensation
TELEVISION

208

EXHIBIT N

61

---

The following rates are for high-budget:*

RATE SCHEDULE A

| Program Length in minutes** | Effective 3/2/77 - 3/1/78 | Effective 3/2/78 - 3/1/79 | Effective 3/2/79 - 3/1/80 | Effective 3/2/80 - 3/1/81 |
| --- | --- | --- | --- | --- |
| 15 minutes or less | $1,235 | $1,334 | $1,441 | $1,571 |
| 30 minutes or less (more than 15) | 2,055 | 2,219 | 2,397 | 2,613 |
| 60 minutes or less (more than 30) | 3,899 | 4,211 | 4,548 | 4,957 |
| 75 minutes or less (more than 60) | 5,464 | 5,901 | 6,373 | 6,947 |
| 90 minutes or less (more than 75) | 5,743 | 6,202 | 6,698 | 7,301 |
| 120 minutes or less (more than 90) | 7,585 | 8,192 | 8,847 | 9,643 |
| plus, for each additional ½ hour or fraction thereof | $1,844 | $1,992 | $2,151 | $2,344 |

RATE SCHEDULE B

| Program Length in minutes** | Effective 3/2/77 - 3/1/78 | Effective 3/2/78 - 3/1/79 | Effective 3/2/79 - 3/1/80 | Effective 3/2/80 - 3/1/81 |
| --- | --- | --- | --- | --- |
| 15 minutes or less | $1,428 | $1,542 | $1,665 | $1,815 |
| 30 minutes or less (more than 15) | 2,612 | 2,821 | 3,047 | 3,321 |
| 60 minutes or less (more than 30) | 4,753 | 5,133 | 5,544 | 6,043 |
| 75 minutes or less (more than 60) | 6,534 | 7,057 | 7,622 | 8,308 |
| 90 minutes or less (more than 75) | 6,891 | 7,442 | 8,037 | 8,760 |
| 120 minutes or less (more than 90) | 9,029 | 9,751 | 10,531 | 11,479 |
| plus, for each additional ½ hour or fraction thereof | $2,141 | $2,312 | $2,497 | $2,722 |

RATE SCHEDULE C (Aggregate sound track running in minutes of narration written by writer hired pursuant to this chart)

| | Effective 3/2/77 - 3/1/78 | Effective 3/2/78 - 3/1/79 | Effective 3/2/79 - 3/1/80 | Effective 3/2/80 - 3/1/81 |
| --- | --- | --- | --- | --- |
| 2 minutes or less of narration | $ 197 | $ 213 | $ 230 | $ 251 |
| over 2 minutes through 5 minutes of narration | 693 | 748 | 808 | 881 |
| Over 5 minutes of narration | Teleplay rewrite minimum for applicable program length. | | | |

NOTE: Excluded from these provisions is material described in Article 13.B.7.p.

Two writers collaborating equal one unit, to receive in the aggregate not less than applicable minimum.

Narration writer may be hired on a week-to-week basis, subject to Article 13.B.7.s.

*If low budget, then applicable rates are equal to corresponding rates for low budget teleplay (under "A" above) and low budget story and teleplay (under "B" above).

**Running time is in terms of sound track.

Article 13B
Compensation
TELEVISION

60

It is further expressly understood that the foregoing rates are not intended to apply to customary or routine introductions, bridges or conclusions. An example of the material intended to be covered is the material delivered by Alfred Hitchcock on the series ''Alfred Hitchcock Presents''. In addition, if such units are re-run, as the term ''re-run'' is used in Article 15B1.b., Company shall pay the writer additional payments expressed in percentages of said total minimum compensation at the rates specified in said Article 15 B1.b. It is expressly understood that, except as specifically provided herein, this paragraph is not intended to extend the coverage of this Basic Agreement to, nor provide payment for, any matter in any television film not elsewhere covered by this Basic Agreement.

q.  TOTAL WRITING COST

Company shall not produce a television film based upon material subject to this Basic Agreement the total purchase and writing cost for which shall be less than the applicable minimum compensation for narration, a story and teleplay, or teleplay as the case may be.

r.  PILOT SCRIPTS, BACK-UP SCRIPTS AND SPIN-OFFS

Pilot Script

A writer employed to write a pilot story or a pilot story and teleplay shall receive for said pilot story or pilot story and teleplay an amount equal to 150% of the applicable minimum initial basic compensation set forth in this Article 13.B. for a pilot story or pilot story and teleplay, but this provision shall not be construed to increase said writer's rights or minimum compensation for any other purpose under this Basic Agreement, such as, but not limited to, reruns and theatrical uses.

Back-Up Script

A writer employed to write a back-up script shall receive for said story and/or teleplay an amount equal to 115% of the applicable minimum initial basic compensation (includes going rate and bonus if applicable) set forth in this Article 13.B. for a story and/or teleplay, but this provision shall not be construed to increase said writer's minimum compensation for any other purpose under this Basic Agreement, such as, but not limited to, reruns and theatrical uses.

Spin-off

When the Company knows prior to engaging a writer to write a story or story and teleplay for an episode of a series that such episode is intended to be used as a spin-off, the Company shall also advise the writer at the time of the initial interview. If Company does not have such knowledge but thereafter broadcasts one or more programs in a new television series based upon such episode, then if the initial compensation paid such writer for such episode was less than 150% of the WGA minimum initial basic compensation therefor Company shall pay writer the difference between such 150% and writer's initial compensation, but this provision shall not be construed to increase the writer's minimum basic compensation for any other purposes under this Basic

Agreement such as, but not limited to, reruns and theatrical use and such payment need not be made when the new television series is based primarily on either a public domain format or public domain character or characters used in the spin-off episode.

s.  WEEK-TO-WEEK AND TERM EMPLOYMENT

(1)  Company agrees that except as hereinafter provided, all employment of writers shall be only on a freelance (non-exclusive) basis, and such employment shall be upon terms and conditions which conform in principle to, and shall not be less favorable than the terms and provisions hereof.

(2)  The Company may employ writers on a term contract basis as follows:

|  | Overall Term | Guaranteed weeks of Employment | Compensation Per Week | | | |
|---|---|---|---|---|---|---|
|  |  |  | 1st Per | 2nd Per | 3rd Per | 4th Per |
| (a) | 52 | 40 | $653 | $705 | $761 | $ 829 |
| (b) | 26 | 20 | 712 | 769 | 831 | 906 |
| (c) | 14 | 14 | 772 | 834 | 901 | 982 |
| (d) | 6 | 6 | 832 | 899 | 971 | 1,058 |

(e)  In no event shall a writer employed on a term basis receive less than the total applicable minimum compensation, as set forth in this Basic Agreement, to which he would have been entitled had he been employed on a freelance basis. At the end of each guaranteed period of employment on a term basis Company shall compute the aggregate minimum compensation to which the writer would have been entitled under this Basic Agreement had he been employed on a freelance basis to write the literary material written by the writer during such period, and shall deduct therefrom the total compensation accruing to the writer during such period, and will promptly pay to the writer the excess, if any. Any dispute as to the amount of compensation payable under this subdivision (e) may be submitted to arbitration, as herein provided. All the provisions of this Basic Agreement, to the extent the same are applicable, shall apply to such term employment including but not limited to the provisions relating to additional compensation for re-runs and theatrical release, and the separation of rights provisions.

(f)  The suspension period provided in the so-called ''force majeure'' clause of employment agreements with writers employed on a week-to-week basis or for a definite term, who receive salary at the rate set forth in (d) above or less a week, shall not exceed four (4) weeks; provided, however, that that Company shall have the right to continue such

Article 13B
Compensation
TELEVISION

EXHIBIT N

suspension from week to week, not exceeding six (6) additional weeks, at one-half salary. If the salary of any such writer shall be at the rate of more than set forth in (d) above per week, such suspension period shall not exceed eight (8) weeks. Nothing herein contained shall be construed to deprive the Company of its right to terminate any such employment agreement after the commencement of the suspension period.

(g)   For a partial sixweek (defined as workweek consisting of less than six days work) following the guaranteed period of employment a writer shall be paid one-fifth of his weekly compensation for each day employed in such partial workweek.

Such writer shall be paid one-fifth of weekly compensation for each day worked at Company's direction in excess of five times the number of weeks worked.

(h)   Such writer under a week-to-week employment may write any literary material covered hereunder, provided, however, if such literary material amounts to a rewrite or more such writer shall be paid not less than the minimum freelance compensation for such literary material, computed as of the end of his employment or as of the end of each six-month period whichever occurs sooner. The compensation of a week-to-week writer shall be the compensation per week as set forth in (d) above.

(3)   Notwithstanding the foregoing, the Company may employ a writer who has not been previously employed as a writer under any Guild MBA in television, theatrical motion pictures or radio dramatic or comedic programs on a term contract basis as follows:

(a)   An over-all term of 14 consecutive weeks with 14 weeks guaranteed employment at a minimum compensation equal to 75% of the rate set forth in subpart (2) (c) above; or

(b)   An initial overall term of 7 consecutive weeks with 7 weeks guaranteed employment at a minimum compensation equal to 60% of the rate set forth in subpart (2)(d) above, plus, pursuant to option or agreement, a second overall term of 7 consecutive weeks with 7 weeks guaranteed employment at a minimum compensation equal to 80% of the rate set forth in subpart (2)(d) above.

## 8.   Reading Time and Obligations of Free Lance Writer Re Revisions

a.   The Company shall have not more than fourteen (14) days (including Sundays and holidays) after the writer's first submission of the story within which to make one (1) request for revision of such story; provided that if, after the writer has made the requested revision of the

story first submitted, the Company shall make a second request for revision, such second revision shall be incorporated in the teleplay; it being understood that the Company shall not be entitled to more than two (2) requests for revision of the story, and not more than fourteen (14) days shall elapse between the first submission of the story and the commencement of the preparation of the teleplay by the writer.

Company may have a second revision of story before teleplay upon additional payment of one-half story minimum, except when second revision of the story is accomplished by execution in the teleplay. It is understood this does not permit a new story.

Story revision time and obligations shall apply to formats.

b.   The Company shall have not more than fourteen (14) days (including Sundays and holidays) after the writer's first submission of the material in teleplay form within which to make one request for revision of the material; provided that if Company shall make such request within seven (7) days (including Sundays and holidays) after the first submission of the literary material in teleplay form, Company shall be entitled to make a second request for revision within seven (7) days (including Sundays and holidays) after submission of the teleplay as first revised. Neither revision permitted under this paragraph b. shall involve a substantial change in the story line.

c.   With respect to films more than thirty (30) minutes in length, the fourteen (14) day period mentioned in paragraph b. shall be increased to twenty-one (21) days and the first seven (7) day period mentioned in paragraph b. shall be increased to fourteen (14) days.

d.   The writer shall be obligated to make revisions requested by the Company in compliance with the foregoing provisions.

e.   Company agrees to use its best efforts to read the material submitted and call for any necessary revisions as soon as possible after submission.

f.   The Company shall promptly at the close of production provide the writer with two (2) copies of the revised final shooting script.

g.   The time limits referred to in paragraphs a., b., and c. shall be increased by seven (7) days for pilot stories and teleplays wherever the writer is paid at least double minimum compensation.

## 9.   Time of Payment

Company will use its best efforts to pay to the writer the applicable installment payment provided in Article 13B 7. f. within forty-eight (48) hours after delivery of the narrative synopsis, story, first draft or final draft teleplay, as the case may be, but in no event shall any such payment be made later than seven (7) days after the delivery of such narrative synopsis, story or first or final draft teleplay. Payment shall not be contingent upon the acceptance or approval by the Company of the literary material so delivered.

Company will pay minimum of 1½% per month when any payment due to the writer pursuant to this sub-article B is due and not paid as provided

herein. If the Company has failed to make such payment because the executed contract was not delivered by the writer to the Company then no such interest is due. If the contract is not so delivered by the writer because of a dispute as to the terms of the contract and the Company shall be held to be wrong, the above described interest payment shall be applicable.

The payment for the week shall be made on the Company's regular payday in the following week for writers employed on a week-to-week or term basis.

**10. Cut-Off**

There shall be no right to cut-off in teleplay employment.

C. **CLAIMED OVERPAYMENTS.**   (See Article 11 A 9)

D. **PAYMENT PROCEDURES**

Company agrees to meet promptly after the signing of this Agreement and from time to time thereafter at the request of the Guild with representatives of the Guild to review Company's payment procedures for the purpose of assuring timely payment of compensation as provided in this Article 13.

## Article 14   Writers also Employed in Additional Capacities (Television)

A. The parties acknowledge that it is customary in the television industry to employ persons to render services as writers under the terms of this Basic Agreement, and the same persons to render services in other capacities which are not subject to this Basic Agreement. For the purposes of this Article 14, a person employed as a writer (as defined in Article 1.C.1.a. of this Basic Agreement) and also an executive producer, producer, associate producer or story editor (as such terms are customarily used and understood in the television industry) is referred to as a "writer also employed in additional capacities", or "such person", or "such writer". Because of the difficulty of ascertaining the amount, duration, nature and extent of the services rendered by such person as a writer, and for the purpose of avoiding disputes concerning those matters and concerning the extent of such person's contributions as a writer to the programs with respect to which he renders his services, the parties agree that the duration or term of such person's employment as a writer in relation to a particular series, during a particular production season, shall be no less than the duration or term of his employment in the additional capacity in relation to such series, during such production season (except as provided in paragraphs C and I of this Article 14), and that such person shall be employed as a writer in relation to such series, during such production season only in accordance with the provisions of this Article 14.

B. The contract of employment of a writer also employed in additional capacities may cover both the employment as a writer and the employment in additional capacities, or there may be a separate contract covering the employment as a writer and a separate contract covering the employment in additional capacities, provided that in the latter case (i.e., where there are separate contracts)

separate compensation shall be provided for the services as a writer from the services in additional capacities, and such separately stated compensation for such person's services as a writer shall not be less than the appropriate minimum compensation for a writer also employed in additional capacities as provided in paragraph K of this Article 14. Similarly, where the employment as a writer and in additional capacities is covered by the same contract, and the compensation as a writer is segregated from the compensation for the additional services, such compensation as a writer shall not be less than the appropriate minimum compensation for a writer also employed in additional capacities as provided in said paragraph K. Where the contract of employment of a writer also employed in additional capacities under such contract does not segregate his compensation as a writer from his compensation for his additional services, the Company shall have the right to allocate to his services as a writer not less than the appropriate minimum compensation for a writer also employed in additional capacities as provided in said paragraph K. Except as provided in the immediately preceding sentence, none of the compensation due such person for his services in a capacity or capacities other than as a writer shall be offset or credited against any compensation due such person for his services as a writer.

C.   A writer also employed in additional capacities may be employed as a writer only on a week-to-week or term basis, (which employment may be exclusive), at no less than the appropriate minimum compensation provided in paragraph K of this Article 14 and subject to all of the provisions of this Basic Agreement; provided, however, that if the Company employs two such persons, then the Company may employ any other individuals (referred to in this Article 14 for convenience as "additional writers") as writers also employed in additional capacities, in relation to the respective series, and such additional writers may be employed as writers on a week-to-week, term or freelance basis, and the duration or term of their employment need not be coterminous with the duration or term of their employment in additional capacities.

D.   Because of the difficulty of determining the amount, nature and extent of the services as a writer performed by a writer also employed in additional capacities and his contribution as a writer to any specific program of a series, it is agreed that, for the purposes of paragraph G of this Article 14, such writer (other than the additional writers referred to in paragraph C of this Article 14) shall be deemed to have performed services as a writer on each program of the series for which he is employed for which writing is done during the respective production season; provided however that if the employment of such writer has been suspended for cause, or terminated for cause, (and for this purpose, any termination of employment of a writer employed on a week-to-week basis shall be deemed to be termination for cause), the number of programs of the respective series for which such writer shall be compensated pursuant to said paragraph G shall be proportionately reduced. In the case of suspension, the reduction shall be in the proportion that the length of the suspension bears to the overall period of employment of the such writer during the respective production season; in the case of termination, the reduction shall be in the proportion that the length of the period from the date of termination to the completion of principal photography of the series during such production season bears to the period from the commencement of such person's

employment as a writer during such production season to the date of completion of principal photography of the series during such production season. If such calculation results in a fraction, no payment shall be made with respect to a fraction of less than 50%, and full payment of one program fee shall be made with respect to a fraction of 50% or more. An additional writer (as such is referred to in paragraph C above) who is employed on a week-to-week, term or freelance basis, need not be deemed to have performed services on each program of the series for which he is employed but shall be entitled to a program fee (or to a share thereof) pursuant to paragraph G for each program for which he did render writing services during his employment. The Company shall notify the term or week-to-week writer that he is an additional writer at the time of his employment, or (as to a writer already employed) when he is assigned as an additional writer.

E.

(1) All writing services rendered by a writer also employed in additional capacities up to and including re-writes shall be deemed to be compensated by the minimum compensation provided for such writer pursuant to paragraph K of this Article 14.

(2) All formats, stories and teleplays written by such writers during their employment as writers also employed in additional capacities shall be separately compensated, without any offset, credit or allocation of any kind against or by any other compensation of any kind due said individual.

(3) In any case in which a writer is employed to write one or more formats, stories or teleplays, or any combination (with or without options) of formats, stories or teleplays, on a free-lance basis, concurrently with his employment as a producer, executive producer, associate producer or story editor, and whether or not such free-lance employment is entered into at the same time or times, such person shall not, by reason of such free-lance employment, be deemed to be a "writer also employed in additional capacities" for any of the purposes of this Article 14, and this Article 14 shall in no way apply to such employment, notwithstanding anything to the contrary in this Article 14.

F.

(1) If an individual is initially employed as an executive producer, producer, associate producer or story editor, but not as a writer, so that at the time of such employment such individual is not a "writer also employed in additional capacities" as defined in paragraph A of this Article 14, but if during such employment such individual, with the knowledge and consent of the Company, performs services as a writer for the series for which he is employed in such additional capacity, such individual shall, from the time he starts to perform such services as a writer, be deemed to be employed as a "writer also employed in additional capacities" for the purposes of this Article 14, except that: (a) if such writing services are limited to those described in sub-divisions (a) to (h), inclusive, of Article 1.C.1.a. of this Basic Agreement and to those described in paragraph E (3) of this Article 14, or (b) if such person is not a "writer", by reason of the provisions of the third paragraph of said Article 1.C.1.a. (immediately following said subdivision (h)) and such writing does not qualify him as a "writer", then in any of said

expected cases, such employment of such individual shall not be subject to this paragraph F. With respect to contracts in existence on the date of execution of this agreement, providing for employment as an executive producer, producer, associate producer or story editor, but not for employment as a writer, and which do not contain an express provision that the employee shall not render services as a writer, or is not employed to render services as a writer, such contracts shall be deemed to include such a provision for the purposes of this paragraph F, if the Company serves written notice on such person to the effect that such person shall not render services as a writer (other than the excepted services referred to above in this subparagraph(1) and in paragraph E (3) of this Article 14.)

(2) A person who becomes a writer also employed in additional capacities pursuant to subparagraph (1) of this paragraph F shall continue to be employed as a writer in connection with the respective series on a term contract basis for a period coterminous with the remainder of the duration or term of his employment in the other capacity or capacities in relation to such series during the respective production season or until the completion of principal photography of all programs of such series produced during such production season, whichever is the earlier, subject to the following provisions of this paragraph F and to the provisions of paragraph I of this Article 14. In such case, the Company shall have the right to allocate to his services as a writer no less than the appropriate minimum compensation for a writer also employed in additional capacities as provided in paragraph K of this Article 14.

(3) Notwithstanding anything to the contrary in this paragraph F, if such person is an "additional writer", as defined in paragraph C of this Article 14, then such person shall be deemed to be employed as a writer and also in additional capacities, pursuant to this paragraph F, only during the period during which he performs services as a writer, and such employment may be on a week-to-week, term or freelance basis.

(4) Any writer employed on a term basis pursuant to this paragraph F may be replaced by the Company with another writer at any time during such term, provided that: (a) the substitute writer may not be replaced during the term of his employment as a writer during the respective production season, except for cause; (b) the rate of compensation payable to such substitute writer for writing shall be no less than the appropriate minimum rate of compensation provided for in paragraph K of this Article 14, or the rate paid to the replaced writer for writing, whichever is higher; (c) the term of employment of the substitute writer shall be no less than the remainder of the term of employment of the replaced writer during the respective production season. Subdivision (a) of this subparagraph (4) is to be interpreted as meaning that the Company shall pay the writer's compensation but shall not be obligated to use such writer's services as a writer, and may employ other writers to perform such services. This subparagraph (4) does not apply to any "additional writer" referred to in subparagraph (3) of this paragraph F.

(5) The Company specifically represents to the Guild that it is not the intention of the Company to use any of the provisions of this Article 14 in

such manner as to evade the purpose and intent of this Article 14. Specifically, the Company expressly represents that it is not its intention to, and agrees that it will not, use the provisions of paragraph E (3) or subparagraph (1) of this paragraph F, for the purpose of avoiding its obligations under this Article 14 regarding the coterminous employment of a writer also employed in additional capacities. Accordingly, where a person is employed as an executive producer, producer, associate producer or story editor with no intention that such person is to perform services as a writer, including rewrites and polishes (other than the excepted writing services referred to in paragraph E (3) and paragraph F (1) of this Article 14), and provided that this contract of employment for such other capacity or capacities provides that such person shall not render services as a writer, or is not employed to render services as a writer (other than that the excepted writing services referred to in said paragraphs E (3) and F(1)):

(a) If such person, without the Company's knowledge and consent, nevertheless does perform services as a writer on the series for which he is employed in the other capacity or capacities (other than the excepted writing services referred to in said paragraphs E(3) and F(1)), then promptly after the Company or the Guild becomes aware of that fact, it shall notify the other party, and said parties shall jointly and cooperatively take appropriate steps designed to prevent such person from further performing unauthorized writing services. If the Guild believes that the Company knows of and condones such person's unauthorized writing, or that it was originally the intent of the Company and its employee to evade the provisions of this Article 14, the Guild may bring the matter to arbitration (but not to grievance) pursuant to Article 12 of this Basic Agreement. If the arbitrator rules in favor of the Guild, the arbitrator shall have the power to make a monetary award to the Guild, no part of which shall be paid or otherwise applied to the benefit of the writer, directly or indirectly. In determining the amount of such award, if any is granted, the arbitrator may consider, among other things, the amount of the minimum compensation which would have been paid to such writer had he initially been employed for the particular series during the particular production season as a writer and in additional capacities pursuant to this Article 14.

(b) If such person, with the Company's knowledge and consent (and the fact of said knowledge or consent is not disputed by the Company), nevertheless does any rewriting or polishing, then such person shall be deemed to be a term writer pursuant to paragraph 14B retroactively from the commencement of his employment by the Company on the particular series during the respective production season.

(c) If this contract of employment does not include a provision that such person shall not render services as a writer, or is not employed to render services as a writer (other than the excepted writing services referred to in said subparagraphs E(3) and F(1)), and if such person nevertheless does any rewriting or polishing, then such person shall be deemed to be a term writer pursuant to paragraph 14B retroactively from the com-

mencement of his employment by the Company on the particular series during the respective production season.

G.   Each person whose employment as a writer is governed by this Article 14, whether such employment is on a week-to-week, term or freelance basis (including the "additional writers" defined in paragraph C of this Article 14) shall be paid a program fee for each program of a series produced for network prime-time exhibition for which such writer performed services as a writer pursuant to this Article 14 (or is deemed to have performed services as a writer, as provided in paragraph D of this Article 14), in the following amount:

| Program Fees | Effective 3/2/77- 3/1/78 | Effective 3/2/78- 3/1/79 | Effective 3/2/79- 3/1/80 | Effective 3/2/80- 3/1/81 |
|---|---|---|---|---|
| 30-minute Program | $194 | $210 | $227 | $247 |
| 60-minute Program | 259 | 280 | 302 | 329 |
| 90-minute Program or Longer | 323 | 349 | 377 | 411 |

provided however that in no event for a particular program need the Company pay a total amount in said program fees which exceeds three times the applicable rate. If more than three writers (a team is deemed to be one writer) are entitled to receive said program fees for the same program, a total sum of three times the applicable rate shall be divided equally among them. Said program fees may not be prepaid nor may they be offset or credited against or by any other compensation of any kind due the respective writers and must be paid not later than the first regular payroll date following completion of principal photography of the respective program. Said program fees shall not be included in "applicable minimum compensation" for the purposes of Article 15 B of this Basic Agreement, but shall be included in "initial compensation" for the purposes of Article 17 of this Basic Agreement.

H.   Nothing in this Article 14 shall be interpreted as precluding the Company from exercising rights of suspension for cause or termination for cause under individual employment contracts, nor from exercising rights of offset, if any, in relation to an indebtedness of the writer to the Company pursuant to law, subject however to the provisions of Article 13.C. of this Basic Agreement.

I.   For the purposes of this paragraph I, the following periods will be referred to as "writing hiatus" periods:

(a) With respect to a writer also employed in additional capacities (except one who becomes such a writer pursuant to paragraph F of this Article 14 and except a story editor), the period between the date of commencement of his employment in a particular production season until the occurrence of the earliest of the following:

(i)   Services as a writer are performed by any writer on the respective series during such production season;

(ii)   A commitment is made with a writer (other than a writer also employed in additional capacities) for such series during such production season;

(iii)   A story conference is held with a writer for such series during such production season;

EXHIBIT N

(iv) Principal photography of a program of such series is started during such production season, and the period following the completion of principal photography of the last program of such series produced during such production season until the termination of such person's employment during such production season.

(b) With respect to a writer also employed in additional capacities (including one so employed pursuant to paragraph F of this Article 14 but not including a story editor) if in a particular production season principal photography of all of the programs of the respective series theretofore ordered by the network has been completed, the period between such date of completion until the occurrence of the earliest of the following after the start of such period:

(i) Services as a writer are performed by any writer on the respective series during such production season;

(ii) A commitment is made with a writer (other than as a writer also employed in additional capacities) for such series during such production season;

(iii) A story conference is held with a writer for such series during such production season;

(iv) Principal photography of a program of such series is started during such production season, provided that such period continues for at least 14 consecutive days.

The Company may suspend the employment of such person as a writer during any writer hiatus period, both as to services as a writer and compensation as a writer, provided however that such person's overall compensation shall be allocated or re-allocated by the Company so that there shall be no reduction in the overall compensation of such person by reason of such suspension, and provided further that the reallocated payments are subject to contributions to an industry pension plan.

J. For the purposes of this Article 14, one time programs including but not limited to a movie-of-the-week, and development deals for specific television programs, shall each, separately, be considered to be a "series", and the employment of an individual as a writer and in additional capacities for such a show or deal shall be governed by this Article 14; provided however that no program fee shall be payable for such a show or program if the writer also employed in additional capacities on such show or program or a team of which he is one receives a "written by" credit for such show or program. Payment of the program fee for such show or program shall not be payable before the screen authorship credits are finally determined. If there are one or more periods of suspension of writing services between the various steps of development deal or of a project for a show (for example, between format and screenplay, or between teleplay and production), the employment as writer of the individual employed as a writer and in other capacities may be suspended as to services and compensation during such periods of suspension.

K. The minimum compensation for week-to-week and term employment for writers also employed in additional capacities shall be the following:

| | Rate per week | | | |
| --- | --- | --- | --- | --- |
| | Effective 3/2/77– 3/1/78 | Effective 3/2/78– 3/1/79 | Effective 3/2/79– 3/1/80 | Effective 3/2/80– 3/1/81 |
| (1) Week-to-week & Term Employment up to and including 9 weeks | $1,551 | $1,675 | $1,809 | $1,972 |
| (2) Term employment 10 through 19 weeks | 1,292 | 1,395 | 1,507 | 1,643 |
| (3) Term employment 20 weeks or over | 1,163 | 1,256 | 1,356 | 1,478 |

L. Where the employment of a writer also employed in additional capacities is covered by a single contract, a copy of the entire contract shall be submitted to the Guild as provided in Article 19.C.1. of this Basic Agreement. Where such employment is covered by separate contracts, the Company shall, concurrently with the delivery to the Guild of a copy of the writer's employment contract pursuant to said Article 19.C.1., deliver to the Guild a copy of those provisions of the contract governing the additional services which define or specify the term of employment. The weekly list provided for in Article 3.A.1. of this Basic Agreement shall indicate the type of employment as a writer (week-to-week, term or freelance), the series for which the person is employed as a writer, whether the writer is also employed in additional capacities, and if so in what additional capacities, and such list shall also include the names of persons, if any, who perform services as writers during the respective week (other than services described in subdivisions (a) to (h), inclusive, of Article 1.C.1 of this Basic Agreement), but who do not "writers" because of the provisions of the third paragraph of said Article 1.C.1.a (immediately following subdivisions (a) through (h)). If such a person is included, the list shall state that he is excepted as a "writer" pursuant to Article 1.C.1.a of this Basic Agreement. Apart from the mere listing of names, as required by Article 3.A.1., any information once given in the report pursuant to this paragraph L need not be repeated in subsequent reports unless there is a change in the information previously given.

M. Nothing contained in this Article 14, including the rights of the Company to allocate compensation and to terminate or suspend employment as a writer as above set forth, shall prevent any such writer from negotiating and contracting with the Company for better terms for the benefit of such writer than are provided in this Article 14. Only the Guild shall have the right to waive any of the provisions of this Article 14 on behalf of or with respect to such writer.

## Article 15   Television Exhibition

### A.   THEATRICAL.

1. As to all motion pictures, the principal photography of which commenced prior to June 13, 1960, the Guild agrees that it does not and will not, either during the term of this Basic Agreement or at any time thereafter,

Article 14
Writers also Employed in
Additional Capacities (Television)

72

73

Article 15A
Television Exhibition
THEATRICAL

214

EXHIBIT N

make any claim for compensation for or with respect to the exhibition of such motion pictures on television.

2. The provisions of this subsection 2. relate and apply only to theatrical motion pictures as defined in Article 1 A.2..

a. produced by the Company or within the provisions of paragraph h. (4) of subsection 3., and

b. the principal photography of which commenced on or after March 2, 1977, which motion pictures are, either during the term hereof or at any time thereafter, released to free television; and

c. based upon a story or screenplay written by writer while in the employ of the Company or in the employ of the actual producing Company as described in paragraph h. (4) of subsection 3. (to which employment the provisions of this Basic Agreement apply as provided in Article 5 hereof) or acquired by the Company (or such actual producing Company) from a professional writer (to which acquisition the provisions of this Basic Agreement apply as provided in Article 5 hereof), which writer or professional writer receives screen credit for the authorship of such story or screenplay, as provided in the Theatrical Schedule A.

3. As to each such theatrical motion picture referred to in 2. above, (herein sometimes called "Such Picture"), the Company will pay to each participating Writer (as such term is hereinafter defined) as additional compensation, a pro-rata share of two per cent (2%) (hereinafter referred to as the "percentage payment") of the Company's accountable receipts from the distribution of Such Picture on free television, computed as hereinafter provided and subject to the following conditions:

a. The term "Producer's gross", as used herein, means the worldwide total gross receipts derived by the distributor of Such Picture (who may be the Company or a distributor licensed by the Company) from licensing the right to exhibit Such Picture on free television; provided, however, that in the case of any Such Picture which is produced outside of the United States, if Such Picture is subject to this Basic Agreement and if such production is under an arrangement (herein referred to as a "foreign production deal") pursuant to which a foreign producer or distributor provides or guarantees any of the financing for the production of Such Picture or furnishes any other consideration for such production and a foreign distributor acquires one or more foreign territories for the distribution of Such Picture on free television, then no monies from any such distribution in any such foreign territory shall be included in Producer's gross except to the extent such foreign producer or foreign distributor is obligated to account to Company or to the distributor of Such Picture for such monies, and except for gross receipts received by such foreign distributor from such distribution in the United Kingdom.

If the distributor of Such Picture does not distribute Such Picture directly to free television, but employs a subdistributor to so distribute

Such Picture, then the "Producer's gross" shall be the worldwide total gross receipts derived by such subdistributor from licensing the right to exhibit Such Picture on free television. In case of an outright sale of the free television distribution rights, for the entire world, or any territory or country, the income derived by the seller from such sale, but not the income realized by the purchaser or licensee of such rights, shall be the "Producer's gross". If any such outright sale shall include free television exhibition rights and other rights, then (but only for the purpose of the computation required hereunder) the Company shall allocate to the free television exhibition rights a fair and reasonable portion of the sales price which shall, for the purpose hereof, be the "Producer's gross". In reaching such determination Company may consider the current market value of free television exhibition rights in comparable motion pictures.

If the Guild shall contend that the amount so allocated was not fair and reasonable, such claim may be determined by submission to arbitration as herein provided; and in the event the Board of Arbitration shall find that such allocation was not reasonable and fair, it shall determine the fair and reasonable amount to be so allocated. If the outright sale includes free television distribution rights to more than one motion picture, Company shall likewise allocate to each Such Picture a fair and reasonable portion of the sales price of the free television rights; and if the Guild contends that such allocation is not fair and reasonable, the question may be determined by submission to arbitration as above provided. If the Board of Arbitration shall find that such allocation was not fair and reasonable, it shall determine the fair and reasonable amount to be so allocated to each Such Picture. Nothing with respect to the price received on the outright sale of only free television distribution rights in a single Such Picture shall be subject to arbitration except that in the event of a dispute, there may be arbitrated the question of whether the price reported by the Company to the Guild as having been received by the Company on such outright sale is less than the amount actually received by the Company on such outright sale. Sums paid to any advertising agency in connection with any exhibition of any Such Picture on free television shall not be included in Producer's gross.

*Guild's right to elect.* The parties further agree with reference to Article 15 A.3: If in the upcoming negotiations with SAG and DGA, the Company agrees to modify the basic substantive provisions regarding licensing of theatrical motion pictures for exhibition on free television, Company will so notify the Guild and accord it the opportunity to elect that this subparagraph be modified in the same manner, as of the date on which the Guild so notifies the Company. Adjustments which statistically maintain the relative allocations of proceeds derived from post-1960 theatrical motion pictures licensed to television among SAG, DGA and WGA as established in 1960 (i.e., the ratio of 6, 2 and 2 of accountable receipts respectively) will not activate this provision, but an increase in the relative allocations to SAG, or DGA in such proceeds will activate this provision, with any such increase to be accorded proportionately to WGA. Upon request the Guild shall be provided with

the statistics upon which the adjustments have been made, and the Guild's right to activate this provision shall be arbitrable. The Guild shall give notice of its election within 60 days after receipt of the Company's Notice or after being provided with the statistics referred to, whichever is later. The election shall be limited to accepting the entire agreement reached with SAG or DGA on licensing theatrical motion pictures for exhibition on free television, and only such entire agreement, but with appropriate equivalent adjustment for writers for provisions peculiar to actors or directors as the case may be.

b. The term "accountable receipts", as used herein, means the balance of the Producer's gross after deducting an arbitrary forty per cent (40%) of the Producer's gross for distribution fees and expenses; except that in the case of an outright sale of free television distribution rights, there shall be deducted only an arbitrary ten per cent (10%) of the Producer's gross for sales commissions and expenses of sale.

c. Company's obligation shall accrue hereunder only after accountable receipts are received by Company but as to foreign receipts such obligation shall accrue only when such receipts can be freely converted to U. S. dollars and are remitted to the United States, and until such time no frozen foreign receipts shall be included in accountable receipts. Payment of amounts accruing hereunder shall be made quarterly on the basis of quarterly statements, as hereinafter provided. Upon request, and if permitted by the authorities of a foreign country, the Company will transfer to any Writer, in the currency of such foreign country, his share, if any, of frozen foreign receipts in such country, provided the writer will bear any costs involved; and such transfer shall be deemed to be payment to the writer of an equivalent number of U. S. dollars at the then current free rate for blocked funds of that category as determined by the Company. Concurrently with such transfer the writer will pay to the Company in U. S. dollars the total amount the Company is required to withhold from such payment under all applicable laws. If the Company utilizes frozen foreign currencies derived from exhibition of Such Picture on free television by conversion thereof to properties that may be freely exported and turned to account, the amount so utilized by the Company shall be deemed to have been converted to U. S. dollars at the then current free market rate for blocked funds of that category determined as above provided. Frozen foreign receipts from free television shall be deemed to be released on a first-in first-out basis, unless the authorities of the foreign country involved designate a specific period that would render such basis inapplicable. Such released funds shall be allocated between Such Picture and other motion pictures distributed by the distributor on free television in the same ratio that receipts, derived from the distribution of Such Picture on free television within the foreign country, bear to the total receipts derived from the distribution of Such Picture and all other motion pictures on free television within the foreign country, during the applicable period, unless the authorities of the foreign country involved require another method of allocation, in

which case such other method shall be used. Foreign receipts shall be accounted for in U. S. dollars at the rate of exchange at which such receipts are actually converted and remitted, and should any discounts, taxes, duties or charges be imposed in connection with the receipt or remittance of foreign funds, only so much of such funds as remain thereafter shall be included in accountable receipts. Company shall not be responsible for loss or diminution of foreign receipts as a result of any matter or thing not reasonably within the control of the Company. The Guild and the writers shall be bound by any arrangements made in good faith by the Company for its account, with respect to the deposit or remittance of foreign revenue. Frozen foreign receipts shall not be considered trust funds and the Company may freely commingle the same with other funds of the Company. No sums received by way of deposits or security need be included in Producer's gross until earned, but when the Company is paid a non-returnable advance by a distributor, such advance shall be included in the Producer's gross.

d. If any license or outright sale of exhibition rights to Such Picture on free television includes as a part thereof any filmed commercial or advertising material, the Company shall be permitted to allocate a reasonable amount (in accordance with then current standard charges in the industry) to such commercial or advertising material, and the amount so allocated shall not be included in Producer's gross hereunder.

e. The term "Participating Writer", as used herein, means a writer who, while in the employ of the Company or in the employ of the actual Producing Company of Such Picture as described in paragraph h. (4) of this subsection 3. (to which employment the provisions of this Basic Agreement apply), or a professional writer from whom the Company (or such actual producer) acquired literary material (to which acquisition the provisions of this Basic Agreement apply), participated in the writing of and received credit pursuant to the Theatrical Schedule A hereof for the writing of the story or screenplay upon which Such Picture was based. If such picture is a remake of a prior motion picture, and if any of the writers of the prior motion picture receive writing credit for the remake, such writers shall be deemed to be "participating writers" for the purposes of this article 15A., but then only if their employment as writers for the prior motion picture, or if the purchase of literary material from them for the prior motion picture, was covered by and subject to a collective bargaining agreement with the Guild.

The "pro-rata share" payable to each Participating Writer shall be as follows:

(1) If the Participating Writer or Writers receive "written by" credit, 100% thereof shall be payable to the credited writer or writers receiving "written by" credit.

(2) If the Participating Writer or Writers receive either story or screenstory credit, or screenplay credit, but not both, 100% thereof

Article 15A
Television Exhibition
THEATRICAL

76

Article 15A
Television Exhibition
THEATRICAL

77

Article 15A
Television Exhibition
THEATRICAL

216

EXHIBIT N

shall be payable to the credited Participating Writer or Writers receiving story or screenstory, or screenplay credit, as the case may be; provided, however, that if the individual employment contract or purchase agreement with the other writer(s) (i.e., those who are not subject to this Basic Agreement) provides for payment to such writer or writers of the additional compensation provided for in this Article 15.A., such writer or writers shall receive the share which would have been payable had such writer or writers been Participating Writers, as provided in clause (3) following.

(3) If the Participating Writer or Writers receive both ''story by'' or ''screenstory by'' and screenplay credit, 75% thereof shall be payable to the credited screenplay writer or writers, and 25% thereof to the credited story or screenstory writer or writers. In the event there is a minor credit, such as adaptation, the writer or writers receiving such minor credit shall be paid ten percent (10%) thereof which sum shall be deducted from the screenplay writer's share.

Any participating writers receiving the same screen credit referred to above shall share equally in such percentage amount specified.

If there are one or more participating Writers who receive screenplay credit and no credit is given for story or screenstory, then the pro-rata share which would have been payable to a participating Writer had he received such story or screenstory credit shall, subject to the provisions of the next following paragraph, be paid to the Participating Writers who receive such screenplay credit. The provisions of the immediately preceding sentence shall also apply with respect to the determination under the Producer-Writers Guild Theatrical Basic Agreements of 1960, 1963, 1970 and 1973 of ''pro rata shares'' payable to Participating Writers as therein defined.

If the Writer's services in Such Picture are performed for the Company on a loan-out basis, then for the purposes of this Article 15A the Company shall be deemed to be the employer, and the lender shall not have any responsibility hereunder with respect to Such Picture.

f. If the picture is licensed for network exhibition, payment with respect to the gross receipts from such license shall be made as follows:

(i) If under the terms of the license there is no possibility that the picture can or may be dropped out of the license, payment must be made within thirty (30) days after receipt of payment from the network with respect to such picture.

(ii) If there is a possibility that such picture can or may be dropped out of such license, then payment with respect to such picture shall be made within thirty (30) days after exhibition of such picture on television pursuant to such license, but not earlier than 30 days after receipt of payment from the network with respect to such picture.

Payment shall be accompanied with a written report of the license fee payable for such picture pursuant to the license and of the amount paid by the network for such picture.

With respect to exhibition of the picture on free television other than pursuant to a license for network exhibition, the following provisions of this subsection f. shall apply:

Within a reasonable time after the expiration of each calendar or fiscal quarter, but not exceeding sixty (60) days, Company will furnish or cause to be furnished to the Guild a written report showing the amount of Producer's gross during the preceding quarter from the distribution of each Such Picture by Company on free television with respect to which Company is required to make payments hereunder (whether distributed by the Company or through another distributor).

Concurrently with the furnishing of each such report, the Company will make the payments shown to be due by such report. All payments shall be made by check payable to the order of the Writers entitled thereto, and shall be delivered to the Guild for forwarding to such Writers; and compliance herewith shall constitute payment to the Writers.

No such reports need be furnished with respect to any period during which there was no such Producer's gross. The Company shall make available for inspection by the Guild all distributor's statements and exhibitor's statements which are available to the Company insofar as they relate to such Producer's gross, and all the financial terms of contracts pertaining to such Producer's gross, and the Guild shall have the right, at reasonable times, to examine the books and records of the Company as to such Producer's gross pertaining to such distribution of any such picture, at whatever place or places such records are customarily kept by the Company. If the Guild requests that it be informed of the license fee paid under a license for the free television exhibition of the picture, or if the Guild requests that it be sent an extract of the financial terms of such a license, and if such information is not extensive in nature, the Company will forward such information or extract without making it necessary for the Guild to send a representative to the offices of the Company. In general, the Company will co-operate in furnishing such information to the Guild by mail or telephone, where doing so is not unreasonable or burdensome. If more than one picture is licensed in a single license agreement, the Company shall inform the Guild, at its request, of the identity of the pictures covered by the license, and shall make available to inspection by the Guild in the office where such license agreement is customarily kept a copy of the terms of such license showing the titles of the pictures licensed under such agreement and the license fee for each such picture. Company agrees to cooperate in responding to reasonable inquiries from the Guild as to whether any such picture is currently being distributed for telecasting on free television. An inadvertent failure to comply with the reporting provisions of this paragraph f. shall not constitute a default by the Company hereun-

Article 15A
Television Exhibition
THEATRICAL

78

EXHIBIT N

Article 15A
Television Exhibition
THEATRICAL

79

Article 15A
Television Exhibition
THEATRICAL

217

der, provided such failure is cured promptly after notice thereof from the Guild is received by the Company.

Company shall make all social security, withholding, unemployment insurance, and disability insurance payment required by law with respect to the additional compensation provided for in this Article 15A.

If the Company shall fail to make any payment provided for in this Article 15A to be made to the Writer when and as the same becomes due and payable, it shall bear interest at the rate of ten per cent (10%) per annum on the unpaid balance thereof commencing to accrue ten (10) days after notice in writing to Company from the Guild of such delinquency.

The compensation payable under this Article 15A shall be excluded from the gross compensation upon which the Company contributions are to be made to the Pension Plan.

g. If a Participating Writer's employment agreement with the Company requires that the Writer's compensation shall be based, in whole or in part, upon, or measured by, a percentage of the gross receipts derived from the distribution of Such Picture, then such percentage compensation shall be credited against any amounts payable to the Writer hereunder, and likewise any payment due to the Writer hereunder shall be credited against such percentage compensation. Where all or a part of a Writer's compensation is a specified sum of money, commonly known and referred to as a "deferment", such deferment may not be credited against amounts payable by the Company to such Writer hereunder.

h. With respect to all Such Pictures, the following provisions shall be applicable:

(1) Television Distributor's Assumption Agreement. Prior to the commencement of principal photography of each Such Picture, if the company is not also the distributor on free television of Such Picture, Company shall obtain from the distributor having such free television distribution rights and deliver to Guild, a separate written agreement herein called "TELEVISION DISTRIBUTOR'S ASSUMPTION AGREEMENT", made expressly for the benefit of Guild as representative of the writers involved, by which such distributor agrees to assume and pay the amounts payable hereunder by reason of the exhibition of Such Picture on free television, when and as the same become due. Such agreement shall be substantially in the following form:

"TELEVISION DISTRIBUTOR'S ASSUMPTION AGREEMENT

In consideration of the execution of a DISTRIBUTION AGREEMENT between _____ Company, and the undersigned Distributor, Distributor agrees that the motion picture presently entitled _____ is subject to the Writers Guild of America Theatrical and Television Basic Agreement of 1977 (hereinafter "Basic Agree-

80

ment") and particularly to the provisions of Article 15A thereof, pertaining to additional compensation payable to writers when theatrical motion pictures are released to free television, and Distributor hereby agrees expressly for the benefit of the Writers Guild of America, West, Inc., herein called WGA, as representative of the writers whose services are included in such motion picture when telecast to make the additional compensation payment required thereby when such motion picture is exhibited on free television. Distributor for and on behalf of the Company shall make all social security, withholding, unemployment insurance and disability insurance payments required by law with respect to the additional compensation referred to in the preceding sentence.

It is expressly understood that the right of Distributor to license such motion picture for exhibition on free television, or to exhibit or cause or permit such motion picture to be exhibited on free television, shall be subject to and conditioned upon the prompt payment of such additional compensation, in accordance with Article 15A of the Basic Agreement. It is agreed that WGA, in addition to all other remedies, shall be entitled to injunctive relief against Distributor in the event such payments are not made.

Prompt payment:

(a) Network exhibition

If the picture is licensed for network exhibition, payment with respect to the gross receipts from such license shall be made as follows:

(i) If under the terms of the license there is no possibility that the picture can or may be dropped out of the license, payment must be made within thirty (30) days after receipt of payment from the network with respect to such picture.

(ii) If there is a possibility that such picture can or may be dropped out of such license, then payment with respect to such picture shall be made within thirty (30) days after exhibition of such picture on television pursuant to such license, but not earlier than 30 days after receipt of payment from the network with respect to such picture.

(b) Other free television exhibition

With respect to exhibition of the picture on free television other than pursuant to a license for network

81

Article 15A
Television Exhibition
THEATRICAL

218

EXHIBIT N

exhibition, the following provisions shall apply: Within a reasonable time after the expiration of each calendar or fiscal quarter, but not exceeding sixty (60) days, Distributor will furnish or cause to be furnished to WGA a written report showing the Producer's gross (as defined in Article 15A of the Basic Agreement) during the preceding quarter from the distribution of such picture by Distributor on free television with respect to which Distributor is required to make payments hereunder (whether distributed by the Distributor or through another distributor licensed by Distributor). Such report shall be accompanied by such payments as may be due.

Distributor shall also make available for inspection by WGA all Distributor's statements delivered to Company insofar as they relate to Producer's gross. WGA shall have the right at reasonable times and on reasonable notice to examine the books and records of Distributor as to Producer's gross. If Distributor shall fail to make such payments as and when due and payable, they shall bear interest at the rate of ten per cent (10%) per annum on the unpaid balance thereof commencing to accrue ten (10) days after notice in writing from WGA of such delinquency.

This DISTRIBUTOR'S ASSUMPTION AGREEMENT shall remain effective and binding upon Distributor as long as it remains the Distributor of such motion picture on free television, and thereafter in perpetuity only if it has provided or guaranteed any of the financing for the production of such motion picture, in accordance with and subject to the provisions of paragraph (3)(i) of Article 15A 3, of the Basic Agreement.

Where there is more than one distributor the provisions of such paragraph h. (3) (iii) of Article 15A 3., of the Basic Agreement shall apply to each distributor which neither provides nor guarantees any of the financing for the production of such motion picture.

The Distributor has, has not (strike whichever is inapplicable) provided or guaranteed financing for production of such motion picture.

Date: _____

       DISTRIBUTOR

       By _____

Address:''

An inadvertent failure on the part of any such distributor to comply with any of the reporting provisions of this

paragraph h. (1) shall in no event constitute a default by the Company or such distributor or a breach of this Basic Agreement, provided that such failure is cured promptly after notice in writing thereof from the Guild.

In the event of the expiration or termination of any distribution agreement, the obligation of Company to obtain and deliver to the Guild such TELEVISION DISTRIBUTOR'S ASSUMPTION AGREEMENT shall apply as well to any subsequent distribution agreement entered into by Company and Company shall obtain and deliver an executed TELEVISION DISTRIBUTOR'S ASSUMPTION AGREEMENT within ten (10) days after the execution of each of such subsequent distribution agreement.

If, with respect to any Such Picture distributor is not liable in perpetuity to pay the television fees provided for hereunder, or if there is no distribution agreement made by Company with respect to any Such Picture granting television distribution rights to the distributor, then the Guild, prior to the commencement of principal photography of Such Picture, may require such further financial assurances from Company as it deems advisable to insure performance of Company's obligations to pay the television fees provided for herein, including without limitation the execution of security agreements, guarantees, or other protective agreements. If any member company of the Association of Motion Picture and Television Producers, Inc., becomes liable in perpetuity under a TELEVISION DISTRIBUTOR'S ASSUMPTION AGREEMENT to pay the television fees provided for hereunder with respect to Such Picture, the Guild will release and cause to be discharged of record all such security agreements, guarantees or other protective agreements entered into or obtained by or from Company, provided, however that Company's primary liability shall not be released thereby.

(2)  Buyer's Assumption Agreement.

If the Company shall sell, transfer or assign its rights to exhibit on free television any Such Picture, it shall obtain from such buyer, transferee or assignee, a separate agreement made expressly for the benefit of the Guild as representative of the writers involved, requiring such buyer, transferee or assignee to comply with the provisions of this Basic Agreement with respect to additional compensation to writers by reason of the exhibition of Such Picture on free television, when and as the same become due. Such agreement shall be substantially in the following form:

**EXHIBIT N**

"BUYER'S ASSUMPTION AGREEMENT"

For a valuable consideration, the undersigned

_____
(Insert name of Buyer, transferee or assignee)
(hereinafter referred to as Buyer) hereby agrees with

_____
(Insert name of Company)

that all motion pictures covered by this agreement, a list of which is appended hereto, are subject to the Writers Guild of America Theatrical and Television Basic Agreement of 1977 (hereinafter "Basic Agreement") and particularly to the provisions of Article 15A thereof, pertaining to additional compensation payable to writers when theatrical motion pictures are released to free television and Buyer hereby agrees expressly for the benefit of the Writers Guild of America, West, Inc., hereinafter called WGA, as representative of the writers whose services are included in each such motion picture when telecast, to assume and be bound by Company's obligation thereunder to make the additional compensation payments required thereby when each such motion picture is exhibited on free television. Buyer for and on behalf of the Company shall make all social security, withholding, unemployment insurance, and disability insurance payments required by law with respect to the additional compensation referred to in the preceding sentence.

It is expressly understood that the right of the Buyer to license each such motion picture for exhibition on free television, or to exhibit or cause or permit such motion picture to be exhibited on free television, shall be subject to and conditioned upon the prompt payment of such additional compensation, in accordance with Article 15A of the Basic Agreement. It is agreed that WGA, in addition to all other remedies, shall be entitled to injunctive relief against Buyer in event such payments are not made.

Prompt payment:

(a)  Network exhibition

If the picture is licensed for network exhibition, payment with respect to the gross receipts from such license shall be made as follows:

(i)  If under the terms of the license there is no possibility that the picture can or may be dropped out of the license, payment must be made within thirty (30) days after receipt of payment from the network with respect to such picture.

(ii)  If there is a possibility that such picture can or may be dropped out of such license, then payment with respect to such picture shall be made

within thirty (30) days after exhibition of such picture on television pursuant to such license, but not earlier than 30 days after receipt of payment from the network with respect to such picture.

Payment shall be accompanied with a written report of the license fee payable for such picture pursuant to the license and of the amount paid by the network for such picture.

(b)  Other free television exhibition

With respect to exhibition of the picture on free television other than pursuant to a license for network exhibition, the following provisions shall apply: Within a reasonable time after the expiration of each calendar or fiscal quarter, but not exceeding sixty (60) days, Buyer will furnish or cause to be furnished to WGA a written report showing the "Producer's gross" (as defined in Article 15A of the Basic Agreement) during the preceding quarter from the distribution of such Pictures by Buyer on free television with respect to which Buyer is required to make payments hereunder (whether distributed by Buyer or through another distributor licensed by Buyer). Such report shall be accompanied by such payments as may be due.

Buyer shall also make available for inspection by WGA all Distributor's statements delivered to Buyer insofar as they relate to Producer's gross. WGA shall have the right at reasonable times to examine the books and records of Buyer as to Producer's gross. If Buyer shall fail to make such payments as and when due and payable, they shall bear interest at the rate of ten per cent (10%) per annum on the unpaid balance thereof commencing to accrue ten (10) days after notice in writing from WGA of such delinquency.

Where there is more than one buyer the provisions of paragraph h. (3) (iii) of Article 15A 3. of the Basic Agreement shall apply to each Buyer.

BUYER

By _____

Date: _____

Address:"

The Company agrees to deliver to the Guild an executed copy of the above referred to Buyer's Assumption Agreement within thirty (30) days after the sale, assignment or transfer of Such Picture, with the name and address of the purchaser or assignee.

Any inadvertent failure on the part of the buyer to comply with any of the reporting provisions of this subparagraph (2) shall in no event constitute a default by the Company or such Buyer or a breach of this agreement, provided that such failure is cured promptly after notice in writing thereof from the Guild.

Upon delivery of such Buyer's Assumption Agreement and on condition that the guild approves in writing the financial responsibility of the purchaser, assignee, or transferee, Company shall not be further liable for the keeping of any such records, or for the payment of such additional compensation for the exhibition of any such pictures on free television, it being agreed that the purchaser, assignee, or transferee, shall solely be liable therefor.

The Guild agrees that it will not unreasonably withhold its approval of the financial responsibility of any such purchaser, assignee or transferee, it being further agreed that if the Guild, within twenty-one (21) days of receipt of written notice of any such sale, assignment or transfer has not advised the Company that it disapproves the financial responsibility of such purchaser, assignee or transferee, the Guild will be deemed to have approved the financial responsibility thereof. In the event the Guild advises the Company within such twenty-one (21) day period that it disapproves the financial responsibility of any such purchaser, assignee or transferee and the Company disputes such disapproval, the Company shall have the right, at its election, to cause to be immediately submitted to arbitration, as herein provided, the issue of whether the Guild has unreasonably withheld the approval of the financial responsibility of such purchaser, assignee or transferee for payments due hereunder.

(3)    Television Distributor's Liability:

With respect to any Such Picture, the following provisions shall be applicable to the distributor of Such Picture for telecasting on free television:

(i)    Where the distributor has provided or guaranteed any of the financing for the production of Such Picture the obligations of the distributor under this Article 15A shall continue in perpetuity notwithstanding the expiration or termination of such distribution agreement, or any foreclosure of a chattel mortgage, security agreement, pledge, pledge, or lien on Such Picture. In the case of foreclosure, should such mortgagee, pledgor or security holder or a third party, who is neither the Company or distributor, acquire title to Such Picture and execute the Buyer's Assumption Agreement, and upon condition that the Guild, in its discretion, approves such

purchaser's financial responsibility, then when the distributor ceases to be the distributor of Such Picture for telecasting on free television the distributor shall thereupon be released from any and all further obligations under this Article 15A with respect to Such Picture. Should any third party (other than in connection with any such foreclosure) acquire the rights of such distributor to the distribution of Such Picture on free television and execute a Television Distributor's Assumption Agreement pursuant to which it is liable in perpetuity to make the payments under this Article 15A then upon condition that the Guild in its discretion approves such third party's financial responsibility, such distributor shall thereupon be released from any and all further obligations under this Article 15A with respect to Such Picture. However such distributor shall not be liable for the payment of any television fees based on monies received by a foreign distributor under a "foreign production deal", as defined in subsection 3.a. of this Article 15A with respect to which such foreign distributor or independent producer is not obligated to account to such distributor.

(ii)    Where the distributor of Such Picture does not provide or guarantee any of the financing of Such Picture, the Television Distributor's Assumption Agreement shall be binding upon the distributor only as long as it is the distributor of Such Picture on free television.

(iii)    Where there is more than one distributor or buyer of Such Picture on free television, the liability of any such distributor or buyer, which neither provides nor guarantees any of the financing for the production of Such Picture, for the payment of television fees under this Article 15A, shall be applicable only to such portion of Producer's gross as is derived by distributor or buyer as the case may be.

The distributor or buyer as used in this subparagraph (iii) refers to a distributor or buyer, as the case may be, under any distribution or sale agreement, as the case may be, with Company, as distinguished from an agreement between such distributor or buyer and its sub-distributor.

(4)    Acquisition of Title by Company:

If Company was not the actual producer of Such Picture which was produced by a signatory Company but acquired title thereto by purchase, assignment, transfer, voluntary or involuntary, or by foreclosure of a chattel mortgage or security agreement

Article 15A
Television Exhibition
THEATRICAL

Article 15A
Television Exhibition
THEATRICAL

or a pledge's sale, Company shall nevertheless be obligated to make the payments herein provided when Such Picture is exhibited on free television, unless such payment required hereunder has already been paid.

(5) Financing-Distribution Agreement by Company:

The obligation of the signatory Company hereunder with respect to the payments provided for in this Article 15A shall also apply to any Such Pictures produced by an independent producer under a contract between the signatory Company and such independent producer for the production of such motion picture, and for the financing and distribution thereof by the signatory Company. However, such signatory Company shall not be liable for the payment of any television fees based on monies received by a foreign distributor under a foreign production deal as defined in paragraph a. of this subsection 3., with respect to which such foreign distributor or such independent producer is not obligated to account to such signatory Company. Nor shall such signatory Company be obligated to obtain any Television Distributor's Assumption Agreement from any foreign distributor referred to in paragraph a. of this subsection 3. except if such foreign distributor is obligated to account to such signatory Company pursuant to subparagraph (a) of this paragraph 3. with respect to monies as therein provided.

(6) Company Liability:

It is expressly understood and agreed that Company shall in all events remain bound hereunder to make the payments due by reason of the exhibition of each Such Picture on free television, irrespective of the assumption of such liability by any other person, firm or company as hereinabove provided, except as otherwise expressly provided in this Basic Agreement.

(7) Failure to Deliver Assumption Agreement:

The failure of Company to obtain and deliver an executed assumption agreement as provided in paragraph h. (1) and h. (2) and subparagraph (i) of this Article 15A 3. shall be deemed a substantial breach of this Basic Agreement.

(8) Company's Dissolution:

If Company dissolves and is no longer in the business of producing motion pictures and if a distributor assumes all of the obligations of the Company under this Article 15A and the financial responsibility of the distributor is approved by the Guild in its discretion, the Company shall thereupon be released of any obligation with respect to any payments due hereunder; provided that if the distributor which assumes all of the obligations of the Company is a member company of the Association of Motion Picture & Television Producers, Inc. or if any such member company is permanently liable to pay the television fees provided for in this

Article 15A with respect to the motion pictures for which the Company is liable to make such payment of television fees, then the financial responsibility of such distributor shall be conclusively deemed approved and such Company shall be released of any obligation with respect to any such payments.

(9) Networks and Television Stations:

No television network, station, sponsor or advertising agency shall be required to execute any Television Distributor's Assumption Agreement, or Buyer's Assumption Agreement, or a Literary Material Assumption Agreement, except, if it is the distributor of Such Picture on free television or the buyer of the Company's free television rights in Such Picture, as the case may be.

i. If the Company shall sell, transfer, assign or otherwise dispose of its rights in any story or screenplay (to which the provisions of this Article 15A 3. apply, or may apply) prior to the production of a motion picture based thereon, to any person or company (hereinafter referred to as the "Buyer") other than a person or company with headquarters outside the United States, the Company shall obtain from the Buyer a separate agreement in substantially the following form:

"LITERARY MATERIAL ASSUMPTION AGREEMENT

_____ agrees

(hereinafter referred to as the "Buyer")

with _____
    (Company)

that the story, screenplay or story

and screenplay covered by this Agreement is subject to the Writers Guild of America Theatrical and Television Basic Agreement of 1977 (therein the "Basic Agreement") and particularly to the provisions of Article 15A 3. thereof pertaining to additional payments to Writers on release of a theatrical motion picture based thereon to free televisi on (but excluding paragraph h. of said Article 15A 3.,) and the said Buyer hereby agrees, expressly for the benefit of the Writers Guild of America, West, Inc., (herein referred to as the Guild) as representatives of the Writers involved, to abide by and perform the provisions of said Basic Agreement and make the additional payments required thereunder, as aforesaid. For the purpose of applying such provisions of said Basic Agreement, the Writer or Writers of such material shall be treated in all respects as though the said material were written by such Writer or Writers while in the employ of the Buyer.

It is expressly understood and agreed that the rights of the Buyer to exhibit or license the exhibition of any motion picture based upon said material shall be subject to and conditioned upon the payment to the Writer or Writers involved of additional compensation, if any, required under subsection 3. (except

paragraph h. thereof) of said Article 15A 3. of said Basic Agreement, and it is agreed that the Guild shall be entitled to injunctive relief and damages against Buyer in the event such payments are not made.

If the Buyer shall sell, transfer, assign or otherwise dispose of its rights in such material to any person or company with headquarters in the United States, it may obtain from the party acquiring such rights a separate agreement in the same form (including this sentence) as this agreement, and will notify the Guild thereof, together with the name and address of the transferee, and deliver to the Guild a copy of such assumption agreement; it being the intent hereof that the obligations herein set forth shall be continuing obligations on the part of such subsequent owners, of such material, so headquartered in the United States.

Date:

               BUYER

      By

Address:''

The Company agrees to give notice to the Guild of such sale, transfer or assignment of the nature above mentioned, with the name and address of the Buyer, and to deliver to the Guild an executed copy of such assumption agreement. An inadvertent failure on the part of the Company to comply with any of the provisions of this paragraph i. shall in no event constitute a default by the Company hereunder or a breach of this Basic Agreement, provided that such failure is cured promptly after notice thereof from the Guild.

Upon delivery of such assumption agreement, Company, or any subsequent owner obtaining the execution of such an assumption agreement, shall not be further liable to the Guild or any Writer for the keeping of any such records or the payment of such additional compensation, or for compliance with credit obligations insofar as they relate to the broadcast of Such Picture on free television; and the Guild agrees to look exclusively to the party last executing such an assumption agreement for the keeping of such records, payment and compliance with credit obligations. If a company with headquarters outside the United States is a subsidiary of the Company, or the Company is the distributor of Such Picture for such a company, then for the purposes of this paragraph i, such company shall be deemed to be headquartered only in the United States.

j. Anything to the contrary herein notwithstanding, it is agreed that the provisions of this subsection 3. apply only if Such Picture is first exhibited on free television after Such Picture has had a bona fide theatrical release. For such purpose Such Picture may be regarded as having had a bona fide theatrical release even though such release has

not fully completed, or shall not have been withdrawn from, its theatrical release, and even though Such Picture may have been released theatrically only domestically or theatrically only in foreign countries or territories. If Such Picture is exhibited on free television prior to the time that it has had a bona fide theatrical release, then the release of Such Picture to free television shall be governed by the provisions of the Basic Agreement then in effect between the parties hereto, but only with respect to the provisions thereof relating to additional compensation for television reruns on free television.

The provisions of this subsection 3. shall not apply to the televising of trailers or advertising a motion picture by shots, etc., substantially in the nature of a trailer, or to the use of stock shots, or to the televising of excerpts from theatrical motion pictures for news or review purposes. For any other use of excerpts from Such Picture in television programs, including television programs which consist substantially of excerpts from theatrical motion pictures, the Company shall pay the following aggregate one-time only sum to the writers determined by the Guild to be entitled to such compensation and pro-rated as determined by the Guild:

(a)  1 minute or less of excerpts — $125, or

(b)  over 1 but not over 2 minutes of excerpts — $250, or

(c)  over 2 minutes of excerpts — the amount referred to in (b) for the first two minutes and $100 for each minute or portion thereof in excess of 2 minutes.

No compensation shall be payable pursuant to this subparagraph j. to a writer of a motion picture from which an excerpt is derived if such writer writes material for and receives writing credit on the program into which such excerpt is inserted.

k. Notwithstanding the sooner termination of this agreement, the parties hereto agree that the terms and conditions of this subsection 3. shall apply and remain in full force and effect, and without change, to Such Pictures produced by the Company, the principal photography of which commenced between March 2, 1977 and March 1, 1981 both dates inclusive, regardless of when (either during or at any time after the expiration of the term of this Basic Agreement or of such period) Such Pictures are released to free television, and regardless of the terms or provisions of any Basic Agreement which is a modification, extension, or renewal of, or substitution for this Basic Agreement.

4. Small Accountings — With regard to all television licensing payments required under this Article 15A the Company may accrue such payments until the aggregate is equal to $50 at which time the payment provision of the appropriate subparagraph shall be effective, except that in any event all accrued amounts of less than $50 due to the writer shall be paid no later than thirty (30) days following the close of the calendar year in which accrued. Nothing herein shall relieve the Company of its obligation to make the accounting reports required elsewhere herein.

5. At the request of the Guild, the Company authorizes the three (3) Networks (ABC-CBS-NBC) as well as any television station to advise the Guild of the fact that a payment was or was not made by the network or station for, and the date of any previous telecast of, a theatrical motion picture specified in the Guild's request.

6. In the event that a Company liable for the payments required hereunder shall license a motion picture to television stations owned or controlled by it, or to a Network owned or controlled by it, the "accountable receipts" shall be comparable to the accountable receipts paid to distributors by comparable stations or comparable Networks, as the case may be, for comparable telecasts of comparable motion pictures in comparable markets and the accountable receipts paid to Company by comparable stations or comparable Networks, as the case may be, for the comparable telecast of such motion picture in comparable markets.

## Article 15   Television Exhibition Re-runs & Foreign Telecasts of TV Films

### B.   TELEVISION

1.   United States and Canada

a.   The minimum compensation above provided for in Article 13B shall constitute payment in full for the telecasting of such film once in each city in the United States and Canada in which any television broadcasting station is now located and once in each city in the United States and Canada in which any television broadcasting station is hereafter for the first time established.

b.   Rerun Formula in the United States and Canada

(1)   A television film which has been telecast not more than once in any city in the United States and Canada is in its first run. A television film which has been telecast more than once, but not more than twice, in any city in the United States and Canada, is in its second run. A similar test applies in determining when a television film is in its third and succeeding runs.

(2)   In the event a television film based upon literary material to which this Basic Agreement applies, is telecast for more than one (1) run in any city in the United States or Canada, the writer or writers who receive story and teleplay screen credit therefor shall be paid additional compensation which, in the aggregate, shall not be less than the following amounts (if more than one writer shares a story or teleplay credit then all of the writers sharing each credit shall be considered a unit and shall participate equally in and receive in the aggregate the re-run payments applicable thereto; except that in case of a comedy-variety program the Guild shall determine the proportions in which such participating writers will share the re-run payment, will notify the Company thereof and Company will make payments accordingly):

(a)   Reruns over television network in prime time:

(i)   With respect to any television film the credited writer(s) of which commenced writing services during the period March 2, 1978, and March 1, 1979, inclusive, the additional compensation payable for the second or any subsequent run which includes telecasting of said film over a television network in prime time shall be not less than 90% of the writer's applicable minimum compensation if an "in season" run, or not less than 70% of the writer's applicable minimum compensation if an "out of season" run.

(ii)   With respect to any television film the credited writer(s) of which commenced writing services during the period between March 2, 1979, and March 1, 1981, inclusive, the additional compensation payable for the second or any subsequent run which includes telecasting of said film over a television network in prime time shall be not less than 100% of the writer's applicable minimum compensation if an "in season" run, or not less than 80% of the writer's applicable minimum compensation if an "out of season" run.

(iii)   For purposes of the preceding two paragraphs, "out of season" shall mean the period of 17 consecutive weeks during each calendar year commencing on May 5 and ending on August 31, inclusive. The remainder of each calendar year shall be deemed "in season."

(b)   Other reruns:

(i)   For the second run, not less than 50% of the writer's applicable minimum compensation if such second run includes the telecasting of such film over a television network, otherwise such payment shall be not less than 40% of the writer's applicable minimum compensation;

(ii)   For the third run, not less than 40% of the writer's applicable minimum compensation if such third run includes the telecasting of such film over a television network, otherwise such payment shall be not less than 30% of the writer's applicable minimum compensation;

(iii)   For the fourth run, not less than 25% of the writer's applicable minimum compensation;

(iv)   For the fifth run, not less than 25% of the writer's applicable minimum compensation;

(v)   For the sixth run, not less than 25% of the writer's applicable minimum compensation,

(vi) For the seventh run, not less than 15% of the writer's applicable minimum compensation;

(vii) For the eighth run, not less than 15% of the writer's applicable minimum compensation;

(viii) For the ninth run, not less than 15% of the writer's applicable minimum compensation;

(ix) For the tenth run, not less than 15% of the writer's applicable minimum compensation;

(x) For the eleventh run, not less than 10% of the writer's applicable minimum compensation;

(xi) For the twelfth run, not less than 10% of the writer's applicable minimum compensation;

(xii) For the thirteenth run and each and every run thereafter, not less than 5% of the writer's applicable minimum compensation (paid separately for each such run).

(3) The "applicable minimum compensation" is the minimum salary or amount required to be paid, under the provisions of this Basic Agreement, for the type of story or teleplay involved.

Where the writer has been employed to write a story, with option for teleplay, the "applicable minimum compensation" for the story is the minimum set forth in Article 13 B 7.a. (p.51). The rate applicable to story and teleplay under Article 13 B 7.c. (p.52) is the "applicable minimum compensation" only in the case of employment under a contract providing for a commitment for both the story and the teleplay.

(4) If a writer or writers are entitled to the applicable minimum payments per episode required to be made on account of exploitation of the television sequel rights (as provided in Article 16B2) or on account of exploitation of character rights (as provided in paragraph h. of Article 15B14), or on account of the production of programs entitling a writer to per episode payments pursuant to paragraph l. of Article 15B14, and if an episode for which such a payment is required is telecast for more than one (1) run in any city in the United States or Canada, the writer or writers entitled to such payments shall be paid additional compensation calculated as provided in subparagraph (2) above, and for such purpose the "applicable minimum compensation" is such applicable minimum payment.

(5) The Company shall pay as provided herein for each respective re-run, not later than four months after the first telecast of the respective re-run in any city in the United States or Canada. However, in the event any re-run is telecast on a television network (or on a regional television network) the Company shall make the appropriate re-run payment not later than thirty (30) days after the telecast of such re-run.

(6) The term "television network" as used in this paragraph shall mean the network facilities of the American Broadcasting Company, the Columbia Broadcasting System, Inc. (CBS, Inc.), or the National Broadcasting Company except in the case of network television films are telecast on any single regional network presently established, and (ii) when television films are telecast on any single regional network which may hereafter be established and which does not include New York, Chicago or Los Angeles.

2. **Foreign Telecasting Formula**

a. In the event such television film is telecast in any part of the world outside the United States and Canada, the writers referred to in 1.b (2) and (4) above, shall be paid additional compensation for such foreign telecasting as follows:

(1) initial payment of not less than 15% of their applicable minimum compensation payable not later than 30 days after the Company obtains knowledge of the first foreign telecast, and in no event later than six months after the first foreign telecast.

(2) 10% of the applicable minimum when the Distributor's Foreign Gross exceeds $7,000.00 for half-hour pictures, $13,000.00 for one-hour pictures, or $18,000.00 for pictures in excess of one hour in length. Such payment to be made no later than thirty (30) days after such gross has been so exceeded, and

(3) a final payment of 10% of the applicable minimum compensation when the Distributor's Foreign Gross exceeds $10,000.00 for half-hour pictures, $18,000.00 for one-hour pictures, or $24,000.00 for pictures in excess of one hour in length. Such payments to be made no later than thirty (30) days after such gross has been so exceeded.

b. After the writer has received a total of 35% of his applicable minimum compensation with respect to any television film, no further sums shall be payable by reason of the Distributor's Foreign Gross received thereafter.

c. The term "foreign telecasting" as used herein, shall mean any telecast (whether simultaneous or delayed) outside the United States, its territories and possessions, and Canada, other than a telecast on any of the following regularly affiliated stations of a United States television network as a part of the United States network television telecast: XH-TV, Mexico City; ZBM, Pembroke, Bermuda, for CBS; XEW-TV or XEQ-TV or XH-TV or XHGC Mexico City, and ZBM, Pembroke, Bermuda, for NBC; and XE-TV Tijuana; and ZFB, Hamilton, Bermuda, for ABC.

d. As used herein the term "Distributor's Foreign Gross" shall mean with respect to any television film, the absolute gross income realized by the distributor of such picture from the foreign telecasting thereof and including, in the case of a "foreign territorial sale" by any such

distributor, the income realized from such sale by such distributor but not the income realized by the "purchaser" or "licensee." "The phrase "absolute gross income" shall not include:

(1) Sums realized or held by the way of deposits or security, until and unless earned, other than such sums as are nonreturnable.

(2) Sums required to be paid or withheld as taxes, in the nature of turnover taxes, sales taxes or similar taxes based on the actual receipts of the television film or on any monies to be remitted to or by the distributor, but there shall not be excluded from distributor's foreign gross any net income, franchise tax or excess profit tax or similar tax payable by the distributor on its net income or for the privilege of doing business.

(3) Frozen foreign currency until the distributor shall have either the right to use such foreign currency in or to transmit such foreign currency from the country or territory where it is frozen. In the event such currency may be utilized or transmitted as aforesaid, it shall be deemed to have been converted to United States dollars at the prevailing free market rate of exchange at the time such right to use or transmit accrues.

Distributor's foreign gross realized in foreign currency in any reporting period required hereunder shall be deemed to be converted to United States dollars at the prevailing free market rate of exchange at the close of such reporting period.

e. If any transaction involving any television film subject to a foreign telecast payment under this Basic Agreement shall also include motion pictures, broadcast time, broadcast facilities or material (including commercial or advertising material) which are not subject to such payment, there shall be a reasonable allocation between the television films which are subject to a foreign telecast payment and such other pictures, time, facilities or material, and only the sums properly allocable to pictures which are subject to a foreign telecast payment shall be included in Distributor's Foreign Gross.

3. **Application of Excess** Company, at its option, may make any part or all of the additional payments for re-runs and foreign telecasts provided herein, at the time of employment of writer or at any time prior to the time the same is due (but only if the agreement between the Company and writer with respect thereto is set forth in writer's individual contract); provided that no part of writer's initial compensation which is at or less than twice the applicable minimum compensation herein set forth may be applied against such re-run and foreign telecast payments, or either.

4. All payments of additional compensation for re-runs or foreign telecasts shall be made promptly by check, payable to the order of the writer entitled thereto, and if not initially paid to the writer, shall be delivered to the Guild for forwarding to such writer and compliance herewith shall constitute payment to the writer. The Company shall accompany such checks with a

statement of the title of the film and the use for which such payment is made. If Company fails to pay such additional compensation when due and payable such delinquent payment shall bear interest at the rate of 1½% per month commencing to accrue from the date of such delinquency.

5. The Company shall keep or have access to (i) complete records showing all cities in the United States and Canada in which all television films subject to this Basic Agreement have been telecast and the number of telecasts in each such city, the television stations on which telecast, and the dates thereof, and (ii) complete records showing Distributor's Foreign Gross for such television films to the extent that such records are pertinent to the computation of payments for foreign telecasting. Company shall also keep or have access to such records as are necessary for the computation of additional compensation for re-runs and foreign telecasts for so long as such re-run or foreign telecast payments may be due or payable. The Guild shall have the right, at all reasonable times, to inspect such records. The undersigned shall give the Guild prompt written notice of the date on which each television film covered hereby is first telecast in any city in the United States and Canada for the second run and for each subsequent run thereafter.

6. With respect to each television film which is distributed for foreign telecasting, Company shall furnish reports to the Guild and the Association of Motion Picture and Television Producers, Inc., showing Distributor's Foreign Gross derived from such television film until:

a. such television film has been withdrawn from distribution for foreign telecasting, or

b. all of the writers on such television film have received the full additional payments for such foreign telecasting to which they are entitled pursuant to subsection 2. above.

Such reports shall be rendered to the Guild on a quarterly basis during the first three (3) years in which any such television film is distributed for foreign telecasting on a semi-annual basis for the next following two (2) years and on an annual basis thereafter. Company agrees to cooperate in responding to reasonable requests from the Guild as to whether any television film is currently being distributed for foreign telecasting.

An inadvertent failure on the part of the Company to comply with the reporting provisions of this Section shall in no event constitute a default by the Company or a breach of this Basic Agreement, provided such failure is cured promptly after notice thereof from the Guild.

7. If a writer's individual employment contract contains a provision giving such writer a percentage or other participation in the receipts, revenues or profits of a television film, such payment may be credited against the minimum additional compensation for re-runs and foreign telecasts or either provided herein, but writer, in any event, shall be entitled to be paid not less than such minimum additional compensation for re-runs, and foreign telecasts, or either, as the case may be, and any payment on account thereof shall likewise be credited against such participation; provided that amounts re-

Article 15B
Television Exhibition Re-runs &
Foreign Telecasts of TV Films
TELEVISION

97

226

EXHIBIT N

ceived by writer as a percentage or other participation in the receipts, revenues or profits of the television film may not be credited against the minimum additional compensation for reruns or foreign telecasts until writer has received as compensation from all sources an amount equal to twice the applicable minimum compensation.

## 8. Television Assumption Agreement

If Producer shall sell, transfer, assign or otherwise dispose of its television rights in any television film or any literary material covered hereby, it shall obtain from such buyer a separate agreement made expressly for the benefit of Guild as representative of the writers entitled to additional compensation under this Article 15B requiring such buyer to comply with the provisions of this Basic Agreement with respect to such additional compensation to such writers for re-runs and foreign telecasting, or either of such film and the credit provisions of the Television Schedule "A" hereof. Such agreement shall be substantially in the following form:

"The undersigned _____ (hereinafter

referred to as 'Buyer') hereby agrees with _____

_____ (insert name of Buyer)

(insert name of Company)

that all television films (based upon literary material being acquired hereunder) covered by this Agreement are subject to the Writers Guild of America 1977 Theatrical and Television Basic Agreement (herein Basic Agreement); and particularly to the provisions thereof pertaining to the payment of additional compensation to writers for re-runs and foreign telecasting of such television films, and the Television Schedule "A", relating to screen credit, and said Buyer hereby agrees, expressly for the benefit of the Guild as representative of such employees involved, to abide by and perform the provisions of said Basic Agreement and make the additional compensation payments required thereby and to cause the requisite screen and advertising credits to be given. Buyer for and on behalf of the Company shall make all Social Security, withholding, Unemployment Insurance and Disability Insurance payments required by law with respect to the additional compensation referred to in the preceding sentence. Buyer further agrees for and on behalf of the Company to make all appropriate contributions to the Producer-Writers Guild of America Pension Plan and the Writers Guild-Industry Health Fund required under the above-mentioned Basic Agreement with respect to such additional compensation. It is expressly understood and agreed that the rights of Buyer to telecast such film shall be subject to and conditioned upon the prompt payment to such writers involved of additional compensation for re-runs and foreign telecasting of said television film as provided in said Basic Agreement and his abiding by the credits provisions of such Schedule "A", and it is agreed that Guild shall be entitled to injunctive relief and damages against Buyer in the event such payments are not made or such credit be not given.

The Buyer agrees to keep or have access to (i) complete records showing all cities in which United States and Canada in which all television

films covered by this Agreement have been telecast and the number of telecasts in each such city, the television stations on which telecast, and the dates thereof and (ii) complete records showing Distributor's Foreign Gross for such films to the extent that such records are pertinent to the computation of payments for foreign telecasting. Writers Guild of America shall have the right at all reasonable times to inspect such records. The Buyer shall also keep or have access to such records as are necessary for the computation of additional compensation for reruns and foreign telecasting for so long as such re-run or foreign telecasting payments may be due or payable. The Buyer shall give Writers Guild of America prompt written notice of the date on which each film covered hereby is first telecast in any city in the United States or Canada, for the second run and for each subsequent run thereafter. With respect to each television film which is distributed for foreign telecasting, the Buyer shall furnish reports to the Writers Guild of America showing Distributor's Foreign Gross derived from such film until (i) such film has been withdrawn from distribution for foreign telecasting, or (ii) all of the writers entitled to additional compensation for foreign telecasting have received the full additional payments for such foreign telecasting to which they are entitled pursuant to subsection 2. of Article 15B of the Basic Agreement. Such reports shall be rendered to the Guild on a quarterly basis during the first three (3) years in which any such film is distributed for foreign telecasting, on a semi-annual basis for the next following two (2) years and on an annual basis thereafter. The Buyer agrees to cooperate in responding to reasonable requests from the Guild as to whether any film is currently being distributed for foreign telecasting. An inadvertent failure to comply with said requirement of notice shall not constitute a default by the Buyer hereunder, provided said failure is cured promptly after notice thereof from Writers Guild of America.

BUYER

By _____

Date: _____

Address:"

Company agrees to give notice to the Guild within thirty (30) days of each sale, assignment or transfer of a television film or literary material which is subject to this Basic Agreement, with the name and address of the purchaser, or assignee, and to deliver to the Guild an executed copy of the above referred to Television Assumption Agreement together with a complete list of writers receiving such screen credit for such television film including social security numbers and re-run salary information. Failure to comply with this requirement shall be deemed a substantial breach of this Basic Agreement. An inadvertent failure on the part of the company to comply with any of the provisions of this paragraph shall in no event constitute a default by the Company or a breach of this Basic Agreement provided that such failure is cured promptly after notice thereof from the Writers Guild of America.

**EXHIBIT N**

Upon delivery of such Television Assumption Agreement and on condition that the Guild approves in writing the financial responsibility of the purchaser, assignee or transferee, Company shall not be further liable for the keeping of any such records to the Guild or writer or for the payment of such additional compensation for re-runs or foreign telecasting or for contributions to the Producer-Writers Guild of America Pension Plan, or to the Writers Guild-Industry Health Fund, or for credit, which are required in connection therewith, it being agreed that the purchaser, assignee or transferre shall solely be liable therefor.

The Guild agrees that it will not unreasonably withhold its approval of the financial responsibility of any such purchaser, assignee or transferee, it being further agreed that if the Guild within twenty-one (21) days of receipt of notice of any such sale, assignment or transfer has not advised the Company that it disapproves the financial responsibility of such purchaser, assignee or transferee, the Guild will be deemed to have approved the financial responsibility thereof. In the event the Guild advises the Company within such twenty-one (21) day period that it disapproves the financial responsibility of such purchaser, assignee or transferee and the Company disputes such disapproval, the Company shall have the right, at its election, to cause to be immediately submitted to arbitration, pursuant to the provisions of Articles 10, 11, and 12 hereof, the issue of whether the Guild has unreasonably withheld the approval of the financial responsibility of such purchaser, assignee or transferee.

## 9.  Continuance of Company's Responsibility

No television network, station, sponsor, or advertising agency which is not the producer of a television film shall be liable for payment of such additional compensation unless it becomes the owner of the Company's television rights therein. It is expressly understood and agreed that the mandatory assumption agreement provisions of subsection 8. above shall not be deemed to apply to distribution agreements whereby the Company licenses a distributor to distribute television films. However, Company may, if it wishes, obtain an assumption agreement from any such distributor or other licensee of television films but the obtaining of any such assumption agreement shall in no event relieve Company from the obligation to keep records hereunder or from the obligation to make payment of additional compensation for re-runs or foreign telecasts and should Company obtain any such assumption agreement from any such distributor, such distributor or licensee and Company may, if Company wishes, be made jointly and severally liable for the keeping of such records and for the making of any such re-run and foreign telecast payments, except that such distributor shall not be liable for such payments or record keeping other than such obligations which arise from telecasts made under the distribution agreement of such distributor.

## 10.  Use of excerpts

The use of an excerpt from a television film shall be deemed a run or foreign telecast of such film hereunder, except in the following circumstances:

(a)  When used for promotional, trailer, news or review purposes; provided, however, that the length of such excerpt(s) shall not exceed 400 feet of 35mm film containing not less than two scenes or 200 feet of 35mm film containing one scene, or the equivalent in running time of the foregoing if 16mm film or video tape is used. For purposes of this subparagraph, a "promotional" use of an excerpt shall be for the purpose of advertising or publicizing the specific program or serial or series from which the excerpt is taken.

(b)  When used as a so-called "stock shot" (as customarily understood in the industry —*i.e.*, shots excluding dialogue or identifiable characters).

(c)  When used for purposes of recapping the story to date in the context of a serial, multi-part program, episodic series, unit series or anthology; provided, however, that if such recap shall exceed 90 seconds in length when used on a program up to and including 60 minutes in total length, or exceed 120 seconds in length when used on a program in excess of 60 minutes in total length, Company shall pay to the credited writer(s) of the program(s) from which the excerpts in the recap were taken an aggregate one-time-only sum equal to $125.00 for each minute or portion thereof by which the recap exceeds such length limitation; and provided, further, that no such recap shall exceed (without being deemed a run or foreign telecast as set forth above) 400 feet of 35mm film containing not less than two scenes or 200 feet of 35mm film containing one scene, or the equivalent in running time of the foregoing if 16mm film or video tape is used.

(d)  When used as a flashback in the context of multipart series, episodic series, unit or anthology series or a one-time show or a prime time serial; provided, however, that if such flashback shall exceed 30 seconds in length, Company shall pay to the credited writer(s) of the program(s) from which the excerpts in the flashback were taken an aggregate, one-time-only sum equal to $125.00 for each minute or portion thereof by which the flashback exceeds such length limitation; and provided, further, that no such flashback shall exceed (without being deemed a run or foreign telecast as set forth above), 400 feet of 35mm film containing not less than two scenes or 200 feet of 35mm film containing one scene, or the equivalent in running time of the foregoing if 16mm film or video tape is used.

(e)  For "compilation" television programs (e.g. "25 Years of Lucy on Television") utilizing excerpts from television films, the Company will pay, for such use, to the credited writer(s) of the excerpted material, pro-rated as determined by the Guild, an aggregate one-time only sum equal to two and one-half (2½) times the applicable thirty-minute minimum (and for this purpose, minimum is deemed to be the going rate plus bonus if the compilation is for network prime time) for each thirty minutes of overall program length in which compilations are used. Exhibition of excerpts in such compilation television programs shall not

Article 15B
Television Exhibition Re-runs &
Foreign Telecasts of TV Films
TELEVISION

100

Article 15B
Television Exhibition Re-runs &
Foreign Telecasts of TV Films
TELEVISION

101

228

EXHIBIT N

be deemed reruns or other use of the television films from which the excerpts are taken and the payments pursuant to this paragraph relating to compilations shall not reduce or affect any other payments which may become due to the writer for the use of the television films from which such excerpts are taken.

No compensation shall be payable pursuant to this Paragraph 10 to a writer of a television film from which an excerpt is derived if such writer writes material for and receives writing credit on the program into which such excerpt is inserted. If two or more writers are entitled to share the additional compensation provided for in sub-paragraph (c) or (d) above, the Guild shall determine the allocation among said writers.

(f) If Company produces a program (other than a "compilation" television program referred to in subparagraph (e) above), for which excerpts of television programs are furnished by another company or person, and if such excerpts are not within the exceptions provided for in subparagraphs (a)-(e) above, or if such excerpts are within such exceptions, but the aggregate running time of such excerpts exceeds the maximum running time limits provided in the respective subparagraph, such use of such excerpts by Company shall be deemed a run or foreign telecast of such film hereunder and the Company shall be obligated to make the rerun or foreign telecast payments with respect hereto. For the purposes of this subparagraph (f), Company means the company which actually produces the new program.

11. **[Omitted]**

12. **Small Accounting**   With regard to all residual payments required under this Article 15B, the Company may accrue such payments until the aggregate is equal to $50.00 at which time the payment provision of the appropriate paragraph shall be effective, except that in any event all accrued amounts of less than $50.00 due to the writer shall be paid no later than thirty (30) days following the close of the calendar year in which accrued. Nothing herein shall relieve the Company of its obligation to make the accounting reports required elsewhere herein.

13. **Additional Compensation for Theatrical Exhibition**

In the event a television film, based upon literary material to which this Basic Agreement applies, is exhibited theatrically, the writer or writers employed thereon who receive story and teleplay screen credit therefor shall be paid additional compensation as follows:

(i)  If the television film is exhibited theatrically outside of the United States, an amount which in the aggregate shall not be less than the total minimum compensation applicable to such literary material as specified in Article 13B. 7.a., b., c. and e. of the Basic Agreement, or not less than the total minimum compensation applicable to such literary material as specified in Article 13A 1. hereof, whichever is the greater;

(ii)  If the television film is exhibited theatrically in the United States, or both in the United States and in a foreign country or

territory, an amount which in the aggregate is not less than 150% of the total minimum compensation applicable to such literary material as specified in Article 13B. 7.a., b., c. and e. of the Basic Agreement, or not less than the total minimum compensation applicable to such literary material as specified in Article 13A 1. hereof, whichever is greater.

There is to be no duplication of the payments provided for in (i) and (ii) above; i.e., if the initial theatrical release of the television film takes place outside of the United States and payment is made pursuant to (i) above, then upon the subsequent theatrical release of the television film in the United States, the amount payable to the writer will be the difference between the amount provided for in (i) above and the amount provided for in (ii) above, and conversely, if the initial theatrical release of the television film takes place in the United States and payment is made pursuant to (ii) above, then no additional compensation will be payable if the television film is subsequently released theatrically outside of the United States. For the purposes of (i) and (ii) above, if two or more television films are combined for theatrical release, the applicable minimum provided for in Article 13A 1. shall be the minimum applicable to one theatrical motion picture of the cost of the combined television films. Such additional compensation shall be paid regardless of whether such film is exhibited alone or as a part of or in combination with other films; and if such film is combined with other television films, the additional compensation for such theatrical release shall be not less than the total minimum compensation applicable to the writing of all such television films or parts thereof which have been so combined. If more than one writer shares the story or teleplay credit, then all of the writers sharing each such credit shall be considered a unit and shall participate equally and receive in the aggregate the theatrical exhibition payment applicable thereto except that in the case of a comedy-variety program the Guild shall determine the proportions in which such participating writers will share the theatrical exhibition payment, will notify the Company thereof and Company will make payments accordingly.

a.  Such additional compensation for theatrical exhibition shall be payable whenever such television film (in whole or in substantial part) is placed in any theatrical exhibition.

b.  All payments of such additional compensation for theatrical exhibition shall be made promptly by check payable to the order of the writer entitled thereto, and if not paid to the writer at the time of employment shall be delivered to Guild for forwarding to such writer, and compliance herewith shall constitute payment to the writer.

c.  The Company at its option, may make the additional payment for theatrical exhibition at the time of the employment of the writer or at any time prior to the time the same is due (but only if the agreement between the Company and the writer with respect thereto is set forth in the writer's individual contract); provided that only such part of the compensation initially paid to the writer as shall exceed twice the applicable

102

103

Article 15B,
Television Exhibition Re-runs &
Foreign Telecasts of TV Films
TELEVISION

229

minimum compensation may be applied in prepayment of additional compensation for theatrical exhibition.

Any exhibition of a film, other than through the medium of free television or as covered by Article 51 (Supplemental Markets), shall constitute a theatrical exhibition and (subject to the provisions of subsection 16. of this Article 15B) payment for such theatrical exhibition shall be as herein provided, except that this shall not apply to showings where no fee or admission charge is paid by the viewing audience.

If the Company licenses or grants to any third party the right to place in theatrical exhibition a television film produced after March 1, 1977 which exhibition is to be before a viewing audience which pays no fee or admission charge to view the same, Company will pay to the writer(s) entitled to story and/or teleplay credit an amount equal in the aggregate to 5% of the gross amounts received by Company derived therefrom; provided, however, the sums paid to the writer(s) hereunder shall in no event exceed the applicable amount otherwise payable to such writer(s) under the provisions of Paragraph 13 had there been a fee or admission charge paid by the viewing audience. Where Company licenses or grants any such right to a subsidiary or other related entity, the gross amounts referred to in the preceding sentence shall be the amounts specifically paid to the Company subject to there having been good faith bargaining between the Company and such subsidiary or related entity. Company shall account to the writer(s) entitled to payments hereunder on no less than an annual basis; provided that no accounting need be made for any 12-month period following the 12-month period during which the Company received no gross amounts with respect thereto. There shall be no duplication of the payments provided for in this subparagraph, and the payments provided for in any other provision of Paragraph 13. That is, any payment made under this subparagraph shall be credited against any payment which may become due the writer(s) under all other provisions of Paragraph 13. Conversely, if a theatrical release payment is made to the writer(s) under the provisions of Paragraph 13 other than under this subparagraph then no further sum shall be payable under this subparagraph.

d. With respect to a television film or multi-part program whose aggregate length as initially broadcast on television is more than four (4) hours and which is exhibited theatrically in condensed form, for purposes of this paragraph 13 the total minimum compensation applicable to such literary material as specified in Article 13.B.7.a.,b.,c., and e. shall be specially determined as follows:

(1) If said film is exhibited theatrically outside of the United States, said minimum shall be based on the actual length of the film in its condensed, theatrical-release form but not less than four times the applicable sixty minute minimum;

(2) If said film is exhibited theatrically in the United States, or both in the United States and in a foreign country or territory, said minimum shall be based on the actual length of the film in its condensed, theatrical-release form, but no less than the sum of (a) four times the applicable 60-minute minimum plus (b) one-half of the difference between (i) the minimum applicable to the program in its initially broadcast length and (ii) four times the applicable 60-minute minimum.

The provisions set forth above in paragraph 13 relating to non-duplication of payments shall also apply to the foregoing special provisions.

e. If the Company shall sell, transfer, assign or otherwise dispose of its theatrical exhibition rights in any television film, it shall obtain from the buyer a separate agreement in substantially the form prescribed with respect to re-runs, requiring the buyer to comply with the provisions of this Basic Agreement with respect to additional compensation payable to the writer for theatrical exhibition of the film; and upon obtaining such agreement Company shall not be further liable to the Guild or writer for the provisions of additional compensation for theatrical exhibition.

The excerpting of so-called "stock shots" by Company from television film for transposition to and use in otherwise separately produced theatrical film shall not be deemed to be an exercise of the theatrical exhibition rights by Company within the meaning of this paragraph.

If Company shall produce a film budgeted at $125,000.00 or more intended primarily for television release and it shall thereafter release such film theatrically in any country in the world, Company shall pay to writer any amount by which the established flat deal theatrical motion picture minimum for such film at the time of its production shall exceed the total of the minimum applicable compensation and minimum theatrical exhibition payments required to be made hereunder. The established flat deal theatrical motion picture minimum shall be the compensation set forth in Article 13A hereof.

14. Additional Compensation for Certain Use of Material to which Separated Rights Do Not Apply

Except as hereinbelow specifically provided, the Company shall have the right to use the literary material written for a serial, episodic series, unit series, or one-time television program in any field or medium whatsoever without any obligation to pay to the writer(s) thereof additional compensation. Additional compensation shall be paid to the writer of a story or (subject to the next sentence hereof) teleplay or story and teleplay for an established serial or episodic series, or for a unit series or one-time television program to which separated rights do not apply (and where specific use is made of the writer's material, rather than, for example, the source material only), as provided in this subsection 14, provided that the terms of this Basic Agreement relating to rights in material apply to such story, teleplay or story and teleplay as provided in Article 2 of this Basic Agreement. If such a

104

Article 15B
Television Exhibition Re-runs &
Foreign Telecasts of TV Films
TELEVISION

105

Article 15B
Television Exhibition Re-runs &
Foreign Telecasts of TV Films
TELEVISION

230

EXHIBIT N

teleplay be based upon a story in the public domain or upon a story owned by the Company, the writer of such teleplay shall not be entitled to any payments under the provisions of this subsection 14, except as provided in paragraph 1 below. A writer employed to rewrite or polish a teleplay written by another person shall not be entitled to any payments under this subsection 14. If more than one writer qualifies for additional compensation under this subsection 14, the Guild shall determine the division of such additional compensation among them.

Such additional compensation shall be as follows:

a. If Company produces a theatrical motion picture based upon such material, it will pay to the writer the sum of $2,274.00 or two per cent (2%) of the above-the-line costs (excluding all theatrical script writing costs and deducting from the above-the-line costs an arbitrary $2,000 representing the value of the underlying rights) or the applicable minimum compensation for a screenplay under the then current basic agreement, whichever is the greater.

b. If Company licenses or grants to any third party the right to use the material as the basis for a theatrical motion picture, it shall require such third party to agree in writing to pay to the writer the sum of $2,274.00 or two per cent (2%) of the above-the-line costs (excluding all the theatrical script writing costs and deducting from the above-the-line costs an arbitrary $2,000.00 representing the value of the underlying rights), whichever is greater, and such undertaking by the third party will relieve the Company of any obligations to the writer in connection with such license or grant.

c. If Company produces a radio program based upon such material, it will pay to the writer the sum of $113.00 for each national radio network broadcast the sum of $76.00 for each regional radio network broadcast and the sum of $76.00 for the unlimited right to use in syndication any transcription made of a program.

d. If the Company licenses or grants to any third party the right to use the material as the basis for a radio program, Company will pay to the writer an amount equal to fifty per cent (50%) of Company net receipts therefrom. The net receipts to the Company shall be computed by deducting from the gross amounts paid to the Company on account of such license or sale of the radio rights all royalties, license fees or participations which the Company is contractually obligated to pay by reason of the license or grant of the radio rights, together with agents' commissions, if any, on the license or grant of such radio rights.

e. If Company exercises the dramatic rights in such material by producing a play on the speaking stage, it will pay to the writer an amount equal to one per cent (1%) of the gross box office receipts of the play.

f. If the Company licenses or grants to any third party the right to use the dramatic rights in the material, Company will pay to the writer an amount equal to twenty-five per cent (25%) of the gross receipts derived by the Company from the license or sale of such rights.

g. If the Company licenses or grants to any third party or exercises itself the publication rights to such material (other than publication rights customarily granted for advertising or publicizing the exploitation of any other rights in the material) Company will pay to the writer an amount equal to twenty-five (25%) of the Company's net receipts derived therefrom.

If the Company licenses or grants to any third party, or exercises itself, the right to produce or reproduce such material on phonograph records, cartridges, compact devices or any other devices which are audio only, Company will pay to the writer or writers as a group an amount equal to that fraction of 25% of the Company's net receipts derived from the licensing, grant or use of the literary material which is equal to the fraction of the overall material in the applicable audio device which such material constitutes. Notwithstanding the foregoing, if such material constitutes more than 50% of the overall material in the applicable audio device, the Company will pay the writer or writers as a group an amount equal to 25% of the Company's net receipts derived therefrom. For purposes of this subparagraph g., the Company's net receipts in each instance shall be computed by deducting from the gross amounts paid to the Company or its licensing agent, whether affiliated or otherwise, with respect to the licensing, grant or use of such material, all costs, expenses and charges incident thereto, including a distribution or servicing fee by the Company (which will include any and all subdistribution or subservicing fees), which fee shall be reasonably in accordance with customary distribution or servicing fees charged in the industry. Where Company licenses or grants any such rights to a subsidiary or other related entity, the gross amounts referred to in the preceding sentence shall be the amounts specifically paid to the Company for such license, grant or use, subject to there having been good-faith bargaining between the Company and such subsidiary or related entity. Company shall account to the writer(s) entitled to payments under this subparagraph g. on no less than an annual basis; provided that no accounting need be made for any 12-month period following the 12-month period during which the Company received no gross amounts with respect to the applicable audio device.

h.   Character payments

(1)  If the writer introduces a new character in the serial or episodic series, and the characterization of such character is fully developed and fully described in the material written by the writer, and from such development and description the character appears to be unique and the principal creation of the writer, and if the Company uses such character as the central character with a continuing role in a new and different serial or episodic type television series, the Company will pay to the writer the sum specified in the following table for each episode of such new and different series produced and broadcast, provided that such writer shall be entitled only to 60% of said amount for 15-minute episodes but shall be

107

Article 15B
Television Exhibition Re-runs &
Foreign Telecasts of TV Films
TELEVISION

231

EXHIBIT N

entitled to 190% of said amount for 60-minute episodes and 250% of said amount for 90-minute or longer episodes. Said applicable amount shall be paid in the same manner as provided in subsection 1. of Article 16 B with respect to television sequel rights and re-run payments will be made in accordance with Article 15B, the "applicable minimum compensation" for such purpose being said applicable amount.

For such characters in literary material written hereunder by writer during

| "1st Period" | March 2, 1977 - March 1, 1978 | — $371 |
| "2nd Period" | March 2, 1978 - March 1, 1979 | — 401 |
| "3rd Period" | March 2, 1979 - March 1, 1980 | — 433 |
| "4th Period" | March 2, 1980 - March 1, 1981 | — 472 |

The character payments provided by this subparagraph (1) shall not apply if any writer, including the creator of the character, is entitled under Article 16 B to separation of rights in the new and different serial or episodic series. However, if separation of rights does exist in the new and different serial or episodic series and the writer who previously introduced the central character is not a participant in such separated rights, said writer alternatively shall be paid with respect to each episode of the new serial or series in which the character appears, the lesser character payment which now applies to a principal character used in subsequent episodes of the same series in which it is introduced.

(2) If a writer for an established episodic series creates a principal character who is distinct and identifiable, and is fully developed and fully described in the material written by the writer, and from such development and description the character appears to be unique and other than generic and the principal creation of the writer, the Company will pay such writer the sum specified in the following table for each episode of such new serial or series in which the character appears.

For such characters in literary material written hereunder by writer during

| "1st Period" | March 2, 1977 - March 1, 1978 | — $106 |
| "2nd Period" | March 2, 1978 - March 1, 1979 | — 114 |
| "3rd Period" | March 2, 1979 - March 1, 1980 | — 123 |
| "4th Period" | March 2, 1980 - March 1, 1981 | — 134 |

The character shall not be deemed unique, as required by the foregoing, if the character is played by an actor who plays himself or herself, or plays an established alter ego.

Company shall be liable for no more than four such payments (or no more than an amount equal to four such payments) for characters on any one episode, unit or program and the writer(s) of the pilot script for any such series shall not be eligible for such payments at all with respect to characters in such pilot script subsequently used in episodes of the series.

Uses of a character in separate episodes of a multi-part closed-end series shall not constitute the use of the character in a new and different episode for the purposes of this Agreement, if the writer who created the character is a participating writer on the subsequent episode.

The character payments provided for by this subparagraph (2) are not subject to re-run payments.

(3) Payments for use of a character which meets the criteria of this Article 15 B 14 h, but which is introduced in a unit of a unit series or a one-time television program to which separation of rights does not apply, shall also be made as follows:

(a) If used as the central character with a continuing role in a new and different serial or episodic series to which separation of rights does not apply, the same character payment as provided in the table in subparagraph (1) above; or

(b) If used as a principal character in a new and different unit of a unit series or in a new and different one-time television program, to which separation of rights does not apply, the same character payment as provided in the table in subparagraph (2) above.

(4) A dispute between writers as to who created such a character shall be determined by the Guild in accordance with its credit arbitration proceedings.

(5) If the Company licenses or grants to any third party the right to use such a new character in the manner described in this paragraph h., the Company will require such third party to agree in writing to pay to the writer the amounts hereinabove provided, and such undertaking by the third party will relieve the Company of any obligations to the writer in connection with such license or grant.

i. If such a teleplay is used for a live television broadcast, and no writer is employed to rewrite, adapt or revise such teleplay for the live broadcast, the Company will pay to the writer for each live telecast (which live telecast shall include without additional compensation supplementary coverage as defined by the then current WGA Live Television Freelance Minimum Basic Agreement) the applicable minimum compensation under the then current WGA Live Television Freelance Minimum Basic Agreement, except that if the broadcast is a live U.S. network broadcast, the Company shall pay the writer the amount required to be paid for a remake under Article 13 B 7 o.

j. If a writer is employed to rewrite, adapt or revise such material for a live television broadcast, and such rewritten, adapted or revised material shall be used for a live television broadcast, each such live broadcast (including supplementary coverage as provided in paragraph i. above) shall be regarded as a "run" of the television film based upon such teleplay, and payment therefor shall be made in the amount and manner provided for a "run" of such television film.

manner provided in Article 15B hereof, except that if the broadcast is a live U.S. network broadcast, the Company shall pay the writer the amount required to be paid for a remake under Article 13 B 7 o.

k. If the Company produces a motion picture, based upon such material, primarily for paid television such use shall be regarded as a use of the theatrical motion picture rights and Company will pay to the writer an additional amount computed in the manner provided in paragraph a. above; and if the Company licenses or grants to any third party the right to use the material as the basis for a motion picture produced primarily for paid television, it will require such third party to agree in writing to pay an additional amount computed in the manner provided in paragraph b. above, and such undertaking by the third party will relieve the Company of any obligations to the writer in connection with such license or grant.

l. The writer of a teleplay based upon a story in the public domain shall be entitled to payments under the foregoing provisions of this subsection 14, if such teleplay is substantially used by Company in any field or medium referred to in said provisions and such public domain story was suggested by the writer in a written proposal made to Company by the writer and the use in question otherwise meets the conditions set forth in this subsection 14. In addition, if such a teleplay is used for the production of a television film which is the pilot of an episodic series or serial which is an established series or serial by virtue of being based upon such public domain story, the writer thereof shall be entitled to a payment in the amount specified in the following table for each episode in such series or serial which is thereafter produced and broadcast substantially utilizing the writer's creative treatment embodied in such teleplay, provided, however, that said writer shall be entitled only to 60% of said amount for 15-minute television films, but shall be entitled to 190% of said amount for 60-minute television films and 250% of said amount for 90-minute or longer television films.

For such teleplay written hereunder by writer during

| "1st Period" | March 2, 1977 - March 1, 1978 — $371 |
| "2nd Period" | March 2, 1978 - March 1, 1979 — 401 |
| "3rd Period" | March 2, 1979 - March 1, 1980 — 433 |
| "4th Period" | March 2, 1980 - March 1, 1981 — 472 |

Except as provided in subsections 1. and 2. of this Article 15B hereof, the applicable payment referred to in the preceding sentence shall satisfy all obligations of the Company to the writer, and no additional sum or sums shall be payable by reason of any use of such episode. Nothing in the foregoing shall give to the writer any right to payment under this subsection 14, with respect to any use by the Company of the public domain material itself as distinct from the use of the writer's teleplay based thereon, nor impair the Company's right to deal with such public domain material freely without obligation to the

writer or anyone. The question of whether the writer suggested and furnished such public domain story and the question of whether the Company substantially used the writer's said creative treatment in subsequent episodes or in another field or medium entitling the writer to a payment hereunder, shall be subject to the grievance and arbitration provisions of Articles 10, 11, and 12 herein. A decision under such procedures as provided in said Articles 10, 11, and 12 shall be binding upon the Company, the Guild and the individual writer or writers involved. The only and maximum remedy under such procedures shall be the applicable minimum additional payment as provided in this paragraph l.

m. If the Company licenses or grants to any third party the merchandising rights to such material (as described in Article 1) Company will pay to writer an amount equal to five per cent (5%) of Company's net receipts (as net receipts are defined in paragraph g. of this subsection 14.) derived from such merchandising rights. Comic books, magazine publications, comic strips, cut-outs, and other activity books shall be deemed to be included as merchandising rights.

n. Company shall give notice to Guild on completion of arrangement for uses under this subsection 14.

## 15. Simulcasts

Where a television film to which the provisions of this Basic Agreement apply is simulcast, the applicable minimum compensation prescribed in subsection 7., a, b, c, e, and h of Article 13B shall be increased by $33\frac{1}{3}\%$; provided that such additional payment shall not be deemed to be part of the "applicable minimum compensation" for the purpose of re-run or theatrical release payments required by this Basic Agreement, and such additional $33\frac{1}{3}\%$ shall be the sole payment required to be made by the Company under this Basic Agreement for simulcasting the material.

## 16. Paid Television

In the event that the Company shall desire to engage any writer to prepare literary material for motion picture film intended primarily for release on Pay-type CATV, Pay Television, or for cassettes to be released in "Supplemental Markets" (as defined and described in Article 51 of this Basic Agreement), the Company will give the Guild notice of such desire no later than sixty days prior to the date upon which it intends to engage such writer. Guild and Company shall thereafter meet and bargain in good faith for the purpose of agreeing upon terms and conditions of employment and compensation for writers engaged by the Company to prepare such literary material, and if no agreement is reached between Company and Guild with respect thereto, Guild may, upon sixty (60) days written notice to Company, instruct its members to refuse to render services with respect to the production of any such films.

Article 15B
Television Exhibition Re-runs &
Foreign Telecasts of TV Films
TELEVISION

110

111

Article 15B
Television Exhibition Re-runs &
Foreign Telecasts of TV Films
TELEVISION

233

EXHIBIT N

# Article 16   Separation of Rights

## A.   THEATRICAL.

1. Definitions. For the purpose of this Section A, Theatrical, the following terms or words used herein shall have the following meanings:

a. The term "dramatic rights" means the right of presentation in dramatic form on the speaking stage with living actors appearing and performing in the immediate presence of an audience, without any recordation, transmission or broadcast thereof intended for or permitting concurrent or future aural, or visual and aural, reception or reproduction at places away from the auditorium or other place of performance.

b. The term "publication rights" includes the right of publication in all writing forms and all writing media, excluding, only comic books, comic strips and newspaper comics.

The provisions of this paragraph shall apply only to material subject to this Basic Agreement and acquired after the effective date hereof under contracts subject to and entered into after the effective date of this Basic Agreement.

c. The term "sequel" as used with reference to a particular motion picture, means a new theatrical motion picture in which the principal characters of the first theatrical motion picture participate in an entirely new and different story.

d. The term "assigned material" means all material in writing or any other fixed form, of every nature that the Company has furnished the Writer (or to which the Company has directed the Writer) upon which material the Company intends the story (or story and screenplay) to be based or from which it is to be, in whole or in part, adapted. The term "assigned material" may include public domain material or a character or characters proposed for use in the story (or story and screenplay).

2. Initial Qualification. The Company agrees that if a Writer, while in the employ of the Company writes an original story (or original story and screenplay) including a complete and developed plot and character development, he shall be initially qualified for separation of rights hereunder. A Writer shall be deemed to have written a complete and developed plot and character development if he does so himself or if the product of the work of such Writer and writers previously (but after June 13, 1960) employed hereunder together constitute such a complete and developed plot and character development. Company also agrees that if it purchases from a professional writer such a story (or story and screenplay) written by such person, such person shall be initially qualified for separation of rights hereunder. If at the time of the transfer of rights to the material so purchased there is in existence a valid agreement for the publication or dramatic production of such material, then for the purpose of this Article 16A such material shall be deemed to have been published or exploited.

With respect to a Writer employed by the Company, if there is assigned material then:

a. If the employment agreement (or written assignment delivered by the Company to the Writer, in the case of a term contract, week-to-week contract, or multiple picture type employment) designates as the assigned material upon which the motion picture is to be based, or from signed material upon which the motion picture is to be based, or from which it is to be adapted, a story contained in a book, magazine, screenplay, play or other dramatic composition, treatment or story in any other form, then the Writer, or any other Writer working thereon, shall not be qualified for separation of rights unless:

(1)  With the knowledge and prior or subsequent consent of the Company the Writer departed from the story contained in such assigned material and created an original story (or original story and screenplay) of the nature first described in this subsection 2., to the extent that there is no longer any substantial similarity between such story written by the Writer and such story contained in the assigned material; or

(2)  The assigned material designated in the employment agreement or written assignment was not actually available to the Writer, and the Writer creates a story (or story and screenplay) of the nature first described in this subsection 2.

If the Writer makes either of such contentions and the Company and Writer cannot agree thereon, either the Writer or the Company may submit the issue to arbitration and if it is determined by arbitration that the facts were as described in (1) or (2) above, then such Writer shall be initially qualified for separation of rights hereunder.

b.  If a character or characters furnished by the Company is intended by the Company to be a principal character in the motion picture, and if such character was taken from material, of any nature, theretofore published or exploited in any manner or by any medium, and if such character is used in the screenplay as a principal character, then the Writer shall not be qualified for separation of rights hereunder. If, however, any such character furnished by the Company as aforesaid was a minor character in previously published or otherwise exploited material, and with the prior or subsequent consent of the Company was converted by the Writer into a principal character in the story (or story and screenplay) of the nature above described in this subsection 2., written by the Writer, and if no minor character as furnished by the Company (as distinguished from such character or characters as developed by the Writer) constitutes a substantial contribution to the final screenplay, and if no principal character furnished by the Company remains a principal character in the motion picture, then such Writer shall be initially qualified for separation of rights hereunder. If such character or characters furnished by the Company were not taken from material theretofore published or exploited in any manner or by any medium, and if the Writer were otherwise qualified for separation of

Article 16A
Separation of Rights
THEATRICAL

234

113

EXHIBIT N

rights hereunder, the Writer shall not be deprived of such separation of rights, unless such character or characters furnished by the Company constitute a substantial contribution to the final screenplay, in which latter event such Writer shall not be qualified for separation of rights hereunder.

3. Final Qualification. If it is determined, in the manner provided in the Theatrical Schedule "A" attached hereto, that the Writer of the story (or story and screenplay), initially qualified for separation of rights as above provided, is entitled to receive "story by" or "written by" or "screen story by" credit, he shall be entitled to separation of rights in the following areas:

a. Publication Rights. Publication rights throughout the world in the "separable material," as hereinafter defined, shall be licensed exclusively to the Writer on a royalty free basis both for the original term of copyright and for any extensions and renewals thereof, without the necessity for the execution by the Company of any further instrument, except as expressly provided below and subject to the provisions of paragraph e. of subsection 7. hereof and to the following:

(1) No publication rights may be exercised by the Writer prior to the expiration of three (3) years from the date of the employment contract (or the date of the assignment of the Writer in the case of a term contract, week-to-week contract or multiple picture type employment) or three (3) years from the date of acquisition in case the material is purchased, or prior to the expiration of six (6) months following the general release of the motion picture, whichever is earlier.

(2) The Company shall be entitled to and shall own the exclusive right to make, publish and copyright or cause to be made, published and copyrighted in the name of the Company or its nominee, serially or otherwise, in any and all languages and throughout the world, synopses, summaries, resumes, adaptations, stories and fictionalized versions of and excerpts from any screenplay or photoplay, in any form and in any publication media (with or without illustrations) for the purpose of advertising, publicity or exploitation, of the motion picture based on such material, provided that any single publication may not exceed 10,000 words in length.

(3) If a Company desires to publish, or cause to be published, a "paperback" type of novelization for the purpose of publicizing or exploiting such motion picture, the Company shall have the right to do so (and without being subject to any limitation on the number of words) if it follows either of the following procedures:

(i) Regular procedure

Publication shall not take place earlier than six (6) months prior to the initial scheduled release date of the motion picture. The Company shall give written notice to the writer entitled to separation of rights, with a copy to the

Guild, specifying such Company's desire for such publication and the name(s) of publisher(s) who are acceptable to the Company. Within 10 days, the Guild shall give the Company written notice of the name of the writer ("Guild-named writer") who intends to negotiate for the publication of such novelization and the name of the agent who will negotiate for such writer. The Guild-named writer shall only be the writer entitled to separation of rights for such motion picture or another accredited writer for such motion picture should the writer entitled to separation of rights desire not to write the novelization. Such agent shall keep the Company fully informed of the status of the negotiations. Any publication agreement entered into by the Guild-named writer shall provide that the Company shall have control of the time and locale of the publication and release and of the cover, title, credits, legends, advertising material, stills, and any other elements furnished by the Company (referred to herein as the "art work"), and the Company shall have the right to arrange for, and keep as its sole property, payment to the Company respecting such art work. All payments for the right to publish or cause the publication of the novelization shall be made to and retained by the Guild-named writer. If the Guild does not give the Company the aforementioned notice within the aforementioned 10-day period, or if the Guild-named writer does not consummate a publication agreement with a publisher within 45 days after the Company's notice to the Guild naming such publisher as acceptable to the Company, the Company shall have the right, on such terms as it may elect, to cause the novelization to be published by such publisher as it may elect. The compensation to be paid the person writing such novelization shall not exceed that offered to the Guild-named writer in his negotiation with the publishing company unless the Guild-named writer is first given an opportunity to write the novelization for such increased compensation. Copyright in any novelization written pursuant to this subparagraph (3) shall be taken and remain in the name of the Company or its nominee.

(ii) Expedited procedure

a) The Company may request the Guild at any time to specify the "Guild-named writer." If at the time of the Company's request the credits are not determined and there has been more than one participating writer, the Guild will conduct an expedited hearing in the same manner as provided in Theatrical Schedule A to determine the writer entitled to "preliminary separation of rights."

If at the time of the Company's request there is only one participating writer, then such writer will be named by the Guild as the Guild-named writer.

Article 16A
Separation of Rights
THEATRICAL

b)   The Guild-named writer will have the right to negotiate with the publisher(s) named by the Company for publication of the novelization.

If the Company names only a publisher which is an affiliate or subsidiary of the Company, such publisher will promptly make a proposal to the writer for the publication of the novelization. The writer will have a period of 45 days to negotiate with another publisher of commensurate status in the publishing industry. If writer obtains a better proposal from the other publisher, he will offer it to the Company-named publisher on a first refusal basis. If the Company-named publisher does not meet the terms within 5 business days, the writer may proceed with a publication agreement with the other publisher.

c)   If the Guild-named writer enters into a publication agreement and thereafter the Guild determines that any other writer has an interest in the "separation of rights," the Guild-named writer shall be required to share the proceeds of such publication in such proportion as determined by the Guild and all the participating writers shall be bound by the Guild determination.

d)   If the Guild-named writer does not enter into a publication agreement within the 45-day period, the Company may cause the novelization to be published and the payments which would be due the Guild-named writer will be paid to the Guild for the account of the writer or writers ultimately determined by the Guild to be entitled to separated rights.

e)   At Company's election, the publication may take place earlier than 6 months prior to the initial scheduled release date of the motion picture; provided, however, that such publication must be for the purpose of publicizing or exploiting the motion picture, and provided, further, that principal photography of the motion picture must be commenced prior to the actual publication date.

If Company elects the expedited procedure in (ii) above, and the Guild-named writer enters into a publication agreement pursuant thereto, in all other respects the provisions of the Regular procedure in (i) above shall apply including Company's sole control of licensing of the "art work."

If the Guild-named writer does not enter into the publication agreement within the applicable aforementioned period, the Company will nevertheless pay or cause to be paid to the writer, if any, entitled to separation of rights, a Two Thousand Five Hundred Dollar ($2,500.00) advance against an amount equal to thirty-five percent (35%) of the Company's adjusted gross receipts from the publisher with respect to such publication. Adjusted gross receipts are the total receipts received by the Company from the publisher

with respect to such publication less only (A) the actual moneys paid for the writing of such novelization (but for the purpose hereof deduction of such moneys shall not be greater than an amount reasonably in accordance with customary amounts paid by the established publishing companies for the paperback novelization of motion picture screenplays), and (B) the sum of five thousand dollars ($5,000.00) which shall be deemed to be, for this purpose only, the cost of the art work. The term "novelization," as used in the preceding sentence means a novelization which is based upon the separable material and utilizing the separable material in a manner which would constitute a copyright infringement of such separable material if the writer were the sole copyright owner thereof. At the request of Company in case of conflict between the time periods delineated hereinabove, and the release schedule of the picture, the Guild will give reasonable waivers to reduce the applicable period for negotiation by the Guild-named writer.

(4)   If the Writer exercises any of the publication rights, and on each occasion that the Writer exercises the publication rights licensed to him hereunder, copyright in the published work shall be taken and remain in the name of the Company or its nominee; Writer shall cause the publisher to comply with all necessary copyright formalities; and the Company shall have, and is hereby granted all rights of every nature in and to the published work, including the right to extend or renew the copyright, except for such rights, if any, as may have been expressly reserved by the Writer under and pursuant to his employment agreement or in the agreement for the purchase of unpublished and unexploited material from a Guild member, and excepting also the publication rights and dramatic rights therein, to the extent that publication and dramatic rights are licensed to and permitted to be used by the Writer under all the terms and provisions of this Article 16A. If the Writer arranges for the publication, of a novel or short story, as permitted hereunder, all royalties and other monies received by such Writer under the publication agreement between the publisher and the Writer shall be the sole property of the Writer.

(5)   If the Writer exercises any publication rights licensed him hereunder, the Writer shall have the right to make his own arrangements for publication of the novel or short story, as permitted hereunder, and shall have exclusive control of all matters relating to such publication, except as expressly provided in subparagraph (4) above and this subparagraph (5) in connection with such exercise. As soon as practical after the Writer has the same, but in any event within a reasonable period prior to the publication thereof, the Writer will submit to the Company a copy or proof of the work in the form in which it is to be published together with a reasonably detailed statement of the manner in which the publication will be

made. The Writer will not use the title of the motion picture as the title of his published work without the prior written consent of the Company; and if the Company requests the title of the motion picture as the title of his published work, the Writer agrees to do so. If prior to the release of the motion picture by the Company it is determined that the Writer is entitled to separation of rights, in the manner hereinafter provided, and if prior to such release the Writer exercises any publication rights licensed hereunder, the Company may, but shall not be required to, use the title of the published work or any translation or adaptation thereof as the title of the motion picture.

b. Dramatic Rights. If the Company does not exploit or cause to be exploited the dramatic rights in the story, screenplay or motion picture at any time prior to two (2) years following the general release of the motion picture in a bona fide dramatic production, intended to exploit such dramatic rights or if the Company does not commence the principal photography of the motion picture within five (5) years (plus the aggregate of periods, not to exceed six (6) months, that commencement of photography is postponed by "force majeure" type contingencies occurring within the last six (6) months of the five (5) year period) following the date of the employment contract (or the date of the written assignment in the case of a term contract, week-to-week contract or multiple picture type employment) or the date of acquisition if the material is purchased, then in either such event the Company shall lose its rights to exploit the dramatic rights, and thereafter the dramatic rights throughout the world in the separable material shall be licensed exclusively to the Writer on a royalty free basis both for the original term of copyright and any extension or renewals thereof without the necessity for the execution by the Company of any further instrument, except as expressly provided below and subject to the provisions of subparagraph e. of paragraph 7 hereof and to the following:

(1) If the Writer exercises the dramatic rights licensed to him hereunder, the Company shall be the copyright proprietor of the dramatic work and, if the dramatic work is registered for statutory copyright, copyright therein shall be taken and remain in the name of the Company or its nominee. Whether or not Writer registers the dramatic work for statutory copyright, the Company shall acquire all rights of every nature in and to the dramatic work, including the right to extend and renew the copyright, except for such rights, if any, as may have been expressly reserved by the Writer under and pursuant to his employment agreement or in the agreement for the purchase of unpublished and unexploited material from a Guild member and except for the publication rights and dramatic rights therein (but only to the extent that such publication rights and dramatic rights are licensed to and permitted to be used by the Writer under all of the terms and provisions of this Article 16A and except for such musical compositions interpolated in the dramatic

work (but not contained in whole or in part in the story, screenplay, or motion picture nor acquired in whole or in part from the Company), which neither contributes to nor forms a part of the story line of the dramatic work. With respect to the musical compositions in which the Company acquires rights under the preceding sentence, nothing contained in such sentence shall be construed to grant to Company any rights in any such musical compositions which are greater than the maximum rights therein at any time acquired or controlled by the Writer.

(2) If the Company, within the period above mentioned, exploits the dramatic rights, the Company will pay or cause to be paid to the Writer sums equal to 50% of the minimum amounts payable to an "Author" under the terms of the Minimum Basic Production Contract recommended by the Dramatists Guild of the Authors League of America, Inc., in effect upon the commencement of the dramatic performance; unless the Writer is the "Author" of the dramatic work in which case the Writer shall only be entitled to the minimum amounts payable pursuant to such Minimum Basic Production Contract in effect when the writing services as such "Author" of the dramatic work are performed. Subject to the provisions hereinafter contained in this subparagraph (2), "minimum amounts" as used in this (2) mean and include only the minimum payments payable to an "Author" by percentages of gross box office receipts payable to a "Producer" under such Minimum Basic Production Contract for a "Producer" under such Minimum Basic Production Contract for payments to be made under this (2) to the Writer shall be made when, as and if percentages of gross box office receipts are paid to the "Author" by the "Producer" under such Minimum Basic Production Contract, or would otherwise be payable to such Author, as aforesaid, except by reason of the deferment thereof because of prepayment against such percentages. For purposes of this (2) there shall not be offset against the minimum percentages of such gross box office receipts otherwise payable to such "Author" by such "Producer" under such Minimum Basic Production Contract, payments set forth in "THIRD (a)" or "FOURTH (a)" of the Minimum Basic Production Contract now in effect (or comparable payments set forth in any Minimum Basic Production Contract hereafter in effect) which such "Producer" may have made thereunder to such "Author"; nor shall any percentages of any such payments be payable hereunder to the Writer. Where under such Minimum Basic Production Contract, the "Producer" elects to pay to the "Author" (as an alternative to the payment of the percentage of the gross weekly box office receipts) monies under "THIRD (c) (i)" or "THIRD (d) (i)" of such Minimum Basic Production Contract for non-musical plays now in effect or under "THIRD (c) (i)" of such Minimum Basic Production Contract for musical plays now in effect, or elects to make comparable alternative payments under any Minimum Basic Production Contract hereafter in effect,

then for purposes of this (2) ''minimum amounts'' shall mean and include only such alternative payments at the minimum rates therefor set forth in such Minimum Basic Production Contract to the extent that such alternative payments are made thereunder in lieu of such percentage of the gross weekly box office receipts. In the case of a musical play where the person who has written the book therefore has not also written the music and lyrics, such ''minimum amounts'' mean and include only a fraction of such minimum percentages of such gross box office receipts or such alternative payments at such minimum rates therefore, as the case may be. Such fraction shall be the same as the fraction of gross box office receipts or alternative payments, as the case may be, to which the person who has written such book is entitled under such person's agreement with such one or more persons who has written the music and lyrics for such musical play.

(3)   If the Writer exercises the dramatic rights licensed to him hereunder he will, prior to the first performance of the dramatic work, submit to the Company a copy thereof, and the Writer will not, without the consent of the Company, use the title of the motion picture or the story or screenplay, as the case may be, as the title of the dramatic work. If the Company requests the Writer to do so, the Writer agrees to use the title of the motion picture as the title of the dramatic work. If prior to the release of the motion picture by the Company it is determined that the Writer is entitled to separation of rights, in the manner hereinafter provided, and if prior to such release the Writer exercises any dramatic rights licensed hereunder, the Company may, but shall not be required to, use the title of the dramatic work or any translation or adaptation thereof as the title of the motion picture.

(4)   If the Writer shall exploit the dramatic rights licensed to him hereunder, and shall require financing from any source, the Writer shall first offer the Company the opportunity to provide such financing by a written notice to the Company, setting forth in detail the terms and conditions upon which the Writer proposes to obtain such financing. Within thirty (30) days after receipt of such notice, the Company may notify the Writer that it elects to provide all or any part of such required financing upon the terms set forth in the Writer's notice. If within such period the Company notifies the Writer that it does not elect to provide such financing, or fails within the thirty (30) day period to respond to the Writer's notice, then the Writer may obtain the required financing elsewhere, but the Writer agrees that he will not offer to any lender or investor terms or conditions more favorable in any respect to such lender or investor than those set forth in Writer's notice to the Company, without again notifying the Company of such more favorable terms or conditions, and permitting the Company a period of thirty (30) days within which to accept or reject the Writer's proposal, in the

manner above provided. The provisions of this subparagraph shall apply in each instance in which the Writer makes any change in any term or condition of this financing offer more favorable to the lender or investor than those set forth in the Writer's last notice to the Company.

4.   Separable Material. Separable material, in which a Writer or Writers entitled thereto shall have separation of rights hereunder, refers to those portions or elements of the story (or story and screenplay) which are the original creation of such Writer or Writers. Separable material shall not include any assigned material or source material, and nothing herein contained shall be interpreted or construed as granting to the Writer any rights of any nature in or to such material. The Writer agrees that he will not make, or permit to be made, any use of any separable material that would infringe upon the copyright (either common law or statutory) or any other rights of the copyright proprietor or other proprietor of any literary, dramatic or musical material. With respect to public domain material incorporated in the Writer's story (or story and screenplay), nothing herein contained shall impair the Company's right to use or deal in or with such material at any time, in any manner or to any extent, without the necessity for the Writer's consent, and without any obligation to the Writer. A Writer who writes or contributes to the writing of a screenplay based upon or adapted from an original story created by another person, which person is entitled to separation of rights hereunder, and which Writer would otherwise be entitled hereunder to separation of rights in such story and screenplay had he written such story, shall not be entitled to any separation of rights; but under such circumstances such other person who has created such story shall have the same rights in such story and screenplay (as though such screenplay were originated and created by him. The Writer employed to rewrite or polish a screenplay written by another person shall not have any separation of rights hereunder, and material originated or created by such Writer shall be separable material available to the Writer entitled to separation of rights with respect to such screenplay.

Only if the writer is employed, subject to this agreement, to write a story and such writer becomes entitled to Separation of Rights hereunder, then if a person other than such writer is employed subject to this Agreement to write a screenplay based on such story, the Guild shall have the right to determine the screenplay writer's proportionate participation, if any, in the distribution of the proceeds or payments, if any, from the separate rights provided for in this Article, including sequel payments (as distinguished from any compensation for additional services to be rendered). However, such distribution shall not entitle such screenplay writer to any separation of rights. Provided the Company has complied with the relevant provisions of this Basic Agreement relating to such payments, payments made by Company to a writer in reliance on such a determination made by the Guild shall be deemed to have been made to the writer entitled thereto, insofar as the Company is concerned, and as to such payments Company shall have no liability to any other writer under this provision. The Guild shall notify the Company in

120
Article 16A
Separation of Rights
THEATRICAL

Article 16A
Separation of Rights
THEATRICAL
121

238

EXHIBIT N

writing of any rules, standards or formula, utilized by the Guild in determining participation, if any, in the distribution of such proceeds, and also shall advise the Company in writing of the screenplay writer's proportionate participation, if any, in such distribution of such proceeds. Neither the contracts with the writers nor the names of the writers shall be disclosed to the Guild Arbitration Committee, if any, making such determination.

**5. Sequel Payments**

a. Notwithstanding the fact that the Writer is entitled to separation of rights hereunder, he shall have no sequel rights in or to the motion picture or the separable material; however, on each occasion that the Company produces a theatrical motion picture which is a sequel to a theatrical motion picture as to which a Writer has been granted separation of rights hereunder, the Company will pay to the Writer an amount equal to 25% of the fixed compensation paid to the writer for his writing services in the writing of the story (or story and screenplay) involved. For such purposes, the compensation of a term contract Writer will be apportioned in accordance with the Company's normal accounting procedure, but in no event shall the payment made to any term Writer on account of the production of a motion picture sequel exceed the sum of $20,000.00. If the Writer entitled to separation of rights hereunder did not write the story (or story and screenplay) while in the employ of the Company, but sold such material to the Company, then the motion picture sequel payment shall be 15% of the fixed payment initially made to the Writer at the time of acquisition.

b. If the writer is entitled to separation of rights under this Article and if the separable material contained a character or characters which are used as the basis for a television series or a one-time television program produced primarily for broadcast over "free" television, the Company will pay to the Writer an amount equal to applicable sequel payments as provided in Article 16B.2. for each episode of such television series or the one time television program so produced and broadcast, either live or by film. All of the foregoing is subject to the following conditions:

(1) If the Writer's contract provides for any television royalties and residuals or any payment based on profits or any other revenue derived from the television series or one time television program, the payments to be made under this subsection 5.b. can be recouped from or offset against such payments based on such royalties, residuals, profits or other revenue.

(2) Rerun payments shall be payable under this paragraph b. only as to separable material acquired by Company from a writer pursuant to an agreement with Company entered into on or after December 13, 1966. Such rerun payments shall be equal in amount to those applicable payments specified in Article 15B.1.b. (4).

(3) As to any television series or one time television payment for which a television sequel payment is otherwise payable to a writer under the Basic Agreement, or any other collective bargaining

agreement to which this Basic Agreement is a successor, no payment shall be payable under this paragraph b.

(4) If more than one writer is entitled to payment under this paragraph b. with respect to the television series or one time television program involved, then all such writers shall be considered as a unit and shall share equally in such payment.

(5) The provisions of this paragraph b. shall apply only to material subject to this Basic Agreement and acquired after the effective date hereof under contracts subject to and entered into after the effective date of this Basic Agreement.

**6. Arbitration**

a. If the writer who receives "story by", or "written by" or "screen story by" credit pursuant to the Theatrical Schedule "A" hereof shall contend that he is qualified for separation of rights under one of the exceptions stated in subsection 2.a.(1) and (2) of this Article 16A, the Guild shall, within ninety (90) days after the determination of "story by" or "written by" or "screen story by" credit, pursuant to such Schedule "A" hereof serve written notice of such writer's contention on the Company together with a list of the credits as finally determined. If the Guild fails to give timely notice of any such writer's contention as set forth above, the Guild and such writer shall be deemed to have waived any and all claims with respect to separation of rights in the material which was the subject of such credit determination. Company may dispute such contention by giving the Guild written notice to such effect no later than twenty (20) days after the actual receipt by Company of the notice referred to in the preceding sentence. Company's notice shall be accompanied by a copy of the assigned material and shall set forth in reasonable detail the basis of Company's contention. If Company does not so timely dispute such contention, then the writer shall be conclusively deemed to have separation of rights in the separable material as defined in subsection 4. of this Article 16A. If the Company does so timely dispute such contention, the Guild may, within sixty (60) days thereafter, give written notice to Company that it disputes Company's contention (setting forth the basis of its position in reasonable detail) or institute arbitration proceedings for the settlement of the dispute under the provisions of Articles 10, 11 and 12 hereof. If the Guild fails to so notify the Company or to institute arbitration proceedings within the periods abovementioned, such writer shall be deemed to have waived, and shall not be entitled to, any separation of rights with respect to the story (or story and screenplay) involved; provided, however, that if there is such an arbitration proceeding, as above provided, involving a situation where more than one writer receives credit as aforesaid, and if in such arbitration proceedings it is determined that a writer is entitled to separation of rights under this Article 16A, the provisions of 7.b. below shall be applicable and no writer who is to be regarded as a tenant in common thereunder, shall be deemed to have made any waiver under this sentence. If the writer and the Company agree, in writing, that the

Article 16A
Separation of Rights
THEATRICAL
122

123

Article 16A
Separation of Rights
THEATRICAL

239

EXHIBIT N

writer is entitled to separation of rights, then the writer shall be entitled to such separation of rights, as so agreed upon, subject to the provisions of 7.b. below. Any action or waiver by the Guild under this provision shall also bind the writer or writers involved. These provisions shall apply only where the screen credits are determined on or after June 16, 1970.

b. If prior to the commencement of principal photography of any motion picture and prior to the determination of credits as provided in subsection 3. hereof, a writer shall contend that he is the author of separable material, and would at the time such contention is made be entitled to exercise publication or dramatic rights, but for the fact that there has been no determination of credits, such Writer may obtain a determination that he is entitled to separation of rights by following the procedure set forth in this paragraph b. The Writer shall notify the Company in writing of his contention and in such written notice the Writer shall designate the particular right or rights intended to be exercised and shall further set forth, in reasonable detail, a description of those portions or elements of the story (or story and screenplay) claimed to be separable material pursuant to the provisions of this Article 16A. If the Writer and the Company are unable to agree thereon within ten (10) days after receipt by the Company of the aforesaid notice from the Writer, then the Writer may within seven (7) days after the expiration of said ten (10) day period institute arbitration proceedings for the settlement of the dispute under the provisions of Articles 10, 11 and 12 hereof.

If the Writer institutes such arbitration proceedings, the issue to be determined by arbitration shall be whether the material designated in Writer's notice is separable material and whether the Writer is entitled to separation of rights therein. The Arbitrators shall be guided in such determination by the provisions of this Article 16A and the standards set forth in the Theatrical Schedule "A" hereof for the proper use of the credits "written by", "story by" and "screen story by". If the motion picture is thereafter produced, such determination in arbitration shall not affect any determination of credits made pursuant to the provisions of such Schedule "A" attached hereto. After such an arbitration is instituted and upon request of the Guild, Company shall furnish to writers available to the Guild the names of all participating Writers and the material contributed by such participating Writers in connection with the story or story and screenplay in issue.

A determination, by agreement or arbitration under the provisions of this paragraph b., that any Writer or Writers are entitled to separation of rights with respect to any material shall be binding upon all other writers theretofore contributing to the writing of such material, and such determination shall supersede the provisions of the first paragraph of subsection 3. and 7.b. hereof with respect to material; but such determination shall not affect the rights, if any, of any other writer subsequently

contributing to the writing of such material, under the provisions of subsection 3. and 7.b. hereof.

c. If at any time Company desires to determine whether any person (hereinafter at times referred to as the "claimant") claims separation of rights hereunder, Company may, by written notice to the claimant, request from such person a statement as to whether or not such claimant claims such separation of rights in respect of a designated story (or story and screenplay). If Company sends such a written notice to the claimant, then Company shall also send a copy of such notice to the Guild. Within twenty (20) days after receipt by the Guild of such notice, such claimant and the Guild shall each notify the Company in writing either that it is the position of such claimant and the Guild, respectively, that such claimant is not entitled to separation of rights or that it is the position of such claimant and the Guild, respectively, that such claimant is entitled to separation of rights, in which latter case claimant or the Guild shall further set forth, in such detail as is reasonably possible, a description of those portions or elements of the story (or story and screenplay) claimed to be separable material pursuant to the provisions of this Article 16A. Such claimant shall be deemed to have waived, and shall not be entitled to any separation of rights with respect to the story (or story and screenplay) involved, if any one of the following occurs:

(1) If both such claimant and the Guild notify the Company in writing that such claimant is not entitled to separation of rights; or

(2) If the Guild notifies the Company in writing that such claimant is not entitled to separation of rights and such claimant does not, within such twenty (20) day period after receipt of such notice by the Guild from Company, serve written notice on the Company that such claimant is entitled to separation of rights, which notice contains the above-mentioned descriptions; or

(3) If within such twenty (20) day period, neither the Guild nor such claimant serves such written notice upon the Company that such claimant is entitled to separation of rights, which notice contains the above-mentioned description.

If separation of rights has not been waived as aforesaid, then at any time after the Company has made such request but no later than twenty (20) days after the Company receives such notice claiming separation of rights as aforesaid from such claimant or the Guild, whichever is last received, the Company may institute arbitration proceedings under the provisions of Articles 10, 11 and 12 hereof for the determination of whether, and the extent to which, such claimant is entitled to separation of rights. If the Company institutes such arbitration proceedings and if such claimant does not, within five (5) days after the receipt of written notice from the Company of the name of the arbiter selected by the Company, serve written notice on the Company that such claimant claims separation of rights and setting forth in such notice, in such detail as is reasonably possible, a description of those portions or elements of

EXHIBIT N

the story (or story and screenplay) claimed to be separable material pursuant to the provisions of this Article 16A, such claimant shall be deemed to have waived, and shall not be entitled to any separation of rights with respect to the story (or story and screenplay) involved. If at the time of such submission to arbitration there has been no determination of credits as provided in subsection 3. above, then the issue to be determined by arbitration shall be, and with the same effect, as set forth in paragraph b. above. The Company may make any request under this paragraph c. or institute arbitration proceedings under this paragraph c. against one or more persons either at the same time or at different times, as Company may from time to time determine. If separation of rights has not been waived as aforesaid, the contents of any notice served or sent under this paragraph c. by the Company, the Guild or such claimant, shall not preclude any party to such arbitration proceeding from raising therein any matter relevant to such determination of separation of rights.

d.  No grievance under Articles 10, 11 and 12 hereof shall be required either as a condition precedent to any arbitration proceedings under this subsection 6. or otherwise under this subsection 6.

7. **Miscellaneous**

a.  Acquisition of Rights by Company. If at any time prior to the disposition or exploitation by the Writer of publication or dramatic rights in separable material, as permitted herein, and either before or after the Company has acquired or employed the Writer to write such material, Company shall wish to acquire either or both of such rights, it shall so notify the Writer and the Guild. The Guild agrees that within fourteen (14) days after such notice, a paid negotiator, whose fees and expenses shall be paid by the Guild, shall meet with the Company for the purpose of negotiating a purchase price for the rights sought to be acquired by the Company. It is agreed that the negotiator will promptly thereafter quote a price at which the desired rights may be acquired by the Company. Company shall have the right to acquire the rights in question for the quoted price within thirty (30) days after Company receives such quotation. If the Company shall fail to purchase the rights in question at the price quoted by such negotiator, the Writer may thereafter sell such rights to any other person, firm or corporation at any price; provided that, if the Company has acquired, or employed the Writer to write, such material the Writer shall first give the Company fourteen (14) days written notice thereof, within which time Company may acquire such rights at such price as has been offered to Writer in good faith by such other person, firm or corporation. If a negotiator is not made available within the fourteen (14) day period first above mentioned, the Company may negotiate directly with the Writer or his representatives.

b.  Writer Teams.  If two or more writers collaborate in or separately contribute to the writing of a story (or story and screenplay) which

satisfies the requirements for separation of rights under the provisions of subsection 2. hereof, and it is determined that such Writers are entitled to share a credit specified in subsection 3. hereof, then all such Writers shall be regarded as equal tenants in common in the rights herein granted with respect to the separable material, and the separable material written by each of such Writers shall be included in the separable material so owned in common by all of such Writers.

c.  Application to Contracts.  If any employment contract, or any contract for the acquisition of literary material, was entered into prior to the date of the commencement of the term of this Basic Agreement, then the Writer or Writers that were parties to any such contract shall not be entitled to any separation of rights under the provisions of this Article 16A.

d.  Execution of Instruments.  The Company and the Writer will, upon request of the other, duly execute, acknowledge and deliver to the other any and all assignments or other instruments which may be reasonably necessary or desirable to effectuate the intent and purposes of this Basic Agreement or to evidence and establish the rights herein agreed to be licensed or granted; provided that such obligation on the part of the Company shall be deemed satisfied if any such assignment or other instrument is in the form of a license by the Writer to the Writer without warranties.

e.  Successors and Assigns.  The provisions of this Article 16A shall be binding upon and shall inure to the benefit of the successors, assigns, heirs, executors, administrators and legal representatives of the Company and the Writers entitled to separation of rights hereunder. The Writer will not cause, allow or sanction any publication or dramatization of the separable material, or any part thereof, or any arrangement, translation or revision thereof to be made in any part of the world or in any language without first granting to, reserving or securing for the Company, without further consideration, all of the rights, licenses and privileges reserved to the Company pursuant to subsection 3.a. (2), (3), (4) and (5) or subsection 3.b. (1), (3) and (4); and in any grants, assignments or licenses hereafter made or entered into by Writer concerning the separable material, the Writer will expressly except and reserve such rights to the Company. The Writer will deliver to the Company an executed copy of any such grant, assignment or license promptly following the execution thereof.

f.  Notices. All notices which the Company is required or may desire to serve upon a Writer, a claimant, or the Guild, under the provisions of this Article 16A shall be addressed to such Writer, claimant, or the Guild, in care of the Guild at its principal office in Los Angeles County, California; all notices which a Writer, a claimant or the Guild is required or may desire to serve upon the Company under the provisions of this Article 16A shall be addressed to the Company at its headquarters for the production of theatrical film in California. Such notices may be

Article 16A
Separation of Rights
THEATRICAL

Article 16A
Separation of Rights
THEATRICAL

**241**

**EXHIBIT N**

served by registered mail or telegram. Any notice so mailed, postage prepaid, shall be conclusively deemed to have been received on the second day following such deposit if posted within the State of California, or on the fifth day following such deposit if posted from a place outside the State of California but within the continental United States, or on the tenth day following such deposit if posted from a place outside the continental United States. Any notice delivered to a telegraph office, toll prepaid, shall be conclusively deemed to have been received upon the day following such delivery. Notwithstanding the foregoing there shall be no presumption of receipt during the period of any strike or work stoppage in the United States mail system.

8. **Writers' Right to Reacquire Literary Material.**

The provisions of this subsection 8. apply only to literary material (i) acquired by Company subject to the terms of this Basic Agreement or the terms of the 1970 or 1973 WGA agreement, (ii) which is original, i.e., not based on any pre-existing material, (iii) which has not been exploited in any medium, and (iv) which Company has decided it will not exploit in any medium in the future. As to such literary material if the writer who has written the same desires to purchase Company's right, title and interest therein, the Guild, on behalf of such writer may notify Company in writing of such desire. Within thirty (30) days following receipt of such written notice, Company shall notify the Guild of the terms and conditions, including the price at which it will sell its right, title and interest in such literary material; provided, however, that Company may instead notify the Guild that the literary material does not meet one or more of the conditions precedent specified in the first sentence of this subsection 8. The Company's decision that it has not decided not to exploit such literary material, and/or regarding the terms and conditions of the sale, shall not be subject to challenge by the Guild or by the writer on any grounds whatsoever whether in arbitration or otherwise even though Company does not in fact exploit or dispose of such material; without limiting the generality of the foregoing, offering the literary material for sale, or negotiating for such sale, shall not be deemed to be an election not to exploit such literary material.

The purchase price designated by Company shall not be in excess of the total direct costs previously incurred by Company in relation only to such literary material, including payments for the acquisition of the literary material and for writing services connected therewith (including writing services in relation to treatments and screenplays based thereon), and fringe benefit costs in relation thereto, such as pension and health and welfare payments and social security payments, but exclusive of overhead and exclusive of costs of any other kind (e.g., costs relating to proposed production other than writing costs).

Within thirty (30) days following notice from the Company of the terms and conditions on which it will sell its right, title and interest in such literary material, including the purchase price, the Guild, on behalf of the writer may serve written notice of acceptance of such terms and conditions and immediately following service of such notice the parties shall proceed to close

the transaction. Failure to effect such purchase in accordance with the procedure specified by the foregoing provisions shall result in the forfeiture of writer's right to purchase such material. At any time before receipt of notice of acceptance of the terms and conditions of sale, Company may dispose of such literary material or of any rights therein or with respect thereto or may itself elect to exploit such material, and in either such event the writer shall no longer have the right to acquire Company's right, title or interest in such material.

In addition to the foregoing, but with respect only to literary material acquired by a Company on and after March 2, 1977, the writer may reacquire such literary material in accordance with the procedures set forth below, if production of a theatrical or television motion picture based on the literary material has not commenced upon expiration of the following applicable time period:

(a) If, during the five-year period after (i) the Company's purchase or license of the literary material (if written by a professional writer) or (ii) completion of the writer's services rendered in connection with the literary material, the Company has not had additional writing services rendered thereon or otherwise actively developed the literary material, and if, further, upon expiration of said five-year period, the Company is not engaged in negotiations for the sale or license of the literary material to a third party, then upon expiration of said five-year period; or

(b) If, upon expiration of the five-year period referred to in subparagraph (a) above, the Company is engaged in negotiations for the sale or license of the literary material to a third party but has not also had additional writing services rendered thereon or otherwise actively developed the literary material, and if said negotiations do not result in a sale or license thereof, then upon the conclusion of said negotiations; or

(c) If neither subparagraph (a) or (b) above applies, then upon expiration of the seven-year period after (i) the Company's purchase or license of the literary material (if written by a professional writer), or (ii) completion of the writer's services rendered in connection with the literary material.

If the writer does reacquire such literary material, such reacquisition is subject to all existing commitments, such as security interests, participations, options, turnaround rights, employment rights, etc.

At any time during the two-year period immediately following expiration of the applicable time period set forth above, the Guild may give the written notice provided in the second sentence of this Paragraph 8 (hereafter "Guild's notice"), and within 30 days thereafter Company shall give the written notice provided in the third sentence of this Paragraph 8 (hereafter "Company's notice"), stating the terms and conditions on which it will sell its right, title and interest in such literary material, including the purchase price. Upon the giving of Company's notice, the literary property shall be deemed literary material which the Company has decided it will not exploit in any medium in the future. The purchase price designated by Company

**EXHIBIT N**

Case 3:16-cv-01442-SRU   Document 43-19   Filed 06/09/17   Page 70 of 114

shall not be in excess of the total direct costs previously incurred by Company in relation only to such literary material as set forth in the fifth sentence of Paragraph 8 above. Within 120 days of the giving of the Company's notice (during which period the Company shall not exploit, produce, sell or dispose of said material to any third person), the Guild, on behalf of the writer, may serve written notice of acceptance of such terms and conditions and immediately following service of such notice the parties shall proceed to close the transaction. Failure to effect such purchase in accordance with the procedure specified by the foregoing provisions by the end of such two-year period (i.e., the years commencing after the expiration of the applicable time period set forth above) shall result in the forfeiture of writer's right to purchase such material any time thereafter under any provision of this Paragraph 8. Within said two-year period the Guild on behalf of the writer may repeat the Guild's notice one or more times. All of the procedures and rights above described with respect to the first giving of the Guild's notice shall apply to the first such repeat notice. All of said procedures and rights shall also apply to the second and any subsequent repeat notices except that the Company shall not exploit, produce, sell or dispose of said material to any third person during any period between the giving of the Guild's second (or subsequent) repeat notice and the expiration of 120 days following the giving of the Company's respective notice.

Furthermore, if Company had previously granted some other person or company the right or option to acquire such material or any rights therein, the writer of such literary material shall not have the right to purchase the same so long as such other right remains outstanding. In the event that more than one writer is involved in the writing of such literary material the Guild shall have the sole responsibility to determine which of such writers has the right to purchase as provided herein and all interested writers shall be bound by the decision of the Guild.

## Article 16   Separation of Rights

B.   TELEVISION

1.   General Qualifications.

a.   Company agrees that separation of rights as provided in subsection 2. and 3. inclusive of this Article 16B shall be accorded to the Writer of a format, story, or story and teleplay for any television film (other than one of an established serial or episodic series) provided that the terms of this Agreement relating to rights in material apply to such format, story or story and teleplay as provided in Article 2 hereof. If at the time of the transfer of rights to the material so purchased there is in existence a valid agreement for the publication or dramatic production of such material, then for the purpose of this Article 16B such material shall be deemed to have been published or exploited. It is agreed as to an established serial or episodic series the Company shall own all of the rights in the material of any nature or description whatever including, but not limited to, the right to use the same in any field or medium whatever without obligation

to the writer except as provided in subsection 14. of Article 15B with respect to additional payments to be made for specific uses. The Guild shall determine which of the writers (considered as a single entity) shall have separation of rights or the proportion in which each shall share in such separation of rights. In that regard the Guild shall establish a set of rules for the determination of the separation of rights as between such writers. The Company is to be supplied with a copy of such rules. Neither the contracts with the writers nor the names of the writers shall be disclosed to the Guild Arbitration Committee.

b.   A writer who contributes to the writing of a teleplay based upon or adapted from a story or format created and written by another person shall not have any separation of rights and shall retain no interest of any character whatsoever in the teleplay. If such a teleplay be based upon a story in the public domain, or upon a story owned by the Company, the Company shall own all rights in the material of every nature and description whatsoever, and the writer shall retain no interest of any character in such material; provided, however, that if such teleplay is based upon a story in the public domain which was suggested and furnished by the writer of such teleplay, then: (i) if such teleplay was written for a television film of an established serial or episodic series, the writer shall be entitled to the payments referred to in paragraph l., of subsection 14. of Article 15B; or (ii) if such teleplay was written for a television film (other than one of an established serial or episodic series) and such teleplay otherwise meets the conditions set forth in said paragraph l., the writer thereof shall be entitled to the payments referred to in said paragraph l. in the same manner as if said television film were one of an established serial or episodic series. It is agreed, however, that if Company shall employ a writer to write a teleplay based upon or adapted from a story to which the provisions of this Agreement (including the separation of rights provisions) apply, the writer of such teleplay shall retain no interest of any character in such teleplay, the writer of the story shall have the same rights in the teleplay as he reserved with respect to the story, and the Company shall have the same rights in the teleplay as were granted to it in the story for the same period of time for which the Company has been granted rights in the story, as herein provided. A writer employed to rewrite or polish a teleplay written by another person shall not have any separation of rights hereunder.

c.   Notwithstanding the fact that the Company shall own all rights in literary material included in episodic series or serial type television films to which the provisions of this Basic Agreement apply, the Company agrees that it will not, without the prior consent of the Guild, use any such literary material in the production of a theatrical motion picture or a live television or radio broadcast prior to use of such material in the production of a television film; and the Guild agrees that it will not unreasonably withhold such consent.

d.   If a serial or Episodic Series (herein called "new 'serial or new episodic series'") is based upon an episode which is a "spin-off" from

EXHIBIT N

an existing serial or episodic series, the writer(s) of the format and/or the story or story and teleplay of such spin-off episode may be entitled to separation of rights in the new serial or new episodic series, subject to the provisions of Article 1C.13.

2. **Television Rights.** Company shall own the exclusive film television rights in the literary material to which the provisions of this Article 16B apply for a period of four (4) years from the date of delivery of the material, and thereafter Company and writer shall each have a non-exclusive right to utilize and exploit the film television rights in the material. Such non-exclusive rights on the part of the Company shall be deemed to include the right to continue to exploit and exhibit forever the television film and to remake the film for television purposes without additional compensation, except to the extent required under the provisions hereof relating to additional compensation for re-runs on television, foreign telecast and theatrical exhibition. Such exclusive television rights shall not include television sequel rights, except as otherwise hereinafter provided.

Company shall have the exclusive right to commence the exploitation of the television sequel rights within the following period:

(i)   within three years from the delivery of the story or story and teleplay (to which the separation of rights provisions of this Article 16B apply); or

(ii)   if a film is based thereon is broadcast within the three year period specified in (i) above, then within three years from the date of broadcast; or

(iii)   if a second pilot film is made, then within four years from the delivery of the story or story and teleplay (to which the separation of rights provisions of this Article 16B apply), or within three years from the release of said pilot film, whichever shall be earlier.

If Company shall so exploit such rights it shall pay to the writer for each episode produced and broadcast the following sum:

For such literary material written by or purchased from writer, hereunder, during

| "1st Period" | March 2, 1977 - March 1, 1978 — | $371 |
| "2nd Period" | March 2, 1978 - March 1, 1979 — | 401 |
| "3rd Period" | March 2, 1979 - March 1, 1980 — | 433 |
| "4th Period" | March 2, 1980 - March 1, 1981 — | 472 |

provided that such writer shall be entitled only to 60% of said amount for 15-minute episodes but shall be entitled to 190% of said amount for 60-minute episodes and 250% of said amount for 90-minute or longer episodes. Except as provided in Article 15B.1.b. and Article 15B.2. hereof, the payment of said applicable amount shall satisfy all obligations of the Company to the writer, and no additional sum or sums shall be payable, by reason of any use of such episodes. If the story or story and teleplay was written by more than one writer all such writers shall be considered as a unit and shall share equally such sequel payments.

In the event and only in such event that Company does not commence such exploitation within said period of time, such sequel rights in the story or story and teleplay and in the format, if any, shall revert to the writer or writers entitled to separation of rights, and Company will have no further interest therein. Company shall be deemed to have commenced the exploitation of the television sequel rights when it has obtained a firm commitment for the production, broadcasting or distribution in syndication of a series of not less than thirteen (13) filmed television episodes of the series, involving the exploitation of such sequel rights, to be broadcast either on consecutive weeks or alternate weeks.

In the event that the Company obtains a commitment for a "mini-series" (i.e., a series of less than thirteen (13) filmed television episodes), the Company shall be deemed to have commenced the exploitation of the television sequel rights and shall pay to the writer for each episode in the initial commitment a sum equal to thirteen (13) times the writer's agreed upon sequel payment divided by the number of episodes in the initial commitment. Compensation for reruns and foreign telecast of each episode in the initial commitment shall be at thirteen (13) times the compensation provided in the writer's contract for such rerun or foreign telecast divided by the number of episodes in the initial commitment, which sum shall be not less than thirteen (13) times the applicable minimum payment for such rerun or foreign telecast divided by the number of episodes in the initial commitment. In the event the pilot program is part of the commitment referred to in the two immediately preceding sentences, then the numerator and denominator in the formulae in said sentences shall each be reduced by one. Sequel rates for episodes in commitments after the initial commitment and compensation for reruns and foreign telecasts of such episodes shall be at the contractual sequel rate and applicable rerun or foreign telecast rate regardless of the number of episodes contracted for in the subsequent commitments.

Nothing in this paragraph 2 shall be construed to preclude the Company from producing a second pilot during the exclusive period provided for therein or from exhibiting such additional pilot during or after said period, provided that a deal is made with the writer of the first pilot to write a story and teleplay for the second pilot at a compensation not less than that paid him for the first pilot. The production and release of a second pilot shall not constitute exploitation of the television sequel rights within the meaning of this paragraph 2.

Rights acquired in a format revert to the writers unless within twenty-four (24) months after delivery of the format, the Company engages the writer or another writer to write a story and teleplay based on said format. If such reversion occurs, only the material supplied by the writer reverts. It does not include anything furnished by Company.

Where there is such a reversion and thereafter the writer sells such format and a series is produced from such format then after the time the film is exploited the Company shall be reimbursed by the writer (to the extent that the writer has received payment on such resale for such format) for the

**EXHIBIT N**

A-357

amount paid by Company to such writer for the format in excess of minimum.

## 3.  Other Rights

a.  Writer shall retain all other rights (hereinafter referred to as the "reserved rights") not expressly referred to in subsection 2. of this Article 16B including but not limited to dramatic, theatrical motion picture, publication, merchandising rights, radio rights, live television rights and television sequel rights (other than the sequel rights mentioned in subsection 2. of this Article 16B), and Company shall only have the limited interest in such rights as hereinafter described.

b.  With reference to certain reserved rights in a format, story or story and teleplay, the writer shall have no right to and will not use, or grant, license or otherwise dispose of to any third party or parties the right to use the following rights:

(1)  The live television rights until a date three and one-half (3½) years after the first broadcast of the television film, or a date five (5) years after the delivery of the story and teleplay, whichever shall be earlier.

(2)  The right to broadcast directly by television a live dramatic presentation of the material, in the exercise of the reserved dramatic rights, until a date three and one-half (3½) years after the first broadcast of the television film, or a date five (5) years after the delivery of the story or story and teleplay, whichever shall be earlier.

(3)  The right to release a theatrical film based upon the format, story or story and teleplay until one (1) year after the first broadcast of the television film or a date two (2) years after the delivery of the story or story and teleplay, whichever shall be earlier.

(4)  The right to broadcast by radio any program based upon or adapted from the format, story or story and teleplay until three (3) years after the first broadcast of the television film or a date four (4) years after the delivery of the story or story and teleplay, whichever shall be earlier.

c.  If during the four (4) year period mentioned in subsection 2. above, the writer desires to sell, license or otherwise dispose of any of the reserved rights, other than dramatic or publication rights, the Company shall have a right of first refusal thereof as follows: At such time as writer shall receive from a third party a bona fide offer, and the writer desires to sell, license or otherwise dispose of the rights involved on the terms of such offer, writer will, by written notice to the Company advise the Company of the rights involved and of such terms. Within seven (7) days (excluding non-business days as provided in Article 43) after receipt of such notice, Company may, by written notice to the writer, elect to purchase, license or otherwise acquire the rights involved on the terms set forth in writer's notice, in which case Company and writer will

enter into an agreement upon such terms. If within the seven (7) day period Company notifies the writer that it does not elect to exercise its right of first refusal, or fails to give writer any written notice, the writer shall be free to enter into an agreement with such third party, but may not do so on terms more favorable to the third party than those set forth in the notice to the Company without again submitting the more favorable terms to the Company for first refusal, as herein provided. The right of first refusal herein granted shall apply to television sequel rights if the same shall revert to the writer prior to the expiration of said four (4) year period.

d.  If at any time prior to the disposition or exploitation of such rights (as permitted herein) by writer, Company shall wish to acquire any of the reserved rights (including dramatic or publication rights) Guild shall meet with Company for the purpose of negotiating a purchase price for the rights sought to be acquired by Company. It is agreed that the Guild will quote a price at which the rights desired to be acquired by the Company may be purchased. Company shall then have the right to acquire the rights in question for the price agreed upon as a result of such negotiations within thirty (30) days from the completion thereof. If Company shall fail to purchase at the lowest price offered by Guild, writer may thereafter sell such rights to any other person, firm or corporation at any price; provided, however, that he first give Company fourteen (14) days' written notice thereof within which time Company may acquire such rights at such price as has been offered to writer in good faith by such other person, firm or corporation.

If at any time the Company wishes (i) to secure protection against a competitive use for which no period of non-competitive use is prescribed in paragraph b. above, or (ii) to extend any period of non-competitive use prescribed in paragraph b. above, or (iii) to extend the four (4) year period of the right of first refusal prescribed in paragraph c. above, or (iv) to secure a right of first refusal on reserved dramatic or publication rights, it will negotiate therefor through the Guild.

It is understood that in acquiring any reserved right, the Company may designate related or subsidiary rights that it wishes to acquire and negative covenants concerning the use of competing rights that it wishes to secure; and the Guild will include such related and subsidiary rights and negative covenants in the price quoted for the reserved right acquired. For example, if the Company desires to acquire the dramatic rights it may include limited publication, radio and television rights for advertising and publicizing the play, and may also require the writer to agree that he will not use or license or grant to others the right to use his reserved live and film television rights. In such case the Guild shall have the right to grant the subsidiary rights and impose the negative covenants requested, and will quote a price to the Company which shall include such subsidiary rights and negative covenants.

e.  Company has the right to negotiate directly with the writer to acquire the theatrical rights, publication rights, and merchandising

EXHIBIT N

rights, and each of them, notwithstanding any provisions of paragraphs d. and f. of this Article 16 B. 3., or either of them, pertaining to negotiation with the Guild for compensation on no less than the following basis:

(1)  Theatrical Rights — The Company shall pay two and one-half percent (2½%) of the bona fide budgeted direct cost (and overhead or other indirect cost shall be excluded except to the extent it exceeds 25% of direct cost), or $20,000, whichever is greater, for theatrical rights. The above shall apply to each theatrical remake and sequel. If such two and one-half percent (2½%) is greater than $20,000, the excess shall be paid not later than 60 days from the delivery of the answer print.

(2)  Publication and Merchandising Rights and each of them — The Company shall pay six percent (6%) of absolute gross (that is, monies remitted by the manufacturer or the publisher, as the case may be), as derived from licensing, for the publication and merchandising rights. Comic books, magazine publications, comic strips, cutouts, and other activity books shall be deemed to be included as merchandising rights.

(3)  In the event the Company fails to commence exploitation of any of the three (3) rights stated in subparagraphs (1) and (2) above within four (4) years from the date of delivery of literary material or three (3) years from the exhibition of the first film of the series or serial in which separation of rights obtains, whichever is shorter, then any rights as to which Company has failed to commence exploitation shall revert to the writer. The payment of the above described $20,000 payment for the theatrical rights shall constitute exploitation of such right. Nevertheless the Company has the right of first refusal as provided in this Article 16B.3.d. There shall be no crediting of any initial compensation against the above described payments.

f.  In regard to the reserved theatrical motion picture rights in any material, to which the separation of rights provisions of this Article 16B apply, if the writer commences the production of a theatrical motion picture based thereon, or has sold, licensed or otherwise disposed of the theatrical motion picture rights in such material (as permitted herein) and shall notify the Company thereof in writing, then, unless prior to receipt of such notice Company has commenced the production of a television film which is a remake of the television film initially based upon such material, the Company will not thereafter exercise or sell, license or otherwise dispose of the television film remake rights in such material. If the Company acquires the theatrical motion picture rights in such material prior to the time the writer has commenced the production of a television film based thereon, or has sold, licensed or otherwise disposed of his non-exclusive film television rights in such material, the writer will not thereafter exercise or sell, license or otherwise dispose of his non-exclusive film television rights in such material. For the pur-

pose of determining whether the Company has commenced the production of a remake or the writer has commenced the production of a theatrical motion picture or a television film, the party shall be deemed to have commenced the production of the motion picture film involved if such party has expended a substantial sum or has undertaken a binding contractual commitment requiring such party to expend a substantial sum for any item of production cost customarily incurred in connection with the production of a motion picture film of the type involved; provided, however, that if principal photography of such motion picture film shall not be commenced within one (1) year after such item of production cost has been incurred, then for the purpose of determining the rights of such parties hereunder the commencement of production of such film shall be deemed not to have occurred. A dispute as to whether a substantial sum has been expended or committed, or as to abandonment, may be submitted to arbitration hereunder.

It is acknowledged that the reserved theatrical motion picture rights in material to which the separation of rights provisions of this Article 16B apply include the right to use the story or teleplay as the basis for a motion picture produced primarily for exhibition by paid television, and accordingly unless the Company has acquired the theatrical motion picture rights, it may not make such use of the story or teleplay.

g.  Company will inform the writer of the name of the person from whom the Company acquired rights with respect to the underlying property and Company without limiting its right to do the same agrees that the writer has the right to make a separate agreement with the owner of the underlying property as to such rights in such property as are reserved by the owner in his dealings with the Company.

4.  **Sketches and Routines.**  Notwithstanding the foregoing provisions of this Article 16B, but subject to the rights to buyout as specified in subsection 3.e. above, with respect to any sketch or routine included in a comedy-variety type television film, Company shall receive only the right to use and exploit the television film in any manner, and in perpetuity, and to remake the film (but only if the film is remade substantially in its entirety); provided that the writer or writers of such sketches or routines shall have no right to, and will not use or grant, license or otherwise dispose of the right to use the television rights, live or film, in such sketches or routines until a date one (1) year after the first broadcast of Company's television film or a date two (2) years after delivery of the script of such material, whichever shall be earlier; and provided further that notwithstanding anything herein contained to the contrary, Company shall be free to use, in any manner, all or any part of any routine or sketch written by a writer hereunder so long as such use, if it were made by another without authorization from the writer, would not violate any rights of the writer.

Notwithstanding the restrictions hereinabove set forth in this subArticle 4., if a writer creates a segment of a comedy-variety program consisting of a self-contained dramatic plot, and characters and characterizations which are distinctive and identifiable and the principal creation of the

**EXHIBIT N**

A-359

writer, and where such segment is fully developed and fully described in the material written by the writer, then such writer shall be entitled to a sequel payment equal to fifty percent (50%) [seventy-five percent (75%) in the case of a network, prime time, once a week or less program] of the episodic sequel payment for a thirty (30) minute episode for each program of the series in which such segment is used after the termination of the writer's employment on such series, it being understood that such sequel payments are not due for programs written during such writer's employment. A dispute between writers as to who created such a segment shall be determined by the Guild in accordance with its credit arbitration procedures.

5. **Upset Price.** Notwithstanding any of these provisions of this Article 16B or of any other provisions of this Basic Agreement in the event Company pays not less than the following "upset price" to each writer or team of writers entitled to separated rights for the writing or acquisition of a format or a format, story and teleplay or a story and teleplay as to which separation of rights applies the Company may bargain freely with the writers concerned with respect to separation of rights subject to the payment of minimum sequel payments. Such upset price shall be as follows, for each writer or team of writers as defined in Article 13:

**UPSET PRICE**

**Initial Compensation of At Least**

| | Effective 3/2/77-3/1/78 | Effective 3/2/78-3/1/79 | Effective 3/2/79-3/1/80 | Effective 3/2/80-3/1/81 |
|---|---|---|---|---|
| Format only (if by a writer other than the writer of story and teleplay) | 7,950 | 8,586 | 9,273 | 10,108 |
| Story and teleplay (other than by the writer of the format) | | | | |
| ½ hr film | 15,900 | 17,172 | 18,546 | 20,215 |
| 1 hr film | 23,850 | 25,758 | 27,819 | 30,323 |
| 1-½ hr film (or longer) | 29,680 | 32,054 | 34,618 | 37,734 |
| Format, story and teleplay by one writer | | | | |
| ½ hr film | 15,900 | 17,172 | 18,546 | 20,215 |
| 1 hr film | 23,850 | 25,758 | 27,819 | 30,323 |
| 1-½ hr film (or longer) | 29,680 | 32,054 | 34,618 | 37,734 |
| Bible — The upset price for a bible is twice the applicable minimum for a bible as computed pursuant to the provisions of Article 13 B 7 m (2). (see page 58, supra) | | | | |

Where the upset price has been paid, the rights acquired after negotiation, permitted by payment of the upset price, shall be set forth in a separate contract. The separate agreement for acquisition of the reserved rights shall state a separate consideration (other than the consideration for the original employment or purchase). Only the amount of initial compensation shall be used in determining whether the upset price has been reached, and with respect to week-to-week or term writers compensation may be allocated toward the upset price if the writer receives in excess of $1,000 per week.

6. **Adapter's Royalty.**

The credited writer or writers of a pilot story (if applicable) and teleplay to which separation of rights does not attach, which teleplay is the basis of a serial or episodic series, shall receive as a group a royalty equal to 75% of the corresponding sequel payment for each episode produced of said serial or episodic series, but no residuals.

7. **Extricable Material.** With regard to an episodic series program, other than the initial program or the pilot film of such series, the story writer shall have a non-exclusive right to the television use of the extricable material commencing one year after production of the series is discontinued. The writer shall further have similar rights to use extricable material in a theatrical motion picture provided that after production of the series is discontinued he gives the Company 18 months' written notice of such intention and provided further that prior to completion of such 18-month period the Company does not use such material in a theatrical motion picture, or sell, license or otherwise dispose of theatrical motion picture rights in such material.

8. **Continuing Rights and Obligations.** The provisions of this Article 16B or of any other provisions of this Basic Agreement in the event 16B shall be binding upon and shall inure to the benefit of the heirs, next of kin, executors, administrators, legal representatives, successors and assigns of the Company and the writer.

## Article 17   Pension Plan and Health Fund

A. **PENSION PLAN**

The Pension Plan established and known as the "Producer-Writers Guild of America Pension Plan" is funded and administered as follows:

1. Company agrees to contribute to the Plan amounts equal in the aggregate to five per cent (5%) of all "gross compensation" earned and paid to Writers for services, covered by and subject to this agreement, performed after the effective date hereof, in an employment capacity (to which employment the provisions of this Basic Agreement apply). Such amounts shall be contributed as and when the compensation is paid to the writer. The term "gross compensation" as used herein shall include amounts paid to an employee as compensation with respect to such services as a writer (including compensation paid as salary settlements and under Article 15B 1.b (2) and Article 15B 2, and including the full compensation paid for services both as a writer and as a story editor where the writer is also employed in the additional capacity of a story editor pursuant to Article 14) whether or not any services are performed, but shall not include:

a. Compensation in excess of $100,000 in connection with any single theatrical motion picture; it being understood that any percentage shall be paid only on the first $100,000 of a writer's gross compensation in connection with any such motion picture.

b. Any amounts payable to a writer under the provisions of Articles 15A and 51 of this Basic Agreement.

139

EXHIBIT N

c. The cost of transportation or living expenses paid to, or on behalf of the writer.

d. The value of any rights arising or acquired by the writer, and any payments made to the writer for the acquisition or exercise of rights under Article 16 hereof entitled "Separation of Rights".

e. In connection with any television film, gross compensation in excess of the greater of the following: (i) the aggregate of 2½ times the applicable minimum initial compensation under this Basic Agreement; (ii) the initial compensation agreed upon in the individual employment contract.

The term "initial compensation" as used herein means the initial compensation agreed to be paid by the Company to the writer for the writer's services upon a television film computed at the rates as specified in and pursuant to subsection 7 a, b, c, e, g, h, i, m, n, and s of Article 13B hereof and paragraphs G and K of Article 14 hereof and shall not include any compensation received by the writer pursuant to Article 15 B of this Basic Agreement nor shall it include the cost of transportation or living expenses paid to or on behalf of the writer, nor shall it include any payments made to the writer for the acquisition or exercise of rights in and/or to any literary property or properties pursuant to Article 16B of this Basic Agreement.

If the writer's services are loaned by the Company, the amounts paid to the writer by the Company shall be the basis for the computation of the writer's gross compensation, and not the amounts received by the Company from the borrower.

2. The Plan shall be administered by at least eighteen (18) Directors, six (6) appointed by the Association of Motion Picture and Television Producers, Inc. (hereinafter referred to as the "Association"), three (3) appointed by American Broadcasting Company, CBS Inc. and National Broadcasting Company (Network Group) and nine (9) appointed by the Guild. For each Director so appointed the Association, the Network Group or the Guild, as the case may be, will appoint an Alternate Director to serve in the event of death, disability, resignation or absence of such Director. The Association, the Network Group and the Guild shall also have the right at any time to remove any Director or Alternate Director appointed by it, and to substitute another Director or Alternate Director. In no event shall there be more than nine (9) Company and nine (9) Guild Directors and likewise their alternates.

The number of Directors to be allocated to the respective employer associations shall be subject to review every three (3) years following the establishment of the respective Plan. At such times the Directors to be allocated to each employer association or Network Group for the ensuing three (3) year period shall be determined, as nearly as practicable, in accordance with the proportion which the aggregate contributions to the Plan, for the preceding three (3) year period, made by the members of each such employer association, bears to the total contributions to the Plan made by members of all such employer associations, or such Network Group, during such period.

The references in these Pension Plan provisions to any employer association shall also apply to any employer association which may be or become a successor thereto.

The Pension Plan shall be industry-wide and open to all Companies signatory to any of the Guild's collective bargaining contracts which provide for payments to the Plan, as above set forth. By signing a letter of adherence to the Plan (herein described), and upon acceptance by the Directors, such other Companies shall be deemed to be parties to the Plan and to have appointed the Company Directors and Alternate Directors previously appointed and then serving.

The funds contributed under the Pension Plan shall constitute a separate Trust Fund created by the Trust Agreement executed by the parties to this Basic Agreement and adopted by the Directors. This Trust Fund shall be used solely for the purpose of providing Pension and death benefits for employees covered by the Guild's collective bargaining contracts in the motion picture industry who are eligible for such benefits under the Plan, and for expenses in connection with the establishment and administration of the Plan.

The Directors of the Plan have determined the form, nature and amount of pension benefits, the rules of eligibility for such benefits, and the effective dates of such benefits.

3. The Plan, including the plan of benefits thereunder, are each contingent upon and subject to obtaining and retaining such approvals from the Internal Revenue Service, the State Franchise Tax Board, and any other appropriate authority, as may be necessary.

   a. To establish the Plan as a qualified Plan under the Internal Revenue Code, and the California Revenue and Taxation Code;

   b. To establish the deductibility for federal income tax and franchise tax purposes of any and all contributions made by the Companies to the Fund;

   c. To establish that the Plan satisfies the requirements imposed by Sec. 7(d)(4) of the Fair Labor Standards Act, in order that contributions by Companies are excluded from employees Regular rate for overtime purposes.

Whenever reference in these Pension Plan provisions is made to the "Plan" such reference shall include any trust established and maintained pursuant to or incorporated in the Plan. Reference herein made to particular laws shall include all rules and regulations promulgated thereunder. If any part of the Plan is not so approved or does not comply with, or conform to the foregoing or any other applicable law, the Plan shall be modified by the Directors in such manner and to such extent as may be necessary in order that the Plan will comply with, and conform to all legal requirements, and that the necessary approvals may be obtained.

The Plan and Declaration of Trust shall provide that no portion of the contributions thereunder may be paid or revert to the Company.

Article 17B
Pension Plan and Health Fund
HEALTH FUND

141

248

EXHIBIT N

4. Company shall furnish the Directors of the Plan upon request with the required information pertaining to the names, job classification, social security numbers and wage information for all Writers covered by this Basic Agreement, together with such information as may be reasonably required for the proper and efficient administration of the Plan. Upon the written request of the Guild to the Company, such information shall be made available to the Guild.

5. No part of the Company's contributions to the Plan may be credited against the Writer's overscale compensation or against any other remuneration that the Writer may be entitled to, no matter what form such remuneration may take; nor shall such contributions constitute or be deemed to be wages due to the individual employee subject to this Basic Agreement, nor in any manner be liable for or subject to the debts, contracts, liabilities or torts of such employees.

6. The Guild at its option, by a sixty (60) day advance written notice to Company during the term of this Basic Agreement, may elect to convert this Plan to a contributory Plan by providing for contributions to the Plan by the Writers in addition to the contributions by Company as above provided. Such notice shall be accompanied by a certification by the Guild that its membership has approved such an election. Within thirty days after receipt of such notice by Company, the parties shall meet, negotiate and mutually agree upon the rate, conditions, method of computation, method of collection, and the effective date for the commencement of such Writer contributions to the Plan, and when agreed upon, such terms and provisions shall become a part of this Basic Agreement in all respects as though fully set forth herein.

B. HEALTH AND WELFARE FUND

The health and welfare fund established and known as the "Writers Guild-Industry Health Fund" is funded and administered as follows:

1. Company agrees to contribute to the Health Fund amounts equal in the aggregate to four per cent (4%) of all "gross compensation" earned and paid to writers for services, covered by and subject to this agreement, performed after the effective date hereof, in an employment capacity (to which employment the provisions of this Basic Agreement apply). Such amounts shall be contributed as and when the compensation is paid to the writer. The term "gross compensation" is used in this sub-Article B as defined in sub-Article A of this Article 17 and is subject to the same ceilings and exceptions provided for in said sub-Article A.

If the writer's services are loaned by the Company, the amounts paid to the writer by the Company shall be the basis for the computation of the writer's gross compensation, and not the amounts received by the Company from the borrower.

2. The Fund shall be administered by at least eighteen (18) Trustees, six (6) appointed by the Association of Motion Picture and Television Producers, Inc. (hereinafter referred to as the "Association"), three (3) appointed by American Broadcasting Company, CBS Inc. and National Broadcasting

Company (Network Group) and nine (9) appointed by the Guild. For each Trustee so appointed the Association, the Network Group or the Guild, as the case may be, will appoint an Alternate Trustee to serve in the event of death, disability, resignation or absence of such Trustee. The Association, the Network Group and the Guild shall also have the right at any time to remove any Trustee or Alternate Trustee appointed by it, and to substitute another Trustee or Alternate Trustee. In no event shall there be more than nine (9) Company and nine (9) Guild Trustees and likewise their alternates.

The Health Fund shall be industry-wide and open to all Companies signatory to any of the Guild's collective bargaining contracts which provide for payments to the Fund, as above set forth. By signing a letter of adherence to the Health Fund (herein described), and upon acceptance by the Trustees, such other Companies shall be deemed to be parties to the Health Fund and to have appointed the Company Trustees and Alternate Trustees previously appointed and then serving.

The funds contributed under the Health Fund shall constitute a separate Trust Fund created by the Trust Agreement executed by the parties to this Basic Agreement and adopted by the Trustees. This Trust Fund shall be used solely for the purpose of providing Health and Welfare benefits for employees covered by the Guild's collective bargaining contracts in the motion picture industry who are eligible for such benefits under the Health Fund, and for expenses in connection with the establishment and administration of the Health Fund.

The Trustees of the Health Fund have determined the form, nature and amount of Health and Welfare benefits, the rules of eligibility for such benefits, and the effective dates of such benefits.

3. The Health Fund, including the plan of benefits thereunder, are each contingent upon and subject to obtaining and retaining such approvals from the Internal Revenue Service, the State Franchise Tax Board, and any other appropriate authority, as may be necessary.

Whenever reference in these Health Fund provisions is made to the Fund such reference shall include any trust established and maintained pursuant to or incorporated in the Fund. Reference herein made to particular laws shall include all rules and regulations promulgated thereunder. If any part of the Health Fund is not so approved or does not comply with, or conform to the foregoing or any other applicable law, the Health Fund shall be modified by the Trustees in such manner and to such extent as may be necessary in order that the Health Fund will comply with, and conform to all legal requirements, and that the necessary approvals may be obtained. The Health Fund and Declaration of Trust shall provide that no portion of the contributions thereunder may be paid or revert to the Company.

4. Company shall furnish the Trustees of the Health Fund upon request, with the required information pertaining to the names, job classification, social security numbers and wage information for all Writers covered by this Basic Agreement, together with such information as may be reasonably required for the proper and efficient administration of the Plan. Upon the

143

Article 17B
Pension Plan and Health Fund
HEALTH FUND

249

EXHIBIT N

written request of the Guild to the Company, such information shall be made available to the Guild.

5. No part of the Company's contributions to the Health Fund shall constitute or be deemed to be wages due to the individual employee subject to this Basic Agreement, nor in any manner be liable for or subject to the debts, contracts, liabilities or torts of such employees.

### Article 18 Notice to Writers Employed on Same Material (General)

At the writer's request, the Company will notify a writer (a) at the time a writer is assigned to any material, if he already is employed by the Company, and (b) before a writer is employed to work on any material, of the names of all other writers then or previously employed by the Company on the same material, or from whom the Company purchased the material on which the writer is employed. Promptly on assigning a writer to any material the Company will notify all other writers who are then employed on such material of the name of the writer so assigned. The provisions of this Article are limited to the best knowledge of the Company. In the case of writers of pilots, or of projects on which there are competing stories, teleplays or screenplays, to be considered for the same production, the notice of the names of all other writers then or previously employed by the Company on the same material or projects, or from whom the Company purchased material (including source material and formats) on which the writer is employed, shall be given to the writer before the deal for his services has been concluded, without the writer requesting same.

For the purpose of the preceding sentence "same material or projects" shall include any television project assigned by the Company during the preceding twelve months which featured or proposed to feature the same performer, regardless of subject matter. If the performer is a performer in a continuing series, the foregoing provisions do not require notice to be given to all the writers on that series, nor do they require that notice be given to a new writer of the identity of all of the writers of the series.

In the case of a remake, the Company shall not be required to furnish the names of the writers employed on the prior photoplay.

### Article 19 Use and Delivery of Standard Form Contracts

#### A. GENERAL

If the Company borrows a writer from a loan-out company (as defined in Article 3 hereof), the Company will provide to the Guild a copy of its contract with the loan-out company for such services. The Guild agrees that the contract and information so furnished shall be deemed confidential and shall not be furnished or communicated to any person, firm or corporation not directly concerned.

Article 18
Notice to Writers Employed
on Same Material (General)
Article 19A
Use and Delivery
of Standard Form Contracts
GENERAL

144

Where the writer utilizes an office in his home in connection with an employment agreement with the Company such utilization by the writer shall be deemed to be at the request of and for the convenience of the employer.

#### B. THEATRICAL

1. The Company agrees that from and after the effective date hereof, Company will submit to the writer or his agent, a written contract setting forth the terms of the writer's employment in the following cases:

a. In a simple week-to-week contract, the contract will be submitted to the writer or his agent within two (2) weeks after his employment.

b. In a simple deal contract, the contract will be submitted to the writer or his agent within three (3) weeks after his employment.

c. A simple contract is defined as a one-picture contract or a week-to-week contract in which there are no provisions for percentages, participation or deferments and in which there are no options for additional pictures.

2. It is understood that there may be other provisions or factors with respect to which the submission of a complete and definite contract within the time period specified in subsection 1. a & b above may be impractical. In any such case the Company may request a waiver from the Guild of the requirements of this Article 19B 1. a & b, and the Guild will not unreasonably withhold the granting of such waiver.

The fact that a deal contract provides for writing to be done in stages, for example, first draft screenplay followed by final draft screenplay, does not prevent it from being a simple contract.

3. As to all other contracts, the Company agrees that from and after the effective date hereof, upon the employment of any writer, such writer shall be tendered, within a reasonable length of time, a written contract setting forth the terms of the employment. Employment contracts shall contain nothing contradictory to any of the provisions of this Basic Agreement.

4. Upon the full execution of a written contract, not less than two (2) copies thereof shall be delivered to the writer or his agent and either or both of such copies shall be executed by the Company, and if both of such copies are not executed by the Company, the copy not so executed shall be accurately conformed by an officer or employee of the Company who shall place upon any such conformed copy his signature or initials in form sufficient to identify such officer or employee.

5. Within one (1) week after the final execution of an employment contract between a Company and writer, then if such contract is subject to this Basic Agreement, the Company will deliver to the Guild a properly conformed copy of such employment contract.

Within one (1) week after receipt by Company of the executed contract referred to below Company will also send to the Guild: (a) excerpts from

Article 19B
Use and Delivery
of Standard Form Contracts
THEATRICAL

250

145

**EXHIBIT N**

contracts of employment with persons employed primarily in non-writing capacities (i.e., producers, directors, etc.) if such contracts contain a right to require writing services subject to this Basic Agreement, which excerpts shall include all of the provisions therein relating to such writing services and (b) copies of separate contracts for such writing services which are entered into with persons employed in non-writing capacities together with such portions of their contracts for non-writing services which relate to their compensation for such writing services.

6.   In an acquisition contract with a professional writer, Company will include a statement that such contract is subject to the provisions of this Basic Agreement to the extent provided in Article 3C 2. (other than the provisions of Article 6, Guild Shop, Article 17, Pension Plan, Health and Welfare, and Retiree Plan) of this Basic Agreement to the extent the same are applicable. Company will tender such acquisition contract to the professional writer within thirty (30) days (or forty (40) days if contract is to be executed outside the State of California) after agreement with respect to the acquisition of the material has been reached, and will send a copy thereof to the Guild within one (1) week after execution thereof by the professional writer.

An inadvertent failure by the Company to furnish a copy of an acquisition contract with a professional writer executed outside of California or a copy of a contract referred to above shall not constitute a breach of this Basic Agreement.

## C.   TELEVISION

1.   Company agrees that from and after the effective date hereof, upon the employment of any writer under the television provisions of this Basic Agreement, it shall tender the writer a contract setting forth all of the terms of the writer's employment, including all of the provisions set forth in Television Schedule "B" attached hereto and made part hereof (except that in the case of writers on term employment or under week-to-week contract said terms shall reflect that the agreement is not a freelance television writer's contract and shall be changed accordingly). None of the terms or conditions of any employment contract shall be less favorable to the writer than, or inconsistent with, or violative of, the applicable terms and conditions contained in this Basic Agreement. Company agrees to tender such contract to the writer within ten (10) days following the commencement of his employment, and agrees to send to Guild a copy of the executed contract of employment within one (1) week after receipt by Company of such executed contract; and the Company further agrees that if a copy shall not be so sent to the Guild, the Guild shall have the right to require the writer to refuse to continue rendering services for the Company until a copy shall be so sent to the Guild and the writer's compliance with such directive from the Guild shall not constitute a breach of his individual contract with the Company. In the event that the Guild gives notice in writing to the Company that such contract contains provision(s) less favorable to the writer, or inconsistent

Note 1:  See Article 14 I, concerning furnishing of contracts.

with, or violative of, the applicable terms and conditions contained in this Basic Agreement and in the further event that Company fails to make the change so requested within a period of fifteen (15) days from and after receipt of Guild's written notice, the difference or controversy may be submitted by either Company or Guild to grievance and arbitration and the finding of the arbitration panel shall be final and conclusive upon the parties hereto.

2.   If Company purchases from a non-professional writer literary material which would otherwise be subject to this Basic Agreement, as provided in Article 3C 2. hereof, it will notify the Guild of the name of such non-professional writer from whom such material is purchased.

3.   If Company acquires from a professional writer literary material subject to this Basic Agreement, to the extent provided in Article 3C 2. hereof, it will include in the acquisition agreement a statement that such agreement is subject to the provisions of this Basic Agreement to the extent provided in 3C 2. (other than the provisions of this Basic Agreement to the extent provided in 3C subject to the provisions of this Basic Agreement to the extent provided in 3C. 2. Company will tender such acquisition contract to the writer within ten (10) days (or twenty (20) days if contract is to be executed outside the State of California) after agreement with respect to the acquisition of the material has been reached, and will send a copy thereof to the Guild within one (1) week after execution thereof by the writer.

An inadvertent failure by the Company to furnish a copy of an acquisition contract with a professional writer executed outside of California or a copy of a contract referred to immediately above or the name of a non-professional writer referred to above shall not constitute a breach of this Basic Agreement.

## Article 20   Speculative Writing

### A.   THEATRICAL

1.   The Company and the Guild agree that there shall be no speculative writing, nor shall either party condone it as a practice. As used herein, the term "speculative writing" has reference to any agreement covered hereunder which is entered into between the Company and any writer whereby the writer shall write material, payment for which is contingent upon the acceptance or approval of the Company or upon the occurrence of any other event such as obtaining financing, or whereby the writer shall, at the request of the Company, engage in rewriting or revising any material submitted under the terms of this Basic Agreement and compensation for the writer's services in connection with such material is contingent upon the acceptance or approval of the Company, or upon the occurrence of any other event such

Note 2:  A total redraft of Article 19, for the purpose of generally simplifying procedures and clarification will be assigned to a joint legal committee, consisting of counsel appointed by WGA and counsel appointed by AMPTP. Recommendations of the joint committee shall be referred back to the parties for consideration. Revisions agreed upon by the parties shall be included in the MBA. Pending completion of the redraft, Article 19, as provided above, remains in effect.

as obtaining financing. Company shall not request a writer to write and submit literary material, other than a submission contemplated by Article 3B 2 of this Basic Agreement, unless the Company first makes commitment with the writer for the writing of at least a story or treatment. If the Company does so make a prohibited request, the writer shall not write and submit such material.

2. The Company and the Guild recognize that there is possibly an area wherein the proper and constructive exchange of ideas and criticism between a writer and a Company may be claimed by the Guild to be speculative writing. Whenever the Guild feels that speculative writing has occurred, the case will be referred to grievance and arbitration and the Company's intent as determined by the facts shall be an important factor in the consideration. It is understood in this connection that nothing in this Article shall limit the submission of original stories or prevent the Company from discussing with any writer any ideas suggested by such writer, or discussing with any writer any ideas or any material suggested by the Company in order to determine the writer's thoughts and reactions with respect to any such idea or other material to determine the writer's suitability for an assignment.

B. TELEVISION

1. The Company and the Guild agree that there shall be no speculative writing, nor shall either party condone it as a practice. As used herein, the term "speculative writing", has reference to any agreement entered into between the Company and any writer whereby the writer shall write material, payment for which is contingent upon the acceptance or approval of the Company, or whereby the writer shall, at the request of the Company engage in rewriting or revising any material submitted under the terms of this Basic Agreement and compensation for the writer's services in connection with such material is contingent upon the acceptance or approval of the Company. Company shall not request a writer to write and submit literary material, other than a submission contemplated by Article 3C 2 of this Basic Agreement unless the Company first makes a commitment with the writer for the writing of at least a story. If the Company does so make a prohibited request, the writer shall not write and submit such material.

2. The Company and Guild recognize that there is possibly an area wherein the proper and constructive exchange of ideas and criticism between a writer and a Company may be claimed by the Guild to be speculative writing. Whenever the Guild feels that speculative writing has occurred, the case will be referred to grievance and arbitration and the Company's intent as determined by the facts shall be an important factor in the consideration. It is understood in this connection that nothing in this Article shall limit the submission of original stories or prevent the Company from discussing with any writer any ideas suggested by such writer, or discussing with any writer any ideas or any material suggested by the Company in order to determine the writer's thoughts and reactions with respect to any such idea or other material to determine the writer's suitability for an assignment, provided,

however that any such discussion relating to an assignment shall be subject to the provisions of subsection 3. hereof.

3. A writer's initial interview with the Company concerning employment in connection with an assignment may only be with (i) a person who is empowered to make, subject to the negotiation of mutually acceptable terms and conditions, the final creative decision to engage a writer for an assignment, or (ii) a person designated by the Company to interview writers with regard to the particular program. Unless a commitment was made by the Company in such initial interview by the writer with the Company concerning the same assignment may only be with a person who without reference to or consultation with any other person, firm or corporation, including but not limited to, network or sponsor, is empowered to make, subject to the negotiation of mutually acceptable terms and conditions, the final decision to engage a writer for an assignment. In no event may a third interview by the writer with the Company take place concerning such assignment, nor may the Company request the writer to render any writing services, unless there has first been a business meeting between the writer, his agent, or representative, with the business affairs executive or other executive of the Company charged with responsibility for negotiating the terms and conditions of a proposed employment contract between the writer and the Company and such terms and conditions have in fact been agreed upon. However, if a time emergency does not permit such business meeting to precede such third interview, such business meeting may take place after such third interview if there has been agreement prior thereto as to the monies to be paid the writer. For the purpose of this subsection 3., an interview shall not be deemed to include (i) a telephone request by Company addressed either to the agent or the writer solely for information concerning the writer's availability for employment or as to his credits, or (ii) an appointment solicited by the writer, the purpose of which is to inform Company of the writer's availability for employment or as to his credits, or (iii) film screenings. It is expressly understood that the writer may in no event be required to deliver any material written by him until all the terms and conditions relating to his employment in connection with such material have been agreed upon.

If in the first interview the writer gives a story, then a second meeting at the request of the Company concerning that story shall constitute a story commitment at minimum compensation.

If at the request of the Company the writer gives a story, either by telephone or in person or otherwise, then a meeting on that story at the request of the Company is a commitment. The parties hereto agree that the use of a telephone call, initiated by an authorized representative of the Company, as a method of circumventing a meeting in person to discuss the story is a violation of the provisions of the next preceding sentence.

4. Company shall furnish in writing to the Guild as to each program and series and serial, the names of all persons empowered to make a commitment with the writers; such notification shall be binding on Company. Any

149

Article 20B
Speculative Writing
TELEVISION

252

EXHIBIT N

Case 3:16-cv-01442-SRU   Document 43-19   Filed 06/09/17   Page 80 of 114

changes must be furnished to the Guild in writing, but shall be effective only after receipt by the Guild.

## Article 21   Location Expenses (General)

1.   If a writer is required by the Company to perform services on any location sufficiently far away from the Company Studio so that overnight accommodations are reasonably necessary, the Company shall furnish and pay for first-class board and lodging, if available, while the writer is required to remain on any such location, and agrees to furnish for the writer first-class transportation, if available, to and from any such location, it being understood that such first-class transportation need not include a drawing room or compartment or passage on any so-called "extra fare" train, or plane, and the Company may in any contract of employment between the Company and a writer designate a reasonable daily maximum liability on the part of the Company for such board and lodging of the writer.

If the writer is required to travel from the writer's then residence to Company's studio or offices in connection with an interview for proposed employment or in connection with writing services under a freelance employment contract, and such travel would reasonably require overnight accommodations (for such purposes travel in excess of 150 miles is deemed reasonably to require overnight accommodations) the Company will:

a)   Supply or reimburse reasonable first class, if available, transportation plus return transportation if the writer does not accept additional employment while at such designated site; and

b)   Pay per diem of $55.00 during the period of travel and continuing until the writer's services commence or in the case of an interview, during the period the writer is required to remain at such site.

The writer must advise the Company prior to the deal for the writer's services being concluded or, in connection with an interview for proposed employment, prior to agreement for travel for such interview being concluded, if the writer's residence is over 150 miles from the Company's studio or offices.

2.   Company will provide a minimum coverage of $50,000 accident insurance for each writer while in transit by airplane during his employment. Writer shall be permitted to fill out a form specifying a beneficiary. Such form shall be filed with the designated representative of the Company.

If the present minimum coverage of $50,000 accident insurance is increased in any other collective bargaining agreement, the writer referred to in this Article shall have the benefit of such increase.

3.   The beneficiary or beneficiaries designated by written notice to the Company shall be entitled to the proceeds of said insurance; provided, however, if the writer does not give a beneficiary designation as aforesaid, then the beneficiary or beneficiaries shall be as designated in the Pension Plan, or if the writer has designated a beneficiary in the Health and Welfare Fund at a later time than the designation in the Pension Plan, then such subsequent designation shall prevail.

## Article 22   Term Contracts-Options (General)

With respect to any contract of employment between the Company and a writer by the terms of which the Company is granted an option or options to extend such employment on a term basis; the first of such option periods shall be not less than thirteen (13) weeks; the second of such option periods shall be not less than twenty-six (26) weeks; the third of such option periods shall be not less than twenty-six (26) weeks and each additional option period shall be not less than fifty-two (52) weeks, and such option periods shall be consecutive, except that the provisions of this Article shall not apply in the following instances:

a.   To a writer who desires to work only a limited portion of each year or whose contract of employment provides for extended lay-off periods.

b.   To a writer whose term of employment is extended for such period, not exceeding, however, 60 days, as may be required to complete any assignment or assignments on which the writer was engaged at the expiration of the term of such contract.

c.   To a writer whose contract is extended for any period or periods by reason of any incapacity or any contractual, legal or equitable default of the writer, or any interference, suspension or postponement by reasons of any causes provided for or specified in the "force majeure" clause of such writer's contract.

d.   To a writer who grants options for employment to write literary material, other than a term basis.

It is understood that the above-designated minimum periods may be either with or without lay-off.

## Article 23   Lay-Off (General)

1.   The Company agrees that with respect to any term contract of employment between the Company and a writer the then current term of which is a period of twenty-six (26) weeks or more and in which an option is granted the Company to place the employment on lay-off without pay for a period of three (3) weeks or more, any installment of lay-off shall be for a minimum of three (3) weeks except in the following instances:

a.   If at any time the remainder of the lay-off allowable during any term of employment is less than a period of three (3) weeks, then such remaining period of lay-off may be given at any one time:

b.   If any part of the allowable lay-off period is given at the end of any term of employment under said contract of employment, then any such lay-off period may be for less than a period of three (3) weeks.

2.   With respect to any term contract of employment between the Company and a writer the then current term of which, as designated in the writer's employment

Article 22
Term Contracts-Options (General)
Article 23
Lay-Off (General)

253

151

EXHIBIT N

agreement, is a period of less than twenty-six (26) weeks and in which an option is granted the Company to place the writer in lay-off, any allowable lay-off must be taken in one period.

3.   The provisions of this Article 23 are not intended to apply to any suspension or lay-off by reason of any incapacity or default of the writer or interference, suspension or postponement by reason of any of the causes provided for or specified in the ''force majeure'' clause of such writer's contract. At any time after the commencement of any lay-off period the Company may recall the writer and if the Company pays the writer continuous contract salary for the intervening period then such period shall not be regarded as lay-off for the purposes of this Basic Agreement.

## Article 24   Guaranteed Employment (General)

1.   If a writer is employed at scale or above on a week-to-week basis he shall be employed for at least one week, except in the following instances in which there is no guarantee of any minimum employment:

a.   Assignments which are complete or which normally could be completed prior to the expiration of the minimum period of employment above mentioned; it being agreed that if at the time of a writer's engagement, the writer and the Company agree in writing that the assignment is one which could normally be completed prior to the expiration of the minimum period of employment and include in such written agreement a short descriptive phrase (such as, but not limited to, ''additional dialogue,'' ''technical aid,'' ''incidental dialogue,'' or any other general descriptive phrase) identifying the work to be done and designate the time within which such assignment could normally be completed and the writer accepts such engagement, then the applicable minimum period shall not apply and the writer may not thereafter deny any fact stated in such written agreement. Either party may terminate any such engagement at any time after the expiration of the time so agreed upon. The daily salary shall be one-fifth (1/5th) of the agreed upon weekly salary.

b.   Any non-exclusive employment, that is to say, any employment in which the writer is not required to devote his entire working time exclusively to such employment.

2.   The obligation of the Company hereunder to furnish employment during the minimum periods of employment above mentioned, or any part thereof, shall be wholly discharged by the payment of the agreed salary for the minimum period.

3.   The provisions of this Article shall, of course, be subject to any and all rights of suspension and/or termination which the Company may have by contract or otherwise, in the event of any incapacity (other than by reason of mere incompetence or unsuitability) or default of the writer, or in the case of any interference, suspension, or postponement by reason of any of the causes provided for or specified in the ''force majeure'' clause of such writer's contract.

## Article 25   Notice of Termination of Employment (General)

Any writer who has worked for the Company on a week-to-week basis for a period of not less than eight (8) consecutive weeks, including time before as well as after the effective date thereof, at a salary of $1,070 or less a week during the first twenty four (24) months of the term hereof or at a salary of $1,165 or less a week during the next twelve (12) months of the term (3/2/79 - 3/1/80) or $1,352 or less a week during the last twelve (12) months of the term (3/2/80 - 3/1/81), shall be entitled to receive and shall be required to give not less than one (1) week's notice prior to the termination of such employment, and any writer who has worked for the Company on a week-to-week basis for a period of not less than fifty-two (52) consecutive weeks, including time before as well as after the effective date hereof, at a salary of $1,070 or less a week during the first twenty four (24) months of the term hereof or at a salary of $1,165 or less a week during the next twelve (12) months of the term hereof (3/2/79 - 3/1/80), or at a salary of $1,352 or less a week during the last 12 months of the term hereof (3/2/80 - 3/1/81), shall be entitled to receive and shall be required to give not less than two (2) weeks' notice prior to the termination of such employment. The eight (8) weeks' and fifty-two (52) weeks' periods above referred to shall be exclusive of any prior period of guaranteed employment. It is understood that for the purposes hereof work performed by the writer shall be deemed to be consecutive during the time for which the writer receives compensation. Any period of suspension by reason of any of the causes provided for or specified in the ''force majeure'' clause of such writer's contract shall not be deemed to break any consecutive period of work but the period or periods of any such suspension shall not be counted as work time for the purposes hereof. If a Company shall discharge a writer solely for the purposes of evading the provisions hereof and shall, within forty-eight (48) hours, re-employ such writer, the writer shall be deemed to have worked continuously regardless of such discharge.

## Article 26   Force Majeure

Company shall have the right to suspend a writer employed on a week-to-week basis or for a definite term during all or any part of any period of so-called ''force majeure.'' If any such suspension continues for a period of five (5) or more weeks after its commencement the writer shall have the right to terminate his employment during the continuance of such suspension by giving Company, after the expiration of such period of five (5) weeks, written notice of such termination to be effective not less than one (1) week after the actual receipt by Company of such notice; provided, however, that such employment shall not be terminated if within one week after the actual receipt of such notice Company reinstates such employment, at the agreed upon compensation provided for thereunder. Nothing herein contained shall be considered to deprive Company of its right after such

152

Article 24
Guaranteed Employment (General)

153

Article 25
Notice of Termination
of Employment (General)
Article 26
Force Majeure

254

EXHIBIT N

reinstatement to suspend any such employment by reason of another event of "force majeure," or of Company's right to terminate any such employment at any time after the commencement of the suspension period.

### Article 27   Motion Pictures to Which Agreement Not Applicable (Theatrical)

It is understood that the provisions of this Basic Agreement shall not apply to motion picture cartoons, newsreels, advertising shorts, trailers, travelogues, commercial films or news or sports commentations.

### Article 28   Warranty and Indemnification (General)

1.   Company and writer may in any individual contract of employment include provisions for warranties of originality and no violation of rights of third parties, indemnification against judgments, damages, costs and expenses including attorney's fees in connection with suits relating to the literary material or the use of the literary material supplied by the writer or the use thereof by Company; provided, however, that the writer shall in no event

a.   be required by contract to waive his right to defend himself against a claim by Company for costs, damages or losses arising out of settlements not consented to by the writer; and Company reserves all of the rights it may otherwise have against the writer;

b.   be required to warrant or indemnify with respect to any claim that his literary material defamed or invaded the privacy of any person unless the writer knowingly used the name or personality of such person or should have known, in the exercise of reasonable prudence, that such person would or might claim that his personality was used in such material;

c.   be required to warrant or indemnify with respect to any material other than that furnished by the writer.

2.   The Company shall indemnify such writer against any and all damages, costs and expenses, including attorneys' fees, and shall relieve the writer of all liability in connection with any claim or action respecting material supplied to the writer by the Company for incorporation into the writer's work or incorporated in the writer's work by employees or officers of the Company other than the writer.

3.   The Company and the writer, upon the presentation of any such claim to either of them or the institution of any such action naming either or both of them as defendants, shall promptly notify the other of the presentation of any such claim or the institution of any such action giving such other party full details thereof, but the pendency of any such claim or action shall not relieve the Company of its obligation to pay to the employee any monies due in the absence of the writer with respect to the literary material contributed by the employee.

The company shall name or cover the writer (including writers employed via loan out companies, if the insurer permits such coverage) as additional insured on its errors and omissions policies respecting theatrical and television motion pictures.

### Article 29   Separate Agreement (General)

This Basic Agreement shall be construed as a separate agreement between the Guild and each Company signatory to a similar agreement with the Guild. No default or breach of a similar agreement by such other Company shall constitute a default or breach by or impose liability on the Company and a default or breach by the Guild as to a Company signatory to a similar agreement with the Guild shall not constitute a default of the Guild as to the Company. Termination of a similar agreement between the Guild and any other Company shall not affect this Basic Agreement.

### Article 30   Writer Employment Agreement of Company (Theatrical)

It is the intent of the parties hereto that nothing in this Basic Agreement shall be construed so as to give to the Company or to any individual writer employed by the Company the right to terminate or the right to refuse to perform (except to the extent specifically provided in Article 7 hereof) pursuant to the provisions of any individual contract between the Company and any such writer, or the right to claim a breach of such individual contract of employment by reason of any breach of any provisions of this Basic Agreement. The Guild shall have the right to waive any of the provisions of this Basic Agreement on behalf of or with respect to any individual writer.

### Article 31   Opportunity to Execute Similar Agreement (Theatrical)

Any person, firm or corporation now or hereafter during the life of this Basic Agreement engaged in the United States in preparation or production of a photoplay in which the Company has a substantial financial interest shall be afforded the opportunity of becoming a signatory to an agreement with the Guild containing the same terms and provisions as this Basic Agreement.

154

Article 27
Motion Pictures to Which
Agreement Not Applicable (Theatrical)
Article 28
Warranty and Indemnification (General)

155

Article 29
Separate Agreement (General)
Article 30
Writer Employment Agreement
of Company (Theatrical)
Article 31
Opportunity to Execute
Similar Agreement (Theatrical)

255

**EXHIBIT N**

## Article 32  Reference to Agreement (General)

This Basic Agreement shall be referred to as Writers Guild of America Theatrical and Television Basic Agreement of 1977.

## Article 33  Jurisdictional Disputes (General)

The Guild agrees to cooperate in good faith with the Company and with other guilds and organizations representing employees of the Company in working out a method for the determination of jurisdictional disputes without work stoppages.

## Article 34  Apprenticeship Program (General)

A committee is to be jointly set up by the Guild and the Companies, with equal representation on it. The purpose of the committee shall be to study the matter and to make recommendations to the Guild and the Companies with respect to a workable apprenticeship program. Any such program shall be jointly administered.

## Article 35  Recognition of Agreement (General)

The Guild agrees that it will take proper steps to provide that its by-laws carry this Basic Agreement into effect and that during the term of this Basic Agreement, it will not maintain or adopt any articles or by-laws or any rules or orders which will be in conflict with this Basic Agreement. The Guild will use its best efforts to cause its by-laws to provide that each of its members shall be bound by the provisions of this Basic Agreement. The Guild will not, by the adoption of by-laws or otherwise, seek to prevent the inclusion in contracts of employment between any writer and the Company, or any Companies signatory hereto of any terms or conditions not violative of this Basic Agreement, or seek to require that individual agreements of employment between any writer and the Company contain any provisions not required by this Basic Agreement. It is the intent of this Basic Agreement that, except to the extent that the Company is expressly limited by this Basic Agreement, the Company is not subject to any restrictions or limitations with respect to individual employment contracts with the writers employed hereunder. The Guild represents and warrants that at all times during the term hereof it will have exclusive jurisdiction over the matters and procedure necessary to carry out the purposes and intent of the foregoing provisions of this

Article 35 and over all other covenants and agreements to be kept or observed by the Guild pursuant to this Basic Agreement. The Company will not either alone or in concert with any other Company signatory to a similar agreement with the Guild take any action of any kind that will interfere with the performance of this Basic Agreement on the part of the Company or violate the provisions of this Basic Agreement.

Company will comply with all federal, state and local laws relating to amounts to be withheld and payments to be made in connection with any wages or salaries payable to writers employed by the Company.

Company acknowledges that all minimums required to be paid to writers employed hereunder are wages or salaries paid to employees and are subject to all federal, state and local laws relating thereto.

## Article 36  Tape (Television)

The provisions of this Basic Agreement apply to the employment of a writer to prepare, and to the purchase of literary materials for, a television film to be produced on tape. However, the parties acknowledge that the Guild is presently engaged in negotiations with the television networks and certain producers of certain live and tape television programs, employment and purchase of literary materials for which have prior to 1973 been covered by a separate WGA Television Freelance Minimum Basic Agreement (sometimes called the "WGA Live Agreement"). When the 1977 agreement is reached by the Guild with ABC, CBS and NBC the provisions of the agreement with said networks covering such employment and purchases shall be an amendment to and incorporated in this 1977 Basic Agreement to apply to such live and tape television programs and shall be binding on the parties hereto, unless the Guild is notified by the Association of Motion Picture and Television Producers within 30 days after notice from the Guild of such network agreement that its member Companies as a group elect not to accept such amendment of this Basic Agreement.* Such 30 day period shall start to run when, and only when, the Guild delivers to said Association, in writing, a copy of the relevant agreement, or other written formulation of the full details of the agreement, including contract language, if available, together with the written acknowledgement of said networks that such Agreement or other written formulation correctly states their understanding with the Guild.

The AMPTP shall after notice from the Guild of such Network Agreement have a 30-day period to notify the Guild that its signatory member Companies as a group elect not to accept such amendment of this Agreement. The Network Agreement having been previously accepted in 1973, the terms of the 1973 Network Agreement shall remain in full force and effect as Article 36 of this Agreement pending acceptance or rejection of the 1977 Network Agreement. If the 1977 Network Agreement is accepted, its provisions shall be retroactively effective as of March 2, 1977. If the 1977 Network Agreement is not accepted, the

*The 1977 Network Agreement was accepted in accordance with this Article 36.

Article 32
Reference to Agreement (General)
Article 33
Jurisdictional Disputes (General)
Article 34
Apprenticeship Program (General)
Article 35
Recognition of Agreement (General)

**EXHIBIT N**

parties shall be free to bargain, and agree to bargain, in good faith concerning employment of writers to prepare, and the purchase of literary materials for, television films to be produced on tape in the program categories covered by the Network Agreement, and Company shall not employ any such writers or purchase any such literary materials until agreement is reached with the Guild on said categories.

Guild and Company further agree as follows with respect to quiz and audience participation programs and minimums for writers of questions, answers and/or ideas for stunts for such programs where such writer supplies no other material: If the Guild enters into a Minimum Basic Agreement with packagers (who must include Goodson-Todman Productions) of more than 50% of the quiz and audience participation programs exhibited on network and syndication, Company will accept and be bound by the terms and conditions of the Guild's Minimum Basic Agreement with such packagers. The effective date of such agreement with Company shall be the date on which the Guild reaches agreement with respect to such programs with packagers of more than 50% of said programs, provided that the Guild serves notice on the Company within 20 days of reaching said agreement; otherwise, the effective date of such agreement with Company shall be the date on which the Guild gives notice to Company that it has reached agreement with packagers of more than 50% of said programs.

### Article 37   Names on Literary Material (Television)

The name (s) of the initial writer(s) shall appear on literary material written hereunder, following which the word "revisions" shall precede the names of all writers, if any, other than the initial writer in the event that such material is revised. Inadvertent failure to so include any name shall not constitute a breach of this Basic Agreement.

### Article 38   Non-Discrimination (General)

The parties to this Basic Agreement agree that, as provided in Federal and State Statutes, there shall be no discrimination due to sex, age, race, creed, color or national origin.

In accordance with this policy, the Company reaffirms and agrees to continue its policy of such non-discrimination in the employment of writers hereunder.

In accordance with this policy, the Guild reaffirms and agrees to continue its policy of such non-discrimination with respect to admission to membership and rights of membership.

The Cooperative Committee shall also serve as a committee on Fair Employment Practices to consider any complaints hereunder.

### Article 39   Pilot Screening (Television)

If over five (5) writers are invited to the screening, the Company will give the Guild the names of the writers invited and will inform the individual writers merely of the number invited. Company will also inform the Writer or

his agent of the approximate number of assignments open to the best of the Company's knowledge at the time such a writer is invited.

### Article 40   Security Instruments (Television)

1. With respect to all television films produced during the term hereof, Company agrees to either:

a. include in any chattel mortgage, pledge or other lien or security agreement covering any television film a provision made expressly for the benefit of the Guild as representative of the writers involved in such film to the effect that if such chattel mortgage, pledgee or lien or security is foreclosed and such mortgagee, pledgee, lien or security holders agree that if such mortgage, pledge, lien or security holder thereby obtains title to such film and subsequently exhibits the same on television or in theatrical release, then in such event after such mortgage, pledge, lien or security holder has recouped its loan so secured plus interest and all costs and expenses of foreclosure such mortgagee, pledgee, lien or security holder will be bound by the provisions of the Writers Guild of America Theatrical and Television Basic Agreement of 1977 with respect to the payment of rerun fees, foreign telecast fees and theatrical use fees thereafter due under this Basic Agreement. Provided, however, that nothing herein provided shall prevent such mortgagee or pledgee who has acquired title to such television film from thereafter making a sale of such television film to a third party free and clear of any limitations whatsoever. Except as otherwise provided in this subsection 1.a. the rights of the Guild hereunder as representative of the writers involved shall be subordinate to the rights of such mortgagee, pledgee, lien or security holder; or

b. in the alternative, to be bound by the provisions of this Basic Agreement with respect to rerun and foreign telecast fees and additional compensation for theatrical rights due after such foreclosure shall have been made. In the event Company elects this alternative, the provisions of subsection 1.a. above shall be inapplicable. If the provisions referred to in subsection 1.a. above are not included in any such chattel mortgage, pledge, lien or security agreement Company shall be deemed to have elected the alternative provided for in this subsection 1.b.

2. In the event of such foreclosure, should Company distribute any such television film for such mortgagee, pledgee, lien or security holder, Company shall be bound during the period of such distribution by the provisions of this Basic Agreement with respect to the payment of rerun fees, foreign telecast fees, and additional compensation for theatrical rights thereafter payable hereunder with respect to said television film. Any amounts paid by Company under this subsection 2. shall be credited against any obligation of the mortgagee, pledgee, lien or security holder that may be due or become due to Guild under subsection 1.a. above; it being understood that under no circumstances shall Guild be entitled to more than one payment of such obligation.

3.   If Company was not the actual producer of a television film which was produced by a signatory to this Basic Agreement, but Company acquires title thereto by purchase, assignment, transfer, voluntary or involuntary, or by foreclosure of a chattel mortgage or a pledgee's sale, or if Company enters into any distribution contract to distribute such television film, Company shall be obligated to pay the rerun fees and foreign telecast fees due hereunder when such film is exhibited on television, and to pay the fees due the writers involved when such film is exhibited in theatrical release, unless such other Company has theretofore made or heretofore become obligated to the Guild to make such payments.

4.   The foregoing provisions of this Article 40 shall not apply to any such television film subject to any security instrument which was in existence on or before June 15, 1970.

## Article 41   Notices (General)

All notices which the Company is required or may desire to serve upon a Writer, a claimant, or the Guild, under the provisions of this Basic Agreement, including, but not by way of limitation, the separation of rights provisions of both theatrical and television shall be addressed to such Writer, claimant, or the Guild, in care of the Guild at its principal office in Los Angeles County, California; all notices which a Writer, a claimant, or the Guild, is required or may desire to serve upon the Company, under the provisions of this Basic Agreement, shall be addressed to the Company at its headquarters for the production of motion pictures in California. Such notices may be served by registered mail or telegram. Any notice so mailed, postage prepaid, shall be conclusively deemed to have been received on the second day following deposit if posted within the State of California, or on the fifth day following such deposit if posted from a place outside the State of California but within the continental United States, or on the tenth day following such deposit if posted from a place outside the continental United States. Any notice delivered to a telegraph office, toll prepaid, shall be conclusively deemed to have been received upon the day following such delivery.

Notwithstanding the foregoing there shall be no presumption of receipt during the period of any strike or work stoppage in the United States mail system.

## Article 42   Posting Bonds (General)

Posting of Bonds — The Guild reserves the right, in the event it determines that a particular Company is not reliable or financially responsible, to require the posting in advance of an adequate bond, cash or other security.

## Article 43   Computation of Time (General)

Wherever in this Basic Agreement a period of time is expressed in terms of seven (7) days or less, or in terms of hours, in computing such period of time,

Article 41
Notices (General)
Article 42
Posting Bonds (General)
Article 43
Computation of Time (General)

160

unless the contrary is expressly provided, there shall be excluded all Saturdays, Sundays and holidays generally recognized in the motion picture industry.

## Article 44   Severability of Provisions (General)

If any provisions of this Basic Agreement shall, during the term hereof, be held void or unenforceable, all other provisions hereof shall nevertheless continue in full force and effect.

## Article 45   Producer-Writer Cooperative Committee (General)

Within fifteen (15) days after the execution of this Basic Agreement there shall be established a committee known as the Producer-Writer Cooperative Committee, composed of not less than sixteen (16) members representatives of the Company and the writers, eight (8) of whom shall be named by the Company signatories hereto and eight (8) named by the Guild. It is understood that any group of seven or more Company signatories hereto, may establish a separate committee for the purposes hereof, and the Guild will name members to meet with each such committee. Such committee or committees shall meet at least once every sixty (60) days. Deliberations shall be wholly informal and any and all matters affecting the operation and application of this Basic Agreement, and the promotion of a harmonious Company-Writer relationship shall be fully and freely discussed. Every effort shall in good faith be made by all members of the committee to prevent abuses from arising under this Basic Agreement, to eliminate inequities, and to promote cooperation between and mutual understanding of the problems of employer and employee.

## Article 46   Foreign Performance Fees (Theatrical)

The Guild has advised the Company that it is informed and believes that in certain foreign countries, on and prior to June 13, 1960, under laws, regulations or practices then existing, certain performance fees collected by performing rights societies, or similar organizations, from motion picture exhibitors are allocated to the writers of the screenplays of motion pictures and therefore should be paid ultimately by or through such societies, or similar organizations, to such writers. The Company has advised the Guild that it is unaware of any such laws, regulations or practices. However, the Company hereby agrees that if the Guild's information proves to be correct as to any foreign country, the Company will cooperate with the Guild in obtaining for any Writer receiving screenplay credit, under this Basic Agreement, payment of such allocated portion of such performance fees to which he may be entitled as aforesaid, by signing such instruments

Article 44
Severability of Provisions (General)
Article 45
Producer-Writer
Cooperative Committee (General)
Article 46
Foreign Performance
Fees (Theatrical)

161

258

EXHIBIT N

as may reasonably be required for such purpose, upon the following understandings and conditions, all of which are hereby approved and accepted by the Guild:

a.   That the Company shall not be obligated or required to surrender, assign, encumber or diminish in any way or to any extent any of its right, title and interest in or to the screenplays of its motion pictures, or in or to its motion pictures themselves, or in or to any copyrights or any performing rights with respect to any such motion picture or any literary or other material;

b.   That the revenue of the Company or any of its assigns or licensees, from the exhibition, marketing, performance or exploitation of the motion picture in question shall not be directly or indirectly diminished or otherwise prejudically affected;

c.   That the Company's agreements under this Article relate only to laws, regulations and practices existing on June 13, 1960;

d.   That under no circumstances shall the Guild or any individual Writer or any performing rights society or any other collection agency or organization or anyone else have the right to take any action or proceeding that would have the effect of enjoining, or preventing or otherwise interfering with the exhibition, marketing, performance or exploitation, by any means or method now or hereafter known, of any motion picture;

e.   That neither the Company nor any of its assigns or licensees shall be liable to the Guild or any individual Writer or anyone else for such performance fees.

Nothing contained in this Article shall be deemed to relate or apply to rights or alleged rights, under the laws of any foreign country, to share in the proceeds or profits of any motion picture, or any literary or other material, as distinguished from performance fees paid by exhibitors.

If the Guild shall claim that screenplay Writers are entitled to receive a share of performing rights collections from motion picture exhibitors in any particular foreign country, as first recited in this Article, the Guild shall furnish full particulars thereof to the Company before making any request pursuant hereto.

Article 47   Writer's Right to View Cut, Answer Print and
             Sneak Preview

A.   THEATRICAL

The Company agrees to invite the following writers to view a cut of the motion picture and will invite such writers to the first sneak preview reasonably in advance if such preview is held:

a.   Prior to the final determination of credits, as provided in the Theatrical Schedule "A" attached hereto, all writers who have participated in the writing of the final screenplay;

b.   After the final determination of screen credits, as in such Schedule "A" provided, only those writers who have been accorded screenplay credit.

It is the good faith intention of the Company that the viewing of the cut must be in sufficient time for the writers to offer editing suggestions which if approved could be effectively implemented.

Provided however that any inadvertent failure on the part of the Company to extend the writers such invitation shall not be deemed to be a breach of this Basic Agreement or a default on the part of the Company. Information concerning the time and place of any sneak preview shall be confidential. The writer will not advise any other person or persons of the time or place of any such sneak preview and in the event of any violation of such confidence by the writer the Company shall thereafter be relieved of any obligations with respect to such writer under the provisions of this Article.

B.   TELEVISION

The provisions of Paragraph A above shall also apply to television pilots, movies-of-the-week, and multi-part closed-end series filmed programs.

As to other television films, the Company shall designate an employee who, upon request, shall inform the following writers of the time and place of the showing of a cut and the answer print:

a.   Prior to the final determination of credits, as in the Television Schedule A attached hereto provided, all writers who have participated in the writing of the story and final teleplay;

b.   After the final determination of screen credits, as in said Schedule A provided, only those writers who have been accorded story and teleplay credit.

C.   Willful breach of the foregoing provisions regarding the viewing of a cut of a theatrical motion picture, television pilot, movie-of-the-week, or multi-part closed-end series filmed program by full time management personnel of the Company may be submitted to grievance and arbitration, and the Grievance Committee and the Arbitrator will have authority to award damages or penalty therefor of up to a total of $1,000.00 in television or $2,000.00 in theatrical, such sum to apply to all affected writers in the aggregate.

Article 48   Professional Status of Writers (General)

It is mutually recognized that the writer of the screenplay or teleplay, by reason of his unique knowledge of the material and his creative abilities, can contribute to the translation of his screenplay or teleplay to the screen by participating in other stages of production, including but not limited to discussions with the producer and director during preparation, production and after preview, in relation to changes in the screenplay or teleplay and in the motion picture. It is the policy of the Company to encourage such participation. If the

Article 47B
Writer's Right to View Cut,
Answer Print and Sneak Preview
TELEVISION

163

Article 48
Professional Status of Writers (General)

259

EXHIBIT N

writer of the screenplay or teleplay notifies the Company he wishes to participate in such discussions, Company shall in good faith invite such participation to such extent as may be feasible under the circumstances, it being understood that the Company shall have the right to determine who shall or shall not be present at a particular conference. Such participation by the writer shall be voluntary and without compensation.

## Article 49   Shopping of Material

### A.   TELEVISION

The Company may not shop literary material to a third party or parties without first obtaining in a separate written document the writer's consent that the literary material may be shopped to the designated third party or parties.

### B.   THEATRICAL

The Company may not shop literary material to any third party or parties whom the writer in a separate written document designates as persons to whom the literary material is not to be shopped.

### C.

If the Company shops any literary material to any third party or parties in violation of the above provisions, it shall pay to the Guild for the benefit of the writer involved the sum of $500.00 for each person or company to whom the literary material has been shopped in violation of the above provisions.

"Shopping" is defined to mean submitting the literary material to a third party or parties and specifically does not include submitting the material to individuals within the Company. If the Company has an option to acquire motion picture or television rights in literary material, or has acquired motion picture or television rights in literary material, the Company may submit such literary material to any third party or parties without restriction or penalty, except as may be otherwise provided in the agreement granting such option or rights.

## Article 50   Copyright (Television)

Company agrees that as to each television film based upon literary material which is subject to the provisions of Article 16 hereof, prior to the first public broadcast by television or other public exhibition thereof for profit, and in order that such film and its underlying material shall (to the extent that such film or material is capable of copyright by the affixation of such notice) be protected for copyright purposes, it will place upon such film a notice which may be one of the following:

a.   "©", date, name of company; or

b.   "copyright", date, name of company; or

c.   a combination of a and b; or

d.   a combination of a and b, with the addition of the words "all rights reserved".

The writer of any literary material subject to the provisions of Article 16B hereof and the Company agree that they will take no action with respect to the rights reserved to the writer or granted to the Company which will cause or permit such literary material to become a part of the public domain in the United States. Insofar as such literary material is covered by the copyright of the television film, the rights reserved to the writer hereunder will be held in trust for such writer by the owner of the copyright. Upon proper indemnification from the writer, the Company or copyright owner of a film will join in any suit for infringement of any of the rights reserved to the writer hereunder, if the writer is advised by counsel that the Company or such copyright owner is a proper or necessary party to any such lawsuit, but failure to join in any such suit shall not constitute a default by the Company or a breach of this Basic Agreement, unless the writer is thereby deprived of the opportunity to prosecute such suit. Company and writer agree at request of the other to join in the execution of any documents which either may deem reasonably necessary to protect the rights reserved or which revert to it or him hereunder.

Without limiting the generality of the foregoing, Company agrees to execute and deliver to writer an assignment under the copyright of all rights in the copyright reserved or which may revert to writer pursuant to the provisions hereof, such assignment to be in the form of a quitclaim except that the delivery and acceptance of such quitclaim shall not be deemed to have relieved Company of any of its obligations herein elsewhere contained with respect to the protection of the rights reserved to the writer.

Within twelve (12) months from the commencement of the term hereof, a committee composed equally of representatives of the Guild and the Association of Motion Picture and Television Producers, Inc. shall meet to reach mutual agreement as to the proper copyright procedure to be followed in order to assure protection of literary material contained on video tape.

Either party may reopen with respect to this Article 50 if the Copyright Act is revised during the term of this Basic Agreement and the parties agree to bargain in good faith. Any agreement reached in such negotiations shall be included in the Basic Agreement. A failure to agree in such negotiations shall not terminate the Basic Agreement and the matter shall not be subject to grievance and arbitration or any other action.

## Article 51   Supplemental Markets

1.   The provisions of this Article 51 relate and apply only to motion pictures as defined in Article 1.A.1. and 1.A.2:

a.   produced by the Company or within the provisions of paragraph h. (4) of subsection 3., of this Article 51, and

**EXHIBIT N**

b. the principal photography of which commenced on or after March 2, 1977, which motion pictures are, either during the term hereof or at any time thereafter, released in supplemental markets (as defined below); and

c. based upon a story or screenplay (the word "screenplay" shall be deemed to include teleplay, for the purposes of this Article) written by a writer while in the employ of the Company or in the employ of the actual producing Company as described in paragraph h (4) of subsection 3. of this Article 51 (to which employment the provisions of this Basic Agreement apply as provided in Article 5 hereof) or acquired by the Company (or such actual producing Company) from a professional writer (to which acquisition the provisions of this Basic Agreement apply as provided in Article 5 hereof), which writer or professional writer received or receives screen credit for authorship of such story or screenplay, as provided in the appropriate Theatrical or Television Schedule A, as the case may be.

2. DEFINITIONS. The term "Supplemental Markets", as used in this Agreement means only: The exhibition of motion pictures by means of cassettes (to the limited extent provided in subparagraph a of this paragraph 2), pay-type CATV, or Pay Television, as those terms are hereafter defined in this paragraph 2 and the exhibition of television motion pictures on any commercial carrier such as commercial airlines, trains, ships, and buses (referred to herein as "in-flight").

a. Cassettes: For the purposes of this Agreement, a cassette is any audio-visual device, including without limitation, cassette, cartridge, phonogram or other similar audio-visual device now known or hereafter devised, containing a motion picture (recorded on film, disc, tapes or other material) and designed for replay through a television receiver or comparable device. The sale or rental of cassettes for replay through a television receiver or comparable device in the home or in closed-circuit use such as in hotel rooms, constitute the "Supplemental Market" for the purposes of this agreement.

b. Pay-Type CATV: Exhibition of motion pictures through a television receiver or comparable device by means of transmission by a Community Antenna Television System (CATV) where, in addition to an obligatory general cable charge to the subscriber for the CATV service: (i) a charge is made for programs selected by the subscriber, or (ii) the subscriber has the option, by making payment, to receive special programming over one or more channels which are not available to the subscriber without such payment.

c. Pay Television: Exhibition of motion pictures through a television receiver or comparable device by means of telecast, cable or closed circuit for which the viewing audience (whether by the individual viewer or by the hotel, motel, hospital or other accommodation where the viewer is) pays to receive the program by making a separate payment for such specific program. Exhibitions in theatres or comparable places by means of telecast or cable is theatrical exhibition and shall not be considered Pay Television.

The term "Supplemental Markets" does not include the exhibition of a motion picture by cassette or otherwise over a television broadcast station in

free television, or in theatrical exhibition and for this purpose "theatrical exhibition" includes what has previously been considered to be the educational market, the exhibition of theatrical motion pictures on any commercial carrier (referred to herein as "In-flight"), such as commercial airlines, trains, ships and buses, and other uses which have been traditionally considered theatrical exhibition of theatrical motion pictures. Wherever reference is made in this Agreement to pay-type CATV or pay television, such reference shall be deemed to include only those uses of motion pictures as to which a charge is actually made to the subscriber (which may be a hotel, motel or other accommodation) for the program viewed, or where the subscriber or viewer has the option, for a payment, to receive special programming over one or more special channels. Where no program charge or special channel charge is made to the subscriber in addition to the obligatory general charge, the transmission of motion pictures by the CATV facility, including programming originated by the CATV facility, is free television exhibition for the purposes of this Agreement, and such exhibition shall not be considered "Supplemental Markets" exhibition.

With respect to theatrical motion pictures, the Company has agreed to the inclusion of pay-type CATV and pay television in the "Supplemental Markets" because under the present pattern of distribution of theatrical motion pictures, pay-type CATV and pay television are supplemental to the primary market. The Company reserves the right in future negotiations to contend that the pattern of release has changed so that pay-type CATV and/or pay television are no longer a "Supplemental Market" but constitute or are a part of the primary market of distribution of theatrical motion pictures, and that therefore no additional payment pursuant to this Article should be made with respect to the release of theatrical motion pictures (including those covered by this agreement) in said markets. The Guild reserves the right to contend in future negotiations that the method of employment and payment provided for in this Basic Agreement for writers of motion pictures are applicable and appropriate to employment and payment to writers of literary materials written directly for motion pictures intended primarily for release on pay-type CATV, pay television or cassettes, and that the provisions of this Agreement with respect to all kinds of "Supplemental Markets", whether they are or have become primary markets or not, shall be improved for the benefit of the writers of literary materials for said markets. Nothing herein shall limit the scope of negotiations on said subjects.

3. As to each such motion picture referred to in 1 above, (herein sometimes called "Such Picture"), the Company will pay to each participating Writer (as such term is hereinafter defined) as additional compensation, a pro-rata share of one and 2/10 percent (1.2%) (hereinafter referred to as the "percentage payment") of the company's accountable receipts from the distribution of Such Picture in "Supplemental Markets", computed as hereinafter provided and subject to the following conditions:

a. The term "Producer's gross", as used herein, means the worldwide total gross receipts derived by the distributor of Such Picture (who may be a

the Company or a distributor licensed by the Company) from licensing the right to exhibit Such Picture in Supplemental Markets; provided, however, that in the case of any Such Picture which is produced outside of the United States, if Such Picture is subject to this Basic Agreement and if such production is under an arrangement (herein referred to as a "foreign production deal") pursuant to which a foreign producer or distributor provides or guarantees any of the financing for the production of Such Picture or furnishes any other consideration for such production and a foreign distributor acquires one or more foreign territories for the distribution of Such Picture in Supplemental Markets, then no monies from any such distribution in any such foreign territory shall be included in Producer's gross except to the extent such foreign producer or foreign distributor is obligated to account to Company or to the distributor of Such Picture for such monies, and except for gross receipts received by such foreign distributor from such distribution in the United Kingdom.

If the distributor of Such Picture does not distribute Such Picture directly in Supplemental Markets, but employs a subdistributor to so distribute Such Picture, then the "Producer's gross" shall be the worldwide total gross receipts derived by such subdistributor from licensing the right to exhibit Such Picture in Supplemental Markets. In case of an outright sale of the Supplemental Markets distribution rights, for the entire world, or any territory or country, the income derived by the seller from such sale, but not the income realized by the purchaser or licensee of such rights, shall be the "Producer's gross". If any such outright sale shall include Supplemental Markets exhibition rights and other rights, then (but only for the purpose of the computation required hereunder) the Company shall allocate to the Supplemental Markets exhibition rights a fair and reasonable portion of the sales price which shall, for the purpose hereof, be the "Producer's gross". In reaching such determination Company may consider the current market value of Supplemental Markets exhibition rights in comparable motion pictures.

If the Guild shall contend that the amount so allocated was not fair and reasonable, such claim may be determined by submission to arbitration as herein provided; and in the event the Board of Arbitration shall find that such allocation was not reasonable and fair, it shall determine the fair and reasonable amount to be so allocated. If the outright sale includes Supplemental Markets distribution rights to more than one motion picture, Company shall likewise allocate to each Such Picture a fair and reasonable portion of the sales price of the Supplemental Markets rights; and if the Guild contends that such allocation is not fair and reasonable, the question may be determined by submission to arbitration as above provided. If the Board of Arbitration shall find that such allocation was not fair and reasonable, it shall determine the fair and reasonable amount to be so allocated to each Such Picture. Nothing with respect to the price received on the outright sale of only Supplemental Markets distribution rights in a single Such Picture shall be subject to arbitration except that in the event of a dispute, there may be arbitrated the question of whether the price reported by the Company to the

Guild as having been received by the Company on such outright sale is less than the amount actually received by the Company on such outright sale.

It is recognized that the method of distributing cassettes may not be similar to the method of distributing theatrical motion pictures in television. However, for the purpose of determining the amounts payable for cassette distribution of motion pictures, it is the intent of the parties that the basis for determining Producer's gross from cassette distribution shall be comparable to the basis used for determining the Producer's gross from the distribution of theatrical motion pictures in television. For example, gross receipts from cassettes sold at the retail level would not be Producer's gross hereunder. As a further example, if the Producer itself acts as a distributor and retailer, a reasonable allocation of the retail gross receipts shall be made as between the Producer as Distributor and the Producer as retailer, and only the former shall be deemed to be Producer's gross. The reasonableness of such allocation shall be subject to arbitration and, in such arbitration, generally prevailing trade practices in the cassette distribution industry with respect to dealings between non-related companies, shall be relevant evidence.

The Producer's gross shall not include:

(i)  Rebates, credits or repayments for cassettes returned (and in this connection the Producer shall have the right to set up a reasonable reserve for returns);

(ii)  Sums required to be paid or withheld as taxes, in the nature of turnover taxes, sales taxes or similar taxes based on the actual receipts of such motion picture or on any monies to be remitted to or by the Producer but there shall not be excluded from Producer's gross any net income tax, franchise tax or excess profit tax or similar tax payable by the Producer or such Distributor on its net income or for the privilege of doing business;

b.  The term "accountable receipts" as used herein, means fifty percent (50%) of the "Producer's gross", except as follows:

(i)  As to the Producer's gross from television motion pictures, the term "accountable receipts" as used herein means 100% of such gross.

(ii)  As to any particular theatrical motion picture, if the Producer's gross from such motion picture exceeds $400,000, the "accountable receipts" of such motion pictures means 50% of the first $400,000 of such Producer's gross and 100% of such Producer's gross in excess of $400,000.

(iii)  At the time, if any, that the producer's gross from Supplemental Markets of all motion pictures covered by collective bargaining agreements between the Guild and any motion picture producer or producers, heretofore, now or hereafter in existence, during any consecutive 12-month period equals $45,000,000, the term "accountable receipts" (as to any particular motion picture covered by this Agreement) shall mean 100% of the Producer's

168

Article 51
Supplemental Markets

EXHIBIT N

169

Article 51
Supplemental Markets

262

gross derived by such motion picture from Supplemental Markets after such date.

c. Company's obligation shall accrue hereunder only after Producer's gross is received by Company but as to foreign receipts such obligation shall accrue only when such receipts can be freely converted to U.S. dollars and are remitted to the United States, and until such time no frozen foreign receipts shall be included in Producer's gross. Payment of amounts accruing hereunder shall be made quarterly on the basis of quarterly statements, as hereinafter provided.

Upon request, and if permitted by the authorities of a foreign country, the Company will transfer to any writer, in the currency of such foreign country, his share, if any, of frozen foreign receipts in such country, provided the writer will bear any costs involved; and such transfer shall be deemed to be payment to the writer of an equivalent number of U. S. dollars at the then current free rate for blocked funds of that category as determined by the Company. Concurrently with such transfer the writer will pay to the Company in U. S. dollars the total amount the Company is required to withhold from such payment under all applicable laws. If the Company utilizes frozen foreign currencies derived from exhibition of Such Picture in Supplemental Markets by conversion thereof to properties that may be freely exported and turned to account, the amount so utilized by the Company shall be deemed to have been converted to U. S. dollars at the above current free market rate for blocked funds of that category determined as above provided. Frozen foreign receipts from Supplemental Markets shall be deemed to be released on a first-in first-out basis, unless the authorities of the foreign country involved designate a specific period that would render such basis inapplicable. Such released funds shall be allocated between Such Picture and other motion pictures distributed by the distributor in Supplemental Markets in the same ratio that receipts, derived from the distribution of Such Picture in Supplemental Markets within the foreign country, bear to the total receipts derived from the distribution of Such Picture and all other motion pictures in Supplemental Markets within the foreign country, during the applicable period, unless the authorities of the foreign country involved require another method of allocation, in which case such other method shall be used. Foreign receipts shall be accounted for in U. S. dollars at the rate of exchange at which such receipts are actually converted and remitted, and should any discounts, taxes, duties or charges be imposed in connection with the receipt or remittance of foreign funds, only so much of such funds as remain thereafter shall be included in accountable receipts. Company shall not be responsible for loss or diminution of foreign receipts as a result of any matter or thing not reasonably within the control of the Company. The Guild and the writers shall be bound by any arrangements made in good faith by the Company or for its account, with respect to the deposit or remittance of foreign revenue. Frozen foreign receipts shall not be considered trust funds and the Company may freely commingle the same with other funds of the Company. No sums received by way of deposits or security need be included in Producer's gross until earned, but when the Company is paid a

non-returnable advance by a distributor, such advance shall be included in the Producer's gross.

d. If any license or outright sale of exhibition rights to such Picture in Supplemental Markets includes as a part thereof any filmed commercial or advertising material, the Company shall be permitted to allocate a reasonable amount (in accordance with then current standard charges in the industry) to such commercial or advertising material, and the amount so allocated shall not be included in Producer's gross hereunder.

e. The term ''Participating Writer'', as used herein, means a writer who, while in the employ of the Company or in the employ of the actual Producing Company of Such picture as described in paragraph h. (4) of this subsection 3. (to which employment the provisions of this Basic Agreement apply), or a professional writer from whom the Company (or such actual producer) acquired literary material (to which acquisition the provisions of this Basic Agreement apply), participated in the writing of and received credit pursuant to the Theatrical Schedule A hereof or the Television Schedule A hereof, as the case may be, for the writing of the story or screenplay, or story and teleplay, as the case may be, upon which Such Picture was based. If Such Picture is a remake of a prior motion picture, and if any of the writers of the prior motion picture receive writing credit for the remake, such writers shall be deemed to be ''Participating Writers'' for the purposes of this paragraph e, but only if their employment as writers for the prior motion picture, or if the purchase of literary material from them for the prior motion picture, was covered by and subject to a collective bargaining agreement with the Guild. The ''pro-rata share'' payable to each Participating Writer shall be as follows:

Seventy-five percent (75%) thereof shall be payable to the credited screenplay or teleplay writer or writers, twenty-five percent (25%) thereof shall be payable to the credited story or screenstory writer or writers. In the event there is a minor credit, such as adaptation, the writer or writers receiving such minor credit shall be paid ten percent (10%) thereof which sum shall be deducted from the screenplay writers' share. The Writer or writers receiving a ''written by' credit shall be entitled to one hundred percent (100%) of the monies.

Any participating writers receiving the same screen credit referred to above shall share equally in such percentage amount specified.

If there are one or more participating Writers who receive screenplay or teleplay credit and no credit is given for story or screen-story, then the pro-rata share which would have been payable to a participating Writer had he received such story or screen-story credit shall, subject to the provisions of the next following paragraph, be paid to the Participating Writers who receive such screenplay or teleplay credit.

If the Writer's services in Such Picture are performed for the Company on a loan-out basis, then for the purposes of this Article the Company shall be deemed to be the employer, and the lender shall not have any responsibility hereunder with respect to Such Picture. With respect to any Such Picture,

if there are one or more Participating Writers who receive credit as aforesaid and one or more Writers who perform services in connection with the writing of the story or teleplay or screenplay and receive screen credit in connection with Such Picture, but who are not subject to this Basic Agreement, then that portion of percentage payment of said one and two-tenths percent (1.2%) which would otherwise have been payable to such one or more Writers not subject to this Basic Agreement may be retained by Company, and the Company shall not be obligated to pay such portion to any such participating Writer receiving credit as aforesaid.

f.   Within a reasonable time after the expiration of each calendar or fiscal quarter, but not exceeding sixty (60) days, Company will furnish or cause to be furnished to the Guild a written report showing the Producer's gross during the preceding quarter from the distribution of each Such Picture by Company in Supplemental Markets with respect to which Company is required to make payments hereunder (whether distributed by the Company or through another distributor).

Concurrently with the furnishing of each such report, the Company will make the payments shown to be due by such report. All payments shall be made by check payable to the order of the Writers entitled thereto, and shall be delivered to the Guild for forwarding to such Writers; and compliance herewith shall constitute payment to the Writers.

No such reports need be furnished with respect to any period during which there was no such Producer's gross. The Company shall make available for inspection by the Guild all distributor's statements and exhibitor's statements which are available to the Company insofar as they relate to such Producer's gross, and all the financial terms of contracts pertaining to such Producer's gross, and the Guild shall have the right, at reasonable times, to examine the books and records of the Company as to such Producer's gross pertaining to such distribution of any Such Picture, at whatever place or places such records are customarily kept by the Company. If the Guild requests that it be informed of the license fee paid under a license for the exhibition of Such Picture in Supplemental Markets, or if the Guild requests that it be sent an extract of the financial terms of such a license, and if such information is not extensive in nature, the Company will forward such information or extract without making it necessary for the Guild to send a representative to the offices of the Company. In general, the Company will cooperate in furnishing such information to the Guild by mail or telephone, where doing so is not unreasonable or burdensome. If more than one picture is licensed in a single license agreement, the Company shall inform the Guild, at its request, of the identity of the pictures covered by the license, and shall make available to inspection by the Guild in the office where such license agreement is customarily kept a copy of the terms of such license showing the titles of the pictures licensed under such agreement and the license fee for each such picture. Company agrees to cooperate in respond-ing to reasonable inquiries from the Guild as to whether any such picture is currently being distributed for telecasting on pay television or in any other Supplemental Market as herein defined. An inadvertent failure to comply

with the reporting provisions of this paragraph f. shall not constitute a default by the Company hereunder, provided such failure is cured promptly after notice thereof from the Guild is received by the Company.

Company shall make all social security, withholding, unemployment insurance, and disability insurance payments required by law with respect to the additional compensation provided for in this Article 51.

If the Company shall fail to make any payment provided for in this Article 51 to be made to the Writer when and as the same becomes due and payable, it shall bear interest at the rate of one and one half percent (1½%) per month on the unpaid balance thereof commencing to accrue ten (10) days after notice in writing to Company from the Guild of such delinquency.

The compensation payable under this Article 51 shall be excluded from the gross compensation upon which the Company contributions are to be made to the Pension Plan.

g.   If a Participating Writer's employment agreement with the Company requires that the Writer's compensation shall be based, in whole or in part, upon, or measured by, a percentage of the gross receipts derived from the distribution of Such Picture, then such percentage compensation shall be credited against any amounts payable to the Writer hereunder, and likewise any payment due to the Writer hereunder shall be credited against such percentage compensation. Where all or a part of a Writer's compensation is a specified sum of money, commonly known and referred to as a "defer-ment", such deferment may not be credited against amounts payable by the Company to such Writer hereunder.

h.   With respect to all Such Pictures, the following provisions shall be applicable:

(1)  Distributor's Assumption Agreement:

Prior to the commencement of principal photography of each Such Picture, if the company is not also the distributor in supplemental markets of Such Picture, Company shall obtain from the distributor having such Supplemental Markets distribution rights and deliver to Guild, a separate written agreement herein called "DISTRIBUTOR'S ASSUMPTION AGREEMENT", made expressly for the benefit of Guild as representative of the writers involved, by which such dis-tributor agrees to assume and pay the amounts payable hereunder by reason of the exhibition of Such Picture in Supplemental Markets, when and as the same become due. Such agreement shall be substantially in the following form:

"DISTRIBUTOR'S ASSUMPTION AGREEMENT

In consideration of the execution of a DISTRIBUTION AGREEMENT between _____ Company, and the undersigned Distributor, Distributor agrees that the motion picture presently entitled _____ is subject to the Writers Guild of America Theatrical and Television Basic Agreement of 1977, as

172

Article 51
Supplemental Markets

173

Article 51
Supplemental Markets

264

amended, (hereinafter "Basic Agreement") and particularly to the provisions of Article 51 thereof, pertaining to additional compensation payable to writers when motion pictures are released in supplemental markets and Distributor hereby agrees expressly for the benefit of the Writers Guild of America, West, Inc., herein called WGA, as representative of the writers whose services are included in such motion picture as released in supplemental markets to make the additional compensation payment required thereby when such motion picture is exhibited in supplemental markets. Distributor for and on behalf of the Company shall make all social security, withholding, unemployment insurance and disability insurance payments required by law with respect to the additional compensation referred to in the preceding sentence.

It is expressly understood that the right of Distributor to license such motion picture for exhibition in supplemental markets, or to exhibit or cause or permit such motion picture to be exhibited in supplemental markets, shall be subject and conditioned upon the prompt payment of such additional compensation, in accordance with Article 51 of the Basic Agreement. It is agreed that WGA, in addition to all other remedies, shall be entitled to injunctive relief against Distributor in the event such payments are not made.

Within a reasonable time after the expiration of each calendar or fiscal quarter, but not exceeding sixty (60) days, Distributor will furnish or cause to be furnished to WGA a written report showing the Producer's gross (as defined in Article 51 of the Basic Agreement) during the preceding quarter from the distribution of such picture by Distributor in supplemental markets with respect to which Distributor is required to make payments hereunder (whether distributed by the Distributor or through another distributor licensed by Distributor). Such report shall be accompanied by such payments as may be due.

Distributor shall also make available for inspection by WGA all Distributor's statements delivered to Company insofar as they relate to Producer's gross. WGA shall have the right at reasonable times and on reasonable notice to examine the books and records of Distributor as to Producer's gross. If Distributor shall fail to make such payments as and when due and payable, they shall bear interest at the rate of one and one-half per cent (1½%) per month on the unpaid balance thereof commencing to accrue ten (10) days after notice in writing from WGA of such delinquency.

This DISTRIBUTOR'S ASSUMPTION AGREEMENT shall remain effective and binding upon Distributor as long as it remains the Distributor of such motion picture in supplemental markets, and thereafter in perpetuity only if it has provided or guaranteed any of the financing for the production of such motion picture, in accordance with and subject to the provisions of paragraph h. (3) (i) of Article 51.3. of the Basic Agreement.

Where there is more than one distributor the provisions of such paragraph h. (3) (iii) of Article 51.3., of the Basic Agreement shall apply to each distributor which neither provides nor guarantees any of the financing for the production of such motion picture.

The Distributor has, has not (strike whichever is inapplicable) provided or guaranteed financing for production of such motion picture.

Date: _____

DISTRIBUTOR

By _____

Address:"

An inadvertent failure on the part of any such distributor to comply with any of the reporting provisions of this paragraph h. (1) shall in no event constitute a default by the Company or such distributor or a breach of this Basic Agreement, provided that such failure is cured promptly after notice in writing thereof from the Guild.

In the event of the expiration or termination of any distribution agreement, the obligation of Company to obtain and deliver to the Guild such DISTRIBUTOR'S ASSUMPTION AGREEMENT shall apply as well to any subsequent distribution agreement entered into by Company and Company shall obtain and deliver an executed DISTRIBUTOR'S ASSUMPTION AGREEMENT within ten (10) days after the execution of each of such subsequent distribution agreement.

If, with respect to any Such Picture distributor is not liable in perpetuity to pay the supplemental markets fees provided for hereunder, or if there is no distribution agreement made by Company with respect to any Such Picture granting supplemental markets distribution rights to the distributor, then the Guild, prior to the commencement of principal photography of Such Picture, may require such further financial assurances from Company as it deems advisable to insure performance of Company's obligations to pay the Supplemental Markets fees provided for herein, including without limitation the execution of security agreements, guarantees, or other protective agreements. If any member company of the Association of Motion Picture and Television Producers, Inc., becomes liable in perpetuity under a DISTRIBUTOR'S ASSUMPTION AGREEMENT to pay the supplemental markets fees provided for hereunder with respect to Such Picture, the Guild will release and cause to be discharged of record all such security agreements, guarantees or other protective agreements entered into or obtained by or from Company, provided, however that Company's primary liability shall not be released thereby.

(2) Buyer's Assumption Agreement.

If the Company shall sell, transfer or assign its rights to exhibit in Supplemental Markets any Such Picture it shall obtain from such buyer, transferee or assignee, a separate agreement made expressly for the benefit of the Guild as representative of the writers involved, requiring

Article 51
Supplemental Markets
174

Article 51
Supplemental Markets
175

Article 51
Supplemental Markets
265

EXHIBIT N

such buyer, transferee or assignee to comply with the provisions of this Basic Agreement with respect to additional compensation to writers by reason of the exhibition of Such Picture in Supplemental Markets, when and as the same become due. Such agreement shall be substantially in the following form:

"BUYER'S ASSUMPTION AGREEMENT

For a valuable consideration, the undersigned _____

_____
(Insert name of Buyer, transferee or assignee)
(hereinafter referred to as Buyer) hereby agrees with

_____
(Insert name of Company)

that all motion pictures covered by this agreement, a list of which is appended hereto, are subject to the Writers Guild of America Theatrical and Television Basic Agreement of 1977, as amended, (hereinafter "Basic Agreement") and particularly to the provisions of Article 51 thereof, pertaining to additional compensation payable to writers when motion pictures are released to supplemental markets and Buyer hereby agrees expressly for the benefit of the Writers Guild of America, West, Inc., hereinafter called WGA, as representative of the writers whose services are included in each such motion picture when telecast, to assume and be bound by Company's obligation thereunder to make the additional compensation payments required thereby when each such motion picture is exhibited in supplemental markets. Buyer for and on behalf of the Company shall make all social security, withholding, unemployment insurance, and disability insurance payments required by law with respect to the additional compensation referred to in the preceding sentence.

It is expressly understood that the right of the Buyer to license each such motion picture for exhibition in supplemental markets, or to exhibit or cause or permit such motion picture to be exhibited in supplemental markets, shall be subject to and conditioned upon the prompt payment of such additional compensation, in accordance with Article 51 of the Basic Agreement. It is agreed that WGA, in addition to all other remedies, shall be entitled to injunctive relief against Buyer in event such payments are not made.

Within a reasonable time after the expiration of each calendar or fiscal quarter, but not exceeding sixty (60) days, Buyer will furnish or cause to be furnished to WGA a written report showing the "Producer's gross" (as defined in Article 51 of the Basic Agreement during the preceding quarter from the distribution of such Pictures by Buyer in supplemental markets with respect to which Buyer is required to make payments hereunder (whether distributed by Buyer or through another distributor licensed by Buyer). Such report shall be accompanied by such payments as may be due.

Buyer shall also make available for inspection by WGA all Distributor's statements delivered to Buyer insofar as they relate to

Producer's gross. WGA shall have the right at reasonable times to examine the books and records of Buyer as to Producer's gross. If Buyer shall fail to make such payments as and when due and payable, they shall bear interest at the rate of one and one-half per cent (1½%) per month on the unpaid balance thereof commencing to accrue ten (10) days after notice in writing from WGA of such delinquency.

Where there is more than one buyer the provisions of paragraph h. (3) (iii) of Article 51.3. of the Basic Agreement shall apply to each Buyer.

_____

_____
BUYER

Date: _____

By _____

Address:"

The Company agrees to deliver to the Guild an executed copy of the above referred to Buyer's Assumption Agreement within thirty (30) days after the sale, assignment or transfer of Such Picture, with the name and address of the purchaser or assignee.

Any inadvertent failure on the part of the buyer to comply with any of the reporting provisions of this subparagraph (2) shall in no event constitute a default by the Company or such Buyer or a breach of this Agreement, provided that such failure is cured promptly after notice in writing thereof from the Guild.

Upon delivery of such Buyer's Assumption Agreement and on condition that the Guild approves in writing the financial responsibility of the purchaser, assignee, or transferee, Company shall not be further liable for the keeping of any such records, or for the payment of such additional compensation for the exhibition of any Such Pictures in supplemental markets, it being agreed that the purchaser, assignee, or transferee, shall solely be liable therefor.

The Guild agrees that it will not unreasonably withhold its approval of the financial responsibility of any such purchaser, assignee or transferee, it being further agreed that if the Guild, within twenty-one (21) days of receipt of written notice of any such sale, assignment or transfer has not advised the Company that it disapproves the financial responsibility of such purchaser, assignee or transferee, the Guild will be deemed to have approved the financial responsibility of any such purchaser, assignee or transferee and the Company disputes such disapproval, the Company shall have the right, at its election, to cause to be immediately submitted to arbitration, as herein provided, the issue of whether the Guild has unreasonably withheld the approval of the financial responsibility of such purchaser, assignee or transferee for payments due hereunder.

(3) Distributor's Liability:

With respect to any Such Picture, the following provisions shall be applicable to the distributor of Such Picture in Supplemental Markets:

(i)   Where the distributor has provided or guaranteed any of the financing for the production of Such Picture the obligations of the distributor under this Article 51 shall continue in perpetuity notwithstanding the expiration or termination of such distribution agreement, or any foreclosure of a chattel mortgage, security agreement, pledge, or lien on Such Picture. In the case of foreclosure, should such mortgage, pledgee or security holder or a third party, who is neither the Company or distributor, acquire title to Such Picture and execute the Buyer's Assumption Agreement, and upon condition that the Guild, in its discretion, approves such purchaser's financial responsibility, then when the distributor ceases to be the distributor of Such Picture in Supplemental Markets the distributor shall thereupon be released from any and all further obligations under this Article 51 with respect to Such Picture. Should any third party (other than in connection with any such foreclosure) acquire the rights of such distributor to the distribution of Such Picture in Supplemental Markets and execute a Distributor's Assumption Agreement pursuant to which it is liable in perpetuity to make the payments under this Article 51 then upon condition that the Guild in its discretion approves such third party's financial responsibility, such distributor shall thereupon be released from any and all further obligations under this Article 51 with respect to Such Picture. However, such distributor shall not be liable for the payment of any Supplemental Market fees based on monies received by a foreign distributor under a "foreign production deal" as defined in subsection 3 a. of this Article 51 with respect to which such foreign distributor or independent producer is not obligated to account to such distributor.

(ii)   Where the distributor of Such Picture does not provide or guarantee any of the financing of Such Picture, the Distributor's Assumption Agreement shall be binding upon the distributor only as long as it is the distributor of Such Picture in Supplemental Markets.

(iii)   Where there is more than one distributor or buyer of Such Picture in Supplemental Markets, the liability of any such distributor or buyer, which neither provides nor guarantees any of the financing for the production of Such Picture, for the payment of Supplemental Market fees under this Article 51, shall be applicable only to such portion of Producer's gross as is derived by distributor or buyer as the case may be.

The distributor or buyer as used in this subparagraph (iii) refers to a distributor or buyer, as the case may be, under any distribution or sale agreement, as the case may be, with Company,

as distinguished from an agreement between such distributor or buyer and its sub-distributor.

(4)   Acquisition of Title by Company:

If Company was not the actual producer of Such Picture which was produced by a signatory Company but acquired title thereto by purchase, assignment, transfer, voluntary or involuntary, or by foreclosure of a chattel mortgage or security agreement or a pledgee's sale, Company shall nevertheless be obligated to make the payments herein provided when Such Picture is exhibited in Supplemental Markets, unless such payment required hereunder has already been paid.

(5)   Financing-Distribution Agreement by Company:

The obligation of the signatory Company hereunder with respect to the payments provided for in this Article 51 shall also apply to any Such Pictures produced by an independent producer under a contract between the signatory Company and such independent producer for the production of such motion picture, and for the financing and distribution thereof by the signatory Company. However, such signatory Company shall not be liable for the payment of any Supplemental Market fees based on monies received by a foreign distributor under a foreign production deal as defined in paragraph a. of this subsection 3., with respect to which such foreign distributor or such independent producer is not obligated to account to such signatory Company. Nor shall such signatory Company be obligated to obtain any Distributor's Assumption Agreement from any foreign distributor referred to in paragraph a. of this subsection 3. except if such foreign distributor is obligated to account to such signatory Company pursuant to subparagraph (i) of this paragraph 3. with respect to monies as therein provided.

(6)   Company Liability:

It is expressly understood and agreed that Company shall in all events remain bound hereunder to make the payments due by reason of the exhibition of each Such Picture in Supplemental Markets, irrespective of the assumption of such liability by any other person, firm or company as hereinabove provided, except as otherwise expressly provided in this Basic Agreement.

(7)   Failure to Deliver Assumption Agreement:

The failure of Company to obtain and deliver an executed assumption agreement as provided in paragraph h. (1) and h. (2) and subparagraph (i) of this Article 51.3. shall be deemed a substantial breach of this Basic Agreement.

(8)   Company's Dissolution:

If Company dissolves and is no longer in the business of producing the motion pictures and if a distributor assumes all of the obligations of the Company under this Article 51 and the financial responsibility of the distributor is approved by the Guild in its discretion, the Company shall

thereupon be released of any obligation with respect to any payments due hereunder; provided that if the distributor which assumes all of the obligations of the Company is a member company of the Association of Motion Picture & Television Producers, Inc. or if any such member company is permanently liable to pay the Supplemental Market fees provided for in this Article 51 with respect to the motion pictures for which the Company is liable to make such payment of Supplemental Market fees, then the financial responsibility of such distributor shall be conclusively deemed approved and such Company shall be released of any obligation with respect to any such payments.

(9) Networks and Television Stations:

No television network, station, sponsor or advertising agency shall be required to execute any Distributor's Assumption Agreement, or Buyer's Assumption Agreement, or a Literary Material Assumption Agreement, except if it is the distributor of Such Picture in Supplemental Markets or the buyer of the Company's Supplemental Markets rights in Such Picture, as the case may be.

i. If the Company shall sell, transfer, assign or otherwise dispose of its rights in any story, screenplay or teleplay (to which the provisions of this Article 51.3. apply, or may apply) prior to the production of a motion picture based thereon, to any person or company (hereinafter referred to as the "Buyer" other than a person or company with headquarters outside the United States, the Company shall obtain from the Buyer a separate agreement in substantially the following form:

"LITERARY MATERIAL ASSUMPTION AGREEMENT

_____ agrees with

(hereinafter referred to as the "Buyer")

_____ that the story, screenplay,

(Company)

story and screenplay or story and teleplay covered by this Agreement is subject to the Writers Guild of America Theatrical and Television Basic Agreement of 1977 as amended, (herein the "Basic Agreement") and particularly to the provisions of Article 51.3. thereof pertaining to additional payments to Writers on release of a motion picture based thereon in the Supplemental Markets (but excluding paragraph h. of said Article 51.3.,) and the said Buyer hereby agrees, expressly for the benefit of the Writers Guild of America, West, Inc., (herein referred to as the Guild) as representatives of the Writers involved, to abide by and perform the provisions of said Basic Agreement and make the additional payments required thereunder, as aforesaid. For the purpose of applying such provisions of said Basic Agreement, the Writer or Writers of such material shall be treated in all respects as though the said material were written by such Writer or Writers while in the employ of the Buyer.

It is expressly understood and agreed that the rights of the Buyer to exhibit or license the exhibition of any motion picture based upon said material shall be subject to and conditioned upon the payment to the Writer or Writers involved of additional compensation, if any, required under subsection 3. (except paragraph h. thereof) of said Article 51.3. of said Basic Agreement, and it is agreed that the Guild shall be entitled to injunctive relief and damages against Buyer in the event such payments are not made.

If the Buyer shall sell, transfer, assign or otherwise dispose of its rights in such material to any person or company with headquarters in the United States, it may obtain from the party acquiring such rights a separate agreement in the same form (including this sentence) as this agreement, and will notify the Guild thereof, together with the name and address of the transferee, and deliver to the Guild a copy of such assumption agreement; it being the intent hereof that the obligations herein set forth shall be continuing obligations on the part of such subsequent owners of such material, so headquartered in the United States.

_____
BUYER

Date: _____

By _____

Address:'' _____

The Company agrees to give notice to the Guild of such sale, transfer or assignment of the nature above mentioned, with the name and address of the Buyer, and to deliver to the Guild an executed copy of such assumption agreement. An inadvertent failure on the part of the Company to comply with any of the provisions of this paragraph i. shall in no event constitute a default by the Company hereunder or a breach of this Basic Agreement, provided that such failure is cured promptly after notice thereof from the guild.

Upon delivery of such assumption agreement, Company, or any subsequent owner obtaining the execution of such an assumption agreement, shall not be further liable to the Guild or any Writer for the keeping of any such records or the payment of such additional compensation, or for compliance with credit obligations insofar as they relate to the exhibition of Such Picture in Supplemental Markets; and the Guild agrees to look exclusively to the party last executing such an assumption agreement for the keeping of such records, payment and compliance with credit obligations. If a company with headquarters outside the United States is a subsidiary of the Company, or the Company is the distributor of Such Picture for such a company, then for the purposes of this paragraph i. such company shall be deemed to be headquartered only in the United States. The provisions of this subsection 3. shall not apply to the distribution or exhibition in relation to Supplemental Markets of trailers or advertising a motion picture by shots, etc., substantially in the nature of a trailer, or to the use of stock shots.

180
Article 51
Supplemental Markets

181
Article 51
Supplemental Markets

268
Article 51
Supplemental Markets

EXHIBIT N

A-381

j. Notwithstanding the sooner termination of this agreement, the parties hereto agree that the terms and conditions of this subsection 3. shall apply and remain in full force and effect, and without change, to Such Pictures produced by the Company, the principal photography of which commenced between March 2, 1977 and March 1, 1981, both dates inclusive, regardless of when (either during or at any time after the expiration of the term of this Basic Agreement or of such period) Such Pictures are released in Supplemental Markets, and regardless of the terms or provisions of any Basic Agreement which is a modification, extension, or renewal of, or substitution for this Basic Agreement, subject however to the provisions of the third paragraph of sub-section 2 of this Article 51.

4. If in the upcoming negotiations with SAG and DGA, the Company agrees to modify the basic substantive provisions regarding supplemental markets, Company will so advise the Guild and accord it the opportunity to elect that this Article be modified in the same manner, as of the date on which the Guild so notifies the Company. Adjustments which statistically maintain the relative allocations of proceeds derived from supplemental bargaining agreements will not activate this provision, but an increase in the relative allocations to SAG or DGA in such proceeds will activate this provision, with any such increase to be accorded proportionately to WGA. Upon request the Guild shall be provided with the statistics upon which the adjustments have been made, and the Guild's right to activate this provision shall be arbitrable. The Guild shall give notice of its election within 60 days after receipt of the Company's notice or after being provided with the statistics referred to, whichever is later. The election shall be limited to accepting the entire agreement reached with SAG or DGA on supplemental markets, and only such entire agreement, but with appropriate equivalent adjustment for writers for provisions peculiar to actors or directors as the case may be.

## Article 52  Industrial Films (General)

Upon request of either party, the parties will on sixty days notice bargain concerning terms and conditions of a separate agreement covering the employment of writers employed to write industrial films.

## Article 53  Financial Information

The Company shall make available for inspection by the Guild all the financial terms of contracts relevant to the determination of the accuracy of any payments due to a writer pursuant to this agreement and the records showing the receipts and deductions to be accounted for. (For example, if the writer is to receive 25% of the Company's net receipts from publishing the writer's screenplay, the Company must make available for inspection by the Guild the financial terms of the agreement with the publisher and its records with respect to

the receipts from the publisher.) The Guild shall have the right, at reasonable times, to examine all such records at whatever place or places such records are customarily kept by the Company. If the Guild requests that it be sent an extract of such financial terms, and if such information is not extensive in nature, the Company will forward such extract, without making it necessary for the Guild to send a representative to the offices of the Company. In general, the Company will cooperate in furnishing such information to the Guild by mail or telephone, where doing so is not unreasonable or burdensome.

## Article 54  Prohibition of so-called "morals clause"

Subject to any contractual obligations to the contrary which may exist on March 1, 1977, Company agrees that it will not include the so-called "morals clause" in any writer's employment agreement covered by this Basic Agreement.

## Article 55  Restraint on licensee right of approval

Subject to any contractual obligations to the contrary which may exist on March 1, 1977, Company agrees that it will not delegate to the licensee of any episodic series the right to approve the writers employed to write stories and/or teleplays of the episodes (other than the pilot) of said episodic series.

## Article 56  Significance of Titles and Sub-Titles (General)

The headings of Articles, paragraphs and other subdivisions hereof are inserted for the purpose of convenient reference, and it is recognized that they may not adequately or completely describe the contents of the provisions that they head. Such headings shall not be deemed to govern, enlarge, limit, modify, or in any other manner affect the scope, meaning, or intent of the provisions of this Basic Agreement or any part or portion thereof; nor shall they otherwise be given any legal affect, except as provided in the preamble to this Basic Agreement.

ACCEPTED AND AGREED:

By  s/ Joseph A. Adelman

On behalf of the aforesaid respective signatory members of the ASSOCIATION OF MOTION PICTURE AND TELEVISION PRODUCERS, INC.

WRITERS GUILD OF AMERICA, WEST, INC. and on behalf of itself and its affiliate

WRITERS GUILD OF AMERICA, EAST, INC.

By  s/ Leonard Chassman

Article 54
Prohibition of so-called
"morals clause"
Article 55
Restraint on licensee
right of approval
Article 56
Significance of Titles
and Sub-Titles (General)

269

183

EXHIBIT N

## THEATRICAL SCHEDULE A

## THEATRICAL CREDITS

1.   Credit shall be given on the screen for the screenplay authorship of feature-length photoplays and shall be worded "Screenplay By." The term "screenplay" means the final script (as represented on the screen) with individual scenes and full dialogue, together with such prior treatment, basic adaptation, continuity, scenario, dialogue, and added dialogue as shall be used in and represent substantial contributions to the final script.

In the exceptional case where a writer has contributed to the development of the final screenplay but is not given screenplay credit hereunder, credit in the form "Adaptation By" may be given, but such credit, shall be subject to automatic credit arbitration as provided in subsection 18. of this Schedule A.

The credits specified in this Schedule A (such as "screenplay by", "story by", "written by", etc.) shall not be varied or embellished in any manner whatsoever without prior approval by the Guild.

In its distribution and licensing agreements with both theatrical exhibitors and broadcasters, the Company will include a provision prohibiting the licensee from eliminating or changing the writing credits as they appear on the positive prints of the motion picture.

Subject to contractual commitments which may exist on March 1, 1977, a writer who is entitled to credit on the screen and who has been paid, or is guaranteed payment of less than $75,000.00 for his services or literary materials relating to the particular motion picture shall have the right to have credit given to him on the screen, advertising or otherwise, in a reasonable pseudonymous name. The writer shall exercise his said right within five days after the final determination of credits under this Schedule A. (None of the writer's rights including but not limited to compensation of any kind shall be affected by the use of said pseudonymous name.)

2.   The term "story," as used throughout this Schedule A means all writing representing a contribution distinct from screenplay and consisting of basic narrative, idea, theme or outline indicating character development and action. The term "source material" means all material upon which the screenplay is based other than story as hereinabove defined, including other material on which the story is based. Credit shall be given on the screen for story authorship of feature-length photoplays to the extent and in the forms provided in the following subparagraphs a. to e., inclusive.

a.   When the screenplay is based upon a story and upon no other source material, screen credit for story authorship shall be given the screen writer, and shall be worded, "Story By," if the story was written under employment of the Company or is an unpublished and unexploited story purchased from a professional writer.

b.   Subject to contractual commitments of the Company which may exist on March 1, 1977, when the screenplay is based upon source material whose acquisition is not covered by this Basic Agreement, screen credit for story authorship shall not be given in the form "Story By," but may be given by the Company to the source material author and may be worded "From a Story By" or "Based on a Story By" or other appropriate wording indicating the form in which it is acquired.

c.   When the screenplay is based upon both story and source material and the story is substantially new or different from the source material, credit for story authorship shall be worded "Screen Story By," which credit shall be subject to automatic credit arbitration as provided in subsection 18. of Schedule A. The Company shall not thereby be limited from giving credit to the author of source material provided such credit shall indicate the form in which it is acquired. The following examples are illustrative and not intended to cover all situations: "From a Play By," "From a Novel By," "From a Saturday Evening Post Story By," "From a Series of Articles By," "From an Unpublished Story By," "Based on a Story By," "Ernest Hemingway's Old Man of the Sea," or other appropriate wording indicating the form in which it is acquired.

"Based upon a Screenplay By" is appropriate source material credit in cases in which literary material is acquired or writers are employed under circumstances in which the credit provisions of this Basic Agreement do not apply, and under contracts whereby purchaser or employer agrees to give writing credits, and if Company takes over the employment contract or acquires the material written under such contract, and subsequently employs, in relation to such material, a writer subject to this Basic Agreement.

Notwithstanding anything in Article 1.A.12 or Article 1.B.1.b. and 1.C.1.b. to the contrary, where a Company buys literary material and there is a commitment for publication or exploitation of that material, Company may agree to give appropriate source material credit permissible under this Paragraph 2c.

d.   When the screenplay is based upon a sequel story written by an employed writer, story credit for such sequel shall be given in the form "Story By." The writer entitled to separation of rights in a theatrical photoplay shall receive credit in the form "Based on Characters Created By" on each theatrical sequel; for purpose of placement and size on the screen, such credit shall be deemed a source material credit under Paragraph 8 of this Theatrical Schedule A. Where there are no separated rights, the author of the source material upon which such sequel is based may be given credit "Based Upon Characters Created By" or other appropriate form of credit. The foregoing provisions of this subparagraph d shall not apply where there is a contrary contractual commitment entered into prior to March 2, 1977.

184

Theatrical Schedule A
THEATRICAL CREDITS

Theatrical Schedule A
THEATRICAL CREDITS

EXHIBIT N

185

270

e. The Company may engage any person to write any source material (including, but not limited to the source material referred to in paragraph c., above) as an independent contractor, and may guarantee source material credit to such person as above provided.

Upon the written request of a writer made prior to his acceptance of employment in connection with a designated photoplay, or upon the written request of a then employed writer made at the time of his assignment to a designated photoplay, the Company shall notify him in writing of any then existing contractual obligation to give credit for source material in connection with such photoplay. The Company shall not be thereby limited from making subsequent contractual obligations to give source material credit, as above provided, in connection with such photoplay. Neither the existence of any form of credit obligation nor the giving of any such credit information shall relieve a writer from his obligation to render services and otherwise perform as provided in his employment agreement. A Company which furnishes a writer hereunder with inaccurate or incorrect credit information shall not be deemed to be in breach of this Basic Agreement or its employment agreement with such writer, if the Company at the time of giving such credit information believes in good faith such information is correct.

The Company shall be deemed to be contractually obligated in any of the cases above mentioned if the Company in good faith considers itself so obligated.

Nothing herein contained shall limit the Company from using and purchasing source material, from entering into agreements to give source material credit therefor, as above provided, from carrying out such credit obligations as may be therein provided.

3. Screen credit on photoplays on which one or more writers or teams has written both the story and the screenplay shall be worded "Written By."

If a writer is entitled to "Written By" credit on a photoplay which he also produces or directs, unless the writer objects nothing herein shall prevent according credit on the screen and/or in paid advertising in the following forms:

"Written and Produced By _____," or
"Written and Directed By _____," or
"Written, Produced, and Directed By _____;"

4. Screen credit for screenplay will not be shared by more than two writers, except that in unusual cases, and solely as the result of arbitration, the names of three writers or the names of writers constituting two writing teams may be used. A writing team is: two writers who have been assigned at about the same time to the same script and who work together for approximately the same length of time on the script. The intention and spirit of the award of credits being to emphasize the prestige and importance of the screenplay achievement, the one, two or at most three writers, or two teams, chiefly responsible for the completed work will be the

only screen writers to receive screenplay credit. Story credit will not be shared by more than two writers.

5. The limitation on the number of credits provided for in subsection 4. shall apply to all feature-length photoplays except episodic pictures (such as TALES OF MANHATTAN and IF I HAD A MILLION) and revues. A revue is a feature-length photoplay in which the story is subordinate to specialties, musical numbers or sketches, and in connection with which star or featured billing is given to the actors, singers, dancers, or musicians appearing in these separate specialties, musical numbers or sketches.

6. Unless the screenplay writing is done entirely without the collaboration of any other writer, no designation of tentative screenplay credit to a production executive shall become final or effective unless approved by a credit arbitration as herein provided, in accordance with the Guild rules for the determination of such credit.

7. When more than one writer has participated in the authorship of a photoplay, then all participants will have the right to agree unanimously among themselves as to which of them shall receive writing credits on the screen, provided that the form of credit agreed upon is in accordance with the terms of this Schedule A, and provided the agreement is reached in advance of arbitration, and provided that the form of such credit is not suggested or directed by the Company. If such unanimous agreement is communicated to the Company before a final determination of credits hereunder, the Company will accept such designation of credits, and such agreed credits shall become final hereunder. The Company will confirm such agreed credits by sending notice thereof to all participants and the Guild, in the manner hereinafter provided in subsections 11. and 12. hereof.

In any case in which a foreign law or government regulation applicable to the employment of writer requires credit to be given, Company shall furnish the Guild with a copy of such law or governmental regulation together with the tentative notice of credit and the Guild agrees that credits determined shall include the minimum credit necessary to comply with such legal requirements.

8. Writing credits as finally determined hereunder shall appear on the screen on a title card immediately preceding the cards on which appear credit to the producer and the director of the photoplay, provided that the card on which appears the credit to the producer immediately precedes that of the director, and otherwise the card on which writing credits appear shall immediately precede that of the director. No other credits except source material credit, may appear on the card on which writing credits appear.

Source material credits (if they appear on the screen) and writing credits finally determined hereunder shall, subject to the foregoing, appear only in the following manner:

a. On one title card on which there appear only writing and source material credits.

Theatrical Schedule A
THEATRICAL CREDITS

186

Theatrical Schedule A
THEATRICAL CREDITS

187

Theatrical Schedule A
THEATRICAL CREDITS

271

EXHIBIT N

b. On separate title cards on each of which there may appear any one or more of such credits, and no other credits.

c. On the main title card of the photoplay on which there may appear any one or more of such credits together with other credits.

Screen credit for the writer of the screenplay shall be accorded in the same style and size of type as that used to accord screen credit to the individual producer or director of the photoplay, whichever is larger.

Whenever source material credit, or source material and story credit given to the same writer, appears on the same title card as the screenplay credit, the screenplay credit must be the initial credit and must occupy not less than 50% of the credit card in type at least as large in all respects as that accorded the source material credit.

Wherever story credit, but no source material credit, appears on the same title card as the screenplay credit, the story credit and screenplay credit shall be in the same size type, the screenplay credit shall be the initial credit and shall occupy the top 50% of the card, and the story credit shall occupy the bottom 50% of the card, except that the requirements of this sentence shall not apply where there is a contrary contractual commitment entered into prior to March 2, 1977. Wherever both a source material credit and story credit given to different writers are placed on the same title card as the screenplay credit, the screenplay credit shall appear in a larger size of type on the upper 60% of such title card. Such source material credit and this story credit shall appear in a smaller size of type than that used for the screenplay credit and shall appear on the lower 40% of such title card which 40% shall be apportioned equally among all writers receiving such source material and story credit. Under the circumstances described in the immediately preceding sentence, the Company shall have the right to place the source material credit on another card without the limitations hereinabove imposed so long as such other card is not inserted between the screenplay credit and the director's credit. The foregoing provisions of this subsection and the preceding subsection shall not be applicable to contract commitments entered into prior to December 13, 1963 which contain terms contrary thereto.

9. A writer who has participated in the writing of the screenplay, or a writer who has been employed by the Company on the story, or who has sold or placed literary material subject to this Basic Agreement, shall, for the purpose of this Basic Agreement, be considered a participant. As a participant, he shall be entitled to participate in the procedure for determination of screen credits, and in addition, in the case of a remake, any writer who has received credit either for story or screenplay in connection with the most recent production of such remake photoplay.

10. Prior to the final determination of screen credits, as provided herein, the work of participants not receiving screen credit may be publicized by the Company. After such a determination of screen credits only persons receiving screen credits or source material credit may be so publicized.

11. Before the writing credits for a motion picture are finally determined (and in the case of a motion picture produced in Company's studios in the Los Angeles

area, no later than three (3) business days following completion of principal photography of such motion picture, except where circumstances make it impractical), the Company will send to each participant and to the Guild concurrently a written notice which will state the Company's choice of credit on a tentative basis, together with the names of all participants, their addresses last known to the Company and if a participant is then also a director or producer of the photoplay the notice will so indicate. Where the Company deems its record of participants incomplete, it may comply with the foregoing by giving notice to each writer whose name and address are furnished by the Guild within five (5) days after the Company's request for such information, in addition to giving notice to each participant shown on its own records.

The Company shall on such notice of tentative credits, for the information of the Guild and participants, state the form of any source material credit which Company intends to use in connection with the photoplay. Such credits shall not be subject to the provisions for protest and arbitration as hereinafter provided, but the Guild shall have the right to object to the form of such a credit.

At the Company's request, the Guild may, but shall not be obligated to, make a determination of screen credits and shall so notify the participants. When a Guild determination is so made, it shall be considered a final determination.

At the request of the Guild made to the Company on commencement of principal photography of such motion picture, the Company shall furnish the Guild with a list of all persons who, to the best of the Company's knowledge, are or were participants (see subsection 9, above) with respect to such motion picture. If thereafter any other writer is engaged by Company to render writing services in or in connection with such motion picture during the principal photography thereof, the Company will promptly notify the Guild of that fact. If the motion picture involved is a remake of an earlier motion picture produced by Company, the list of writers to be supplied by the Company pursuant to this paragraph shall include the name of any writer employed by the Company to render writing services with respect to the most recent prior production by Company of such earlier motion picture and who received screen credit for such writing services.

A casual or inadvertent failure by the Company to forward the notices, list, names or other information to the Guild or persons specified at the times or places designated pursuant to this subsection 11, shall not be deemed to be a breach of this Basic Agreement.

12. The notice specified in subsection 11, hereof, will be sent by telegraph to writers outside of Los Angeles area or by telegram, messenger or special delivery mail to writers in such area. In case of remakes the Company shall not be under any obligation to send any notice to any writer contributing to the screenplay or story of the original production unless such writer received screen credit in connection with such original production.

Notices may be sent by mail, telegram or personal delivery as above provided. If the notices are mailed, registered or certified mail shall be used, with return receipt requested; the failure of the addressee to sign or return the receipt shall not invalidate the notice.

**EXHIBIT N**

188

Theatrical Schedule A
THEATRICAL CREDITS

189

Theatrical Schedule A
THEATRICAL CREDITS

272

13.   The Company will keep the final determination of screen credits open until a time specified in the notice by the Company, but such time will not be earlier than six o'clock p.m. of the tenth business day following the next day after the dispatch of the notice above specified; provided, however, that if in the good faith judgment of the Company there is an emergency requiring earlier determination and the Company so states in its notice, such time may be no earlier than six o'clock of the fifth business day following the next day after the dispatch of the notice above specified.

If within the time specified, a written request to read the script has not been delivered to the Company from any of the participants, or a written protest of the tentative credits has not been delivered to the Company from any participant or from the Guild, the tentative credits shall become final. Every protest, including that of the Guild, shall state the grounds or basis therefor in the notice thereof. The Guild agrees not to use its right of protest indiscriminately. In the event of an emergency and on Company's request, the Guild may reduce such "fifth business day" period. The Guild agrees to cooperate as fully as possible in considering such requests.

14.   If a request to read the script is received by the Company from a participant within the time specified in subsection 13. hereof, or if a written protest of the tentative credits is received by the Company from a participant or the Guild within said period, the Company will withhold final determination of credits until a time to be specified by the Company which time will not be earlier than one hundred and twenty (120) hours, exclusive of Sundays and holidays, after the scripts are delivered to the Guild office in Los Angeles, or one hundred and twenty (120) hours after the Guild is notified that the scripts are available at the Company's studio, whichever is earlier. In the event of an emergency and on the Company's request, the Guild may grant a reduction of such one hundred and twenty (120) hour period. The Guild agrees to cooperate as fully as possible in considering such requests.

The tentative screen credits shall become final if no protest is timely made.

15.   Upon receipt of a protest or request to read the script, the Company will deliver a copy of the script to the Guild office in Los Angeles for each participant who requests it, and the Company shall notify the participants and the Guild by telegraph informing them of the name of the protesting party and the new time set for final determination.

16.   If a unanimous designation of credits as provided for in subsection 7. hereof or a request for arbitration as hereinafter provided is not communicated to the Company within the time limit set for the final determination of credits, the Company may make the tentative credits final.

17.   Any notice specified in the foregoing paragraphs shall, unless a specified form of service thereof is otherwise provided for herein, be sent by the Company by telegraphing, mailing or delivering the same to the last known address of the writer or may be delivered to the writer personally. If the notices are mailed, registered or certified mail shall be used with return receipt requested; the failure of the addressee to sign or return the receipt shall not invalidate the notice.

18.   Unless a unanimous agreement has been reached in accordance with subsection 7. hereof, any participant or the Guild, may within the period provided for in subsection 14. hereof, file with the Company at its Studio and the Guild at its Los Angeles office a written request for arbitration of credits. In any case where automatic credit arbitration is required under this Schedule A the Guild will be deemed to have made a written request for arbitration of credits, at the time the Company submits the notice of tentative credits, and in such case Company will immediately make available to the Guild the material as provided for under this subsection.

The Guild through its arbitration committee shall make and advise the Company of its decision within the limitations of this Schedule A. Said decision shall be made and advised within twelve business days of the requests referred to in the immediately preceding paragraph; if in the good faith judgment of the Company there is an emergency requiring earlier decision and the Company so notifies the Guild, said decision shall be made and advised within ten business days of the requests referred to in the immediately preceding paragraph. In the event the decision of the arbitration committee is not rendered within said period, as the same may have been extended by the Company, the Company may make the tentative credits final, provided the terms and provisions of this subsection 18 have been fully complied with by the Company.

In the event of an emergency and upon the Company's request that the time for arbitration be shortened, the Guild agrees to cooperate as fully as possible. If the material is voluminous or complex, or if other circumstances beyond the control of the Guild necessitate a longer period in order to render a fair decision, and the Guild requests an extension of time for arbitration, the Company agrees to cooperate as fully as possible.

Prior to the rendition of the decision said committee may make such investigations and conduct such hearings as may seem advisable to it. Immediately upon receipt of said request for arbitration, the Company shall make available to Guild three (3) copies of the script, and three copies of all available material written by the participants and three copies of all available source material, provided, however that if three copies of any such material shall not be available, Company shall only be required to provide such copies as are available but in such case the time within which the committee may be required to render its decision as provided for herein shall be extended from ten days to twenty days. In addition, the Company shall cooperate with the arbitration committee to arrive at a just determination by furnishing all available information relative to the arbitration. Upon request of the arbitration committee, the Company shall provide the committee with a copy of the cutting continuity if it is available at the time of arbitration.

The decision of the Guild arbitration committee, and any Board of Review established by the Guild in connection therewith, with respect to writing credits, in-so-far as it is rendered within the limitations of this Schedule A, shall be final, and the Company will accept and follow the designation of screen credits contained in such decision and all writers shall be bound thereby.

19.   The decision of the Guild arbitration committee may be published in such media as the Guild may determine. No writer or Company shall be entitled to

collect damages or shall be entitled to injunctive relief as a result of any decision of the Committee with regard to credits. In signing any contract incorporating by reference or otherwise all or part of this Basic Agreement, any writer or Company of them under the laws of libel or slander or otherwise with regard to proceedings before the Guild arbitration committee and any full and fair publication of the findings and/or decisions of such Committee. The Guild and any writer signing any contract incorporating by reference or otherwise or referring to this Schedule A, and any writer consenting to the procedure set forth in this Schedule A, shall not have any rights or claims of any nature against any Company growing out of or concerning any action of the Guild or its arbiters or any of them, or any determination of credits in the manner provided in this Schedule A, and all such rights or claims are hereby specifically waived.

20. In the event that after the screen credits are determined as hereinabove provided, material changes are made in the script or photoplay, either the Company or a participant and the Guild jointly may re-open credit determination by making a claim to the Guild or Company, as the case may be, within forty-eight (48) hours after completion of the writing work claimed to justify the revision of credits, in which case the procedure for determining such revised credits will be the same as that provided for the original determination of credits.

The Company agrees to make revisions in advertising material previously forwarded to the processor or publisher to reflect such re-determined credits, provided that such revisions can physically and mechanically be made prior to the closing date of such processor or publisher and at reasonable expense and provided the processor or publisher has not yet commenced work on that part of the material which the change would affect.

21. No writer shall claim credit for any participation in the screen authorship of any photoplay for which the credits are to be determined by the procedure herein provided for prior to the time when such credits have in fact actually been so determined, and no writer shall claim credits contrary to such determination.

22. In any publicity issued or released prior to the final determination of credits as herein provided, the Company may include such screenplay or screenplay and story credits as the Company may in good faith believe to be fair and truthful statement of authorship. After such final determination of credits, the Company shall not issue or release any publicity which shall state screenplay or screenplay and story authorship contrary to such determination. No casual or inadvertent breach of the foregoing shall be deemed to constitute a breach by the Company.

Writing credit, but not necessarily in the form specified in this Schedule A, shall be included in publicity releases issued by the Company relating to the picture when the producer and the director are mentioned, whether in the form of a production or presentation credit or otherwise, except where such release is restricted to information about such individual or individuals. The writing credit shall also be included in all other publicity and promotional matter, including screening invitations issued by the Company where the credit of the producer or director is included whether in the form of a production or presentation credit or

otherwise. Prior to a final determination of credits the Company shall include those credits which it in good faith believes to be a fair and truthful statement of authorship.

Screenplay or screenplay and story credit in accordance with the final determination of such credit will be given on any paid advertising issued anywhere in the world, provided such advertising is prepared by the Company in the Continental United States and is controlled by the Company where such advertisement is used; it being understood that in such advertising prepared prior to final determination of screenplay and story credits, the Company shall include such screenplay or screenplay and story credit as the Company may in good faith believe to be a fair and truthful statement of authorship. After final determination of credits, the Company shall not prepare for issuance any advertising which shall state screenplay or screenplay and story authorship contrary to such final determination.

Where there is only a single writer on a project and if a paid advertisement is issued in which that writer would have received credit hereunder had there been a final determination of credit at that time, then such writer shall be given credit in such advertisement in accordance with the credit requirements of this Schedule A.

In forms of advertising covered hereunder the names of the individual writers accorded screenplay or screenplay and story credit for photoplay will appear in the same size and style of type as that in which the name of either the individual producer of the photoplay or, the director of the photoplay shall appear in such advertising, whichever is larger. Provided, however, that:

a. If three (3) or more writers share screenplay credit; then the Company shall not be required to use, for the advertising credit to which such three (3) or more writers are entitled, an area in excess of the minimum area that would be occupied by the names of the first two (2) of such writers, if only such first two (2) writers were entitled to share screenplay credit; it being understood that such purpose the Company may diminish height of the type in which the names of the three (3) or more writers appear in addition to narrowing from side to side the names of such three (3) or more writers; it being further understood that for the purpose of determining which of the writers are the first two (2), the order in which such writers appear in the notification of the Guild's determination reached in its credit arbitration proceedings shall control; and

b. Where a writer entitled to screenplay credit is also entitled to credit as the director and/or producer of the photoplay, then the name of such writer need only be mentioned once in such advertising, provided, however, that he receives credit as a writer, provided further that the order of credit as between writer, producer and director shall be the same as the order with respect to which such credits are given on the screen; and

c. In giving such credit on twenty-four (24) sheets, the names of the individual writers shall in no event appear in type less than 3-½ inches in height, or if the screenplay or story credit is shared by more than two (2), in type less than 2-½ inches in height; and

Theatrical Schedule A
THEATRICAL CREDITS

274

EXHIBIT N

193

192

d. In giving such credit in forms of advertising covered hereunder, other than on twenty-four (24) sheets the names of the individual writers shall in no event appear in type of a height less than 15% of the height of type used for the title of the photoplay, or if there are two (2) titles of the photoplay, the larger title of the photoplay. Company may seek a waiver of the double billing provision, in particular cases such as the "Beau Geste" ads and the Guild will not unreasonably withhold such waivers.

In all cases the location of the credit accorded to any writer under this subsection 22 shall be discretionary with the Company.

Where the title of the photoplay is in letters of varying sizes, the percentage above referred to shall be based on not less than the average size of all the letters in such title.

The foregoing obligation to accord advertising credit shall be limited to screenplay or screenplay and story or written by credit and shall not apply:

a) To so-called "teaser" advertising, except that if a "Produced by" or "Directed by" credit is included, the writing credit shall also be included.

b) To advertisements less than four column inches in size, but if such advertising contains a "Produced by" or "Directed by" credit, the writing credit shall also be included.

c) To radio or the audio portion of television advertising.

d) Where credit is given neither to the individual producer nor director of the photoplay.

e) To special advertising relating only to the source material on which the picture is based, or author thereof, any member or members of the cast, the director, individual producer, or other personnel concerned in its production, or similar matters.

Advertising shall be deemed to have been prepared hereunder when the Company has forwarded the finished copy therefor to the processor or publisher. The Company agrees, however, to revise advertising prepared prior to the final determination of credits so as to show the screenplay or screenplay and story credit as finally determined, if such revision can physically and mechanically be made prior to the closing date of such processor or publisher and at reasonable expense, and provided the processor or publisher has not yet commenced work on that part of the material which the change would affect.

The Company shall require that all writing credits as they appear on the screen appear in any published version of the whole or substantial part of a picture script, and in any novel based on the screenplay, provided that with respect to any novel based on such screenplay the credit shall indicate that such novel is based on such screenplay. Such writing credit shall appear on the title page in the same size and style of type used for the writer of the novel. If the name of the writer of the novel appears on the cover the "screenplay" or "written by" credit shall also appear on the cover in the same size and style of type as the writer of the novel, provided, however, that the writing credit need not so appear if the writer of the screenplay is the writer of the novel. The contract with the publisher shall provide

that this provision is for the express benefit of the writer and the Guild, and that the publisher will comply with such requirements. But the failure of a publisher to comply with any of such requirements shall not constitute a breach by the Company.

In connection with the radio or television broadcast of a half-hour or more in length, the whole or nearly the whole of the entertainment portion of which consists of the adaptation of a screenplay or substantial part thereof, the screenplay or screenplay and story credit as it appears on the screen shall be given either orally or visually.

Where the major writing contribution to a photoplay is in the form of narration, credit for such narration shall be given and worded in the following form: "narration written by." When a narration credit is given in lieu of a screenplay credit on any photoplay, then such narration credit shall be subject to all of the rights and limitations as are provided in this subsection 22, with respect to screenplay credit.

If thereafter the Company distributes or licenses the distribution of a souvenir program or theatrical program of a motion picture hereunder, or a phonograph record or phonograph album made from the sound track of a motion picture hereunder, and the individual producer or director of such picture is named in his capacity as such in such program or on the liner, cover or jacket of such album or records, then the writer shall also be named. The size of such credit as specified under this Schedule A shall be related to the size of the title as it is used in the listing of credit for such picture on such program, liner, cover or jacket. If Company includes the director or individual producer credits in any catalogue or sales brochure it issues to the public, the applicable writer's credit will also be included.

If in giving credits with relation to a product, the Company gives a "produced by" and also a "directed by" credit then Company shall require the writer's credits to be given in accordance with the provisions of this Schedule A. The failure of a third party to comply with such requirement shall not constitute a breach by Company.

Where the Company supplies written handouts to reviewers and critics it will list writing credits, if they have theretofore been determined.

No casual or inadvertent breach of any of the foregoing shall be deemed to constitute a default, or a breach by the Company of this Basic Agreement.

23. In connection with "sneak" previews before the first general release of a photoplay in the United States, the Company shall give such screenplay or screenplay and story credits as the Company may in good faith believe to be a fair and truthful statement of authorship, but it shall be the obligation of the Company in good faith to have such credit determined prior to such sneak previews; and there shall be no other preview or theatrical showings of any kind except sneak previews, until correct writing credit has been determined as herein provided and included in the main title.

24. The provisions of this Schedule A shall govern the determination of writing credits for shorts (as defined in the Basic Agreement) based upon written scripts, except that:

Theatrical Schedule A
THEATRICAL CREDITS

194

Theatrical Schedule A
THEATRICAL CREDITS

195

275

EXHIBIT N

a. Such writing credits shall appear in forms selected by the Company. In this connection, the Company agrees to use forms of credit which represent a fair and truthful statement of authorship.

b. The location of screen credit shall be discretionary with the Company and such credit may appear on a card with other credits.

c. The right of protest shall be limited to participants. Protests shall be directed only to improper or untruthful statements of the facts of authorship, rather than to the form in which such authorship is stated.

d. The period of time specified in paragraph 14 hereof shall be forty-eight (48) hours in place of one hundred and twenty (120) hours.

e. The period of time specified in paragraph 18 shall be three (3) business days in place of ten (10) business days, and the arbitration decision shall not affect the form of the writing credit.

f. The provisions of subsection 22. requiring the giving of advertising credit, shall not apply to shorts, but if such writing credits are advertised, they shall be a fair and truthful statement of authorship.

25. In connection with the sale, assignment, or licensing of any literary material or rights therein, which material is subject to the credit provisions of this Schedule, Company shall obtain an acknowledgment in writing that the purchaser, assignee or licensee, as the case may be, will abide by all of the obligations incurred to writers by Company under the terms and provisions of this Schedule A. Upon the execution of such an acknowledgment, Company shall be considered to have fully complied hereunder and thereupon shall be relieved of all obligations under this Schedule A, with respect to such material or rights therein, as the case may be.

26. a. Company will submit to the office of the Guild, 8955 Beverly Boulevard, Los Angeles, California 90048, attention of its Executive Director, a copy of the initial and subsequent campaign advertising material, prior to the issuance or distribution of such advertising material. If at the time of such submission, the Company has the copy of the souvenir program, theatrical program, liner, cover or jacket referred to in subsection 22. above, or the copy of the title and cover page of the novelization, referred to in subsection 22. above, the Company will also furnish such copy to the Guild at such time. If the exigencies of time so require, Company may comply with the above by submitting such advertising material to the office of Writers Guild of America, East, Inc., 22 West 48th Street, New York, 36, New York, Attention of its Executive Director. If within twenty-four (24) hours after such submission in Los Angeles or if within thirty-six (36) hours after such submission in New York the Guild protests by telegram delivered (collect if desired) to the Company, that such advertising material does not conform to the provisions of this Schedule A, subsection 22. above, then the Guild may, within twenty-four (24) hours after making such protest, submit the dispute to arbitration under this subsection 26. The arbitrator shall make his decision and deliver it to the respective offices of the Company and Guild within twenty-four (24) hours after such submission to arbitration.

The arbitrator shall be selected in accordance with the following procedure. There shall be a panel of ten (10) arbitrators designated as Arbitrators Number 1, 2, 3, 4, 5, 6, 7, 8, 9 and 10, respectively. The first such arbitration shall be submitted to Arbitrator Number 1, the second such arbitration (or the first such arbitration if Arbitrator Number 1 is unavailable therefor) shall be submitted to Arbitrator Number 2, and so on in rotation. The initial panel of arbitrators is:

| | |
|---|---|
| Roger Davis | Ed Mosk |
| Dixon Dern | Addison Mueller |
| Martin Gang | Ed Perlstein |
| Deane Johnson | Gordon Stulberg |
| Richard Maxwell | Ken Ziffren |

The arbitration shall be held in Los Angeles, California. The cost of such arbitration shall be borne equally by the Company and the Guild. The Company and Guild shall each bear its own attorneys' fees.

If the arbitrator decides that the Guild's protest is valid, he must designate in what respect such advertising material does not conform to the provisions of this Schedule A, subsection 22. above. This shall be the limit of the arbitrator's authority. The decision of the arbitrator shall be binding upon the Company, the Guild, and the writer or writers involved. Company shall not issue any such advertising material which would violate such decision.

It is hereby agreed that if the arbitrator in any arbitration under the provisions of this subsection 26. does not make his decision and deliver it to the respective offices of the Company and Guild within 24 hours after the dispute has been submitted to him under this subsection 26., then, at any time thereafter prior to the making and delivering of such decision, either the Guild or the Company may elect to remove the dispute from such arbitrator and re-submit it to the next arbitrator in rotation. If so re-submitted, such next arbitrator in rotation shall make his decision and deliver it to the respective offices of the Company and Guild within 24 hours after such re-submission. The aforesaid election and re-submission shall be exercised and effected by written notice by the Guild or the Company, as the case may be, to the other party. If the first arbitrator shall make and deliver his decision after the expiration of 24 hours after the dispute has been submitted to him and prior to the re-submission of the dispute to the next arbitrator in rotation as aforesaid, such decision shall have the same effect as though it had been made and delivered by the first arbitrator within 24 hours after the original submission of the dispute to him.

If the Guild fails to submit its protest in the manner and within the time period specified above, or if the Guild fails to submit the dispute to arbitration in the manner and within the time period specified above, then in either of such events the Guild shall be conclusively deemed to have approved such advertising material and such approval shall be binding upon the Guild and the writer or writers involved. The Company shall not issue or distribute any advertising material prior to the expiration of the period within which the Guild may protest nor in the event of a protest by Guild (submitted in the

Case 3:16-cv-01442-SRU   Document 43-19   Filed 06/09/17   Page 104 of 114

manner and within the time period specified above) prior to the expiration of (i) seventy-two (72) hours after such advertising material has first been submitted as aforesaid by Company to the Guild in Los Angeles or (ii) eighty-four (84) hours after such advertising material has first been submitted as aforesaid by Company to the Guild in New York, as the case may be.

In determining any twenty-four (24) or thirty-six (36) hour period referred to above in this subsection 26 a., there shall be excluded Saturdays, Sundays, and the six holidays recognized in the motion picture industry, to-wit: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving and Christmas.

Time is of the essence as to all of the provisions of this subsection 26.

b. Company will forward, wherever practical, by Air Mail, to the Guild, to the attention of its Executive Director, a copy of each of its press books immediately upon its publication and before its general distribution. The present address of the Guild is 8955 Beverly Boulevard, Los Angeles, California 90048.

Such press books shall conform to the provisions of this Schedule A, subsection 22., above.

The Guild shall send a written answer to the Company immediately upon receipt of the Company's press book. If Company does not receive such an answer from the Guild within six days from the time the Company has sent the press book to the Guild, the Guild shall be considered to have approved the press book, and such approval shall be binding upon the Guild and the writer or writers involved. If within such six days the Guild should protest to the Company that any advertising contained in such press book neither previously approved as part of initial advertising material nor as part of subsequent advertising material, does not conform with the advertising provisions quoted above, the Guild and the Company shall appoint a joint committee which shall immediately determine the validity of the Guild's protest. If the committee determines it is a valid protest, it may specify the corrections, if any, necessary to conform the advertising with the above mentioned advertising provisions.

27. If the Company shall sell or license the so-called stage presentation rights to a screenplay with respect to which a writer has received a "written by," "story by," or "screen story by" screen credit, then Company shall provide in the contract of sale or in the license that the writer shall be accorded appropriate credit reflecting such screen credit in (1) the program for the stage presentation based upon such screenplay, (2) newspaper advertising of one-half page or larger for the Broadway showings of such stage presentation, and (3) billboards and lobby displays for such stage presentations, but only if general credits are also accorded in such programs, newspaper advertising, lobby displays, and billboards, e.g., director credit, stage play writer credit, producer credit, choreographer credit, and the like. The failure of the purchaser or licensee of the stage presentation rights to comply with such contractual requirements shall not constitute a breach of this agreement by the Company.

28. a. Notwithstanding any other provision of this Schedule A, but subject to the provisions of subsection 28d. below, if the individual producer or director is accorded a "production" or "presentation" type of credit, such as "A Sam Jones Production" or "A Sam Jones Picture" or "A Sam Jones Presentation," on the screen (wherever such credit may appear on the screen other than in the position where such individual producer or director credit would normally appear pursuant to this Schedule A), such "production" or "presentation" type of credit may be accorded in a different style and/or a different size (whether larger or smaller) of type than used to accord credit to the writer of the screenplay, subject to the following:

(1) If such "production" or "presentation" type credit on the screen is in such different style or different size of type, it shall not be placed on the screen between the card according credit to the writer of the screenplay and the card according credit to the director of the photoplay.

b. Subject only to the provisions expressly relating thereto contained in this subsection 28, the matter of "production" or "presentation" type credit shall not be governed by this Basic Agreement; it being agreed that the Company may accord such "production" or "presentation" type credit as it may see fit.

c. [Deleted]

d. Where a "production" or "presentation" type of credit is given by the Company in advertising:

(1) The writing credit in such advertising shall be in size of type not less than 75% of the size of the type of the production or presentation credit if such a credit is accorded to the producer or the director of the picture, and not less than 100% of the size of the type of the largest production or presentation credit if two or more persons receive such production or presentation credit, and not less than the size specified in (2) below. In all cases, such credit will be given in the same style of type as the credit of the individual receiving the (largest) production or presentation credit. The provisions of this sub-paragraph (1) shall not apply where a production or presentation credit is given to a writer (alone or with one or more other persons) and such writer receives sole writing credit for the respective motion picture.

(2) Where a single presentation or production credit is accorded, the writing credits shall be in size of type not less than 20% of the size of the type of the main title, as such title appears in the advertising involved. Where more than one presentation or production credit is accorded, the size of the writing credits shall be increased by an additional 5% of the size of the main title for each such additional production or presentation credit (e.g., a total of 25% for two, 30% for three, etc.). For the purposes of this paragraph, if two or more names are used on one line in one presentation or production credit, such will count as one presentation or production credit (e.g., "A John Jones-Bob Brown Presentation"; but not "A John Jones Production of a Bob Brown Presentation").

Theatrical Schedule A
THEATRICAL CREDITS

EXHIBIT N

(3) The credit accorded to the author of the source material is not subject to the restrictions of this paragraph 28d, and shall not be considered a "production" or "presentation" credit.

(4) The provisions of this paragraph 28d, shall not apply: (i) to impersonal corporate presentation or production credits where the corporate name is wholly impersonal, such as "Columbia Pictures Corp. presents", and shall further not apply to the names of any distributing company, whether or not impersonal, including Walt Disney Productions; and (ii) advertisements less than four column inches in size, teasers and special advertising.

Notwithstanding anything to the contrary set forth in the second unnumbered paragraph of paragraph 22, or in this sub-paragraph 28d, both inclusive, all credit requirements of contracts in existence on the effective date of this agreement which conflict with any of the provisions of said paragraphs shall control, and such contracts may be performed in accordance with their terms without regard to the provisions of said paragraphs. All advertising and publicity contained in copy prepared prior to the effective date of this agreement which conforms to the applicable requirements of the 1973 WGA Agreement may continue to be used.

29. On the request of either party for modification of this Schedule A on the ground of hardship in the application of any of its provisions, the other party agrees to meet and negotiate with respect to changes to eliminate such claimed hardships.

30. Where used in this Schedule A, the term "writer" or "employed writer" shall have the same meaning as provided in Article 1 B.1.a. of the Basic Agreement.

## TELEVISION SCHEDULE A

### TELEVISION CREDITS

1. Credit shall be given on the screen for the authorship of stories and teleplays and shall be worded "Teleplay by", or "Story by", or "Written by" (for story and teleplay) or, in the case of variety and audience participation shows only, "Written by", or "Special material by", as the case may be. The term "Teleplay" means the script as produced on the television screen or as shown in its final form, by whatever means the medium may employ. In the exceptional case where a writer has contributed to the development of the final teleplay but is not given teleplay credit hereunder, credit in the form "Adaptation by" may be given, but such credit shall be subject to automatic credit arbitration as provided in subsection 17. of Schedule A, Television.

If a writer is entitled to "Written by" credit on a television film which he also produces or directs, unless the writer objects nothing herein shall prevent according credit on the screen and/or in paid advertising in the following forms: "Written and Produced By _____", or "Written and Directed By _____", or "Written, Produced, and Directed By _____":

Subject to contractual commitments which may exist on March 1, 1977, a writer who is entitled to credit on the screen and who has been paid, or has been guaranteed payment of less than three times the applicable minimum provided for in this agreement for his writing services or literary materials relating to the particular teleplay shall have the right to have credit given to him on the screen, advertising or otherwise in a reasonable pseudonymous name. The writer shall exercise his said right within the time he may give written notice of protest as provided in paragraph 13 of this Schedule A. (None of the writer's rights including but not limited to compensation of any kind, shall be affected by the use of said pseudonymous name.)

2. The term "Story" means all writing written substantially in whole by a writer or writers as hereinbefore defined, representing a contribution distinct from Teleplay and consisting of basic narrative, idea, theme or outline indicating character development and action. The term "Source material" means all material upon which a teleplay is based other than the story, as hereinabove defined, including other material on which the story is based. Credit shall be given for story authorship of teleplays to the extent and in the forms provided in the following paragraph a. to e. inclusive:

a. When a teleplay is based upon story and upon no other source material, credit for story authorship shall be given to the television writer and shall be worded, "Story By."

b. When the teleplay is based upon source material, no story authorship credit may be given to the television writer (except pursuant to paragraph c. and d. below) but, subject to contractual commitments in effect on June 19, 1960 with source material authors the source material author may not be given "Story by" credit, it being understood and agreed, however, that the company may give to the source material author any appropriate credit other than the two words "Story by", and that the credit given to source material authors may include, but shall not be limited to, the source material credits referred to in paragraph c. below.

c. When the teleplay is based upon both story and source material and the story is substantially new or different from the source material, credit for story authorship shall be worded, "Television Story by", which credit shall be subject to automatic credit arbitration as provided in subsection 17. of this Schedule A. The Company shall not hereby be limited from giving credit to the author of source material provided such credit shall indicate the form in which it is acquired, such as for example, "From a play by", "From a novel by", "From a radio play by", "From a Saturday Evening Post story by", "From a series of articles by", "From an unpublished story by", "Based upon a short story by", or other appropriate wording.

Notwithstanding anything in Article I.A. 12 or Article 1.B.1.b. and 1.C.1.b. to the contrary, where a Company buys literary material and there is a commitment for publication or exploitation of that material, Company may agree to give appropriate source material credit permissible under this Paragraph 2c.

Television Schedule A
TELEVISION CREDITS

200

Television Schedule A
TELEVISION CREDITS

201

278

**EXHIBIT N**

d. Where the teleplay is based upon a sequel story, credit for such sequel story shall be given in the form ''Story by'' and the author of the source material upon which such sequel is based may be given credit, ''Based upon characters created by'', or other appropriate form of credit. If the source material is in the form of a format or characters, then the source material credit may be given in the following forms: ''From the format by'', or ''Characters created by''.

e. Upon the written request of a writer made prior to his acceptance of employment in connection with a designated program or upon the written request of a then employed writer at the time of his assignment to a designated program, the Company shall notify him in writing of any then existing contractual obligations to give credit for source material in connection with such program. The Company shall not thereby be limited from making subsequent contractual obligations to give source material credit as above provided in connection with such program. Neither the existence of any form of credit obligation nor the giving of any such credit information shall relieve a writer from his obligation to render services and otherwise perform as provided in his employment agreement. A Company which furnishes a writer hereunder with inaccurate or incorrect information shall not be deemed to be in breach of this Basic Agreement or its employment agreement with such writer if the Company at the time of giving such credit information believes in good faith such information is correct.

The Company shall be deemed to be contractually obligated in any of the cases above mentioned if the Company in good faith considers itself so obligated.

Nothing herein contained shall limit the Company from using and purchasing source material, from entering into agreements to give source material credit therefor, as above provided, and from carrying out such credit obligations as may be therein provided.

In the case of a Variety or Audience Participation program on film where a writer has contributed material and is not otherwise entitled to be included in the ''Written by'' credit customarily shared by such writers, additional credit may be given for such material in the form ''Special Material by''. Writers of Variety and Audience Participation Shows shall be deemed included under all the provisions of this Schedule A, the same as writers of dramatic programs (despite the fact that only ''Story'' and ''Teleplay'' are hereinafter referred to, and when credits for Variety or Audience Participation Shows are involved hereunder the terms ''Written by'' and ''Special Material by'' shall be deemed included whenever the terms ''Story by'' and ''Teleplay by'' appear.

3. Screen credit for teleplay will not be shared by more than two (2) writers, except that in unusual cases, and solely as the result of Guild arbitration provided hereunder, the names of three (3) writers or the names of two (2) writing teams may be used. A writing team for the purpose of this Schedule A only shall be deemed to be two writers (excluding production executives) who have been assigned at about the same time to the same script and who work together for approximately the same

length of time on the script. The same limitation shall apply to screen credit for story authorship by writers hereunder.

4. The limitation as to the number of writers receiving credit provided for in subsection 3. shall apply to all teleplays except multiple-story teleplays, revues, Variety and Audience Participation shows.

5. Unless the writing of the story and/or teleplay is done entirely without the collaboration of any other writer, no story or teleplay credit to a production executive shall become final or effective unless approved by a credit arbitration as herein provided, in accordance with the Guild rules for the determination of such credit. Such credit arbitration, however, shall be without prejudice to the Company's position in any arbitration relating to payment pursuant to Article 13B.7C. A production executive for the purpose hereof shall be defined as any employee of the Company customarily hired for or engaging in activities considered part of the managerial phase of company's business activities. If Company shall claim that a writer has been assigned to write a teleplay based upon a story composed or created by a production executive, the story and teleplay shall be subject to an automatic arbitration pursuant to the provisions of this Schedule A.

6. When more than one (1) writer has participated in the authorship of a story and/or teleplay, then all participants will have the right to agree unanimously among themselves as to which of them shall receive writing credits on the television screen, provided that the form of credit agreed upon shall be in accordance with the terms of this Credits schedule, and provided further the agreement is reached in advance of arbitration and the form of such credit is not suggested or directed by the Company. If such unanimous agreement is communicated to the company before the final determination of credits hereunder, the company will accept such designation of credits, and such agreed credits shall become final hereunder. The company will confirm such agreed credits by sending notice thereof to all participants and to the Guild in the manner provided in this Schedule, subsections l0.-11. In no case shall a writer grant to another writer, or accept for himself, credit which is not properly earned.

7. Writing credit, required under the provisions of this Schedule A and as finally determined hereunder, shall appear on a separate card or cards on the television screen subject to the following conditions:

a. Writing credit (other than Source Material credit) may appear on the same card on which appears the title of the particular episode, but in no event in size of type less than 30% of the size of the title; or

b. Writing credit, including Source Material credit, if given, may appear on a separate card or cards immediately following the title card of the particular episode; or

c. Writing credit, including Source Material credit, may appear immediately prior to or following immediately after the director's credit. Writing credits placed pursuant to this subparagraph c. shall not be more than the second personal credit prior to the beginning or subsequent to the ending of the teleplay as the case may be. For this purpose, however, if Source material credit appears on a separate card from the other writing

Television Schedule A
TELEVISION CREDITS
202

Television Schedule A
TELEVISION CREDITS
279

203

EXHIBIT N

credits these two separate cards immediately succeeding each other shall count as one credit. Commercials or a credit to the production company shall not be deemed to be a "personal credit" for the purposes of this provision.

d. Credit for Anthology Series. With respect to anthology series only, the company shall give the writing credits in either of the positions set forth in a. or b. above unless the initial sponsor of the series having the right to do so pursuant to its agreement with the Company requires the Company to refrain from placing the credit in either of such positions. In such case, however, the Company shall place the writing credits as provided in c. above.

e. The credit given to a television writer or writers pursuant to this Schedule A shall precede (but need not immediately precede) source material credit except that

(1) the obligation imposed by this sentence should be subject to contractual commitments, heretofore or hereafter entered into by the Company with any source material author, requiring that source material credit precede television writing credit;

(2) the Company shall in any event have the right to give precedence to source material credit if the source material author's name has marquee value.

For purposes of illustration, a few examples of names having marquee value are: Kathleen Norris, Paddy Chayefsky, Ernest Hemingway, Erle Stanley Gardner, George Axelrod, Ogden Nash and John Van Druten.

If roller type credits are used, the Company in lieu of the use of a separate card shall set the writing credits in such fashion that when they are centered on the screen, no other credit shall be visible.

Source Material credit may be given on the same card on which other writing credits appear provided that writing credit (other than Source Material credit) shall be the first credit appearing on such card and provided further that the Source Material credit shall not occupy more than 40% of the space on such card and is not displayed more prominently than the other writing credits appearing thereon; provided however, that this provision shall be subject to and not affect any individual personal service agreements in effect on March 18, 1957. In no event, however, shall Source Material credit be included on the card on which the other writing credits appear with the title of the particular episode.

Teleplay credit shall precede story credit, it being understood that if both are on the same card, teleplay credit shall be the first credit and both credits shall be in the same style and size.

8. A Company shall not enter into any contract to give credit to any writer or writers hereunder for reasons of the writer's prestige or for any reasons other than earned credit, and writing credit for any writer or writers shall be assigned solely on the basis of actual contribution to the story or teleplay as determined in the event of question by the Credits Arbitration machinery of the Guild.

9. The Guild shall set up and maintain a record and listing of credits comparable to the Bulletin of the Academy of Motion Picture Arts and Sciences for the benefit

of writers engaged in writing for television. Any participant in the writing of a story for television or in the writing of a teleplay or any other material which shall appear on the television screen, whose contribution is deemed insufficient to warrant visual television screen credit, shall be eligible to have the nature of his contribution recorded in the aforementioned Bulletin and be made available to such writer for exploitation purposes, provided, however, that the final decision as to his contribution and what credit he shall receive and where, in the event of question, rests solely with the arbitration machinery of the Guild. Company shall be under no obligation with respect to the establishment or maintenance of any such records or listings.

10. A writer who has participated in the writing of the teleplay or of the story (other than Source Material) with respect thereto and, in the case of a remake, any writer who has received credit for story (other than Source Material) or teleplay in connection with the most recent production of such remade television film shall, for the purposes of this Basic Agreement, be considered a participant. As a participant, he shall be entitled to participate in the procedure for determination of writing credits.

11. Before the writing credits are finally determined, the Company will send concurrently to each participant and to the Guild written notice, which will state the Company's choice of credits on a tentative basis, together with the names of all participants and their addresses last known to the Company. Where the Company deems its record of participants incomplete, it may comply with the foregoing by giving notice to each writer whose name and address are furnished by the Guild within two (2) days after the Company's request for such information, in addition to giving notice to each participant shown in its own records.

The Company shall on such notice of tentative credits, for the information of the Guild and participants, state the form of any source material credit which the company intends to use in connection with the photoplay. Such credits shall not be subject to protest and arbitration as hereinafter provided but the Guild shall have the right to object to the form of such credit.

At the Company's request, the Guild may, but shall not be obligated to, make a tentative determination of screen credits and send out the notice.

12. The notice specified in subsection 11. hereof, will be sent by telegram to writers outside of Los Angeles or New York area, depending on the place of production, or by telegram, messenger or special delivery mail to writers in such areas. No notice will be sent to writers outside of the United States or writers who have not filed a forwarding address with the Company. In case of remakes the Company shall not be under any obligation to send any notice to any writer contributing to the teleplay or story of the original production, unless the writer has received credit.

Notices may be sent by mail, telegram or personal delivery as above provided. If notices are mailed, registered or certified mail shall be used, with return receipt requested; the failure of the addressee to sign or return the receipt shall not invalidate the notice.

Television Schedule A
TELEVISION CREDITS

Television Schedule A
TELEVISION CREDITS

13. The Company will keep the final determination of screen credits open until a time specified in the notice by the Company but such time will not be earlier than six o'clock p.m. of the fifth business day following the next day after the dispatch of the notice above specified; provided, however, that if in the good faith judgment of the Company there is an emergency requiring earlier determination and the Company so states in its notice, such time will not be earlier than six o'clock p.m. of the next business day following the next day after the dispatch of the notice above specified. If within the time specified, a written protest of the tentative credits has not been delivered to the Company from any participant or from the Guild, the tentative credits shall become final. Every protest, including that of the Guild, shall state the grounds or basis therefore in the notice thereof. The Guild agrees not to use its right of protest indiscriminately.

14. If a written protest of the tentative credits is received by the Company from a participant or the Guild within said period, the Company will withhold final determination of credits until a time to be specified by the Company which time will not be earlier than eight business days after the Company delivers to the Guild, all of the scripts involved; provided, however, that if in the good faith judgment of the Company there is an emergency requiring earlier determination and the Company so states in its notice, said time may be no earlier than 120 hours after the Company delivers to the Guild all of the scripts involved.

In any case where the Guild is required to read more than four (4) scripts pursuant to a protest hereunder, the Company shall be required to add to the eight business days or 120 hours above provided a period of twenty-four (24) hours for each additional script or fraction thereof.

If the material is voluminous or complex, or if other circumstances beyond the control of the Guild necessitate a longer period in order to render a fair decision, and the Guild requests an extension of time for arbitration, the Company agrees to cooperate wherever practicable.

15. Upon receipt of a protest, the Company will deliver three (3) copies of the final script and three (3) copies of all material written by the participants and three (3) copies of all available source material to the Guild offices in Los Angeles or New York and the Company shall notify the participants and the Guild by telegram informing them of the name of the protesting party and the new time set for final determination.

16. Any notice specified in the foregoing paragraphs shall, unless a specified form of service thereof is otherwise provided for herein, be sent by the Company by telegraphing, mailing or delivering the same to the last known address of the writer or may be delivered to the writer personally, and to the Guild at the last known address of the Guild in Los Angeles or New York.

17. Unless a unanimous agreement has been reached in accordance with subsection 6. hereof, any participant or the Guild may within the period provided for in subsection 13. hereof, file with the Company at its Studio and the Guild at its Los Angeles or New York office, as the case may be, a written request for arbitration of credits. In any case where automatic credit arbitration is required under this Schedule A, the Guild will be deemed to have made a written request for arbitration of credits at the time the Company submits the notice of tentative credits and in such case the Company will immediately make available to the Guild the material as provided for under subsection 15. of this Schedule A. The Guild through its arbitration committee shall, within the time limit specified by the Company make and advise the Company of its decision within the limitations of this Schedule A. In the event the decision of the arbitration committee is not rendered within said period, as the same may have been extended by the Company, the Company may make the tentative credits final, provided the terms and provisions of this Schedule have been fully complied with by the Company.

Prior to the rendition of the decision, said committee may make such investigations and conduct such hearings as may seem advisable to it. The Company shall cooperate with the arbitration committee to arrive at a just determination by furnishing all available information relative to that arbitration. Upon request of the arbitration committee, the Company shall provide the committee with a copy of the cutting continuity if it is available at the time of arbitration.

The decision of the Guild arbitration committee with respect to writing credits, including any Board of Review established in connection therewith, insofar as it is rendered within the limitations of this paragraph shall be final, and the Company will accept and follow the designation of screen credits contained in such decision and all writers shall be bound thereby.

If the matter is referred to a Board of Review of the Guild, the Guild shall have an additional five business days within which to render its credit arbitration decision; provided, however, that if in the good faith judgment of the Company there is an emergency and the Company so states in its notice, the Guild's time shall not be extended except as provided in paragraph 14.

18. The decision of the Guild arbitration committee may be published in such media as the Guild may determine. No writer or Company shall be entitled to collect damages or shall be entitled to injunctive relief as a result of any decision of the committee with regard to credits. In signing any contract incorporating by reference or otherwise all or part of this Basic Agreement, any writer or Company specifically waives all rights or claims against the Guild and/or its arbiters or any of them under the laws of libel or slander or otherwise with regard to proceedings before the Guild arbitration committee and any full and fair publication of the findings and/or decisions of such committee. The Guild and any writer signing any contract incorporating by reference or otherwise referring to this subsection or any writer consenting to the procedure set forth in this subsection, shall not have any rights or claims of any nature against any Company growing out of or concerning any action of the Guild or its arbiters or any of them, or any determination of credits in the manner provided in this subsection, and all such rights or claims are hereby specifically waived.

19. In the event that after the screen credits are determined as hereinabove provided, material changes are made in the script or photoplay, either the Company or participant and the Guild jointly may reopen credit determination by making a claim to the Guild or Company as the case may be, within forty-eight (48) hours after completion of the writing claimed to justify the revision of credits, in

which case the procedure for determining such revised credits will be the same as that provided for the original determination of credits.

The Company agrees to make revisions in advertising material previously forwarded to the processor or publisher to reflect such redetermined credits, provided that such revisions can physically and mechanically be made prior to the closing date of such processor or publisher and at reasonable expense and provided the processor or publisher has not yet commenced work on that part of material which the change would affect.

20. No writer shall claim credit for any participation in the screen authorship of any teleplay or story for which the credits are to be determined by the procedure herein provided for prior to the time when such credits have in fact actually been so determined, and no writer shall claim credits contrary to such determination.

21. With reference to credits in advertising which is contracted for by the Company and which is more than eight column inches in size, if the names of the individual producer or director shall be included, the name of the writer shall be included and in all such instances the writer shall receive parity as to size and style of type with the director and producer except in those instances where the Company shall have determined in good faith that the individual director's or producer's name has box office value. In connection with a series, anthology or episodic, or serial, if advertising credit is given to a producer or a director only in connection with advertising the entire series the writer shall be given credit in such advertising where the number of scripts contributed by such writer shall equal the number of programs produced or directed by the producer or director receiving such advertising credit. If spoken credits are accorded to the writer. Oral self identification by a producer or director shall not be deemed to be a spoken credit for the purpose hereof. In the event that the Company licenses or grants to any third party the right to make any of the uses of serial or episodic series material specified in Article 15B 14., it shall use its best efforts, in contracting with such third party, to require such third party to accord to the writer or writers of such material credit therefore which is appropriate to the field or medium for which such material is licensed; provided however, that Company shall be obligated, in any contract with such third party for hard cover or paperback book publication of such material, to provide for credit to such writer or writers in a manner consistent with credits ordinarily given in the book publishing industry in similar instances. If Company itself uses such material pursuant to paragraphs a. or e. of said Article 15B 14., it will accord appropriate credit to such writer or writes in connection therewith, but in the event of any dispute concerning the appropriateness of such credit the company's decision shall be final. Nothing contained in this subsection 21. shall be deemed to affect, limit or modify the provisions of subsection 8. of Article 15B of this Basic Agreement, it being the intent that a "Buyer" executing an assumption agreement under subsection 8. shall in all respects be in the same position as the "Seller".

22. No commercial or advertising matter, audio, or visual, shall appear on or above the writer's card either as background or otherwise. The following uses of a sponsor's name, mark, slogan, product or package shall not be deemed to involve an appearance of "commercial or advertising matter":

a. Such use as a part of or in direct conjunction with the title of the program or program series, (as in "DuPont Show of the Month", "GE Theatre", "US Steel Hour");

b. Such use as an integral part of draperies, sets, or props appearing under a superimposition of credits where such draperies, sets or props were used in the entertainment portion of the program (as in various types of variety, comedy variety and audience participation programs);

c. The superimposition of a crawl or roller-type credit over a still or moving photograph of a sponsor's product on a set or sets used in the entertainment portion of the program where the use, demonstration, or exhibition of such product was integrated with the entertainment portion of the program;

d. Such use as a part of the playing or singing of the sponsor's musical theme.

Anything in this subsection 22. to the contrary notwithstanding, it is understood and agreed that on any particular program the writer will be given parity of treatment with the director insofar as the appearance of commercial or advertising matter on their respective cards is concerned.

23. A credit on the screen in the form "created by" shall be given on each episode of an episodic series or serial, to the writer where such writer has separated rights and is entitled to sequel payments for such episode under Article 16B2. Such credit ("created by") shall be on a separate card and shall be contiguous to a writing credit. The Company may contract to give such credit to any person, but such contract shall provide that in the event another writer is determined to be entitled to such credit, as above provided, that writer shall then be given the "created by" credit and the person whose contract provided for such credit may be given a "developed by" credit or other similar credit. If the contract was executed prior to June 16, 1966 providing for such "created by" credit, such credit may be given notwithstanding the above provisions. In the event no one is entitled to such separation of rights or in the case of anthology episodes, nothing herein shall prevent, or require, the giving by the Company a "created by" credit.

a. A writer entitled to "created by" credit shall be given appropriate source material credit in hard cover or paperback book publications arising out of the series. The contract with the publisher shall provide that this provision is for the express benefit of the writer and the Guild, but the failure of a publisher to comply with such requirement shall not constitute a breach by the Company.

b. With regard to any episodic series or serial in which a writer subject to this Basic Agreement has separated rights, is entitled to sequel payments under Article 16B2. and receives a "created by" credit, if the Company desires to grant a "developed by" credit, such credit may only be given for writing and shall be subject to a Guild arbitration to determine its appropriateness. The Guild's decision in this regard shall be final.

c. A "developed by" or "developed for television" or any like credit may be given only to a person who has contributed to the writing of the program,

Television Schedule A
TELEVISION CREDITS
208

Television Schedule A
TELEVISION CREDITS
209

282

EXHIBIT N

Case 3:16-cv-01442-SRU   Document 43-19   Filed 06/09/17   Page 110 of 114

*Credits not to affect rates — There is no Separation of Rights for Narration

NARRATION
(by writer other than writer of teleplay or story and teleplay)

| Nature of material | FILM ASSEMBLED IN STORY SEQUENCE | | | FILM FOOTAGE NOT ASSEMBLED IN STORY SEQUENCE | | |
|---|---|---|---|---|---|---|
| | *Credit to Narration Writer | Freelance Minimum Writer | Residuals to Narration (Automatic arbitration) | *Credit to Narration Writer | Freelance Minimum Writer | Residuals to Narration (Automatic arbitration) |
| 1. | Written by | See Rate Schedule B | Yes, based on % of applicable freelance minimum in Rate Schedule B | Narration written by | See Rate Schedule A | Yes, based on % of applicable freelance minimum in Rate Schedule A |
| 2. Story only — 211 | Narration written by | See Rate Schedule A | Yes, based on % of applicable freelance minimum in Rate Schedule A | Narration written by | See Rate Schedule A | Yes, based on % of applicable freelance minimum in Rate Schedule A |
| 3. Story and Teleplay | None, but if over 8 minutes of narration then on same card (if story credit then on same card) | See Rate Schedule C | If "Narration by" credit, then only shared residuals, as determined on WGA credit arbitration (aggregate of no more than story residuals) Automatic & teleplay (residuals) | None, but if over 8 minutes of narration (same card) | See Rate Schedule C | If "Narration by" credit, then only shared residuals, as determined on WGA credit arbitration (aggregate), may receive Narration by credit (same card) |

EXHIBIT N

series or episode involved; provided however that any such credit provided for in any contract in existence on the effective date of this agreement may be given whether or not it satisfies the requirements of this subparagraph c.

24. A credit entitled "narration written by" or "narration by" shall be in accordance with the chart on page 211.

25. Notice of tentative credits shall be in the following form, which form has been approved by the Guild:

NOTICE OF TENTATIVE WRITING CREDITS

TO: Writers Guild of America, West, Inc. 8955 Beverly Boulevard, Los Angeles, California 90048 and Participating Writers

NAMES OF PARTICIPATING WRITERS          ADDRESS

_____

Title of Episode: _____  Production # _____
                  (indicate if pilot)

Series Title: _____

Producing Company: _____

Executive Producer: _____

Producer: _____  Assoc. Producer: _____

Director: _____  Story Editor (or Consultant): _____

Other Production Executives, if Participating Writers _____

Writing credits on this episode are tentatively determined as follows:

ON SCREEN:

Source material credit ON THIS EPISODE (On separate card, unless otherwise indicated) if any:

Continuing source material or Created By credit APPEARING ON ALL EPISODES OF SERIES (on separate card, unless otherwise indicated) if any:

The above tentative credits will become final unless a protest or request to read the final script is communicated to the undersigned not later than 6:00 P.M. _____

BY: _____

26. Where the Company supplies material to newspapers and periodicals such as TV Guide for listing programs, it will list writing credits if they have theretofore been determined.

27. Where the Company has failed to provide credit on the screen in accordance with final credit determination it shall correct each print before such print is

## TELEVISION SCHEDULE B

### STANDARD FORM FREELANCE FILM TELEVISION WRITER'S EMPLOYMENT CONTRACT.

Agreement entered into at _____, this _____ day of _____

19____ between _____, hereinafter called ''Company''

and _____, hereinafter called ''Writer'';

#### WITNESSETH:

1.   Company hereby employs the Writer to render services in the writing, composition, preparation and revision of the literary material described in subsection 2. hereof, hereinafter for convenience referred to as the ''work''. The Writer accepts such employment and agrees to render his services hereunder and devote his best talents, efforts and abilities in accordance with the instructions, control and directions of the Company.

2.   **FORM OF WORK:**

(    )   Plot outline (based on _____).

(    )   Story (based on _____).

(    )   Story and teleplay (based on _____).

(    )   Teleplay (based on _____).

(    )   Rewrite (of _____).

(    )   Polish (of _____).

(    )   Other material (described as _____).

3.   **DELIVERY:**

If the Writer has agreed to complete and deliver the work, and/or any changes and revisions, within a certain period or periods of time, then such agreement will be expressed in this paragraph as follows:

4.   **RIGHT TO OFFSET:**

With respect to Writer's warranties and indemnification agreement, the Company and the Writer agree that upon the presentation of any claim or the institution of any action involving a breach of warranty, the party receiving notice thereof will promptly notify the other party in regard thereto. Company agrees that the pendency of any such claim or action shall not relieve the Company of its obligation to pay the Writer any monies due hereunder, and the Company will not have the right to withhold such monies until it has sustained a loss or suffered an adverse judgment of decree by reason of such claim or action.

Television Schedule B
STANDARD FORM FREELANCE FILM
TELEVISION WRITER'S EMPLOYMENT CONTRACT

213

284

**EXHIBIT N**

re-telecast and place a full-page advertisement in either DAILY VARIETY or the HOLLYWOOD REPORTER specifically crediting the writer. Such remedies shall be in addition to any claim the individual writer may have for damages by reason of such failure to provide proper credit.

28.   Each writing credit card required hereunder shall appear on the screen a minimum of two seconds, or the length of the producer's or director's credit, whichever is shown longer.

29.   If by reason of method of assignment of the writer or other circumstances in connection with a program or series, the provisions of this Schedule A are inappropriate, either the Guild or the Company may raise the question of such inappropriateness and the mutual agreement reached by them with respect to the credit to be given, if any, shall be binding and conclusive on these parties and the writers.

30.   A writer also employed in the additional capacity of a story editor for any episodic series or serial shall receive a credit as story editor on a separate card. Any form of credit for such person other than ''story editor,'' ''story consultant'', or ''story supervisor'', cannot be used without Guild approval. Credit for such story editor shall not be deemed to be a credit for screen authorship, within the meaning of Article 8 of this Basic Agreement, or within the scope of paragraphs 1 to 29, both inclusive, of this Television Schedule A, for any purpose whatsoever, including, but not limited to the procedure for determining credits for screen authorship. Any person entitled to such credit (whether in the forms stated, or otherwise) under any contract in existence on the effective date of this agreement may be given such credit as required by such contract, whether or not it satisfies or is consistent with the provisions of this paragraph 30.

## 5.   COMPENSATION:

As full compensation for all services to be rendered hereunder, the rights granted to the company with respect to the work, and the undertakings and agreements assumed by the Writers, and upon condition that the Writer shall fully perform such undertakings and agreements, Company will pay the Writer the following amounts:

   a.   Compensation for services $ _____

   b.   Advance for television re-runs $ _____

   c.   Advance for theatrical use $ _____

No amounts may be inserted in b. or c. above unless the amount set forth in a. above is at least twice the applicable minimum compensation set forth in the Writers Guild of America Theatrical and Television Basic Agreement of 1977 (herein "Basic Agreement") for the type of services to be rendered hereunder.

If the assignment is for story and teleplay or teleplay the following amounts of the compensation set forth in a. above will be paid in accordance with the provisions of Article 13B of said Basic Agreement.

   (1) $ _____   following delivery of story.

   (2) $ _____   following delivery of first draft teleplay.

   (3) $ _____   following delivery of final draft teleplay.

In the event Writer receives screen credit as provided in Article 15B 13. of the Basic Agreement on the television film based on the above work and said film is exhibited theatrically, Company shall pay to the Writer the additional sum of $ _____.

## 6.   MINIMUM BASIC AGREEMENT:

The parties acknowledge that this contract is subject to all of the terms and provisions of the Basic Agreement and to the extent that the terms and provisions of said Basic Agreement are more advantageous to Writer than the terms hereof, the terms of said Basic Agreement shall supersede and replace the less advantageous terms of this agreement. Writer is an employee as defined by said Basic Agreement and Company has the right to control and direct the services to be performed.

## 7.   GUILD MEMBERSHIP:

To the extent that it may be lawful for the Company to require the Writer to do so, Writer agrees to become and/or remain a member of Writers Guild of America in good standing as required by the provisions of said Basic Agreement. If Writer fails or refuses to become or remain a member of said Guild in good standing, as required in the preceding sentence, the Company shall have the right at any time thereafter to terminate this agreement with the Writer.

IN WITNESS WHEREOF, the parties hereto have duly executed this agreement on the day and year first above written.

By _____

                    Company

_____

                    Writer

(The foregoing Freelance Film Television Writer's Contract may contain any other provisions acceptable to both Writer and company and not less favorable to, inconsistent with or violative of any of the terms or provisions of the Basic Agreement above mentioned.)

214

Television Schedule B
STANDARD FORM FREELANCE FILM
TELEVISION WRITERS EMPLOYMENT CONTRACT

215

Television Schedule B
STANDARD FORM FREELANCE FILM
TELEVISION WRITERS EMPLOYMENT CONTRACT

285

EXHIBIT N



A-398

WRITERS GUILD OF AMERICA, west, Inc.
Affiliated with the Writers Guild of America, inc.
Member of International Writers Guild

8955 BEVERLY BOULEVARD
LOS ANGELES, CALIFORNIA 90048 • CRestview 6-1000
CAble: IMPCTURES, LOS ANGELES

As of March 2, 1977

Association of Motion Picture & Television Producers, Inc.
8480 Beverly Boulevard
Los Angeles, California 90048

Re: WGA-British Screenwriting
Credits Agreement

Gentlemen:

This will record that we have agreed that the provisions of the letter agreement dated as of December 31, 1966, between WGA and the Writers Guild of Great Britain shall be applicable as to the determination of writing credits where there is a conflict in jurisdiction by reason of the engagement of a British writer and a writer subject to the WGA 1977 Theatrical and Television Basic Agreement ("MBA") on a particular motion picture. Said letter is Exhibit I to the WGA 1970 MBA and Exhibit 1 to said WGA 1977 MBA, and is hereby in the WGA 1977 MBA deemed to refer to the WGA 1977 MBA as opposed to the 1966 to 1970 Basic Agreement.

We have further agreed that WGA will notify you when it has reached a new agreement with the Writers Guild of Great Britain. Unless AMPTP objects to the provisions and application of the revised agreement within thirty days of AMPTP's receipt of a copy thereof from WGA, said revised agreement shall be deemed substituted in the WGA 1977 MBA for the letter agreement of December 31, 1966 and, from and after said thirty day period, shall be applicable as to the determination of writing credits where there is a conflict in jurisdiction by reason of the engagement of a British writer and a writer subject to the WGA 1977 MBA.

Very truly yours,

Writers Guild of America,
West, Inc.
on behalf of itself and
its affiliate
Writers Guild of America,
East, Inc.

By  s/ Leonard Chassman

AGREED:
On behalf of the respective
signatory members of the
Association of Motion Picture
and Television Producers, Inc.

By  s/ Joseph A. Adelman

Exhibit I

216

EXHIBIT 1
WGA-British Screenwriting
Credits Agreement

As of December 13, 1966

The Writers Guild of Great Britain
7 Harley Street
London, W. 1, England

Attention:  Lord Willis

Re: Screenwriting Credits Agreement

Gentlemen:

The purpose of this agreement is to establish procedures and to resolve differences between your organization (herein called "British Guild") and the undersigned (herein called "WGA") as to the determination of writing credits where there is a conflict in jurisdiction by reason of the engagement of a British writer and a writer subject to the WGA 1966 Theatrical Basic Agreement (herein called "Basic Agreement") on a particular motion picture.

The British Guild and WGA hereby agree as follows:

1. Where a Producer, signatory to the Basic Agreement

(a) first employs a British writer to write a screenplay for a motion picture, which employment is outside the geographical coverage of the Basic Agreement; and

(b) subsequently employs or acquires material for such motion picture from a writer within the geographical coverage of the Basic Agreement; and

(c) such motion picture is to be and is produced outside the United States; and

(d) the writer referred to in (b) above expressly so agrees in his employment or acquisition agreement; then

the British Guild shall determine the writing credits for such motion picture.

2. The determination of credit hereunder by the British Guild shall be in accordance with Schedule A of the Basic Agreement and the WGA Screen Credits Manual as such documents may be amended from time to time.

3. When all the conditions set forth in paragraph 1 above are met and the British Guild shall determine the writing credits, then, for the purposes of this agreement, wherever in the Basic Agreement or in the Credits Manual reference is made to "Guild", "WGA", or "union", such reference shall be deemed to mean and include WGA and the British Guild.

4. When all the conditions set forth in 1 above are not met, and the Producer employs or acquires material for a motion picture from a writer within the geographical application of the Basic Agreement, then WGA shall determine the writing credits for such motion picture.

217

EXHIBIT I
WGA-British Screenwriting
Credits Agreement

286

EXHIBIT N

5. The British Guild and WGA shall use its best efforts to keep the other advised of any available information regarding employment of writers or acquisition of material that would be subject to this agreement.

6. The term of this agreement shall commence with the date hereof and shall continue for the term of the Basic Agreement and any subsequent WGA Theatrical Basic Agreement, unless either WGA or the British Guild serves written notice upon the other not later than 90 days prior to the expiration date of the Basic Agreement or any subsequent WGA Theatrical Basic Agreement that this agreement is to terminate upon the expiration date of the Basic Agreement or of any subsequent WGA Theatrical Basic Agreement.

If the foregoing correctly reflects our understanding and agreement, please so indicate by signing below.

Very truly yours,

WRITERS GUILD OF
AMERICA, WEST, INC.
on behalf of itself
and its affiliate
WRITERS GUILD OF
AMERICA, EAST, INC.

By (Signed) Michael H. Franklin

Executive Director

ACCEPTED AND
AGREED:

WRITERS GUILD OF
GREAT BRITAIN

By (Signed) Alan Sapper

General Secretary

218

EXHIBIT I
WGA-British Screenwriting
Credits Agreement

**EXHIBIT N**

287

# FORM PA

UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

**PA** 81-093

PA PAU

EFFECTIVE DATE OF REGISTRATION

9    26    80
(Month)   (Day)   (Year)

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE CONTINUATION SHEET (FORM PA/CON)**

**① Title**

TITLE OF THIS WORK:

FRIDAY THE 13TH

NATURE OF THIS WORK: (See instructions)

motion picture photoplay
in 95 minutes

PREVIOUS OR ALTERNATIVE TITLES:

**② Author(s)**

IMPORTANT: Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). If any part of this work was made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates blank.

NAME OF AUTHOR:

1   Georgetown Productions, Inc.

Was this author's contribution to the work a "work made for hire"?  Yes **x**   No

AUTHOR'S NATIONALITY OR DOMICILE:

Citizen of USA ......... or Domiciled in ...........
(Name of Country)              (Name of Country)

AUTHOR OF: (Briefly describe nature of this author's contribution)

entire work (see Space "6")

DATES OF BIRTH AND DEATH:

Born ......... Died .........
(Year)        (Year)

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:

Anonymous?  Yes ... No ...
Pseudonymous?  Yes ... No ...

If the answer to either of these questions is "Yes," see detailed instructions attached.

NAME OF AUTHOR:

2

Was this author's contribution to the work a "work made for hire"?  Yes   No

AUTHOR'S NATIONALITY OR DOMICILE:

Citizen of ......... or Domiciled in ...........
(Name of Country)              (Name of Country)

AUTHOR OF: (Briefly describe nature of this author's contribution)

DATES OF BIRTH AND DEATH:

Born ......... Died .........
(Year)        (Year)

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:

Anonymous?  Yes ... No ...
Pseudonymous?  Yes ... No ...

If the answer to either of these questions is "Yes," see detailed instructions attached.

NAME OF AUTHOR:

3

Was this author's contribution to the work a "work made for hire"?  Yes   No

AUTHOR'S NATIONALITY OR DOMICILE:

Citizen of ......... or Domiciled in ...........
(Name of Country)              (Name of Country)

AUTHOR OF: (Briefly describe nature of this author's contribution)

DATES OF BIRTH AND DEATH:

Born ......... Died .........
(Year)        (Year)

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:

Anonymous?  Yes ... No ...
Pseudonymous?  Yes ... No ...

If the answer to either of these questions is "Yes," see detailed instructions attached.

**③ Creation and Publication**

YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED:

Year 1980

(This information must be given in all cases.)

DATE AND NATION OF FIRST PUBLICATION:

Date April 18, 1980
(Month)   (Day)   (Year)

Nation U.S.A.
(Name of Country)

(Complete this block ONLY if this work has been published.)

**④ Claimant(s)**

NAME(S) AND ADDRESS(ES) OF COPYRIGHT CLAIMANT(S):

Georgetown Productions, Inc.
c/o Paramount Pictures Corporation
1 Gulf and Western Plaza
New York, New York 10023

TRANSFER: (If the copyright claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright.)

• Complete all applicable spaces (numbers 5-9) on the reverse side of this page
• Follow detailed instructions attached     • Sign the form at line 8

DO NOT WRITE HERE

Page 1 of 2 pages

| EXAMINED BY RW | APPLICATION RECEIVED |
| CHECKED BY GN | SEP 04 1980 |

CORRESPONDENCE
☐ Yes

DEPOSIT RECEIVED
SEP 26 1980

DEPOSIT ACCOUNT
FUNDS USED ☒

REMITTANCE NUMBER AND DATE

FOR
COPYRIGHT
OFFICE
USE
ONLY

PA  81-093

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED ADDITIONAL SPACE, USE CONTINUATION SHEET (FORM PA/CON)**

**PREVIOUS REGISTRATION:**

- Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office? Yes      No  X

- If your answer is "Yes," why is another registration being sought?  (Check appropriate box)
  - ☐ This is the first published edition of a work previously registered in unpublished form.
  - ☐ This is the first application submitted by this author as copyright claimant.
  - ☐ This is a changed version of the work, as shown by line 6 of the application.

- If your answer is "Yes," give: Previous Registration Number _____ Year of Registration _____

⑤ Previous Registration

**COMPILATION OR DERIVATIVE WORK:** (See instructions)

PREEXISTING MATERIAL: (Identify any preexisting work or works that the work is based on or incorporates.)
Some of the musical compositions in the sound track.

MATERIAL ADDED TO THIS WORK: (Give a brief, general statement of the material that has been added to this work and in which copyright is claimed.)
Screenplay, remaining musical compositions and other literary and cinematographic materials.

⑥ Compilation or Derivative Work

**DEPOSIT ACCOUNT:** (If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.)

Name: Brylawski & Cleary

Account Number: DA 050385

**CORRESPONDENCE:** (Give name and address to which correspondence about this application should be sent.)

Name: E. Fulton Brylawski

Address: 224 East Capitol Street (Apt)
Washington, D.C. 20003 (City) (State) (ZIP)

⑦ Fee and Correspondence

**CERTIFICATION:** I, the undersigned, hereby certify that I am the: (Check one)
☐ author ☐ other copyright claimant ☐ owner of exclusive right(s) ☒ authorized agent of Gaylord Productions Inc.
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Handwritten signature: (X) Debra Acevedo

Typed or printed name: Debra Acevedo       Date 9/3/80

⑧ Certification

MAIL
CERTIFICATE
TO

Brylawski & Cleary
(Name)
224 East Capitol Street
(Number, Street and Apartment Number)
Washington, D.C. 20003
(City) (State) (ZIP code)

(Certificate will be mailed in window envelope)

⑨ Address For Return of Certificate

● 17 U.S.C. (506(e)) FALSE REPRESENTATION - Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.
U.S. GOVERNMENT PRINTING OFFICE: 1980-311-425/9



RADIO TELEVISION SCREEN

## *Writers Guild of America, East, Inc.*

*Affiliated with Writers Guild of America, West, Inc.*

*Member of International Writers Guild*

*22 West 48th Street, New York, N.Y. 10036 / 575-5060*

June 14, 1979

Mr. Victor Miller
726 Broad Street
Stratford, CT.  06497

> Re:  The Manny Company
> "Friday 13"

Dear Mr. Miller:

Thank you for filing your employment agreement for "Friday 13" with the Guild.

In performing the Guild's routine freelance employment analysis, the following provisions were called to the Guild's attention. This does not mean that the remaining provisions of the agreement comply with the minimum basic agreement, nor that they do not comply—merely that certain provisions attracted the Guild's attention.

First of all, the agreement is not dated. Is the Guild correct in assuming that it was executed during the 3/2/79- 3/1/80 period, during which the current rates apply?

Second, there is no source material listed. If you are writing the screenplay based upon your own original material, you may be entitled to payment for "additional payment- no assigned material," It is important for you to inform the Guild whether there was, in fact, assigned material. If there was no assigned material, it appears that your compensation may be slightly below WGA minimum. In that case, the Guild would seek an adjustment on your behalf from the Manny Company.

*Officers: CRAIG FISHER, President*

*ALLEGRA BRANSON, Vice President*
*KEN GAUGHRAN, Secretary-Treasurer*
*LEONARD WASSER, Executive Director*

*LORING MANDEL., National Chairman*
*COHN, GLICKSTEIN, LURIE,*
*OSTRIN & LUBELL, Counsel*

65

WGAE000008

Mr. Victor Miller
Page 2
June 14, 1979


In addition, the installment payments appear improper.  MBA
Article 13 A (3) requires that you be paid at least $1,055 within
a week following commencement of writing services.  If the Manny
Company deducts that $1,055 from the $5,569 first draft payment,
the installments would then appear appropriate.

The Guild would also appreciate information concerning the length
of time you are expected to work on this project.  The MBA contains
relevant provisions which preclude producers from "tying up" writers
for too long unless the economic provisions are appropriate.

Thanks again for filing your agreement with the Guild.  I shall
await your response prior to communicating with the Manny Company.

                         Very truly yours,

                         James H. Kaye
                         Assistant Executive Director


JHK:dk

cc:  Leonard Wasser

320
WGAE000009

*Assoc*
*FreelaNce*

## APPLICATION FOR MEMBERSHIP

in

### *Writers Guild of America, East, Inc.*

*Affiliated with Writers Guild of America, West, Inc.*

*Member of International Writers Guild*

*1212 Avenue of the Americas, New York, N. Y. 10036* / *PLaza 7-3317*

I hereby apply for membership in the WRITERS GUILD OF AMERICA, EAST, INC.

I agree to abide by its Constitution and By-Laws, to support its aims and purposes and to abide by any basic contract or agreement adopted by the WRITERS GUILD OF AMERICA, EAST, INC.

I am presently engaged in writing for _____ RADIO, __X__ SCREEN, __x*__ TELEVISION.

* nothing sold yet

NAME (please *print*) __Victor B. Miller__    Soc. Sec. # __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__

PSEUDONYM(S) __None__

ADDRESS __726 Broad Street__    CITY and STATE __Stratford, Conn. 06497__

TELEPHONE NUMBER: Home __(203)377-6354__    Business _____

AGENT __Ms. Karen Hitzig---William Morris (NYC)__

DATE __Mar. 21, 1974__    SIGNATURE _____

Please complete information on reverse side of application.

YOUR CHECK IN THE AMOUNT OF $206.25 SHOULD ACCOMPANY THIS APPLICATION.

Balance to come
$106.25

RECEIVED MAR 2 5 1974

VICTOR MILLER
726 BROAD ST.
STRATFORD, CT. 06497

Writers Guild of America, East
22 West 48th Street
New York, New York 10036

6·4·79

Gentlemen:

Herewith the copy of a contract drawn between
me and The Manny Company, a Guild Signatory, concerning
the writing of a screenplay tentatively titled: FRIDAY 13.
Please file it for me.

Thank you,

Victor Miller

RECEIVED JUN - 6 1979

**EXHIBIT U**                                          **322**

WGAE000007

1  UNITED STATES COURT OF APPEALS
2  FOR THE SECOND CIRCUIT
   -------------------------------x
3  THE MANNY COMPANY and
   SEAN S. CUNNINGHAM FILMS, LTD.,

4           Plaintiffs-Appellees

5           vs.

6  GEORGETOWN PRODUCTIONS, INC.                    86-7665

7           Defendant

8           -and-

9  BELMONT MANAGEMENT, INC.,

10          Defendant-Appellant.
   -------------------------------x

11

12

13      The plaintiffs, by their attorney and the defendant
   and defendant-appellant, by their respective attorneys
14 hereby stipulate and agree as follows:

15 1)  This appeal from the Declaration and Order of the
       District Court dated July 2, 1986 (the "order") and
16     Judgment of The District Court dated July 25, 1986
       ("Judgment") is hereby withdrawn, with prejudice and
17     waiving all rights to appeal, and appellant waives
       all further findings of fact and law.

18 2)  In full satisfaction of the Order and Judgment, defendants
       shall pay to Blumenthal and Lynne, as attorneys for
19     plaintiff, one hundred thousand dollars ($100,000)
       and the parties shall direct the bonding company
20     which has posted the supersedias bond, Fidelity
       and Deposit Company of Maryland, to make such payment
21     and to pay the balance to Carl Kaminsky, Esq., as
       attorney for defendants.  Defendants shall thereafter
22     have no obligations under such bond to plaintiffs.

23

24

25

A-407

3)   Such payments to the attorneys for plaintiff shall
be in satisfaction of all payments payable with respect
to the film "Friday The 13th, Part I ("The Film")
to Sean S. Cunningham Films, Ltd. ("Films") and to
the Writers Guild of America, Inc. W.G.A., for Victor
Miller out of payments made by Paramount Pictures
Corp. to either of the defendants prior to May 27, 1986.
Defendants shall remain liable for all obligations
to such parties for payments made thereafter, including
for sequel rights, but shall instruct Paramount Pictures
Corp (and any other party, including Warner Brothers
Pictures Corp., which may make payments with respect
to the Film) to make direct payments to Films and
the WGA, Victor Miller and Sean S. Cunningham, in
appropriate amounts, includig payments for sequels
to the Film.  Such amounts are to be determined in
accordance with the letter dated May 24, 1986 from
Belmont Management, Inc. contained in the record on
appeal at page 73A.  In addition, defendants acknowledge
that after May 27, 1986 certain payments were made
by Paramount Pictures Corp. to defendants and that
defendants did not make required payments to Films
and WGA.  The parties shall direct Paramount Pictures
Corp. to make direct payment to Films and WGA of
such obligations out of the first funds to be
distributed by it with respect to The Film and prior
to making any distribution to defendants.

4)   All obligations of defendants hereunder are joint
and several.

5)   This stipulation and settlement does not satisfy any
obligations of the defendants to plaintiffs and the
WGA for payments received and to be received by defendants
from Warner Brothers Pictures Corp with respect to
The Film or for sequel rights thereto.

6)   The District Court shall retain jurisdiction of this
action and the parties for the purpose of interpreting
and enforcing this stipulation.  All further claims,
disputes and controversies between plaintiffs
or either of them and defendants or either of them
relating to The Film shall be determined by arbitrator
in New York City in accordance with the rules
and regulations of the American Arbitration Association,
except such arbitration shall be before a single arbitrator
and held within seven days of a demand for arbitration.

CONFIDENTIAL

PLAINTIFFS001891

1   Any such proceeding shall be commenced by service
    of a demand for arbitration by certified mail at the
2   last known address of the party, with a copy of any
    demand against plaintiffs and defendants to be sent
3   respectively to Blumenthal & Lynne, Esqs. and Carl
    Kaminsky, Esq.

4

5   7)  Defendants shall make no further assignment of any
        rights relating to The Film unless (a) all obligations
        are assumed by the assignee and (b) a notice thereof
6       is given to all other parties hereunder.

7   January 8, 1987

8
    Blumenthal & Lynne, a                  Carl Kaminsky, Esq.
9   Professional Corporation               Attorney for Defendants

    BY:
10      Richard L. Blumenthal              Stanley Gould, Esq.
11      Attorney for Plaintiffs            of Counsel for
        488 Madison Avenue                 Defendant-Appellant
12      New York, N.Y. 10022

13  So ordered
    Appeal withdrawn with prejudice in open court.
14  So Ordered:                        C.J.
15                          1 - 8 - 89

16

17

18

19

20

21

22                                      A TRUE COPY
                                      ELAINE B. GOLDSMITH
23
                                      Patricia Dundas
24                                    Deputy Clerk

25

SOUTHERN DISTRICT REPORTERS, U.S. COURTHOUSE
FOLEY SQUARE, NEW YORK, N.Y. — 791-1020          CU/W&I 000239

## LETTER OF IRREVOCABLE AUTHORITY

July 19, 1988

Paramount Pictures Corporation
One Gulf+Western Plaza
New York, New York  10023-7799

Re: "FRIDAY THE 13TH" and "FRIDAY THE 13TH, PART II"

Dear Sir/Madam:

Reference is made to the following documents relating to the motion pictures entitled "FRIDAY THE 13TH" and "FRIDAY THE 13TH, PART II" (the "Pictures"):  (i) an Agreement dated as of February 13, 1980 between Georgetown Productions, Inc . ("Georgetown") and Paramount Pictures Corporation ("Paramount"); (ii) an Agreement dated as of January 8, 1981 between Georgetown and Paramount; (iii) an Instrument of Assignment and Assumption dated February 1982, pursuant to which Georgetown assigned to Belmont Management, Inc. ("Belmont") all of Georgetown's right, title and interest in and to the foregoing agreements; and to all other agreements, letters or amendments relating to the Pictures (the "Agreements").

Subject to the terms and conditions of the Agreements, the undersigned warrant and represent that, pursuant to the Stipulation of Settlement approved by the United States Court of Appeals for the Second Circuit on January 8, 1987, they have irrevocably agreed among themselves and irrevocably instruct Paramount henceforth from the amounts otherwise payable to Belmont pursuant to the Agreements, to deduct therefrom and pay to Mr. Victor Miller ("Miller"), by check payable to Wordsmith, Inc. c/o the Writers Guild of America ("WGA"), all amounts due Miller pursuant to the WGA Basic Agreement with respect to the Pictures on or after May 27, 1986, as well as three (3) theatrical sequel payments due prior thereto.  For purposes of calculating the specific amount to be paid Miller, Paramount is hereby authorized and directed to deliver to the WGA, from this date forward, annual cumulative distribution statements as well as necessary statements for applicable earlier periods from which, in part, the WGA will calculate and provide to Paramount written requests for payments which specify the amount to be paid pursuant hereto ("Payment Requests").

In connection with the foregoing instructions, the undersigned agree as follows:

1.  Among the undersigned, the calculations of the WGA shall be absolutely final and binding.  Paramount shall not be held liable to any of the undersigned by reason of any action taken by it in reliance on the written instructions provided by the WGA nor shall Paramount be held liable for any delays or errors of calculation caused by its honoring of this instruction or the acts of the WGA.

2.  All payments made to Miller pursuant to these instructions shall be fully deducted from and exclusively funded from amounts otherwise payable to Belmont pursuant to the Agreements.  Delivery of funds in accordance with these instructions shall constitute satisfaction of any obligations to Belmont to the full extent of the payment delivered.  To the extent, if any, the WGA authorizes payments to Miller

CU/W&I 000313

PLAINTIFFS001966

Paramount Pictures Corporation
July 19, 1988
Page Two

which exceed the amounts otherwise payable to Belmont, Paramount shall pay such
excess amount only from funds subsequently payable to Belmont and shall in no way
be responsible for advancing such sums to Miller.

3. The undersigned agree that payments to Miller shall be made in full after payment of
proceeds pursuant to any other instruction or letter of irrevocable authority, if such
instruction predates this Letter. The undersigned also agree that before issuing
payments to Miller pursuant to these instructions, Paramount shall be entitled to
deduct from all sums otherwise payable to Belmont in which Paramount has been
granted a first and prior lien, the outstanding balance on any existing loans, interest
thereon and/or advances, if any, which Paramount may have delivered to Belmont or
its predecessor in interest. Belmont and Georgetown agree to indemnify Paramount
for all costs it sustains, including the cost of counsel fees, in the event that any third
party or party hereto makes a claim against Paramount that Paramount was not
entitled to pay Miller's share in the above–described fashion.

4. As and for the first Payment Request from the WGA, Paramount is hereby instructed
to pay to Miller the sum of $27,393.46 for the period from June 28, 1986 through and
including the June 27, 1987 accounting statement. This payment represents all sums
due Miller in connection with the Pictures for the period through and including June
27, 1987, including any and all late charges due thereon.

5. The undersigned understand and acknowledge that Paramount is acting merely as a
paymaster and as an accommodation to the parties and that in the event of any
dispute concerning payment and/or accounting hereunder, the undersigned shall look
solely to Miller or the WGA and not to Paramount. We acknowledge that nothing
contained herein will obligate Paramount to perform any act in derogation of or
prejudicial to its own rights and interests under the Agreements or which will
adversely affect or be in conflict with any lien, security interest, right, or title
which Paramount may have or acquire under the Agreements, and that the rights of
Paramount under the Agreements shall at all times be prior and superior to the rights
of the undersigned to the extent provided in the Agreements. We agree to indemnify
and hold Paramount harmless from and against all claims, losses, costs, judgments,
settlements, damages and expenses (including reasonable counsel fees) relating to
payments, if any, made hereunder in accordance with Payment Requests. If any of
the undersigned becomes aware of the institution of any action or the making of any
claim relating to payments, if any, made hereunder in accordance with Payment
Requests, it shall give the other signatories and Paramount prompt notice of the
existence of such action or claim. If Paramount becomes aware of the institution of
any action or the making of any claim relating to payments made hereunder in
accordance with Payment Requests, it shall give the undersigned prompt notice of
the existence of such action or claim. In the event any claim relating to the amounts
payable hereunder is made by any person or entity, we agree that Paramount shall
have, in addition to any other rights and remedies, the right to withhold any
payments due hereunder until such other claim is resolved.

6. It is agreed that all payments provided for herein shall be made promptly after the
WGA delivers to Paramount the Payment Requests based on statements rendered by
Paramount in accordance with the terms of the Agreements and that, unless provided
for in said Agreements, Miller shall not have the right to inspect the books and
records of Paramount.

CU/W&I 000314

CONFIDENTIAL

**EXHIBIT X**

PLAINTIFFS001967

Paramount Pictures Corporation
July 19, 1988
Page Three

7.   Should any legal proceeding relating to any amounts payable hereunder be
     commenced against Paramount, we agree that Paramount may interplead us as
     parties to such proceeding, that we will be subject to the jurisdiction of the court or
     tribunal before which the proceeding is commenced, that any determination of such
     court or tribunal will be binding on us, and that should said court or tribunal order
     Paramount to pay any monies due us in a manner differently than required hereunder,
     including to any third party, Paramount may do so without liability.

8.   Nothing contained herein shall be deemed or construed to prevent or preclude
     Paramount on the one hand and Georgetown and Belmont on the other hand from
     amending or modifying any of the provisions of the Agreements to the full extent to
     which said parties mutually agree.  Georgetown and Belmont agree to notify the
     WGA in advance in the event that the Agreements are amended, modified or
     terminated for any reason.  Georgetown and Belmont authorize and instruct
     Paramount also to give such notice to the WGA, provided that Paramount shall have
     no liability due to any failure to give such notice.  Georgetown and Belmont agree
     that the terms and conditions of this Letter of Irrevocable Authority shall apply to
     any successor to Paramount's distribution rights under the Agreements.

9.   Georgetown, Belmont, The Manny Company and Sean S. Cunningham Films, Ltd.
     acknowledge that neither the WGA nor Victor Miller has seen or reviewed the
     Agreements, however, the undersigned, including the WGA and Miller, each
     acknowledge that the lack of such opportunity to review the agreements shall in no
     way affect or impair Paramount's rights, duties or obligations under the Agreements
     or this Letter of Irrevocable Authority.

10.  This Letter of Irrevocable Authority may be executed in any number of counterparts,
     each of which shall constitute an original, but all of which taken together shall
     constitute one and the same instrument.

GEORGETOWN PRODUCTIONS, INC.        THE MANNY COMPANY

By _____, Treas   By _____

Title _____        Title _G.P._____

BELMONT MANAGEMENT, INC.            SEAN S. CUNNINGHAM FILMS, LTD.

By _____        By _____

Title _____        Title _Pres._____

THE WRITERS GUILD OF AMERICA        VICTOR MILLER

By _____        _____

Title _____

0202

CU/W&I 000315

## ACCEPTANCE OF PARAMOUNT PICTURES CORPORATION

The undersigned, _____Paul D. Springer_____, on behalf of Paramount Pictures Corporation, hereby acknowledges receipt of the annexed Letter of Irrevocable Authority and agrees that it will furnish accounting statements or reports and pay any and all monies payable with respect to the Pictures under the Agreements in accordance with the foregoing authorizations and instructions.

PARAMOUNT PICTURES CORPORATION

By _____

Paul D. Springer

Title _Senior Vice President_

Date _December 2, 1988_

0202

CU/W&I 000316

A-413

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| HORROR, INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership, Plaintiffs, <br><br> - against - <br><br> VICTOR MILLER, an individual; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.: 3:16-cv-01442-SRU <br><br> **June 9, 2017** |

**DECLARATION OF WILLIAM L. COLE IN SUPPORT OF PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF PLAINTIFFS'
COMPLAINT AND COUNT I OF DEFENDANT'S COUNTERCLAIM**

A-414

## DECLARATION OF WILLIAM L. COLE

I, WILLIAM L. COLE, declare:

1.      I have been designated by Plaintiffs Horror, Inc. and Manny Company as an expert witness to opine on custom and practice for screenwriters in the motion picture industry and how that custom and practice is impacted or controlled by the Writers Guild of America Basic Agreement.  A true and correct copy of my Expert Report is attached to the Declaration of Julia R. Haye.

2.      I am an attorney at law duly licensed to practice by the State of California as well as, *inter alia*, the Supreme Court of the United States.  I am, through my Professional Corporation, a partner in the law firm of Mitchell, Silberberg & Knupp, LLP ("MSK").  I have practiced continuously at MSK since 1977 and have been a partner in the firm since 1982.  I have served as the chair or co-chair of the MSK Labor and Employment Department since the mid-1980's.  During my entire tenure at MSK and continuing, most of my time has been devoted to representing employers in the motion picture and television industry.  I have personal knowledge of the following facts, and if called as a witness, I could and would competently testify thereto.

3.      An Assignment Agreement, or an agreement by which a writer assigns his, her, or its rights in and to an original screenplay, typically includes language "granting," "assigning," or "licensing" rights in or to independently written pre-existing material, or states that the producer is "acquiring" rights in pre-existing or independently written material.  Attached hereto as Exhibit "Y" is a true and correct copy of a sample form "Assignment Agreement."  This agreement is typical in that it contains language of assignment, e.g., the writer "hereby assigns and transfers" to the producer "any and all rights, title, and interest of any kind" in and to the writer's original screenplay.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ⟋ᵗʰ day of June, 2017, at ___Los Angeles___, ___CA___.

_____
William L. Cole

## ASSIGNMENT AGREEMENT

This sets forth the agreement ("Agreement"), dated _____, 2010, between _____ and _____ regarding that certain "Property" known as _____ (as defined in Paragraph 1 below).

1.      PROPERTY:  As used herein, the term "Property" shall mean the screenplay written by _____ entitled _____ (the "Screenplay"), all plots, themes, formats, characters, title, versions, rewrites, adaptations, translations and other elements thereof, and all, if any, creative contributions thereto by _____ and _____.

2.      ASSIGNMENT:  _____ hereby assigns and transfers to _____, throughout the universe, exclusively, and in perpetuity, any and all rights, title, and interest of any kind or nature in, to, and in connection with the Property.  The rights granted to Producer shall include, but are not limited to, all motion picture, television, prequel, sequel, remake, stage, radio, internet, home video, character, publication, and allied, ancillary, subsidiary, merchandising and incidental rights with respect to any of the foregoing, the right to exploit any or all of the foregoing and all characters, titles, plots, stories, actions, dialogue, scenes, parts, and elements contained in the Property exclusively, in perpetuity, and throughout the universe in or by any means or media now known or hereafter discovered in any and all languages, and all promotional and advertising rights with respect to any of the foregoing.  _____ shall be the owner of the copyright and all other rights of every kind now known or hereafter recognized in all productions based on, including, or using the Property.

3.      CONSIDERATION:  In full and complete consideration of the rights granted hereunder, _____ shall be entitled to the greater of:

        (a)      An amount equal to one and one-half percent (1.5%) of the Budget of the first feature-length motion picture produced based on the Property (the "Picture") (for purposes of this paragraph, the term "Budget" shall mean the approved budget for the Picture on the first day of its principal photography, less financing costs, interest, completion bond, and contingency); or

        (b)      Twenty-five percent (25%) of all sums actually received by _____, if any, only in connection with the sale of the Screenplay or the Property, provided that in no event shall _____ be entitled to a portion of any sums received by _____ in respect of directing and/or producing services rendered by _____ in connection with the Picture.

Such consideration shall be payable to _____ within ten (10) business days following the commencement of principal photography of the Picture.

4.      CREDIT:

        (a)      Executive Producer Credit:  Subject to the standard terms and exclusions of the financier or applicable distributor of the Picture, if any, _____ shall be entitled to credit in substantially the form "Executive Producer – _____" on screen on all finished release prints of the Picture, in the main titles (i.e., where the credits for the principal cast and the

1

**EXHIBIT Y**                                                                     3

"produced by" and "directed by" credits appear, whether located at the beginning or the end of the Picture), in a size, type, and style no less favorable the size, type, and style of the credit accorded to any other Executive Producer of the Picture, as an Executive Producer.  All other characteristics of          credit shall be in the sole discretion of the producer or applicable distributor of the Picture.

(b)      Credit Election:          may, in          sole discretion, decline to be accorded credit as an Executive Producer of the Picture, provided that          must notify the producer or applicable distributor of the Picture, in writing, of          election to decline such credit within two (2) business days following          viewing of a director's cut of the Picture.

5.      REPRESENTATIONS AND WARRANTIES:          represents and warrants that:  (i)          has the full right, power, and authority to enter into this Agreement and to grant all of the rights, titles, and interests and benefits granted hereunder; (ii)          is the sole and exclusive owner of and controls all rights in and to the Property, and no person or entity has any rights or is owed any obligations with respect to the Property; (iii)          has not granted, transferred, assigned, mortgaged, pledged or hypothecated any of the rights in or to the Property to any third party or otherwise encumbered the Property or any of the rights granted hereunder, and will not do so or attempt to do so in the future; (iv) there is no pending or (to the best of knowledge in the exercise of reasonable prudence) threatened claim or litigation which would interfere with or adversely impact the Property or any rights granted to          hereunder; (v)          has not produced, or authorized any third party to produce, a motion picture of any kind based in whole or in part on the Property; and (vi) the person signing this agreement on behalf of          is authorized to sign this Agreement, and all corporate action has been taken which is necessary for          to enter into and perform this Agreement.          shall indemnify, hold harmless, and, if          so requests, defend          and          successors, assigns, and licensees (including the parents, subsidiaries, affiliates, officers, directors, principals, employees, and shareholders of such successors, assigns, and/or licensees) from and against any and all third-party claims damages, and expenses (including reasonable attorneys' fees) arising out of any breach of          representations, warranties, or covenants hereunder.

6.      ADDITIONAL DOCUMENTS:  Concurrently with the execution and delivery of this Agreement,          will execute, acknowledge and deliver to          a Short Form Agreement, in the form attached hereto as Exhibit A, incorporated herein by this reference.          will, upon request, execute, acknowledge and deliver to          such additional documents consistent herewith as          may reasonably deem necessary to evidence and effectuate          rights hereunder, and hereby grant to          the right as attorney-in-fact to execute, acknowledge, deliver and record in the U.S. Copyright Office or elsewhere any and all such documents if          fails to execute same after so requested by          The appointment shall be a power coupled with an interest.  A copy of all such documents executed by          pursuant to rights hereunder shall be sent to          , provided that an inadvertent failure to do so shall not constitute a breach hereunder.

7.      ASSIGNMENT:          shall have the right to assign, license, or otherwise transfer this Agreement and any rights or obligations hereunder, in whole or in part, to any party.  Except for the right to receive amounts due to it,          may not assign this agreement or          rights or

<div align="center">2</div>

obligations hereunder.

8.    <u>REMEDIES</u>:  In the event of any breach of this Agreement,            rights and remedies hereunder shall be limited to            right to recover damages, if any, in an action at law.  In no event shall            be entitled to seek and/or obtain any injunctive or equitable relief, including any right to terminate, rescind or cancel this Agreement or the assignment to            of the Property.  In no event shall            have any right to enjoin or restrain the development, production, distribution, advertising, or other exploitation of the Picture (or any other production based, in whole or in part, on the Property).

9.    NOTICES:  Any notice hereunder shall be in writing.  Notices to            shall be sent c/o

                                Notices to            shall be sent to:  _____
_____.

10.    <u>MISCELLANEOUS</u>:  This agreement will be construed and enforced in accordance with the laws of the United States and the State of California applicable to agreements entered into and fully performed within said State, without regard to conflict of law principles.  Any proceeding in connection with this Agreement shall be filed only in an appropriate State or Federal court located in Los Angeles, CA, and both            and            agree to submit to the exclusive jurisdiction of such court.  This Agreement does not constitute a joint venture or partnership of any kind between            and           .  This Agreement shall be deemed to have been drafted by all the parties hereto, since all parties were assisted by their counsel in reviewing and agreeing thereto, and no ambiguity shall be resolved against any party by virtue of its participation in the drafting of this Agreement.  This Agreement is binding on the parties and their licensees, successors, and assigns.  This Agreement, together with Exhibit A, expresses the entire agreement between            and            in connection with the subject matter hereof, expressly supersedes all previous agreements, arrangements and representations between the parties, whether written or oral, in connection with the subject matter herewith, and may not be amended except by a writing signed by            and           .

Agreed to and accepted:

By: _____            _____
Its: _____

**EXHIBIT A**
**SHORT FORM ASSIGNMENT**

Dated as of _____ , 2010.

_____ , for good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, hereby grants to _____ (and _____ licensees, successors, and assigns), exclusively and in perpetuity, any and all rights of any kind (including, without limitation, all motion picture, television, and other rights) in and to the screenplay entitled _____ written by _____, as more fully described in a more formal agreement between _____ and _____ dated as of _____, 2010.

Agreed to and accepted:

.

By: _____          _____
Its: _____

STATE OF                              )

                                      )

COUNTY OF                             )

        On _____, 20__, before me, _____, a Notary Public, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

        Signature _____

                (Seal)

4

**EXHIBIT Y**                                                                    **6**

A-420

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| HORROR INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership, <br><br> Plaintiffs, <br><br> vs. <br><br> VICTOR MILLER, an individual; and DOES 1 through 10, <br><br> Defendants. <br><br> VICTOR MILLER, an individual; <br><br> Counterclaimant, <br><br> vs. <br><br> HORROR INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership; and DOES 1 through 10, <br><br> Counterclaim-Defendants. | Case No.: No. 3:16-cv-01442-SRU <br><br> **DECLARATION OF VICTOR MILLER IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** <br><br> June 9, 2017 |

I, Victor Miller, declare as follows:

1.      I am the defendant and counterclaimant in this case. I submit this declaration in support of my Motion for Summary Judgment, Or In the Alternative, Partial Summary Judgment, and, if called as a witness at the trial of this matter, I would and could competently testify, under oath, as to the facts contained herein, which are personally known to me.

2.      I received a Bachelor of Arts degree in English from Yale University in 1962, and a Masters of Arts degree in Theatre and Speech from Tulane University in 1967.  In 1970 I co-

founded The American Shakespeare Theatre's Center for Theatre Techniques in Education.

3.      As a freelance writer I have written nine published novels and the screenplays for six produced films, including the original screenplay for *Friday the 13th* (1980), and numerous unproduced films.  I have also written extensively for television, for which I received three Emmy awards plus eight Emmy nominations.  By 1979, I had written several published novels and the screenplays for three produced films ("Friday the 13th" was the fourth).

4.       My best friend, in and around 1979, was Sean Cunningham ("Cunningham"), an independent film director and producer. Cunningham's "office" was a room above his two-car garage in Westport, Connecticut.

5.      In early 1979, Cunningham, inspired by the low-budget horror film *Halloween* (1978), suggested that we collaborate on a comparable low-budget film horror film.

6.      I immediately saw *Halloween* at the theater in Bridgeport, Connecticut, close to my home in Stratford, and after bouncing ideas off of Cunningham, I wrote a detailed 15-page horror film treatment, which I entitled "The Long Night at Camp Blood" (the "Treatment"), and shared it with Cunningham.  A true and correct copy of my Treatment is attached hereto as Exhibit "A".

7.      Shortly thereafter I wrote an original screenplay based on my Treatment, which I also entitled "The Long Night at Camp Blood" (the "First Draft"), and provided it to Cunningham. In searching my files at home, I found only an unbound copy of my First Draft without a title page. A true and correct copy of this document is attached hereto as Exhibit "B".

8.      I wrote the film Treatment and First Draft "on spec," hoping that Cunningham could raise the financing for our horror film, but without a contract or any guarantee of compensation. Cunningham and I were both flat broke at the time. It was my understanding that Cunningham would use, and that he did in fact use, my material to raise financing for the film.

9.       Sometime after I had given Cunningham my Treatment and First Draft screenplay, he suggested to me a better and more commercial title for our horror film: "Friday the 13th".

10.     I recall that the first thing I thought of when we decided on this title was that I should add to the screenplay references to that date (Friday the 13th) as the story unfolds. While writing the second draft of my screenplay ("Second Draft") I therefore added references in the story to Friday the 13th. The only copy of the Second Draft I found in my files is a reformatted copy with a title page created by Cunningham with the title "Friday 13." Cunningham was fearful that use of the "Friday the 13th" title might elicit a legal challenge so he used the working title – "Friday 13" – instead. A true and correct copy of this document is attached as Exhibit "C".

11.     Cunningham presented to me for signature a filled-out form screenwriting contract between me and his entity The Manny Company ("Manny"), which Cunningham and I promptly signed on or about June 4, 1979 (the "Agreement"). A true and correct copy of the Agreement was attached as Exhibit 1 to the Complaint herein, and for convenience is also attached hereto as Exhibit "D".

12.      By this time, I was well into writing the Second Draft of the screenplay, which I soon completed and provided to Cunningham.

13.     Thereafter, I made minor revisions to my Second Draft, with the exception of changing the ending of the story to a chair-jumper (consisting of a scene with Jason coming out of the water and attacking the lone survivor "Alice"), followed by a scene with Alice in the hospital regaining consciousness, and wondering if that was a dream.

14.     On July 4, 1979, Cunningham took out an advertisement in Variety for the horror film "Friday the 13th" to flush out whether anyone would make a legal claim regarding this title; as no one, did he thereafter started to officially use this title. A true and correct copy of the advertisement is attached hereto as Exhibit "E".

15.     I wrote the Treatment and all drafts of the screenplay in the study of my home in Stratford, on my own IBM Selectric typewriter, using, of course, my own typewriter ribbon and paper.

16.     I was free to hire and pay for my own assistant if I had wanted to, but there was certainly no need for this.

3

A-423

17.     With respect to my writing of the Treatment and screenplay I determined in my sole discretion the days I would write and the hours of the day I would write. I'm a morning person so I usually would write between 7 a.m. and noon.

18.     I worked at my own pace, but I write quickly. The duration of the writing process I described above was approximately two months.

19.     I naturally discussed my Treatment and screenplay drafts with Cunningham, as he was both my friend and the contemplated director of the film. We periodically and enthusiastically bounced ideas off of one another, but Cunningham neither instructed nor told me what to do, nor did he supervise me as I was writing this material. The creative process of a writer does not work like that.

20.     Neither Manny nor Cunningham had any right that I was aware of to assign to me any additional writing projects.

21.     I was never paid for my Treatment. I was eventually paid gross lump sum amounts totaling $ 9,282 for my screenplay. The payments to me were made quite a while after I had provided my material to Cunningham; first, because he had not yet raised financing for the film, and then because his financiers were notoriously late in providing the funds needed by Cunningham to produce the film.

22.     Neither Cunningham nor Manny withheld or deducted any taxes, social security, Medicaire, etc. from the gross payments made to me. A true and correct copy of a letter from Sean S. Cunningham Films, Ltd. enclosing a check for the gross amount of $3,713 (the gross sum in my Agreement with Manny) is attached hereto as Exhibit "F".

23.     Although Cunningham put the Agreement in the name of The Manny Company, in reality, Cunningham's active company, Sean S. Cunningham Films, Ltd., was the actual company producing the Film.

24.     In connection with my writing of the screenplay for our low-budget independent film, I, of course, did not receive from Cunningham, Manny or anyone else any health insurance, medical and/or dental plan, vacation pay, pension plan, or worker's compensation insurance.

25.     Neither Cunningham, Manny nor anyone else made any contributions on my behalf to the Writer's Guild of America pension and health fund in connection with my writing the *Friday the 13th* screenplay.

26.     I received sole writing credit (in the form "Written by Victor Miller") on the *Friday the 13th* film released in 1980 (the "Film"). The only scene I can think of in the Film which I did not write consists of a brief scene in which a policeman on a motorcycle visits Camp Crystal Lake and cautions some of the Camp counselors to behave. Attached as Exhibit "G" is a true and correct copy of a document produced by plaintiffs containing the Film's credit block, which accurately depicts my writing credit.

27.     In 2016, I caused my attorneys at Toberoff & Associates, P.C., to draft, serve, and file with the U.S. Copyright Office the three notices of termination referenced in plaintiffs' Complaint and my Counterclaim herein.

I declare under penalty of perjury under the laws of the United States that the above facts are true and correct, and that this declaration was executed on this 9th day of June, 2017, in California.

Victor Miller

THE LONG NIGHT AT CAMP BLOOD

FADE IN:

THE CAMERA picks out the camp sign: Camp Crystal
Lake. Hotpress Letters SUPERIMPOSE:

JULY 4, 1958

There is, on the SOUND TRACK, the Everly Brothers'
latest hit as CAMPERS come and go with their parents on
this parents' day at this camp. THE CAMERA establishes
all the many fun activities, watching them as if it might
be a hidden observer. There are rifflry demonstrations,
swimming meets, arts and crafts, canoeing, etc.

During the first minute or so we have covered
all the pleasant aspects of a very popular and well-run
camp. But, then, the CAMERA appears to be irresistably
pulled down a side path, one which is overgrown, private,
off-limits to the boys and girls who are between the ages
of 10  and 14.

At first we are only aware of a few rustlings
in the leaves, some heavy breathing. The CAMERA is now
a full-fledged voyeur as it catches glimpses of something
illicit going on behind a clump of bushes.

INTERCUT a number of angles, compressing time,
to see that a couple of CAMPERS are making their first
12 year-old scrabblings at making out. It is sweaty and
hurried and frightened, and full of irresistible pres-
sure. SHE is flashily pretty and an early developer. He
is trying to get as much as he can. Both are in it up
to their necks if they get caught.

MILLER EX. A

Page 2

SHE takes his hand off the outside of her camp
t-shirt and looks off toward the CAMERA. "Thought I
heard something..." He pursues his goal of more flesh.
The hidden figure is relentless, closing in. Until finally,
the girl, in her embrace, opens her eyes and sees what will
be the last sight ever as a hatchet flashes into view.
The CAMERA does not dwell on what is an instantaneous
death. Instead it upcuts to the boy, struggling for his
life, laced with his late girlfriend's blood, fighting
the camera. A long hunting kinfe flashes into view. The
boy stops it, receives a cut, struggles. The knife falls.
He picks up the knife to defend himself. Slashes at the
hand that strangles him.

The index finger of the unseen attacker is
struck from its hand, landing in a flash on a bed of moss.

The boy is killed.

The attacker's hand reaches into FRAME and picks
up the finger and then the attacker runs away.

QUICK CUT TO: a young COUNSELLOR who has come
to look for the neckers, standing at the edge of the
mossy clearing, shreiking with terror.

FADE TO BLACK

FADE IN:

A country road. HOTPRESS LETTERS: JUNE 28, 1979
It is rural. In the BG a filling station that sells gas
for 33 cents a gallon (just about) because it hasn't heard
about the crisis yet. A mangey dog with one ear waddles
out to sniff a hitchhiker, with backpack, who makes her
way along this woodsy road.  This is ANNIE, 19, immature

Page 3

and eager as all hell to be the best person she knows
how to be. She is cute, and can't stop talking when she
gets going.   She thumbs a ride in an open Jeep. We don't
see the driver on account of the camera sits in the driver
seat. Well, Annie is elated. She does all the talking and
the camera never has to do more than shrug. Annie is
going to be a counsellor at Camp Crystal Lake and boy is
she ever excited about it. The new owner has written her
and accepted her and wowee,this is her chance to work
with children and does she ever like children and, say,
didn't they just pass Crystal Lake?

      The camera notes that the Jeep has roared past
the gate of Camp Crystal lake.

      Annie is upset, but she doesn't know what to
do as she says, "Please stop. I think we'd better stop."
Her terror grows and, finally, she tries to reach for the
steering wheel. The hand of the driver comes out and
slaps her back and, in a flash of revelation we see that
the driver's hand has an amputated finger right where the
killer had lost his finger so many years ago. Annie looks
around as the Jeep barrels along the road and, failing
all else, bails out into the underbrush alongside of the
road. The Jeep stops and the camera pursues ANNIE as she
tries to escape through the growth. It's too thick. Her
screams are not heard by anybody out here and she is kille
as she turns  to face her assailant.

      A gaily decorated hearse drives quickly past the
filling station which we saw so much earlier. In it are

MILLER EX. A

VM00002

Page 4

three twenty-year-olds who look fun, fresh, scrubbed
and expectant. The driver of the vehicle is NED, a joker
and a knowitall who fancies himself as a ladies man. His
best pal is JACK, a real ladies man who is currently into
a heavy petting session with MARCIE his flame for the
summer. JACK is handsome, a basketball player, and
thoroughly confident of himself. MARCIE is always up for
a party, smoking grass, drinking, fucking, touching
bodies, playing pranks--inshort, she is my kind of woman.
Because she has an incredible body. JACK will be in
charge of woodlore and softball and  volleyball. MARCIE
will be in charge of the watersafety and NED will run the
rifle range. NED hopes the other girls will be up to
his standards and put out.

     Finally the hearse roars into the road marked
CAMP CRYSTAL LAKE.

     The hearse drives into the middle of the
camp compound where we see a Jeep parked---a Jeep not
unlike the one we saw earlier, but Jeeps look all alike
don't they? MR. CHRISTY, "Call me Steve," stands with the
other new counsellors and many hands are shaken as they
all get to know each other for the first time. Mr. CHRISTY
has hired these people through the mails, we find. We
meet, in this idyllic setting, BRENDA,a bored sort of girl
who is gorgeous, who will handle archery, BILL, a shy and
good-looking guy who will take care of the sailing program
and ALICE, a quiet girl who is internal and lovely and in
charge of arts and crafts. MR. CHRISTY is 38, physical and
a real go-getter.

MILLER EX. A

VM00003

A-429

Page 5

        We up cut to MR. CHRISTY, in the camp council room
finishing up his spiel about how he means to have this
camp build and become the best in the east. He gives them
all their assignments and says that the camp safety inspec
will be out tomorrow at 8:30 AM so they've got to get all
the final stuff taken care of right quick. He'll be
going into the county seat to fill out the rest of that
gosh-darned paperwork and to pick up the rest of the
supplies. He should be back by midnight. Too bad Annie
has proved to be so irresponsible. She was to be cook
and bottlewasher. Oh, well, you can't hit 100% every
time. NED has a question before they break. He'd heard
funny stories whenever he'd said he was counselling at
Camp Crystal. Somebody had even called it Camp Blood.
What was all that about? The past is past, Christy says.
His parents owned this place in 1958. A brutal, unsolved
murder of two campers ruined the camp's reputation and
his folks went bankrupt. Steve was 18 at the time and
he watched it kill his folks. He vowed he would some
day buy the place back. He did, fixed it up and, by God,
in his parents' memories, this will be the finest camp
in all the wide world.

        They move outside and as Steve points out each
kid's area MARCIE sees these big black birds circling
over some trees in the distance. Something must be dead,
Jack says. Thos are carrion birds. Steve says proobably a
car hit a skunk on the road or something. "I hate dead
things," says Brenda.

        We watch as these kids, minus STEVE, who roars off

VM00004

Page 6

to the county seat in his Jeep, meet each other. The
light-hearted among them are overjoyed that the adult is
gone and they can do it to it. They are all terrifically
excited about the whole deal.

BRENDA goes off to check out the archery equipment,
BILL to check his boats, etc. BRENDA gets to the range and
looks over the targets. As she turns away from one, an arro
streaks into the gold. She whips around, furious, to
see NED standing there with a smoking bow in his hands.
"You ever do something dumb like that again, and I'll
tack you on the camp wall to dry," she says. (We're still
trying to catch our breath after the shock.)

We cut to the interior of the arts and crafts
lodge. ALICE has done a monumental job of dusting and
cleaning and opening her supplies and inventorying. She
has dirt smudged on her nose and looks good enough to
eat. (Why not? Please, be my guest.) As we get in her rythy
the door bangs back shockingly. BILL stands in the gloom.
He apologizes and suggests he will have to fix that hinge.
ALICE is spooked and laughs. They get to know each other
and begin a possible love affair as we cut to a paper
target being ripped apart by NED who empties five shots
into it rapidfire. NED is getting out his anger and
shouldn't be trusted. As he puts down his rifle JACK & MARC
whisk by yelling "Skinny dipping or die!" NED joins them,
they pick up BRENDA and cavort past BILL & ALICE who are
walking along. (I forgot to insert the part where JACK
checks out bis camping gear and we see the line of hatchets
and Coleman lanterns, etc.)

**MILLER EX. A**

VM00006

Page 7

What follows is a glorious skinny-dipping sequence.
Although ALICE doesn't feel like taking off her bikini and
BILL keeps on his speedo, the others are not mean-spirited
and enjoy the cold water on their incredibly lovely bods.

And then the CAMERA becomes a watcher again. Through
the trees, around the bushes, the watcher watches the
naked youths and the mood is similar to when the campers
were necking and had to be punished.

INTERCUT with the skinny-dipping we see the
watcher go to the camp and 1) puts a snake in Alice's
suitcase. 2) Does something to the food in the larder.
3) Makes some sort of adjustment to the power generator.

The kids decide that they've had enough skinny-
dipping, but ALICE says she'll work on her tan awhile.
She lies alone and is watched.  The sun moves through the
sky (thanks, Galileo, for nothing) and we stand over ALICE
as a shadow passes her. She wakes with a start.

It is BILL saying that she has overslept. ALICE
says she has to go unpack. Get ready for supper.

ALICE goes to her room off the arts and crafts
hall and jostles her suitcase up on her bed. She turns and
brushes her hair as we stare at the suitcase which we
have seen filled with snake. She hums to herself. Oh, gee,
it's late, she turns and takes off her suit and opens the
suitcase and steps back in terror as the snake strikes
and misses. The kids come a'running to see the naked girl
kept at bay by the snake. BILL grabs a nearby shovel and
halves the beast right on ALICE's bed. (Something very
Freudian there.)

MILLER EX. A

VM00007

A-432

Page 8

"I guess Steve Christy forgot to warn us about the fact that Camp Blood is surrounded by poisonous snakes," says NED, ever the gay blade. Let's go cook supper. And smoke some grass. I'm bushed and hyper after the snake, says MARCIE. "Long thin things always do that to her," says NED, ever the gay blade and repressed homosexual.

The girls are cooking and preparing various gourmet treats. Some are vegetarians, some are meat eaters. But it is dusk and they need more light to cook by. BILL and JACK go to the generator to start it up. STEVE CHRISTY had given lessons to JACK before leaving. They open the shed and JACK reaches in. Takes his time, repeating the steps Steve had given him, orally and then almost dies as a gigantic shock passes through his jocky body. He is only saved by BILL's quick-thinking boy-commando-tactic of throwing a body block across him, severing the connection. "Tnaks for saving my life," says the dazed JACK. "I had to," says BILL, "because the last thing I wanted to do tonight was give you mouth to mouth resuscitation." BILL looks at the generator and days it's a total loss, but isn't it funny that this puddle is right here where you were standing. And this connection has come unglued. "The puddle wasn't there this morning." Probably an underground well... They trudge off to the supply shed where they will get Coleman lanterns to help them through the night.

JACK opens the supply shed and they grab four lanterns. As they do, we can't help noticing that all the camp axes are missing from their rack. The boys do not see.

MILLER EX. A

Page 9

     As the boys return and go about the job of doing
the mantles, the lanterns, the fuel, etc., ALICE is
washing some dishes and reaches into the dishwater and
lets out a little scream. She'd only cut herself on a
piece of broken glassware. It's nothing. Just jumpy, I
guess. BRENDA reaches up into the larder where we saw
the watcher and reaches for something on a high shelf
and a whole clatter of cans falls down. It scares the
hell out of us, but doesn't hurt anybody. "That Steve
really isn't much for neatness," she says. "Good thing
tomorrow's camp safety inspectors didn't see what we've
seen so far," says NED who's itching for action. He
reaches for the California dip which MARCIE has made
from food in the larder. Dips a chip and samples. Sud-
denly NED goes into shock, grabbing his throat and
falling to the floor. They all huddle around, panic-
struck.

     NED smiles and does a big finish. He was just
funning. "I don't think I could spend a whole summer
of your bullshit," says MARCIE.

     "Where are the fucking knives?" says BRENDA, ever
the foul mouth. "How can we make dinner without knives?"
This place is too much. The honeymoon is over.

     "I'll get a long-knife from the supply shed,"
volunteers NED, to make up for his sins. He leaves.

**MILLER EX. A**

VM00009

Page 10

Well, since dinner won't be ready for awhile, JACK & MARCIE decide to step out for a quick skin-thrash in a local bed. It's almost dark as they grab a flashlight and run to the nearest cabin. They run in by a flash of lightning (impending rain) and leap into the bottom bunk of the cabin's nearest rack. In a trice they are naked and in coitus. The flashlight is left on on the floor pointing upwards. As they reach their climax, MARCIE  opens her eyes and sees the bottom of the mattress above her. There is a big brownish stain but she pays it no mind.

We do.  The CAMERA MOVES upwards and, in a flash of lightning we see NED, his throat cut horribly, lying on the top bunk with an horrible grin on his dead self.

The fornicators continue their work and then MARCIE allows as to how she has to pee something crazy. She bops off leaving JACK lying in the bunk smoking a joint. We look at him, the brown stain, the dead NED and then suddenly an arrow pops up surprisingly through JACK's throat. He clutches it as we see that, all along, the watcher/killer has been under the fucking bed! The killer with the missing finger! It scrabbles out the door, leaving JACK illuminated with an arrow through his throat, now deceased.

MARCIE is in the outdoor privy squatting on the crapper with the flashlight next to her as thunder rolls across Crystal Lake. She is nervous but happy, dripping probably, reading the graffiti on the outhouse walls.

MILLER EX. A

VM00010

Page 11

She stops to listen to the crunch-crunching
outside. "Is that you, Jack?" "Come on, Jack, stop kidding
around." At length, just as she stands to try to push
open the door, the door is slammed open and she is killed
in the midst of a lightning flash, her pants down in every
sense of the words.

Back in the kitchen, BILL, BRENDA and ALICE sit
with the food ready. Ned is probably working on some
dumb joke, they think, and smart money knows that the
other two are sacked out doing the deed somewhere. So,
they start to eat. The storm grows around them. ALICE
is genuinely worried.

BRENDA finishes first and says she's very tired.
As much as she'd like to stay and gab, she'll go to
her cabin and write a letter and then crap out. We follow
her out of the main cabin. She walks along and the first
few drops of rain begin. From the watcher's POV we see
her run through the rain, look, lose her bearings and
do a 360. BRENDA is scared. The light from the main cabin
should be over there, but it isn't. The lightning il-
luminates something or somebody? BRENDA is panic-stricken
and runs through the weeds, the brush, the briars and the
brambles. She runs and she runs where the rabbits won't
even go. The thing pursues her. In the flashes of
lightning we see flashes of the killer, but never enough
to know the total horror.

In a terrible , wet, dripping and nasty flash, she
falls and we fade out before the end is known.

MILLER EX. A

VM00011

Page 12

Back in the cabin BILL and ALICE get closer to-
gether. Heck, she's scared and he's pretty capable. He
makes a few advances and they have some explaoratory
kisses. The couch is nice and so are they. BILL gets
her to calm down. They both knew from first sight they
would like each other. They are so similar and then,
POW, right in the middle of their embrace, over their
shoulder, BRENDA smashes through the window, h⌢anging
*the dead*
from a rope and tossed, Tarzan-like at the lovers!

BILL and ALICE bolt as the rain and thunder
blister the sky. "Run for the car!" "We've got to get
out!" (Perhaps they make a quick search for the others
and come up empty-handed first.)

The car, the hearse, won't start. The rain
comes down. BILL and ALICE open the hood. No distributor
cap. "I'm frightened."

They run to the cabin nearby and find JACK skewered
in some horrible pose, NED likewise. ALICE, terrified,
sees a light at the privy. They run together to find
MARCIE in another awful tableau, perhaps half in and
half out of the crapper. (Hi, Phil.)

The watcher moves inside the main cabin. Oh, my
god, we say as BILL & ALICE head for the main cabin and
what they think is safety. We see the one-finger-missing
hand and arm duck out of sight behind a ping-pong table.

BILL tries to calm ALICE and discovers that
BRENDA'S corpse has been stolen. Oh, my lord...BILL &

MILLER EX. A

VM00012

Page 13                                                    midnight or

ALICE know now that all they must do is last until 8:30

when the safety inspectors come. It's 12 hours until

then. They have enough Coleman fuel and food and BILL

comes up with a cudgel he'll use if necessary.

ALICE slumps down upon him and they begin the pro-

cess of waiting.

The watcher slips out a back window that is

open and goes about some bloody task we don't see

all of. (You and I know that the watcher is dragging

out the corpses and hanging them all from the main tree.

Like fruit.)

The clock on the mantel makes so much noise as it

ticks to ten and BONGS us into cardiac arrest. ALICE is

getting so drowsy. BILL makes coffee off in one corner

of the room. (Perhaps we saw the watcher fiddle with the

coffee pot.)

ALICE lets her head slip and she dozes. BILL

smiles, and drinks a cup of coffee. He decides to make a

perimeter check.  He checks this closet, that one, this

thing, that thing throughout the big central cabin. He

goes into the larder. While he's in there we look at

a piece of hallway and see that fresh wet footprints

are there to show us that the watcher has been by. BILL

comes out and goes down the hall but doesn't see

what we've seen. He makes a turn and gets  an arrow through

the eyeball and drops everso quickly.

"Bill?" says ALICE who's woken up. She comes throug

the kitchen and heads down. "Bill?" "Bill?" Bill?" She

opens the larder to have BILL's bloody-eyed corpse swing

MILLER EX. A

VM00013

Page 14

out at her like a sick pendulum. She screams and runs
and screams and runs, right for the main room and the
front door, running right smack into a yellow-
slickered figure which scares the embryos out of us all.

But it's okay! The slicker-person is a nice-
looking woman in her fifties. Looks like the kind of
woman you'd meet at a bridge party.

"There there now, my dear, there there!"

ALICE shreiks and MRS. VORHEES takes her to the
couch to calm her down. MRS. VORHEES lives in the area
and saw the lights and heard the commotion. ALICE can
now start to get some of the words out. "So many dead..."
ALICE says. "The camp has been called Camp Blood," Mrs.
VORHEES says. "Why, I lost my own son here so many
years ago. He was drowned, in a foolish canoing accident.
There wasn't adequate *his counsellors cared more about making* supervision. And then the next
year those two children were killed." As she strokes
ALICE'S head we notice that MRS. VOORHEES is missing
her little finger or whatever finger our killer is
missing. (Yipes!)

"I'll be glad when Mr. Christy comes back," says
ALICE. "He won't be back," says MRS. VOORHEES, who has
taken a hunting knife from her slicker. "I killed him
long ago."

What follows is a screaming hair-raising chase in
out and around the campsite. ALICE runs into the hanging
bodies of her fellow counsellors, *including MR. CHRISTY!* knocks MRS. VOORHEES
out, thinks she's safe and MRS. VOORHEES comes back and
comes back and comes back until there is an ambiguous

MILLER EX. A

Page 15


FADE OUT and, oh, my god, we CUT TO:


DAYLIGHT, the next morning as a State Vehicle drives along
the road to Camp Crystal Lake. The two bureaucrats look
perfect for their job. They turn in and drive down the
road and HOLY SHIT! THEY JAM ON THEIR BREAKS! The
tires slew around in the dirt! We see what they see:


All the pretty young dead bodies hang like Ukranian
eggs from the main tree by the flagpole outside the
main cabin.

They get out of the car and see that below the
tree is a figure of a woman with her back to us, rocking
back and forth. She is humming a word, "Mommy, mommy, mommy
but we can't hear her so well.

"Miss?" says oneof the bureaucrats.

SHREIK as ALICE, crazy, turns around with the
bloody head of MRS. VOORHEES in her lap!

A bird of prey screams in the sky and we ROLL
CREDITS.


END.

MILLER EX. A

1   FADE IN:                                                        1

EXT.      RURAL ROAD      DAY

A lonely dirt road in early summer. The road winds
through lush greenery.

A 1958 Mercury sedan piles along the dirt road,
raising a cloud of dust behind it. THE CAMERA PANS
with the car as it passes a sign.

The CAMERA HOLDS on the sign:

                    CAMP CRYSTAL LAKE
                    Established 1935

As the car roars away we can hear on the TRACK, the
Everly Brothers' latest hit, "Dream."

HOTPRESS LETTERS:

                    July 4, 1958

                                        CUT TO:


2   EXT.      CAMP          DAY                                    2


The Mercury has flashed past us again. Inside are
two PARENTS.  They slow down and move towards a
central administration building beneath a large
lowering tree.

In a WIDE ANGLE we see that the camp is a beehive
of activity.  This is parents' day.  The PARENTS
and CAMPERS come and go, the kids dragging the older
folks along as quickly as they can.

                                        (Continued)

MILLER EX. B

VM00144

2.

2    (Continued)                                          2

The camp itself is rustic, low-key, charming and
inviting.  This is obviously a camp for fairly
wealthy folk.

A large sparkling lake beckons in the distance.

                                        CUT TO:


3    EXT.    RIFLE RANGE   DAY                            3

The silence and peace in the camp is ruptured as we
see, from a distant vantage point, a dozen CAMPERS
lined up at the firing line, popping targets to
pieces with their .22's.

PARENTS stand by, behind their offspring.

                                        CUT TO:


4    EXT.    LAKE         DAY                             4

The CAMERA, in the middle of the lake, looks at
the camp from this  POV as twenty CAMPERS yell like
banshees and leap into the cool water.

The CAMERA PANS slightly to one side, towards the
woods.  A slow, slow ZOOM takes us on a oblique from
the laughing and splashing children.  Something is
pulling us towards the woods.

                                        CUT TO:


5    EXT.    FOREST       .DAY                            5

CROSSFADE the SOUNDS OF CAMPERS in the water...

                    CAMP ADMINISTRATOR
                       (VO, Filt.PA)
          Parents and Campers will please assemble
          in the big meeting room in ten minutes.
          Thank you.

                                        (Continued)


**MILLER EX. B**

VM00145

5   (Continued)                                          5

The CAMERA continues its TRACK FORWARD towards the
path which is nicely cut into the undergrowth which
surrounds the camp.

It is dark under the overgrowth.  A MUSICAL THEME
CROSSFADES with the SOUNDS of laughing CHILDREN and
PARENTS.  It is cold and foreboding.

                                    CUT TO:


6   EXT.      FOREST CLEARING    DAY               6

The sun can barely cut through the leafy bower. But
the rustles are stronger, the breathing heavier, the
basic urges stronger.

As the CAMERA PASSES a small thicket, we see two
figures in an embrace.  They are seated on a fallen
log.  The CAMERA MOVES to get a better vantage
point.

BARRY is 17, a counsellor in training.  CLAUDETTE is
16 and in the same program.  BARRY wears a pair of
Bermudas; a t-shirt with Counsellor written across it;
white sneakers.

CLAUDETTE wears tennis shorts and a t-shirt like
BARRY's.

BARRY is the pursuer in the relationship, trying to
earn his wings with celerity.  They kiss.  BARRY
sneaks his right hand up the outside of CLAUDETTE's
t-shirt to her breast.  Her hand reaches up and takes
it away.

                    BARRY
          Claudette...

                    CLAUDETTE
          Somebody'll see...

                    BARRY
          They're all busy with their parents.

He ends the argument by snaking his hand inside her
t-shirt so that part of her bra is exposed.  She is
a pretty girl, attractive and well worth BARRY's

                                    (continued)

A-443

Case 3:16-cv-01442-SRU   Document 45-1   Filed 06/09/17   Page 24 of 187          4.

6    (Continued)                                                    6

efforts.  He seals her protesting lips by kissing her.

FROM THE VOYEUR'S POV, the CAMERA CIRCLES around to get
a better vantage.  A hand moves into FRAME and pulls
back some branches.  A branch pops.

On the log, CLAUDETTE hears the branch pop. She pulls
her head back and snatches BARRY's hand from her bra.

                    CLAUDETTE
                  (thick whisper)
          Somebody's there, Barry.

                    BARRY
          Come on, Claudette.  A man's not made
          out of stone.

                    CLAUDETTE
          Let's go back, Barry.

                    BARRY
          I need you so much, Claudette...

BARRY leans in and goes under her bra and they kiss
heavily.

The VOYEUR pauses, then moves, never seen--except for
a bit of his foot or hand--from the POV of the CAMERA,
closer and closer as the two TEENAGERS become more
and more oblivious.

Closer.  The MUSIC THEME swells, becomes discordant.

QUICK CUT CU of CLAUDETTE's and BARRY's faces, their
eyes closed, the perspiration streaking their red
skin.  Suddenly CLAUDETTE looks up into the CAMERA
and sees what will be the last sight of her young
life.

A hatchet flashes into FRAME, brought down with
hundreds of pounds of force, right between her eye-
brows.

The CAMERA SWINGS to BARRY.  The VOYEUR's powerful
hand is around his throat.  He backpeddles, trying
to get a scream out, trying to save himself, fighting
the CAMERA, moving back and back.

                                        (Continued)

**MILLER EX. B**

VM00147

6        (Continued)                                                      6

ANOTHER ANGLE as BARRY rams into a tree and can get
no further.  His head bangs against the bark.

From the POV of the VOYEUR, a hunting knife soars
against the leafy umbrella above.

BARRY's eyes go into panic, as, bathed in his girl-
friend's blood, he tries to stop the blade from its
inevitable descent.

CU BARRY's hand grasping the wrist of the VOYEUR,
grasping for the knife.

CU the forest floor as the knife falls to a bed of
moss.  Two hands flash into FRAME.  BARRY's hand
starts to snag the blade, but it slips away.  The
VOYEUR's bloody hand starts to win, then BARRY's
hand gets it and thrusts upwards.  There is a con-
fused jumble at the top of the FRAME and then, onto
the bed of moss, falls the VOYEUR's little finger,
stricken from his hand.

REACTION SHOT BARRY, horrified at what he's done:
his horror makes him lose his resolve as the VOYEUR
grabs the young boy's hand and turns the blade into
his t-shirted gut.  Then pulls upward.

BARRY stares up at the sky, his mouth an open,
soundless shriek.

MCU the mossy bed, the bloody finger in the FG, as
BARRY's body falls to earth.  The VOYEUR reaches into
FRAME, plucks up the amputated little finger and
then exits across the FRAME.

QUICK CUT TO: TRUDY, an attractive young counsellor,
searching for the missing campers.  She stands at the
edge of the clearing, her hands pressing in on her
temples, her throat filled with a scream of terror.
The MUSIC has stopped abruptly.

THE SCREEN BLEEDS TO WHITE.

It is completely quiet.

                                        CUT TO:

**MILLER EX. B**

VM00148

A-445

6.

7                                                                    7

FADE IN:

EXT.     RURAL HIGHWAY     DAY

It's not so much a highway as the last surfaced road
before the real forest starts.  In the BG there is
a filling station on its last legs, which, in addition
to gasoline, sells notions, sandwiches, sodas, bread
and live bait.  A sign reads: "No Gas Today."  There
are no cars anywhere to be seen.

          HOTPRESS TITLE:

                    THE PRESENT     _FR113? if24hrs?_

A mangy old mongrel wanders out from his post in front
of the gas station to check on a young HITCH-HIKER
who has just walked into view.  The HITCH-HIKER stops,
pets the dog and adjusts her over-sized backpack.

This is ANNIE STERN, 19, immature, and as eager to
please as a new puppy who has just been housebroken.
ANNIE is cute, talkative, positive, and sadly, too
naive for this world.

                    ANNIE
          Hiya, boy.  Oh, 'scuse me.  Hiya, girl.
          You speak English?  How far to Camp
          Crystal Lake?

The dog licks her face.

                    ANNIE (Contd)
          That far, hunh?  Okey-dokey.  So long,
          girl.

ANNIE trudges along further. The dog watches her go.

                                        CUT TO:


8    EXT.     RURAL HIGHWAY     DAY                        8

About a half mile further down the road, ANNIE is
beginning to get a little worried about the time.
It's hot and she's late.

She looks up.

From HER POV a Jeep barrels along the road towards us.

ANNIE smiles and assumes her best hitch-hiking stance.

                                        CUT TO:

**MILLER EX. B**

VM00149

19      (Continued)                                                    19

        When the knife has passed, all we can see is a look
        of surprise on ANNIE's face.

        The CAMERA PULLS BACK.  Her throat has been cut in one
        stroke.

        A bird wheels across the sky above, shrieking with
        its kill.

                                              CUT TO:


20      EXT.      RURAL HIGHWAY      DAY                              20

        A gaily decorated but much-in-need-of-repair van tools
        along with road in front of the filling station we
        saw earlier.  The SOUNDTRACK is suddenly filled with
        the insistent beat of a disco record on the car's
        ancient radio.

        The mongrel dog lifts his head to watch, then goes
        back to dreaming of gristle and bones.

                                              CUT TO:


21      INT.      VAN            DAY                                  21

        In the camper van are three young PEOPLE.  They are
        full of fun, and  are fresh and expectant as they drive
        towards Crystal Lake. They are almost instantly like-
        able.

        At the wheel is NED, a short twenty-year-old who has
        a very well-developed upper body from lifting weights.
        He is nice-looking, a joker who works very hard to
        cover the fact that his lower body doesn't work too
        well.  He had polio as a kid and doesn't walk quite
        normally.  He is always planning some kind of event
        to get the attention on him. He is funny, alert, and
        wishes he could be more at ease.

        Next to him in front is JACK, an athlete who could
        win the Robert Redford look-alike contest. He is
        quieter than NED, more inner-directed and a little
        confused when things get complicated.  He would love
        to simplify his existence, even though he's only
        had twenty years so far.

                                              (continued)

**MILLER EX. B**

VM00150

A-447

Case 3:16-cv-01442-SRU   Document 45-1   Filed 06/09/17   Page 28 of 187          11.

21          (Continued)                                                        21

          MARCIE doesn't simplify JACK's life. She makes it
          more complicated, but they still love each other.
          She is the original party girl, a free spirit.  She
          enjoys life, is very attractive, and hasn't learned
          about the fact that life can be painful.  She likes
          it when everybody around her is having a good time.
          She is 19.

          As they drive, MARCIE massages the kinks out of
          JACK's shoulders.

                              MARCIE
                    That's all you ever think of, Neddy.

                              NED
                    Now there you are dead wrong.

                              JACK
                    Ha!

                              NED
                    I do not always think about sex.  Some-
                    times I think about kissing girls.

          MARCIE finds a sore spot in JACK's neck.

                              JACK
                    Ow!

                              NED
                    I was simply asking if you thought that
                    I might score with the other lady
                    counsellors, seeing as how your incredible
                    jugs have already been spoken for.

                              MARCIE (sarcastic)
                    Realy nice mouth, fellah.

                              NED
                    If I'm supposed to run the rifle range,
                    maybe I can threaten to kill them if
                    they won't make love.  Bang! Bang! You're
                    fucked!

                              MARCIE
                    You are a true piece of work, Ned.

          She hits NED playfully on the arm.

                              MARCIE (Contd)
                          (to JACK)
                    How about our last Jay?

MILLER EX. B                                      (continued)
                                                        VM00151

21      (Continued)                                              21

                              NED
                  What about the dope paragraph in Mr.
                  Christy's letter?

                              MARCIE
                  Quote: controlled substances are expressly
                  forbidden. Possession or use of marijuana
                  or alcohol on campgrounds will mean instant
                  dismissal. Unquote.

         NED lights the joint he has taken from his pocket and
         hands it to her.

                              MARCIE (Contd)
                  Thanks.

         They all laugh.

                                              CUT TO:


22      EXT.      RURAL ROAD      DAY                            22

         The van rattles along past the CAMERA, the laughter
         from inside fading as the vehicle moves into the distance.

                                              CUT TO:


23      EXT.      CAMP          DAY                              23

         This is the original set-up: the lonely dirt road
         which winds through the greenery. The van jolts its
         way along past the sign which reads "Camp Crystal
         Lake, Established 1953)"  This is a new sign, all
         freshly painted in a more modern look.

                                              CUT TO:

                              /35


24      INT.      VAN          DAY                               24

         MARCIE is wide-eyed, looking at the lush surroundings.

                                              (continued)

MILLER EX. B

VM00152

24      (Continued)                                              24

                            MARCIE
                It's beautiful....

                                            CUT TO:


25      EXT.      MAIN CAMP AREA      DAY                        25

        This is the central compound of the camp. There in
        the clearing is the flagpole, a central administration/
        meeting building, cabins, storage sheds, an outdoor
        bulletin board, the corner of a tennis court, a small
        parking area and a floor of pine needles. In the BG
        is a sparkling lake.

        This is the same camp 21 years later. Fresh paint, a
        new shed, a missing cabin.  The floating dock is not
        yet in the water.

        A Jeep of the sort we saw earlier is parked at the main
        building. Next to the Jeep there is a beat-up Datsun
        sedan.  Sitting on its hood is BRENDA, another young
        and very pretty new counsellor. BRENDA is dark where
        MARCIE is light.  BRENDA is a more complex person,
        more trouble to herself.  She appears  to be aloof;
        really she is afraid of being hurt.  She uses cynicism
        to get her through tight spots.

        Standing, talking to BRENDA, is ALICE, a softly
        beautiful, fragile-looking young woman of 20.  She is
        unearthly, artistic, quiet, taking everything in,
        storing it neatly, giving it shape.  ALICE holds her
        knapsack to her chest as she listens to BRENDA speak.
        ALICE has a most delicious smile.

        The van charges into the compound, and the area comes
        to life.  From around the corner of a cabin comes
        STEVE CHRISTY, the new owner of Camp Crystal Lake.
        He is strong, charming, in his forties, a physical
        man who burns with a particular dream. STEVE is at
        his best with younger kids. They like and immediately
        respect him.  He knows a lot about nature, animals,
        wildlife, having spent so much of his life in the
        wilds on his own.

        Walking along with STEVE CHRISTY is BILL, a tall, thin,
        almost ascetic-looking young man, the last of the
        group of counsellors.  BILL is handsome is the same
        way that ALICE is beautiful--other-worldly.  He has
        a merry twinkle in his eyes, but he is not the show-
        off that NED is.  BILL sees the world through ironic
        eyes.

**MILLER EX. B**                                    (continued)
VM00153

25                                                                                  25

   (Continued)

NED climbs down from the van and we can see, for
the first time that he is partially crippled.
BRENDA looks over and notices his ungainliness.
She looks away.

NED nudges JACK when he sees BRENDA.

                     NED (half whisper)
        Look at that...roll on summer...

MARCIE walks behind him and gooses him.

                    MARCIE (sotto voce)
        How those jugs suit ya?

Before NED can answer "Terrific!" MARCIE goes to BRENDA.

                    MARCIE (Contd)
       I'm Marcie.

                    BRENDA
       Brenda.

                    ALICE
       Alice.

                    MARCIE
       This is Jack.  And that's Ned.

STEVE CHRISTY plays right through.

                    STEVE
       Welcome to Camp Crystal Lake.  I'm
       Steve Christy.

                             CUT TO:

26   INT.    BIG MEETING ROOM    DAY                                   26

This is the central core of the camp. There is a
giant fireplace at one end---large enough for a person
to stand in.  There are occasional stuffed animals, a
moose head, a rack of ancient reading matter, some
folding chairs that look a hundred years old, a brand
new ping-pong table, some lamps and old patio furniture,
and a generally warm atmosphere. The place smells of
rain and hickory smoke.

                        (continued)

**MILLER EX. B**

VM00154

26      (Continued)                                                    26

The meeting has been going on for a good forty minutes
and is winding down. STEVE CHRISTY stands at a portable
blackboard which he has been using.  On one side we can
see the names and assignments:

          ALICE:        Cabin #1 & Arts and Crafts
          ANNIE:        Cabin #1 & Chef
          BRENDA:       Cabin #2 & Archery
          MARCIE:       Cabin #2 & Water Safety
          BILL:         Cabin #3 & Boating
          NED:          Cabin #4 & Rifle Range
          JACK:         Cabin #4 & Athletics

On the other side of the board is a schedule of the day
for the Boys and Girls, from Reveille at 7:00 AM to Taps
at 9:30 PM.  There are two columns, one for the males and
one for the females.

The CAMERA LOOKS at the new counsellors as STEVE goes
through the last of his bits.  We see ALICE taking notes
in a neat hand in a small notebook. MARCIE is scribbling
on the back of a magazine the things she need to remember.
JACK leans in intently. BILL looks at the others with whom
he'll be living.  He catches ALICE's attention and they
exchange a brief smile. He looks back at STEVE. NED is
daydreaming, looking out the window. BRENDA is listening
and memorizing whatever she'll need to know.

                    STEVE
          Tomorrow morning the State Camp Safety
          Inspectors will be out here to check us
          out and give us their stamp of approval.
          In three more days the kids will arrive.
          I'm going to run us all ragged until then.
          Jack, I want to show you how to operate
          the generator because I've got to go into
          town and I won't be back until late.  Bill,
          the canoes all need another coat.  Alice,
          I haven't even had a minute to inventory
          all the supplies for arts and crafts. If
          we're missing something, I better know
          about it as soon as possible.

                    NED
          Steve?  Could you clear up something
          for me?

                    STEVE
          I'll try.

                    NED
          How come this camp was closed for twenty
          years?

                                        (Continued)

**MILLER EX. B**

VM00155

26      (Continued)                                          26

        NED knows the answer.  A troubled look passes across
        STEVE's face.

                        STEVE
                Okay, let's bury the past.  I guess you've
                all heard the rumors about this place. In
                1958 my parents had built Camp Crystal
                Lake to one of the best camps in the country.
                There were a couple of accidents.  Some
                kids died.  It was tragic.

        The CAMERA watches the reactions of the new counsellors.

                        ALICE
                That's so sad...

                        STEVE
                It ruined the camp, bankrupted my folks.
                Well, before they died I promised them I
                would reopen Crystal Lake.  That day is
                here now. Okay, Ned?

        NED nods, a little bit ashamed of having brought it up.

                        STEVE (Contd)
                Well, I wish Annie was here.  In the mean-
                time, let's get working.  I want to make
                this the best camp in the country.

                                        CUT TO:


27      EXT.    TENNIS COURTS        DAY                      27

        Not in the best shape, the courts are on the mend.
        STEVE stands at the edge showing them to the coun-
        sellors: NED has sneaked up closer to BRENDA.

                        STEVE
                I'll be running the tennis clinic so
                you'll be on your own during the after-
                noons.  In emergencies, I'll be here.
                Otherwise, I trust your judgement.

        STEVE turns to lead the way off.  NED whispers to BRENDA.

                        NED
                That is his first mistake.

                                        (continued)

**MILLER EX. B**

VM00156

27      (Continued)                                              27

        BRENDA pretends not to have heard.  Walks off. MARCIE
        cruises by NED, having eavesdropped.  She loves
        watching the process.  She grins at NED.

                                                CUT TO:


28      EXT.      EDGE OF THE FOREST        DAY               28

        STEVE stands with the group.

                        STEVE
                The red trail has been blazed with these
                markers and is approximately two miles
                long.  Too long for the younger campers,
                but just perfect for the middlers.

        JACK looks off and sees the overgrown trail which we
        have seen before.  The THEME fades in lightly.

                        JACK
                You plan to chop that one, Steve?

        STEVE looks off at the forebidding trail. Looks con-
        cerned, then shakes his head and smiles.

                        STEVE
                No.  The undergrowth is too heavy.

        He leads the way off.

                                                CUT TO:


29      EXT.      MAIN CAMP AREA        DAY (Later)           29

        STEVE is at the wheel of his Jeep.  The Counsellors
        are standing within earshot.  They have changed into
        work clothes--cut-offs, etc.  BILL has some painting
        equipment.

                        JACK
                You want it all listed separately?

                        STEVE
                If you think you can do it in time.  Use
                your own judgement.

                                                (Continued)

**MILLER EX. B**

VM00157

29      (Continued)                                              29

JACK nods.

                          STEVE (Contd)
               Brenda, as soon as you get the archery
               range set up, break down the campers
               by age and grouping.  The records are
               on my desk.

                          BRENDA
               Okay.

                          STEVE
               I wish I could stick around, but I've
               got a million errands to run.  I should
               be back by midnight.
                          (pause)
               Thank you all.  Oh, if Annie checks in,
               get her working on the kitchen.

He wheels around and drives away.

                          NED
               He neglected to mention that this place is
               called Camp Blood by all the restless
               natives.

                          MARCIE
               Neddy, perhaps you'd like to tell us that
               there are poisonous snakes in the outhouse
               and green lizards that bite your buns in
               swimming.

NEDDY listens with a smile as he lights up his second
joint of the day.  Hands it to MARCIE, who tokes and
hands it to BRENDA.

                          NED
               Nope. The green lizards are in the cabins.

BRENDA takes a puff and holds it in like a pro.

                          BRENDA
               Time for archery.

BRENDA hands the jay to ALICE, who shakes her head.

                          ALICE
               Too much work...

**MILLER EX. B**                          (continued)

29      (Continued)                                              29

        ALICE heads for the arts and crafts cabin.  BILL
        waves a paintbrush. Walks away.

                        MARCIE
                Let's all meet back here for a break
                in a coupla hours!

        She takes a quick toke and heads off.

                                                CUT TO:


30      EXT.      EDGE OF LAKE                                    30

        The CAMERA peers over a row of bottom-up canoes. The
        CAMERA looks slowly along. A brush slaps into view.
        Relieved, we follow it up to see BILL, sweating like
        a pig, doing a craftsmanlike job on the canoes.
        He stops, looks around.

        From his  POV, we look at the underbrush behind him.
        Nothing.  Maybe a forest critter.

        BILL goes back to work.

                                                CUT TO:


31      EXT.      EQUIPMENT SHED     DAY                          31

        The screen has gone completely BLACK.  The door to the
        shed is whipped open quickly, letting in the full
        brightness of the sun.  There is a shape.

        The CAMERA irises down so that we can see that JACK
        has come into the shed with a clipboard to do his
        inventory.

        As JACK looks around, we can take the time to see that
        there are a half dozen Coleman lanterns, a few cans
        of lantern fuel, a couple of hibachis, some entrenching
        tools, packs, portable ice chests, life rings, camp
        stools, charcoal, and so forth. Up on the long side
        wall are a half dozen hatchets, hanging neatly in a
        row.  Beneath them are a half dozen hunting knives
        in sheathes, also hanging neatly.

                                                (continued)

**MILLER EX. B**

VM00159

A-456

Case 3:16-cv-01442-SRU   Document 45-1   Filed 06/09/17   Page 37 of 187      20.

31          (Continued)                                                    31

          Suddenly a hand comes into FRAME and touches JACK
          on the back as he is preoccupied with his inventory.
          JACK turns with a start.  He looks right at us.

          From JACK's POV we see MARCIE standing in the doorway.

                              MARCIE
                    What are those for?  An Indian raid?

          She points to the row of hatchets and knives.

                              JACK
                    What can I do for you?

                              MARCIE
                    You can start by giving me those life
                    rings.

          He hands her two life-saving bouys.

                              MARCIE (Contd)
                    And finish by meeting me in my cabin after
                    taps.

          She kisses him on the cheek and gooses him playfully.

          JACK smiles and watches her go.  He gets back to work.

                                                  CUT TO:


32          EXT.     TRAIL          DAY                                     32

          MARCIE, carrying her life rings, walks towards the shore,
          her life-saving station and high-chair, etc.  The CAMERA
          is tight on her, from behind.

          The Theme fades in very slightly.  We observe her from
          further away, through a bush.

                                                  CUT TO:


**MILLER EX. B**

VM00160

36      INT.      ARTS & CRAFTS CABIN      DAY                    36

        ALICE snaps around, sensing that she is being watched.
        In CU her frightened face looks at the sun-drenched
        dusty pane.  Her face relaxes, and eases into her
        characteristic smile until BANG!  The sound of a heavy
        door slamming echoes through the room.

        The CAMERA ZOOMS BACK from her face to see somebody
        standing in the doorway.  It is BILL.

        MCU BILL, realizing he has scared the hell out of her.

                        BILL
                Whoops, sorry.

                        ALICE
                Oh.  It wasn't your fault.  I just got
                spooked.

        BILL has streaks of paint on his hands and arms, and a
        blotch on one cheek. He looks handsome.  There is a
        moment between them which neither can quite get a
        handle on.  BILL breaks it by looking across at the
        easel.

                        BILL
                Well, look at that, won't you.  Did you
                do it?

                        ALICE
                Yes.  I took a little break.

                        BILL
                It's lovely.

        ALICE smiles, rubs the back of her hand across her cheek.

                        BILL (Contd)
                A little spooky somehow...

        ALICE flips the cover shut.  The remark wasn't what she
        wanted to hear.

                        ALICE
                It was just a quick sketch.  I've been
                so busy.

        BILL looks at her, wishing she hadn't misunderstood him.
        ALICE takes her clipboard and goes over to take down a
        box from a high shelf.  She doesn't realize that there
        is something on top of the box.

                                        (Continued)

**MILLER EX. B**

VM00161

36   (Continued)                                                    36

ALICE lugs it down and suddenly a bunch of leather-
working tools tumbles down, shattering the silence.

ALICE is startled.  BILL tries to help her.

                         BILL
               You're lucky none of them clobbered
               you.  Maybe you ought to take a break.

                         ALICE
               I've got so much work to do...I haven't
               even unpacked.

                         BILL
               There's plenty of time.

                                        CUT TO:


37   EXT.     ARTS & CRAFTS CABIN         DAY               37

MARCIE rushes into the compound with a towel around
her neck.

                         MARCIE
               All-eee-alleee-in-free!  It's break time
               at Camp Crystal Lake!

                                        CUT TO:


38   INT.     ARTS & CRAFTS CABIN         DAY               38

We can hear MARCIE (off) as BILL smiles.  ALICE turns
and shrugs "Okay" as we hear:

                         MARCIE (O.S.)
               Come on, Alice.  I need protection!

                                        CUT TO:


39   EXT.     CRYSTAL LAKE         DAY               39

A long wide shot reveals the cool clear lake during
the lull of a hot afternoon.

                                        (Continued)

39   (Continued)                                              39

The relative calm of the heat is battered in the
distance by NED, who runs into the water. His running
is ungainly, but his spirit is not. He is ready to
howl.  NED is followed almost immediately by MARCIE
and JACK.  BRENDA strips to a bikini on the shore and
leaps in after them.

WE CUT CLOSER to see BILL and ALICE at the edge of the
water, about to go in.  BILL flips off his t-shirt;
he plans to swim in his cut-offs.  ALICE wears a halter
top and shorts.  They run for the water and splash in.

CUT TO:


BILL, JACK and NED have an impromptu swimming race.
There is a great deal of splashing, swirling water
as MARCIE and ALICE cheer them on.  BRENDA watches too.

CUT TO:


BRENDA, an accomplished athlete, does a near-perfect
half-gainer.

NED applauds.

CUT TO:


JACK & MARCIE, up to their necks in cool water, lean
forward and kiss gently.  NED sneaks up and drenches
them both by splashing them. They turn and splash him
like crazy.

CUT TO:


NED walks on his hands in LS along the diving board and
does a flip into the water.

BRENDA applauds.

CUT TO:

                                              (Continued)

**MILLER EX. B**

VM00163

A-460

Case 3:16-cv-01442-SRU   Document 45-1   Filed 06/09/17   Page 41 of 187        26.

39        (Continued)                                                    39

BILL lies on his back in the water and spits a tower
of water into the air.

CUT TO:


ALICE is doing a very nice butterfly stroke. She slows
her pace and treads water for a moment.  NED, swimming
nearby, smiles.

                    NED
          Don't you find that bathing suit confining?

                    ALICE
          Yes, I do.  Which is exactly why I'm
          wearing it.

NED does a take, laughs, and smiles.

                    NED
          My error.

BRENDA swims into FRAME.

                    NED
          But I have heard that there are sand
          sharks in these waters. They can eat
          the clothes right off you.  They
          especially like Levis.

ALICE laughs.

                    NED (Contd)
          See?  I'm getting to you. Slowly.

He smiles and swims off.

CUT TO:


JACK swings out over the water on a rope which is tied
to a tree.  He yells and soars out.

THE CAMERA watches him splash-land, then PANS SLOWLY
back to the shore.

                                        CUT TO:


**MILLER EX. B**                                         VM00164