# 18-3123-cv

## United States Court of Appeals
### *for the*
## Second Circuit

---

HORROR INC., a Massachusetts corporation, MANNY COMPANY,
a Connecticut Limited Partnership,

*Plaintiffs-Counter-Defendants-Appellants,*

– v. –

VICTOR MILLER, an individual,

*Defendant-Counter-Claimant-Appellee,*

DOES, 1 through 10, inclusive,

*Defendants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT, NEW HAVEN

## DEFERRED JOINT APPENDIX
## VOLUME III OF III
## [PAGES A-601 – A-867]

MARC TOBEROFF
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, California 90265
(310) 246-3333

*Attorneys for Defendant-Counter-
   Claimant-Appellee*

KATHLEEN M. SULLIVAN
TODD ANTEN
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiffs-Counter-
   Defendants-Appellants*

*(For Continuation of Appearances See Inside Cover)*

Bonnie E. Eskenazi
Julia R. Haye
Greenberg Glusker Fields Claman
   & Machtinger LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067
(310) 553-3610

*Attorneys for Plaintiffs-Counter-*
*   Defendants-Appellants*

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, filed August 24, 2016 (Doc. 1)................ A-13

Answer and Counterclaim filed by
    Defendant/Counterclaimant Victor Miller, filed
    November 17, 2016 (Doc. 37) ............................... A-36

Local Rule 56(a)(1) Statement in Support of
    Plaintiffs' Motion for Summary Judgment, filed
    June 9, 2017 (Doc. 43-2) ...................................... A-66

Declaration of Robert M. Barsamian in Support of
    Plaintiffs' Motion for Summary Judgment, filed
    June 9, 2017 (Doc. 43-3) ...................................... A-83

Declaration of Sean S. Cunningham in Support of
    Plaintiffs' Motion for Summary Judgment, filed
    June 9, 2017 (Doc. 43-4) ...................................... A-87

    Exhibit A to Cunningham Declaration:
    July 24, 1978 Correspondence from the WGA
    (Doc. 43-5)............................................................ A-98

    Exhibit B to Cunningham Declaration:
    Writer's Flat Deal Contract between Victor Miller
    and The Manny Company (Doc. 43-6).................. A-99

    Exhibit C to Cunningham Declaration:
    First Draft Treatment, titled *The Long Night at
    Camp Blood* [reproduced at A-425 – A-439]
    (Doc. 43-7)

    Exhibit D to Cunningham Declaration:
    Second Draft Treatment, titled *Friday 13*
    (Doc. 43-8)............................................................ A-101

**Page**

Exhibit F to Cunningham Declaration:
First Draft Screenplay, without title page
[reproduced at A-440 – A-508] (Doc. 43-10)

Exhibit G to Cunningham Declaration:
Second Draft Screenplay, titled *Friday 13*
[reproduced at A-509 – A-600] (Doc. 43-11)

Exhibit H to Cunningham Declaration:
Rights Agreement between The Manny Company
and Georgetown Productions, Inc., dated May 7,
1980 (Doc. 43-12)..................................................   A-120

Declaration of Julia R. Haye in Support of
  Plaintiffs' Motion for Summary Judgment,
  filed June 9, 2017 (omitted herein) (Doc. 43-13)

Exhibit I to Haye Declaration:
May 9, 2017 Printout of Sean S. Cunningham's
IMDbPro Filmography (Doc. 43-14)....................   A-127

Exhibit J to Haye Declaration:
Expert Report of William L. Cole (Doc. 43-15)....   A-131

Exhibit K to Haye Declaration:
Excerpts of Deposition of Victor Miller,
dated April 28, 2017 (Doc. 43-16)........................   A-164

Exhibit L to Haye Declaration:
Transcript of January 27, 2003 interview of
Victor Miller conducted by Peter Bracke
(Doc. 43-17)...........................................................   A-261

Exhibit N to Haye Declaration:
1977 WGA Theatrical & Television Basic
Agreement (Doc. 43-19).......................................   A-287

**Page**

Exhibit O to Haye Declaration:
1980 Copyright Registration for *Friday the 13th*
(Registration No. PA 81-093) (Doc. 43-20)........... A-400

Exhibit R to Haye Declaration:
Victor Miller's Notices of Termination of
Copyright for *Friday the 13th*, dated January 21,
2016, June 27, 2016 and July 14, 2016
[reproduced at A-618 – A-624, A-631 – A-634]
(Doc. 43-23)

Exhibit S to Haye Declaration:
Letter from WGA to Victor Miller, dated
June 14, 1979 (Doc. 43-24) ................................... A-402

Exhibit T to Haye Declaration:
Victor Miller's Application for Membership in
the WGA, dated March 21, 1974 (Doc. 43-25) ..... A-404

Exhibit U to Haye Declaration:
Letter from Victor Miller to WGA, dated
June 4, 1979 (Doc. 43-26) ..................................... A-405

Exhibit W to Haye Declaration:
Stipulated Settlement, *Manny Co. v. Georgetown
Prods., Inc.*, No. 86-7665 (2d Cir. Jan. 8, 1998)
(Doc. 43-28)........................................................... A-406

Exhibit X to Haye Declaration:
Executed Letter of Irrevocable Authority to
Paramount Pictures Corporation, dated July 19,
1988, re: *Friday the 13th* and *Friday the 13th,
Part II* (Doc. 43-29) .............................................. A-409

Declaration of William L. Cole in Support of
Plaintiffs' Motion for Partial Summary Judgment,
filed June 9, 2017 (Doc. 43-30) ............................ A-413

**Page**

Exhibit Y to Cole Declaration:
Sample form "Assignment Agreement"
(Doc. 43-30)........................................................... A-416

Declaration of Victor Miller in Support of His
Motion for Summary Judgment, filed June 9,
2017 (Doc. 45-1)................................................... A-420

Exhibit A to Miller Declaration:
First Draft Treatment, titled *The Long Night at
Camp Blood* (Doc. 45-1)....................................... A-425

Exhibit B to Miller Declaration:
First Draft Screenplay, without title page
(Doc. 45-1)............................................................ A-440

Exhibit C to Miller Declaration:
Second Draft Screenplay, titled *Friday 13*
(Doc. 45-1)............................................................ A-509

Exhibit D to Miller Declaration:
Writer's Flat Deal Contract between Victor Miller
and The Manny Company (Doc. 45-1).................. A-601

Exhibit E to Miller Declaration:
Advertisement in *Variety* for *Friday the 13th*,
dated July 4, 1979 (Doc. 45-1) ............................ A-603

Exhibit F to Miller Declaration:
Letter from Sean Cunningham to James Trupin of
JET Literary Agency, dated August 22, 1979
(Doc. 45-1)............................................................ A-604

Exhibit G to Miller Declaration:
Copy of a document containing the credit block
for *Friday the 13th* (Doc. 45-1) ........................... A-605

**Page**

Declaration of Marc Toberoff in Support of
Defendant and Counterclaimant Victor Miller's
Motion for Summary Judgment, filed June 9,
2017 (Doc. 45-2)....................................................  A-606

Exhibit C to Toberoff Declaration:
E-mail exchange between Marc Toberoff and
Jennifer Parsignault of PWGA, with attachments,
dated June 7, 2017 (Doc. 45-2)..............................  A-610

Exhibit D to Toberoff Declaration:
Rights Agreement between The Manny Company
and Georgetown Productions, Inc., dated May 7,
1980 [reproduced at A-120 – A-126] (Doc. 45-2)

Exhibit H to Toberoff Declaration:
Victor Miller's Notice of Termination of
Copyright for *Friday the 13th*, dated January 21,
2016 (Doc. 45-2)....................................................  A-618

Exhibit J to Toberoff Declaration:
Victor Miller's Notice of Termination of
Copyright for *Friday the 13th*, dated June 27,
2016 (Doc. 45-2)....................................................  A-621

Exhibit K to Toberoff Declaration:
Document Cover Sheet to U.S. Copyright Office
re: Notice of Termination (Doc. 45-2) ...................  A-625

Exhibit L to Toberoff Declaration:
Victor Miller's Notice of Termination of
Copyright for *Friday the 13th*, dated July 14,
2016 (Doc. 45-2)....................................................  A-631

Supplemental Declaration of Sean S. Cunningham
in Support of Plaintiffs' Opposition to Motion for
Summary Judgment, filed June 30, 2017
(Doc. 47-1)............................................................  A-635

**Page**

Plaintiffs' Local Rule 56(a)(2) Statement in Support
of Opposition to Motion for Summary Judgment,
filed June 30, 2017 (Doc. 47-2) ............................ A-641

Plaintiffs' Evidentiary Objections to the
Declarations of Victor and Marc Toberoff,
dated June 30, 2017 (Doc. 48) .............................. A-652

Excerpt of Defendant and Counter-Claimant Victor
Miller's Memorandum of Points and Authorities
in Opposition to Plaintiffs' Motion for Summary
Judgment, filed June 30, 2017 (Doc. 51) ............... A-660

Declaration of Victor Miller in Opposition to
Plaintiffs' Motion for Summary Judgment, dated
June 30, 2017 (Doc.51-1) ..................................... A-662

Exhibit I to Miller Declaration:
June 30, 2017 Printout of Victor Miller's
IMBbPro Filmography (Doc. 51-1) ....................... A-666

Declaration of Marc Toberoff in Opposition to
Plaintiffs' Motion for Summary Judgment, filed
June 30, 2017 (Doc. 51-2) ..................................... A-671

Exhibit P to Toberoff Declaration:
Excerpts of Deposition of Sean R.
Cunningham, dated May 12, 2017 (Doc. 51-2) ..... A-674

Exhibit Q to Toberoff Declaration:
Excerpts from *Crystal Lake Memories: The
Complete History of Friday the 13th*, by Peter
Bracke (Doc. 51-2) ................................................ A-754

Exhibit R to Toberoff Declaration:
Excerpts from *On Location in Blairstown: The
Making of Friday The 13th*, by David Grove
(Doc. 51-2)............................................................. A-761

**Page**

Defendant and Counter-Claimant Victor Miller's
Local Rule 56(a)(2) Response and Statement of
Disputed Material Facts in Opposition to
Plaintiffs' Motion for Summary Judgment, filed
June 30, 2017 (Doc. 51-3) ..................................... A-784

Declaration of Jennifer C. Parsignault,
Manager-Compliance Department of the PWGA
Pension and Health Plans, filed July 14, 2017
(Doc. 55-1)............................................................. A-800

Exhibit A to Parsignault Declaration:
PWGA Pension Plan Statements for Victor
Miller, 1978-1981 (Doc. 55-1).............................. A-803

Exhibit B to Parsignault Declaration:
Excerpts of Victor Miller's Earning Statements
from 1981 to the present [excerpted as a
voluminous exhibit] (Doc. 55-1) .......................... A-807

Declaration of Marc Toberoff in Reply to Plaintiffs'
Evidentiary Objections and in Further Support of
Defendant and Counterclaimant Victor Miller's
Motion for Summary Judgment, filed July 14,
2017 (Doc. 56-1)................................................... A-812

Exhibit T to Toberoff Declaration:
Letter from Bonnie Eskenazi to PWGA
Custodian of Records, enclosing Subpoena, dated
November 22, 2016 (Doc. 56-1)............................ A-816

Exhibit U to Toberoff Declaration:
Excerpts of January 3, 2017 E-mail from Jannette
Gore to Marc Toberoff attaching production of
documents [excerpted as a voluminous exhibit]
(Doc. 56-1)............................................................ A-828

**Page**

Plaintiffs' Evidentiary Objections to the July 14,
 2017 Declarations of Marc Toberoff and Jennifer
 C. Parsignault, filed August 4, 2017 (Doc. 64)...... A-847

Notice of Appeal, filed October 18, 2018 .................. A-865

<u>WRITER'S FLAT DEAL CONTRACT</u>

(Short Form; complete screenplay, no options)

EMPLOYMENT AGREEMENT between <u>The Manny Company</u>

(hereinafter sometimes referred to as "Company") and <u>Victor Miller</u>

_____(hereinafter sometimes referred to as "Writer"),

dated this_____day of_____, 19_____.

    1.  The Company employs the Writer to write a complete and finished

screenplay for a proposed motion picture to be budgeted at $<u>under $1 million</u>,

and presently entitled or designated <u>Friday 13</u>

and including the following:

    ◯ Treatment            ⊗ First draft screenplay
    ◯ Original Treatment    ⊗ Final draft screenplay
    ◯ Story               ◯ Rewrite of screenplay

based upon (describe form of material & title)_____

_____

written by_____.

    2. (a) The Writer represents that (s)he is a member in good standing
of the Writers Guild of America, (West or East), Inc., and warrants that (s)he
will maintain his/her membership in the Writers Guild of America, (West or
East), Inc., in good standing during the term of this employment.

    (b) The Company warrants it is a party to the WGA 1977 Theatrical
and Television Basic Agreement (which agreement is herein designated MBA).

    (c) Should any of the terms hereof be less advantageous to the
Writer than the minimums provided in said MBA, then the terms of the MBA shall
supersede such terms hereof; and in the event this Agreement shall fail to
provide for the Writer the benefits which are provided by the MBA, then such
benefits for the Writer provided by the terms of the MBA are deemed incorporated
herein.  Without limiting the generality of the foregoing, it is agreed that
screen credits for authorship shall be determined pursuant to the provisions
of Schedule A of the MBA in accordance with its terms at the time of such
determination.

    3.  The Company will pay to the Writer as full compensation for his

services hereunder the sum of <u>Nine thousand two hundred eighty-two</u> DOLLARS

($ <u>9,282</u>   ), payable as follows:

                                     (Continued)

(3/77)

MILLER EX. D
CONFIDENTIAL

PLAINTIFFS001029

(a) Not less than _____ DOLLARS ($ _____)
shall be paid not later than the first regular weekly pay day of the Company
following the expiration of the first week of the Writer's employment.

(b) _____ DOLLARS ($ _____)
shall be paid within forty-eight (48) hours after delivery of the TREATMENT,
ORIGINAL TREATMENT or STORY, whichever is appropriate, to the Company.

(c) Five thousand five hundred sixty-nine DOLLARS ($ 5,569 )
shall be paid within forty-eight (48) hours after delivery of the FIRST DRAFT
SCREENPLAY to the Company; and

(d) Three thousand seven hundred and thirteen DOLLARS ($ 3,713 )
shall be paid within forty-eight (48) hours after delivery of the FINAL DRAFT
SCREENPLAY.

(e) _____ DOLLARS ($ _____)
shall be paid within forty-eight (48) hours after delivery of the REWRITE.

4. The Writer will immediately on the execution hereof diligently
proceed to render services hereunder and will so continue until such services
are completed.

5. On delivery of a treatment to the Company, the Company may call for
changes within three (3) days thereafter; if the Company fails in writing to
call for any such changes, the treatment shall be deemed approved, and the Writer
shall proceed with the first draft screenplay based on such treatment or
adaptation.

On delivery of a first draft screenplay to the Company, the Company
may call for changes within three (3) days thereafter; if the company fails in
writing to call for any such changes, the first draft screenplay shall be deemed
approved, and the Writer shall proceed with the final draft screenplay.

On delivery of the final draft screenplay to the Company, the Company
may call for changes within three (3) days thereafter; if the Company fails in
writing to call for any such changes, the final draft screenplay shall be deemed
approved.

6. This contract is entire, that is, the services contemplated hereunder
include all of the writing necessary to complete the final screenplay above
described, and this Agreement contemplates payment of the entire agreed upon
compensation.

_____
(Writer)

Address 726 Broad St.

Stratford, Conn. 06497

_____

_____

The Manny Company
(Company)

By _____

Title (Sean S. Cunningham)
General Partner

Address 155 Long Lots Road

Westport, Connecticut 06880

MILLER EX. D
CONFIDENTIAL

PLAINTIFFS001030

Case 3:16-cv-01442-SRU   Document 45-1   Filed 06/09/17   Page 184 of 187



FROM THE PRODUCER OF *LAST HOUSE ON THE LEFT* COMES

THE MOST TERRIFYING FILM EVER MADE!

FRIDAY THE 13TH

PRODUCED AND DIRECTED BY SEAN S. CUNNINGHAM

CURRENTLY IN PRODUCTION AVAILABLE IN NOVEMBER 1979

CONTACT

Cunningham Films, Ltd., 155 Long Lots Road, Westport, Ct. 06880 • (203) 255-0666 • Telex 148-411 (answer back: vaabl)

MILLER EX. E

A-604



sean s. cunningham films, ltd.

August 22, 1979

Mr. James Trupin
JET Literary Agency
124 East 84th Street
New York, NY  10028

Dear Jim:

Enclosed please find a check in the amount of
$3,713.00 per our agreement with your client
Victor Miller.

Best regards,

Sean S. Cunningham

SSC:dp

Enclosure

cc:  Victor Miller

155 long lots road, westport, conn. O688O ● 2O3-255-O666 ● telex 148-411 answer back vasbl

**MILLER EX. F**

VM00221

A SEAN S. CUNNINGHAM FILMS, LTD. PRODUCTION
Starring BETSY PALMER, ADRIENNE KING, HARRY CROSBY, LAURIE BARTRAM,
MARK NELSON, JEANNINE TAYLOR, ROBBI MORGAN, KEVIN BACON.
Director of Photography BARRY ABRAMS. Music by HARRY MANFREDINI.
Associate Producer STEPHEN MINER. Written by VICTOR MILLER.
Produced and Directed by SEAN S. CUNNINGHAM.

A GEORGETOWN PRODUCTIONS, INC. Presentation. Filmed in PANAVISION®

R RESTRICTED
UNDER 17 REQUIRES ACCOMPANYING PARENT OR ADULT GUARDIAN

© 1980 Georgetown Productions, Inc. All Rights Reserved.

MILLER EX. G
CONFIDENTIAL

PLAINTIFFS000178

A-606

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| HORROR INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership,<br><br>Plaintiffs,<br><br>vs.<br><br>VICTOR MILLER, an individual; and DOES 1 through 10,<br><br>Defendants.<br><br>VICTOR MILLER, an individual;<br><br>Counterclaimant,<br><br>vs.<br><br>HORROR INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership; and DOES 1 through 10,<br><br>Counterclaim-Defendants. | Case No.: No. 3:16-cv-01442-SRU<br><br>**DECLARATION OF MARC TOBEROFF IN SUPPORT OF DEFENDANT AND COUNTERCLAIMANT VICTOR MILLER'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**<br><br>June 9, 2017 |

I, Marc Toberoff, declare as follows:

1.     I am counsel for Victor Miller the defendant and counterclaimant in this action. I submit this declaration in support of Victor Miller's Motion for Summary Judgment, Or In The Alternative, Partial Summary Judgment, and, if called as a witness at the trial of this matter, I would and could competently testify, under oath, as to the facts contained herein, which are personally known to me.

2.     For the Court's convenience, attached hereto as Exhibit "A" is a true and correct

copy of the Complaint filed by Plaintiffs in this action.

3.      For further convenience, attached hereto as Exhibit "B" is a true and correct copy of the Answer and Counterclaim filed by Defendant and Counterclaimant Victor Miller in this action.

4.       Attached hereto as Exhibit "C" are true and correct copies of an email exchange I had on June 6, 2017 with a Jennifer Parsinault, a Manager at the PWGA Pension and Health Plans Compliance Department, and the WGA Statements of Earnings and Contributions for Victor B. Miller for the period January 1, 1978 through December 31, 1980 that Ms. Parsinault attached to her email.

5.      Attached hereto as Exhibit "D" is a true and correct copy of a document produced by Plaintiffs herein:  an agreement dated May 7, 1980 between the Manny Company and Georgetown Productions, Inc., attaching the Agreement between the Manny Company and Victor Miller.

6.      Attached hereto as Exhibit "E" is a true and correct copy of a document  produced by Plaintiffs herein entitled "Verified Complaint" in the action entitled *Manny Company vs. Georgetown Productions, Inc. et al.* in the Southern District of New York, 85 Civ. 7175 (MP) and verified by Sean S. Cunningham on.

7.      Attached hereto as Exhibit "F" is a true and correct copy of a document produced by Plaintiffs herein entitled "Affidavit of Sean S. Cunningham" sworn to on May 25, 1986 in the action entitled *Manny Company vs. Georgetown Productions, Inc. et al.* in the Southern District of New York, 85 Civ. 7175 (MP).

8.      Attached hereto as Exhibit "G" is a true and correct copy of a document produced by Plaintiffs herein entitled "Reply Affidavit of Sean S. Cunningham" and stamped filed on July 19, 1966 in the action entitled *Manny Company vs. Georgetown Productions, Inc. et al.* in the Southern District of New York, 85 Civ. 7175 (MP).

9.      On January 21, 2016, I, on Victor Miller's behalf, caused to be served on the Manny Company ("Manny"), by its general partners Sean S. Cunningham Films, Ltd. and Sean

S. Cunningham, and on other potential successors in interest of Manny, a statutory notice of termination under 17 U.S.C. §203(a) with an effective termination date of January 25, 2018 (the "Termination Notice").  A true and correct copy of the Termination Notice is attached hereto as Exhibit "H".

10.     On January 21, 2016, I caused the Termination Notice to be filed with the U.S. Copyright Office.  A true and correct copy of the Copyright Office Certification of Recordation of the Termination Notice dated February 3, 2016 is attached hereto as Exhibit "I".

11.     On June 27, 2016, I, on Victor Miller's behalf, served an amended notice of termination, with an effective termination date of July 1, 2018 (the "First Amended Termination Notice"), revised to include as recipients Plaintiff Horror, Inc. ("Horror") and other of Manny's alleged successors whose assignments were not reflected in the U.S. Copyright Office records. A true and correct copy of the First Amended Termination Notice is attached hereto as Exhibit "J".

12.     On June 28, 2016, I caused the First Amended Termination Notice to be filed with the U.S. Copyright Office.  True and correct copies of the signed Copyright Office Document Cover Sheet, the attached First Amended Termination Notice and the USPO Return Receipt of this Filing from the Copyright Office are attached as composite Exhibit "K".

13.     When the First Amended Termination Notice to one recipient was returned, I, on behalf of Victor Miller, in an abundance of caution, modified some of the recipients' addresses (the "Second Amended Termination Notice") and on July 14, 2016, I caused the notice to be served. The Second Amended Termination Notice has an effective date of July 15, 2018.  A true and correct copy of the Second Amended Termination Notice is attached hereto as Exhibit "L".

14.      Attached as Exhibit "M" are true and correct copies of USPO Return Receipts from Horror, Inc. and related parties, demonstrating their receipt of the Second Amended Termination Notice.

15.     On July 22, 2016, I caused the Second Amended Termination Notice to be filed with the U.S. Copyright Office.  True and correct copies of the signed Copyright Office Document Cover Sheet, the attached Second Amended Termination Notice and the USPO

3

A-609

Return Receipt of this filing from the Copyright Office are attached as composite Exhibit "N".

16.     As the First Amended Notice of Termination and Second Amended Notice of Termination were filed with the Copyright Office six and seven months, respectively, after the original Termination Notices were filed, I have not yet received the Copyright Office's standard Certificates of Recordation for these notices.

I declare under penalty of perjury under the laws of the United States that the above facts are true and correct, and that this declaration was executed on this 9th day of June, 2017, in California.

/s/ Marc Toberoff
_____
Marc Toberoff

A-610



Marc Toberoff <mtoberoff@toberoffandassociates.com>

---

## Victor Miller / Friday the 13th

**Marc Toberoff** <mtoberoff@toberoffandassociates.com>        Wed, Jun 7, 2017 at 11:17 AM
To: jparsignault@wgaplans.org

Hi Jennifer:

It was good speaking with you.

Can you please provide the documentation you reviewed on which you based your conclusion that no contributions were made to the WGA's pension or health funds on behalf of Victor Miller in connection with his writing in 1979 of the screenplay for the "Friday the 13th" film (1980), and any explanation that might be helpful in understanding that conclusion.

Thank-you.

Marc Toberoff
Toberoff & Associates, P.C.
23823 Malibu Road, Suite 50-363
Malibu, California 90265
Tel: 310.246.3333
Fax: 310.246.3101
toberoffandassociates.com

---

This message and any attached documents may contain information from Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or otherwise use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

TOBEROFF EX. C

# TOBEROFF
## & ASSOCIATES, PC

Marc Toberoff <mtoberoff@toberoffandassociates.com>

---

## Victor Miller / Friday the 13th

**Parsignault, Jennifer C <JParsignault@wgaplans.org>**                    Wed, Jun 7, 2017 at 11:47 AM
To: "Marc Toberoff (mtoberoff@toberoffandassociates.com)" <mtoberoff@toberoffandassociates.com>

Dear Mr. Toberoff,

Attached please find Producer-WGA Pension Plan statements for Victor Miller for the years 1978 through 1981. The statement from 1979 details no reported earnings to the pension plan or health fund for any projects; the only item is a balance forward from 1978.

The 1978 statement details reported earnings from The Manny Company in the amount of $8,555. This was for a different project contracted with Manny Productions, "Manny's Orphans."

The project "Friday the 13th" from 1979 was contracted at $9,282 for a first draft and final draft screenplay as per the writing agreement. Since no earnings of this amount are detailed in Mr. Miller's 1979 pension plan statement, this would indicate that no contributions were made on Mr. Miller's behalf to the WGA pension and health fund in connection with his writing services on "Friday the 13th."

Please note that contributions are made on reportable earnings to both the pension plan and the health fund simultaneously. If earnings do not appear on a pension statement, it is concluded that contributions were not remitted to the pension plan on those earnings. Likewise, it can be concluded that contributions were also not remitted to the health fund on those earnings.

Please also note that on theatrical motion picture projects, earnings for residuals and sequel payments are not reportable.

Please feel free to contact me if I can be of further assistance.

Sincerely,

Jennifer Parsignault | Manager – Employer Compliance Department

jparsignault@wgaplans.org

TOBEROFF EX. 6
VM00214

```
A-612
```

# PWGA
## Pension & Health Plans

2900 W. Alameda Ave. Suite 1100, Burbank, CA 91505

818-846-1015 x147 | www.wgaplans.org

**From:** Marc Toberoff [mailto:mtoberoff@toberoffandassociates.com]
**Sent:** Wednesday, June 07, 2017 11:17 AM
**To:** Parsignault, Jennifer C
**Subject:** Victor Miller / Friday the 13th

Hi Jennifer:

It was good speaking with you.

Can you please provide the documentation you reviewed on which you based your conclusion that no contributions were made to the WGA's pension or health funds on behalf of Victor Miller in connection with his writing in 1979 of the screenplay for the "Friday the 13th" film (1980), and any explanation that might be helpful in understanding that conclusion.

Thank-you.

Marc Toberoff
Toberoff & Associates, P.C.

23823 Malibu Road, Suite 50-363

Malibu, California 90265

Tel: 310.246.3333

Fax: 310.246.3101

toberoffandassociates.com

————

This message and any attached documents may contain information from Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or otherwise use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

This message and any attached documents contain information from the Producer-Writers Guild of America Pension Plan and Writers' Guild-Industry Health Fund that may be confidential and/or privileged. If you are not the intended

TOBEROFF EX. C

recipient, you may not read, copy, distribute or use this information. If you have received this email in error, please notify the sender immediately by reply e-mail and then delete this message.

**Miller.V - 1978 - 81.pdf**
187K

TOBEROFF EX. C

# PRODUCER—WRITERS GUILD OF AMERICA PENSION PLAN

310 NORTH SAN VICENTE BOULEVARD, SUITE 305
LOS ANGELES, CALIFORNIA 90048
(213) 659-6430

## STATEMENT OF EARNINGS AND CONTRIBUTIONS
### DECEMBER 31, 1978

SEE REVERSE SIDE FOR INFORMATION
REGARDING THIS STATEMENT.

NAME AND SOCIAL SEC. NO.

VICTOR BROOKE MILLER     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
726 BROAD ST
STRATFORD CT 06497

| QUALIFIED YEARS | |
|---|---|
| 1960 Through 1977 | 2 |
| 1978 | 1 |

| YEAR | EMPLOYER CODE | EMPLOYER NAME | EARNINGS SUBJECT TO CONTRIBUTION | EMPLOYER CONTRIBUTION AT 5% |
|---|---|---|---|---|
| | | BALANCE FORWARD AS OF 1977 | 13,500.00 * | 675.00 * |
| 1978 | K202 | THE MANNY COMPANY | 8,555.00 | 427.75 |
| | | TOTALS FOR 1978 | 8,555.00 | 427.75 |
| | | TOTAL AS OF 12-31-78 | 22,055.00 ** | 1,102.75 ** |

**IMPORTANT**

If at any time you wish to change your Designated Beneficiary you must
notify the Plan. The required Designation of Beneficiary form for this
purpose may be obtained by contacting the Plan Office.

**CAUTION - Do Not Use This Report For Income Tax Purposes - (See Reverse Side)**

TOBEROFF EX. C      VM00217

| A-615 |

# PRODUCER—WRITERS GUILD OF AMERICA PENSION PLAN

310 NORTH SAN VICENTE BOULEVARD, SUITE 305
LOS ANGELES, CALIFORNIA 90048

(213) 659-6430

## STATEMENT OF EARNINGS AND CONTRIBUTIONS

### DECEMBER 31, 1979

NAME AND SOCIAL SEC. NO.

SEE REVERSE SIDE FOR INFORMATION
REGARDING THIS STATEMENT.

VICTOR BROOKE MILLER     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
726 BROAD ST
STRATFORD CT 06497

| QUALIFIED YEARS | |
|---|---|
| 1960 Through 1978 | 3 |
| 1979 | 0 |

| YEAR | EMPLOYER CODE | EMPLOYER NAME | EARNINGS SUBJECT TO CONTRIBUTION | EMPLOYER CONTRIBUTION AT 5% |
|---|---|---|---|---|
| | | BALANCE FORWARD AS OF 1978 | 22,055.00 @ | 1,102.75 * |
| | | TOTAL AS OF 12-31-79 | 22,055.00 @@ | 1,102.75 ** |



★ PENSION PLAN ★

### IMPORTANT

If at any time you wish to change your Designated Beneficiary you must notify the Plan. The required Designation of Beneficiary form for this purpose may be obtained by contacting the Plan Office.

**CAUTION - Do Not Use This Report For Income Tax Purposes-(See Reverse Side**

TOBEROFF EX. C       VM00218

A-616

# PRODUCER—WRITERS GUILD OF AMERICA PENSION PLAN

310 NORTH SAN VICENTE BOULEVARD, SUITE 305
LOS ANGELES, CALIFORNIA 90048
(213) 659-6430

### STATEMENT OF EARNINGS AND CONTRIBUTIONS
### DECEMBER 31, 1980

SEE REVERSE SIDE FOR INFORMATI
REGARDING THIS STATEMENT.

NAME AND SOCIAL SEC. NO.

MILLER VICTOR B
726 BROAD ST
STRATFORD CT 06497

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

| QUALIFIED YEARS | |
|---|---|
| 1960 Through 1979 | 3 |
| 1980 | 1 |

| YEAR | EMPLOYER CODE | EMPLOYER NAME | EARNINGS SUBJECT TO CONTRIBUTION | EMPLOYER CONTRIBUTI AT 5% |
|---|---|---|---|---|
| | | BALANCE FORWARD AS OF 1979 | 22,055.00 * | 1,102.75 |
| 1980 | A015 | COLUMBIA PICTURES IND | 35,000.00 | 1,750.00 |
| 1980 | A555 | AMERICAN INTERNATIONAL | 40,000.00 | 2,000.00 |
| | | TOTALS FOR 1980 | 75,000.00 ⊗ | 3,750.00 |
| | | TOTAL AS OF 12-31-80 | 97,055.00 ** | 4,852.75 |



### IMPORTANT

If at any time you wish to change your Designated Beneficiary you must
notify the Plan.    The required Designation of Beneficiary form for this
purpose may be obtained by contacting the Plan Office.

**CAUTION - Do Not Use This Report For Income Tax Purposes - (See Reverse Si**

TOBEROFF EX. C

VM00219

| A-617 |

# PRODUCER—WRITERS GUILD OF AMERICA PENSION PLAN

310 NORTH SAN VICENTE BOULEVARD, SUITE 305
LOS ANGELES, CALIFORNIA 90048
(213) 659-6430

STATEMENT OF EARNINGS AND CONTRIBUTIONS
DECEMBER 31, 1981

NAME AND SOCIAL SEC. NO.

SEE REVERSE SIDE FOR INFORMATION
REGARDING THIS STATEMENT.

MILLER VICTOR B       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
726 BROAD ST
STRATFORD CT 06497

| QUALIFIED YEARS | |
|---|---|
| 1960 Through 1980 | 4 |
| 1981 | 1 |

| YEAR | EMPLOYER CODE | EMPLOYER NAME | EARNINGS SUBJECT TO CONTRIBUTION | EMPLOYER CONTRIBUTION AT 5% |
|---|---|---|---|---|
| | | BALANCE FORWARD AS OF 1980 | 97,055.00 * | 4,852.75 * |
| 1981 | A0015000 | COLUMBIA PICTURES IND | 15,000.00 | 750.00 |
| | | TOTALS FOR 1981 | 15,000.00 * | 750.00 * |
| | | TOTAL AS OF 12-31-81 | 112,055.00 ** | 5,602.75 ** |



**IMPORTANT**

If at any time you wish to change your Designated Beneficiary you must notify the Plan.   The required Designation of Beneficiary form for this purpose may be obtained by contacting the Plan Office.

## CAUTION- Do Not Use This Report For Income Tax Purposes-(See Reverse Side)

**TOBEROFF EX. C**

VM00220

## NOTICE OF TERMINATION:

### "FRIDAY THE 13TH"

To:  Paramount Pictures Corporation
     5555 Melrose Ave.
     Los Angeles, CA 90038
     Attn: Legal Department

     Sean S. Cunningham Films, Ltd.
     4420 Hayvenhurst Ave.
     Encino, CA 91436
     Attn: Sean Cunningham, President

     Warner Bros. Entertainment Inc.
     4000 Warner Blvd.
     Burbank, CA 91522
     Attn: Legal Department

     Crystal Lake Entertainment
     4420 Hayvenhurst Ave.
     Encino, CA 91436
     Attn: Sean Cunningham, CEO

     New Line Film Productions Inc.
     4000 Warner Blvd., Bldg. 76
     Burbank, CA 91522
     Attn: Legal Department

PLEASE TAKE NOTICE that pursuant to Section 203(a) of the United States Copyright Act (17 U.S.C. § 203(a)) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. § 201.10, the author Victor Miller, being the person entitled to terminate copyright transfers pursuant to said statutory provisions. hereby terminates the grant(s) of his rights under the copyright(s) in and to the literary work entitled "Friday 13" a.k.a. "Friday the 13th" that was made pursuant to that certain agreement identified below, and sets forth in connection therewith the following[1]:

1.     The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Paramount Pictures Corporation. 5555 Melrose Ave., Los Angeles, CA 90038; New Line Film Productions Inc., 4000 Warner Blvd., Bldg. 76, Burbank, CA 91522; Warner Bros. Entertainment Inc., 4000 Warner Blvd., Burbank, CA 91522; Crystal

---

[1] Nothing contained in this notice shall be construed as an admission, waiver or limitation of any right or remedy of Victor Miller, at law or in equity, with respect to the subject matter hereof, all of which are hereby expressly reserved.

**TOBEROFF EX. H**
CONFIDENTIAL

Lake Entertainment, 4420 Hayvenhurst Ave., Encino, CA 91436; and Sean S. Cunningham

Films, Ltd. 4420 Hayvenhurst Ave., Encino, CA 91436.  Pursuant to 37 C.F.R. Section

201.10(d), service of this notice is being made by first class mail, postage pre-paid to the above

grantees or successors at the addresses shown.

    2.      The work to which this Notice of Termination applies is the original screenplay

written by Victor Miller and entitled "A Long Night at Camp Blood" a.k.a. "Friday 13" (the

"Work")[2] on which the movie "Friday the 13th" (1980) was based.

    3.      This Notice of Termination applies to the grant and transfer made by Victor

Miller on July 6, 1979 to The Manny Company of Mr. Miller's rights under copyright in and to

the Work, pursuant to the Writer's Flat Deal Contract between the same parties, signed on or

about June 4, 1979.

    4.      The effective date of termination of the grant(s) identified hereinabove shall be

January 25, 2018.

    5.      Victor Miller is the author of the Work entitled to exercise his termination right

and interest pursuant to 17 U.S.C. § 203(a) as to the grant(s) identified hereinabove.  This Notice

has been signed by all persons needed to terminate such grant(s) under 17 U.S.C. § 203(a).

Dated: January 21, 2016

                                      TOBEROFF & ASSOCIATES, P.C.

                                      By: _____

                                        Marc Toberoff
                                    23823 Malibu Road, Suite 50-363
                                    Malibu, California 90265

                                    As counsel for and on behalf of Victor Miller

---

    [2] This Notice of Termination applies as well to each and every element of such Work, including the
characters therein, and to each and every prior draft or iteration of the Work.

**TOBEROFF EX. H**
CONFIDENTIAL

PLAINTIFFS000013

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the foregoing document described as

NOTICE OF TERMINATION: "FRIDAY THE 13TH" to be served this __ day of January,

2016, by First Class Mail, postage prepaid, upon each of the following:

Paramount Pictures Corporation
5555 Melrose Ave.
Los Angeles, CA 90038
Attn: Legal Department

Sean S. Cunningham Films, Ltd.
4420 Hayvenhurst Ave.
Encino, CA 91436
Attn: Sean Cunningham, President

Warner Bros. Entertainment Inc.
4000 Warner Blvd.
Burbank, CA 91522
Attn: Legal Department

Crystal Lake Entertainment
4420 Hayvenhurst Ave.
Encino, CA 91436
Attn: Sean Cunningham, CEO

New Line Film Productions Inc.
4000 Warner Blvd., Bldg. 76
Burbank, CA 91522
Attn: Legal Department

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2/

day of January, 2016, at Malibu, California.

Marc Toberoff
Toberoff & Associates, P.C.
23823 Malibu Road, Suite 50-363
Malibu, California 90265

Counsel for Victor Miller

3

TOBEROFF EX. H
CONFIDENTIAL

PLAINTIFFS000014

## NOTICE OF TERMINATION:

### "FRIDAY THE 13TH"

To:  Horror, Inc.                                 Robert Barsamian
     54 Jaconnet Street                           92 Dartmouth Street
     Newton, MA 02461                             Newton, MA 02465-2802
     Attn: Robert Barsamian, President

     Jason, Inc., Terror, Inc., Georgetown        Jason, Inc., Terror, Inc., Georgetown
     Productions, Inc., Belmont                    Productions, Inc., Belmont Management, Inc.,
     Management, Inc., Jason Productions           Jason Productions Inc., and Friday Four, Inc.
     Inc., and Friday Four, Inc.                  c/o Robert Barsamian
     c/o 54 Jaconnet Street                       92 Dartmouth Street
     Newton, MA 02461                             Newton, MA 02465-2802

     Paramount Pictures Corporation               Sean S. Cunningham Films, Ltd.
     5555 Melrose Ave.                            4420 Hayvenhurst Ave.
     Los Angeles, CA 90038                        Encino, CA 91436
     Attn: Legal Department                       Attn: Sean Cunningham, President

     Warner Bros. Entertainment Inc.              Crystal Lake Entertainment
     4000 Warner Blvd.                            4420 Hayvenhurst Ave.
     Burbank, CA 91522                            Encino, CA 91436
     Attn: Legal Department                       Attn: Sean Cunningham, CEO

     New Line Film Productions Inc.
     4000 Warner Blvd., Bldg. 76
     Burbank, CA 91522
     Attn: Legal Department

     PLEASE TAKE NOTICE that pursuant to Section 203(a) of the United States Copyright

Act (17 U.S.C. § 203(a)) and the regulations issued thereunder by the Register of Copyrights, 37

C.F.R. § 201.10, the author Victor Miller, being the person entitled to terminate copyright

transfers pursuant to said statutory provisions, hereby terminates the grant(s) of his rights under

the copyright(s) in and to the literary work entitled "Friday 13" that was made pursuant to that

TOBEROFF EX. J
CONFIDENTIAL

PLAINTIFFS000052

certain agreement identified below, and sets forth in connection therewith the following[1]:

1.       The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Horror Inc., 54 Jaconnet Street, Newton, MA 02461, Attn: Robert Barsamian, President; Robert Barsamian, 92 Dartmouth Street, Newton, MA 02465-2802; Jason, Inc., Terror, Inc., Georgetown Productions, Inc., Belmont Management, Inc., Jason Productions Inc., and Friday Four, Inc. c/o 54 Jaconnet Street, Newton, MA 02461 and c/o Robert Barsamian, 92 Dartmouth Street, Newton, MA 02465-2802; Paramount Pictures Corporation, 5555 Melrose Ave., Los Angeles, CA 90038; New Line Film Productions Inc., 4000 Warner Blvd., Bldg. 76, Burbank, CA 91522; Warner Bros. Entertainment Inc., 4000 Warner Blvd., Burbank, CA 91522; Crystal Lake Entertainment, 4420 Hayvenhurst Ave., Encino, CA 91436; and Sean S. Cunningham Films, Ltd. 4420 Hayvenhurst Ave., Encino, CA 91436.   Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail, postage pre-paid to the above grantees or successors at the addresses shown.

2.       The work to which this Notice of Termination applies is the original screenplay written by Victor Miller and entitled "A Long Night at Camp Blood" a.k.a. "Friday 13" (the "Work")[2] on which the movie "Friday the 13th" (1980) was based.

3.       This Notice of Termination applies to the grant and transfer made by Victor Miller on July 6, 1979 to The Manny Company of Mr. Miller's rights under copyright in and to the Work, pursuant to the Writer's Flat Deal Contract between the same parties, signed on or about June 4, 1979.

---

[1] Nothing contained in this notice shall be construed as an admission, waiver or limitation of any right or remedy of Victor Miller, at law or in equity, with respect to the subject matter hereof, all of which are hereby expressly reserved.

[2] This Notice of Termination applies as well to each and every element of such Work, including the characters therein, and to each and every prior draft or iteration of the Work.

2

TOBEROFF EX. J
CONFIDENTIAL

A-623

4.    The effective date of termination of the grant(s) identified hereinabove shall be July 1, 2018.[3]

5.    Victor Miller is the author of the Work entitled to exercise his termination right and interest pursuant to 17 U.S.C. § 203(a) as to the grant(s) identified hereinabove.  This Notice has been signed by all persons needed to terminate such grant(s) under 17 U.S.C. § 203(a).

Dated: June 27, 2016                          TOBEROFF & ASSOCIATES, P.C.

                                              By: _____
                                                    Marc Toberoff
                                              23823 Malibu Road, Suite 50-363
                                              Malibu, California 90265

                                              As counsel for and on behalf of Victor Miller

---

[3] On January 21, 2016, a Notice of Termination regarding the Work (with an effective date of January 25, 2016) was served on all parties hereto except Robert Barsamian and his various entities (Horror, Inc., Jason Inc., Terror, Inc., Georgetown Productions, Inc., Belmont Management, Inc., Jason Productions, Inc., and Friday Four, Inc.) because a search of the records of the U.S. Copyright Office did not reveal a copyright assignment of the Work to these parties.  In an abundance of caution, Victor Miller hereby serves this Notice to include these additional parties, to the extent relevant, while reserving all rights as to his prior Notice of Termination.

3

**TOBEROFF EX. J**
CONFIDENTIAL

PLAINTIFFS000054

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the foregoing document described as

NOTICE OF TERMINATION: "FRIDAY THE 13TH" to be served this 27th day of June, 2016,

by First Class Mail, postage prepaid, upon each of the following:

Horror, Inc.
54 Jaconnet Street
Newton, MA 02461
Attn: Robert Barsamian, President

Jason, Inc., Terror, Inc., Georgetown
Productions, Inc., Belmont
Management, Inc., Jason Productions
Inc., and Friday Four, Inc.
c/o 54 Jaconnet Street
Newton, MA 02461

Paramount Pictures Corporation
5555 Melrose Ave.
Los Angeles, CA 90038
Attn: Legal Department

Warner Bros. Entertainment Inc.
4000 Warner Blvd.
Burbank, CA 91522
Attn: Legal Department

New Line Film Productions Inc.
4000 Warner Blvd., Bldg. 76
Burbank, CA 91522
Attn: Legal Department

Robert Barsamian
92 Dartmouth Street
Newton, MA 02465-2802

Jason, Inc., Terror, Inc., Georgetown
Productions, Inc., Belmont Management, Inc.,
Jason Productions Inc., and Friday Four, Inc.
c/o Robert Barsamian
92 Dartmouth Street
Newton, MA 02465-2802

Sean S. Cunningham Films, Ltd.
4420 Hayvenhurst Ave.
Encino, CA 91436
Attn: Sean Cunningham, President

Crystal Lake Entertainment
4420 Hayvenhurst Ave.
Encino, CA 91436
Attn: Sean Cunningham, CEO

I declare under penalty of perjury that the foregoing is true and correct. Executed this

27th day of June, 2016, at Malibu, California.

Marc Toberoff
Toberoff & Associates, P.C.
23823 Malibu Road, Suite 50-363
Malibu, California 90265

Counsel for Victor Miller

4

**TOBEROFF EX. J**
CONFIDENTIAL

PLAINTIFFS000055

**A-625**



# Document Cover Sheet

UNITED STATES COPYRIGHT OFFICE

Copyright Office fees are subject to change.
For current fees check the Copyright Office website at
*www.copyright.gov*, write to the Copyright Office,
or call (202) 707-3000.

**For Recordation of Documents**

Volume _____   Document _____

Volume _____   Document _____

Date of recordation  M _____ D _____ Y _____
(ASSIGNED BY THE COPYRIGHT OFFICE)

Funds received _____

DO NOT WRITE ABOVE THIS LINE · SEE INSTRUCTIONS ON REVERSE

To the Register of Copyrights: *Please record the accompanying original document or properly certified copy thereof.*

**1** First party name given in the document    Horror, Inc.
(IMPORTANT: *Please read instruction for this and other spaces.*)

**2** First title given in the document    Friday the 13th

**3** Total number of titles in the document    2

**4** Amount of fee calculated    $140

**5** Fee enclosed
☑ Check  ☐ Money order
☐ Fee authorized to be charged to Copyright Office deposit account

Deposit account number _____

Deposit account name _____

**6** Completeness of document
☑ Document is complete by its own terms    ☐ Document is not complete. Record "as is."

IMPORTANT NOTE: *A request to record a document "as is" under 37 CFR §201.4(c)(2) is an assertion that: (a) the attachment is completely unavailable for recordation; (b) the attachment is not essential to the identification of the subject matter of the document; and (c) it would be impossible or wholly impracticable to have the parties to the document sign or initial a deletion of the reference to the attachment.*

**7** Certification of Photocopied Document    Complete this certification if a photocopy of the original signed document is substituted for a document bearing the actual original signature.
NOTE: *This space may not be used for documents that require an official certification.*

I declare under penalty of perjury that the accompanying document is a true and correct copy of the original document.

Signature _~M / M~_    Date 6/28/2016

Duly authorized agent of    Victor Miller

**8** Return to:
Name    Toberoff & Associates, PC

Number/street    23823 Malibu Rd.    Apt/suite    50-363

City    Malibu    State    CA    Zip    90265

Phone number    (310) 246-3333    Fax number    (310) 246-3101

Email    mtoberoff@toberoffandassociates.com

SEND TO: *Library of Congress, Copyright Office, Documents Recordation Section, 101 Independence Avenue SE, Washington, DC 20559-6000*
INCLUDE ALL THESE TOGETHER: (1) Two copies of this form; (2) payment from a deposit account or by check/money order payable to *Register of Copyrights*; (3) the document.

**TOBEROFF EX. K**

NOTICE OF TERMINATION:

"FRIDAY THE 13TH"

To:   Horror, Inc.                          Robert Barsamian
      54 Jaconnet Street                    92 Dartmouth Street
      Newton, MA 02461                      Newton, MA 02465-2802
      Attn: Robert Barsamian, President

      Jason, Inc., Terror, Inc., Georgetown    Jason, Inc., Terror, Inc., Georgetown
      Productions, Inc., Belmont               Productions, Inc., Belmont Management, Inc.,
      Management, Inc., Jason Productions       Jason Productions Inc., and Friday Four, Inc.
      Inc., and Friday Four, Inc.              c/o Robert Barsamian
      c/o 54 Jaconnet Street                   92 Dartmouth Street
      Newton, MA 02461                         Newton, MA 02465-2802

      Paramount Pictures Corporation           Sean S. Cunningham Films, Ltd.
      5555 Melrose Ave.                        4420 Hayvenhurst Ave.
      Los Angeles, CA 90038                    Encino, CA 91436
      Attn: Legal Department                   Attn: Sean Cunningham, President

      Warner Bros. Entertainment Inc.          Crystal Lake Entertainment
      4000 Warner Blvd.                        4420 Hayvenhurst Ave.
      Burbank, CA 91522                        Encino, CA 91436
      Attn: Legal Department                   Attn: Sean Cunningham, CEO

      New Line Film Productions Inc.
      4000 Warner Blvd., Bldg. 76
      Burbank, CA 91522
      Attn: Legal Department


      PLEASE TAKE NOTICE that pursuant to Section 203(a) of the United States Copyright

Act (17 U.S.C. § 203(a)) and the regulations issued thereunder by the Register of Copyrights, 37

C.F.R. § 201.10, the author Victor Miller, being the person entitled to terminate copyright

transfers pursuant to said statutory provisions, hereby terminates the grant(s) of his rights under

the copyright(s) in and to the literary work entitled "Friday 13" that was made pursuant to that

**TOBEROFF EX. K**

certain agreement identified below, and sets forth in connection therewith the following[1]:

1.      The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Horror Inc., 54 Jaconnet Street, Newton, MA 02461, Attn: Robert Barsamian, President; Robert Barsamian, 92 Dartmouth Street, Newton, MA 02465-2802; Jason, Inc., Terror, Inc., Georgetown Productions, Inc., Belmont Management, Inc., Jason Productions Inc., and Friday Four, Inc. c/o 54 Jaconnet Street, Newton, MA 02461 and c/o Robert Barsamian, 92 Dartmouth Street, Newton, MA 02465-2802; Paramount Pictures Corporation, 5555 Melrose Ave., Los Angeles, CA 90038; New Line Film Productions Inc., 4000 Warner Blvd., Bldg. 76, Burbank, CA 91522; Warner Bros. Entertainment Inc., 4000 Warner Blvd., Burbank, CA 91522; Crystal Lake Entertainment, 4420 Hayvenhurst Ave., Encino, CA 91436; and Sean S. Cunningham Films, Ltd. 4420 Hayvenhurst Ave., Encino, CA 91436.   Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail, postage pre-paid to the above grantees or successors at the addresses shown.

2.      The work to which this Notice of Termination applies is the original screenplay written by Victor Miller and entitled "A Long Night at Camp Blood" a.k.a. "Friday 13" (the "Work")[2] on which the movie "Friday the 13th" (1980) was based.

3.      This Notice of Termination applies to the grant and transfer made by Victor Miller on July 6, 1979 to The Manny Company of Mr. Miller's rights under copyright in and to the Work, pursuant to the Writer's Flat Deal Contract between the same parties, signed on or about June 4, 1979.

---

[1] Nothing contained in this notice shall be construed as an admission, waiver or limitation of any right or remedy of Victor Miller, at law or in equity, with respect to the subject matter hereof, all of which are hereby expressly reserved.

[2] This Notice of Termination applies as well to each and every element of such Work, including the characters therein, and to each and every prior draft or iteration of the Work.

2

**TOBEROFF EX. K**

4.      The effective date of termination of the grant(s) identified hereinabove shall be July 1, 2018.[3]

5.      Victor Miller is the author of the Work entitled to exercise his termination right and interest pursuant to 17 U.S.C. § 203(a) as to the grant(s) identified hereinabove.  This Notice has been signed by all persons needed to terminate such grant(s) under 17 U.S.C. § 203(a).


Dated: June 27, 2016                                TOBEROFF & ASSOCIATES, P.C.


                                                    By: _____
                                                        Marc Toberoff
                                                    23823 Malibu Road, Suite 50-363
                                                    Malibu, California 90265

                                                    As counsel for and on behalf of Victor Miller

---

[3] On January 21, 2016, a Notice of Termination regarding the Work (with an effective date of January 25, 2016) was served on all parties hereto except Robert Barsamian and his various entities (Horror, Inc., Jason Inc., Terror, Inc., Georgetown Productions, Inc., Belmont Management, Inc., Jason Productions, Inc., and Friday Four, Inc.) because a search of the records of the U.S. Copyright Office did not reveal a copyright assignment of the Work to these parties.  In an abundance of caution, Victor Miller hereby serves this Notice to include these additional parties, to the extent relevant, while reserving all rights as to his prior Notice of Termination.

3

**TOBEROFF EX. K**

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the foregoing document described as

NOTICE OF TERMINATION: "FRIDAY THE 13TH" to be served this 27th day of June, 2016,

by First Class Mail, postage prepaid, upon each of the following:

| | |
|---|---|
| Horror, Inc.<br>54 Jaconnet Street<br>Newton, MA 02461<br>Attn: Robert Barsamian, President | Robert Barsamian<br>92 Dartmouth Street<br>Newton, MA 02465-2802 |
| Jason, Inc., Terror, Inc., Georgetown<br>Productions, Inc., Belmont<br>Management, Inc., Jason Productions<br>Inc., and Friday Four, Inc.<br>c/o 54 Jaconnet Street<br>Newton, MA 02461 | Jason, Inc., Terror, Inc., Georgetown<br>Productions, Inc., Belmont Management, Inc.,<br>Jason Productions Inc., and Friday Four, Inc.<br>c/o Robert Barsamian<br>92 Dartmouth Street<br>Newton, MA 02465-2802 |
| Paramount Pictures Corporation<br>5555 Melrose Ave.<br>Los Angeles, CA 90038<br>Attn: Legal Department | Sean S. Cunningham Films, Ltd.<br>4420 Hayvenhurst Ave.<br>Encino, CA 91436<br>Attn: Sean Cunningham, President |
| Warner Bros. Entertainment Inc.<br>4000 Warner Blvd.<br>Burbank, CA 91522<br>Attn: Legal Department | Crystal Lake Entertainment<br>4420 Hayvenhurst Ave.<br>Encino, CA 91436<br>Attn: Sean Cunningham, CEO |
| New Line Film Productions Inc.<br>4000 Warner Blvd., Bldg. 76<br>Burbank, CA 91522<br>Attn: Legal Department | |

I declare under penalty of perjury that the foregoing is true and correct. Executed this

27th day of June, 2016, at Malibu, California.

Marc Toberoff
Toberoff & Associates, P.C.
23823 Malibu Road, Suite 50-363
Malibu, California 90265

Counsel for Victor Miller

4

**TOBEROFF EX. K**

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Library of Congress, Copyright
office, Document Recordation
Section
101 Independence Avenue SE
Washington, DC 20559 6000

9590 9403 0981 5271 6170 42

2. Article Number (Transfer from service label)

7015 0640 0001 6762 1224

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

WASHINGTON, DC 20559

Certified Mail Fee   $3.30

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)   $
☐ Return Receipt (electronic)   $
☐ Certified Mail Restricted Delivery   $
☐ Adult Signature Required   $
☐ Adult Signature Restricted Delivery   $

Postage   $0.68

Total Postage and Fees   $6.68

Sent To
Library of Congress Copyright Office Section Documents Recordation
Street and Apt. No., or PO Box No.
101 Independence Avenue SE
City, State, ZIP+4®
Washington, DC 20559 - 6000

PS Form 3800, April 2015 PSN 7530-02-000-9047   See Reverse for Instructions

7015 0640 0001 6762 1158

**TOBEROFF EX. K**

A-631

## NOTICE OF TERMINATION:

## "FRIDAY THE 13TH"

To:  Horror, Inc.
c/o OVP Management
1340 Centre Street #207
Newton, MA 02459
Attn: Robert Barsamian, President

Robert Barsamian
92 Dartmouth Street
Newton, MA 02465-2802

Jason, Inc., Terror, Inc., Georgetown
Productions, Inc., Belmont
Management, Inc., Jason Productions
Inc., and Friday Four, Inc.
c/o 1340 Centre Street #207
Newton, MA 02459

Jason, Inc., Terror, Inc., Georgetown
Productions, Inc., Belmont Management, Inc.,
Jason Productions Inc., and Friday Four, Inc.
c/o Robert Barsamian
92 Dartmouth Street
Newton, MA 02465-2802

Paramount Pictures Corporation
5555 Melrose Ave.
Los Angeles, CA 90038
Attn: Legal Department

Sean S. Cunningham Films, Ltd.
4420 Hayvenhurst Ave.
Encino, CA 91436
Attn: Sean Cunningham, President

Warner Bros. Entertainment Inc.
4000 Warner Blvd.
Burbank, CA 91522
Attn: Legal Department

Crystal Lake Entertainment
4420 Hayvenhurst Ave.
Encino, CA 91436
Attn: Sean Cunningham, CEO

New Line Film Productions Inc.
4000 Warner Blvd., Bldg. 76
Burbank, CA 91522
Attn: Legal Department

PLEASE TAKE NOTICE that pursuant to Section 203(a) of the United States Copyright

Act (17 U.S.C. § 203(a)) and the regulations issued thereunder by the Register of Copyrights, 37

C.F.R. § 201.10, the author Victor Miller, being the person entitled to terminate copyright

transfers pursuant to said statutory provisions, hereby terminates the grant(s) of his rights under

the copyright(s) in and to the literary work entitled "Friday 13" that was made pursuant to that

TOBEROFF EX. L

certain agreement identified below, and sets forth in connection therewith the following[1]:

1.     The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Horror Inc., c/o OVP Management 1340 Centre Street #207, Newton, MA 02459, Attn: Robert Barsamian, President; Robert Barsamian, 92 Dartmouth Street, Newton, MA 02465-2802; Jason, Inc., Terror, Inc., Georgetown Productions, Inc., Belmont Management, Inc., Jason Productions Inc., and Friday Four, Inc. c/o 1340 Centre Street #207, Newton, MA 02459 and c/o Robert Barsamian, 92 Dartmouth Street, Newton, MA 02465-2802; Paramount Pictures Corporation, 5555 Melrose Ave., Los Angeles, CA 90038; New Line Film Productions Inc., 4000 Warner Blvd., Bldg. 76, Burbank, CA 91522; Warner Bros. Entertainment Inc., 4000 Warner Blvd., Burbank, CA 91522; Crystal Lake Entertainment, 4420 Hayvenhurst Ave., Encino, CA 91436; and Sean S. Cunningham Films, Ltd. 4420 Hayvenhurst Ave., Encino, CA 91436.   Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail, postage pre-paid to the above grantees or successors at the addresses shown.

2.     The work to which this Notice of Termination applies is the original screenplay written by Victor Miller and entitled "A Long Night at Camp Blood" a.k.a. "Friday 13" (the "Work")[2] on which the movie "Friday the 13[th]" (1980) was based.

3.     This Notice of Termination applies to the grant and transfer made by Victor Miller on July 6, 1979 to The Manny Company of Mr. Miller's rights under copyright in and to the Work, pursuant to the Writer's Flat Deal Contract between the same parties, signed on or

---

[1] Nothing contained in this notice shall be construed as an admission, waiver or limitation of any right or remedy of Victor Miller, at law or in equity, with respect to the subject matter hereof, all of which are hereby expressly reserved.

[2] This Notice of Termination applies as well to each and every element of such Work, including the characters therein, and to each and every prior draft or iteration of the Work.

TOBEROFF EX. L

A-633

about June 4, 1979.

    4.    The effective date of termination of the grant(s) identified hereinabove shall be July 15, 2018.[3]

    5.    Victor Miller is the author of the Work entitled to exercise his termination right and interest pursuant to 17 U.S.C. § 203(a) as to the grant(s) identified hereinabove.  This Notice has been signed by all persons needed to terminate such grant(s) under 17 U.S.C. § 203(a).

Dated: July 14, 2016

                    TOBEROFF & ASSOCIATES, P.C.

                    By: _____
                        Marc Toberoff
                        23823 Malibu Road, Suite 50-363
                        Malibu, California 90265

                    As counsel for and on behalf of Victor Miller

---

[3] On January 21, 2016, a Notice of Termination regarding the Work (with an effective date of January 25, 2016) was served on all parties hereto except Robert Barsamian and his various entities (Horror, Inc., Jason Inc., Terror, Inc., Georgetown Productions, Inc., Belmont Management, Inc., Jason Productions, Inc., and Friday Four, Inc.) because a search of the records of the U.S. Copyright Office did not reveal a copyright assignment of the Work to these parties.  In an abundance of caution, Victor Miller hereby serves this Notice to include these additional parties, to the extent relevant, while reserving all rights as to his prior Notice of Termination.

TOBEROFF EX. L

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the foregoing document described as

NOTICE OF TERMINATION: "FRIDAY THE 13TH" to be served this 14th day of July, 2016,

by First Class Mail, postage prepaid, upon each of the following:

Horror, Inc.
c/o OVP Management
1340 Centre Street #207
Newton, MA 02459
Attn: Robert Barsamian, President

Robert Barsamian
92 Dartmouth Street
Newton, MA 02465-2802

Jason, Inc., Terror, Inc., Georgetown
Productions, Inc., Belmont
Management, Inc., Jason Productions
Inc., and Friday Four, Inc.
c/o 1340 Centre Street #207
Newton, MA 02459

Jason, Inc., Terror, Inc., Georgetown
Productions, Inc., Belmont Management, Inc.,
Jason Productions Inc., and Friday Four, Inc.
c/o Robert Barsamian
92 Dartmouth Street
Newton, MA 02465-2802

Paramount Pictures Corporation
5555 Melrose Ave.
Los Angeles, CA 90038
Attn: Legal Department

Sean S. Cunningham Films, Ltd.
4420 Hayvenhurst Ave.
Encino, CA 91436
Attn: Sean Cunningham, President

Warner Bros. Entertainment Inc.
4000 Warner Blvd.
Burbank, CA 91522
Attn: Legal Department

Crystal Lake Entertainment
4420 Hayvenhurst Ave.
Encino, CA 91436
Attn: Sean Cunningham, CEO

New Line Film Productions Inc.
4000 Warner Blvd., Bldg. 76
Burbank, CA 91522
Attn: Legal Department

I declare under penalty of perjury that the foregoing is true and correct. Executed this

14th day of July, 2016, at Malibu, California.

Marc Toberoff
Toberoff & Associates, P.C.
23823 Malibu Road, Suite 50-363
Malibu, California 90265

Counsel for Victor Miller

4

**TOBEROFF EX. L**

A-635

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| HORROR, INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership, Plaintiffs, <br><br> - against - <br><br> VICTOR MILLER, an individual; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.: 3:16-cv-01442-SRU <br><br> **June 30, 2017** |

**SUPPLEMENTAL DECLARATION OF SEAN S. CUNNINGHAM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

## SUPPLEMENTAL DECLARATION OF SEAN S. CUNNINGHAM

I, SEAN S. CUNNINGHAM, declare:

1.      The facts set forth in this declaration are personally known to me and I have first-hand knowledge thereof.  If called as a witness, I could and would testify competently to the facts set forth herein under oath.

2.      I am an established producer, director, and writer of feature films.  I first began producing and directing films in 1970, and have produced over twenty-seven feature films throughout my decades-long career.  My films have enjoyed both critical acclaim and box office success.  I primarily produce and direct feature films through my company, Sean S. Cunningham Films, Ltd. ("SSCF"), of which I am a principal.  SSCF is the general partner of Plaintiff Manny Company ("Manny").

3.      On June 9, 2017, I submitted a declaration in support of Plaintiffs' Motion for Partial Summary Judgment, which sets forth in relevant facts concerning the development of the motion picture *Friday the 13th* (1980) (the "Film"), including the development and creation of the screenplay for the Film (the "Screenplay").  Those facts and statements will not be repeated here.

4.      I have reviewed Defendant Victor Miller's ("Miller") Motion for Summary Judgment and the June 9, 2017 Declaration of Victor Miller submitted in support thereof.  Miller makes numerous statements which are factually incorrect.  Many of Miller's misstatements are contradicted by the statements and documents presented in my June 9, 2017 declaration.  However, several of Miller's misstatements are not addressed in my previous declaration and, therefore, are specifically addressed herein.

5.      When I first asked Miller if he was interested in working on my new horror film idea, which became *Friday the* 13th ("the "Film"), he was very hesitant.  Miller was not familiar with the horror genre and had never worked on a horror film.  I, on the other hand, had already

A-637

produced the cult horror film *The Last House on the Left*, famed director Wes Craven's first film. I assured Miller that I would teach him about the horror genre and guide him through the writing process. Based on my assurances, Miller agreed to write for my proposed horror film.

6.     After agreeing to write for my proposed horror film, Miller's first assignment was to come up with venues for the Film to take place. Although Miller and I both agreed to set the Film in a summer camp before it opens, the venue, as with all elements of the Film, was subject to my control and approval. Miller did not start preparing any written materials at all <u>until after</u> I had approved the agreed-upon venue for the Film.

7.     The employment agreement that I used to memorialize in writing my agreement to hire Miller, on behalf of Manny, to provide writing services for the Film was a standard WGA form employment agreement (the "Employment Agreement") for that time. Miller insisted that the Film be done as a union project, and  expressly requested that the Employment Agreement be entered pursuant to, and be governed by, the MBA, so that he would receive the benefits and minimum terms and conditions of employment provided by the MBA.

8.     After entering into the Employment Agreement with Miller, in early June 1979, Miller and I began vigorously developing the screenplay for the Film (the "Screenplay"). As the first step in the preparation of the Screenplay, I asked Miller to prepare a treatment (the "Treatment"), so that I would have something to show potential investors. Miller prepared the Treatment at my specific request and direction, based on our meetings and discussions regarding the agreed-upon setting, scenes, story arc, plots and characters for the Film, and with my tutorials, guidance, and instructions. Miller titled the Treatment *The Long Night at Camp Blood* because, at the time, I was not sure whether my preferred title *Friday the 13*[th] would be clear for me to use.

9.     Miller never placed a copyright notice on the draft of the Treatment that he provided to me. Prior to this litigation, he has never told me that he claimed any ownership of the Treatment.

10.     After receiving the Treatment from Miller, I was not satisfied with what Miller had prepared.  I rewrote, revised, and restructured the Treatment on my own and without any input or permission from Miller and placed the title *Friday 13* (which was consistent with my desired title *Friday the 13th*) to create a more presentable version to show potential investors (the "Cunningham Treatment").

11.     When I completed the revised draft, I placed a copyright designation on the Cunningham Treatment in the name of Sean S. Cunningham Films, Ltd. ("SSCF"), the general partner of Manny.  I gave a copy of my revised Cunningham Treatment, which included the cover page and copyright designation, to Miller.  Miller never told me that the copyright designation was wrong, and never told me that he objected to it in any way.

12.     I directed, supervised, and controlled the entire process of creating and developing the Screenplay.  Miller did not start writing until I asked him to.  Almost daily, Miller and I met at each other's houses, and in my home office, to develop scenes and discuss ideas for the Screenplay, including scenes, plots, characters and story lines.  Sometimes when I met Miller at his house to work on the Screenplay and Miller drafted on his typewriter, I stood over his shoulder making suggestions and contributions.

13.     Although Miller and I collaborated closely in developing the Screenplay, I retained final authority over what went into, or stayed out of, the Screenplay and, ultimately, the Film.  Miller did not include any scenes, concepts, characters, elements, themes or plots in the Screenplay over my objection.  By contrast, I insisted Miller include certain scenes and changes that were dictated by me despite the fact that Miller did not like those scenes or changes.  Miller was required to, and did in fact, follow my instructions.

14.     In short, from start to finish, the Film was my motion picture project:  I conceived of the idea to make a horror film; I hired Miller (through Manny) to write the Screenplay; I supervised, directed, and worked collaboratively with Miller on the development of the Treatment and Screenplay for the Film; I had final approval of the both the Treatment and Screenplay; I hired and assembled the team to develop and produce the Film; I obtained the

A-639

financing for the Film; I made key casting decisions; I produced and directed the Film; and I controlled all creative decisions. But for my idea, vision, and experience as a producer and director, and my ability to assemble the creative team, obtain financing, and successfully produce and direct the Film, the *Friday the 13th* franchise would not exist.

15. This was not the first film that I hired Miller to work on. Miller and I had a long history of working on feature films together. We worked on five films over the course of five years, and I considered Miller part of my filmmaking "team."

16. Miller was not at his leisure to complete the Screenplay on his own schedule. Miller was required to complete certain tasks and/or drafts of the Screenplay by the deadlines that I set, consistent with the pre-production and production schedule.

17. Miller was not entitled to, and did not, hire any assistants to perform the writing services he was required to perform under the Employment Agreement.

18. An essential part of the filmmaking business is developing and writing screenplays. Through its employees, Manny was most certainly in the business of developing and writing screenplays.

19. Despite my significant contributions to the development of the Screenplay, I never made any attempt to formally claim writing credit for the Screenplay. I was already receiving credit as the producer and director of the Film. I wanted Miller, my friend, to have the screenwriting credit and, as the principal of the production company producing the Film, I elected to give Miller sole "written by" credit on the Screenplay and did not believe it was necessary or permitted under the MBA to make a claim for my own writing credits.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 30th day of June, 2017, at Los Angeles, California.

_____

Sean S. Cunningham

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2017, a true and correct copy of the foregoing

DECLARATION OF SEAN S. CUNNINGHAM IN SUPPORT OF PLAINTIFFS'

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT was filed electronically.  Notice of

this filing will be sent to those who are currently on the list to receive e-mail notices by operation

of the Court's electronic filing system. Parties may access this filing through the Court's system.

By: _____

EDMUND J. FERDINAND, III (ct21287)
jferdinand@24iplg.com
ALEXANDER R. MALBIN (ct29419)
amalbin@24iplg.com
JESSICA S. RUTHERFORD (ct27273)
jrutherford@24iplg.com
129 Post Road East
Westport, Connecticut 06880
Telephone: 203.557.4224
Fax: 203.905.6747

BONNIE E. ESKENAZI (SBN 119401)
BEskenazi@GreenbergGlusker.com
JULIA R. HAYE (SBN 198138)
JHaye@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590
Telephone:  310.553.3610
Fax:  310.553.0687
(Admission *Pro Hac Vice*)

*Attorneys for Plaintiffs,*
*Horror, Inc. and Manny Company*

A-641

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| HORROR, INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership, Plaintiffs, <br><br> - against - <br><br> VICTOR MILLER, an individual; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.: 3:16-cv-01442-SRU <br><br> **June 30, 2017** |

## PLAINTIFFS' LOCAL RULE 56(a)(2) STATEMENT IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGEMENT

Edmund J. Ferdinand, III (ct21287)
jferdinand@24iplg.com
Alexander R. Malbin (ct27273
amalbin@24iplg.com
FERDINAND IP, LLC
Jessica S. Rutherford (ct29419)
jrutherford@24iplg.com
129 Post Road East
Westport, Connecticut 06880
Telephone:  (203) 557-4224
Fax:  (203) 905-6747

Bonnie E. Eskenazi (CA SBN 119401)
BEskenazi@GreenbergGlusker.com
Julia R. Haye (CA SBN 198138)
JHaye@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590
Telephone:  (310) 553-3610
Fax:  (310) 553-0687
(Admission *Pro Hac Vice*)

*Attorneys for Plaintiffs and Counterclaim Defendants Horror, Inc. and Manny Company*

A-642

Plaintiffs and Counterclaim Defendants Horror, Inc. and Manny Company (together, "Plaintiffs") hereby submit this Local Rule 56(a)(2) Statement in opposition to the Motion for Summary Judgment by Defendant and Counterclaim Plaintiff Victor Miller ("Miller").  Plaintiffs respond to each of Defendant's statements of fact as follows, and where issues are disputed cites to, the Docket Number and page number of the referenced exhibit:

1.      Admitted that Miller was a screenwriter prior to 1979.  Plaintiffs state further that, in 1979, Miller was also a member in good standing of the Writers Guild of America, East, Inc. ("WGA").  Declaration of Julia Haye in Support of Plaintiffs' Motion for Partial Summary Judgment, Dkt. No. 43-13 ("Haye Decl."), Exs. T, U.

2.      Admitted that, in 1979, Manny Company ("Manny") was a Connecticut limited partnership of which Sean S. Cunningham Films, Ltd. was a general partner.  Plaintiffs do not contend that Sean Cunningham's ("Cunningham") status as a general partner of Manny is material to the issues presented in the Motion for Summary Judgment.

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      Denied that Cunningham approached Miller regarding writing a horror film "in the first quarter of 1979."  Cunningham first approached Miller regarding writing a horror film "[i]n the spring of 1979. . . ."  Declaration of Sean Cunningham in Support of Motion for Partial Summary Judgment, Dkt. No. 43-4 ("Cunningham Decl."), ¶ 7.  Denied that Cunningham "suggest[ed] they collaborate" on that project.  In the spring of 1979, Cunningham "contacted Miller to see if he would be interested in working on my new horror film idea."  Cunningham Decl., ¶ 7; Supplemental Declaration of Sean Cunningham In Support of Plaintiffs' Opposition to Motion for Summary Judgment, filed concurrently herewith ("Supp. Cunningham Decl."), ¶¶ 5-6.  Admitted that Cunningham originated the idea for *Friday The 13th*, that Cunningham was

inspired by *Halloween*, and that Cunningham approached Miller about potential employment as a writer on the project.

7.      Denied.  Prior to Miller's writing any material in connection with *Friday The 13th*, including any treatment titled *The Long Night At Camp Blood*, Miller and Cunningham agreed that "Miller would write the screenplay for [Cunningham's] horror film project, and that, like *Manny's Orphans*, it would be done under the auspices of the WGA.  [Cunningham and Miller] then began discussing ideas for the film."  Cunningham Decl., ¶ 9; Haye Decl. ¶ 4, Ex. K at 156:12-20.  Cunningham then "tutor[ed] Miller on key elements of successful horror films" and the two "met several times a week, at each other's houses and in [Cunningham's] home office to discuss ideas and locations for the film."  Cunningham Decl., ¶¶ 6-10.  The parties then entered into an Employment Agreement on or before June 4, 1979.  Cunningham Decl., ¶ 14, Ex. B.  Only after Miller entered into the Employment Agreement, and after Miller engaged in a collaborative process guided by Cunningham, did Miller write a treatment for Manny based on Cunningham's original idea, which Miller titled *The Long Night At Camp Blood*.  Cunningham Decl., ¶¶ 14, 20, Ex. B; Supp. Cunningham Decl., ¶ 8; Haye Decl. ¶ 4, Ex. K at 157:6-20, 159:20-162:1.  Miller prepared the Treatment at Cunningham's specific request and direction, based on their meetings and discussions regarding the agreed-upon setting, scenes, story arc, plots and characters for the Film, and with Cunningham's tutorials, guidance, and instructions.  Supp. Cunningham Decl., ¶ 8.

8.      Denied.  After agreeing that Miller would write *Friday the 13th* based on Cunningham's original idea, the parties entered into the Employment Agreement on or before June 4, 1979.  Cunningham Decl., ¶¶ 9, 14, Ex. B.  The Employment Agreement incorporates the 1977 Writers Guild of America Basic Agreement ("MBA") by reference.  Cunningham Decl., Ex. B.  Pursuant to the terms of the Employment Agreement and the MBA, Miller wrote a first draft Screenplay of *Friday The 13th* ("First Draft Screenplay") for Manny.  Cunningham Decl., ¶¶ 6-10, 14-18, 20, 25-27, Exs. B, F; Haye Decl., Ex. N at Article 13, 1., a.  Miller prepared his First Draft Screenplay based on Cunningham's input and ideas, including his guidance and

approval as to the "setting, scenes, story arc, plots and characters for the Film . . . ."
Cunningham Decl., ¶¶ 20, 25; Supp. Cunningham Decl., ¶¶ 12-14.  Miller did not complete his
First Draft Screenplay for *Friday the 13th* until approximately late July of 1979.  Cunningham
Decl., ¶ 27; Haye Decl. ¶ 5, Ex. L at 8.

9.      Denied.  There is a handwritten note that reads "FRI 13" in the First Draft
Screenplay which indicates that Miller was incorporating references to the *Friday the 13th* title in
the First Draft Screenplay.  Cunningham Decl., Ex. F at 6.  Plaintiffs state further that the second
draft Treatment ("Cunningham Treatment"), which Cunningham wrote prior to the First Draft
Screenplay, bears the title *Friday 13*.  Cunningham Decl., ¶¶ 22, 25, Ex. D.

10.      Denied.  Pursuant to the terms of the Employment Agreement and the MBA,
Miller wrote a final draft Screenplay of *Friday The 13th* for Manny ("Second Draft Screenplay").
Cunningham Decl., ¶¶6-10, 14-18, 20, 25-27, Ex. B, Ex. G; Haye Decl., Ex. N at Article 13.1., a.
Miller prepared this Second Draft Screenplay based on Cunningham's input and ideas, including
his guidance and approval as to the "setting, scenes, story arc, plots and characters for the Film . .
. ."  Cunningham Decl., ¶¶ 20, 25, 27; Supp. Cunningham Decl., ¶¶ 12-14.  In fact the Second
Draft screenplay, entitled *Friday 13*, was typed entirely by Cunningham's assistant, and bears a
copyright notice in the name of Sean S. Cunningham Films.  Cunningham Decl., ¶¶ 26, Ex. G;
Haye Decl. ¶ 4, Ex. K at 212:5 - 213:9.

11.      Admitted that there are three references to "Friday 13" or "Friday the 13th" in the
Second Draft Screenplay.

12.      Admitted that Miller revised the Second Draft Screenplay.  Plaintiffs state further
that Miller's revisions were based on "extensive notes, mark-ups and ideas . . . ." from Mr.
Cunningham and Philip Scuderi of Georgetown Films.  Cunningham Decl., ¶ 28; Supp.
Cunningham Decl., ¶¶ 12-14.

13.      Admitted.  Plaintiffs state further that many of the literary elements in the First
and Second Draft Screenplays are not found in the Treatment.  Cunningham Exs. C, F, G.
Plaintiffs state further that Cunningham substantially "revised and restructured [Miller's] draft

Treatment on my own, and made several creative changes in a second draft Treatment, which ultimately were included the early drafts of the Screenplay and the Film."  Cunningham Decl., ¶¶ 22, Ex. D.

14.     Denied.  Miller used Cunningham's assistant, copy machine and office facilities in preparing the screenplays for *Friday the 13th*, and the entire Second Draft Screenplay was typed by Cunningham's assistant using a typewriter, ribbon, and paper provided by Cunningham. Cunningham Decl., ¶ 26; Haye Decl. ¶ 4, Ex. K at 212:5 - 213:5.

15.     Denied.  Cunningham and the MBA (which was incorporated into Miller's Employment Agreement) set Miller's work schedule.  Supp. Cunningham Decl., ¶ 16. Cunningham and Miller jointly developed the screenplays, including during meetings at Cunningham's home office.  Cunningham Decl., ¶¶ 6, 20, 25-26.  Miller used Cunningham's assistant, copy machine and office facilities in preparing the screenplays for *Friday the 13th*, and the entire Second Draft Screenplay was typed by Cunningham's assistant.  Cunningham Decl., ¶ 26; Haye Decl. ¶ 4, Ex. K at 162:24-163:11, 186:22-190:5, 212:5-213:5.  Cunningham necessarily dictated the days and hours when Miller could use Cunningham's home office and set deadlines for Miller consistent with the pre-production and production schedules.  Supp. Cunningham Decl., ¶ 16.  Additionally, Article 13.A.4. of the MBA expressly provides for a "Maximum Period of Employment," while Article 19.A. of the MBA provides that "[w]here the writer utilizes an office in his home in connection with an employment agreement with the Company, such utilization shall be deemed at the request of and for the benefit of and for the convenience of the employer."  Haye Decl., Ex. N at Articles 13.A.4., 19.A.

16.     Admitted.  Plaintiffs state further that Article 13.A.4. of the MBA expressly provides for a "Maximum Period of Employment."  Haye Decl., Ex. N at Article 13.A.4.

17.     Admitted that the Employment Agreement was executed no later than June 4, 1979.  Cunningham Decl., Ex. B.  Plaintiffs state further that Cunningham and Miller entered into a prior, oral agreement that Miller would be employed by Manny to write the screenplay for *Friday the 13th* under the auspices of the WGA.  Cunningham Decl., ¶¶ 9, 14.  Plaintiffs state

further that the "Writer's Flat Deal Contract" is an "Employment Agreement" prepared by the WGA and which incorporates by reference "the WGA 1977 Theatrical and Television Basic Agreement (which agreement is herein designated MBA)."  Cunningham Decl., ¶ 17, Ex. B. Cunningham set Miller's work schedule in order to meet the pre-production and production requirements.  Supp. Cunningham Decl., ¶ 7.

18.     Admitted.

19.     Admitted.  Plaintiffs state further that the Employment Agreement provides, in pertinent part: "The Company employs the Writer to write a complete and finished screenplay for a proposed motion picture to be budgeted at $under $1 million, and presently entitled or designated Friday 13 . . ."  Cunningham Decl., Ex. B.

20.      Denied.  Manny had the right to assign Miller additional writing projects for *Friday the 13th*, as it did when Manny required Miller to revise the Second Draft Screenplay. Cunningham Decl., ¶ 28; Supp. Cunningham Decl., ¶¶ 12-14.  Manny also had the right to require Miller to complete the required work in the event of a "Failure to Deliver Material Within Allotted Time Period."  Haye Decl., Ex. N at Article 13.A.8.

21.      Admitted that the Second Draft screenplay bears the title *Friday 13*. Cunningham Decl., Ex. G.  Plaintiffs state further that the preceding Cunningham Treatment also bears the title *Friday 13*.  Cunningham Decl., Ex. D.

22.     Admitted.

23.     Admitted.  Plaintiffs state further that paragraph 1 of the Employment Agreement also contains the following line, to be filled in as applicable: "based upon (describe form of material and title) _____ written by _____." Cunningham Decl., Ex. B.

24.     Denied.  The Employment Agreement incorporates the MBA by reference. Cunningham Decl., Ex. B.  Article 13.A.4. of the MBA expressly provides for a "Maximum Period of Employment," and provides a formula to compute the maximum period of time within

which Miller was required to complete the "First Draft Screenplay" and "Final Draft Screenplay." Haye Decl., Ex. N at Article 13.A.4.

25.      Admitted that the boxes in the Employment Agreement entitled "[ ] Treatment" or "[ ] Original Treatment" are not checked. Cunningham Decl., Ex. B. Denied that the Employment Agreement does not provide for distinct payments for a treatment. The Employment Agreement incorporates the MBA by reference. Cunningham Decl., Ex. B. Article 13.A.1.a. of the MBA expressly provides for a distinct payment due for a treatment. Haye Decl., Ex. N at Article 13.A.1.a. Miller and the WGA have both acknowledged in writing that "all sums due to Miller in connection with the Pictures for the period through and including June 27, 1987" have been paid. Haye Decl., Ex. X, at ¶ 4. This includes payment for the treatment.

26.      Admitted. Plaintiffs state further that the Employment Agreement incorporates the MBA by reference. Cunningham Decl., Ex. B. The amounts set forth in paragraph 3 of the Employment Agreement are the minimum amounts of compensation provided for in Article 13.A.1.a. of the MBA. Haye Decl., Ex. N at 13.A.1.a. In the chart on page 41 of the MBA, these amounts can be found under subsection e., "First Draft of Screenplay (alone or with option for Final Draft Screenplay)," and under the heading "LOW BUDGET" for the period "3/2/79-3/1/80." That is, the amounts set forth in paragraph 3 of the Employment Agreement were collectively bargained for and are set forth in the MBA.

27.      Admitted that Manny paid Miller $9,282 in 1979. Plaintiffs lack knowledge or information as to Manny's deductions or withholdings from any payment to Miller in 1979, and on that basis deny the remainder of this statement. Plaintiffs state further that Miller and the WGA have both acknowledged in writing that "all sums due to Miller in connection with the Pictures for the period through and including June 27, 1987" have been paid. Haye Decl., Ex. X, at ¶ 4.

28.      Denied. Miller has received numerous additional payments in connection with *Friday the 13th*, including but not limited to an additional payment of $27,393.46 made by Paramount on behalf of the producers and deducted from producers' share of the profits. Haye

Decl., Ex. X, at ¶¶ 4, 5; Haye Decl. ¶ 4, Ex. K at 257:11-258:14.  Miller has also received

approximately $220,000 in sequel payments and residuals pursuant to the MBA.  Haye Decl. ¶ 4,

Ex. K at 117:2-6, 118:12-19, 119:21-122:9, 236:2-5, 250:16-19, 261:20-263:1; Haye Decl., Ex.

L at 22-23.

        29.     Denied.  The Employment Agreement incorporates the MBA by reference.

Cunningham Decl., Ex. B.  The MBA requires an employer to make contributions to the WGA's

ERISA plans, namely the Pension Plan and Health and Welfare Fund.  Haye Decl., Ex. N at

Article 17A., B.  Miller and the WGA have both acknowledged in writing that "all sums due to

Miller in connection with the Pictures for the period through and including June 27, 1987" have

been paid.  Haye Decl., Ex. X, at ¶ 4.  This includes all required contributions to the WGA's

ERISA plans.  Haye Decl., Ex. N at Article 17.A.1.a., 17.A.1.b, 17.B.1.  The MBA also provides

for myriad other employment benefits, including but not limited rights to the payment of

residuals (Article 51(3)), payments for sequels (Article 16.A.5), "Credits for Screen Authorship"

(Article 8 and Schedule A), payment of "Location Expenses" (Article 21), the right to watch a

preliminary cut or preview of any movie based on the Writer's work prior to theatrical release

(Article 47), and the right to consult on any translation of the Writer's work (Article 48, entitled

"Professional Status of Writers").  Miller has received numerous benefits pursuant to the MBA

in connection with his writing services on *Friday the 13th*.  Haye Decl. ¶ 4, Ex. K at 249:4-8,

250:2-16, 257:11-259:1, 261:20-263:16; Haye Decl., Ex. L at 22-23; Cunningham Decl. ¶ 32;

Declaration of Robert Barsamian in Support of Plaintiffs' Motion for Partial Summary

Judgment, Dkt. No. 43-3, ¶ 5.

        30.     Denied.  Miller and the WGA have both acknowledged in writing that "all sums

due to Miller in connection with the Pictures for the period through and including June 27, 1987"

have been paid.  Haye Decl., Ex. X, at ¶ 4.  This includes all required contributions to the

WGA's ERISA plans, namely the Pension Plan and Health and Welfare Fund.  Haye Decl., Ex.

N at Article 17.A.1.a., 17.A.1.b, 17.B.1.

31.     Denied.  Miller and the WGA have both acknowledged in writing that Paramount, on behalf of the producers, paid "all sums due to Miller in connection with the Pictures for the period through and including June 27, 1987."  Haye Decl., Ex. X, at ¶ 4.  This includes all required contributions to the WGA's ERISA plans, namely the Pension Plan and Health and Welfare Fund.  Haye Decl., Ex. N at Article 17.A.1.a., 17.A.1.b, 17.B.1.

32.     Admitted.  Plaintiffs state further that this credit was collectively bargained for and provided to Miller pursuant to the MBA.  Haye Decl., Ex. N at Article 8, Schedule A.

33.      Denied that Miller served the termination notice on Manny or on any "actual or potential successors-in-interests of Manny."  Declaration of Marc Toberoff, Dkt. No. 45-2 ("Toberoff Decl."), Ex. H at 3.  Admitted that the notice dated January 21, 2016 provides that the effective date of termination would be January 25, 2018.

34.     Admitted.

35.     Denied.  Miller prepared a new termination notice dated June 27, 2016. Toberoff Decl., Ex. J.  Admitted that Miller served this June 27, 2016 termination notice on the parties listed on the Certificate of Service.  Plaintiffs state further that this notice provides that the effective date of termination would be July 1, 2018.

36.     Admitted that Miller mailed the June 27, 2016 termination notice to the United States Copyright Office on June 28, 2016.  Toberoff Decl., Ex. K.  Denied that this was an "amended" termination notice.

37.      Denied.  Miller prepared a new termination notice dated July 14, 2016.  Toberoff Decl., Ex. L.  Admitted that Miller served this July 14, 2016 termination notice on the parties listed on the Certificate of Service, and that the notice provides that the effective date of termination would be July 15, 2018.

38.     Admitted that Miller mailed the July 14, 2016 termination notice to the United States Copyright Office on July 22, 2016.  Toberoff Decl., Ex. N.   Denied that this was an "amended" termination notice.

Dated: June 30, 2017                          Respectfully submitted,

By:  _Bonnie Eskenazi_

EDMUND J. FERDINAND, III (ct21287)          BONNIE E. ESKENAZI (SBN 119401)
jferdinand@24iplg.com                       BEskenazi@GreenbergGlusker.com
ALEXANDER R. MALBIN (ct29419)               JULIA R. HAYE (SBN 198138)
amalbin@24iplg.com                          JHaye@GreenbergGlusker.com
JESSICA S. RUTHERFORD (ct27273)             GREENBERG GLUSKER FIELDS
jrutherford@24iplg.com                      CLAMAN & MACHTINGER LLP
129 Post Road East                          1900 Avenue of the Stars, 21st Floor
Westport, Connecticut 06880                 Los Angeles, California  90067-4590
Telephone: 203.557.4224                     Telephone:  310.553.3610
Fax: 203.905.6747                           Fax:  310.553.0687
                                            (Admission *Pro Hac Vice*)

                                            *Attorneys for Plaintiffs,*
                                            *Horror, Inc. and Manny Company*

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2017, a true and correct copy of the foregoing

**PLAINTIFFS' LOCAL RULE 56(a)(2) STATEMENT IN SUPPORT OF OPPOSITION**

**TO MOTION FOR SUMMARY JUDGEMENT** was filed electronically.  Notice of this filing

will be sent to those who are currently on the list to receive e-mail notices by operation of the

Court's electronic filing system. Parties may access this filing through the Court's system.

By: _____

EDMUND J. FERDINAND, III (ct21287)
jferdinand@24iplg.com
ALEXANDER R. MALBIN (ct29419)
amalbin@24iplg.com
JESSICA S. RUTHERFORD (ct27273)
jrutherford@24iplg.com
129 Post Road East
Westport, Connecticut 06880
Telephone: 203.557.4224
Fax: 203.905.6747

BONNIE E. ESKENAZI (SBN 119401)
BEskenazi@GreenbergGlusker.com
JULIA R. HAYE (SBN 198138)
JHaye@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590
Telephone:  310.553.3610
Fax:  310.553.0687
(Admission *Pro Hac Vice*)

*Attorneys for Plaintiffs,*
*Horror, Inc. and Manny Company*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| HORROR, INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership, Plaintiffs, <br><br> - against - <br><br> VICTOR MILLER, an individual; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.: 3:16-cv-01442-SRU <br><br> **June 30, 2017** |

**PLAINTIFFS' EVIDENTIARY OBJECTIONS TO THE DECLARATIONS
OF VICTOR MILLER AND MARC TOBEROFF**

Edmund J. Ferdinand, III (ct21287)
jferdinand@24iplg.com
Alexander R. Malbin (ct27273
amalbin@24iplg.com
FERDINAND IP, LLC
Jessica S. Rutherford (ct29419)
jrutherford@24iplg.com
129 Post Road East
Westport, Connecticut 06880
Telephone:  (203) 557-4224
Fax:  (203) 905-6747

Bonnie E. Eskenazi (CA SBN 119401)
BEskenazi@GreenbergGlusker.com
Julia R. Haye (CA SBN 198138)
JHaye@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590
Telephone:  (310) 553-3610
Fax:  (310) 553-0687
(Admission *Pro Hac Vice*)

*Attorneys for Plaintiffs and Counterclaim
Defendants Horror, Inc. and Manny Company*

A-653

Plaintiffs and Counterclaim Defendants Horror, Inc. and Manny Company (together, "Plaintiffs") hereby object to the following testimony and evidence included in and attached to the Declarations of Victor Miller ("Miller") and Marc Toberoff In Support of Victor Miller's Motion for Summary Judgment:

Declaration of Victor Miller:

Paragraph 22 – Miller lacks personal knowledge as to The Manny Company's withholdings, and his testimony to this effect lacks foundation.  FRE 602.

Paragraph 23 – Miller lacks personal knowledge as to "the actual company producing the film," and his testimony to this effect lacks foundation.  FRE 602.

Paragraph 24 – Miller lacks personal knowledge as to whether The Manny Company contributed to any WGA ERISA plan, including the Pension Plan and the Health and Welfare Fund, or provided him with any benefits through the WGA, and his testimony to this effect lacks foundation.  FRE 602.  To the extent that Miller purportedly learned this from a WGA employee or representative, this testimony is hearsay not subject to any exception.  FRE 801-803.

Paragraph 25 – Miller lacks personal knowledge as to whether The Manny Company contributed to any WGA ERISA plan, including the Pension Plan and the Health and Welfare Fund, and his testimony to this effect lacks foundation.  FRE 602.  To the extent that Miller purportedly learned this from a WGA employee or representative, this testimony is hearsay not subject to any exception.  FRE 801-803.

A-654

The Court should also note that Mr. Miller's declaration testimony repeatedly contradicts his own admissions prior to and during this litigation.  For example, in paragraphs 11 and 12 of his declaration, Miller testifies that he signed his Employment Agreement on June 4, 1979, and that, at that time, he was "well into writing the Second Draft of the screenplay, which I soon completed and provided to Cunningham."  However, in 2003, Mr. Miller told journalist Peter Bracke in a recorded interview that "we did not get started on the project until about June or July 1979, but I am willing to be told otherwise."  Declaration of Julia Haye in Support of Plaintiffs' Motion for Partial Summary Judgment, Dkt. No. 43-13 ("Haye Decl."), Ex. L at 8.  That is, as of 2003, Mr. Miller stated that most if not all of his work on the *Friday the 13th* post-dated his June 4, 1979 Employment Agreement.  Miller Decl., ¶ 11.  This calls into question the entirety of Miller's declaration testimony, including his testimony that he wrote his Treatment and First Draft of the *Friday the 13th* screenplay "on spec," and "without a contract or any guarantee of compensation."

In another example, Mr. Miller also testifies in paragraph 21: "I was never paid for my Treatment.  I was eventually paid gross lump sum amounts totaling $ 9,282 for my screenplay."  This testimony flatly contradicts a Letter of Irrevocable Authority dated July 19, 1988, signed by both Mr.  Miller and the WGA, which provides, in pertinent part: "As and for the first Payment Request from the WGA, Paramount is hereby instructed to pay to Miller the sum of $27,393.46 for the period from June 28, 1986 through and including the June 27, 1987 accounting statement.  ***This payment represents all sums due Miller in connection with the Pictures for the period through and including June 22, 1987, including any and all late charges thereon.***"  Haye Decl., Ex. X, ¶ 4 (emphasis added).  Mr. Miller has also testified under oath that he received both sequel payments and residual payments in connection with *Friday the 13th*.  Haye Decl. ¶ 4, Ex.

K at 117:2-6, 118:12-19, 119:21-122:9, 236:2-5, 250:16-19, 261:20-263:1; Haye Decl., Ex. L at 22-23.

In light of the facts asserted by Mr. Miller prior to this litigation, when he had no reason or incentive to falsify his statements versus the very different (and self-serving) facts claimed by Mr. Miller today in his declaration, Mr. Miller's declaration testimony is not credible. It appears the point of his declaration is to establish a false timeline and payment history that is contradicted by both his prior admissions and the documents created prior to this litigation.

Declaration of Marc Toberoff:

Exhibit C – This purported email from an employee of the Producers-Writers Guild of America Pension and Health Plans ("PWGA") to Mr. Toberoff is hearsay not subject to any exception. FRE 801-803. Mr. Toberoff does not have personal knowledge of the contents of this email. The email is also hearsay within hearsay, as it refers to purported records dating back to 1978. The contents of the email are also improper opinion testimony. FRE 701.

The Court should note that Mr. Toberoff did not designate anyone from the Producers-Writers Guild of America Pension and Health Plans ("PWGA") as a witness in this matter, nor did he produce this email until June 7, 2017, well after the May 19, 2017 discovery cut-off. *See* Fed. R. Civ. P. 16(b). In fact, Mr. Toberoff did not even send his email to PWGA requesting this information until June 7. Exhibit C at 2. This attempt to take informal discovery after the discovery cutoff and without seeking leave of the Court was plainly calculated to deprive Plaintiffs of the opportunity to examine any witness regarding the contents of this purported email.

To this end, it is crucial to note that ***Plaintiffs issued a Subpoena to the PWGA in December of 2016, and the PWGA produced documents pursuant to that subpoena. The PWGA did not produce this email in response to Plaintiffs' subpoena***, nor did Mr. Toberoff

separately subpoena the PWGA.   That is, Mr. Toberoff knew well in advance of the discovery

cutoff that the PWGA might have relevant information, but he chose not to seek this information

until after the discovery cutoff.  *See, e.g., Integra Life Sciences, Ltd. v. Merck*, 190 F.R.D. 556,

599 (S.D. Cal. 1999) (denying leave to take additional discovery after the discovery cutoff where

the information "was clearly known to Defendants well in advance of the discovery cutoff…").

Accordingly, the Court should sustain these objections and exclude Exhibit C.

        The Court should also note that, because Plaintiffs issued a Subpoena to the PWGA,

**_Mr. Toberoff knew that PWGA was represented by counsel for purposes of this litigation_**.  Yet,

Mr. Toberoff circumvented PWGA's counsel and conveniently omitted from his email to the

PWGA that he was seeking the requested information in order to use it in this litigation.  In fact,

it is not clear that the PWGA's counsel has even been informed about the emails provided to

Toberoff, or that the employee even knew that her employer was represented by counsel in this

litigation.  Mr. Toberoff's tactics are highly suspect.  *See In re: Pacific Pictures Corp.*, 679 F.3d

1121, 1124 (9th Cir. 2012) ("The ethical and professional concerns raised by Toberoff's actions

will likely occur to many readers, but they are not before this court.").


Dated: June 30, 2017

                                        Respectfully submitted,


                                        By: _____

EDMUND J. FERDINAND, III (ct21287)       BONNIE E. ESKENAZI (SBN 119401)
jferdinand@24iplg.com                    BEskenazi@GreenbergGlusker.com
ALEXANDER R. MALBIN (ct29419)            JULIA R. HAYE (SBN 198138)
amalbin@24iplg.com                       JHaye@GreenbergGlusker.com
JESSICA S. RUTHERFORD (ct27273)          GREENBERG GLUSKER FIELDS
jrutherford@24iplg.com                   CLAMAN & MACHTINGER LLP
129 Post Road East                       1900 Avenue of the Stars, 21st Floor
Westport, Connecticut 06880              Los Angeles, California  90067-4590
Telephone: 203.557.4224                  Telephone:  310.553.3610
Fax: 203.905.6747                        Fax:  310.553.0687
                                         (Admission *Pro Hac Vice*)

                                         *Attorneys for Plaintiffs,*
                                         *Horror, Inc. and Manny Company*

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2017, a true and correct copy of the foregoing

**PLAINTIFFS' EVIDENTIARY OBJECTIONS TO THE DECLARATIONS OF VICTOR**

**MILLER AND MARC TOBEROFF** was filed electronically.  Notice of this filing will be sent

to those who are currently on the list to receive e-mail notices by operation of the Court's

electronic filing system. Parties may access this filing through the Court's system.


By: _Bonnie Cokenaji_ _____

| | |
|---|---|
| EDMUND J. FERDINAND, III (ct21287) | BONNIE E. ESKENAZI (SBN 119401) |
| jferdinand@24iplg.com | BEskenazi@GreenbergGlusker.com |
| ALEXANDER R. MALBIN (ct29419) | JULIA R. HAYE (SBN 198138) |
| amalbin@24iplg.com | JHaye@GreenbergGlusker.com |
| JESSICA S. RUTHERFORD (ct27273) | GREENBERG GLUSKER FIELDS |
| jrutherford@24iplg.com | CLAMAN & MACHTINGER LLP |
| 129 Post Road East | 1900 Avenue of the Stars, 21st Floor |
| Westport, Connecticut 06880 | Los Angeles, California  90067-4590 |
| Telephone: 203.557.4224 | Telephone:  310.553.3610 |
| Fax: 203.905.6747 | Fax:  310.553.0687 |
| | (Admission *Pro Hac Vice*) |

*Attorneys for Plaintiffs,*
*Horror, Inc. and Manny Company*

| From: | CMECF@ctd.uscourts.gov |
|---|---|
| To: | CMECF@ctd.uscourts.gov |
| Subject: | Activity in Case 3:16-cv-01442-SRU Horror Inc. et al v. Miller et al Objection |
| Date: | Friday, June 30, 2017 3:51:13 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

### United States District Court for the District of Connecticut

### Notice of Electronic Filing

The following transaction was entered by Eskenazi, Bonnie on 6/30/2017 at 6:50 PM EDT and filed on 6/30/2017

| | |
|---|---|
| **Case Name:** | Horror Inc. et al v. Miller et al |
| **Case Number:** | 3:16-cv-01442-SRU |
| **Filer:** | Horror Inc. |
| | Manny Company |
| **Document Number:** | 48 |

**Docket Text:**
**OBJECTION re [45] MOTION for Summary Judgment , [46] MOTION for Summary Judgment filed by Horror Inc., Manny Company. (Eskenazi, Bonnie)**


**3:16-cv-01442-SRU Notice has been electronically mailed to:**

Alexander Rudolf Malbin     amalbin@24iplg.com

Bonnie E. Eskenazi     BEskenazi@GreenbergGlusker.com, calendar@greenbergglusker.com, jgore@GreenbergGlusker.com

Edmund J. Ferdinand , III     jferdinand@24iplg.com, lauras@24iplg.com

Jessica Strom Rutherford     jrutherford@24iplg.com

John J. Martin     jhnjmartin@att.net

Julia R. Haye     JHaye@GreenbergGlusker.com, calendar@greenbergglusker.com, jgore@GreenbergGlusker.com

Marc Toberoff     mtoberoff@toberoffandassociates.com,
tlamoureux@toberoffandassociates.com

**3:16-cv-01442-SRU Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1034868047 [Date=6/30/2017] [FileNumber=5023684-0
] [028316bf1a3e8302035b23e4ddb75edc8b087c393865a6db7f08f8b389bd31483e9
1f78e4e63c98ed74b2e1975e88b04a6948592a18d0d65f5f25b56f36c4dfb]]

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

HORROR INC., a Massachusetts corporation;
and MANNY COMPANY, a Connecticut
Limited Partnership,

            Plaintiffs,

    vs.

VICTOR MILLER, an individual; and
DOES 1 through 10,

            Defendants.

---

VICTOR MILLER, an individual;

            Counterclaimant,

    vs.

HORROR INC., a Massachusetts corporation;
and MANNY COMPANY, a Connecticut
Limited Partnership; and DOES 1 through 10,

            Counterclaim-Defendants.

Case No.: No. 3:16-cv-01442-SRU

**June 30, 2017**

### DEFENDANT AND COUNTERCLAIMANT VICTOR MILLER'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Marc Toberoff (Federal Bar No. phv08515)
*mtoberoff@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Rd, Ste 50-363
Malibu, California, 90265
Telephone:(310) 246-3333
Fax: (310) 246-3101

Attorneys for Defendant and
Counterclaimant Victor Miller

As described more fully in Miller's motion for summary judgment (at 33-35), incorporated herein by reference, and as asserted in Miller's Rule 56(a)2 Response and Statement of Disputed Material Facts filed herewith, there is significant evidence that Miller wrote his Treatment, and First Draft Screenplay "on spec" in the hope that Cunningham could come up with financing, but no *guarantee* of compensation. Miller Decl., ¶¶ 6-12; Exs. A-C; Cunningham Depo., at 177:16 -178:13, Miller Decl. II, ¶ 12. Although Miller was eventually paid for his Screenplay, Miller was never compensated for his Treatment. Miller Decl., ¶ 21, Ex. D, ¶ 1; Haye Decl., Ex. N at 198; Miller Decl. II, ¶ 12; Cunningham Depo. at 155:2 -156:15; 160:5-15. Both aspects preclude a finding that the Treatment and Screenplay were "works for hire," even in the unlikely event the Court determined Miller to be an "employee" under the Act and *Reid*. Because, at a minimum, genuine issues of material fact exist regarding the timing and speculative nature of Miller's writing, Plaintiffs' Motion must be denied in any event.

The "expert report" of Plaintiffs' alleged expert William Cole, a labor layer, does nothing to change this result.  Haye Decl., Ex. J.  (the "Report"). *First*, though couched as an opinion on the custom and practices in the entertainment industry, the Report is improper under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  It consists of a labor lawyer opining on the meaning and application of a collectively bargained agreement, the WGA's MBA, and then interpreting a WGA Arbitration decision, thereby either acting as an attorney advocat in expert's clothing or improperly usurping the role of the Court. *Second,* the single arbitration decision it cites and attaches is easily distinguishable because there the writer began work *after* deal terms had been set and drafts of the writer's agreement had been exchanged by counsel, none of which is present here.

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

HORROR INC., a Massachusetts corporation;
and MANNY COMPANY, a Connecticut
Limited Partnership,

      Plaintiffs,

 vs.

VICTOR MILLER, an individual; and
DOES 1 through 10,

      Defendants.

VICTOR MILLER, an individual;

      Counterclaimant,

 vs.

HORROR INC., a Massachusetts corporation;
and MANNY COMPANY, a Connecticut
Limited Partnership; and DOES 1 through 10,

      Counterclaim-Defendants.

Case No.: No. 3:16-cv-01442-SRU

**DECLARATION OF VICTOR MILLER
IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

**June 30, 2017**

I, Victor Miller, declare as follows:

1.      I am the defendant and counterclaimant in this case. I submit this declaration in opposition to Plaintiffs' Motion for Summary Judgment, and, if called as a witness at the trial of this matter, I would and could competently testify, under oath, as to the facts contained herein, which are personally known to me.

2.      I created the character of "Jason Vorhees" ("Jason") in the treatment ("Treatment") and screenplay ("Screenplay") I wrote in 1979 underlying the 1980 film *Friday the 13th* ("Film"). While my literary material and the Film speak for themselves, I can say without equivocation that Jason is central to the story in my Treatment, Screenplay and the Film. He is the escalating mystery of the Film, unlocked in the third act of my Screenplay, the motivating force that drove his mother "Mrs. Voorhees" to insanity and to kill for him. Though believed dead from drowning due to camp counselors' neglect – the motive for revenge – I wrote Jason as a present force in the Film once he and the Film's mystery is revealed. This was done through both the use of present voiceovers (VO) (*e.g.*, "Come out, come out … wherever you are.") as Jason rises from the supernatural beyond, and by having Jason speak through Mrs. Vorhees' mouth (Lipsync)(*e.g.*, "Kill her, mommy! Kill her, mommy!"), as if she were channeling him.

3.      I wrote the final scene of the Film where Alice drifts in a canoe on an idyllic Crystal Lake, as Jason springs from the water and drags Alice below; followed by Alice abruptly waking up in the hospital from a nightmare (or perhaps, reality). Sean Cunningham ("Cunningham"), the Film's director, said he thought we needed a "chair jumper" at the end of the movie, and that's what I came up with. I don't have a copy of my final draft Screenplay which contains this final scene, and remarkably, no drafts of the screenplay, not even the Film's final shooting script, were produced in this case by Plaintiffs even though I repeatedly and specifically requested this. The closest thing to the final shooting script is the "Combined Continuity" a.k.a. "Release Dialogue Script" which tracks the Film, shot-by-shot along with the dialogue.  I therefore attach as Exhibit "H" a true and correct copy of an excerpt from the

2

"Release Dialogue Script" reflecting the Film's final scene discussed above.

4.     I envisioned Jason as abnormal and "slow" as this was part of the reason he drowned. Jason's face as he rises from the water was the handiwork of Tom Savini, the very talented special effects artist on the Film.

5.     I received sole "Written by" credit on the Film. I thereafter consistently received credit for the *Friday the 13th* characters (*e.g.*, "Based On the Characters Created by Victor Miller"), on derivative works like the sequel films *Friday the 13th Part II* (1981), *Friday the 13th Part III* (1983), *Friday the 13th: The Final Chapter (1984); Friday the 13th Part VII: Jason Takes Manhattan* (1989). *Jason X* (2001), *Freddy v. Jason* (2003), *Friday the 13th* (2009), *Friday the 13th: The Revenge* (2014), on the television mini-series *Jason Xmas* (2014-2017) and on the video game *Friday the 13th: The Game* (2017). A true and correct copy of a printout from the film and television industry website IMDbPro reflecting these "Characters by" credits is attached hereto as Exhibit "I."

6.     As a screenwriter I have always worked from my home on a freelance project-by-project basis, including with respect to *Friday the 13th* and the other films I wrote that Sean Cunningham directed and/or produced.

7.     I wrote *Here Comes the Tigers* under a pseudonym to placate Cunningham who wanted to avoid paying the WGA's minimum screenplay fees.

8.     To my knowledge, Steve Miner alone wrote a 2-page story for *Manny's Orphans*.

9.     With respect to *Friday the 13th* f. k. a. *The Long Night at Camp Blood*, Cunningham would at times make a few comments (often quite general) in the margins of my Screenplay drafts. These were notes or suggestions; Cunningham did not dictate what I should do or write; it was more a matter of friends enthusiastically bouncing ideas off of one another. With Cunningham I was free to reject his ideas or notes if I believed they did not work from a literary or dramatic point of view.

10.    I distinctly remember the genesis of *Friday the 13th*. I was in my kitchen when the phone rang, and Cunningham said let's "rip-off *Halloween*" because it was making a ton of

money at the box office.  Cunningham said a similar thing regarding the first film we worked on together, *Here Comes the Tigers*, *i.e.*, let's "rip-off the *Bad News Bears*." That was the lingo he commonly used.

11.     When writing a movie, the structure of the film is critical. I learned more about the structure and key ingredients of a suspenseful horror movie watching *Halloween* than I did from Cunningham or anyone else.

12.     I wrote the "A Long Night at Camp Blood" Treatment and first draft Screenplay in the hope that Cunningham could use this material to raise money and ultimately succeed in financing the Film, but I had at that point, no delusions, guarantees, oral or written agreement that I would be compensated if Cunningham did not succeed, which had happened before on other projects like a Clint Eastwood-type film Cunningham and I wanted to make. Even though I wrote this script in the hopes Cunningham would succeed in raising the money for it, he failed to do so and consequently I was not compensated for my material.

13.     Neither Manny nor Plaintiff Horror Inc.'s ("Horror") predecessor Georgetown Productions, Inc. ("Georgetown") paid me the residual and sequel payments which first became payable to me in 1981, despite repeated requests and demands, necessitating legal action. Even after this matter appeared to have been resolved in 1987 it was not until about 1989 that I finally got these residual and sequel payments from Paramount Pictures, not Manny, Georgetown or Horror. This dispute had nothing to do with Manny and Georgetown's non-payment of health and pension contributions, based on the amount Manny paid me for the Screenplay in 1979, which, to date, has not been paid by Manny, Georgetown, Horror or anyone else.

I declare under penalty of perjury under the laws of the United States that the above facts are true and correct, and that this declaration was executed on this 30th day of June, 2017, in California.

Victor Miller

A-666

# IMDbPro



**Photos (2)**

**Videos (1)**



**STARmeter**
**33,425**

▲ 2,476 this week

## Our Shared Credits



**See how I'm connected to Victor Miller (I).**

Claim my page

# Victor Miller (I)

Writer | Actor | Producer

| Overview | Personal Details | Media | Connections |
|---|---|---|---|

| KNOWN FOR | Friday the 13th (1980) | All My Children (1987-2006) | Freddy v |
|---|---|
| AWARDS | 7 wins & 16 nominations More » |
| BORN | May 14, 1940 (age 77) |

## Featured Images



## Filmography

| PROJECTS IN DEVELOPMENT (5 TITLES) STATUS | YEAR | BUI |
|---|---|---|
| **Rock Paper Dead: Betrayal** – Executive Producer, Writer | 2018 | Script |
| **Opening Day** – Executive Producer | 2017 | |
| **CarnieVille** – Psychologist | | |
| **Hell House** – Writer | | $ |
| | Turnaround | |
| **Rock Paper Dead: 3** – Executive Producer, Writer | | |
| | Optioned | |
| PAST FILM & VIDEO (43 TITLES) U.S. GROSS | YEAR | BUI |

A-667

| | | |
|---|---|---|
| **The Monster Project** – Special Thanks | 2017 | |
| **Dylan vs. Jason: Evil Clashes** (Short) – Very Special Thanks | 2017 | |
| **Eden Falls** – Writer | 2017 | $ |
| **Rock Paper Dead** – Man in Overalls (uncredited), Producer, Writer | 2017 | |
| **Friday the 13th: Wanted Legend** (Short) – Writer (characters) | 2015 | |
| **Friday the 13th: The Revenge** (Video) – Writer (based on a character created by) | 2014 | |
| **Unwelcome** (Short) – Uncle Ghastly | 2014 | |
| **An Unfortunate Friday the 13th Part 4** (Short) – Writer (characters) | 2012 | |
| **Nobody Gets Out Alive** – Thanks | 2012 | |
| **An Unfortunate Friday the 13th Part 3** (Short) – Writer (characters) | 2012 | |
| **Deliverance from Evil** – Actor | 2012 | |
| **#Touch** (Video) – Officer #1 | 2012 | |
| **Horror Movie: The Movie** (Short) – Writer (characters) | 2012 | |
| **Dream Weaver Chronicles Vol 3** (Short) – RIchard | 2011 | |
| **Dream Weaver Chronicles Volume 1** – Party Goer | 2011 | |
| **Voorhees (Born on a Friday)** (Short) – Special Thanks | 2011 | |
| **Close Encounter of Mahjong** – Executive Producer | 2011 | |
| **Voltage** (Short) – Special Thanks | 2011 | |
| **An Unfortunate Friday the 13th Part 2** (Short) – Writer (characters) | 2011 | |
| **A Likely Story** (Short) – Extra (uncredited) | 2011 | |
| **Freddy vs. Jason vs. Ash** (Short) – Writer (character) (uncredited) | 2011 | |

| | | |
|---|---|---|
| **Friday the 13th: Return of Jason** (Short) – Writer (characters) | 2011 | |
| **An Unfortunate Friday the 13th** (Short) – Writer (characters) | 2009 | |
| **Friday the 13th** – Writer (characters) | 2009 | $1 |
| | $65MM | |
| **A Friday the 13th Reunion** (Video) – Himself, Special Thanks | 2009 | |
| **Fresh Cuts: New Tales from Friday the 13th** (Video) – Himself, Special Thanks | 2009 | |
| **The Nightmare Ends on Halloween** (Short) – Special Thanks | 2004 | |
| **Michael Vs. Jason** (Short) – Writer (characters) | 2004 | |
| **Jason Vs. Leatherface** (Short) – Writer (characters) | 2003 | |
| **The Cold Heart of Crystal Lake** (Short) – Writer (characters) | 2003 | |
| **Freddy vs. Jason** – Writer (characters) | 2003 | $3 |
| | $82MM | |
| **Jason X** – Writer (characters) | 2001 | $1 |
| | $13MM | |
| **Friday the 13th Part VIII: Jason Takes Manhattan** – Writer (characters) | 1989 | $ |
| | $14MM | |
| **Friday the 13th Part VII: The New Blood** – Writer (characters) (uncredited) | 1988 | $2 |
| | $19MM | |
| **Jason Lives: Friday the 13th Part VI** – Writer (characters) (uncredited) | 1986 | $ |
| | $19MM | |
| **Friday the 13th: A New Beginning** – Writer (characters) (uncredited) | 1985 | $2 |
| | $21MM | |
| **Friday the 13th: The Final Chapter** – Writer (character creator) | 1984 | $2 |
| | $33MM | |

**Friday the 13th Part III** – Writer (character creator)    1982    $2

$36MM

**A Stranger Is Watching** – Writer (screenplay)    1982

**Friday the 13th Part 2** – Writer (characters)    1981    $1

$19MM

**Friday the 13th** – Writer (story), Writer    1980    $

$37MM

**Manny's Orphans** – Vice Principal, Writer    1978    $

**The Black Pearl** – Writer    1977

| PAST TELEVISION (6 TITLES) | YEAR | EPIS CO |
|---|---|---|

**Jason Xmas** (TV Mini-series) – Writer (based on a character created by) (9 episodes, 2014–2017)    2014–2017

Part 9 (Jan 13, 2017) – Writer (based on a character created by)

Part 8 (Jul 12, 2015) – Writer (based on a character created by)

Part 7 (Jan 7, 2015) – Writer (based on a character created by)

Show more

**One Life to Live** (TV Series) – Writer    1968–2013

**Guiding Light** (TV Series) – Writer (Co-head writer)    1952–2009

**All My Children** (TV Series) – Writer (associate head writer) (6 episodes, 1987–2005), Writer (3 episodes, 2005–2006), Writer (breakdown writer) (1 episode, 2005), Writer (1 episode, 2001), Writer (1 episode, 2001)    1987–2006

Episode #1.9374 (May 31, 2006) – Writer

Episode #1.9256 (Dec 15, 2005) – Writer (breakdown writer)

Episode #1.9253 (Dec 12, 2005) – Writer

Show more

**General Hospital** (TV Series) – Writer (1 episode, 2002), Writer (script writer) (1 episode, 2002)    2002

A-670

Episode #1.9994 (Apr 9, 2002) – Writer (script writer)

Episode #1.9992 (Apr 5, 2002) – Writer



**Another World** (TV Series) – Writer (associate head writer) (27 episodes, 1991–1993)     1991–1993

Episode #1.6855 (Jun 17, 1991) – Writer (associate head writer)

Episode #1.6853 (Jun 13, 1991) – Writer (associate head writer)

Episode #1.6852 (Jun 12, 1991) – Writer (associate head writer)

Show more

| SELF (6 TITLES) | YEAR | BU |
| --- | --- | --- |
| | U.S. GROSS | |
| **Crystal Lake Memories: The Complete History of Friday the 13th** (Video) – Himself - Writer | 2013 | |
| **Midnight Matinee Psycho** (Video) – Himself | 2013 | |
| **His Name Was Jason: 30 Years of Friday the 13th** (TV Movie) – Himself | 2009 | |
| **Friday's Legacy: Horror Conventions** (Video) – Self | 2009 | |
| **Return to Crystal Lake: Making 'Friday the 13th'** (Video) – Himself | 2003 | |
| **Whispers from the Shadows** (TV Series) – Himself - Host (3 episodes) | | |
| I Am the Key – Himself - Host | | |
| Jar of Mist – Himself - Host | | |
| The Treatment Room – Himself - Host | | |

| OTHER (1 TITLES) | YEAR | BU |
| --- | --- | --- |
| | U.S. GROSS | |
| **Friday the 13th: The Game** (Video Game) – Writer (based on the characters of) | 2017 | |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

HORROR INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership,

              Plaintiffs,

    vs.

VICTOR MILLER, an individual; and DOES 1 through 10,

              Defendants.

VICTOR MILLER, an individual;

              Counterclaimant,

    vs.

HORROR INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership; and DOES 1 through 10,

              Counterclaim-Defendants.

Case No.: No. 3:16-cv-01442-SRU

**DECLARATION OF MARC TOBEROFF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**June 30, 2017**

I, Marc Toberoff, declare as follows:

1.    I am counsel for Victor Miller the defendant and counterclaimant in this action. I submit this declaration in opposition to Plaintiffs' Motion for Summary Judgment ("Motion"), and, if called as a witness at the trial of this matter, I would and could competently testify, under oath, as to the facts contained herein, which are personally known to me.

2.    Attached hereto as Exhibit "O" are true and correct copies of an email exchange I had on June 26, 2017 with Jennifer Parsinault, a Manager at the PWGA Pension and Health

Plans Compliance Department, and the WGA Statements of Earnings Detail for Victor Miller that Ms. Parsinault attached to her email to me, reflecting _no contributions_ by anyone to the WGA's pension and health fund in connection with Miller's writing of _Friday the 13th_.

3.        On May 20, 2017, I took the deposition of Sean S. Cunningham ("Cunningham"), principal of Plaintiff Manny Company ("Manny") in this action. Attached hereto as Exhibit "P" are true and correct copies of excerpts from the certified copy of Cunningham's deposition transcript.

4.        Attached hereto as Exhibit "Q" are true and correct copies of excerpts from _Crystal Lake Memories: The Complete History of Friday the 13th_ by Peter Bracke, published in 2005, which book of interviews is relied upon by Plaintiffs in their Motion.

5.        Attached hereto as Exhibit "R" are true and correct copies of excerpts from the book _On Location in Blairstown: The Making of Friday The 13th_ by David Grove, which book and author is relied upon by Plaintiffs in their Motion. Sean S. Cunningham is quoted extensively in this book. Upon the Court's request, Miller will lodge a copy of this book with the Court.

6.        Attached hereto as Exhibit "S" is a true and correct copy of a document produced by Plaintiffs: a letter dated May 24, 1985 from Plaintiff Horror, Inc.'s predecessor, Belmont Management, Inc., to Sean Cunningham, Sean Cunningham Films, Ltd.

I declare under penalty of perjury under the laws of the United States that the above facts are true and correct, and that this declaration was executed on June 30, 2017, in California.

/s/ Marc Toberoff

_____

Marc Toberoff

2

A-673

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing DECLARATION OF MARC

TOBEROFF IN SUPPORT OF DEFENDANT AND COUNTERCLAIMANT VICTOR

MILLER'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT was

served electronically by the Court's ECF system and that all interested parties in this case are

registered CM/ECF users.

The undersigned declares under penalty of perjury under the laws of the United States

that the above is true and correct.

Dated: June 30, 2017                                    /s/ Marc Toberoff

                                    _____

                                    Marc Toberoff

A-674

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
 1              UNITED STATES DISTRICT COURT FOR

 2                THE DISTRICT OF CONNECTICUT

 3  HORROR INC., a Massachusetts )
    Corporation; and MANNY       )
 4  COMPANY, a Connecticut       )
    Limited Partnership          )
 5                               )
                      Plaintiffs, ) CASE NO: 3:16-CV-01442-SRU
 6                               )
    - against -                  )
 7                               )
    VICTOR MILLER, an individual;)
 8  And DOES 1 through 10,       )
    Inclusive                    )   CORRECTED TRANSCRIPT
 9                               )      JUNE 12, 2017
                     Defendant.)
10  _____)

11  VICTOR MILLER, an individual,)
                                 )
12           Counter-claimant,)
    - against -                  )
13  HORROR, INC., a Massachusetts)
    Corporation, and MANNY       )
14  COMPANY, a Connecticut       )
    Limited Partnership; and     )
15  DOES 1 through 10, inclusive.)
              Counter-Defendants.)
16  _____)

17                   DEPOSITION OF

18                  SEAN CUNNINGHAM

19              LOS ANGELES, CALIFORNIA

20                   MAY 12, 2017

21  ATKINSON-BAKER, INC. COURT REPORTERS

22  (800) 288-3376

23  WWW.DEPO.COM

24  REPORTED BY:  WHITNEY SAIZ-HARDWICK, CSR NO. 13747

25  FILE NO:  AB04F57
```

1

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-675

```
1    Complete History of Friday the 13th" by Peter Bracke,

2    foreword by Sean Cunningham.

3              (Exhibit 18 was marked for

4              identification.)

5        Do you recall this book being an exhibit in Victor

6    Miller's deposition?

7        A    Yes.

8        Q    And you wrote the foreword to this book?

9        A    Yes, I did.

10       Q    Is the author, Peter Bracke, a friend of yours?

11       A    No.

12       MS. ESKENAZI:  Objection.  Vague and ambiguous.

13   BY MR. TOBEROFF:

14       Q    He's not a friend?

15       A    We are friendly.

16       Q    Did you get a copy of this book where you wrote the

17   foreword?

18       A    No.

19       Q    Did you get a copy of the book after you wrote the

20   foreword?

21       A    Yes, I did.

22       Q    And do you recall approximately when that was?  Was

23   it shortly after it was published?

24       A    Yes.

25       Q    I assume you reviewed the book at some point; is
```

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-676

1    that correct?

2        A    That I looked at it and reviewed it that way, not as

3    a critic, but as a reader, yes, I did.

4        Q    When is the first time that you reviewed the book?

5        A    When I got it shortly after it was published.  It

6    was within a week of it's publication.

7        Q    And did you also review the book in connection with

8    this case?

9        A    Yes.  I looked at -- you know, I looked at Peter's

10   words about things that I said.

11       Q    When you looked at the book, did you also look at

12   the places you were quoted in the book?

13       A    I'm sure I did.  I don't recollect looking at

14   everything, but I looked at it.

15       Q    And you were interviewed by Peter Bracke for this

16   book?

17       A    I was.

18       Q    How many times?

19       A    I don't recall.

20       Q    But you recall at least being interviewed once?

21       A    Yes.

22       Q    And after you were originally interviewed, were you

23   interviewed again with some follow-up questions?

24       A    Not that I recall.

25       Q    Now, when you reviewed the book, you mentioned that

19

Sean Cunningham
May 12, 2017

TOBEROFF EX. P

A-677

1   you read some of the things you said, did you also read the

2   things that Victor Miller said regarding the genesis of the

3   "Friday the 13th" movies?

4        A    Yes, I did.

5        Q    Sometimes in this deposition -- by the way, I'm

6   going to be referring to the film.  I don't want to keep --

7   that refers to the "Friday the 13th" movie that was released

8   it 1980.  Obviously the contacts -- I'm going to go over your

9   background so I can be referring to other films.  When I say

10  "the film" I'm talking about the "Friday the 13th" film

11  released in 1980.

12            Do you understand that?

13       A    I do.

14       Q    After reading this book, did you write to Peter

15  Bracke complaining that something in the book is inaccurate?

16       A    I did not.

17       Q    Did you call him and complain that something in the

18  book was inaccurate?

19       A    I did not.

20  MR. TOBEROFF:  I'd like to mark as Exhibit 19 the cover

21  of another book entitled "On Location in Blairstown:  The

22  making of Friday the 13th" by David Grove with a foreword by

23  Tom Savini.

24            (Exhibit 19 was marked for

25            identification.)

20

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
**www.depo.com**

1       MS. ESKENAZI:  Objection.  It's vague and ambiguous.

2  Lacks foundation.

3       THE WITNESS:  I don't know why people would do it.

4  BY MR. TOBEROFF:

5       Q    You have no idea?

6       A    I don't know.

7       Q    Was "The Art of Marriage" a white coater,

8  Mr. Cunningham?

9       MS. ESKENAZI:  Objection.  Vague and ambiguous.

10       THE WITNESS:  As I understand it, yes.

11  BY MR. TOBEROFF:

12       Q    So in the context of "The Art of Marriage," what

13  does white coater really mean?

14       MS. ESKENAZI:  Objection.  It's been asked and answered.

15  BY MR. TOBEROFF:

16       Q    You can answer.

17       MS. ESKENAZI:  You can answer again.

18       THE WITNESS:  A white coater refers to a person who comes

19  out, as an expert or as a doctor, wearing a white coat that

20  speaks to the audience, and then shows footage to support

21  whatever he was talking about.

22  BY MR. TOBEROFF:

23       Q    Aren't you missing a very important part of the

24  description of what a white coater means?

25       A    I don't think so.

28

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

Atkinson-Baker Court Reporters
www.depo.com

```
 1        Q    You don't think so?
 2        MS. ESKENAZI:  Objection.  Argumentative.
 3   BY MR. TOBEROFF:
 4        Q    There is --
 5        MS. ESKENAZI:  "You don't think so" is a question?
 6        MR. TOBEROFF:  Please stop coaching the witness.  You're
 7   talking more than the witness in this case.
 8        MS. ESKENAZI:  Objection.  Asked and answered.
 9             You can answer, again.
10   BY MR. TOBEROFF:
11        Q    Mr. Cunningham, doesn't a white coater really mean
12   that you're showing a hardcore triple X-rated porn movie, but
13   you're doing it under the guise of a medical documentary to
14   preserve -- to be able to say you're exercising your First
15   Amendment rights?  Isn't that what a white coater is?  Come
16   on.  You were in the porn business.
17        MS. ESKENAZI:  Objection.  Misstates the testimony.
18   Vague and ambiguous.  Argumentative.
19        THE WITNESS:  No.
20   BY MR. TOBEROFF:
21        Q    So a white coater isn't selling a porn movie as an
22   educational or medical movie?  That's not what white coater
23   means?
24        MS. ESKENAZI:  Objection.  Vague and ambiguous.
25   Misstates the testimony.  And asked and answered.
```

29

Sean Cunningham
May 12, 2017

TOBEROFF EX. P

A-680

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
1        Q    Did you make money from the film?

2        A    Yes, we did.

3        Q    A lot of money?

4        MS. ESKENAZI:  Objection.  Vague and ambiguous.

5        THE WITNESS:  My feeling was that we made a lot of money.

6   BY MR. TOBEROFF:

7        Q    Did you actively market the film?

8        MS. ESKENAZI:  Objection.  Irrelevant.

9        THE WITNESS:  No.

10  BY MR. TOBEROFF:

11       Q    Not at all?

12       MS. ESKENAZI:  Objection.  Vague and ambiguous.

13  BY MR. TOBEROFF:

14       Q    Did you participate in the marketing of the film?

15       A    There was no marketing of the film, as we understand

16  it.

17       Q    Did you participate in publicity for the film?

18       A    I did not.

19       Q    Now, after that film, you were involved in a film

20  entitled "Together" which is listed as being released in

21  1970; is that correct?

22       A    Yes, I'm sorry.  It's listed as '71.

23       Q    Oh, excuse me.  1971.  And it says here you were the

24  director, producer, and the writer of that film; is that

25  correct?
```

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
www.depo.com

1       Q     And Marilyn Chambers is the same Marilyn Chambers

2    that did "Behind the Green Door" and became a porn star?

3       A     Subsequent to "Together," yes.

4       Q     How did you meet her?

5       A     My brother used to date her.  And her sister -- and

6    we were family -- were friends.

7       Q     So after the film was introduced by your father

8    playing the part of a counselor who gives advice on

9    relationships, did the film feature a lot of sex?

10      A     It did.

11      Q     Isn't it correct that the film features an explicit

12   scene where Marilyn Chambers takes a flower and uses it to

13   caress a large, flaccid, black penis until it gradually

14   becomes erect?

15      A     No.

16      Q     Nothing like that scene is in the picture?

17      A     Something like that is in the picture.

18      Q     Describe the scene.

19      A     You just described it, but it is not Marilyn

20   Chambers.

21      Q     Who is it?

22      A     An actor, but I don't know the name.

23      Q     So the description of the scene is correct, but it's

24   an actress's name you forget?

25      A     That's correct.

41

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
www.depo.com

```
1        THE WITNESS:  I think that "The Art of Marriage" would be
2   classified as soft porn.
3   BY MR. TOBEROFF:
4        Q    Soft porn?
5        A    Uh-huh.
6        Q    Is it your testimony today that you've never been
7   involved in a porn film?
8        MS. ESKENAZI:  Objection.  Vague and ambiguous.
9        THE WITNESS:  No.
10  BY MR. TOBEROFF:
11       Q    What porn film or films have you been involved in?
12       A    I was around people who made pornographic films.
13  And there was one film called "Fireworks Woman" that I spent
14  a bunch of time working on.  And another film called "The
15  Case of the Full Moon Murders," in which also had
16  pornographic elements in it.
17       Q    So the "Fireworks Woman," that was produced in 1975?
18       A    I don't remember.  That sounds late, but I don't
19  remember the exact date.
20       Q    Sometime in the --
21       A    In the mid-'70s.
22       Q    Early to mid-'70s?
23       A    Yeah.
24       Q    And you produced that film, essentially?
25       A    Which?
```

43

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

1      A    Yes.

2      Q    And alternative titles of that were "The Case of the

3   Smiling Stiffs," have you ever heard that alternative title?

4      A    No, I haven't.

5      Q    How about a working title for that film, called

6   "Silver C," have you ever heard that title?

7      A    Yes, I recall "Silver C."

8      Q    What does the "C" stand for?

9      A    I believe it meant silver cock.

10     Q    Now, you worked on that with Steve Miner?

11     A    Yes, yes.

12     Q    In Miami?

13     A    Yes, in southern Florida.

14     Q    Well, briefly, can you summarize the premise of that

15   movie?

16     A    The premise of that movie was that there was a

17   special seductive vampire that would take her victims and get

18   them off in such a way that it was more than they could take

19   and they would die in full erection.

20     Q    Isn't it essentially about a vampire who kills guys

21   by giving them fellatio?

22     A    Yes.

23     Q    I have it that that picture was released in 1973,

24   does that sound right?

25     A    That sounds approximately right, yes.

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-684

**Atkinson-Baker Court Reporters**
**www.depo.com**

1      A    I don't remember.

2      Q    Does that sound familiar?

3      A    I don't remember.

4      MS. ESKENAZI:  Asked and answered.

5      THE WITNESS:  It does not sound familiar, but it sounds

6  funny to me.

7  BY MR. TOBEROFF:

8      Q    But you kept your name off the film; is that

9  correct?

10      A    I can't recall.  I believe so.

11      Q    How did the "Fireworks Woman" project come about?

12      MS. ESKENAZI:  Objection.  Lacks foundation.

13      THE WITNESS:  I don't know.  I wasn't part of it.

14  BY MR. TOBEROFF:

15      Q    What was the budget of that film?

16      MS. ESKENAZI:  Objection.  Lacks foundation.

17      THE WITNESS:  I don't know.

18  BY MR. TOBEROFF:

19      Q    Do you know who financed it?

20      MS. ESKENAZI:  Objection.  Lacks foundation.

21      THE WITNESS:  I do not know.

22  BY MR. TOBEROFF:

23      Q    Let's talk about the other film you mentioned.  I

24  think you said "Case of the Full Moon Murders"; is correct

25  that?

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-685

**Atkinson-Baker Court Reporters**
**www.depo.com**

1      A    Yes.

2      Q    And alternative titles of that were "The Case of the

3   Smiling Stiffs," have you ever heard that alternative title?

4      A    No, I haven't.

5      Q    How about a working title for that film, called

6   "Silver C," have you ever heard that title?

7      A    Yes, I recall "Silver C."

8      Q    What does the "C" stand for?

9      A    I believe it meant silver cock.

10     Q    Now, you worked on that with Steve Miner?

11     A    Yes, yes.

12     Q    In Miami?

13     A    Yes, in southern Florida.

14     Q    Well, briefly, can you summarize the premise of that

15   movie?

16     A    The premise of that movie was that there was a

17   special seductive vampire that would take her victims and get

18   them off in such a way that it was more than they could take

19   and they would die in full erection.

20     Q    Isn't it essentially about a vampire who kills guys

21   by giving them fellatio?

22     A    Yes.

23     Q    I have it that that picture was released in 1973,

24   does that sound right?

25     A    That sounds approximately right, yes.

46

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
www.depo.com

```
 1    "Together," which was released in 1971, did you have a

 2    production company at that time?

 3         A    I think so.

 4         Q    What do you believe the name of that company was?

 5         A    Sean S. Cunningham Films Limited.

 6         Q    When was Sean S. Cunningham Films Limited

 7    established?

 8         A    1971.

 9         Q    Where?

10         A    Delaware.

11         Q    Were you the sole shareholder?

12         A    I was.

13         Q    Does that company still exist today?

14         A    Yes.

15         Q    Are you the sole shareholder today?

16         A    Yes.

17         Q    Are you the sole officer?

18         A    Yes.

19         Q    Are you the sole director?

20         A    Yes.

21         Q    Has Sean S. Cunningham Films Incorporated ever been

22    a signatory to the Writer's Guild of America?

23         A    I don't believe so.

24         Q    In this deposition, I'm going to refer to the

25    Writers Guild of America as the WGA.  And at times I may
```

**Sean Cunningham**
May 12, 2017

TOBEROFF EX. P

A-687

1    Q    Okay.  How did this film come about?

2    A    It came about when Hallmark, the guys from Hallmark

3  offered to finance another movie, if there was something that

4  we might want to do that would be consistent with trying to

5  get drive-in audiences.  And Wes and I were delighted to say

6  yes, and then go about figuring it out.

7    Q    What was the budget of "Last House on the Left"

8  approximately?

9    A    Approximately, I think around $19,000, but that

10  would include a blow up and other expenses.  I think the core

11  expenses were closer to 50 or 55.

12    Q    And who put up that money?

13    A    Hallmark.

14    Q    So just to be clear, Hallmark Releasing Corporation

15  was a company whose principals were Robert Barsamain, Steve

16  Minasian, and Phil Scuderi?

17    MS. ESKENAZI:  Lacks foundation.  Calls for speculation.

18    THE WITNESS:  The three gentleman named were responsible

19  for financing it.  Whether it belongs to Georgetown or not, I

20  don't know.

21  BY MR. TOBEROFF:

22    Q    Were they also engaged -- did Hallmark own theaters?

23    A    I don't know.

24    MS. ESKENAZI:  Objection.  Calls for speculation.  Lacks

25  foundation.

50

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
**www.depo.com**

1    the girls who was murdered.

2         Q    Were they raped before being murdered?

3         A    Yes -- or they were certainly abused.

4         Q    Was one of the alternate titles of "Last House on

5    the Left, "Sex Crimes of the Century"?

6         A    Yes.

7         Q    Do you recall a poster depicting a naked woman with

8    her throat slashed and blood dripping down between her

9    breasts for this film?

10        A    I don't recall.

11        Q    Do you recall a poster like that?

12        MS. ESKENAZI:  Objection.  Asked and answered.

13        THE WITNESS:  I really don't recall.

14   BY MR. TOBEROFF:

15        Q    Did you direct and produce a film called "Here Come

16   the Tiger"?

17        A    Yes.

18        Q    That's listed as being released in 1978.

19        A    That sounds right.

20        Q    Is that right?

21        A    I think so.

22        Q    How did this film project come about?

23        A    It came about when Phil Scuderi reached out to me, I

24   guess, in the fall of -- late summer of '77 and asked me if I

25   had seen "Bad News Bears."  And that he was interested in

                                                              55

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-689

1   doing a -- you know, basically a ripoff of "Bad News Bears,"

2   could I do that.  I said sure, and three weeks later we were

3   shooting.

4       Q    And I forgot to ask you, on the -- prior to that the

5   film you did with Phil Scuderi and his company, what was the

6   relationship like?  What was your experience like with him?

7       MS. ESKENAZI:  Objection.  Vague and ambiguous.

8   Compound.

9       THE WITNESS:  It was a mixed bag, but it was friendly.

10  BY MR. TOBEROFF:

11      Q    Well, why do you say a mixed bag?

12      A    Phil would often promise money and not be able to

13  deliver it on time.  And if we had disagreements, it was

14  usually about him owing money and not paying it.

15      Q    Why do you believe he wasn't able to pay bills on

16  time?

17      MS. ESKENAZI:  Objection.  Calls for speculation.  Lacks

18  foundation.

19  BY MR. TOBEROFF:

20      Q    Do you have an understanding as to why he didn't pay

21  bills on time?

22      A    I have an understanding that he had a long history

23  of it.  Why he insisted on not paying bills, I don't know.

24      Q    I have read that people -- there's a reputation that

25  Phil Scuderi or his entities are tied to the mob.  Are you

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
**www.depo.com**

1     Q    Let me rephrase that.

2          Did Phil Scuderi and his partners ever use another

3     company to finance films of yours?

4     A    Phil Scuderi, in my experience, had a habit of using

5     different corporations to finance whatever he was doing.  I

6     couldn't speak to which ones did what, but it was not a

7     consistent -- checks did not consistently come from one

8     source.

9     Q    What other company did he use?

10    A    I remember Belmont being a company.  You've got

11    Hallmark, Georgetown, Belmont.  The rest just go out of my

12    head.

13    Q    And by Georgetown, you're referring to Georgetown

14    Productions, Inc.?

15    A    I think so, yeah.

16    Q    When they didn't pay their bills on time, did that

17    cause problems for you as a producer?

18    A    Yes, it did.

19    Q    What kind of problems?

20    A    I couldn't pay my bills.

21    Q    And you couldn't pay your crew?

22    A    It would happen on the day, you know, but they're

23    problems.

24    Q    And was that a repeated experience with them?

25    MS. ESKENAZI:  Objection.  Vague and ambiguous.

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
**www.depo.com**

1      THE WITNESS:  We had a lot of difficulty with the cash

2   flow on "Friday the 13th."

3   BY MR. TOBEROFF:

4      Q    And how about on "The Last House on the Left"?

5      A    I don't remember them being as severe as they were

6   on "Friday the 13th."

7      Q    But you had cash flow problems with them?

8      A    Yes.

9      Q    And I believe you mentioned before "Last House on

10  the Left" they financed another film.  Was it "Together"?

11     A    They did not finance it, they distributed it.

12     Q    Did you have any cash problems with them with

13  respect to distributing "Together"?

14     A    No.

15     Q    So going back to "Here Come The Tigers", who wrote

16  the script?

17     A    Victor Miller.

18     Q    Were you friends with Victor Miller before "Here

19  Come The Tigers"?

20     A    Yes, we were friends.  Victor lived near me and I

21  had met him couple, three years earlier through a friend of

22  mine that had worked on "Black Pearl" and he was a funny,

23  charming guy that I stayed in touch with.

24     Q    So you met him approximately 1975, three years

25  earlier?

60

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

Atkinson-Baker Court Reporters
www.depo.com

```
1        A    Yes.

2        Q    And who was your mutual friend?

3        A    Brud, B-R-U-D, Talbot.

4        Q    That's Bruce Talbot, known as Brud?

5        A    He was always known as Brud.

6        Q    So you and Victor both lived in the same town?

7        A    No.  But nearby in Connecticut.

8        Q    Where did you live?

9        A    I lived in Westport and Victor lived in, I believe,

10   Stratford.

11       Q    How long would it take to drive to each other's

12   houses?

13       A    I don't recall.  About 20 minutes.

14       Q    What was your address in Westport, Connecticut?

15       A    At the time of "Here Come the Tigers," it was 155

16   Long Lots Road, L-O-N-G, L-O-T-S, Road.

17       Q    Westport, Connecticut?

18       A    Yes, sir.

19       Q    Now, by the time you first met Miller, was that

20   approximately 1975, he had written a number of detective

21   novels at that point?

22       MS. ESKENAZI:  Objection.  Lacks foundation.  Calls for

23   speculation.

24       THE WITNESS:  I don't recall what he had written, but he

25   was a writer.
```

61

Sean Cunningham
May 12, 2017

TOBEROFF EX. P

```
1   producing the film?

2       A    Probably not.

3       Q    Now, did Victor Miller write a treatment for "Here

4   Come the Tigers" before he wrote the script?

5       A    I don't recall.

6       Q    But he wrote a screenplay?

7       A    He did.

8       Q    Do you recall how many drafts?

9       A    No, I do not.

10      Q    And was he paid before he started writing or at some

11  point after?

12      A    I don't recall, but he was paid a small amount of

13  money to get started.  And as I said earlier, the whole --

14  from beginning to end was three weeks.

15      Q    So was "Here Come the Tigers" a nonunion independent

16  production?

17      A    Yes.

18      Q    What's the difference between a nonunion film and a

19  union film, if you know?

20      MS. ESKENAZI:  Objection.  Calls for a legal conclusion.

21  BY MR. TOBEROFF:

22      Q    You can answer.

23      A    Generally speaking, nonunion films are cheaper than

24  union films because you are not paying as much for your crew.

25      Q    Is that the reason people make a nonunion film as
```

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-694

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
 1    opposed to a union film?
 2        MS. ESKENAZI:  Objection.  Calls for speculation.  Lacks
 3    foundation.
 4        THE WITNESS:  I don't know.
 5    BY MR. TOBEROFF:
 6        Q    Is that the reason you would produce a nonunion
 7    film -- or produced a nonunion film --
 8        A    Yes.
 9        Q    -- as opposed to a union film?
10        A    Yes.
11        Q    What's the benefit of producing a -- you mentioned
12    the benefit of producing a nonunion film.  What's the benefit
13    of producing a union film?
14        MS. ESKENAZI:  Objection.  Calls for a legal conclusion.
15    BY MR. TOBEROFF:
16        Q    You can answer.
17        A    Speaking from my own experience, usually the people
18    that you would like to hire are in one of the unions or
19    guilds, and so that if you have enough money, you get to hire
20    the people you want.
21        Q    Do you believe that the -- you can get a higher
22    caliber of talent on a film if it's a union film?
23        A    Generally I believe that to be true.
24        Q    Did you become a closer friend of Victor Miller
25    during the development and production of "Here Come the
```

65

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-695

**Atkinson-Baker Court Reporters**
**www.depo.com**

1   opposed to a union film?

2      MS. ESKENAZI:  Objection.  Calls for speculation.  Lacks

3   foundation.

4      THE WITNESS:  I don't know.

5   BY MR. TOBEROFF:

6      Q   Is that the reason you would produce a nonunion

7   film -- or produced a nonunion film --

8      A   Yes.

9      Q   -- as opposed to a union film?

10      A   Yes.

11      Q   What's the benefit of producing a -- you mentioned

12   the benefit of producing a nonunion film.  What's the benefit

13   of producing a union film?

14      MS. ESKENAZI:  Objection.  Calls for a legal conclusion.

15   BY MR. TOBEROFF:

16      Q   You can answer.

17      A   Speaking from my own experience, usually the people

18   that you would like to hire are in one of the unions or

19   guilds, and so that if you have enough money, you get to hire

20   the people you want.

21      Q   Do you believe that the -- you can get a higher

22   caliber of talent on a film if it's a union film?

23      A   Generally I believe that to be true.

24      Q   Did you become a closer friend of Victor Miller

25   during the development and production of "Here Come the

65

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

1   Tigers"?

2       MS. ESKENAZI:  Objection.  Vague and ambiguous.

3       THE WITNESS:  With "Here Come the Tigers," Victor and I

4   began a long and close friendship which started with "Here

5   Come the Tigers."

6   BY MR. TOBEROFF:

7       Q    Did you regard him as a skilled writer?

8       MS. ESKENAZI:  Objection.  Vague and ambiguous.  At what

9   point in time?

10  BY MR. TOBEROFF:

11      Q    When you asked him to write "Here Come the Tigers."

12      A    Victor made -- Victor told me that he made his

13  living by writing and he was a good guy.  So when Phil asked

14  me to -- if there was a way to do "Here Come the Tigers," I

15  asked Victor who was the only writer I knew that lived close

16  to me, if he'd be interested in writing the movie under these

17  conditions.  Victor said, Yes, what the hell.

18      Q    At that point in time did you have an office, or

19  were you working out of your house?

20      A    I had a home office at that time.

21      Q    Where was that?

22      A    In Connecticut.

23      Q    In your home in Connecticut?

24      A    Uh-huh.

25      Q    Where in your home was it located?

66

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
www.depo.com

1    he was nervous as a cat about it, because he had kids and a

2    wife and needed health insurance and all of the benefits that

3    come from being a member.  I was fine with that, that I would

4    hire him as a guild member, that I would sign with the guild

5    through the Manny Company and he would have all of the

6    benefits that he was entitled to.  So that's why or how I

7    became a guild member with Victor.

8         Q    And is the budget differential between the two films

9    a factor in that as well?

10        A    Yes.

11        Q    Is the Manny Company -- does it still exist today?

12        A    Yes.

13        Q    Do you -- what's the difference between Sean S.

14   Cunningham Films Inc. and the Manny Company in terms of your

15   use of these companies?

16        MS. ESKENAZI:  Objection.  Vague and ambiguous.

17   BY MR. TOBEROFF:

18        Q    Let me -- the Manny Company was established to

19   produce "Manny's Orphans"; correct?

20        A    Uh-huh.

21        Q    After "Manny's Orphans" did you continue to use it

22   to produce films?

23        A    I used it on "Friday the 13th."

24        Q    Any other films?

25        A    Not to my recollection.

79

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-698

**Atkinson-Baker Court Reporters**
**www.depo.com**

1    Q    And did the limited partners participate -- in the

2    Manny Company in "Friday the 13th"?

3    A    They did not.

4    Q    Did they -- do you know how that works, that you use

5    the Manny Company to produce "Friday the 13th," but the

6    limited partners didn't financially participate in "Friday

7    the 13th"?

8    MS. ESKENAZI:  Objection.  Vague and ambiguous.  Lacks

9    foundation.  Calls for speculation.

10   THE WITNESS:  Did you ask me how it works?

11   BY MR. TOBEROFF:

12   Q    Yeah.  I would --

13   A    I don't know --

14   Q    What I mean is, if the Manny Company was a

15   production company used on "Friday the 13th," how can it be

16   that the limited partners didn't participate in it

17   financially?

18   MS. ESKENAZI:  Same objections.  Calls for speculation.

19   Lacks foundation.  Calls for a legal conclusion.

20   BY MR. TOBEROFF:

21   Q    You can answer.

22   A    The Manny Company -- I thought of the Manny Company

23   as a company, as an entity.  And when Victor and I decided to

24   go forward with "Friday the 13th," we decided to use the

25   Manny Company because it was already a signatory and he had

80

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-699

**Atkinson-Baker Court Reporters**
**www.depo.com**

1    already filed one of his contracts with the Manny Company.

2    So it was in place for our deal with the Writer's Guild, and

3    that was the reason we used it.

4       Q    So you used the Manny Company and "Friday the 13th"

5    because it was a guild signatory basically?

6       A    Yes.

7       Q    Do you file tax returns every year for the Manny

8    Company?

9       A    I do not.

10       Q    Do you know whether the Manny Company is still

11    actually in existence today?

12    MS. ESKENAZI:  Objection.  Asked and answered.

13    THE WITNESS:  Huh?

14    MS. ESKENAZI:  It's been asked and answered.

15    THE WITNESS:  Yes, it still exists today.

16    BY MR. TOBEROFF:

17       Q    What makes you think that?

18       A    Bonnie told me.

19    MS. ESKENAZI:  We're going to strike that.  And remember

20    any discussions that you have with lawyers are not part of

21    this proceeding.

22    BY MR. TOBEROFF:

23       Q    Aside from that, do you have any other basis for

24    your conclusion?

25       A    No.

81

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
 1          Short answer is:  I don't remember a treatment on
 2     "Manny's Orphans," but I remember a lot of work on it.
 3          Q    Do you remember the script going through more than
 4     one draft?
 5          A    Yes.
 6          Q    Do you recall approximately --
 7          A    No.
 8          Q    Do you have a recollection of how many drafts?
 9          A    No.
10          Q    And Victor wrote the screenplay -- was Victor still
11     a freelance writer at that time?
12          MS. ESKENAZI:  Objection.  Vague and ambiguous as to the
13     meaning of freelance.
14          MR. TOBEROFF:  Don't coach the witness.
15          MS. ESKENAZI:  Vague and ambiguous as to the meaning of
16     freelance --
17          MR. TOBEROFF:  That's all you have to say.
18          THE WITNESS:  I'm sorry.  The question was?
19     BY MR. TOBEROFF:
20          Q    Was he still working as a freelance writer at that
21     time, out of his house?
22          MS. ESKENAZI:  Objection.  Vague and ambiguous.
23          THE WITNESS:  When I --
24     BY MR. TOBEROFF:
25          Q    It's a "yes" or "no" question.
```

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
www.depo.com

1      MS. ESKENAZI:  If you don't --

2      THE WITNESS:  I don't know.  I don't know what a

3   freelance writer means.

4   BY MR. TOBEROFF:

5      Q    You have no idea what that means?

6      A    I have no idea what you mean by it.

7      Q    What do you mean by it?

8      A    I don't know.

9      Q    You don't -- what do you think it means?

10      MS. ESKENAZI:  Assumes facts not in evidence that he has

11   any understanding of what the question is.

12   MR. TOBEROFF:  Stop coaching the witness.

13   BY MR. TOBEROFF:

14      Q    What do you think it means?

15      MS. ESKENAZI:  If you have an understanding, you can give

16   it to him.

17      THE WITNESS:  Well, I guess by freelance I -- if I were

18   using the word "freelance", it would be whether or not

19   somebody is available to work for me or if they have other

20   commitments.  It they're not free, then they're not free,

21   they have other commitments.  But if you don't have

22   commitments, then you're free to make your own decisions

23   about where you work and with whom you work.

24   BY MR. TOBEROFF:

25      Q    So would you consider a traditional employee who

**Sean Cunningham**
May 12, 2017

TOBEROFF EX. P

A-702

**Atkinson-Baker Court Reporters**
**www.depo.com**

1  gets paid an annual salary and reports to work at 9:00 to

2  5:00 a freelancer?

3      MS. ESKENAZI:  Objection.  Calls for legal conclusion.

4  BY MR. TOBEROFF:

5      Q    You wouldn't call that a freelancer, would you?

6      MS. ESKENAZI:  Objection.  Calls for legal conclusion.

7  It's also vague and ambiguous.

8  BY MR. TOBEROFF:

9      Q    I'm asking your understanding.  You can answer.

10     A    I think --

11     MS. ESKENAZI:  Also calls for speculation and lacks

12  foundation.

13     THE WITNESS:  My understanding of a freelance writer is

14  what I told you.  And if somebody works 9:00 to 5:00 at a

15  company, they work from 9:00 to 5:00 at a company, but that

16  would have nothing to do with the original discussion we had

17  about being a freelance writer.

18  BY MR. TOBEROFF:

19     Q    But you wouldn't call somebody who works a 9:00 to

20  5:00 job who gets paid a yearly salary, a freelancer, would

21  you?

22     MS. ESKENAZI:  He answered your question.  You want him

23  to answer it again?  And same objections.  Lacks foundation.

24  Calls for speculation.  Calls for legal conclusion.

25     THE WITNESS:  If somebody worked for me on a 9:00 to 5:00

85

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
www.depo.com

1      A    It did not do well.

2      Q    Did you make much money on "Manny's Orphans"?

3      A    I did not.

4      Q    So we're now in, I guess, 1977, 1978.  How many --

5    you were married at the time; correct?

6      A    Uh-huh.

7      Q    And you mentioned you had four children.  Did you

8    have four children at the time?

9      A    I did not; I had two children at the time.

10     Q    How did you -- did you support yourself by doing

11   other jobs?  We've gone over some of these films.  Did you

12   have other jobs to support yourself?

13     A    At this point, no.  I just did -- I just did "Here

14   Come the Tigers" and "Manny's Orphans."  I didn't have any

15   supplemental jobs.

16     Q    Were you finding it difficult to support your family

17   with the modest income that came in from those films?

18     A    I could support my family, but I certainly would

19   have been comfortable if I had more money.

20     Q    I believe Victor Miller testified that both of you

21   were pretty broke at the time.  Is that fair to say?

22     A    Yes.

23     Q    So having done two films with Victor, were you

24   closer friends at this period of time after the conclusion of

25   "Manny's Orphans"?

**Sean Cunningham**
May 12, 2017

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
www.depo.com

```
 1        A    No.  But I considered him a good friend.
 2        Q    Did you have a best friend at that particular point
 3   in time?
 4        A    No, but I had other social contacts.
 5        Q    Would you say he was one of your closest friends at
 6   that time?
 7        A    Yes.
 8        Q    Now, we spoke about two films that you did with
 9   Victor that got made.  Did you develop any films with Victor
10   that didn't get made?
11        A    Yes.
12        Q    What films were that?
13        A    I don't remember the names, but I know that there
14   was -- we tried to do a Clint Eastwood script, which is to
15   say some version of a "Dirty Harry" story, not necessarily
16   for Clint Eastwood, but on that model.
17        Q    What was the title of that?
18        A    I can't remember for the life of me.
19        Q    Did you write a script for that?
20        A    We --
21        Q    Or I should say, did Victor write a script for that?
22        A    Yes, he did as I -- I think we did get a script on
23   that.  And I think we did get a script on a novel that Victor
24   was writing about kids in a school bus getting kidnapped,
25   but -- and I think that may have had the title "Blue Bird."
```

93

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
1       Q    So we'll call it the Clint Eastwood movie, even

2    though Clint wasn't in it, or the "Dirty Harry" type of

3    movie.  The "Dirty Harry" type of movie, did you submit the

4    script, Victor's script, to try and get it financed?

5       A    Yes, I did.  In a very limited way.

6       Q    What do you mean by "limited"?

7       A    I didn't have a lot of people to submit it to.  And

8    it didn't -- you know, had some agents and a lawyer in New

9    York, and they read it and it was -- didn't get a warm

10   reception.

11      Q    Did you give it to Phil Scuderi or any member of his

12   group?

13      A    I don't recall.

14      Q    What about the second one, the "Blue Bird" projet,

15   kids in a school bus, did you try and get that financed?

16      A    I did.  I'm just at a loss for dates because that

17   could have been after "Friday the 13th."  I just don't

18   remember exactly when we worked on it, but it was just

19   another movie I know that we worked on that did not get

20   produced.

21      Q    That's okay.  I don't need the date right now.

22           But do you remember who you gave -- do you remember

23   working on trying to get that movie financed?

24      A    I do remember the event, but I don't remember the

25   details.
```

94

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
www.depo.com

```
 1      Q    W-Y-M-A-N?

 2      A    (Inaudible response.)

 3      Q    What's his firm's name?

 4      A    He just moved from -- his practice used to be called

 5  Wyman and Isaacs, and they just moved into -- I'm drawing a

 6  blank.  I'm sure that you have it.

 7      Q    And where is he located?

 8      A    I know that you guys have talked.

 9      Q    Where is he located?

10      A    Downtown Los Angeles.

11      Q    Let's talk about the film released in 1980 under the

12  title "Friday the 13th," which again sometimes I'll refer to

13  it as "the film" during this line of questioning.

14      A    Uh-huh.

15      Q    You directed and produced "Friday the 13th"?

16      A    I did.

17      Q    What inspired you to make the film?

18      A    I wanted to work on a movie that I could get

19  financed and distributed.

20      Q    That was your objective?

21      A    Uh-huh.

22      Q    To make money?

23      A    Yeah.

24      Q    Would you say that was the objective with the prior

25  films that we spoke about?
```

98

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
www.depo.com

```
 1   BY MR. TOBEROFF:
 2       Q    What do you mean by that?
 3       A    Films at that point, that point in time, were not
 4   generally released nationally, they were released on a
 5   territory-by-territory basis, and you could release a movie
 6   in one territory, say New England and it might or might not
 7   include Boston, and you'd spend whatever money you spent to
 8   open it with ads and posters and your title.  And if it did
 9   okay, then you would have some more money and you might have
10   enough money to go to a larger territory, like Cleveland or
11   Gainesville, and try it again, to build on what you learned
12   on a territory-by-territory basis and you try to find what
13   audiences responded to and how to build an audience.  It was
14   the way films had been traditionally released up to that
15   point.
16       Q    "Halloween" was released in October of 1978; does
17   that sound about right to you?
18       A    It sounds about right, but I couldn't be sure.
19   Yeah, that sounds right.
20       Q    Did you see it in or about that time?
21       A    I certainly -- I must have, yes.
22       Q    After you saw "Halloween" and wanted to do another
23   horror film, what did you contemplate the budget of your new
24   horror film to be roughly?  You mentioned low budget.  What
25   did you have in mind?
```

101

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-708

**Atkinson-Baker Court Reporters**
www.depo.com

```
 1      A    After seeing "Halloween," I, you know, I filed away

 2    the information and it just hung around in my head about

 3    trying to make a movie called "Friday the 13th," trying to

 4    make it well, trying to figure out a budget.  If I went down

 5    that road and trying to figure if I could get the money to do

 6    another horror film, if I choose to do it.

 7      Q    At this time -- so when did your work on the prior

 8    film "Manny's Orphans" conclude?

 9      A    My recollection is that it was -- that it was

10    optioned by United Artists in the spring of 1979, I'm pretty

11    sure of that date.

12      Q    When did you finish shooting "Manny's Orphans"?

13      A    I think in late '78, might have been the summer of

14    '78.

15      Q    And "Manny's Orphans" was released in 1978, wasn't

16    it?

17      A    Yes.  But it wasn't released, you know, by a regular

18    distributor, it wasn't -- you know, not even AIP picked it

19    up.

20      Q    And after "Manny's Orphans" between the "Manny's

21    Orphans" and "Friday the 13th," did you work on any other

22    films?

23      MS. ESKENAZI:  Objection.  Vague and ambiguous.

24      THE WITNESS:  By that, did you mean did I think of doing

25    another film besides "Friday the 13th"?  The answer is yes,
```

107

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-709

**Atkinson-Baker Court Reporters**
**www.depo.com**

1    just looking for any ideas that would enable us to keep, you

2    know, to keep the gang together.

3    BY MR. TOBEROFF:

4        Q    Did you actively develop any other films?

5        A    No.

6        Q    So during the period from when you stopped shooting

7    "Manny's Orphans" until you started developing "Friday the

8    13th," you weren't producing any other films; correct?

9        A    That's correct.

10       Q    And you weren't developing screenplays for any other

11   films?

12       A    Not that I recall.

13       Q    And did you have any other source of income during

14   that period?

15       A    I did not.

16       Q    How long after you saw "Halloween" did you mention

17   your idea to do a horror film to Victor Miller?

18       A    Oh, boy, I don't know.  I know I had seen it.  And

19   there was a time, you know, later that I asked Victor if he

20   had seen it, and he said no.  And I said take a look at it,

21   and he did.  And I don't know how long it was between the

22   time I saw it and the time I thought Victor should take a

23   look at it.

24       Q    What did you -- what was the gist of your

25   conversation to Victor when you first -- what is the gist of

108

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-710

**Atkinson-Baker Court Reporters**
www.depo.com

1   were you pressing upon him to write your new horror film?

2       A    Because he's one of my guys.  You know, I -- we were

3   friends and we liked to work together and this was something,

4   you know, as a guy that I'm working with a lot and kicking

5   around ideas a lot, I would think that I have an obligation

6   to try to run stuff by him.  And if he responds to it, then

7   maybe we can figure it out and the idea of figuring it out,

8   you know, means you take this idea which is a smoke and

9   mirrors and you try to translate it into something that

10   people will invest in and give you money to make.

11       Q    I understand.

12           How soon after you mentioned "Halloween" to Victor

13   did he go out and see it?

14       A    I don't know.

15       Q    But fairly quickly?

16       A    I would assume.

17       Q    And do you know where he saw it?

18       A    No.

19       Q    What theater?

20       A    I don't.

21       Q    Did Bridgeport, Connecticut have a theater?

22       A    I'm sure; it's a big city.

23       Q    Did you ever see films in Bridgeport?

24       A    No.

25       Q    Did Victor live near Bridgeport?

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-711

1    working out the story elements that we've been discussing,

2    but start to get stuff down on paper so we have a formal --

3    as soon as possible, get to a formal script or something that

4    we could start to show around.

5        Q    And approximately how long did it take Victor to

6    write this treatment?

7        A    I don't know, but it was pretty quick.  It was, I

8    think, probably a couple weeks.

9        MR. TOBEROFF:  Okay.  I think this is a good point to

10   take a lunch break.

11           (A lunch recess was taken at

12           1:05 P.M. - 2:05 P.M.)

13   BY MR. TOBEROFF:

14       Q    So you stated that it took Victor about two weeks to

15   write a treatment.  How many drafts of the screenplay did he

16   turn in to you after he wrote the treatment?

17       A     Well, I think Victor's first treatment was two

18   weeks, and then I probably took another two weeks on a

19   revised treatment, which was my notes and other things.  And

20   Victor -- I think Victor wrote two treatments and then after

21   that, I think he worked with --

22       MS. ESKENAZI:  Two treatments or two screenplays?

23       THE WITNESS:  I meant two screenplays after he got the

24   treatment done.  Wake up.

25           I think Victor did two treatments and then

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
**www.depo.com**

1      MS. ESKENAZI:  Objection.  It's been asked and answered.

2          You can answer again.

3      THE WITNESS:  I think you just asked me if I had a basis

4   to guess or something like that based on the fact that --

5   BY MR. TOBEROFF:

6      Q    No.  A basis to estimate.  Remember, I told you the

7   difference between guessing and estimating.

8      A    You did.  And you asked me to estimate and I said I

9   didn't remember.

10     Q    I said you said you spoke to him before.  And based

11  on the fact that you were there and you spoke to him, does

12  that give you a basis for estimating the length of time

13  roughly?

14     A    No.

15     Q    So Victor recalls that he did run out to see

16  "Halloween" soon after you approached him and were all

17  excited about doing another horror movie.  Do you have any

18  reason to disbelieve that?

19     A    No.

20     Q    Once you settled on the summer camp location for

21  this new film, what did you want Victor to do next?

22     A    I wanted him to start writing.

23     Q    Start writing what?

24     A    Start working on -- formally start working on a

25  treatment, which would -- or on the script, which means

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
www.depo.com

1    subsequent revisions he would just bring over --

2        MS. ESKENAZI:  Do you mean two treatments or screenplays?

3        MR. TOBEROFF:  You can't ask him questions.

4        THE WITNESS:  My teeth fell out again.

5            Victor did two drafts after he started to write the

6    screenplay.  And after he wrote those drafts, subsequent

7    revisions, he brought over to the office and we would insert

8    them into the script.

9    BY MR. TOBEROFF:

10        Q    Like pages?

11        A    Pages, yeah.

12        Q    So you mentioned that after he wrote the treatment,

13    you had some notes on that, and then he wrote a revised

14    treatment?

15        A    No.  He -- my recollection is he wrote a treatment

16    and then I incorporated all of my notes into a revised

17    treatment that I could show to people and that became the

18    basis for the first draft.

19        Q    And how long approximately did it take Victor to

20    write the first draft?

21        MS. ESKENAZI:  The first draft of what?

22    BY MR. TOBEROFF:

23        Q    The screenplay for the film.

24        A    Right.  Well, I don't know.  But I would say three

25    weeks probably, maybe less.  But I think three weeks.  When

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-714

**Atkinson-Baker Court Reporters**
**www.depo.com**

1   he goes, he really likes to write very fast.

2       Q    And how long approximately -- so after he turned in

3   the first draft, you had notes on that; correct?

4       A    Yeah.

5       MS. ESKENAZI:  First draft of what, excuse me?

6   BY MR. TOBEROFF:

7       Q    Let me just clarify.  When I say first draft or

8   second draft, I'm only referring to first-draft screenplay,

9   second draft screenplay.  I'm not referring to drafts of the

10  treatment.  Do you understand that?

11      A    Yes.

12      Q    So after he turned in the first-draft screenplay,

13  you had notes on it; correct?

14      A    Yes.

15      Q    And you provided him with your notes presumably;

16  correct?

17      A    Correct.

18      Q    And then so how long did it take for you to

19  approximately review his script and provide him with notes,

20  if you recall?

21      A    I don't recall specifically, but I would guess less

22  than a week.

23      Q    You could estimate, but don't guess.

24      A    I would estimate less than a week.

25      Q    And how long before Victor turned in a second draft

                                                          129

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

Atkinson-Baker Court Reporters
www.depo.com

1   screenplay?

2       A    Again, I'd be estimating, but I'm thinking maybe two

3   weeks, maybe less.

4       Q    Do you recall that there were a lot of changes

5   between the second draft and the first-draft screenplay?

6       A    I don't recall the progression.  The bigger pieces

7   stayed in place, but the stuff that changed the most would be

8   dialogue as we went along and big or small, I don't know.

9       Q    By the way, you spoke about giving him notes.  Would

10  you write in the margins of the literary material he would

11  provide to you?

12      A    Yes.  I think that was one of -- there were two

13  kinds of notes.  If they were specific and specific to what

14  he had written, we had developed a shorthand.  And I wrote on

15  his pages and he knew what that meant and he could act on it.

16  If it was more of a conceptual thing, then it was taking

17  notes.  But I think that certainly, by the time, we got to

18  the second draft, it would, I think almost surely be on his

19  hardcopy of the script.

20      Q    And in addition to something specific, if you add

21  something general like, We need more suspense, you might also

22  note that in the margins?

23      A    No, probably not that.

24      Q    Or, This needs to be funnier?

25      A    I might put something in the margin like, Do better,

Sean Cunningham
May 12, 2017

TOBEROFF EX. P

A-716

```
1    further this project?

2        A    Well, it would be a long list of things --

3        Q    What did you do next, is my question.

4        A    What did I do next?

5    MS. ESKENAZI:  Objection.  It's vague and ambiguous.

6    Calls for a narrative.

7    THE WITNESS:  If next means what was the next step in the

8    screenplay or what was the next --

9    BY MR. TOBEROFF:

10       Q    You're trying to get a film made.  What did you do

11   once you revised the treatment?

12       A    The short answer is I focused on trying to raise the

13   money.

14       Q    How did you go about that?

15       A    First thing I had to do was clear the title.  And by

16   the time we ran the ad, which I believe was around the 4th of

17   July, waited to see if there was going to be, you know, any

18   lawyers letters or anything.  And at the same time I was

19   talking to people about this idea of doing a horror film, you

20   know, what do you think, and I had talked to Phil Scuderi

21   earlier about what do you think about, like, a horror film

22   ten little Indians at a Summer Camp.  And he thought that

23   was -- he thought that could really work, at least in his

24   world of drive-in theaters and stuff.

25           Anyway, I had the revised treatment.  If somebody
```

142

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-717

1   were interested, I could send them the revised treatment so I

2   had a better idea of what I'm doing.  And I had started to

3   call it "Friday the 13th."

4       Q    When did you speak to Phil Scuderi first about this

5   project?

6       A    I think the first time I mentioned it to him was

7   probably May of '79, something like that.

8       Q    What makes you think it was May of '79?

9       A    Well, because when I had mentioned to Victor that I

10   had spoken to Phil about our concept, he -- Victor got upset

11   and didn't want to do -- didn't want to get into business

12   with Phil Scuderi at -- ever again.

13       Q    Why is that?

14       A    He had a very bad experience working with Phil in

15   "Here Come the Tigers."  And I assured him that he would be

16   working for me and not Scuderi.  It's an idea that I had and

17   I was trying to test its commercial viability.

18       Q    I didn't follow the last part.  We're talking about

19   Phil Scuderi's bad experience, and then you say it was an

20   idea he had --

21       A    I think it was --

22       Q    Just a second.  Let me just finish.

23           So I don't understand the last part you were talking

24   about the relationship.  I asked you when you first brought

25   this to Phil Scuderi's attention, you said May of '79, and

143

TOBEROFF EX. P

A-718

**Atkinson-Baker Court Reporters**
**www.depo.com**

1      MR. TOBEROFF:  So I'm going to show you what's been

2   marked as Exhibit 16 in Victor Miller's deposition.

3           (Exhibit 16 was marked for

4           identification.)

5   BY MR. TOBEROFF:

6      Q    Do you recognize Exhibit 16?

7      A    It appears to be the -- Victor's first draft of

8   "Friday the 13th," it's unmarked so I'm not sure, but that's

9   what I think it is.

10     Q    And do you believe this is what he turned in after

11  turning in the treatment?

12     A    I believe it is.

13     MR. TOBEROFF:  I'd like to show you what's been marked as

14  Exhibit 17 in Victor Miller's deposition.

15          (Exhibit 17 was marked for

16          identification.)

17  BY MR. TOBEROFF:

18     Q    Do you recognize Exhibit 17?

19     MS. ESKENAZI:  Could I have a copy, please?

20     MR. TOBEROFF:  Excuse me.  I'm sorry.

21     MS. ESKENAZI:  Thank you.

22  BY MR. TOBEROFF:

23     Q    Now, do you see how -- I'm sorry.  I'm not sure.

24  Did you answer my question?  Did you recognize Exhibit 17?

25     A    Yes.  It's what we were calling the second draft of

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
www.depo.com

1    "Friday the 13th."

2        Q    And do you recognize this as Victor's second draft

3    that we spoke about previously?

4        A    Yes.

5        Q    Do you see how the cover page at the top, it says

6    Sean S. Cunningham Films Limited, and then there's a logo,

7    and then at the bottom there's copyright, sign -- it says,

8    "Copyright 1979, Sean S. Cunningham Films Limited, all rights

9    reserved"?

10       A    Yes, I do.

11       Q    Did Victor Miller compile this cover page?

12       A    No.

13       Q    Who did?

14       A    We compiled it at the office.  We also typed it at

15   the office.

16       Q    Move to strike as nonresponsive.

17            Why does this script -- why is the title of -- on

18   this title page that you did, why does it say "Friday 13",

19   instead of "Friday the 13th"?

20       A    I thought it scanned better.

21       Q    What do you mean by "it scanned"?

22       A    When someone reads it, they tend to read it as

23   "Friday the 13th," that's just been my experience and that's

24   what I put.

25       Q    You thought "it scanned better"?

147

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-720

```
 1      A    Yeah.

 2      Q    I don't know what that means.  I still don't know

 3   what that means, "scanned better"?

 4      A    What I mean by that is that when you read it and you

 5   scan across the letters, sometimes you add extra things that

 6   you think are there that aren't, and it's really an

 7   abbreviation for the words "Friday the 13th."  But the short

 8   version of it is Friday 13.  And if I type out the words

 9   "Friday the 13th" with a T-H at the end of it, it doesn't

10   look right.

11      Q    But it looked right enough to put it on the screen

12   with a title "Friday the 13th"; correct?

13      A    It would not be in 12 point courier.

14      Q    So your decision to call it "Friday 13" on the

15   scripts instead of "Friday the 13th" is because it's in

16   courier?

17      A    Because I thought it scanned better.

18      Q    To the human eye?

19      A    Yes.

20      Q    But it doesn't scan better to the human eye up on

21   the screen; is that right?

22      A    That's correct.  I think that if you put "Friday the

23   13th" up on the screen in 12 point courier, it wouldn't scan

24   very well.

25      Q    It's hard to follow that explanation.  Let me try
```

148

Sean Cunningham
May 12, 2017

TOBEROFF EX. P

A-721

```
 1        A    Yes, it is.

 2        Q    Now you'll notice in paragraph one, you'll see

 3   there's six boxes there.

 4        A    Yes.

 5        Q    And the boxes say, "treatment", "original script",

 6   "story", "first-draft screenplay", "final-draft screenplay",

 7   "rewrite of screenplay".  Do you see that?

 8        A    Yes.

 9        Q    So the very first thing on the list there is

10   treatment.  You testified that you hired Victor to write a

11   treatment and that you paid him to write the treatment.  Why

12   isn't the box checked off on his WGA contract?

13        A    I don't think that I said that I paid Victor

14   specifically to write the treatment.

15        Q    Why isn't the box checked off on this contract?

16        A    Because it wasn't a treatment.

17        Q    Do you also see in the first paragraph the preamble

18   paragraph, you see that where it says the Manny Company is

19   filled in?

20        A    Yes.

21        Q    And then Victor Miller is filled in?

22        A    Yes.

23        Q    This was filled in with a typewriter?

24        A    I think so, yes.

25        Q    And do you see in the next line after they defined
```

155

Sean Cunningham
May 12, 2017

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
www.depo.com

```
 1    Victor Miller as the, quote, writer end, quote, it says dated
 2    this, and there's a blank space, day of, and there's a big
 3    blank space, coma, nineteen and then there's another blank
 4    space.  You see those?
 5        A    Yes, I do.
 6        Q    Even though this is very clearly set up to fill in
 7    the date, why date -- why is there no date filled in on this
 8    agreement?
 9        A    I don't know.
10        Q    Do you have any idea why you or your office would
11    have not put a date in there?
12        A    No, I don't.
13        Q    Do you agree that this form contract clearly calls
14    for that date to be filled in?
15        A    No.
16        Q    You disagree with that statement?
17    MS. ESKENAZI:  Well, objection.  It's vague and
18    ambiguous.
19    BY MR. TOBEROFF:
20        Q    Do you agree that this contract clearly calls by
21    these blank spaces for that date to filled in after the
22    writer's name?
23    MS. ESKENAZI:  Objection.  Vague and ambiguous.
24    THE WITNESS:  I can see that there are blank spaces
25    there.
```

156

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
www.depo.com

```
 1   my question, Mr. Cunningham?
 2       MS. ESKENAZI:  You've gotten the answer now twice.  I'll
 3   let him answer one more time and then we're going to have to
 4   move on.
 5       MR. TOBEROFF:  No, we're not.
 6       THE WITNESS:  Looking at this contract, it appears as if
 7   this is where you would put the date that it was written.
 8   BY MR. TOBEROFF:
 9       Q    Thank you.
10            On Page 2, under Victor Miller, where it says -- do
11   you see the address that's on Page 2, 726 Ford Street,
12   Stratford, Connecticut?
13       A    Yes.
14       Q    Was that Victor's home --
15       A    Yes, I believe so.
16       Q    -- at the time?
17            Is it your customary business practice not to date
18   contracts?
19       A    No.
20       Q    Is it your customary practice as a film producer not
21   to date contracts?
22       A    No.
23       Q    Is it your customary practice as a film producer not
24   to date contracts with writers?
25       A    No.
```

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-724

1    correct?

2        A    Not looking at it, but I assume that you're correct,

3    yes.

4        Q    And that's the reason why in this -- strike that.

5            Is this a WGA form contract?

6        A    Yes.

7        Q    Do you recall whether you obtained it from the WGA?

8        A    That's the only place it's available, yes.

9        Q    And is it your belief that they have a separate box

10   checked off labeled treatment?  Because if you check that

11   box, you would have to pay a writer a different amount than

12   if you just checked the box first-draft screenplay and

13   final-draft screenplay?

14       A    I believe that would be true, if I had checked the

15   box.

16       Q    So if you had checked the box treatment, you would

17   have to pay Victor Miller more money than if you had

18   checked -- strike that.

19            If you had checked the box treatment, first-draft

20   screenplay and final-draft screenplay, you would end up,

21   under the WGA agreement, having to pay Victor Miller more

22   money than if you just checked off, as is written here,

23   first-draft screenplay and final-draft screenplay; is that

24   correct?

25       A    I don't know, but I'm guessing that it is.

TOBEROFF EX. P

Atkinson-Baker Court Reporters
www.depo.com

```
 1        Q    What's your awareness today?

 2        MS. ESKENAZI:  Objection.  Vague and ambiguous.

 3   BY MR. TOBEROFF:

 4        Q    Sitting here today, are you aware that the Writer's

 5   Guild agreement calls for separate payments for treatment --

 6   first-draft screenplay, final-draft screenplay, revisions of

 7   screenplay?

 8        MS. ESKENAZI:  Objection.  Assumes facts not in evidence.

 9   Calls for speculation.  Lacks foundation.

10        THE WITNESS:  I am aware that the WGA has minimums.  I

11   don't know what the specific minimums are.

12   BY MR. TOBEROFF:

13        Q    But it has separate minimums for a treatment for

14   first-draft screenplay, second draft screenplay, first set of

15   revisions, second set of revisions.  Do you know that sitting

16   here today?

17        MS. ESKENAZI:  Objection.  Compound.  Asked and answered.

18   Calls for speculation.  Lacks foundation.  And assumes facts

19   not in evidence.

20        THE WITNESS:  And I don't know.

21   BY MR. TOBEROFF:

22        Q    And approximately how many films have you produced

23   so far?  What's your best estimate?

24        A    Twenty.

25        Q    Twenty films?
```

171

Sean Cunningham
May 12, 2017

TOBEROFF EX. P

A-726

```
1        A    Maybe, I don't know.

2        Q    Is that your best estimate, twenty films?

3        A    Yeah.

4        Q    And of those how many were WGA films?

5        A    I'm going to guess.

6        Q    Don't guess.

7        A    Give me a second.

8        MS. ESKENAZI:  Don't write on those.

9        THE WITNESS:  Oh, okay.

10       MS. ESKENAZI:  Those are the court reporter's exhibits.

11       THE WITNESS:  I would say that after looking over the

12  IMDB Pro summary, I produced at least twenty films that were

13  consistent with -- under a WGA contract.

14            (Exhibit 21 was marked for

15            identification.)

16  BY MR. TOBEROFF:

17       Q    So even though you produced that amount of films, is

18  it your testimony that you don't know that the more boxes

19  that are checked off on a WGA contract, like this, for these

20  different types of literary material, the more money that you

21  have to pay under the WGA to the writer?

22       MS. ESKENAZI:  Objection.  Assumes facts to the in

23  evidence.  Asked and answered.  Lacks foundation.  Calls for

24  speculation.

25       THE WITNESS:  I don't know.
```

172

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-727

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
1   BY MR. TOBEROFF:
2       Q    Doesn't it follow that, on a contract like this, the
3   more boxes you check off for literary material, the more work
4   a writer has to do?
5       A    I don't know.
6       Q    You don't know what?
7       A    If it follows.
8       Q    You don't believe that logically follows that the
9   more boxes you check off, treatment, first draft screenplay,
10  second draft screenplay, rewrite of screenplay, that the
11  writer has to do more work?
12      MS. ESKENAZI:  Objection.  Calls for speculation.
13  Incomplete hypothetical.
14      THE WITNESS:  So I don't know.
15  BY MR. TOBEROFF:
16      Q    Okay.  I'm going to rephrase the question this way.
17  If you have a WGA flat deal writing contract with a writer,
18  and you check off more of these boxes on a flat deal contract
19  like this, you don't know whether or not you have to pay the
20  writer more under the WGA agreement or the same as if you
21  only checked off less boxes?
22      MS. ESKENAZI:  Objection.  Asked and answered.  Calls for
23  speculation.  Lacks foundation.  Assumes facts not in
24  evidence.
25      THE WITNESS:  I don't know.
```

173

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-728

**Atkinson-Baker Court Reporters**
**www.depo.com**

1   BY MR. TOBEROFF:

2        Q    Okay.  So is it your testimony, after doing 23 WGA

3   films, that you don't know if you check off just first-draft

4   screenplay in one instance, and then in another instance you

5   check off first-draft screenplay and final-draft screenplay,

6   that in the latter instance, where you checked off both first

7   draft and final draft, you would pay more than if you just

8   checked off first draft?

9        MS. ESKENAZI:  Objection.  Asked and answered.  Calls for

10  speculation.  Assumes facts not in evidence.  Lacks

11  foundation.

12       THE WITNESS:  I don't know.

13  BY MR. TOBEROFF:

14       Q    So you have no idea on this writer's flat deal

15  contract, sitting here today, that the more boxes you check

16  off, the more money you have to pay the writer; is that your

17  testimony?

18       MS. ESKENAZI:  Objection.  It's been asked and answered.

19  I'm going to let him answer one more time and then I'm going

20  to instruct him not to answer.  It's been asked and answered.

21  BY MR. TOBEROFF:

22       Q    Is that your testimony, that you don't know the

23  answer to that question?

24       A    Yes, I don't know.

25       Q    I need to remind you at this point, Mr. Cunningham,

174

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

Atkinson-Baker Court Reporters
www.depo.com

1       Q    And you say that even though you've testified that

2   he wrote a treatment and that he wrote revisions to a second

3   draft screenplay; is that correct?

4       MS. ESKENAZI:  Objection.  Vague.

5       THE WITNESS:  I believe that I testified that I hired

6   Victor Miller to write the screenplay for "Friday the 13th,"

7   which would include all of the work that it takes to get from

8   here to there.  And in whatever Victor's process was, that's

9   what our agreement, Victor's and mine, was.  And that's what

10  we both understood it to be.  And neither one of us perceived

11  it to be a violation.

12  BY MR. TOBEROFF:

13      Q    But you know, sitting here today, that that's not

14  how it works?

15      A    I don't know.

16      MR. TOBEROFF:  I'd like to mark as Exhibit 22 a one-page

17  document that says on the top, "From the producer of 'Last

18  House on the Left' comes the most terrifying film ever made,

19  'Friday the 13th'."

20          (Exhibit 22 was marked for

21          identification.)

22  BY MR. TOBEROFF:

23      Q    Do you recognize Exhibit 22?

24      A    It is the ad that ran in Variety in 1979.

25      Q    You've been quoted by numerous sources, including

177

Sean Cunningham
May 12, 2017

TOBEROFF EX. P

Atkinson-Baker Court Reporters
www.depo.com

1    Peter Bracke's book, of stating that at the time you ran this

2    ad, July 4th, 1979, you had no story, you had no screenplay,

3    all you had was this title?  Do you recall stating that in

4    interviews?

5        MS. ESKENAZI:  Objection.  Assumes facts not in evidence.

6        THE WITNESS:  Yes, I said that.

7    BY MR. TOBEROFF:

8        Q    That's completely false, isn't it?

9        A    No.

10       Q    You previously testified to various literary

11   material and receiving it before July 4th, 1979, right here

12   in this deposition.

13       A    Then I stand corrected.

14       Q    What does that mean, "I stand corrected"?

15       A    When you referred to the articles that you had read

16   in which I was quoted as saying that all I had was a title

17   and I had to figure something out, that was a story I was

18   telling a reporter because it's a good story.  The fact is

19   that if I know my testimony today said that we had an idea to

20   make "Friday the 13th," which was going to be ten little

21   Indians in Summer Camp, and I believe that that's my

22   testimony, is it not?

23       Q    Are you saying that it -- over the years you would

24   tell this story that you ran the ad, and at the time you ran

25   the ad, you had no script, you had no material, you had no

178

Sean Cunningham
May 12, 2017

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
**www.depo.com**

1   story, are you saying that's just made for a better tale?

2       A   No.

3       Q   Are you saying that when you ran this script -- when

4   you ran this ad, in July 4th, 1979, are you saying that you

5   had no treatment or a screenplay from Victor Miller?

6       MS. ESKENAZI:  Objection.  It misstates the testimony.

7   It's misleading.  And it assumes facts not in evidence.

8   BY MR. TOBEROFF:

9       Q   You can answer.

10      A   I believe that at the beginning of June 1979 when I

11  had committed to run this ad and hired Victor Miller to start

12  writing, I didn't have much of anything.  A month later when

13  the ad actually ran, I had received Victor's first treatment.

14      Q   I see.

15      So you have a specific recollection sitting here

16  today that you committed to running this ad a month before it

17  appeared on July 4th, 1979?

18      A   Absolutely.

19      Q   And why do you have that specific recollection?

20  What gives you that?  Because you've been very hazy on a lot

21  of other things.  What gives you that specific recollection

22  here?

23      MS. ESKENAZI:  Objection.  That's argumentative.  It's

24  untrue.  It misstates the testimony.  He's been very clear

25  about what's happened with respect to "Friday the 13th."

179

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-732

**Atkinson-Baker Court Reporters**
www.depo.com

```
 1      A     Yes.

 2      Q     Did Victor Miller get sole writing credit on this

 3   film?

 4      A     Yes.

 5      Q     And that's written by Victor Miller, credit we see

 6   in this billing block?

 7      A     Yes.

 8      Q     Was is there any sort of WGA credit arbitration

 9   regarding the first "Friday the 13th" movie?

10      A     Not that I recall.

11      Q     How did it work considering that this was a

12   screenplay -- sorry.

13            How does it work considering that this was a union

14   picture?  Were materials submitted to the WGA and then they

15   make a credit determination?

16      MS. ESKENAZI:  Objection.  Calls for expert opinion.

17   Lacks foundation.  And incomplete hypothetical.

18      THE WITNESS:  I don't know.

19   BY MR. TOBEROFF:

20      Q     Well, have you had experiences with the guild with

21   regard to credit?

22      A     Yes, I have.

23      Q     Describe those experiences, generally.

24      MS. ESKENAZI:  Objection.  Vague and ambiguous.

25      THE WITNESS:  Generally, I think you submit a list to the
```

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-733

1    WGA of all of the writers who may have contributed to the

2    final screenplay and the WGA then determines who should get

3    credit.

4    BY MR. TOBEROFF:

5        Q    Was that done in the case of the first "Friday the

6    13th" movie?

7        A    I don't recall.

8        Q    Who determined that Victor Miller should have sole

9    writing credit on the film?

10       A    Me.

11       MR. TOBEROFF:  Let's take a short break.

12            (A brief recess was taken at

13            4:47 P.M. - 5:03 P.M.)

14       MR. TOBEROFF:  I'd like to mark as Exhibit 24 a printout.

15   It's a composite exhibit.  These are just printouts of the

16   cast and crew on various "Friday the 13th" films from IMDB.

17   It's publicly available.

18            (Exhibit 24 was marked for

19            identification.)

20       MR. TOBEROFF:  And I'd like to mark --

21       MS. ESKENAZI:  It actually reads a "Friday the 13th," two

22   casting.

23       MR. TOBEROFF:  They're selected printouts.  The first one

24   is "Friday the 13th Part 2," the next one is "Friday the 13th

25   Part 3," and the next one is "Friday the 13th:  The Final

203

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
**www.depo.com**

1      A    Yes.

2      Q    The latter; right?

3      A    No.

4      MS. ESKENAZI:  Objection.  It's vague and ambiguous.  And

5   it's misstating his testimony.

6      THE WITNESS:  So where are we?

7   BY MR. TOBEROFF:

8      Q    This is very important, so I would ask you to focus.

9      A    I'm --

10     Q    Would Victor turn in material, and then after

11  turning in material, go over to your office and retype the

12  material with scene numbers like this?

13     A    No.

14     Q    Who would retype Victor's material with scene

15  numbers like this?

16     A    Cindy.

17     Q    So do you have any reason to believe that Victor

18  created the material that was underlying Exhibit 16 that was

19  then retyped with scene numbers?  Do you have any reason to

20  believe that Victor did not write that first draft at his

21  home?

22     MS. ESKENAZI:  Objection.  Misstates the testimony.

23  Misleading.  And it assumes facts not in evidence.

24  BY MR. TOBEROFF:

25     Q    Let me make it easier.

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P