**Atkinson-Baker Court Reporters**
**www.depo.com**

```
 1      A    No.

 2      Q    -- on his computer at his home?

 3      MS. ESKENAZI:  Objection.  Misleading.  Misstates the

 4  evidence.

 5      THE WITNESS:  I don't know where Victor --

 6  BY MR. TOBEROFF:

 7      Q    That's not my question.

 8           Do you have any reason to believe that Victor didn't

 9  write this treatment at his home?

10      A    No.

11      Q    Turning to Exhibit 16, which you said you believe

12  was the first draft screenplay.  Do you have any reason to

13  believe that Victor did not write that at his home?

14      A    Yes.

15      Q    What is that reason?

16      A    Well, this is not Victor's typing and indeed he --

17  this is 16?

18      Q    Yes.

19      A    So this is clearly created at the office, which is

20  our office, and Victor surely did some of the work there in

21  order to create the document.

22      Q    Wait a second.

23           Is it your testimony that Victor would reformat his

24  script or that he would turn in his material to you, and your

25  secretary would reformat it and type it and put it in scenes?
```

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-736

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
 1        A    Yes.

 2        Q    The latter; right?

 3        A    No.

 4        MS. ESKENAZI:  Objection.  It's vague and ambiguous.  And

 5   it's misstating his testimony.

 6        THE WITNESS:  So where are we?

 7   BY MR. TOBEROFF:

 8        Q    This is very important, so I would ask you to focus.

 9        A    I'm --

10        Q    Would Victor turn in material, and then after

11   turning in material, go over to your office and retype the

12   material with scene numbers like this?

13        A    No.

14        Q    Who would retype Victor's material with scene

15   numbers like this?

16        A    Cindy.

17        Q    So do you have any reason to believe that Victor

18   created the material that was underlying Exhibit 16 that was

19   then retyped with scene numbers?  Do you have any reason to

20   believe that Victor did not write that first draft at his

21   home?

22        MS. ESKENAZI:  Objection.  Misstates the testimony.

23   Misleading.  And it assumes facts not in evidence.

24   BY MR. TOBEROFF:

25        Q    Let me make it easier.
```

213

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-737

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
 1        A    Please.

 2        Q    Victor wrote a first draft of a screenplay?

 3        A    Yes.

 4        Q    The one he actually typed up we don't have; correct?

 5        MS. ESKENAZI:  Objection.  It assumes facts not in

 6   evidence.

 7   BY MR. TOBEROFF:

 8        Q    Correct?  You can answer.

 9        A    No, we do not have any draft other than this.

10        Q    Right.

11             But Victor did write a draft -- a first draft;

12   correct?

13        A    Yes.

14        MS. ESKENAZI:  Objection --

15   BY MR. TOBEROFF:

16        Q    And did you have any reason to believe he didn't

17   write that at his home?

18        MS. ESKENAZI:  Objection.  Misstates the testimony.

19        THE WITNESS:  It's my understanding or recollection that

20   Victor wrote a draft, which I'm sure is closely represented

21   by this document, but he did not type this document.  And I'm

22   sure that he and I conferred, you know, based on whatever he

23   had typed up in the first place to smooth out and change and

24   do whatever we would have done to have consensus on these

25   pages.
```

214

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-738

**Atkinson-Baker Court Reporters**
**www.depo.com**

1　over to his house and sort of stand over his shoulder as he

2　was actually writing it?

3　　　A　　Surely.  Sometimes, sure.

4　　　Q　　The treatment?

5　　　A　　Yeah.  Or everything that we did, we were joined at

6　the hip.  All right?  And, you know, if he was typing in

7　Stratford and I was in Stratford, I'd be looking over his

8　shoulder, we'd be talking about stuff.

9　　　Q　　Wait a second.  You brainstorm with Victor about

10　"Friday the 13th," he then writes a treatment.  The

11　treatment, which is Exhibit 14 is 15 pages long; correct?

12　　　A　　Yes.

13　　　Q　　Is it your testimony that while he was writing those

14　fifteen pages you were in the room?

15　　　A　　I don't think that's my testimony.

16　　　Q　　How about when he wrote the first draft, were you in

17　the room while he was writing the first draft?

18　　　A　　Surely, for part of it.

19　　　Q　　Well, you just testified that you don't know where

20　he wrote it.

21　　　A　　Yes.

22　　　Q　　Did Victor choose his own hours and times of day

23　when he would write?

24　　　A　　Victor always wrote in the daytime.

25　　　Q　　And he was the one who decided that?

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
 1        A    Yeah.

 2        MS. ESKENAZI:  Objection.  Vague and ambiguous.

 3   BY MR. TOBEROFF:

 4        Q    Did you say yeah?

 5        A    I said yeah, yes.

 6        Q    When Victor was writing the treatment and then the

 7   screenplay for the "Friday the 13th" film, did you have the

 8   right to require him to perform other writing assignments?

 9        MS. ESKENAZI:  Objection.  That's vague and ambiguous.

10   Calls for a legal conclusion.

11        THE WITNESS:  I don't know.

12   BY MR. TOBEROFF:

13        Q    Well, you chuckled when I said that.  Why did you

14   chuckle?

15        A    It sounded like a stupid question.

16        Q    It's stupid because of course you didn't?

17        MS. ESKENAZI:  Objection.  It's argumentative.

18   BY MR. TOBEROFF:

19        Q    You can answer.

20        A    You asked me if I had the right to do something, and

21   it just, I -- and I don't know.

22        Q    But why did you chuckle?

23        MS. ESKENAZI:  Objection.  It's been asked and answered.

24           I instruct not to answer.

25        MR. TOBEROFF:  You're instructing not to answer?
```

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-740

**Atkinson-Baker Court Reporters**
**www.depo.com**

1       MS. ESKENAZI:  I'm instructing not to answer.

2       MR. TOBEROFF:  When I asked him why did he chuckle when I

3   asked the question.

4       MS. ESKENAZI:  Let's move on.

5       THE WITNESS:  Can read that back, please?

6                          (Record read.)

7   BY MR. TOBEROFF:

8       Q    What sounded stupid about it?

9       A    Waiting for you?

10      Q    Yes.

11      A    What made me laugh?

12      Q    Yes.

13      A    I don't know.  You asked a question, it sounded

14  silly and I laughed.  I don't know what made me laugh.

15      Q    So you couldn't -- when he was writing "Friday the

16  13th," there's nothing that gave you a right to say to him

17  stop writing, need to take a break, I want you to write

18  another picture of mine and require you to do so?  There's

19  nothing that gave you that right, was there?

20      MS. ESKENAZI:  Objection.  Calls for legal conclusion.

21      THE WITNESS:  I don't know.

22  BY MR. TOBEROFF:

23      Q    You don't know whether you had a right to --

24      A    No, I don't.

25      Q    So what basis did you have at the time to require

                                                            223

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
 1    him to write something else for another project?

 2        MS. ESKENAZI:  Objection.  Calls for speculation.  Lacks

 3    foundation.  Is misleading the witness.  Assumes facts not in

 4    evidence and calls for a legal conclusion.

 5    BY MR. TOBEROFF:

 6        Q    You could answer the question.

 7        A    I don't know.

 8        Q    You don't know.  What's the question I asked you?

 9        A    If I had the right to do something.

10        Q    Do what?

11        A    Whatever you asked.  I don't know.

12        Q    You're saying you don't know and you don't even know

13    what the question -- you don't know to is --

14        MS. ESKENAZI:  Now you're getting argumentative.  Do you

15    want to move on and ask a question.

16        MR. TOBEROFF:  No.

17    BY MR. TOBEROFF:

18        Q    You said you don't know and my question is:  You

19    don't know what?

20        MS. ESKENAZI:  Asked and answered.

21        THE WITNESS:  I don't know if I had a right to ask Victor

22    to do something.

23    BY MR. TOBEROFF:

24        Q    To do what?

25        A    I don't know.  The last time you asked the question
```

                                                                      224

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
www.depo.com

1    you said to write something else.

2         Q    Other than material for "Friday the 13th" --

3         MS. ESKENAZI:  Objection.  Calls for legal conclusion.

4    BY MR. TOBEROFF:

5         Q    Other than material for "Friday the 13th," you had a

6    contract with Victor, you said to write the script for

7    "Friday the 13th" and that's what he was doing.  During that

8    period, did you have something that gave you the right to

9    require Victor to write a different project than "Friday the

10   13th"?

11        MS. ESKENAZI:  Asked and answered.

12             I'm going to instruct not to answer.

13             Move on, Counsel.

14        MR. TOBEROFF:  I'm entitled to an answer to that

15   question, you can only instruct on the basis of privilege.

16   He has not answered.

17        MS. ESKENAZI:  Move on.

18        MR. TOBEROFF:  He said I don't know, and he didn't know

19   the question.  I'm not moving on; entitled to an answer to

20   that question.

21        MS. ESKENAZI:  I'm instructing not to answer.  Move on.

22        MR. TOBEROFF:  You can only instruct him on the basis of

23   privilege.

24        MS. ESKENAZI:  It's getting late and you can't keep

25   badgering the witness and continuing to ask him the same

225

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-743

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
1        Q    Did Manny pay Victor Miller a salary to write the
2   "Friday the 13th" screenplay or a fixed fee?
3        MS. ESKENAZI:  Objection.  Calls for legal conclusion.
4   Lacks foundation.  Assumes facts not in evidence.  Calls for
5   speculation.
6        THE WITNESS:  I don't recall.
7   BY MR. TOBEROFF:
8        Q    Were you paying Victor an annual salary at that
9   time?
10       A    No.
11       Q    Were you paying him a monthly salary at that time?
12       MS. ESKENAZI:  Objection.  Calls for speculation.  Lacks
13   foundation.
14       THE WITNESS:  To be clear, the time you're talking about
15   is when we were writing or shooting or doing what?
16   BY MR. TOBEROFF:
17       Q    Let me ask it this way:  His writing contract you
18   recall calling for a flat fee payment for a first draft and a
19   second draft; correct?
20       A    On "Manny's Orphans"?
21       Q    "Friday the 13th."
22       A    Yes, I recall that.
23       Q    And you paid those flat fees to him?
24       A    I did.
25       Q    You didn't pay him by the hour; is that correct?
```

229

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

1      A    That's correct.

2      Q    And you didn't pay him overtime; is that right?

3      A    That's correct.

4      Q    Was Victor entitled to be paid for sick days when he

5   worked for you on "Friday the 13th"?

6      MS. ESKENAZI:  Objection.  Calls for legal conclusion.

7   Lacks foundation.  Calls for speculation.

8      THE WITNESS:  I don't know.

9   BY MR. TOBEROFF:

10      Q    You don't know what I mean by that?

11      MS. ESKENAZI:  Objection.  Confusing.  Misleading.

12   Misstates the evidence.

13          Can you read back the prior question and answer.

14          (Record read.)

15   BY MR. TOBEROFF:

16      Q    I'm referring, you understand that sometimes an

17   employee will be paid -- given a certain number of sick days?

18   You understand that?

19      MS. ESKENAZI:  Objection.  Calls for speculation.  Lacks

20   foundation.  Calls for a legal conclusion.

21      THE WITNESS:  I don't know.

22   BY MR. TOBEROFF:

23      Q    You don't know what?

24      MS. ESKENAZI:  And it's an incomplete hypothetical.

25      THE WITNESS:  If you would ask the question again.

TOBEROFF EX. P

A-745

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
 1   BY MR. TOBEROFF:
 2       Q    You just said, "I don't know."  How can you say "I
 3   don't know" if you don't know the question?
 4       A    I want to make sure what you were asking.
 5       Q    What do you think I was asking?
 6       A    I don't know.
 7       MS. ESKENAZI:  Do you need to take another break?
 8       THE WITNESS:  No.
 9       MS. ESKENAZI:  Okay.
10       THE WITNESS:  Thank you.
11   BY MR. TOBEROFF:
12       Q    Did you have any arrangement with Victor Miller at
13   this time to pay him for sick days?
14       MS. ESKENAZI:  Objection.  Calls for legal conclusion.
15   Lacks foundation.  Calls for speculation.
16       THE WITNESS:  I believe the only agreement I had with
17   Victor was to work closely with me to come up with a
18   screenplay that we could shoot for a movie called "Friday the
19   13th."  That agreement between us assumed that it was going
20   to take weeks, if not months, to do.  That was my
21   understanding of my deal with Victor.
22   BY MR. TOBEROFF:
23       Q    Why is it that his flat deal contract doesn't have a
24   time period within which he's supposed to turn in a
25   first-draft screenplay or a second draft screenplay?
```

231

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
 1       A    I don't know.

 2       Q    Have you entered into agreements with writers that

 3   contain a schedule for them to turn in the work that they're

 4   doing for you?

 5       A    Yes.

 6       Q    Did you pay Victor Miller for his writing on "Friday

 7   the 13th" any more than the two lump sum payments reflected

 8   in his writer's flat deal contract?

 9       A    My recollection is that he got a non-cash bonus at

10   the end.

11       Q    What do you mean by that?

12       A    Trying to work for at least a week, trying to figure

13   out a new ending to the movie.  And I didn't think I could

14   get a check cleared for him as a writer, so I arranged to buy

15   a fence for his house in exchange for his work and goodwill.

16       Q    Do you remember what that fence cost?

17       A    No.  I think I heard Victor say $1500.

18       Q    But you don't remember one way or the other?

19       A    I do not.

20       Q    Did the Manny Company provide Victor Miller any

21   employee benefits?

22       MS. ESKENAZI:  Objection.  Vague and ambiguous as to the

23   Manny Company as opposed to the WGA.

24       MR. TOBEROFF:  Don't lead the client.

25       MS. ESKENAZI:  It's vague and ambiguous.
```

                                                                    232

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
**www.depo.com**

1    MR. TOBEROFF:  Don't lead him.

2    MS. ESKENAZI:  It's vague and ambiguous.

3  MR. TOBEROFF:  Don't be desperate and lead the client.

4    THE WITNESS:  The Manny Company signed with the WGA and

5  made a deal with Victor.  And by doing that, Victor was to

6  receive a bunch of benefits.  And I think that's as

7  responsive as I can be.

8  BY MR. TOBEROFF:

9    Q    So I'll ask it this way:  Did the Manny Company

10  directly provide Victor Miller with any employee benefits?

11    MS. ESKENAZI:  Objection.  Vague and ambiguous.  Calls

12  for speculation.  Lacks foundation.  And assumes facts not in

13  evidence.

14    THE WITNESS:  I don't know.

15  BY MR. TOBEROFF:

16    Q    Did the Manny Company have -- did you or the Manny

17  Company take out health insurance for Victor Miller?

18    MS. ESKENAZI:  Objection.  Calls for speculation.  Lacks

19  foundation.  And is misleading.

20    THE WITNESS:  Not that I recall.

21  BY MR. TOBEROFF:

22    Q    Did you have a medical plan for Victor Miller?

23    MS. ESKENAZI:  Objection.  Vague and ambiguous as to

24  whether you're talking about the Manny Company or the WGA.

25    MR. TOBEROFF:  You're leading the witness.

233

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-748

**Atkinson-Baker Court Reporters**
**www.depo.com**

1    MS. ESKENAZI:  You're deliberately misleading the witness

2    and you're misstating the evidence.

3    MR. TOBEROFF:  You're having a Donald Trump moment here,

4    stop leading the witness.

5    MS. ESKENAZI:  You're having a Sean Spitzer moment.

6    BY MR. TOBEROFF:

7    Q    Okay.  I understand your theory about the WGA that

8    Bonnie keeps reminding you of, so I understand that theory.

9    I'm not talking about the WGA.  I'm not talking about the

10   indirect provision through the WGA.  I'm specifically talking

11   about the Manny Company and Sean Cunningham.  And I'm asking

12   whether you provided Victor with any kind of medical plan?

13   MS. ESKENAZI:  That's misleading.  It's vague and

14   ambiguous.  And it's misleading.

15   BY MR. TOBEROFF:

16   Q    Please answer.

17   A    To the best of my knowledge, all of Victor's

18   benefits flowed through the WGA.  And I do not recall

19   creating a medical plan for Victor.

20   Q    Did the Manny Company or you give Victor life

21   insurance?

22   A    Not that I recall.

23   Q    Did you -- strike that.

24        Did the Manny Company have its own pension plan in

25   which Victor Miller participated?

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-749

```
 1        THE WITNESS:  I don't know.

 2   BY MR. TOBEROFF:

 3        Q     Did you withhold any income tax from Victor Miller's

 4   compensation set forth in his writer's flat deal contract?

 5        A     I don't know.  I don't think so.

 6        Q     Did you withhold any amounts for social security?

 7        A     I don't recall.

 8        Q     One way or the other?

 9        A     I don't recall.

10        Q     So do you believe you may have withheld amounts for

11   social security from the $9,282 set forth in his contract?

12        MS. ESKENAZI:  Objection.  Asked and answered.

13           You can answer again.

14        THE WITNESS:  I don't recall.

15   BY MR. TOBEROFF:

16        Q     Did you withhold any amounts for Medicare?

17        A     I don't recall.

18        Q     On "Manny's Orphans," is your answer the same, that

19   you don't recall whether you paid the money in the contract

20   or you withhold social security and Medicare?

21        A     That's correct, I don't recall the deductions for

22   Victor or the contributions for Victor; they were what they

23   were.

24        Q     Well, you just said you didn't withhold any income

25   tax, you recall that?
```

238

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

A-750

**Atkinson-Baker Court Reporters**
**www.depo.com**

1    Q    Did you use a professional payroll company?

2    A    I don't recall.

3    Q    Have you ever had an employee for which you do

4    recall withholding income tax, social security, Medicare,

5    federal unemployment tax, things of that nature?

6    A    Yes.

7    Q    So you know what I'm talking about when I mention

8    these things; correct?

9    A    Yes, I think I do.

10   Q    And what's your understanding of the requirement to

11   withhold income tax, contribute to social security,

12   contribute to Medicare, pay federal unemployment tax, and

13   such things as that?  Is it your understanding that you do

14   those things with respect to a regular salary employee, but

15   that you don't do those things with respect to a freelancer?

16   MS. ESKENAZI:  Objection.  Calls for speculation.  Lacks

17   foundation.  Assumes facts not in evidence.  And vague and

18   ambiguous.  And calls for legal conclusion.

19   THE WITNESS:  I don't know.

20   BY MR. TOBEROFF:

21   Q    Do you have any understanding of that?

22   MS. ESKENAZI:  Same objections.

23   THE WITNESS:  I don't know.

24   BY MR. TOBEROFF:

25   Q    You don't know whether or not you have an

240

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

**Atkinson-Baker Court Reporters**
www.depo.com

```
1         Q      Do you keep copies of your tax returns going back
2    that far?
3         A      No.
4         Q      Does your accountant?
5         A      I don't think so.
6         Q      Do you know one way or the other?
7         A      No.
8         Q      Now, you had a crew that worked on the "Friday the
9    13th" production; correct?
10        A      Yes.
11        Q      Were they hired by the Manny Company?
12        A      They were hired by me.
13        Q      By you personally?
14        A      I don't understand.  A company can't hire somebody,
15   can they?
16        Q      Yes.
17               Wasn't the Manny Company the one that signed Victor
18   Miller's flat deal contract?
19        A      I signed a check on behalf of the Manny Company.
20        Q      My question is:  Did you use the Manny Company for
21   other crew members?
22        A      I did not.
23        Q      Did you use Sean S. Cunningham Films Incorporated?
24        A      Limited, yes.  As a production company.
25        Q      What kind of entity is Sean S. Cunningham Films?
```

248

**Sean Cunningham**
May 12, 2017

TOBEROFF EX. P

A-752

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
1    13th" worked for me full time.

2    BY MR. TOBEROFF:

3        Q    Were they regular salaried employees of the Manny

4    Company or one of your entities?

5        MS. ESKENAZI:  Objection.  Calls for legal conclusion.

6    Calls for speculation.  Lacks foundation.

7        THE WITNESS:  Is your question who paid them?

8    BY MR. TOBEROFF:

9        Q    No.  Were they regular salary employees for you or

10   one of your companies?

11       A    I don't know what that means.

12       MS. ESKENAZI:  Same objections.  Calls for --

13   BY MR. TOBEROFF:

14       Q    Was Cindy Veazy a regular salaried employee of

15   yours?

16       MS. ESKENAZI:  Calls for legal conclusion.  Calls for

17   speculation.  Lacks foundation.  Vague and ambiguous.

18       THE WITNESS:  I don't know.  I thought you meant who paid

19   them.  When you keep coming back with "regular salaried

20   employee", which I take it to be a term of art and I don't

21   understand it.

22   BY MR. TOBEROFF:

23       Q    You don't understand what's meant by "regular

24   salaried employee", is that your testimony?

25       A    I don't know what you mean by it in this context,
```

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P

Atkinson-Baker Court Reporters
www.depo.com

```
 1    yes, that's my testimony.
 2         Q    Do you know what I mean by traditional employee as
 3    opposed to an independent contractor?
 4         MS. ESKENAZI:  Objection.  Calls for legal conclusion.
 5         THE WITNESS:  No, I don't.
 6    BY MR. TOBEROFF:
 7         Q    Do you know what an independent contractor is?
 8         MS. ESKENAZI:  Objection.  Calls for legal conclusion.
 9         THE WITNESS:  No.
10    BY MR. TOBEROFF:
11         Q    I'm asking for not a legal conclusion, I'm asking
12    for your civilian understanding of what an independent
13    contractor is.
14         A    My current understanding is that it would be
15    something like an Uber driver.
16         Q    An Uber driver, what do you mean by that?
17         A    An Uber driver is a guy who drives an Uber car.
18         Q    So let me ask you a question:  If you engage
19    somebody to paint your house and you're going to pay him a
20    flat fee for painting the entire outside of your house, would
21    you call that person a regular salaried employee of yours?
22         MS. ESKENAZI:  Objection.  Vague and ambiguous.  Calls
23    for legal conclusion.  Lacks foundation.  Calls for
24    speculation.  And it's an incomplete hypothetical.
25         THE WITNESS:  I would call that guy the painter.
```

253

**Sean Cunningham**
**May 12, 2017**

TOBEROFF EX. P



CRYSTAL LAKE MEMORIES

THE COMPLETE HISTORY OF

# FRIDAY THE 13TH

PETER M. BRACKE     FOREWORD BY SEAN S. CUNNINGHAM

CONFIDENTIAL     TOBEROFF EX. Q     PLAINTIFFS001340

A-755







**Top:** Sean Cunningham (left) and Steve Miner, circa 1986. After Cunningham hired the young Miner as a production assistant on 1972's *Last House on the Left*, they formed a close friendship that continues to this day. Miner went on to direct the first two *Friday the 13th* sequels, as well as the hit 1986 horror-comedy *House*, which Cunningham produced.

**Middle:** Frank Mancuso, Sr., in a 1982 publicity pose. He began his career as a booking agent for Paramount Pictures in 1962, and by 1983, he was named the studio's Chairman and CEO. He would acquire *Friday the 13th* for the studio in 1980.

**Bottom:** Hallmark Releasing's George Mansour. In 1971, Mansour acquired Sean Cunningham's second directorial effort, *Together*, for the company. The founders of Hallmark eventually went on to fund *Last House on the Left*, which Cunningham produced, as well as *Friday the 13th*.

Sean Cunningham's beginnings were inauspicious at best. He struggled to make a name for himself in New York's "anti-establishment" film scene of the early 1970s, scraping by on a diet of industrial shorts and commercials—and the occasional soft-core porn. Yet Cunningham's drive and determination remained unflappable. He was once heard to boast, even before he produced his first motion picture, "All you need in order to be a film producer is a telephone and some stationery!"

Although Sean Cunningham would toil in the trenches of low-budget, unremarkable exploitation pictures for the ten years before the unprecedented success of *Friday the 13th*, his youthful bravado proved magnetic. And many of those drawn into his rag-tag filmmaking family would come to play a crucial part in the birth of the *Friday* franchise—a group whose backgrounds were as disparate as their talents were unique, and often united by little more than raw ambition. There was Wes Craven, an ex-Humanities professor-turned-aspiring filmmaker; Steve Miner, a former ski-bum on the verge of his first Hollywood break; Harry Manfredini, a New York-based composer and part-time session musician; Bill Freda, editor-for-hire; and Victor Miller, the Yale-educated screenwriter torn between prestige and schlock. But those most influential to Cunningham's destiny would be three men of great mystery, owners of the Boston-based regional chain Esquire Theatres who were about to make an unexpected transition from shady back-door dealmakers to major studio-supported financiers.

All were anxious to make their mark on motion picture history. And they would.

**SEAN CUNNINGHAM, Producer & Director:** My first film was called *The Art of Marriage*. At the time, we had what were called "white coaters." They allowed you to get away with showing hardcore XXX-rated movies as long as they were under the guise of freedom of speech. You billed it as an "educational" or "medical" movie. At the beginning, someone would come out in a white coat and say, "We're now going to show you marriage practices in Denmark and these are the ways you can improve your marital bliss." And then for the next 80 minutes you saw people fucking like crazy. At the end, the same guy with the white coat would come out again and say, "Now that you have experienced these practices, you can go home with your mate and practice these things at home." We didn't have anybody actually fucking onscreen, just two people without clothes on lying on top of each other.

I just can't tell you how simple things are when you don't know anything. I had never even touched a camera before. I had no idea whatsoever what I was getting into. *The Art of Marriage* cost something like $3,500 that I had scraped together. I think we had three crew members, and I don't even know why we had to have that many. We just were afraid of getting arrested. That was how I embarked upon my filmmaking career. This was 1970, approximately.

**GEORGE MANSOUR, Distributor, Esquire Theatres:** Back in the late '60s, I was working for Warner Bros. as a "short-booker"—in other words, I wasn't trusted with major films. There were big books and you had a number of prints and you wrote in where the prints were going and the name of the movie house. And I knew all of them. So I would fill in for this drunk guy all the time and call up and try to get dates and make sure that the prints went out to the proper movie houses.

Esquire Theatres was one of Warner's accounts. They owned and operated about one hundred screens, mostly on the East Coast. Esquire were not the best payers—they were a little shady and shaky—but they also had a lot of good movie houses. I got a rapport going between myself and the owners—Phil Scuderi, Steve Minasian and Robert Barsamian. One thing led to another, they had an opening and offered me a job. So I went from a trainee booker for Warner, who was selling to movie houses, to working a distribution company who was booking movies from them.

**RON KURZ, Screenwriter, *Part 2*:** I had known of Phil Scuderi and Esquire since my days in the early 1970s as a theater manager in Baltimore. I became aware of Phil because of some of his distribution tricks. He was like William Castle—taking out insurance policies against dying of fright or having kids handing out logo-imprinted toilet paper on downtown street corners. Phil, who has since died, was quite a force in the schlock movie business—just picture a cross between Roger Corman and Michael Corleone: a trained lawyer, crude and suave at the same time, and full of street smarts. And when he got into movie production, he could rip off the latest box office hit and have something on screen in a matter of months. I should know—I wrote a few of them.

TOBEROFF EX. Q
CONFIDENTIAL

PLAINTIFFS001355



Above: One of the many shocking images from *The Last House on the Left*.

Distributed theatrically in 1972 by Hallmark Releasing, this notorious cult classic was directed by Wes Craven and produced by Sean Cunningham. The film was initially tested under different titles, including *Sex Crime of the Century* and *Krug & Company*. It was not until the film was renamed and couplet with an inventive ad campaign that recommended to terrified patrons, "To avoid fainting, keep repeating, 'It's only a movie...'," (below) that it became one of the most successful exploitation films of the early 1970s.

Such publicity gimmicks would prove influential to *Friday the 13th* when, almost a decade later, Hallmark helped create ad concepts for the film. "The original marketing for *Friday the 13th* was Hallmark's," says the company's former publicist George Mansour. "And it could easily have been the idea of any of the guys in the office, because it was very loose and crazy. We didn't have an ad agency or anything like that. It wasn't until Paramount really came in on the third *Friday* that they were involved in the marketing."



CAN A MOVIE GO TOO FAR?

MARI, SEVENTEEN

IS DYING. EVEN FOR HER THE WORST IS YET TO COME!

TO AVOID FAINTING KEEP REPEATING IT'S ONLY A MOVIE ONLY A MOVIE ONLY A MOVIE ONLY A MOVIE

LAST HOUSE ON THE LEFT

WARNING!

NOT RECOMMENDED FOR PERSONS OVER 30!

Westport, and I knew that there were a number of industrial and educational filmmakers there. So I moved back home to Connecticut in hopes of finding some work. I heard that somebody in town was shooting a movie, and it turned out to be Sean Cunningham, who was producing *Last House on the Left* with Wes Craven. I didn't know Sean at the time, but I had grown up with his younger brothers. So I asked Sean to give me a job, and he did, at something like fifteen dollars a week. I was a gofer, but I ended up doing a little bit of everything. I held the boom mike, I carried lights, I took script notes, anything that was needed. I remember a lot of twenty-four hour days, trying to finish up and get out of a given location. And we didn't have script boards, so we would be going through the script, crossing out pages, wondering, "Did we shoot this part yet?"

SEAN CUNNINGHAM: *Last House* became a kind of double-edged sword. Since it was very cheap and exploitative, and successful at its own level, all people thought of me was with the notion that, "If you want to get puke in a bucket—and get it cheap—boy, I've got just the guy for you!" I'm certainly glad to have made it, because it made a whole bunch of other things possible. But at the time, there was no thought of, "Is this something that I'm even going to be talking about twenty-five years from now?"

WES CRAVEN: At this point in my life, *Last House* is so far back in my past that it's more of an oddity than a sore point. I see it, in a way, as a protest film. There was an initial stage in horror cinema, during which *Last House* was made, where gore stood for everything that was hidden in society. Guts stood for issues that were being repressed, so the sight of a body being eviscerated was exhilarating to an audience, because they felt, "Thank God, it's finally out in the open and slopping around on the floor." But that gets very old very fast.

I don't think *Last House* was really the progenitor of what Sean did in *Friday the 13th*... the violence in that film was bizarre, but it wasn't real; it was goofy. I was more interested in psychological underpinnings and irony, and I think Sean discovered after *Last House* that he was much more interested in being entertaining rather than assaultive. *Last House* didn't allow you to have fun at all.

SEAN CUNNINGHAM: In terms of film politics and possibilities, *Last House* is important. But it is very, very hard to watch. It's not a fun movie at any level. And boy, did I not want to make *Last House on the Left Part II* or *III*. Wes and I were also striking off in slightly different directions. I was trying to do documentary films and commercials. Steve Miner had been working for me, and he was trying to cut some NHL film. We were all just learning.

I also did not want to deal any longer with Phil and the folks in Boston. They were and continue to be very difficult people to deal with. In a perfect world, you wouldn't have to deal with people who cause you problems. So after *Last House*, Wes and I just decided to stay away from them. We were friendly, and I didn't want to quite close the door, but I didn't particularly want to work with them again.

Eventually, I wound up going to Spain to do a tax shelter movie called *Blind Planet*. I was somehow the American who had brought in the financing and they wanted to make their own movie, and they didn't want my input. And in Spain they have siesta, so I was getting drunk twice a day. Plus, I didn't have too many responsibilities, so I could get drunk as much as I wanted to. And I had two alcoholic parents, so I knew a lot about booze. I thought I had decided that I wasn't going to become a drunk like my parents. And I didn't. I became a drunk unlike my parents.

When I came home, my wife had had it. I went to AA on Mondays to get her off my back—meeting after meeting. And as it turned out, I was one of those fortunate guys—I discovered sobriety. That's when my life really changed dramatically. Sobriety brings with it very different perspectives. I no longer had interest in the "naughty factor." I just wasn't going to do that anymore. That was a big turning point.

So after coming back from Spain and still wanting to do something else, one day, out of the blue, I got a call from Phil Scuderi to come out to Boston. I said, "What the hell?" So he sits me down in his office, this is around Labor Day, 1976, and he has this thick Boston accent: "Have you ever seen that *Bad News Bears* movie?" So a writer named Victor Miller and I put together this silly little rip-off movie called *Here Come the Tigers* with only three weeks of prep and script.

VICTOR MILLER, Screenwriter: I was very impressed with Sean. He had an incredible mind and seemed to know a lot. And, of course, he had done *Last House on the Left*, which was a lot more than I had done. It's funny, because Sean was

TOBEROFF EX. Q

CONFIDENTIAL

PLAINTIFFS001357

A-757

anything but scary. He was goofy and sort of carefree at that point. I also always liked his metaphor that a good movie was putting together a good rollercoaster for people. We both wanted to make a living at it; we definitely thought about movies as entertainment, not as teaching tools for the universe.

SEAN CUNNINGHAM: I think *Here Come the Tigers* cost like $250,000, if that. It could be much lower. It was guerrilla filmmaking. It was all kids from the local little leagues; it was like being on a three-week field trip with a bunch of sixth-graders. It was good and bad, frustrating and exciting. I loved it.

VICTOR MILLER: Those where the days when everybody said, "What America needs is a good G-rated movie." I guess *Here Come the Tigers* made its money back, but they lied about America wanting G-rated films. But that did not stop us from making another G-rated film, *Manny's Orphans*—or *Kick*, depending on which version you saw. Steve Miner had come up with the idea for it and I wrote the screenplay and we did it, another low budget film, and shot it around Bridgeport, Connecticut.

SEAN CUNNINGHAM: We had this notion of a bunch of orphans in a halfway house; they put together a soccer team and the underdog wins. So we raised the money to do what became known as *Manny's Orphans*. It was a lot of fun to make, and again I loved working with the kids. I really thought it was going to be a breakthrough film for me. Then we went out to try and sell it and the reaction was lukewarm. United Artists said, "Let's take this and use it as a pilot for a TV series," and they optioned the movie. That was the good news. The bad news was all they did was option it, they didn't buy it.

I was trying to figure out what the heck we could do to keep the lights on, to support my wife and my kids. I loved this notion of doing a warm, fuzzy children's series, but that wasn't gonna pay the bills. I decided I had to make some kind of a movie. I didn't want to go back to horror, but we were broke. And the most important thing you can do in a film career is make money. Because if you make money, people will let you make more films and take chances and nobody will blame you.

*Sean Cunningham would find the inspiration he needed with the release in 1978 of a low-budget, independently financed and distributed horror film entitled* Halloween. *The story of an escaped mental patient named Michael Myers who returns to his hometown to stalk and murder a trio of babysitters, along with the film's stylish direction by John Carpenter and easy to replicate elements—a simple but effective structure, limited locations, a masked killer and a fresh-faced cast of relative unknowns—served as the blueprint for a new sub-genre of the horror film that would soon become known as the "slasher movie."*

*Although excited by the commercial possibilities of following in the success of* Halloween, *Cunningham's return to horror was still a reluctant one. Even if the film that would become known as* Friday the 13th *was more calculated rip-off than genuine inspiration, the roots of the film's conception, development and financing would, ultimately, begin with the relationships Cunningham had forged eight years prior—and the three men with whom he had sworn he would never do business again.*

VICTOR MILLER: Around early 1979, I was living in Stratford; Sean and I were going to each other's houses probably two, three or four days a week just working on things. We were coming up with projects that we thought would be great for Clint Eastwood and other stuff that, of course, never got made. Then one day he called me up and said, "*Halloween* is making a lot of money at the box office. Why don't we rip it off?"

STEVE MINER: I loved the original *Halloween*. It was a breakthrough for American cinema really. It pioneered several concepts, of the independent film having mainstream success, and of a certain type of horror film as a genre. And it was really well done, a really terrific film. It relied on classic suspense and situations, and not gore. With *Friday the 13th*, we tried to copy the success of *Halloween*, clearly. We did it to break into the movies. At the time, we were working out of a garage in Connecticut. And we didn't even have a script.

SEAN CUNNINGHAM: Victor and I sat down at the kitchen table and started kicking around ideas. We'll take a remote location and put a lot of young people in jeopardy. Then we went down the list: are they in jeopardy from a real force or

## "Those were the greatest times I ever had making movies."

**Sean Cunningham on *Here Come the Tigers* and *Manny's Orphans***

Below: The trade ad that launched *Friday the 13th*. Appearing in the July 4, 1979 issue of *International Variety* the ad while placed by Sean Cunningham primarily to generate investment capital, also served a second, more covert purpose. "I talked with Steve Miner about it," remembers Cunningham, "and the two of us thought that while we liked the title *Friday the 13th*, we didn't know if we could legally use it or not. So that is in part why we took out that big ad, because then I somehow was gonna sue us, they'd let us know. And as it turned out, we had no problems with the title at all."

However, George Mansour, who worked for Phil Scuderi, one of the co-owners of Georgetown Productions, the company that would eventually fund *Friday the 13th*, disputes that claim. "Actually there was a problem with the title," says Mansour. "There was a movie before ours called *Friday the 13th: The Orphan*. Moderately unsuccessful. But someone still threatened to sue. I don't know whether Phil paid them off, but it was finally resolved. So, another *Friday the 13th* did exist."



FROM THE PRODUCER OF *LAST HOUSE ON THE LEFT* COMES
**THE MOST TERRIFYING FILM EVER MADE!**

**FRIDAY 13TH**

LONG NIGHT AT CAMP BLOOD

CONFIDENTIAL — TOBEROFF EX. Q

they came in with an initial offer of $125,000. It was a good start. They came back to me after we had an early draft of the script and they had said that they changed their mind—they wanted to invest the entire $500,000. They really wanted to control it all. We tried to negotiate the deal in a certain way that I thought I could live with, but they wouldn't cave on a few points that I considered to be crucial, like who gets the money and when, and cash flow.

Finally, one night I was having a phone conversation with Phil Scuderi. I said, "No. I just can't do it." And I hung up on him. It wasn't the wrong thing to do—it was the right thing to do. And I think it would still be the right thing to do if it were only me involved. On the one hand, they're putting up all the money, so we get to make the movie. But on the other hand, it was just going to be like signing up for a root canal. It was a way to go forward, but it was another way to go backwards.

That was a very troubled night. I spent the night tossing and turning, and I got up early in the morning and went jogging. I remember this so clearly. Sometimes when you run you wind up being free-associative. All this stuff bubbled up. I thought, "It's not the deal you want, but it's not the movie you want, either. You're just trying to put it together and all these people are counting on you. Fuck, what's the big deal? So you didn't get what you wanted." Sometimes we do the right things for the wrong reasons.

So I come back to the house, it's 6:45 a.m. and the kids had just gotten up. I called Phil at home and said, "I thought about our conversation last night, and I changed my mind. I'm willing to do it on the terms you suggest." And he said, "I'm glad you called because I was just leaving the house." He was about to go take the money and invest it in a shopping center.

That's how we got to make *Friday the 13th*. It really came down to, if I had called him twenty minutes later it never would have happened.

*Dated August 21, 1979, Victor Miller's third draft of "Long Night at Camp Blood" deviated unusually little from the final shooting script of* Friday the 13th. *It was with this draft in hand that Sean Cunningham would begin pre-production for the film: scouting locations, assembling a crew and beginning casting sessions in a non-descript warehouse in New York City.*

*The hodgepodge of characters that pepper Miller's script are undeniably generic, albeit dependable, archetypes: roughly a half dozen thinly-sketched, would-be victims familiar to any American teenager—the good girl, the practical joker, the jock, the slut, the potential boyfriend. And in the film's heroine, Alice, Miller would build upon the foundation laid by Carpenter's prototypical babysitter Laurie Strode in* Halloween, *while also granting his creation a resourcefulness and intelligence transparently lacking in scream queens past.*

*Few answering the open casting calls could have expected anything more than just another low-budget horror film in the wake of* Halloween's *success, but for one group of fresh-faced young actors,* Friday the 13th *would be a very lucky day indeed.*

VICTOR MILLER: I was sitting in the waiting room at Columbia Pictures after *Friday the 13th* had come out and was such a success, and I heard one of the guys describing the movie as "the Pepsi Generation being horribly killed."

SEAN CUNNINGHAM: I remember thinking what was so scary about *Jaws* was looking up at the legs of all these innocent children and lovers and parents. It wasn't that they did anything wrong, or right. So when I was doing *Friday the 13th*, I wanted to create this world of young lovely kids, and that somebody is going to bite their legs off without any rhyme or reason. And therein lies the fear.

When we decided to cast the film, we'd never used a casting agency before. I was very fortunate to run into Barry Moss in New York. He worked with Julie Hughes at TNI Casting, and they were primarily theatrical agents. And for whatever reason, Barry really responded to it. Julie wasn't quite so sure. But they just broke their necks to get me the best actors they could find, and were absolutely instrumental in getting us the credible cast that we needed.

BARRY MOSS, Casting Director: We had done *Hero at Large* and *The Champ* before *Friday the 13th*. We didn't think it was a comedown, not at all. This was before the stigma of horror movies. There was *Halloween*, which was a big hit, and then this was the next one. Then a few years after that it became sort of like a grade-B thing to do. At the time, it was not. It wasn't grade-A, but in New York actors loved to do movies because there are so few opportunities. And I loved the script. I remember reading it one night on my little terrace, "Oh, no, not Jack! Don't kill Jack!"

KEVIN BACON, "Jack": Ever since I was a little kid, I always had an overdeveloped fantasy life and plugged myself into those fantasies whenever I could. By the time I was nine, I wanted to be a painter. When I was thirteen years old, I wanted to be a conga drum player. Then, when I reached fifteen or sixteen, it came to me that I was going to be an actor. I had a really strong sense that I was going to make a living even though I was going to be an artist. That was a big driving force, because I wanted to be free from any financial connection to my parents as soon as I possibly could. I didn't want to owe anybody anything. I still think of myself as a workhorse. The summer I turned eighteen, I remember coming up out of the New York subway with my little suitcase at Seventy-Second Street and Broadway, thinking it was the center of the universe.

My first movie was *Animal House*. I was attending Circle in the Square at the time, and the casting director called up the school and said, "We're looking for preppy freshman, we behind the ears." It didn't register as anything real. The guy said, "How's scale?" and I said, "Scale is fine." I had no idea what scale meant. I ended up with a couple of scenes in that movie in which I get whacked on the backside with a paddle, and I get flattened into the cement at the end. And after five weeks on the set in Oregon, I figured I was a movie star and didn't have to go back to school. Six months later there I was, back in New York, waiting tables.

I heard about *Friday the 13th* because I traveled in some of the same acting circles as Mark Nelson, and I knew Jeannine Taylor as well. I think the casting directors just thought we worked well together as a threesome.

SEAN CUNNINGHAM: At that point he wasn't Kevin Bacon the movie star as we know him now, he was just a kid from New York trying to figure out how to make it happen. And he had a chance to be in a movie, to have a bunch of lines and show what he could do. I thought he was really smart. And I guess he still is great looking, but he was a *great* looking kid. It was kind of a no-brainer to hire him.

JEANNINE TAYLOR, "Marcie": I had the bug pretty early. I began to take voice lessons at the age of fourteen and then sang in school assemblies and at church and community events. Then I got some parts in school plays, and began to yearn to be a serious actress. Right after college I immediately moved to New York. I couldn't wait. I had the great good fortune to work with really fabulous, renowned artists very early. I was incredibly lucky. I was living many American girls' dreams.

But as far as acting in major motion pictures—frankly, I didn't think I was pretty enough. I didn't ever think of myself in that way. It was kind of a fluke, really. Barry Moss and Julie Hughes were a big

THIS PAGE/OPPOSITE PAGE: IMAGES COURTESY CRYSTAL LAKE ENTERTAINMENT.

CONFIDENTIAL
TOBEROFF EX. Q
PLAINTIFFS001360





Top: Often working long hours and throughout the night, the crew of *Friday the 13th* manage to steal a catnap between setups.

Above: Director of photography Barry Abrams grabs a few winks during a break in filming. Abrams would also work with Sean Cunningham on such films as *Here Come the Tigers* (1978) and *A Stranger is Watching* (1982).

Opposite page: Actors Jeannine Taylor (left) and Mark Nelson (right) rehearse a scene as Kevin Bacon (far left) looks on. This still was taken on the very first day of principal photography on *Friday the 13th*—September 4, 1979.

low-budget things in New York, where we'd all run to the banks to cash our checks and there would be no funds. And it was never like that on this. I would mail the check home, and after the first one or two cleared I stopped worrying about it. Of course, after the movie came out and was a big hit, I'd run into people who worked on it and we'd say, "Oh, shit, maybe we should have taken the points!"

**SEAN CUNNINGHAM:** Georgetown Productions was just another name for Hallmark. It was just another corporate entity. They had to change things every once in a while. It sounds so low-rent, but it wasn't like they'd write a check and the money would be in the bank. They would say they would write a check and then they wouldn't, and then it wouldn't arrive, and then you can't make payrolls and you're trying to pay the laboratories and stuff like that. They were theater owners, and cash would come in on the weekends, and they would have a limited number of places where they could spend the money. It was the squeaky wheel thing—there was a lot of that going on. Every week it was always a battle. You had to fight so hard just to pay the bills, which is a fight that was completely separate from how hard it is to make any movie, even when you have the money.

What poor Steve Miner had to go through—I couldn't have done it without him. And Steve didn't even want to do this picture at all. I had to beg him to do it. He said that he would work as the Line Producer and the Unit Production Manager and make all that stuff happen. He had to keep dealing with these people day after day until we finally got to the end of it.

**GEORGE MANSOUR:** Sean Cunningham got a better deal on *Together* than he would ever have gotten from anybody else. And he would never have had the opportunity to make *Last House on the Left* and *Friday the 13th* if Hallmark hadn't bought *Together*. Sure, we paid him very little money, and we made a lot of money on those films. But no one else would have invested that kind of publicity and prints and attention. If Sean had made *Friday the 13th* for Sony Pictures now, he would have been fucked. The majors would have written off everything and he would have had nothing. He got a substantial amount of money out of *Friday the 13th*. And after that Sean never made a decent movie, or one that could make any money.

However, I will say this about Phil and Steve and Bob—I won't characterize them as more than shady, without mentioning any other kind of word. They would lie about things they didn't need to lie about, and they sort of liked to portray themselves as worse than they were. There was a certain frisson for them about being outlaws. But they were nice people underneath it all. All movie companies are tough. Just try dealing with Harvey Weinstein. At least Phil and Steve and Robert, after everything was said and done, they were okay. Maybe they'd fuck Universal, but if you were a little guy, they'd be less inclined to fuck you. They'd only fuck you half the way.

**SEAN CUNNINGHAM:** I don't resent all the money that Scuderi and Minasian made. Nobody else had that kind of faith in me and wrote those kinds of checks. They took an enormous risk. And as a result, they made an enormous amount of money. Okay, fair enough. The problems that they caused me are problems that some people would love to have.

But it was always a push-pull relationship. It was always an incredible ordeal to extract the money to make the movies. They'd tell me, "I'll give you $25,000 on Friday." And they wouldn't give me the money. It was never, ever easy. But to give them full credit, they were people who, when I said I was going to go do something, they'd believe me and I'd go do it. Phil trusted me—I think Phil trusted me. But I can't complain. If it hadn't been for them, I would have never made *Friday the 13th*.

**ADRIENNE KING:** Everyone else was complaining about the money situation. But Sean was very organized and kept everyone calm. No matter what was going on, the actors didn't know about it. I'm sure they were having money problems left and right, but Sean would just say, "It's going to be a big hit!" For us, we knew going in that everyone was on minimum, so that was just the deal. I was just thrilled to be there.

Not that money was never a factor. At the beginning of the shoot, the wardrobe person had bought me a pair of boots and they were too small. So being that we were on this tight budget, she started walking around in my boots with three pairs of socks, trying to get my boot to fit my foot. So I put them on and I did my first scene with my tight boots, and afterwards I said to Sean, "I have to do a lot of running in this film and I really need boots that fit." He goes, "Jeez, okay, when you go back to New York this weekend go find a pair of boots. Just make sure they're on sale."

CONFIDERLOFF EX. Q                                                PLAINTIFFS001365



*Minimalist, thrifty and occasionally crude,* Friday the 13th *both suffered and benefited from the limitations of its small budget. Cunningham and his crew had to be inventive with the resources at their disposal: limited equipment, the moodiness of the location, and creative production design. But the result was a dark, sparse, neo-verité nightmare influenced as heavily by the documentary makers with whom Cunningham had rubbed shoulders during his early years as by the more stylized films of the era that critics accused him of shamelessly swiping from.*

**SEAN CUNNINGHAM:** I wasn't creatively invested in *Friday the 13th.* I didn't have "artistic" inklings. The style was, "What does it take to tell the story?" And we created technical problems that you wouldn't believe. We were out in this totally remote location in New Jersey. Then, in the script, the storm comes in. And on top of that, the lights have to go out. So I have to shoot this film with no source light whatsoever, not even moonlight. There I am, out in the middle of nowhere, trying to maneuver everyone. Consequently, it takes forever to go from here to there. Anything you want to do is three to four hours of setup time.

There have been criticisms of the way *Friday the 13th* looks. But my poor DP, Barry Abrams, he begged me for more light. I didn't have the money. I was like, "Barry, you're killing me! Why do we need all those lights?!" *Friday the 13th* was almost the definition of minimalist filmmaking at the time. How low can we light it to qualify as a movie that somebody would pay us money to see? And reality is perhaps the most effective method to present horror. "This could happen to me" is what truly scares the wits out of an audience. I think another reason why the film is seductive in its own way is that the amateurishness gives it a verité kind of reality, which a slick movie doesn't create. You feel like you're witnessing a real event, which I suppose is an accomplishment.

**ADRIENNE KING:** It was like *The Blair Witch Project* twenty years beforehand. That's what we felt like in the dark, in the woods. It wasn't a handheld camera, but it was close.

**PETER STEIN, Camera Operator:** We shot *Friday the 13th* with a very small crew. A gaffer and an assistant cameraman, that was about the size of it. And you've got to figure out where to place the lights so they're not going to be in the shot, but they're going to do the job. And do it all without front-lighting the action, because that is not horror film lighting. You want to edge-light and backlight, and just have a little bit of fill to give it that dramatic, scary look. And for the effects, you want to light them even darker, to not feature them too much. The lighter it is, the more the audience's attention goes to it. So if you keep it dark and in the shadows, it works better. I think it was those considerations that really contributed to the look of *Friday the 13th.*

**SEAN CUNNINGHAM:** There's a technique that has since become a cliché, which is the stalker POV. I used it in *Friday the 13th,* and John Carpenter certainly used it before I did. It's the notion that there is an unexplained, unexpected person in the story. And that by switching to that point of view you can create a certain kind of anxiety. Because the camera is in the wrong place and it's telling you, non-verbally, that there's somebody else possibly present. And that we, the audience, have information that the characters don't have. So whereas the character might just wander into the equipment shack thinking everything is fine, we're saying, "No, there's somebody out there, don't ya' see?" That is one of the many devices that we used to try to increase the tension, and it's certainly the main visual dynamic of *Friday the 13th.*

**JEANNINE TAYLOR:** As an actress, it was interesting to do those switches. When Marcie recounts her dream, I think her fear does come across. That was one part of my performance that I thought was pretty okay. The sound of the storm triggers this happy-go-lucky girl's only real terror. The film changes tone at that point and goes into a darker place. That's an aspect that I can say was interesting to try and do.

The actual shower scene—my death scene—I'm just goofing around. My character is in love, she's in this great place and has all

THIS PAGE: TITLE PAGE: IMAGES COURTESY CRYSTAL LAKE ENTERTAINMENT

CONFToBEROFF EX. Q                                    PLAINTIFFS001366

Case 3:16-cv-01442-SRU   Document 51-2   Filed 06/30/17   Page 178 of 204



TOBEROFF EX. R



*The silhouette of the axe that kills Marcie. (Photo courtesy of Henri Guibaud)*

In 2001, I was the first journalist to do any serious retrospective on Friday the 13th. I interviewed members of the cast and crew and unearthed information that had never been made public before. In May 2002, I published a major article on the film in the American horror film magazine Fangoria. I

VM00344

TOBEROFF EX. R

A-763

was the first and only journalist to interview the likes of Peter Brouwer, Harry Crosby, Sean Cunningham, Victor Miller, Robbi Morgan, Mark Nelson, Betsy Palmer and Tom Savini in the context of "looking back" at Friday the 13th and its impact.

In 2005, I was the first journalist to publish a book on the film, Making Friday the 13th: The Legend of Camp Blood. It covered the entire Friday the 13th series, with several chapters devoted to the "first" film. In the subsequent years, both the book and the magazine article have been referenced in various books, DVDs, online and research projects. It seems like everyone I talk to, from fans to Hollywood filmmakers, has a copy of the book.

In 2010, I decided the original Friday the 13th film warranted a book of its own, entirely devoted to the execution, filming, legacy and planning that went into the creation of the 1980 film. I wanted to create a book in the vein of other wonderful books, such as David A. Szulkin's Wes Craven's Last House on the Left: The Making of a Cult Classic and Stephen Rebello's Alfred Hitchcock and the Making of Psycho.

Having completed On Location in Blairstown: The Making of Friday the 13th, I'm proud to say this book will be a shocking revelation to the most passionate fans of the 1980 film, but also to film historians in general. It's full of untold production stories and recollections that shatter many long held beliefs about Friday the 13th and answer many questions about the film and the time period in which it was conceived and born.

This book bears its title On Location in Blairstown: The Making of Friday the 13th not because I was present in Blairstown, New Jersey during September and October 1979, but because I wanted the title to indicate the book was written to capture the place and time when Friday the 13th was brought to life.

I also wanted to highlight the lives of the cast and crew who

VM00345

TOBEROFF EX. R

was the first and only journalist to interview the likes of Peter Brouwer, Harry Crosby, Sean Cunningham, Victor Miller, Robbi Morgan, Mark Nelson, Betsy Palmer and Tom Savini in the context of "looking back" at Friday the 13th and its impact.

In 2005, I was the first journalist to publish a book on the film, Making Friday the 13th: The Legend of Camp Blood. It covered the entire Friday the 13th series, with several chapters devoted to the "first" film. In the subsequent years, both the book and the magazine article have been referenced in various books, DVDs, online and research projects. It seems like everyone I talk to, from fans to Hollywood filmmakers, has a copy of the book.

In 2010, I decided the original Friday the 13th film warranted a book of its own, entirely devoted to the execution, filming, legacy and planning that went into the creation of the 1980 film. I wanted to create a book in the vein of other wonderful books, such as David A. Szulkin's Wes Craven's Last House on the Left: The Making of a Cult Classic and Stephen Rebello's Alfred Hitchcock and the Making of Psycho.

Having completed On Location in Blairstown: The Making of Friday the 13th, I'm proud to say this book will be a shocking revelation to the most passionate fans of the 1980 film, but also to film historians in general. It's full of untold production stories and recollections that shatter many long held beliefs about Friday the 13th and answer many questions about the film and the time period in which it was conceived and born.

This book bears its title On Location in Blairstown: The Making of Friday the 13th not because I was present in Blairstown, New Jersey during September and October 1979, but because I wanted the title to indicate the book was written to capture the place and time when Friday the 13th was brought to life.

I also wanted to highlight the lives of the cast and crew who

TOBEROFF EX. R

VM00345

A-765

collaborated on Friday the 13th, not just in the context of the making of Friday the 13th itself, but also in terms of their careers and lives prior to and after Friday the 13th's release in 1980.

Since I've interviewed virtually the entire production unit who worked on Friday the 13th, some of whom are now dead, this was, in many ways, the most interesting part of writing this book, especially since I've grown close to many of the cast and crew members over the years.

One thing I seek to avoid in this book is to "defend" Friday the 13th in any way or put the film in any kind of critical context. I set out to document and report the elements that went into the creation of Friday the 13th, without any of my own personal commentary.

As the scope of the book - and the title - mandates, I avoid discussing the Friday the 13th sequels in any meaningful detail except in the context of how the rest of the Friday the 13th franchise has affected the 1980 film. This book is focused on the 1980 film, the original Friday the 13th-- the only film in the series that holds my true passion.

TOBEROFF EX. R

A-766



*Together* was a surprising box office success and marked the beginning of Sean Cunningham's relationship with Hallmark Releasing Corporation, the newly-formed distribution company in Boston – run by Robert Barsamian, Stephen Minasian and Philip Scuderi – for whom *Together* was one of the first titles they distributed. Cunningham only received a tiny portion of the film's profits. (Photo courtesy of David A. Szulkin)

"Theater is an anachronism – it doesn't last," Cunningham said. "Film is a lasting statement. I had raised some money for theatrical projects, and that didn't seem like a very good financial investment. I figured maybe I could

TOBEROFF EX. R

raise some money for movies, and figure out how to make them as I went along. It seemed like fun, so that's what I tried to do."

Cunningham's time in the theater represented the last time in his professional career he was ever involved in an enterprise entirely driven by creative, innocent motives. Although the theatrical world was, is, very competitive and ruthless, the world of theater, in retrospect, was like a panacea compared to the abyss that Cunningham found himself entangled in throughout the 1970s.

Cunningham's fateful decision, in the twilight of 1969, to move into the filmmaking arena marked the beginning of his transformation from energetic, optimistic, upper-crust New England boy to the brash, cynical, self-effacing, wholly businesslike figure that emerged throughout the 1970s.

"I lived like a gypsy in the 1970s," Cunningham says. "I had a passion for the theater, but I didn't approach film with any sense of artistry. I looked at the prospect of making films as being a fun job and I was hoping I could make enough off the movies so that I didn't have to get a real job. That was my goal."

With a budget of $3500, gathered from donations Cunningham sought from family and friends, he officially entered the film business in the fall of 1969 when he directed, produced and wrote a sex documentary – or "white coater" as it would come to be known – called The Art of Marriage.

A complete novice in the rituals of low budget filmmaking, Cunningham only brought three crew members with him for the making of The Art of Marriage. Whether it was beginner's luck, or blissful ignorance, The Art of Marriage was a modest success when the film was released in a handful of theaters in 1970.

"At the time, we had [referring to the film] what were called 'white coaters,'" Cunningham said. "They allowed you to get away with showing hardcore XXX-rated movies as long as they were under the guise of freedom of speech. You billed it as an 'educational' or 'medical' movie. At the beginning, someone would come out and say, 'We're now going to show you marriage practices in Denmark and these are the ways you can improve your marital bliss.' Then for the next 80 minutes you saw people fucking like crazy."

For Cunningham, who has always measured the success of a film

TOBEROFF EX. R

A-768

through the prism of a cost-to-revenue ratio, The Art of Marriage served its purpose by giving him some degree of financial breathing room, as well as invaluable filmmaking experience. "I was in completely uncharted waters," Cunningham said. "As dreadful as The Art of Marriage was, I had to find a theater that would make some sort of deal with me to play it. The Art of Marriage was first released at the Brant Theater on 42nd Street in Manhattan, and it played for twenty-seven weeks! We probably got over $100,000, so I had what most people in the film business never had: a hit movie."



*Together's* *unlikely commercial success established Sean Cunningham as a*

TOBEROFF EX. R

A-769

# THE BOSTON CONNECTION

When Together was finally completed, Cunningham went out and sought a distribution deal, and was met with universal rejection. Desperate, he brought the film to Esquire Theaters of America, the theater chain operated out of Boston by partners Robert Barsamian, Stephen (Steve) Minasian and Philip Scuderi.

Esquire controlled a chain of movie theaters throughout New England and upstate New York that represented a mix of urban movie houses, multiplexes, drive-ins and porno houses, the last two sectors of which the company were most idenjpgied with. By the fall of 1970, Esquire had expanded its operations to include film distribution, under the banner of Hallmark Releasing Corporation.

Together was one of Hallmark's very first releases as a distribution arm, and also technically marked the company's first entry into film production, since partner Stephen Minasian received a token producer credit - as Steve Minasian - on the released film, even though he had no creative involvement with the film itself.

The partnership with Hallmark, later renamed Georgetown Productions, on Together marked the beginning of a decade-long working relationship – a very one-sided, stormy and often unhealthy relationship driven by desperation and greed - that would eventually– under the Georgetown moniker – spawn Friday the 13th.

VM00388

TOBEROFF EX. R

A-770

*Friday the 13th* in pop culture.

Cunningham brought a palpable sense of desperation and weariness to *Friday the 13th*. This was a project that represented, in many ways, the end of the line for the then down-on-his-luck filmmaker. Cunningham (born in New York City on December 31, 1941) was 36 years old when he began developing *Friday the 13th* in 1978--an age where a man takes stock of his life, and measures how much he's amounted to. "All I was trying to do was make a potboiler," Cunningham said. "To put it bluntly, I couldn't pay the rent. I asked myself, 'What's the scariest phrase in the English language?' It's got to be *Friday the 13th*."

Prior to *Friday the 13th*, Cunningham's biggest commercial success came as a producer on the exploitation-horror film *Last House on the Left* (AKA *The Last House on the Left*). The film was directed and written by Cunningham's friend and mentor, horror kingpin Wes Craven.

TOBEROFF EX. R

other horror-slasher films, most notably Happy Birthday to Me (1981) and Sleepaway Camp (1983).



*The slasher film* Prom Night – *in which* Halloween *star Jamie Lee Curtis was the lead - was filmed almost simultaneous to* Friday the 13th *in 1979 and was a much more blatant copy of* Halloween *than was* Friday the 13th. *(Photo courtesy of Peter Simpson)*

It's in Friday the 13th's third act where the motive and reasoning behind the killer's murderous actions is embodied in the form of the killer's disfigured, mongoloid son, the iconic Jason Voorhees. The introduction of this secondary villain was a concept that further distanced the film from Halloween and ultimately established Friday the 13th to be the most influential horror-slasher film, in terms of both execution and story construction, of its era. Jason hadn't been seen before.

TOBEROFF EX. R

# CHAPTER 2
# STRAIGHT OUTTA WESTPORT:
# THE SEEDS OF SPLATTER

"You don't have to pass a bar exam to become a movie producer. You just have to buy some stationery."

– Sean Cunningham

"I always looked at Sean as being more of a businessman than a filmmaker."

- Production designer Virginia Field

The origin of Friday the 13th is tied to the life of its founder, Sean Sexton Cunningham, the son of first-generation Irish immigrants. He spent the first six years of his life in New York, living in a Fifth Avenue apartment with his family, which later included two younger brothers. The Cunninghams relocated to Westport, Connecticut in 1948 and it was this setting that defined Cunningham's destiny, especially the direction and tone of his filmmaking career that eventually spawned Friday the 13th.

Cunningham flourished in academics as an adolescent and seemed poised to enter a professional vocation that matched his prim, respectable

VM00378

TOBEROFF EX. R

A-773

reserved. Robert Barsamian (b. September 20, 1928) was Stephen Minasian's brother-in-law and maintained a quiet business role in the company.



*Advertisement for* Sex Crime of the Century*, one of the alternate titles that* Last House on the Left *was released as. (Photo courtesy of David A. Szulkin)*

"Phil Scuderi was a handsome, charismatic, firecracker of a guy," recalls George Mansour, a Hallmark booking agent in the 1970s. "He was a smart, tenacious, terrific person, but he had lots of affairs, and had lots of mistresses, including a secretary who worked in the office. Steve Minasian

TOBEROFF EX. R

A-774

# LAST HOUSE ON THE LEFT

presented by

## SEAN S. CUNNINGHAM FILMS LTD.

starring

DAVID HESS • LUCY GRANTHAM • SANDRA CASSEL • MARC SHEFFLER • and introducing ADA WASHINGTON

Written and directed by                    WES CRAVEN

Produced by                    SEAN S. CUNNINGHAM

COLOR BY MOVIELAB  •  Running Time 91 mins.

• • • • •

## PRODUCER'S STATEMENT

Since the opening of the motion picture "Last House On The Left," municipal officials, film reviewers, and theatergoers have deluged the theaters with complaints about the film, and requested that its exhibition be terminated immediately.

The thrust of the criticism is that the film is too violent.

The critics have completely failed to understand this film. It is one of the finest anti-violence films ever made. Here, at last, is a film which puts violence in its proper perspective, as so few films have in the past.

In this film, unlike so many recent, successful motion pictures, violence is not glorified, nor the violators romanticized. All is shown as ugly and as debauched as it is in real life. For example, we have all seen recently motion pictures in which upwards of 50 and 60 people are killed before the last reel. It is all done in an atmosphere where real people do not die, do not bleed, or do not suffer.

In this film, prior to the last couple of minutes, only two persons have been killed — but they are shown in the true nature of what homicide is, real people dying tragically.

In past films, criminals are made glamourous and heroic. We identify with them in a happy and pleasant manner. In "Last House On The Left" the criminals are shown for what they really are, mean and horrible.

Nor does the film make any attempt to minimize or make pleasurable experimentation with drugs. This is risky business which can only produce consequences as shown in the film.

This, then, is a moral film. A film which has become all the more gripping because we have become so unused to seeing how wicked and unforgivable violence and killing are.

For as long as records for numbers of homicide are broken each week in our urban centers, and the evening news brings us new tales of violence and burning, and we continue to treat these horrors in a nonchalant manner, it will be necessary for films like "Last House On The Left" to bring the true measure of violence to the consciousness of us all.

It is indeed ironic that the criticism which this film has received is because the worth of its message has been improperly assessed. The large numbers of parents now bringing their children to the theater is perhaps illustrative that the true meaning of this film is now being properly received. The film is rated 'R' in the best sense of that rating.

— ORDER ALL ACCESSORIES FROM —



ESQUIRE PRINTING, INC.

788 ELMWOOD AVENUE
PROVIDENCE, RHODE ISLAND 02907
(401) 781-0000

TRAILERS • 1-SHEETS

STILLS • RADIO SPOTS

PRESS • MATS

*The partners at Esquire/Hallmark were notorious for outrageous promotional gimmicks. (Photo courtesy of David A. Szulkin)*

Whether it was Boston's virulent reputation as a mob city, particularly in the 1970s, or the lurid aspects of Hallmark's theater business, or the garish, over-the-top wise-guy attire that Scuderi and his partners would often wear in public, the company was dogged by reputed ties to organized crime. This reputation was emboldened by the fact that Hallmark, and the names of its partners, showed-up in various federal investigations into organized crime, most involving the alleged smuggling of film prints, of pornographic films (a

TOBEROFF EX. R

A-775



*Australian video cover for* The Case of the Smiling Sjpgfs. The Case of the Smiling Sjpgfs *was an unlikely hit in Australia where the film retains a strong cult following. (Photo courtesy of David A. Szulkin)*

Cunningham says that the inspiration for Last House on the Left resulted from a discussion he had with Wes Craven, about the role of violence in cinema which Cunningham felt, by 1971, existed on the level of cartoonish fantasy. "We resisted doing a conventional horror movie," Cunningham said. "At that time, that meant Vincent Price walking around in a castle, and the young groom saying, 'You stay here, honey, I'm gonna go for help!' Around this

TOBEROFF EX. R

there."

The awful experience in Miami foretold an abyss in Cunningham's career that lingered between 1974 and 1976. Anxious to move on from Case of the Full Moon Murders, Cunningham agreed to join Wes Craven on the hardcore film The Fireworks Woman. Cunningham produced the film which Craven co-wrote and directed under the pseudonym Abe Snake, one of many Craven used between 1974 and 1975 for the various X-rated film titles he worked on. Cunningham kept his name off the film altogether.

Released in 1975, The Fireworks Woman marked the end of Cunningham's porn career and his one and only acting appearance (Cunningham can be seen pushing a lawnmower in one scene). No matter what, Cunningham was done with porn.

Needing a change of scenery, as well as time to reassess his career goals, Cunningham – who also tried, without success, to develop a children's fantasy film project based on the Hansel and Gretel fairytale – next moved to Spain where he set-up a tax shelter corporation. There, he served as an un-credited co-producer on the obscure Spanish tax shelter film The People who own the Dark (AKA Planeta Ciego) which was released into total obscurity in 1976.

The time in Spain, and the surrounding period, represented the most tumultuous period in Cunningham's life. His personal demons took hold of him during this time and embodied themselves in a bout with alcoholism-- a byproduct of the dauntless career pressures and struggles. "In Spain, they have siesta, so I was getting drunk twice a day," Cunningham said. "Plus, I didn't have too many responsibilities, so I could get drunk as much as I wanted to, and I had two alcoholic parents, so I knew a lot about booze. I thought I had decided that I wasn't going to become a drunk like my parents, and I didn't. I became a drunk unlike my parents."

TOBEROFF EX. R

A-777

*beyond Sean Cunningham's grasp as a filmmaker. (Photo courtesy of Kim Gottlieb-Walker www.lenswoman.com)*

By October of 1978, with Manny's Orphans languishing in purgatory, Cunningham realized his only means of business and filmmaking survival was to retreat back to the primitive style of exploitation/horror filmmaking that had given him his only taste of real success. He wasn't made for porn, despite the surprise success of Together, and he certainly wasn't cut-out to make kids' films, but Cunningham had a knack for exploitation and horror. "You have to understand that I had all of my money tied-up in the children's film," said Cunningham, referring to Manny's Orphans. "I couldn't figure out what else I had to sell. The only thing I had was my track record; the films I had done earlier, which were all kind of dark and gothic."

While the kids' movie genre was alien to him, Cunningham could relate to the success of Halloween, and the impact of John Carpenter's film, and, in particular, how and why Halloween worked so well. "I think the influence of Halloween has been overstated in that the two films themselves are very different," Cunningham says. "I was very influenced by the structure of Carpenter's film, and why it worked so well, the formula, whereas the story and technique were of little interest to me."

In the fall of 1978, Cunningham reached out to colleagues and friends with his desire to make a horror film out of Halloween's model. Some of these people had worked with Cunningham on Here Come the Tigers and Manny's Orphans, and were under the distinct impression that Cunningham was ready to abandon filmmaking altogether and enter a less frustrating profession somewhere in the business world. "After we did the last kids' movie, I knew that Sean wasn't going to continue making films that didn't make money," Virginia Field says. "Sean wasn't passionate about that."

The first person Cunningham reached out to was Wes Craven,, his one true filmmaking mentor. Despite the fact that Craven's only two years older than Cunningham, Craven was very much the teacher and Cunningham the student in their relationship. Cunningham had leaned on Craven's advice and counsel throughout the making of Here Come the Tigers and Manny's Orphans. Sensing this was a crucial juncture in his career, Cunningham was especially

VM00431

open to Craven's guidance; he knew this might be the last stop.



*Sean Cunningham took his own inspiration for the Pamela Voorhees character from the Evelyn Draper character played by actress Jessica Walter in the thriller film Play Misty for Me. (Photo courtesy of Jason Pepin)*

Craven saw Halloween and appreciated and understood the artistry and technique in John Carpenter's film far more than Cunningham did. The two friends had several discussions throughout the fall of 1978. None of these discussions involved the possibility of Craven directing said horror film. This project, whatever it was going to be, was Cunningham's baby. "Sean was good friends with Wes Craven and they talked a lot about Halloween before we all got involved with Friday the 13th," Virginia Field recalls. "I had no idea we copied Halloween until I saw Halloween later and saw the similarities in Friday the 13th."

Cunningham next approached Victor Miller who'd become his go-to writer, indeed the only writer in his small circle. He instructed Miller to see Halloween, study it, and create the foundation for a horror script they could develop together. "We had already tried to give America what it said it wanted

TOBEROFF EX. R

A-779



*Sean Cunningham was close friends with screenwriter Dean Riesner who received co-writing credit on the Clint Eastwood-directed film Play Misty for Me. Cunningham later adopted Jessica Walter's butch appearance in Play Misty for Mewhen conceptualizing – and casting – the Pamela Voorhees' role. (Photo courtesy of Jason Pepin)*

Despite his non-horror pedigree, Miller felt he had a good handle on what made Halloween tick, and what Cunningham was looking to take from that film. "I saw Halloween and figured out the genre, the structure of that film, pretty quickly," says Miller. "It was simple. You start with a historical evil,

TOBEROFF EX. R

and some event in the past that shadows the present day action. Then you create a setting where teenagers or college-aged kids are isolated and beyond the help of adults. The last part was that you kill anyone who has premarital sex. Those are the truths I learned from watching Halloween."

Throughout Christmas 1978 and early 1979, Cunningham and Miller went back and forth, in each other's kitchens, dissecting Halloween for the purpose of crafting their own horror film. "I laid-out the structure of what I had learned from John Carpenter and Debra Hill's Halloween and I began trying out different ideas that could work," Miller recalls. "Some of the ideas were god-awful but the good ones stuck. Over the years of our friendship, Sean and I had developed shorthand for talking plot and concepts in his kitchen and mine and during lulls in the volleyball games at his house in Westport. I had written a couple of other scripts for Sean that never saw the light of day – they were vehicles for somebody like Clint Eastwood, etc. – that Sean and I thought might fly. It really was loose, easy, and exciting. We always laughed a lot. I would come in with ideas and we'd wrestle them back and forth."

One of the key decisions Cunningham and Miller grappled with during their many conferences was the choice of an isolated location for their horror film. After mulling around such venues as an apartment building, an amusement park funhouse, and an isolated island, Cunningham and Miller finally settled on the summer camp locale that has become so synonymous with the horror film genre. "I made up a list of venues for teenagers to be isolated in that included "summer camp" about midway down the page," Miller recalls. "We both finally agreed that was it. It took longer than you might have thought, but hindsight makes it seem kind of obvious now."

As for other genre influences, Miller denies any discussion or knowledge of legendary Italian filmmaker Mario Bava and his 1971 film Twitch of the Death Nerve (AKA Bay of Blood, The Bay of Blood). Although many horror film historians have cited the influence of Bava's film in Friday the 13th, Miller pleads ignorance to this. "Sean certainly never mentioned him to me," Miller says. "Bava was not anyone I knew about. Credit should've gone to Carpenter and Hill for being my inspiration, and Carrie, Diabolique and The Haunting – Carrie for the chair jumper at the end."

Next, Cunningham and Miller discussed the kinds of bizarre deaths they wanted to feature in the story, and for this purpose, Cunningham and Miller

TOBEROFF EX. R

A-781

# THE MOST TERRIFYING FILM EVER MADE!

By the end of March 1979, Victor Miller was knee-deep into the writing of a first draft script entitled Long Night at Camp Blood (AKA A Long Night at Camp Blood). Cunningham and Miller worked through several drafts through the spring and early summer of 1979.

Cunningham gave Miller constant encouragement and careful notes, just as he'd done several years earlier. "Sean would edit each draft with phrases like 'Keep it relentless,'" Miller recalls. "Sean came up with the title Friday the 13th after I had already written a first draft called, infelicitously, Long Night at Camp Blood."

VM00442

financed the puerile comedy film King Frat, a blatant Animal House rip-off that was scarcely released in July of 1979. The Scuderi people flooded Cunningham's office as well. "I do recall sending my resume to Connecticut when the first of the Friday the 13th films was being produced, with no response," recalls Reuben Trane, the producer of King Frat who later worked with Scuderi on the horror-slasher film Eyes of a Stranger (1981). "I never had a handle on Scuderi. I always felt he was using cash from his many screens to finance his film ventures. It seems we had money on Monday after a good weekend and no money after a rainy weekend."

If Cunningham could've found any way to avoid doing business with Scuderi and his partners again, he would've taken the opportunity. It just wasn't there. Cunningham took a second mortgage out on his Westport home with the thought of producing Friday the 13th as a guerilla project. The second mortgage was also an attempt to gain some sort of independence, and leverage with Scuderi, should he have been Cunningham's only option.

If the Variety advertisement ultimately failed in its main purpose to secure mainstream financing for Friday the 13th, the Richard Illy photograph made for great wallpaper at Cunningham's Westport home office. "I was dating Denise Pinckley at the time who'd become a temp for Sean in Connecticut, and started working for Georgetown, and I couldn't believe it when she told me that the office was wallpapered with my shot," Illy recalls. "Then I met this woman who told me she'd been working as a temp at this ad agency and that the ad agency was papered with the images of the Friday the 13th logo, which I found very ironic."

Another oft-repeated mantra on Cunningham's part over the years, and this goes hand-in-hand with the advertisement in Variety, is the notion that the Friday the 13th project had no money, no outline, no script, and basically just had the Friday the 13th title at the time of the Variety advertisement. While the money part is certainly true, the fact is that the story elements were well in place, at least in terms of Cunningham and Miller's approval, even though Miller's script still bore the title Long Night at Camp Blood instead of Friday the 13th.

Victor Miller's version of the Friday the 13th script was nearly complete by the time of the Variety ad's appearance, after which Cunningham and Miller spent two more weeks working on it. While it's true that

VM00450

TOBEROFF EX. R

# GEORGETOWN

Gaining a monopoly over the Friday the 13th title was a relief for Cunningham who was fearful of potential legal action from the other production. While the title controversy turned out to be a false alarm for Cunningham, his dealings with Philip Scuderi in July and August were very acrimonious. Friday the 13th marked the first credited production for the newly-christened Georgetown Productions banner, but the dynamic of the Cunningham-Scuderi relationship was the same.

The transition from Hallmark Releasing to Georgetown Productions represented a differentiation without a change in how business was conducted. It was the same two-story building on Church Street, the same payroll clerk, secretary, and, most certainly, the company was still controlled by the same three Boston lawyers-turned-exploitation movie moguls: Robert Barsamian, Stephen Minasian and the flamboyant Scuderi.

VM00458

TOBEROFF EX. R

A-784

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

HORROR INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership,

Plaintiffs,

    vs.

VICTOR MILLER, an individual; and DOES 1 through 10,

Defendants.

VICTOR MILLER, an individual;

Counterclaimant,

    vs.

HORROR INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership; and DOES 1 through 10,

Counterclaim-Defendants.

Case No.: No. 3:16-cv-01442-SRU

**DEFENDANT AND COUNTER-CLAIMANT VICTOR MILLER'S LOCAL RULE 56(a)2 RESPONSE AND STATEMENT OF DISPUTED MATERIAL FACTS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

June 30, 2017

A-785

<u>**Local Rule 56(a)2 Statements In Support of Defendant and Counterclaimant Victor**</u>
<u>**Miller's Opposition to Plaintiffs' Motion for Summary Judgment**</u>

Pursuant to Local Rule 56(a)2, defendant and counterclaimant Victor Miller ("Miller") hereby sets forth the following Statement in Response to Plaintiffs' Local Rule 56(a)1 Statement in support of Plaintiffs' Motion for Summary Judgment. In accordance with Local Rule 56(a)2, each paragraph number of Miller's Statement in Response corresponds to the numbered paragraphs in Plaintiffs' Statement of Undisputed Facts. In accordance with Local Rule 56(a)2, Miller also hereby submits his Statement of Disputed Issues of Material Fact.

In support of this statement Miller submits the sworn Declaration of Victor Miller in Support of his Motion for Summary Judgment ("Miller Decl."), and the exhibits attached thereto, previously filed and incorporated herein by this reference; the concurrently filed sworn Declaration of Victor Miller in Opposition to Plaintiffs' Motion for Summary Judgment ("Miller Decl. II"), and the exhibits attached thereto; the sworn Declaration of Marc Toberoff in support of Victor Miller's Motion for Summary Judgment ("Toberoff Decl.") and the exhibits attached thereto, previously filed and incorporated herein by this reference; and the concurrently filed sworn declaration of Marc Toberoff in Opposition to Plaintiffs' Motion for Summary and the exhibits attached thereto ("Toberoff Decl. II").

**I.     RESPONSE TO PLAINTIFFS' LOCAL RULE 56(A)1 STATEMENT**

1.     Admitted.

2.     Admitted, with the qualification that Miller is also an author of novels and teleplays. Miller Decl., ¶ 3.

3.     Admitted, with the qualification that "has negotiated *the* collective bargaining agreements" (emphasis added) is unclear and therefore cannot be admitted or denied.

1

4.      Admitted, but denied to the extent that Plaintiffs' characterization could imply that Miller was hired for "a series of motion pictures," when in fact he worked independently on an *ad hoc* project by project basis.  Miller Decl., Ex. D; Declaration of Sean Cunningham ("Cunn. Decl"), ¶¶ 3, 4.

5.      Admitted.

6.      Denied. In the book of interviews entitled *Crystal Lake Memories* by Peter Bracke relied upon by Plaintiffs, Cunningham himself states that the idea was that of Phil Scuderi so "I put together this silly little rip-off movie called *Here Comes the Tigers*." Toberoff Decl. II, Ex. Q at 16 (1357).

7.      Admitted, except to the extent this omits that Miller wrote *Here Comes the Tigers* under a pseudonym to placate Cunningham who did not want to pay the minimum screenplay fees required by the WGA's 1977 Minimum Basic Agreement. Miller Decl. II, ¶ 6.

8.      Admitted, noting its irrelevance to the requisite legal analysis in this case.

9.      Admitted, noting its irrelevance.

10.      Admitted, but not as to the "team member" characterization, and denied insofar as Steve Miner alone wrote the underlying 2 page story for *Manny's Orphans*. Miller Decl. II, ¶ 8.

11.      Admitted, with the qualification that Manny was a single-purpose limited partnership formed by Cunningham to produce the film, *Manny's Orphans*.  Toberoff Decl., Ex. G at PL00896.

12.      Denied, except admitted that Miller and Cunningham would meet and naturally bounce ideas off of one another regarding the development of a particular film; that Cunningham would at times make a few comments (often quite general) in the margins of Miller's screenplay drafts; and that they would work out any limited creative differences in opinion regarding the

2

film in question. Miller Decl., ¶ 19; Miller Decl. II, ¶ 9.

13.     Admitted, with the qualification that Miller distinctly remembers receiving in his kitchen a phone call from Cunningham in early 1979 wherein Cunningham said "let's rip-off Halloween," and this comports with Miller's and Cunningham's interviews in *Crystal Lake Memories*. Miller Decl. II., ¶ 10; Toberoff Decl. II, Ex. Q at 16 (PL001357) (Cunningham referencing "a little rip-off movie called *Here Comes the Tigers*.")

14.     Admitted that while well-versed in writing screenplays, Miller had not written the screenplay for a horror film before *Friday the 13th,* but denied that he was "hesitant" to do so (unsupported by Plaintiffs' cites), and that Cunningham's desire to emulate *Halloween* (1978) was a "horror film idea." Miller Decl. II, ¶ 10.

15.     Admitted that Cunningham produced this low-budget horror/sexploitation film, but deny that it is a "cult classic."

16.     Denied, except admit that in the course of Miller's writing of the Friday the 13th screenplay ("Screenplay"), Cunningham did mention *Psycho's* killing off an important character early on; that it is better if killings are personal; and that it was a good idea to keep villains masked, with the qualification that Miller learned the elements of a successful horror film from seeing *Halloween* (1978).  Declaration of Julia Haye ("Haye Decl."), Ex. K at 90:1-8; Miller Decl. II, ¶ 11.

17.     Denied. Haye Decl., Ex. K at 156:12-20; Miller Decl. II, ¶ 12.

18.     Admitted, except denied as to "[a]fter reaching this oral agreement." Miller Decl. II, ¶ 12.

19.     Denied, except admitted that Miller came up with multiple potential venues until he conceived that an old summer camp before it opens would be the best setting for a horror

3

A-788

film, and Cunningham liked this as well.  Haye Decl., Ex. L at 8.

20.	Admitted, except to the extent this suggests that Cunningham was the decision maker. Miller rejected Cunningham's ideas, and often Miller rejected his own suggestions on his laundry list of potential venues as bad ideas. Haye Decl., Ex. L at 8, Ex. K at 163:1-25; Miller Decl. II, ¶ 9.

21.	Denied. Miller Decl., ¶¶ 6-11, Exs. A, B, C; Miller Decl. II, ¶ 9; Toberoff Decl. II, Ex. P at 147:2-148:13.

22.	Denied. Miller Decl. II, ¶ 9.

23.	Admitted, with the qualification that Scuderi had also been involved in Cunningham's prior porn films, *The Art of Marriage* (1970) and *Together* (1971). Toberoff Decl. II, Ex. Q at 14 (PL001355); Ex. R at VM00382-384, 388.

24.	Admitted, except denied as to the characterizations of "a bad experience" and that "Miller was forced to accept" the scene, and the irrelevance of this to the Manny-Miller relationship on *Friday the 13th* is noted. Haye Decl. ¶ 4, Ex. K at 85:23-86:6;

25.	Admitted, except denied that this Agreement was entered into "before June 4, 1979."

26.	Admitted, except denied that the Agreement was entered into "pursuant to" the MBA; and denied to the extent Plaintiffs' overbroad use of "employee benefits" entails fixed and contingent cash compensation (like residuals and sequel payments).

27.	Denied, in that Miller has insufficient information to admit or deny this conclusion, and notes that even if the Agreement were a WGA form, Plaintiffs have not shown that the WGA at the time did not have other applicable form agreements.

28.	Admitted.

29.    Admitted that the Agreement says "Employment Agreement," but otherwise denied as to Plaintiffs' implied characterization that this is relevant to the proper legal analysis of whether one is an "employee" or "independent contractor" under the Copyright Act's "work for hire" definition, 17 U.S.C. § 101 and *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989)("*Reid*"). *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 291 (2d Cir. 2002) ("[U]nder agency law, '[t]he manner in which the parties designate the relationship is not controlling" *quoting* 3 Am.Jur.2d *Agency* § 19 (2002)); *Carter v. Helmsley-Spear, Inc.*71 F.3d 77, 83 (2nd Cir. 1995)("One of the factors that did not persuade us was the appellants' simplistic contention that usage of the words 'employ' or 'employment' in the agreements … establishes that the plaintiffs were employees.").

30.    Admitted to the extent the words "assign" or "assignment" do not appear in the Agreement, but denied insofar as this is meant to imply that a purchase or implied license of Miller's Screenplay did not take place based on the Agreement and the parties' other conduct.

31.    Denied insofar as the Court is referred to the Agreement itself for its actual and complete language and terms.  Miller Decl., Ex. D.

32.    Admitted that the Agreement states this in part, but the Court is referred to the Agreement itself for its actual and complete language and terms. Miller Decl., Ex. D.

33.    Admitted that the MBA provides for minimum fees for specific material (e.g. treatment, first draft screenplay, final draft screenplay) residual and sequel payments, but denied that these are "employee benefits" as understood by *Reid* and the common law of agency or that the minimum fees are "salary," and it is admitted that the WGA provides its members with a pension and health plan (if that is what Plaintiffs meant). Haye Decl., Ex. N, Art. 9, 13, 15, 17.

34.    Admitted that Miller agreed at his deposition that one of the advantages of being

in a union is that it provides things that an individual may not be able to obtain on his own, but denied that this included anything about "the union negotiate[ing] with signatory employers," and objects insofar as this is predominantly a legal conclusion, and that Plaintiffs did not present the purported testimony they cited to.

35.     Denied. Miller Decl., ¶¶ 8, 12, Ex. D.

36.     Admits that paragraph 1 of the form Agreement has a blank space preceded by "based upon (describe form of material & title) _____ written by _____" and, without limitation, boxes entitled "[ ] Treatment" and "[ ] Original Treatment," which Cunningham (who filled out and presented the filled-out Agreement to Miller for signature) failed to fill in, but otherwise denied that Miller was "required" to correct Cunningham's errors. Miller Decl., ¶ 11, Ex. D; Toberoff Decl II, Ex. P ("Cunningham Depo.") at 160:5-25; 172:11-173:7; 174:1-2.

37.     Admitted.

38.     Admitted that Cunningham and Miller signed the "Friday 13" Agreement on June 4, 1979, but denied that this means that Miller's had not already written his Treatment entitled *The Long Night at Camp Blood*. Miller Decl., ¶¶ 6 -11, Ex. D.

39.     Admitted.

40.     Denied insofar as Cunningham stated "*My impression* is that we did not get started on the project until *about* June or July of 1979, *but I am willing to be told otherwise*", that this was in a casual 2003 interview, 24-years after the events in question, and that none of it rises to the level of a binding factual admission. Haye Decl., Ex. L, at 8 (emphasis added).

41.     Denied as Miller does not have sufficient knowledge to admit or deny this statement, and further noted that a month appears to far exceed the lead time required for an ad in *Variety;* and that this appears as an attempt to evade Cunningham's prior inconsistent

statements that he had only a title at the time of the July 4 Variety ad. *See* Toberoff Decl. II, Ex. R at VM00450; Cunningham Depo., 177:22-13; 179:10-14.

42.     Admitted that Miller wrote the *The Long Night at Camp Blood* Treatment for the Film on spec in the hope that Cunningham could use it to raise financing for their horror project, but otherwise denied; and denied in so far as the ordering of this statement and its contents implies that Miller's Treatment and first draft of the Screenplay were written after the June 4, 1979 Agreement. Miller Decl., ¶¶ 6-12; Cunningham Depo., at 177:16 -178:13, Miller Decl. II, ¶ 12.

43.     Admit only that Miller wrote the Treatment after Cunningham expressed enthusiasm for the summer camp (before it opens) setting that Miller suggested, but otherwise denied. Miller Decl., ¶¶ 6-12.

44.     Admitted, with the qualification that this is irrelevant as under the 1976 Copyright Act, a statutory copyright subsists in the author of a work the moment it is fixed in tangible form. 17 U.S.C. §§ 101, 102, 201(a).

45.     Admitted, with the qualification that this was consistent with Miller's knowledge that Cunningham would use Miller's material written "on spec" to hopefully raise financing for the project. Miller Decl. II, ¶ 12.

46.     Denied. Miller Decl., Ex. D at 82, 87, 90, 93; Miller Decl. II, ¶¶ 1-2, 4; Ex. H at 5AB/12 -14 (PL002295-97); Ex. I.

47.     Denied. Cunn. Decl., Exs. C, D.

48.     Admitted, except denied that the copyright notice in the name of "Sean S. Cunningham Films, Ltd." placed by rote on the reformatted Treatment was related to Manny or connotes copyright ownership by Manny. *Id.*, Ex. D.

49.     Admitted that Miller and Cunningham met at each other's houses to discuss ideas for the Film, but otherwise denied.

50.     Denied, but admit that the Film contained one small inconsequential scene involving a policeman on a motorcycle that Miller did not write. Miller Decl., ¶ 26, Ex. G.

51.     Admit that Miller used Cunningham's copy machine from time to time and that his assistant would re-type Miller's written material to reformat it with scene numbers in the margins, but otherwise denied.  Miller Decl., ¶ 15.

52.     Admitted with the qualification that this statement is missing words, and denied to the extent Plaintiffs imply that the copyright notice in the name of "Sean S. Cunningham Films, Ltd." placed by rote on the Screenplay connotes copyright ownership by Manny. Miller Decl., Ex. C.

53.     Admitted.

54.     Denied. Miller Decl., ¶ 26, Ex. G; Miller Decl. II, ¶¶ 2-5.

55.     Admitted only to the extent that in the first and second Screenplay drafts that Mrs. Vorhees says Jason Vorhees drowned, and the townsfolk allude to this as well, but denied insofar as in several scenes we hear Jason's voice in the present as a voice-over and as channeled by Mrs. Vorhees; and the ending of the Film begs the question as to whether Alice was dreaming and whether Jason is actually dead. Miller Decl., Ex. D at 82, 87, 90, 93; Miller Decl. II, ¶¶ 2-5; Ex. H at 5AB/12 -14 (PL002293-95).

56.     Admitted that Miller criticized the Friday the 13th sequels, but denied as to Plaintiffs' characterization, and noted that this is irrelevant to the legal analysis governing derivative works which is solely based on a comparison of the copyrighted material in question.

57.     Admitted, but Plaintiffs' characterizations are denied.

8

58.     Denied. Miller Decl., Ex. D at 82, 87, 90, 93; Miller Decl. II, Ex. H at 5AB/12 -14

(PL002293-95).

59.     Admitted only that in an agreement dated May 7, 1980 Manny sold to

Georgetown Productions, Inc. ("Georgetown") all of its right, title and interest in and to the

Screenplay, and that therein Manny represents and warrants to Georgetown: "That Victor Miller

is the sole author of the Screenplay," and "That the Screenplay is original …"; refers to the

"screenplay written by Victor Miller, as author for" Manny; and elsewhere purports to sell to

Georgetown "[t]he right to copyright the Screenplay in its own name," but otherwise denied, and

noted that neither Manny nor Georgetown registered the copyright to the Screenplay in their own

names; and that other than serving as admissions, Manny and Georgetown's unilateral acts or

statements are not particularly relevant to the objective legal analysis. Cunningham Decl., Ex. H

at 1, 2.

60.     Admitted.

61.     Admitted.

62.     Admitted that Miller believed that Cunningham or Georgetown owned the Film,

but denied insofar as Plaintiffs insinuate that there was any sort of dispute or repudiation of

Miller's original authorship of the Treatment, and Screenplay, when Miller received sole writing

credit on the Film. Miller Decl., ¶ 26, Ex. G; Miller Decl. II, Ex. I, ¶ 5.

63.     Miller denies this on the basis that he has insufficient information to admit or

deny, and notes that other than a party Horror Inc.'s affidavit, Plaintiffs provide no evidence of

this under circumstances when such evidence would likely be in a purported owner's possession.

64.     Denied.  Miller Decl., ¶¶ 24-25; Toberoff Decl., ¶ 4, Ex. C; Toberoff Decl. II, ¶ 1,

Ex. O. Miller admits the WGA commenced a grievance and arbitration procedure against

Cunningham, and that after Cunningham sued Georgetown, Miller, in 1989, received from Paramount Pictures residual and sequel payments long after these payments were due from Manny, but denies that these are "employee benefits" with the meaning of *Reid*, 490 U.S. at 737 and *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992). Haye Decl., Ex. L at 22, Ex. V; Toberoff Decl., Ex. E.

65.     Admit only insofar as the dispute was over Cunningham's non-payment of residuals and sequel payments only, and otherwise denied. Toberoff Decl., Ex. E; Haye Decl., Ex. V.

66.     Admit only insofar as the WGA contacted Cunningham in 1980 and demanded residual and sequel payments due Miller, and that when Cunningham *repeatedly* ignored and/or provided false promises of payment in response to the WGA's requests, the WGA commenced a grievance and arbitration proceeding against Cunningham in mid-1985 as to Cunningham's non-payment of residuals and sequel payments only; otherwise denied. Toberoff Decl., Ex. E; Haye Decl., Ex. V, Miller Decl. II, ¶ 13.

67.     Denied insofar as only the residual and sequel payments owed Miller were finally paid to Miller in 1989 by a third party, Paramount Pictures. No contributions whatsoever were to the WGA's pension and health fund in connection with Miller's writing of the Screenplay were never made by Plaintiffs, Cunningham, Georgetown or anyone else. Miller Decl., ¶ 25; Toberoff Decl., ¶ 4, Ex. C; Miller Decl., ¶ 13, Toberoff Decl. II, ¶ 2, Ex. O

68.     Admitted.

69.     Admitted, insofar as Miller was referring to the Film, but denied insofar as Plaintiffs' insinuate here and in Nos. 70-87 that Miller's off-the-cuff responses in a casual interview, 24 years after the events in question, rise to the level of relevant admissions against

interest.

70.     Admitted, but noted as irrelevant.

71.     Admitted that Miller said this, with the qualification that it is non-specific to *Friday the 13th*, and irrelevant.  Haye Decl., Ex. L at 7.

72.     Admitted only that Miller said that "Cunningham called me up and said 'Halloween is making a lot of money at the box office, why don't we rip it off' like Bad New Bears …" *Id*; Miller Decl. ¶ 10; Toberoff Decl., Ex. Q at 14 (PL001355).

73.     Admitted.

74.     Admitted Miller said this in part, with the qualification that Miller was speaking colloquially, not literally, as he of course was under no duty or obligation to Cunningham to see *Halloween*.

75.     Admitted that Miller referred to certain of these alleged comments by Cunningham, but denied as to Plaintiffs' characterizations, including, without limitation, that "Cunningham taught Miller about horror films;" and to the extent the Court finds this even relevant, respectfully refers the Court to Miller's interview for the contents of what Miller actually said and the context within which he said it. Haye Decl., Ex. L at 7.

76.     Denied insofar as Cunningham stated "*My impression* is that we did not get started on the project until *about* June or July of 1979, *but I am willing to be told otherwise*", that this was in a casual 2003 interview, 24-years after the events in question, and it does not rise to the level of a binding admission. Haye Decl., Ex. L, at 8 (emphasis added).

77.     Admitted, but denied as to Plaintiffs' characterization of this, and noted that this is not particularly relevant.

78.     Denied. Haye Decl., Ex. L at 8.

79.     Denied. Miller does not say that he had nothing to do with Jason being a "Mongoloid;" he says, consistent with his testimony, that he conceived Jason as "not a normal kid, he was slow," and humbly proceeds to give credit to the special effects artist Tom Savini. Haye Decl., Ex. L, at 12, Ex. K (Miller Depo.), at 228:14-21; Miller Decl., ¶¶ 2-5, Exs. H, I.

80.     Admitted as to the quoted language only, but with the qualification that it is taken out of context of Miller's full interview responses, and that these causal comments are irrelevant to the legal analysis and conclusion that the sequelized Jason character is derivative as a matter of copyright law, as demonstrated by Millers Screenplay and the first Film; and is not a question of Miller's personal opinions regarding the sequels' artistic merits. Miller Decl., Ex. D at 82, 87, 90, 93; Miller Decl. II, Miller Decl., ¶¶ 2-5, Exs. H, I.

81.     Admitted, but denied as to "that Miller entered into a lawsuit in 1986 with Cunningham and Georgetown." Haye Decl., Ex. L at 22, Ex. V; Toberoff Decl., Ex. E.

82.     Denied. Miller was solely referring to the residual and sequel payments that were in dispute, which were finally paid by a third party in 1989. Toberoff Decl., Ex. E; Haye Decl., Ex. V, Miller Decl. II, ¶ 13; *see* Responses Nos. 64, 66, 77, *supra*.

83.     Admitted, but the book was neither produced by Plaintiffs in discovery nor did Plaintiffs even attempt to authenticate the alleged interview quotations at Miller's deposition. Notwithstanding these objections, Nos. 83-87 are largely irrelevant, and none rise to the level of admissions against interest.

84.     Admitted, with the qualification that this is not an admission and is irrelevant.

85.     Admitted, with the qualification that this is not an admission.

86.     Admitted, with the qualification that this is not an admission.

87.     Admitted, with the qualification that this is not an admission and is irrelevant to

12

A-797

the legal analysis of whether the sequelized "Jason Vorhees" character is derivative of the "Jason Vorhees" character in Miller's Screenplay and the Film, which is objectively based on Miller's material itself and on the "Written by Victor Miller" credit on the Film, and the "Based on Characters Created by Victor Miller" credit on numerous derivative sequel films, *Friday the 13th* television programs and even a video game, over nearly four decades. Miller Decl., Ex. D at 82, 87, 90, 93; Miller Decl., ¶¶ 2-5, Exs. H, I.

## II.     DISPUTED ISSUES MATERIAL FACTS

1.      Whether the WGA, whose predecessor was certified by the National Labor Relations Board ("NLRB") in 1938, when most screenwriters worked as regular salaried employees within the "Studio; System," would so qualify or be certified by the NLRB in 1979 or today under the National Labor Relations Act, 29 U.S.C. § 151 *et seq*., as amended by the Labor Management Relations Act of 1947, 29 U.S.C. §§ 141-197, given that, with the decline of the Studio System in the late 1950's, most screenwriters in 1979, like today, work from their homes as freelancers or independent contractors on a project-by-project basis?  *See* Miller's Opposition to Plaintiffs' Motion for Summary Judgment, Section I. C, D.

2.      Whether Miller wrote his Treatment entitled *A Long Night at Camp Blood* "on spec" prior to entering into the June 4, 1979 *Friday 13* Agreement, with no guarantee of being compensated for his writing or material?  Miller Decl., ¶¶ 6-11, Exs. A, B, C, D; Miller Decl. II, ¶ 12; Toberoff Decl. II, Ex. P ("Cunningham Depo.") at 155:2 -156:15; 160:5-15; 177:16-178:13.

3.      Whether Miller wrote the Treatment "on spec" notwithstanding the time he wrote it because he was never compensated for his Treatment, given the unchecked "[ ] Treatment" box in the June 4, 1979 Agreement and the fact that the minimum fee in the WGA's 1977 Minimum Basic Agreement ("MBA") for a treatment and screenplay is substantially greater than the amounts payable to Miller under his Agreement. Miller Decl., ¶ 21, Ex. D, ¶ 1; Haye Decl., Ex.

13

N (MBA) at 198; Cunningham Depo. at 155:2 -156:15; 160:5-15.

4.      Whether Miller wrote his first draft Screenplay entitled *A Long Night at Camp Blood* "on spec" prior to entering into the June 4, 1979 *Friday 13* Agreement, with no guarantee of being compensated for his writing or material?  Miller Decl., ¶¶ 6-12, Exs. A, B, C, D; Miller Decl. II, ¶ 12; Cunningham Depo., at 146:12-148:13; 177:16-178:13.

5.      Whether Miller wrote a portion of his second draft Screenplay "on spec" prior to entering into the June 4, 1979 *Friday 13* Agreement, with no guarantee of being compensated for his writing or material? Miller Decl., ¶¶ 6-11, Exs. A, B, C, D;

6.      Whether the Jason Vorhees character is derivative of the Jason Vorhees character in Miller's Screenplay and the Film (for which he received sole "Written by" credit) presents a mixed question of fact and law, and a disputed issue of material fact to the extent the Court permits Plaintiffs to try this issue, which goes beyond Plaintiffs' First Count for a declaratory judgment in its Complaint. Complaint, ¶ 34 f.; Miller Decl., ¶¶ 2-5, Exs. H, I.

|  |  |
|---|---|
| Respectfully submitted. | Defendant and Counterclaimant Victor Miller |
| Dated: June 30, 2017 | By:     /s/ Marc Toberoff |
|  | Marc Toberoff (FBN phv08515) |
|  | TOBEROFF & ASSOCIATES, PC |
|  | 23823 Malibu Rd., Ste. 50-363 |
|  | Malibu, CA 90265 |
|  | Telephone: (310) 246-3333 |
|  | Facsimile: (310) 246-3101 |
|  | Email: mtoberoff@toberoffandassociates.com |
|  |  |
|  | Attorneys for Defendant and Counterclaimant Victor Miller |

14

A-799

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Defendant and Counterclaimant Victor Miller's Local Rule 56(a)2 Response and Statement of Disputed Material Facts dated June 30, 2017 was served electronically by the Court's ECF system on said date and that all interested parties in this case are registered CM/ECF users.

The undersigned declares under penalty of perjury under the laws of the United States that the above is true and correct.

Dated: June 30, 2017                    /s/ Marc Toberoff
                                         Marc Toberoff

15

A-800

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| HORROR INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership, <br><br> Plaintiffs, <br><br> vs. <br><br> VICTOR MILLER, an individual; and DOES 1 through 10, <br><br> Defendants. | Case No.: No. 3:16-cv-01442-SRU <br><br> **DECLARATION OF JENNIFER C. PARSIGNAULT, MANAGER-COMPLIANCE DEPARTMENT OF THE PWGA PENSION AND HEALTH PLANS** <br><br> **July 14, 2017** |
| VICTOR MILLER, an individual; <br><br> Counterclaimant, <br><br> vs. <br><br> HORROR INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership; and DOES 1 through 10, <br><br> Counterclaim-Defendants. | |

I, Jennifer C. Parsignault, declare as follows:

1.      I am the acting Manager of the Compliance Department of the PWGA Pension and Health Plans. I can competently testify, under oath, as to the facts contained herein, as such are personally known to me.

2.      The PWGA keeps records in the ordinary course of its business, under the names of WGA member-writers, detailing the earnings of WGA members and the consequent financial

contributions of production companies to the PWGA pension and health plans on behalf of WGA members with respect to their earnings on television and/or film productions like the 1980 film "Friday the 13th" ("PWGA Records").

3.     As the Manager of the Compliance Department of the PWGA pension and health plans I help monitor whether signatory production companies comply with their obligations to routinely report such earnings and to make such financial contributions to the PWGA plans, and accordingly have both access to and comprehend the PWGA Records.

4.     Attached as Exhibit "A" hereto are true and correct copies of the Producer-WGA Pension Plan Statements for Victor Miller for the years 1978 through 1981.

5.     The 1979 statement reflects no reported earnings or contributions to the PWGA's pension or health plans for any projects; the only item is a balance forward from 1978. The 1978 statement details reported earnings of $8,555 and contributions from The Manny Company, however, our records indicate that this was for a different film entitled "Manny's Orphans."

6.     I understand from Victor Miller's 1979 agreement pertaining to "Friday the 13th", which I have electronic access to, that Mr. Miller was to receive $9,282 for a first draft and final draft screenplay. Since no earnings of this amount (or any amount), nor any contributions are detailed in Mr. Miller's 1979 pension plan statement, this indicates that no contributions were made on Mr. Miller's behalf to the PWGA pension and health plans in connection with his writing of "Friday the 13th."

7.     Contributions are made on reportable earnings to both the pension plan and the health fund simultaneously. If earnings and contributions do not appear on the relevant pension statement, contributions were not remitted to the pension plan on those earnings. Likewise, contributions were not remitted to the health fund on those earnings.

8.      Attached as Exhibit "B" are true and correct copies of Victor Miller's earning statements from 1981 to the present reflecting his earnings and corresponding contributions, (listed by year, project and company name) to the PWGA pension and health fund. Inspection of these records indicates no entry for "Friday the 13th", nor for The Manny Company, Georgetown Productions, Inc, Belmont Management, Inc., Horror, Inc. or Paramount Pictures.

9.      If anyone had paid contributions to the pension and health fund on behalf of Mr. Miller for the project "Friday the 13th," their names would appear on these statements along with the project "Friday the 13th", the reported earnings and corresponding contributions.

10.      Based on the records attached as Exhibits A and B hereto, it is concluded that no contributions were made by The Manny Company or any other person or entity to the PWGA pension and health plans on Mr. Miller's behalf in connection with "Friday the 13th."

I declare under penalty of perjury under the laws of the United States that the above facts are true and correct, and that this declaration was executed on this 14th day of July, 2017, in California.

Jennifer C. Parsignault

# PRODUCER—WRITERS GUILD OF AMERICA PENSION PLAN

310 NORTH SAN VICENTE BOULEVARD, SUITE 305

LOS ANGELES, CALIFORNIA 90048

(213) 659-6430

### STATEMENT OF EARNINGS AND CONTRIBUTIONS
### DECEMBER 31, 1978

NAME AND SOCIAL SEC. NO.

SEE REVERSE SIDE FOR INFORMATION
REGARDING THIS STATEMENT.

VICTOR BROOKE MILLER      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
726 BROAD ST
STRATFORD CT 06497

| QUALIFIED YEARS | |
|---|---|
| 1960 Through 1977 | 2 |
| 1978 | 1 |

| YEAR | EMPLOYER CODE | EMPLOYER NAME | EARNINGS SUBJECT TO CONTRIBUTION | EMPLOYER CONTRIBUTION AT 5% |
|---|---|---|---|---|
| | | BALANCE FORWARD AS OF 1977 | 13,500.00 * | 675.00 * |
| 1978 | K202 | THE MANNY COMPANY | 8,555.00 | 427.75 |
| | | TOTALS FOR 1978 | 8,555.00 * | 427.75 * |
| | | TOTAL AS OF 12-31-78 | 22,055.00 ** | 1,102.75 ** |



**IMPORTANT**

If at any time you wish to change your Designated Beneficiary you must
notify the Plan. The required Designation of Beneficiary form for this
purpose may be obtained by contacting the Plan Office.

### CAUTION- Do Not Use This Report For Income Tax Purposes-(See Reverse Side)

PARSINAULT EX. A                                              VM00217

| A-804 |

# PRODUCER—WRITERS GUILD OF AMERICA PENSION PLAN

310 NORTH SAN VICENTE BOULEVARD, SUITE 305

LOS ANGELES, CALIFORNIA 90048

(213) 659-6430

### STATEMENT OF EARNINGS AND CONTRIBUTIONS

## DECEMBER 31, 1979

NAME AND SOCIAL SEC. NO.

SEE REVERSE SIDE FOR INFORMATION
REGARDING THIS STATEMENT.

VICTOR BROOKE MILLER          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
726 BROAD ST
STRATFORD CT 06497

| QUALIFIED YEARS | |
|---|---|
| 1960 Through 1978 | 3 |
| 1979 | 0 |

| YEAR | EMPLOYER CODE | EMPLOYER NAME | EARNINGS SUBJECT TO CONTRIBUTION | EMPLOYER CONTRIBUTION AT 5% |
|---|---|---|---|---|
| | | BALANCE FORWARD AS OF 1978 | 22,055.00 @ | 1,102.75 * |
| | | TOTAL AS OF 12-31-79 | 22,055.00 @@ | 1,102.75 ** |



★ PENSION PLAN ★

INCEPTION MARCH 31, 1960

**IMPORTANT**

If at any time you wish to change your Designated Beneficiary you must
notify the Plan. The required Designation of Beneficiary form for this
purpose may be obtained by contacting the Plan Office.

## CAUTION - Do Not Use This Report For Income Tax Purposes-(See Reverse Side

PARSINAULT EX. A                                                          VM00218

A-805

# PRODUCER—WRITERS GUILD OF AMERICA PENSION PLAN

310 NORTH SAN VICENTE BOULEVARD, SUITE 305

LOS ANGELES, CALIFORNIA 90048

(213) 659-6430

STATEMENT OF EARNINGS AND CONTRIBUTIONS

DECEMBER 31, 1980

SEE REVERSE SIDE FOR INFORMATI
REGARDING THIS STATEMENT.

NAME AND SOCIAL SEC. NO.

MILLER VICTOR B          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
726 BROAD ST
STRATFORD CT 06497

| QUALIFIED YEARS | |
|---|---|
| 1960 Through 1979 | 3 |
| 1980 | 1 |

| YEAR | EMPLOYER CODE | EMPLOYER NAME | EARNINGS SUBJECT TO CONTRIBUTION | EMPLOYER CONTRIBUTI AT 5% |
|---|---|---|---|---|
| | BALANCE FORWARD AS OF 1979 | | 22,055.00 * | 1,102.75 |
| 1980 | A015 | COLUMBIA PICTURES IND | 35,000.00 | 1,750.00 |
| 1980 | A555 | AMERICAN INTERNATIONAL | 40,000.00 | 2,000.00 |
| | | TOTALS FOR 1980 | 75,000.00 * | 3,750.00 |
| | | TOTAL AS OF 12-31-80 | 97,055.00 ** | 4,852.75 |



## IMPORTANT

If at any time you wish to change your Designated Beneficiary you must notify the Plan.   The required Designation of Beneficiary form for this purpose may be obtained by contacting the Plan Office.

**CAUTION - Do Not Use This Report For Income Tax Purposes-(See Reverse Sid**

PARSINAULT EX. A

VM00219

# PRODUCER—WRITERS GUILD OF AMERICA PENSION PLAN

310 NORTH SAN VICENTE BOULEVARD, SUITE 305
LOS ANGELES, CALIFORNIA 90048
(213) 659-6430

### STATEMENT OF EARNINGS AND CONTRIBUTIONS
### DECEMBER 31, 1981

NAME AND SOCIAL SEC. NO.

SEE REVERSE SIDE FOR INFORMATION
REGARDING THIS STATEMENT.

MILLER VICTOR B          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
726 BROAD ST
STRATFORD CT 06497

| QUALIFIED YEARS | |
|---|---|
| 1960 Through 1980 | 4 |
| 1981 | 1 |

| YEAR | EMPLOYER CODE | EMPLOYER NAME | EARNINGS SUBJECT TO CONTRIBUTION | EMPLOYER CONTRIBUTION AT 5% |
|---|---|---|---|---|
| | | BALANCE FORWARD AS OF 1980 | 97,055.00 * | 4,852.75 * |
| 1981 | A0015000 | COLUMBIA PICTURES IND | 15,000.00 | 750.00 |
| | | TOTALS FOR 1981 | 15,000.00 * | 750.00 * |
| | | TOTAL AS OF 12-31-81 | 112,055.00 ** | 5,602.75 ** |

**IMPORTANT**

If at any time you wish to change your Designated Beneficiary you must notify the Plan.   The required Designation of Beneficiary form for this purpose may be obtained by contacting the Plan Office.

## CAUTION- Do Not Use This Report For Income Tax Purposes-(See Reverse Side)

PARSINAULT EX. A

A-807

# Earnings Detail By Writer

**Report Quarter:** 19791 - 20004
**Report Generated On:** 06/05/2017 10:50:53 AM
**Report Generated by:** jparsignault
**Writer Name And SSN:** 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   Miller, Victor
**Sort By:** Employer Name,Year/Quarter

| Employer Code | Employer's Name | Project/Episode Title | Project No. | WGAPHP Proj# | QTR | Trx ID | Pension Earnings | Health Earnings | Pension Rate % | Decoupled Rate % | Health Rate % | Pension Contrib | Decoupled Contrib | Health Contrib | Ep Num |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 58 | AGNES NIXON & | ALL MY CHILDREN | | | 1991/1 | 63636 | $0.00 | $187.26 | 0.00 | 0 | 4.00 | $0.00 | $0.00 | $7.49 | |
| | | ALL MY CHILDREN | | | 1991/1 | 63636 | $187.26 | $0.00 | 6.00 | 0 | 0.00 | $11.24 | $0.00 | $0.00 | |
| | | | 1991/1 | | Totals: | Earnings | $187.26 | $187.26 | | | | $11.24 | $0.00 | $7.49 | |

**Sub Total for AGNES NIXON & ASSOCIATES**   $11.24   $0.00   $7.49

| Employer Code | Employer's Name | Project/Episode Title | Project No. | WGAPHP Proj# | QTR | Trx ID | Pension Earnings | Health Earnings | Pension Rate % | Decoupled Rate % | Health Rate % | Pension Contrib | Decoupled Contrib | Health Contrib | Ep Num |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 118 | AMERICAN BROADCASTING | NO PROJECT TITLE | | | 1982/1 | 84972 | $0.00 | $448.84 | 0.00 | 0 | 4.00 | $0.00 | $0.00 | $17.95 | |
| | | NO PROJECT TITLE | | | 1982/1 | 84972 | $448.84 | $0.00 | 5.00 | 0 | 0.00 | $22.44 | $0.00 | $0.00 | |
| | | | 1982/1 | | Totals: | Earnings | $448.84 | $448.84 | | | | $22.44 | $0.00 | $17.95 | |
| | | NO PROJECT TITLE | | | 1983/1 | 84972 | $0.00 | $448.84 | 0.00 | 0 | 4.00 | $0.00 | $0.00 | $17.95 | |
| | | NO PROJECT TITLE | | | 1983/1 | 84972 | $448.84 | $0.00 | 6.00 | 0 | 0.00 | $26.93 | $0.00 | $0.00 | |
| | | | 1983/1 | | Totals: | Earnings | $448.84 | $448.84 | | | | $26.93 | $0.00 | $17.95 | |
| | | NO PROJECT TITLE | | | 1984/1 | 84972 | $0.00 | $448.84 | 0.00 | 0 | 4.00 | $0.00 | $0.00 | $17.95 | |
| | | NO PROJECT TITLE | | | 1984/1 | 84972 | $448.84 | $0.00 | 6.00 | 0 | 0.00 | $26.93 | $0.00 | $0.00 | |
| | | | 1984/1 | | Totals: | Earnings | $448.84 | $448.84 | | | | $26.93 | $0.00 | $17.95 | |
| | | | | | 1985/1 | 82707 | $0.00 | $33,750.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $1,856.25 | |
| | | | | | 1985/1 | 82707 | $33,750.00 | $0.00 | 6.00 | 0 | 0.00 | $2,025.00 | $0.00 | $0.00 | |
| | | NO PROJECT TITLE | | | 1985/1 | 84972 | $0.00 | $448.84 | 0.00 | 0 | 4.00 | $0.00 | $0.00 | $17.95 | |
| | | NO PROJECT TITLE | | | 1985/1 | 84972 | $448.84 | $0.00 | 6.00 | 0 | 0.00 | $26.93 | $0.00 | $0.00 | |
| | | NO PROJECT TITLE | | | 1985/1 | 164709 | $0.00 | -$3,750.00 | 0.00 | 0 | 4.00 | $0.00 | $0.00 | -$150.00 | |
| | | NO PROJECT TITLE | | | 1985/1 | 164709 | -$3,750.00 | $0.00 | 6.00 | 0 | 0.00 | -$225.00 | $0.00 | $0.00 | |
| | | | 1985/1 | | Totals: | Earnings | $30,448.84 | $30,448.84 | | | | $1,826.93 | $0.00 | $1,724.20 | |
| | | | | | 1985/2 | 82707 | $0.00 | $33,750.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $1,856.25 | |

PARSINAULT EX. B

VM00251

Case 3:11-cv-01442-SRU   Document   Filed 11/14/1...

| Project No. | Project/Episode Title | Employer's Name | Employer Code |
|---|---|---|---|
| | | AMERICAN BROADCASTING | 118 |

| Period | Date | Code | Earnings | Pension Earnings | Health Earnings | Pension Rate % | Deferred % | Health Rate % | Pension Contrib | Decoupled Contrib | Health Contrib | Ep Num |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1985/2 | 1985/2 | 82707 | $33,750.00 | $33,750.00 | $0.00 | 6.00 | 0 | 0.00 | $2,025.00 | $0.00 | $0.00 | $0.00 |
| **1985/2 Totals:** | **Earnings** | | **$33,750.00** | **$33,750.00** | **$0.00** | | | | **$2,025.00** | **$0.00** | **$1,856.25** | |
| 1985/3 | 1985/3 | 82707 | $0.00 | $0.00 | $33,750.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $1,856.25 | |
| | 1985/3 | 82707 | $33,750.00 | $33,750.00 | $0.00 | 6.00 | 0 | 0.00 | $2,025.00 | $0.00 | $0.00 | |
| **1985/3 Totals:** | **Earnings** | | **$33,750.00** | **$33,750.00** | **$33,750.00** | | | | **$2,025.00** | **$0.00** | **$1,856.25** | |
| 1985/4 | 1985/4 | 82707 | $0.00 | $0.00 | $33,750.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $1,856.25 | |
| | 1985/4 | 82707 | $33,750.00 | $33,750.00 | $0.00 | 6.00 | 0 | 0.00 | $2,025.00 | $0.00 | $0.00 | |
| **1985/4 Totals:** | **Earnings** | | **$33,750.00** | **$33,750.00** | **$33,750.00** | | | | **$2,025.00** | **$0.00** | **$1,856.25** | |
| 1986/1 | 1986/1 | 82707 | $0.00 | $0.00 | $36,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $1,980.00 | |
| | 1986/1 | 82707 | $36,000.00 | $36,000.00 | $0.00 | 6.00 | 0 | 0.00 | $2,160.00 | $0.00 | $0.00 | |
| **1986/1 Totals:** | **Earnings** | | **$36,000.00** | **$36,000.00** | **$36,000.00** | | | | **$2,160.00** | **$0.00** | **$1,980.00** | |
| 1986/2 | 1986/2 | 31798 | $4,000.00 | $0.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 | |
| | 1986/2 | 31798 | $0.00 | $4,000.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 | |
| | 1986/2 | 31798 | $4,000.00 | $0.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 | |
| | 1986/2 | 31798 | $0.00 | $4,000.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 | |
| | 1986/2 | 83574 | $4,000.00 | $0.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 | |
| | 1986/2 | 83574 | $0.00 | $4,000.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 | |
| | 1986/2 | 163799 | $4,000.00 | $0.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 | |
| | 1986/2 | 163799 | $0.00 | $4,000.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 | |
| **1986/2 Totals:** | **Earnings** | | **$16,000.00** | **$16,000.00** | **$16,000.00** | | | | **$960.00** | **$0.00** | **$880.00** | |
| | 1986/3 | 31008 | $4,000.00 | $0.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 | |
| | 1986/3 | 31008 | $0.00 | $4,000.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 | |
| | 1986/3 | 31743 | $4,000.00 | $0.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 | |
| | 1986/3 | 31743 | $0.00 | $4,000.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 | |
| | 1986/3 | 57696 | $4,000.00 | $0.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 | |
| | 1986/3 | 57696 | $0.00 | $4,000.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 | |
| | 1986/3 | 57812 | $4,000.00 | $0.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 | |

VM000252

PARSINAULT EX. B

**Case 3.1   Document   Filed 11/14/1442-SRU**

| Employer Code | Employer's Name / Project-Episode Title | Project No. (WGAPH) | Prof | Pension Earnings | Pension Filed Earnings | Health Earnings | Pension Rate % | Decoupled Rate % | Health Rate % | Pension Contrib | Decoupled Contrib | Health Contrib | Ep Num |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 118 | AMERICAN BROADCASTING | | 1986/3 | 57812 | $4,000.00 | $0.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 |
| | ONE LIFE TO LIVE | | 1986/3 | 84424 | $0.00 | $4,000.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 |
| | ONE LIFE TO LIVE | | 1986/3 | 84424 | $4,000.00 | $0.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 |
| | | | 1986/3 | 136620 | $0.00 | $4,000.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 |
| | | | 1986/3 | 136620 | $4,000.00 | $0.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 |
| | | | 1986/3 | 136792 | $0.00 | $4,000.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 |
| | | | 1986/3 | 136792 | $4,000.00 | $0.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 |
| | | | 1986/3 | 136992 | $0.00 | $4,000.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 |
| | | | 1986/3 | 136992 | $4,000.00 | $0.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 |
| | | | 1986/3 | 136992 | $0.00 | $4,000.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 |
| | | | 1986/3 | 162646 | $4,000.00 | $0.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 |
| | | | 1986/3 | 162646 | $0.00 | $4,000.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 |
| | ALL MY CHILDREN | | 1986/3 | 164087 | $4,000.00 | $0.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 |
| | ALL MY CHILDREN | | 1986/3 | 164087 | $0.00 | $4,000.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 |
| | | | 1986/3 | 188244 | $4,000.00 | $0.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 |
| | | | 1986/3 | 188244 | $0.00 | $4,000.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 |
| | | | 1986/3 | 189951 | $4,000.00 | $0.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 |
| | | | 1986/3 | 189951 | $0.00 | $4,000.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 |
| | | | 1986/3 | 191089 | $4,000.00 | $0.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 |
| | | | 1986/3 | 191089 | $0.00 | $4,000.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 |
| | **1986/3  Totals:** | | | **Earnings** | **$52,000.00** | **$52,000.00** | **$52,000.00** | | | | **$3,120.00** | **$0.00** | **$2,860.00** |
| | ONE LIFE TO LIVE | | 1986/4 | 58069 | $0.00 | $4,000.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 |
| | | | 1986/4 | 58069 | $4,000.00 | $0.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 |
| | ONE LIFE TO LIVE | | 1986/4 | 58499 | $0.00 | $722.26 | $722.26 | 0.00 | 0 | 4.00 | $0.00 | $0.00 | $28.89 |
| | | | 1986/4 | 58499 | $722.26 | $0.00 | $0.00 | 6.00 | 0 | 0.00 | $43.34 | $0.00 | $0.00 |
| | ONE LIFE TO LIVE | | 1986/4 | 164652 | $0.00 | $4,000.00 | $4,000.00 | 0.00 | 0 | 5.50 | $0.00 | $0.00 | $220.00 |
| | | | 1986/4 | 164652 | $4,000.00 | $0.00 | $0.00 | 6.00 | 0 | 0.00 | $240.00 | $0.00 | $0.00 |
| | **1986/4  Totals:** | | | **Earnings** | **$8,722.26** | **$8,722.26** | **$8,722.26** | | | | **$523.34** | **$0.00** | **$468.89** |
| | NO PROJECT TITLE | | 1986/3 | 19873 | $6,900.00 | $0.00 | $0.00 | 6.00 | 0 | 0.00 | $414.00 | $0.00 | $0.00 | 6181 |

PARSINAULT EX. B

| Employer Code | Employer's Name | Project/Episode Title | | Ep Num | Pension Earnings | Health Earnings | Pension Rate % | Decoupled Rate % | Health Rate % | Pension Contrib | Decoupled Contrib | Health Contrib |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 118 | AMERICAN BROADCASTING | NO PROJECT TITLE | 1987/3 | 6181 | $6,900.00 | $0.00 | 6.00 | 0 | 0.00 | $414.00 | $0.00 | $0.00 |
| | | | 1987/3 | 6339 | $0.00 | $6,900.00 | 0.00 | 0 | 6.00 | $0.00 | $0.00 | $414.00 |
| | | | 1987/3 | 6339 | $6,900.00 | $0.00 | 6.00 | 0 | 0.00 | $414.00 | $0.00 | $0.00 |
| | | NO PROJECT TITLE | 1987/3 | 59407 | $0.00 | $6,900.00 | 0.00 | 0 | 6.00 | $0.00 | $0.00 | $414.00 |
| | | NO PROJECT TITLE | 1987/3 | 59407 | $6,900.00 | $0.00 | 6.00 | 0 | 0.00 | $414.00 | $0.00 | $0.00 |
| | | | 1987/3 | 110282 | $0.00 | $6,900.00 | 0.00 | 0 | 6.00 | $0.00 | $0.00 | $414.00 |
| | | | 1987/3 | 110282 | $6,900.00 | $0.00 | 6.00 | 0 | 0.00 | $414.00 | $0.00 | $0.00 |
| | | NO PROJECT TITLE | 1987/3 | 137667 | $0.00 | $6,900.00 | 0.00 | 0 | 6.00 | $0.00 | $0.00 | $414.00 |
| | | NO PROJECT TITLE | 1987/3 | 137667 | $6,900.00 | $0.00 | 6.00 | 0 | 0.00 | $414.00 | $0.00 | $0.00 |
| | | NO PROJECT TITLE | 1987/3 | 160675 | $0.00 | $6,900.00 | 0.00 | 0 | 6.00 | $0.00 | $0.00 | $414.00 |
| | | NO PROJECT TITLE | 1987/3 | 160675 | $6,900.00 | $0.00 | 6.00 | 0 | 0.00 | $414.00 | $0.00 | $0.00 |
| | | NO PROJECT TITLE | 1987/3 | 161222 | $0.00 | $6,900.00 | 0.00 | 0 | 6.00 | $0.00 | $0.00 | $414.00 |
| | | NO PROJECT TITLE | 1987/3 | 161222 | $6,900.00 | $0.00 | 6.00 | 0 | 0.00 | $414.00 | $0.00 | $0.00 |
| | | NO PROJECT TITLE | 1987/3 | 163279 | $0.00 | $6,900.00 | 0.00 | 0 | 6.00 | $0.00 | $0.00 | $414.00 |
| | | NO PROJECT TITLE | 1987/3 | 163279 | $6,900.00 | $0.00 | 6.00 | 0 | 0.00 | $414.00 | $0.00 | $0.00 |
| | | **1987/3 Totals:** | | Earnings | **$55,200.00** | **$55,200.00** | | | | **$3,312.00** | **$0.00** | **$3,312.00** |
| | | NO PROJECT TITLE | 1987/4 | 8012 | $6,900.00 | $0.00 | 6.00 | 0 | 0.00 | $414.00 | $0.00 | $0.00 |
| | | NO PROJECT TITLE | 1987/4 | 8012 | $0.00 | $6,900.00 | 0.00 | 0 | 6.00 | $0.00 | $0.00 | $414.00 |
| | | NO PROJECT TITLE | 1987/4 | 32223 | $6,900.00 | $0.00 | 6.00 | 0 | 0.00 | $414.00 | $0.00 | $0.00 |
| | | NO PROJECT TITLE | 1987/4 | 32223 | $0.00 | $6,900.00 | 0.00 | 0 | 6.00 | $0.00 | $0.00 | $414.00 |
| | | NO PROJECT TITLE | 1987/4 | 58789 | $6,900.00 | $0.00 | 6.00 | 0 | 0.00 | $414.00 | $0.00 | $0.00 |
| | | NO PROJECT TITLE | 1987/4 | 58789 | $0.00 | $6,900.00 | 0.00 | 0 | 6.00 | $0.00 | $0.00 | $414.00 |
| | | NO PROJECT TITLE | 1987/4 | 59378 | $6,900.00 | $0.00 | 6.00 | 0 | 0.00 | $414.00 | $0.00 | $0.00 |
| | | NO PROJECT TITLE | 1987/4 | 59378 | $0.00 | $6,900.00 | 0.00 | 0 | 6.00 | $0.00 | $0.00 | $414.00 |
| | | NO PROJECT TITLE | 1987/4 | 59829 | $6,900.00 | $0.00 | 6.00 | 0 | 0.00 | $414.00 | $0.00 | $0.00 |
| | | NO PROJECT TITLE | 1987/4 | 59829 | $0.00 | $6,900.00 | 0.00 | 0 | 6.00 | $0.00 | $0.00 | $414.00 |
| | | NO PROJECT TITLE | 1987/4 | 60260 | $8,900.00 | $0.00 | 6.00 | 0 | 0.00 | $534.00 | $0.00 | $0.00 |
| | | NO PROJECT TITLE | 1987/4 | 60260 | $0.00 | $8,900.00 | 0.00 | 0 | 6.00 | $0.00 | $0.00 | $534.00 |

PARSINAULT EX. B

VM000254

Project No.: Case 3:1... WGAPR 1442 SRU    Document Filed

| Employer Code / Employer's Name | Project/Episode Title | Group | Document No. | Earnings | Pension Earnings | Health Earnings | Rate % | Pension Rate % | Decoupled Rate % | Health Rate / Pension Contrib % | Pension Contrib | Decoupled Contrib | Health Contrib | Ep Num |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5871   WORDSMITH, INC. | LIFE TO LIVE-ALL MY CHIL | 19844 | 6579 | $0.00 | $45,500.00 | $45,500.00 | 0.00 | 6.00 | 0 | 4.00 | $0.00 | $0.00 | $1,820.00 | |
| | LIFE TO LIVE-ALL MY CHIL | 19844 | 6579 | $45,500.00 | $0.00 | $0.00 | 6.00 | | 0 | 0.00 | $2,730.00 | $0.00 | $0.00 | |
| | LIFE TO LIVE-ALL MY CHIL | 19844 | 6579 | $0.00 | $25,000.00 | $25,000.00 | 0.00 | 6.00 | 0 | 4.00 | $0.00 | $0.00 | $1,000.00 | |
| | LIFE TO LIVE-ALL MY CHIL | 19844 | 6579 | $25,000.00 | $0.00 | $0.00 | 6.00 | | 0 | 0.00 | $1,500.00 | $0.00 | $0.00 | |
| | JURY DUTY | 19844 | 138753 | $0.00 | -$15,000.00 | -$15,000.00 | 0.00 | 6.00 | 0 | 4.00 | $0.00 | $0.00 | -$600.00 | |
| | JURY DUTY | 19844 | 138753 | -$15,000.00 | $0.00 | $0.00 | 6.00 | | 0 | 0.00 | -$900.00 | $0.00 | $0.00 | |
| | **19844 Totals:** | | Earnings | $55,500.00 | $55,500.00 | $55,500.00 | | | | | **$3,330.00** | **$0.00** | **$2,220.00** | |
| | | 19852 | 6579 | $0.00 | $8,250.00 | $8,250.00 | 0.00 | 6.00 | 0 | 5.50 | $0.00 | $0.00 | $453.75 | |
| | | 19852 | 6579 | $8,250.00 | $0.00 | $0.00 | 6.00 | | 0 | 0.00 | $495.00 | $0.00 | $0.00 | |
| | **19852 Totals:** | | Earnings | $8,250.00 | $8,250.00 | $8,250.00 | | | | | **$495.00** | **$0.00** | **$453.75** | |
| | | 19853 | 6579 | $0.00 | $8,250.00 | $8,250.00 | 0.00 | 6.00 | 0 | 5.50 | $0.00 | $0.00 | $453.75 | |
| | | 19853 | 6579 | $8,250.00 | $0.00 | $0.00 | 6.00 | | 0 | 0.00 | $495.00 | $0.00 | $0.00 | |
| | **19853 Totals:** | | Earnings | $8,250.00 | $8,250.00 | $8,250.00 | | | | | **$495.00** | **$0.00** | **$453.75** | |
| | | 19854 | 6579 | $0.00 | $16,250.00 | $16,250.00 | 0.00 | 6.00 | 0 | 5.50 | $0.00 | $0.00 | $893.75 | |
| | | 19854 | 6579 | $16,250.00 | $0.00 | $0.00 | 6.00 | | 0 | 0.00 | $975.00 | $0.00 | $0.00 | |
| | **19854 Totals:** | | Earnings | $16,250.00 | $16,250.00 | $16,250.00 | | | | | **$975.00** | **$0.00** | **$893.75** | |
| | | 19861 | 6579 | $0.00 | $16,000.00 | $16,000.00 | 0.00 | 6.00 | 0 | 5.50 | $0.00 | $0.00 | $880.00 | |
| | | 19861 | 6579 | $16,000.00 | $0.00 | $0.00 | 6.00 | | 0 | 0.00 | $960.00 | $0.00 | $0.00 | |
| | **19861 Totals:** | | Earnings | $16,000.00 | $16,000.00 | $16,000.00 | | | | | **$960.00** | **$0.00** | **$880.00** | |

**Sub Total for WORDSMITH, INC.**    $279,750.00   $395,250.00   $16,435.00   $0.00   $16,541.25

**Grand Total**    $5,908,794.14   6,135,916.14   $354,173.90   $0.00   $378,031.88

VM00329

PARSINAULT EX. B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| HORROR INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership,<br><br>     Plaintiffs,<br><br>  vs.<br><br>VICTOR MILLER, an individual; and DOES 1 through 10,<br><br>     Defendants.<br><br>────────────<br><br>VICTOR MILLER, an individual;<br><br>     Counterclaimant,<br><br>  vs.<br><br>HORROR INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership; and DOES 1 through 10,<br><br>     Counterclaim-Defendants. | Case No.: No. 3:16-cv-01442-SRU<br><br>**DECLARATION OF MARC TOBEROFF IN REPLY TO PLAINTIFFS' EVIDENTIARY OBJCETIONS AND IN FURTHER SUPPORT OF DEFENDANT AND COUNTERCLAIMANT VICTOR MILLER'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**<br><br>**July 14, 2017** |

   I, Marc Toberoff, declare as follows:

   1.  I am counsel for Victor Miller the defendant and counterclaimant in this action. I submit this declaration in reply to Plaintiffs' Evidentiary Objections and in further support of Victor Miller's Motion for Summary Judgment, Or In The Alternative, Partial Summary Judgment, and, if called as a witness at the trial of this matter, I would and could competently testify, under oath, as to the facts contained herein, which are personally known to me.

A-813

2.       On November 22, 2016, Plaintiffs' counsel served a subpoena *duces tecum* on the PWGA and provided me with a service copy. True and correct copies of Plaintiffs' cover letter and subpoena are attached hereto as Exhibit "T".

3.       On January 3, 2016, I received an email from the office of Plaintiffs' counsel Bonnie Eskenazi, purporting to attach the documents as produced by the PWGA in response to Plaintiffs' subpoena. True and correct copies of this January 3, 2016 email and the PWGA documents, as produced by Plaintiffs, are attached hereto as Exhibit "U."

4.       Significantly, with respect to Plaintiffs' unfounded accusations, I was unaware of and was not provided until July 10, 2017 with a copy of the cover letter from the PWGA's outside counsel enclosing the PWGA documents responsive to Plaintiffs' subpoena.

5.       I therefore had no idea that the PWGA was represented by outside counsel with regard to Plaintiffs' subpoena, until I learned of this for the first time in Plaintiffs' false and accusatory Evidentiary Objections.

6.       On May 31, 2017, I provided the PWGA with a form signed by my client Victor Miller, authorizing me to receive copies of his PWGA records. True and correct copies of my email to the PWGA enclosing the signed PWGA authorization form are attached hereto as Exhibit "V."

7.       On June 7, 2017, I contacted Jennifer Parsignault in the PWGA Compliance Department by telephone, specifically informed her of this lawsuit, and asked her to confirm whether the Manny Company or anyone else had in fact contributed to the PWGA pension and health plans on behalf of Victor Miller in connection with "Friday the 13th." On June 7, 2017, Ms. Parsignault responded by email informing me that no contributions were made, attaching the relevant PWGA business records which showed this. True and correct copies of this email exchange and the relevant PWGA business records enclosed, were attached as Exhibit "C" to my Declaration In Support Of Victor Miller's Motion for Summary Judgment.

8.       On June 7, 2017, I Bates-labelled and produced to Plaintiffs Mr. Parsinault's June 7, 2017 email and attachments.

A-814

9.      On June 26, 2017 I contacted Ms. Parsignault by email again to reconfirm that no pension and health contributions were made *at any time, by anyone* on Victor Miller's behalf with respect to "Friday the 13th." True and correct copies of my email, Ms. Parsignault's email response that no contributions were made by anyone, and the second set of relevant PWGA business records she enclosed, were attached as Exhibit "O" to my Declaration In Opposition to Plaintiffs' Motion for Summary Judgment.

10.     On June 28, 2017, I Bates-labelled and produced to Plaintiffs Mr. Parsinault's June 26, 2017 email and attachments.

11.     Between July 5, 2017 and July 10, 2017, I repeatedly requested by emails to Plaintiffs' counsel copies of the PWGA's actual response to Plaintiff's subpoena, *i.e.*, the cover letter from the PWGA attorney ("Cover Letter") I had never received and the documents as actually produced by the PWGA. In partial response, Plaintiffs' counsel stated in a July 7 email: "FYI, we literally added bates labels to the PDF's received, in the exact order as received from the PWGA", although I had not asked about that. On July 10, 2017, Plaintiffs' counsel finally produced by email the December 21, 2016 Cover Letter, but did not produce the documents in the form produced by the PWGA, representing to me that these had not been produced in electronic form. True and correct copies of this email exchange are attached hereto as Exhibit "W."

12.     On July 10, 2017 I contacted Reich, Adell & Cvitan, the law firm on the Cover Letter, to inquire about the PWGA's actual production on December 21, 2016; was informed that the PWGA had produced the responsive documents, although counsel written the Cover Letter, and I was connected with the relevant PWGA executive. In response, on July 11, 2017, Chris Karman, Sr. Pension Benefits Analyst at the PWGA sent me the documents as produced by the PWGA on December 22, 2016, and confirmed that "Yes, these documents were sent to the [Plaintiff's] attorneys in a pdf format," contrary to the representation by Plaintiffs' counsel. True and correct copies of my email exchange with Mr. Karmin are attached as Exhibit "X."

13.     Examination of the PDF file provided to me by the PWGA (consisting of the

A-815

documents, as produced by the PWGA on December 21, 2016 to Plaintiffs) revealed that the *first* pages in the PWGA's production were their statements, indicating that no pension and health contributions had been made in connection with "Friday the 13th".  In fact, the very first page was their <u>1979</u> Statement. To avoid, unnecessarily large Exhibits, attached hereto as Exhibit "Y" are true and correct copies of the December 21, 2016 Cover Letter, and the relevant <u>first</u> two pages of the PWGA's actual production to Plaintiffs, exactly as they appear in the December 21, 2016 PDF emailed to me by the PWGA on July 11, 2017.

14.    A comparison of Exhibit "U" to Exhibit "Y" reveals that Plaintiffs' counsel appears to have removed the highly relevant statements from the top of the PWGA's actual production, and buried them in Plaintiffs' Bates-labelled PWGA production to Miller, presumably to deter detection.

15.    On July 5, 2017, I, on Victor Miller's behalf, served on the Manny Company ("Manny"), Sean S. Cunningham Films, Ltd., Horror, Inc. and other potential successors in interest of Manny, a statutory notice of termination under 17 U.S.C. §203(a) pertaining to Miller's treatment entitled "A Long Night At Camp Blood" ("Treatment") with an effective termination date of July 6, 2019 (the "Termination Notice"). This additional Termination Notice was served in response to Plaintiffs' June 30, 2017 opposition brief, and solely out of an abundance of caution. A true and correct copy of the Termination Notice is attached hereto as Exhibit "Z."

I declare under penalty of perjury under the laws of the United States that the above facts are true and correct, and that this declaration was executed on this 14th day of July, 2017, in California.

/s/ Marc Toberoff

———————————————————
Marc Toberoff

A-816

**Bonnie E. Eskenazi**

D:  310.785.6857
F:  310.201.2357
BEskenazi@GreenbergGlusker.com
File Number: 08226-00016

**GREENBERG GLUSKER**
The Counsel You Keep™

November 22, 2016

<u>**Via Hand Delivery**</u>

Custodian of Records
Producer-Writers Guild of America Pension Plan
2900 W. Alameda Avenue
Burbank, CA  91505

      Re:    <u>Horror Inc. et al. v. Miller, et al.</u>
            USDC District of Connecticut Case No. 3:16-cv-01442 (SRU)

Dear Sir or Madam:

      Enclosed please find a Subpoena to Testify at a Deposition in a Civil Action issued to the Custodian of Records of Producer-Writers Guild of America Pension Plan, with attached requests for production of documents (the "Subpoena"), in connection with the above-entitled action.

      The deposition is currently noticed for December 22, 2016, at 10:00 a.m., at the offices of Greenberg Glusker Fields Claman & Machtinger LLP, 1900Avenue of the Stars, 21st Floor, Los Angeles, CA 90067.  Given the upcoming holidays, we are willing to discuss a mutually agreeable alterative date for the deposition.

      In addition, in lieu of live deposition testimony, we are willing to discuss the possibility of satisfying your obligations under the Subpoena by production of the requested documents and provision of a declaration certifying the authenticity of the documents produced.

      Please contact me as soon as possible to discuss a mutually agreeable date for the deposition and production of documents.

      Sincerely,

      *Bonnie Eskenazi*

      Bonnie E. Eskenazi

cc:    All counsel of record

**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, California 90067
T:  310.553.3610   |   F:  310.553.0687

**GreenbergGlusker.com**

TOBEROFF EX. T
08226-00016/2716103.1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| HORROR, INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership,<br><br>                        Plaintiffs,<br><br>        - against -<br><br>VICTOR MILLER, an individual; and DOES 1 through 10, inclusive,<br><br>                        Defendants. | Case No.: 3:16-cv-01442-SRU<br><br>**NOTICE OF DEPOSITION OF CUSTODIAN OF RECORDS OF PRODUCER-WRITERS GUILD OF AMERICA PENSION PLAN**<br><br>Date:     December 22, 2016<br>Time:    10:00 a.m.<br>Place:   Greenberg Glusker<br>           1900 Ave of the Stars<br>           21st Floor<br>           Los Angeles, CA 90067 |

PLEASE TAKE NOTICE that Plaintiffs Horror, Inc. and Manny Company ("Plaintiffs") will take the deposition of the Custodian of Records of Producer-Writers Guild of America Pension Plan, on December 22, 2016, starting at 10:00 a.m. and continuing until completed or otherwise adjourned.  The deposition will be taken at the offices of Greenberg Glusker Fields Claman & Machtinger LLP, 1900 Avenue of the Stars, 21st Floor, Los Angeles, CA 90067, before a certified court reporter duly licensed by the State of California to administer oaths and will be recorded by stenographic method, through the instant visual display of the testimony, sound, and visual means.  Accordingly, "real time transcription" by means of "Livenote" or other computer software may be used.  Plaintiffs reserve the right to use the videotaped deposition at trial.

PLEASE TAKE FURTHER NOTICE that the witness is required to produce, at said time and place, the documents and things described on the Attachment to Subpoena issued to the deponent.  A true and correct copy of the Subpoena and Attachment to Subpoena are attached hereto as Exhibit A and incorporated herein by this reference.

Dated:  November 21, 2016

Respectfully submitted,

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP

By: _____

BONNIE E. ESKENAZI (SBN 119401)
BEskenazi@GreenbergGlusker.com
JULIA R. HAYE (SBN 198138)
JHaye@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590
Telephone:  310.553.3610
Fax:  310.553.0687
(Admission *Pro Hac Vice* Pending)

and

EDMUND J. FERDINAND, III (ct21287)
jferdinand@24iplg.com
ALEXANDER R. MALBIN (ct29419)
amalbin@24iplg.com
JESSICA S. RUTHERFORD (ct27273)
jrutherford@24iplg.com
129 Post Road East
Westport, Connecticut 06880
Telephone: 203.557.4224
Fax: 203.905.6747

*Attorneys for Plaintiffs,*
*Horror, Inc. and Manny Company*

TOBEROFF EX. T

# EXHIBIT A

TOBEROFF EX. T

A-820

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
District of Connecticut

| | |
|---|---|
| Horror, Inc., et al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   3:16-cv-01442-SRU |
| Victor Miller, et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  Custodian of Records of Producer-Writers Guild of America Pension Plan
2900 W. Alameda Ave., Burbank, CA 91505-4220
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See attachment.

| Place:  Greenberg Glusker, 1900 Ave of the Stars, 21st Floor Los Angeles, CA 90067 | Date and Time: December 22, 2016 at 10:00 am |
|---|---|

The deposition will be recorded by this method:  stenographic method and videotape and/or audiotape

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See attachment.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  11/21/2016

CLERK OF COURT

OR

_____  /s/ Bonnie E. Eskenazi
*Signature of Clerk or Deputy Clerk*   *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Plaintiffs
Horror, Inc. and Manny Company _____ , who issues or requests this subpoena, are:

Bonnie Eskenazi, Greenberg Glusker, et al., 1900 Avenue of the Stars, 21st Floor, Los Angeles, CA 90067;
310-553-3610; BEskenazi@ggfirm.com.

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

TOBEROFF EX. T

## <u>ATTACHMENT TO SUBPOENA</u>

## <u>DEFINITIONS</u>

As used herein, the following terms shall have the following meanings:

A.      "WGA PLANS" means the Producer-Writers Guild of America Pension Plan, the Writers Guild-Industry Health Fund, and/or any other ERISA plan associated with the Writers Guild of America, East, Inc. and Writers Guild of America, West, Inc. between 1970 and the present, as well as their respective officers, employees, agents, directors, attorneys, representatives, predecessors, successors or assigns, or any person acting on their behalf, and each of them.

B.      "MILLER" means Defendant Victor Miller, Wordsmith, Inc., and/or any other loanout company used by Mr. Miller, as well as their respective officers, employees, agents, directors, attorneys, representatives, predecessors, successors or assigns, or any person acting on their behalf, and each of them.

C.      "FRIDAY THE 13th" means the original horror film entitled *Friday the 13th*, which was released on or about May 9, 1980 (the "Film"), including any screenplays, treatments, or other literary material titled or prepared in connection with the Film, including any such materials titled "Friday 13" or "A Long Night At Camp Blood."

D.      "FRIDAY PROJECT(S)" means any and all sequels, prequels, remakes, or spin-offs of FRIDAY THE 13th, whether written or produced for film, television, or any other medium, including but not limited to stage productions or other literary materials.

E.       "COMMUNICATIONS" means any and all contact between two or more PERSONS including, without limitation, all written contact by such means as letters, memoranda, telegrams, and e-mail and including, without limitation, all oral contact by such means as face-to-face meetings and telephone conversations.  For the avoidance of

doubt, COMMUNICATIONS refers to such contact between any two or more persons, including, without limitation, contact between WGA PLANS and MILLER, and/or any third parties.

F.     "DOCUMENT(S)" shall encompass all documents and electronically stored information ("ESI") as defined in Local Rule 26 and Federal Rule of Civil Procedure 34, including without limitation writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations, stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form, and including all non-identical copies of any documents or ESI.

G.     As used herein "any" includes the word "all," and vice versa, and the singular includes the plural, and vice versa.

H.     As used herein, "and" and "or" shall be considered conjunctively or disjunctively as necessary to make this request inclusive rather than exclusive.

## **INSTRUCTIONS**

A.     Please produce all of the specified documents, including any electronic copies thereof, which are in WGA PLANS' possession, or available to WGA PLANS, or to which WGA PLANS may gain access through reasonable effort, including information in the possession of WGA PLANS' past and present attorneys, bookkeepers, investigators, consultants, affiliates, subsidiaries, or other persons directly or indirectly employed or retained by WGA PLANS, or anyone else otherwise subject to WGA PLANS control who maintains records on WGA PLANS' behalf, in WGA PLANS' name or otherwise under WGA PLANS' control.

B.     Any comments, notation or marking appearing on any document, electronic records, and not a part of the original is considered a separate document, and any draft,

A-823

preliminary form or superseded version of any document is also considered a separate document.

C.      Any document, including electronic records, attached to another document must not be separated.

D.      If electronic records stored in, or accessible through, computer or other data retrieval systems are produced, they must be accompanied with instructions and all other materials necessary to use or interpret such data.

E.      Where specific documents are listed as part of a general category of documents, both the listed documents and all documents falling within the general category are to be produced.

F.      If any portion of any document is responsive to any request, then the entire document must be produced.

G.      If any document responsive to this demand once existed, but has been destroyed or discarded, or is otherwise not capable of being produced, furnish a list specifying each such document and setting forth the following information: the date of the document; a description of the subject matter of the document; and a statement of circumstance under which the document was destroyed or discarded or why such document is not capable of being produced.

H.      If WGA PLANS claims that the attorney-client privilege or any other privilege is applicable to any document sought by these discovery requests, the substance of that document need not be disclosed in WGA PLANS' answers to these requests for production.  However, WGA PLANS shall, with respect to that document:

    1.      State the date of the document;

    2.      Identify the author of the document;

    3.      Identify any person who received the document;

    4.      Identify any person from whom the document was received;

TOBEROFF EX. T

     5.     State the subject of the document with sufficient particularity as to allow WGA PLANS' claim of privilege to be adjudicated;

     6.     State the nature and basis of the privilege claimed; and

     7.     State the request number to which the document is responsive.

    I.     WGA PLANS is to produce electronically stored information ("ESI") in the following form(s):  (a)  bates-numbered, single-paged, electronically searchable TIFF images, with parent-child relationships of DOCUMENTS kept intact (e.g., an e-mail message must remain connected with its attachments), with no "de-duping" across the data set, with an Ipro load file (or an ASCII delimited text file with all images and data cross-referenced) containing the document breaks, a csv or dat file containing the beginning and ending document breaks, with no "locked" data and all associated embedded data and metadata intact, including without limitation, BEG_BATES, END_BATES, BEG_ATTACH_BATES, END_ATTACH_BATES, DOC_DATE, DOC_TITLE, DOC_CHAR, AUTHOR, RECIPIENT, CC, BCC, OCR TEXT, DATETIME, TOTAL_PAGES, NATIVE FILE NAME, AUTHORC, APPNAME, VERSION, ATTACH_CNT, ATTACH_LST, CDATE, CDATE_ONLY, CTIME_ONLY, E_CDATE, E_CDATEONLY, E_CTIMEONLY, CREATIONDA, CREATOR, D_CREATED, DTCDATEONL, DTCTIMEONL, DT_LASTSAVE, DISCOVERY_P, ENTRY_ID, FILESIZE, IMAGELENGTH, IMAGEWIDTH, LAST_ACCESS, DO_LASTACCE, TO_LASTACCE, LASTMODI, LMDATEONLY, LMTIMEONLY, LOCATION, MD5HASH, E_MD5HASH, SHA, MESG_HDR, MESG_ID, NAME, OWNER, PR_CONVERSA, PR_CREATION, PR_INTERNET, PR_LASTMODI, PR_MESSAGES, PR_SENDEREM, PR_SENDERNA, PR_TRANSPOR, PRIMARYAUT, PRODUCER, PUBLISHER, E_RDATE, E_RDATEONLY, E_RTIMEONLY, E_SUBJECT, RECIPIENTS, REVISION_DA, SENT_DT, SENTDTONLY and SENTTMONLY; (b) for electronically stored audio and/or video files, please produce them in accordance with subsection (a), except that they should be

produced not as TIFF images, but in their native format or, if they are a file type that is proprietary and not readily accessible, in a format that is widely used (e.g., MPEG, WAV, etc.); and (c) for electronically stored information in databases, please produce such information in accordance with subsection (a), except that the data should be isolated and copied into a new database file to the extent it is possible to do so and to do so without altering the associated metadata or embedded data and to the extent the information can be useable without access to the rest of the database (if that is not the case, then the responding party should meet and confer with the propounding party to address the production of data from databases).  Plaintiffs hereby reserve the right to request that some or all of the requested documents be produced in native format if certain information can only be ascertained with the native file (e.g., to see "embedded data" in certain documents, such as seeing the formulas used, if any, to create the information in certain cells in a spreadsheets or to see the relationship between certain cells).

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

DOCUMENTS sufficient to show all monies paid, remitted, or contributed to the WGA PLANS by or on behalf of MILLER in respect of FRIDAY THE 13th  and/or any FRIDAY PROJECT(S).

**REQUEST FOR PRODUCTION NO. 2:**

DOCUMENTS sufficient to show any and all benefits, including without limitation pension, health, and welfare benefits, paid or otherwise remitted by the WGA PLANS to MILLER between 1970 and the present.

A-826

**REQUEST FOR PRODUCTION NO. 3:**

All DOCUMENTS concerning the action entitled *Horror, Inc. and The Manny Company v. Victor Miller*, United States District Court for the District of Connecticut, Case No. 3:16-cv-01442-SRU.

**REQUEST FOR PRODUCTION NO. 4:**

All COMMUNICATIONS between MILLER and the WGA PLANS concerning, referring, or relating to FRIDAY THE 13th and/or any FRIDAY PROJECT(S), including without limitation all internal DOCUMENTS concerning, referring to, or discussing such COMMUNICATIONS.

**REQUEST FOR PRODUCTION NO. 5:**

All COMMUNICATIONS between the WGA PLANS and Paramount Pictures Corporation, Warner Bros. Entertainment, Inc., New Line Productions, Inc., and/or any other third parties concerning, referring, or relating to FRIDAY THE 13th, and/or any of the FRIDAY PROJECT(S) to the extent such files relate to MILLER, including without limitation all internal DOCUMENTS concerning, referring to, or discussing such COMMUNICATIONS.

**REQUEST FOR PRODUCTION NO. 6:**

All DOCUMENTS that refer, relate to, or evidence any demand letter, grievance, arbitration, lawsuit, or other proceeding initiated by MILLER or on MILLER'S behalf in connection with FRIDAY THE 13th and/or any FRIDAY PROJECT(S), including any such proceedings initiated by the WGA PLANS on MILLER's behalf.

**REQUEST FOR PRODUCTION NO. 7:**

To the extent not produced in response to the above Requests, all of the WGA PLANS' files, including without limitation electronic database entries, concerning FRIDAY THE 13th, and/or any of the FRIDAY PROJECT(S) to the extent such files relate to MILLER.

A-827

# PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is Greenberg Glusker Fields Claman & Machtinger LLP, 1900 Avenue of the Stars, 21st Floor, Los Angeles, California 90067.

On **November 22, 2016**, I served the following documents: **NOTICE OF DEPOSITION OF CUSTODIAN OF RECORDS OF PRODUCER-WRITERS GUILD OF AMERICA PENSION PLAN** on the interested parties in this action by placing a copy thereof enclosed in a sealed envelope addressed as follows:

| | |
|---|---|
| Marc Toberoff | *Attorneys for Defendant Victor Miller* |
| Toberoff & Associates, P.C. | T: 310-246-3333 |
| 23823 Malibu Road, Suite 50-363 | F: 310-246-3101 |
| Malibu, CA  90265 | E: mtoberoff@toberoffandsociates.com |

☒ **(BY PERSONAL DELIVERY)**  By providing a copy of the document(s) listed above in a sealed envelope to an attorney service with instructions to personally deliver the envelope(s) as listed above on **November 22, 2016**.

| | |
|---|---|
| John J. Martin | *Attorneys for Defendant Victor Miller* |
| J Martin Business Law Group, LLC | T: 917-902-8872 |
| PO Box 1350 | E: jhnjmartin@att.net |
| Fairfield, CT 06825 | |
| 917-902-8872 | |
| Email: jhnjmartin@att.net | |

☒ **(BY E-MAIL)**  I caused a true copy of the foregoing document to be served by e-mail at the e-mail address set forth above.  Each e-mail was complete and no reports of error were received.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **November 22, 2016**, at Los Angeles, California.

| | |
|---|---|
| _____Jannette G. Gore_____ | _____ |
| | Signature |

TOBEROFF EX. T

| A-828 |

7/13/2017     Case 3:16-cv-01442-SRU    Toberoff & Associates, PC Mail - Horror / Miller    Document 56-1    Filed 07/14/17    Page 19 of 662

# TOBEROFF
## & ASSOCIATES, PC

**Marc Toberoff**
**<mtoberoff@toberoffandassociates.com>**

---

# Horror / Miller

1 message

---

**Gore, Jannette**
<jgore@greenbergglusker.com>
To: "mtoberoff@toberoffandassociates.com"
<mtoberoff@toberoffandassociates.com>
Cc: "Haye, Julia" <jhaye@greenbergglusker.com>

Tue, Jan 3, 2017 at 1:03
PM

Attached please find a copy of the documents
produced by Producer-Writers Guild of America
Pension Plan.

*Jannette Gore*   D: 310-201-7476

Assistant to Bonnie Eskenazi  |  Ricardo Cestero  |  Julia Haye

**Jannette G. Gore | Legal Secretary**
D: 310.201.7476 | F: 310.553.0687 | JGore@greenbergglusker.com
**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, CA 90067
O: 310.553.3610 | GreenbergGlusker.com |

TOBEROFF EX. U

We inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax related penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.



**PWGA000001.pdf**
13820K

**VICTOR BROOKE MILLER**
1708 Cornell Drive
Alameda, California 94501
510-521-8228

RECEIVED

APR 30 '03

PENSION AND HEALTH
TRUSTS

4/28/2003

Ms. Stacey L. Johnson
Pension Benefits Assistant
Pension Benefits Department
Producer-Writers Guild of America Pension Plan
1015 North Hollywood Way
Burbank, California 91505-2547

Dear Ms. Johnson:

Per your phonecall this morning with my wife, Elizabeth T. Miller, l am instructing you please not to withhold any taxes from my pension payments.

I am sorry for any confusion (mine) in filling out the proper forms in the first place.

Thank you for your kind consideration to this request.

Sincerely yours,

Victor Brooke Miller

Elizabeth T. Miller

A-831



**EDD**
Employment
Development
Department
State of California

## Withholding Certificate for Pension or Annuity Payments

Type or Print Your Full Name
VICTOR BROOKE MILLER

Your Social Security Number

Home Address (Number and Street or Rural Route)
1708 CORNELL DRIVE

Claim or Identification Number (if any) of Your Pension or Annuity Contract

City or Town, State and ZIP Code
ALAMEDA, CA 94501

**Complete the following applicable lines:**

1. I elect not to have income tax withheld from my pension or annuity. (Do not complete lines 2, 3, or 4.) . . . . . . . . ▶ ☑

2. I want my withholding from each pension or annuity payment to be figured using the number of allowances and marital status shown below:

   a. Number of allowances you are claiming from the Regular Withholding Allowances Worksheet A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶

   b. Number of allowances from the Estimated Deductions Worksheet B . . . . . . . . . . . . . ▶ 2

   ☐ SINGLE or MARRIED (with two or more incomes)   ☒ MARRIED (one income)   ☐ HEAD OF HOUSEHOLD

3. I want the following **additional** amount withheld from each pension or annuity payment. **Note:** You cannot enter an amount here without entering the number (including zero) of allowances on line 2 above . . . . . . . . . . . . . . . ▶ $

4. I want this designated amount withheld from each pension or annuity payment. (Do not complete lines 1, 2, or 3.) . . ▶ $

Your Signature ▶ *Victor Brooke M*          Date ▶ 4/16/03

Cut Here

- - - - - - - - - - - Cut here and give Form W-4P to the payer of your pension or annuity. Keep the top part for your records. - - - - - - - - - - -

Form **W-4P**

Department of the Treasury
Internal Revenue Service

## Withholding Certificate for Pension or Annuity Payments

▶ For Privacy Act and Paperwork Reduction Act Notice, see page 4.

OMB No. 1545-0415

**2003**

Type or print your full name
VICTOR BROOKE MILLER

Your social security number

Home address (number and street or rural route)
1708 CORNELL DRIVE

Claim or identification number (if any) of your pension or annuity contract

City or town, state, and ZIP code
ALAMEDA, CA 94501

**Complete the following applicable lines:**

1 Check here if you **do not want any** Federal income tax withheld from your pension or annuity. (Do not complete lines 2 or 3.) ▶

2 Total number of allowances and marital status you are claiming for withholding from each **periodic** pension or annuity payment. (You may also designate an additional dollar amount on line 3.) . . . . . . . . . . ▶ ___ (Enter number of allowances.)

   Marital status: ☐ Single   ☐ Married   ☐ Married, but withhold at higher "Single" rate

3 Additional amount, if any, you want withheld from each **periodic** payment. **Note:** *For periodic payments, you cannot enter an amount here without entering the number (including zero) of allowances on line 2* . . . ▶ $

Your signature ▶ *Robroff Esul M*          Date ▶ 4-16-03

Cat. No. 10225T

PWGA000002

every month and you complete this form in December 2002. Enter the result here and on Form W-4P, line 3, page 1. This is the additional amount to be withheld from each payment . . . . . . . . . **9** $

## Table 1: Multiple Pensions/More-Than-One-Income Worksheet

| Married Filing Jointly | | | | All Others | |
|---|---|---|---|---|---|
| If amount from **LOWEST** paying pension or job is— | Enter on line 2 above | If amount from **LOWEST** paying pension or job is— | Enter on line 2 above | If amount from **LOWEST** paying pension or job is— | Enter on line 2 above |
| $0 - $4,000 . . . . . 0 | | 50,001 - 60,000 . . . . 9 | | $0 - $6,000 . . . . . 0 | |
| 4,001 - 9,000 . . . . . 1 | | 60,001 - 70,000 . . . . 10 | | 6,001 - 11,000 . . . . . 1 | |
| 9,001 - 15,000 . . . . . 2 | | 70,001 - 90,000 . . . . 11 | | 11,001 - 18,000 . . . . . 2 | |
| 15,001 - 20,000 . . . . . 3 | | 90,001 - 100,000 . . . . 12 | | 18,001 - 25,000 . . . . . 3 | |
| 20,001 - 25,000 . . . . . 4 | | 100,001 - 115,000 . . . . 13 | | 25,001 - 29,000 . . . . . 4 | |
| 25,001 - 33,000 . . . . . 5 | | 115,001 - 125,000 . . . . 14 | | 29,001 - 40,000 . . . . . 5 | |
| 33,001 - 38,000 . . . . . 6 | | 125,001 and over . . . . 15 | | 40,001 - 55,000 . . . . . 6 | |
| 38,001 - 44,000 . . . . . 7 | | | | 55,001 - 75,000 . . . . . 7 | |
| 44,001 - 50,000 . . . . . 8 | | | | 75,001 - 100,000 . . . . . 8 | |
| | | | | 100,001 - 110,000 . . . . . 9 | |
| | | | | 110,001 and over . . . . . 10 | |

## Table 2: Multiple Pensions/More-Than-One-Income Worksheet

| Married Filing Jointly | | All Others | |
|---|---|---|---|
| If amount from **HIGHEST** paying pension or job is— | Enter on line 7 above | If amount from **HIGHEST** paying pension or job is— | Enter on line 7 above |
| $0 - $50,000 . . . $450 | | $0 - $30,000 . . . $450 | |
| 50,001 - 100,000 . . . 800 | | 30,001 - 70,000 . . . 800 | |
| 100,001 - 150,000 . . . 900 | | 70,001 - 140,000 . . . 900 | |
| 150,001 - 270,000 . . . 1,050 | | 140,001 - 300,000 . . . 1,050 | |
| 270,001 and over . . . 1,200 | | 300,001 and over . . . 1,200 | |

TOBEROFF EX. U

PWG000003

# Producer–Writers Guild of America Pension Plan
### Terence L. Young, Chief Executive Officer

May 15, 2007

VICTOR BROOKE MILLER
1708 CORNELL DR
ALAMEDA CA 94501

Re:   Review of Pension Benefits

Dear Victor Brooke Miller:

Your pension benefits have been reviewed for post retirement contributions earned in 2006 and prior. Under the terms of the Plan, contributions made on your behalf after your retirement and after age 65 are reviewed on an annual basis and will be used in the calculation of your benefit effective on the January 1st following the year the contributions were made. The payment of the additional benefits will be made after January 1st, but will be paid retroactive to January 1st.

We are pleased to advise you that beginning June 1, 2007, your gross monthly benefit will be increased to $11,382.87 (less any taxes withheld) to reflect this adjustment. In addition, you will receive an adjustment check for $2,071.15 (less any taxes withheld) representing the difference in the amounts that you were actually paid as compared to what you should have been paid from January 1 through May 1, 2007.

If you have any questions, please contact the Pension Benefits Department at the Administrative Office by calling (818) 846-1015 or (800) 227-7863 and selecting "5" from the main menu.

Sincerely,

Pension Benefits Department




**1015 N. Hollywood Way • Burbank, CA 91505-2526**
**818.846.1015 • 800.227.7863 • FAX 818.526.6571 • 566.4416**
*www.wgaplans.org*

A-834

```
Page 1                          WGAPH PENSION SYSTEM              05/14/2007
Reference #: 023886         Post Retirement Recalculation         16:51


                 Soc Sec No              Name              Date Birth  Age
Writer     :                   MILLER,VICTOR BROOKE        05/14/1940  63-00
Beneficiary:                   MILLER,ELIZABETH SPOUSE     05/12/1942  61-00
=============================================================================
Retirement Date: 06/01/2003 Option: 10  Last Recalc. Date: 01/01/2006  Type: AP
  Recalc. Date: 01/01/2007


--------Period---------       Earnings    Contribution   Rate      Benefit
  Thru        06/01/2003   3,642,269.89    217,061.97    48.3000
                            587,980.00      35,278.80    45.7500
                             83,080.00       4,984.80    44.0000
                          2,329,721.70     139,783.29    Excess
                          6,643,051.59     397,108.86    Total

06/01/2003 -  01/01/2006     591,269.69     35,476.22    48.3000
                             516,000.00     30,960.00    Excess
                           1,107,269.69     66,436.22    Total

01/01/2006 -  01/01/2007     171,525.00     10,291.53    48.3000 =   4,970.81
                             171,525.00     10,291.53    Increase      4,970.81
-----------------------------------------------------------------------------

                                       Monthly            414.23
                            Current Pension Award      10,968.64
                            Total                      11,382.87
```



PWGA000005

A-835

RETIREMENT EARNINGS HISTORY

REPORT NUMBER: R190A
MEMBER: MILLER, VICTOR BROOKE
DATE RANGE: 01/01/50 THRU 01/01/07

PAGE: 1
DATE: 05/14/07
TIME: 16:51:56

| CO # | COMPANY NAME | REF # | ENT# | QTER | RECEIVED | PROJECT | YEAR | EARNINGS | % | CONTRIBUTION | BENEFIT RATE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ANNUAL TOTAL - | 1975 | 5,000.00 | | 250.00 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1976 | 8,500.00 | | 425.00 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1978 | 8,555.00 | | 427.75 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1980 | 75,000.00 | | 3,750.00 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1981 | 50,000.00 | | 2,500.00 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1982 | 40,070.84 | | 2,399.96 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1983 | 103,448.84 | | 6,206.93 | 48.300% |
| 005871 | WORDSMITH, INC. | 033165 | 0001 | 81/1 | 04/03/87 | A STRANGER'S WATCHINGS | | 30,000.00 | 5.00 | 1,500.00 | |
| 005871 | WORDSMITH, INC. | 056000 | 0004 | 81/1 | 11/07/88 | A STRANGER IS WATCHING | | 5,000.00 | 5.00 | 250.00 | |
| 005871 | WORDSMITH, INC. | | | | | COMPANY TOTAL - | | 35,000.00 | | 1,750.00 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1981 | 35,000.00 | | 1,750.00 | 48.300% |
| 000118 | AMERICAN BROADCASTING CO., | FLO 038137 | 0030 | 82/1 | 08/17/87 | NO PROJECT TITLE | | 448.84 | 5.00 | 22.44 | |
| 000118 | AMERICAN BROADCASTING CO., FLORIDA | | | | | COMPANY TOTAL - | | 448.84 | | 22.44 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1982 | 448.84 | | 22.44 | 48.300% |
| 000118 | AMERICAN BROADCASTING CO., | FLO 038137 | 0016 | 83/1 | 08/17/87 | NO PROJECT TITLE | | 448.84 | 6.00 | 26.93 | |
| 000118 | AMERICAN BROADCASTING CO., FLORIDA | | | | | COMPANY TOTAL - | | 448.84 | | 26.93 | 48.300% |
| 005871 | WORDSMITH, INC. | 033165 | 0002 | 83/1 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | -1,000.00 | 6.00 | -60.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0003 | 83/2 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | 2,500.00 | 6.00 | 150.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0004 | 83/3 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | 3,000.00 | 6.00 | 180.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0005 | 83/4 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | 1,000.00 | 6.00 | 60.00 | |
| 005871 | WORDSMITH, INC. | | | | | COMPANY TOTAL - | | 5,500.00 | | 330.00 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1983 | 5,948.84 | | 356.93 | 48.300% |
| 000118 | AMERICAN BROADCASTING CO., | FLO 038137 | 0017 | 84/1 | 08/17/87 | NO PROJECT TITLE | | 448.84 | 6.00 | 26.93 | |
| 000118 | AMERICAN BROADCASTING CO., FLORIDA | | | | | COMPANY TOTAL - | | 448.84 | | 26.93 | 48.300% |
| 005871 | WORDSMITH, INC. | A08165 | 0001 | 84/1 | 09/01/84 | 407, S0001000 | | 32,500.00 | 6.00 | 1,950.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0004 | 84/1 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | -10,000.00 | 6.00 | -600.00 | |
| 005871 | WORDSMITH, INC. | 056000 | 0007 | 84/1 | 11/07/88 | GETTING IN | | 30,000.00 | 6.00 | 1,800.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0007 | 84/2 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | 45,000.00 | 6.00 | 2,700.00 | |
| 005871 | WORDSMITH, INC. | 056000 | 0003 | 84/2 | 11/07/88 | GETTING IN | | 10,000.00 | 6.00 | 600.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0008 | 84/3 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | 27,500.00 | 6.00 | 1,650.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0009 | 84/4 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | 45,500.00 | 6.00 | 2,730.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0010 | 84/4 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | 25,000.00 | 6.00 | 1,500.00 | |
| 005871 | WORDSMITH, INC. | 056000 | 0001 | 84/4 | 11/07/88 | JURY DUTY | | -15,000.00 | 6.00 | -900.00 | |
| 005871 | WORDSMITH, INC. | | | | | COMPANY TOTAL - | | 160,000.00 | | 9,600.00 | 48.300% |
| | | | | | | | | 30,500.00 | | 1,830.00 | 45.750% |
| | | | | | | | | 190,500.00 | | 11,430.00 | TOTAL |
| | | | | | | ANNUAL TOTAL - | 1984 | 160,448.84 | | 9,626.93 | 48.300% |
| | | | | | | | | 30,500.00 | | 1,830.00 | 45.750% |
| | | | | | | | | 190,948.84 | | 11,456.93 | TOTAL |
| 000118 | AMERICAN BROADCASTING CO., | FLO 018552 | 0001 | 85/1 | 03/14/86 | | | 33,750.00 | 6.00 | 2,025.00 | |

TOBEROFF EX. U

PWGA000006

```
REPORT NUMBER: R190A                          RETIREMENT EARNINGS HISTORY                    PAGE: 2
MEMBER: MILLER, VICTOR BROOKE                                                                DATE: 05/14/07
DATE RANGE: 01/01/50 THRU 01/01/07                                                           TIME: 16:51:56
```

| CO # | COMPANY NAME | REF | ENT# | QTER | RECEIVED | PROJECT | EARNINGS | % | CONTRIBUTION | BENEFIT RATE |
|---|---|---|---|---|---|---|---|---|---|---|
| 000118 | AMERICAN BROADCASTING CO., FLO | 033163 | 0001 | 85/1 | 04/20/87 | NO PROJECT TITLE | -3,750.00 | 6.00 | -225.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 038137 | 0018 | 85/1 | 08/17/87 | | 448.84 | 6.00 | 26.93 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 018552 | 0002 | 85/2 | 03/14/86 | | 33,750.00 | 6.00 | 2,025.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 018552 | 0003 | 85/4 | 03/14/86 | | 33,750.00 | 6.00 | 2,025.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 018552 | 0004 | 85/4 | 03/14/86 | | 33,750.00 | 6.00 | 2,025.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLORIDA | | | | | COMPANY TOTAL - 1985 | 131,698.84 | | 7,901.93 | 48.300% |
| 005871 | WORDSMITH, INC. | 033165 | 0011 | 85/2 | 04/03/87 | | 8,250.00 | 6.00 | 495.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0012 | 85/3 | 04/03/87 | | 8,250.00 | 6.00 | 495.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0013 | 85/4 | 04/03/87 | | 16,250.00 | 6.00 | 975.00 | |
| 005871 | WORDSMITH, INC. | | | | | COMPANY TOTAL - 1985 | 32,750.00 | | 1,965.00 | 48.300% |
| | | | | | | ANNUAL TOTAL - 1985 | 164,448.84 | | 9,866.93 | 48.300% |
| 000118 | AMERICAN BROADCASTING CO., FLO | 018552 | 0005 | 86/1 | 03/14/86 | | 36,000.00 | 6.00 | 2,160.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 021307 | 0004 | 86/2 | 06/20/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 021307 | 0006 | 86/2 | 06/20/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 021863 | 0003 | 86/2 | 07/03/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 022721 | 0004 | 86/2 | 07/26/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 022204 | 0003 | 86/3 | 07/16/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 022330 | 0003 | 86/3 | 07/17/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 022535 | 0003 | 86/3 | 07/24/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 022669 | 0003 | 86/3 | 07/31/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 023099 | 0003 | 86/3 | 08/07/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 024012 | 0003 | 86/3 | 08/18/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 023722 | 0003 | 86/3 | 08/21/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 024083 | 0007 | 86/3 | 08/28/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 024364 | 0003 | 86/3 | 09/05/86 | ALL MY CHILDREN | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 024583 | 0003 | 86/3 | 09/11/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 024883 | 0008 | 86/3 | 09/18/86 | ONE LIFE TO LIVE | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 025175 | 0006 | 86/3 | 09/25/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 025520 | 0003 | 86/3 | 10/02/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 025796 | 0003 | 86/4 | 10/06/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 026082 | 0003 | 86/4 | 10/17/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 033363 | 0001 | 86/4 | 11/03/87 | ONE LIFE TO LIVE | 722.26 | 6.00 | 43.34 | |
| 000118 | AMERICAN BROADCASTING CO., FLORIDA | | | | | COMPANY TOTAL - 1986 | 112,722.26 | | 6,763.34 | 48.300% |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 026604 | 0023 | 86/4 | 10/31/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 027470 | 0011 | 86/4 | 11/21/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 027514 | 0011 | 86/4 | 11/24/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 027625 | 0010 | 86/4 | 12/01/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 027781 | 0033 | 86/4 | 12/03/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 027987 | 0007 | 86/4 | 12/09/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 028214 | 0007 | 86/4 | 12/15/86 | GUIDING LIGHT. | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 028214 | 0016 | 86/4 | 12/15/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 028501 | 0007 | 86/4 | 12/22/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |

TOBEROFF EX. U

PWGA000007

REPORT NUMBER: R190A
MEMBER: MILLER, VICTOR BROOKE
DATE RANGE: 01/01/50 THRU 01/01/07

PAGE: 3
DATE: 05/14/07
TIME: 16:51:56

RETIREMENT EARNINGS HISTORY

| CO # | COMPANY NAME | REF | ENT# | QTER | RECEIVED | PROJECT | EARNINGS | % | CONTRIBUTION | BENEFIT RATE |
|---|---|---|---|---|---|---|---|---|---|---|
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 028563 | 0007 | 86/4 | 12/29/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 028733 | 0006 | 86/4 | 01/05/87 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| | | | | | | COMPANY TOTAL - 1986 | 49,500.00 | | 2,970.00 | 48.300% |
| 005871 | WORDSMITH, INC. | 033165 | 0014 | 86/1 | 04/03/87 | | 16,000.00 | 6.00 | 960.00 | |
| 005871 | WORDSMITH, INC. | | | | | | 16,000.00 | | 960.00 | |
| | | | | | | COMPANY TOTAL - 1986 | 16,000.00 | | 960.00 | 48.300% |
| | | | | | | ANNUAL TOTAL - 1986 | 178,222.26 | | 10,693.34 | 48.300% |
| 000118 | AMERICAN BROADCASTING CO., FLO | 038191 | 0004 | 87/3 | 08/14/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 038691 | 0003 | 87/3 | 08/20/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 038672 | 0003 | 87/3 | 08/25/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 038821 | 0003 | 87/3 | 09/03/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 039209 | 0003 | 87/3 | 09/11/87 | | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 039480 | 0003 | 87/3 | 09/18/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 039747 | 0003 | 87/3 | 09/24/87 | | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 040062 | 0003 | 87/3 | 10/02/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 040374 | 0002 | 87/4 | 10/08/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 040791 | 0002 | 87/4 | 10/19/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 040975 | 0002 | 87/4 | 10/23/87 | NO PROJECT TITLE | 8,900.00 | 6.00 | 534.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 041385 | 0002 | 87/4 | 10/29/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 041469 | 0002 | 87/4 | 11/04/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 041794 | 0002 | 87/4 | 11/12/87 | | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 042259 | 0003 | 87/4 | 11/20/87 | | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 042590 | 0002 | 87/4 | 11/30/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 042766 | 0003 | 87/4 | 12/03/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 043207 | 0002 | 87/4 | 12/14/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 043326 | 0002 | 87/4 | 12/17/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 043704 | 0002 | 87/4 | 12/28/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., FLO | 043825 | 0002 | 87/4 | 01/04/88 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| | | | | | | COMPANY TOTAL - 1987 | 146,900.00 | | 8,814.00 | 48.300% |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 031911 | 0008 | 87/1 | 03/17/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 032107 | 0008 | 87/1 | 03/23/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 032371 | 0008 | 87/1 | 03/31/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 032752 | 0008 | 87/1 | 04/06/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 036202 | 0008 | 87/2 | 06/26/86 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 033193 | 0007 | 87/2 | 04/20/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 033230 | 0008 | 87/2 | 04/20/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 033529 | 0006 | 87/2 | 04/28/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 034628 | 0017 | 87/2 | 05/01/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 033842 | 0010 | 87/2 | 05/04/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 034199 | 0007 | 87/2 | 05/11/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 034409 | 0008 | 87/2 | 05/15/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 034921 | 0008 | 87/2 | 06/01/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 035309 | 0007 | 87/2 | 06/08/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |

TOBEROFF EX. U

PWGA000008

A-838

```
Page 01                              WGAPH PENSION SYSTEM              05/10/2006
Reference #: 020880              Early/Normal Retirement Benefit        15:52


                 Soc Sec No            Name               Date Birth    Age
Writer    :      ███████ MILLER,VICTOR BROOKE            05/14/1940  63-00
==============================================================================
                                  *              Earnings
     Years of Service             *              Compensation  Contribution
Past Service    :                 *    Earned  :    6643051.59    397108.70
Screen Credit :                   *    Projected:
'Live Years'    :                 *    Total   :    6643051.59    397108.70
Fund Years    :   27              *
Total         :   27              *    48.300  :    3642269.89    217061.99
                                  *    45.750  :     587980.00     35278.80
                                  *    44.000  :      83080.00      4984.80
                                  *    39.000  :
                                  *    Excess  :    2329721.70    139783.11
                                  *    Total   :    6643051.59    397108.70
         ----------------------------------------------------------------
                 Earned  Health  Eligibility  Quarters
           1987 & Prior + 1988 & Beyond  +  Future  =  Total     Needed
                 44             64              0        108         0
         ----------------------------------------------------------------
Benefit Date    : 06/01/2003  Qualified Years: 27
Normal Retirement Date: 06/01/2005  Minimum Distribution Date: 04/01/2011
Payment Year: 2006  415 Limit @ Age  63 Years and    Months =  118,978.00
         ----------------------------------------------------------------
                      Benefit Calculation for All Employers
                      Benefit Calculation for All Employers

Rate      Earnings   Contribution      QDRO        Net     Rate      Benefit
48.300 3,642,269.89  217,061.99 -     .00 =  217,061.99 x 48.300 = 104,840.94
45.750   587,980.00   35,278.80 -     .00 =   35,278.80 x 45.750 =  16,140.07
44.000    83,080.00    4,984.80 -     .00 =    4,984.80 x 44.000 =   2,193.32
39.000          .00         .00 -     .00 =         .00 x 39.000 =        .00
Excess 2,329,721.70  139,783.11                   Frozen Subtotal:  18,333.39
Total  6,643,051.59  397,108.70                         Subtotal: 123,174.33
                              0 Screen Credit Years x 24.00 =            .00
                                  Total Benefit Payable At 65: 123,174.33
                          Total Benefit Adjusted For Early:  120,974.32


                          Five Year Certain Benefit

                    Benefit        Factor        Annual           Monthly
          Regular: 104,840.94 x 100.0000% = 104,840.94
          Frozen:   18,333.39 x  88.0000% =  16,133.38
                              415 Adjusted: 120,974.32
          Screen:         .00 x 100.0000% =        .00
                                  Subtotal: 120,974.32
                                  Less QDRO:       .00
                       Final Benefit: 120,974.32 / 12   =   10,081.19


Benefit Breakdown:
    Monthly Five Year Certain
```

A-839

```
Page 02                              WGAPH PENSION SYSTEM              05/10/2006
Reference #: 020880              Early/Normal Retirement Benefit         15:52


                  Soc Sec No              Name              Date Birth   Age
Writer    :          MILLER,VICTOR BROOKE              05/14/1940    63-00
     48.30% =   8,736.75  45.75% =  1,183.60  415 Benefit =        .00
     44% =        160.84  39% =         .00  Screen Credit =       .00
--------------------------------------------------------------------------
```

*(handwritten: 7617.95 ok / in 545)*

```
                         Ten Year Certain Benefit

                 Benefit      Factor      Annual         Monthly
                 120,974.32 x 95.4000% = 115,409.50 / 12  =   9,617.46
     Monthly Ten Year Certain
     48.30% =   8,334.87  45.75% =  1,129.15  415 Benefit =        .00
     44% =        153.44  39% =         .00  Screen Credit =       .00

       Benefit Calculation for     NONE : EARNINGS WITH NO HISTORY

  Rate     Earnings  Contribution     QDRO        Net      Rate     Benefit
  48.300   249,177.00  13,830.07 -     .00 =  13,830.07 = 48.300 =  6,679.93
  45.750        .00        .00 -       .00 =        .00 = 45.750 =       .00
  44.000        .00        .00 -       .00 =        .00 = 44.000 =       .00
  39.000        .00        .00 -       .00 =        .00 = 39.000 =       .00
  Excess        .00        .00               Frozen Subtotal:        .00
  Total    249,177.00  13,830.07               Subtotal:   6,679.93
                                   Total Benefit Payable At 65:   6,679.93


       Benefit Calculation for    000035: ABC PICTURES CORPORATION

  Rate     Earnings  Contribution     QDRO        Net      Rate     Benefit
  48.300 1,252,699.36  75,161.97 -     .00 =  75,161.97 = 48.300 = 36,303.22
  45.750    40,000.00   2,400.00 -     .00 =   2,400.00 = 45.750 =  1,098.00
  44.000    35,840.00   2,150.40 -     .00 =   2,150.40 = 44.000 =    946.18
  39.000        .00        .00 -       .00 =        .00 = 39.000 =       .00
  Excess 1,313,835.85  78,830.15               Frozen Subtotal:   2,044.18
  Total  1,328,539.36  79,712.37               Subtotal:  38,347.40
                                   Total Benefit Payable At 65:  38,347.40
                                   Total Benefit Adjusted Early:  38,102.10


       Benefit Calculation for    000058: AGNES NIXON & ASSOCIATES

  Rate     Earnings  Contribution     QDRO        Net      Rate     Benefit
  48.300     187.26      11.24 -       .00 =      11.24 = 48.300 =      5.43
  45.750        .00        .00 -       .00 =        .00 = 45.750 =       .00
  44.000        .00        .00 -       .00 =        .00 = 44.000 =       .00
  39.000        .00        .00 -       .00 =        .00 = 39.000 =       .00
  Excess        .00        .00               Frozen Subtotal:        .00
  Total      187.26      11.24               Subtotal:      5.43
                                   Total Benefit Payable At 65:      5.43
```

```
Page 03                              WGAPH PENSION SYSTEM               05/10/2006
Reference #: 020880              Early/Normal Retirement Benefit        15:52
```

```
             Soc Sec No            Name              Date Birth    Age
Writer   :   ████████  MILLER,VICTOR BROOKE          05/14/1940   63-00
```

Benefit Calculation for    000118: AMERICAN BROADCASTING CO., N.Y

| Rate | Earnings | Contribution | QDRO | Net | Rate | Benefit |
|------|----------|--------------|------|-----|------|---------|
| 48.300 | 467,167.62 | 28,025.57 - | .00 = | 28,025.57 = 48.300 = | | 13,536.35 |
| 45.750 | .00 | .00 - | .00 = | .00 = 45.750 = | | .00 |
| 44.000 | .00 | .00 - | .00 = | .00 = 44.000 = | | .00 |
| 39.000 | .00 | .00 - | .00 = | .00 = 39.000 = | | .00 |
| Excess | .00 | .00 | | Frozen Subtotal: | | .00 |
| Total | 467,167.62 | 28,025.57 | | Subtotal: | | 13,536.35 |
| | | | | Total Benefit Payable At 65: | | 13,536.35 |

Benefit Calculation for    000302: BENTON & BOWLES, INC.

| Rate | Earnings | Contribution | QDRO | Net | Rate | Benefit |
|------|----------|--------------|------|-----|------|---------|
| 48.300 | 103,500.00 | 6,210.00 - | .00 = | 6,210.00 = 48.300 = | | 2,999.43 |
| 45.750 | .00 | .00 - | .00 = | .00 = 45.750 = | | .00 |
| 44.000 | .00 | .00 - | .00 = | .00 = 44.000 = | | .00 |
| 39.000 | .00 | .00 - | .00 = | .00 = 39.000 = | | .00 |
| Excess | .00 | .00 | | Frozen Subtotal: | | .00 |
| Total | 103,500.00 | 6,210.00 | | Subtotal: | | 2,999.43 |
| | | | | Total Benefit Payable At 65: | | 2,999.43 |

Benefit Calculation for    000665: SAATCHI & SAATCHI COMPTON, INC

| Rate | Earnings | Contribution | QDRO | Net | Rate | Benefit |
|------|----------|--------------|------|-----|------|---------|
| 48.300 | 90,000.00 | 5,400.00 - | .00 = | 5,400.00 = 48.300 = | | 2,608.20 |
| 45.750 | .00 | .00 - | .00 = | .00 = 45.750 = | | .00 |
| 44.000 | .00 | .00 - | .00 = | .00 = 44.000 = | | .00 |
| 39.000 | .00 | .00 - | .00 = | .00 = 39.000 = | | .00 |
| Excess | .00 | .00 | | Frozen Subtotal: | | .00 |
| Total | 90,000.00 | 5,400.00 | | Subtotal: | | 2,608.20 |
| | | | | Total Benefit Payable At 65: | | 2,608.20 |

Benefit Calculation for    005615: WALT DISNEY PICTURES AND TELEV

| Rate | Earnings | Contribution | QDRO | Net | Rate | Benefit |
|------|----------|--------------|------|-----|------|---------|
| 48.300 | 12,197.55 | 731.98 - | .00 = | 731.98 = 48.300 = | | 353.55 |
| 45.750 | .00 | .00 - | .00 = | .00 = 45.750 = | | .00 |
| 44.000 | .00 | .00 - | .00 = | .00 = 44.000 = | | .00 |
| 39.000 | .00 | .00 - | .00 = | .00 = 39.000 = | | .00 |
| Excess | .00 | .00 | | Frozen Subtotal: | | .00 |
| Total | 12,197.55 | 731.98 | | Subtotal: | | 353.55 |
| | | | | Total Benefit Payable At 65: | | 353.55 |

A-841

```
Page 04                          WGAPH PENSION SYSTEM                    05/10/2006
Reference #: 020880           Early/Normal Retirement Benefit              15:52


              Soc Sec No              Name              Date Birth    Age
Writer    :  ████████MILLER,VICTOR BROOKE              05/14/1940   63-00

        Benefit Calculation for   005871: WORDSMITH, INC.

Rate      Earnings   Contribution      QDRO        Net      Rate       Benefit
48.300  249,250.00    14,605.00 -      .00 =  14,605.00 = 48.300 =    7,054.22
45.750   30,500.00     1,830.00 -      .00 =   1,830.00 = 45.750 =      837.23
44.000        .00          .00 -      .00 =        .00 = 44.000 =         .00
39.000        .00          .00 -      .00 =        .00 = 39.000 =         .00
Excess        .00          .00                   Frozen Subtotal:       837.23
Total   279,750.00    16,435.00                         Subtotal:     7,891.45
                                        Total Benefit Payable At 65:   7,891.45
                                        Total Benefit Adjusted Early:  7,790.98


        Benefit Calculation for   008159: D'ARCY MASIUS BENT & BWS USA,

Rate        Earnings   Contribution    QDRO         Net      Rate       Benefit
48.300  1,217,786.00    73,067.69 -     .00 =  73,067.69 = 48.300 =   35,291.69
45.750    517,480.00    31,048.80 -     .00 =  31,048.80 = 45.750 =   14,204.84
44.000     47,240.00     2,834.40 -     .00 =   2,834.40 = 44.000 =    1,247.14
39.000         .00          .00 -     .00 =        .00 = 39.000 =          .00
Excess  1,015,885.85    60,952.96                 Frozen Subtotal:    15,451.98
Total   1,782,506.00   106,950.89                        Subtotal:    50,743.67
                                         Total Benefit Payable At 65:  50,743.67
                                         Total Benefit Adjusted Early: 48,889.43


        Benefit Calculation for   015293: TELEVEST DAYTIME PROGRAMS, INC

Rate     Earnings   Contribution       QDRO        Net      Rate       Benefit
48.300     305.10       18.47 -       .00 =      18.47 = 48.300 =        8.92
45.750       .00          .00 -       .00 =        .00 = 45.750 =         .00
44.000       .00          .00 -       .00 =        .00 = 44.000 =         .00
39.000       .00          .00 -       .00 =        .00 = 39.000 =         .00
Excess       .00          .00                   Frozen Subtotal:         .00
Total      305.10       18.47                           Subtotal:        8.92
                                        Total Benefit Payable At 65:     8.92
```

Case 3:16-cv-01442-SRU   Document 56-1   Filed 05/14/17   Page 148 of 662

```
REPORT NUMBER: R190A                                                           PAGE:   1
MEMBER:  MILLER, VICTOR BROOKE                                                 DATE: 05/08/06
DATE RANGE: 01/01/50 THRU 06/01/03                                            TIME: 15:42:14
```

| CO # | COMPANY NAME | REF # | ENT# | QTER | RECEIVED | PROJECT | | EARNINGS | % | CONTRIBUTION | BENEFIT RATE |
|------|--------------|-------|------|------|----------|---------|---|----------|---|--------------|--------------|
| | | | | | | ANNUAL TOTAL - | 1975 | 5,000.00 | | 250.00 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1976 | 8,500.00 | | 425.00 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1978 | 8,555.00 | | 427.75 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1980 | 75,000.00 | | 3,750.00 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1981 | 50,000.00 | | 2,500.00 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1982 | 40,070.84 | | 2,399.76 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1983 | 103,448.84 | | 6,206.93 | 48.300% |
| 005871 | WORDSMITH, INC. | 033165 | 0001 | 81/1 | 04/03/87 | A STRANGER'S WATCHING | | 30,000.00 | 5.00 | 1,500.00 | |
| 005871 | WORDSMITH, INC. | 056000 | 0004 | 81/1 | 11/07/88 | A STRANGER IS WATCHING | | 5,000.00 | 5.00 | 250.00 | |
| 005871 | WORDSMITH, INC. | | | | | COMPANY TOTAL - | 1981 | 35,000.00 | | 1,750.00 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1981 | 35,000.00 | | 1,750.00 | 48.300% |
| 000118 | AMERICAN BROADCASTING CO., N.Y | 038137 | 0030 | 82/1 | 08/17/87 | NO PROJECT TITLE | | 448.84 | 5.00 | 22.44 | 48.300% |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | | | | | COMPANY TOTAL - | 1982 | 448.84 | | 22.44 | |
| | | | | | | ANNUAL TOTAL - | 1982 | 448.84 | | 22.44 | 48.300% |
| 000118 | AMERICAN BROADCASTING CO., N.Y | 038137 | 0016 | 83/1 | 08/17/87 | NO PROJECT TITLE | | 448.84 | 6.00 | 26.93 | 48.300% |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | | | | | COMPANY TOTAL - | 1983 | 448.84 | | 26.93 | |
| 005871 | WORDSMITH, INC. | 033165 | 0002 | 83/1 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | -1,000.00 | 6.00 | -60.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0003 | 83/2 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | 2,500.00 | 6.00 | 150.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0004 | 83/3 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | 3,000.00 | 6.00 | 180.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0005 | 83/4 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | 1,000.00 | 6.00 | 60.00 | |
| 005871 | WORDSMITH, INC. | | | | | COMPANY TOTAL - | 1983 | 5,500.00 | | 330.00 | 48.300% |
| | | | | | | ANNUAL TOTAL - | 1983 | 5,948.84 | | 356.93 | 48.300% |
| 000118 | AMERICAN BROADCASTING CO., N.Y | 038137 | 0017 | 84/1 | 08/17/87 | NO PROJECT TITLE | | 448.84 | 6.00 | 26.93 | 48.300% |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | | | | | COMPANY TOTAL - | 1984 | 448.84 | | 26.93 | |
| 005871 | WORDSMITH, INC. | A08165 | 0001 | 84/1 | 09/01/84 | 407, S0001000 | | 32,500.00 | 6.00 | 1,950.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0006 | 84/1 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | -10,000.00 | 6.00 | -600.00 | |
| 005871 | WORDSMITH, INC. | 056000 | 0002 | 84/1 | 11/07/88 | GETTING IN | | 30,000.00 | 6.00 | 1,800.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0007 | 84/2 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | 45,000.00 | 6.00 | 2,700.00 | |
| 005871 | WORDSMITH, INC. | 056000 | 0003 | 84/2 | 11/07/88 | GETTING IN | | 10,000.00 | 6.00 | 600.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0008 | 84/3 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | 27,500.00 | 6.00 | 1,650.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0009 | 84/4 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | 45,500.00 | 6.00 | 2,730.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0010 | 84/4 | 04/03/87 | LIFE TO LIVE-ALL MY CHIL | | 25,000.00 | 6.00 | 1,500.00 | |
| 005871 | WORDSMITH, INC. | 056000 | 0001 | 84/4 | 11/07/88 | JURY DUTY | | -15,000.00 | 6.00 | -900.00 | |
| 005871 | WORDSMITH, INC. | | | | | COMPANY TOTAL - | 1984 | 160,000.00 | | 9,600.00 | 48.300% |
| | | | | | | | | | | 1,830.00 | 45.750% |
| | | | | | | ANNUAL TOTAL - | 1984 | 190,500.00 | | 11,430.00 | TOTAL |
| | | | | | | | | 160,448.84 | | 9,626.93 | 48.300% |
| | | | | | | | | 30,500.00 | | 1,830.00 | 45.750% |
| | | | | | | | | 190,948.84 | | 11,456.93 | TOTAL |
| 000118 | AMERICAN BROADCASTING CO., N.Y | 018552 | 0001 | 85/1 | 03/14/86 | | | 33,750.00 | 6.00 | 2,025.00 | |

TOBEROFF EX. U

PWGA000128

Case 3:16-cv-01442-SRU Document 56-1 Filed 03/14/17 Page 149 of 662

REPORT NUMBER: R190A                                                  PAGE: 2
MEMBER:   MILLER, VICTOR BROOKE                                     DATE: 05/08/06
DATE RANGE: 01/01/50 THRU 06/01/03                                TIME: 15:42:14

| CO # | COMPANY NAME | REF # | ENT# | QTER | RECEIVED | PROJECT | EARNINGS | % | CONTRIBUTION | BENEFIT RATE |
|------|--------------|-------|------|------|----------|---------|----------|---|--------------|-------------|
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 033163 | 0001 | 85/1 | 04/20/87 | | -3,750.00 | 6.00 | -225.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 038137 | 0018 | 85/1 | 08/17/87 | NO PROJECT TITLE | 448.84 | 6.00 | 26.93 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 018552 | 0002 | 85/2 | 03/14/86 | | 33,750.00 | 6.00 | 2,025.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 018552 | 0003 | 85/3 | 03/14/86 | | 33,750.00 | 6.00 | 2,025.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 018552 | 0004 | 85/4 | 03/14/86 | | 33,750.00 | 6.00 | 2,025.00 | |
| | | | | | | COMPANY TOTAL - 1985 | 131,698.84 | | 7,901.93 | 48.300% |
| 005871 | WORDSMITH, INC. | 033165 | 0011 | 85/2 | 04/03/87 | | 8,250.00 | 6.00 | 495.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0012 | 85/3 | 04/03/87 | | 8,250.00 | 6.00 | 495.00 | |
| 005871 | WORDSMITH, INC. | 033165 | 0013 | 85/4 | 04/03/87 | | 16,250.00 | 6.00 | 975.00 | |
| 005871 | WORDSMITH, INC. | | | | | COMPANY TOTAL - 1985 | 32,750.00 | | 1,965.00 | 48.300% |
| | | | | | | ANNUAL TOTAL - 1985 | 164,448.84 | | 9,866.93 | 48.300% |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 018552 | 0005 | 86/1 | 03/14/86 | | 36,000.00 | 6.00 | 2,160.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 021307 | 0004 | 86/2 | 06/20/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 021307 | 0006 | 86/2 | 06/20/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 021573 | 0003 | 86/2 | 07/03/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 022721 | 0003 | 86/2 | 07/25/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 022204 | 0003 | 86/3 | 07/16/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 022330 | 0003 | 86/3 | 07/17/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 022525 | 0003 | 86/3 | 07/24/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 022869 | 0003 | 86/3 | 07/31/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 023099 | 0003 | 86/3 | 08/07/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 024012 | 0003 | 86/3 | 08/18/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 023722 | 0003 | 86/3 | 08/21/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 024083 | 0007 | 86/3 | 08/28/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 024364 | 0004 | 86/3 | 09/05/86 | ALL MY CHILDREN | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 024583 | 0003 | 86/3 | 09/11/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 024883 | 0008 | 86/3 | 09/18/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 025175 | 0006 | 86/3 | 09/25/86 | ONE LIFE TO LIVE | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 025572 | 0003 | 86/3 | 10/02/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 025796 | 0003 | 86/4 | 10/06/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 026082 | 0003 | 86/4 | 10/17/86 | | 4,000.00 | 6.00 | 240.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 041363 | 0001 | 86/4 | 11/03/87 | ONE LIFE TO LIVE | 722.26 | 6.00 | 43.34 | |
| | | | | | | COMPANY TOTAL - 1986 | 112,722.26 | | 6,763.34 | 48.300 |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 026604 | 0023 | 86/4 | 10/31/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 027470 | 0011 | 86/4 | 11/21/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 027514 | 0011 | 86/4 | 11/24/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 027625 | 0010 | 86/4 | 12/01/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 027781 | 0033 | 86/4 | 12/03/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 027987 | 0017 | 86/4 | 12/09/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 028214 | 0007 | 86/4 | 12/15/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 028634 | 0016 | 86/4 | 12/22/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 028501 | 0007 | 86/4 | | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |

TOBEROFF EX. U

PWGA000129

A-843

Case 3:16-cv-01442-SRU   Document 56-1   Filed 07/14/17   Page 150 of 662

REPORT NUMBER- R190A
MEMBER: MILLER, VICTOR BROOKE
DATE RANGE: 01/01/50 THRU 06/01/03

PAGE: 3
DATE: 05/08/06
TIME: 15:42:14

| CO # | COMPANY NAME | REF # | ENT# | QTER | RECEIVED | PROJECT | EARNINGS | % | CONTRIBUTION | BENEFIT RATE |
|---|---|---|---|---|---|---|---|---|---|---|
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 028563 | 0007 | 86/4 | 12/29/86 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | 028733 | 0006 | 86/4 | 01/05/87 | GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 000665 | SAATCHI & SAATCHI COMPTON, INC | | | | | COMPANY TOTAL - 1986 | 49,500.00 | | 2,970.00 | 48.300% |
| | | | | | | | | | | |
| 005871 | WORDSMITH, INC. | 033165 | 0014 | 86/1 | 04/03/87 | | 16,000.00 | 6.00 | 960.00 | |
| 005871 | WORDSMITH, INC. | | | | | COMPANY TOTAL - 1986 | 16,000.00 | 6.00 | 960.00 | 48.300% |
| | | | | | | | | | | |
| | | | | | | ANNUAL TOTAL - 1986 | 178,222.26 | | 10,693.34 | 48.300% |
| | | | | | | | | | | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 038191 | 0004 | 87/3 | 08/14/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 038691 | 0003 | 87/3 | 08/20/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 038672 | 0003 | 87/3 | 08/25/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 038821 | 0003 | 87/3 | 09/03/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 039209 | 0003 | 87/3 | 09/11/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 039480 | 0003 | 87/3 | 09/18/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 039747 | 0003 | 87/3 | 09/24/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 040062 | 0003 | 87/3 | 10/08/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 040374 | 0003 | 87/4 | 10/08/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 040791 | 0003 | 87/4 | 10/19/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 040975 | 0003 | 87/4 | 10/23/87 | NO PROJECT TITLE | 8,900.00 | 6.00 | 534.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 041199 | 0002 | 87/4 | 10/29/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 041467 | 0002 | 87/4 | 11/04/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 041794 | 0002 | 87/4 | 11/12/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 042259 | 0002 | 87/4 | 11/20/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 042590 | 0002 | 87/4 | 11/30/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 042766 | 0002 | 87/4 | 12/03/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 043207 | 0002 | 87/4 | 12/14/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 043326 | 0002 | 87/4 | 12/17/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 043704 | 0002 | 87/4 | 12/28/87 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | 043825 | 0002 | 87/4 | 01/04/88 | NO PROJECT TITLE | 6,900.00 | 6.00 | 414.00 | |
| 000118 | AMERICAN BROADCASTING CO., N.Y. | | | | | COMPANY TOTAL - 1987 | 146,900.00 | | 8,814.00 | 48.300% |
| | | | | | | | | | | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 031911 | 0008 | 87/1 | 03/17/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 032107 | 0008 | 87/1 | 03/23/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 032346 | 0008 | 87/1 | 03/30/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 032752 | 0008 | 87/1 | 04/06/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 036202 | 0008 | 87/2 | 06/26/86 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 033193 | 0007 | 87/2 | 04/20/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 033230 | 0008 | 87/2 | 04/20/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 033529 | 0006 | 87/2 | 04/28/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 034628 | 0017 | 87/2 | 05/01/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 033842 | 0010 | 87/2 | 05/04/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 034199 | 0008 | 87/2 | 05/11/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 034409 | 0008 | 87/2 | 05/15/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 034921 | 0007 | 87/2 | 06/01/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |
| 008159 | D'ARCY MASIUS BENT & BWS USA, | 035309 | 0007 | 87/2 | 06/08/87 | THE GUIDING LIGHT | 4,500.00 | 6.00 | 270.00 | |

TOBEROFF EX. U

PWGA000130

# Producer–Writers Guild of America Pension Plan

Terence L. Young, Chief Executive Officer

## Pension Payment Verification Form

February 29, 2008

VICTOR BROOKE MILLER
1708 CORNELL DR
ALAMEDA CA 94501

**• • • • • • • • • • • • • • •**
***IMPORTANT!***
***Don't Delay!***
Form must be received by
**May 14, 2008** to continue
receiving your pension.
**• • • • • • • • • • • • • • •**

*Please sign in the gray box below in front of a notary public or a Plan Representative at the Administrative Office certifying that the Participant or Beneficiary named above is receiving his/her pension benefit payments.* A Plan Representative at the Administrative Office may witness the signature for free. Just come by the Administrative Office and see any team member of the Pension Benefits Department any weekday (except holidays) from 8:30 am to 5:00 pm. Bring a valid unexpired government-issued photo ID, such as a CA driver's license or a US Passport. No appointment is necessary. See information on reverse side ONLY if you are a legal representative based on a Power of Attorney, Conservatorship or Guardianship.

✍ **Sign Here➔**

| By signing my name below, I, VICTOR BROOKE MILLER, hereby certify under penalty of perjury that I am receiving my pension benefit payments. | |
|---|---|
| Sign in this Box In front of a Notary Public or Plan Representative | Date |

*TO BE COMPLETED BY A NOTARY PUBLIC OR PLAN REPRESENTATIVE*

State of _____)
) ss
County of _____)

On _____, before me, the undersigned, a Notary Public in and for said State, personally appeared _____ , personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same in his/her/their authorized capacity.

Witness my hand and Official Seal.

_____

## RETURN YOUR NOTARIZED FORM IN THE ENCLOSED ENVELOPE

▬▬▬ VICTOR BROOKE MILLER



N. Hollywood Way • Burbank, CA 91505-2526
818.846.1015 • 800.227.7863 • FAX 818.526.6571 • 566.4416
*Visit us at www.wgaplans.org*

TOBEROFF EX. U

PWGA000597

revised 2/29/08

## Producer–Writers Guild of America Pension Plan
Terence L. Young, Chief Executive Officer

---

*For Power of Attorney, Conservatorship, or Guardianship Only*

### DO NOT COMPLETE THIS BOX IF YOU ARE THE PAYEE NAMED BELOW

I, _____(print name of representative), am duly authorized to
act on behalf of VICTOR BROOKE MILLER and hereby certify under penalty of perjury
that he/she is still living and that the pension benefit payments are used for his/her benefit.
Attached is a copy of the document authorizing me as his/her legal representative.

| Signature of Representative-To be witnessed by a Notary Public or Plan Representative | Date |
|---|---|

---

*TO BE COMPLETED BY A NOTARY PUBLIC OR PLAN REPRESENTATIVE*

State of _____ )
                          ) ss
County of _____ )
On _____, before me, the undersigned, a Notary Public in and for said State,
personally appeared _____ , personally known to me or proved to me on the
basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged that he/she/they executed the same in his/her/their
authorized capacity.

Witness my hand and Official Seal.

_____



TOBEROFF EX. U

1015 N. Hollywood Way • Burbank, CA 91505-2526
818.846.1015 • 800.227.7863 • FAX 818.526.6571• 566.4416
*Visit us at www.wgaplans.org*

PWGA000598

A-847

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

HORROR, INC., a Massachusetts corporation; and
MANNY COMPANY, a Connecticut Limited Partnership,
Plaintiffs,

- against -

VICTOR MILLER, an individual; and DOES 1 through 10,
inclusive,

Defendants.

Case No.: 3:16-cv-01442-SRU

**August 4, 2017**

### PLAINTIFFS' EVIDENTIARY OBJECTIONS TO THE JULY 14, 2017 DECLARATIONS OF MARC TOBEROFF AND JENNIFER C. PARSIGNAULT, SUMMITED WITH DEFENDANT VICTOR MILLER'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Edmund J. Ferdinand, III (ct21287)
jferdinand@24iplg.com
Alexander R. Malbin (ct27273
amalbin@24iplg.com
FERDINAND IP, LLC
Jessica S. Rutherford (ct29419)
jrutherford@24iplg.com
129 Post Road East
Westport, Connecticut 06880
Telephone: (203) 557-4224
Fax: (203) 905-6747

Bonnie E. Eskenazi (CA SBN 119401)
BEskenazi@GreenbergGlusker.com
Julia R. Haye (CA SBN 198138)
JHaye@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590
Telephone: (310) 553-3610
Fax: (310) 553-0687
(Admission *Pro Hac Vice*)

*Attorneys for Plaintiffs and Counterclaim
Defendants Horror, Inc. and Manny Company*

On July 14, 2017, Defendant Victor Miller ("Miller") improperly submitted two additional declarations with his reply brief in support of his motion for summary judgment: (1) Declaration of Marc Toberoff In Reply to Plaintiffs' Evidentiary Objections and In Further Support of Defendant and Counterclaimant Victor Miller's Motion for Summary Judgment or Partial Summary Judgment ("Toberoff Reply Declaration") (Dkt. No. 56-1), and (b) Declaration of Jennifer C. Parsignault, Manager-Compliance Department of the PWGA Pension and Health Plans ("Parsignault Reply Declaration") (Dkt. No. 55-1).  These declarations improperly raise new matters which were <u>not</u> submitted in connection with Miller's moving papers or Plaintiffs' opposition.

Reply papers must be limited to matters raised in the opposition papers and cannot raise new matters or introduce new facts not previously submitted with the party's moving papers. L.R. 7(d); *see* The Rutter Group, *Federal Civil Procedure Before Trial*, § 12.109 ("It is improper for the moving party to 'shift gears' and introduce new facts or different legal arguments in the reply brief than presented in the moving papers.").  Courts have broad discretion to disregard in their entirety late-filed factual matters.  *Lee v. Burkhart,* 991 F.2d 1004, 1010 n. 4 (2d Cir.1993) (declining to consider plaintiff's allegation raised for first time in reply brief); *Knipe v. Skinner,* 999 F.2d 708, 711 (2d Cir.1993) ("Arguments may not be made for the first time in a reply brief."); *Ernst Haas Studio, Inc. v. Palm Press, Inc.,* 164 F.3d 110, 112 (2d Cir.1999) ("new arguments may not be made in a reply brief"); *Aurora Loan Services, Inc. v. Posner, Posner & Associates, P.C.,* 513 F. Supp.2d 18, 20 (SDNY 2007) (refusing to consider additional evidence submitted with plaintiff's reply brief, finding that plaintiff "was aware of and in possession of these documents at the time they filed for summary judgment, and it therefore could have included them in its papers").  In addition, Local Rule 7(d) specifically provides that

any reply brief must not exceed 10 pages and "must be strictly confined to a discussion of matters raised by the responsive brief and must contain references to the pages of the responsive brief to which reply is being made." L.R. 7(d).

Notwithstanding these well-established principles, the two new declarations submitted by Miller with his reply brief raise new facts not previously introduced in Miller's moving papers. In fact, one of the declarations that Miller submitted is from a new witness, Ms. Parsignault, who did not previously submit any declaration whatsoever in connection with Miller's moving papers or his opposition to Plaintiff's motion for summary judgment. The Parsignault Reply Declaration improperly and untimely offers new evidence and raises new factual matters for the first time on reply. Miller easily could have submitted a declaration from Ms. Parsignault with either his moving papers, or in connection with his opposition to Plaintiffs' summary judgment motion, but chose not to do so. Instead, Miller improperly waited to submit this declaration with his reply brief, thereby depriving Plaintiffs of the opportunity to fully analyze and respond to the statements contained in Ms. Parsignault's declaration.

The matters set forth in the Toberoff Reply Declaration and Parsignault Reply Declaration were known to Miller both at the time he filed his motion on June 9, 2017 and opposition to Plaintiffs' motion on June 30, 2017. There is simply no excuse for Miller's decision to wait to introduce this additional testimony on reply. Both declarations should be stricken in their entirety. *Aurora*, *supra*, 513 F. Supp.2d 18 at 20.

Moreover, the Court should note that Mr. Toberoff did not designate anyone from the PWGA as a witness in this matter, including Ms. Parsignault, nor did he disclose or produce any communications with representatives of the PWGA until June 7, 2017, well after the May 19, 2017 discovery cut-off. *See* Fed. R. Civ. P. 16(b). FRCP Rule 26(a) requires every party to

provide "the name and, if known, the address and telephone number of each individual likely to

have discoverable information…that the disclosing party may use to support its claims or

defenses."  FRCP 26(a)(1)(A)(i).  In addition, a party must timely supplement its disclosures if

additional information becomes available.  FRCP 26(e)(1)(A).  When a party fails to identify a

witness in compliance with Rule 26(a), the party "is not allowed to use [that witness] to supply

evidence ***on a motion***, at a hearing, or at trial, unless the failure was substantially justified or is

harmless."  FRCP 37(c) (emphasis added).  Here, Miller has no justifiable basis for failing to

timely disclose Ms. Parsignault as a potential witness.  For this reason alone, Ms. Parsignault's

declaration should be stricken in its entirety.

Not only did Miller fail to timely disclose Ms. Parsignault, or anyone from the PWGA, as

a potential witness, Mr. Toberoff did not even send his email to the PWGA requesting this

information until June 7.  This attempt to take informal discovery after the discovery cutoff and

without seeking leave of the Court was plainly calculated to deprive Plaintiffs of the opportunity

to examine any witness regarding their proffered testimony and their communications with Mr.

Toberoff.

To this end, it is crucial to note that ***Plaintiffs issued a Subpoena to the PWGA in***

***December of 2016, and the PWGA produced documents pursuant to that subpoena***.  That is,

Mr. Toberoff knew well in advance of the discovery cutoff that the PWGA might have relevant

information, but he chose not to seek this information until after the discovery cutoff.  *See, e.g.,*

*Integra Life Sciences, Ltd. v. Merck*, 190 F.R.D. 556, 599 (S.D. Cal. 1999) (denying leave to take

additional discovery after the discovery cutoff where the information "was clearly known to

Defendants well in advance of the discovery cutoff…").

For these reasons, Mr. Toberoff's reply declaration and Ms. Parsignault's declaration

should be stricken in their entirety.  However, if the Court considers any of the new material

contained in either reply declaration, it should afford Plaintiffs' a reasonable opportunity to

respond thereto.  Accordingly, in the event that the Court should consider either of these

declarations, or any portion thereof, Plaintiffs request that the Court consider Plaintiffs'

responsive submissions, filed concurrently herewith.  *Litton Industries, Inc. v. Lehman Bros.*

*Kuhn Loeb Inc.*, 767 F.Supp. 1220, 1235 (SDNY 1991) ("Where new evidence is presented in a

party's reply brief or affidavit in further support of its summary judgment motion, the district

court should permit the nonmoving party to respond to the new matters prior to disposition of the

motion."); *see also Beaird v. Seagate Tech., Inc.*, 145 F3d 1159, 1164-1165 (10th Cir. 1988); *Lu*

*v. Lezell*, 45 F.Supp.3d 86, 91 (D DC 2014) (court may ignore new arguments in reply or grant

leave to file sur-reply); *Springs Indus., Inc. v. American Motorists Ins. Co.*, 137 FRD 238, 240

(ND TX 1991) (if reply brief raises new material (and is permitted), nonmovant should be given

opportunity for further response).

 In addition, Plaintiffs further object to the following specific testimony and evidence

included in and attached to the Toberoff Reply Declaration and Parsignault Reply Declaration:


**Toberoff Reply Declaration (Dkt. No.56-1):**

 Objections Applicable to All Paragraphs (the "General Objection"):  Mr. Toberoff

purposely misconstrues the facts and circumstances concerning Plaintiffs' custodian of records

subpoena issues to the Producer-Writers Guild of America Pension Plan ("PWGA"), and the

PWGA's production of documents in response thereto.

 On November 22, 2016, Plaintiffs served four third party custodian of records deposition

subpoenas seeking the production of documents and testimony, including the original subpoena

served on PWGA.  Mr. Toberoff was also served with notice of each of the subpoenas on

November 22, 2016.  Declaration of Julia R. Haye filed concurrently herewith ("Haye Reply

Decl.") ¶ 2.  All four subpoenas were noticed for deposition on December 22, 2016.  *Id.* ¶ 2.

Based on conversations between Plaintiffs' counsel and PWGA's counsel, the PWGA deposition

subpoena date was continued to and re-noticed for January 9, 2017.  Mr. Toberoff was served

with a copy of the amended subpoena to the PWGA on December 9, 2016.  *Id.* ¶ 2.

As demonstrated by the exhibits attached to Mr. Toberoff's own declaration, Plaintiffs'

counsel received documents produced by the PWGA ***in the mail*** on December 23, 2016, during

which time Plaintiffs' counsel was out of the office for the holidays.  Haye Reply Decl. ¶ 3.

Contrary to Mr. Toberoff's unfounded suggestion, Plaintiffs' counsel did ***not*** receive the

PWGA's document production in "electronic form" via email, which could have been forwarded

to Mr. Toberoff "as produced" by the PWGA.  Rather, the documents were contained on a

***physical CD*** that was mailed to Plaintiffs' lead counsel, Bonnie Eskenazi, via regular U.S. mail,

with an enclosed cover letter, dated December 21, 2016, from Adam J. Thomas, counsel for the

PWGA.  *Id.*  This cover letter is attached as Exhibit "U" to the Toberoff Reply Decl.  Plaintiffs'

counsel did not receive or become aware of the package mailed to it from PWGA's counsel until

they returned to the office on January 2, 2017, after the holiday break.  *Id.* ¶ 3.

Immediately upon returning to the office on January 2, 2017, Plaintiffs' counsel

processed the documents contained on the ***physical CD***.  *Id.* ¶ 4.  Because the documents

contained on the physical CD received from the PWGA had no Bates numbers or other reference

numbers whatsoever, Plaintiffs' counsel placed an identifying Bates number on the bottom

corner of each document, to ensure that both parties would have a "control set" of all documents

produced by the PWGA, as well as a means of referencing the documents.  *Id.*  The very next

day, on January 3, 2017, Plaintiffs' counsel emailed Mr. Toberoff a complete set of all documents received from the PWGA, complete with Bates numbers.  *Id.* ¶ 5.  The documents were provided to Mr. Toberoff in the exact order and in the same format as contained on the physical CD received in the mail from PWGA's counsel.  *Id.*  As Plaintiffs' counsel has previously explained to Mr. Toberoff on multiple occasions, no documents were removed, reordered, or deleted from the PWGA production, and the only addition made by Plaintiffs' counsel was adding Bates numbers to the documents for control purposes.  *Id.*

Notwithstanding the foregoing, Mr. Toberoff attempts to deflect attention from his own improper conduct by claiming, without any basis whatsoever, that Plaintiffs' counsel did not provided him with a copy of the documents "as produced" by the PWGA.  Mr. Toberoff's unfounded assumption appears to be based on his faulty belief that Plaintiffs' counsel received documents from the PWGA "in PDF format" via email.  They did ***not***.  *Id.* ¶ 6.  As Mr. Toberoff well knows, Plaintiffs received the documents in the mail on a ***physical CD***.  *Id.* ¶ 4.  Obviously, Plaintiffs' counsel could not have emailed Mr. Toberoff the physical CD it received in the mail from PWGA's counsel, nor would burning another CD without Bates labels be helpful to anyone in this case because there would be no control set to determine what documents were in each party's possession.

Apparently dissatisfied that Plaintiffs' explanations did not fit his narrative, Mr. Toberoff took it upon himself to, once again, circumvent PWGA's counsel and obtain documents directly from the PWGA, presumably in an effort to support his baseless accusation that Plaintiffs did not provide him with a copy of the PWGA documents "as produced" by the PWGA.  Mr. Toberoff's accusations are demonstrably false.

First, Plaintiffs' counsel has never spoken with, nor had any contact with Chris Karman,

who Mr. Toberoff states is the Sr. Pension Benefits Analyst at the PWGA.  Plaintiffs' counsel

has only ever communicated with Adam Thomas, outside counsel for the PWGA.  Haye Reply

Decl. ¶ 7.  As detailed above, the ***only*** documents received by Plaintiffs from the PWGA were

received on a ***physical CD*** mailed to it from Mr. Thomas.  *Id.* ¶¶ 6-7.  Plaintiffs have not

received any documents from Mr. Karman, nor have they received any documents directly from

the PWGA whatsoever via email or any other electronic means.  *Id.* ¶ 7.  To the extent that Mr.

Karman sent documents to Mr. Toberoff via email, ***Mr. Toberoff has not produced those***

***documents to Plaintiffs and Plaintiffs do not have, and have never had, a copy of the***

***documents that Mr. Toberoff claims to have received directly from the PWGA***.  *Id.* ¶ 8.  Given

that Plaintiffs never received any documents directly from Mr. Karman, nor any documents

produced by the PWGA in email format, and that Mr. Toberoff has not produced to Plaintiffs any

documents that he purports to have received from Mr. Karman, Plaintiffs cannot verify the

authenticity of any such documents, nor can they determine whether the documents that Mr.

Karman sent to Mr. Toberoff are the same documents (or in the same order) that were produced

to Plaintiffs by PWGA's counsel via the physical CD mailed to Plaintiffs' counsel.   Therefore,

Mr. Toberoff's testimony, as well as Exhibit X to his declaration, are entirely improper and

should be stricken in their entirety.

Furthermore, Mr. Toberoff intentionally misquotes Mr. Karman's email which he

attaches as Exhibit X to give the false impression that Mr. Karman sent the documents to

***Plaintiffs'*** counsel in a method other than disclosed by Plaintiffs' counsel.  This is demonstrably

false.  Mr. Karman's email simply states: 'Yes, these documents were sent to the attorneys in a

pdf format."  As an initial matter, the contents of Mr. Karman's email are double hearsay and

also lack foundation.  Moreover, at best, Mr. Karman's email is ambiguous:  Mr. Karman does

A-855

not state which attorneys he refers to, and it is quite likely that he is referring to his own outside counsel, Mr. Thomas.  Obviously, Mr. Karman may have provided documents to his own counsel in a format which differed from the ultimate format in which Mr. Thomas provided the production to Plaintiffs' counsel.  Yet Mr. Toberoff presumes, without any basis to do so, that Mr. Karman is referring to providing documents directly to Plaintiffs' counsel – an event which never occurred.

Furthermore, the fact that the files were provided "in a pdf format" is not the relevant inquiry.  The files contained on the physical CD that Plaintiffs' counsel received in the mail from PWGA's counsel were "in a pdf format" on the CD.  But this does not mean that those "pdf files" were emailed to Plaintiffs' counsel or provided in any other electronic form that could simply have been forwarded to Mr. Toberoff – they were _**not**_.  The fact that the physical CD contained the documents "in a pdf format" is irrelevant.  Plaintiffs' could not email the physical CD to Mr. Toberoff, as he suggests, but instead could only either have extracted the documents from the physical CD and given a copy to Mr. Toberoff, or burned a copy of the CD onto another physical CD, without extracting or examining the contents.  However, burning another physical copy of the CD would have done neither party any good because the documents were not Bates labeled and, therefore, there would be no control set to determine what documents each party has in its possession.  Haye Reply Decl. ¶ 9.  Plaintiffs' counsel therefore took the logical step of Bates labeling the documents before providing them to Mr. Toberoff.

If Mr. Toberoff had any legitimate concerns regarding the specific documents that Plaintiffs' counsel received from PWGA's counsel and which were provided to Mr. Toberoff, Mr. Toberoff should have spoken directly with the PWGA's counsel, Mr. Thomas, and asked Mr. Thomas for an exact copy of the physical CD that he mailed to Plaintiffs' counsel.

A-856

Alternatively, Mr. Toberoff could have requested to examine the original CD at the offices of Plaintiffs' counsel.  He did neither of these things in the months since he received a copy of PWGA's document production.  Instead, even after being warned about his ethical obligations once he had been formally advised that the PWGA is represented by counsel, Mr. Toberoff once again has attempted to improperly and belatedly take additional discovery by bypassing PWGA's counsel and requesting documents directly from a PWGA non-legal representative with whom Plaintiffs' counsel has had no contact, and without notifying Plaintiffs or providing Plaintiffs with a copy of the documents that he received directly from the PWGA representative.  Mr. Toberoff's intentionally misleading suggestion that Plaintiffs' counsel somehow acted improperly is nothing more than sheer conjecture intended to draw the Court's attention away from Mr. Toberoff's unethical conduct in directly contacting a party who is represented by legal counsel.  It also further demonstrates Mr. Toberoff's lack of candor with the Court.[1]

Similarly, Mr. Toberoff's claims that he was unaware that the PWGA was represented by counsel are also demonstrably untrue.  Throughout this entire period, from November through the end of December 2016, Mr. Toberoff and Plaintiffs' counsel, Julia Haye, had multiple meet and confer discussions regarding the parties' initial disclosures and discovery matters.  Haye Reply Decl. ¶ 10.  These discussions included, without limitation, updates regarding the status of document productions in response to the third party subpoenas, anticipated receipt of documents, and whether oral depositions would be going forward on the dates noticed.  *Id.* ¶ 10.  During these discussions, Ms. Haye explained to Mr. Toberoff that she had been communicating with PWGA's counsel (as well as representatives of the WGAE, WGAW, and the Writers Guild Health Plan) and expected documents to be produced in response to the subpoenas shortly.  *Id.* ¶ 10.  Mr. Toberoff's statements that he had "no idea" that the PWGA was represented by outside

---

[1] If the Court would like to examine the original CD produced to Plaintiffs' counsel, it will be made available.

counsel are simply not true.

Additionally, even if Mr. Toberoff failed to recall his conversations with Ms. Haye about dealing with the PWGA's outside legal counsel on the PWGA's document production, under normal circumstances, any time a legal subpoena is served on an organization or entity, that entity's counsel typically responds to the subpoena, as was done here. Mr. Toberoff has been practicing litigation for decades, certainly long enough to know that an entity's counsel normally is involved with producing documents pursuant to a subpoena. Especially since he went back to the PWGA to follow up on the prior document production, he could have (and should have) inquired about who had handled the PWGA's prior document production in this case. Deliberate ignorance is no excuse for unethical behavior.

Paragraph 3 – For each of the reasons detailed in the General Objection set forth above and incorporated herein,[2] Mr. Toberoff's testimony lacks foundation, and is argumentative, intentionally misleading and inaccurate. FRE 401, 602.

Paragraphs 4 and 5 – For each of the reasons detailed in the General Objection set forth above and incorporated herein, Mr. Toberoff's testimony lacks foundation, and is irrelevant, argumentative, intentionally misleading and inaccurate. FRE 401, 602.

Paragraph 6 – Mr. Toberoff's testimony violates the best evidence rule and is irrelevant. FRE 401, 1002. Furthermore, Mr. Toberoff's testimony purports to describe his actions on May 31, 2017 – nine days ***before*** Miller filed his summary judgment motion. Mr. Toberoff could have offered this purported testimony with his moving papers. This untimely testimony should be disregarded in its entirety. L.R. 7(d); *Lee*, *supra*, 991 F.2d at 1010 n.4; *Knipe*, 999 F.2d at 711; *Ernst*, *supra*, 164 F.3d at 112; *Aurora*; *supra*, 513 F. Supp.2d at 20. Moreover, Mr.

---

[2] For the sake of brevity, Plaintiffs will not repeat the full text of the above General Objection for each paragraph, and instead will reference and incorporate the full text as appropriate.

A-858

Toberoff's obtaining his client's permission to speak with the PWGA does not excuse Mr.

Toberoff's unethical behavior.  If Mr. Miller wanted to speak to the PWGA and obtain further

clarification of issues in this action, he could have done so without involving his counsel.  Once

Mr. Toberoff took it upon himself to directly contact the PWGA, however, it was Mr. Toberoff's

ethical duty to be sure he was not contacting a party who is represented by counsel.  In addition,

for each of the reasons detailed above in the General Objection and incorporated herein, Mr.

Toberoff's testimony is also intentionally misleading and inaccurate.

Paragraph 7 – Mr. Toberoff lacks personal knowledge as to whether The Manny

Company contributed to any WGA ERISA plan, including the Pension Plan and the Health and

Welfare Fund, or provided Miller with any benefits through the WGA, and his testimony to this

effect lacks foundation.  FRE 602.  To the extent that Mr. Toberoff purportedly learned this from

a purported PWGA employee or representative, this testimony is hearsay not subject to any

exception.  FRE 801-803.  Furthermore, Mr. Toberoff's testimony purports to describe his

actions on June 7, 2017 – two days *__before__* Miller filed his summary judgment motion.  Mr.

Toberoff could have offered this purported testimony with his moving papers.  This untimely

testimony should be disregarded in its entirety.  L.R. 7(d); *Lee*, *supra*, 991 F.2d at 1010 n.4;

*Knipe*, 999 F.2d at 711; *Ernst*, *supra*, 164 F.3d at 112; *Aurora*; *supra*, 513 F. Supp.2d at 20.  In

addition, for each of the reasons detailed above in the General Objection and incorporated herein,

Mr. Toberoff's testimony is also intentionally misleading and inaccurate.

Plaintiffs have already submitted detailed objections to Exhibit "C" to Mr. Toberoff's

previously-filed Declaration in Support of Victor Miller's Motion for Summary Judgment, which

Mr. Toberoff references in Paragraph 7, but does not re-attach to his Reply Declaration.

Plaintiffs' previous objections to Exhibit "C" will not be repeated, but are incorporated by

reference herein.

Paragraph 9 – Mr. Toberoff lacks personal knowledge as to whether The Manny

Company contributed to any WGA ERISA plan, including the Pension Plan and the Health and

Welfare Fund, or provided Miller with any benefits through the WGA, and his testimony to this

effect lacks foundation.  FRE 602.  To the extent that Mr. Toberoff purportedly learned this from

a purported PWGA employee or representative, this testimony is hearsay not subject to any

exception.  FRE 801-803.   In addition, for each of the reasons detailed in the General Objections

set forth above and incorporated herein, Mr. Toberoff's testimony is also intentionally

misleading and inaccurate.

Plaintiffs have already submitted detailed objections to Exhibit "O" to Mr. Toberoff's

previously-filed Declaration in Support of Victor Miller's Motion for Summary Judgment, which

Mr. Toberoff references in Paragraph 9, but does not re-attach to his Reply Declaration.

Plaintiffs' previous objections to Exhibit "O" will not be repeated, but are incorporated by

reference herein.

Paragraph 11 – Mr. Toberoff's testimony constitutes hearsay and is not subject to any

exception.  FRE  801-803.  For each of the reasons detailed in the General Objections set forth

above and incorporated herein, Mr. Toberoff's testimony is also intentionally misleading,

inaccurate, and argumentative.  Once again, Mr. Toberoff intentionally attempts to imply that he

did not receive the documents "as produced by the PWGA," presumably to misleadingly suggest

that Plaintiffs' counsel somehow acted improperly.  As detailed above, this is demonstrably false

and belied by the facts.

Paragraph 12 & Exhibit X – For each of the reasons detailed in the General Objections

set forth above and incorporated herein, Mr. Toberoff's testimony is intentionally misleading and

inaccurate.  Mr. Toberoff's testimony and Exhibit X also constitute hearsay and are not subject
to any exception.  FRE  801-803.  Mr. Toberoff's testimony also lacks foundation, and is
argumentative and irrelevant.  FRE 401, 602.  Furthermore, Mr. Toberoff lacks personal
knowledge regarding the manner in which documents were produced to Plaintiffs' counsel.  FRE
602.

Paragraph 13 – For each of the reasons detailed in the General Objections set forth above
and incorporated herein, Mr. Toberoff's testimony is intentionally misleading and inaccurate.
Mr. Toberoff's testimony and Exhibit Y also constitute hearsay and are not subject to any
exception.  FRE  801-803.  Mr. Toberoff's testimony also lacks foundation and authentication.
FRE 602, 901.  Furthermore, Mr. Toberoff lacks personal knowledge regarding the manner in
which documents were produced to Plaintiffs' counsel, and his testimony is speculation.  FRE
602.  It is also argumentative and irrelevant.  FRE 401.

Paragraph 14 – For each of the reasons detailed in the General Objections set forth above
and incorporated herein, Mr. Toberoff's testimony is intentionally misleading and inaccurate.
Mr. Toberoff's testimony and Exhibit Y also constitute hearsay and are not subject to any
exception.  FRE  801-803.  Mr. Toberoff's testimony also lacks foundation and authentication.
FRE 602, 901.  Furthermore, Mr. Toberoff lacks personal knowledge regarding the manner in
which documents were produced to Plaintiffs' counsel, and his testimony is speculation.  FRE
602.  Mr. Toberoff's testimony is also argumentative, irrelevant, and intentionally misleading.
FRE 401.

Paragraph 15 – For each of the reasons detailed in the General Objections set forth above
and incorporated herein, Mr. Toberoff's testimony is intentionally misleading and inaccurate.
Mr. Toberoff's testimony lacks foundation, assumes facts not in evidence, and violated the best

evidence rule, and improperly offers a legal conclusion.  FRE 602, 1002.

**Parsignault Reply Declaration (Dkt. No.55-1):**

<u>Paragraph 2</u> – Ms. Parsignault's testimony lacks foundation, assumes facts not in evidence, violates the best evidence rule, and is irrelevant.  FRE 401, 602.

<u>Paragraph 3</u> –  Ms. Parsignault's testimony lacks foundation, assumes facts not in evidence, and is irrelevant.  FRE 401, 602.

<u>Paragraph 5</u> – Ms. Parsignault's testimony lacks foundation, assumes facts not in evidence, violates the best evidence rule, and is irrelevant.  FRE 401, 602.   Ms. Parsignault also lacks personal knowledge regarding contributions made by the Manny Company or its successors-in-interest with respect to the film *Friday the 13th* ("Film") and/or any payments made in connection with the settlement designated for PWGA contributions.  FRE 602.

Furthermore, Ms. Parsignault's testimony is flatly contradicted by the Letter of Irrevocable Authority dated July 19, 1988, signed by both Miller and the WGA, which provides, in pertinent part: "As and for the first Payment Request from the WGA, Paramount is hereby instructed to pay to Miller the sum of $27,393.46 for the period from June 28, 1986 through and including the June 27, 1987 accounting statement. ***This payment represents all sums due Miller in connection with the Pictures for the period through and including June 22, 1987, including any and all late charges thereon***."  Declaration of Julia R. Haye in Support of Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 43-13) ("Haye Decl."), Ex. X, ¶ 4 (emphasis added). Ms. Parsignault does not even mention or discuss the settlement between the parties or the 1988 Letter of Irrevocable Authority because she clearly has no personal knowledge of it.

<u>Paragraph 6</u> – Ms. Parsignault's testimony lacks foundation, assumes facts not in evidence, violates the best evidence rule, and is irrelevant.  FRE 401, 602.   Ms. Parsignault also

A-862

lacks personal knowledge regarding contributions made by the Manny Company or its successors-in-interest with respect to the Film and/or any payments made in connection with the settlement designated for PWGA contributions.  FRE 602.  Furthermore, Ms. Parsignault's "understanding" lacks foundation and constitutes improper opinion testimony.  FRE 701. Plaintiffs' also incorporate their objections to Paragraph 5, above.

Paragraph 7 – Ms. Parsignault's testimony lacks foundation, assumes facts not in evidence, violates the best evidence rule, and is irrelevant.  FRE 401, 602.   Ms. Parsignault also lacks personal knowledge regarding contributions made by the Manny Company or its successors-in-interest with respect to the Film and/or any payments made in connection with the settlement designated for PWGA contributions.  FRE 602.  Plaintiffs' also incorporate their objections to Paragraph 5, above.

Paragraph 8 – Ms. Parsignault's testimony lacks foundation, assumes facts not in evidence, violates the best evidence rule, and is irrelevant.  FRE 401, 602.

Paragraph 9 – Ms. Parsignault's testimony lacks foundation, assumes facts not in evidence, violates the best evidence rule, and is irrelevant.  FRE 401, 602.   Ms. Parsignault also lacks personal knowledge regarding contributions made by the Manny Company or its successors-in-interest with respect to the Film and/or any payments made in connection with the settlement designated for PWGA contributions.  FRE 602.  Plaintiffs' also incorporate their objections to Paragraph 5, above.

Paragraph 10 – Ms. Parsignault's testimony lacks foundation, assumes facts not in evidence, violates the best evidence rule, and is irrelevant.  FRE 401, 602.   Ms. Parsignault also lacks personal knowledge regarding contributions made by the Manny Company or its successors-in-interest with respect to the Film and/or any payments made in connection with the

settlement designated for PWGA contributions.  FRE 602.  Furthermore, Ms. Parsignault's

conclusions also lack foundation and constitute improper opinion testimony.  Plaintiffs' also

incorporate their objections to Paragraph 5, above.


Dated:  August 4, 2017

                                        Respectfully submitted,


                                        By: _____

EDMUND J. FERDINAND, III (ct21287)        BONNIE E. ESKENAZI (SBN 119401)
jferdinand@24iplg.com                        BEskenazi@GreenbergGlusker.com
ALEXANDER R. MALBIN (ct29419)           JULIA R. HAYE (SBN 198138)
amalbin@24iplg.com                          JHaye@GreenbergGlusker.com
JESSICA S. RUTHERFORD (ct27273)         GREENBERG GLUSKER FIELDS
jrutherford@24iplg.com                      CLAMAN & MACHTINGER LLP
129 Post Road East                           1900 Avenue of the Stars, 21st Floor
Westport, Connecticut 06880             Los Angeles, California  90067-4590
Telephone: 203.557.4224                Telephone:  310.553.3610
Fax: 203.905.6747                          Fax:  310.553.0687
                                          (Admission *Pro Hac Vice*)

                                          *Attorneys for Plaintiffs,*
                                          *Horror, Inc. and Manny Company*

A-864

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2017, a true and correct copy of the foregoing

**PLAINTIFFS' EVIDENTIARY OBJECTIONS TO THE JULY 14, 2017**

**DECLARATIONS OF MARC TOBEROFF AND JENNIFER C. PARSIGNAULT,**

**SUMMITED WITH DEFENDANT VICTOR MILLER'S REPLY IN SUPPORT OF**

**MOTION FOR SUMMARY JUDGMENT** was filed electronically.  Notice of this filing will

be sent to those who are currently on the list to receive e-mail notices by operation of the Court's

electronic filing system. Parties may access this filing through the Court's system.


By:  _Bonnie Cokenap_

EDMUND J. FERDINAND, III (ct21287)
jferdinand@24iplg.com
ALEXANDER R. MALBIN (ct29419)
amalbin@24iplg.com
JESSICA S. RUTHERFORD (ct27273)
jrutherford@24iplg.com
129 Post Road East
Westport, Connecticut 06880
Telephone: 203.557.4224
Fax: 203.905.6747

BONNIE E. ESKENAZI (SBN 119401)
BEskenazi@GreenbergGlusker.com
JULIA R. HAYE (SBN 198138)
JHaye@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590
Telephone:  310.553.3610
Fax:  310.553.0687
(Admission *Pro Hac Vice*)

*Attorneys for Plaintiffs,*
*Horror, Inc. and Manny Company*

A-865

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| HORROR, INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership, Plaintiffs,<br><br>- against -<br><br>VICTOR MILLER, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.: 3:16-cv-01442-SRU<br><br>**October 18, 2018** |

## NOTICE OF APPEAL

Edmund J. Ferdinand, III (ct21287)
jferdinand@24iplg.com
Alexander R. Malbin (ct27273)
amalbin@24iplg.com
Jessica S. Rutherford (ct29419)
jrutherford@24iplg.com
FERDINAND IP, LLC
1221 Post Road East, Suite 302
Westport, Connecticut 06880
Telephone: (203) 557-4224
Fax: (203) 905-6747

Bonnie E. Eskenazi (CA SBN 119401)
BEskenazi@GreenbergGlusker.com
Julia R. Haye (CA SBN 198138)
JHaye@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590
Telephone: (310) 553-3610
Fax: (310) 553-0687
(Admission *Pro Hac Vice*)

*Attorneys for Plaintiffs and Counterclaim Defendants Horror, Inc. and Manny Company*

A-866

Notice is hereby given that Plaintiffs Horror, Inc. and Manny Company ("Plaintiffs") in the above-named case, hereby appeal to the United States Court of Appeals for the Second Circuit from the final judgment entered in this action on September 28, 2018.

Dated: October 18, 2018

Respectfully submitted,

By: _Bonnie Eskenazi_

Edmund J. Ferdinand, III (ct21287)
jferdinand@24iplg.com
Alexander R. Malbin (ct27273)
amalbin@24iplg.com
Jessica S. Rutherford (ct29419)
jrutherford@24iplg.com
FERDINAND IP, LLC
1221 Post Road East, Suite 302
Westport, Connecticut 06880
Telephone: (203) 557-4224
Fax: (203) 905-6747

BONNIE E. ESKENAZI (SBN 119401)
BEskenazi@GreenbergGlusker.com
JULIA R. HAYE (SBN 198138)
JHaye@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590
Telephone:  310.553.3610
Fax:  310.553.0687
(Admission *Pro Hac Vice*)

*Attorneys for Plaintiffs,*
*Horror, Inc. and Manny Company*

1

# CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2018, a true and correct copy of the foregoing

**NOTICE OF APPEAL** was filed electronically.  Notice of this filing will be sent to those who

are currently on the list to receive e-mail notices by operation of the Court's electronic filing

system.  Parties may access this filing through the Court's system.

By: _Bonnie Eskenazi_

EDMUND J. FERDINAND, III
(ct21287)
jferdinand@24iplg.com
ALEXANDER R. MALBIN (ct29419)
amalbin@24iplg.com
JESSICA S. RUTHERFORD (ct27273)
jrutherford@24iplg.com
129 Post Road East
Westport, Connecticut 06880
Telephone: 203.557.4224
Fax: 203.905.6747

BONNIE E. ESKENAZI (SBN 119401)
BEskenazi@GreenbergGlusker.com
JULIA R. HAYE (SBN 198138)
JHaye@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590
Telephone:  310.553.3610
Fax:  310.553.0687
(Admission *Pro Hac Vice*)

*Attorneys for Plaintiffs,*
*Horror, Inc. and Manny Company*

2