# 18-3123-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

HORROR INC., a Massachusetts corporation, MANNY COMPANY,
a Connecticut Limited Partnership,

*Plaintiffs-Counter-Defendants-Appellants,*

– v. –

VICTOR MILLER, an individual,

*Defendant-Counter-Claimant-Appellee,*

DOES, 1 through 10, inclusive,

*Defendants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT, NEW HAVEN

## SPECIAL APPENDIX

MARC TOBEROFF
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, California 90265
(310) 246-3333

*Attorneys for Defendant-Counter-
Claimant-Appellee*

KATHLEEN M. SULLIVAN
TODD ANTEN
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiffs-Counter-
Defendants-Appellants*

*(For Continuation of Appearances See Inside Cover)*

BONNIE E. ESKENAZI
JULIA R. HAYE
GREENBERG GLUSKER FIELDS CLAMAN
   & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067
(310) 553-3610

*Attorneys for Plaintiffs-Counter-*
   *Defendants-Appellants*

## SPECIAL APPENDIX TABLE OF CONTENTS

**Page**

Ruling on Cross-Motions for Summary Judgment,
    filed September 28, 2018 ...................................... SPA-1

Judgment, filed June 28, 2018 ................................... SPA-63

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| HORROR INC. and MANNY COMPANY, Plaintiffs, | No. 3:16-cv-1442 (SRU) |
| v. | |
| VICTOR MILLER, Defendant. | |

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Nearly 40 years ago, a screenplay was written about Camp Crystal Lake. The film created from the screenplay went on to significant commercial success. Lurking below that peaceful surface, however, was the Copyright Act's termination right, waiting for just the right moment, when it would emerge and wreak havoc on the rights to the screenplay.

This is a case about copyright ownership in the screenplay to the original *Friday the 13th* film. The Copyright Act, which went into effect in 1978, only a year before the screenplay was written, provided authors with a new and important benefit—the ability to terminate grants of their copyright interests and reclaim their copyrights, beginning thirty-five years after they first transferred their rights. The termination right was established to permit authors to access the long tail of proceeds from a successful work that they could not initially have anticipated when they conveyed away their rights. The important exception to the Copyright Act's termination right is that the copyright in "works made for hire" by an employee, and, in limited circumstances, an independent contractor, cannot be clawed back. The termination right cannot apply in such cases because the hiring party is itself considered the initial author of the work.

The defendant in this declaratory judgment action is Victor Miller ("Miller"), the credited screenwriter of the original *Friday the 13th* screenplay. In 1979, Miller was contacted by his

friend, Sean Cunningham ("Cunningham"), an already successful producer, to collaborate on a horror film project—with Miller as the screenwriter and Cunningham as the producer.  The duo's process was informal, meeting at each other's homes and at coffee shops in the southern Connecticut area.  But the deal was also papered over, and Miller, a Writer's Guild of America ("WGA") member, was officially hired to write the screenplay for the film pursuant to a short form-agreement by the Manny Company ("Manny"), an entity formed by Cunningham that was a party to the WGA collective bargaining agreement.  The agreement between Miller and Manny was silent regarding authorship of the screenplay (as that term is used in the Copyright Act) but Miller plainly relinquished any control over the exploitation of the screenplay to Cunningham and Manny.  Cunningham and Manny eventually sold their interest in the film, and the runaway hit earned Manny's successors in interest significant profits.  Now, more than three decades later, Miller has timely filed and served notices purporting to terminate any permission he granted to Manny and its successors to exploit his work.

Manny and Manny's latest successor-in-interest, Horror Inc. ("Horror") have brought the present action seeking a declaration that Miller prepared the screenplay as a work for hire, and thus never held authorship rights in the work and cannot terminate Horror's ongoing exploitation of the copyright.[1]  Miller has counterclaimed seeking a declaration of the validity of his termination of Horror's and Manny's rights.

Understanding the context of this case requires understanding what is not in dispute. This is not a case where the parties signed a written agreement that expressly provided that Miller's work was being commissioned as a work made for hire.  Such a writing is one of two

---

[1] Manny and Horror have also brought state law counterclaims that will only be viable to the extent I first declare Miller's work on the screenplay to have been "work made for hire".

SPA-3

paths to work-for-hire status, and writings of that type are the norm in the motion picture industry.

Horror's and Manny's remaining path to work-for-hire status for Miller lies in the argument that Miller produced the work as Manny's employee, within the scope of his employment. Perhaps concerned by the implications of Miller's casual relationship with Cunningham, however, Horror and Manny do not focus on the traditional agency-law analysis mandated by the Supreme Court for determining employee status under the Copyright Act. Horror and Manny propose a sort of "no further inquiry" rule of employee status resulting from Miller's hiring, as a WGA member by a signatory to the WGA collective bargaining agreement. Unfortunately for Horror and Manny, the Supreme Court's agency-law analysis does not allow any exceptions for union members, and under the proper agency analysis Miller was not Manny's employee. Accordingly, the screenplay written by Miller was not a work-for-hire.

I.      **Background**

Victor Miller is a professional writer of novels, screenplays and teleplays, and has been a member of the Writers Guild of America, East, Inc. ("WGA") since 1974. [Plaintiffs' 56(a)(1) Statement ("Pls.' Facts"), Doc. No. 43-2, at ¶ 2; Defendant's 56(a)(1) Statement ("Def.'s Facts"), Doc. No. 45-3, at ¶ 1.] Sean S. Cunningham is a producer, director, and writer of feature films, who began producing and directing films in 1970. [Declaration of Sean S. Cunningham ("Cunningham Decl."), Doc. No. 43-4, at ¶ 2.] Cunningham's involvement in filmmaking is primarily coordinated through Sean S. Cunningham Films, Ltd. ("SSCF"), of which Cunningham is a principal. [Cunningham Decl., Doc. No. 43-4, at ¶ 2; Pls.' Facts, Doc. No. 43-2, at ¶ 1.] In 1976, Miller and Cunningham, who were already close friends [Def.'s Facts, Doc. No. 45-3, at ¶ 4], began working together on motion picture projects, starting with a film titled *Here Come the*

*Tigers* [Pls.' Facts, Doc. No. 43-2, at ¶¶ 4-5].  *Here Come the Tigers* was a "non-union project",

written by Miller and produced and directed by Cunningham.  [Pls.' Facts, Doc. No. 43-2, at ¶¶

6-7.]

In 1978, Miller and Cunningham again collaborated on another film, *Manny's Orphans*.

In order to develop *Manny's Orphans*, Cunningham and his company, SSCF, formed The Manny

Company ("Manny"), a Connecticut Limited Partnership, with Cunningham and SSCF as its

general partners.  [Def.'s Facts, Doc. No. 45-3, at ¶¶ 2-3.]   In order to engage Miller to work on

*Manny's Orphans*, Miller was hired by Manny, which had become a signatory to the then-

operative collective bargaining agreement between the WGA and signatory industry employers,

the 1977 WGA Theatrical and Television Basic Agreement (the "Minimum Basic Agreement" or

"MBA").  [Pls.' Facts, Doc. No. 43-2, at ¶ 11.]

On each film, the nature of Miller's and Cunningham's working relationship remained

the same:  while Miller was writing the screenplay, he and Cunningham would meet at each

other's homes, Cunningham's home office, a local diner, or over the phone, in order to exchange

ideas.  [Cunningham Decl., Doc. No. 43-4, at ¶ 6; Pls.' Facts, Doc. No. 43-2, at ¶¶ 7, 12;

Defendant's 56(a)(2) Response ("Def.'s Obj. to Pls.' Facts"), Doc. No. 51-3, at ¶ 12.][2]

In 1979, the success of the low-budget horror film *Halloween* inspired Cunningham to

make a horror film.  [Pls.' Facts, Doc. No. 43-2, at ¶ 13; Def.'s Facts, Doc. No. 45-3, at ¶ 6.]

---

[2] The exact nature of the working relationship between Miller and Cunningham on such projects is subject to
dispute.  [*Compare* Pls.' Facts, Doc. No. 43-2, at ¶ 12 ("For all produced films they worked on prior to *Friday the
13th* . . . , Cunningham and Miller's method of working together remained the same: . . . Miller and Cunningham
would meet . . . to discuss specific ideas for the films, Miller would submit drafts . . . and Cunningham would make
changes and modifications and mark up the drafts . . . and Miller would take Cunningham's notes and comments and
make edits. Their discussions would include specifics.  At times, they would hash out disagreements regarding the
scenes and plots to jointly decide how it should proceed.") *with* Def.'s Obj. to Pls.' Facts, Doc. No. 51-3, at ¶ 12
("Denied, except admitted that Miller and Cunningham would meet and naturally bounce ideas off of one another
regarding the development of a particular film; that Cunningham would at times make a few comments (often quite
general) in the margins of Miller's screenplay drafts; and that they would work out any limited creative differences
in opinion regarding the film in question.").]

SPA-5

Cunningham contacted Miller to solicit his involvement as a writer for the film.  [Pls.' Facts, Doc. No. 43-2, at ¶ 14; Plaintiffs' 56(a)(2) Response ("Pls.' Obj. to Def.'s Facts"), Doc. No. 47-2, at ¶ 6; Def.'s Facts, Doc. No. 45-3, at ¶ 6.][3]  Miller agreed to work on the project, and, at some point in time over the course of working alone and with Cunningham on a story and script, Miller entered into a "Writer's Flat Deal Contract" (the "Contract") with Manny.  [Pls.' Facts, Doc. No. 43-2, at ¶ 25; Def.'s Facts, Doc. No. 45-3, at ¶ 17.][4]

The Contract itself is a brief form agreement with blanks to be filled in by the parties.[5] Styled as an "EMPLOYMENT AGREEMENT", it states that "[t]he Company employs the Writer to write a complete and finished screenplay for a proposed motion picture . . . presently entitled or designated Friday 13."  [Ex. B, Cunningham Decl., Doc. No. 43-6]  The form allows the parties to check various boxes to designate whether the work product called for in the

---

[3] The parties dispute to what extent Cunningham had an *idea* for the horror film at the time that, motivated by *Halloween*'s success, he reached out to Miller.  [*Compare* Pls.' Facts, Doc. No. 43-2, at ¶ 14 ("Cunningham contacted Miller to see if he would be interested in working on this new horror film idea.") *with* Def.'s Obj to Pls.' Facts, Doc. No. 51-3, at ¶ 14 ("[D]enied that . . . Cunningham's desire to emulate *Halloween* (1978) was a 'horror film idea'."); *see also* Pls.' Obj. to Def.'s Facts at ¶ 8 ("After agreeing that Miller would write *Friday the 13th* based on Cunningham's original idea . . . .").]

[4] The parties dispute the point in time at which the Contract was executed, relative to Miller's progress working on the project.  Miller contends that, prior to the June 4, 1979 execution of the Contract, Miller had already workshopped settings with Cunningham, written a sixteen-page treatment, titled *The Long Night at Camp Blood*, and written a first draft of the screenplay.  [Def.'s Facts, Doc. No. 45-3, at ¶¶ 7-8, 17; Def.'s Obj. to Pls.' Facts, Doc. No. 51-3, at ¶ 42.] The plaintiffs contend that Miller and Manny entered into the Contract "on or before June 4, 1979", and before Miller had written any treatments or draft screenplays.  [Pls.' Facts, Doc. No. 43-2, at ¶¶ 25, 40-42; Pls.' Obj. to Def.'s Facts at ¶ 7.]  The plaintiffs further contend that even before the Contract was executed, after only some "initial discussions" during which Cunningham explained the "key elements of successful horror films" to Miller, Cunningham and Miller had also "orally agreed that Miller would be engaged to write the screenplay for Cunningham's horror film project and that it would be done as a union film."  [Pls.' Facts, Doc. No. 43-2, at ¶¶ 16-18.]  On the other hand, Miller takes the position that at the time he wrote the treatment and first draft screenplay, he was not expecting guaranteed compensation for his work.  [*See* Miller Opp. Decl., Doc. No. 51-1, at ¶ 12 ("I wrote the . . . Treatment and first draft Screenplay in the hope that Cunningham could use this material to raise money and ultimately succeed in financing the Film, but I had . . . no delusions, guarantees, oral or written agreement that I would be compensated if Cunningham did not succeed, which had happened before on other projects . . . Cunningham and I had wanted to make."); *but see* Pls.' Facts, Doc. No. 43-2, at ¶ 35 ("Although Cunningham had not yet secured financing for the Film at the time Cunningham entered into the written Employment Agreement with Miller, Cunningham knew that, pursuant to the MBA, he was contractually committed to pay Miller the nearly $10,000 due to him thereunder, irrespective of whether Cunningham ultimately secured financing for the Film.").]

[5] In a parenthetical header, it is labeled "Short Form; complete screenplay, no options".  [Ex. B, Cunningham Decl., Doc. No. 43-6.]  The parties agree that Cunningham, on behalf of Manny, filled out the Contract and provided it to Miller for his signature.  [Def.'s Facts, Doc. No. 45-3, at ¶ 18; Pls.' Obj. to Def.'s Facts at ¶ 18.]

agreement will include a "Treatment", "Original Treatment", "Story", "First draft screenplay",

"Final draft screenplay", or "Rewrite of screenplay", and only the boxes for "First draft

screenplay" and "Final draft screenplay" are checked.  [Ex. B, Cunningham Decl., Doc. No. 43-

6.]  The form also includes a section in which the parties can identify pre-existing materials on

which the agreed-upon work product will be based ("based upon (describe form of material &

title) _____ written by _____").  [Ex. B, Cunningham Decl., Doc. No. 43-6.]  In

the Contract, the "Writer" represents that he is a member in good standing of the Writers Guild

of America, and the Contract provides that, "[s]hould any of the terms hereof be less

advantageous to the Writer than the minimums provided in [the] MBA, then the terms of the

MBA shall supersede such terms" and that, in the event the Contract fails "to provide for the

Writer the benefits which are provided by the MBA, then such benefits for the Writer provided

by the terms of the MBA are deemed incorporated herein."  [Ex. B, Cunningham Decl., Doc. No.

43-6.]  The form agreement provides a fillable blank where the total lump sum payable to the

"Writer" can be filled in, and the total sum of $9,282 was filled in.  [Ex. B, Cunningham Decl.,

Doc. No. 43-6.] The form agreement also includes a series of fillable blanks where the total lump

sum payment designated for the "Writer" can be subdivided into component amounts payable for

delivery of a treatment, first draft screenplay, final draft screenplay, etc., and only the blanks

designating amounts payable for a first draft screenplay and final draft screenplay are filled in

(calling for payments of $5,569 and $3,713, respectively).  [Ex. B, Cunningham Decl., Doc. No.

43-6.]  Finally, the Contract provides that, following completion of any deliverable by the

Writer, the Company has three days to call for changes to such deliverable, after which, such

deliverable shall be deemed approved.  [Ex. B, Cunningham Decl., Doc. No. 43-6.]

At some point in time following Cunningham's recruitment of Miller for the horror film

project, Miller saw *Halloween* [Def.'s Facts, Doc. No. 45-3, at ¶ 7], discussed ideas and locations

for the film with Cunningham [Pls.' Facts, Doc. No. 43-2, at ¶ 18], came up with the idea for

setting the film at a summer camp before it opens [Pls.' Facts, Doc. No. 43-2, at ¶ 20], wrote a

16-page treatment for the horror film titled "The Long Night at Camp Blood" [Def.'s Facts, Doc.

No. 45-3, at ¶ 7; Pls.' Obj. to Def.'s Facts, Doc. No. 47-2, at ¶ 7][6], wrote a first draft screenplay

and second draft screenplay [Def.'s Facts, Doc. No. 45-3, at ¶¶ 8, 10; Pls.' Obj. to Def.'s Facts,

Doc. No. 47-2, at ¶¶ 8, 10], and made revisions to the second draft screenplay, including adding

a new ending [Def.'s Facts, Doc. No. 45-3, at ¶ 12].[7]

Miller wrote the various versions of the treatment and screenplay over the course of

approximately two months.  [Def.'s Facts, Doc. No. 45-3, at ¶ 16]  As with Miller's and

Cunningham's prior collaborations, Miller and Cunningham met at each other's homes to discuss

---

[6] Both parties acknowledge the existence of a subsequent second draft treatment, bearing a cover page titling the treatment "Friday 13", describing the treatment as "A Screenplay Treatment By Victor Miller", and including a copyright notice that reads "© Copyright 1979[,] Sean S. Cunningham Films, Ltd.[,] All Rights Reserved." [Ex. D, Cunningham Decl., Doc. No. 43-8; Pls.' Facts, Doc. No. 43-2, at ¶ 48.]  The parties disagree, however, about whether, to create the second treatment, "Cunningham revised, rewrote, and restructured the first draft treatment on his own and made several creative changes, which ultimately were included in the early drafts of the [s]creenplay and the [f]ilm." [Pls.' Facts, Doc. No. 43-2, at ¶ 47; *see also* Def.'s Obj. to Pls.' Facts, Doc. No. 51-3, at ¶ 47.]
[7] In order to establish the timing of these events, relative to his execution of the Contract, Miller points out that:  (1) his first treatment was titled differently than the work described in the Contract; (2) the first draft screenplay likewise contains no references to the eventual "Friday the 13th" title, and, by contrast, Miller's second draft screenplay, which was admittedly created following execution of the Contract, contains numerous references to "Friday the 13th"; (3) Miller's second draft screenplay contains a cover page and calls for a title sequence bearing the title  "Friday 13", which, Miller argues, suggests that the second draft screenplay was completed shortly after the Contract, but before Cunningham had cleared the title "Friday the 13th" via a July 4, 1979 ad in *Variety* magazine; and (4) given that it took approximately eight weeks to write the treatment and first and second draft screenplays, Miller did not have enough time to write these all following execution of the Contract.  [Def.'s Response to Pls.' Evid. Obj., Doc. No. 56, at 4.]  On the other hand, the plaintiffs point to: (1) the Contract itself, which does not describe the covered screenplays as being based on any pre-existing material [Pls.' Facts, Doc. No. 43-2, at ¶ 36]; (2) a 2003 interview given by Miller in which he states that "we did not get started on the project until about June or July 1979, but I am willing to be told otherwise" [Ex. L, Haye Decl., Doc. No. 43-17, at 8]; and (3) a handwritten markup on the first draft of the screenplay which writes "FRI 13? if 24 hrs.?" beside a description of the time as "The Present" [Ex. F, Cunningham Decl., Doc. No. 43-10, at 6].
   There were likely numerous actual "drafts" of the screenplay created [*see, e.g.*, Ex. L, Haye Decl., Doc. 43-17, January 7, 2003 Interview with Victor Miller ("I came up with the highly unfavorable title of Long Night at Camp [Blood], and that was its working title until about the third or fourth draft . . . .")], but the parties have focused in their briefing on a division of the timeline into first draft, second draft, and subsequent revisions.

SPA-8

ideas for the film and Miller drafted the treatment and screenplay at his own home.  [Pls.' Facts,

Doc. No. 43-2, at ¶ 49; Miller Decl., Doc. No. 45-1, at ¶ 15; Cunningham Supp. Decl., Doc. No.

47-1, at ¶ 12.]  Among the ideas Cunningham contributed were the suggestion that the killings

that occur in the movie should be "personal" (and that guns are "impersonal" ways to kill in

movies), that the killer should remain masked at all times, and that a major character should be

killed early on.  [Miller Dep., Doc. No. 43-16, at 89:15-90:11, 189:23-190:17.].

  Miller wrote the treatment and screenplay on his own typewriter, using his own

typewriter ribbon and paper.  [Def.'s Facts, Doc. No. 45-3, at ¶ 14; Pls.' Obj. to Def.'s Facts,

Doc. No. 47-2, at ¶ 14; Def.'s Obj. to Pls.' Facts, Doc. No. 51-3, at ¶ 51; Miller Decl., Doc. No.

45-1, at ¶ 15.]  Miller made use of Cunningham's photocopier and photocopy paper, and

Cunningham's assistant re-typed the entire second draft of the screenplay to reformat the draft to

contain the proper margin content.  [Def.'s Facts, Doc. No. 45-3, at ¶ 14; Pls.' Obj. to Def.'s

Facts, Doc. No. 47-2, at ¶ 14; Pls.' Facts, Doc. No. 43-2, at ¶ 51; Def.'s Obj. to Pls.' Facts, Doc.

No. 51-3, at ¶ 51; Miller Decl., Doc. No. 45-1, at ¶ 15.]  Miller usually did his writing in the

morning because he was a "morning person" [Miller Decl., Doc. No. 45-1, at ¶ 17], and not

because Cunningham would dictate Miller's specific work hours [Miller Decl., Doc. No. 45-1, at

¶ 17; Pls.' Opp. Br., Doc. No. 47, at 26-27].  Miller was responsible, however, for conforming

his completion of screenplay drafts to the demands of the film's broader production schedule.

[Pls.' Obj. to Def.'s Facts, Doc. No. 47-2, at ¶ 15; Cunningham Supp. Decl., Doc. No. 47-1, at ¶

16.]  Cunningham did not have the right to assign additional projects beyond the writing of the

treatment and screenplay to Miller.  [Def.'s Facts, Doc. No. 45-3, at ¶ 20; Pls.' Obj. to Def.'s

Facts, Doc. No. 47-2, at ¶ 20.]  Cunningham, and later on, even an eventual investor, Phil

Scuderi ("Scuderi") did suggest revisions and additions for Miller to make to the screenplay, and

occasionally required revisions and additions over Miller's objections.  [Pls.' Obj. to Def.'s

Facts, Doc. No. 47-2, at ¶ 20; Cunningham Decl., Doc. No. 43-4, at ¶ 29; Cunningham Supp.

Decl., Doc. No. 47-1, at ¶ 13.]

     Once Miller had completed an early draft of the treatment, Cunningham revised and

edited the treatment in order to create a version to show to potential investors.  [Cunningham

Decl., Doc. No. 43-4, at ¶ 22; Miller Dep., Doc. No. 43-16, at 180:17-181:24, 274:23-276:11.]

Cunningham's revisions included adding a title page that read:

<u>FRIDAY 13</u>

A Screenplay Treatment

By

Victor Miller

and included a copyright notice in the name of Sean S. Cunningham Films, Ltd., which was the

general partner of Manny.  [Ex. D, Cunningham Decl., Doc. No. 43-8; Cunningham Decl., Doc.

No. 43-4, at ¶ 22; Miller Dep., Doc. No. 43-16, at 274:23-276:11.]  The version of the second

draft screenplay typed by Cunningham's assistant likewise contained a title page with identical

formatting that stated "A Screenplay By Victor Miller" and that also included a copyright notice

in the name of Sean S. Cunningham Films, Ltd.  [Ex. G, Cunningham Decl., Doc. No. 43-11;

Cunningham Decl., Doc. No. 43-4, at ¶ 26; Miller Dep., Doc. No. 43-16, at 212:8-213:5.]  Miller

received a copy of the screenplay draft that contained the copyright notice in the name of Sean S.

Cunningham Films, Ltd.  [Cunningham Decl., Doc. No. 43-4, at ¶ 26; Miller Dep., Doc. No. 43-

16, at 212:8-213:5].

     One potential investor who had expressed an interest in the film was Scuderi, principal of

Georgetown Productions, Inc. ("Georgetown").  [Pls.' Facts, Doc. No. 43-2, at ¶ 23; Def.'s Obj.

to Pls.' Facts, Doc. No. 51-3, at ¶ 23; Cunningham Decl., Doc. No. 43-4, at ¶ 12.]  Cunningham

eventually provided an early draft of the screenplay to Scuderi, and after reviewing the draft, at

some point between late July and mid-August 1979, Scuderi agreed to finance the entire

$500,000 budget of the film in exchange for Georgetown having complete control over the

screenplay and ultimate film.  [Cunningham Decl., Doc. No. 43-4, at ¶¶ 27-28.]  Pre-production

of the film began shortly thereafter, in mid-August 1979 and principal photography began in or

about September 1979.  [Cunningham Decl., Doc. No. 43-4, at ¶ 27.]  Following his joining the

project, Scuderi, acting on Georgetown's behalf, provided his own input and ideas, which were

occasionally incorporated into the screenplay and film despite Miller's misgivings.[8]

[Cunningham Decl., Doc. No. 43-4, at ¶¶ 28-29].

       For his work on the treatment and screenplay, Miller was paid $9,282 in 1979—the total

lump sum called for under the Contract for Miller's work.  [Pls.' Obj. to Def.'s Facts, Doc. No.

47-2, at ¶ 27; Ex. B, Cunningham Decl., Doc. No. 43-6.]  Disputes arose as early as 1980

regarding whether Miller was receiving additional sequel and residual payments allegedly due to

him under the MBA, and in 1989 Miller received an additional $27,396.46 in settlement of such

disputes.  [Pls.' Facts, Doc. No. 43-2, at ¶ 65-67; Ex. X, Haye Decl., Doc. No. 43-29, at 327-29;

Miller Dep., Doc. No. 43-16, at 234:16-250:19.]  Since that time, Miller has received additional

sequel and residual payments, totaling approximately $200,000.  [Pls.' Obj. to Def.'s Facts, Doc.

No. 47-2, at ¶ 28; Miller Dep., Doc. No. 43-16, at 262:16-263:1.]  Manny did not directly

provide Miller with any traditional employee benefits (e.g., vacation pay or plans, health care

plans, insurance plans, pension plans) during his brief period of work on the treatment and

---

[8] The only example provided by plaintiffs of Scuderi's contribution is his "insistence" that the last scene of the
eventual film (a scene in which, in a dream sequence, Jason abruptly emerges from the water to pull the protagonist
into the lake) be written and incorporated into the film.  [Pls. Br. at 16-17; Cunningham Decl., Doc. No. 43-4, at ¶
29.]  Although Miller disputes that Scuderi made any contributions to the screenplay or film [Def.'s Obj. to Pls.'
Facts, Doc. No. 51-3, at ¶ 54; Miller Decl., Doc. No. 45-1, at ¶ 26], I have assumed that Scuderi did indeed
participate in the ways alleged, for the purpose of evaluating Miller's motion for summary judgment.

screenplay [Miller Decl., Doc. No. 45-1, at ¶ 24], and there is no indication that Manny or any

other entity ever made contributions to WGA health care or pension plans related to Miller's

work on the treatment or screenplay [Parsignault Decl., Doc. No. 55-1 at ¶¶ 1-9].[9]  Manny also

paid Miller the lump sum payments due to him under the agreement without any deductions or

withholding for taxes, Social Security or Medicare.  [Def.'s Facts, Doc. No. 45-3, at ¶ 27; Miller

Decl., Doc. No. 45-1, at ¶ 22.]

    *Friday the 13th* was released on or about May 9, 1980 and was an immediate hit.  [Pls.'

Facts, Doc. No. 43-2, at ¶ 60; Def.'s Obj. to Pls.' Facts, Doc. No. 51-3, at ¶ 60.]  Miller was

provided with exclusive "written by" credit for the film.  [Def.'s Facts, Doc. No. 45-3, at ¶ 32;

Pls.' Obj. to Def.'s Facts, Doc. No. 47-2, at ¶ 32.]   Two days before the public release of the

film, Manny sold to Georgetown all of its "right, title and interest" in and to the screenplay.

[Pls.' Facts, Doc. No. 43-2, at ¶ 59; Ex. H, Cunningham Decl., Doc. No. 43-12.]  The agreement

between Manny and Georgetown described the screenplay as "written by Victor Miller, as author

for [Manny]", and Manny "represent[ed] and warrant[ed]" in the agreement "[t]hat Victor Miller

is the sole author of the [s]creenplay."  [Ex. H, Cunningham Decl., Doc. No. 43-12.]  In the

---

[9] Plaintiffs repeatedly and unhelpfully attempt to invoke a provision in the settlement of the 1980s disputes relating
to Miller's sequel and residual payments, which stated that the $27,396 settlement payment represented "all sums
due to Miller in connection with the Pictures for the period through and including June 27, 1987", as proof that
Miller did receive health and pension benefits.  [*See, e.g.*, Pls.' Opp. Br., Doc. No. 47, at 32 (quoting Ex. X, Haye
Decl., Doc. No. 43-29, at ¶ 4).]  As a preliminary matter, it is at best misleading to invoke such a generic statement,
made in the context of a dispute that did not implicate health or pension benefits, as a sort of "admission" by Miller
or the WGA that health and pension benefits were actually paid.  In light of the subject matter of the 1980s disputes
it is not even reasonable to construe the foregoing statement as indicating a willingness by Miller and the WGA to
accept the proffered settlement amount *in lieu of* pension or health benefits that were owing, as opposed to mere
satisfaction of all of the sequel and residual payments at issue.  And even if such an interpretation were reasonable,
that type of settlement agreement would not alter the evidenced lack of actual pension or health benefit payments,
which is the relevant inquiry here, in assessing the nature of the working relationship between Miller and Manny.  In
fact, plaintiffs appear to actually acknowledge the fact that the 1980s disputes did not bear on pension or health care
benefits when they make the contradictory argument that the lack of any distinct lawsuits brought by Miller or the
WGA related to pension plan benefits demonstrates that Manny had always separately made the required pension
contributions.  [*See* Pls.' Opp. Br., Doc. No. 47, at 33.]  I also reject the plaintiffs' argument that a lack of prior
lawsuits related to unmade pension or health care payments serves as sufficient evidence that such payments were,
in fact, made.

agreement, Manny transferred to Georgetown, among other rights, "the right to copyright the [s]creenplay".[10]  [Ex. H, Cunningham Decl., Doc. No. 43-12.]  On September 26, 1980, Georgetown obtained a copyright registration for the film, which claimed copyright in the "entire work" including the "screenplay, remaining musical compositions and other literary and cinematographic materials".  [Ex. O, Haye Decl., Doc. No. 43-20.]  The copyright registration lists Georgetown as the author of the work as a work made for hire.  [Ex. O, Haye Decl., Doc. No. 43-20.]  The Copyright Office's digital version provides a "written by" credit to Miller.

Plaintiff Horror, Inc. acquired its rights and interests in the Friday the 13th franchise and the original *Friday the 13th* film and screenplay from its predecessors-in-interest Georgetown, Jason Productions Inc. (a/k/a Jason, Inc.), Friday Four Inc., and Terror Inc.  [Barsamian Decl. at ¶ 4.]  On January 26, 2016, Miller served a termination notice (the "First Termination Notice") pursuant to 17 U.S.C. § 203(a) on Paramount Pictures Corporation, Sean S. Cunningham Films, Ltd., Warner Bros. Entertainment Inc., New Line Film Productions Inc., and Crystal Lake Entertainment, purporting to terminate the grants of Miller's rights under the copyrights in and to the screenplay made to Manny on July 6, 1979, pursuant to the Contract entered into on June 4, 1979.  [Toberoff Decl., Ex. H, Doc. No. 45-2]  The First Termination Notice stated an effective date of termination of January 25, 2018.  [Toberoff Decl., Doc. No. 45-2 at ¶ 9.]  Miller's

---

[10] Manny's transfer to Georgetown, in May 1980, of the right "to copyright the [s]creenplay" is presumably something of a misstatement—the copyright itself first vests automatically in the author or authors of a work "from the moment the work is 'fixed in any tangible medium of expression'".  *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 (9th Cir. 1989) (quoting 17 U.S.C. § 102(a)); *see also* 17 U.S.C. § 201(a).  The screenplay had first been fixed on paper, and the copyright thus existed, long before Manny transferred its rights to Georgetown.  Whether Manny or Miller can be considered the author or authors of the screenplay is, of course, the central dispute at issue in this case.  The agreement between Manny and Georgetown presumably intended to transfer to Georgetown the distinct ability to register the copyright.  *See Apparel Bus. Sys., LLC v. Tom James Co.*, 2008 WL 858754, at *18 (E.D. Pa. Mar. 28, 2008) ("The rights associated with copyright ownership are not embodied in the physical paper of the copyright registration; rather, those rights arise as soon as the work is fixed in a tangible medium of expression."); 17 U.S.C. § 408(a) ("[R]egistration is not a condition of copyright protection.").

attorney recorded the First Termination Notice with the U.S. Copyright Office prior to January 25, 2018.  [Toberoff Decl., Doc. No. 45-2 at ¶ 10.]

On June 27, 2016, Miller served a second termination notice (the "Second Termination Notice") on the aforementioned companies as well as Horror, Inc., Robert Barsamian, Jason, Inc., Terror, Inc., Georgetown Productions, Inc., Belmont Management, Inc., Jason Productions Inc., and Friday Four, Inc., again purporting to terminate the grants of Miller's rights under the copyrights in and to the screenplay made to Manny on July 6, 1979, pursuant to the Contract entered into on June 4, 1979.[11]  [Toberoff Decl., Ex. J, Doc. No. 45-2.]  The Second Termination Notice stated an effective date of termination of July 1, 2018.  [Toberoff Decl., Doc. No. 45-2 at ¶ 11.]  Miller's attorney mailed the Second Termination Notice to the U.S. Copyright Office for recording on June 28, 2016—i.e., prior to July 1, 2018.  [Toberoff Decls., Doc. No. 45-2 at ¶ 12; Ex. K, Toberoff Decl., Doc. No. 45-2; Pls.' Obj to Def.'s Facts, Doc. No. 47-2, at ¶ 36.]

On July 14, 2016, Miller served a third termination notice (the "Third Termination Notice") on the same companies served with the Second Termination Notice, modifying only the addresses of some of the recipients.  [Toberoff Decl., Doc. No. 45-2 at ¶ 13; Ex. L, Toberoff Decl., Doc. No. 45-2]  The Third Termination Notice stated an effective date of termination of July 15, 2018.  [Toberoff Decl., Doc. No. 45-2 at ¶ 13; Ex. L, Toberoff Decl., Doc. No. 45-2.]  Miller's attorney mailed the Third Termination Notice to the U.S. Copyright Office for recording on July 22, 2016—i.e., prior to July 15, 2018.  [Toberoff Decls., Doc. No. 45-2 at ¶ 15; Ex. N, Toberoff Decl., Doc. No. 45-2.]

---

[11] A footnote in the Second Termination Notice indicates that the second notice was sent because the additional parties served therewith were not revealed as assignees of the rights to the screenplay pursuant to the search of U.S. Copyright Office records conducted prior to serving the First Termination Notice.  [Ex. J, Toberoff Decl., Doc. No. 45-2.]

Horror and Manny commenced the present lawsuit on August 24, 2016, seeking a declaration: that the screenplay was written by Miller as a "work made for hire" as that phrase is used in the Copyright Act, and thus that Miller does not have any right to terminate Horror's copyright interests in the screenplay, that each of Miller's termination notices are therefore invalid, that Horror is entitled to continue to exclusively exploit the copyright in the screenplay throughout the entire copyright term, and that Miller's termination notices constitute a material breach and repudiation of his "[e]mployment agreement" with Manny. [Compl., Doc. No. 1.] Plaintiffs also seek an alternative declaration, in the event that any of Miller's termination notices are deemed valid, limiting the elements of the screenplay to which the termination applies to only those creative elements in the screenplay that can be identified as having been created by Miller. Plaintiffs have also brought a series of state law claims against Miller, all of which rely on the alleged illegitimacy of Miller's termination notices. [Compl., Doc. No. 1.] On November 17, 2016, Miller filed a counterclaim seeking a declaration that the screenplay was not prepared as a work for hire, and thus a determination that at least one of his three termination notices is valid. [Counterclaim, Doc. No. 37.] Cross-motions for summary judgment regarding the work for hire claims and the legitimacy and effect of Miller's termination notices followed. [Motions for Summary Judgment, Doc. Nos. 43, 45.]

## II.    Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

14

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). In the context of cross-motions for summary judgment, the same standard is applied, however, in deciding each motion, the court must construe the evidence in the light most favorable to the respective non-moving party. *See Scholastic, Inc. v. Harris*, 259 F.3d 73, 81 (2d Cir. 2001).

When a motion for summary judgment is properly supported by documentary and testimonial evidence, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

15

judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48.  To present a "genuine" issue of material fact, there must be contradictory

evidence "such that a reasonable jury could return a verdict for the non-moving party."  *Id.* at

248.

If the nonmoving party has failed to make a sufficient showing on an essential element of

his case with respect to which he has the burden of proof at trial, then summary judgment is

appropriate.  *Celotex*, 477 U.S. at 322.  In such a situation, "there can be 'no genuine issue as to

any material fact,' since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322-23; *accord*

*Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's

burden satisfied if he can point to an absence of evidence to support an essential element of

nonmoving party's claim).  In short, if there is no genuine issue of material fact, summary

judgment may enter.  *Celotex*, 477 U.S. at 323.

## III.    Discussion

This case presents complicated and interesting questions of authorship and ownership of

the copyright in the screenplay for the well-known, original *Friday the 13th* movie.  The

Copyright Act of 1976 provides that copyright ownership vests initially in the author or authors

of a copyrighted work, 17 U.S.C. § 201(a), and the initial "author" is usually considered to be

"the party who actually creates the work, that is, the person who translates an idea into a fixed,

tangible expression entitled to copyright protection", *Community for Creative Non-Violence v.*

*Reid*, 490 U.S. 730, 737 (1989) (hereinafter "*CCNV*").  In the case of a "work made for hire",

however, "the employer or other person for whom the work was prepared is considered the

author" of the work and the initial owner of the copyright therein.  17 U.S.C. § 201(b); *CCNV*,

490 U.S. at 730.[12]  All authors can transfer subsequent ownership of a copyright, or any portion

of the exclusive rights comprised in a copyright, by any means of conveyance, 17 U.S.C. §

201(d), but an author can eventually terminate the transfer of his or her copyright interests

pursuant to the procedures set out in 17 U.S.C. § 203(a), unless the copyrighted work is a work

made for hire.  Once an author has terminated a transfer of copyright interests, the interests revert

to the author, but such reversion does not prevent the continuing exploitation of any derivative

works prepared prior to the termination and properly under the authority of the transferred

interests.  17 U.S.C. § 203(b).

In both their complaint and motion for partial summary judgment, Horror and Manny

seek a declaration that Miller wrote the screenplay as a work made for hire for Manny (which

subsequently transferred its copyright interests in the screenplay to Horror), and thus that

Miller's purported termination of Horror's copyright interests in the screenplay are invalid.

Conversely, Miller seeks, in both his complaint and motion for summary judgment, a declaration

that his writing of the screenplay did not constitute a work made for hire, and thus that he is

entitled to recover the United States copyright in the screenplay.  To the extent that Miller's

work on the screenplay is held to have not been "for hire", Manny and Horror request a

determination of authorship of, and thus copyright ownership in, individual creative elements of

the screenplay.  Accordingly, following my determination that the screenplay was not a work

made for hire, I must examine whether Miller can be excluded from authorship status on any

other grounds, whether Miller was the sole author of his contributions to the screenplay, whether

Miller shared joint authorship of the screenplay, and whether any portions of the screenplay can

be carved out from Miller's termination right.

---

[12] Following the lead of the *CCNV* Court, I will "use the phrase 'work for hire' interchangeably with the more cumbersome statutory phrase 'work made for hire.'"  490 U.S. at 737 n.1 (1989).

A. <u>The Screenplay Was Not a Work Made for Hire</u>

Plainly, the best outcome for Horror and Manny would be if Miller were determined to have made his writing contributions to the screenplay while working for hire for Manny.  In such a case, Manny would be deemed the initial author of the screenplay, 17 U.S.C. § 201(b), and Miller would not possess any exercisable termination rights, 17 U.S.C. § 203.  The Copyright Act of 1976, which became effective in 1978, 17 U.S.C. App'x, one year before Miller and Manny began working on the screenplay, provides two routes according to which a writer's contributions could be considered "for hire."  A "work made for hire" is defined as:

> (1) a work prepared by an employee within the scope of his or her employment; or
>
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, *as a part of a motion picture* or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101 (emphasis added).  Thus, the framework set up by the definition in section 101 establishes "two mutually exclusive means" through which a work for hire might arise.  *CCNV*, 490 U.S. at 742-43.  So long as the hired party qualifies as an employee and not an independent contractor, section 101(1) applies to all works created by that employee acting within the scope of his or her employment.  *Id.*  Section 101(2), meanwhile, confers work-for-hire status on even those works prepared by independent contractors, but only if the work was specially commissioned for use in one of the nine types of specifically enumerated works set out in section 101(2), and only if the parties expressly agreed to the work-for-hire status in a signed writing.  *Id.* at 738.

SPA-19

1.  *The Screenplay was not specially commissioned as a work for hire pursuant to the parties' agreement in a signed written instrument*

Manny and Horror make no argument that the screenplay was specially commissioned as a work for hire pursuant to an express agreement in a signed written instrument.  Works commissioned as contributions to a motion picture are one of the categories set out in section 101(2), and indeed, "the norm for Hollywood production . . . is for all concerned to execute work for hire agreements, vesting all copyright ownership in the producer."  1 Nimmer on Copyright § 6.07 (2018); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 743 (9th Cir. 2015) ("The reality is that contracts and the work-made-for-hire doctrine govern much of the big-budget Hollywood performance and production world.").  It is only in the absence of such agreements that thorny issues of authorship arise, due to the numerous potential creative contributors to a motion picture.  *See* F. Jay Dougherty, *Not A Spike Lee Joint? Issues in the Authorship of Motion Pictures Under U.S. Copyright Law*, 49 U.C.L.A. L. Rev. 225, 269 (2001) ("In most cases these issues of authorship are avoided because in the United States, contributors to a film prepare their work as a work made for hire for the producer.  Yet there can be instances in which work-for-hire arrangements are not made or somehow fail." (citation omitted)); *see also* 1 Nimmer on Copyright § 6.05 (2018) (noting that "[a] motion picture is a joint work consisting of a number of contributions by different 'authors', including the writer of the screenplay", but that "[n]ormal practice" is for the motion picture studio to insist that all relevant parties execute agreements applying the work for hire doctrine with "the legal result, in that instance, . . . that there is only one 'author'").

Notably, the Contract executed by Manny and Miller does not contain any express agreement regarding work-for-hire status, or any other express arrangement regarding copyright.  [Ex. B, Cunningham Decl., Doc. No. 43-6.]  The WGA 1977 Theatrical and Television Basic

Agreement, the collective bargaining agreement between the WGA and signatory companies in

operation at the time, likewise contains no express agreement regarding work for hire status.[13]

[Ex. N, Haye Decl., Doc. No. 43-19,]  It is interesting to note that, although Horror and Manny

claim that Sean Cunningham used as the template for the Contract "the standard WGA short

form complete screenplay agreement issued by the WGA at the time", Cunningham Decl., Doc.

No. 43-4, at ¶ 17, the comparable screenwriter's short-form contract now in use by the WGA

does expressly designate that any writing covered by the contract is work made for hire, Writer's

Theatrical Short-Form Contract, at ¶ 24, https://www.wgaeast.org/wp-

content/uploads/typo3/user_upload/writers_theatrical_short-form_contract.pdf ("Writer

acknowledges that all results . . . of Writer's services . . . are being specially ordered by Producer

for use as part of a Motion Picture and shall be considered a 'work made for hire' for Producer

. . . in accordance with Sections 101 and 201 of . . . the U.S. Copyright Act.").  Intriguingly,

although Miller entered into the Contract with Manny in 1979, and the Copyright Act became

effective in 1978, a type-written notation in the bottom left-hand corner of each page of the

Contract ("3/77") suggests that the form Cunningham used for the Contract was last updated in

1977.  [Ex. B, Cunningham Decl., Doc. No. 43-6.]  In any event, whether or not motivated by the

failure of the Contract to expressly designate the screenplay as a work for hire, Horror and

Manny have conceded that they are not pursuing a work for hire theory under section 101(2).

[Pls.' Opp. Br., Doc. No. 47, at 11 n.7.]  The screenplay will thus be considered a work made for

---

[13] It should be noted that, although Horror and Manny argue that the Contract "incorporate[d]" the terms of the WGA's collective bargaining agreement and was "governed" by the provisions of the collective bargaining agreement [Pls.' Br., Doc. No. 43-1, at 2, 11], that is not strictly true.  The Contract did not incorporate the MBA in its entirety, and merely provided that no terms of the Contract would be *less* favorable to Miller than the terms in the MBA (and that Miller would receive screen credits pursuant to Schedule A of the MBA).  [Ex. B, Cunningham Decl., Doc. No. 43-6, at ¶ 2(c).]

hire only if Miller's contributions to the screenplay were made as Manny's "employee", within

the scope of his employment, pursuant to section 101(1).

2. *Miller did not prepare the Screenplay as Manny's employee within the scope of his employment.*

Horror and Manny argue that Miller was necessarily an employee of Manny, and not an

independent contractor, because Miller, a WGA member, was hired by Manny, a WGA

collective bargaining agreement signatory company, pursuant to a contract controlled by the

WGA's collective bargaining agreement with signatory companies.  [Pls.' Br., Doc. No. 43-1, at

26-30.]  That is, of course, not the traditional test mandated by the Supreme Court in *CCNV* for

determining whether a hired party is an employee or independent contractor according to the

definition of "work made for hire" contained in section 101(1) of the Copyright Act.  The

established *CCNV* test relies on the general common law of agency, and not labor law, and sets

out a series of non-exhaustive factors to be used in determining whether a work was prepared by

an employee agent.  *See CCNV*, 490 U.S. at 751-52.  Horror and Manny reject the applicability

of the *CCNV* factors to the present case, arguing that, because the Copyright Act's definition of

"employee" is identical to the definition used in the National Labor Relations Act ("NLRA") and

because labor law requires that Miller be considered Manny's employee, Miller must also be

considered Manny's employee for the purposes of the Copyright Act.  The multi-factor test set

out in *CCNV*, so goes their argument, is only designed to be used when an individual's

employment status is otherwise "unclear."  [Pls.' Br., Doc. No. 43-1, at 30 n.14.]  As detailed

below, because I reject Horror's and Manny's attempt to circumvent the *CCNV* analysis, and

because, under the *CCNV* analysis, there is no reasonable dispute that Miller wrote the

screenplay as an independent contractor, I hold that Miller did not prepare the screenplay as a

work for hire under section 101(1) of the Copyright Act.

a. Labor law does not provide grounds for displacing the *CCNV* analysis.

i. The *CCNV* factors are not subordinate to labor law considerations.

As a preliminary matter, there is nothing in *CCNV* to suggest that the Supreme Court intended its agency law analysis to serve the more limited purpose that Horror and Manny now propose. In other words, there is nothing to suggest that any subordination of the *CCNV* analysis to labor law considerations was intended. Quite the opposite—the *CCNV* Court repeatedly used sweeping language suggesting the general applicability of its agency law analysis. *See CCNV*, 490 U.S. at 750-51 ("To determine whether a work is for hire under the Act, a court first should ascertain, using principles of general common law of agency, whether the work was prepared by an employee or an independent contractor. After making this determination, the court can apply the appropriate subsection of § 101."); *id.* at 740 ("Nothing in the text of the work for hire provisions indicates that Congress used the words 'employee' and 'employment' to describe *anything other than* 'the conventional relation of employer and employé'. . . . On the contrary, [the text suggests] Congress' intent to incorporate the agency law definition. . . ." (emphasis added) (quoting *Kelley v. Southern Pac. Co.*, 419 U.S. 318, 323 (1974)). In fact, in holding that an individual's potential "employee" status for the purposes of the Copyright Act should be determined pursuant to agency law, the Court expressly distinguished the use of agency law under the Copyright Act from the broader definition of "employee" once used under labor law. *See id.* at 740 (describing *NLRB v. Hearst Publ'ns, Inc.*, 322 U.S. 111, 124-32 (1944), as "rejecting agency law conception of employee for purposes of the National Labor Relations Act where structure and context of statute indicated broader definition"). Although even at the time of the *CCNV* decision, the *Hearst* Court's broad interpretation of the NLRA had itself been nullified by Congressional amendment, *see Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324-25 (1992), the fact remains that in no way did the *CCNV* Court indicate an intent to

subordinate its agency law analysis to any other standard—and particularly not to any other

statutory regimes' deviations from agency law principles.

Moreover, although Horror and Manny rely on *Darden* to argue that the Copyright Act's

definition of "employee" must follow the development of labor law [Pls.' Br., Doc. No. 43-1, at

27], *Darden* only stood for a commonality of interpretation among the Copyright Act, NLRA,

and ERISA inasmuch as all three were controlled by the common law of agency.  503 U.S. at

322-25.  In fact, the core of the Supreme Court's opinion in *Darden* consisted of a rejection of

attempts by petitioners and amici to subordinate the *CCNV* agency analysis to broader definitions

of "employee":

> Darden tried to subordinate [*CCNV*] to *Rutherford Food Corp. v. McComb*
> . . . which adopted a broad reading of "employee" under the Fair Labor
> Standards Act (FLSA).  And *amicus* United States, while rejecting Darden's
> position, also relied on *Rutherford Food* for the proposition that, when
> enacting ERISA, Congress must have intended a modified common-law
> definition of "employee" that would advance, in a way not defined, the
> Act's "remedial purposes." . . .   But *Rutherford Food* supports neither
> position.  The definition of "employee" in the FLSA [used in *Rutherford
> Food*] . . . stretches the meaning of "employee" to cover some parties who
> might not qualify as such under a strict application of traditional agency law
> principles. . . . [This] precludes reliance on FLSA cases when construing
> ERISA's concept of "employee."

*Darden*, 530 U.S. at 325-26.  *Darden* is thus a shaky platform for Horror's and Manny's

argument (detailed below) that implications unique to labor law, which rely on the byzantine

machinations of the NLRA's statutory regime, require a departure from the *CCNV* analysis for

the purposes of interpreting the Copyright Act.

Finally, it is worth noting that, in justifying its generally applicable agency law analysis,

the *CCNV* Court was itself not silent on the place of contributors to a motion picture in such an

analysis.  The Court's opinion included a thorough review of the legislative history of the

Copyright Act, over the course of which the Court noted that, whereas an earlier draft bill had

only included works prepared by employees in the definition of "works made for hire",

subsequent revisions to the bill added as works for hire "works for use '. . . as a part of a motion

picture. . . . because [the interested parties] concluded that these commissioned works, *although*

*not prepared by employees and thus not covered by the first subsection*, nevertheless should be

treated as works for hire", so long as the contracting parties had expressly so agreed in writing."

490 U.S. at 746 (emphasis added) (citing S. 1006, H.R. 4347, H.R. 5680, H.R. 6835, 89th Cong.,

1st Sess., § 101 (1965); Supplementary Report of the Register of Copyrights on the General

Revision of the U.S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess., Copyright Law

Revision, pt. 6, p. 67 (H.R. Judiciary Comm. Print 1965)).[14]

     ii.  <u>Labor law does not require a holding that Miller was Manny's employee.</u>

     Even if the *CCNV* Court did leave the door open for labor law considerations to impinge

on its mandated agency-law analysis, Horror's and Manny's argument that labor law requires a

holding that Miller was Manny's employee is misplaced.  Horror's and Manny's argument is that

the NLRA provides only "employees" with the right to organize, form, join, or assist labor

organizations, and to bargain collectively, 29 U.S.C. § 157; [Pls.' Br., Doc. No. 43-1, at 27-28],

and that the definition of "employee" under the NLRA "specifically excludes 'any individual

having the status of independent contractor'", [Pls.' Br., Doc. No. 43-1, at 27 (quoting *N.L.R.B.*

*v. United Ins. Co. of Am.*, 390 U.S. 254, 255 n.1 (1968))]; 29 U.S.C. § 152(3).  Horror and

---

[14] In reviewing the arguments for adding to the definition of works for hire a category covering independent contractors, the *CCNV* Court also noted the statement of John R. Peterson of the American Bar Association, in which the speaker observed that "I don't think there is any valid philosophical or economic difference between the situation in which you have a man on a continuing basis of orders which justifies placing him on your payroll, and the situation in which you give him a particular order for a particular job."  Preliminary Draft for Revised U.S. Copyright Law and Discussions and Comments on the Draft, 88th Cong., 2d Sess., Copyright Law Revision, Part 3, p. 260 (H. Judiciary Comm. Print 1964).  In addition to the foregoing statement's articulation of one of the agency law factors for distinguishing employees from independent contractors eventually set out in *CCNV*, the latter category of a man "give[n] a particular order for a particular job" corresponds to the type of single-picture hiring relationship that existed between Miller and Manny.

Manny are presumably not arguing, however, that the simple fact of union membership

precludes any work an individual union member ever accepts from being considered work as an

independent contractor, for Supreme Court precedent clearly acknowledges that possibility.  *See*

*Am. Fed'n of Musicians of U.S. & Canada v. Carroll*, 391 U.S. 99, 105-06 (1968) (recognizing

that union member musicians could be independent contractors for the purposes of individual

commissions as orchestra leaders); *see also Home Box Office, Inc. v. Directors Guild of Am.,*

*Inc.*, 531 F. Supp. 578, 598-600 (S.D.N.Y. 1982), *aff'd*, 708 F.2d 95 (2d Cir. 1983) (holding that

union member television directors are independent contractors when engaged in certain specific

"producer-director" jobs for HBO).[15]   Horror and Manny instead attempt a more nuanced

argument—that union members are only necessarily employees when hired by union signatory

companies pursuant to a relevant collective bargaining agreement.

From that point, Horror and Manny's argument progresses on two separate tracks.  On

the first track, Horror and Manny point to the exemptions provided to union members from

antitrust regulation.  [Pls.' Br., Doc. No. 43-1, at 26-30.]  Horror and Manny argue that,

inasmuch as certain union activity is protected from antitrust regulation, *see, e.g., Connell Const.*

*Co., Inc. v. Plumbers and Steamfitters Local Union No. 100*, 421 U.S. 616, 621-22 (1975);15

U.S.C. § 17; 29 U.S.C. § 52, and inasmuch as the NLRA provides the protections of union

membership exclusively to employees and not independent contractors, 29 U.S.C. § 152, any

application of union agreements to the hiring of independent contractors would involve the

independent contractors in the concerted actions of the union without the protective shield of the

NLRA, thus subjecting the contract in question, and the broader union coordination with such

---

[15] In *Home Box Office*, even when certain union members were deemed to be employees rather than independent
contractors, the district court did not rely on the simple fact that their employment conditions were subject to union
agreements and instead engaged in the type of agency law analysis later mandated by *CCNV*.  *See* 531 F. Supp. at
593-97.

independent contractors to antitrust regulation.  Specifically, Horror and Manny point to the statutory exemption from the antitrust laws for labor organizations outlined in *United States v. Hutcheson*, 312 U.S. 219, 232 (1941), and observe that a party seeking refuge in the *Hutcheson* statutory exemption must be a "bona-fide labor organization, and not an independent contractor or entrepreneur", [Pls.' Br., Doc. No. 43-1, at 28 (quoting *H. A. Artists & Assocs., Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 717 n.20 (1981))].  Plaintiffs argue that, because the WGA is the federally-recognized labor union with jurisdiction over screenwriters, and because Miller was hired by Manny as a screenwriter under the terms of the MBA between the WGA and signatory employers, Miller's Contract with Manny, and the collective action of the WGA more generally, would be subject to antitrust enforcement if Miller's involvement with the WGA brought the WGA outside the definition of "bona-fide labor organization[s]" protected under the *Hutcheson* statutory exemption.

What Horror's and Manny's argument misses is that the protection for "bona-fide labor organization[s]" extends beyond the actions of a union that relate exclusively to members hired as employees.  The *Hutcheson* test for statutory antitrust exemption asks whether the union has acted in its self-interest and not in combination with any "non-labor group[]".  *H.A. Artists & Assocs., Inc.*, 451 U.S. at 714-15 (quoting *Hutcheson*, 312 U.S. at 232).  Where there is "job or wage competition or some other economic inter-relationship affecting legitimate union interests between the union members and the independent contractors", even independent contractors are properly considered a "labor group", and can participate in union activity and be subject to union regulation, including minimum fee scales and other terms of employment.  *Am. Fed'n of Musicians*, 391 U.S. at 105-07; *see also Home Box Office, Inc.*, 531 F. Supp. at 600 ("Despite the independent-contractor status of such producer-directors, however, they may properly be the

SPA-27

subject of the Guild's collective organizing efforts. . . . [The] independent producer-directors[]
are in job or wage competition or some other economic interrelationship affecting legitimate
union interests with the union members.").  In other words, even screenwriters hired as
independent contractors pursuant to the *CCNV* analysis can be subject to union regulation and
the minimum terms set out in the MBA, because if their hiring relationships were not so
regulated they could undermine the ability of screenwriter-union-members deemed to be
employees under *CCNV* to secure employment pursuant to the MBA's minimum terms.  *Am.
Fed'n of Musicians*, 391 U.S. at 109 ("[T]he price floors, including the minimums for leaders
[who act as independent contractors], are simply a means for coping with the job and wage
competition of the leaders to protect the wage scales of musicians who respondents concede are
employees on club-dates, namely sidemen and subleaders."); *Home Box Office, Inc.*, 531 F.
Supp. at 600 ("All producer-directors [including those acting as independent contractors] . . . are
. . . in direct competition with other Guild members for Guild-category jobs. . . . The Guild has a
legitimate interest in seeking to preserve the directorial parts of the producer-director's job for its
members working under Guild-established terms and conditions . . . [and] in preventing the
erosion of standards threatened by the existence of productions on which directors work under
substandard conditions.").  The ability of unions to represent and regulate independent
contractors applies where the independent contractors are union members who, from job to job
are sometimes hired as employees and sometimes hired as independent contractors, *see Am.
Fed'n of Musicians*, 391 U.S. at 103 (applying the statutory exemption for labor groups to union
members who "may perform in different capacities on the same day or during the same week, at
times as leader [(independent contractor)] and other times as subleader or sideman
[(employee)]"); *Home Box Office, Inc.*, 531 F. Supp. at 602-03 (applying the statutory exemption

to union regulation of "director-packager" entrepreneurs who likewise sometimes work as

director[-employees] for production companies other than their own, and holding that the union

can require the director-packagers to comply with union agreements even when acting as

independent contractors), and also applies where the independent contractors are only ever hired

as independent contractors, *Am. Fed'n of Musicians*, 391 U.S. at 108 (citing approvingly the

court of appeals' observation that "'even those orchestra leaders who, as employers in club dates,

lead but never perform as players, are proper subjects for membership because they are in job

competition with union subleaders; each time a non-union orchestra leader performs, he

displaces a 'union job' with a 'non-union job."); *see also Los Angeles Meat & Provision Drivers

Union, Local 626 v. United States*, 371 U.S. 94, 103 (1962) (noting that labor organizations often

might "have a legitimate interest in soliciting self-employed entrepreneurs as members").

On the second track, Horror and Manny argue that union members are necessarily

employees when hired pursuant to a collective bargaining agreement.  That argument is less

grounded in case law and seemingly relies instead on an appeal to common sense notions of the

many terms of art that are at issue.  Horror and Manny assert, without any citations, but bolstered

by the occasional use of italicization and/or bolding, that union membership and any engagement

to provide services pursuant to the terms of a collective bargaining agreement "***is the antithesis

of independent contractor status.***"  [Pls.' Br., Doc. No. 43-1, at 28-29 (emphases in original).]

Horror and Manny appeal to an apparently lay sensibility:

> By definition, an independent contractor is independent—he is free to
> negotiate the terms of his engagement and is not mandated by law to adhere
> to the minimum terms and conditions of any collective bargaining
> agreement; he is free to accept terms and conditions of employment that are
> *less favorable*, or which substantially vary, from the terms mandated by the
> collective bargaining agreement.  For this fundamental reason, a person
> cannot be engaged by a union signatory employer under the terms of a
> collective bargaining agreement and, at the same time, maintain that he is

> an "independent contractor" who is free to negotiate the minimum terms
> and conditions of his engagement.

[Pls.' Br., Doc. No. 43-1, at 29 (emphasis in original).]  Aside from offering scant justification

for departing from the more thoroughly supported *CCNV* analysis, the argument amounts to no

more than an unsupported bit of wordplay that is both circular and generally unconvincing.

As a preliminary matter, absent any basis in statute or precedent, the argument that the

relevant measure of an independent contractor's independence is his ability to depart from the

terms of a collective bargaining agreement seems grounded in nothing other than Horror's and

Manny's optimistic assertion that that is the case.  And while Horror and Manny claim that the

definitional hallmark of an independent contractor is the independence to depart above or below

the minimum terms and conditions of any collective bargaining agreement, the threshold

measurement of independence could just as easily be the more limited independence to depart

only above the minimum terms of a collective bargaining agreement, as the parties did here.

The novel "independent contractors are independent" standard also in no way

distinguishes independent contractors from employees, the ultimate goal of any such analysis.  A

non-unionized convenience store clerk, for example, who would otherwise pass the usual tests

for employee status, would have to be deemed an independent contractor under such an analysis,

because he is free to negotiate whatever terms of employment he can wheedle out of the

convenience store owner.  To the extent Horror's and Manny's argument is that the "independent

contractors are independent" standard for assigning employee status should only be used to

isolate the lack of independence that results from union restrictions where the hired party would

otherwise be considered an independent contractor, it is circular to suggest that the proposed

standard can provide its own justification for applying only in such circumstances.

In sum, neither of the two arguments presented by Horror and Manny convince me that

labor law requires that I conclude that Miller was Manny's employee.  Indeed, applying the

analysis mandated by *CCNV*, Miller was an independent contractor.

      b.  Under the *CCNV* agency law analysis, Miller wrote the screenplay as an
           independent contractor.

Having decided that labor law provides no authority for skirting the analysis mandated by

the Supreme Court in *CCNV* for determining a hired party's status as employee or independent

contractor under the Copyright Act, I now turn to the agency law analysis mandated by the

*CCNV* Court.  The Supreme Court set out thirteen non-exhaustive factors to be considered:

> [1] the hiring party's right to control the manner and means by which the
> product is accomplished[;] . . . [2] the skill required; [3] the source of the
> instrumentalities and tools; [4] the location of the work; [5] the duration of
> the relationship between the parties; [6] whether the hiring party has the
> right to assign additional projects to the hired party; [7] the extent of the
> hired party's discretion over when and how long to work; [8] the method of
> payment; [9] the hired party's role in hiring and paying assistants; [10]
> whether the work is part of the regular business of the hiring party; [11]
> whether the hiring party is in business; [12] the provision of employee
> benefits; and [13] the tax treatment of the hired party".

*CCNV*, 490 U.S. at 751-53 (citing Restatement (Second) of Agency § 220(2) (1958)).  Although

"[n]o one of these factors is determinative", *id.* at 752, the Second Circuit has held that the hiring

party's right to control the manner and means of creation, the skill required, the provision of

employee benefits, the tax treatment of the hired party, and whether the hiring party has the right

to assign additional projects to the hired party will usually be highly probative and should be

given more weight in the analysis.  *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992).  The

Second Circuit has also cautioned that courts should not apply the *CCNV* test "in a mechanistic

fashion" and should consider the relative importance of each factor in light of the idiosyncratic circumstances of a given case. *Id.* at 861-62.[16]

          i.   <u>The hiring party's right to control the manner and means by which the product was accomplished</u>

Although the *CCNV* Court rejected any analysis that relies exclusively on either the right to control or actual control exerted over a hired party's work, 490 U.S. at 750-51, the right to control the manner and means of creation nonetheless remains an important factor in the traditional agency law analysis, *id.* at 751; *Aymes*, 980 F.2d at 861. In analyzing this factor, however, we must be careful not to ask simply whether the hiring party directed or supervised the work, because that standard is "hard not to meet when one is a hiring party" of any stripe. *CCNV*, 490 U.S. at 750. "If inevitable, routine participation sufficed to transform the hiring party into a work-for-hire author, [*CCNV*] would be eviscerated and the law would retrogress to the 'actual supervision and control' rule" rejected in *CCNV*. *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 314 (S.D.N.Y. 2000). We must therefore instead look to the specific quality and depth of control applicable in a particular case.

In *Langman Fabrics v. Graff Californiawear, Inc.*, the Second Circuit held that the "right to control" factor weighed in favor of work for hire status for a feather design in a fabric pattern where the hiring party "controlled the artist's work to the smallest detail", including by standing over the artist during the artist's daily work at the hiring party's place of business and providing detailed instructions about "the tapering of the feathers, the size of the feathers, the overlapping,

---

[16] Prior to considering the individual *CCNV* factors, I note that, although Horror and Manny attempt to leverage the fact that the Contract refers to Miller as being "employ[ed]", the use of terms of employment in the hiring contract, like other methods of attempting to distort the agency law analysis, is of no effect. *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 87 (2d Cir. 1995) ("One of the factors that did not persuade us was the appellants' simplistic contention that usage of the words 'employ' or 'employment' in the agreements . . . establishes that the plaintiffs were employees. The use of these terms does not transform them into 'magic words' imbued with legally controlling significance.").

the spacing, the thickness, the relationship of one feather to another, and the overall view of all

the feathers".  160 F.3d 106, 111-13 (2d Cir. 1998).  On the other hand, in *Marco v. Accent Pub.*

*Co.*, a case addressing a copyright in photographs, the Third Circuit discounted the importance of

the hiring party's right to control where the party "controlled only the subject matter and

composition of the images" and "did not control most aspects of the work, which include the

choice of light sources, filters, lenses, camera, film, perspective, aperture setting, shutter speed,

and processing techniques".  969 F.2d 1547, 1551-52 (3d Cir. 1992).  The Third Circuit also

noted that the hiring party in *Marco* only sometimes physically supervised the photographer's

photo sessions and observed that the hiring party's "control of the product was thus no greater

than the control exercised by the [hiring party] in *CCNV*, who articulated the subject and

composition, who supplied models, who occasionally supervised the work, who constructed part

of the sculpture, and who was still not an employer".  *Id.* at 1552.

Courts in this Circuit have likewise emphasized in their analysis of the right to control

factor "the extent of the hiring party's control over the hired party's *daily* activities".  *Tagare v.*

*Nynex Network Sys. Co.*, 994 F. Supp. 149, 156-57 (S.D.N.Y. 1997) (emphasis in original)

(collecting cases). The district court in *Tagare* also observed that the *CCNV* Court itself

discounted a hiring party's right to control where "daily supervision" of the artist was not

possible and the hiring party only "directed enough of [the artist's] work to ensure that he

produced a sculpture that met their specifications".  *Id.* at 156 (quoting *CCNV*, 490 U.S. at 752).

Indeed, the fact that supervisors "discussed and sometimes made changes to [the hired party's]

plans does not convert [the hired party's] relationship with [the hiring party] into one of

employment, since such conduct is fully consistent with an independent contractor relationship".

*O'Dell v. Eggensperger*, 1996 U.S. Dist. LEXIS 22597, at *3-4 (S.D.N.Y. Dec. 13, 1996).  A

hiring party's instructions or required changes are least likely to weigh in favor of work for hire

status when they are "so general as to fall within the realm of unprotectible [sic] ideas". *SHL*

*Imaging*, 117 F. Supp. 2d at 314.

In the present case, Miller characterizes his working relationship with Cunningham as a

"creative collaboration and exchange of ideas" [Def.'s Br., Doc. No. 45, at 22], and the

impression of a collegial, non-hierarchical working dynamic is bolstered by Cunningham's and

Miller's status as old friends, and their casual habit of meeting at each other's homes to generate

and discuss ideas.  Taking the record facts in the light most favorable to Horror and Manny, it is

clear that Cunningham was able to exert at least some control over Miller's writing.

Cunningham provided Miller with guidance on some of the basic ideas and elements of a horror

movie, including that killings should be personal, that guns were too impersonal, and that a main

character should be killed off early.  Cunningham also "retained final authority over what went

into, or stayed out of, the Screenplay", and occasionally insisted that Miller make changes to the

screenplay despite the fact that Miller opposed such changes.

Still, few of the examples of Cunningham's control adduced by Horror and Manny rise

above the level of the sort of big picture approval authority and general suggestions that do not

weigh heavily in favor of a right to control.  Cunningham's suggestion that killings be

"personal", or that a killing occur early in the story, are unprotectable ideas, rather than

protectable expressions of such ideas, 17 U.S.C. § 102, and, to the extent Cunningham was

explaining to Miller that those elements should be included because they are horror movie

staples, then such elements were also unprotectable *scenes a faire*, *see Hoehling v. Universal*

*City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980).  Similarly, Cunningham's account that he

and Miller shared the task of coming up with the setting of a summer camp for the screenplay

neither reveals control over the details of Miller's expression, as opposed to approval of general ideas, nor evidences a clear relationship of control, as opposed to cooperation. [Cunningham Decl., Doc. No. 43-4, at ¶ 10.] Horror's and Manny's most specific example of control being exerted over Miller's work is the statement that Miller was required to include a scene where Jason comes back to life at the end of the movie, but even that example describes an instruction to include a general idea, and does not provide evidence that Miller's expression of that idea was controlled.[17] There is no evidence that Cunningham controlled the details of Miller's work, or supervised Miller's daily activities. Cunningham was only sometimes present while Miller worked, and much of Miller's writing occurred at his own home. Although Miller and Cunningham met frequently at each other's residences, Cunningham's own description of such meetings as being for the purpose of "develop[ing] scenes and discuss[ing] ideas" does not suggest close or direct control. [Cunningham Decl., Doc. No. 43-4, at ¶ 12.] In fact, Cunningham contrasts his ultimate "final authority" with the more quotidian interactions between himself and Miller where they "collaborated closely". [Cunningham Decl., Doc. No. 43-4, at ¶ 13.] The closest Cunningham comes to describing occasional detailed control over Miller's activities is his statement that he "[s]ometimes . . . stood over [Miller's] shoulder" while Miller wrote, but Cunningham does not describe any behavior that suggests that he exercised control over Miller's expression during those bouts of supervision, stating only that on those occasions he would "mak[e] suggestions and contributions". [Cunningham Supp. Decl., Doc. No. 47-1, at ¶ 12.][18]

---

[17] The fact that Miller was forced to include a scene where Jason comes back to life is even more attenuated from Manny's (i.e., Miller's putative employer's) right to control Miller's work, because Cunningham (Manny's representative) was apparently also against the inclusion of such a scene, and the scene was only included based on the insistence of Scuderi (Georgetown's representative). Georgetown cannot even be considered for a status as Miller's putative employer until May 7, 1980, long after the screenplay was completed.

[18] Cunningham also describes instructing Miller to go see the film *Halloween* during Miller's consideration of whether to assist with the screenplay project. [Cunningham Decl., Doc. No. 43-4, at 7.] That anecdote does not

In sum, although Cunningham possessed ultimate approval authority over Miller's output, that fact is consistent with a hiring party's role in both independent contractor and employment relationships.  *See* 2 Patry on Copyright § 5:54.  The simple fact that Cunningham provided direction or supervision is also not dispositive.  *See CCNV*, 490 U.S at 750.  Although the record points to frequent interaction between Cunningham and Miller, there is little in the record to suggest that such interactions frequently consisted of Cunningham exercising close control over Miller's work, and there is nothing in the record that suggests Cunningham controlled the details of Miller's creative expression or otherwise directed the performance of Miller's daily activities. Despite a lack of detailed control over Miller's expression or confining control over Miller's work habits, however, Cunningham's discussions with Miller and approval authority did broadly affect the aesthetic content of the screenplay.  Viewing the record most favorably to Cunningham, the right to control factor thus points no more than slightly towards employment status in this case, and is not dispositive.

  ii. <u>The skill required for Miller's work</u>

   Horror and Manny concede that "screenwriting is a skilled profession and that Miller is a skilled screenwriter."  Pls.' Opp. Br., Doc. No. 47, at 19-20.  Courts that have addressed cases where the hired party was a skilled professional artist have regularly found the factor to weigh in favor of independent contractor status.  *See CCNV*, 490 U.S. at 752 (sculptor); *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 86-87 (2d Cir. 1995) (same); *Marco*, 969 F.2d at 1552___ (photographer); *Ulloa v. Universal Music & Video Distribution Corp.*, 303 F. Supp. 2d 409, 415-

---

indicate close control of the screenplay's creation by Cunningham as Miller's employer.  As a preliminary matter, at the point in time when Cunningham asked Miller to see *Halloween*, they were no more than friends—no hiring relationship had been established with respect to the screenplay.  Moreover, Miller's viewing of *Halloween* bears no close connection with Miller's copyrightable expression in the screenplay.

16 (S.D.N.Y. 2004) (singer); *Johannsen v. Brown*, 797 F. Supp. 835, 841 (D. Or. 1992) (graphic artist).  Miller's work writing the screenplay for a successful motion picture required skill.  This factor weighs in favor of Miller's status as independent contractor.[19]

### iii.  The provision of employee benefits

Because the purpose of the *CCNV* analysis is to distinguish work done by independent contractors from work done by those standing in a traditional employee relationship, courts analyzing the employee benefits factor look to whether traditional employee benefits were provided.  *See, e.g.*, *CCNV*, 490 U.S. at 753 (examining contributions to unemployment insurance or workers' compensation funds); *Aymes*, 980 F.2d at 862 (looking at health, unemployment, life insurance); *Carter*, 71 F.3d at 86 (life, health, liability insurance, and paid vacations).  Manny did not provide Miller with any traditional employee benefits, and failed to even make the contributions to WGA health care or pensions plans required under the MBA that Manny and Horror so heavily rely on.

Horror and Manny seem to attempt two types of arguments to establish that employee benefits satisfying the *CCNV* analysis were provided to Miller.  First, Horror and Manny obfuscate, simply referring to payments for sequels and residuals as "benefits".  Second, Horror and Manny point to the 1987 settlement of Miller's dispute regarding unpaid sequel and residual

---

[19] Horror and Manny attempt two confusing and unsupported arguments against the skill factor bearing any weight. First, they appear to argue that because the factor cannot alone be dispositive of Miller's independent contractor status, it cannot weigh in favor of independent contractor status at all.  [Pls.' Opp. Br., Doc. No. 47, at 20.]  Horror's and Manny's first argument is not even deductively valid and thus will not be addressed further.  Second, Horror and Manny flatter Cunningham's relative skill and expertise in the horror genre, as compared to Miller.  [Pls.' Opp. Br., Doc. No. 47, at 20.]  Although courts have looked to the hiring party's *lack* of skill to suggest that the hired party was hired precisely because of their skill, *See Langman*, 160 F.3d at 113, that argument should not be confused with a suggestion that a hiring party's own skill somehow subverts the agency law analysis examination of the hired party's skill.  Miller is plainly a skilled writer, and Miller's skill weighs in favor of independent contractor status.

payments, in which the parties acknowledged that the settlement payment covered "all sums due to Miller".

As a preliminary matter, risk-bearing deferred compensation in the form of sequel or residual payments is not a traditional employee benefit. And, as noted above, even if the statement regarding "all sums due Miller" in the 1987 settlement could, in light of the record, reasonably be interpreted as referring to traditional employee benefits, the fact that such a statement was made, years after Miller's work on the screenplay, does not address whether, at the time of Miller's employment, Manny actually provided any such benefits. *Cf. Ullola,* 303 F. Supp. 2d at 415 ("[B]ecause the tax treatment of the Plaintiff largely occurred after litigation was threatened, it provides little, if any, persuasive evidence of the parties' contemporaneous belief of an employment relationship."). Because Manny did not provide any traditional employee benefits, this factor weighs heavily in favor of Miller's independent contractor status.

iv. The tax treatment of the hired party

Miller has presented evidence that Manny never withheld or deducted any taxes, social security, or other comparable payments from his compensation, and instead simply paid him the full lump sum payments owed to him under the agreement. [Ex. F, Miller Decl., Doc. No. 45-1; Miller Decl., Doc. No. 45-1, at ¶ 22.] Horror and Manny do not present any probative evidence that Miller was treated as an employee for tax purposes, and in fact have affirmatively conceded that they are unable to provide any evidence of Manny's tax treatment of Miller. [Pls.' Opp. Br., Doc. No. 47, at 34.] There is thus no dispute that Miller was not treated as a traditional employee for tax purposes, and this factor weighs in favor of Miller's independent contractor status.

v.  <u>Whether the hiring party has the right to assign additional projects to the hired party</u>

Citing as examples Cunningham's ability to require Miller to modify the screenplay to Cunningham's (or Scuderi's) satisfaction by adding a scene, and Cunningham's theoretical ability to force Miller to continue writing the screenplay to completion if Miller did not finish the screenplay on time, Horror and Manny apparently concede that Cunningham and/or Manny did not have the right to assign additional projects to Miller beyond the writing of the screenplay. Horror and Manny assert that this inability is not important, arguing that "the Court must differentiate between Cunningham's right to assign Miller additional tasks to perform in connection with the Film, as opposed to the right to assign Miller new writing assignments on a separate and different feature film."  [Pls.' Opp. Br., Doc. No. 47. at 26-27.]

Manny's inability to assign Miller additional projects unrelated to completion of the *Friday the 13th* screenplay is, however, of central importance here.  Where there is a dispute over whether a given project was created by an employee or independent contractor, examination of whether a hiring party had the right to assign additional projects is useful because an independent contractor's engagement is more likely to be "project-by-project", *Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998), with the relationship terminating upon completion of the contractually assigned project.  *See Aymes*, 980 F.2d at 863 ("[I]ndependent contractors are typically hired only for particular projects."); *see also Thibault v. Bellsouth Telecomm., Inc.*, 612 F.3d 843, 849 (5th. Cir 2010) (holding that "temporary, project-by-project, on-again-off-again relationship" points toward independent contractor status).  A traditional employee, on the other hand, will typically be hired to create not just a single artistic project, but will instead be subject to the employer's ability to assign distinct artistic projects during the term of the employee's engagement.  *See Carter*, 71 F.3d at 80, 86 (holding that artists created a sculpture in the lobby

of a building as employees where the artists were hired "to design, create and install sculpture and other permanent installations" in the building for a one-year period, building management retained right in employment agreement to require artists to "render such other related services and duties as may be assigned to [them] from time to time by the Company", and management "did, in fact, assign such other projects" beyond the lobby sculpture, requiring artists to "create art work . . . other than that in the [l]obby . . . on the sixth floor . . . , on the eighth floor, and in the boiler room.").  The powers Horror and Manny point to—Manny's ability to require Miller to modify the screenplay to Cunningham's liking, or to require Miller to continue working on the screenplay until it was completed— thus do not represent an ability to assign additional projects to Miller, and instead suggest (unsurprisingly) that Manny could require Miller to actually complete the single screenplay project to Cunningham's satisfaction.  *See Marco*, 969 F.2d at 1551 ("Although the district court considered Accent's right to require Marco to reshoot unsatisfactory images, this right was merely a right to final approval, which differs from the right to assign more work.").

Viewing the satisfactory completion of the screenplay as the project for which Miller was hired, nothing in Miller's agreement with Manny suggests an ability to assign additional projects to Miller.  In fact, the Contract is so tailored to completion of only the single screenplay that in its integration clause, where it declares itself to be "entire", the entirety of the service contemplated by the agreement is described as "all of the writing necessary to complete the final screenplay".  [Ex. B, Cunningham Decl., Doc. No. 43-6.]

Horror and Manny also seem to argue that evaluation of the right-to-assign-additional-projects factor should tip in their favor because, even if Miller was hired on a project-by-project basis, that is "not an indicia of independent contractor status, but rather is a right collectively

bargained for by Miller's labor union".  [Pls.' Opp. Br., Doc. No. 47, at 25.]  In making that

argument, Horror and Manny fail to acknowledge that the applicable collective bargaining

agreement contemplates both circumstances in which a writer would agree to work on a project-

by-project basis and circumstances in which a writer would agree to work for a fixed period of

time.  [*See, e.g.*, Ex. N, Haye Decl., Doc. No. 43-19, at 48.]  And Horror and Manny provide no

explanation why the *CCNV* analysis could not weigh in favor of independent contractor status for

WGA members hired on a project-by-project basis, while weighing in favor of employee status

for union members hired by a production company for a fixed term.  Moreover, setting aside any

possible reliance on the already rejected labor law argument that work pursuant to a collective

bargaining agreement by itself determines employee status, Horror and Manny do not explain

why the simple application of the MBA to a working condition that would ordinarily suggest

independent contractor status should preclude the traditional agency law analysis of that

condition.

    At best, Horror and Manny rely on the overlap of that argument with a more complicated

argument they articulate in rejecting application of the ordinary agency analysis to other *CCNV*

factors—that the considerations traditionally applicable to a factor are irrelevant where an

applicable agreement not only contemplated the working conditions relevant to that factor, but

also provided that such working conditions could not be used against the hiring party to establish

independent contractor status.  For example, in arguing that I should not credit Miller's ability to

work from home using his own tools, Horror and Manny point to language in the MBA that

provides that "[w]here the writer utilizes an office in his home in connection with an

employment agreement with the Company, such utilization shall be deemed at the request of and

for the convenience of the employer."  [Pls.' Opp. Br., Doc. No. 47, at 21 (quoting Ex. N, Haye

Decl., Doc. No. 43-19, at 145).]  No comparable language can be found in the MBA addressing

the limitation of Miller's engagement to the single screenplay project, however.  Moreover, as

explained below, Horror's and Manny's underlying argument is misplaced even with respect to

the factors to which pertinent MBA language actually applies.

Miller was engaged for the completion of a single screenplay project.  Manny's lack of a

right to assign additional projects to Miller weighs in favor of independent contractor status.

Analysis of the collective weight of the *CCNV* factors deemed most important by the

Second Circuit in *Aymes* strongly favors a holding that Miller was an independent contractor.

None of the foregoing *Aymes* factors points conclusively to employee status, while all but the

right-to-control factor point clearly to independent contractor status.  Although I hold that the

right-to-control factor only slightly favors employee status, and is essentially inconclusive, even

if that factor pointed more strongly towards employee status, it would not be dispositive, *CCNV*,

490 U.S. at 752, and would not be enough to overcome the weight of the remaining factors,

*Graham*, 144 F.3d at 235.  In fact, the combined weight of just Miller's tax and benefits

treatment is likely enough to result in a determination of independent contractor status.  *See*

*Aymes*, 980 F.2d at 863 ("The importance of these two factors is underscored by the fact that

every case since [*CCNV*] that has applied the test has found the hired party to be an independent

contractor where the hiring party failed to extend benefits or pay social security taxes.").  The

following brief examination of the additional *CCNV* factors not highlighted in *Aymes* also

weighs in favor of independent contractor status.

> vi.  The duration of Manny's and Miller's relationship and the method of Miller's
> payment

Where, as here, the hiring relationship is held to be project-by-project, the separate

duration-of-the-relationship factor must examine the duration of the individual contracted-for

project.  Horror's and Manny's attempted alternative framing, to examine the total period of the

parties' relationship across multiple projects [Pls.' Opp. Br., Doc. No. 47, at 22-23], would

undermine the more important preceding factor's imperative that a "temporary, project-by-

project, on-again-off-again relationship" points towards independent contractor status.  Horror's

and Manny's alternative framing could lead to absurd outcomes: for example, if a homeowner

hires a house painter once every ten years to spend a day painting the homeowner's garage door,

then what is important to the agency law analysis is that each engagement lasted only one day,

and not that, after three painting engagements, the parties will have done business for thirty

years.

Miller worked on the screenplay project for approximately two months—"a relatively

short period of time".  *CCNV*, 490 U.S. at 752-53.  Other courts have found even longer periods

of time short enough to favor independent contractor status.  *See, e.g.*, *Recht v. Metro Goldwyn*

*Mayer Studio, Inc.*, 580 F. Supp. 2d 775, 783 (W.D. Wis. 2008) (holding that three months of

work weighed in favor of independent contractor status).

Although Horror and Manny correctly note that "a lengthy duration of . . . engagement is

not a requirement to establish an employment relationship" [Pls.' Opp. Br., Doc. No. 47, at 23],

that observation does not change the fact that the duration of engagement remains a viable *CCNV*

factor, and that a short period of engagement points toward independent contractor status, while

a long period points toward employee status.

The short duration of Manny's and Miller's relationship with respect to the screenplay

suggests independent contractor status.

Miller was paid a flat fee for completion of the screenplay project, which was divided

into two lump sums based on his "completion of . . . specific job[s], a method by which

42

independent contractors are often compensated". *CCNV*, 490 U.S. at 753 (quoting *Holt v. Winpisinger*, 811 F.2d 1532, 1540 (D.C. Cir. 1987)).  His later receipt of residual and sequel payments likewise represented deferred compensation paid based on his completion of the screenplay, and not the hourly wages or regular salary that might indicate traditional employee status.  *Aymes*, 980 F.2d at 863.  The method of payment can be a "fairly important factor" when the facts point clearly one way or another.  *Id.*  Miller's compensation was based exclusively on his completion of the individual project--he was never paid based on time worked.  Accordingly, the method-of-payment factor suggests independent contractor status.

> vii. <u>The source of Miller's instrumentalities and tools, the location of Miller's work, and the extent of Miller's discretion over when and how long to work</u>

Miller supplied his own tools, did not work at the hiring party's place of business, and had discretion over when and how long to work, which are characteristics of independent contractors.  *CCNV*, 490 U.S. at 752-53.  Miller's primary work on the screenplay—the writing of the screenplay—was done using his own typewriter and paper, although he used Cunningham's photocopier and copy paper and relied on Cunningham's secretary to re-type a draft of the screenplay.  Similarly, Miller generally wrote at home and at his own pace (writing in the morning because he was a "morning person"), but he would also meet frequently with Cunningham, often at his friend Cunningham's house and the schedule for such meetings was necessarily controlled by Cunningham's availability.

Horror and Manny argue that Miller "was not at his leisure to complete the [s]creenplay on his own schedule" and that instead, Cunningham and the MBA "set the deadlines for completion of Miller's writing services and deadlines to complete specific writing tasks".  [Pls.' Opp. Br., Doc. No. 47, at 27.]  Their argument mostly misstates the nature of the relevant factor, however.  The existence of an external deadline for delivery of a completed project can hardly be

inconsistent with independent contractor status.  *CCNV*, 490 U.S. at 753 ("Apart from the deadline for completing the sculpture, Reid had absolute freedom to decide when and how long to work.").  Aside from Miller's early "assignment" to come up with a setting for the screenplay [Cunningham Supp. Decl., Doc. No. 47-1, at ¶ 6], there is no evidence of other individual assignments that could have controlled the pace of Miller's writing.  And even if I were to assume that Cunningham assigned other tasks to Miller with sufficient regularity to affect Miller's general budgeting of his time, that would not be sufficient to outweigh the importance of Miller's daily control over the times at which he worked.

Horror and Manny further propose that, to the extent Miller did supply his own tools and work from home, the ordinary agency law analysis of those factors should be subverted, because the MBA contained language stating that such activity "shall be deemed at the request of and for the convenience of the employer."  [Pls.' Opp. Br., Doc. No. 47, at 21 (quoting Ex. N, Haye Decl., Doc. No. 43-19, at 145).]  That argument is unavailing, because it would circumvent the agency-law analysis required by *CCNV*.  The Supreme Court noted that section 101(2) only extended work-for-hire status to works by independent contractors in a limited set of circumstances and cautioned that hiring parties should not be allowed to circumvent section 101(2)'s limitations and benefit from work-for-hire doctrine outside of traditional employment relationships merely by re-defining the section 101(1) analysis to cover their hiring relationship. *Id.* at 750 (rejecting an interpretation of section 101(1) reliant on a hiring party's actual control because that interpretation "leaves the door open for hiring parties, who have failed to get a full assignment of copyright rights from independent contractors falling outside the [section 101](2) guidelines, to unilaterally obtain work-made-for-hire rights [under section 101(1)] . . . as long as they directed or supervised the work, a standard that is hard not to meet when one is a hiring

44

party").  Allowing a hiring party to avoid a ruling of independent contractor status under the

*CCNV* factors by virtue of a contract declaring the relevant factors unavailing would hijack the

agency-law analysis and allow potentially all works by independent contractors to be deemed

works by employees under section 101(1), despite Congress's clear goal to limit the types of

works by independent contractors subject to work-for-hire status.  Indeed, permitting a hiring

party to obtain an agreement disclaiming the viability of certain *CCNV* factors would be no

different than permitting enforcement of an agreement simply declaring that a work is for hire

despite falling outside of the ordinary scope of sections 101(1) or 101(2)—the latter ploy having

already been rejected by the Second Circuit.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280,

291 (2d Cir. 2002) ("The parties to a grant may not agree that a work shall be deemed one made

'for hire' in order to avoid the termination provisions if a 'for hire' relationship ... does not in

fact exist between them. . . . [I]t is the relationship that in fact exists between the parties, and not

their description of that relationship, that is determinative.") (quoting 3 Nimmer on Copyright §

11.02[A][2] (2000 ed.)).  Accordingly, even though the MBA declares that a writer's working

from home shall be deemed "at the request of and for the convenience of the employer", those

magic words cannot erase the agency-law consequences of Miller's work from home, using

mainly his own tools.

Miller frequently worked from home and his primary tool was his own typewriter.  Miller

also generally controlled the hours at which he worked.  He did, however, use some of

Cunningham's tools, often met with Cunningham at Cunningham's house, and saw the pace of

his work impinged on by tasks of Cunningham's invention.  The net effect of these factors

weighs only slightly in favor of independent contractor status.

SPA-46

     viii.   <u>Miller's role in hiring and paying assistants</u>

The nature of Miller's work on the film did not lend itself to the use of assistants.  Miller

spent his time writing for the low-budget project by himself and met casually with Cunningham

to discuss ideas.  There is no indication that Miller sought to hire any assistants.  Accordingly,

this factor simply does not yield much insight into Miller's relationship with Manny, and is

accorded no weight in this case.

     ix.  <u>Manny's status as a business in the regular pursuit of filmmaking</u>

Although the question whether Manny was a business is a factor that "will always have

very little weight in this analysis", *Aymes*, 980 F.2d at 863, Manny was clearly a business, and

this factor accordingly weighs in favor of employee status.  Manny was also formed for the

purpose of filmmaking, and thus Miller's hiring was part of Manny's regular business, so this

related factor also weighs in favor of employee status.

*       *       *

Having already determined that the *CCNV* factors deemed most important in *Aymes*

weigh clearly in favor of independent contractor status, analysis of the remaining factors yields

mixed results and certainly provides no justification for reversing that assessment.  Miller

performed skilled work, received no employee benefits, was not treated as an employee for tax

purposes, and his engagement did not provide Manny the right to assign additional projects.  The

weight of those factors alone might be enough to determine Miller's status, but other factors also

bolster Miller's independent contractor status.  Miller was paid in lump sums based on his

completion of the screenplay, and worked on the screenplay for Manny for only a short period of

time.  Miller mainly used his own tools, and frequently worked from home at his own pace.

Although Cunningham did not tightly control the manner and means of Miller's work, even if he

46

did somewhat control Miller's work, that factor, together with the fact that Manny was in the business of filmmaking cannot overcome the significance and effect of the other factors.

Because Miller was an independent contractor, the screenplay cannot qualify as a work for hire under section 101(1). Nor does the screenplay qualify as a work for hire under section 101(2). Accordingly, Miller did not prepare the screenplay as a work for hire, and Miller must be considered the author of his work on the screenplay in whom initial ownership of the copyright in the screenplay vested. 17 U.S.C. § 201. As a result, unless Horror and Manny otherwise claim authorship rights in the screenplay, any rights they have to the copyright in the screenplay must originally derive via grant from Miller, which Miller has terminated pursuant to 17 U.S.C. § 203.

 B. Miller is the sole author of the screenplay

There is no dispute in this case that Miller made significant contributions to the screenplay. Horror and Manny have argued, however, that Cunningham and Scuderi both made their own contributions to the creative work [*see e.g.*, Cunningham Decl., Doc. No. 43-4, at ¶¶ 25, 28], and have asked me to determine the extent of Miller's authorship of the screenplay [Pls. Br. at 38-39]. Accordingly, I consider whether, outside of the work-for-hire analysis, Cunningham's and Scuderi's participation in the screenwriting process can otherwise qualify them either to deprive Miller of authorship status or to share authorship of the screenplay with Miller.

"[T]he author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *CCNV*, 490 U.S. at 737 (citing 17 U.S.C. § 102). In a well-known case, *Lindsay v. Wrecked and Abandoned Vessel R.M.S. Titanic*, however, the district court observed that, although ordinarily the author of a work

will be the individual who physically created and fixed the work in its original medium of expression, the actual concept of authorship is not so narrow, and more properly applies to the individual who is responsible for "the existence of those facts of originality, of intellectual production, of thought, and conception" within the work that are subject to copyright protection. 1999 WL 816163, at *4 (S.D.N.Y. October 13, 1999) (internal quotation mark omitted) (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 346-47 (1991)).  The district court in *Lindsay* held that, where an individual "exercised such a high degree of control" over a documentary film, including by "identifying specific camera angles and shooting sequences", providing "detailed instructions for positioning and utilizing the light towers", and actually "direct[ing] the filming . . . such that the final product duplicates his conceptions and visions of what the film should look like", such individual, and not the third-party who physically held the camera, may be considered the author of the work.  *Id.* at *5.  In the present case, however, although Cunningham sometimes stood over Miller's shoulder while Miller wrote and frequently discussed ideas with Miller, Miller was frequently left to his own devices to write alone.  There is thus no reasonable possibility that Miller served as no more than a conduit for Cunningham's creative expression.  There is, in fact, insufficient evidence that Cunningham's contributions to the screenplay were ever specific enough to constitute protectable expression rather than unprotectable ideas.  Cunningham's behavior therefore cannot rise to the level of detailed control seen in *Lindsay* and Cunningham is not entitled to claim exclusive authorship of the screenplay in place of Miller.

Although Miller is entitled to authorship credit for the screenplay, Horror's and Manny's claims of Cunningham's and Scuderi's contributions might be interpreted as an argument of joint authorship of the screenplay with Miller, based on their respective contributions.  The Copyright

Act defines a "joint work" as "a work prepared by two or more authors with the intention that

their contributions be merged into inseparable or interdependent parts of a unitary whole."  17

U.S.C. § 101.  In the Second Circuit, the standard for joint authorship requires the joint-

authorship proponent to establish "that each of the putative co-authors (1) made independently

copyrightable contributions to the work; and (2) fully intended to be co-authors."  *Thomson v.*

*Larson*, 147 F.3d 195, 200 (2d Cir. 1998).  Although, as pointed out above, there is insufficient

evidence of independently copyrightable contributions by Cunningham or Scuderi, even more

fatal to any claim of joint authorship by Cunningham or Scuderi is the lack of sufficient evidence

of intent among the parties to be co-authors.  The requirement of co-authorship intent is a

mutual-intent requirement.  *Id.* at 201.  All putative co-authors must "fully intend to be joint

authors".  *Id.* (internal quotation mark omitted) (quoting *Childress v. Taylor*, 945 F.2d 500, 509

(2d Cir. 1991)).  The inquiry into intent is "not strictly subjective", and requires a "nuanced

inquiry" into objective indicia of authorship intent, including decision-making authority over the

creative work, billing credit for the work, and the nature of written agreements with third parties

related to the work.  *Id.* at 201-04.

        In this case, although Cunningham did retain approval authority over the screenplay, that

is not surprising because the screenplay was a distinct work commissioned for his production

company.  The decision-making authority factor is thus not particularly helpful.[20]  The billing

factor is, on the other hand, strongly reflective of a lack of co-authorship intent.  Miller was

provided with sole credit for writing the screenplay, in all official documentation, including in

---

[20] In *Thomson*, the nature of the joint-authorship claim was reversed from the situation presented here, with the undisputed primary author of the work in that case standing as the authority figure over the party attempting a joint-authorship claim.  *Id.* at 197.  The decision-making authority factor was thus more probative in that case, because it indicated a lack of intent by the authoritative author to cede anything other than an "advisory" role to the assisting party.  *Id.* at 203, 203 n.21.  In this case, Cunningham's final approval authority cannot demonstrate that Miller, who physically wrote the screenplay, was merely an "advisor", and shows no more than that Cunningham played a role in commissioning the screenplay.

copies of the treatment and screenplay that Cunningham concedes he assembled himself. Cunningham's position of authority here likewise suggests that he was capable of challenging or modifying Miller's exclusive billing to the extent that billing was not reflective of reality. Finally, the transfer-of-rights agreement by which Manny conveyed its rights in *Friday the 13th* to Georgetown is also highly indicative of a lack of co-authorship intent. That agreement, signed by Cunningham as Manny's representative, described Miller as the only "writer" and "author" of the screenplay. [Ex. H, Cunningham Decl., Doc. No. 43-12. at 1.] The foregoing factors demonstrate a lack of intent by Miller to share joint authorship with Cunningham (and vice-versa), and also demonstrate a lack of intent to share joint authorship with Scuderi, whose participation in the screenwriting process was even less involved. Thus, neither Cunningham nor Scuderi qualify as joint authors of the screenplay with Miller.

Acknowledging that Miller is entitled to authorship credit for his writing of the screenplay and that neither Cunningham nor Scuderi are joint authors with Miller does not end the inquiry regarding Cunningham's or Scuderi's authorship rights in some portion of the screenplay. It remains at least theoretically possible that, apart from Miller's general authorship of the screenplay, Cunningham or Scuderi might retain their own individual authorship rights over their specific contributions to the screenplay. *See Thomson*, 147 F.3d at 206. Indeed, Horror and Manny request exactly that type of apportionment of authorship among the various parties. [Pls. Br. at 38-39.] The Second Circuit has not yet decided "whether a person who makes a non-*de minimis* copyrightable contribution but cannot meet the mutual intent requirement of co-authorship, retains . . . any rights and interests in his or her own contribution." *Id*. at 206. Although one district court in this Circuit, in addressing the question, proposed that, where contributions are "great enough" authorship rights in such contributions are possible,

*Kwan v. Schlein*, 2009 WL 10678967, at *5 (S.D.N.Y. Apr. 23, 2009), I need not explore the problem further in this case.  As a preliminary matter, there is insufficient evidence that Cunningham or Scuderi made independently copyrightable contributions.  No specific sections of the screenplay have been attributed to Cunningham, and as discussed above, Horror and Manny have not provided sufficient evidence of Cunningham's contribution of anything other than unprotectable ideas and scenes a faire.  Even less evidence of copyrightable contributions by Scuderi has been adduced.  Moreover, even if Horror and Manny had sustained their burden to present evidence of copyrightable authorship by either party, claims of Cunningham's and Scuderi's authorship would be barred by the Copyright Act's statute of limitations, to which I turn next.

    C.  <u>The statute of limitations does not preclude Miller's exercise of his termination rights, but does preclude Horror's and Manny's assertion of multiple authorship of the screenplay</u>

        The Copyright Act's statute of limitations provides that "[n]o civil action shall be maintained under the [Act] unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b).  A claim of copyright ownership accrues "when 'a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right'", *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) (quoting *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992)), however, even though "an alleged author is aware of his claim to ownership of the work 'from the moment of its creation', *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 317 (2d Cir. 2013) (quoting *Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996)), the alleged author "does not need to bring suit until there has been an 'express repudiation' of that claim", *Gary Friedrich*, 716 F.3d at 317 (quoting *Zuill v. Shanahan*, 80 F.3d 1366, 1370-71 (9th Cir. 1996)).  Express repudiation of authorship can occur, for example, (i) where a work is published without the alleged author receiving appropriate billing credit, (ii) where the alleged

author is presented with contractual language exclusively identifying other individuals as authors of the work, or (iii) where the alleged author learns that they are entitled to royalties they are not receiving. *See Gary Friedrich*, 716 F.3d at 317.

Early accrual of the Copyright Act's three-year limitations period can thus easily be applied to a case where a creative work is first (and persistently) published with only certain parties receiving credit as creators of the work, and then, years after the initial publication, one or more third parties affiliated with the work attempt to claim co-authorship rights along with the credited creator. *See*, *e.g.*, *Kwan*, 634 F.3d at 226-29; *Zuill*, 80 F.3d at 1367-71. Exactly that type of easy case is presented by Cunningham's and Scuderi's claims of authorship in the screenplay for *Friday the 13th*.[21] Since 1979, Miller has received sole credit as the writer of the screenplay, including on cover pages of screenplay drafts prepared by Cunningham himself, and including in public releases of the film.[22] Moreover, in 1981, Miller was likewise described as the sole writer and "author" of the screenplay in a transfer-of-rights agreement between Manny, controlled by Cunningham, and Georgetown, controlled by Scuderi. Cunningham and Scuderi were thus both thoroughly on notice from an early stage that their claims of copyrightable writing contributions to the screenplay had been repudiated. The Copyright Act's statute of limitations thus prevents them from claiming partial authorship in response to the long-acknowledged sole writer's attempt to exercise his potential termination rights. Accordingly, even if Horror and Manny had presented sufficient evidence of Cunningham's or Scuderi's joint

---

[21] Cunningham's and Scuderi's personal claims of direct authorship are, of course, distinct from Manny's claim of authorship based on its employment of Miller.

[22] The only contrary evidence adduced by Horror and Manny—the entry for the screenplay on IMDB.com, a publicly editable database, which provides Cunningham with "story by" credit, alongside Miller (and, tellingly, describes another party as an "uncredited" writer)—is not sufficient to create a material issue of fact regarding Miller's consistent receipt of credit, particularly within the limitations period. Most importantly, IMDB.com was plainly not an active website within the three-year limitations period following Miller's receipt of sole credit in 1979 (to say nothing of the generally questionable probative value of publicly editable websites).

authorship or independent authorship of copyrightable portions of the screenplay, their authorship claims would be barred by the applicable statute of limitations.

The case for application of the three-year statute of limitations to Miller's attempt to exercise his statutory termination rights, on the other hand, is not strong.  Horror and Manny have failed to present sufficient evidence of the statute of limitations' internal triggering requirement of an "express repudiation" of Miller's authorship. Horror and Manny have adduced only two sets of circumstances that could even possibly constitute repudiations of Miller's authorship:  First, Miller's receipt of a copy of the draft screenplay with a cover page on which, adjacent to wording crediting Miller as the screenwriter, Cunningham had included a copyright notice in the name of Sean S. Cunningham Films, Ltd.; second, Georgetown's recording of a copyright registration for the completed film, in which Georgetown is described as the author of the film as a work for hire, Miller is credited as the writer of the screenplay, and the screenplay is listed as original material in which the author claims copyright.[23]

The copyright notice in the name of Sean S. Cunningham Films, Ltd. cannot qualify as an express repudiation of Miller's authorship.  First, a copyright notice is not an indication of authorship, but rather, an indication of ownership—a distinct concept.  17 U.S.C. § 401; *see also* 17 U.S.C. § 201; *cf. Gaiman v. McFarlane*, 360 F.3d 644, 653 (7th Cir. 2004) ("The function of

---

[23] Horror and Manny also point to a statement by Miller in a 2003 interview that Cunningham and Scuderi "were the owners of this thing".  [Pls. Br. at 38 (citing Ex. L, Haye Decl., Doc. No. 43-17, at 21).]  Horror and Manny have actually at multiple junctures emphasized Miller's past statements in interviews, or Miller's past behavior, as indicating his colloquial understanding that Cunningham and/or Manny "owned" the film (and presumably, by extension the screenplay—although that extension is itself not legally accurate).  Those arguments are specious. There is no dispute in this case that Manny and its successors have, for the last few decades, *owned* some rights in the screenplay.  The question this case presents is whether such copyright interests vested initially in Miller, as the original author of the screenplay, with Manny obtaining from Miller either a transfer of ownership of the screenplay's copyright or a license thereto, or whether such copyright interests in the screenplay vested initially in Manny, as the original work for hire author of the screenplay prepared by Miller as Manny's employee.  In the former scenario, Miller would be able to terminate his earlier transfer of the copyright interests to Manny and its successors pursuant to 17 U.S.C. § 203.  Because both scenarios are consistent with Miller's prior acknowledgment of Manny's and related parties' ownership interests, Miller's generic statements acknowledging mere ownership interests are not sufficiently probative of any fact at issue in this case.

copyright notice is to warn off copiers, not to start the statute of limitations running." (citations

omitted)).  The copyright notice in this case is particularly incapable of evidencing an express

repudiation of Miller's authorship, because Miller, despite his possession of initial authorship

rights, did indeed transfer some rights in the copyright to Manny in tandem with his hiring, and

Cunningham's subsequent affixation of an indicia of ownership to the screenplay thus is entirely

consistent with Miller's authorship.  Also consistent with Miller's authorship is Miller's receipt

of writer's credit on the cover.  Second, even if the copyright notice could be interpreted as an

express repudiation of Miller's authorship, it would have been a repudiation of Miller's

authorship by Sean S. Cunningham Films, Ltd.—not by Manny.  Horror and Manny have not

pursued any argument that Sean S. Cunningham Films, Ltd. was Miller's employer and thus the

legitimate author of the screenplay under a work-for-hire analysis.  Express repudiation of

ownership triggers the statute of limitations for claims by a plaintiff against the same party

whose authorship claim constituted the repudiation.  *See e.g., Kwan*, 634 F.3d at 226-29;

*Merchant*, 92 F.3d at 56; *see also Mahan v. Roc Nation, LLC*, 634 F. App'x 329, 331 (2d Cir.

2016).  Horror and Manny therefore cannot hide behind Sean S. Cunningham Films' plainly

incorrect claim of ownership in order to argue that Miller is generally precluded from exercising

his authorship rights.

Georgetown's registration of a copyright for the completed film also does not qualify as

an express repudiation of Miller's authorship capable of running the pertinent statute of

limitations.  As a preliminary matter, although the registration did include an authorship claim by

Georgetown as employer for hire, the claim was again patently incorrect and untraceable to

Manny's and Horror's current claim.  Georgetown only obtained rights in the screenplay in May

of 1980, long after Miller had already completed the screenplay he had been hired by Manny to

54

deliver, and thus long after Manny would have become the original *author* under Horror's and

Manny's work-for-hire theory—a status it could not transfer to Georgetown—with Manny

presumably subsequently transferring copyright *ownership* to Georgetown.  Horror's and

Manny's claim in this case that Manny was the author of Miller's work for hire on the screenplay

is thus itself inconsistent with Georgetown's misguided authorship claim in the copyright

registration.  Georgetown's registration of itself as the author of a work for hire therefore cannot

serve as a repudiation of Miller's claim of authorship against Manny.

Moreover, even if Georgetown's claim in the registration could be related to Manny's

current authorship claim, "the mere act of registering an adverse claim in the Copyright office

[is] not an effective repudiation" of authorship rights. *Wilson v. Dynatone Publ'g Co.*, 892 F.3d

112, 119 (2d Cir. 2018).  "If mere registration of a copyright without more sufficed to trigger the

accrual of an ownership claim, then rightful owners would be forced to maintain constant vigil

over new registrations. Such a requirement would be vastly more burdensome than the

obligations that 'a reasonably diligent plaintiff' would undertake." *Id.* (quoting *Kwan*, 634 F.3d

at 228).[24]  The record at summary judgment in this case includes no evidence that Miller was

aware of Georgetown's registration or the fact that Georgetown's registration listed the

screenplay as a work for hire.

---

[24] In taking this position, the Second Circuit has sided with sister circuits that have declined to treat copyright registrations as express repudiations of authorship.  *See Brownstein v. Lindsay*, 742 F.3d 55, 72 (3d Cir. 2014) ("A challenger to a plaintiff's authorship could surreptitiously apply for copyright registration of the plaintiff's work to start the statute of limitations running and, if the plaintiff did not discover the registration until three years thereafter, the plaintiff's authorship would be nullified."); *Gaiman*, 360 F.3d at 654-55 ("In addition to the copyright notices, McFarlane registered copyright on the issues and the books. But to suppose that by doing so he provided notice to Gaiman of his exclusive claim to the characters is again untenable. Authors don't consult the records of the Copyright Office to see whether someone has asserted copyright in their works. . . . The significance of registration is that it is a prerequisite to a suit to enforce a copyright. . . . it is no more the purpose of registration to start statutes of limitations running than it is the purpose of the copyright notice itself to do so.").  Only the First Circuit, in *Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, has taken the position that a registration of copyright ownership "put the world [and thus the putative author] on constructive notice" of the countervailing authorship facts stated in the registration certificate, 119 F.3d 55, 66 (1st Cir. 1997), and in *Saenger* the author was under actual notice as well as the putative constructive notice of the copyright registration.  *See id.*

Miller is not barred by the Copyright Act's statute of limitations from asserting his termination rights as an author under section 203.  And because neither Cunningham nor Scuderi can claim joint-authorship with Miller, the valid exercise of Miller's termination rights caused the copyright in the screenplay to revert to Miller.[25]

D.   The Effect of Miller's Termination Notices

Horror and Manny have attacked the effectiveness of Miller's termination notices for failing to identify any express grant of rights sought to be terminated, failing to be properly served on current rights holders, and for failing to seek the termination of rights in the initial treatment.  None of those arguments succeed in preventing the effective termination of Horror's and Manny's rights in the screenplay.

Because Miller authored the screenplay, to the extent Horror and its predecessors engaged in an authorized use of the copyright in the screenplay, such authority must have derived, in the first instance, from Miller.  I therefore reject Horror's and Manny's argument that Miller's inability to identify any express language through which he conveyed his initial copyright precludes his termination of such conveyance pursuant to section 203.

---

[25] The record shows one and only one scene not written by Miller, per his own admission, in which a motorcycle policeman arrives at the camp and cautions some of the children to behave.  [Miller Decl., Doc. No. 45-1, at ¶ 26.]  The practical consequences of that fact are limited, however.  Cunningham and Scuderi are barred by the statute of limitations from claiming any authorship of the screenplay, which would include claims of authorship of the motorcycle policeman scene.  And even if one or both of them could claim authorship of that scene, they would not be able to claim joint-authorship of the entire screenplay, as opposed to distinct and isolated authorship of only that scene.  *See Thomson*, 147 F.3d at 206 (acknowledging, but not deciding the possibility that where elements of joint-authorship are not satisfied, a party might still claim authorship of their own contributions).  Still, it cannot strictly be said that Miller wrote the entire screenplay.  Because there is no valid claim of joint-authorship, however, Miller's lack of authorship of the one motorcycle policeman scene will not preclude Miller from terminating his copyright in those parts of the screenplay he did author.  Miller's validly exercised termination right will thus actually result in the reversion to Miller of a copyright in the entire screenplay other than the one motorcycle policeman scene.  For convenience, I will continue to refer to Miller in this decision as the sole author of the screenplay.

Horror and Manny have been unclear regarding whether they are arguing that (i) regardless of Miller's authorship of the screenplay, because Miller cannot identify an express transfer to Manny, there is nothing for Miller to terminate, leaving Manny and Horror with whatever interminable Miller-derived rights they hold in the Miller-authored screenplay, or that (ii) Miller's inability to identify express language of transfer itself demonstrates that Miller never held any rights to transfer, and thus the screenplay must be a work for hire.  [*Compare* Pls. Br. at 23 ("Because there was no grant or assignment, the termination rights under the 1976 Act cannot apply.") *and* Pls.' Opp. Br., Doc. No. 47, at 35 n.10 ("The argument that Miller's Termination Notices are invalid and ineffective because there was no 'grant' or 'transfer' made by Miller is addressed at pages 23-26 in Plaintiffs' MSJ."), *with* Pls. Reply at 1 n.2 ("Miller asserts that 'Plaintiffs [] argue that even if Miller's Screenplay is clearly not a 'work for hire' . . . Miller has no termination right because there was . . . no terminable transfer.'  Plaintiffs make no such argument.  Plaintiffs argue the absence of any grant or transfer language . . . underscores that Miller worked on the Film as an employee." (alterations in original) (citation omitted)).]  Both arguments are, in any event, without merit.

The former argument, which Horror and Manny disclaim in their reply brief, is contrary to both the language and purpose of section 203.  To the extent Miller authored the screenplay, he was the initial owner of its copyright.  17 U.S.C. § 201(a).  If Manny (and then Horror) held any rights in the copyright, they must therefore have derived from Miller. It would be absurd to suggest that, by failing to use express language in providing that right to Manny, Miller conveyed rights that are immune from the termination right, leaving Miller unable to ever reacquire control over his work.  The termination right was designed to allow authors to reclaim their copyrights regardless of the nature of any earlier contractual language.  *See Marvel*, 310

F.3d at 290-91.  And despite Horror's and Manny's implication, section 203 does not require any

express language of transfer.  In keeping with its purpose, the language of section 203 sweeps

broadly, applying the termination right to any "exclusive or non-exclusive grant of a transfer or

license of copyright".  17 U.S.C. § 203(a).  Section 203 thus leaves no method of conveyance

excepted from the author's termination right.[26]  And although "transfers" of copyright ownership

must be in writing, and perhaps more express than anything that could be perceived in the

language of Miller's Contract with Manny, 17 U.S.C. § 204, non-exclusive licenses, which are

excluded from the definition of "transfers", 17 U.S.C. § 101, but which are still subject to the

termination provisions of section 203, may be implied from conduct, *Graham*, 144 F.3d at 235; 3

Nimmer on Copyright § 10.03[A] (2018).  An implied license will arise in situations where one

party "created a work at [the other's] request and handed it over, intending that [the other] copy

and distribute it".  *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.*, 211

F.3d 21, 25 (2d Cir. 2000) (internal quotation marks omitted) (quoting *Effects Assocs., Inc. v.

Cohen*, 908 F.2d 555, 558 (9th Cir. 1990)).  In other words, the conditions necessary to create a

grant of a non-exclusive license, which is subject to section 203's termination right, are a perfect

fit with the facts of this case:  Manny requested that Miller create the screenplay, Miller wrote

the screenplay and delivered it to Manny, and Miller did so intending that Manny use the

screenplay in the *Friday the 13th* film.  *See I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir.

1996).  Thus, to the extent no more express grant of rights could be identified, the conditions of

this case satisfy the requirements of a nonexclusive implied license.  And, where a nonexclusive

---

[26] The Copyright Act defines a "transfer of copyright ownership" as "an assignment, mortgage, exclusive license, or
any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a
copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license".  17 U.S.C.
§ 101.  Although that otherwise general definition of a "transfer" of ownership carved out nonexclusive licenses,
section 203 expressly adds nonexclusive licenses back into the set of conveyances subject to the termination right.
17 U.S.C. § 203.

license stems from a hiring relationship between two parties, absent any other relevant arrangements, the hiring agreement between the parties is the natural source of the license.  *See Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 826 (9th Cir. 2001).  Thus, to the extent Horror and Manny have any rights in the copyright, which originally vested in Miller, they must have come via a transfer from Miller, or from a nonexclusive license from Miller.  In either event the circumstances of Miller's grant are covered by section 203, and Miller's Contract is the appropriate locus of such conveyance and accordingly the appropriate document for Miller to point to in terminating his grant.  Section 203 intends to allow authors to terminate all categories of grants of their copyrights, and Miller will not be precluded from doing so based on the specific wording of his Contract.  *Marvel*, 310 F.3d at 290-91.

The admonition in *Marvel* that writers cannot waive their termination right by contract applies to invalidate Horror's and Manny's second argument—that Miller's inability to identify express language of transfer itself demonstrates that Miller never held any rights to convey (and later terminate) because he was working for hire.  The foregoing discussion has already invalidated Horror's and Manny's premise, because a terminable grant can exist absent specific language of transfer, and thus a lack of specific language is not itself evidence of work-for-hire status, nor a replacement for the *CCNV* analysis.  Moreover, once the *CCNV* analysis has determined that Miller was not an employee and thus did not create a work for hire as Manny's employee, the content of any agreement between Manny and Miller cannot alter that fact.  *See id.* at 291.

Horror and Manny point out that Horror, the current grantee of the copyright in the screenplay, was not named in the First Termination Notice.  However, Miller followed up the First Termination Notice with a Second Termination Notice.  The Second Termination Notice

named Horror as a party whose rights in the screenplay were being terminated, and Horror and

Manny concede that the Second Termination Notice was served on Horror.  [Pls.' Opp. Br., Doc.

No. 47, at ¶ 35.]  Although Horror and Manny argue that the Second Termination Notice was

defective because it contained certain incorrect addresses, that error does not rise to the level of

invalidating the Second Termination Notice.  *See* 17 U.S.C. § 203(a)(4)(B); 37 C.F.R. § 201.10.

Miller's Second Termination Notice, with an effective date of July 1, 2018, validly terminated

Miller's grant of the rights to the screenplay.[27]

Horror and Manny next argue that none of Miller's first three termination notices named

the treatment for the screenplay that preceded the full drafts, and thus that even if any of Miller's

first three termination notices are valid,[28] they only terminate the copyright in the screenplay

proper, and not in the earlier treatment.  That argument fails to properly take account of the

language of Miller's termination notices, which applied his termination to "each and every prior

draft or iteration of the Work".  [Exs. H-J, Toberoff Decl.]  The Copyright Office regulations

require only that the notice of termination "reasonably identify" the grant, 37 C.F.R. §

201.10(b)(2)(v), and forgive "[h]armless errors" in the notice, 37 C.F.R. § 201.10(e)(1); *see also*

*Siegel v. Warner Bros. Entertainment Inc.*, 658 F. Supp. 2d 1036, 1093-94 (finding harmless

error in the omission from a termination notice of distinct individual comic strips, which were

nonetheless deemed included in the notice).  No party in receipt of Miller's termination notices,

which referred to all prior drafts and iterations of the work, could reasonably have believed that

Miller sought to terminate only the copyrights in the completed screenplays, and not in the

preliminary treatments.  Moreover, Horror and Manny have argued that Miller's writing of the

---

[27] In any event, the Third Termination Notice, whose proper service Horror and Manny do not dispute, had an
effective date of only two weeks later, on July 14, 2018, also prior to the date of this ruling.

[28] In reaction to Horror's and Manny's argument, Miller apparently served a fourth termination notice, specifically
identifying his treatment, on July 5, 2017.  [Def.'s Reply, Doc. No. 55, at 9 n.4.]

treatment was accounted for in the Contract, and that, although the Contract only allocated payments to Miller for two screenplay drafts, Miller was nonetheless compensated for his work on the preliminary treatments.  Having previously subsumed the treatments within the screenplay, Horror and Manny cannot now seek to avoid the pertinent consequences of that connection.  Miller's valid Second Termination Notice effectively terminated Horror's rights to any copyrightable content first fixed in the treatment along with the rights to the copyrightable content first fixed in the complete screenplay.

*          *          *

Miller's Second Termination Notice effectively reclaimed sole ownership of the copyright in the screenplay, effective July 1, 2018.  Because Miller was the sole author of the screenplay to the original *Friday the 13th* film, his reacquired copyright will extend to all copyrightable content in the screenplay (excluding the single scene involving a motorcycle police officer discussed earlier, which does not affect Miller's sole authorship of, and now, copyright ownership in, the remainder of the screenplay).  There is therefore no further need to engage in the examination requested by Horror and Manny to itemize the authorship of each individual creative element of the screenplay.  Miller, as sole author of all but one scene has reclaimed ownership in a copyright spanning all copyrightable elements in all but the excluded scene.  I also decline to analyze the extent to which Miller can claim copyright in the monstrous "Jason" figure present in sequels to the original film.  Horror may very well be able to argue that the Jason character present in later films is distinct from the Jason character briefly present in the first film, and Horror or other participants may be able to stake a claim to have added sufficient independently copyrightable material to Jason in the sequels to hold independent copyright in the adult Jason character.  That question is not properly before the court in this case, however.

Miller's termination notices apply only to the copyright in the screenplay for the first film, and did not purport to terminate a separate copyright in the adult Jason character present in later films.  Adjudication of the status of any copyright in the adult Jason character will have to await a ripe dispute with respect to that issue.

**IV.     Conclusion**

I hold that Miller did not prepare the screenplay as a work for hire and that Miller's Second Termination Notice validly terminated Horror's rights to the copyright in the screenplay to *Friday the 13th*.  Horror's and Manny's remaining state law claims all depend on Miller having written the screenplay as a work for hire, and can therefore be dismissed as a matter of law.  I therefore GRANT Miller's motion for summary judgment [Doc. Nos. 45-46], and DENY Horror's and Manny's motion for partial summary judgment [Doc. No. 43].  Miller is declared the sole owner of the copyright in the screenplay to *Friday the 13th*, effective as of the effective date of his second termination notice.  Miller's motion for consideration of extra evidence [Doc. No. 70] is DENIED as moot.  The clerk shall enter judgment and close this case.

So ordered.

Dated at Bridgeport, Connecticut, this 28th day of September 2018.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

SPA-63

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Horror Inc.
Manny Company

                    v.                                    3:16cv1442(SRU)

Victor Miller
Doe

J U D G M E N T

        This cause came on before the Honorable Stefan R. Underhill, United

States District Judge, as a result of defendant's motion for summary judgment and

plaintiff's motion for partial summary judgment.

        The Court has reviewed all the papers filed in conjunction with the motion

and on September 28, 2018 entered an order granting the defendant's motion for

summary judgment and denying plaintiff's motion for partial summary judgment.

        Therefore, it is ORDERED, ADJUDGED AND DECREED that judgment

shall entered in favor of the defendants and the matter closed.

        Dated at Bridgeport, Connecticut this 28th of September, 2018.

                                                ROBIN D. TABORA, Clerk


                                        By    /s/ Maria Corriette
                                                Maria Corriette
                                                Deputy Clerk

Entered on the Docket 09/28/2018