# 18-3123-cv

## United States Court of Appeals
### *for the*
## Second Circuit

———————————————

HORROR INC., a Massachusetts corporation, MANNY COMPANY,
a Connecticut Limited Partnership,

*Plaintiffs-Counter-Defendants-Appellants,*

— v. —

VICTOR MILLER, an individual,

*Defendant-Counter-Claimant-Appellee,*

DOES, 1 through 10, inclusive,

*Defendants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT, NEW HAVEN

## FINAL FORM BRIEF FOR PLAINTIFFS-COUNTER-DEFENDANTS-APPELLANTS

BONNIE E. ESKENAZI
JULIA R. HAYE
GREENBERG GLUSKER FIELDS CLAMAN
    & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067
(310) 553-3610

KATHLEEN M. SULLIVAN
TODD ANTEN
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiffs-Counter-Defendants-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Horror Inc. and Manny Corporation each states that it has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

# TABLE OF CONTENTS

**Page**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.......................................i

TABLE OF AUTHORITIES .................................................................v

PRELIMINARY STATEMENT ...........................................................1

JURISDICTION.................................................................................3

ISSUES PRESENTED.........................................................................3

STATEMENT OF THE CASE..............................................................4

    A.    Statutory Framework.................................................................4

    B.    The Legislative History Of Section 101................................5

    C.    The WGA Collective Bargaining Agreement ......................7

    D.    Factual Background..................................................................12

          1.    Miller's Work As A Screenwriter For Manny.........................12

          2.    The "Friday 13" Employment Contract....................................13

          3.    The Writing And Production Of *Friday The 13th* ....................15

          4.    Miller's Receipt Of Employment Benefits ..............................18

    E.    The District Court's Order ..................................................19

SUMMARY OF ARGUMENT .............................................................21

STANDARD OF REVIEW ..................................................................24

ARGUMENT .....................................................................................25

I.    THE DISTRICT COURT ERRED IN DISREGARDING THE WGA
COLLECTIVE BARGAINING AGREEMENT GOVERNING
MILLER'S EMPLOYMENT CONTRACT ................................................25

    A.    The District Court Decision Conflicts With The Text, Structure,
And History Of Section 101(1) ...........................................26

    B.    The District Court Decision Conflicts With The NLRA ...................28

    C.    The District Court Decision Has Adverse Practical Consequences....32

II.   THE DISTRICT COURT ERRED IN APPLYING THE *REID* FACTORS ...................................................................34

   A.   The District Court Should Have Considered The WGA Collective Bargaining Agreement As An Additional Factor ..............36

   B.   The *Reid* Factors Emphasized In *Aymes* Favor Employee Status.......39

      1.   Manny's Right To Control The Manner And Means Of Creation ...................................................................39

      2.   Skill Required Of Miller ...........................................43

      3.   Provision Of Employee Benefits ...............................44

      4.   Tax Treatment Of Miller.............................................46

      5.   Manny's Right To Assign Additional Tasks ..............47

   C.   The Additional *Reid* Factors Support Employee Status......................48

      1.   Duration Of The Relationship....................................48

      2.   Method Of Payment ..................................................49

      3.   Source Of Instrumentalities And Tools ....................50

      4.   Location Of The Work...............................................51

      5.   Discretion Over When And How Long To Work ...................52

      6.   The Hiring Of Assistants ..........................................53

      7.   Whether The Work Was Part Of Manny's Regular Business ..53

   D.   At A Minimum, Triable Issues Of Fact Preclude Summary Judgment Of Independent Contractor Status ......................................54

III.  THE DISTRICT COURT ERRED IN HOLDING MILLER'S TERMINATION NOTICES TIMELY UNDER THE THREE-YEAR STATUTE OF LIMITATIONS....................................................56

CONCLUSION ....................................................................59

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................................61

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## <u>Cases</u>

*Am. Fed'n of Musicians of U.S. & Canada v. Carroll*,
   391 U.S. 99 (1968) ............................................................. 31

*Aymes v. Bonelli*,
   980 F.2d 857 (2d Cir. 1992) ......................................... 36, 39, 51, 52

*Bhd. of Ry., Airline & S.S. Clerks. v. REA Exp., Inc.*,
   523 F.2d 164 (2d Cir. 1975) ..............................................31

*Brennan v. Nassau Cnty.*,
   352 F.3d 60 (2d Cir. 2003) ..............................................24

*Community for Creative Non-Violence v. Reid*,
   490 U.S. 730 (1989) ................................................ *passim*

*Corley v. United States*,
   556 U.S. 303 (2009) ....................................................26

*Eisenberg v. Advance Relocation & Storage, Inc.*,
   237 F.3d 111 (2d Cir. 2000) ......................................... 36, 40

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018) .................................................30

*Everly v. Everly*,
   352 F. Supp. 3d 834 (M.D. Tenn. 2018) ...............................57

*Fox v. Costco Wholesale Corp.*,
   918 F.3d 65 (2d Cir. 2019) .............................................24

*Friedman v. Swiss Re Am. Holding Corp.*,
   643 F. App'x 69 (2d Cir. 2016) ...................................... 56, 59

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*,
   716 F.3d 302 (2d Cir. 2013) ......................................... 55, 57

*Harper & Row Publishers, Inc. v. Nation Enters.*,
   471 U.S. 539 (1985) ....................................................27

*Home Box Office, Inc. v. Directors Guild of Am., Inc.*,
   531 F. Supp. 578 (S.D.N.Y. 1989) .....................................31

iv

*Jaffer v. Hirji*,
887 F.3d 111 (2d Cir. 2018) .............................................................24

*JustMed, Inc. v. Byce*,
600 F.3d 1118 (9th Cir. 2010) ................................................... 47, 51

*Langman Fabrics v. Graff Californiawear, Inc.*,
160 F.3d 106 (2d Cir. 1998) ................................... 24, 36, 41, 43, 49, 52, 54, 55

*Mahan v. Roc Nation, LLC*,
634 F. App'x 329 (2d Cir. 2016) .......................................................57

*Merchant v. Levy*,
92 F.3d 51 (2d Cir. 1996) ...............................................................57

*Metcalf & Eddy v. Mitchell*,
269 U.S. 514 (1926) ........................................................................39

*In re Metro-Goldwyn-Mayer Studios*,
7 N.L.R.B. 662 (1938) ............................................................... 10, 37

*Morton v. Mancari*,
417 U.S. 535 (1974) ........................................................................30

*NLRB v. United Ins. Co. of Am.*,
390 U.S. 254 (1968) ........................................................................29

*Nationwide Mut. Ins. Co. v. Darden*,
503 U.S. 318 (1992) ................................................................... 29, 30

*Salamon v. Our Lady of Victory Hosp.*,
514 F.3d 217 (2d Cir. 2008) ........................................................ 36, 37, 39

*Scorpio Music (Black Scorpio) S.A. v. Willis*,
(S.D. Cal. Mar. 4, 2013) .................................................................57

*Simpson v. City of New York*,
793 F.3d 259 (2d Cir. 2015) ........................................................ 56, 58

*Tagare v. Nynex Network Sys. Co.*,
994 F. Supp. 149 (S.D.N.Y. 1997) .....................................................41

*Tomas v. Gillespie*,
385 F. Supp. 2d 240 (S.D.N.Y. 2005) ................................................57

*United States v. Estate of Romani*,
    523 U.S. 517 (1998) ...................................................................31

*Wellman v. Writers Guild of Am. W.*,
    146 F.3d 666 (9th Cir. 1998) ..................................................29

*Williams v. Crichton*,
    84 F.3d 581 (2d Cir. 1996) .....................................................41

*Wilson v. Dynatone Publ'g Co.*,
    892 F.3d 112 (2d Cir. 2018) ...................................................59

## Statutory Authorities

17 U.S.C. § 101 ............................................................... 5, 22, 26

17 U.S.C. § 101(1)............................ 1, 2, 3, 4, 20, 22, 25, 26, 27, 28, 35

17 U.S.C. § 101(2)................................................................ 26, 28

17 U.S.C. § 107 ......................................................................27

17 U.S.C. § 201(a) ....................................................................4

17 U.S.C. § 201(b) ..................................................................4, 5

17 U.S.C. § 203 ......................................................................57

17 U.S.C. § 203(a) ........................................................ 4, 5, 19, 21

17 U.S.C. § 410(c) ...................................................................54

17 U.S.C. § 507(b) ...................................................................57

28 U.S.C. § 1291 ......................................................................3

28 U.S.C. § 1331 ......................................................................3

28 U.S.C. § 1338 ......................................................................3

28 U.S.C. § 1367(a) ...................................................................3

29 U.S.C. § 152(3) ...............................................................30, 50

29 U.S.C. § 157................................................................ 23, 29, 30, 50

## Legislative Materials

Copyright Law Revision: Hearings on H.R. 4347, 5680, 6831, 6835 before Subcomm. No. 3 of the H. Comm. on the Judiciary, 89th Cong., 1st Sess., pt. 1 (1965) .........................................................................7, 28

H.R. Rep. 94-1476 (1976).......................................................................7, 27

Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law, 87th Cong. 1st Sess. (1961).......................................6

S. Rep. 94-473 (1975) ................................................................................7

Studies Prepared for the Subcomm. on Patents, Trademarks, and Copyrights of the S. Comm. on the Judiciary, 86th Cong. 2d Sess., Study No. 13 (Apr. 1958) ......................................................................6

Supp. Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess., pt. 6 (1965) .................................................................................. 6, 27, 28

## Additional Authorities

Catherine L. Fisk, *Hollywood Writers & the Gig Economy*, 2017 U. CHI. LEGAL FORUM 177 (2018) .................................................... 8, 9, 10

Catherine L. Fisk, *The Role of Private Intellectual Property Rights in Markets for Labor and Ideas: Screen Credit and the Writers Guild of America, 1938-2000*, 32 BERKELEY J. EMP. & LAB. L. 215 (2011)..... 9, 10, 11

John L. Schwab, *Audiovisual Works and the Work for Hire Doctrine in the Internet Age*, 35 COLUM. J.L. & ARTS 141 (2011)...................................9, 11

Michael C. Harper, *Defining the Economic Relationship Appropriate for Collective Bargaining*, 39 B.C. L. REV. 329 (1998) ....................................30

Nancy Lynn Schwartz, THE HOLLYWOOD WRITERS' WARS (1982) ........................9

Restatement (Second) of Agency (1958)
    § 220(2)...................................................................................... 20, 35
    § 220(2)(i)...................................................................................38
    § 220, cmt. i .......................................................................... 38, 43
    § 220, cmt. m ..............................................................................38

Writers Guild of America, West, *Guide to the Guild* (2015) ..................................10

## PRELIMINARY STATEMENT

This case involves the question whether screenwriter Victor Miller wrote the screenplay for the iconic 1980 horror film *Friday the 13th* as an employee of the film's producer the Manny Company ("Manny"), or rather as an independent contractor. The answer to that question determines whether the screenplay is a "work made for hire" under section 101(1) of the Copyright Act, 17 U.S.C. § 101(1), in which case Miller lacks the right to terminate the rights in the screenplay now held by Manny's successor Horror Inc. ("Horror"). The U.S. District Court for the District of Connecticut (Underhill, J.) erroneously ruled, on summary judgment, that Miller wrote the screenplay as an independent contractor, not as an employee, and thus that the screenplay was not a "work made for hire." That ruling requires this Court's reversal for either or both of two reasons.

*First*, the court erred as a matter of law in ignoring the collective bargaining context that makes clear that Miller wrote the screenplay as an employee. Miller was and is a member of the Writers Guild of America ("WGA"). Manny could hire him only by complying with the strict terms of the WGA collective bargaining agreement to which Manny was a signatory. That collective bargaining agreement makes clear that a screenwriter writing a screenplay for a WGA signatory is an employee, protected by numerous employment benefits. The WGA collective bargaining structure is the product of nearly a century of efforts to ensure that screenwriters have

protected employment rights against studios and production companies. The district court's decision threatens to upend that structure, disrupting long-settled relationships in the film industry and undermining the very benefits the WGA has so successfully negotiated for its members.

*Second*, the district court misapplied the factors the Supreme Court set forth in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 750-52 (1989) ("*Reid*"), for distinguishing employees from independent contractors under section 101(1). The court erroneously gave no weight in its *Reid* analysis to Miller's union employment status as a WGA member working on WGA-covered work under a contract with a WGA-signatory employer bound by the WGA collective bargaining agreement. And the *Reid* factors in any event strongly favor Miller's employee status. At a minimum there are triable issues of fact under the *Reid* factors that preclude summary judgment for Miller and require remand.

Even if the Court does not reverse or vacate for the above reasons, it should reverse or vacate because any termination here is time-barred under the Copyright Act's three-year statute of limitations. Even if Miller acted as an independent contractor (he did not), any rights Miller held in the screenplay copyright were repudiated no later than 1980, meaning that his purported 2016 termination notices were long since untimely.

## JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338 and 1367(a).  The district court entered a ruling on the parties' cross-motions for summary judgment on September 28, 2018 ("Order"), SPA1-62, and a final judgment on September 28, 2018, SPA63.  Plaintiffs filed a timely notice of appeal on October 8, 2018.  A865-66.  This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether a screenplay written by a member of the Writers' Guild of America ("WGA"), in his capacity as a WGA-covered employee, under a WGA employment contract entered into with a WGA signatory bound by the WGA collective bargaining agreement, is a work made for hire within the scope of employment under section 101(1) of the Copyright Act, 17 U.S.C. § 101(1).

2.      Whether the screenplay here is a work made for hire within the scope of an employment relationship under *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989).

3.      Whether the repudiation of the asserted copyright in 1979 and 1980 renders the putative termination notices served in 2016 untimely under the Copyright Act's three-year statute of limitations.

## STATEMENT OF THE CASE

The iconic 1980 horror movie *Friday the 13th* was envisioned, developed, produced, cast, and directed by Sean Cunningham through his WGA-signatory production company, Manny. As one of the first steps in putting his creative vision on the screen, Cunningham (through Manny) hired Miller, a WGA member, to develop an initial screenplay whose drafting Cunningham closely supervised. Manny and Miller entered into a form WGA employment contract that expressly incorporated employment benefits guaranteed to WGA members by WGA signatory companies (*e.g.*, minimum guaranteed salary, health benefits, and residual and sequel payments), and Miller collected these benefits for nearly 40 years.

Nonetheless, the district court ruled on summary judgment that Miller authored the screenplay as an independent contractor—not as an employee whose work was made for hire for Manny—and thus that Miller was an author who could terminate a grant of a transfer or license of the screenplay's copyright under section 203(a) of the Copyright Act, 17 U.S.C. § 203(a). For the reasons set forth in this appeal, that ruling conflicts with the "works made for hire" provisions of the Copyright Act, 17 U.S.C. §§ 101(1), 201(b), and therefore requires reversal or vacatur.

### A. Statutory Framework

The Copyright Act of 1976 provides that copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). Authorship confers a number

of rights under the Act, including the right to terminate the author's grant of a transfer or license of rights under that copyright. 17 U.S.C. § 203(a).

Where a work is "made for hire, the employer or other person for whom the work was prepared is considered the author … unless the parties have expressly agreed otherwise in a written instrument signed by them." 17 U.S.C. § 201(b). A work "made for hire" is defined in section 101 as either:

> (1) a work prepared by an employee within the scope of his or her employment; or
>
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. …

17 U.S.C. § 101.

## B. The Legislative History Of Section 101

Current section 101 of the 1976 Copyright Act developed out of a long process of legislative study and revision that began in 1955. *See generally Reid*, 490 U.S. at 743-48. Under the 1909 Copyright Act, an employer was deemed the author of a "work made for hire," but that term was not statutorily defined. *Id*. at 743-44. The term was judicially interpreted, however, as applying "only to works made by salaried

employees in the regular course of their employment."[1]  Following a Copyright Office study, the Register of Copyrights recommended to Congress that "works made for hire" be statutorily defined as "works created by an employee within the regular scope of his employment."[2]  The Register then issued a Supplementary Report recommending that the definition of a "work made for hire" be expanded to include a "work prepared by an employee within the scope of his employment" *or* a work "specially ordered or commissioned" if "the parties expressly agree in writing that [it] shall be considered a work made for hire."[3]

This approach contrasted with that of the patent law system, in which an employee presumptively owned rights to an invention created in the course of employment and the employer merely had a "shop right," or an implied right to use the work without payment.  In recommending revision to the Copyright Act, the Copyright Register specifically *rejected* the argument advanced by "[s]creenwriters

---

[1]  Studies Prepared for the Subcomm. on Patents, Trademarks, and Copyrights of the S. Comm. on the Judiciary, 86th Cong. 2d Sess., Study No. 13 at 130 (Apr. 1958), *available at* https://www.copyright.gov/history/studies/study13.pdf.

[2]  Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law, 87th Cong. 1st Sess. at 86-87 (1961), *available at* https://www.copyright.gov/history/1961_registers_report.pdf.

[3]  Supp. Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess., pt. 6 at xx-xxi, 66-67 (1965) ("Supp. Report"), a*vailable at* https://ipmall.law.unh.edu/sites/default/files/hosted_resources/lipa/copyrights/Supplementary%20Register%27s%20Report%20on%20the%20General%20Revision%20of.pdf.

and composers for motion pictures" that Congress should adopt the "shop right" doctrine from patent law. *See* H.R. Rep. 94-1476 at 121 (1976); S. Rep. 94-473 at 104-05 (1975). For example, the Composers & Lyricists Guild of America urged Congress to provide that employees would retain authorship of their works, with an employer having only the right to use the works "in its regular business" or "for the specific purpose" for which it was commissioned.[4] Evelyn Burkey, Executive Director of the WGA, echoed this concern, arguing that the "shop right" approach was needed to encourage screenwriters to write for broadcasting and motion picture studios.[5] In explaining why Congress nonetheless rejected the "shop right" proposal, a House report noted that "[t]he presumption that initial ownership rights vest in the employer for hire is well established in American copyright law, and to exchange that for the uncertainties of the shop right doctrine would … be of *dubious value to employers and employees alike*." H.R. Rep. 94-1476 at 121 (emphasis added).

## C. The WGA Collective Bargaining Agreement

It is undisputed that, at the time Manny employed Miller to write the screenplay, Miller was a member of the WGA, and Manny was a signatory to the

---

[4] Copyright Law Revision: Hearings on H.R. 4347, 5680, 6831, 6835 before Subcomm. No. 3 of the H. Comm. on the Judiciary, 89th Cong., 1st Sess., pt. 1 at 271-72 (1965) ("1965 Hearings"), *available at* https://catalog.hathitrust.org/Record/001162243.

[5] *Id.* at 310-11.

then-extant collective bargaining agreement that the WGA had negotiated with a host of studios and film producers: namely, the 1977 WGA Theatrical and Television Basic Agreement ("MBA"). A287-399. The MBA is a comprehensive, 218-page document requiring signatories like Manny to hire WGA members to write screenplays on specified terms and under specified guaranteed employment benefits and protections. *Id.* Such collective bargaining agreements guarantee screenwriters numerous employment benefits they could not have obtained independently before they were unionized.[6]

Prior to the rise of the WGA, studios hired screenwriters on short-term contracts, requiring them to perform services "whenever and wherever" the studios requested and to "promptly and faithfully comply with all requirements, directions, requests, [and] rules" of the studio. Catherine L. Fisk, *Hollywood Writers & the Gig Economy*, 2017 U. Chi. Legal Forum 177, 182 (2018) ("*Hollywood Writers*"). Screenwriters often worked long hours and weekends, "in offices on the back lots just like any other employee, churning out stories, screenplays and treatments, adapting

---

[6]    While many theatrical motion pictures are unionized, not all workers on those motion pictures are protected by collective bargaining. For example, while most screenwriters, directors, and actors are unionized through the WGA, the Directors Guild of America, and Screen Actors Guild-American Federation of Television and Radio Artists, respectively, visual effects artists are not protected by a collective bargaining agreement for their work on films. *See* https://www.iatse.net/organize/union-vfx.

stories and novels, and polishing plots, characters, settings, and dialogue." Catherine L. Fisk, *The Role of Private Intellectual Property Rights in Markets for Labor and Ideas: Screen Credit and the Writers Guild of America, 1938-2000*, 32 BERKELEY J. EMP. & LAB. L. 215, 223 (2011) ("*Screen Credit*"). Studios had the power to lay off screenwriters without pay or to unilaterally renew the writer's contract without the writer's consent. Fisk, *Hollywood Writers*, *supra*, at 182. And screenwriters lacked basic medical and financial protections in the form of employer health and pension plans. *See* John L. Schwab, *Audiovisual Works and the Work for Hire Doctrine in the Internet Age*, 35 COLUM. J.L. & ARTS 141, 148-49 (2011) ("*Audiovisual Works*"). Screenwriters also lacked any ability to control screen credit, which "made it hard for the writer to get hired by another studio or to get a pay raise." Fisk, *Screen Credit*, *supra*, at 225; *see also* Nancy Lynn Schwartz, THE HOLLYWOOD WRITERS' WARS 24 (1982) (noting that "[t]he wage scale for writers was based on credits").

Inadequate compensation, lack of screen credit, one-sided renewal options for studios, and the fear of being laid off without notice drove screenwriters to embrace the legal status of "employee" and unionize. Fisk, *Screen Credit*, *supra*, at 225-26; *see also* Fisk, *Hollywood Writers*, *supra*, at 182-83. Because writers understood that studios were not going to allow them to "veto changes" to a script or "own their scripts," collective bargaining was seen as the only means "to reclaim some modest degree of creative power and respect." Fisk, *Hollywood Writers*, *supra*, at 184. To

that end, in 1933, a group of screenwriters formed the Screen Writers Guild, which later changed its name to the Writers Guild of America, to ensure that writers obtained improved contract terms and increased compensation. *See* Fisk, *Screen Credit*, *supra*, at 226.[7]

The studios initially resisted writers' efforts to claim they were "employees" and therefore "eligible to unionize." Fisk, *Hollywood Writers*, *supra*, at 184-85. In the seminal case *In re Metro-Goldwyn-Mayer Studios*, 7 N.L.R.B. 662 (1938), the studios argued that writers were well-paid artists, not employees, because they earned higher incomes and "were not required 'to observe regular office hours or to maintain office discipline.'" Fisk, *Hollywood Writers*, at 185 (quoting *Metro-Goldwyn-Mayer*, 7 N.L.R.B. at 687). But the NLRB rejected that argument, agreeing with the writers that they were "employees" within the meaning of the National Labor Relations Act ("NLRA") because producers, among other things, had the power to dictate the content of writers' work and stipulate where they were to write. *Metro-Goldwyn-Mayer*, 7 N.L.R.B. at 688.

---

[7]  *See also* Writers Guild of America, West, *Guide to the Guild* 14-15 (2015), *available at* https://www.wga.org/uploadedFiles/who_we_are/fyi15.pdf. The WGA consists of two separate labor unions: the Writer's Guild of America, East, Inc. and the Writer's Guild of America, West, Inc. Because both are bound by the same collective bargaining agreement, this brief refers to both as the "WGA."

As a result of the WGA's collective bargaining efforts pursuant to the NLRA, the WGA "negotiate[d] and enforce[d] minimum compensation and other protections for writers on an industry-wide basis," gave writers a say in determining screen credit, and created a system of revenue-sharing through "residuals" that became essential to sustaining writers in periods of unpredictable employment. Fisk, *Screen Credit, supra*, at 219. In exchange for the benefits of that union membership, "screenwriters expressly acknowledged that they were not independent creative entities: they were studio employees whose terms of employment were subject to the collective bargaining agreement reached by their representatives." Schwab, *Audiovisual Works, supra*, at 148.

Under the MBA, signatories like Manny were required to provide WGA members like Miller, certain benefits such as:

- Minimum salary requirements, A310-11 (Art. 13.A.1);

- Payments of residuals, A373-81 (Art. 51.3);

- Payments for sequels, A351 (Art. 16.A.5);

- Maximum time periods of employment for a film, A311 (Art. 13.A.4);

- Detailed rules for screen credits, A304, 390-96 (Art. 8 & Theatrical Sched. A);

- WGA arbitration in case of disputes over credit A309 (Art. 11.E);

- Payment of location expenses, A365 (Art. 21);

- The right to watch a preliminary cut or preview, A371 (Art. 47);

- The right to consult on translations, A371-72 (Art. 48);

- The right to WGA representation to enforce compliance with WGA rules A305 (Art. 11.A.1);

- Pension benefits under the Producers' and WGA's joint Pension Plan, which is governed by ERISA, and to which the employer contributes a percentage of the writer's compensation, A359-61 (Art. 17.A); and

- Health and welfare benefits under the Producers' and WGA's joint Health and Welfare Fund, also governed by ERISA, and to which the employer contributes a percentage of the writer's compensation, A361-62 (Art. 17.B).

### D. Factual Background

#### 1. Miller's Work As A Screenwriter For Manny

Cunningham, the principal of Sean S. Cunningham Films, Ltd. ("SSCF"), is a producer, director and writer of feature films. A127-30; A88 (¶2). Miller, a screenwriter, has been a member of the WGA since 1974. A67 (¶2); A785 (¶2); A404. Miller and Cunningham worked together in the 1970s on a series of motion picture projects. A170-71; A88 (¶3). For example, Miller wrote the screenplay for Cunningham's film *Here Come the Tigers*, a non-union project, under a pseudonym because he knew he was not permitted to accept such employment as a WGA member under the WGA's rules. A68 (¶¶7-8); A786 (¶¶7-8); A172-73; A133 (¶9). When Miller worked with Cunningham on his next film, *Manny's Orphans*, Miller insisted that Cunningham's production company, Manny, first become a signatory to the MBA so that Miller could take advantage of the minimum employment terms and many

12

benefits the MBA conferred upon WGA members. A183, 185; A98; A88-89 (¶¶4-5); A69 (¶11); A786 (¶11); *see also* A287-399.

In early 1979, Cunningham decided to make a horror film, and contacted Miller, who had no experience with horror films, to see if he would be interested in potential employment as the writer. A193-94; A89-90 (¶¶6-7); A267-68; A787. Cunningham tutored Miller on successful elements of horror films. A195-96, 227-28; A90 (¶8); A636-37 (¶¶5, 8); A267-68. Cunningham and Miller had intensive discussions of the ideas for the film, A210-14; A90 (¶9), meeting several times a week, including at each other's houses and in Cunningham's home office, A214-15; A90 (¶10), A637 (¶¶6, 8). After Cunningham rejected over 50 settings, Miller suggested the setting of a summer camp and Cunningham approved. A210-16; A268; A90 (¶10); A637 (¶6). Cunningham had also begun talking to potential investors for the film, including Phil Scuderi, principal of Georgetown Productions, Inc. ("Georgetown"). A91 (¶12). Cunningham and Miller orally agreed that Miller would write the screenplay for Cunningham's horror project, and that the film, like *Manny's Orphans*, would be made as a union film under WGA terms. A90 (¶9); A209.

## 2. The "Friday 13" Employment Contract

Cunningham and Miller reduced their oral agreement to writing in an employment contract, executed no later than June 4, 1979. A99-100; A405, The agreement, made on the then-extant WGA standard form, A92 (¶17), provided that

13

Manny "employ[ed]" Miller to "write a complete and finished screenplay for a proposed motion picture … presently entitled or designated *Friday 13*" and affirmed that Miller is a member of the WGA, that Manny is a signatory to the MBA, and that MBA benefit terms prevail over any less advantageous terms in the contract:

EMPLOYMENT AGREEMENT between The Manny Company

(hereinafter sometimes referred to as "Company") and Victor Miller

_____ (hereinafter sometimes referred to as 'Writer'),

dated this _____ day of _____ , 19 ___ .

     1.  The Company employs the Writer to write a complete and finished screenplay for a proposed motion picture to be budgeted at $under $1 million , and presently entitled or designated Friday 13 and including the following:

         ( ) Treatment        (x) First draft screenplay
         ( ) Original Treatment  (x) Final draft screenplay
         ( ) Story           ( ) Rewrite of screenplay

based upon (describe form of material & title) _____

_____

written by _____ .

     2. (a) The Writer represents that (s)he is a member in good standing of the Writers Guild of America, (West or East), Inc., and warrants that (s)he will maintain his/her membership in the Writers Guild of America, (West or East), Inc., in good standing during the term of this employment.

     (b) The Company warrants it is a party to the WGA 1977 Theatrical and Television Basic Agreement (which agreement is herein designated MBA).

     (c) Should any of the terms hereof be less advantageous to the Writer than the minimums provided in said MBA, then the terms of the MBA shall supersede such terms hereof; and in the event this Agreement shall fail to provide for the Writer the benefits which are provided by the MBA, then such benefits for the Writer provided by the terms of the MBA are deemed incorporated herein. Without limiting the generality of the foregoing, it is agreed that screen credits for authorship shall be determined pursuant to the provisions of Schedule A of the MBA in accordance with its terms at the time of such determination.

14

A99.

Miller specifically insisted that the employment agreement be governed by the MBA so that he would receive its minimum terms and employee benefits. A91 (¶15); A637 (¶7); A168, 199-202. Miller's contractual compensation in fact satisfied the minimum guarantees under the MBA. *Compare, e.g.*, A100 *with* A310; *see also* A198. And Miller sent a copy of the employment contract to the WGA so that it would be put "on file" so as to protect his rights to receive payments and benefits under the MBA. A197; A405.

### 3. The Writing And Production Of *Friday The 13th*

In June 1979, Cunningham and Miller began developing the screenplay for the proposed horror film. Cunningham came up with film elements, plots, scenes and characters, discussed those ideas with Miller at various venues (their respective houses, Cunningham's home office, or a local diner), and Miller submitted drafts to Cunningham, which Cunningham edited. A89, 92-93 (¶¶6, 20); A174-81, 186-90. At Cunningham's direction, Miller prepared a 15-page treatment drawn from Cunningham and Miller's meetings and based on the agreed-upon setting, scenes, arcs, plots, characters and Cunningham's horror tutorials and guidance. A92-93 (¶20); A637 (¶8); A193-96, 214, 218-19; A425-39. The treatment was titled *The Long Night at Camp Blood* because Cunningham was not yet sure if the title he created, *Friday the 13th*, was clear to use. A90-94 (¶¶11, 19-20, 23); A637 (¶8); A425. Miller did not

include his name or a copyright notice on the treatment nor did he register it with the Copyright Office. A92-93 (¶20); A637 (¶9); A425; A222. In Miller's treatment, Camp Crystal Lake was closed for years after an ordinary boy, Jason, drowned while being supervised by an inattentive counselor; when it reopens, counselors are killed off one by one and the killer is revealed as Jason's mother. *See generally* A425-39.

Cunningham was unsatisfied with the draft treatment and revised and restructured it into a second draft treatment without Miller's input or permission. A93 (¶22); A638 (¶10); A220-21, 256-58; A101-19. Cunningham unilaterally changed the title page on that second draft treatment, which included Cunningham's chosen title *Friday 13* and the "©" designation, attributed to SSCF, the general partner of Manny. A101; A93 (¶22); A638 (¶¶10-11); A256-58. Cunningham gave a copy to Miller, who never complained about the title change or the copyright notice in SSCF's name. A93 (¶22); A638 (¶11).

Cunningham continued to closely direct, supervise and control Miller in creating scenes, plots, characters and storylines as they met on a near-daily basis to revise the screenplay, meeting at each other's houses or in Cunningham's office. *See, e.g.*, A94 (¶25); A638 (¶¶12-13); A214-15, 223-27; A271-72. Cunningham's own revisions in the second draft treatment remained in the first draft screenplay. A440-508.

Miller used Cunningham's copy machine, paper, office facilities, and assistant to prepare the screenplay. A94 (¶26); A229-30; A509-600. Miller was required to complete tasks and drafts by Cunningham's set deadlines. A639 (¶16). The cover of the second draft screenplay was titled *Friday 13* and again had a "©" designation attributed to SSCF, A509, without any complaint from Miller, A94 (¶26); A230, 233.

Cunningham accepted an offer from Scuderi to finance the entire $500,000 film budget if Georgetown had complete control. Pre-production on *Friday the 13th* began in mid-August 1979, with Scuderi providing extensive new edits, A94-95 (¶¶27-28), including the ultimate film's closing scene, where Jason is a disfigured child who comes back to life, emerges from the depths of a lake, and pulls a character into the water. A95 (¶29); A75 (¶55); A792 (¶55); A234-35. Miller opposed the idea of Jason coming back to life because in his treatment, Jason was dead, which was the impetus for Jason's mother killing the counselors. A95 (¶29). Scuderi nonetheless insisted on its inclusion. The film was released in May 1980 and was an immediate hit, A96 (¶31), spawning many sequels. The well-known character of adult Jason in a hockey mask who kills indiscriminately did not first appear until *Friday the 13th, Part III*, long after Miller's involvement ended. A95 (¶29).

Manny transferred to Georgetown all "right, title and interest" in the film, including Manny's copyright in the screenplay. A95 (¶30); A120-26; A84 (¶3). The transfer agreement states that Miller wrote the screenplay "as author *for Assignor*," *i.e.*

17

Manny, and that Georgetown may copyright the screenplay in its own name. A120-21 (emphasis added). Georgetown registered the film, including the screenplay, with the U.S. Copyright Office. A400-01. The Registration lists Georgetown as the author, and the film as a "work made for hire." A401. Plaintiff Horror, the successor-in-interest to Georgetown, later acquired from Georgetown and other entities its rights, title and interest to the *Friday the 13th* franchise and original film—including the screenplay. A84 (¶¶2,4).

### 4. Miller's Receipt Of Employment Benefits

For nearly 40 years, Miller has received significant benefits under the terms of the employment contract and the MBA from his employment on *Friday the 13th*. Those benefits include residuals, sequel payments, and pension, health and welfare benefits paid by the pertinent WGA ERISA plans. A250-52; A96 (¶32); A84-85 (¶5); A282-83.

In August 1980, for example, the WGA (on Miller's request and behalf) legally pursued Manny for sequel and residual payments owed to Miller under the MBA's requirements. A96 (¶32); A84-85 (¶5); A236-44. In 1989, Miller received a payment to settle the dispute for "all sums due Miller," A410 (¶¶4-5), and all agreed no further sums were owed, A245-52; A96 (¶32); A84-85 (¶5); A282-83; A406-08. In addition, Miller has received about $220,000 in sequel and residual payments for the film, as required under the MBA. A647-48 (¶28). Thus, for nearly 40 years, Miller has

18

received payment of all sums and benefits as provided under the employment contract and the MBA.[8]

## E.    The District Court's Order

In 2016, Miller served notices of termination purporting to terminate Miller's grant of rights to Manny of the copyright in the screenplay pursuant to 17 U.S.C. § 203(a).  A618-24, 631-34.[9]  Horror and Manny filed this action against Miller, seeking a declaration that Miller wrote the screenplay as a work made for hire pursuant to his employment contract with Manny, that Horror is the exclusive owner of the copyright for the screenplay, and that Miller's purported termination notices are invalid.  *See* A13-28.  Miller asserted a counterclaim for declaratory judgment that the screenplay was not a work for hire and that his termination notices were valid and enforceable.  A53-61.  After discovery, the parties cross-moved for summary judgment.

The district court granted summary judgment for Miller and denied Plaintiffs' motion for partial summary judgment.  SPA1-62.  The district court ruled that, as a

---

[8]    There is no record of Miller ever filing a grievance that Manny did not make its required contribution to the WGA-affiliated ERISA plans as required under the MBA. A304-05, 359-61 (Arts. 10, 17.A.1, B.1); A648-49 (¶¶29-31); A252.

[9]    Miller failed to include Horror in his first notice, and listed the wrong address for Horror in the second.  A618-24; A649-50 (¶¶33-38).

matter of law, Miller "did not prepare the screenplay as a work for hire under section 101(1) of the Copyright Act."  SPA21.

*First*, the court deemed irrelevant (SPA21-30) the fact that the employment contract here was entered into under the WGA collective bargaining agreement.  The court found it not dispositive that "Miller, a WGA member, was hired by Manny, a WGA collective bargaining agreement signatory company, pursuant to a contract controlled by the WGA's collective bargaining agreement with signatory companies."  SPA21.  The court instead ruled that the factors set forth in *Reid* provide the governing test for determining "employee" status under section 101(1), and deemed those factors "not subordinate" to "labor law considerations."  SPA22-24.  Even if the WGA may protect only "employees" as a matter of labor law, the court reasoned, "even screenwriters hired as independent contractors pursuant to the [*Reid*] analysis can be subject to union regulation and the minimum terms set out in the MBA."  SPA27.  The court also rejected the argument that Miller, as a WGA member, was necessarily an employee when he was hired to work as a WGA screenwriter on a WGA-covered film expressly under the terms of the MBA.  SPA28-29.

*Second*, the district court held (SPA30-47) that Miller wrote the screenplay as an independent contractor under the 13 factors listed in *Reid*, *see* SPA30 (quoting *Reid*, 490 U.S. at 751-53) (citing Restatement (Second) of Agency § 220(2) (1958) ("Restatement")).  The court held that factor one (Manny's right to control the work)

"slightly" favored employment status (SPA31-35), while factors two (skill required), six (right to assign additional projects), twelve (employee benefits) and thirteen (tax treatment) favored independent contractor status (SPA35-41). The court then provided "brief examination" of the remaining *Reid* factors, concluding that they "weigh[] in favor of independent contractor status." SPA41-47. The court did not give any weight to Miller's WGA membership, Manny's status as a WGA signatory company, or the fact that the Miller-Manny employment contract was controlled by the WGA collective bargaining agreement, the MBA.

The district court further concluded that Miller's exercise of purported termination rights under section 203(a) was not barred by the Copyright Act's three-year statute of limitations. Specifically, it held that the cover pages identifying SSCF and not Miller as the copyright claimant, the copyright registration identifying Georgetown as the author of a work made for hire, and Miller's admissions that he was not the owner, did not indicate repudiation of Miller's purported ownership rights sufficiently to trigger the limitations period. SPA53-56.

## SUMMARY OF ARGUMENT

The copyright to the *Friday the 13th* screenplay belonged to Manny at the time of creation (and now belongs to its successor-in-interest Horror) because the screenplay is a work made for hire: Miller wrote the screenplay as Manny's employee in the scope of his employment, and not as an independent contractor. This Court

therefore should reverse the district court's grant of summary judgment to Miller, for either or both of two reasons.

I.      The definition of "employee" in section 101(1)—which says that a work is made for hire when created by an employee in the scope of employment—is determined by common law agency principles.   Under those principles, WGA screenwriters who write for WGA signatories bound by a WGA collective bargaining agreement are employees and not independent contractors.  Because Miller (a WGA member) wrote the screenplay for Manny (a WGA signatory), on a WGA film in his capacity as a WGA-covered writer, pursuant to the agreed-upon terms of the WGA collective bargaining agreement, he necessarily wrote it as an "employee."

The text, structure and legislative history of section 101 of the Copyright Act confirm as much.  In crafting the language of the "work made for hire" provision in connection with the 1976 Act's amendments, Congress explicitly *rejected* the position urged by the WGA and other guilds that WGA members should be presumed to work as independent contractors who retain ownership of works they have been hired to create.  Instead, as the Copyright Register concluded, works created pursuant to the terms of a collective bargaining agreement are works *"prepared by an employee within the scope of his employment."*  The district court erred in ignoring this history and enforcing the exact result Congress rejected.

The district court's decision also manufactures a needless conflict between the Copyright Act and the NLRA, which applies the *same* definition of "employee" as the Copyright Act, and states that only "employees" can belong to a union and enjoy the benefits of collective bargaining, 29 U.S.C. § 157, as Miller did here.

Finally, the district court's decision upends long-settled customs and practices in the film industry, turning screenwriters long protected as employees by the WGA and its collective bargaining power into independent contractors. Unless reversed, the decision threatens to create a cloud of uncertainty over a host of other WGA-covered projects.

II.    Even if the Court applies the factors employed in *Reid*, it still should reverse because, properly interpreted, those factors require a finding that Miller wrote the screenplay as Manny's employee rather than as an independent contractor. Most critically, Manny exerted extensive, near-daily control over Miller's writing, providing detailed technical input and rendering all ultimate decisions. In addition, *Reid* factors that might in other contexts suggest the typical "freedom" of an independent contractor (such as location and hours of work, or length of the project) here instead are evidence of an employee relationship because they reflect bargained-for rights specifically required by the WGA collective bargaining agreement in the context of a carefully negotiated employment relationship. At a minimum, disputed factual issues preclude summary judgment in Miller's favor.

III.    Separately, the district court erred when it ruled, as a matter of law, that Miller's termination notices could not be barred by the statute of limitations.  Miller's claim of copyright ownership to the screenplay accrued upon an express repudiation of his ownership, and Miller was on express notice of such repudiation, including through the use of the © designation next to *SSCF's* name on the scripts' covers.

## STANDARD OF REVIEW

This Court "'review[s] *de novo* the award of summary judgment, construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences and resolving all ambiguities in its favor.'"  *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)).

As to copyright ownership, "the ultimate determination, on settled facts, of whether a work qualifies as a work-for-hire is a question of law, which we review *de novo*."  *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 111 (2d Cir. 1998) (reversing summary judgment ruling that artist was not an employee and remanding for trial).  "The application of a statute of limitations presents a legal issue and is also reviewed *de novo*."  *Brennan v. Nassau Cnty.*, 352 F.3d 60, 63 (2d Cir. 2003).

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN DISREGARDING THE WGA COLLECTIVE BARGAINING AGREEMENT GOVERNING MILLER'S EMPLOYMENT CONTRACT

In holding that Miller's work on the screenplay under his employment contract with Manny was not a work made for hire under section 101(1), the district court deemed "labor law considerations" irrelevant. SPA21-30. It thus conspicuously ignored that Miller was a WGA member, hired to do WGA-covered work, under contract with a WGA signatory who was bound by a WGA collective bargaining agreement, and entitled to benefits guaranteed by that agreement, including minimum salary, residuals, and health and other employment benefits. The WGA collective bargaining agreement precluded Miller and Manny from freely negotiating terms as could parties under an independent-contractor relationship. Neither could deviate from the MBA-mandated minimums that the WGA had already negotiated on behalf of its members with all signatory studios and production companies.

This should be the beginning and the end of the inquiry. Employment of a WGA-member writer as a WGA-covered employee on a WGA-signatory film governed by a WGA collective bargaining agreement inherently creates an employment and not an independent contractor relationship. The numerous errors the district court made in holding otherwise require reversal.

### A. The District Court Decision Conflicts With The Text, Structure, And History Of Section 101(1)

To begin with, the district court erroneously appeared to fault Manny for not including the magic words "work made for hire" in its employment contract with Miller. *See* SPA2-3, 19-21. The court even stated without any factual support that "writings of that type are the norm in the motion picture industry." SPA3.

But nothing in section 101 of the Copyright Act requires as much. Section 101 provides *two* avenues for deeming a work a "work made for hire": preparation "by an employee within the scope of his or her employment," 17 U.S.C. § 101(1), *or* an express, written agreement that a "specially ordered or commissioned" work is a work made for hire, *id.* § 101(2). By offering two alternative paths to establishing works made for hire, Congress made clear that the express, written "work-made-for-hire" agreement required under section 101(2) is not required under section 101(1). To the contrary, no writing at all is required to establish that a work is made for hire within an employment relationship under section 101(1), as that requirement is specifically included in section 101(2). The district court's suggestion that an express writing was needed here was therefore error, and violates the settled canon that no part of a statute should be rendered meaningless surplusage. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant") (citation omitted).

26

The district court decision conflicts not only with section 101(1)'s text and structure, but also with its legislative history. Congress expressly considered and rejected the screenwriters' arguments that it should import into the Copyright Act the "shop right" system from patent law. *See supra* at 5-7. Congress thus specifically declined to treat screenwriters (and other guild members) as independent contractors who initially owned copyrights while the studios that employed them were relegated to holding only an implied license. H.R. Rep. 94-1476 at 121. And as the Copyright Register acknowledged in its Supplementary Report on that issue, works created pursuant to the terms of a collective bargaining agreement in particular are understood to be works *"prepared by an employee within the scope of his employment."* Supp. Report at 68.

The district court, in finding Miller an independent contractor despite his WGA-governed employment on a WGA film, effectively granted Miller exactly the kind of "shop right" regime that the guilds requested and that Congress squarely rejected. The Supreme Court has previously given weight to such congressional rejections of lobbying proposals when construing the Copyright Act. *See, e.g.*, *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561 (1985) (in construing scope of 17 U.S.C. § 107, noting that "[t]he drafters resisted pressures from special interest groups to create presumptive categories of fair use, but structured the provision as an

affirmative defense requiring a case-by-case analysis"). The district court erred in ignoring that aspect of the Congressional record.

The district court also erred in ignoring the Congressional testimony from the guilds themselves showing that they considered their members to be employees covered by the "works-made-for-hire" provisions. *See, e.g.*, 1965 Hearings at 264-65, 271-72, 310-11. Instead, the court focused exclusively and erroneously (SPA23-24 & n.14) on the evolution of the "commissioned" works provision of the Act. But the proposal ultimately embodied in section 101(2) expanded, not contracted, the scope of works made for hire to include works "prepared by freelance authors at the instance, direction, and risk of a publisher or producer." Supp. Report at 67 (emphasis added). The addition of section 101(2) did not diminish the scope of employment-based works made for hire under section 101(1); the inclusion of "motion pictures" among the contexts enumerated in section 101(2) does not disqualify the independent recognition of film-based works made for hire under section 101(1); and section 101(2) says nothing about the status of writers who create works pursuant to a *collective bargaining agreement*.

### B. The District Court Decision Conflicts With The NLRA

The district court further erred in interpreting the Copyright Act so as to create a needless conflict with the National Labor Relations Act ("NLRA"). The court does not dispute that, under the NLRA, only "employees" (which excludes independent

contractors) have the right to organize or join labor unions and to bargain collectively. 29 U.S.C. § 157; *see* SPA24. Nor does the court dispute that Miller, a WGA member, was employed to write a screenplay for a WGA signatory under the minimum terms and conditions of the MBA—the collective bargaining agreement negotiated by the WGA as a federally recognized labor union. *See, e.g.*, *Wellman v. Writers Guild of Am. W.*, 146 F.3d 666, 668 (9th Cir. 1998) ("the [WGA] is a labor union and the screenwriters' collective bargaining representative in the motion picture industry"). The district court ruled nonetheless that Miller might still be an independent contractor. That ruling was error.

To begin with, common law agency principles define the meaning of "employee" where otherwise unspecified under *both* the Copyright Act and the NLRA. *See Reid*, 490 U.S. at 739-41; *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 256 (1968) ("[T]he Board and the courts apply general agency principles in distinguishing between employees and independent contractors."); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-25 (1992) (confirming same definition of "employee" used in *Reid* under the Copyright Act applies to both the NLRA and ERISA).[10] But the district court read "employee" under the Copyright Act to mean

---

[10]   The district court's insistence (SPA22-23) on treating the definition of "employee" distinctly under copyright law and labor law is the same position that the U.S. government asserted, and the Supreme Court *rejected*, in *Darden*. There, the Court
(*footnote continued*)

something different from "employee" under the NLRA, which provides that only "*[e]mployees* shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively … [or] engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. § 157 (emphasis added); *see also id.* § 152(3) ("independent contractor" not an "employee").  Because it is undisputed that Miller is a WGA member who worked for a WGA signatory on a WGA project, the district court should have concluded that Miller was an "employee" of Manny because only an "employee" can legally participate in such a union capacity to begin with.

Contrary to the district court's reasoning (SPA22-24), this conclusion does not "subordinate" copyright law to labor law, but rather *harmonizes* the two regimes by looking to common law agency principles governing who is and is not an "employee." As the Supreme Court recently instructed when examining the intersection of the NLRA and the Federal Arbitration Act, "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at 'liberty to pick and choose among congressional enactments' and must instead strive 'to give effect to both.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (quoting *Morton v.*

---

stated that the particular statutory purpose of the definition of "employee" is irrelevant; rather, "Congress means an agency law definition for 'employee' unless it clearly indicates otherwise." 503 U.S. at 325; *see also* Michael C. Harper, *Defining the Economic Relationship Appropriate for Collective Bargaining*, 39 B.C. L. REV. 329, 338 (1998) (discussing *Darden*).

*Mancari*, 417 U.S. 535, 551 (1974)); *see also, e.g.*, *United States v. Estate of Romani*, 523 U.S. 517, 530 (1998) ("the proper inquiry is how best to harmonize the impact of the two statutes"); *Bhd. of Ry., Airline & S.S. Clerks. v. REA Exp., Inc.*, 523 F.2d 164, 171 (2d Cir. 1975) (resolving tension between Railway Labor Act and NLRA, as incorporated into Bankruptcy Act, by giving effect to fact that "employees are represented … by collective bargaining representatives").

The district court further erred in misplacing reliance (SPA24-28) on cases like *Am. Fed'n of Musicians of U.S. & Canada v. Carroll*, 391 U.S. 99 (1968), and *Home Box Office, Inc. v. Directors Guild of Am., Inc.*, 531 F. Supp. 578 (S.D.N.Y. 1989) ("*HBO*"), for the proposition that "the simple fact of union membership" (SPA25) does not mandate employee status and preclude any status as an independent contractor. These cases involve only the scope of the antitrust exception for labor activity, not the issue of employee status under a collective bargaining agreement for Copyright Act purposes. And even their antitrust holdings are inapposite to a screenwriter writing a screenplay under a collective bargaining agreement for screenwriters. In *HBO*, for example, the court reasoned that a "producer-director," who has a "degree of control … markedly greater than that ordinarily exercised by directors not also acting as producers," was "properly regarded as an independent contractor" despite membership in the directors' guild. 531 F. Supp. at 599-600. But just because one can be both a union-covered employee and an independent contractor

31

at the same time when wearing two different hats and performing a "dual function" does not mean one can be both a union-covered employee and an independent contractor at the same time when wearing a *single* hat and performing only a *single* function, as Miller did here.

### C. The District Court Decision Has Adverse Practical Consequences

The district court's ruling further requires reversal because it upends the settled customs and practices that have governed the screenwriter-studio relationship for nearly a century, as embodied in the WGA's collective bargaining protections for its members. WGA screenwriters like Miller *consent* through WGA membership to being deemed employees in exchange for a host of employment benefits they reap through the WGA's collective bargaining power that they could not reap individually through bilateral contracts. Having received the benefits of that bargain, Miller should not be heard to claim independent contractor status as if those hard-fought negotiations and protections did not exist.

This is especially so on the record here, where Miller has availed himself of WGA benefits based on his *Friday the 13th* work for nearly 40 years—including by having the WGA sue on his behalf to collect benefits for his work on *Friday the 13th* he believed he was owed. *See supra* at 18-19. Miller cannot have it both ways— availing himself of his screenwriting work on *Friday the 13th* to garner advantages only employees enjoy, while simultaneously insisting that he is an independent

contractor for purposes of copyright termination rights. To allow him to do so would upset long-settled expectations and reliance on WGA collective bargaining practices.

If upheld, the district court's decision threatens to undermine both the ability of screenwriters to collectively bargain and the expectations of employers that have engaged in collective bargaining for nearly a century, almost certainly leading employers to challenge whether the WGA can continue to organize and collectively bargain on behalf of screenwriters. In fact, such a finding will beg the question: are *all* employees who work on films actually independent contractors? If so, the district court's decision may inadvertently set the stage for the decertification of all unions governing the film industry, which is one of the largest unionized private sector industries in the United States.

A finding that screenwriters are independent contractors will also upset the expectations of employers who have collectively bargained for and relied on the provisions in the MBA. Since the 1930s, the film industry has existed at the intersection of copyright law and labor law. The fundamental underpinning of the MBA is that screenwriters who are hired by an employer to write a treatment or script are employees, with the employer being deemed the author of the work for copyright purposes. Various forms of compensation provided for in the MBA, including residuals, sequel payments, and reserved or separated rights, were designed to compensate writers for conceding that they do not own copyright in their own works.

*See, e.g.*, A346-49 (Arts. 16.A.2, 16.A.3.a) (requiring an employer to license certain rights in a screenplay "exclusively to the Writer on a royalty free basis both for the original term of copyright and for any extensions and renewals thereof"). Negating this bedrock principle underlying the MBA calls the entire premise of the MBA into question, and upsets the expectations of employers throughout the film industry.

## II.    THE DISTRICT COURT ERRED IN APPLYING THE *REID* FACTORS

Even if the district court were correct that the above analysis is insufficient and that it was required to apply the *Reid* factors here, it nonetheless erred in granting summary judgment that Miller acted as an independent contractor rather than as Manny's employee under those factors. The district court erroneously failed to give weight to Miller's and Manny's WGA status under *Reid*, and in any event, the record here contains numerous disputed facts under the *Reid* factors that preclude summary judgment that Miller acted as an independent contractor rather than an employee.

*Reid* was not a union or collective bargaining case. In *Reid*, a nonprofit association dedicated to eliminating homelessness retained an individual sculptor (Reid) on a one-on-one basis to create a sculpture to dramatize the issue. 490 U.S. at 733. In deciding whether Reid was an employee or independent contractor of CCNV, the Court held that "[n]othing in the text of the work for hire provisions indicates that Congress used the words 'employee' and 'employment' to describe anything other than the conventional relation of employer and employ[ee]." *Id.* at 740 (quotations

omitted). *Reid* thus concluded that "Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine," which is confirmed "by § 101(1)'s use of the term 'scope of employment,' a widely used term of art in agency law." *Id.*; *see also id.* at 750-51 ("To determine whether a work is for hire under the Act, a court first should ascertain, using principles of general common law of agency, whether the work was prepared by an employee or an independent contractor.").

*Reid* lists the following factors "[i]n determining whether a hired party is an employee under the general common law of agency":

> [1] the hiring party's right to control the manner and means by which the product is accomplished[;] … [2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; and [13] the tax treatment of the hired party.

SPA30 (quoting *Reid*, 490 U.S. at 751-52) (citing Restatement § 220(2)). This Court has held that five of the *Reid* factors will be significant "in virtually every situation": (1) the employer's right to control the manner and means of creation; (2) the skill required; (3) employee benefits; (4) tax treatment; and (5) whether the employer has

the right to assign additional projects. *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992); *see Langman Fabrics*, 160 F.3d at 111.

Notably, "*Reid*'s list is non-exhaustive," and "'[o]ther relevant factors may also be considered so long as they are drawn from the common law of agency that *Reid* seeks to synthesize.'" *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 227 (2d Cir. 2008) (quoting *Eisenberg v. Advance Relocation & Storage, Inc.,* 237 F.3d 111, 114 n.1 (2d Cir. 2000)). And even as to the identified factors, including the five flagged in *Aymes*, the Court "must weigh only those 'that are actually indicative of agency in the *particular circumstances*,' disregarding those that are either irrelevant or of indeterminate weight." *Salamon*, 514 F.3d at 227 (quoting *Langman Fabrics*, 160 F.3d at 111) (emphasis added).

### A. The District Court Should Have Considered The WGA Collective Bargaining Agreement As An Additional Factor

As noted above, the entire relationship between Manny (a WGA-signatory employer) and Miller (a WGA member) was governed by the WGA collective bargaining agreement, the MBA. Even if these facts standing alone are not dispositive, they are entitled to great weight when evaluating the relationship between these parties, as the outcome of those collective bargaining negotiations reflects and explains how and why many of Miller's acts are consistent with a screenwriter's "employee" status.

As noted, *see supra* at 7-12, before the WGA was created, screenwriters fought for classification as employees rather than independent contractors, to secure job benefits and control over screen credit. Ultimately, the NLRB ruled that writers are "employees" under the NLRA—even though they did not maintain regular office hours or fit the stereotypical form of office discipline—because producers had the power to dictate the content of the work. *Metro-Goldwyn-Mayer*, 7 N.L.R.B. at 688. In forming the WGA, writers collectively negotiated for desired benefits—ranging from screen credit and revenue sharing, to minimum guaranteed payments and the ability to work wherever they want—in exchange for the concession that they were *not* independent contractors. Those negotiated benefits that WGA members now enjoy are not idiosyncratic features that writers coincidentally share in a vacuum; they are the defining features of the carefully negotiated bargain demanded by the union for its employee members, which employer signatories are required to follow. Such considerations are all the more important here because *Reid* had no reason to even consider union membership when listing the factors; it was a case between a (non-union) sculptor and a non-profit organization, not a guild member and a guild-signatory employer. For this reason, collective bargaining is exactly one of those "other relevant factors" that *Reid* should synthesize here. *Salamon*, 514 F.3d at 227.

Moreover, as noted in *Reid*, to determine whether a work was created by an employee, "we have traditionally looked for guidance to the Restatement." 490 U.S.

at 752 n.31.  The Restatement makes clear that "community custom in thinking that a kind of service … is rendered by servants, *is of importance*."  Restatement § 220, cmt. m (emphasis added); *see also id.* cmt. i (noting "importance" of "custom of the community … in a particular occupation").  In addition, "whether or not the parties believe they are creating the relation of master and servant" is a relevant factor. Restatement § 220(2)(i).

Under industry custom and practice, WGA members who write for signatory employers in their capacity as covered employees expect to be treated as employees, as confirmed by both the WGA's history and congressional testimony.  *See supra* at 5-12.  Writers depend on that very expectation in order to secure MBA benefits.  The unrebutted expert report of William Cole, who has forty years of experience handling matters relating to the WGA in the motion picture industry, further confirms that, even absent a written agreement, "under the custom and practice in the industry, writing performed with the knowledge and consent of a signatory employer is treated as writing under employment covered by the WGA Basic Agreement."  A131, 133 (¶¶3, 8).  Likewise, screenwriters know and expect that, in exchange for the WGA benefits they receive, they give up their claim to independent contractor status, and thus, copyright authorship.  That exchange was the entire driving force behind the formation of the WGA:  screenwriters fought for decades to be considered

"employees," because they knew it was the only way to bargain for and secure the employment protections they now receive under the MBA.

Miller has already acknowledged this custom and practice, as well as the parties' expectation of such treatment. He used a pseudonym on *Here Come the Tigers* because he knew WGA members were not allowed to work on non-union films. A68 (¶¶7-8); A786 (¶¶7-8); A172-73; A133 (¶9). And on *Manny's Orphans*, Miller insisted that Manny become a WGA signatory so that Miller could collect the benefits that are typical of an employment relationship. A89 (¶5). If Miller had been an independent contractor, such actions would have been unnecessary. A136-37 (¶¶16-18). Moreover, Miller himself never believed he had any ownership or right to use the screenplay that he had written for Manny, A281, a right that would belong only to an independent contractor, not an employee.

### B. The *Reid* Factors Emphasized In *Aymes* Favor Employee Status

#### 1. Manny's Right To Control The Manner And Means Of Creation

While the district court did admit that "Cunningham was able to exert at least some control over Miller's writing" (SPA33), it gave short shrift to Cunningham's extensive control over the manner and means of creation of the screenplay—the "most important factor … '[that] differentiates the employee or servant from the independent contractor.'" *Salamon*, 514 F.3d at 228 (quoting *Metcalf & Eddy v. Mitchell*, 269 U.S.

514, 521 (1926)); *Eisenberg*, 237 F.3d at 114 ("greatest emphasis" should be placed on first factor).

For example:

- Cunningham came up with the idea to make a horror film and presented it to Miller;

- Cunningham tutored Miller in the art of making a successful horror film, including pacing, scenes, structure and strategy;

- Cunningham and Miller worked together to develop the setting, scenes, arcs, plots and characters;

- Unsatisfied with the first draft of the treatment, Cunningham revised, rewrote and restructured the draft to create the second draft on his own;

- Cunningham and Miller met on a *near-daily basis* to discuss scenes, plots, characters and storylines;

- Cunningham gave Miller extensive and detailed notes and comments, directing Miller to make changes and modifications;

- Cunningham stood over Miller's shoulder as he typed, making suggestions and contributions;

- Cunningham added entire scenes that Miller did not write, including scenes that Miller objected to;

- Cunningham unilaterally changed the film's title; and

- Cunningham retained full control of each element that remained or was rejected, including having sole authority over all changes—going so far as to reject up to 50 of Miller's potential locations before agreeing to the summer camp, and to force Miller to include scenes that he hated, such as of a young Jason coming back to life[11] and a police scene.

---

[11] The district court's quibble (SPA34 & n.17) that this scene was insisted upon by Georgetown, not Cunningham, is actually further evidence that Manny was the

*(footnote continued)*

A89-95 (¶¶6-12, 20-22, 25-26, 28-29); A636-39 (¶¶5-6, 8, 10, 12-14); A268, 276-77, 281; A177-78, 187, 193-96, 211-15, 223-27.  In Cunningham's words:

> I directed, supervised, and controlled the entire process of creating and developing the Screenplay.  Miller did not start writing until I asked him to.  Almost daily, Miller and I met at each other's houses, and in my home office, to develop scenes and discuss ideas for the Screenplay, including scenes, plots, characters and story lines. Sometimes when I met Miller at his house to work on the Screenplay and Miller drafted on his typewriter, I stood over his shoulder making suggestions and contributions.

A638 (¶12); *see also* A224 ("We were in and out of each other's house all the time.").

Such near-daily and pervasive activity strongly suggests that Miller was an employee, not an independent contractor.  *Compare Tagare v. Nynex Network Sys. Co.*, 994 F. Supp. 149, 156-57 (S.D.N.Y. 1997) (acknowledging "the extent of the hiring party's control over the hired party's *daily* activities") *with Reid*, 490 U.S. at 752 ("daily supervision of [Reid's] activities [in Baltimore] from Washington practicably impossible").  As in *Langman Fabrics*, Cunningham controlled the work down to the smallest detail.  160 F.3d at 111-13.  Moreover, Cunningham was responsible for setting tone, mood, pacing, and other elements that are just as important to the screenplay's creation as dialogue.  *Cf. Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996) (in determining whether work is protectable, the Court looks

---

employer and maintained control over the contents of the screenplay (including through his agent), while Miller did not.

not only to the words as written, but also the "total concept and feel, theme, characters, plot, sequence, pace, and setting").

The district court's conclusory statements distancing Cunningham from the screenplay—*e.g.*, that Cunningham was only "sometimes" present, that he did not control the "details of Miller's work," or that "'develop[ing] scenes and discuss[ing] ideas' does not suggest close or direct control" (SPA34)—are factual assessments belied by the record and with which a jury could easily disagree, as Cunningham provided extensive detail that would allow a reasonable jury to strongly credit Manny's control.  It is difficult to imagine more "control" of a writer than standing over his shoulder, particularly when it's the producer-director.  Nor does the district court's conclusory assumption that Cunningham provided only "big picture approval authority and general suggestions" (SPA33) accurately capture the extent of Cunningham's supervision.  The district court failed to construe this evidence in Plaintiffs' favor as required on summary judgment, especially in light of Miller's concessions that he no longer accurately remembers events from almost 40 years ago. A272 (in 2003, trying to remember which ideas were his, conceding that "time plays tricks on me"); A266 (cannot remember conversations with Cunningham because "mind is also selective"); A272 (regarding scene he cannot remember writing:  "I do not remember that version.  It does not sound like me …"); A223-24 (Miller has "no

particular memory" of frequency of meetings other than "[w]e were in and out of each other's houses all the time").

### 2. Skill Required Of Miller

While courts consider the level of skill required in assessing whether a hired person is an employee, such a factor takes on particular relevance when the hirer "himself could not" perform the skill. *Langman Fabrics*, 160 F.3d at 113. That is not the case here. Miller had minimal expertise in writing *horror* films. To be sure, Miller had screenwriting experience when he was hired by Manny; however, he had "no background in horror movies whatsoever," and didn't even like them. A267; A193-94. As a result, *Cunningham* had to tutor *Miller* on "key elements" of successful horror films. A90 (¶8); A636-37 (¶5) ("I assured Miller that I would teach him about the horror genre and guide him through the writing process."). Further, Cunningham proved his ability to do the work, including by rewriting, revising and restructuring the treatment on his own, as well as through his own collaboration. A638 (¶¶10-12). This weighs strongly against independent-contractor status.

In any event, "[e]ven where skill is required, if the occupation is one which ordinarily is considered as … an incident of the business establishment of the employer, there is an inference that the actor is a servant." Restatement § 220, cmt. i. As discussed above, screenwriting is an occupation in which it is generally understood by its participants that a WGA writer acts as an employee on a WGA film. If it were

otherwise, all screenwriters for films would presumptively be deemed independent contractors merely because they are screenwriters, and thus would presumptively own the results of their services—an absurd result irreconcilable with industry customs and the very existence of the WGA.

### 3. Provision Of Employee Benefits

Above and beyond his salary, Miller received extensive employee benefits stemming from his employment by Manny, which were provided by the employment contract by virtue of the MBA and would not be guaranteed to independent contractors who otherwise would have to separately negotiate for each benefit. For example:

- Pension, health and welfare benefits provided by the WGA's ERISA plans, to which Manny was required to contribute in an amount equal to 9% of Miller's salary;

- Entitlement to residuals;

- Entitlement to sequel payments;

- Proper screen credits and related protections;

- Location expenses;

- The right to WGA representation to enforce WGA benefits;

- The right to watch a preliminary or "preview" prior to release; and

- The right to consult on any translation.

*See* A304-05, 309, 351, 359-62, 365, 371-81 (Arts. 8, 11.A.1, 11.E, 16.A.5, 17.A, 17.B, 21, 47, 48 & 51.3); *see also* A250-52; A96 (¶32); A84-85 (¶5); A282-83. Miller

has reaped these employment benefits for almost 40 years—he was represented by the WGA to pursue Manny for payments due for his work on the film under the MBA, and received a settlement that Miller concedes included all sums due. A236-52; A96 (¶32); A84-85 (¶5); A282-83; A409-12.

The district court discounted these benefits because they were not "traditional." SPA36. But there is no dispute that in the film industry these are "traditional" and critical employment benefits to which Miller was entitled and received. These benefits were *already* negotiated as part of the standard WGA short-form employment agreement the parties entered into and deemed most crucial in the WGA's collective bargaining, so there was no need (or ability) to separately negotiate for them.

The district court further incorrectly ruled (SPA36) that Manny "failed to even make the contributions to WGA health care or pension plans required under the MBA." This unexplained statement misses the mark. *First*, whether Manny *made* contributions is entirely distinct from whether Miller *received* the benefits. Miller has never claimed that he did not receive health care or pension benefits through the WGA's ERISA plans (through which such benefits are paid) for this film, nor did he ever file a grievance; in contrast, he did file a grievance to collect residual and sequel payments for this film, and conceded that he received "all" payments owed as of that time. *Second*, Miller's settlement for "all sums" due includes any potential required contributions to the WGA's ERISA plans. A410 (¶4); A359-62 (Arts. 17.A.1, B.1);

A648-49 (¶¶29-31). Miller has never complained to the WGA that he didn't receive such benefits pursuant to the MBA. A252. *Third*, the entirety of the district court's support appears to be a declaration purportedly submitted by Jennifer Parsignault of the PWGA Pension and Health Plans to which Plaintiffs timely objected. SPA11; A800-02. Ms. Parsignault was not designated by either side as a witness, she was not identified by PWGA's counsel in response to a deposition subpoena, and Miller never disclosed her (or any of the information contained in her declaration) until he filed Ms. Parsignault's declaration with his *reply* brief. A847-63. Thus, without affording Plaintiffs the opportunity to even learn about her existence until it was too late (let alone to depose her), the court appears to have improperly relied on her testimony which was, in any event, deeply disputed and must be construed in Plaintiffs' favor. *See* A861 (detailing how her testimony is contradicted by letter stating that settlement payment "represents all sums due Miller " (quoting A410)).

### 4. Tax Treatment Of Miller

Manny hired Miller almost 40 years before this litigation started; it is not surprising that it no longer has tax records from 1979. That absence, however, cannot support an award of summary judgment to *Miller*, as he does not have any direct evidence of his tax treatment either.

The district court nonetheless erroneously construed Miller's purported circumstantial evidence of tax treatment in his favor rather than in Manny's.

46

Specifically, the court relied (SPA37) solely on Miller's claim that he was paid "full lump sum payments" for his work. Miller has no direct evidence of such payments, but rather a copy of a 1979 cover letter saying a check for $3,713 was enclosed. A604. Miller has no evidence of the actual amount of the check, nor evidence of any kind regarding how the initial payment of $5,569 was treated for tax purposes. A100.[12] Absent direct evidence of tax treatment, and in light of the circumstantial, incomplete and competing inferences to accord the remaining facts, this factor is, at most, neutral here.

### 5. Manny's Right To Assign Additional Tasks

While Miller was hired as a screenwriter for the film, nothing in the employment agreement prohibited Manny from assigning additional tasks to Miller in connection with writing the film. For example, Cunningham assigned Miller the tasks to come up with ideas for settings, to master the key strategies for horror film structure and success, and to write scenes he did not like or want to write.

The district court erred by discounting these tasks and instead treating as dispositive (SPA38-41) the fact that the employment agreement was for a single film. But this begs the question, as it would require a conclusion that essentially every

---

[12] As another example, Miller never claimed Manny provided him with 1099 forms, which would indicate "a company claiming a worker to be an independent contractor in one context but an employee in another, [which] is not the case here." *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1128 (9th Cir. 2010) (citation omitted).

screenwriter is an independent contractor—exactly what the WGA negotiated *against* when it secured its collective bargaining benefits. Rather, the Court should consider that the right for a screenwriter to be hired on a single project is a condition of the MBA that Miller and Manny agreed to abide by when they opted for WGA member/signatory-status. A310-14 (Art. 13.A). In negotiating these benefits, the WGA specifically bargained for its members' right to work on a project-by-project basis rather than as a nine-to-five employee of a single employer.[13] This is a crucial element of the WGA-supported system, which allows writers to move from project to project while still securing all of the benefits to which employees are accustomed.

## C. The Additional *Reid* Factors Support Employee Status

### 1. Duration Of The Relationship

While Miller's employment as a screenwriter for Manny was a few months long, that is not an unusual length of employment in film. It is customary for a writer to be hired on a "flat deal" (or single project) basis for theatrical motion pictures. A134-35 (¶12(e)). Such an arrangement, once again, is contemplated by the MBA (A310-14 (Art. 13.A)), which not only sets forth rates for those "flat deal" contracts,

---

[13] The district court notes that the MBA contemplates circumstances in which a writer works on a project-by-project basis, and circumstances in which a writer agrees to work for a fixed period of time, asking why the former is not an independent contractor while the latter an employee. SPA40. But the MBA in the cited paragraph also includes *television* deals, which generally involve different timelines than a single motion picture. A314.

but also directs them to be treated as wages subject to withholding under Article 35. (There is no withholding of wages for independent contractors.) In other words, this is another example of a benefit that writers sought and secured through collective bargaining, and that has been formalized and accepted in the industry as a condition of an employment relationship through the MBA.

In addition, the MBA provides for a "Maximum Period of Employment" that Miller was permitted to work. *See* A311 (Art. 13.A.4) (writer employed at minimum basic compensation rate not permitted to provide services beyond maximum time listed). Cunningham thus could not require Miller to provide services beyond the maximum number of weeks listed without paying additional compensation.

Such a duration is also a typical and necessary incident of the film industry, which regularly consists of project-by-project work for discrete engagements; otherwise, every screenwriter would become a de facto independent contractor, potentially leading to the dismantling of the WGA as an organizing body. In this context, an employment relationship of several months is consistent with employee status. *Langman Fabrics*, 160 F.3d at 113 (recognizing employment where artist worked for "about three months").

### 2. Method Of Payment

Miller's payments were consistent with the MBA's terms for a "flat rate" project. Under the MBA (A311 (Art. 13.A.1, 4)), an employer must pay based on the

49

number of writing steps the writer completes. Miller was hired to write two steps and thus was initially paid in two tranches pursuant to the MBA's minimum salary requirements. A100. This particular arrangement favors an employment relationship because it is precisely how the WGA negotiated salary guarantees for their employee writers—negotiations that could not have taken place on behalf of independent contractors. 29 U.S.C. §§ 152(3), 157. This is why it is so important for WGA members to maintain these protections; absent collective bargaining, as Miller admits, writers' salaries and benefits would be far worse. A199-200. Although the district court quibbled (SPA42-43) that Miller was not paid "hourly wages" or a "regular salary," he was paid in exactly the manner WGA *employee* screenwriters are paid pursuant to the MBA.

### 3. Source Of Instrumentalities And Tools

While courts sometimes consider whether a hired party uses his own instrumentalities and tools, such an inquiry usually has limited import. Particularly in the context of screenwriting, where the writer usually works almost exclusively on an easily movable typewriter (then) or computer (now) with minimal costs unique to the act of writing, use of such materials reveals little about the nature of employment.

In any event, Miller did make significant use of Manny's tools. For example, Miller used Cunningham's assistant, copy machine, paper, and office facilities to prepare the screenplay, and his assistant typed the entire second draft screenplay. A94

(¶26); A229-30. Thus, the district court's singular focus on the "typewriter and paper" (SPA43) was misguided and ignored contrary evidence.

### 4. Location Of The Work

Miller and Cunningham routinely worked at Cunningham's house or office. A214-15, 224; A89-90 (¶¶6, 10); A638 (¶12). Thus, the district court's statement that Miller "did not work at the hiring party's place of business" (SPA43) is belied by the evidence. Moreover, while location may be relevant for sculptors or artists creating physically imposing works (as in *Reid*), screenwriting is mobile. As courts recognize in such contexts, a "physical separation between the hiring party and the worker … is less germane in light of the kind of work [Miller] was doing." *JustMed*, 600 F.3d at 1128; *cf. Aymes*, 980 F.2d at 861 (each factor's relevance depends on the "nature of the work").

Further, the MBA explicitly states that when a screenwriter "utilizes an office in his home," such work-at-home "shall be deemed to be at the request of and for the convenience of the employer." A362 (Art. 19.A). This bargained-for right, which reflects custom in the film industry, A180, strongly favors recognition of an employment relationship. While the district court asserted (SPA44-45) that such consideration would "circumvent the agency-law analysis required" by *Reid*, to ignore it would distort the nature of the actual relationship. If Manny and Miller *hadn't* been WGA members/signatories that entered an employment agreement incorporating

51

Miller's right to work at home, then Miller's location might be probative; the MBA, however, removed that discretion and thus, at minimum, renders that factor indicative of an employee relationship (or, at minimum, unhelpful).

### 5. Discretion Over When And How Long To Work

Under the MBA, as well as industry custom and practice, screenwriters for motion pictures generally write according to their own schedules to a discrete deadline—they are permitted to set their own hours as long as they complete the tasks by a date specified by their employers. A310-11, 362 (Arts. 13.A.1-4, 19.A). Thus, any flexibility that Miller had is not intrinsic to his employment status, but was a negotiated part of, and guaranteed by, the MBA. Moreover, because it is intrinsic to the "nature of the work," it does not inform the employment-status inquiry. *Aymes*, 980 F.2d at 861.

Cunningham gave Miller multiple deadlines by which to complete certain tasks or drafts, consistent with demanding pre-production and production schedules. A639 (¶16). To meet those deadlines, Miller established a set schedule, working consistently through the morning and stopping at the evening, consistent with a regular employment schedule. *See* A262 ("I could not drink until 6 p.m. or 5 p.m. … so that I always made sure that I did *my day's output*") (emphasis added); *Langman Fabrics*, 160 F.3d at 113 (working "regular hours" supports employment relationship). Accordingly, this factor favors an employment relationship.

52

### 6. The Hiring Of Assistants

As the district court correctly found, Miller did not hire any assistants to perform the work he was hired to do under the employment contract. SPA46; A639 (¶17). While this favors employee status (as it demonstrates a lack of control and authority), the district court incorrectly gave it "no weight." SPA46. But the reason Miller did not hire assistants is because his contract with Manny was a personal services contract requiring him to personally perform the hired services, making this a factor that favors employment status.

### 7. Whether The Work Was Part Of Manny's Regular Business

As the district court correctly found, Manny was a business "formed for the purpose of filmmaking, and thus Miller's hiring was part of Manny's regular business." SPA46. While the district court downplayed its importance (SPA46), Manny's business actually strongly favors Miller's employee status. The sole reason Manny became a signatory to the WGA was so that it could hire WGA writers to provide writing services in connection with film production. A639 (¶18). Given that the entire reason for Manny's existence was to turn screenplays into motion pictures under the auspices of the WGA, this factor heavily favors Plaintiffs. (In contrast, in *Reid*, creating a sculpture was not part of CCNV's business of eliminating homelessness). In other words, Miller's hiring was at the very core of Manny's existence and mission.

53

**D.    At A Minimum, Triable Issues Of Fact Preclude Summary Judgment Of Independent Contractor Status**

Even if the above application of the *Reid* factors does not require summary judgment for Manny and Horror (it does), it at least precludes summary judgment for Miller. There is more than enough evidence for a jury to reasonably find that Miller was Manny's employee. Manny exercised extensive, daily control over the details of Miller's work; Miller worked under a standard employment contract as a WGA member on a WGA film pursuant to the terms of a WGA collective bargaining agreement; and Miller received and exploited the benefits of that employment relationship for nearly 40 years. At a minimum, the district court should not have resolved numerous disputed facts in Miller's favor rather than in favor of non-movants Manny and Horror.

This is especially so in light of the fact that *Miller* bore the burden of proof. The U.S. copyright registration for the film lists Manny's successor-in-interest as the author—including of the "[s]creenplay" (A401)—and states that it was a "work made for hire" (A400) ("Name of Author"). Plaintiffs are thus entitled to "a statutory presumption of the validity of the facts stated in its copyright registration," which, although not irrebuttable, is prima facie evidence, and thus shifts "the burden of proof" to Miller to establish "that [Manny] was not the author of the [screenplay]." *Langman Fabrics*, 160 F.3d at 111 (citing 17 U.S.C. § 410(c)).

This Court has not hesitated to vacate and remand other decisions granting summary judgment on work-made-for-hire status based on triable issues of fact. *See, e.g.*, *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 316 (2d Cir. 2013) (vacating grant of summary judgment on work-made-for-hire where "the circumstances surrounding the creation of the work are genuinely in dispute"). *Langman Fabrics* is particularly instructive: There, Langman hired a textual designer as a "freelance" artist. 160 F.3d at 108-09. The district court ruled on summary judgment that the artist was an independent contractor as a matter of law. *Id.* 109-10. This Court reversed, holding that the district court did not review the disputed facts "in the light most favorable to Langman Fabrics," including by failing to credit Langman's testimony regarding the circumstances of the design's creation and the artist's benefits. *Id.* at 113. This Court concluded that,

> resolving all factual disputes favorably to Langman Fabrics, the evidence would support a holding that the artist was Langman Fabrics' employee under the *Reid* test. Langman Fabrics therefore made an adequate showing that it was the author of the design under the work-for-hire doctrine, and it should have been allowed to proceed to trial under this theory.

*Id.*

So too here, the district court was obligated to, but did not, construe all factual disputes in Manny's and Horror's favor—including evidence of Cunningham's constant oversight and control over the work, Miller's receipt of benefits, and the

multiple ways in which the terms, scope and incidents of Miller's employment were dictated by a collective bargaining agreement intended to protect WGA members as employees. Taken together (as it must be), the evidence is more than sufficient to allow a jury to reasonably find that Miller was an employee, not an independent contractor. *See Friedman v. Swiss Re Am. Holding Corp.*, 643 F. App'x 69, 72 (2d Cir. 2016) (vacating grant of summary judgment where court "failed to consider the record as a whole, just as a jury would" and "[i]nstead … viewed each piece of evidence in isolation") (quotations omitted). The district court's refusal to construe the disputed material facts in Manny's favor—especially Cunningham's version over Miller's—requires vacatur and remand here. *See Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) ("choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment") (quotations omitted).

## III. THE DISTRICT COURT ERRED IN HOLDING MILLER'S TERMINATION NOTICES TIMELY UNDER THE THREE-YEAR STATUTE OF LIMITATIONS

Even assuming *arguendo* that Miller had any ownership rights in the screenplay, the three-year statute of limitations bars Miller from raising such claims through the 2016 termination notices. The district court's dismissal of that defense as a matter of law (SPA51-56) was thus erroneous.

Under the Copyright Act, "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim

accrued." 17 U.S.C. § 507(b). "Although an alleged author is aware of his claim to ownership of the work 'from the moment of its creation,' the author does not need to bring suit until there has been an 'express repudiation' of that claim." *Gary Friedrich Enters.*, 716 F.3d at 317 (quoting *Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996)); *see also Mahan v. Roc Nation, LLC*, 634 F. App'x 329, 331 (2d Cir. 2016) (claims premised upon or challenging another's ownership "accrue once there has been an 'express repudiation' of ownership").

Under section 203, copyright termination claims accrue from the time where there has been an express repudiation of the claimant's ownership. In *Tomas v. Gillespie*, 385 F. Supp. 2d 240, 246 (S.D.N.Y. 2005), for example, the plaintiff's attempt to exercise a termination right under section 203 was held time-barred because her ownership claim, brought in 2000, "began to accrue upon defendants' plain repudiation" of her ownership in 1993.[14] Moreover, factual disputes over the sufficiency of repudiation must defeat summary judgment. *See Gary Friedrich Enters.*, 716 F.3d at 317-19.

---

[14] *See also, e.g.*, *Everly v. Everly*, 352 F. Supp. 3d 834, 842 (M.D. Tenn. 2018) ("where the claims presuppose copyright ownership or other copyright interests and those interests are disputed, the claims are barred if not brought within the three-year statute of limitations"); *Scorpio Music (Black Scorpio) S.A. v. Willis*, 2013 WL 790940, at *3 (S.D. Cal. Mar. 4, 2013) (similar).

Here, Miller was aware that Cunningham's claim of copyright ownership in the screenplay expressly repudiated his own. For example, in 1979, a notice on the title pages of drafts of a treatment and screenplay given to Miller read "© Copyright 1979 Sean S. Cunningham Films, Ltd." A101; A509; A256-58. Miller said nothing. A93-94 (¶¶22, 26); A638 (¶11). In addition, Georgetown's copyright registration names Georgetown as the film's author (including of the screenplay), and that it was made as a work for hire. A400-01. And in 2003, Miller admitted that "Sean and (Scuderi) were the owners of this thing, I was not an owner." A281. Such repudiation is consistent with Miller's own acts of accepting WGA benefits afforded only to employees, not independent contractors. *See supra* at 18-19. Construing these together in Plaintiffs' favor (as the Court must), factual disputes preclude summary judgment in Miller's favor on this issue.

The district court erroneously found that the statute of limitations cannot bar Miller's claims as a matter of law because it decided that the above facts, *while consistent with repudiation*, could also be consistent with Miller's claim of initial ownership. SPA53-55 & n.23. *See Simpson*, 793 F.3d at 265. For example, the court rationalized that the © designation attributed to SSCF was not a repudiation because Manny, not SSCF, was Miller's employer (SPA54), disregarding that SSCF and Cunningham were the two general partners of Manny. Similarly, the court held (SPA54) that it was "patently incorrect" for Georgetown to claim ownership of the

film as a work-for-hire and that it was "untraceable" to Plaintiffs' claims; however, Manny's assignment of rights to Georgetown specifically references and attaches the agreement, A120-26, that identifies Miller "as author for [Manny]," A120. Thus, Georgetown's ownership claim is consistent with Manny's position that the screenplay was a work-for-hire.

The district court's disregard (SPA55 & n.24) of the registration as supporting express repudiation under *Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112 (2d Cir. 2018) is similarly inapposite. *Wilson* states that "mere registration of a copyright *without more*" is insufficient repudiation evidence for the purposes of *notice, id.* at 119 (emphasis added), but acknowledged that such registration, accompanied by additional facts, can constitute sufficient evidence of repudiation, *id.* at 119-20 & n.2. Miller's admission that Manny's and Georgetown's principals were the owners can easily be construed as an express repudiation; while the court minimized such talk as "colloquial" (SPA53 n.23), a jury may disagree. In short, the district court improperly reviewed each fact in isolation and in Miller's favor. *See Friedman*, 643 F. App'x at 72. Summary judgment of timeliness was therefore inappropriate.

## CONCLUSION

The judgment below should be reversed, or at a minimum vacated and remanded for further proceedings.

Dated: June 3, 2019                        Respectfully submitted,

/s/ Kathleen M. Sullivan
Kathleen M. Sullivan
Todd Anten
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Bonnie E. Eskenazi
Julia R. Haye
GREENBERG GLUSKER FIELDS
    CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067
(310) 553-3610

*Attorneys for Plaintiffs-Counter-
Defendants-Appellants Horror Inc. and
Manny Company*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because it contains 13,787 words (based on the Microsoft Word word-count function) excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using **Microsoft Word** in **Times New Roman, 14-point type**.

Dated:      October 15, 2019

/s/ Kathleen M. Sullivan
Kathleen M. Sullivan
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

*Attorneys for Plaintiffs-Counter-Defendants-Appellants Horror Inc. and Manny Company*

61