# 18-3123-cv

## United States Court of Appeals

### *for the*

### Second Circuit

———————

HORROR INC., a Massachusetts corporation, MANNY COMPANY,
a Connecticut Limited Partnership,

*Plaintiffs-Counter-Defendants-Appellants,*

– v. –

VICTOR MILLER, an individual,

*Defendant-Counter-Claimant-Appellee,*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT, NEW HAVEN

## FINAL FORM BRIEF FOR DEFENDANT-
## COUNTERCLAIMANT-APPELLEE

Marc Toberoff
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Rd., Ste 50-363
Malibu, California 90265
(310) 246-3333

*Attorneys for Defendant-Counterclaimant-
Appellee Victor Miller*

October 15, 2019

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................1

ISSUES PRESENTED FOR REVIEW ..................................................4

STATEMENT OF THE CASE...............................................................4

    A.    Statutory Background..................................................4

    B.    Factual Background.....................................................7

    C.    The District Court's Decision ..................................12

SUMMARY OF ARGUMENT ...........................................................17

ARGUMENT ....................................................................................21

I.    MILLER'S SCREENPLAY WAS NOT A
"WORK MADE FOR HIRE"...............................................21

    A.    Under the Common Law of Agency, Miller Was an
Independent Contractor ..........................................24

            1.    Miller is an Independent Contractor Under
the First-Priority *Aymes* Factors ................25

            2.    The Remaining Agency Law Factors Also
Favor Independent Contractor Status ........36

    B.    Labor Law is Not Relevant to the Work for Hire
Question and Would Not Change the Result If It Were ....39

            1.    Labor Law is Not Relevant to the Copyright
Act's Work-for-Hire Doctrine ...................39

            2.    Members of Labor Unions Frequently
Work as Independent Contractors, and Unions
Frequently Bargain Over Independent Contractors'
Working Conditions...................................44

            3.    Appellants Misconstrue the Labor History
of Screenwriters .......................................48

    C.    Miller's Treatment and First Draft Screenplay
Are Not "Work for Hire" In Any Event..................50

II.    MILLER'S NOTICE OF TERMINATION WAS TIMELY ........52

    A.    The Timeliness of Notices of Termination is
Not Governed by Section 507(b) ............................52

i

      B.     Miller's Counterclaim for Declaratory Relief Satisfies
             Section 507(b) in Any Event ................................................................ 55

      C.     Miller's Defense of His Termination Notice Is
             Not Barred In Any Event .................................................................... 58

CONCLUSION ........................................................................................................ 59

# TABLE OF AUTHORITIES

## Cases

*American Federation of Musicians v. Carroll*,
  391 U.S. 99 (1968) ........................................................... 44, 45, 46, 47

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ....................................................................... 30

*Aymes v. Bonelli*,
  980 F.2d 857 (2d Cir. 1992) ..................................................... passim

*Barnhart v. Sigmon Coal Co.*,
  534 U.S. 438, 460–61 (2002) ........................................................ 43

*Carter v. Helmsley-Spear, Inc.*,
  71 F.3d 77 (2d Cir. 1995) ............................................................. 26

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ....................................................................... 30

*Community for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989) ................................................................ passim

*D. Ginsberg & Sons, Inc. v. Popkin*,
  285 U.S. 204 (1932) ....................................................................... 53

*Eisenberg v. Advance Relocation & Storage, Inc.*,
  237 F.3d 111 (2d Cir. 2000) .......................................................... 40

*Ennio Morricone Music, Inc. v. Bixio Music Group Ltd.*,
  No. 17-3595 (2d Cir. Aug. 21, 2019) ............................................. 22

*Epic Systems Corp. v. Lewis*,
  138 S. Ct. 1612 (2018). ................................................................. 42

*Familoe v. Ford Motor Co.*,
  277 F. Supp. 2d 778 (N.D. Ohio 2002) .......................................... 40

*Francklyn v. Guilford Packing Co.*,
  695 F. 2d 1158 (9th Cir. 1983), .................................................... 42

*FTC v. Morton Salt Co.*,
   334 U.S. 37 (1948) ................................................................21

*Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*,
   716 F.3d 302 (2d Cir. 2013) ................................................55

*Graham v. James*,
   144 F.3d 229 (2d Cir. 1998) ............................... 26, 29, 31

*H.A. Artists & Associates v. Actors' Equity Ass'n*,
   451 U.S. 704 (1981) ............................................................47

*Hanson v. Friends of Minn. Sinfonia*,
   181 F.Supp.2d 1003 (D. Minn. 2002) .................................40

*Hi–Tech Video Prods., Inc. v. Capital Cities/ABC, Inc.*,
   58 F.3d 1093 (6th Cir. 1995) ..............................................29

*Home Box Office v. Directors Guild of America*,
   531 F.Supp. 578 (S.D.N.Y. 1982) ......................................47

*Hurwitz v. Directors Guild of Am., Inc.*,
   364 F.2d 67 (2d Cir. 1966) .................................................44

*In Re Metro-Goldwyn-Mayer Studios*,
   7 N.L.R.B. 662 (1938) .................................................. 48, 49

*Jackson v. Gaylord Ent. Co.*,
   2007 WL 4480704 (M.D. Tenn. 2007) ................................40

*Johannsen v. Brown*,
   797 F. Supp. 835 (D. Or. 1992) .........................................26

*Jou v. Accurate Research, Inc.*,
   73 Fed. App'x 964 (9th Cir. 2003) ............................... 29, 36

*Kennel v. Dover Garage, Inc.*,
   816 F.Supp. 178 (E.D.N.Y. 1993); ....................................40

*Knight v. State Univ. of N.Y. at Stony Brook*,
   2014 WL 4639100 (E.D.N.Y. 2014) ...................................40

iv

*Laborers' Pension Trust Fund v. Pref. Trenching, Inc.*,
969 F. Supp. 455 (E.D. Mich. 1997);..................................................40

*Langman Fabrics v. Graff Californiawear, Inc.*,
160 F.3d 106 (2d Cir. 1998)..........................................................35

*Lariscey v. United States*,
949 F. 2d 1137 (Fed. Cir. 1991)....................................................42

*Lerohl v. Friends of Minn. Sinfonia*,
322 F.3d 486 (8th Cir. 2003)..........................................................40

*Los Angeles Meat & Provision Drivers Union, Local 626 v. United States*,
371 U.S. 94 (1962),.......................................................................45

*Luckenbach Steamship Co. v. United States*,
312 F.2d 545 (2d Cir. 1963)..........................................................58

*Marco v. Accent Publishing Co.*,
969 F.2d 1547 (3d Cir. 1992)..................................................26, 33

*MedImmune v. Genentech, Inc.*,
598 U.S. 118 (2007)......................................................................54

*Mills Music, Inc. v. Snyder*,
469 U.S. 153 (1985).................................................................5, 53

*Neder v. United States*,
527 U.S. 1 (1999),.........................................................................53

*New York Times v. Tasini*,
533 U.S. 483 (2001).......................................................................6

*NLRB v. Hearst Publications, Inc.*,
322 U.S. 111 (1944)......................................................................39

*NLRB v. United Insurance Co. of America*,
390 U.S. 254 (1968).....................................................................42

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
572 U.S. 663 (2014)......................................................................55

*Quintanilla vs. Texas Television, Inc.*,
139 F.3d 494 (5th Cir. 1998)................................................................33

*RadLAX Gateway Hotel v. Amalgamated Bank*,
566 U.S. 639 (2012)............................................................................53

*Recht v. Metro Goldwyn Mayer Studio, Inc.*,
580 F.Supp.2d 775 (W.D. Wis. 2008) ................................................36

*Roadway Package System, Inc.*,
326 N.L.R.B. 842 (1998)....................................................................42

*Salamon v. Our Lady of Victory Hosp.*,
514 F.3d 217 (2d Cir. 2008)........................................................ 23, 40

*SHL Imaging, Inc. v. Artisan House, Inc.*,
117 F. Supp. 2d 301 (S.D.N.Y. 2000)................................................32

*Stewart v. Abend*, 495 U.S. 207 (1990) ............................................4, 5

*Tagare v. Nynex Network Sys. Co.*,
994 F.Supp. 149 (S.D.N.Y. 1997)......................................................38

*Tomas v. Gillespie*,
385 F. Supp. 2d 240 (S.D.N.Y. 2005),...............................................57

*Ulloa v. Universal Music & Video Distribution Corp.*,
303 F. Supp. 2d 409 (S.D.N.Y. 2004)......................................... 26, 28

*United States v. Western Pacific R.R. Co.*,
352 U.S. 59 (1956)..............................................................................58

*Update Art, Inc. v. Modiin Pub., Ltd.*,
843 F.2d 67 (2d Cir. 1988)...................................................................6

*Wilson v. Dynatone Publ'g Co.*,
892 F.3d 112 (2d Cir. 2018)................................................................57

*Woods v. Bourne Co.*,
60 F.3d 978 (2d Cir. 1995)................................................. 18, 21, 30

## Statutes

17 U.S.C. §101 ........................................................................... passim

17 U.S.C. §201 ................................................................ 18, 21, 51, 54

17 U.S.C. §203 ................................................................................ passim

17 U.S.C. §304 ............................................................................ 4, 18, 21

17 U.S.C. §507 ................................................................................ passim

17 U.S.C. §701 ................................................................................ 42

28 U.S.C. §1338 .............................................................................. 42

28 U.S.C. §2201 .............................................................................. 54

29 U.S.C. §152 ................................................................................ 45

29 U.S.C. §157 ................................................................................ 46

29 U.S.C. §159 ........................................................................ 45, 49, 50

29 U.S.C. §164 ................................................................................ 45

29 U.S.C. §402 ................................................................................ 45

Pub. L. 80–101……………………………………………………………48

Pub. L. 94–553, title I, § 102, Oct. 19, 1976, 90 Stat. 2598 .................... 41

## Other Authorities

BLACK'S LAW DICTIONARY, *action* (11th ed. 2019). ............................... 53

Copyright Law Revision: Hearings on H.R. 4347, 5680, 6831, 6835 before
Subcomm. No. 3 of the H. Comm. on the Judiciary, 89th Cong., 1st Sess., pt. 1
at 311 ....................................................................................... 43

Fed. R. Civ. P. 3 .............................................................................. 54

H.R. Rep. No. 94–1476 (1976) ........................................................... 5

Joseph North, *The New Hollywood*, 32 THE NEW MASSES 14 (July 11, 1939)
(quoted in HORNE, CLASS STRUGGLE IN HOLLYWOOD 45) ..................... 48

Ralph K. Winter, *Collective Bargaining and Competition: The Application of
Antitrust Standards to Union Activities*, 73 YALE L. J. 14 (1963). ............... 47

Supp. Report of the Register of Copyrights on the General
   Revision of the U.S. Copyright Law: 1965 Revision Bill,
   89th Cong., 1st Sess., pt. 6 at 66 (1965). ............................................................43

## **Regulations**

37 C.F.R. §201.10 ..........................................................................................................6

## **Constitutional Provisions**

U.S. Const., Art. I, §8, Cl. 8.......................................................................................4

## PRELIMINARY STATEMENT

Victor Miller and Sean Cunningham were best friends, trying to make it in the film business. Miller—a stay at-home writer; Cunningham—an independent producer, with an office in his garage. And the movie they ended up making is one of the best-known horror films of all time: *Friday the 13th* (1980).

The horror hit *Halloween* (1978) had just come out. And so the two friends thought they'd try one of their own. Miller wrote a treatment. Cunningham shopped it, looking for financing, while Miller worked on the script. Once Cunningham lined up backing, he gave Miller an agreement promising a fixed sum for writing the screenplay. As a Writer's Guild of America member, Miller was supposed to work only with WGA signatories, so Miller's agreement was with "The Manny Company," a shell-company signatory Cunningham had used for a prior indie film.

Miller's screenplay, it turned out, was pretty good. *Friday the 13th* was a massive success, launched a horror franchise, and made millions for others—but not Miller. He got his $9,282 fee for the script, of course, and eventually, some residuals. Cunningham, who he thought was his best friend, went on to produce eleven sequels, leaving Miller behind. Unfortunately, that's show business.

The Copyright Act, however, gives authors important "termination rights," designed for situations just like Miller's. Under the Act, once thirty-five years have

1

elapsed, an author can recapture the U.S. copyright to his work by unilaterally terminating, without cause, any transfer or license. The purpose is to give authors, like Miller, a second chance to finally share in their work's value, once it is established. So, in 2016, following the procedures prescribed by the Act, Miller served Manny and its successor Horror, Inc. with statutory notices of termination.

Under the Act, appellants would keep all rights to the original movie and eleven sequels, plus all foreign rights to Miller's screenplay originally licensed. Miller's termination thus did not end *Friday the 13th*, it just ensured that its author would finally participate in the fruits of his creation, likely in a new license to appellants.

Upon receiving Miller's statutory notice, however, appellants abruptly filed this lawsuit claiming Manny, not Miller was the "author" of the screenplay as a "work made for hire"—the Act's sole exemption from termination. But for *that* to be true under Section 101 (defining a "work made for hire"), appellants would have to show that Miller was a conventional "employee" of the shell company, not the independent contractor he was. An independent contractor's work is only "for hire" if there is a signed writing expressly saying so, and none exists here.

According to the Supreme Court in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 743 (1989) whether Miller wrote his screenplay as an "employee" or "independent contractor" turns on the common-law agency factors

2

long used to distinguish between the two. Under this test, and particularly those factors this Court found most important in *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992), Miller is as prototypical an independent contractor as one could ever hope to find. He wrote his iconic screenplay from home, on his own schedule and typewriter, received a lump sum for this short project (with no taxes withheld), and got no employee benefits. Manny, *itself*, did not treat Miller as its "employee."

As they cannot win under settled agency law, appellants created a new test: Miller's status should be determined by their version of *labor law*. But no federal court in the country has *ever* used labor law to construe "work for hire" under the Copyright Act, both because the Supreme Court has unequivocally said the rule is otherwise, and because of the absurd consequences that would follow. For instance, copyright law would effectively be decided and administered by the NLRB instead of the federal courts and Register of Copyrights, respectively. Unsurprisingly, appellants' labor-law argument is falsely premised on rules that don't exist (like "only employees can be members of a labor union") and for which they cite no authority—all rendering their appeal an easy one to decide.

The judgment below for Miller should be affirmed.

## ISSUES PRESENTED FOR REVIEW

1. Whether the appellee, Victor Miller, created the works at issue as an "employee" of the appellant Manny, such that they are "works made for hire" under the Copyright Act. 17 U.S.C. §101.

2. Whether Miller's notice of termination for those works is time-barred under 17 U.S.C. §507(b).

## STATEMENT OF THE CASE

### A. Statutory Background

American copyright law has distinctive roots in the Constitution, which bestows on Congress the power to give "Authors and Inventors the exclusive Right to their respective Writings and Discoveries," so as to "promote the Progress of Science and useful Arts." U.S. Const., Art. I, §8, Cl. 8. From that unique soil, unique rights have grown. This case is about one of them.

The Copyright Act of 1976, 17 U.S.C. §101 *et seq.*, significantly enhanced authors' rights by instituting the termination right. An author of a copyrighted work may recapture his rights by statutorily terminating without cause the "grant of a transfer or license of copyright or of any right under a copyright," thirty-five years after such transfer. 17 U.S.C. §203(a); *see also* 17 U.S.C. §304(c), (d) (applicable to pre-1978 transfers). To protect this authorial right, Congress made it "inalienable," *Stewart v. Abend*, 495 U.S. 207, 230 (1990): An author can exercise

4

the termination right "notwithstanding any agreement to the contrary." 17 U.S.C.

§203(a)(5). A publisher, in other words, cannot pay an author not to terminate its

grant or license when the statutory "window" opens.

As a matter of contract law, a unilateral right of authors (but not their

counterparties) to terminate valid grants without cause, which cannot be sold for

any price, is quite unusual. As a matter of copyright law, however, it is old hat.

Since the Copyright Act of 1831, Congress has given authors the ability to recover

transferred copyrights, to afford them "a second chance to control and benefit from

[their] work." *Stewart*, 495 U.S. at 218, 219-20.

This distinctive right exists because authors are in a distinctive business.

They write or compose with no way of knowing whether their works will succeed.

Congress has long recognized that to see their works published, authors agree to

one-sided copyright transfers designed by publishers to be as expansive as

possible, for as little compensation as possible. It felt the termination right was

"needed because of the unequal bargaining position of authors, resulting in part

from the impossibility of determining a work's value until it has been exploited."

H.R. Rep. No. 94–1476 at 124 (1976); *see also Mills Music, Inc. v. Snyder*, 469

U.S. 153, 172-73 (1985). Congress therefore decided that once a publisher has had

a generous period to enjoy a work's success, its author should be able to finally

participate in "the true value of his work product." *Id.* at 173. The Copyright Act's

5

termination provisions thus reflect a deliberate calibration of "the author/publisher balance." *New York Times v. Tasini*, 533 U.S. 483, 495 n.3 (2001).

Reflecting this balance, terminated parties, like appellants, can continue to exploit prior "derivative works" (e.g., the twelve *Friday the 13th* films) "under the terms of" their original license. 17 U.S.C. §203(b)(1). In addition, because the Act has no extra-territorial application, terminated parties retain all *foreign copyright interests* originally licensed. *Update Art, Inc. v. Modiin Pub., Ltd.,* 843 F.2d 67, 72 (2d Cir. 1988). Terminated parties are also afforded a competitive advantage to *reacquire* the author's recaptured copyright interests, 17 U.S.C. §203(b)(4), which is common due to the retention by terminated parties of key rights.

The author of a work transferred or licensed after January 1, 1978 can terminate same, during a five-year window commencing thirty-five years later. 17 U.S.C. §203(a)(3). Termination is carried out by serving at least two years' advance notice, stating an effective termination date within the five-year window, in the form prescribed by the Act and the Register of Copyright's regulations. 17 U.S.C. §203(a)(4); 37 C.F.R. §201.10. Upon the effective termination date, "all rights under this title that were covered by the terminated grants revert" to the author. 17 U.S.C. §203(b).

The termination right is subject to only one exception: it does not apply to a "work made for hire" as defined in 17 U.S.C. §101. The Act defines a "work made

6

for hire" as one that (1) was "prepared by an employee within the scope of his or her employment," *or* (2) was "specially ordered or commissioned for use as a contribution to a collective work" including "a motion picture" provided that "the parties expressly agree in a written instrument … that the work shall be considered a work made for hire." 17 U.S.C. §101.

### B.    Factual Background

The appellee, Victor Miller, is an award-winning author of novels, teleplays and screenplays. A421 (¶3). He has written extensively for television, for which he has received three Emmy Awards and eight Emmy nominations, and has also written several published novels and screenplays for produced films. A421 (¶3). He is a Yale graduate and the co-founder of The American Shakespeare Theatre's Center for Theatre Techniques in Education. A420-21 (¶¶2-3). And in 1979, Miller wrote the original screenplay for one of the best-known horror films of all time: *Friday the 13th* (1980) (the "Film"), for which he received sole writing credit. A424 (¶26).

In 1979, Miller's best friend was another young man named Sean Cunningham. A421 (¶4). Although Cunningham styled himself as an independent director-slash-producer, A421 (¶4), in those days, he was usually broke, made low-budget films, and attended to his duties as the nominal head of various paper "production companies" from a desk above his garage. A685; A754-60; A761-83.

7

His debut work was a pornographic movie made for $3,000, *The Art of Marriage,*
thus titled (as Cunningham explained) because "they allowed you to get away with
showing hardcore XXX-rated movies as long as they were under the guise of
freedom of speech. You billed it as an 'educational' or 'medical movie.'" A755.
Cunningham's *The Case of the Smiling Stiffs* (1973) and *The Fireworks Woman*
(1975) were also hardcore pornography. A775, 776.

But Cunningham had higher aspirations. In 1978, he produced and directed
*Here Come the Tigers*—a film designed to "rip off" *Bad News Bears*. A688-89;
A756-57. Although it was a disappointment, soon after, the slasher hit *Halloween*
prompted Cunningham to suggest to his friend Miller that they emulate it. A13
(¶2). Miller thought it was worth a try, and after seeing *Halloween* in early 1979,
he wrote a 15-page treatment entitled "The Long Night at Camp Blood." A421
(¶6); A425-39. Shortly thereafter, Miller wrote the first draft of a full-length
screenplay with the same title. A440-508. Miller wrote both the treatment and the
first draft "on spec"—that is, without any contract and thus no guarantee of ever
being paid—in the hopes that it would help his friend raise the money for their
project. A421 (¶8); A19 (¶22).

At some time after the first draft was written, as Miller was into his second
draft, Cunningham suggested a more commercial title—"Friday the 13th". A421
(¶9). To account for the new title, Miller inserted specific references to this date in

8

his second draft screenplay. A-422 (¶10); A515-16, 518, 575. Cunningham worried, however, that the title might elicit legal challenges, so he used the working title "Friday 13" instead. A422 (¶10); A509.

As Miller continued work on his second draft, and Cunningham made progress securing financing, he furnished Miller with an agreement that "papered over" their relationship. SPA2. The agreement was with "The Manny Company", a limited partnership that Cunningham had used on another film (Sean S. Cunningham Films, Ltd., was the general partner). A31-32; A15 (¶10); A422 (¶11); A601-02. The Agreement was a form "Writer's Flat Deal Contract", with various blanks filled in for a "motion picture … entitled … Friday 13", but not the space for its date. A601 (¶1). In the Agreement's first paragraph, the boxes for "First draft screenplay" and "Final draft screenplay" are checked, but the boxes for "Treatment" and/or "Original Treatment" are not. A601 (¶1). The Agreement promised Miller lump-sum payments of $5,569 for his first draft, and $3,713 for a final draft. A601-02 (¶3). The Agreement nowhere states that Miller's screenplay is a "work made for hire." A601-02.

The Agreement was executed by Manny and Miller on or about June 4, 1979. A422 (¶11); A17 (¶16). By this time, Miller had made substantial progress on his second draft, and (following Cunningham's July 4th advertisement in *Variety* to flush out anyone claiming the title), the Film's name was changed to

9

"Friday the 13th." A422 (¶14); A603. Miller thereafter made only minor revisions to his second draft, though he did write a new ending in the final draft screenplay. A422 (¶13).

Miller wrote on his own schedule, from the study of his own home, on his own IBM Selectric typewriter, using his own paper and ribbons. A422 (¶15). In the process, he and Cunningham bounced ideas off one another as Cunningham was to be the director and producer of the Film. A423 (¶19). Cunningham, however, did not purport to dictate Miller's creative writing. A423 (¶19). Miller was paid the lump sum amounts set forth in the Agreement, from which Manny did not withhold or deduct any federal or state income tax, nor any payroll deductions for Social Security or Medicare (for which Manny also did not pay the employer's matching amount); Manny also did not report or pay federal unemployment taxes or FICA taxes. A604. Manny also did not provide Miller with any employee benefits: no health insurance, no medical or dental plan, no paid vacation, no worker's compensation insurance and no pension. A423 (¶24).

Pre-production for the Film was conducted in the Summer of 1979, and principal photography began "in or about October 1979." A19 (¶23). Georgetown Productions, Inc. ("Georgetown") put the money up for the Film, which cost approximately $500,000. A19 (¶22). In May 1980, Manny assigned its rights in the *Friday the 13th* screenplay to Georgetown, in a contract which attached Miller's

10

form Agreement. A120-26. In that contract, Manny "represent[ed] and warrant[ed]" that "the Screenplay is original" and that "Victor Miller is the sole author of the Screenplay." A121 (¶2). Like its agreement with Miller, Manny's contract with Georgetown nowhere states that Miller's screenplay was a "work made for hire." A120-26. Georgetown's rights went through a series of entities, of which appellant Horror, Inc. ("Horror") is the successor. SPA12.

Upon its release, *Friday the 13th* became a franchise-launching hit; for writing it, Miller received $9,282 per his Agreement with Manny. A423 (¶21); A601-02 (¶3); A604; A605. A decade later, in 1989, after years of having to prod Cunningham and Georgetown, Miller received $27,396 in television residuals, and thereafter a modest stream of residuals averaging less than $7,000 per year. A251-52.

In January 2016, Miller invoked his termination right to recapture the copyrights to his treatment and screenplay under 17 U.S.C. §203(a). As relevant here, Miller timely served appellants with a statutory notice of termination, effective July 15, 2018, and filed it with the U.S. Copyright Office. A608 (¶13); A631-34; A20 (¶28). Appellants commenced this lawsuit in August 2016, seeking (as relevant to this appeal) a declaration that Miller's notice of termination was ineffective, alleging that Miller's screenplay was ineligible for termination as a purported "work made for hire" under 17 U.S.C. §101. A13-28. Miller counter-

claimed for a declaration that his notice of termination was valid. A36-65. Following discovery, both sides moved for summary judgment.

### C. The District Court's Decision

On the parties' cross-motions for summary judgment, Chief Judge Underhill concluded that "Miller did not prepare the screenplay as a work for hire," that Miller had therefore "validly terminated Horror's rights to the copyright in the screenplay" and his "treatment," and that therefore Miller is "the sole owner of the copyright in the screenplay [and treatment] to *Friday the 13th*" as of the effective date of his notice of termination (July 1, 2018). SPA61-62.

The court began by analyzing the question of whether Miller's treatment and screenplay were "works for hire." SPA18. Because Manny's Agreement with Miller contained no "express agreement regarding work-for-hire status," as 17 U.S.C. §101 requires for an independent contractor's contribution to a film to be "work made for hire,"[1] both parties agreed, and the district court confirmed, that the screenplay could *only* be a "work made for hire" under Section 101 if "Miller's contributions to the screenplay were made as Manny's 'employee.'" SPA20-21.

---

[1] The court observed that the "comparable screenwriter's short-form [writing] contract now in use by the WGA" does contain such an express work-for-hire term. SPA20.

The district court concluded that *Miller* was no such thing. The court began by rejecting appellants' central argument— "a sort of 'no further inquiry' rule of employee status resulting from Miller's hiring, as a WGA member by a signatory to the WGA collective bargaining agreement." SPA3, 21. That, the court concluded, is not the "test mandated by the Supreme Court" to determine "whether a hired party is an employee or independent contractor" for purposes of the Copyright Act's work-for-hire provisions. SPA21. There was "nothing to suggest" that labor-law considerations were appropriate in that analysis, and indeed the district court noted that the Supreme Court had "expressly distinguished the use of agency law under the Copyright Act from the broader definition of 'employee' once used under labor law." SPA22 (citing *CCNV*, 490 U.S. at 740).

The district court also found that conclusion to be reinforced by Section 101's legislative history, which the Supreme Court had reviewed in *CCNV*. SPA23-24. Although earlier draft bills had "only included works prepared by employees" in the work for hire definition, the bill was revised to add commissioned works for use "as part of a motion picture," because "these commissioned works, *although not prepared by employees*," nevertheless should be treated as works for hire, but only if "the contracting parties had expressly so agreed in writing." SPA24 (quoting *CCNV*, 490 U.S. at 746) (emphasis in district court's order).

The district court also concluded that even if "labor law considerations" were relevant to the Copyright Act's work for hire provisions, Miller would still prevail. SPA24. The "simple fact of union membership" was not enough to render a person an "employee," even for labor-law purposes. SPA 25. Nor was it true that union members were "necessarily employees" simply because they were "hired by union signatory companies pursuant to a relevant collective bargaining agreement." SPA25. To the contrary, as the district court noted, "even independent contractors" could "participate in union activity and be subject to union regulation, including minimum fee scales and other terms of employment." SPA26. The court concluded that Miller's status as a WGA member and Manny's status as a WGA signatory thus did not demonstrate that he was anyone's "employee" under Section 101 of the Copyright Act. SPA24-30.

Having rejected appellants' labor-law argument, the district court turned to "the agency law analysis mandated by the [Supreme] Court." SPA30. The court observed that while the Supreme Court set forth a long list of traditional factors used to distinguish "employees" from "independent contractors" under the common law of agency, this Court had held that some of those factors are "most important." SPA30 (citing *Aymes*, 980 F.2d at 861); SPA46. The district court concluded that these first-priority factors strongly indicated that Miller was an "independent contractor", as did nearly all other factors.

14

As to the first-priority factors, the district court concluded that four of the five pointed "clearly to independent contractor status", while one was "inconclusive." SPA41. The court found that Miller was engaged in a skilled profession, SPA35-36, that Manny did not provide Miller with any customary employee benefits, SPA36-37, that Manny did not treat Miller as an employee for tax purposes, SPA37, and that Miller's "engagement did not provide Manny the right to assign [him] additional projects," SPA46. As to whether Manny had the right to control Miller's creative writing, the district court found this factor "essentially inconclusive" and that "even if that factor [had] pointed more strongly towards employee status, it would not be dispositive." SPA41 (citing *CCNV*, 490 at 752).

Having determined that the "factors deemed most important in *Aymes* weigh clearly in favor of independent contractor status," the district court's "analysis of the remaining factors" provided "no justification for reversing that assessment" and, in fact, reinforced it. SPA46. Miller did his work over a short period (two months), was paid a flat fee, supplied his own tools, wrote at home and at his own pace, and had discretion over when and how long to work. SPA42-43. All of these factors, the court concluded, favored independent-contractor status, though perhaps less than the higher-priority *Aymes* factors. SPA45. The remaining factors had little weight: Miller's work did not lend itself to assistants (so his role in hiring or

paying them was irrelevant), and Manny's status as a business, "'will always have very little weight in this analysis'". SPA46 (quoting *Aymes*, 980 F.2d at 863).

In sum, the district court concluded that under the agency-law analysis "mandated by the Supreme Court in *CCNV* for determining a hired party's status as employee or independent contractor under the Copyright Act," "Miller wrote the screenplay as an independent contractor," not as Manny's "employee." SPA30. Accordingly, as Miller and Manny had not expressly agreed in a signed instrument that Miller's work shall be considered a "work made for hire," it did not qualify as such under Section 101 of the Act. SPA19. The district court also concluded that Miller was the sole author of the screenplay, as credited for decades, SPA47-51, and that Miller's notice of termination complied with the Act, SPA56-60.[2]

The district court further concluded that appellants' argument that Miller's notice of termination was barred by Section 507(b)'s three-year statute of limitations was "not strong." SPA53. The court reasoned that appellants failed to present evidence of an "express repudiation" of Miller's authorship, required to trigger the statute on an authorship claim. SPA53. Cunningham had put a copyright

---

[2] The district court also rejected appellants' argument, not preserved on appeal, that there was no assignment here to terminate. The district court noted that when an author's engagement agreement falls short of "work for hire," a non-exclusive license is typically implied, and such licenses are expressly subject to termination under 17 U.S.C. §203(a). SPA58-59.

notice (for "Sean S. Cunningham Films") on the screenplay's title page, but this was consistent with Miller's authorship (as distinguished from ownership), as evidenced by Miller's sole writing credit on the same cover page (and even Sean Cunningham Films' ownership, as opposed to Manny's, was "plainly incorrect."). SPA53-54. The court reasoned that the "patently incorrect" 1980 filing with the Copyright Office listing *Georgetown* as the author of the *Film* is not only "inconsistent" with *Manny's* authorship claim regarding the screenplay, "'the mere act of registering'" a copyright is "'not an effective repudiation' of Miller's authorship rights." SPA54-55. In fact, "since Miller received sole credit as the writer of the screenplay" on the 1979 screenplay's title page, the 1980 Film, and in Manny's contract with Georgetown, it was appellants' claims of *joint authorship* that were time-barred. SPA52-53.

The district court therefore entered summary judgment for Miller, concluding that he "did not prepare the screenplay as a work for hire," that his notice of termination was valid and effective, and that he was therefore "the sole owner of the copyright in the *Friday the 13th* screenplay." SPA62.

This appeal followed. [Notice of Appeal]

## SUMMARY OF ARGUMENT

Under the Copyright Act, the author of a creative work may recapture his copyright (during certain time windows) by statutorily terminating "the exclusive

or nonexclusive grant of a transfer or license of copyright or of any right under a

copyright." 17 U.S.C. §203(a); §304(c). The sole exception is a "work made for

hire," because as to such works "the employer … is considered the author". 17

U.S.C. §201(b), §203(a). Under the statute, a work qualifies as "for hire" under

two mutually exclusive circumstances, *CCNV*, 490 U.S. at 743, only one of which

is claimed by appellants: "(1) a work prepared by an employee within the scope of

his or her employment." 17 U.S.C. §101. The Supreme Court has held that

"employee" in Section 101 means a "conventional employment relationship,"

governed by the traditional factors of agency law. *CCNV*, 490 U.S.at 743; *see also*

*Aymes*, 980 F.2d at 861. Because "work made for hire" is a statutory exception to

termination, it is appellants' burden to prove it. *Woods v. Bourne Co*., 60 F.3d 978,

993-994 (2d Cir. 1995).

Judged by the *CCNV* factors, this is not a close case. Despite the long list of

traditional agency-law factors, it is hard to find even *one* that clearly indicates a

traditional employment relationship between Miller and Manny. Miller was

engaged in a skilled profession; he worked where and when he wanted; he was not

given any employment benefits; he was not treated as an employee for tax

purposes; his engagement was limited to a single project; and it was of brief

duration. In fact, the factors this Court has held are *most* important (like tax

treatment and employment benefits) most clearly favor Miller's independent-

18

contractor status. *Aymes*, 980 F.2d at 861. The district court was therefore correct to enter summary judgment: viewing the evidence in the light most favorable to appellants, Miller was undoubtedly an independent contractor.

Appellants appear to recognize that they lose under the *CCNV* factors, and so have focused most of their attention on changing the subject. They argue that, notwithstanding the Supreme Court's directive in *CCNV* and this Court's confirmation in *Aymes*, Miller should be deemed an "employee" because he was a member of a labor union (the Writers Guild of America, or WGA), and did work for a signatory (Manny) to the WGA's collective-bargaining agreement. This matters, say appellants, because only "employees" can join labor unions, and collective-bargaining agreements only cover "employees." Thus, they say Miller *must* have been an employee for labor-law purposes, and so must be treated that way under the Copyright Act.

That argument is, first and foremost, wrong as a matter of copyright law. Appellants do not supply a single legal authority holding that one's status as an "employee" under labor law means *anything* in the copyright context. To the contrary, when a federal court must determine whether someone (even a union member) is an employee or independent contractor under one of the many statutes where that is relevant, judges routinely apply *the CCNV agency-law factors*. The proposal to import labor-law status determinations would also cause a myriad of

practical problems, such as effectively placing the NLRB in charge of administering the Copyright Act.

Worse still, appellants' argument is wrong as a matter of *labor law*, which does not require all members of a labor union to be "employees," and which does not bar unions from bargaining over the working conditions of independent contractors. Miller's membership in the WGA, and Manny's status as a signatory to the WGA agreement, would therefore not even be probative of Miller's "employee" or "independent contractor" status if this *were* a labor case.

Finally, Miller's notice of termination complied with the Copyright Act's statutory deadlines and the Register of Copyright's regulations, and so is not time-barred. Miller's termination notice is governed by Section 203(a)'s specific timing rules, not Section 507(b)'s three-year limitations period applicable to "civil actions," and under Section 203(a) an author *must* wait at least thirty-five years before termination is available. At any rate, even if the three-year period applied, Miller satisfied it. The period does not start running on a claim of authorship until that authorship is expressly repudiated. But Miller received sole screenwriting credit from appellants for decades, and it was not until this litigation that appellants expressly repudiated his authorship.

The district court's judgment for Miller was correct and should be affirmed.

20

## ARGUMENT

## I. MILLER'S SCREENPLAY WAS NOT A "WORK MADE FOR HIRE"

When a work is created its copyright "vests initially in the author or authors of the work." 17 U.S.C. §201(a). By "author," Congress meant just what an ordinary listener would think: the person who "actually creates the work," that is, "the person who translates an idea into a fixed, tangible expression," such that it is copyrightable. *CCNV*, 490 U.S. at 737. In most situations, the *person* who is the author will be just that—a natural person, like Victor Miller. As relevant here, it is that author who under the Act may recover his copyright (during certain time windows) by terminating "the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright." 17 U.S.C. §203(a); §304(c).

There is only one "exception" to the usual rule. *CCNV*, 490 U.S. at 737. When a work is "made for hire," then "the employer or other person for whom the work was prepared is considered the author." 17 U.S.C. §201(b). For such works, there is no termination right. 17 U.S.C. §203(a) (termination applies to "any work other than a work made for hire"). Appellants, as the "party claiming [this] exception," "bear the burden of proof" on it. *Woods v. Bourne Co.*, 60 F.3d 978, 993-994 (2d Cir. 1995) (discussing exception to the termination right). *See also FTC v. Morton Salt Co.*, 334 U.S. 37, 44-45 (1948) (noting the "general rule of

21

statutory construction" that "the burden of proving justification or exemption under a special exception to … a statute generally rests on one who claims its benefits").

A work for hire "can arise through one of two mutually exclusive means." *CCNV*, 490 U.S. at 743. For a work like Miller's screenplay, "specially ordered or commissioned" as "part of a motion picture," the mechanism is "a written instrument," signed by both parties, "expressly agree[ing] … that the work shall be considered a work made for hire." *Id*. at 738. As this Court recently explained, this "technical phrase" requirement for independent contractors has many advantages: it is "straightforward and easy to apply," "furthers the goal of ensuring that all commissioned works are not categorically deemed 'works made for hire,'" and "saves courts the knotty work of sorting out the parties' intent years" later. *Ennio Morricone Music, Inc. v. Bixio Music Group Ltd.*, No. 17-3595 (2d Cir. Aug. 21, 2019) (slip op., at 6) (upholding termination right of composer who was engaged to write six film scores for the same entity).

No such writing exists here, and appellants never alleged any written instrument signed by Miller "expressly" agreeing that his treatment and screenplay would be a "work made for hire." Everyone therefore agrees that the screenplay does not qualify as work for hire under Section 101's "specially ordered or commissioned" clause. SPA19. Upon receiving Miller's notice of termination, Appellants nonetheless chose to sue him under Section 101's other prong—"a

work prepared by an employee within the scope of his or her employment"—even though Miller was clearly never Manny's "employee."

The Supreme Court has held, and this Court has affirmed many times since, that "employee" in Section 101 means a "conventional employment relationship," determined by the traditional factors of agency law. *CCNV*, 490 U.S.at 743, *Aymes*, 980 F.2d at 860-61. (Although the list of traditional factors in *CCNV* is non-exclusive, this Court has held that *any others* must still be drawn from the common law of agency. *Salomon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 227 (2d Cir. 2008).) Judged by those factors, this is not a close case. Miller was a skilled artisan who worked where, when and for how long he wanted; Manny did not provide him any employment benefits, nor treat him as an employee for tax purposes; and his engagement was limited to a single project of brief duration. In fact, despite the long list of agency factors considered at common law, it is difficult to find even *one* that clearly indicates a traditional employment relationship.

In apparent recognition of this, appellants have entrusted their fate to a more exotic argument—so exotic that they are unable to point to a single federal court, anywhere, that has ever adopted it. Appellants observe, correctly, that Miller was a member of a labor union—the WGA—and performed work for a signatory (Manny) to the WGA's collective bargaining agreement. Appellants argue that because in their view (1) only employees have the right to join labor unions, and

23

(2) labor unions can only bargain on behalf of employees—Miller *must* be treated as an "employee" under the Copyright Act.

This argument is wrong as a matter of copyright law (which has never borrowed its definition of "employee" from labor law), wrong as a matter of labor law (which permits non-"employees" to be union members, and unions to bargain for their working conditions), and even wrong as a matter of administrative law (as it would effectively require the NLRB to administer a major provision of the Copyright Act, which it has no authority to do). It is also unnecessary: the Act already provides that contributions to "a motion picture" by independent contractors may be treated as "works made for hire" if the parties expressly agree. 17 U.S.C. §101.

## A. Under the Common Law of Agency, Miller Was an Independent Contractor

In "using the term 'employee'" in Section 101, "Congress meant to refer to a hired party in a conventional employment relationship." *CCNV*, 490 U.S. at 743. Therefore, to "determine whether a work is made for hire under the Act, a court should first ascertain, using principles of the common law of agency, whether the work was prepared by an employee." *Id.* at 750–51. There are several non-exclusive factors that traditionally bear on whether a person is an "employee" at common law, including:

the hiring party's right to control the manner and means by which the product is accomplished … the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 751-52.

All or nearly all of the applicable factors weigh in favor of Miller's independent-contractor status. However, not all of these factors are equally important. What makes the case for Miller particularly clear is that the most important factors are also the ones that most clearly demonstrate that he worked as an independent contractor.

### 1.    Miller is an Independent Contractor Under the First-Priority *Aymes* Factors

This Court has recognized that a few common-law factors "will almost always be relevant" and "should be given more weight in the analysis, because they will usually be highly probative of the true nature of the employment relationship." *Aymes*, 980 F.2d at 861. Those are "(1) the hiring party's right to control the manner and means of creation; (2) the skill required; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party." *Id. See*

*also Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998) (concluding that a worker was an independent contractor because "[a]lmost all of the *Aymes* factors line up in favor of that conclusion").

### (a)    Screenwriting Is a Skilled Profession

Appellants concede (at 43) that screenwriting is a skilled occupation, and Miller is a skilled screenwriter—that is why Cunningham, though intending to direct and produce the Film, approached Miller to write it. By 1979, when Miller wrote the screenplay, he had already written several published novels and three produced films. A421 (¶3). Cases involving professional creative artists have regularly found the skill factor to weigh strongly in favor of independent contractor status. *E.g.*, *CCNV*, 490 U.S. at 752 (sculptor); *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 86-87 (2d Cir. 1995) (same); *Marco v. Accent Publishing Co.,* 969 F.2d 1547, 1552 (3d Cir. 1992) (photographer); *Ulloa v. Universal Music & Video Distribution Corp.*, 303 F. Supp. 2d 409, 415–16 (S.D.N.Y. 2004) (singer); *Johannsen v. Brown*, 797 F. Supp. 835, 841 (D. Or. 1992) (graphic artist).

Appellants' only response (at 43) is that Cunningham was purportedly *also* a "skilled writer." That is factually dubious (appellants cite only Cunningham's praise of himself as evidence), but even if one credits it, appellants do not explain why this would matter. If an electrician is hired to rewire a home, why would his

26

status as an independent contractor differ if the homeowner happened to be skilled in the trade, too? Appellants do not say, and there is no reason it would.

### (b)  Manny Did Not Provide Miller Employee Benefits

Manny provided Miller with no employee benefits whatsoever: no health insurance, no medical or dental plan, no paid vacation, no pension, no life insurance. A423 (¶24). Nor did Manny contribute on Miller's behalf to federal unemployment or worker's compensation insurance as would have been required for employees. A423 (¶24).

Although they do not dispute those basic facts, appellants attempt (at 44-46) to capitalize on Miller's receipt of certain benefits from the WGA. But Miller's receipt of *WGA* benefits does not demonstrate that he was in a conventional employment relationship with *Manny*. (To the contrary, a guild might offer health and pension benefits to its members *because* so many work as independent contractors.) At any rate, appellants cite no authority for the proposition that a third party's provision of health and pension benefits has any effect on whether the relationship in question is conventional employment. Worse, Manny did not even contribute to the WGA's health and pension plans (A607 (¶4); A610-17) and Appellants do not seriously contend otherwise.[3]

---

[3] Appellants object (at 46) to a declaration from an executive at PWGA Pension and Health Plans, which attached evidence of their non-payment, and argue

Instead, appellants rely on a 1987 settlement agreement that settled "all sums" due Miller—which, they say, includes health and pension contributions to the WGA. As the district court observed, the dispute that was settled concerned residual and sequel payments and had nothing whatsoever to do with benefit contributions to the WGA plans, so it is "at best misleading" to characterize the settlement this way. SPA11 n.9. Even if it were not, a 1987 settlement of obligations to a third party (the WGA) could not retroactively convert the parties' 1979 relationship into one of conventional employment. *See Ulloa,* 303 F.Supp. 2d at 415 ("[B]ecause the tax treatment of the Plaintiff largely occurred after litigation was threatened, it provides little, if any, persuasive evidence of the parties' contemporaneous belief of an employment relationship").

Appellants also attempt (at 44) to characterize as "benefits" various items like the "benefit" of "proper screen credit," the "entitlement to residuals," and the "right to consult on any translation." These are good things, but they are not the sort of benefits that have ever been thought to demonstrate a *conventional employment relationship*. As the district court put it, there is no sense in which "risk-bearing deferred compensation in the form of sequel or residual payments"

---

without citation that it was "improperly" relied upon by the district court. The PWGA, however, also produced *this same evidence* in response to *appellants'* subpoena. A816-27; A828-46.

(for example) is a "traditional employee benefit." SPA37. All independent contractors receive "benefits" from their work—that is why they do it. The point of this prong is to separate employees from independent contractors, and things like "proper screen credit"—which *all* screenwriters receive—do not do that.

### (c) Manny Did Not Treat Miller as an Employee for Tax Purposes

This Court has held that the parties' tax treatment is, along with employee benefits, *the* most "highly indicative" factor regarding whether a worker is a conventional employee. *Aymes*, 980 F.2d at 862. *See also Graham*, 144 F.3d at 235. And other circuits are strongly in accord: "In virtually every case," how "the employer treats the worker for tax purposes" provides a "strong indication of a worker's employment status." *Hi–Tech Video Prods., Inc. v. Capital Cities/ABC, Inc.*, 58 F.3d 1093, 1096-7 (6th Cir. 1995); *Jou v. Accurate Research, Inc.*, 73 Fed. App'x 964, 966 (9th Cir. 2003) ("[m]ost compellingly," the company "did not treat the programmers as 'employees' for tax purposes"). Tax treatment is a clear, bright-line inquiry, and so allows parties to predict with clarity how the law will see their relationship decades later. It is also intuitively fair to condition the legal benefits of an employment relationship on the employer's assumption of the tax responsibilities that come with it.

As the district court concluded, appellants presented no evidence that Manny ever treated Miller as an employee for tax purposes, and there is good evidence it

did not. SPA37. Manny simply paid Miller the flat sums in paragraph 3 of their Agreement—for example $3,713 upon delivery of the final draft screenplay. A602 (¶3). Miller submitted documentary evidence that he was paid a check for that exact amount—$3,713—with no tax withholding. A422 (¶22); A604. There is no evidence that Manny withheld any income tax, Social Security, or Medicare, paid the employer's share of payroll assessments or made federal unemployment contributions. To the contrary, Cunningham said he did *not* recall withholding taxes for Miller. A749. That was consistent with his recollection that he also did not file tax returns for Manny. A699.

In response, appellants argue (at 47) that because Miller does not have a copy of that particular check (he deposited), just Manny's signed letter enclosing and describing it, taxes might still have been withheld from it—or maybe from some earlier payment. But the "mere existence of some alleged factual dispute between the parties" is not enough to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Because it is appellants' burden to prove that Miller's screenplay was made for hire, *Woods*, 60 F.3d at 993-994, their failure to introduce any evidence "sufficient to establish the existence" of employee tax treatment entitles Miller to summary judgment on the question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). No reasonable jury could

conclude that Miller was treated as an employee for tax purposes when the only evidence is to the contrary.

### (d)    Miller's Engagement Was Limited to One Project

Like the hiring party in *CCNV*, Manny "had no right to assign additional projects" to Miller. *CCNV*, 490 U.S. at 753; A423 (¶20). "[I]ndependent contractors are typically hired only for particular projects". *Aymes*, 980 F.2d at 863. Manny's Agreement engaged Miller to write the screenplay for one movie, and that was all. A601 (¶1).

In response, appellants argue (at 47) that Miller was assigned "additional tasks" like "master[ing] the key strategies for horror film structure," and "com[ing] up with ideas for settings." That is rather like saying a lawyer charged with writing a brief is given the "additional task" of writing an argument section. Coming up with "ideas for settings" is inherent in Miller's writing of the screenplay. As this Court has explained, an independent contractor's engagement is more likely to be "project-by-project." *Graham*, 144 F.3d at 235. Miller's engagement by Manny was exactly of that sort.[4]

_____

[4] Appellants come perilously close to the truth (at 47-48) with the observation that the project-by-project nature of screenwriting means that almost "every screenwriter is an independent contractor." That is not *quite* right: as the district court observed, the WGA's collective-bargaining agreement contemplates that some writers will work as more traditional employees. SPA40 (E.g., writers on a long-running episodic television series.) But it is correct that most screenwriters

**(e)** **The Hiring Party's Right to Control the Manner and Means of Creation**

Although *CCNV* rejects control over a hired party's work as the exclusive test for independent-contractor status, it does remain relevant. 490 U.S. at 750–51. But it is not enough to demonstrate that the hiring party supervised or directed the work, even closely—that standard is "hard not to meet when one is a hiring party" of any stripe. *Id.* at 750. If nothing more than "inevitable, routine participation suffced to transform the hiring party into a work-for-hire author," then *CCNV*'s analysis would be meaningless, and the law would "retrogress to the 'actual supervision and control' rule" rejected by *CCNV* itself. *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 314 (S.D.N.Y. 2000).

In this case, Miller was supervised by Cunningham only to the extent one would expect of any screenwriter collaborating with a director/producer. In the main, Miller wrote from his home, at his own pace, on his own typewriter, without daily supervision. A422 (¶¶15-17, 19); *see CCNV*, 490 U.S. at 731, 752; *Aymes*, 980 F.2d at 861-62. To be sure, Cunningham—as the man who was ultimately to direct the film—had ideas. But the right-to-control factor must be understood in the

---

today *are* independent contractors. That does not "beg the question," as appellants argue, but rather follows its correct answer when the traditional agency-law factors are applied.

industrial context a party is working. The point is to *distinguish* independent contractors from employees—every screenwriter can expect the film's director and/or producer to have substantial input.

It is therefore no surprise that Miller and Cunningham bounced ideas off of one another, or that Cunningham made big-picture suggestions (like wanting the killings to feel "personal"). A195-96, 225-27. But that is not enough to render an artisan a conventional "employee." *See Quintanilla vs. Texas Television, Inc.*, 139 F.3d 494, 497-98 (5th Cir. 1998) (finding no "employee" status and no "work for hire" as a matter of law where plaintiff "had control over the concert, but did not control the manner" in which defendant taped the event); *Marco*, 969 F.2d at 1551–52 (3rd Cir. 1992) (holding that a photographer is not a work-for-hire employee even where the hiring party controlled "the subject matter and composition of the images").

Consider the facts of *CCNV* itself. Reid was a sculptor who was hired and given, up front, incredibly detailed direction; the organization hiring him wanted:

> a sculpture of a modern Nativity scene in which, in lieu of the traditional Holy Family, the two adult figures and the infant would appear as contemporary homeless people huddled on a streetside steam grate. The family was to be black (most of the homeless in Washington being black); the figures were to be life-sized, and the steam grate would be positioned atop a platform 'pedestal,' or base, within which special-effects equipment would be enclosed to emit simulated `steam' through the grid to swirl about the figures. They

33

also settled upon a title for the work—'Third World America'—and a legend for the pedestal: 'and still there is no room at the inn.'

*CCNV*, 490 U.S. at 733.

Reid was also given explicit ongoing direction as he worked. His patrons, for example, "rejected [his] proposal to use suitcases or shopping bags to hold the family's personal belongings, insisting instead on a shopping cart." *Id.* at 734. Reid was told that the family should be reclining, not sitting or standing. *Id.* Reid's patrons suggested people to use as models, and took him to visit the streets of their city to get a sense of the conditions. *Id.* Yet the Supreme Court had no trouble concluding that Reid remained an independent contractor. "True," the Court said, Reid's patrons "directed enough of [his] work to ensure that he produced a sculpture that met their specifications," but not enough to render him their employee, especially given that many of the other agency factors cut the other way. *Id.* at 752.

The same is true here. Appellants say (at 40) that after *Halloween* (1978) was a hit, Cunningham came up with the suggestion to do a horror film—which is unsurprising and far less than in *CCNV*. Appellants say that Cunningham gave Miller screenplay "notes and comments"—a common function of a movie director or producer, and certainly less "controlling" than suggesting *specific models* for the sculpture in *CCNV*. Appellants say Cunningham "unilaterally changed the *film's*

34

title" (emphasis added) which differs from *CCNV* only in that the sculptor there never had the chance to come up with the title. Appellants say that Miller and Cunningham developed some scenes and characters together, but such an exchange of ideas between the screenwriter and director/producer is how the movie business works—especially given that Miller and Cunningham were close friends. A421 (¶4).

Appellants make much (at 40-42) of Cunningham's testimony that occasionally he "stood over Miller's shoulder making suggestions." But appellants do not even say what his "suggestions" were. Certainly, Cunningham did not mean that he dictated as Miller typed—why, then, would he have bothered hiring a screenwriter, rather than a typist, or given Miller sole "written by" credit on the film? *Compare Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 111-13 (2d Cir. 1998) (hiring party controlled the worker on a feather fabric design "to the smallest detail," standing over him during his daily work, giving detailed instructions about "the tapering of the feathers, the size of the feathers, the overlapping, the spacing, the thickness, the relationship of one feather to another, and the overall view of all the feathers").

In sum, the relationship between Miller and Cunningham (even if characterized as "tutorials," "ideas," or "standing over his shoulder") was an entrepreneurial collaboration between friends—Miller, the writer, and

Cunningham, the director/producer—working out of their homes on an ultra-low-budget indie film. Neither acted as if Manny had the right to control Miller, nor thought about it for one second as Miller wrote.

## 2. The Remaining Agency Law Factors Also Favor Independent Contractor Status

The overwhelming case for independent-contractor status on the *Aymes* factors is sufficient to end the inquiry; as this Court has said, they are the ones of greatest relevance and importance. 980 F.2d at 861. However, the other agency-law factors enumerated in *CCNV* also weigh in favor of Miller's status as an independent contractor.

### (a) Duration of Project and Method of Paying Miller

It is undisputed that Miller did his work in about two months, SPA42, the kind of "relatively short" period typical of independent contractors. *CCNV*, 490 U.S. at 752-53; *see also Jou*, 73 Fed.Appx. at 966 ("Typically" independent contractors are hired "for short periods of time and for discrete projects"); *Recht v. Metro Goldwyn Mayer Studio, Inc.*, 580 F.Supp.2d 775, 783 (W.D. Wis. 2008) (composer's "three month[]" engagement suggested he was an independent contractor).

Miller was also paid a flat fee (two lump sums, payable upon completion of first and final drafts), "a method by which independent contractors are often compensated." *CCNV*, 490 U.S. at 753; A601-02 (¶3). Miller was never paid an

36

hourly wage or a "salary," despite appellants' unexplained use of this term (at, e.g., 4, 11, 25, 44, 50). And as for Miller's receipt of a 1987 settlement payment for "residual[s]," such risk-bearing "deferred compensation" is certainly not evidence of a conventional employment relationship. SPA43.

None of these basic facts are disputed—and as this Court acknowledged, the "method of payment" when clear like this is a "fairly important factor". *Aymes*, 980 F.2d at 863.

### (b) Location Where Miller Worked, Source of His Instrumentalities and Tools and Miller's Discretion Over When and How Long to Work

Miller wrote his treatment and screenplay at his home, supplied his own instrumentalities and tools (his typewriter, ribbons and paper) and enjoyed the "freedom to decide when and how long to work." *CCNV*, 490 U.S. at 753; A423 (¶17) (Miller was a "morning person"). This is not disputed. Appellants have never argued that Manny had the power to dictate Miller's schedule to him, and their Agreement does not even contain any writing deadlines. A601-02. All of this further demonstrates independent contractor status. *CCNV*, 490 U.S. at 752-53; A422, 423 (¶¶15, 17-18).

To be sure, Miller sometimes talked with Cunningham about the project, A423 (¶19), at a coffee shop, or in his or Cunningham's kitchen—an independent contractor needn't be a hermit. Nor does it show much of anything that *after* Miller

37

wrote his treatment and screenplay, they were re-typed by Cunningham's secretary to add a spiffy title page and marginal scene numbers; and then copied on Cunningham's photocopier. The analysis focuses on Miller's *writing*.

### (c) Miller's Role in Hiring and Paying Assistants and Whether the Hiring Party is In Business and the Work is Part of its Business

As the district court correctly noted, "[t]he nature of Miller's work in writing the screenplay did not lend itself to the use of assistants" and "[t]here is no indication that Miller sought" to hire any. SPA46. And as this Court has held, "the authority to hire assistants will not normally be relevant if the very nature of the work [here, creative writing] requires the hired party to work alone." *Aymes*, 980 F.2d at 861. Similarly, it is not terribly significant that Manny (though largely a paper company that did even not produce the Film) is arguably in the film business as "[t]his factor will generally be of little use" in distinguishing between an independent contractor and employee and "carries little weight" because most businesses hire both. *Aymes*, 980 F.2d at 863. In practice, "courts rarely even address this factor." *Tagare v. Nynex Network Sys. Co.*, 994 F.Supp. 149, 158 (S.D.N.Y. 1997). On balance these two (or three) factors are either irrelevant or of negligible weight, and do little to advance the analysis.

In sum, under *CCNV*, *Aymes* and the common law of agency, this is not a difficult case. Victor Miller's work on *Friday the 13th* could be used to teach law students what a prototypical independent-contractor relationship looks like.

38

### B. Labor Law is Not Relevant to the Work for Hire Question and Would Not Change the Result If It Were

Perhaps owing to the overwhelming case for independent-contractor status under agency law, appellants' principal argument (at 25-34) attempts to end-run that inquiry. Whatever the *CCNV/Aymes* factors indicate, say appellants, Miller must be deemed an employee because he was a member of the WGA and Manny was a signatory to its collective-bargaining agreement. That, say appellants (at 25), should be "the beginning and the end of the inquiry," as it "inherently" makes Miller an employee under the Copyright Act, regardless of *CCNV*. That is wrong as a matter of copyright law *and* labor law.

### 1. Labor Law is Not Relevant to the Copyright Act's Work-for-Hire Doctrine

The Copyright Act has never turned on or been subordinate to labor law, and using a worker's status under labor law to determine whether he is an "employee" under the Copyright Act's work-for-hire provisions is inconsistent with *CCNV*. The Supreme Court has instructed federal courts to determine whether a work was "made for hire" under Section 101 of the Act by "using principles of the general common law of agency." 490 U.S. at 751. In fact, the Court *expressly* distinguished its agency-law approach from the broader definition of "employee" once used under labor law. *Id.* at 740 (describing *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 124-32 (1944)).

While the Court's list of agency-law factors "is non-exhaustive," this Court has nonetheless held that *any others* must still be "drawn from the common law of agency that [*CCNV*] seeks to synthesize." *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 227 (2d Cir. 2008) (quoting *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 n.1 (2d Cir. 2000)). The Supreme Court, and this Court, could hardly have been clearer—the test is agency law, not labor law.

Appellants' interpretation of the Copyright Act is also out-of-step with the way federal courts determine whether a particular person is an "employee" or "independent contractor" in other statutory contexts. When they do, they use the common-law agency test described in *CCNV*, *even when the hired party is a union member*. That is true in Title VII cases, *see, Lerohl v. Friends of Minn. Sinfonia*, 322 F.3d 486, 487-93 (8th Cir. 2003); *Hanson v. Friends of Minn. Sinfonia*, 181 F.Supp.2d 1003 (D. Minn. 2002); *Knight v. State Univ. of N.Y. at Stony Brook*, 2014 WL 4639100 at *1-3, 7 (E.D.N.Y. 2014) (unpublished); in Age Discrimination in Employment Act cases, *see Jackson v. Gaylord Ent. Co*., 2007 WL 4480704 at *1 (M.D. Tenn. 2007) (unpublished), *Kennel v. Dover Garage, Inc*., 816 F.Supp. 178, 181 (E.D.N.Y. 1993); in ERISA cases, *see Laborers' Pension Trust Fund v. Pref. Trenching, Inc*., 969 F. Supp. 455 (E.D. Mich. 1997); and in cases under the Americans With Disabilities Act, *see Familoe v. Ford Motor Co.*, 277 F. Supp. 2d 778 (N.D. Ohio 2002). All of these cases, like this one,

40

involved union members employed pursuant to a collective-bargaining agreement. But not a single one gave *any* weight to that fact; instead, the court simply applied the agency-law test laid out in *CCNV*.

On the other side of the ledger, appellants have not pointed to a single federal court anywhere in the country that has ever adopted their labor-law theory.[5] That is true even though the Act's work-for-hire provision has been in effect in its current form for more than four decades. Pub. L. 94–553, title I, § 102, Oct. 19, 1976, 90 Stat. 2598 (effective date of Copyright Act). For over forty years, despite the film industry being "one of the largest unionized private sector industries in the United States," (Opening Br. at 33), no one has ever suggested that union membership has any bearing on whether the worker's creative output was "made for hire." Perhaps this is because appellants have, at last, seen clearly what all others could not. Or perhaps their argument has never been adopted by any federal court anywhere in the nation because it is wrong.

Using labor law to determine who qualifies as an employee under the Copyright Act would also be strangely circular. The test for determining whether someone is an employee under the labor laws is, today, the common law of agency.

---

[5] Below, they cited only *Gilpin v. Siebert*, 419 F. Supp. 2d 1288, 1295 (D. Or. 2006), which is inapposite as the worker *admitted* that she was an "employee", and the sole question was whether her work was within "the scope of that employment." 2005 WL 3285543 at *3 (D. Or.) (plaintiff's trial motion).

*NLRB v. United Insurance Co. of America*, 390 U.S. 254, 256 (1968). The NLRB often must decide whether particular groups are "employees" for labor-law purposes. *E.g.*, *SuperShuttle DFW, Inc. and Amalgamated Transit Union Local 1338*, 367 NLRB No. 75 (2019). When doing so, the Board often cites *CCNV* itself. *E.g.*, *Roadway Package System, Inc.*, 326 N.L.R.B. 842, 849 (1998). But if labor law is the measure of "employee" status under the Copyright Act, then those Board decisions would effectively bind federal courts, which have exclusive jurisdiction over copyright cases (28 U.S.C. §1338) and the Copyright Office, which is charged with administering the Act (17 U.S.C. §701). Yet the Board has no such authority to "interpret [the NLRA] in a way that limits the work of a second statute," nor "to address the meaning of a second statute it does not administer." *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1629 (2018).

Finally, appellants invoke the legislative history of the Copyright Act, worrying (at 27) that treating Miller as an independent contractor would "import into the Act the 'shop right' system from patent law," which Congress declined to do. But the "shop right" is an equitable doctrine that permits an *employer* to use, without payment, a worker's invention when made using the employer's resources. *Lariscey v. United States*, 949 F. 2d 1137, 1144 (Fed. Cir. 1991). The shop right is "not necessarily limited" to an "employer-employee relationship," *Francklyn v. Guilford Packing Co.*, 695 F. 2d 1158, 1160-61 (9th Cir. 1983), so it is extremely

42

difficult to discern what relevance appellants think it has here. Appellants also say (at 27) that the Register of Copyrights concluded that all works created pursuant to a collective bargaining agreement are works for hire. Not quite—the Register summarized *someone else's* argument (who is not identified), which he then rejected. Supp. Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess., pt. 6 at 66 (1965).

Appellants also invoke (at 28) Congressional testimony by two unions, including the WGA, saying that the guilds "considered their members to be employees covered by the 'works-made-for-hire' provisions." Opening Br. at 28. Again—not true. What the WGA representative said in his testimony was that his members "function … within an employment *or commissioned relationship* [as independent contractors]." Copyright Law Revision: Hearings on H.R. 4347, 5680, 6831, 6835 before Subcomm. No. 3 of the H. Comm. on the Judiciary, 89th Cong., 1st Sess., pt. 1 at 311 (emphasis added).

At any rate, legislative history is of dubious value here. The Act's work-for-hire provisions represent "a carefully worked out compromise aimed at balancing legitimate interests on both sides," on an issue that had been "difficult and hotly contested" during the bill's development. *Id.* Free-wheeling appeals to witness statements or unenacted measures risk upsetting the delicate bargain actually struck. Knotty compromises are precisely where fidelity to text is most useful, and

legislative history less so. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 460–61 (2002).

### 2. Members of Labor Unions Frequently Work as Independent Contractors, and Unions Frequently Bargain Over Independent Contractors' Working Conditions

Appellants' argument is also premised on assumptions about American labor law that are incorrect. Contrary to appellants' suggestion, it is very common for members of labor unions to sometimes work as employees and sometimes as independent contractors. *See American Federation of Musicians v. Carroll*, 391 U.S. 99, 103 (1968) (members "may perform in [these] different capacities on the same day or in the same week"). That's especially true for creative professions. It is thus quite common for labor unions to negotiate over the wages and other working conditions of independent contractors as "the allowable area of union activity" is not "restricted to an immediate employer-employee relation." *Id.* at 106.

### (a) Members of a Labor Union Are Free to Work as Independent Contractors

Unions are "voluntary associations," which enjoy "great freedom to regulate their internal affairs, including their membership policies." *Hurwitz v. Directors Guild of Am., Inc.*, 364 F.2d 67, 71 (2d Cir. 1966). A member of a labor union can be "any person," as long as they fulfill "the requirements for membership" the

*union* has set. 29 U.S.C. §402.[6] So, for example, the Supreme Court has recognized that unions often have a "legitimate interest" in having "self-employed entrepreneurs as members," *Los Angeles Meat & Provision Drivers Union, Local 626 v. United States*, 371 U.S. 94, 103 (1962), and supervisors, who are not "employees" under the NLRA, 29 U.S.C. §152(3), can join unions, 29 U.S.C. §164. As the Supreme Court and this Court have recognized, even independent contractors who *never* work as employees are "proper subjects" for union membership. *Carroll*, 391 U.S. at 108 (approving this Court's observation that "even those orchestra leaders [independent contractors] who … never perform as players [employees], are proper subjects for [union] membership").

The WGA is a good example. Membership is not based on whether a writer works as a conventional "employee" or "independent contractor," but rather on the amount of "writing employment and/or sales" of literary material. Writer's Guild of America, *Going Guild: How to Become a Member*, https://www.wga.org/the-guild/going-guild/join-the-guild (last accessed Aug. 24, 2019). The WGA's 1977

---

[6] By contrast, when Congress meant to burden union membership, it did so explicitly. *See, e.g.*, 29 U.S.C. §159(b) (restricting activities of unions that "admit[] to membership … employees other than guards"). A court should not "assume that Congress has omitted … requirements that it nonetheless intends to apply," and that reluctance should be "even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. Immigrations and Customs Enforcement*, 543 U.S. 335, 341 (2005).

minimum basic agreement, applicable to Miller's screenplay, *expressly* regulates a member-writer's work not performed pursuant to any employment. *See, e.g.*, A313 (Art. 13 A.13.a, setting pay scale to sales of literary work by members); A370 (Art. 49 B, restricting signatories from shopping such material to third parties).

Thus, while appellants observe correctly (at 30) that employees have a right to "form, join, or assist" labor unions, 29 U.S.C. §157, they are quite wrong to suggest that this *restricts unions* from admitting members who may work as independent contractors. Tellingly, when appellants assert the latter proposition—that "the NLRA … provides that only '*[e]mployees* shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively ... [or] engage in other concerted activities for the purpose of collective bargaining'"—the word "only" is outside of the quotation marks, and is not supported by any authority. Opening Br. at 30 (emphasis in original).

### (b) Labor Unions Can and Do Regulate the Employment of Independent Contractors

It is therefore no surprise that labor unions often negotiate regarding the working conditions of independent contractors as well as conventional employees. The only restrictions to this come from *antitrust* law (not labor law), and are not relevant here. In *Carroll*, for example, the Supreme Court approved collective bargaining by a musicians' union of an agreement governing orchestra leaders who everyone agreed were independent contractors giving one-time performances. 391

46

U.S. at 106. As the district court recognized, given *Carroll*, independent writers like Miller can surely "be subject to union regulation and the minimum terms set out in the MBA." SPA27.

Or consider *Home Box Office v. Directors Guild of America*, 531 F.Supp. 578 (S.D.N.Y. 1982) ("*HBO*") *aff'd*, 708 F.2d 95 (2d Cir. 1983). There, HBO objected to DGA restrictions imposed on the engagement of certain DGA members, who were not "employees" (as they controlled, for example, "all hiring" and "work schedules"). *Id.* at 599. Yet despite these directors' "independent-contractor status," they were "properly … the subject of the Guild's collective organizing efforts." *Id.*at 600. What the DGA can do for independent directors, the WGA can and did do for independent writers. SPA27-28.

Appellants' response (at 31) is that *Carroll* and *HBO* involved "the scope of the antitrust exception for labor activity." Yes—that's the point. It is *because* labor unions can have just about anyone as a member, and *because* they can then engage in sector-wide bargaining governing their members' work (as the WGA does), that unions "possess the power to control the character of competition in an industry." *H.A. Artists & Associates v. Actors' Equity Ass'n*, 451 U.S. 704, 713 (1981); *see also* Ralph K. Winter, *Collective Bargaining and Competition: The Application of Antitrust Standards to Union Activities*, 73 Yale L. J. 14 (1963).

### 3.    Appellants Misconstrue the Labor History of Screenwriters

Appellants also make frequent appeals to their version of labor history, discussing (at 36-39) screenwriters' organizing battles and *In Re Metro-Goldwyn-Mayer Studios*, 7 N.L.R.B. 662 (1938), which recognized the right of studio screenwriter-employees to engage in collective bargaining. A page of history can be worth a volume of logic, but only if one supplies the *whole* page.

First, when the NLRB decided *Metro-Goldwyn-Mayer*, independent contractors were not statutorily excluded from the NLRA's definition of "employees." That did not happen until almost a decade later, with the Labor-Management Relations Act of 1947 (the "Taft–Hartley Act"), Pub. L. 80–101.

Second, *Metro-Goldwyn-Mayer* was decided under completely different industrial conditions—the old "studio system," where a small number of vertically integrated studios produced movies using creative personnel, including screenwriters, on long-term employment contracts.[7] Writers, in those days, "punched a clock" and "sat in cubbyholes, writing to order like tailors cutting a suit." Joseph North, *The New Hollywood*, 32 THE NEW MASSES 14 (July 11, 1939) (quoted in HORNE, CLASS STRUGGLE IN HOLLYWOOD 45). Even then, everyone agreed that some screenwriters still worked as freelancers, *Metro-Goldwyn-Mayer*,

---

[7] *See* GERALD HORNE, CLASS STRUGGLE IN HOLLYWOOD, 1930–1950: MOGULS, MOBSTERS, STARS, REDS & TRADE UNIONISTS (2001).

7 N.L.R.B. at 687 n.39, and when the "studio system" ended in the mid-1950s freelance work became the norm.

Given these industrial changes, today "almost all screenwriters and TV writers who are not on the staff of a regular [television] show might be deemed independent contractors under the NLRA." Catherine L. Fisk, *The Role of Private Intellectual Property Rights in Markets for Labor and Ideas: Screen Credit and the Writers Guild of America, 1938–2000*, 32 BERKELEY J. EMP. & LAB. L. 215, 228 n.59 (2011) (cited by appellants at 8–11). But, as discussed above, that is no barrier to their membership in the WGA, nor to the WGA's ability to negotiate their working conditions.

Finally, despite appellants' dire prediction (at 33, bereft of any citations) that the district court's decision will result in "the decertification of all unions governing the film industry," there is no cause for alarm. A union is "certified" as the bargaining representative of a group of workers at a particular company (the "bargaining unit") if elected by those workers. 29 U.S.C. §159(c)(1).[8] As to that

---

[8] There is no procedure to "certify" or "decertify" a union *for an entire industry*, as appellants suggest; certification is inapplicable to industry-wide (or "sectoral") bargaining. The WGA can force sectoral bargaining because of its raw labor power, not the NLRA. *See* David Madland, *How to Promote Sectoral Bargaining in the United States*, Center for American Progress Action Fund, https://www.americanprogressaction.org/issues/economy/reports/2019/07/10/174385/promote-sectoral-bargaining-united-states/ (last accessed Aug. 26, 2019).

company, a union can only be "decertified" by a majority vote of that bargaining unit of workers. 29 U.S.C. §159(c)(1)(A). Appellants never explain why affirming the judgment in this case would prompt *screenwriters* to petition for decertification elections, or why the WGA would lose them, or (most importantly) what any of this has to do with the Copyright Act.

In sum, appellants are proposing to abandon the Supreme Court's and this Court's settled rules of copyright law and replace them with labor-law rules that do not exist, and they imagine this to be necessary based on historical events, taken out of context, to avoid future events that would never happen. The district court was correct to decline that proposal.

### C. Miller's Treatment and First Draft Screenplay Are Not "Work for Hire" In Any Event

As demonstrated, the district court's judgment for Miller should be affirmed on a straightforward application of the agency-law analysis mandated by *CCNV* and *Aymes*. However, even if one were to accept appellants' eldritch labor-law theories, the record evidence regarding Miller's treatment and first draft screenplay would preclude entry of summary judgment in appellants' favor.

After Miller saw *Halloween*, he wrote a detailed 15-page film treatment which he entitled "The Long Night at Camp Blood." A421 (¶¶5-6); A425-39. The treatment (as a "work[] of authorship fixed in a[] tangible medium of expression") is copyrightable, and Miller owned that copyright initially as the author of it. 17

50

U.S.C. §102(a), §201(a). That treatment cannot conceivably have been "for hire" because Miller wrote it "on spec," *i.e.*, without any guarantee of compensation, and, in fact, he was never paid for it. A421, 423 (¶¶8, 21). The Agreement that Miller and Manny later entered into does not even purport to hire Miller to write the treatment or to pay Miller for it. A120-126; A601 (¶1) (the boxes for "Treatment" are conspicuously un-checked).

After writing the treatment, Miller wrote his first draft screenplay. A440-508. The first draft was also entitled "The Long Night at Camp Blood," as it was written prior to the time Cunningham came up with the title "Friday the 13th." A421-22 (¶¶7, 9-10). The first draft was likewise written "on spec," prior the Agreement, and therefore without any guarantee of compensation. A421 (¶8). Although the Agreement refers to "a proposed motion picture … presently entitled … Friday 13," no reference whatsoever to "Friday the 13th" appears in the pages of Miller's first draft screenplay. A440-508. Miller's *second draft*, however, written closer to the June 4, 1979 date of the Agreement, contains several such references. A422 (¶10); A515-16, 519, 575. The evidence therefore strongly indicates that like his treatment, Miller wrote the first draft screenplay prior to any employment by Manny, and thus it cannot be a "work made for hire" under Section

101 either. Plaintiffs-appellants argued otherwise below,[9] though they have not specifically renewed that argument on appeal.

## II.    MILLER'S NOTICE OF TERMINATION WAS TIMELY

Appellants' argument (at 56-59) that Miller's notice of termination is barred by the Act's three-year statute of limitations for "civil actions" is without merit. 17 U.S.C. §507(b).

### A.    The Timeliness of Notices of Termination is Not Governed by Section 507(b)

For post-1977 works, like Miller's screenplay, an author must wait thirty-five years before he can recover the copyright via termination. 17 U.S.C. §203(a)(3). Once the window opens, termination "may be effected at any time during a period of five years." 17 U.S.C. §203(a)(3). The service of a termination notice is also governed by specific timing rules. 17 U.S.C. §203(a)(4)(A) (service must be "not less than two or more than ten years" before the termination date). Miller satisfied these rules, as the district court concluded, SPA59-61, and appellants do not argue otherwise. Those specific provisions control whether an author's termination is timely.

---

[9] Plaintiffs-appellants relied on the "expert report" of a labor lawyer (to which Miller objected under Fed. R. Evidence 702, *see* A661), interpreting a single arbitration decision. But, unlike here, the writer in that arbitration had commenced work *after* deal terms had been set and drafts of his agreement had been exchanged by counsel.

Because the termination provisions solely exempt "works for hire", terminated grantees will invariably claim this. If Section 507(b) time-barred an author from showing that his work was not "made for hire," then termination would be effectively impossible, vitiating Congress' plan to provide economic benefits to authors. *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985) (discussing purpose of termination provisions). It is *exactly* to avoid such situations, where a specific provision would be rendered superfluous if "swallowed" by a more general one, that courts employ the "well established canon of statutory interpretation" that "the specific governs the general." *RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). *See also D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932) (noting "cardinal rule" that "if possible, effect shall be given to every clause and part of a statute").

At any rate, Section 507(b) does not apply to termination notices because they are not "civil actions." Section 507(b) provides that "no civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. §507(b). "Civil action" is not defined, but it is presumed that "Congress intends to incorporate the well-settled meaning of the common-law terms it uses," *Neder v. United States*, 527 U.S. 1, 23 (1999), and at common law, an "action" is a "judicial proceeding." BLACK'S LAW DICTIONARY,

*action* (11th ed. 2019). *See also* Fed. R. Civ. P. 3 (A "civil action is commenced by filing a complaint with the court.")

An author's exercise of termination rights under Section 203 is *not* a "civil action." Termination is accomplished by serving notice upon the grantee and filing a copy with the Copyright Office, in the form prescribed by the Register of Copyrights. 17 U.S.C. §203(a)(4). Judicial action is not required because a notice of termination is self-executing. 17 U.S.C. §201(b) (upon "the [noticed] effective date of termination, all rights under this title that were covered by the terminated grants revert.") Miller's exercise of his termination right was therefore not a "civil action" subject to Section 507.

To be sure, a lawsuit seeking declaratory relief as to the validity of a termination notice (like this one) *is* a "civil action." But that claim "accrues" only once the termination notice is served—here, January 2016—*and challenged* because the scope of the Declaratory Judgment Act is restricted to "actual controversies," 28 U.S.C. §2201(a). A suit about the validity of a hypothetical future termination notice would not be justiciable. *See MedImmune v. Genentech, Inc.*, 598 U.S. 118, 126-127 (2007) (declaratory judgment suit may not seek "an opinion advising what the law would be upon a hypothetical state of facts") (quoting *Aetna Life Insurance v. Haworth*, 300 U.S. 227, 240–41 (1937)).

### B.    Miller's Counterclaim for Declaratory Relief Satisfies Section 507(b) In Any Event

Section 507(b)'s three-year period commences "after the claim accrued." 17 U.S.C. §507(b). Miller's counterclaim did not begin to accrue until he served his termination notice in 2016 and appellants challenged it—well within the limitations period. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 670 (2014) (claim accrues "when [a] plaintiff has a complete and present cause of action") (internal quotation marks and citation omitted).

Even if Miller's counterclaim as to the validity of his termination notice were, instead, a pure authorship claim, it would still be timely under Section 507(b). An authorship claim does not accrue until a "reasonably diligent plaintiff" would have known that his authorship was disputed, which requires "express repudiation" of that authorship, such as by publishing a work without appropriate credit. *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 316–17 (2d Cir. 2013) (quoting *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) and *Zuill v. Shanahan*, 80 F.3d 1366, 1370–71 (9th Cir. 1996)).

Nothing like that occurred here. Until commencing this litigation, neither appellant expressly repudiated Miller's authorship. In fact, it is undisputed that Cunningham accorded Miller sole writing credit on the 1980 film ("Written by Victor Miller") and on the title pages of the treatment and screenplay. A424 (¶26);

A605.[10] Moreover, when Manny assigned the rights in Miller's screenplay to Georgetown, Manny warranted and represented "[t]hat Victor Miller is the sole author of the Screenplay." A121 (¶2).

Appellants muster two responses, neither convincing. First, they argue (at 59) that their "ownership" of the screenplay was known in 1979. This confuses ownership with *authorship* of a work—*every* author knows that the copyright interest sought to be recaptured by termination has been held by someone else for decades. That's the whole point. It is therefore irrelevant that title pages were marked "© Copyright 1979 Sean S. Cunningham Films, Ltd."[11], reflecting an ownership interest, not authorship, which is why the very same title pages say written "by Victor Miller."[12] A101; A509.

---

[10] In fact, given Miller's sole writing credit, *appellants'* veiled co-authorship claims (e.g., at 17, 40) are long time-barred under Section 507 and the very cases they cite, as the district court recognized. SPA51-53. *See Merchant*, 92 F.3d at 56-57 ("A co-author knows that he or she jointly created a work from the moment of creation") and *Zuill*, 80 F.3d at 1369.

[11] In addition to being irrelevant, this notice is defective, because a copyright notice must give "the name of the owner," 17 U.S.C. §401(b)(3). *Manny*, not Sean S. Cunningham Films, held the screenplay which it assigned to Georgetown in 1980. A120-26.

[12] Similarly irrelevant is Miller's comment (cited by appellants at 58) that Cunningham and his business partner "were the owners of the thing, I was not an owner."

*Tomas v. Gillespie*, 385 F. Supp. 2d 240 (S.D.N.Y. 2005), cited by appellants (at 57), is not to the contrary. Tomas claimed to be the natural daughter of Dizzy Gillespie, entitled to an *ownership* interest in his works. She did not file her paternity claim until seven years after defendants had expressly rejected it, so the district court held the suit time-barred. *Id. Tomas* stands for the unremarkable proposition that an ownership claim derived from paternity accrues when paternity is clearly disputed, and has nothing to do with this case. *Id.* at 241–42.

Second, appellants invoke (at 58-59) a copyright registration filed by Georgetown in late 1980 listing *Georgetown* as the *film's* author.[13] A400-01. Appellants do not explain why this would have notified Miller that *Manny* was claiming to be the *screenplay's* author. But at any rate, "mere registration of a copyright" is not enough for a claim of authorship to accrue—if it were, authors "would be forced to maintain constant vigil over new registrations," a "vastly" more burdensome obligation than any ordinary person would undertake. *Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 119 (2d Cir. 2018).

---

[13] Georgetown's registration was *also* defective—Manny assigned its interest in Miller's screenplay to Georgetown in late 1980, after it was written, and that assignment (signed by Georgetown and Manny) expressly states that Miller is the "sole author" of the Screenplay. A120-26.

57

### C. Miller's Defense of His Termination Notice Is Not Barred In Any Event

Finally, Miller would also not be barred from arguing that his termination notice was valid as a *defense* to *appellants'* claim for declaratory relief. It is "well settled that limitations do not normally run against a defense." *Luckenbach Steamship Co. v. United States*, 312 F.2d 545, 548-51, 549 n.3 (2d Cir. 1963). That is because "use [of] the statute of limitations to cut off the consideration of a particular defense" would be "quite foreign to the policy of preventing the commencement of stale litigation." *United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 72 (1956).

## <u>CONCLUSION</u>

The judgment of the district court should be affirmed.


Dated: October 15, 2019

Respectfully submitted,

/s/ Marc Toberoff

_____

Marc Toberoff
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Rd., Ste 50-363
Malibu, California 90265
(310) 246-3333

*Counsel for Defendant-*
*Counterclaimant-Appellee*
*Victor Miller*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32

and Local Rule 32.1, because it contains 13,606 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32,

because it is set in 14-point Times New Roman (a proportionally spaced typeface).


Dated:  October 15, 2019                              /s/ Marc Toberoff

                                                     _____

                                                     Marc Toberoff
                                                     TOBEROFF & ASSOCIATES, P.C.
                                                     23823 Malibu Rd., Ste 50-363
                                                     Malibu, California 90265